of EBITDA performance, despite the changeover in Medicare payment systems.[5]

35.     The first two quarters of fiscal 2000 Genesis was on pace to achieve comparable EBITDA results for fiscal 2000. On February 3, 2000, Genesis announced EBITDA results for the first quarter, showing that it had earned, on a standalone basis, $50.8 million of EBITDA. In its written "Presentation to the Bank Group Regarding Restructuring Considerations", dated March 14, 2000, Genesis management provided a "cash flow summary" that made the following EBITDA projections for the Company (on a standalone basis) (in $ millions):

| 2000 | 2001 | 2002 | 2003 | 2004 | 2005 |
|------|------|------|------|------|------|
| 191  | 205  | 213  | 221  | 230  | 239  |

36.     In a separate document prepared for the same senior lender meeting, Genesis management projected stand-alone EBITDA for the ensuing four months as follows (in $ millions):

| March | April | May | June |
|-------|-------|-----|------|
| $16,896 | $17,529 | $17,862 | $17,895 |

Thus, management was projecting that EBITDA for the third quarter of fiscal 2000

_____

[5] At the Genesis stockholders meeting of March 16, 2000, Michael Walker, chief executive officer of Genesis, reported that its senior lender interest coverage ratio was about 1.8 to 1 and its total interest coverage ratio was 1.4 to 1, ratios which indicated that Genesis would be able to continue meeting its debt obligations. In contrast, management was not optimistic about MC. Walker reported that MC had negative debt coverage of 0.5 and was definitely "under water". It was not expected to meet its senior, much less its junior, debt payments.

(April-June) would exceed the $50 million rate announced for the first quarter. On May 4, Genesis announced EBITDA results for the second quarter (January-March), which showed EBITDA, on a standalone basis, of $51 million. Thus, Genesis was clearly headed towards another year of EBITDA in excess of $200 million.

37.    But once Goldman had achieved a significant position in Genesis debt, and took its seat on the seven member senior lender steering committee, optimism at Genesis suddenly vanished. Almost immediately, on June 22, 2000, both Genesis and MC filed petitions for reorganization under Chapter 11 of the Bankruptcy Code, in the federal bankruptcy court in Wilmington, Delaware.[6] This came as a shock to Genesis bondholders, who had been assured, at the March 16th shareholders meeting, that Genesis was in good financial shape and would be able to continue to service its debt and other obligations.[7] During the ensuing year, Genesis' EBITDA projections and LTM EBITDA both fell through the floor.

---

[6] MC's bankruptcy had been anticipated. Its EBITDA for fiscal 1999 was $73.3 million, just barely enough to cover its annual debt payments of $70 million; but during the first two quarters of fiscal 2000, MC's EBITDA had dropped by half, falling to about $27.7 million on an annualized basis. It was therefore a foregone conclusion that MC's senior debt would ultimately be deemed substantially "impaired".

[7] Specifically, on March 21, 2000, Jim Baker of GMS had spoken with Jack Anderson, a Genesis board member, who reiterated the sentiments expressed at the stockholder meeting, that Genesis was in stable financial condition and did not face any immediate crisis. In April of 2000, Randy Faires of GMS had also spoke to Anderson, who repeated what he had said to Baker, including that the GMS bondholders were in good shape. In contrast, he observed that MC was unable to meet its debt payments.

38.    The senior creditors were closely monitoring industry multipliers to determine the effect that particular EBITDA levels would have on the enterprise value of Genesis. On August 2, 2000, Chilmark, which had been retained by the senior creditors, made a written presentation to them in which it set out the Genesis EBITDA projections and the prevailing industry multiples for valuing health care companies. It reported that long-term care companies were currently trading at multiples of 3.1-5.8 times EBITDA, and pharmacy services at multiples of about 5.6.

39.    In or about April of 2001, Genesis released a preliminary plan of reorganization that included Budgeted EBITDA projections for fiscal 2001 (ending September 30, 2001) of only $158.443 million, a staggering $50 million below Genesis' past performance.

### C. The Warburg and Chilmark Valuations and the Approval of The Plan

40.    In July of 2001, Genesis submitted a final proposed reorganization plan (the "Plan") that posited that the Company, on a stand-alone basis, was worth $200 million less than the senior creditor claims *alone*. The Plan provided for Genesis to merge with MC and for about 94% of the new equity of the combined entity to be conveyed to the senior creditors in satisfaction of their claims.

