120.  In January of 2000, Mariner filed for bankruptcy. Genesis continued to sell pharmaceuticals to Mariner, and as a "critical vendor" of pharmaceutical supplies, Genesis was entitled to receive "most favored vendor" treatment in the Mariner bankruptcy and therefore had little fear of non-payment. Genesis also had the additional protection of having its executive, David Barr, serve as chairman of the Mariner unsecured creditors committee. As a result, despite the bankruptcy, Genesis continued to be paid, in full, for all products it was delivering to Mariner, even though Mariner had not formally elected to affirm the supply contracts. As of March of 2000, Genesis had made no provision to reserve any of the receivables from Mariner; nor was any provision even discussed for the possible loss of the Mariner business.

121.  By August 30, 2000, Genesis had began negotiating to purchase APS from Mariner. On October 10, 2000, Hager told the unsecured creditors committee that an "opportunity" had presented itself to acquire APS, but that a "risk" of losing the Mariner pharmaceutical contract had also arisen. By linking the two, Hager suggested that unless APS were acquired, the entire Mariner business might well be lost.

122.  By the end of October, Genesis and the financial advisors to the senior creditors were hypothesizing that a complete loss of the Mariner business could

occur, and if it did it would reduce Genesis revenue by $52.8 million and EBITDA by $15.6 million. They further hypothesized that, in order to keep the Mariner business, Genesis might have to reduce its prices to Mariner (and, hence, its EBITDA) by $7.5 million.

123.    But the prospect of losing the Mariner business never became a serious possibility, for two reasons: prior to approval of the bankruptcy Plan, Genesis reached an agreement to continue to provide pharmaceuticals to Mariner *regardless* of what happened with APS; and, in any event, it had also signed a contract to acquire APS. But defendants took steps to make sure that the Mariner issue was not formally resolved until after confirmation of the Plan.

124.    On April 30, 2000, Genesis filed an "emergency" motion in the Mariner bankruptcy to compel Mariner to affirm or reject the pharmacy contracts, claiming that an immediate resolution was necessary to prevent "irreparable harm" to Genesis. This "emergency" motion was then adjourned by agreement eight times, for a total of 18 months, until October of 2001. It was only then, when the Genesis Plan had been safely approved, that the extension of the pharmaceutical supply contract was "finalized" and disclosed.

125.    In fact, negotiations to acquire APS and to extend the supply contract had been ongoing for almost a year before the Plan was approved. As early

as November, 2000, several of the senior creditors, led by Goldman, had put together a financing package to enable Genesis to acquire APS; simultaneously, negotiations were proceeding for the continuation of the Mariner pharmaceutical supply contract, under slightly altered pricing terms. The senior creditors assented to the acquisition of APS by Genesis, and drafts of letter agreements were exchanged in September, November, March and on April 12, 2001. Genesis signed a final letter agreement as of April 12, 2001, and APS accepted it on April 17 – a development which obviated any legitimate concerns that the Mariner business might be lost, but which was not disclosed to the court or to the unsecured creditors. Meanwhile, the motion to compel affirmation or rejection of Genesis' contracts with Mariner was repeatedly adjourned, to avoid a formal resolution of the matter that could not have been concealed.

126. The prospect of acquiring APS should have led to a positive adjustment to Budgeted EBITDA, because this transaction was projected to enhance Genesis' revenues and earnings significantly.[12] Instead, in the spring of 2001 defendants disclosed that Budgeted EBITDA projections of $158 million had been prepared, and that they reflected a downward "adjustment" that assumed that the

---

[12] In fact, Houlihan Lokey, advisors to the unsecured creditors committee, determined that the acquisition of APS would add so much to Genesis' reorganization value that it would add 6% to the percentage of the new reorganized company that the debentureholders would be entitled to receive, increasing that percentage from 20.1% to 26.6% of the entire reorganized company.

entire Mariner business would be lost. This adjustment was originally set at $11.123 million, but had grown to $13.424 million by the time it was incorporated into the Budgeted EBITDA. Goldman and Highland made an all-out, successful effort to persuade the unsecured creditors committee and its financial advisors, Houlihan Lokey, that the Mariner business was likely to be lost and that a downward adjustment of EBITDA was therefore warranted. The creditors committee was persuaded and agreed to the reduction.

