subsequent investigation revealed that approximately $6 million of these costs had been improperly charged against Genesis LTM EBITDA, lowering the valuation by another $50 million (A102 ¶¶ 137-38).

### 6.  Improper Deduction of Non-Recurring Costs  for the "First Choice Plan"

On January 1, 2000, Genesis started a new employee health insurance plan called the "First Choice Plan". The plan quickly proved unaffordable and by September 30, 2000, at the latest, Genesis had announced that the plan would be discontinued after March 31, 2001 (A102 ¶ 140).

In the last quarter of fiscal 2000, Genesis took a charge to earnings of about $13 million with respect to the cancellation of the First Choice Plan. Because the Plan had already been designated for termination by this time, GAAP defined this adjustment as a non-recurring charge, and it was treated as such in the Genesis 2001 10-K. Nonetheless, it was improperly (and secretly) included in the calculation of LTM EBITDA (A103 ¶ 141), thereby reducing the calculated valuation of Genesis by over $100 million.

### 7.  Improper Inflation of Pharmacy Cost of Goods Sold

Genesis' pharmacy subsidiary contributed about $1 billion in revenues to the Company each year, representing about 55% of the total. The pharmacy cost of goods sold ("CGS"), as a percentage of revenue, was 58.7% in fiscal 1998 and 58% in fiscal 1999. In fiscal 2000 the budgeted CGS was 59.2% and, on August 2, 2000, Genesis management reported to the senior lender steering committee that the actual average CGS had been 59.8%. Nonetheless, the budgeted EBITDA for fiscal 2001 assumed a pharmacy CGS of 61.9%, allegedly based on results for the first two quarters (A104 ¶ 144).

There was no legitimate basis for projecting the pharmacy CGS level this high, or for staying with that inflated projection even after they were contradicted by the actual results for the first two quarters. In its 10Q issued about seven months after the Plan was confirmed, Genesis disclosed the

truth for the first time: that the actual pharmacy CGS for the first two quarters of fiscal 2001 had been 59.3%. The inflation of pharmacy CGS by 2.6% would have reduced annual EBITDA by about $26 million (A104-A105 ¶¶ 145-46), reducing the valuation of Genesis by another $200 million.

## D. The Misrepresentations Come to Light

In dismissing the complaint, the bankruptcy court erroneously concluded that the fraud was fully disclosed before the bankruptcy confirmation hearing. However, the complaint alleges in detail how the fraud actually came to light *after* the confirmation hearing. The bankruptcy court signed the order confirming the bankruptcy reorganization plan on September 20, 2001. The complaint alleges that just over one month later, in November of 2001, Genesis disclosed that it had made massive increases in its insurance reserves. Its 10-K issued on December 28, 2001, almost three months after Plan confirmation, showed that reserves had shot up by $23.7 million, doubling since the prior year (A121 ¶ 178(a)). This information clearly related back to the valuation period, which included the first nine months of the 2001 fiscal year.

Then, in its 10-Q for the first quarter of fiscal 2002, dated February 12, 2002, over four months after confirmation, Genesis made disclosures about its continuing business providing pharmaceuticals to the Mariner Corporation (A121 ¶ 178(b)). Genesis' EBITDA during the valuation period had been adjusted downward by $24.5 million to reflect the anticipated loss of this business. But now Genesis disclosed for the first time that it had signed an agreement with Mariner, just when the reorganization plan was being approved, to extend the pharmaceutical supply agreement through the year 2003. Once again, this information related back to events that had occurred during the valuation period and which had, or should have had, an impact on the EBITDA data used for the confirmation proceeding valuation.

Then, in its 10-Q for the second quarter of fiscal 2002, issued seven months after confirmation, Genesis disclosed for the first time that it had excluded from EBITDA, prior to plan

confirmation, 10% of revenues on its sales to Manorcare (A93 ¶ 117). In this same 10-Q Genesis also disclosed for the first time that its pharmacy cost of goods sold during the first two quarters of fiscal 2001 had been 59.2% of revenues, not the "budgeted" 62.9% CGS that had ostensibly been based on the results of those quarters (A121 ¶ 178 ©)).

These post-confirmation revelations prompted a complete re-evaluation by the debentureholders of the financial data that Genesis had submitted to the court. After months of investigation and analysis, plaintiffs discovered that many other dubious transactions had adversely affected the EBITDA data that had been reported to the court.

In short, the complaint leaves no doubt that the fraud was not disclosed until after confirmation of the Plan.

### III. ARGUMENT

#### A. JURISDICTION AND STANDARD OF REVIEW

This Court has jurisdiction over the subject matter of this action pursuant to 28 USC § 158(a). *In re YES! Entm't Corp. v. Kingsborough*, 316 B.R. 141 (D. Del. 2004).

This appeal concerns issues of law and is therefore governed by a *de novo* standard of review. *In re Olick*, No. 99-CV-5128, 2000 U.S. Dist. LEXIS 4275, at * 6, 2000 WL 354191 at *2-*3 (E.D. Pa. Apr. 4, 2000); *In re United Artists Theatre Co.*, 315 F.3d 217 (3d Cir. 2003); *YES! Entm't*, 316 B.R. at 144; *In re Lernout & Hauspie Speech Prods. N.V.*, 308 B.R. 672, 675 (D. Del. 2004); *Sabratek Liquidating, LLC v. Ross & Hardies*, Civ. A. No. 04-226, 2005 U.S. Dist. LEXIS 11257, at *4, 2005 WL 1385203 at *2 (D. Del. Mar. 30, 2005). *De novo* review "extends to the Bankruptcy Court's application of the law to the facts." *In re RBGSC Inv. Corp.*, 253 B.R. 352, 362 (E.D. Pa. 2000) (citation omitted) (whether or not *res judicata* applies to a prior bankruptcy order is a question of law, and therefore, *de novo* standard applies). "*De novo* review requires the court to make a judgment independent of the bankruptcy court's, without deference to that court's analysis

and conclusions." *In re Piper Aircraft Corp.*, 244 F.3d 1289, 1295 (11th Cir. 2001) (citation omitted).

