**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| IN RE:<br><br>GENESIS HEALTH VENTURES, INC., et al.,<br><br>      Debtors. | C.A. No. 05-CV-427 (KAJ)<br>Related to Case No. 00-2692 (JHW)<br>Jointly Administered |
| RICHARD HASKELL, et al.,<br><br>     Plaintiffs-Appellants,<br><br>  v.<br><br>GOLDMAN, SACHS & CO., et al.,<br><br>     Defendants-Appellees. | Adv. Pro. No.: 04-53375 (JHW) |

**PLAINTIFFS-APPELLANTS' OPENING MEMORANDUM**

R. Bruce McNew (# 967)
TAYLOR & McNEW LLP
3711 Kennett Pike, Suite 210
Greenville, DE 19807
Telephone: (302) 655-9200
*Attorneys for Plaintiffs*

*Co-Counsel*:
Stanley M. Grossman
H. Adam Prussin
Leigh Handelman Smollar
POMERANTZ HAUDEK BLOCK
 GROSSMAN & GROSS LLP
100 Park Avenue, 26th Floor
New York, New York 10017
Telephone: (212) 661-1100

Date of Filing: November 21, 2005

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................... iii

I. NATURE AND STAGE OF THE PROCEEDINGS ............................... 1

II. SUMMARY OF ARGUMENT ............................................... 5

III. STATEMENT OF FACTS ................................................. 6

    A. The Parties ......................................................... 6

    B. The Plan Confirmation Proceedings ................................... 7

        1. Defendants Submit Valuations of Genesis Based on "Budgeted"
           And "LTM" EBITDA ......................................... 7

        2. The Debentureholders' Objections to the Plan ......................... 9

        3. Discovery .................................................... 9

        4. The Confirmation Hearing and Approval of the Plan .................. 10

           a. The Court's Valuation of Genesis ........................... 10

           b. The Releases in the Plan ................................... 11

    C. The Post-Confirmation Discovery Of Defendants' Fraud .................... 12

        1. Improper Exclusion from EBITDA of All Sales to Mariner ............ 12

        2. Improper Exclusion of 10% of Pharmacy Sales to Manorcare .......... 14

        3. Improper Expensing of Excessive Insurance Reserves ................. 15

        4. Excessive Deduction for Loss of AGE Institute Business .............. 17

        5. Improper Deduction of Non-Recurring Employee and
           Management Retention Bonuses ............................ 17

        6. Improper Deduction of Non-Recurring Costs for the "First Choice Plan" . 18

        7. Improper Inflation of Pharmacy Cost of Goods Sold .................. 18

    D. The Misrepresentations Come to Light ................................. 19

III. ARGUMENT .......................................................... 20

    A. JURISDICTION AND STANDARD OF REVIEW ......................... 20

    B. THE STRICT STANDARDS APPLICABLE TO A MOTION TO DISMISS ..... 21

    C. RES JUDICATA DOES NOT BAR PLAINTIFFS' ACTION ................. 21

        1. Res Judicata Is Inapplicable Where the Prior Judgment Was
           Procured by Fraud ........................................... 21

        2. The Claims for Relief Asserted in the Present Complaint Are Not
           the Same As Those Raised as Objections
           in the Bankruptcy Proceedings ............................... 25

    D. COLLATERAL ESTOPPEL IS INAPPLICABLE HERE AS WELL ........... 29

    E. THE PLAN DID NOT RELEASE GENESIS FROM THESE CLAIMS ......... 31

        1. The Plan Does Not Discharge or Release Any Claim Based on
           Fraud or Willful Misconduct in the Course of the Confirmation
           Proceedings ................................................. 31

        2. Because Section 10.6 of the Plan Expressly Preserves These Claims
           It Also Necessarily Limits the Res Judicata Effect of the Plan Confirmation
           ........................................................ 33

    F. SECTION 1144'S LIMITATION PERIOD FOR REVOKING A PLAN
        DOES NOT APPLY TO THIS ACTION FOR MONEY DAMAGES ....... 35

CONCLUSION ............................................................ 39

L.R. 7.1.3(a)(G) Opinions Annexed

*In re Bridgeport Holdings, Inc.,* No. 03-12825(PJW)
    2005 Bankr. LEXIS 1552 (Bankr. D. Del. Aug. 12, 2005) ................. Annex 1

*Tanaka Bros. Farms, inc. v. Home State Bank,*
    (Civ. A. No. 86-2108-S, 1986 U.S. Dist. LEXIS 17745
    (D. Kan. Nov. 13, 1986) ........................................... Annex 2

## TABLE OF AUTHORITIES

**CASES**                                                                          Page

*A.B.H. Investments, Inc. v. Narven Enters., Inc.*, No. D040361,
    2003 Cal. App. Unpub. LEXIS 11126, 2003 WL 22796049
    (Cal. App. 4th Dist. filed Nov. 25, 2003) (Not Reported
    in Cal. Rptr. 3d) *review denied*, (Mar. 24, 2004) . . . . . . . . . .  23 n.12, 28 n.15, 36 n.20

*A.J. Masi Electric Co. v. Marron & Sipe Bldg. & Contracting Corp.*,
    574 A.2d 1323 (Conn. App. Ct. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  34 n.18

*In re AmeriServe Food Distrib. Inc.*, 267 B.R. 668 (D. Del. 2001) . . . . . . . . . . . . . . . .  23 n.12

*In re Ampace Corp.*, 279 B.R. 145 (Bankr. D. Del. 2002) . . . . . . . . . . . . . . . . . . . . . . . . .  35

*In re Ariz. Fast Foods, LLC*, 299 B.R. 589 (Bankr. D. Ariz. 2003) . . . . . . . . . . . . . . . .  35 n.19

*In re Associated Vingage Group, Inc.*, 283 B.R. 549
    (B.A.P. 9th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  35 n.19

*In re BCP Mgmt.*, 320 B.R. 265 (D. Del. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  21

*In re Bankvest Capital Corp.*, 375 F.3d 51 (1st Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . 35 n.19

*In re Bridgeport Holdings, Inc.*, No. 03-12825(PJW),
    2005 Bankr. LEXIS 1552 (Bankr. D. Del. Aug. 12, 2005), . . . . . . . . . . . . . . . . .  35 n.19
    (Op. annexed hereto).

