similar results through the first two quarters of fiscal 2000.[1] Defendants were going to have to justify such pessimistic financial projections to the Court.

6.    By the time the Bankruptcy Court was prepared to rule on the proposed Plan in August of 2001, fiscal 2001 was almost over; it was too late, at that point, to rely solely on projected EBITDA for periods that were already in the past. By August of 2001, Genesis had reported EBITDA results through the third quarter (ending June 30). The Company therefore sought to confirm the accuracy of the projections by submitting "historical" EBITDA for the trailing 12 month period (the "LTM EBITDA"). Those results coincided *exactly* with the projected EBITDA data: $158 million. The senior creditors then submitted a valuation report prepared by their advisors, Chilmark Partners ("Chilmark"), which used the LTM EBITDA to confirm Warburg's $1.3 billion valuation of the Company.

7.    The Court was persuaded by these presentations. On October 2, 2001, it issued an order confirming a joint plan of reorganization for Genesis under Chapter 11 of the Bankruptcy Code (the "Plan"), which cancelled all the Genesis debentures, in exchange for nominal consideration, while transferring over 94% of the equity in the Company to the senior creditors.

---

[1] These EBITDA data are for Genesis on a standalone basis, without including results for its subsidiary MC.

10

8.    Throughout this process defendants misled both the Court and the junior creditors at every turn. In fact, plaintiffs have subsequently discovered that both the Budgeted EBITDA projections *and* the LTM EBITDA were "cooked", to depress EBITDA and thereby depress the valuation of Genesis. By depressing that valuation, defendants were able to persuade the Bankruptcy Court that it was fair and appropriate to award virtually all the equity in the Company to the senior creditors, to the virtual exclusion of junior creditors, primarily the plaintiffs.

9.    To depress the Genesis EBITDA, Genesis management, at the behest of the senior creditors, engaged in a series of improper accounting maneuvers that collectively cut Genesis' EBITDA by over 30%. Most notably:

- It voluntarily, and *retroactively,* lowered the fees payable to Genesis under various management contracts with MC. Cost to Budgeted and LTM EBITDA: $11.6 million.

- It excluded from EBITDA all sales to Mariner Post-Acute Network, and 10% of sales to HCR Manorcare, based on spurious speculation that this business might, in the future, be lost. In fact, none of this business was lost. Cost to Budgeted and LTM EBITDA: $24.5 million.

- It took unprecedented insurance loss reserves that were not justified by its actual liability exposure, and then improperly charged them all to EBITDA. Cost to LTM EBITDA: at least $13 million.

- It improperly deducted from EBITDA certain non-recurring bankruptcy reorganization costs and costs associated with a

11

discontinued of an employee health benefit plan. Cost to LTM EBITDA: $16.7 million.

10.    These actions were not bona fide business judgments; rather, they all violated GAAP (Generally Accepted Accounting Principles), generally accepted definitions of EBITDA, SEC and IACPA requirements, and/or with other established or contractual financial principles. It was no coincidence that all these decisions and "adjustments" trended in the same direction: to depress EBITDA and, hence, the calculated reorganization value of the Company. Collectively, these manipulations wiped out hundreds of millions of dollar in valuation. In the absence of these manipulations, Genesis' EBITDA would have substantially exceeded $200 million, the calculated valuation of Genesis would have exceeded $1.6 billion, and the debentureholders would have received Genesis stock equal in value to the par value of their debentures.

11.    Although the perpetrators of these decisions were Genesis senior management -- and, in particular, George Hager, the CFO -- the direct beneficiaries were the senior creditors. As in most bankruptcy proceedings, management of the debtor was completely at the mercy of the senior creditors, who were going to decide which Genesis executives would remain with the Company both during and after the bankruptcy reorganization, and which would go; and who would receive "retention

12

**A53**

bonuses" and other lucrative financial packages from the Company, and who would not. In this case, the senior lender power was concentrated in the hand of the seven member Steering Committee, which was dominated by its investment bank members. Shortly after confirmation of the Plan, after the scheme had succeeded and the senior creditors had taken over the Company, the four most senior Genesis executives received financial packages worth, collectively, over \$23 million – many times greater than compensation concurrently being paid to executives of comparable companies in the health care industry.

