("W/C"), and employee health and casualty insurance. Prior to June of 2000, Genesis had been self-insured for WC and had purchased GL/PL insurance from a third party carrier. On June 1, 2000, just before filing its bankruptcy petition, Genesis restructured its insurance program (which included MC) by obtaining third party WC insurance and switching its GL/PL coverage to its own wholly owned insurance subsidiary, Liberty Health Corporation ("Liberty"), which is domiciled in Bermuda. Liberty never filed bankruptcy.

59.    Liberty maintained four layers of reinsurance for this GL/PL coverage, which collectively provided "stop loss" limits to Genesis' exposure. That limit (which included claims pertaining to MC) was initially $14 million, including $9 million for its Florida elder care facilities and $5 million for its other facilities. Thus, for the twelve month period June 1, 2000-May 30, 2001, Liberty's maximum possible GL/PL exposure, for both Genesis and MC, could not exceed $14 million. For the period June 1, 2001 through May 30, 2002, this aggregate stop loss limit was raised to $19 million.

60.    In this line of business "stop loss" limits are generally very high, and would never be reached absent some catastrophic liability incident. That was true for Genesis as well. For the twelve month insurance period ending May 30, 2001, Genesis (including MC) had approximately 1600 operating beds in Florida, for which

35

the actuarial loss experience, as determined by Genesis' risk management actuary, Tillinghast Towers-Perrin, was $2,888 per bed. For 1600 beds, the actuarial exposure was about $4.6 million, about half the $9 million stop loss limit for Genesis' Florida homes during that period. It would therefore have been appropriate to set aside reserves, and charge them against earnings, in the total amount of $4.6 million for the Florida facilities, for the period ending May 30, 2001.

61.    But Genesis went far beyond posting reserves commensurate with its actual exposure. Instead, it posted reserves equal to its total stop loss limits and fully expensed those payments immediately. Between July 1 and August, 2, 2000, Genesis (on a consolidated basis) fully funded the GL/PL self-insurance program for 2000-2001, by transferring to Liberty $14 million (in the form of letters of credit), the aggregate stop loss limit, and fully expensed that entire payment during the LTM period. Moreover, it appears that Genesis posted significant additional reserves on the insurance renewal date, June 1, 2001. The LTM EBITDA period ended on June 30, 2001. During the month of June large deposits were made to Liberty and were fully expensed at the time they were made, so that they could be used to reduce LTM EBITDA. These deposits not only exceeded, on a pro rata basis, the actuarial risk, but they were also paying to cover risks that were already covered by the stop loss provisions of the reinsurance carriers.

36

62.    The senior creditors were well aware of these transactions and the effect they would have on the LTM EBITDA; but neither the public nor the junior creditors, including the bondholders, were informed.

63.    Normally, the payment of insurance claims and deposits to reserves ought to be comparable, leaving the total reserve balance relatively static. But the reserve levels maintained by Genesis were anything but static. The great increases in insurance reserves, held by Liberty and posted by Genesis during this period, were reflected in the consolidated Genesis/MC 10Qs and 10Ks, as follows:

| Date | Reserve Balance ($ thousands) |
|------|-------------------------------|
| 9/30/99 | 24,599 |
| 9/30/00 | 27,899 |
| 9/30/01 | 51,625 |
| 6/30/02 | 74,912 |

However, the last two of these figures were not disclosed until after the confirmation hearing. The rapid build-up in reserves shows that Genesis was making payments to Liberty, and expensing them, far more quickly than Liberty was paying out claims.[9]

---

[9] These data also show that the practice of over-depositing into reserve accounts, and expensing those deposits, continued post-confirmation. This had the effect of keeping EBITDA consistent with the data that had been used to value the Company, thus preventing suspicions from arising; by depressing post-confirmation EBITDA, the trading price for Genesis stock was also kept down, rendering valueless the options that had been provided to the debentureholders in the Plan, which had an exercise price of $20.33 per share. Now that those options have expired, the excessive

37

64.    GAAP requires that companies deduct contingent liabilities from earnings under certain circumstances. SFAS No. 5, "Accounting for Contingencies", provides, in part, as follows:

