# EXHIBIT B

Westlaw.

Not Reported in F.Supp.2d  
Not Reported in F.Supp.2d, 2004 WL 724960 (D.Del.)  
**(Cite as: Not Reported in F.Supp.2d)**

Page 1

**H**
Briefs and Other Related Documents
Only the Westlaw citation is currently available.
United States District Court,D. Delaware.
In re: HECHINGER INVESTMENT COMPANY OF DELAWARE, INC., et al. Debtors.
HECHINGER LIQ. TRUST, Assignee of HSBC Bank USA, not individually, but solely as indenture trustee, Plaintiff,
v.
BANKBOSTON RETAIL FINANCE INC., individually and as agent for lenders under Amended and Restated Credit Agreement dated March 18, 1999, and General Electric Capital Corporation, Defendants.
**No. 99-02261-PJW, Civ. 00-973-SLR.**

March 28, 2004.

Mark Minuti, Michael F. Bonkowski, and Jeremy Ryan, of Saul Ewing LLP, Wilmington, Delaware, for Plaintiff, David M. Friedman, Howard W. Schub, David E Ross, Andrew K. Glenn, Ian D. Katz, and Marvin C. Peguese, of Kasowitz, Benson, Torres & Friedman LLP, New York, New York, of counsel.
Teresa K.D. Currier, and Peter J. Duhig, of Kleet Rooney Lieber & Schorling, P.C., Wilmington, Delaware, for Defendant BankBoston Retail Finance Inc. Paul S. Samson, and Jeffrey D. Ganz, of Riemer & Braunstein LLP, Boston, Massachusetts, of counsel.
Steven M. Miller, and Carl N. Kunz, III, of Morris, James, Hitchens & Williams, LLP, Wilmington, Delaware, for Defendant General Electric Capital Corporation. John Cambria, Claude D. Montgomery, and Clay J. Pierce, of Salans, New York, New York, of counsel.

OPINION

ROBINSON, Chief J.

I. INTRODUCTION

*1 1. This case is an adversary proceeding initiated in connection with the bankruptcy petition filed by Centers Holdings, Inc. and its subsidiaries (collectively "Center Holdings") under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware. The order of reference has been withdrawn and the case is pending before this court. (D.I.1)

2. The court has jurisdiction over this action pursuant to 28 U.S .C. § 1334(b). The case is "related to" the debtor's bankruptcy estate as it will affect the amount available for distribution to other creditors in the bankruptcy proceeding. See In re Pacor, 743 F.2d 984, 994-95 (3d Cir.1984).

3. Plaintiff Hechinger Liquidation Trust, as assignee of HSBC Bank USA, Inc., alleges two counts in its complaint against defendants Bankboston Retail Finance, Inc. and General Electric Capital Corporation. First, plaintiff seeks an "equitable lien" in the property of Hechinger Company and its subsidiaries. Second, plaintiff seeks equitable subordination pursuant to § 501(c) of the Bankruptcy Code, 11 U.S.C. § 510(c). Summary judgment motions were filed by both parties and denied on December 10, 2002. (D.I.61) Beginning on October 14, 2003, a three day bench trial on the merits was held. Having considered the evidence and testimony, the court concludes that plaintiff has failed to prove by a preponderance of the evidence that it is entitled to an equitable lien. Pursuant to Fed.R.Civ.P. 52, these are the court's findings of fact and conclusions of law.

II. BACKGROUND

4. This case involves a complex series of transactions resulting in the merger of two do-it-yourself home improvement retail store chains, the Hechinger Company ("Hechinger") and Builders Square, Inc. ("Builders Square"). (PTX 45)

5. Giving rise to the present litigation is an indenture previously entered into in October 1992 by Hechinger and First Union National Bank of North Carolina as Indenture Trustee (the "Indenture"). [FN1] Pursuant to the Indenture, Hechinger issued $100 million of 9.45% senior unsecured debentures in November 1992 and an additional $100 million of 6.95% senior unsecured notes in October 1993 (collectively, the "Notes"). (Id., ¶ 52-53)

FN1. On January 31, 1997, American stock Transfer and Trust Company became the

Not Reported in F.Supp.2d                                                                                                            Page 2
Not Reported in F.Supp.2d, 2004 WL 724960 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

Indenture Trustee.