41.    In support of this Plan, Genesis submitted a valuation of the

25

Company prepared by the Warburg, dated July 2001. A month later, on August 22, 2001, Warburg submitted a modified valuation report. In arriving at its valuation, Warburg relied primarily on Genesis' "Budgeted EBITDA" figure of $158 million for fiscal 2001. Warburg applied a multiplier to the projected EBITDA figure, derived from price-to-EBITDA multiples exhibited by three other publicly traded healthcare companies (Beverly Enterprises, HCR Manor Care and Omnicare), to arrive at an enterprise value range for Genesis of $1.2 billion to $1.45 billion, with a midpoint of about $1.35 billion.

42.    But by the time the final Warburg valuation was submitted in August of 2001, only one month was left in fiscal 2001. It would have been inappropriate for the Court, in valuing the Company, to rely solely on projections for periods that were, by now, almost all in the past, and for which historical EBITDA data now existed.

43.    To cure that problem the senior creditors also submitted, on the same day, August 22, 2001, their own valuation analysis, prepared by Chilmark. Unlike the Warburg Report, which had been based on projections for fiscal 2001, Chilmark used a historical LTM EBITDA figure, also supplied by Genesis management, of $158,118,000, for the period July 1, 2000 (the fourth quarter of fiscal 2000) to June 30, 2001 (the third quarter of fiscal 2001). Relying on these EBITDA

figures, Chilmark valued Genesis at between $1.17 to $1.43 billion, with a midpoint of about $1.3 billion.

44.    The primary purpose of the Chilmark submission was to put the "historical" EBITDA data before the Court, to establish that it was consistent with the Budgeted EBITDA projections for fiscal 2001, upon which the Warburg valuation had relied. Because most of the periods covered by those reports overlapped ( *i.e.* they both had the first three quarters of fiscal 2001 in common), the Court viewed the LTM data as providing *post hoc* confirmation of the accuracy of the Budgeted EBITDA projections.

45.    The filing of the Chilmark report on August 22 was the first time that historical EBITDA data had been used, by any party, to support the bankruptcy reorganization Plan. It was far too late, at that point, for any interested party to challenge the LTM EBITDA figures: the deadline for objecting to the Plan had already passed; discovery was almost over; and the confirmation hearing was only one week away.

46.    However, if both the projections *and* the LTM EBITDA were wrong, so, to, were the valuations. Significantly, both Warburg and Chilmark disclaimed any opinion concerning the validity or accuracy of either the projected or LTM EBITDA figures. Moreover, because EBITDA does not appear in any financial

statement, and because the LTM EBITDA period did not correspond with the period

covered by any Genesis financial statement, its auditor, KPMG, never considered any

of Genesis' EBITDA data in its opinions certifying Genesis' financial statements.

This scenario gave senior management of Genesis a clear opportunity to manipulate

the results of the valuation, by manipulating their own EBITDA pronouncements.

47.     The Delaware Bankruptcy Court held a confirmation hearing on

August 28 and 29, 2001, seven weeks after the Plan was first filed and, as noted

above, six days after the Chilmark and the final Warburg reports were first made

available. On September 12, 2001, the Court issued an opinion confirming the

essential elements of the Plan. *Matter of Genesis Health Ventures, Inc., et al.,*

*Debtors,* 266 B.R. 591. The centerpiece of the Court's ruling was its determination

that, based on the valuation report prepared by Warburg, the reorganization value of

Genesis was so low, compared to the size of the senior creditor claims, that an

allocation of 94% of the new Genesis equity to the senior creditors was reasonable.

48.     In accepting the projections on which the Warburg valuation was

based, the Court relied heavily on the testimony of Genesis' CFO, defendant Hager,

to the effect that "the actual results for the first 10 months of the 2001 fiscal year were

on target with budget projections." That conclusion was based on the LTM EBITDA

figures that had been supplied to Chilmark and which were the basis of its report.

28

49.    Pursuant to the Plan approved by the Court, the senior creditors were credited with $195 million in "adequate protection payments" they had previously received, and were awarded new senior notes in the face amount of $94.9 million, shares of new convertible preferred stock with an aggregate liquidation preference of $31 million, and about 94.3% of the newly issued common stock of the Company.

50.    In an attempt to procure the consent of the Unsecured Creditors Committee of Genesis, the Plan threw a bone to the provided that the debentureholders would receive about 3.8% of the new Genesis common stock and would receive warrants to purchase an additional 5.7% of the new Genesis stock at an exercise price of $20.33 per share. The warrants were to expire one year later, on October 2, 2002. Although the unsecured creditors committee approved the Plan[8], the debentureholders, voted overwhelmingly to reject it. In bankruptcy parlance, the Plan was "crammed down" on the dissenting debentureholders.