127. But at that very moment Hager was advising the senior creditors that, even if the APS acquisition never went through, the Mariner business would *still* not be lost. On April 3, 2001, he told the senior lender steering committee that the pharmacy supply contract with Mariner would be in force for another 18 months, with Genesis having the right to match any competitive bid for two years after that. Handwritten notes of that meeting also indicate that Hager reported that Mariner was legally prohibited from lowering its pharmacy rates from Genesis. In short, he told the senior creditors that the Mariner pharmaceutical business was locked in, at full rates, until the end of 2002, and at somewhat reduced pricing up to 2005, irrespective of whether or not APS was acquired.

128. Neither the signing of the letter of intent to acquire APS, nor the extension of the pharmacy supply contract, was disclosed to the unsecured creditors;

nor were they informed that the supply contract would remain in effect until 2005, *regardless* of whether or not Genesis acquired APS. In fact, Genesis actually signed *both* a formal extension agreement with Mariner *and* a contract to acquire APS before the Genesis Bankruptcy Plan was approved, and those agreements were not disclosed either, until well after the reorganization Plan had been approved. The final agreement to buy APS was executed on or about September 24, 2001, but defendants did not disclose it until October 8, 2001, *6 days* after the Court approved the Genesis bankruptcy Plan. Genesis did not disclose the extension of the Mariner supply contract until its 10Q for the first quarter of 2002, which was filed 4 months after the confirmation of the Plan. Both the purchase and the supply agreement extension were approved in the Mariner bankruptcy on November 1, 2001, about a month after the court approved the Genesis bankruptcy Plan.

129. As noted above, SFAS No. 5 permits the accrual of a loss contingency *only* when the potential loss is "probable". Here, the loss of the Mariner business was never "probable". The exclusion of over $13 million from the EBITDA projections and LTM EBITDA (and, therefore, of over $100 million from the Genesis valuation) for this reason was improper.

57

### e. Excessive Deduction from Budgeted EBITDA
### for Loss of AGE Institute Business

130.  Genesis had a contract to provide management, pharmacy and rehabilitation services to AGE Institute, a not-for-profit company that owned 20 nursing homes, mostly in Florida. On 2000, AGE Institute notified Genesis that it was unilaterally terminating the contract effective October 31, 2000. The annual revenues from this contract totaled $19.224 million.

131.  AGE Institute had been encountering serious financial difficulties for over a year, and by the date of the termination Genesis had run up an account receivable from AGE Institute of over $20 million, about a year's worth of unpaid bills. Recognizing AGE Institute's weak financial condition, Genesis had been setting aside substantial reserves against that receivable and the future fee income.  Genesis had determined that approximately two-thirds of this amount was collectible. It filed suit for the unpaid balance, seeking $28 million in damages.

132.  At a meeting with the senior creditors in September of 2000, Genesis reported the loss of the AGE Institute business. It specifically advised them that the management contract had a 20% EBITDA margin and that the adverse impact on EBITDA would therefore be about $2,226,000.  This was consistent with the subsequent disclosures in the Genesis 10K for 2000, which stated that Operating

Income from the AGE contracts was $2 million annually. At the September meeting Management also represented that it had already reserved $1 million through the end of July, 2000, as against the AGE Institute business. The setting aside of such reserves, and the accruing of the commensurate loss, had already reduced Genesis' EBITDA.

133. On October 10, 2000, three weeks after the September meeting with the senior creditors, Genesis made a presentation to the Unsecured Creditors Committee concerning the loss of the AGE Institute business, and asked the Committee to approve an adjustment to the budgeted EBITDA being used for valuation purposes. Although Genesis used the same presentation boards it had recently used for the senior lender presentation, certain key data was changed. Now the EBITDA margin on the AGE Institute management contract was represented to be 74%, rather than 20%, and the adverse effect on EBITDA was represented to be $5.25 million, rather than $2.23 million. Those amounts took into consideration some, but not all, of what had already been reserved with respect to the loss of the AGE Institute business. Genesis management requested that budgeted EBITDA be adjusted downward by $5.25 million to reflect the loss of this business, and the Unsecured Creditors Committee, being unaware of the much lower figures that had been used in the presentation to the senior creditors, and of the reserve already set aside for the

loss of the AGE Institute business, agreed.