### B. THE STRICT STANDARDS APPLICABLE TO A MOTION TO DISMISS

The Third Circuit has a liberal test for construing the adequacy of pleadings. *Timothy B. v. Neshaminy Sch. Dist.,*153 F. Supp. 2d 621 (E.D. Pa. 2001). *See also Whetherhold v. RadioShack Corp.,* 339 F. Supp. 2d 670, 673 (E.D. Pa. 2004). On a Rule 12(b)(6) motion to dismiss a complaint, a court must "accept as true the factual allegations in the complaint and all reasonable inferences that can be drawn from them." *Langford v. City of Atlantic City*, 235 F.3d 845, 847 (3d Cir. 2000). Dismissal is only warranted "where it is certain that no relief could be granted under any set of facts that could be proved." *Markowitz v. Northeast Land* Co., 906 F.2d 100, 103 (3d Cir. 1990) (citation omitted); *see also Household Int'l, Inc. v. Westchester Fire Ins. Co.*, 286 F. Supp. 2d 369, 372 (D. Del. 2003); Dismissal Op. 324 B.R. at 515; *In re BCP Mgmt.,* 320 B.R. 265, 270 (D. Del. 2005).

### C. RES JUDICATA DOES NOT BAR PLAINTIFFS' ACTION

#### 1. Res Judicata Is Inapplicable Where the Prior Judgment Was Procured by Fraud

In dismissing the action, the bankruptcy court acknowledged that there is "a so-called fraud exception" to *res judicata* (324 B.R. at 525-26), citing *McCarty v. First of Georgia Ins. Co.,* 713 F.2d 609, 612 (10th Cir. 1983)("*Res judicata* . . . does not shield a blameworthy defendant from the consequences of his own misconduct"); and *Browning v. Levy*, 283 F.3d 761 (6th Cir. 2002). In order to trigger the fraud exception from a prior bankruptcy order, the plaintiff must:

> [D]emonstrate that the judgment was obtained as the result of a scheme or collusion that is designed to influence corruptly the proceedings, or to inhibit the ability of an adverse party to fully present his case or defense, and which has the effect of foreclosing to him the opportunity to have a fair and complete trial.

*Browning v. Navarro*, 826 F.2d 335, 345(5th Cir. 1987). Hence, *res judicata* does not bar a claim where "[p]laintiff in the prior action was unaware of the additional facts due to the fraud or negligent misrepresentation of the other party". James Wm. Moore et al., 18 MOORE'S FEDERAL

21

PRACTICE § 131.21 (Matthew Bender 3d ed. 1999) (footnote citing *McCarty*, 713 F.2d at 612-13).

This doctrine springs from the general principle that, for any judgment to have either *res judicata*

or collateral estoppel effect, the parties must have had a "full and fair opportunity" to litigate the

issue or cause of action in question. *Kremer v. Chemical Constr. Corp.*, 456 U.S. 461, 481 (1982).

In *In re PHP Healthcare Corp.*, No. 98-2608, 2002 Bankr. LEXIS 449, 2002 WL 923932

(Bankr. D. Del. May 7, 2002), after the plan confirmation, the plaintiff debtor sued

PricewaterhouseCoopers ("PwC") to void a preferential transfer. PwC argued that because the court

had found that it was disinterested when it authorized PwC to represent the debtor, *res judicata*

applied and required dismissal of the action. LEXIS, at *2, WL at *1. The court refused to apply

*res judicata*:

> [The court] found disinterestedness based on information disclosed by PwC, which
> has proven to be incomplete. The court was not informed of the payments that PwC
> received which are now alleged to be preferential.

LEXIS, at * 8, WL at *3.

In the present case the bankruptcy court held that the fraud exception did not apply, for two

reasons. First, it held that

> [T]he plaintiffs do not contend that the defendants wrongfully concealed material
> facts from them prior to confirmation. Rather, the plaintiffs contend that the
> documents produced by the defendants prior to confirmation were too voluminous
> to review adequately, that there was insufficient time to review the materials
> thoroughly, and that the materials were not reviewed to ferret out fraud . . . . The
> affirmative act of concealment or contrivance is missing in the plaintiffs'
> presentation. . . . As to the SEC disclosure, the SEC filings were timely filed, and
> included post confirmation data

324 B.R. at 526. As discussed above, this determination reflects a complete misreading of the

complaint. Plaintiffs did *not* allege that the fraud was disclosed to them in the materials produced

prior to the hearing. Rather, the complaint alleges, in great detail, that the fraud was not disclosed

until post-confirmation financial disclosures by Genesis.[12] Nor did plaintiffs allege that the post-confirmation SEC disclosures were limited to post-confirmation data, as the Opinion implies. Rather, the complaint alleges in detail exactly what *pre-confirmation* facts were disclosed in the *post-confirmation* SEC filings.

Second, the court held that the fraud exception was inapplicable because plaintiffs

[W]ere not prevented from asserting their claims at confirmation. As noted above, their claims focused on the correctness of the enterprise valuation of the debtors. That claim was fully litigated at confirmation.

(*Id.*). This determination would require, for the fraud exception to apply, that the injured party was *totally precluded* by the fraud from asserting a claim or defense. But that is not what *Browning* or any of the other relevant cases requires. All that is required is that the injured party show that he or she was prejudiced by being prevented from establishing or presenting *some element, phase or aspect* of the claim.