*Browning v. Levy*, 283 F.3d 761 (6th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  21

*Browning v. Navarro*, 826 F.2d 335 (5th Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . .  21, 22

*Buckley v. Goldman, Sachs & Co.*, Civ. A. No. 02-CV-11497,
    2005 U.S. Dist. LEXIS 9626, 2005 WL 1206865
    (D. Mass. May 20, 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  34 n.18

*In re Bulic*, 997 F.2d 299 (7th Cir 1993). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  29

*Christian v. American Home Assurance Co.*, 577 P.2d 899 (Okla. 1977) . . . . . . . . . . . . . . .  24

*In re Circle K Corp.*, 181 B.R. 457 (Bankr. D. Ariz. 1995). . . . . . . . . . .  23 n.12, 36, 37, 38-39

*CitiSteel USA, Inc. v. General Electric Co.*,
    78 Fed. Appx. 832 (3d Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  33

*In re Coffee Cupboard, Inc.*, 119 B.R. 14 (E.D.N.Y. 1990) . . . . . . . . . . . . . . . . . . . . . . . .  36, 37

*D&K Props. Crystal Lake v. Mutual Life Ins. Co.*,
    112 F.3d 257 (7th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*Donaldson v. Bernstein*, 104 F.3d 547 (3d Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . 36 n.20

*Eastern Minerals & Chems. Co. v. Mahan*, 225 F.3d 330
    (3d Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26-27, 28

*Edwards v. Wyatt*, 266 B.R. 64 (E.D. Pa. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . 25-26, 27-28

*In re Emmer Bros. Co.*, 52 B.R. 385 (D. Minn. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . 28, 36, 37

*In re Freeman*, 30 F.3d 1459 (Fed. Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*GNB Battery Technologies v. Gould, Inc.*, 65 F.3d 615
    (7th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33-34

*In re Genesis Health Ventures, Inc.*, 266 B.R. 591
    (Bankr. D. Del. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11-12 n.9

*In re Graham*, 973 F.2d 1089 (3d Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29, 31 n.16

*Hotel Corp. of the South v. Rampart 920*, 46 B.R. 758
    (E.D. La. 1985), *aff'd*, 781 F.2d 901 (5th Cir. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . 37

*Houbigant, Inc. v. Dev. Specialists, Inc.*, 229 F. Supp. 2d 208
    (S.D.N.Y. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23 n.12

*Household Int'l, Inc. v. Westchester Fire Ins. Co.*,
    286 F. Supp. 2d 369 (D. Del. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21, 28 n.15

*In re Huang*, 275 F.3d 1173 (9th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*Hudgins v. Davison*, 127 B.R. 6 (E.D. Va. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*In re I. Appel Corp.*, 300 B.R. 564 (S.D.N.Y. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

*J.E. Faltin Motor Transp., Inc. v. Eazor Express, Inc.*,
    172 F. Supp. 175 (W.D. Pa. 1959), *aff'd*, 273 F.2d 444
    (3d Cir. 1959) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32-33

*Janess v. Messick*, 202 B.R. 196 (Bankr. D. Del, 1996) . . . . . . . . . . . . . . . . . . . . . . . . . 31 n.16

*In re Kelley*, 199 B.R. 698 (B.A.P. 9th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*In re Kmart Corp.*, 310 B.R. 107 (Bankr. N.D. Ill. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . 35 n.19

*In re Kovalchick*, 175 B.R. 863 (E.D. Pa. 1994) .................................... 29

*Kremer v. Chemical Constr. Corp.*, 456 U.S. 461 (1982) ......................... 22, 29

*Langford v. City of Atlantic City*, 235 F.3d 845 (3d Cir. 2000) ....................... 21

*In re Lernout & Hauspie Speech Prods. N.V.*, 308 B.R. 672
(D. Del. 2004) ...................................................... 20

*In re Laing*, 945 F.2d 354 (10th Cir. 1991) ...................................... 29

*Lovell v. Mixon*, 719 F.2d 1373 (8th Cir. 1983) ................................... 29

*Lundborg v. Phoenix Leasing*, 91 F.3d 265 (1st Cir. 1996) ....................... 31 n.16

*In re Mariner Post-Acute Network Inc.*, 267 B.R. 46
(Bankr. D. Del. 2001) ........................................... 26, 28 n.15

*Markowitz v. Northeast Land Co.*, 906 F.2d 100 (3d Cir. 1990) ....................... 21

*McCarty v. First of Georgia Ins. Co.*, 713 F.2d 609
(10th Cir. 1983) ................................................ 21, 23-24

*Merrifield v. Beaven/Inter-American Cos.*, No. 89 C 8436,
1992 U.S. Dist. LEXIS 11964, 1992 WL 193553
(N.D. Ill. Aug. 3, 1992) ............................................ 34 n.18

*In re Midstate Mortg. Investors, Inc.*, 105 Fed. Appx. 420
(3d Cir. 2004) .................................................... 37 n.22

*Montana v. United States*, 440 U.S. 147 (1979) .................................... 29

*National Gypsum Co. v. Prostok*, Civ. A. No. 3:98-CV0869,
2000 U.S. Dist. LEXIS 16174, 2000 WL 1499345
(N.D. Tex. 2000), *aff'd*, 44 Fed. Appx. 654
(5th Cir. 2002) .................................................... 32