12.    This action does not seek to set aside the Genesis Bankruptcy Plan or re-divide the Genesis "pie". Rather, it seeks to recover from the defendants the hundreds of millions of dollars of damages plaintiffs suffered as a result of defendants' misrepresentations to them, to the public and to the Bankruptcy Court.

## II. **THE PARTIES**.

13.    The 275 plaintiffs collectively held (either directly or through brokerage, retirement, corporate or other accounts) over \$205 million of Genesis subordinated debentures on October 2, 2001, the date the Genesis bankruptcy reorganization plan became effective. The Company had issued three series of debentures, as follows (all amounts stated in millions of dollars in face amount):

13

| Date Issued | Maturity | Amount | Rate |
|---|---|---|---|
| 06/95 | 2005 | $120 | 9.75% |
| 10/96 | 2006 | $125 | 9.25% |
| 12/98 | 2009 | $125 | 9.88% |
| TOTAL | | $370 | |

Many of the plaintiffs are brokerage customers of GMS Investment Advisors, Inc. ("GMS"). Eighty three of the plaintiffs are retirement or family investment accounts. Collectively, the plaintiffs held over 55% of all the debentures outstanding.[2] A complete list of the plaintiffs and their holdings in Genesis debentures is attached as Exhibit 1.

14.    Defendant Genesis is a Pennsylvania corporation with headquarters at 101 East State Street, Kennett Square, Pennsylvania. It is a leading provider of health care and support services to the elderly. Including its subsidiary MC, Genesis has two primary business segments: pharmacy services and in-patient services.

15.    **Pharmacy Services.** Genesis provides pharmacy services in 41 states through its NeighborCare pharmacy subsidiary. NeighborCare has 59

---

[2] Although the debentures were, by their terms, secured, because the valuation of Genesis ultimately accepted by the Court was less than the senior secured debt, the debentureholders were reclassified as unsecured creditors for purposes of the bankruptcy.

14

institutional pharmacies and 22 medical supply and home medical equipment distribution centers.

16. **Nursing Care Facilities.** Genesis also provides in-patient services through nursing homes and assisted living facilities, including 33 stand-alone assisted living facilities and 19 transitional care units, located in 15 states. It currently owns, leases, manages or jointly owns 256 nursing care centers with 31,073 beds, located primarily in the eastern United States. It provides rehabilitation services, diagnostic services, respiratory services, hospitality services, group purchasing services and healthcare consulting services.

17. Prior to its merger with Genesis in October of 2001 (as part of the court-approved bankruptcy Plan), MC was a separate entity that was also in the nursing home/assisted living facility industry. Genesis acquired a 43.6% interest in MC in October of 1997, through a leveraged buyout. In that transaction, Eldercare Corporation, owned 56.4% by Texas Pacific Group and other venture capital firms (collectively, "TPG") and 43.6% by Genesis, obtained ownership of MC. At the time of the leveraged buyout, Genesis entered into long term, arm's length agreements to manage MC's facilities and to provide pharmaceuticals and other services to MC. Pursuant to the bankruptcy reorganization Plan, MC became a wholly-owned

15

subsidiary of Genesis on October 2, 2001.[3]

18.    Defendant George V. Hager, Jr. ("Hager") is executive vice president and chief financial officer of Genesis, and held that position during the relevant time period. Since December of 2003 he has also been the chief executive officer of the recently spun off nursing home operations formerly owned by Genesis.