> 1. ... a "contingency" is defined as an existing condition, situation or set of circumstances involving uncertainty as to possible gain ... or loss (hereinafter a "loss contingency") to an enterprise that will ultimately be resolved when one or more future events occur or fail to occur. ....
>
> 3. When a loss contingency exists, the likelihood that the future event or events will confirm the loss or impairment of an asset or the incurrence of a liability can range from probable to remote. .... This Statement uses the term *probable* ...as follows:
>
>> a. *Probable.* The future even or events are likely to occur. ...
>
> 4. Examples of loss contingencies include: .... risks of loss from catastrophes assumed by property and casualty insurance companies ....
>
> 8. An estimated loss from a loss contingency (as defined in paragraph 1) shall be accrued by a charge to income if *both* of the following conditions are met:
>
>> a. Information available prior to issuance of the financial statements indicates that it is probable that an asset had been impaired or a liability had been incurred at the date of the financial statements. It is implicit in this

---

deposits can be returned to Genesis at any time, benefiting the defendant Genesis equity holders but not the former debentureholders.

38

> condition that it must be probable that one or
> more future events will occur confirming the
> fact of the loss.
>
> b.   The amount of loss can be reasonably
> estimated.

Thus, under GAAP, charges to earnings, based on contingent insurance liabilities, are

to be accrued only when the liability is probable and the amount can be reasonably

estimated.

65.   Genesis did not report publicly, until the third quarter of 2002: (i)

what its aggregate stop loss limits were for its GL/PL insurance, (ii) that it had

deposited reserves equal to 100% of those limits, and (iii) that it had fully expensed

all those deposits in the current period, regardless of whether those deposits exceeded

Genesis' actual exposure to claims, in violation of GAAP. Genesis never reported that

it had deposited, and expensed, amounts in excess of the stop loss limits.

66.   Genesis has never explained the reasons for these surcharges to

reserves; nor has it ever disclosed the total insurance claims it actually received during

this period, so that the amount of claims could be compared to the size of the reserves

being taken. Instead, Genesis management made vague, conclusory pronouncements

to the unsecured creditors, in their quarterly and annual reports, and in statements to

the financial wire services, to the effect that insurance costs were "spiraling upwards".

39

These statements had the effect of explaining away the sudden tripling in insurance reserves reported by the Company within an 18 month time period.

67.    Genesis was, however, telling the truth to the senior creditors. On August 8, 2000, it explained the stop loss provisions and the fact that it was funding the self-insurance deposits via a letter of credit from the DIP financing provided by the senior creditors. It also told the senior creditors that W/C costs were declining from 1999 levels, and that rates had declined slighty from 2000 to 2001. In June of 2001, Genesis explained to the senior creditors that the GL/PL retention (the amount up to the stop loss limit) had been fully funded and expensed. Hager, other members of Genesis management, and the senior creditors all knew that the actuarially experienced losses were $2,888 per Florida bed, and $152 per bed in all other states, an amount far lower than the amounts being reserved and expensed.

68.    Plaintiffs estimate that the excessive insurance reserve charges deducted from EBITDA, during the valuation period, were at least $13 million.

**b. Improper Deduction from Budgeted and LTM EBITDA of $11.6 million by Renegotiating Genesis' Management Agreements with MC**

69.    A major part of the inducement for Genesis to acquire its stake in MC in 1997 was that it also would be able to earn significant revenues by (a) providing management services to MC, (b) selling pharmaceuticals to MC from the

40

Genesis institutional pharmacy division, NeighborCare, and (c) selling therapy services from its therapy division.

70.    On October 9, 1997, MC signed a five year management contract with Genesis with an automatic two-year renewal. At about the same time, separate therapy and pharmacy contracts were also signed. These contracts were negotiated at arm's length, with Texas Pacific Group and Cypress Group, which collectively owned over 56% of the MC stock, representing MC. The management services contract provided for payment of a fee equal to 6% of MC's gross revenue. This fee was well within industry norms, as were the pharmacy and therapy contracts as well.

71.    In its Disclosure Statement, ultimately disseminated in support of the bankruptcy reorganization Plan, Genesis recounted that

> At the time the management services agreement and other agreements were entered into, Multicare was controlled by parties unrelated to Genesis or the Genesis Debtors. The terms of these agreements were the product of arm's-length negotiations between Genesis and the parties controlling Multicare and the agreements were approved by Multicare's independent board of directors. In addition, the terms were disclosed at the time off the issuance of Multicare's senior subordinated notes (Class M5).