6. The Indenture contained a clause restricting future secured debt (the "Negative Pledge") stating, in part, that
the Issuer will not, and will not permit any Restricted Subsidiary to, create, assume, incur any Indebtedness secured by a Lien on any Operating Property or Operating Asset of the Issuer or any Restricted Subsidiary, whether such Operating Property or Operating Asset is now or hereafter acquired[.]

(PTX 2, § 3.6) The operating assets and property covered by the Indenture's Negative Pledge included all of the merchandise, inventories, furniture, fixtures, all real property and improvements thereon. (*Id.*, § 1.1) The Indenture required that if Hechinger or any of its subsidiaries incurred indebtedness in violation of the Negative Pledge, Hechinger must "effectively provide[ ] concurrently with the issuance, assumption or guarantee of any such Indebtedness that the [Notes] be secured equally and ratably with such Indebtedness." (*Id.*, § 3.6)

*2 7. The Indenture contains a purchase money exception to the Negative Pledge, exempting
[l]iens to secure the payment of all or any part of the purchase price or construction costs in respect of Operating Property or Operating Assets acquired by the Issuer or a Restricted Subsidiary after the date hereof securing Indebtedness, incurred prior to, at the time of, or within 18 months after, the opening for business of any such Operating Property or the acquisition of such Operating Assets, in the aggregate not in excess of the amount expended in the acquisition of such property or properties plus the aggregate amount expended for improvements thereon[.]

(*Id.*, § 3.6(c)) The Indenture also contains a refinancing exception, exemptingthe extension, renewal or replacement of any Lien permitted by subparagraph (b), (c), (d), (e), (f), (g) or (n), but only if the principal amount of Indebtedness secured by the Lien immediately prior thereto is not increased and the Lien is not extended to other property.

(*Id.*, § 3.6(h)) Finally, the Indenture states with respect to the Negative Pledge:Notwithstanding the foregoing provisions of this Section 3.6, the Issuer or any Restricted Subsidiary may create or assume Liens in addition to those permitted by the foregoing provisions of this Section 3.6, and renew, extend or replace such Liens; *provided,* that at the time such creation, assumption, renewal, extension or replacement, and after giving effect thereto, Exempted Debt does not exceed 10% of Consolidated Tangible Net Assets.

(*Id.*)

8. Between 1984 and 1997, Builders Square operated as a wholly-owned subsidiary of Kmart Corporation ("Kmart"). Beginning in 1996, with the assistance of investment bank Rothschild, Inc. ("Rothschild"), Kmart began exploring options to sell Builders Square. (PTX 45, ¶ 1-6) After being retained, Rothschild solicited several potential buyers for Builders Square including Hechinger.

9. The acquisition of Builders Square by Hechinger was the result of a series of complex transactions which occurred during the period of September 25, 1997 to September 29, 1997 (the "1997 Transactions"). The negotiations for the 1997 Transactions were extensive and at arms length. An investment fund managed by Leonard Green & Partners L.P. ("Leonard Green"), an investment banking firm, was the equity sponsor of the 1997 Transactions. In preparation for the 1997 transactions, GEI II, L.P., a Leonard Green investment fund, formed Center Holdings which subsequently created BSQ Acquisition, Inc. ("BSQ Acquisition") as a subsidiary. Builders Square formed BSQ Transferee Corporation ("BSQ Transferee"). (*Id.*, ¶ 7-8)

10. On September 25, 1997, Builders Square transferred most of its operating assets and liabilities to BSQ Transferee in exchange for one hundred percent of BSQ Transferee's stock and a $10.7 million promissory note. BSQ Acquisition purchased the stock of BSQ Transferee from Builders Square for $10 million in cash in addition to a warrant to purchase thirty percent of the stock in Center Holdings. BSQ Transferee became a subsidiary of BSQ Acquisition, and Center Holdings and BSQ Acquisition would ultimately be the parent corporations of the corporate entity operating the Hechinger's-Builders Square home improvement chain. (*Id.*, ¶ 9)

*3 11. On September 25, 1997, BSQ Transferee obtained a $171 million interim loan from a group of lenders (the "Chase Group") led by The Chase Manhattan Bank ("Chase"). The loan was secured by inventory, accounts receivables and equipment of BSQ Transferee. BSQ Transferee loaned $110 million to BSQ Acquisition, which used approximately $100.6 million of the loan proceeds to