51.    In its original form, the Plan also contained sweeping releases from liability not only for Genesis but also for the senior creditors and their advisors. Those proposed releases would have absolved Genesis and its senior creditors, and

---

[8] Although the bondholders represented 75% of the dollar amount of unsecured claims, they had only 33% of the votes on the committee, which was dominated by trade creditors who had ongoing business relationships with Genesis.

29

their "members, officers, directors, employees, agents or professionals" from "any liability to any holder of any claim or equity interest for any act or omission" in connection with the bankruptcy case or the approval of the bankruptcy plan of reorganization. In its decision approving the Plan, the Court held that "the release of third-party claims against the Senior creditors must be stricken". 266 B.R. at 609. The revised release, which was ultimately approved by the Court, did not extinguish any potential claims against the senior creditors; nor did it extinguish any potential claims against Genesis, MC or their insiders or advisors for fraud or gross negligence.

52.    On the effective date of the Plan, Genesis' pre-existing common stock and debentures (plaintiffs' holdings)were deemed cancelled, and the Company authorized the issuance of 41 million shares of its "New Common Stock", approximately 3.8% of which was eventually issued to former Genesis debentureholders, including the plaintiffs. In addition, Genesis issued "new warrants", expiring on October 2, 2002, to purchase an additional 4,559,475 shares (approximately 5.7%) of "New Common Stock" at an exercise price of $20.33 per share. Neither the New Common Stock nor the new warrants had yet been issued at the time of the misrepresentations alleged herein.

### D. The Scheme

### 1. Overview

53.    The Warburg and Chilmark valuations represented that Genesis had suffered a drastic loss of value in a very short time. If, as expected in early 2000, Genesis had maintained the EBITDA performance it had demonstrated during 1998, 1999 and the first two quarters of fiscal 2000 -- annual EBITDA of $205-210 million -- application of either the Warburg or Chilmark valuation methods would have led to a reorganization value for Genesis of $1.7 - $1.9 billion, $300 - $600 million above the total claims of the senior lenders. If that had happened, there would have been enough value for junior creditors, most notably the subordinated debentureholders, to recover the full par value of their debentures.

54.    But somewhere between March of 2000 and August of 2001, when the financial advisors submitted their final reports to the Bankruptcy Court, over half a billion dollars of enterprise value had disappeared, and there was now next to nothing left over for the debentureholders. Defendants brought about that result by manipulating and falsifying both the projected and LTM EBITDA data.

55.    The Budgeted EBITDA projections used by Warburg started with the baseless presumption that corporate level payroll expenses would increase by $35 million for additional staff, despite the fact that the company was shrinking. These

31

2001 Budgeted EBITDA projections also included the following additional, contrived, negative "adjustments", which were made, as needed, to keep the end result as close as possible to $158 million for valuation purposes -- and, thus, to maximize the recovery for the senior creditors, at the expense of everyone else:

- $13.242 million was taken out because of the anticipated loss of business supplying pharmaceuticals to Mariner Post-Acute Network ("Mariner"), even though there was never any possibility that this business would be lost.

- $11.6 million was also taken out to reflect the retroactive reduction in the management fees and other charges payable by MC to Genesis. This "renegotiation" was not undertaken to make these contracts more "fair", but to arbitrarily transfer value, retroactively, out of Genesis.

- a deduction for the loss of the AGE Institute business was overstated by about $4 million.

- about $2 million should have been, but was not, added because of an increase in the proportion of Medicare patients at Genesis facilities.

Collectively, these manipulations whittled down the projections by over $70 million. But for these manipulations, projected EBITDA would have been consistent with Genesis' recent historical performance in 1998, 1999 and the first two quarters of 2000.

56.    The artificially depressed Budgeted EBITDA projections were "confirmed" by the submission of "historical" LTM EBITDA data, which coincided

32

almost exactly with the projections. But the LTM data had been manipulated as well.

These manipulations included the following:

- As with the projections, 100% of the EBITDA from Mariner, totaling $13.4 million, was excluded on the spurious ground that this income would probably be lost.

- As with the projections, MC management, pharmacy and therapy charges were retroactively lowered by $11.6 million, reducing EBITDA by this same amount, on the spurious ground that this would make them more "fair".

- Excessive insurance reserve expenses of about $13 million were improperly subtracted.

- Non-recurring expenses of about $13 million for terminated First Choice employee health plan were improperly subtracted.

- 10% of the pharmacy revenues payable by Manorcare, totaling about $11 million, were not reported, without a reasonable basis to believe that those charges would probably not be paid.

- $6 million in expenses for the non-recurring "Special Recognition Program" were improperly subtracted.

- $4 million in expenses the for non-recurring executive deferred compensation were improperly subtracted.

- Pharmacy costs of goods sold were artificially inflated by about $13 million.