134.    Under SFAS No. 5, the loss contingency that should have been accrued was the "reasonable estimate" of the actual loss of earnings. The $5.25 million figure used by defendants was not a "reasonable estimate" of the actual loss caused by the loss of the AGE Institute business, and it was therefore improper to take such a charge against earnings (and, hence, EBITDA).    At most, the adjustment should have been in the amount represented to the senior creditors, $2.23 million. Given the possibility that much of that amount had already been reserved against, it is likely the true amount of the adjustment should have been far lower still.

135.    Through this device, Genesis management improperly lowered Budgeted EBITDA by about $3 million and thereby reduced the calculated valuation of Genesis by more than 8 times that amount.

### f. Improper Deduction from LTM EBITDA of Non-Recurring Employee and Management Retention Bonuses

136.    As noted above, non-recurring charges and restructuring charges are not to be included in EBITDA.  Bankruptcy reorganization expenses are expressly defined, by GAAP, as non-recurring expenses. See AICPA Statement of Position 90-7 (paragraph 27) (provisions for losses resulting from the reorganization and restructuring of the business should be reported separately as reorganization items ...).

Paragraphs 28 and 49 of SOP 90-7 further provide that restructuring and reorganization expenses, professional fees and similar types of expenditures directly relating to the Chapter 11 proceeding are, by definition, non-recurring, as defined by APB 30, paragraphs 19 through 24.

137.  On September 5, 2000 (in the fourth quarter of fiscal 2000), Genesis obtained Bankruptcy Court approval for a "Special Recognition Program" totaling over $11 million. The program was allegedly designed to assure that key employees remained with the Company despite the ongoing bankruptcy.

138.  This program fit the classic definition of one-time, non-recurring charges and expenses, unusual in nature and infrequent of occurrence, which are not part of EBITDA. Accordingly, Genesis categorized these expenses reorganization costs, separate and apart from its statement of operations, in its consolidated financial statements for fiscal 2001.

139.  Of this $11 million, approximately $6 million of these charges improperly found their way into the Genesis standalone LTM EBITDA, improperly reducing it by that amount.

### g. Improper Deduction from Budgeted and LTM EBITDA of Non-Recurring Costs for the "First Choice Plan"

140.  On January 1, 2000, Genesis started a new employee health

insurance plan called the "First Choice Plan", which was made available to certain Genesis and MC employees. The plan quickly proved unaffordable and by the end of the 2000 fiscal year (September 30, 2000), at the latest, Genesis had announced that the plan would be discontinued after March 31, 2001. The decision to discontinue the plan was disclosed in the Genesis 10-K for fiscal 2000.

141.   In the last quarter of fiscal 2000, Genesis took a charge to earnings (on a consolidated basis, including MC) for an "insurance adjustment" of $35,235,000. Of that amount, approximately $21 million represented exit costs of the First Choice Health Plan; and of that amount, about $13 million was attributed to Genesis on a standalone basis. Because the Plan had already been designated for termination by this time, the insurance adjustment was a non-recurring charge, as defined in APB 30, paragraph 26, and was treated as such in the Genesis 2001 10-K. Nonetheless, it was improperly included in the calculation of LTM EBITDA.

142.   At meetings with the unsecured creditors committee, Hager tried to explain away the sharp spike in insurance costs by claiming that those types of costs had skyrocketed industry-wide. These statements were designed to, and did, cover up the fact that Genesis' insurance charges had been manipulated upwards by the inappropriate inclusion of the non-recurring charges incurred in connection with the First Choice Plan.

143.  At a meeting of management and the senior creditors steering committee of March 13, 2001, Goldman and the other lenders present recognized that the First Choice Plan had been discontinued and that the charges associated with that plan were non-recurring. Nonetheless, they did nothing to take these costs out of the LTM EBITDA calculation.[13]

### h. Improper Reduction of Budgeted EBITDA based on Sudden Increase in Pharmacy Cost of Goods Sold

144.  Genesis' "Neighbor Care" pharmacy subsidiary contributes about $1 billion in revenues to the Company each year, representing about 55% of the total. The NeighborCare cost of goods sold ("CGS"), as a percentage of revenue, was 58.7% in fiscal 1998 and 58% in fiscal 1999. In fiscal 2000 the budgeted CGS was 59.2% and, on August 2, 2000, Genesis management reported to the senior lender steering committee that as of mid-2000, the actual average CGS had been 59.8%. Two months later, Genesis management told the unsecured creditors committee that the budgeted EBITDA for fiscal 2001 assumed a pharmacy CGS of 61.9%, based on the most recent two months' results.