In *McCarty*, for example, the plaintiffs first instituted a breach of contract action against their insurer. After the district court dismissed that case, plaintiffs obtained documentary proof that the insurer had lied in disclaiming the policy and brought a second action, this one in tort. The Tenth Circuit refused to apply *res judicata*, because "'where plaintiff's omission *of an item of his cause*

---

[12] Even if some evidence of the fraud had been contained in these last-minute disclosures, at most there would be an issue of fact as to whether the circumstances of their disclosure gave plaintiffs a full and fair opportunity to litigate these issues. *A.B.H. Investments, Inc. v. Narven Enters., Inc.*, No. D040361, 2003 Cal. App. Unpub. LEXIS 11126, at *32, 2003, WL 22796049 at *11 (Cal. App. 4th Dist., Nov. 25, 2003) (Not Reported in Cal. Rptr. 3d), *review denied*, (Mar. 24, 2004); *In re Circle K Corp.*, 181 B.R. 457, 462-63 (Bankr. D. Ariz. 1995) (whether plaintiff could have discovered the fraud before confirmation was an issue of fact); *Houbigant, Inc. v. Dev. Specialists, Inc.*, 229 F. Supp. 2d 208, 222 (S.D.N.Y. 2002); *Tanaka Bros. Farms, Inc. v. Home State Bank*, Civ. A. No. 86-2108-S, 1986 U.S. Dist. LEXIS 17745 (D. Kan. Nov. 13, 1986) (annexed hereto) (issue of fact when plaintiff knew about fraud); *In re AmeriServe Food Distrib. Inc.*, 267 B.R. 668, 672 (D. Del. 2001) (where a new expert report appeared at plaintiff's "door a 'couple of days' before [the bankruptcy court] disposition . . . casts doubt that [plaintiff] had 'a fair opportunity procedurally, substantively and evidentially to pursue his claim the first time.'" (citation omitted).

*of action* was brought about by the defendant's fraud, deception, or wrongful conduct, the former judgment had been held not to be a bar to suit.'" 713 F. 2d at 613 (citation omitted) (emphasis added).

In *Powell v. American Bank & Trust Co.*, 640 F. Supp. 1568, 1574 (N.D. Ind. 1986), a fraud action for damages, plaintiffs claimed that defendants had improperly obtained a probate order approving the sale of plaintiffs' bank stock by failing to disclose that the banking industry had recently agreed upon a new regulation that would add tremendously to the value of the stock. The district court held that in view of the fraud the order of the probate court was not preclusive, and it refused to dismiss the case, holding that *res judicata* "was not created to protect such fraud on the courts," or to prevent a plaintiff "from presenting *all of his case* to the court" (emphasis added).

Similarly, in *Christian v. American Home Assurance Co.*, 577 P.2d 899, 905 (Okla. 1977), the court refused to apply *res judicata* in a case where the plaintiff, upon winning a breach of contract action against his insurer for failing to pay his claim, instituted another lawsuit against the insurer for a bad faith disclaimer of coverage. Because the facts surrounding defendants' bad faith had been fraudulently concealed during the first trial, the court allowed the second case to proceed:

> Where plaintiff's omission *of an item of his cause of action* was brought about by defendant's fraud, deception or wrongful concealment, the former judgment has been held not to be a bar to suit on the omitted part of the claim.

(Citation omitted; emphasis added). This language is echoed in the RESTATEMENT (SECOND) OF JUDGMENTS § 26, cmt. j (1982), which says that a "defendant cannot justly object to being sued on a *part or phase of a claim* that the plaintiff failed to include in an earlier action because of the defendant's own fraud" (emphasis added). [13]

---

[13] Similarly, in *United States Rubber Co. v. Lucky Nine, Inc.*, 159 So. 2d 874 (Fla. Dist. Ct. App. 1963), the court held that *res judicata* would not bar a second action on a debt where, in the first such action defendant had misrepresented the amount he owed, and had thereby limited the size of the judgment against him. Although the plaintiff, despite the fraud, had been able to assert *some* claim against the defendant, this was held not to bar a second claim where the defendant had,

24

Here, defendants' fraud prevented the debentureholders from asserting a critical "item, part or phase" of their position, and as a result they could never present "all of their case" to the court. Under these circumstances, *res judicata* cannot apply.

### 2. The Claims for Relief Asserted in the Present Complaint Are Not the Same As Those Raised as Objections in the Bankruptcy Proceedings

In deciding that this case presented the same "claim for relief" that had been adjudicated in the Plan confirmation proceedings, the bankruptcy court stated that

> The factual underpinnings of this complaint, involving the alleged undervaluation of the enterprise value of the debtors by the debtors' officer, Hager, and the senior lenders to eliminate junior creditors and receive most of the ownership of the reorganized companies, and the alleged participation by the Senior Lenders in presenting misleading and false financial information to the court in the course of confirmation hearings, are so close to the claim actually litigated at confirmation that it would be unreasonable not to have brought them both at the same time in the bankruptcy forum.

324 B.R. at 522-23. The court acknowledged that

> [T]he alleged misconduct on the part of the named Senior Lenders, including control of the debtors, fraudulent manipulation of adjustments to projected and actual EBIDTA numbers, and fraudulent misrepresentations through the Debtors' management to the creditor body, was not specifically asserted at confirmation by the objectors. . . . . However . . . I must conclude that the critical factual underpinnings at issue in the complaint, i.e., the correctness of the enterprise valuation of the debtors proposed by the proponents of the plan, are the same . . . .

*Id.* at 523.

To the contrary, the "factual underpinnings" of the objections and of this action are fundamentally different from each other. The objections assumed that the EBITDA data used by Genesis and the senior creditors as the basis for the valuation were prepared in good faith; the complaint in this action alleges exactly the opposite. *Res judicata* normally prevents a "'party from litigating a claim that it could have raised or did raise in a prior proceeding in which it raised another

---

through fraud, prevented the plaintiff from recovering the full amount owed.

claim based on the same cause of action.'" *Edwards v. Wyatt*, 266 B.R. 64, 71 (E.D. Pa. 2001) (citation omitted). But in this Circuit, at least, the *res judicata* doctrine is narrowly applied where the prior judgment was issued in a bankruptcy proceeding. In such cases, the scope of *res judicata* has essentially been limited to theories of liability actually raised in the bankruptcy proceedings; it does not extend to theories that could have, or even should have, been asserted but were not. *Eastern Minerals & Chems. Co. v. Mahan*, 225 F.3d 330, 337 (3d Cir. 2000); *see also Edwards*, 266 B.R. at 72; *In re Mariner Post-Acute Network Inc.*, 267 B.R. 46, 53 (Bankr. D. Del. 2001).