*In re Newport Harbor Assocs.*, 589 F.2d 20 (1st Cir. 1978) ................ 36 n.20, 37-38

*In re Olick*, No. 99-CV-5128, 2000 U.S. Dist. LEXIS 4275,
2000 WL 354191 (E.D. Pa. Apr. 4, 2000) .................................. 20

*In re Orange Tree Assocs., Ltd.*, 961 F.2d 1445
(9th Cir. 1992) .................................................... 37-38

*In re PHP Healthcare Corp.*, No. 98-2608, 2002 Bankr. LEXIS 449,
2002 WL 923932 (Bankr. D. Del. May 7, 2002) ............................ 22

*In re Pen Holdings, Inc.*, 316 B.R. 495 (Bankr. M.D. Tenn. 2004) .................. 35 n.19

*Pepper v. Litton*, 308 U.S. 295 (1939) ........................................... 29

*In re Piper Aircraft Corp.*, 244 F.3d 1289 (11th Cir. 2001) ............... 20-21, 28 & n.15

*Powell v. American Bank & Trust Co.*, 640 F. Supp. 1568
    (N.D. Ind. 1986) ...................................................... 24

*In re RBGSC Inv. Corp.*, 253 B.R. 352 (E.D. Pa. 2000) ............................. 20

*In re Railworks Corp.*, 325 B.R. 709 (Bankr. D. Md. 2005) ...................... 35 n.19

*Rushton v. Shea*, 419 F. Supp. 1349 (D. Del. 1976) ................................ 29

*In re S.N.A. Nut Co.*, 215 B.R. 1004 (Bankr. N.D. Ill. 1997) ...................... 27 n.14

*Sabratek Liquidating, LLC v. Ross & Hardies*,
    Civ. A. No. 04-226, 2005 U.S. Dist. LEXIS 11257,
    2005 WL 1385203 (D. Del. Mar. 30, 2005) ................................ 20

*Southland Corp. v. Ashland Oil, Inc.*, Civ. No. 88-0700,
    1988 U.S. Dist. LEXIS 13108, 1988 WL 125855
    (D.N.J. Nov. 23, 1988) ................................................ 32

*Tanaka Bros. Farms, Inc. v. Home State Bank*,
    Civ. A. No. 86-2108-S, 1986 U.S. Dist. LEXIS 17745
    (D. Kan. Nov. 13, 1986)(Op. Annexed hereto) .......................... 23 n.12

*Timothy B. v. Neshaminy Sch. Dist.*, 153 F. Supp. 2d 621
    (E.D. Pa. 2001) ...................................................... 21

*In re USN Communs., Inc.*, 280 B.R. 573 (Bankr. D. Del. 2002) ..................... 34-35

*In re United Artists Theatre Co.*, 315 F.3d 217 (3d Cir. 2003) ...................... 20

*United States Rubber Co. v. Lucky Nine, Inc.*, 159 So. 2d 874
    (Fla. Dist. Ct. App. 1963) ........................................... 24 n.13

*In re Value Music Concepts, Inc.*, 329 B.R. 111
    (Bankr. N.D. Ga. 2005) ............................................... 35

*Washington Pub. Power Supply Sys. v. Pittsburgh-Des Moines
    Corp.*, 876 F.2d 690 (9th Cir. 1989) ................................. 34 n.18

*In re Western Integrated Networks, LLC*, 322 B.R. 156
    (Bankr. D. Colo. 2005) ............................................... 35 n.19

*Whetherhold v. RadioShack Corp.*, 339 F. Supp. 2d 670
(E.D. Pa. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Williams v. Texaco*, 165 B.R. 662 (D.N.M. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36 n.20

*In re YES! Entm't Corp. v. Kingsborough*, 316 B.R. 141
(D. Del. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

## STATUTES and RULES

Bankruptcy Code

11 U.S.C. § 1144 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4-5, 6, 35-39

Judiciary and Judicial Procedure

28 U.S.C. § 158(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

## MISCELLANEOUS

Lawrence P. King, ed., 8 COLLIER ON BANKRUPTCY ¶ 1144.04 [2][a]
(Matthew Bender 15th ed. rev. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35-36

James Wm. Moore et al., 18 MOORE'S FEDERAL PRACTICE
§ 131.21 (Matthew Bender 3d ed. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21-22

RESTATEMENT (SECOND) OF JUDGMENTS (1982)

§ 26, cmt. j . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24
§ 26(1)(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34 n.18

## I. NATURE AND STAGE OF THE PROCEEDINGS

This is an appeal from an order of the Delaware Bankruptcy Court dismissing this action on the pleadings.[1]

Plaintiffs are 275 former debentureholders of defendant Genesis Health Ventures, Inc. ("Genesis"), a multi-billion-dollar health care company. In 2000, sensing an opportunity to make a quick killing, a small group of financial institutions, led by defendant Goldman Sachs & Company ("Goldman"), bought up the lion's share of Genesis' senior debt at a huge discount and then forced Genesis into bankruptcy. In the bankruptcy court they pushed through a reorganization plan (the "Plan") that gave themselves and other senior creditors over 94% of the newly issued stock of the reorganized company while wiping out the claims of the junior creditors, including the plaintiffs, for 3.8 cents on the dollar. After the Plan was approved, the senior creditors held stock that was worth many times the value of their original investment.

To accomplish this, the defendant financial institutions worked closely with Genesis management to cook the books so that Genesis would look less valuable than it really was. They provided this manipulated financial information to their advisors, who used it to produce low-ball valuations of Genesis that were below the total amount of the senior creditor claims, and Defendants submitted those valuations to the bankruptcy court to support approval of the Plan. Unaware that the financial data had been corrupted, the objecting debentureholders had no chance of defeating the Plan, and the bankruptcy court approved it in September of 2001.