19.    Defendant Goldman is a New York limited partnership with headquarters at 85 Broad Street, New York, N.Y. It is one of the largest investment banking firms in the world, and is a member of the New York Stock Exchange. It is a wholly owned subsidiary of Goldman Sachs Group, Inc., a Delaware corporation that also is headquartered at 85 Broad Street. In the months preceding the Genesis bankruptcy, Goldman acquired $175 million in Genesis debt participations, making it by far the largest senior creditor of Genesis. Goldman's average purchase price for these debt participations was about 53¢ on the dollar. Goldman also purchased about $81 million in MC senior debt participations, and thereby became by far the largest senior creditor of MC. Goldman's average purchase price for its MC debt participations was about 48¢ on the dollar. Ultimately, Goldman received through the bankruptcy cash and securities worth far more than 100% of the face value of the

---

[3] For purposes of this complaint, unless the context otherwise requires, all references to "Genesis" for the period up to October 2, 2001, are to the stand-alone company. References to "Genesis" for the period after October 2, 2001 include its wholly owned MC subsidiary.

16

debts it had purchased.

20.    Pursuant to the Plan, Goldman was awarded about 6.6 million shares of Genesis stock, representing about 15.7% of the total shares issued. Since approval of the Plan in October, 2001, Joseph A. ("Jody") LaNassa, III, has been Goldman's designee as one of the six directors of Genesis, and (most significantly) is one of only two members of its compensation committee. Until December of 2002 LaNassa was co-portfolio manager and Vice President-Distressed Bank Debt at Goldman,  and since then he has been Managing Director - Special Situations Investing at Goldman.

21.    Defendant Mellon is a Delaware corporation with headquarters at One Mellon Center, Pittsburgh, PA. It is one of the largest diversified financial institutions in the world. It was a primary lender for the original revolving credit facilities for both Genesis and MC and held almost $56 million in Genesis senior debt, and over $10 million in MC senior debt, by the time of the bankruptcy. In the bankruptcy, Mellon acted as agent and representative for all the senior creditors, a practice which enabled the other members of the senior lender group to remain virtually anonymous and to conceal the extent to which investment banks, including Goldman, had supplanted the original lending consortium as the actual senior lender group. In the reorganization Mellon acquired shares of Genesis stock and other

17

consideration worth far more than the face value of the debt participations it held.

22.    Defendant Highland Capital Management ("Highland") is an investment advisory firm whose headquarters are in Dallas, Texas. Pursuant to the Plan, Highland received approximately 3 million shares of new Genesis stock, representing over 7% of the total issued and outstanding. Since approval of the Plan in October, 2001, Highland's president, James D. Dondero, has been one of the six directors of Genesis.

### III. FACTUAL ALLEGATIONS

#### A. Background: The Investment Banks Snap Up Genesis Debt at a Hefty Discount

23.    Before their bankruptcies, both Genesis and MC had large amounts of outstanding debt. Genesis had outstanding about $120 million of senior secured debt (primarily mortgages), $1.01 billion of other senior debt and $387 million of junior debt, consisting primarily of the three series of debentures held by the plaintiffs.

24.    MC was even more heavily leveraged, relative to its revenues. By September 30, 1999, it had about $776 million of debt outstanding, consisting of $526 million of senior debt and $250 million of junior debt. Much of that debt had been incurred in connection with the leveraged buy-out in 1997.

18

25.    The senior credit facilities for both Genesis and MC had been sponsored by Merrill Lynch, which organized a consortium of over 60 banks, originally led by Mellon Bank, Citicorp, First Union Bank and Nations Bank. By early 2000 the institutions that held the $1.01 billion unsecured Genesis senior debt also collectively held $424 million of the $526 million senior MC debt. However, the loan facilities were completely separate, with no cross guarantees or cross-collateralization.

26.    When these loans were originally extended, the healthcare industry was booming, largely as a result of the generous "cost plus" fee structure used by Medicare to reimburse nursing care facilities for services rendered. Genesis and MC receive most of their income from the federal Medicare and Medicaid programs.