72.    By March of 2000, about the time when Goldman joined the senior lender steering committee, these senior Genesis/MC managers had begun an examination of the management, pharmacy, therapy and service contracts between

41

Genesis and MC. The stated reason for the examination was to determine the "fairness" of the very contracts that Genesis continued to represent had been negotiated at arm's length less than three years earlier. The real purpose of this exercise, however, was to divert as much value as possible from Genesis (and its bondholders) to MC, and thereby minimize the share of Genesis to which the Genesis bondholders would be deemed entitled.

73.    But renegotiation of the agreements was complicated by the fact that the same senior executives were in charge of both companies. Immediately after the acquisition of MC in 1997, management of the two companies had been kept separate; but by November of 1999, MC's financial condition had deteriorated so severely that its board of directors had resigned and managerial control had been transferred to an operating committee consisting of George Hager, Michael Walker and Rick Howard, who were also the CFO, CEO and Vice president of Genesis, respectively. Therefore, someone else had to be brought in to give the appearance of an arm's length renegotiation.

74.    Mellon suggested Beverly Anderson for that position. Notes taken by Chilmark at a steering committee meeting of April 13, 2000, show that Sherman White, an executive vice president of Mellon, had suggested Anderson's name, and the senior creditors selected her for the task. On April 13, 2000, Anderson was hired

42

as an "independent restructuring officer", and Anderson retained E&Y Capital Advisors ("E&Y") to work with her in the renegotiations. E&Y could not be retained directly by either Genesis or MC because of a conflict of interest.

75. Although Genesis represented in the Plan disclosure statement, and in its 10K report, that Anderson was independent, she was, in fact, financially beholden both to Goldman and to Genesis. Anderson had done consulting work for Mariner Post Acute Network ("Mariner"), and had run up an unpaid bill of over $500,000.00. By 2000 Mariner had filed for bankruptcy, and Anderson's claim was now just another unsecured pre-petition claim, which ordinarily would have had little chance of repayment. Anderson's only hope of payment was to be designated a "critical vendor" to Mariner, which would be highly unusual for a consultant unless the creditors consented.

76. Yet the Mariner creditors were for the most part the very same institutions that controlled the Genesis Bank Steering Committee. Four members of the Genesis Steering Committee held at least $380 million of Mariner's senior debt, with Goldman alone holding $242.3 million (over 25%) of it. Because Genesis was also a major creditor of Mariner, David Barr of Genesis chaired the Mariner unsecured creditors committee. Goldman and Genesis were therefore perfectly placed to determine whether Anderson's $500,000 bill would ever be paid.

43

77.    Although the renegotiated contracts between Genesis and MC were not signed until August of 2001, the Steering Committee had set the final terms eight months earlier. On October 10, 2000, Hager gave the Genesis unsecured creditors committee a preview: the contract renegotiation, he said, would result in a reduction of the management contract rate from 6% to 4.6%.

78.    A few weeks later, on November 13, 2000, E&Y made a presentation to the unsecured creditors committee of MC, during which it discussed its view of the fairness of the various existing contracts with Genesis, and the effect of changes that had been achieved in negotiations. At the time, a total of $16 million in contract reductions were being discussed, broken down as follows:

| | |
|---|---|
| Rehabilitation: | $2.8 million |
| Pharmacy | $3.0 million |
| Hospitality | $1.7 million |
| Management fees | $8.5 million |

79.    Yet E&Y reported that it had concluded that, for rehabilitation services, the existing arrangements were far from "unfair". It specifically determined that, compared to market rates,

- Medicare part A per diem rates as a whole were the same or better for Multicare facilities

44

A85

- Medicare Part B fee schedule percentages were the same or better for Multicare facilities

- Non-Medicare payor rates and premium service rates were the same or better for Multicare facilities.

In sum, E&Y characterized the fees Genesis had been charging for rehabilitation services as "market rate". Despite this, E&Y reported that Genesis had agreed to lower these fees by $2.8 million per year, even though a cut of that magnitude would cut its margins for these services by 46%.

100.    Similarly, E&Y concluded that the existing pharmacy deal MC had with Genesis was also fair and reasonable:

- [Prescription] Drug costs - Multicare pays slightly more than unaffiliated customers.

- OTC [over the counter drug costs] - Prices are market.

- IV's - No disadvantage identified

- Medical Supplies - Multicare receives better pricing than unaffiliated customers.