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                          Page 3
Not Reported in F.Supp.2d, 2004 WL 724960 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

purchase all of the Hechinger Company public stock from the shareholders, making Hechinger Company a subsidiary of BSQ Acquisition. The Chase Group also loaned the Hechinger Stores Company (a subsidiary of Hechinger) $112 million, $89,599,034.08 of which was used to pay the CIT Credit Corporation. As part of the 1997 Transactions, substantially all of the Builders Square operating assets were transferred to a Hechinger subsidiary, Hechinger Investment Company of Delaware, Inc. ("HICD), which became the new operating company for the combined entities. (*Id.*, ¶ 12, 14)

12. On September 26, 1997, HICD entered into a permanent loan agreement (the "Permanent Credit Agreement") with the Chase Group. The loan agreement provided for a maximum available credit of $600 million with an initial advance of $243 million to purchase from BSQ Transferee certain operating assets and liabilities originally purchased by BSQ Transferee from Builders Square, which were the subject of the HICD Bill of Sale from BSQ Transferee.[FN2] BSQ Transferee then used part of the $243 million payment to repay the $171 million interim loan from Chase. The Hechinger Stores Company repaid its $112 million loan from Chase using, in part, funds remaining from the initial $243 million advance to HICD. (*Id.*, ¶ 15)

> FN2. Pursuant to the terms of a Bill of Sale, Assignment and Assumption Agreement, entered into as of September 26, 1996, the ("HICD Bill of Sale"), BSQ Transferee sold to HICD
> the retail store contents and warehouse and headquarters assets (other than assets consisting of improvements and fixtures) used in [BSQ Transferee's] Business and relating to [BSQ Transferee's] operations of [BSQ Transferee's] Business.
> (*Id.*, ¶ 17) The "Business" referred to in the HICD Bill of Sale included substantially all of the operating assets and liabilities from Builders Square, excluding its mortgages and capital lease obligations. (*Id.*, ¶ 18, 19) These assumed operating liabilities totaled approximately $400 million. (*Id.*, ¶ 20)

13. Center Holdings' leasehold obligations concerning the Builders Square properties were governed by several agreements. On September 25, 1997, Kmart and BSQ Transferee entered into a Consent and Undertaking Agreement which permitted further subleases and exercise of options in the subject matter leases under certain terms and conditions for guaranties to Kmart by all debtors. On September 26, 1997, BSQ Transferee and HICD entered into a rental agreement, sublease and lease. (*Id.*, ¶ 22-24)

14. On September 29, 1997, Hechinger Stores Company and Hechinger Stores East Coast Company transferred their operating assets and liabilities to HICD, completing the combination of the Hechingers and Builders Square chains. (*Id.*, ¶ 25)

15. Prior to the 1997 Transactions, Leonard Green conducted substantial due diligence on Hechinger, Builders Square and the do-it-yourself store industry. (D.I. 179 at 693, 695-97, 701-03, 678-87, 689-91) Kmart and its investment banker, Rothschild, also conducted due diligence. (D.I. 180 at 928-33)

16. The Chase Group conducted its own due diligence that included a review of the companies' internal books and records; meetings with management; a solvency opinion from an independent valuation firm; valuation of the inventory; cash flow sensitivity analyses; counsel's opinions that there were no breaches of the Indenture or of any other material agreements; the borrower's certification of no default and full compliance of all loan covenants; and a review of relevant documents and opinions by Chase's counsel. (PTX 27; DTX 18, 37; D.I. 180 at 936-39, 943-45) Chase also obtained post-transaction certifications from Hechinger that there was no default under the Indenture. (DTX 27, 28, 29)

*4 17. Following the 1997 Transactions, Hechinger performed a valuation of the acquired Builders Square assets and liabilities, at fair market value, consistent with GAAP purchase accounting requirements. (D.I. 180 at 782-86, 814-15; D.I. 179 at 367-68, 378-80, 382-83) That valuation determined that the Builders Square assets and liabilities had a net fair market value of $260 million as of September 27, 1997. (D.I. 179 at 382; DTX 78, ex 13) The purchase accounting valuation was audited by KPMG. Plaintiff has not claimed that the post-transaction purchase accounting or the KPMG audit were improper. (DTX 25)

18. On March 18, 1999, defendants refinanced and paid to the Chase Group the full amount outstanding under the Permanent Loan, thereby becoming HICD's senior lenders. Pursuant to a series of agreements, defendants were assigned all of Chase Group's liens and security interests under the Chase Security

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                          Page 4
Not Reported in F.Supp.2d, 2004 WL 724960 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

Agreement.