These manipulations whittled down Genesis' LTM EBITDA by as much as $80 million. In the six days between the first release of the LTM EBITDA and the confirmation hearing, it was simply impossible for the debentureholders to uncover

33

this elaborate fraud, much less prove it.

## 2. Specifics

57.    The Genesis "DIP" Financing Agreement with the senior creditors

defines EBITDA as net income, as determined by GAAP,

> *plus* (a) the sum of depreciation expense, amortization
> expense, other non-cash expenses, adjustments for
> inventory valuation, net total federal state and local income
> tax expenses, gross interest expense less gross interest
> income, extraordinary losses, *non-recurring charges* or
> restructuring charges, effect of changes in accounting
> principles and Chapter 11 expenses [emphasis added],
>
> *minus* (b) extraordinary gains,
>
> *plus or minus* (c) the amount of cash received or expended
> which was taken into account in determining EBITDA for
> the current or any prior period.

This definition used in the Genesis DIP loan agreement is typical of those used in the

financial community, for reporting as well as for valuation purposes and, upon

information and belief, was the definition both Warburg and Chilmark assumed

Genesis had used in preparing its projected and LTM EBITDA data.

### a. Improper Deduction from LTM EBITDA of Additions to Insurance Reserves that were Well In Excess of Potential Liability Exposure

58.    Nursing homes and pharmacies, including those operated by

Genesis, carry general/professional liability ("GL/PL"), workers compensation

34

("W/C"), and employee health and casualty insurance. Prior to June of 2000, Genesis had been self-insured for WC and had purchased GL/PL insurance from a third party carrier. On June 1, 2000, just before filing its bankruptcy petition, Genesis restructured its insurance program (which included MC) by obtaining third party WC insurance and switching its GL/PL coverage to its own wholly owned insurance subsidiary, Liberty Health Corporation ("Liberty"), which is domiciled in Bermuda. Liberty never filed bankruptcy.

59.    Liberty maintained four layers of reinsurance for this GL/PL coverage, which collectively provided "stop loss" limits to Genesis' exposure. That limit (which included claims pertaining to MC)was initially $14 million, including $9 million for its Florida elder care facilities and $5 million for its other facilities. Thus, for the twelve month period June 1,2000-May 30, 2001, Liberty's maximum possible GL/PL exposure, for both Genesis and MC, could not exceed $14 million. For the period June 1, 2001 through May 30, 2002, this aggregate stop loss limit was raised to $19 million.

60.    In this line of business "stop loss" limits are generally very high, and would never be reached absent some catastrophic liability incident. That was true for Genesis as well. For the twelve month insurance period ending May 30, 2001, Genesis (including MC) had approximately 1600 operating beds in Florida, for which

35

the actuarial loss experience, as determined by Genesis' risk management actuary, Tillinghast Towers-Perrin, was $2,888 per bed. For 1600 beds, the actuarial exposure was about $4.6 million, about half the $9 million stop loss limit for Genesis' Florida homes during that period. It would therefore have been appropriate to set aside reserves, and charge them against earnings, in the total amount of $4.6 million for the Florida facilities, for the period ending May 30, 2001.

61.    But Genesis went far beyond posting reserves commensurate with its actual exposure. Instead, it posted reserves equal to its total stop loss limits and fully expensed those payments immediately. Between July 1 and August, 2, 2000, Genesis (on a consolidated basis) fully funded the GL/PL self-insurance program for 2000-2001, by transferring to Liberty $14 million (in the form of letters of credit), the aggregate stop loss limit, and fully expensed that entire payment during the LTM period. Moreover, it appears that Genesis posted significant additional reserves on the insurance renewal date, June 1, 2001. The LTM EBITDA period ended on June 30, 2001. During the month of June large deposits were made to Liberty and were fully expensed at the time they were made, so that they could be used to reduce LTM EBITDA. These deposits not only exceeded, on a pro rata basis, the actuarial risk, but they were also paying to cover risks that were already covered by the stop loss provisions of the reinsurance carriers.

36

62.    The senior creditors were well aware of these transactions and the effect they would have on the LTM EBITDA; but neither the public nor the junior creditors, including the bondholders, were informed.