145.  There was no legitimate basis for that assumption. In its 10Q for

---

[13] Ironically, the improper inclusion of these non-recurring Choice Plan costs in EBITDA triggered an EBITDA "covenant default" under the Genesis DIP loan agreement.. Rather than correct this "default" by excluding the charges from EBITDA, as Genesis should have done, it agreed to pay the DIP lenders a $1 million "default fee" in exchange for a "waiver" of this non-existent default.

the second quarter of fiscal 2002, issued about seven months after the Plan was confirmed, Genesis disclosed for the first time the pharmacy CGS for the first two quarters of fiscal 2001. CGS had been 59.3%, not 61.9%, as represented to the unsecured creditors committee and used as a basis of the budgeted EBITDA figures.

146.    Because of the large volumes involved, the inflation of pharmacy CGS by 2.6% would have reduced EBITDA by about $26 million on an annualized basis.

### i. Failure to Adjust Budgeted EBITDA to Reflect Increased Medicare Population Mix

147.    Even after the advent of PPS, Medicare daily reimbursement rates were about $140 per day higher than Medicaid rates and, as a result, Medicare patients were far more profitable than other patients and were therefore highly coveted by nursing care facilities.

148.    Beginning in early 2001 and building steadily through the year, Genesis was experiencing a greater percentage of Medicare patients than it had in fiscal 2000. In fact, Medicare patient days had increased from 12.2% of total patient days in 2000, to 14.5% in 2001. Nonetheless, in projecting EBITDA, Genesis used the patient mix data for 2000 and assumed that it would continue unchanged into the future. The benefit of this additional 2.3% Medicare patient ratio would have been

several million of additional EBITDA for the remainder of fiscal 2001.

149.   Genesis management advised the senior creditors of the improvement in the Medicare census, but did not inform other creditors, or the Bankruptcy Court. More importantly, although Genesis management had pounced on every opportunity to make negative adjustments to EBITDA, it never sought a positive adjustment to reflect this favorable development.  Defendants should have, but did not, make an upward adjustment to budgeted EBITDA to reflect this development.

150.   Genesis did not disclose its overall Medicare census for the first two quarters of 2001 until April 30, 2002, over four months after the Plan was approved, when it filed its 10-Q for the second quarter of 2002.

151.   Had they adjusted the EBITDA data to reflect the improved Medicare census, EBITDA would have increased by about $4 million.

### j.  Unjustified Increase of $35 Million in Budgeted EBITDA for Projected Additional Personnel Costs

152.   One of the fundamental assumptions, on which the Budgeted EBITDA data were based, was that personnel expenses at the corporate level were going to increase by $35 million, even though Genesis was actively divesting itself of nursing beds and would, presumably, not need additional personnel to oversee this shrinking operation. In fact, the new positions that Genesis created, and factored into

Budgeted EBITDA, were not filled.

153. Included among the projected personnel costs were new management performance driven incentives, which the Budgeted EBITDA assumed would be awarded even though the performance criteria for awarding those bonuses were utterly unrealistic and unreachable.

### k. **Increasing the Senior Creditor Claims**

154. In July of 2000, Goldman, Highland, Mellon and two other senior creditors committed to providing debtor-in-possession ("DIP") financing of $200 million for Genesis and $50 million for MC. The DIP financing proposal was approved by the Bankruptcy Court on July 18, 2000. By the time the Plan was approved, Genesis had drawn down $200 million in DIP financing; but MC had drawn down nothing. Repayment of DIP financing is the highest priority claim in bankruptcy.

155. Genesis used the proceeds of its DIP borrowings as follows:

| | |
|---|---|
| Repay Tranche II prepetition senior debt: | $40 million |
| Pay pre-petition senior interest: | 44 million |
| Pay post petition senior interest: | 112 million |
| Other | 4 million |
| Total: | $200 million |

156.   Had the senior creditors not interfered, Genesis could have paid these charges out of its regular cash flow, without utilizing the DIP credit facility and without gratuitously increasing the claims of the senior creditors by $200 million.

157.   But the senior creditors *did* interfere, effectively forcing Genesis to draw down the DIP credit facility. First, they "deemed" all $25 million in free cash that was held in the accounts of Genesis and MC to belong to MC only, and then "froze" those funds so that they could not be paid out. Then they prevented MC from drawing down any of its $50 million DIP facility to pay its bills to Genesis. By shutting off the financial spigot, the senior creditors prevented MC from using any of this $75 million to pay its Genesis bills. But for the intervention of the senior creditors and the acquiescence of Genesis/MC management (who were the same people), MC could have, and should have, paid at least $75 million of the $109 million pre-petition claims of Genesis.