*Eastern Minerals,* the controlling case on this subject in this Circuit, illustrates how these special principles work. There the creditor-plaintiff had filed a proof of claim in the debtor's bankruptcy in the amount of $2.2 million, had objected to the sale of certain assets of the debtor, and had threatened to file other claims involving transactions between the debtor and various affiliated entities. The creditor ultimately settled all these objections and reduced its claim from $2.2 million to $900,000, and the court entered judgment in that amount. A plan was then approved that resulted in a distribution from the debtor to the creditor of $380,000 on its $900,000 judgment.

The creditor then sued the debtor's sole shareholder in state court to recover the remainder of the money, claiming that the defendant had used the debtor as his "'mere instrumentality' and 'alter ego' for his individual benefit." 225 F. 3d at 338.   Unlike the present case, in *Eastern Minerals* the creditor had been aware of all these facts during the bankruptcy proceedings, and had *chosen not to* bring the claim there. The defendant moved to dismiss the action on grounds of *res judicata*, arguing that this was a claim the creditor could have brought in the bankruptcy court, and it involved the same series of transactions, and that he was a "privy" of the corporation that had been sued, and would thereby be entitled to protection of the rule.

The Third Circuit rejected the application of *res judicata*, holding that "[a]lthough some of the descriptions of certain events and particular relationships are common to both claims, the theory

26

of the case and relief sought in [plaintiff's] instant complaint are markedly different . . ." The *Eastern Minerals* court emphasized that "the similarity of certain events in and of itself does not trigger a bar of [plaintiff's] subsequent complaint;" that "the mere existence of overlapping facts and events . . . is not sufficient to foreclose [the subsequent] claim"; and that "[c]laim preclusion only bars claims arising from the same cause of action previously raised, not every conceivable claim that could have been brought in the context of a bankruptcy case over which the court would have had jurisdiction." *Id.* at 337 (footnote omitted).[14]

In *Edwards*, an individual debtor, owned a large block of stock in Pilot Corp., which was to be sold off as part of the liquidation proceedings. He also had outstanding disputes with Pilot and two of its large shareholders, Wyatt and Phillips. In the course of the bankruptcy proceedings Edwards settled these disputes in exchange for Wyatt's oral agreement to help Edwards obtain the maximum value for the sale of his stock and not to enter into any agreement with Phillips concerning that stock without his involvement. On the very day of the scheduled sale of his stock, Edwards discovered that Wyatt and Phillips, who up to that point had been submitting competing bids for Edwards' stock, had put in a joint bid to purchase the shares, thereby eliminating competition between them. Edwards objected to the bid "as an illegal collusive effort to control the sales price for his assets." 266 B.R. at 68.

The bankruptcy court rejected this objection and allowed the trustee to accept the bid. Later, Edwards sued Wyatt for breach of the oral contract and fraud. Even though the same oral contract had been the centerpiece of Edwards' objection to the collusive bid in the bankruptcy proceeding, the district court denied defendant's motion to dismiss on *res judicata* grounds:

In the Bankruptcy Court, Edwards objected to an illegal collusive effort to control

---

[14] This line of reasoning extends to other Circuits as well. *See In re S.N.A. Nut Co.*, 215 B.R. 1004, 1010 (Bankr. N.D. Ill. 1997) ("A general rule that confirmation acts as an adjudication of any claim that could have been raised in the bankruptcy proceeding is without merit").

27

> the sale of his assets and sought to halt the sale of those assets. In this Court, Edwards is simply claiming he has been injured by Wyatt's breach of independent financial promises and he seeks recovery for those injuries. Of course, the Court does not deny that there are facts in each set of claims which do relate. Nevertheless, the mere existence of overlapping facts and events is not sufficient to preclude Edwards' current claims.

266 B.R. at 72 (citing *Eastern Minerals*, 225 F.3d at 337).[15]

In attempting to distinguish the Genesis case from *Eastern Minerals* and *Edwards*, the bankruptcy court gave too much emphasis to the "overlapping facts and events" in this case and the Plan reorganization proceedings, and failed to give enough emphasis to the fact that the "theory of the case and the relief sought" are entirely different, because the facts underlying the present action were not disclosed until after Plan confirmation.

Moreover, *res judicata* is inapplicable because the fraud claims could not have been raised in the bankruptcy proceedings. "Claims that could have been brought" and are therefore subject to *res judicata* " "'are claims in existence at the time the original complaint is filed or claims actually asserted by supplemental pleadings or otherwise in the earlier action'". *Piper Aircraft*, 244 F. 3d at 1299 (citation omitted). "[C]laims for fraud are deemed to arise when the fraud is discovered by the injured party, and not when it takes place." *In re Emmer Bros. Co.,* 52 B.R. 385, 394 (D. Minn. 1985) (citations omitted).

---

[15] *See also, e.g.*, *Piper Aircraft*, 244 F. 3d 1289 (refusing to apply *res judicata* to subsequent case arising out of circumstances leading to plan confirmation, because the bankruptcy court had not expressly ruled on this specific claim at issue); *A.B.H. Investments*, 2003 Cal. App. Unpub. LEXIS 11126, at *33, 2003 WL 22796049 at *12 (disclosure during bankruptcy proceedings about certain funding "does not show that the bankruptcy court adjudicated defendants' alleged misrepresentations and concealment regarding the source of this funding"); *Household Int'l*, 286 F. Supp. 2d at 375 (although both actions relate to the extent of coverage provided by [insurer's] policies, the earlier action "dependent upon contract interpretation and whether or not the claims were wrongfully denied," while subsequent lawsuit "focus[ed] on [insurer's] alleged misrepresentations or omissions to [insured] and its understanding of [the insured's] needs for the policy"); *Mariner Post-Acute Network*, 267 B.R. at 53-54 (financing orders holding that debtors should turn over to secured lenders any funds due to debtors did not preclude subsequent proceeding concerning whether any funds were due to debtors in the first place).