The manipulated financial data consisted of actual and projected "EBITDA" data for the Company for the period of about one year preceding approval of the Plan (the "valuation period"). "EBITDA" is considered a good measure of a company's earnings capacity because it excludes non-recurring and extraordinary items. The Complaint specifically alleges that defendants artificially depressed Genesis' EBITDA, in large part by improperly excluding, as nonrecurring, earnings that

---

[1] Adv. Pro. No. 04-53375-JHW, Amended Opinion entered May 3, 2005 (D.I. #36).

actually *were* expected to recur, and by failing to exclude unusual or one-time-only expenses. The

bankruptcy court determined that the complaint "conceded" that evidence about these manipulations

had been disclosed during the Plan confirmation proceeding; however, in fact, the complaint alleges

the exact opposite, that this evidence was concealed until *months after confirmation.* For example:

- Months after approval of the Plan, Genesis publicly disclosed, for the first time, that it had signed, within days of the Court's approval of the Plan, an agreement to extend the Mariner supply contract years into the future. During the valuation period, Genesis had excluded from EBITDA millions of dollars of earnings from its contract with Mariner, arguing that its Mariner contract was almost certainly not going to be renewed and was therefore non-recurring revenue. This information was never disclosed during the Plan confirmation proceedings.

- Months after approval of the Plan, Genesis also disclosed for the first time that it had excluded from earnings during the valuation period 10% of the income it had been receiving pursuant to a pharmaceutical supply contract with Manorcare, even though Genesis officials testified before the bankruptcy court that none of this income was being excluded. There was no basis under GAAP for such an exclusion. This information was also never disclosed during the Plan confirmation proceedings.

- Months after approval of the Plan, Genesis also disclosed for the first time that it had almost doubled its insurance loss reserves in the space of a single year, an amount which was well beyond any possible liability exposure, and released financial data from which the debentureholders could figure out that it had charged most of those reserve increases against EBITDA during the valuation period. None of this information was disclosed during the Plan confirmation proceedings either.

- Months after approval of the Plan, Genesis also disclosed for the first time that its pharmacy costs of goods sold had been about 59% of revenues, a typical percentage, rather than the 61% used for valuation purposes. This overstatement of costs lowered EBITDA during the valuation period by millions of dollars, a fact which, once again, was never disclosed during the Plan confirmation proceedings.

Once plaintiffs realized that defendants had engaged in these manipulations, they searched

for other possible instances of fraud that could have affected the valuation process. Their research

eventually uncovered several additional items, including:

- Costs of certain self-insurance plans, which had been designated for cancellation *before approval of the Plan*, had been kept in the EBITDA figures for the valuation period, even though those costs were non-recurring and should have been excluded.

- Various special bankruptcy reorganization expenses, which were also non-recurring, had also been included in the EBITDA figures for the valuation period.

None of these additional manipulations, as well as others described below, had been disclosed prior to confirmation of the Plan. Had Genesis' EBITDA been fairly presented, defendants' own experts, using the same valuation methodologies, would have valued Genesis hundreds of millions of dollars higher, and the debentureholders' distribution in the bankruptcy would have been commensurately greater. Plaintiffs estimate their damages to be at least $200 million.

Plaintiffs, who collectively had held over $205 million in Genesis debentures, brought the present action in New York State Supreme Court in January of 2004, alleging that the defendants were guilty of fraud or gross negligence in submitting false financial information to the bankruptcy court to obtain approval of the Plan. The debentureholders consented to removal and transfer of the action to the Genesis bankruptcy proceeding, which is still ongoing in Delaware.

Defendants moved to dismiss the complaint, primarily on the ground that the bankruptcy court, in approving the Plan, "conclusively" determined the value of Genesis and therefore barred any claims relating to that valuation. Plaintiffs countered that a judgment procured by fraud is not entitled to preclusive effect, and that to hold otherwise would allow those who submit false information in judicial proceedings to use the fruits of their own fraud to shield their own wrongdoing. The motion was argued in August, 2004. In its dismissal opinion issued nine months later, in May, 2005, the bankruptcy court dismissed the action. *In re Genesis Health Ventures, Inc.*, 324 B.R. 510 (Bankr. D. Del. 2005).

The bankruptcy court recognized that a judgment procured by fraud cannot have preclusive effect (324 B.R. at 525-26). However, after a dismissive two-sentence analysis, it concluded that the complaint did not really allege fraud at all, but, rather, *conceded* that "most or all the information establishing defendants' fraudulent conduct was actually provided in discovery prior to the confirmation hearings." Although the complaint expressly alleged that the fraud had first been

revealed in post-confirmation SEC disclosures by Genesis, the court brushed that off with the offhand comment that those SEC disclosures had been "timely filed and included post-confirmation data" (*id.* at 526).

In fact, the complaint alleges exactly the opposite: that the fraud was carefully concealed until months after the Plan was confirmed, when substantial parts of it were first revealed in Genesis' post-confirmation SEC disclosures, which contained information about *pre-confirmation events*. Although most of the discovery in the Plan confirmation proceedings occurred in the two or three weeks preceding the confirmation hearings, the debentureholders never alleged that the fraud was actually disclosed at that time (and, of course, neither do the defendants); and although plaintiffs relied on post-confirmation SEC filings, the critical information in those filings related to the pre-confirmation period. The bankruptcy court's application of *res judicata* and collateral estoppel was therefore based on a complete misreading of the complaint.

The bankruptcy court also held that the claims against Genesis should be dismissed for two additional reasons. First, it determined that those claims were barred by §1144 of the Bankruptcy Code, which imposes a 180-day time limit on any attempt to "revoke" a bankruptcy plan. Although conceding that at "first blush" this action does not appear to seek revocation of the Plan, the bankruptcy court nevertheless held that any damage remedy against Genesis would amount to a de facto revocation because it would "negatively affect innocent parties and creditors who received value in the forms of new equity and new debt in the reorganized debtor" (324 B.R. at 517). But there was no showing that any "innocent party" would suffer any injury if the claims against Genesis were allowed to proceed.