27.    However, the year following the MC leveraged buy-out, Congress drastically revised the system for Medicare reimbursement to nursing care facilities. In 1998 it replaced the old "cost plus" reimbursement formula with a new Prospective Payment System ("PPS"), which pegged reimbursements to a fixed per diem rate that was determined by the patient's diagnosis and the treatments being provided. The three year "phase in" period for the PPS reimbursement formula began on January 1, 1999. Immediately afterwards Medicare reimbursement rates started to decline. Nursing care facilities, which were carrying huge debt loads incurred when the old

19

"cost plus" system was in effect, were now forced to make their debt payments from a lower revenue base.

28.    These changes had a severe impact on MC, which operated exclusively in the nursing care facility business and which had incurred very large debt obligations in the 1997 leveraged buy-out. By the end of fiscal 1999, it was in default on its debt repayment obligations.

29.    Genesis was more diversified than MC, in large part because of its pharmacy operations; it therefore suffered a lesser, though still significant, impact from the phase in of PPS. By March of 2000, Genesis was still able to meet its debt obligations as they became due, and expected that, if it could stem the cash drain to MC, that it would continue to be able to do so for the foreseeable future. Nonetheless, the risk associated with holding Genesis debt increased, and many of the original lenders to Genesis were eagerly unloaded their Genesis (and MC) debt holdings at significant discounts from par value.

30.    Certain investment banks, and in particular Goldman, perceived this situation as an investment opportunity. Their strategy was to purchase large quantities of "debt participations" from the original lending banks at tremendous discounts and then, using their clout as senior creditors, to force the companies into bankruptcy and seize control.  Goldman, for example, set up an entire division to

20

**A61**

invest in the debt of distressed companies, headed by Jody LaNassa. This division invested in at least seven distressed companies in the healthcare industry.

31.    Goldman and other investment banks wasted no time in moving in on Genesis (and, in particular, on its Neighborcare pharmacy division, which Goldman viewed as the health-care jewel). The Genesis senior lender group was initially headed by Mellon Bank, but by March, 2000, Goldman and Highland had acquired so many of the debt participations that they were invited to join Mellon on the seven member Senior Lender Steering Committee. By August of 2000 investment banks, including Goldman, had purchased about half the total Genesis and MC senior debt participations from the original lending consortium, at discounts of 30% to 50% from par. Goldman itself had acquired (through its affiliate Goldman Sachs Credit Partners) about $256 million of the Genesis and MC senior debt. Goldman was therefore by far the largest senior creditor of both Genesis and MC, with claims 3 times greater than any other senior creditor, and was therefore able to dominate completely the senior creditor Steering Committee.

32.    Goldman then further enhanced its position of power and influence by (i) underwriting and administering the DIP financing, (ii) underwriting the exit financing, and (iii) becoming the largest holder of the synthetic lease financing facility. In short order, Goldman had assumed the de facto lead position in

21

the senior creditor group, and controlled all of the Genesis and MC purse strings. Goldman's control over the fate of Genesis continued after Genesis emerged from bankruptcy, to this very day.

### B. The Bankruptcy and Sudden Collapse of Genesis' EBITDA

33.    In the elder care and pharmacy industries, as elsewhere, the primary barometer of financial performance is earnings before interest, taxes, depreciation and amortization ("EBITDA"). EBITDA is not a line item on an income statement, and is not certified or reviewed by outside auditors. Nonetheless, there are standard rules for calculating EBITDA, and Genesis had a practice of announcing its EBITDA results on a quarterly and annual basis. [4]

34.    In both 1998 and 1999 Genesis (excluding MC) had earned over $200 million in EBITDA, which had been more than sufficient to meet its debt payment obligations and to finance its operations. As late as March, 2000, Genesis management had been optimistic about the Company's ability to maintain this level

---

[4] Genesis would announce consolidated EBITDA, including MC, and separate EBITDA for MC on a standalone basis. By subtracting the second figure from the first, and adding back certain entries that were eliminated for accounting purposes, sophisticated investors could, with great difficulty, calculate for themselves Genesis' EBITDA on a standalone basis. For investors, such as plaintiffs, who held Genesis debt securities, the standalone Genesis data was of paramount importance.