Once again, Genesis was ready to improve upon an already fair deal: E&Y reported that it had consented to lower its prescription medication charges by about $2 million per year, and to lower its medical supply charges – which were already "better" than those charged to other customers – by another $1 million.

101.    Hospitality rate charges tell the same story: although E&Y

45

concluded that Genesis' "rates are market", Genesis had agreed to reduce them dramatically, saving MC $1.7 million in 2000 and $2.1 million in 2001, and costing Genesis equal amounts.

102.    Finally, E&Y determined that management contract services in the industry range from a "base rate" of 3% to 6% of revenue, and that incentive fees range "up to 7% of gross or 1 to 25% of NOI [net operating income]". Although the Genesis contract had a base rate that was at the high end of this range, it did not have either a budget incentive fee or a stretch incentive fee. Moreover, the existing contract included a provision that prevented it from receiving 2% (one third) of its base rate in the event that MC fell below certain financial parameters. Because of MC's weak financial condition, it had consistently operated well below those financial parameters. Consequently, Genesis had actually been receiving only a 4% base rate fee.

103.    Nonetheless, Genesis had once again acquiesced in still further reductions, bringing the base rate down from 6% to 4.6%, a change which would boost MC's EBITDA (and reduce Genesis') by $8.5 million per year.

104.    Further negotiations apparently followed the November 13 presentation, because by January 23, 2001, the senior financial advisor to the banks, Policano & Manzo, advised Chilmark, the banks' valuation experts, that the total MC

46

**A87**

contract adjustments were set at $11.6 million.

105.   On January 9, 2001, Policano & Manzo had advised the senior creditors that Genesis' costs to manage Genesis, MC and a few third party beds was $80.4 million per year.  Using customary industry formulas for apportioning these expenses, the cost of providing the management services to MC was about $35.8 million per year. At the original 6% base rate, the revenues generated from the MC management contract were about $38 million (as calculated by E&Y), providing a razor thin "profit" margin of about $2.2 million. But even that profit margin was illusory; 2% of the fees were "accruing", unpaid, totaling about $13.1 million annually. As a result, under the existing management contract Genesis was actually *losing* about $10 million per year. Moreover, substantial additional amounts were not being paid at all.

106.   By reducing the base rate to 4.6%, an already bad situation was being made even worse. Now there would not even be a paper profit: management fee revenues would drop to $29.6 million – $6.2 million *below* the cost of providing those services. The unsecured creditors were not informed of these facts.  To the contrary, they were misled by Hager about the true costs of providing the management services, because he showed them only the payroll costs of providing the management services.

107.   Adding to the unreality of this renegotiation is that these new

47

agreements had *no prospective application whatsoever*. By the date they were signed and submitted for Court approval, Genesis and MC had already submitted a joint plan of reorganization pursuant to which the two companies would be merged and all intercompany management and other agreements would be extinguished. The *only* purpose of this renegotiation, therefore, was to achieve *retroactive* reductions in these fees, and thereby affect the relative valuations of these companies for purposes of the bankruptcy proceedings. The new contract rate was applied retroactively to reduce LTM EBITDA and projected EBITDA for the valuation period by $11.6 million. At the multiples used by the valuation experts, defendants had transferred, by this stroke of the pen, about $97 million in value from Genesis to MC -- and, therefore, from the Genesis bondholders to the senior creditors.

108.  This benefitted the Genesis senior creditors by lowering the valuation of Genesis dramatically, thereby proportionately increasing the share of Genesis stock they could obtain through the bankruptcy. Virtually all of these same creditors were also senior creditors of MC. But raising the value of MC did not have any negative affect on the MC senior creditors. MC had so little value that, even after adding $11.6 million to the bottom line, it was still worth substantially less than the senior creditor claims.

109.  In short, the "renegotiation" of the Genesis and MC agreements

48

**A89**

was not a bona fide transaction done in good faith. It was simply a contrivance to transfer value, for bankruptcy purposes, from Genesis to MC and thereby help the Genesis senior creditors achieve a greater share of the Genesis equity, at the expense of the Genesis bondholders, including plaintiffs.