### IV. CLAIM FOR AN EQUITABLE LIEN

19. Under New York law, an equitable lien may be imposed notwithstanding the failure of a creditor and debtor to observe the formalities of perfecting a proper security interest. See *James v. Alderton Dock Yards* 256 N.Y. 298, 303 (1931). Equitable liens have been held to have survived the adoption of the Uniform Commercial Code and, in New York, are liberally applied. See *Albany Sav. Bank, F.S.B v. Novak*, 574 N.Y.S.2d 140, 141 (N.Y.Sup.1991). To obtain an equitable lien, the creditor must demonstrate a clear intent of the parties to create a security interest and knowledge of that security interest by the party against whom the equitable lien is asserted. See *Pennsylvania Oil Products Refining Co. v. Willrock Producing Co., Inc.*, 267 N.Y. 427, 434-35 (1935).

20. Equitable liens arising from a negative pledge in an indenture have only been awarded in a single case. See *Chase Nat. Bank of City of New York v. Sweezy*, 281 N.Y.S. 487 (N.Y.Sup.1931). In *Sweezy*, the court awarded an equitable lien to bondholders in the collateral acquired by a secured creditor finding that the negative pledge had been violated. Critical in that case, however, was the fact that the lender against whom the equitable lien was imposed was also the indenture trustee for the bondholders. *Id.* at 491. [FN3]

> FN3. Since *Sweezy*, only one other New York court has considered the claim of an equitable lien arising from a similar negative pledge clause. See *Kelly v. Central Hanover Bank & Trust Co. v. Kelly*, 11 F.Supp. 497 (S.D.N.Y.1935). The district court in *Kelly* found that even when a secured creditor has knowledge of the debtor's breach of a negative pledge, an equitable lien should not be imposed. *Id.* at 507. Notably, although the Second Circuit remanded to the district court for further findings of fact, the district court subsequently declined to provide additional facts. *Kelly v. Central Hanover Bank & Trust Co. v. Kelly*, 85 F.2d 61 (2d Cir.1936)(remanding for additional findings of fact) *remanded to* 14 F.Supp. 346 (S.D.N.Y.1936)(declining to make further findings of fact).

21. Under the Permanent Credit Agreement, the Chase Group advanced $243 million to finance the merger and to refinance an existing credit facility in the amount of $89,599,034.08. Accordingly, to the extent Builders Square had a value of less than $153,400,965.92, the Chase Group loan would be a breach of the Indenture's Negative Pledge. (D.I.61)

22. Valuation is a mixed question of law and fact. See *Amerada Hess Corp. V. C.I.R.*, 517 F.2d 75 (3d Cir.1975). The Third Circuit instructs that in determining the proper valuation methodology, the court must consider both the purpose of the valuation as well as the property to be valued. *Id.* at 82; *id.* at 88 ("It is axiomatic that the same item may have different 'value' for different purposes."). See also *Powers v. C.I.R.*, 312 U.S. 259, 260 (1941)("The criteria to be employed in determining value necessarily must differ somewhat in respect to the kinds of property to be valued under the statute. A question of law is presented therefore as to the standard to be applied."). In some contexts, there is legal guidance to support the use of a particular methodology. See, e.g., *In re PWS Holding Co.*, 228 F.3d 224 (3d Cir.2000) (concluding that, for purposes of determining solvency under state fraudulent transfer law, a business enterprise valuation taking into consideration the value of the going concern was appropriate); *Mellon Bank, N.A. v. Metro Comm., Inc.*, 945 F.2d 635, 650 (3d Cir.1991) (applying a balance sheet valuation to determine solvency for purposes of 11 U.S.C. § 548); 8 Del. C. 262(h)(defining value of business as "the value of the Company to the stockholder as a going concern rather than its value to a third party as an acquisition" for purposes of shareholder appraisal action).