63.    Normally, the payment of insurance claims and deposits to reserves ought to be comparable, leaving the total reserve balance relatively static. But the reserve levels maintained by Genesis were anything but static. The great increases in insurance reserves, held by Liberty and posted by Genesis during this period, were reflected in the consolidated Genesis/MC 10Qs and 10Ks, as follows:

| Date | Reserve Balance ($ thousands) |
| --- | --- |
| 9/30/99 | 24,599 |
| 9/30/00 | 27,899 |
| 9/30/01 | 51,625 |
| 6/30/02 | 74,912 |

However, the last two of these figures were not disclosed until after the confirmation hearing. The rapid build-up in reserves shows that Genesis was making payments to Liberty, and expensing them, far more quickly than Liberty was paying out claims.[9]

---

[9] These data also show that the practice of over-depositing into reserve accounts, and expensing those deposits, continued post-confirmation. This had the effect of keeping EBITDA consistent with the data that had been used to value the Company, thus preventing suspicions from arising; by depressing post-confirmation EBITDA, the trading price for Genesis stock was also kept down, rendering valueless the options that had been provided to the debentureholders in the Plan, which had an exercise price of $20.33 per share. Now that those options have expired, the excessive

37

64.     GAAP requires that companies deduct contingent liabilities from earnings under certain circumstances. SFAS No. 5, "Accounting for Contingencies", provides, in part, as follows:

> 1. ... a "contingency" is defined as an existing condition, situation or set of circumstances involving uncertainty as to possible gain ... or loss (hereinafter a "loss contingency") to an enterprise that will ultimately be resolved when one or more future events occur or fail to occur. ....
>
> 3. When a loss contingency exists, the likelihood that the future event or events will confirm the loss or impairment of an asset or the incurrence of a liability can range from probable to remote. .... This Statement uses the term *probable* ...as follows:
>
>> a. *Probable*. The future even or events are likely to occur. ...
>
> 4. Examples of loss contingencies include: .... risks of loss from catastrophes assumed by property and casualty insurance companies ....
>
> 8. An estimated loss from a loss contingency (as defined in paragraph 1) shall be accrued by a charge to income if *both* of the following conditions are met:
>
>> a. Information available prior to issuance of the financial statements indicates that it is probable that an asset had been impaired or a liability had been incurred at the date of the financial statements. It is implicit in this

---

deposits can be returned to Genesis at any time, benefiting the defendant Genesis equity holders but not the former debentureholders.

38

> condition that it must be probable that one or
> more future events will occur confirming the
> fact of the loss.
>
> b. The amount of loss can be reasonably
> estimated.

Thus, under GAAP, charges to earnings, based on contingent insurance liabilities, are
to be accrued only when the liability is probable and the amount can be reasonably
estimated.

65.    Genesis did not report publicly, until the third quarter of 2002: (i)
what its aggregate stop loss limits were for its GL/PL insurance, (ii) that it had
deposited reserves equal to 100% of those limits, and (iii) that it had fully expensed
all those deposits in the current period, regardless of whether those deposits exceeded
Genesis' actual exposure to claims, in violation of GAAP. Genesis never reported that
it had deposited, and expensed, amounts in excess of the stop loss limits.

66.    Genesis has never explained the reasons for these surcharges to
reserves; nor has it ever disclosed the total insurance claims it actually received during
this period, so that the amount of claims could be compared to the size of the reserves
being taken. Instead, Genesis management made vague, conclusory pronouncements
to the unsecured creditors, in their quarterly and annual reports, and in statements to
the financial wire services, to the effect that insurance costs were "spiraling upwards".

39

These statements had the effect of explaining away the sudden tripling in insurance reserves reported by the Company within an 18 month time period.

      67.    Genesis was, however, telling the truth to the senior creditors. On August 8, 2000, it explained the stop loss provisions and the fact that it was funding the self-insurance deposits via a letter of credit from the DIP financing provided by the senior creditors. It also told the senior creditors that W/C costs were declining from 1999 levels, and that rates had declined slighty from 2000 to 2001. In June of 2001, Genesis explained to the senior creditors that the GL/PL retention (the amount up to the stop loss limit) had been fully funded and expensed. Hager, other members of Genesis management, and the senior creditors all knew that the actuarially experienced losses were $2,888 per Florida bed, and $152 per bed in all other states, an amount far lower than the amounts being reserved and expensed.

      68.    Plaintiffs estimate that the excessive insurance reserve charges deducted from EBITDA, during the valuation period, were at least $13 million.

**b. Improper Deduction from Budgeted and LTM EBITDA of $11.6 million by Renegotiating Genesis' Management Agreements with MC**

      69.    A major part of the inducement for Genesis to acquire its stake in MC in 1997 was that it also would be able to earn significant revenues by (a) providing management services to MC, (b) selling pharmaceuticals to MC from the

Genesis institutional pharmacy division, NeighborCare, and (c) selling therapy services from its therapy division.

70.     On October 9, 1997, MC signed a five year management contract with Genesis with an automatic two-year renewal. At about the same time, separate therapy and pharmacy contracts were also signed. These contracts were negotiated at arm's length, with Texas Pacific Group and Cypress Group, which collectively owned over 56% of the MC stock, representing MC. The management services contract provided for payment of a fee equal to 6% of MC's gross revenue. This fee was well within industry norms, as were the pharmacy and therapy contracts as well.