158.   All the while, Genesis continued to supply management and other

67

services, as well as pharmaceutical products, to MC throughout the bankruptcy, without being paid anything on its pre-petition charges. Genesis could have been paid for some of its pre-petition charges had it been deemed a "critical vendor" under the Bankruptcy Code. But, shockingly, Genesis never sought, and never received, such status – even though in other bankruptcy cases involving Genesis customers, such as Mariner, Genesis *had* routinely been granted such status, and even though MC was paying about 75% of pre-petition claims of other vendors who were far less "critical" than Genesis.

159.    The status of Genesis' enormous account receivable from MC for pre-petition charges was not disclosed until August of 2001, when Genesis filed with the Court its "settlement agreement" with MC.  In addition to reducing its fee for services rendered under the various management and operational contracts, as described above, this "settlement agreement" also relieved MC of its $109 million contractual obligations to pay Genesis for pre-petition goods and services provided. As justification for this raw give-away, the settlement agreement recited that, because of the fairness analysis prepared by Beverly Anderson,  MC had come to realize that it had $22 million in "claims" against Genesis for past overcharges under the various inter-company agreements -- and that Genesis had agreed to cancel its entire $109 million claim against MC in exchange for the "release" of this newly-discovered $22

68

million "claim". Genesis' failure to insist upon payment of MC's outstanding obligations contributed mightily to forcing it to draw down its DIP credit facility.

160. Genesis took additional actions that exacerbated its own cash crunch, including: (a) unnecessarily transferring excessive insurance reserve payments to Liberty, described above; (b) allowing accounts payable to shrink dramatically while accounts receivable grew, also dramatically, and (c) allowing Manorcare to withhold 10% of amounts due. During the bankruptcy, accounts receivable increased by $70 million, *despite* the write-off of $14 million of other receivables; while accounts payable were *decreasing* by $59 million. This reflects a  a speed-up in payments to vendors, coupled with slow-down in efforts to collect on debts due and owing.

161. Collectively, these actions stripped Genesis of well over $200 million in operating capital and contributed directly to its need to draw upon the equivalent amount of DIP financing, further assuring that the senior creditors would be deemed impaired.

### 3. Summary of the Misrepresentations

162. To effectuate their scheme, defendants made the following misrepresentations to the Court and to the unsecured creditors:

1.    They misrepresented that LTM EBITDA data supplied by Genesis, for

valuation purposes, had been prepared in good faith, without disclosing the accounting and financial manipulations described herein.

2.    They misrepresented the Budgeted EBITDA data supplied to Warburg had been prepared in good faith, without disclosing the accounting and financial manipulations described herein.

3.    They gave false testimony to the bankruptcy court supporting the validity of these EBIDTA data, including the testimony of George V. Hager.

4.    They gave false and misleading information to the Unsecured Creditors Committee concerning the fairness of the management contract with MC, to persuade it to go along with the renegotiation of that contract and its consequent adverse consequences on the Genesis EBITDA and valuation. They also failed to disclose the blatant conflicts of interest of the so-called "independent" restructuring officer, Beverly Anderson, who negotiated these contractual revisions.

5.    They gave false and misleading information to the Unsecured Creditors Committee concerning the EBITDA margin that the Company had been realizing on its business with the AGE Institute, and failed to disclose the far lower EBITDA margins management had disclosed to the senior lender group, to persuade the Unsecured Creditors to go along with an exaggerated adjustment to EBITDA, and the reduction of the Genesis valuation resulting from the loss of that business.

6.     They represented that there was a serious possibility that the Mariner business would be lost, without disclosing that the Mariner agreement had been extended, and that APS had signed an agreement to be acquired by Genesis.

7.     They failed to disclose that the EBITDA calculations excluded 10% of the Manorcare revenue, and that it was not probable that this revenue would be lost.

8.     They failed to disclose that Genesis had booked, as current expenses, payments into insurance reserves that far exceeded current liability exposure and stop loss limits.

9.     They failed to disclose that non-recurring expenses, including those associated with cancelling the First Choice plan, and special payments made to executives to induce them to stay during the bankruptcy proceedings, were being deducted from EBITDA.