28

### D. **COLLATERAL ESTOPPEL IS INAPPLICABLE HERE AS WELL**

The prerequisites for collateral estoppel or issue preclusion are:

(1) the issue sought to be precluded [is] the same as that involved in the prior action; (2) that issue [was] actually litigated; (3) it [was] determined by a final and valid judgment; and (4) the determination [was] essential to the prior judgment ...

*In re Graham*, 973 F.2d 1089, 1097 (3d Cir. 1992) (citations omitted; alterations and omission in the original). "[T]he issue [sought to be precluded], must have been one which was actually litigated and one which was essential to the decision, not one of 'those that merely lurk in the record before the court.'" *Rushton v. Shea*, 419 F. Supp. 1349, 1363 (D. Del. 1976) (citation omitted).

In addition, the party against whom the doctrine is asserted must have had a full and fair opportunity to litigate the issue in the first proceeding. *Kremer*, 456 U.S. at 481 n.22; *Lovell v. Mixon,* 719 F. 2d 1373, 1377 (8th Cir. 1983). "The doctrine of issue preclusion is premised on principles of fairness." *In re Freeman*, 30 F.3d 1459, 1467 (Fed. Cir. 1994) (citation omitted). Therefore, as in *res judicata*, fraud in the original proceeding renders collateral estoppel inoperative. *In re Bulic,* 997 F.2d 299, 305 n.7 (7th Cir 1993); *In re Laing,* 945 F.2d 354, 357 (10th Cir. 1991). *See also Pepper v. Litton*, 308 U.S. 295, 305-06 (1939) (bankruptcy court may disallow or subordinate a judgment procured by fraud); *In re Kovalchick*, 175 B.R. 863, 872 (E.D. Pa. 1994) ("[n]otwithstanding the doctrines of *res judicata* and collateral estoppel, this court may not be bound by judgments secured by fraud . . . ") (citation omitted). If there is reason to doubt the quality, extensiveness, or fairness of procedure in the prior litigation, collateral estoppel is inapplicable. *Montana v. United States*, 440 U.S. 147, 164 n.11(1979).

For all the reasons discussed above in connection with *res judicata*, the debentureholders never had a full and fair opportunity to litigate the issue of whether the EBITDA dated submitted to the court had been manipulated, and never had a "full and fair opportunity" to do so, because evidence relating to that issue was covered up and misrepresented..

29

Moreover, the issue of whether the EBITDA data was fraudulent was not actually litigated, or actually decided, in the Plan confirmation proceedings. In confirming the Plan, the bankruptcy court made no finding as to whether defendants artificially depressed the value of Genesis by intentionally or with gross negligence submitting false EBITDA data. Although the enterprise value of Genesis at the time of Plan confirmation was litigated and decided (324 B.R. at 527), that is not the way "issue" is defined for collateral estoppel purposes.

To establish issue identity, the factual predicate of both "issues" must be essentially the same and must both have been "actually litigated" in the prior proceeding. For example, in *Hudgins v. Davison*, 127 B.R. 6 (E.D. Va. 1991), the bankruptcy court found for the debtor after trial of a creditor's charge that the debtor had misrepresented its assets. A year later, the trustee filed suit to revoke the discharge of the debtor, alleging fraud on the basis of facts different from those raised at trial. The district court found that collateral estoppel did not apply "because the issues presented in the trustee's complaint, while generally based upon fraud, involve different factual allegations and were not 'actually litigated' in the prior suit brought by the creditor." *Id.* at 8.

Similarly, in *In re Huang,* 275 F.3d 1173 (9th Cir. 2002), Huang had settled an action by her bank charging her with fraud, RICO, and other misconduct. In that settlement agreement she admitted that these loans would not be dischargeable in bankruptcy, and the court entered a judgment enforcing the settlement agreement. Fourteen months later Huang filed for bankruptcy, alleging that the loans were, in fact, dischargeable in bankruptcy because the bank had defrauded her into signing the settlement agreement. The Ninth Circuit held that collateral estoppel was not justified on the fraud issue because "[f]raud, or facts showing fraud, are not mentioned in the Settlement Agreement or in the judgment enforcing it." *Id.* at 1178.

By the same token, the court's Plan confirmation opinion makes no mention of any claims

of fraud, and therefore cannot be said to have resolved them.[16]

### E. **THE PLAN DID NOT RELEASE GENESIS FROM THESE CLAIMS**

#### 1. **The Plan Does Not Discharge or Release Any Claim Based on Fraud or Willful Misconduct in the Course of the Confirmation Proceedings**

The bankruptcy court held that the claims against Genesis were expressly released in the

Plan, and that the release thereafter acted as an additional reason to dismiss the present action. The

court, we submit, got it exactly backwards: the Plan expressly states that such claims are *not* released

by the Plan. In holding that the release applies here, the bankruptcy court relied on paragraphs 10.2

and 10.3 of the Plan, which, as noted above, provide in pertinent part that

> Except as otherwise provided herein . . . the rights afforded in the Plan . . .
> shall discharge all existing debts and Claims, . . . . [A]gainst the Debtors . . . based
> upon any act or omission, transaction, or other activity of any kind or nature that
> occurred prior to the Effective Date [of the Plan], . . .
>
> . . . .
>
> . . . [E]ach holder . . . of a Claim or Equity Interest . . . shall be deemed to
> have forever waived, released, and discharged the Debtors, to the fullest extent
> permitted by section 1141 of the Bankruptcy Code, of and from any and Claims,
> Equity Interests, rights and liabilities that arose prior to the Effective Date. . . .

324 B.R at 518 n.3. (*See also* A30-A31).

The court then held that:

> The plaintiffs' contention, without specific citation, that the "Confirmed Plan
> expressly does not release any claim against the debtors for willful misconduct or
> gross negligence in post-petition matters" is not substantiated.

*Id.* (footnote omitted).