Moreover, the court ignored well-settled case law holding that a party injured by bankruptcy fraud may still seek damages against a former debtor, without invoking the time limit on "revocation" actions . The bankruptcy court in effect created a new rule, unsupported by any case

4

law authority, that *any* post-confirmation damage action against the debtor amounts to a de facto "revocation" of the plan and is therefore subject to the 180-day time limit. Such a rule would effectively obliterate the limitation of § 1144 to "plan revocation" attempts, because *any* claim against the debtor would now be subject to the statute. Such a drastic expansion of § 1144 would not further any purpose of the Bankruptcy Code and would unfortunately encourage the very type of conduct that occurred here.

Second, the bankruptcy court held that the Plan itself discharged Genesis from any claim of fraud or gross negligence committed in the course of the Plan confirmation proceedings. Here, the court relied on §§ 10.2 and 10.3 of the Plan (A30-A31),[2] which released Genesis generally from all pre-confirmation claims; but it overlooked § 10.6 of the Plan (A31), which expressly preserved any claim based on "any act or omission in connection with, or arising out of, the Reorganization Cases, [or] the confirmation of the Plan of Reorganization" that are based on "willful misconduct or gross negligence". That type of conduct is, of course, exactly what the present complaint alleges. The court's separate grounds for dismissing the claims against Genesis were, therefore, groundless.

## II. SUMMARY OF ARGUMENT

1.      *Res judicata* and collateral estoppel are inapplicable because the Plan confirmation decision was procured by fraud. Contrary to the bankruptcy court's decision, the complaint did not "concede" that the fraud was disclosed during the confirmation proceedings, but, in fact, alleged exactly the opposite. The fraud crippled the debentureholders' ability to defeat or modify the Plan in those proceedings.

2.      *Res judicata* is also inapplicable because the claims for relief are different now from the "claim" asserted in the objections to Plan confirmation. No fraud claim, and no damage claim was asserted in those proceedings.

---

[2] "A" page references are to pages in accompanying Appendix.

3.    Collateral estoppel is also inapplicable because the issues raised here concerning manipulation of EBITDA, were not the same and were not actually adjudicated in the Plan confirmation proceedings.

4.    The 180-day limitation period imposed by §1144 of the Bankruptcy Code is inapplicable because the damages sought in this action would not amount to a "de facto revocation" of the Genesis reorganization Plan.

5.    The Plan does not exculpate any defendant from willful misconduct or gross negligence in the course of the Plan confirmation proceedings but, rather, expressly preserves such claims.

### III.  STATEMENT OF FACTS[3]

#### A.  The Parties

The 275 plaintiffs collectively held over $205 million of Genesis subordinated debentures. Genesis is a leading provider of health care and support services to the elderly.[4] It had two primary business segments:  pharmacy services and in-patient services.  Defendant George V. Hager, Jr. ("Hager") is executive vice president and chief financial officer of Genesis, and held that position during the relevant time period (A57 ¶ 18).[5]

By August of 2000 investment banks, including defendant Goldman, had purchased about half the total Genesis and MC senior debt participations from the original lending consortium, at

---

[3] Because the court dismissed the action on the pleadings, the facts are taken from the allegations of the complaint, which are assumed to be true for purposes of this motion.

[4] Prior to October of 2001, Multi-Care Corp. ("MC") was a 43.6%-owned subsidiary of Genesis that was also in the elder care industry. Pursuant to the Plan, MC merged into Genesis. Since the approval of the Plan, Genesis has spun off its nursing home business, after which the Company was known as Neighborcare, Inc., until 2005, when it was sold for over $2 billion.

[5] Paragraph ("¶") references are to paragraphs of the Complaint, a copy of which is included in the accompanying Appendix.

6

discounts of 30% to 50% from par. Goldman itself acquired $175 million of Genesis' senior debt, making it by far the largest senior creditor of Genesis. Goldman's average purchase price for these debt participations was about 53¢ on the dollar (A57 ¶ 19).

Defendant Mellon was an original lender, and at the time of the bankruptcy held almost $56 million in Genesis senior debt. In the bankruptcy, Mellon acted as agent and representative for all the senior creditors (A58 ¶ 21). Defendant Highland Capital Management ("Highland") is an investment advisory firm (A59 ¶ 22).

Today, Goldman and Highland are the two largest shareholders of Genesis and each has a designee on the six-person board of directors. They received stock, notes and other consideration which, based on their own depressed valuations, was approximately equal in value to 100% of the face amount of their creditor claims. When the *actual* value of the Genesis shares they received is considered, the reality is that they received substantially more than the face value of their claims. Because Goldman and Highland had purchased those senior creditor claims from the lenders for less than half their face value, they were able to triple their money in the space of three years (A58-A59 ¶¶ 21-22).

By March, 2000, Goldman and Highland joined Mellon on the seven member Senior Lender Steering Committee (the "Committee"), where they exercised ultimate control over the Company and the bankruptcy proceedings. Most importantly, their approval would now be needed for all the management incentives, retention bonuses and other benefits that would ultimately shower millions of dollars upon Genesis senior management (A62 ¶ 31).