22

of EBITDA performance, despite the changeover in Medicare payment systems.[5]

35.    The first two quarters of fiscal 2000 Genesis was on pace to achieve comparable EBITDA results for fiscal 2000. On February 3, 2000, Genesis announced EBITDA results for the first quarter, showing that it had earned, on a standalone basis, $50.8 million of EBITDA. In its written "Presentation to the Bank Group Regarding Restructuring Considerations", dated March 14, 2000, Genesis management provided a "cash flow summary" that made the following EBITDA projections for the Company (on a standalone basis) (in $ millions):

| 2000 | 2001 | 2002 | 2003 | 2004 | 2005 |
|------|------|------|------|------|------|
| 191  | 205  | 213  | 221  | 230  | 239  |

36.    In a separate document prepared for the same senior lender meeting, Genesis management projected stand-alone EBITDA for the ensuing four months as follows (in $ millions):

| March    | April    | May      | June     |
|----------|----------|----------|----------|
| $16,896  | $17,529  | $17,862  | $17,895  |

Thus, management was projecting that EBITDA for the third quarter of fiscal 2000

---

[5] At the Genesis stockholders meeting of March 16, 2000, Michael Walker, chief executive officer of Genesis, reported that its senior lender interest coverage ratio was about 1.8 to 1 and its total interest coverage ratio was 1.4 to 1, ratios which indicated that Genesis would be able to continue meeting its debt obligations. In contrast, management was not optimistic about MC. Walker reported that MC had negative debt coverage of 0.5 and was definitely "under water". It was not expected to meet its senior, much less its junior, debt payments.

23

(April-June) would exceed the $50 million rate announced for the first quarter. On May 4, Genesis announced EBITDA results for the second quarter (January-March), which showed EBITDA, on a standalone basis, of $51 million. Thus, Genesis was clearly headed towards another year of EBITDA in excess of $200 million.

37.     But once Goldman had achieved a significant position in Genesis debt, and took its seat on the seven member senior lender steering committee, optimism at Genesis suddenly vanished. Almost immediately, on June 22, 2000, both Genesis and MC filed petitions for reorganization under Chapter 11 of the Bankruptcy Code, in the federal bankruptcy court in Wilmington, Delaware.[6] This came as a shock to Genesis bondholders, who had been assured, at the March 16th shareholders meeting, that Genesis was in good financial shape and would be able to continue to service its debt and other obligations.[7] During the ensuing year, Genesis' EBITDA projections and LTM EBITDA both fell through the floor.

---

[6] MC's bankruptcy had been anticipated. Its EBITDA for fiscal 1999 was $73.3 million, just barely enough to cover its annual debt payments of $70 million; but during the first two quarters of fiscal 2000, MC's EBITDA had dropped by half, falling to about $27.7 million on an annualized basis. It was therefore a foregone conclusion that MC's senior debt would ultimately be deemed substantially "impaired".

[7] Specifically, on March 21, 2000, Jim Baker of GMS had spoken with Jack Anderson, a Genesis board member, who reiterated the sentiments expressed at the stockholder meeting, that Genesis was in stable financial condition and did not face any immediate crisis. In April of 2000, Randy Faires of GMS had also spoke to Anderson, who repeated what he had said to Baker, including that the GMS bondholders were in good shape. In contrast, he observed that MC was unable to meet its debt payments.

24

38.    The senior creditors were closely monitoring industry multipliers to determine the effect that particular EBITDA levels would have on the enterprise value of Genesis. On August 2, 2000, Chilmark, which had been retained by the senior creditors, made a written presentation to them in which it set out the Genesis EBITDA projections and the prevailing industry multiples for valuing health care companies. It reported that long-term care companies were currently trading at multiples of 3.1-5.8 times EBITDA, and pharmacy services at multiples of about 5.6.