### c. Improper Deduction of $11 Million from Budgeted and LTM EBITDA By Excluding 10% of the Pharmacy Sales to Manorcare

110.    In August of 1998, Genesis purchased the Vitalink Pharmacy from HCR Manorcare ("Manorcare") and also entered into an agreement requiring Manorcare to purchase pharmaceuticals from Genesis through 2004 at scheduled pricing rates. When the PPS Medicare reimbursement system went into effect in 1999, Manorcare demanded unwarranted price concessions from Genesis to help compensate for reduced reimbursement rates from Medicare. When Genesis refused, Manorcare purported to terminate its contract with Genesis, and Genesis commenced litigation to compel enforcement of the agreement. Manorcare also commenced its own arbitration proceeding, and all pending actions were ultimately consolidated before the arbitrator.

111.    At the March, 2000, meeting with the Steering Committee, Genesis management touched upon the Manorcare situation but gave no hint of any possibility that the Manorcare account might be lost, or that any substantial portion

49

of the Manorcare income was in jeopardy or would soon be excluded from income.

112.  On May 23, 2000, the arbitrator announced that, in view of the imminent bankruptcy filing of Vitalink and Genesis, the trial of the case, which had been scheduled for June of 2000, would be postponed indefinitely. Genesis subsequently reported in its 10K for 2000 that

> in connection with this stay, the parties agreed that [Manorcare] may pay, on an interim basis, ... 90% of the face amount of all invoices .... The remaining 10 percent must be held in a segregated account by Manorcare.

Thus, the withholding agreement was not compelled by any ruling of the arbitrator.[10]

113.  Although Genesis disclosed the existence of the withholding agreement, it did not disclose, in any 10K or 10Q filing issued during the period, or anywhere else, that when the holdback agreement was entered it had booked a prepaid expense equal to 10% of the Manorcare revenue. That expense reduced Genesis' LTM EBITDA by about $11 million, but that fact was not disclosed. The Chilmark valuation report also did not disclose the impact of this 10% holdback on its valuation of the Company. The unsecured creditors therefore had no idea that such an expense had been booked and that 10% of the Manorcare revenues had thereby been excluded from EBITDA.

_____

[10] Nor was the 10% holdback tied to the stay of the arbitration. Although the stay was announced in May of 2000, the holdback did not begin until November or Deceber of 2000.

50

114. In addition, the Genesis budgeted EBITDA figures included a $4 million "adjustment" for "price compression", to reflect the possibility that Genesis might be forced to make price concessions, in the future, in order to retain the Manorcare business. However, no price concessions were made to Manorcare during the 2001 fiscal year.

115. In April of 2002, several months after the Court approved the bankruptcy Plan, the arbitrator ruled that the Genesis contract with Manorcare was fully enforceable, and required Manorcare to turn over all the escrowed funds, with interest, totaling $21.7 million. In its 10Q for the second quarter of 2002, Genesis described the arbitrator's ruling and disclosed, for the first time, that it had been, in effect, excluding 10% of the Manorcare revenue from EBITDA up to that point.[11]

116. Under SFAS No. 5, it is improper to accrue a loss contingency unless it is "probable" that an event will occur that will cause the loss, and the amount of that loss can be reasonably estimated. Where, as here, the putative loss contingency arose from a pending litigation, it would be inappropriate to accrue any

---

[11]To reflect the release of the escrowed funds, Genesis booked a credit, which it categorized as "non-recurring". Because non-recurring income is not included in EBITDA, the use of this accounting device had the effect, once again, of excluding this income from post-confirmation EBITDA. In other words, $21.7 million of earnings from sales to Manorcare were forever excluded from Genesis' EBITDA. As noted above, by keeping Genesis' post-confirmation EBITDA down, defendants were able to keep "under water" the warrants the bondholders had received as part of the bankruptcy Plan.

51

loss unless counsel representing the debtor had rendered an opinion that it was probable that a loss of this particular magnitude would occur. No such opinion would have been rendered here, because it was never "probable" that Manorcare would succeed on its claims. The original contract fee schedule was reasonable and enforceable. Manorcare's fabricated claim was frivolous and should have been treated as such.

117.    This 10% exclusion of the Manorcare revenues from EBITDA reduced LTM EBITDA by about $11 million, and the valuation of Genesis by close to $90 million.

118.    Moreover, the $4 million "price compression adjustment" to budgeted EBITDA had no basis because no price concessions were made during that fiscal year.

### d. Improper Deduction of $13.4 Million from Budgeted and LTM EBITDA by Retroactively Excluding All Sales to Mariner

119.    Like Genesis, Mariner operated nursing care facilities and also had a separate pharmaceutical subsidiary, American Pharmaceutical Supply Company ("APS"). Genesis had a contract to supply pharmaceuticals to fifty-eight Mariner nursing homes that were not in APS service locations, and the contract generated revenue of about $53 million per year.