*5 23. Consistent with the Third Circuit's guidance, the court notes that the purpose of the valuation in the case at bar is to determine whether the Negative Pledge clause was breached and whether defendants, who are strangers to the Indenture, had notice of its breach. This is, at its heart, a dispute between creditors who were secured and those who were not. [FN4]

> FN4. Disputes between secured and unsecured creditors are hardly novel and, to large degree, are the essence of both Article 9 of the U.C.C. and the Bankruptcy Code. In both statutory schemes, lien holders and unsecured creditors generally stand behind secured creditors. There are certain exceptions, such as where the secured interest is fraudulently conveyed or under

Case 1:05-cv-00427-KAJ   Document 16-3   Filed 01/23/2006   Page 6 of 7

Not Reported in F.Supp.2d                                                                                                    Page 5
Not Reported in F.Supp.2d, 2004 WL 724960 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

circumstances where the law imputes knowledge of the debtors' insolvency to the secured creditor at the time of the transfer of interest. *See* 11 U.S.C. § 548 (2003)(fraudulent transfers) *and* N.Y. Debtor & Creditor Law § 270 et seq. (2003)(Uniform Fraudulent Conveyance Act). Bankruptcy preference actions and fraudulent conveyances, however, are inapposite to the present dispute.

24. In support of its contention that the Negative Pledge was breached, plaintiff proffered expert testimony as to the value of Builders Square in 1997 from the standpoint of an equity investor. At trial and in oral arguments, plaintiff focused on the propriety and reasonableness of its valuation in comparison to defendants' proffered valuations.

25. Dr. Israel Shaked, plaintiff's financial expert, employed two valuation methods to reach the conclusion that Builders Square was worth less than $153 million. The first method employed by Dr. Shaked was a comparable company multiple analysis which values a company based upon publicly traded stock prices of comparable companies in the same industry by deriving multiples for specific indicators of value ("CCM analysis"). [FN5] (D.I. 178 at 144-64) Using these multiples, adjusted for competitive ranking and interest bearing debt, Dr. Shaked concluded that Builders Square had an equity value ranging between negative $374 million to negative $60 million, with a negative value of negative $73.2 million. (*Id.* at 162-64) Dr. Shaked's second method of valuation involved a discounted cash flow analysis to value Builders Square as an on-going concern ("DCF analysis"). [FN6] (*Id.* at 168-88) The result of the DCF analysis was the determination by Dr. Shaked that Builders Square had a negative equity value in excess of negative $500 million. (*Id.* at 168)

> FN5. Dr. Shaked selected companies which he first identified as competitors using "standard industrial classification," and then selected from that group companies that: (1) were in the same line of business as Builders Square; (2) had not filed bankruptcy prior to the 1997 Transactions; and (3) had similar characteristics as Builders Square. (*Id.* at 148-51) As a result of this process, Dr. Shaked identified four comparable companies. Dr. Shaked identified three indicators of value based upon the companies' financial data for the twelve months preceding the 1997 Transactions, including EBIT (earnings before interest and taxes); EBITDA (earnings before interest, taxes, depreciation and amortization); and EBITDAR (earnings before interest, taxes, depreciation, amortization and rent).

> FN6. This method identifies future cash flow which is reasonably expected to be generated by a business, and then discounts those future cash streams to obtain their dollar value at the time of the 1997 Transactions.

26. Defendants offered the testimony of two experts as evidence that Builders Square assets exceeded the requirements of the Negative Pledge. Defendants' first expert, Louis Paone, performed a CCM analysis, DCF analysis and a merger and acquisition analysis ("M & A analysis"). (*Id.* at 537-38) Under his CCM analysis, Paone testified that Builders Square had a value of between $350 and $410 million. [FN7] (*Id.*) Under the M & A analysis, Paone testified that Builders Square had a value of between $430 and $500 million. [FN8] Finally, using his DCF analysis Paone testified that Builders Square had a value of between $420 and $480 million. [FN9]

> FN7. Mr. Paone relied upon different assumptions in performing his comparable company multiple analysis. First, he did not utilize historical EBITDA and EBIT. Second, he used revenue, adjusted assets and projected EBITDA in his analysis.

> FN8. The M & A analysis involved looking at comparable merger transactions to determine a post-merger enterprise value.