71.     In its Disclosure Statement, ultimately disseminated in support of the bankruptcy reorganization Plan, Genesis recounted that

> At the time the management services agreement and other agreements were entered into, Multicare was controlled by parties unrelated to Genesis or the Genesis Debtors. The terms of these agreements were the product of arm's-length negotiations between Genesis and the parties controlling Multicare and the agreements were approved by Multicare's independent board of directors. In addition, the terms were disclosed at the time off the issuance of Multicare's senior subordinated notes (Class M5).

72.     By March of 2000, about the time when Goldman joined the senior lender steering committee, these senior Genesis/MC managers had begun an examination of the management, pharmacy, therapy and service contracts between

41

Genesis and MC. The stated reason for the examination was to determine the "fairness" of the very contracts that Genesis continued to represent had been negotiated at arm's length less than three years earlier. The real purpose of this exercise, however, was to divert as much value as possible from Genesis (and its bondholders) to MC, and thereby minimize the share of Genesis to which the Genesis bondholders would be deemed entitled.

73.    But renegotiation of the agreements was complicated by the fact that the same senior executives were in charge of both companies. Immediately after the acquisition of MC in 1997, management of the two companies had been kept separate; but by November of 1999, MC's financial condition had deteriorated so severely that its board of directors had resigned and managerial control had been transferred to an operating committee consisting of George Hager, Michael Walker and Rick Howard, who were also the CFO, CEO and Vice president of Genesis, respectively. Therefore, someone else had to be brought in to give the appearance of an arm's length renegotiation.

74.    Mellon suggested Beverly Anderson for that position. Notes taken by Chilmark at a steering committee meeting of April 13, 2000, show that Sherman White, an executive vice president of Mellon, had suggested Anderson's name, and the senior creditors selected her for the task. On April 13, 2000, Anderson was hired

42

as an "independent restructuring officer", and Anderson retained E&Y Capital Advisors ("E&Y") to work with her in the renegotiations. E&Y could not be retained directly by either Genesis or MC because of a conflict of interest.

75.    Although Genesis represented in the Plan disclosure statement, and in its 10K report, that Anderson was independent, she was, in fact, financially beholden both to Goldman and to Genesis. Anderson had done consulting work for Mariner Post Acute Network ("Mariner"), and had run up an unpaid bill of over $500,000.00. By 2000 Mariner had filed for bankruptcy, and Anderson's claim was now just another unsecured pre-petition claim, which ordinarily would have had little chance of repayment. Anderson's only hope of payment was to be designated a "critical vendor" to Mariner, which would be highly unusual for a consultant unless the creditors consented.

76.    Yet the Mariner creditors were for the most part the very same institutions that controlled the Genesis Bank Steering Committee. Four members of the Genesis Steering Committee held at least $380 million of Mariner's senior debt, with Goldman alone holding $242.3 million (over 25%) of it. Because Genesis was also a major creditor of Mariner, David Barr of Genesis chaired the Mariner unsecured creditors committee. Goldman and Genesis were therefore perfectly placed  to determine whether Anderson's $500,000 bill would ever be paid.

43

77.     Although the renegotiated contracts between Genesis and MC were not signed until August of 2001, the Steering Committee had set the final terms eight months earlier. On October 10, 2000, Hager gave the Genesis unsecured creditors committee a preview: the contract renegotiation, he said, would result in a reduction of the management contract rate from 6% to 4.6%.

78.     A few weeks later, on November 13, 2000, E&Y made a presentation to the unsecured creditors committee of MC, during which it discussed its view of the fairness of the various existing contracts with Genesis, and the effect of changes that had been achieved in negotiations. At the time, a total of $16 million in contract reductions were being discussed, broken down as follows:

| | |
|---|---|
| Rehabilitation: | $2.8 million |
| Pharmacy | $3.0 million |
| Hospitality | $1.7 million |
| Management fees | $8.5 million |

79.     Yet E&Y reported that it had concluded that, for rehabilitation services, the existing arrangements were far from "unfair". It specifically determined that, compared to market rates,

- Medicare part A per diem rates as a whole were the same or better for Multicare facilities

44

- Medicare Part B fee schedule percentages were the same or better for Multicare facilities

- Non-Medicare payor rates and premium service rates were the same or better for Multicare facilities.

In sum, E&Y characterized the fees Genesis had been charging for rehabilitation services as "market rate". Despite this, E&Y reported that Genesis had agreed to lower these fees by $2.8 million per year, even though a cut of that magnitude would cut its margins for these services by 46%.