10.    They misrepresented the pharmacy cost of goods sold.

11.    They failed to disclose that the Budgeted EBITDA assumed that personnel expenses at the corporate level were going to increase by $35 million, at a time when Genesis was actively divesting itself of nursing beds.

### 4. Each Defendant Participated and Had Knowledge of the Misrepresentations

160.   Defendant Hager was the chief financial officer of Genesis and of

71

MC during the relevant period and, as such, was directly involved with, and responsible for, the preparation of the Genesis financial statements and actual and "budgeted" EBITDA figures. He was aware that the budgeted EBITDA numbers grossly understated Genesis' prospective financial performance for the relevant period, and that the adjustments requested and obtained to those numbers were based on misrepresentations and nondisclosures of material facts. He participated in the fraud in order to secure the approval of the senior creditors of a lucrative compensation package for himself, and in the hope of retaining his position with the Company after the senior creditors formally became controlling stockholders or, failing that, to obtain lucrative severance packages.

161.   Goldman orchestrated and directed the scheme described herein, with the cooperation of Mellon and Highland. Goldman and Highland aggressively purchased Genesis debt participations at drastic discounts, seeing an opportunity to double or triple their money within the space of 18 months. In a bankruptcy their claims, acquired at a discount of about 50 percent, would be scheduled at 100 percent of face value. If they could convince the bankruptcy court that Genesis was worth less than the face amount of their claims, they could seize the equity of the company and be free of hundreds of millions of dollars of pre-existing indebtedness.

162.   Goldman inserted itself into these proceedings in about March of

72

2000, at a time when Genesis management was optimistic about Genesis' prospects and was projecting EBITDA for the Company in the $200 million range. First, it joined the senior lender steering committee. Its attitude manifested itself immediately: at the March meeting of Genesis with the steering committee, management proposed that Genesis' debts be restructured so that the junior bonds could be repurchased at a deep discount to market. The response of the Goldman representative, Jody LaNassa, as recorded in his notes, was "R U Nuts?" This revealing comment unmasks Goldman's intent to enrich itself, as much as possible, at the expense of the debentureholders.

163.  Then, in July of 2000, it took a lead position in the DIP lending facility. After that point Goldman, Mellon and Highland, acting in concert, effectively controlled all of the Genesis purse strings for the duration of the bankruptcy, and they also controlled the financial fate of the individual Genesis senior managers, including the four individual defendants named in this action. Contemporaneously with Goldman's ascendancy, the outlook of Genesis management took a 180 degree turn and became relentlessly pessimistic as both the reported and the projected financial results for the Company nose-dived.

164.  Goldman, Mellon and Highland procured the cooperation of Genesis senior management by offering them immensely lucrative retention bonuses,

73

including stock grants, options and the forgiveness of debt they had incurred to purchase Genesis shares. The packages offered to the four most senior managers had an aggregate post-reorganization value of about $23 million, not including severance benefits. These packages are now worth about $28 million. Moreover, although they were justified as retention incentives to assure that these key executives would remain with the company, within a year after confirmation of the Plan three of the four recipients of these retention payments had departed from the Company and had cashed in their severance benefits, totaling an additional $10 million in cash and other benefits. Only one, defendant George Hager, remains with the Company. These packages, when offered, had a value that was about three times the value of compensation paid to senior executives at comparable companies.

165. Under the guise of monitoring compliance with DIP loan covenants, Goldman quarterbacked the entire panoply of financial manipulations detailed in this complaint. They conducted monthly meetings with Genesis management. Goldman's notes of those meetings show that they were tracking, in minute detail, (a) the actual EBITDA being generated, (b) the targeted EBITDA level necessary in order to achieve a finding of senior lender impairment; (c) reconciliation of the LTM EBITDA being used for valuation purposes to the pro forma budgeted EBITDA, which was also being used for valuation purposes, to make sure that they

were in agreement; (d) the EITDA relationship of Genesis and MC; (e) the "current state of play"; (f) the various adjustments discussed in this complaint, and their affect on the "current state of play"; (g) anticipated Medicare revenue and its potential affect on the "current state of play"; (h) the "significant exposure" created by the fact that the valuation multipliers the experts were going to be using was 20 to 30% higher for the Genesis pharmacy sector than for the nursing home sector.

166.   To assure that the predetermined valuation was achieved, adjustments to Budgeted EBITDA were fed to Hager by the senior creditors' financial advisors, Policano & Manzo and Chilmark, through the Steering Committee.