In fact, the "unsubstantiated" contention was based on § 10.6 of the Plan, which deals

---

[16]  *See also Graham*, 973 F.2d at 1098 (collateral estoppel not applied "even though the
penalty imposed by the Tax Court was based on the fraud penalty . . . authorize[d] in cases where
fraud is established, [because] the issue of fraud was never litigated or admitted, nor was a specific
factual finding concerning it made"); *cf. Lundborg v. Phoenix Leasing*, 91 F.3d 265, 271-72 (1st Cir.
1996) (where defendant opposed plaintiff's motion to set aside confirmation of plan on the basis of
fraud, the bankruptcy court ruled that the motion had no basis, because there was no showing that
the fraud issue was actually adjudicated); *Janess v. Messick*, 202 B.R. 196, 198 (Bankr. D. Del,
1996) (same).

directly with claims based on misconduct during the bankruptcy proceedings and plan confirmation proceedings.[17] That provision "exculpated" Genesis and its "members, officers, directors, employees, agents, or professionals" from

> [A]ny liability to any holder of any Claim or Equity Interest for any act or omission in connection with, or arising out of, the Reorganization Cases, the confirmation of the Plan of Reorganization, the consummation of the Plan of Reorganization, or the administration of the Plan of Reorganization or property to be distributed under the Plan of Reorganization, *except for willful misconduct or gross negligence*

(Emphasis added. *See also* A31).

The debentureholders' complaint expressly charges Genesis with "willful misconduct or gross negligence" "in connection with, or arising out of, the confirmation of the Plan of Reorganization." These are precisely the types of claims that § 10.6 of the Plan expressly states are *not* being barred or released. While §§ 10.2 and 10.3 of the Plan do provide in general for the release of pre-confirmation claims against the debtor, those sections do not deal specifically with possible claims arising out of the bankruptcy proceedings themselves. That is the role of § 10.6.

"Courts apply the rules of contract interpretation to the interpretation of a reorganization plan." *National Gypsum Co. v. Prostok*, Civ. A. No. 3:98-CV-0859, 2000 U.S. Dist. LEXIS 16174, at *48, 2000 WL 1499345 at *16 (N.D. Tex. 2000) (citation omitted), *aff'd*, 44 Fed. Appx. 654 (5th Cir. 2002). Under principles of contract law, a more specific provision, such as § 10.6, trumps more general provisions, such as §§ 10.2 and 10.3. *Southland Corp. v. Ashland Oil, Inc.*, Civ. No. 88-0700, 1988 U.S. Dist. LEXIS 13108, 1988 WL 125855 (D.N.J. Nov. 23, 1988). *See also J.E. Faltin Motor Transp., Inc. v. Eazor Express, Inc.*, 172 F.Supp. 175, 178 (W.D. Pa. 1959), *quoting* CORBIN ON CONTRACTS, § 547, *aff'd*, 273 F.3d 444 (3d Cir. 1959):

---

[17] In making this determination that the contention was "unsubstantiated" the court cited page 53 of plaintiffs' memorandum in opposition to the motion to dismiss. That page did not cite the relevant provision, because it had been described in great detail in the fact section of that brief, which quoted § 10.6 specifically. At other points in the decision the bankruptcy court referred directly to § 10.6 (324 B.R. at 525).

"If the apparent inconsistency is between a clause that is general and broadly inclusive in character and one that is more limited and specific in its coverage, the latter should generally be held to operate as a modification and pro tanto nullification of the former."

(Citations omitted).

As we have seen, § 10.6 expressly refuses to bar claims based on willful or grossly negligent conduct in the Plan confirmation process. That provision directly applies here, and therefore trumps the more general exculpation provisions of §§ 10.2 and 10.3.

### 2. Because Section 10.6 of the Plan Expressly Preserves These Claims It Also Necessarily Limits the Res Judicata Effect of the Plan Confirmation

Because §10.6 refuses to release claims of willful misconduct or gross negligence in the course of the bankruptcy proceedings, it expresses the parties', and the court's, determination that anyone injured by such conduct should retain a full right to redress. That right would be meaningless if, in such an action, the guilty parties could hide behind, and invoke the benefits of, the "preclusive effect" of the Plan confirmation order they obtained through their own wrongful conduct. That is why § 10.6 operates as a reservation of rights provision, and thereby limits the preclusive effect of those proceedings on subsequent claims that fit within the exclusion. In this respect, § 10.6 parallels, and confirms, the fraud exception to *res judicata* and collateral estoppel, extending it to instances of "gross negligence" in procuring confirmation of the Plan.

The bankruptcy court held that §10.6 of the Plan "does not preserve any right to bring claims that would be otherwise barred by the Plan and the confirmation order" (324 B.R. at 525). But it would be an exercise in futility to include § 10.6, which refuses to release such claims, while enshrining as conclusive the very findings that were the product of that misconduct. A contract provision will not be construed in such a way as to render it a nullity. *CitiSteel USA, Inc. v. General Electric Co.,* 78 Fed. Appx. 832, 837 (3d Cir. 2003)(provisions not to be construed as "meaningless"); *GNB Battery Technologies v. Gould, Inc.* 65 F. 3d 615, 622 (7th Cir. 1995)(courts

33

should avoid interpretation that "gives no effect to some terms" of an agreement).

The bankruptcy court held that the exculpation provisions are superseded by the *res judicata* effect of the Plan confirmation. In fact, however, the rule is precisely the opposite: exculpation provisions override *res judicata*. "[U]nder a generally accepted exception to the *res judicata* doctrine, a litigant's claims are not precluded if the court in an earlier action expressly reserves the litigant's right to bring those claims in a later action.'" *D&K Props. Crystal Lake v. Mutual Life Ins. Co.*, 112 F.3d 257, 260 (7th Cir. 1997), quoting *Apparel Art Int'l, Inc. v. Amertex Enters.*, 48 F.3d 576, 586 (1st Cir. 1995).[18] Accordingly, "most courts hold that where a disclosure statement and/or plan of reorganization expressly reserves an action for later adjudication, *res judicata* does not apply." *In re USN Communs., Inc.*, 280 B.R. 573, 588 (Bankr. D. Del. 2002) (citations omitted). *See also In re Kelley*, 199 B.R. 698, 704 (B.A.P. 9th Cir. 1996) ("If a confirmed plan expressly reserves the right to litigate a specific cause of action after confirmation, then res judicata does not apply"(citations omitted)).