### B. The Plan Confirmation Proceedings

### 1. Defendants Submit Valuations of Genesis Based on "Budgeted" And "LTM" EBITDA

In the elder care and pharmacy industries, as elsewhere, the primary barometer of financial performance is Earnings Before Interest, Taxes, Depreciation and Amortization ("EBITDA"). In

both 1998 and 1999 Genesis (excluding its subsidiary MC) had more than $200 million in EBITDA. For the first two quarters of fiscal 2000, EBITDA was in line with prior years' performance (A64 ¶ 35). But soon after Goldman had taken its seat on the Committee, both Genesis and MC filed petitions for reorganization under Chapter 11 (A65 ¶ 37). In July of 2001, Genesis submitted a proposed Plan that posited that the Company was worth $200 million less than the senior creditor claims *alone*. It provided for Genesis to merge with MC and for about 94% of the new equity of the combined entity to be distributed to the senior creditors in satisfaction of their claims (A66 ¶ 40).

In support of this Plan, Genesis submitted valuations of the Company prepared by UBS Warburg ("Warburg"), the last of which was submitted on August 22, 2001. Warburg started with Genesis' "Budgeted EBITDA" figure of $158 million for fiscal 2001 (ending September 30), about $50 million below Genesis' performance in 1999 and 2000. To this figure it applied a multiplier derived from a comparable company trading analysis, and calculated an enterprise value range of $1.2 billion to $1.45 billion, with a midpoint of about $1.35 billion (A66 ¶ 41).

But by August of 2001, 11 of the 12 months for which earnings had been projected had now passed. To cure that problem the senior creditors submitted, on the same day as Warburg's final report, their own valuation analysis, prepared by Chilmark Partners ("Chilmark"). Chilmark relied on actual, historical "LTM" [Last Twelve Months] EBITDA for the period July 1, 2000 through June 30, 2001, which had also been supplied by Genesis management. By an astonishing coincidence, this LTM EBITDA was *also* exactly $158 million, precisely dovetailing with the Budgeted EBITDA projections that had been prepared over a year earlier (A67 ¶ 43). Using these figures, Chilmark valued Genesis at between $1.17 billion to $1.43 billion, with a midpoint of about $1.3 billion, within an eyelash of the valuation calculated by Warburg. Not surprisingly, the bankruptcy court ultimately viewed the Chilmark analysis and the LTM data as retroactively confirming the Budgeted

8

EBITDA projections.[6]

## 2. The Debentureholders' Objections to the Plan

Certain debentureholders objected to the proposed Plan and tried to prove that Genesis was worth more than the senior creditor claims; but none of them alleged that any of the EBITDA data had been manipulated (A78 ¶¶ 174-75).[7]  For example, a group of debentureholders ("the GMS Group") submitted an objection claiming, in part, that Genesis was worth more than Warburg's valuation. Its valuation expert, Evercore, reached a much higher valuation of Genesis, but it relied on Genesis' EBITDA data, primarily by using a higher valuation multiple.

## 3. Discovery

The complaint recounts that all discovery related to confirmation of the Plan occurred during the three weeks immediately before the hearing (A117-A120 ¶¶ 169-77).  From this, the bankruptcy court surmised that plaintiffs were conceding that the fraud was disclosed in those materials but that plaintiffs were not diligent or savvy enough to realize it in time (324 B.R. at 526).  But the complaint says no such thing. Rather, in its very next section (A121-A22 ¶¶ 178-79), it explains that the fraud was not disclosed until the SEC filings Genesis issued months after the confirmation hearing.

Paragraphs 169-77 (A117-A120) were included in the complaint in anticipation of a challenge that never materialized: an argument that there was enough suspicious information in the

---

[6]  The filing of the Chilmark report one week before the Plan confirmation hearing was the first time that historical EBITDA data had been used by any party to support the bankruptcy Plan. (A26 ¶ 43). Both Warburg and Chilmark disclaimed any opinion concerning the validity or accuracy of either the Budgeted or LTM EBITDA figures (A27, A78 ¶¶ 46, 175).

[7] Because the LTM EBITDA data were not submitted until the day after the last of these objections was filed, none of the objections mentions that subject. Instead, the objectors challenged the adequacy of disclosures; the scope of the proposed releases; the forgiveness of loans to officers and directors; the possible payment of "interest on interest" to the senior lenders; the classification of the debentureholder claims; the contention that the senior lenders were receiving more than 100% of the face value of their claims, while junior creditors were receiving a haircut; that the apportionment of new debt instruments as between Genesis and MC was unfair; and that the Plan was an "improper substantive consolidation" of Genesis and MC.

There is no reference in the court's confirmation opinion to any challenge to the accuracy of Genesis' financial information; for there was none. Instead, the court recounted that the debentureholders had submitted other projections of Genesis' EBITDA which the Company had prepared at various times, for various purposes, and which showed numbers somewhat higher than those ultimately used. The court held that this evidence was not persuasive because the other projections had been done to support various "negotiating postures." Most importantly, the court relied heavily on "the fact that the debtors' actual results are on target with 2001 budget projections for the first ten months of the fiscal year", a fact which "confirms the reasonableness of the management projections". 266 B.R. at 614.

Thus, although the confirmation proceedings entailed a dispute over the valuation of Genesis, with many experts testifying and many documents produced, they were all arguing about the wrong thing. The debentureholders and the court took as a given that the EBITDA data used by Warburg and Chilmark had been prepared in good faith. We now know differently.

### b. The Releases in the Plan

In its dismissal opinion the bankruptcy court held that any claims of fraud by Genesis in the bankruptcy proceedings had been released and discharged by §§ 10.2 and 10.3 of the Plan, which generally exculpated Genesis from all pre-confirmation claims. However, both of those sections start with the phrase "except as otherwise provided herein". (A30-A31) Section 10.6 pertains specifically to the debtor's conduct in the course of the bankruptcy proceedings, and exculpates Genesis and its "members, officers, directors, employees, agents or professionals" only from

> [A]ny liability to any holder of any Claim or Equity Interest for any act or omission in connection with, or arising out of, the Reorganization Cases, the confirmation of the Plan of Reorganization, the consummation of the Plan of Reorganization, or the administration of the Plan of Reorganization or property to be distributed under the Plan of Reorganization, *except for willful misconduct or gross negligence.*

11

(Emphasis added)[9] (A31).  "Willful misconduct or gross negligence" is exactly what the debentureholders allege here (A31). Section 10.6 deals specifically with the survival of claims based on such conduct and therefore controls over the more general §§ 10.2 and 10.3.