39.    In or about April of 2001, Genesis released a preliminary plan of reorganization that included Budgeted EBITDA projections for fiscal 2001 (ending September 30, 2001) of only $158.443 million, a staggering $50 million below Genesis' past performance.

## C. The Warburg and Chilmark Valuations and the Approval of The Plan

40.    In July of 2001, Genesis submitted a final proposed reorganization plan (the "Plan") that posited that the Company, on a stand-alone basis, was worth $200 million less than the senior creditor claims *alone*. The Plan provided for Genesis to merge with MC and for about 94% of the new equity of the combined entity to be conveyed to the senior creditors in satisfaction of their claims.

41.    In support of this Plan, Genesis submitted a valuation of the

25

**A66**

Company prepared by the Warburg, dated July 2001. A month later, on August 22, 2001, Warburg submitted a modified valuation report. In arriving at its valuation, Warburg relied primarily on Genesis' "Budgeted EBITDA" figure of $158 million for fiscal 2001. Warburg applied a multiplier to the projected EBITDA figure, derived from price-to-EBITDA multiples exhibited by three other publicly traded healthcare companies (Beverly Enterprises, HCR Manor Care and Omnicare), to arrive at an enterprise value range for Genesis of $1.2 billion to $1.45 billion, with a midpoint of about $1.35 billion.

42.    But by the time the final Warburg valuation was submitted in August of 2001, only one month was left in fiscal 2001. It would have been inappropriate for the Court, in valuing the Company, to rely solely on projections for periods that were, by now, almost all in the past, and for which historical EBITDA data now existed.

43.    To cure that problem the senior creditors also submitted, on the same day, August 22, 2001, their own valuation analysis, prepared by Chilmark. Unlike the Warburg Report, which had been based on projections for fiscal 2001, Chilmark used a historical LTM EBITDA figure, also supplied by Genesis management, of $158,118,000, for the period July 1, 2000 (the fourth quarter of fiscal 2000) to June 30, 2001 (the third quarter of fiscal 2001). Relying on these EBITDA

26

figures, Chilmark valued Genesis at between $1.17 to $1.43 billion, with a midpoint of about $1.3 billion.

44.     The primary purpose of the Chilmark submission was to put the "historical" EBITDA data before the Court, to establish that it was consistent with the Budgeted EBITDA projections for fiscal 2001, upon which the Warburg valuation had relied.  Because most of the periods covered by those reports overlapped ( *i.e.* they both had the first three quarters of fiscal 2001 in common), the Court viewed the LTM data as providing *post hoc* confirmation of the accuracy of the Budgeted EBITDA projections.

45.     The filing of the Chilmark report on August 22 was the first time that historical EBITDA data had been used, by any party, to support the bankruptcy reorganization Plan.  It was far too late, at that point, for any interested party to challenge the LTM EBITDA figures: the deadline for objecting to the Plan had already passed; discovery was almost over; and the confirmation hearing was only one week away.

46.     However, if both the projections *and* the LTM EBITDA were wrong, so, to, were the valuations. Significantly, both Warburg and Chilmark disclaimed any opinion concerning the validity or accuracy of either the projected or LTM EBITDA figures. Moreover, because EBITDA does not appear in any financial

27

statement, and because the LTM EBITDA period did not correspond with the period covered by any Genesis financial statement, its auditor, KPMG, never considered any of Genesis' EBITDA data in its opinions certifying Genesis' financial statements. This scenario gave senior management of Genesis a clear opportunity to manipulate the results of the valuation, by manipulating their own EBITDA pronouncements.