52

120. In January of 2000, Mariner filed for bankruptcy. Genesis continued to sell pharmaceuticals to Mariner, and as a "critical vendor" of pharmaceutical supplies, Genesis was entitled to receive "most favored vendor" treatment in the Mariner bankruptcy and therefore had little fear of non-payment. Genesis also had the additional protection of having its executive, David Barr, serve as chairman of the Mariner unsecured creditors committee. As a result, despite the bankruptcy, Genesis continued to be paid, in full, for all products it was delivering to Mariner, even though Mariner had not formally elected to affirm the supply contracts. As of March of 2000, Genesis had made no provision to reserve any of the receivables from Mariner; nor was any provision even discussed for the possible loss of the Mariner business.

121. By August 30, 2000, Genesis had began negotiating to purchase APS from Mariner. On October 10, 2000, Hager told the unsecured creditors committee that an "opportunity" had presented itself to acquire APS, but that a "risk" of losing the Mariner pharmaceutical contract had also arisen. By linking the two, Hager suggested that unless APS were acquired, the entire Mariner business might well be lost.

122. By the end of October, Genesis and the financial advisors to the senior creditors were hypothesizing that a complete loss of the Mariner business could

53

**A94**

occur, and if it did it would reduce Genesis revenue by $52.8 million and EBITDA by $15.6 million. They further hypothesized that, in order to keep the Mariner business, Genesis might have to reduce its prices to Mariner (and, hence, its EBITDA) by $7.5 million.

123.    But the prospect of losing the Mariner business never became a serious possibility, for two reasons: prior to approval of the bankruptcy Plan, Genesis reached an agreement to continue to provide pharmaceuticals to Mariner *regardless* of what happened with APS; and, in any event, it had also signed a contract to acquire APS. But defendants took steps to make sure that the Mariner issue was not formally resolved until after confirmation of the Plan.

124.    On April 30, 2000, Genesis filed an "emergency" motion in the Mariner bankruptcy to compel Mariner to affirm or reject the pharmacy contracts, claiming that an immediate resolution was necessary to prevent "irreparable harm" to Genesis. This "emergency" motion was then adjourned by agreement eight times, for a total of 18 months, until October of 2001. It was only then, when the Genesis Plan had been safely approved, that the extension of the pharmaceutical supply contract was "finalized" and disclosed.

125.    In fact, negotiations to acquire APS and to extend the supply contract had been ongoing for almost a year before the Plan was approved. As early

54

as November, 2000, several of the senior creditors, led by Goldman, had put together a financing package to enable Genesis to acquire APS; simultaneously, negotiations were proceeding for the continuation of the Mariner pharmaceutical supply contract, under slightly altered pricing terms. The senior creditors assented to the acquisition of APS by Genesis, and drafts of letter agreements were exchanged in September, November, March and on April 12, 2001. Genesis signed a final letter agreement as of April 12, 2001, and APS accepted it on April 17 – a development which obviated any legitimate concerns that the Mariner business might be lost, but which was not disclosed to the court or to the unsecured creditors. Meanwhile, the motion to compel affirmation or rejection of Genesis' contracts with Mariner was repeatedly adjourned, to avoid a formal resolution of the matter that could not have been concealed.

126. The prospect of acquiring APS should have led to a positive adjustment to Budgeted EBITDA, because this transaction was projected to enhance Genesis' revenues and earnings significantly.[12] Instead, in the spring of 2001 defendants disclosed that Budgeted EBITDA projections of $158 million had been prepared, and that they reflected a downward "adjustment" that assumed that the

---

[12] In fact, Houlihan Lokey, advisors to the unsecured creditors committee, determined that the acquisition of APS would add so much to Genesis' reorganization value that it would add 6% to the percentage of the new reorganized company that the debentureholders would be entitled to receive, increasing that percentage from 20.1% to 26.6% of the entire reorganized company.

55

entire Mariner business would be lost. This adjustment was originally set at $11.123 million, but had grown to $13.424 million by the time it was incorporated into the Budgeted EBITDA. Goldman and Highland made an all-out, successful effort to persuade the unsecured creditors committee and its financial advisors, Houlihan Lokey, that the Mariner business was likely to be lost and that a downward adjustment of EBITDA was therefore warranted. The creditors committee was persuaded and agreed to the reduction.