> FN9. Mr. Paone's discounted cash flow analysis differed from Dr. Shaked's in several respects. First, he relied upon unmodified projections by Leonard Green. (D.I. 179 at 628) Second, he projected substantial changes in same store sales and gross margins. (*Id.* at 529) Third, he projected no increase in labor or rent costs for ten years. (*Id.* at 649) Fourth, Mr. Paone valued Builder Square assets based upon post-merger synergies.

27. Defendants' second expert, Robert Rock, testified that Builders Square had a net asset value of $258 million using an adjusted balance sheet valuation

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 724960 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

Page 6

method. (D.I. 180 at 817-819) An adjusted balance sheet valuation involves the restatement of balance sheet items based on their market values. Rock relied on the audited financial statements of the company and the audit statements of their auditors. (*Id.* at 816-17)

28. To obtain an equitable lien under New York law, plaintiff has the burden of demonstrating both the breach of the Negative Pledge, as per the court's December 10, 2002 memorandum opinion, and knowledge by the defendants of both the clause and its breach. [FN10] In the absence of the presence of the badges of fraud, to require something less than actual knowledge on the part of defendants would result in the imposition of a duty as between a secured lender and prior unsecured creditors of the debtor. Such a duty, the court finds, does not have a basis in law. *See, e.g., In re Sharp Intern. Corp., 302 B.R. 760, 777-81 (E.D.N.Y.2003).*

> FN10. In its December 10, 2002 memorandum opinion, the court stated that the "analysis begins with a determination of whether the Negative Pledge clause has been breached. Absent a breach of the Negative Pledge clause, no basis exists to grant plaintiff the equitable remedies requested." (D.I. 61 at 9-10) The law is clear, however, that absent knowledge of a breach, no basis exists to grant the remedy of an equitable lien. Consequently, defendants' knowledge and the proper valuation method to be employed are intertwined.

*6 29. Consequently, while Dr. Shaked's analysis might have been appropriate to establish a breach as between the parties to the Indenture itself, it does not satisfy plaintiff's burden with respect to a stranger to the Indenture. Even if the court were to find that Dr. Shaked's analysis is legally and factually the best valuation methodology under these circumstances and, therefore, the Negative Pledge was breached, his analysis is legally irrelevant to whether the Chase Group had knowledge of the breach.

30. It is uncontroverted that the 1997 Transactions were negotiated in good faith, at arms-length and with reliance upon professional advice and opinions with respect to compliance with the terms of the Negative Pledge. It is uncontroverted that post-merger, Hechinger valued Builders Square's net assets and liabilities at $260 million under GAAP fair market value standards for purchase accounting. It is also uncontroverted that an independent audit confirmed the post-merger valuation. In the absence of a showing of fraud or bad faith, the court concludes that it would be contrary to principles of equity and law to impair the status of a secured creditor by determining that the valuation methodology used by the parties to the 1997 Transactions was unreasonable or improper. *See Gray v. Cytokine Pharmasciences, Inc.,* C.A. No. 17451 (Del. Ch. April 25, 2002)(concluding that expert valuations by both plaintiff and defendant were unreliable as they were prepared for litigation and instead adopting the valuation of a third-party at the time of the disputed transaction). Even if the court were to adopt plaintiff's expert's testimony with respect to the value of Builders Square, the court finds no evidence that Chase Bank or defendants had actual knowledge of that valuation, that they were under no legal duty to know that valuation and, therefore, there is no basis in law or equity to impose a lien based on that valuation.

### V. CONCLUSION

31. The court concludes that plaintiff has failed to prove by a preponderance of the evidence that it is entitled to an equitable lien and, therefore, judgment will be entered in favor of defendants.

D.Del.,2004.
In re Hechinger Inv. Co. of Delaware, Inc.
Not Reported in F.Supp.2d, 2004 WL 724960 (D.Del.)

Briefs and Other Related Documents (Back to top)

• 2004 WL 943555 (Trial Motion, Memorandum and Affidavit) Post-Trial Sur-Reply Brief of Defendants Fleet Retail Finance, Inc. and General Electric Capital Corporation (Feb. 04, 2004)
• 2004 WL 943556 (Trial Motion, Memorandum and Affidavit) Post-Trial Reply Brief for Plaintiff the Hechinger Liquidation Trust (Jan. 16, 2004)
• 1:00CV00973 (Docket) (Nov. 17, 2000)

END OF DOCUMENT