100.  Similarly, E&Y concluded that the existing pharmacy deal MC had with Genesis was also fair and reasonable:

- [Prescription] Drug costs - Multicare pays slightly more than unaffiliated customers.

- OTC [over the counter drug costs] - Prices are market.

- IV's - No disadvantage identified

- Medical Supplies - Multicare receives better pricing than unaffiliated customers.

Once again, Genesis was ready to improve upon an already fair deal: E&Y reported that it had consented to lower its prescription medication charges by about $2 million per year, and to lower its medical supply charges – which were already "better" than those charged to other customers – by another $1 million.

101.  Hospitality rate charges tell the same story: although E&Y

45

concluded that Genesis' "rates are market", Genesis had agreed to reduce them dramatically, saving MC $1.7 million in 2000 and $2.1 million in 2001, and costing Genesis equal amounts.

102.    Finally, E&Y determined that management contract services in the industry range from a "base rate" of 3% to 6% of revenue, and that incentive fees range "up to 7% of gross or 1 to 25% of NOI [net operating income]". Although the Genesis contract had a base rate that was at the high end of this range, it did not have either a budget incentive fee or a stretch incentive fee. Moreover, the existing contract included a provision that prevented it from receiving 2% (one third) of its base rate in the event that MC fell below certain financial parameters. Because of MC's weak financial condition, it had consistently operated well below those financial parameters. Consequently, Genesis had actually been receiving only a 4% base rate fee.

103.    Nonetheless, Genesis had once again acquiesced in still further reductions, bringing the base rate down from 6% to 4.6%, a change which would boost MC's EBITDA (and reduce Genesis') by $8.5 million per year.

104.    Further negotiations apparently followed the November 13 presentation, because by January 23, 2001, the senior financial advisor to the banks, Policano & Manzo, advised Chilmark, the banks' valuation experts, that the total MC

contract adjustments were set at $11.6 million.

105. On January 9, 2001, Policano & Manzo had advised the senior creditors that Genesis' costs to manage Genesis, MC and a few third party beds was $80.4 million per year. Using customary industry formulas for apportioning these expenses, the cost of providing the management services to MC was about $35.8 million per year. At the original 6% base rate, the revenues generated from the MC management contract were about $38 million (as calculated by E&Y), providing a razor thin "profit" margin of about $2.2 million. But even that profit margin was illusory; 2% of the fees were "accruing", unpaid, totaling about $13.1 million annually. As a result, under the existing management contract Genesis was actually *losing* about $10 million per year. Moreover, substantial additional amounts were not being paid at all.

106. By reducing the base rate to 4.6%, an already bad situation was being made even worse. Now there would not even be a paper profit: management fee revenues would drop to $29.6 million – $6.2 million *below* the cost of providing those services. The unsecured creditors were not informed of these facts. To the contrary, they were misled by Hager about the true costs of providing the management services, because he showed them only the payroll costs of providing the management services.

107. Adding to the unreality of this renegotiation is that these new

47

agreements had *no prospective application whatsoever*. By the date they were signed and submitted for Court approval, Genesis and MC had already submitted a joint plan of reorganization pursuant to which the two companies would be merged and all intercompany management and other agreements would be extinguished. The *only* purpose of this renegotiation, therefore, was to achieve *retroactive* reductions in these fees, and thereby affect the relative valuations of these companies for purposes of the bankruptcy proceedings. The new contract rate was applied retroactively to reduce LTM EBITDA and projected EBITDA for the valuation period by $11.6 million. At the multiples used by the valuation experts, defendants had transferred, by this stroke of the pen, about $97 million in value from Genesis to MC -- and, therefore, from the Genesis bondholders to the senior creditors.

108.    This benefitted the Genesis senior creditors by lowering the valuation of Genesis dramatically, thereby proportionately increasing the share of Genesis stock they could obtain through the bankruptcy. Virtually all of these same creditors were also senior creditors of MC. But raising the value of MC did not have any negative affect on the MC senior creditors. MC had so little value that, even after adding $11.6 million to the bottom line, it was still worth substantially less than the senior creditor claims.

109.    In short, the "renegotiation" of the Genesis and MC agreements

48

was not a bona fide transaction done in good faith. It was simply a contrivance to transfer value, for bankruptcy purposes, from Genesis to MC and thereby help the Genesis senior creditors achieve a greater share of the Genesis equity, at the expense of the Genesis bondholders, including plaintiffs.