167.   Moreover, as noted above, Goldman took all the steps necessary to strip Genesis of cash, so that it would be forced to draw down its entire $200 million DIP loan facility. It "froze" MC's available cash  and prohibited MC from drawing down on its $50 million DIP loan facility, to pay its obligations to Genesis.

168.   After confirmation of the Plan, Goldman took complete control of Genesis. It holds over 15% of the common stock (the largest block by a factor of two)and its managing director, Jody LaNassa, is one of the six members of the board and is also a member of the compensation committee. James Dondero of Highland Capital (the second largest holder)also sits on the Genesis board and its audit committee.

75

## IV. PLAINTIFFS DID NOT HAVE A FULL AND FAIR OPPORTUNITY TO LITIGATE THESE ISSUES IN THE BANKRUPTCY COURT

169.   Plaintiffs did not discover the manipulations during the course of the bankruptcy proceedings and could not have done so through the exercise of reasonable diligence.

170.   Until the last week of the bankruptcy proceedings, the valuation of Genesis was being assessed solely on the basis of the budgeted (projected) EBITDA figures, which management (i.e. George Hager) had represented had been constructed from the "bottom up". These budgeted EBIDTA figures had never been reviewed or tested by the Genesis auditors, KPMG, or by Warburg or Chilmark, who nonetheless relied on them in reaching their valuations.  Moreover, by asserting that the figures had been constructed from the "bottom up", Genesis was representing that this data had not been extrapolated from prior actual EBITDA data, but was instead based exclusively on unspecified internal assessments that would defy any efforts to test, to tie them in or to compare them to previous financial information.

171.   Compounding the difficulties in uncovering the manipulations, there was no forewarning, until one week before the confirmation hearing, that any of the plan proponents would be relying on historical LTM EBITDA data to support confirmation of the Plan.  The deadline for filing Plan objections was August 17,

2001. On August 22, Chilmark submitted its valuation report, based on LTM EBITDA data. This was the first time any valuation had been submitted that was ostensibly based on historical LTM data; yet it was submitted, without advance notice, after the objection deadline had passed, and only 6 days before the Plan confirmation hearing.

172. The fraud was greatly facilitated by the last-minute production of documents and the extremely time-compressed, limited depositions that followed. About 25% of the documents were produced by August 8; the balance were produced the following week. More than 50,000 documents were produced at the last minute, in disorganized, incomplete and piecemiel fashion, compounding the problems of reviewing them in a timely fashion. Depositions began on August 16, 2001, and were completed by August 24. Creditors were allowed to examine Hager, at his deposition on August 23, for only three hours. It was simply not possible for the debentureholders to uncover the massive deceptions inherent in the EBITDA data in the time allotted before the confirmation hearing of August 28 and 29. Moreover, because the debentureholders did not, at that time, suspect that a fraud was being committed, they did not review the documents with that possibility in mind.

173. The deposition of George Hager, Genesis' chief financial officer, occurred on August 23, 2001, a single day after the Chilmark and final UBS reports

were submitted. Plaintiffs have subsequently discovered that Chilmark had been

retained as early as 2000 to prepare a valuation study of Genesis. Its work product was

withheld until the last possible moment, to make it virtually unchallengeable in the

time available. There was no opportunity within this short time period to analyze,

much less refute, the myriad assumptions and manipulations that infected the LTM

EBITDA data. There was not even sufficient time to review the tens of thousands of

pages of documents produced, at the last minute, by Chilmark, Warburg, Goldman and

the Company, among others.

174. Moreover, because never, until one week prior to the confirmation

hearing, had actual EBITDA data been used as a basis for approving the Plan, junior

creditors and other objectors did not have an incentive to challenge and investigate

"actual" EBITDA results. Had actual LTM EBITDA data been used from the start as

a basis for valuing Genesis, the bondholders would have subjected those data to

intense scrutiny and would have hired a forensic accounting firm to do it.

175. As a result, none of the objections raised to confirmation of the

Plan touched upon the manipulations alleged here. There were no objections in the

bankruptcy proceeding to the way EBITDA had been defined or calculated. Two

objections to confirmation of the Plan were filed by debentureholders: one by the

GMS Group, whose investors collectively held approximately $172 million of Genesis

78

debentures; and the other by Charles L. Grimes, who held $20 million of Genesis

debentures. In accordance with the Court-ordered schedule, both objections were filed

*before* the Chilmark and the final Warburg valuations were submitted. The GMS

Group and Grimes alleged that the Plan should be rejected because senior creditors

were *not* impaired but, rather would be receiving stock worth substantially more than

100% of their claims under the plan, while other creditors would receive a minimal

recovery. But neither objection could, or did, challenge the EBITDA data on which

the Chilmark and Warburg valuations were based.