In this case the bankruptcy court held that because §10.6 was not written in the specific language of a preservation of rights, it could not be construed as such (324 B.R. at 525). However, courts in this District have found that *res judicata* has no application even if a plan uses general and broad language to preserve claims. *USN Communs.*, 280 B.R. at 589 (rejecting defendant's argument that "a reservation must specifically disclose the proposed subsequent action against the particular

---

[18] *See also Buckley v, Goldman, Sachs & Co.*, Civ. A. No. 02-cv-11497 2005 U.S. Dist. LEXIS 9626, 2005 WL 1206865 (D. Mass. May 20, 2005); *Washington Pub. Power Supply Sys. v. Pittsburgh-Des Moines Corp.*, 876 F.2d 690, 699 (9th Cir. 1989) ("[w]hen a court reserves a question for further adjudication a judgment does not bar subsequent determination of that question" (citations omitted)); *Merrifield v. Beaven/Inter-American Cos.*, No. 89 C 8436, 1992 U.S. Dist. LEXIS 11964, at *7-*9, 1992 WL 193553 at *3 (N.D. Ill. Aug. 3, 1992); *A.J. Masi Electric Co. v. Marron & Sipe Bldg. & Contracting Corp.*, 574 A.2d 1323, 1324 (Conn. App. Ct. 1990); *RESTATEMENT (SECOND) OF JUDGMENTS* § 26(1)(b) (1982) ("the general rule" against splitting of a cause of action "does not apply to extinguish the claim," when the "court in the first action has expressly reserved the plaintiff's right to maintain the second action").

defendant"). *Accord In re Ampace Corp.*, 279 B.R. 145, 159 (Bankr. D. Del. 2002) (general language preserving certain claims was sufficient); *see also In re I. Appel Corp.*, 300 B.R. 564, 568-69 (S.D.N.Y. 2003).

In fact, several recent cases thoroughly considered the issue of how specific a preservation clause must be in order to permit post confirmation prosecution, and have found that "specific identification of defendants or causes of action is not necessary." *In re Value Music Concepts, Inc.*, 329 B.R. 111, 119, 120 n. 15 (Bankr. N.D. Ga. 2005)(noting that "this Court's observation is that the cases requiring specific identification of causes of action and defendants are not a new trend but a departure from the fundamentally sound approach exemplified by the cases [cited herein]").[19]

## F. SECTION 1144'S LIMITATION PERIOD FOR REVOKING A PLAN DOES NOT APPLY TO THIS ACTION FOR MONEY DAMAGES

The court also held that this action is untimely, as against Genesis, because it was not commenced within 180 days of the entry of the Confirmation Order (324 B.R. at 516-17). This limitation period, contained in § 1144 of the Bankruptcy Code, applies to actions for revocation or modification of a confirmation order.

The present action does not seek an order revoking or modifying the Plan; and in its dismissal opinion the bankruptcy court recognized that courts have regularly allowed parties injured in a bankruptcy proceeding to assert common law fraud claims for damages arising out of those proceedings against debtors, and others, after expiration of the 180-day period. (*Id.*). As stated in Lawrence P. King, ed., 8 *Collier on Bankruptcy* ¶ 1144.04 [2][a] (Matthew Bender 15th ed rev.

---

[19] *Accord, In re Bridgeport Holdings, Inc.*, No. 03-12825 (PJW), 2005 Bankr. LEXIS 1552 (Bankr. D. Del. Aug. 12, 2005) (annexed hereto); *In re Railworks Corp.*, 325 B.R. 709, 716-18 (Bankr. D. Md. 2005); *In re Western Integrated Networks, LLC*, 322 B.R. 156 (Bankr. D. Colo. 2005); *In re Pen Holdings Inc.*, 316 B.R. 495, 504-05 (Bankr. M.D. Tenn. 2004); *In re Kmart Corp.*, 310 B.R. 107, 119-26 (Bankr. N.D. Ill. 2004); *In re Ariz. Fast Foods, LLC*, 299 B.R. 589 (Bankr. D. Ariz. 2003); *In re Bankvest Capital Corp.*, 375 F.3d 51, 59-60 (1st Cir. 2004); *In re Associated Vintage Group, Inc.*, 283 B.R. 549, 563-65 (B.A.P. 9th Cir. 2002).

1997):

> Even though the 180 day deadline is absolute, a court is not without power
> to remedy an injustice created by fraud in a bankruptcy case. While the court is
> without power after expiration of the deadline to *revoke* the confirmation order,
> there may be other avenues to provide relief to parties affected by fraud during the
> chapter 11 case. The nature of the relief will vary from case to case depending on
> the nature of the fraudulent conduct and the position of the parties to the chapter 11
> case. The most likely form the relief will take is to allow a party injured by fraud
> to maintain an action for damages caused by the fraud.

(Footnote omitted). *See also Emmer Bros.*, 52 B.R. at 391 (creditor allowed to prosecute a fraud

damage action *against the debtor* a year after plan confirmation; 180-day period held inapplicable

because it was not "an attempt to revoke or otherwise collaterally attack the confirmation order");

*Circle K*, 181 B.R. at 462 (court denied motion for summary judgment under §1144 and allowed

creditors to pursue claims *against debtor* alleging fraud in the course of the bankruptcy proceeding,

reasoning that "[i]f plaintiffs prevail, the Court can fashion a remedy that does not upset the

confirmed plan, *i.e.*, monetary damages"); *In re Coffee Cupboard, Inc.*, 119 B.R. 14, 19-20

(E.D.N.Y. 1990) (holding that "the 180 day deadline in Section 1144 does not act as a bar to truly

independent causes of action based on a *debtor's* wrongful conduct") (emphasis added, citation

omitted).[20]

The bankruptcy court deemed all these precedents inapplicable because here, it believed,

allowing the damage claims to proceed against Genesis might reduce the value of the Genesis stock,

warrants and debt securities distributed to the senior creditors under the Plan (324 B.R. at 516-17).