### C.  The Post-Confirmation Discovery Of Defendants' Fraud[10]

### 1.  Improper Exclusion from EBITDA of All Sales to Mariner

Like Genesis, Mariner Post-Acute Network ("Mariner") operated nursing homes and had a separate pharmaceutical subsidiary, American Pharmaceutical Supply Company ("APS"). Genesis had a contract to supply pharmaceuticals to fifty-eight Mariner nursing homes, and the contract generated revenue of about $53 million per year (A93 ¶ 119).

In January of 2000, Mariner filed for bankruptcy. Genesis continued to sell pharmaceuticals to Mariner and, as a "critical vendor", it continued to be paid in full under its agreement.  As of March of 2000, Genesis had made no provision to reserve any of the receivables from Mariner; nor was any provision even discussed for the possible loss of the Mariner business.  Later that year Mariner decided to sell APS; and by August 30, 2000, Genesis had began negotiating to purchase APS.  Had this purchase gone through, millions in EBITDA, well beyond anything experienced in the past, would have been added to Genesis' financial results (A94 ¶¶ 120-21).

However, defendants projected the opposite would occur – in the spring of 2001 they announced that they now expected to lose the Mariner supply contracts.  Therefore pharmaceutical sales to Mariner should be "adjusted out" of Budgeted EBITDA, reducing that figure by $13.424

---

[9] In its original form, the releases from liability applied not only to Genesis but also to its senior creditors and all of their advisors. But in its decision approving the Plan, the court held that "the release of third-party claims against the Senior Lenders must be stricken". 266 B.R. at 609. That is why the court did not hold that the Plan released or discharged plaintiffs' claims against the senior creditors.

[10] The following are just examples of some of the most serious frauds described in the complaint.

million. The proffered justification was that if another company purchased APS it would have the "inside track" to acquire all of the Mariner business, including sales to Mariner locations being serviced currently by Genesis, and that therefore current sales to Mariner could no longer be reviewed as recurring revenues. Defendants waged a concerted campaign to convince the junior creditors that the impending sale of APS threatened the Mariner supply contract. Even when Genesis signed a letter of intent to buy APS, Genesis still maintained that the exclusion of the Mariner sales remained necessary because another purchaser might come forward and outbid Genesis (A96 ¶ 126).

But unbeknownst to the debentureholders and the court, Genesis had protected itself from this possibility by separately negotiating an extension of its pharmacy supply contract, which would remain in effect regardless of who acquired APS. The complaint alleges that the terms of the extension were agreed upon months before the Plan approval hearings and were disclosed to the senior creditors at that time; but that the agreement was deliberately concealed until after confirmation in order to maintain the illusion that the continuation of this revenue was in doubt, so that Genesis to continue to exclude the Mariner revenues from EBITDA (A97 ¶ 127).

Finally, on September 24, 2001, about 12 days after the court issued its opinion approving the Plan, and just four days *after* the court's order approving the Plan, Genesis and Mariner signed their agreement and submitted it for court approval in the Mariner bankruptcy proceeding (A97 ¶ 128). The debentureholders did not become aware of it until Genesis itself disclosed the extension of the Mariner supply contract in its 10Q for the first quarter of 2002, filed 4 months after the confirmation of the Plan (A97 ¶ 128).

In its dismissal opinion the bankruptcy court brushed off these critical allegations, holding that because the Mariner supply contract was signed two weeks after its confirmation opinion, "no affirmative act of concealment" had been alleged (324 B.R. 526 n.8). The court's assumption that

13

this agreement was totally unanticipated at the time of the Plan confirmation hearings took place is preposterous. Worse, it contradicts the complaint, which specifically alleges that the terms of the agreement had been settled months before the confirmation hearings. The bankruptcy court's eagerness to turn a blind eye to such conduct is unfathomable.

GAAP permits the accrual of a loss contingency *only* when the potential loss is "probable". Here, the loss of the Mariner business was never "probable", and by the date the Plan was confirmed Genesis had a contract already in hand that guaranteed that this business would not be lost. Therefore, the exclusion of over $13 million from the EBITDA projections and LTM EBITDA , causing the reduction in Genesis valuation over $100 million, was manifestly improper (A98 ¶ 129).

### 2. **Improper Exclusion of 10% of Pharmacy Sales to Manorcare**

In August of 1998, Genesis entered into an agreement to sell pharmaceuticals to Manorcare through 2004 at scheduled prices. In 1999, Manorcare demanded price concessions; and when Genesis refused, Manorcare purported to terminate the contract, resulting in an arbitration (A90 ¶ 110).

On May 23, 2000, the arbitrator announced that, in view of Genesis' imminent bankruptcy filing, the hearing of the case would be postponed indefinitely. Genesis subsequently reported that Manorcare had agreed, while the arbitration was pending, to pay 90% of Genesis' charges for pharmaceuticals, and would deposit the remaining 10% into escrow. Genesis did not disclose, however, that the escrowed 10% had been excluded from EBITDA, reducing it by about $11 million (A91 ¶¶ 112-13). This one exclusion reduced the Genesis valuation by $90 million.

In April 2002, several months after the court approved the Plan, the arbitrator ruled that the Genesis contract with Manorcare was enforceable and required Manorcare to turn over all the escrowed funds, with interest, totaling $21.7 million. Four months after Plan confirmation, in its 10Q for the second quarter of 2002, Genesis described the arbitrator's ruling and disclosed, *for the*

14

*first time*, that it had been excluding 10% of the Manorcare revenue from EBITDA (A92 ¶ 115).