47.     The Delaware Bankruptcy Court held a confirmation hearing on August 28 and 29, 2001, seven weeks after the Plan was first filed and, as noted above, six days after the Chilmark and the final Warburg reports were first made available. On September 12, 2001, the Court issued an opinion confirming the essential elements of the Plan. *Matter of Genesis Health Ventures, Inc., et al., Debtors,* 266 B.R. 591. The centerpiece of the Court's ruling was its determination that, based on the valuation report prepared by Warburg, the reorganization value of Genesis was so low, compared to the size of the senior creditor claims, that an allocation of 94% of the new Genesis equity to the senior creditors was reasonable.

48.     In accepting the projections on which the Warburg valuation was based, the Court relied heavily on the testimony of Genesis' CFO, defendant Hager, to the effect that "the actual results for the first 10 months of the 2001 fiscal year were on target with budget projections." That conclusion was based on the LTM EBITDA figures that had been supplied to Chilmark and which were the basis of its report.

28

49.    Pursuant to the Plan approved by the Court, the senior creditors were credited with $195 million in "adequate protection payments" they had previously received, and were awarded new senior notes in the face amount of $94.9 million, shares of new convertible preferred stock with an aggregate liquidation preference of $31 million, and about 94.3% of the newly issued common stock of the Company.

50.    In an attempt to procure the consent of the Unsecured Creditors Committee of Genesis, the Plan threw a bone to the provided that the debentureholders would receive about 3.8% of the new Genesis common stock and would receive warrants to purchase an additional 5.7% of the new Genesis stock at an exercise price of $20.33 per share. The warrants were to expire one year later, on October 2, 2002. Although the unsecured creditors committee approved the Plan[8], the debentureholders, voted overwhelmingly to reject it. In bankruptcy parlance, the Plan was "crammed down" on the dissenting debentureholders.

51.    In its original form, the Plan also contained sweeping releases from liability not only for Genesis but also for the senior creditors and their advisors. Those proposed releases would have absolved Genesis and its senior creditors, and

---

[8] Although the bondholders represented 75% of the dollar amount of unsecured claims, they had only 33% of the votes on the committee, which was dominated by trade creditors who had ongoing business relationships with Genesis.

29

their "members, officers, directors, employees, agents or professionals" from "any liability to any holder of any claim or equity interest for any act or omission" in connection with the bankruptcy case or the approval of the bankruptcy plan of reorganization. In its decision approving the Plan, the Court held that "the release of third-party claims against the Senior creditors must be stricken". 266 B.R. at 609. The revised release, which was ultimately approved by the Court, did not extinguish any potential claims against the senior creditors; nor did it extinguish any potential claims against Genesis, MC or their insiders or advisors for fraud or gross negligence.

52.    On the effective date of the Plan, Genesis' pre-existing common stock and debentures (plaintiffs' holdings)were deemed cancelled, and the Company authorized the issuance of 41 million shares of its "New Common Stock", approximately 3.8% of which was eventually issued to former Genesis debentureholders, including the plaintiffs. In addition, Genesis issued "new warrants", expiring on October 2, 2002, to purchase an additional 4,559,475 shares (approximately 5.7%) of "New Common Stock" at an exercise price of $20.33 per share. Neither the New Common Stock nor the new warrants had yet been issued at the time of the misrepresentations alleged herein.

30

### D. The Scheme

### 1. Overview

53.     The Warburg and Chilmark valuations represented that Genesis had suffered a drastic loss of value in a very short time. If, as expected in early 2000, Genesis had maintained the EBITDA performance it had demonstrated during 1998, 1999 and the first two quarters of fiscal 2000 -- annual EBITDA of $205-210 million -- application of either the Warburg or Chilmark valuation methods would have led to a reorganization value for Genesis of $1.7 - $1.9 billion, $300 - $600 million above the total claims of the senior lenders. If that had happened, there would have been enough value for junior creditors, most notably the subordinated debentureholders, to recover the full par value of their debentures.

54.     But somewhere between March of 2000 and August of 2001, when the financial advisors submitted their final reports to the Bankruptcy Court, over half a billion dollars of enterprise value had disappeared, and there was now next to nothing left over for the debentureholders. Defendants brought about that result by manipulating and falsifying both the projected and LTM EBITDA data.