127.    But at that very moment Hager was advising the senior creditors that, even if the APS acquisition never went through, the Mariner business would *still* not be lost. On April 3, 2001, he told the senior lender steering committee that the pharmacy supply contract with Mariner would be in force for another 18 months, with Genesis having the right to match any competitive bid for two years after that. Handwritten notes of that meeting also indicate that Hager reported that Mariner was legally prohibited from lowering its pharmacy rates from Genesis. In short, he told the senior creditors that the Mariner pharmaceutical business was locked in, at full rates, until the end of 2002, and at somewhat reduced pricing up to 2005, irrespective of whether or not APS was acquired.

128.    Neither the signing of the letter of intent to acquire APS, nor the extension of the pharmacy supply contract, was disclosed to the unsecured creditors;

56

**A97**

nor were they informed that the supply contract would remain in effect until 2005, *regardless* of whether or not Genesis acquired APS. In fact, Genesis actually signed *both* a formal extension agreement with Mariner *and* a contract to acquire APS before the Genesis Bankruptcy Plan was approved, and those agreements were not disclosed either, until well after the reorganization Plan had been approved. The final agreement to buy APS was executed on or about September 24, 2001, but defendants did not disclose it until October 8, 2001, *6 days* after the Court approved the Genesis bankruptcy Plan. Genesis did not disclose the extension of the Mariner supply contract until its 10Q for the first quarter of 2002, which was filed 4 months after the confirmation of the Plan. Both the purchase and the supply agreement extension were approved in the Mariner bankruptcy on November 1, 2001, about a month after the court approved the Genesis bankruptcy Plan.

129. As noted above, SFAS No. 5 permits the accrual of a loss contingency *only* when the potential loss is "probable". Here, the loss of the Mariner business was never "probable". The exclusion of over $13 million from the EBITDA projections and LTM EBITDA (and, therefore, of over $100 million from the Genesis valuation) for this reason was improper.

57

### e. Excessive Deduction from Budgeted EBITDA
### for Loss of AGE Institute Business

130.  Genesis had a contract to provide management, pharmacy and rehabilitation services to AGE Institute, a not-for-profit company that owned 20 nursing homes, mostly in Florida. On 2000, AGE Institute notified Genesis that it was unilaterally terminating the contract effective October 31, 2000.  The annual revenues from this contract totaled $19.224 million.

131.  AGE Institute had been encountering serious financial difficulties for over a year, and by the date of the termination Genesis had run up an account receivable from AGE Institute of over $20 million, about a year's worth of unpaid bills. Recognizing AGE Institute's weak financial condition, Genesis had been setting aside substantial reserves against that receivable and the future fee income.  Genesis had determined that approximately two-thirds of this amount was collectible. It filed suit for the unpaid balance, seeking $28 million in damages.

132.  At a meeting with the senior creditors in September of 2000, Genesis reported the loss of the AGE Institute business. It specifically advised them that the management contract had a 20% EBITDA margin and that the adverse impact on EBITDA would therefore be about $2,226,000.  This was consistent with the subsequent disclosures in the Genesis 10K for 2000, which stated that Operating

58

Income from the AGE contracts was $2 million annually. At the September meeting Management also represented that it had already reserved $1 million through the end of July, 2000, as against the AGE Institute business. The setting aside of such reserves, and the accruing of the commensurate loss, had already reduced Genesis' EBITDA.

133. On October 10, 2000, three weeks after the September meeting with the senior creditors, Genesis made a presentation to the Unsecured Creditors Committee concerning the loss of the AGE Institute business, and asked the Committee to approve an adjustment to the budgeted EBITDA being used for valuation purposes. Although Genesis used the same presentation boards it had recently used for the senior lender presentation, certain key data was changed. Now the EBITDA margin on the AGE Institute management contract was represented to be 74%, rather than 20%, and the adverse effect on EBITDA was represented to be $5.25 million, rather than $2.23 million. Those amounts took into consideration some, but not all, of what had already been reserved with respect to the loss of the AGE Institute business. Genesis management requested that budgeted EBITDA be adjusted downward by $5.25 million to reflect the loss of this business, and the Unsecured Creditors Committee, being unaware of the much lower figures that had been used in the presentation to the senior creditors, and of the reserve already set aside for the

59