### c. Improper Deduction of $11 Million from Budgeted and LTM EBITDA By Excluding 10% of the Pharmacy Sales to Manorcare

110.    In August of 1998, Genesis purchased the Vitalink Pharmacy from HCR Manorcare ("Manorcare") and also entered into an agreement requiring Manorcare to purchase pharmaceuticals from Genesis through 2004 at scheduled pricing rates. When the PPS Medicare reimbursement system went into effect in 1999, Manorcare demanded unwarranted price concessions from Genesis to help compensate for reduced reimbursement rates from Medicare. When Genesis refused, Manorcare purported to terminate its contract with Genesis, and Genesis commenced litigation to compel enforcement of the agreement. Manorcare also commenced its own arbitration proceeding, and all pending actions were ultimately consolidated before the arbitrator.

111.    At the March, 2000, meeting with the Steering Committee, Genesis management touched upon the Manorcare situation but gave no hint of any possibility that the Manorcare account might be lost, or that any substantial portion

49

of the Manorcare income was in jeopardy or would soon be excluded from income.

112.   On May 23, 2000, the arbitrator announced that, in view of the imminent bankruptcy filing of Vitalink and Genesis, the trial of the case, which had been scheduled for June of 2000, would be postponed indefinitely. Genesis subsequently reported in its 10K for 2000 that

> in connection with this stay, the parties agreed that [Manorcare] may pay, on an interim basis, ... 90% of the face amount of all invoices .... The remaining 10 percent must be held in a segregated account by Manorcare.

Thus, the withholding agreement was not compelled by any ruling of the arbitrator.[10]

113.   Although Genesis disclosed the existence of the withholding agreement, it did not disclose, in any 10K or 10Q filing issued during the period, or anywhere else, that when the holdback agreement was entered it had booked a prepaid expense equal to 10% of the Manorcare revenue. That expense reduced Genesis' LTM EBITDA by about $11 million, but that fact was not disclosed. The Chilmark valuation report also did not disclose the impact of this 10% holdback on its valuation of the Company. The unsecured creditors therefore had no idea that such an expense had been booked and that 10% of the Manorcare revenues had thereby been excluded from EBITDA.

---

[10] Nor was the 10% holdback tied to the stay of the arbitration. Although the stay was announced in May of 2000, the holdback did not begin until November or December of 2000.

50

114.   In addition, the Genesis budgeted EBITDA figures included a $4 million "adjustment" for "price compression", to reflect the possibility that Genesis might be forced to make price concessions, in the future, in order to retain the Manorcare business. However, no price concessions were made to Manorcare during the 2001 fiscal year.

115.   In April of 2002, several months after the Court approved the bankruptcy Plan, the arbitrator ruled that the Genesis contract with Manorcare was fully enforceable, and required Manorcare to turn over all the escrowed funds, with interest, totaling $21.7 million. In its 10Q for the second quarter of 2002, Genesis described the arbitrator's ruling and disclosed, for the first time, that it had been, in effect, excluding 10% of the Manorcare revenue from EBITDA up to that point.[11]

116.   Under SFAS No. 5, it is improper to accrue a loss contingency unless it is "probable" that an event will occur that will cause the loss, and the amount of that loss can be reasonably estimated.   Where, as here, the putative loss contingency arose from a pending litigation, it would be inappropriate to accrue any

---

[11]To reflect the release of the escrowed funds, Genesis booked a credit, which it categorized as "non-recurring". Because  non-recurring income is not included in EBITDA, the use of this accounting device had the effect, once again, of excluding this income from post-confirmation EBITDA. In other words, $21.7 million of earnings from sales to Manorcare were forever excluded from Genesis' EBITDA. As noted above, by keeping Genesis' post-confirmation EBITDA down, defendants were able to keep "under water" the warrants the bondholders had received as part of the bankruptcy Plan.

51

loss unless counsel representing the debtor had rendered an opinion that it was probable that a loss of this particular magnitude would occur. No such opinion would have been rendered here, because it was never "probable" that Manorcare would succeed on its claims. The original contract fee schedule was reasonable and enforceable. Manorcare's fabricated claim was frivolous and should have been treated as such.

117.    This 10% exclusion of the Manorcare revenues from EBITDA reduced LTM EBITDA by about $11 million, and the valuation of Genesis by close to $90 million.

118.    Moreover, the $4 million "price compression adjustment" to budgeted EBITDA had no basis because no price concessions were made during that fiscal year.

### d. Improper Deduction of $13.4 Million from Budgeted and LTM EBITDA by Retroactively Excluding All Sales to Mariner

119.    Like Genesis, Mariner operated nursing care facilities and also had a separate pharmaceutical subsidiary, American Pharmaceutical Supply Company ("APS"). Genesis had a contract to supply pharmaceuticals to fifty-eight Mariner nursing homes that were not in APS service locations, and the contract generated revenue of about $53 million per year.

52