176.   In its objection the GMS Group specifically alleged that Warburg

had  undervalued the Company because it utilized "an unreasonably low EBITDA

multiplier, and applied this multiplier to an EBITDA that is undisputedly out of date,

resulting in unreasonably low market capitalization compared to comparable

companies in the same industry". None of the holders of the subordinated debentures

challenged the accuracy or bona fides of the management projections used by Warburg

in its valuation.

177.   The GMS Group retained the services of its own valuation expert,

the Evercore Group. Although Evercore reached a much higher valuation of Genesis,

its report also relied on management's EBITDA figures.

## V. Plaintiffs' Discovery of the Scheme

178.    Subsequent to confirmation of the Plan, disturbing information was disclosed, over a period of months, that cast into doubt, for the first time, the veracity of the EBITDA data that had been used in support of the Plan:

a.      In November of 2001, Genesis disclosed for the first time the massive increases in insurance reserves that Liberty had taken, and expensed, during the relevant valuation period. In its 10-K issued on December 28, 2001, well after Plan confirmation, showed that reserves had shot up by $23.7 million, doubling in a single year.

b.      In its 10-Q for the first quarter of fiscal 2002, dated February 12, 2002, Genesis disclosed that it had not lost the Mariner/APS business, because the service agreement had been extended through 2003. This had happened even though another company had actually acquired APS.

c.      In its 10-Q for the second quarter of fiscal 2002, dated May 15, 2002, Genesis disclosed that its cost of goods sold in its pharmacy operations was 59.2% of revenues, rather than 62.5%, the percentage used to calculate the historical LTM data used for valuation purposes; and it also disclosed for the first time that 10% of Manorcare revenues had been excluded from income (and EBITDA) during the LTM period.

179.   These revelations and others collectively raised a red flag, for the first time, concerning potential manipulations of the Genesis EBITDA figures used in the valuation process.

## VI. THE AFTERMATH: MANAGEMENT REAPS ITS REWARDS AND GOLDMAN AND HIGHLAND SEIZE TOTAL CONTROL

180.   Within one year after the consummation of the Plan, three of the four most senior management figures had resigned from their positions at Genesis, after receiving enormous special incentives, during the bankruptcy, to stay with the Company.

a.   Michael Walker resigned as chief executive officer and received $5,100,000 of severance, $425,000 of incentive compensation, and life insurance and other related benefits of $91,367. In addition, unrestricted shares of common stock valued at $2,744,550 vested upon his resignation.

b.   David Barr resigned as Vice Chairman and received $1,500,000 of severance, and life insurance and other related benefits of $310,000. In addition, unrestricted shares of common stock valued at $1,372,275 vested upon his resignation.

c.   Richard Howard, who had succeeded David Barr as Vice Chairman, entered into a "voluntary separation agreement" with Genesis in October of 2002, pursuant to which he received $2,797,000 of severance, incentive

81

compensation of $250,000 and life insurance and other benefits of $418,000. In addition, unrestricted shares of common stock valued at $1,220,000 vested upon his resignation.

181.  Goldman, the largest single stockholder of Genesis, with about 15.7%, has placed one of its own managing directors, Joseph A. LaNassa, on the 6-person Genesis board, and he is one of the members of the compensation committee. Highland Partners, another member of the senior lender group, is the second largest shareholder, with just over 7% of the outstanding stock. Highland Partners has placed one of its executives, James D. Dondero, onto the Genesis board as well.

### FIRST CAUSE OF ACTION: FRAUD

182.  Plaintiffs incorporate by reference paragraphs 1-181.

183.  By their participation in the scheme described above, each defendant has committed a fraud on the plaintiffs and on the Bankruptcy Court. Defendants' actions constitute willful misconduct and was therefore not released in the Genesis bankruptcy proceeding.

184.  Genesis and Hager were directly involved in the preparation of all the misleading financial information that led to the under-valuation of Genesis.

185.  Goldman, Mellon and Highland controlled this entire process, periodically reviewing in detail the financial information prepared by Genesis