---

[20] *See also A.B.H. Investments*, 2003 Cal. App. Unpub. LEXIS 11126, at *7, *32, 2003 WL
22796049 at *3, *11 (holding that the 180-day limitation period "does not bar participants injured
by fraud from seeking damages or other relief under common law theories in state or federal
courts"(citation omitted), and affirming the denial of summary judgment on the fraud count, finding
that "plaintiffs' claims for monetary damages would not upset the Plan" or "re-divide the pie");
*Donaldson v. Bernstein*, 104 F.3d 547, 553 (3d Cir. 1997) ("'misconduct during the bankruptcy
proceeding' by the debtor often compels the court to allow the fraud to be redressed") (quoting
*Emmer Bros.*, 52 B.R. at 394-95); *In re Newport Harbor Assocs.*, 589 F.2d 20, 24 (1st Cir. 1978);
*Williams v. Texaco*, 165 B.R. 662, 672 n.3 (D.N.M. 1994).

36

This, the court held, would be an "indirect" revocation of the Plan even though plaintiffs are not making any claim to the securities or any other property distributed pursuant to the Plan.[21] In holding that any claim against the debtor amounts to a *de facto* revocation of the reorganization plan, the court overlooked the fact that most of the cases holding §1144 inapplicable were cases just like this, brought against the debtor. If the court below was right, all these cases were wrong. In fact, to the best of our knowledge, no other court has ever ruled that all damage claims against the debtor automatically fall within §1144 merely because they might reduce the value of the debtor's newly issued securities. The case that came closest to such a ruling, *Hotel Corp. of the South v. Rampart 920*, 46 B.R. 758, 770-71 (E.D. La. 1985), *aff'd*, 781 F. 2d 901 (5th Cir. 1986) (*cited in* 324 B.R. at 516), held that such a claim against the debtor was an attempt to "do indirectly what they no longer may do directly". But that conclusory ruling offered no rationale, cited no supporting authority, and came after the court had ruled that the claims were barred by *res judicata* anyway. Not surprisingly, then, no court has subsequently followed this decision.

In contrast, the bankruptcy court acknowledged that in *Coffee Cupboard, Emmer Bros.* and *Circle K,* the courts had all allowed claims against the debtor concerning bankruptcy fraud to go forward despite the lapse of 180 days, determining that those claims were not an effort to redivide the pie (324 B.R. at 516).[22] The court never attempted to distinguish those cases from the present case.

In support of its ruling on this point the bankruptcy court cited only two cases, *Newport Harbor Assocs.,* 589 F.2d at 24.n6, and *In re Orange Tree Assocs., Ltd.,* 961 F.2d 1445, 1447-48 (9th Cir. 1992)(324 B.R. at 517). Neither case is apposite here. In *Newport Harbor* the plaintiff had

---

[21] Indeed, at least one of these defendants, Mellon Bank, no longer holds any such securities.

[22] The court also cited *In re Midstate Mortg. Investors, Inc.,* 105 Fed. Appx. 420, 423 (3d Cir. 2004), which also concerned a direct attack on a reorganization plan, because it attempted to revoke releases granted in the plan.

"moved the bankruptcy court to revoke the confirmation of the 1973 plan and reopen the Chapter XI proceedings" (*id.* at 21); and, similarly, in *Orange Tree* the plaintiff was "seeking to overturn the order confirming the Orange Tree reorganization plan on the ground of fraud in its procurement"(*id.* at 1446, footnote omitted). Such efforts are squarely within the 180-day proscription of §1144. The cases obviously do not stand for the proposition that the 180-day limitation can also apply to independent causes of action that seek no such relief, simply because they would diminish the value of the securities distributed pursuant to the plan.

The novel theory espoused by the court below would turn almost any damage action against a debtor into an effort to "revoke" the debtor's reorganization plan. Such a rule would effectively eliminate the safety valve the law presently provides for claims like ours that are filed more than 180 days after plan confirmation.

Tellingly, the bankruptcy court deliberately did not apply its reasoning under §1144 to the claims against the senior creditor defendants, apparently concluding that, as to them, the claims asserted here did not amount to a *de facto* revocation of the Plan. The court never, however, explained how the claims against these defendants would not also be considered as a revocation of the Plan as to them; and these defendants, it will be recalled, received a very large percentage of the securities distributed pursuant to that Plan, and would be the parties most directly affected if the value of the securities they received pursuant to the Plan were diminished. The court provided no explanation because none is possible.

Finally, the bankruptcy court's reasoning assumes its own conclusion, which is that "innocent" investors were entitled to expect that Genesis was going to be immune, after 180 days, to any claim arising from the bankruptcy proceeding that might adversely affect the value of its securities. In other words, these claims must be barred because investors will have assumed that they would be barred. Such reasoning turns logic on its head: investor expectations concerning their legal

38

rights must be based on the courts' decisions, not the other way around. Given the existence of *Circle K* and other cases holding that damage actions *are* available under these circumstances, there was no basis for any assumption that a damage claim against Genesis would necessarily be barred after 180 days. It is therefore not a "revocation" of the plan for the court to entertain claims which, under existing law, could properly be asserted even after the 180 day time limit imposed by §1144.

## CONCLUSION

For the foregoing reasons, the bankruptcy court's order dismissing the complaint should be reversed.

Dated: November 21, 2005

Respectfully submitted,

By: _____
R. Bruce McNew (# 967)
TAYLOR & McNEW LLP
3711 Kennett Pike, Suite 210
Greenville, DE 19807
Telephone: (302) 655-9200

*Attorneys for Plaintiffs*

CO-COUNSEL:

Stanley M. Grossman
H. Adam Prussin
POMERANTZ HAUDEK BLOCK
 GROSSMAN & GROSS LLP
100 Park Avenue, 26th Floor
New York, N.Y. 10017-5516
Telephone: (212) 661-1100

Leigh Handelman Smollar
POMERANTZ HAUDEK BLOCK
 GROSSMAN & GROSS LLP
One North LaSalle Street, Suite 2225
Chicago, IL 60602-3908
Telephone: (312) 377-1181

39