Under GAAP a loss contingency cannot be accrued unless it is "probable" that the loss will occur and the amount of that loss can be reasonably estimated. Where the putative loss contingency arises from a pending litigation, no loss can be accrued unless Genesis' counsel had opined that a loss, of a particular size, was probable. That did not happen here, because it was never "probable" that Manorcare would succeed on its claims; and no such opinion letter was ever produced (A92 ¶ 116).

### 3. Improper Expensing of Excessive Insurance Reserves

Nursing homes and pharmacies, including those operated by Genesis, carry general/profes-sional liability ("GL/PL"), workers compensation ("WC"), and employee health and casualty insurance. On June 1, 2000, just before filing its bankruptcy petition, Genesis and MC restructured their insurance program by obtaining third party WC insurance and switching their GL/PL coverage to Genesis' wholly owned insurance subsidiary, Liberty Health Corporation ("Liberty"). Genesis expensed all deposits it made to Liberty's reserve accounts (A75 ¶ 58).

Liberty obtained reinsurance for this GL/PL coverage, which provided "stop loss" limits to Genesis' and MC's exposure. That limit was initially $14 million, including $9 million for its Florida elder care facilities and $5 million for its other facilities. Based upon its own internal actuarial studies done in June of 2000, Genesis calculated that its (Liberty's) actual likely exposure was about half the total stop loss limits. That is the amount that should have been reserved, and no amount above that could properly have been charged against EBITDA (A76 ¶ 59).

But Genesis went far beyond that and instead posted reserves significantly in excess of its total stop loss limits, and fully expensed those reserve payments immediately. A review of financial statements issued by Genesis *after the Plan was confirmed* reveals, upon analysis, that between July 1 and August, 2, 2000, *before* confirmation, Genesis (including MC) had fully funded the

15

GL/PL self-insurance program for 2000-2001, by transferring to Liberty $14 million, the aggregate stop loss limit, and it fully expensed that entire payment during the LTM period. Subsequent financial disclosures also showed that Genesis posted significant additional reserves in the month following the insurance renewal date, June 1, 2001, but before the end of the LTM EBITDA period on June 30, 2001. During that month Genesis made large deposits to Liberty and fully expensed all of them. Those deposits not only exceeded, on a pro rata basis, the actuarial risk, but they were risks that were already covered by reinsurance. Plaintiffs now estimate that Genesis (excluding MC) intentionally took excessive insurance reserve expenses during the valuation period of approximately $13 million, lowering EBITDA by that same amount, and the resulting valuation by about $100 million (A77 ¶ 61).[11]

GAAP requires that companies deduct contingent liabilities from earnings under certain circumstances. Charges to earnings, based on contingent insurance liabilities, are to be accrued only when both the liability is probable and the amount can be reasonably estimated (A79 ¶ 64). Neither condition was satisfied here.

Genesis did not report publicly, until the third quarter of 2002 (a year after confirmation of the Plan): (I) what its aggregate stop loss limits were for its GL/PL insurance, (ii) that it had deposited reserves equal to 100% of those limits, and (iii) that it had fully expensed all those deposits in the current period, regardless of whether those deposits exceeded Genesis' actual exposure to claims. Moreover, Genesis never reported that it had deposited, and expensed, amounts

---

[11] These manipulations in insurance reserves coincided with an overall massive increase to Genesis' insurance reserves. The consolidated Genesis/MC 10Qs and 10Ks for fiscal 2000, 2001 and 2002 show that on September 30, 2000, loss reserve balance was $27.9 million; by a year later, that amount had risen to $51.6 million; and that by June 30, 2002, the total was $74.9 million. The last two figures were disclosed after the confirmation hearing. Thus, neither the court nor the debentureholders had the slightest idea that Genesis and MC had nearly doubled their collective insurance loss reserves in the past year, much less that this entire $24 million increase had been fully expensed.

in excess of the stop loss limits, and in excess of its own internal actuarial estimates of its potential

exposure to claims. Instead, Genesis management maintained that insurance costs were "spiraling

upwards" (A80-A81 ¶¶ 65-66). It turns out that these reports of spiraling costs were grossly

exaggerated.

### 4. Excessive Deduction for Loss of AGE Institute Business

Genesis had a contract to provide management, pharmacy and rehabilitation services to AGE

Institute, a not-for-profit company that owned 20 nursing homes. In 2000, AGE Institute went

bankrupt and notified Genesis that it was unilaterally terminating the contract (A99 ¶ 130).

At a meeting with the senior creditors in September of 2000, Genesis management reported

that the adverse impact on EBITDA would be about $2.226 million. About three weeks later,

Genesis management asked the Unsecured Creditors Committee to approve an adjustment to the

Budgeted EBITDA to reflect the loss of this business. Now, however, they represented that the

adverse effect on EBITDA would be $5.25 million, rather than $2.23 million. The reduction to

EBITDA was therefore at least $3 million overstated which, at a multiplier of over 8, reduced the

valuation by over $24 million (A99-A101 ¶¶ 132-33, 135).

### 5. Improper Deduction of Non-Recurring Employee and Management Retention Bonuses

As noted above, non-recurring charges and restructuring charges are not to be included in

EBITDA. GAAP expressly defines bankruptcy reorganization expenses as non-recurring expenses

(A101 ¶ 136). On September 5, 2000, Genesis obtained bankruptcy court approval for a "Special

Recognition Program" totaling over $11 million. The program was allegedly designed to assure that

key employees remained with the Company despite the ongoing bankruptcy. This program fit the

classic definition of one-time, non-recurring charges and expenses which are not part of EBITDA.

Accordingly, Genesis categorized these expenses as reorganization costs, separate and apart from

its statement of operations, in its consolidated financial statements for fiscal 2001. Nonetheless,