55.     The Budgeted EBITDA projections used by Warburg started with the baseless presumption that corporate level payroll expenses would increase by $35 million for additional staff, despite the fact that the company was shrinking. These

31

2001 Budgeted EBITDA projections also included the following additional, contrived, negative "adjustments", which were made, as needed, to keep the end result as close as possible to $158 million for valuation purposes -- and, thus, to maximize the recovery for the senior creditors, at the expense of everyone else:

- $13.242 million was taken out because of the anticipated loss of business supplying pharmaceuticals to Mariner Post-Acute Network ("Mariner"), even though there was never any possibility that this business would be lost.

- $11.6 million was also taken out to reflect the retroactive reduction in the management fees and other charges payable by MC to Genesis. This "renegotiation" was not undertaken to make these contracts more "fair", but to arbitrarily transfer value, retroactively, out of Genesis.

- a deduction for the loss of the AGE Institute business was overstated by about $4 million.

- about $2 million should have been, but was not, added because of an increase in the proportion of Medicare patients at Genesis facilities.

Collectively, these manipulations whittled down the projections by over $70 million. But for these manipulations, projected EBITDA would have been consistent with Genesis' recent historical performance in 1998, 1999 and the first two quarters of 2000.

56.     The artificially depressed Budgeted EBITDA projections were "confirmed" by the submission of "historical" LTM EBITDA data, which coincided

32

almost exactly with the projections. But the LTM data had been manipulated as well.

These manipulations included the following:

- As with the projections, 100% of the EBITDA from Mariner, totaling $13.4 million, was excluded on the spurious ground that this income would probably be lost.

- As with the projections, MC management, pharmacy and therapy charges were retroactively lowered by $11.6 million, reducing EBITDA by this same amount, on the spurious ground that this would make them more "fair".

- Excessive insurance reserve expenses of about $13 million were improperly subtracted.

- Non-recurring expenses of about $13 million for terminated First Choice employee health plan were improperly subtracted.

- 10% of the pharmacy revenues payable by Manorcare, totaling about $11 million, were not reported, without a reasonable basis to believe that those charges would probably not be paid.

- $6 million in expenses for the non-recurring "Special Recognition Program" were improperly subtracted.

- $4 million in expenses the for non-recurring executive deferred compensation were improperly subtracted.

- Pharmacy costs of goods sold were artificially inflated by about $13 million.

These manipulations whittled down Genesis' LTM EBITDA by as much as $80 million. In the six days between the first release of the LTM EBITDA and the confirmation hearing, it was simply impossible for the debentureholders to uncover

33

**A74**

this elaborate fraud, much less prove it.

## 2. Specifics

57.     The Genesis "DIP" Financing Agreement with the senior creditors

defines EBITDA as net income, as determined by GAAP,

> *plus* (a) the sum of depreciation expense, amortization expense, other non-cash expenses, adjustments for inventory valuation, net total federal state and local income tax expenses, gross interest expense less gross interest income, extraordinary losses, *non-recurring charges* or restructuring charges, effect of changes in accounting principles and Chapter 11 expenses [emphasis added],
>
> *minus* (b) extraordinary gains,
>
> *plus or minus* (c) the amount of cash received or expended which was taken into account in determining EBITDA for the current or any prior period.

This definition used in the Genesis DIP loan agreement is typical of those used in the

financial community, for reporting as well as for valuation purposes and, upon

information and belief, was the definition both Warburg and Chilmark assumed

Genesis had used in preparing its projected and LTM EBITDA data.

### a. Improper Deduction from LTM EBITDA of Additions to Insurance Reserves that were Well In Excess of Potential Liability Exposure

58.     Nursing homes and pharmacies, including those operated by

Genesis, carry general/professional liability ("GL/PL"), workers compensation

34