**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | : | |
| | : | |
| Genesis Health Ventures, Inc., et al., | : | Civ. Act. No. 05-CV-427 (KAJ) |
| | : | Related to Case No. 00-2692 (JHW) |
| Debtors, | : | Jointly Administered |
| | : | |
| Richard Haskell et al., | : | |
| | : | |
| Plaintiffs-Appellants, | : | |
| | : | Adv. Pro. No.: 04-53375 (JHW) |
| v. | : | |
| | : | |
| Goldman, Sachs & Co., et al., | : | |
| | : | |
| Defendants-Appellees. | : | |
| | : | |

Dated:  January 23, 2006

## APPENDIX OF UNREPORTED CASES

Teresa K.D. Currier (3080)
Peter J. Duhig (4024)
KLETT ROONEY LIEBER &
SCHORLING, PC
The Brandywine Building
1000 West Street, Suite 1410
Wilmington, Delaware  19801
(302) 552-4200

Attorneys for Defendant Mellon Bank, N.A.

- and -

Steven Russo
SIVE, PAGET & RIESEL, P.C.
460 Park Avenue
New York, New York  10022
(212) 421-2150

Attorneys for Defendant Mellon Bank,
N.A. with respect to plaintiffs Charles
L. Grimes, Louis IG Ireland Trust C.
Yvonne Cooke, Jane G. Brown,
Serena R. Schwartz and
Gordon W. Chaplin

Richard S. Toder
Menachem O. Zelmanovitz
Matthew E. Schernecke
MORGAN, LEWIS & BOCKIUS LLP
101 Park Avenue
New York, New York  10178
(212) 309-6000

Attorneys for Defendant Mellon Bank, N.A. with
respect to all Plaintiffs other than Charles L.
Grimes, Louise IG Ireland Trust, C. Yvonne
Cooke, Jane G. Brown, Serena R. Schwartz and
Gordon W. Chaplin

**TABLE OF CASES**

**EXHIBIT 1**: ....................................................................Airline Reporting Corp. v. Belfon,
......................................... No. Civ. 2003-146, 2004 WL 903800 (D. V.I. April 24, 2004)

**EXHIBIT 2:** ...................................................... In re Crown Am. Realty Trust Sec. Litig.,
................................. No. Civ. A. 95-202, 1997 WL 599299 (W.D. Pa. Sept. 15, 1997)

**EXHIBIT 3:** ...........................De Lage Landen Fin. Servs., Inc. v. Cardservice Int'l, Inc.,
................................. No. Civ. A. 00-2355, 2001 WL 799870 (E.D. Pa. July 12, 2001)

**EXHIBIT 4:**.............................................................................. Grant v. Kingswood Apts.,
..................................No. Civ. A. 01-1523, 2001 WL 1178796 (E.D. Pa. Oct. 2, 2001)

**EXHIBIT 5**:........................................................... In re Hechinger Inv. Co. of Del., Inc.,
......No. 99-02261-PJW, Civ. 00-973-SLR, 2004 WL 724960 (D. Del. Mar. 28, 2004),
......................................................... aff'd, 2005 WL 1793503 (3d Cir. July 29, 2005)

**EXHIBIT 6:** ..............................................................Liafail, Inc. v. Learning 2000, Inc.,
...........................No. C.A. 01-599 GMS, No. C.A. 01-678 GMS, 2002 WL 31667861,
............................................................................................................(D. Del. Nov. 25, 2002)

**EXHIBIT 7:** .......................................................................Playtex, Inc. v. Columbia Cas.,
............. No. Civ. A. 88C-MR. 233, 1993 WL 390469 (Del. Super. Ct. Sept. 20, 1993)

**EXHIBIT 8:** ............................................................................... In re Prods. Liab. Litig.,
..........................................No. MDL 1014, 1996 WL 482977 (E.D. Pa. Aug. 22, 1996)

**EXHIBIT 9:** .....................................................State Farm Mut. Auto. Ins. Co. v. Makris,
..................................No. Civ. A. 01-5351, 2003 WL 924615 (E.D. Pa. Mar. 4, 2003)

**<u>EXHIBIT 1</u>**

Westlaw.

Not Reported in F.Supp.2d                                                      Page 1
Not Reported in F.Supp.2d, 2004 WL 903800 (D.Virgin Islands)
**(Cite as: Not Reported in F.Supp.2d)**

**H**
Only the Westlaw citation is currently available.
District Court of the Virgin Islands, Division of St.
Thomas and St. John.
AIRLINES REPORTING CORPORATION,
Plaintiff,
v.
Angela BELFON a/k/a Angela Hedrington, Ronald
Belfon and Verne David, Defendants.
No. Civ.2003-146.

April 24, 2004.

MEMORANDUM

MOORE, J.
**\*1** This matter comes before the Court on the motion
to dismiss of defendants Verne David and Ronald
Belfon arguing that they have individual immunity
from the liabilities of a corporation and that the
plaintiff has not met Rule 9's particularity
requirements in pleading fraud.

I. FACTUAL AND PROCEDURAL
BACKGROUND

Airlines Reporting Corporation ["ARC"] issues blank
ticket stock and other traffic documents to travel
agents to be used as tickets for air travel. ARC also
serves as an intermediary through which travel agents
report sales and remit proceeds to the airline carriers.

Angela Belfon is a shareholder, president and
director of the travel agency World Wide Travel Inc.
["WWT"] and a signatory on all WWT bank
accounts. ARC alleges that Ronald Belfon, vice
president, served as a full time managerial employee
of WWT. ARC also alleges that Verne David,
WWT's treasurer, served as finance and
administration director, was actively involved in the
financial management, and was a signatory on
several WWT bank accounts.

ARC entered into an Agent Reporting Agreement
["ARA"] with WWT, which authorized the travel
agency to issue ARC traffic documents. Angela
Belfon was the only officer who signed the ARA.
Under the ARA, WWT agreed that the proceeds of
the ticket sales were the property of the carriers and
were to be held in trust in a designated bank account
until properly accounted for. WWT designated
account no. 193-331879 at Banco Popular ["WWT
escrow account"] for this purpose and allowed ARC's
bank to issue direct electronic debits against the
account.

ARA also required WWT to submit a sales reports at
the end of each week listing the traffic documents
issued to travelers for that seven-day period. In each
weekly sales report, WWT was to include a
settlement authorization form notifying ARC of the
maximum amount of money that could be withdrawn
from the WWT escrow account for that period.

In June 2001, ARC first exercised its right under the
ARA to audit WWT's ticket records because it was
receiving the weekly sales reports late and those
reports were listing sales that were outside the
relevant seven-day period. As a result of the June
2001 audit, ARC discovered that WWT had failed to
report $283,577.66 in sales of their traffic documents.
Ms. Belfon explained that the errors were inadvertent
and provided a certified check to cover the
unreported sales. ARC now alleges that this was a
fraudulent representation meant to conceal WWT's
conversion of ARC's funds for their own personal
gain. ARC also now alleges that Ms. Belfon
fraudulently issued the certified check because she
knew it would cause an overdraft on the designated
account.

ARC alleges that in April or May of 2002, WWT
again began to convert sales proceeds for other
purposes. After further reporting irregularities, ARC
notified WWT of their intention to perform a second
audit. Upon this notice and against ARC's explicit
instructions, WWT sent several weekly sales reports
which contained hundreds of previously unreported
sales in an attempt to rectify their inadequate
bookkeeping before the second audit. After the
second audit, ARC's agents asked for immediate
payment of the $12,642.99 in unreported sales found
during the audit and Ms. Belfon refused to pay. They
also asked for the immediate return of all ticket stock
and plates and were again refused. On August 5,
2002, ARC notified WWT of the automatic
termination of their agreement, unless these demands
were met.

**\*2** On August 7, 2002, ARC attempted to collect on

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 903800 (D.Virgin Islands)
(Cite as: Not Reported in F.Supp.2d)

Page 2

the several weekly sales reports which had contained hundreds of out-of-period sales. Banco Popular denied these requests for insufficient funds. ARC alleges that WWT wrongfully instructed Banco Popular not to honor those settlement authorization forms.

On August 8, 2002, WWT filed a voluntary petition under Chapter 11 of the Bankruptcy Code and became a Debtor in Possession ["DIP"]. ARC alleges that while operating as a DIP, WWT converted over $400,000.00 in sales proceeds from ARC traffic documents from the escrow account to use for their personal purposes, including financing their Chapter 11 operations.

On August 29, 2003, ARC filed this action against the officers of WWT, namely, Angela Belfon, Ronald Belfon and Verne David, as individuals. ARC claims breach of fiduciary duty in Count I, conversion in Count II, fraud in Count III, common law conspiracy to commit fraud in Count IV, and breach of corporate fiduciary duty in Count V. ARC sues only the Belfons for tortious interference with contract in Count VI. Angela Belfon has filed an answer denying all claims. Ronald Belfon and Verne David have now moved for dismissal. FN1

> FN1. ARC has moved for leave to file supplemental information and authority in opposition to this motion to dismiss. Ronald Belfon has opposed this motion and asked that this Court strike the additional filings, sanction the plaintiff, and award him costs of $300.00. Because I deny the defendants' motion to dismiss without considering these additional filings, I also deny ARC's motion for leave to supplement.

## II. DISCUSSION

### A. Whether Count I fails to state a claim against defendants Verne David and Ronald Belfon

In Count I, ARC claims that the ARA's execution and the designation of the WWT escrow account created an *express trust relationship* between ARC and WWT. ARC further alleges that the defendants knowingly caused WWT to breach its fiduciary obligations to ARC by converting the trust funds, *i.e.,* the sale proceeds, to other purposes. ARC's asserts that Verne David and Ronald Belfon are personally liable for this breach of fiduciary duty.

Defendants David and Ronald Belfon move to dismiss the claim against them as individuals. They contend that WWT was not a fiduciary of ARC in the express trust agreement under the terms of the ARA. Defendants claim that since there was no express trust relationship, only the corporate entity, WWT, is a party to the contract. Defendants cite 13 V.I.C. § 344(a) as barring suit against them as officer's for WWT's liability regarding the ARA. They further contend that even if the claims against them were not barred by statute, they should still be dismissed because only WWT's president Angela Belfon signed the ARA.

In determining a Rule 12(b)(6) motion to dismiss, "the material allegations of the complaint are taken as admitted," and the Court must liberally construe the complaint in plaintiff's favor. *Jenkins v. McKeithen,* 395 U.S. 411, 421 (1969) (citing Fed.R.Civ .P. 8(f) and *Conley v. Gibson,* 355 U.S. 41 (1957)). All reasonable inferences are drawn in favor of plaintiff. *Sturm v. Clark,* 835 F.2d 1009, 1011 (3d Cir.1987). Thus the Court cannot dismiss Count I "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley,* 355 U.S. at 45-46; *Piecknick v. Commonwealth of Pennsylvania,* 36 F.3d 1250, 1255 (3d Cir.1994).

*3 Applying these rules, I cannot dismiss Count I because plaintiff has adequately stated a claim for breach of trust against defendants Verne David and Ronald Belfon as individuals. A trust is "a fiduciary relationship with respect to property, subjecting the person by whom the title to the property is held to equitable duties to deal with the property for the benefit of another person, which arises as a result of a manifestation of an intention to create it." RESTATEMENT (SECOND) OF TRUSTS § 2 (1959). Taking the plaintiff's material allegations as true, as I must, it is clear that ARC could prove facts establishing that the ARA manifested an intent that WWT hold the sales proceeds in trust. *See In re Penn Central Transportation Company,* 486 F.2d 519, 527 (3d Cir.1973) (finding an analogous relationship to be an express trust). An officer of a corporation "who knowingly causes the misappropriation of trust property by the corporation is personally liable for participation in the breach of trust committed by the corporation." *In Re Folliard,* 10 B.R. 875, 876 (D.Md.1981) (citing 4 Scott on Trust s 326.3 at 2563 (3d ed.1967)); *see also Forastieri v. Eastern Airlines, Inc.,* 1983 U.S. Dist. Lexis 15698 (D.P.R.1983). Thus, plaintiff could prove that Ronald Belfon and

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 903800 (D.Virgin Islands)
(Cite as: Not Reported in F.Supp.2d)

Page 3

Verne David knowingly caused the misappropriation of ARC's funds held in trust by WWT and as a result may be personally liable for WWT's breach of an express trust agreement.

B. Whether Counts II-VI should be dismissed against defendants David and Belfon pursuant to Rule 9(b)

In Counts I-VI of the complaint, ARC refers to WWT officers Angela Belfon, Ronald Belfon, and Verne David collectively as the "Defendants." Count III alleges that the "Defendants" committed certain fraudulent acts against ARC. Count IV alleges that the defendants conspired to defraud ARC. On Counts III and IV, ARC asks that judgment be entered against each defendant "jointly and severally." (Compl., ¶ 128, 135.) Defendants argue that Counts II-VI are deficient in that they fail to attribute particular fraudulent acts to particular defendants, but instead "lump" the co-defendants together. (Def.'s Mot. Dism. at 4-5.) Defendants further contend that Rule 9(b) requires that ARC allege in the complaint what each individual defendant officer did that was fraudulent. I disagree.

Rule 9(b) provides that: "In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." In deciding whether this particularity requirement has been satisfied, a court must primarily determine "how much detail is necessary to give adequate notice to an adverse party and enable him to prepare a responsive pleading." 5 CHARLES ALAN WRIGHT ET AL., FEDERAL PRACTICE AND PROCEDURE § 1298 (2003). I find that ARC has given the three WWT officers adequate notice. ARC has alleged that all three WWT officers conspired and participated in the alleged fraud. Only WWT employees, like the three defendants named in this action, would know who participated in the alleged fraud. *See Curry v. Cayman Resources Corp.*, 595 F.Supp. 1364, 1372 (D.Ga.1984) (relaxing 9(b)'s requirements when defendant is a director and controlling person of a small corporation). I will not require ARC to plead how each participated without the benefit of discovery. *See In re Craftmatic Securities Litigation v. Kraftshow*, 890 F.2d 628, 645 (3d Cir.1989) ("[p]articularly in cases of corporate fraud, plaintiffs cannot be expected to have personal knowledge of the details of corporate internal affair ...").

**\*4** At the hearing, defendants also argued that ARC has failed to comply with the Third Circuit Court of Appeals' requirements in *Shapiro v. UJB Financial Corp.* 964 F.2d 272 (3d Cir.1992). In *Shapiro,* the Court of Appeals acknowledged that even a relaxed 9(b) standard required that when fraud was alleged upon information and belief, the plaintiff must state that the necessary information lies in defendants' exclusive control *and* provide a statement of facts upon which the belief is proffered. *Id.* at 285. Where ARC's complaint does make certain allegations upon information and belief, it does clearly state the supporting facts but it does not explicitly state in the pleadings that the necessary information lies in defendants' exclusive control. In this factual context, I will not require ARC to include such boilerplate language because it is clear by implication from the context that the necessary information lies in the defendant officers's control. Therefore, I will deny the motion to dismiss. ARC has given the defendants adequate notice of its allegations of fraud and satisfied Rule 9(b).

III. CONCLUSION

I will deny the motion to dismiss because the plaintiff has adequately stated a claim in Count I and has met the requirements in pleading fraud in Counts II-VI.

ORDER

For the reasons given in the Memorandum of even date, it is hereby

ORDERED that the motion of defendants' Ronald Belfon and Verne David to dismiss (docket # 20) is DENIED; and it is further

ORDERED that the plaintiff ARC's motion for leave to file supplemental information and material in opposition to the motion to dismiss (docket # 25 and docket # 32) is DENIED.

D.Virgin Islands,2004.
Airlines Reporting Corp. v. Belfon
Not Reported in F.Supp.2d, 2004 WL 903800 (D.Virgin Islands)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**EXHIBIT 2**

Westlaw.

Not Reported in F.Supp.
Not Reported in F.Supp., 1997 WL 599299 (W.D.Pa.)
(Cite as: Not Reported in F.Supp.)

Page 1

**H**

Only the Westlaw citation is currently available.
United States District Court, W.D. Pennsylvania.
In re CROWN AMERICAN REALTY TRUST
SECURITIES LITIGATION
No. Civ.A. 95-202J.

Sept. 15, 1997.

Lee Squitieri, Alfred G. Yates, Jr., Gerald L.
Rutledge, Richard Schiffrin, Andrew Barroway,
Curtis V. Trinko, Richard A. Finberg, Eric T. Smith,
Scott W. Fisher, Edwood S. Simon, John P.
Zuccarini, for plaintiff.
Gregory B. Jordan, Jack B. Cobetto, Roy W. Arnold,
for defendant.

MEMORANDUM AND ORDER

SMITH, J.

I. *Introduction*

*1 On August 10, 1995, Robert Johnson, Sr., filed a
class action complaint against defendants, Frank J.
Pasquerilla, Mark E. Pasquerilla, and Crown
American Realty Trust ("Crown"), alleging
violations of federal securities law. The class
alleged included all persons besides the defendants
and their families who had purchased shares of
Crown between March 1, 1995 and August 8, 1995.
Docket no. 5, ¶ 23. This action was docketed at 95-
202J. On August 17, Nick Reis filed a similar class
action complaint asserting securities law violations
against the same defendants, which was docketed at
95-207J. Alice Nash, Helene Nash Gauzza and
Alvin J. Kalish filed another class action complaint
alleging the same facts and claims on September 8,
which was docketed at 95-220J. By order dated
December 26, 1995, these three class actions were
consolidated at the above-captioned civil action and a
Consolidated Amended Class Action Complaint was
filed on February 23, 1996. *See* dkt. no. 5. A Motion
for Class Certification followed on March 11, 1996.
Defendants responded with a Motion to Stay
Discovery, a Motion to Stay Class Certification, and
a Motion to Dismiss.

I previously stayed discovery and the motion for
class certification pending the resolution of the

Motion to Dismiss. *See* dkt. no. 24. This
memorandum resolves the defendants' Motion to
Dismiss, dkt. no. 12.

II. *Facts*

Crown is a Maryland real estate investment trust
("REIT") established on May 14, 1993 and offered to
the public in August of that same year. Dkt. no. 16,
exh. D, at 1. "The Company is primarily engaged in
the business of owning, operating, managing, leasing,
acquiring, developing, redeveloping, expanding,
renovating and financing enclosed shopping malls...."
*Id.* exh. A, at 3. Defendant Frank Pasquerilla is
Crown's Chairman and CEO, and defendant Mark
Pasquerilla is its President. Dkt. no. 16, exh. A, at
7.

Crown's predecessor started in the 1950s as a small
concern known then as Crown Construction
Company. In 1969, the company developed its first
enclosed shopping mall, the Logan Valley Mall in
Altoona, Pennsylvania. The company continued to
construct shopping malls in succeeding years and
eventually changed its name to Crown American
Corporation ("CAC") in 1972. Dkt. no. 16, exh. E,
at 24. Prior to the formation of the REIT, CAC
owned twenty malls and had leasehold and ownership
interests in several others. *Id.* at 25. The Pasquerilla
family also owned certain real estate surrounding
these malls and had an ownership interest in CAC
itself. Crown was formed to acquire
substantially all of the enclosed shopping mall
properties of [CAC] and ... own (i) 22 Malls and a
50% general partnership interest in the Palmer Park
Mall, (ii) approximately 200 acres of outparcels and
undeveloped land, the majority of which adjoins or is
in the vicinity of certain of the Malls, (iii) the Patrick
Henry Corporate Center and Pasquerilla Plaza and
(iv) the Anchor Pad.

*2 Dkt. no. 16, exh. E, at 23.

The malls transferred to Crown are "generally located
in middle markets where there are relatively few
other enclosed shopping malls ." *Id.* at 5.
Historically, these malls have been expanded and
renovated to maintain their competitive positions in
their respective markets. *Id.* These facts were
specifically set forth in the prospectus' description of

Not Reported in F.Supp.
Not Reported in F.Supp., 1997 WL 599299 (W.D.Pa.)
(Cite as: Not Reported in F.Supp.)

the business and properties. The prospectus also stated that the REIT intended to "promote a program of renovation and expansion in circumstances where management believes that higher rental rates and occupancy levels can be achieved. The REIT intend[[ed]] to continue ... to capitalize on such opportunities...." *Id.* at 31. The ability of the REIT to refinance the debt incurred for the expansion and renovation of the malls was cited as a risk in the prospectus. It stated that "[t]he REIT does not expect to have sufficient funds of its own to make all of the balloon payments of principal totaling approximately $39 million when due in 1994 under a construction mortgage on Oak Ridge Mall and $39 million when due in 1995 under construction mortgages on Bradley Square and Mount Berry Square.... There can be no assurance that the REIT will be able to refinance any such indebtedness, or to otherwise obtain funds by selling assets or by raising equity." Dkt. no. 16, exh. E, at 16.

After the initial public offering (IPO), Crown intended to make regular quarterly dividends. *Id.* at 35. The prospectus noted that dividends would be distributed from the Funds from Operations ("FFO"). It stressed that **"[t] he estimate of Funds from Operations is being made solely for the purpose of setting the initial distribution and is not intended to be a projection or forecast of the REIT's results of operation."** *Id.* (boldface in original).

On March 1, 1995, Crown issued a press release reporting the FFO for 1994 at $1.60 per share and compared that figure to the pro forma FFO for December 1993 of $1.38. Dkt. no. 16, exh. G. The press release also discussed leasing information, tenant sales, mall acquisitions, mall expansions and financial highlights.

Crown's 1994 Annual Report was released on or about March 31, 1995. It stated that Crown's "Funds from Operations for the twelve months ended December 31, 1994, grew to $43.4 million, or $1.60 per share, a 15% increase over the Pro Forma Funds from Operations for 1993 of $37.6 million, or $1.38 per share." Dkt. no. 16, exh. A, at 26. The annual report also stated in the introductory letter to shareholders that "Crown American has continued to pay regular quarterly dividends of $.35 per share ($1.40 per share annually) since our formation in August 1993. In 1995, we expect to continue to pay $1.40 per share in annual dividends." Dkt. no. 16, exh. A, at 4. The letter also noted that a major fire had damaged its Logan Valley Mall ("LVM") property. The fire, which occurred just before

Christmas 1994, destroyed approximately 150,000 square feet of mall shop space. The report stated:
*3 The mall reopened the very next day and within three days some of the burned out tenants began reopening in temporary space in other areas of the mall. About half of the 45 affected tenants were reopened within two months. We expect to begin rebuilding this mall in spring 1995 and look forward to a bigger and better Logan Valley Mall in spring 1996. One important aspect of this tragedy is that the damaged portion of the mall was covered by property and business interruption insurance. Accordingly, the fire will not have any material effect on future operating results until normal recovery is completed.

Dkt. no. 16, exh. A, at 6.

Management's Discussion and Analysis in the 1994 Annual Report also discussed projected dividends and the LVM fire. It stated management's belief that the "cash generated from property operations will provide the necessary funds on a short-term and long-term basis for its operating expenses, interest expenses on outstanding indebtedness and recurring capital expenditures and tenant allowances, and all dividends to the shareholders necessary to satisfy the REIT requirements under the Internal Revenue Code." *Id.* at 28. It cautioned that the ability to pay dividends was affected by several factors, and specifically noted cash flow from operations and capital expenditures as two such factors. With regard to the LVM fire, management noted that the "company is evaluating various reconstruction plans for the destroyed portion of the mall and is also considering expanding and renovating the mall. Funds for the expansion and renovation of the mall would come from property insurance proceeds and mortgage financing..." *Id.* at 28-29.

The Annual Report also touted the fact that one of its anchor tenants, the Hess's Department Store, had been sold to the Bon Ton and the May Department Store Company. Crown explained that the importance of this transaction was that these companies averaged a higher annual sales volume per square foot than Hess's. "The additional sales and traffic ... translates into additional sales and traffic for the entire mall." Dkt. no. 16, exh. A, at 3. The transaction obligated Crown to "renovate the mall where the leased [May] Store is located." *Id.* at 40. The May Company also planned to assume Hess's leases and pour its own money into expanding and renovating the stores' anchor site. *Id.* at 3, 40.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1997 WL 599299 (W.D.Pa.)
**(Cite as: Not Reported in F.Supp.)**

significantly impact their ability to continue to leverage Trust assets in order to make necessary capital improvements; and (c) given the fact that Crown had very limited access to the capital markets and could not sustain its growth through additional leverage, defendants decided to embark on a new, and unannounced, strategy of expansion through internal financing, thereby requiring it to cut its dividend.

Dkt. no. 5, ¶ 52.

Plaintiffs asserted that
the defendants knew, or but for their recklessness should have known but failed to disclose that given, *inter alia,* the significant cash commitment associated with rebuilding the Logan Valley Mall, its obligation to renovate malls where the May Company would operate anchor stores and its cash outlay to purchase the two Pasquerilla controlled malls, maintaining the dividend at the $1.40 [sic] would threaten the fiscal integrity of the Trust.

Dkt. no. 5, ¶ 71.

The defendants' course of action allegedly damaged all persons besides the defendants and their immediate families "who purchased common shares of beneficial interests of the Trust between March 1, 1995, and August 8, 1995." Dkt. no. 5, ¶ 23. Plaintiffs' injury arose, plaintiffs averred, as a consequence of their purchase of Trust shares at "artificially inflated prices...." *Id.* at ¶ 21.

### III. *Claims Asserted*

Plaintiffs' Consolidated Amended Complaint asserts claims based upon alleged violations of section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated by the Securities and Exchange Commission and codified at 17 C.F.R. § 240.10b-5. Section 10(b) provides:
It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange-
(b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange ... any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j(b). Rule 10b-5 further provides that it is unlawful "[t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading...." 17 C.F.R. § 240.10b-5. "The private right of action under § 10(b) and Rule 10b-5 ... creates liability for false or misleading statements or omissions of material fact that affect trading on the secondary market." *In re Burlington Coat Factory Securities Litig.,* 114 F.3d 1410, 1417 (3d Cir.1997) (footnote omitted).

**\*6** A distillation of the plaintiffs' Consolidated Amended Complaint in light of these statutory and regulatory provisions yields the following claims:
1. that the statement in Crown's 1994 Annual Report that "[i]n 1995, we expect to continue to pay $1.40 per share in annual dividends" was false and misleading in light of the circumstances under which it was made;
2. that the reported statements by Crown CEO Frank Pasquerilla which projected an FFO of $1.70 for 1995 and an expectation that the dividend would remain at $1.40 were false and misleading in light of the circumstances under which they were made;
3. that management's assurances about Crown's ability to maintain its annual dividend of $1.40 during the period from March 1, 1995 to August 8, 1995 were false and misleading in light of the circumstances under which they were made;
4. that the statements in Crown's March 1, 1995 Press Release and the 1994 Annual Report regarding the renovation and upgrading of the LVM were misleading in light of the circumstances under which they were made because they created the belief that these improvements "would largely be covered by insurance proceeds and have no effect on the Trust's operation." Dkt. no. 5, ¶ 58.
5. that the public filings required under securities laws were false and misleading because they omitted material information regarding the extent of significant capital expenditures that Crown intended to undertake in 1995 in connection with the LVM renovation, mall expansions and improvements at properties where the Hess's anchor had been taken over by the May Company, and the purchase of the remaining interests in the Wyoming Valley Mall and the Middletown Mall.
6. that the public filings required under securities laws were false and misleading because they omitted material information regarding Crown's ability to continue to leverage its assets to obtain capital.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1997 WL 599299 (W.D.Pa.)
(Cite as: Not Reported in F.Supp.)

IV. *Elements of a Section 10(b) Claim Under the Exchange Act and a Rule 10b-5 Claim*

In *Kline v. First Western Government Securities, Inc.,* 24 F.3d 480 (3d Cir.1994), the Third Circuit set forth the elements of a section 10(b) claim. Those elements are: (1) that defendants made misstatements or omissions of material fact; (2) with scienter; (3) in connection with a purchase or sale of securities; (4) upon which plaintiffs relied; and (5) plaintiffs' reliance was the proximate cause of their injury. *Id.* at 487. Most recently, in *Burlington Coat,* the Third Circuit explained:

The first step for a Rule 10b-5 plaintiff is to establish that defendant made a materially false or misleading statement or omitted to state a material fact necessary to make a statement not misleading. Next, plaintiff must establish that defendant acted with scienter and that plaintiff's reliance on defendant's misstatement caused him or her injury. Finally, since the claim being asserted is a "fraud" claim, plaintiff must satisfy the heightened pleading requirements of Federal Rule of Civil Procedure 9(b).

*\*7* 114 F.3d at 1417 (citations omitted).

V. *12(b)(6) Standard*

A motion to dismiss cannot be granted unless the allegations in the complaint taken as true fail to state any claim upon which relief can be granted. *Angelastro v. Prudential-Bache Securities, Inc.,* 764 F.2d 939, 944 (3d Cir.1985) (citing *Conley v. Gibson,* 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)). In ruling upon a motion to dismiss, a district court must accept as true all facts alleged in the complaint, and view them in the light most favorable to the plaintiff. *Markowitz v. Northeast Land Co.,* 906 F.2d 100, 103 (3d Cir.1990). A court "need not credit a complaint's 'bald assertions' or 'legal conclusions.' " *Burlington Coat,* 114 F.3d at 1429-30 (quoting *Glassman v. Computervision Corp.,* 90 F.3d 617, 628 (1st Cir.1996)).

Normally, a district court deciding a motion to dismiss will not consider documents that are not a part of the pleadings. "However, an exception to the general rule is that a 'document *integral* to or *explicitly relied* upon in the complaint' may be considered 'without converting the motion [to dismiss] into one for summary judgment.' " *Burlington Coat,* 114 F.3d at 1426 (quoting *Shaw v. Digital Equipment Corp.,* 82 F.3d 1194, 1220 (1st

Cir.1996) (emphasis added by the 3d Cir.)); *see also In re Donald J. Trump Casino Securities Litig.,* 7 F.3d 357, 368 n. 9 (3d Cir.1993) (approving the consideration of a prospectus attached to a motion to dismiss in a securities action because the plaintiff's claims were based on the document).

VI. *9(b) Standard*

As I noted above, securities claims grounded upon section 10(b) of the Exchange Act and Rule 10b-5 are fraud claims to which the heightened pleading standard of Rule 9(b) applies. *Burlington Coat,* 114 F.3d at 1417. In the securities context, Rule 9(b) requires

plaintiffs [to] plead with particularity the circumstances of the alleged fraud in such a way as to inject "precision and some measure of substantiation into their allegations of fraud." By way of example, allegations of "who, what, when, where and how: the first paragraph of any newspaper story," would satisfy the particularity requirement of Rule 9(b).

*In re Westinghouse Securities Litig.,* 832 F.Supp. 948, 965 (W.D.Pa.1993) (citing, *inter alia, Seville Indus. Machinery Corp. v. Southmost Machinery Corp.,* 742 F.2d 786, 791 (3d Cir.1984)), *rev'd in part on other grounds,* 90 F.3d 696 (3d Cir.1996).

The specific identification of the false and misleading statements or omissions and allegations of "how" such information is false and misleading may be sufficient in some cases to satisfy the requirements of Rule 9(b). But if the claim is based on a forward-looking statement, Rule 9(b) imposes a higher hurdle. To adequately state a claim under the federal securities laws, it is not enough merely to identify a forward-looking statement and assert as a general matter that the statement was made without a reasonable basis. Instead, plaintiffs bear the burden of "plead[ing] factual allegations, not hypotheticals, sufficient to reasonably allow the inference" that the forecast was made with either (1) an inadequate consideration of the available data or (2) the use of unsound forecasting methodology.

*\*8* *Burlington Coat,* 114 F.3d at 1429 (citing *Glassman,* 90 F.3d at 628-29).

Similarly, the particularity hurdle imposed by Rule 9(b) requires that the element of scienter be supported by factual allegations that "could give rise to a 'strong' inference of scienter." *Id.* at 1422. The court explained that "[p]laintiffs must either (1)

Not Reported in F.Supp.
Not Reported in F.Supp., 1997 WL 599299 (W.D.Pa.)
**(Cite as: Not Reported in F.Supp.)**

[allege facts that] identify circumstances indicating conscious or reckless behavior by defendants or (2) allege facts showing both a motive and a clear opportunity for committing the fraud." *Id.* (citation omitted).

The heightened pleading standard of Rule 9(b) as applied in securities cases, however, does not require specific factual allegations to support the plaintiffs' reliance upon the alleged misleading information. Such factual allegations are unnecessary because plaintiffs enjoy a "rebuttable presumption of reliance if plaintiffs bought or sold their securities in an 'efficient' market.... [T]he presumption of reliance [is] based on the theory that in an efficient market the misinformation directly affects the stock prices at which the investor trades and thus, through the inflated or deflated price, causes injury even in the absence of direct reliance." *Id.* at 1419 n. 8.

Whether a plaintiff's securities claim satisfies Rule 9(b)'s heightened pleading standard need only be determined if the plaintiff's allegations state a claim upon which relief may be granted under Rule 12(b)(6). If the plaintiffs' complaint survives a Rule 12(b)(6) motion to dismiss but fails to satisfy Rule 9(b)'s requirements, a district court in most instances should grant leave for the plaintiffs to amend their complaint.

## VII. *Crown's 1994 Annual Report Statement: "We expect" a $1.40 Annual Dividend in 1995*

Plaintiffs' Consolidated Amended Class Action Complaint avers that Crown's 1994 Annual Report, disseminated on or about March 31, 1995, contains a material misstatement that is actionable under section 10(b) of the Exchange Act and Rule 10b-5. The alleged misstatement is set forth in the Annual Report's introductory "Letter to Our Shareholders" under the heading "We Continue to Pay Regular Dividends." Dkt. no. 16, exh. A, at 4. That letter states: "In 1995, we expect to continue to pay $1.40 per share in annual dividends." *Id.*

Plaintiffs allege that "defendants' statements during the Class Period concerning the intent and ability of Crown to maintain its dividend level ... were materially false and misleading ... resulting in a fraud on the market for Crown's shares." Dkt. no. 5, ¶ 26(b). As a result of this statement regarding Crown's ability to maintain its dividend for 1995, plaintiffs allege that "defendants artificially inflated the market price of Crown's stock during the Class

Period...." Dkt. no. 5, ¶ 85.

Generally, non-specific statements regarding earnings and forecasts that are vague expressions of hope are not actionable. *Burlington Coat*, 114 F.3d at 1427-28. The determination of whether such statements are actionable requires a case-by-case evaluation. In some cases, "[c]ertain vague and general statements of optimism have been held not actionable as a matter of law because they constitute no more than 'puffery' and are understood by reasonable investors as such." *Id.* at 1428 n. 14. Optimistic predictions about the future, however, may be actionable if the prediction strays from a general expression of hope and fosters a belief in a specific and definite outcome. In that event, the projections, estimates or forecasts "may be actionable misrepresentations if the speaker does not genuinely and reasonably believe them." *In re Trump*, 7 F.3d at 368. *See also In re Craftmatic Sec. Litig.*, 890 F.2d 628, 645-46 (3d Cir.1990); *Hershkovitz v. Nutri/system, Inc.*, 857 F.2d 179, 184 (3d Cir.1988).

*9 Defendants assert that the statement regarding the expected dividend in the Annual Report is not actionable because Crown's mere expectancy regarding the future fails to state a claim for securities fraud. Dkt. no. 13, at 12-18. They contend that the plaintiffs have failed to identify any specific statement made by defendants "that can reasonably be construed as promising or guaranteeing any specific dividend." Defendants further argue that the "bespeaks caution" doctrine renders this statement unactionable because the Annual Report disclosed that the distribution of dividends was dependent upon several factors.

### A. *Rule 12(b)(6)*

The alleged misrepresentation states that Crown "expect[s] to continue to pay $1.40 per share in annual dividends." This statement is clearly a prediction of Crown's ability to distribute a specific dividend for 1995. While the verb "expects" is general, the reference to a specific dividend amount of $1.40 is not. Nor does this statement include language of qualification which would place it within that genre known as "puffery," a form of exaggeration which reasonable investors can readily identify. *Burlington Coat*, 114 F.3d at 1428 n. 14. For this reason, I conclude that this statement from the Annual Report passes Rule 12(b)(6) muster.

Defendants contend that the statement must be read

Not Reported in F.Supp.
Not Reported in F.Supp., 1997 WL 599299 (W.D.Pa.)
(Cite as: Not Reported in F.Supp.)

Page 7

in the context of the entire Annual Report which contains cautionary language, in the word "expect" itself, and in the report's disclosure that the distribution of dividends was dependent upon several factors. This cautionary language, according to the defendants, negates the materiality of the alleged misstatement under the "bespeaks caution" doctrine.

The "bespeaks caution" doctrine has been embraced by the Third Circuit in the context of offering documents. *See Westinghouse,* 90 F.3d at 707; *Trump,* 7 F.3d at 371. The "bespeaks caution" doctrine is appropriately considered here because the Annual Report containing the alleged misrepresentation would have been used by investors in determining whether to purchase shares and is, therefore, the functional equivalent of an offering document. Application of the doctrine renders the alleged misrepresentation or omission immaterial if there is sufficient cautionary language that is "substantive and tailored to the specific future projections, estimates, or opinions." *Trump,* 7 F.3d at 371-72. "[A] vague or blanket (boilerplate) disclaimer which merely warns the reader that the investment has risks will ordinarily be inadequate to prevent misinformation." *Id.* at 371.

In this case, the cautionary language relied upon by the defendants is not tailored to the specific forecast of a 1995 annual dividend of $1.40. The Management Discussion and Analysis section in the Annual Report recites only that:
The Company's ability to pay dividends is affected by several factors, including cash flow from operations and capital expenditures. Dividends by the Company will be at the discretion of the Board of Trustees and will depend on the cash available to the Company, its financial condition, capital and other requirements, and such factors that the Trustees may consider.

*10 Dkt. no. 16, exh. A, at 28. This "boilerplate" disclaimer is similar to those found in many companies' annual reports and public filings. It merely states the obvious: that Crown will not be able to pay a given level of dividends if the company's finances are inadequate to do so or the Board simply declines to declare such a dividend. As such, it does nothing to qualify or mitigate Crown's specific prediction of a $1.40 per share dividend in 1995, and plaintiff's dividend expectancy claim based upon the Annual Report survives the defendants' Motion to Dismiss under Rule 12(b)(6).

## B. *Rule 9(b)*

### 1. *Particularity Regarding Misleading Character of Forward-Looking Statements*

Rule 9(b)'s particularity requirement means that plaintiffs must allege facts that demonstrate that Crown's prediction of a $1.40 dividend was made without a reasonable basis. *Burlington Coat,* 114 F.3d at 1427. This requires more than "simply mouth[ing] the required conclusion of law." *Id.* at 1430. Rather, plaintiffs must plead factual allegations which are "ßufficient to reasonably allow the inference' that the forecast was made with either (1) an inadequate consideration of the available data or (2) the use of unsound forecasting methodology." *Id.* at 1429. Because the complaint does not contain any allegations pertaining to the use of unsound forecasting methodologies, the only question is whether the complaint sufficiently alleges facts which permit an inference that the defendants inadequately considered the available data.

Plaintiffs' complaint avers:
51.... [D]efendants knew or were reckless in not knowing that several factors were at work which jeopardized the Trust's ability to maintain its current level of dividend payout.
52. Specifically, during the Class Period defendants knew or had reason to know but failed to disclose that: (a) ... significant capital expenditures were necessary to upgrade existing Trust shopping malls to make them competitive in the markets in which they operated; (b) ... the fair market value of existing REIT properties was significantly below "stated" values which defendants knew or had reason to know but failed to disclose during the Class Period, would significantly impact their ability to continue to leverage Trust assets in order to make necessary capital improvements; and (c) ... given the fact that Crown had very limited access to the capital markets and could not sustain its growth through additional leverage, defendants decided to embark on a new, unannounced, strategy of expansion through internal financing, thereby requiring it to cut its dividend.
53. As a result, defendants knew or had reason to know that the dividend was substantially at risk because existing cash flow could not adequately fund the necessary major capital improvements while at the same time sustaining the dividend, without jeopardizing the integrity of the entire Trust.

*11 Dkt. no. 5, ¶¶ 51-53.

Not Reported in F.Supp.                                                                  Page 8
Not Reported in F.Supp., 1997 WL 599299 (W.D.Pa.)
**(Cite as: Not Reported in F.Supp.)**

These allegations indicate that defendants had knowledge or a reason to know of the factors that would affect the ability of Crown to distribute an annual dividend of $1.40 in 1995. Indeed, the Annual Report discussed the significant capital expenditures associated with mall purchases and renovations at not only the LVM, but also other properties. *See* dkt. no. 16, exh. A. Such knowledge could give rise to an inference that defendants, to some degree at least, considered these facts when making the forward-looking prediction of dividend levels. Plaintiffs' allegations identifying the "several factors ... at work which jeopardized the Trust's ability to maintain its current level of dividend payout" sufficiently plead why this consideration was allegedly inadequate. *See Roots Partnership v. Lands' End, Inc., 965 F.2d 1411, 1419 (7th Cir.1992)* (complaint failed to allege reasonable basis for statements since it did not allege that problems "were so significant that they jeopardized the possibility of attaining the fiscal 1990 earnings goal."). *See also Kowal v. MCI Communications Corp., 16 F.3d 1271, 1278-79 (D.C.Cir.1994)* (court dismissed complaint which failed to plead sufficient facts to suggest that competitive pressure significantly jeopardized possibility of attaining projected earnings). The effect these factors would have on Crown's ability to distribute the expected dividend is explained by plaintiffs' averment regarding the extent to which Crown is leveraged in comparison to other REITS and the obligations it was required to satisfy in connection with its mall renovations, expansions and purchases. Dkt. no. 5, ¶ ¶ 54-61, 67. For these reasons, I conclude that plaintiffs' complaint satisfies the particularity requirement of Rule 9(b) by alleging facts that permit an inference that the forecast was made without an adequate consideration of the available data.

### 2. *Particularity of Scienter Element*

Rule 9(b)'s heightened pleading standard also requires that the plaintiffs' dividend expectation claim based on the forward-looking statement in the Annual Report be supported by factual allegations "that could give rise to a 'strong' inference of scienter." *Burlington Coat, 114 F.3d at 1418.* Plaintiffs may satisfy this burden by factual allegations showing a motive and opportunity for committing the alleged fraud or by circumstances indicating a conscious or reckless behavior by the defendants. *Id.* (quoting *Acito v. IMCERA Group, Inc., 47 F.3d 47, 53 (2d Cir.1995)).*

### a. *Motive and Opportunity*

In *Shields v. Citytrust Bancorp, Inc., 25 F.3d 1124 (2d Cir.1994)*, the Second Circuit declared that scienter can be pleaded by alleging facts which demonstrate both motive and an opportunity to commit fraud. The court explained:

Motive would entail concrete benefits that could be realized by one or more of the false statements and wrongful nondisclosures alleged. Opportunity would entail the means and likely prospect of achieving concrete benefits by the means alleged.

**\*12** *Id.* at 1130.

Instantly, plaintiffs' averments as to motive consist of the following:

Defendants caused, allowed and/or participated in, the wrongdoing complained of herein in order to:

(a) encourage the investment community to first purchase shares in the Trust which resulted in substantial pecuniary benefits to Frank J. Pasquerilla, his family and his related corporate entities; and/or

(b) cover up the significant capital investments that were required to bring Trust properties once owned by Frank J. Pasquerilla and his related entities, up to competitive standards with more modern facilities; and/or

(c) prevent an increase of the costs associated with borrowing capital should the Trust's true financial condition, including the fair market value of various Trust properties, become known, and/or

(d) protect the Pasquerillas' positions as executives and directors of the Trust and the substantial compensation, benefits and prestige obtained thereby.

Dkt. no. 5, ¶ 19. Plaintiffs claim that these were the motives behind defendants' allegedly false and misleading statements that were made in an effort to artificially inflate the stock price. They also allege thatdefendants knew or were reckless in not knowing by not later than March 1, 1995, that the Trust's access to capital markets, whether debt or equity, was severely impaired.... This made additional borrowing more difficult and to the extent that it was possible to borrow additional monies, defendants knew they would have to pay higher interest rates to attract capital. In addition, defendants knew that as the stock price fell, the market capitalization also fell and thus the Trust's debt ratio continued to grow significantly worse. Therefore, in order to have any access to further funding by means of increased debt, let alone, at comparatively lower interest rates, defendants were under pressure to keep the stock

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1997 WL 599299 (W.D.Pa.)
**(Cite as: Not Reported in F.Supp.)**

price as high as possible.

*Id.* ¶ 67.

It is true that defendants "had the opportunity, if they wished, to manipulate the price" of Crown's stock, *In re Time Warner Inc. Securities Litig.,* 9 F.3d 259, 269 (2d Cir.1993), but plaintiffs fail to adequately articulate a motive and an opportunity to commit the fraud alleged here.

Starting with the last of plaintiffs' separate averments as to motive, protecting the Pasquerillas' positions and their compensation, without more, is an inadequate allegation. *Shields,* 25 F.3d at 1130 ("[P]laintiff must do more than merely charge that executives aim to prolong the benefits of the positions they hold.... [Otherwise,] the required showing of motive and opportunity would be no realistic check on aspersions of fraud...."). Such an allegation is inadequate also because it fails to explain how artificially inflating the stock price by making a misstatement about the expected dividend for 1995 could help preserve the Pasquerillas' positions and compensation. *Burlington Coat,* 114 F.3d at 1422-23 n. 12. Plaintiffs do not allege that the defendants' compensation and financial remuneration for their positions is dependent upon the stock's value or the number of issued shares. Even if they had, plaintiffs would still need to allege additional facts to establish a sufficient motive. *Acito v. Imcera Group, Inc.,* 47 F.3d 47, 54 (2d Cir.1995) (*cited with approval in Burlington Coat,* 114 F.3d at 1422 n. 12).

**\*13** Defendants' alleged motive of preventing an increase in Crown's borrowing costs should its true financial condition become known presents a closer issue and relates directly to plaintiffs' allegation that Crown affirmatively misstated its ability to continue paying a $1.40 per share dividend. Crown, as a REIT, is required to pay out 95% of its earnings in dividends. *See* 26 U.S.C. § 857(a)(1)(A); Dkt. no. 5, ¶ 30; Dkt. no. 16, exh. E, at 13. Both equity and capital markets react negatively to news of a corporation's decreased earnings or a cut in its dividend. As the company becomes less attractive to both investors and lenders, its share price and credit rating suffer. In a capital-intensive business such as Crown's, the inevitable increase in borrowing costs eventuated by bad earnings news places more pressure on earnings and, in a vicious cycle, makes future dividends even more uncertain. Notwithstanding the force of these well-recognized principles of corporate finance, I conclude that

plaintiffs' allegations of scienter are insufficient for Rule 9(b) purposes.

This situation is similar to that presented in *Shields* in which plaintiffs alleged that defendants artificially inflated the price of a bank's stock by concealing nonperforming loans. 25 F.3d at 1129, 1130. In holding that plaintiffs' allegations of scienter did not suffice under Rule 9(b), the court refused to find any benefit to defendants in actions which merely postponed the "inevitable":

In looking for a sufficient allegation of motive, we assume that the defendant is acting in his or her informed economic self-interest. It is hard to see what benefits accrue from a short respite from an inevitable day of reckoning. There is no claim here that false statements were made in an effort to sell off shares held by management, or to delay a criminal prosecution. For related reasons, the Complaint fails to allege a sufficient opportunity to derive a benefit from the alleged misstatements and nondisclosures: the ordinary course of bank business would lead to the review of the loan portfolios, which it did.

*Id.* (citation omitted). Thus, while plaintiffs can and do allege that defendants' misstatements "fooled" the Wall Street analysts for a few months, they do not allege that there existed any opportunity to continue the deception permanently, nor do they aver that defendants could obtain any benefit, other than their own prestige and continuation in office, from perpetrating this alleged fraud on a short-term basis.

In a related allegation, plaintiffs aver that the misstatement was made for the purpose of keeping the stock price as high as possible in order to gain access to further funding interest rates. *See* dkt. no. 5, ¶ 67. Once again, authority from the Second Circuit is instructive. In *San Leandro Emergency Med. Plan v. Philip Morris,* 75 F.3d 801, 813-14 (2d Cir.1996), the alleged motive for the company's nondisclosure of certain information was its desire to maintain its bond or credit ratings at high levels to maximize marketability of its debt securities and minimize interest rates. The court held "that a company's desire to maintain a high bond or credit rating [does not] qualif[y] as a sufficient motive for fraud in these circumstances...." *Id.* at 814. It noted that, while one of the executives had realized a large profit, the significance of this gain was undermined by the fact that the other defendants retained their shares and the executive who did sell shares at the allegedly inflated price actually acquired more shares than he sold. *Id.*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1997 WL 599299 (W.D.Pa.)
(Cite as: Not Reported in F.Supp.)

**\*14** In the instant matter, plaintiffs' allegation of a desire to maximize marketability and minimize interest rates are not accompanied by any factual allegations that the individual defendants realized a gain by the sale of their securities during the period in which the stock was allegedly artificially inflated. Accordingly, consistent with *San Leandro,* 75 F.3d at 814, and *Shields,* 25 F.3d at 1130, I conclude that this allegation of motive also fails to pass muster under Rule 9(b).

For the same reason, the motive of covering up the significant capital investment required to keep Crown's malls competitive is also insufficient under Rule 9(b). Plaintiffs simply fail to allege that such understatements could be maintained for very long, especially given the public nature of the properties and the regular appraisals and inspections required by lenders, or that any concrete, short-term benefit could be achieved by hiding the need for capital improvements.

Plaintiffs also aver that the defendants acted to manipulate the stock price by making a misstatement about the expected 1995 dividend in order to induce the investment community to "first purchase shares in the Trust which resulted in substantial pecuniary benefits to Frank J. Pasquerilla, his family and his related corporate entities." Dkt. no. 5, ¶ 19(b). While defendants would have benefitted from inducing the purchase of Crown stock at the time of the IPO in August 1993, no concrete benefit to them is apparent from inducing *further* investment in the stock during the Class Period. The allegation to this effect fails to satisfy Rule 9(b)'s particularity requirement because it does not provide sufficient information to create a "strong" inference that further investment in Crown would have generated "substantial pecuniary benefits" for the Pasquerillas, their families and their related businesses beyond those which they already enjoyed as a consequence of the public offering. In other words, the complaint is deficient because there is no reference to the "concrete benefits" the Pasquerillas, their families and related entities would reap by making this misstatement.

### b. *Conscious or Reckless Behavior*

In pleading scienter, allegations of conscious and reckless behavior by defendants must refer to "circumstantial evidence that would indicate conscious fraudulent behavior or recklessness." *Shields,* 25 F.3d at 1129. Merely setting forth

defendants' forecast and the after-the-fact dividend reduction is inadequate to comply with Rule 9(b)'s particularity standard. *Id.* As the Second Circuit noted in *Shields,* such a technique "is sufficient to allege that the defendants were wrong, but misguided optimism is not a cause of action and does not support an inference of fraud. We have rejected the legitimacy of 'alleging fraud by hindsight.' " *Id.* at 1129.

Although I have concluded that plaintiffs have satisfied the particularity requirement for forward-looking statements by pleading defendants' allegedly inadequate consideration of the data, this is not the same as an averment that the defendants' *expectation* of a $1.40 annual dividend-later proven wrong when the dividend was reduced in August 1995-was knowingly or recklessly false when uttered. These assertions may "strongly suggest[ ] that defendants should have been more alert and more skeptical," *id.,* but such allegations of mere negligence are not demonstrative of a conscious effort or a recklessness that would support a "strong inference" of fraud. Accordingly, I conclude that plaintiffs' securities fraud claim based on the alleged misstatement of dividend expectancy set forth in the Annual Report is inadequate under Rule 9(b).

**\*15** In the absence of sufficient allegations of scienter for plaintiffs' securities fraud claim based on the forward-looking statement predicting a $1.40 per share annual dividend, this claim will be dismissed pursuant to Federal Rule of Civil Procedure 9(b) with leave to amend.

### VIII. *Frank Pasquerilla's Statements Projecting A Specific FFO and Annual Dividend for 1995*

Plaintiffs aver that in 1994, the defendants were "priming the market" for 1995 by representing that Crown "would not need to reduce its dividends and would be able to cover the $1.40 dividend for 1995 as it did in 1994. For instance, defendant Frank Pasquerilla stated, in the *Pittsburgh Post-Gazette* on April 6, 1994, that 'in 1995, the figure [FFO] should hit $1.70 per share .' " Dkt. no. 5, ¶ 42. Frank Pasquerilla's involvement in this priming effort was again evident, according to the plaintiffs, in a statement attributed to him by the March 22, 1995 *Harrisburg Patriot.* The complaint alleges that the news story "quoted Frank Pasquerilla [as] stating that he expects Crown's 1995 FFO 'to exceed the $1.60 per share it earned in 1994' ... [and] that Crown 'expects to keep its dividend at $1.40 a share this

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                              Page 11
Not Reported in F.Supp., 1997 WL 599299 (W.D.Pa.)
**(Cite as: Not Reported in F.Supp.)**

year, the same as in 1994.' " Dkt. no. 5, ¶ 47.

Like the plaintiffs' first claim, their second claim rests on the theory that these statements by Frank Pasquerilla "concerning the intent and ability of Crown to maintain its dividend level ... [were] materially false and misleading ... resulting in a fraud on the market for Crown's shares." Dkt. no. 5, ¶ 26(b). A discussion of each of the statements allegedly made by Frank Pasquerilla follows:

A. *April 1994 Statement Reported in the Pittsburgh Post-Gazette*

1. Rule 12(b)(6)

Plaintiffs' complaint purports to state a claim based on Frank Pasquerilla's April 1994 statement that Crown's 1995 FFO "should hit $1.70 per share. Although the issue is close, I conclude that this claim survives defendants' Motion to Dismiss pursuant to Rule 12(b)(6).

Defendants argue that this claim must be dismissed with prejudice because Frank Pasquerilla's statement was made in April 1994, some eleven months before the start of the class period. They rely for this proposition on a district court opinion, *In re Cypress Semiconductor Sec. Litig.*, 891 F.Supp. 1369, 1374 n. 2 (N.D.Cal.1995), which held, in a footnote and without analysis, that statements reported in an article more than one year before the class period were not actionable. That case is unpersuasive, for two reasons.

First, the *Cypress* court never explained the rationale for its holding, which it believed "require[d] little discussion." *Id.* Instead, it relied solely on an unpublished decision, *In re Seagate Technology II Sec. Litig.*, No. C-89-2493(A)-VRW, Fed Sec.L.Rep. (CCH) ¶ 98,530, 1995 WL 66841 (N.D.Cal. Feb.8, 1995), *aff'd mem.*, 98 F.3d 1346 (9th Cir.1996). *Accord In re IBM Corp. Sec. Litig.*, 954 F.Supp. 81, 84 (S.D.N.Y.1997) (relying entirely on *Seagate* ). The *Seagate* court stated, for its part, and without citation to authority, that "liability cannot attach to statements made either before or after the class period." 1995 WL 66841, at *4. This *ipse dixit* approach provides little persuasive authority, particularly given the fact that other courts, in contrast, while also providing scant explanations, have permitted such pre-class period claims to go forward, at least at the 12(b)(6) stage. *See In re*

*MTC Elec. Technologies Shareholders Litig.*, 898 F.Supp. 974, 987 (E.D.N.Y.1995); *In re Kidder Peabody Sec. Litig.*, No. 94 CIV. 3954(JFK), Fed.Sec.L.Rep (CCH), ¶ 99,030, 1995 WL 590624, *5 (S.D.N.Y. Oct.4, 1995); *Urbach v. Sayles*, No. 91-1291, Fed.Sec.L.Rep. (CCH) ¶ 96,247, 1991 WL 236183, *9 (D.N.J. Sept.4, 1991), *clarified on other grounds*, 779 F.Supp. 351 (D.N.J.1991).

**\*16** There is, to be sure, some authority from district courts outside this circuit for the proposition that the power of forward-looking statements to mislead becomes attenuated over time and thus immaterial as a matter of law. These courts have reasoned that any misstatements have either become stale or have been superseded by later events and disclosures. *See Rand v. Cullinet Software, Inc.*, 847 F.Supp. 200, 210 (D.Mass.1994) (stale sales projections made inside class period, but seven months before class representative purchased shares); *In re Time Warner Inc. Sec. Litig.*, 794 F.Supp. 1252, 1260 (S.D.N.Y.1992) (alleged misstatement concerning company's value, made ten months before the class period began, "cannot have formed a basis for plaintiffs' expectations when they purchased shares ten or more months later; innumerable intervening factors could have changed the company's value" since the statement was made), *aff'd in part and rev'd in part on other grounds*, 9 F.3d 259 (2d Cir.1993).

This view is not supported, however, by *Burlington Coat*. There, alleged misstatements were made inside the class period and up to a year before the price of the stock nosedived, yet the court did not consider the possibility that their effect had been attenuated when it analyzed plaintiffs' claims, and for good reason. In an efficient market, material information "is immediately incorporated into stock prices." 114 F.3d at 1425. Thus, a false statement predicting high earnings in excess of the market's expectations will, all things being equal, cause the price of the company's stock to rise. In the absence of any contradictory information, that misinformation will continue to be incorporated in the stock's price until the predicted earnings fail to materialize, at which point the price will drop.

In the instant case, it appears as an intuitive matter that, if Frank Pasquerilla made a misleading statement in April 1994 and that statement was not corrected, the market price for Crown's shares could have been artificially inflated, particularly given the series of corroborating statements the defendants allegedly made in succeeding months. The fact that the statement was made at a time before any of the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                    Page 12
Not Reported in F.Supp., 1997 WL 599299 (W.D.Pa.)
**(Cite as: Not Reported in F.Supp.)**

class members purchased shares would seem to be irrelevant, as it still could have been partly responsible-along with the other alleged misrepresentations-for the injury to investors who purchased their shares over a year later. That being the case, in the absence of controlling authority, I cannot conclude as a matter of law that this statement is too stale to be actionable.

### 2. Rule 9(b)

#### a. Particularity of Character of Forward Looking Statement

Rule 9(b) requires that plaintiffs allege sufficient facts to demonstrate that Frank Pasquerilla's April 1994 prediction of an FFO of $ 1.70 in 1995 was made without a reasonable basis. *Burlington Coat, 114 F.3d at 1427.* To satisfy this heightened pleading standard, plaintiffs may allege that the "forecast was made with either (1) an inadequate consideration of the available data or (2) the use of unsound forecasting methodology." *Id.* at 1429. As I noted before in discussing Crown's representations regarding the annual dividend of $1.40, the complaint does not aver the use of unsound forecasting methodologies. *See supra* § VII.B.1. Accordingly, the inquiry is whether plaintiffs' complaint pleads enough facts to allow an inference that the April 1994 prediction by Frank Pasquerilla was made with an inadequate consideration of the available data.

**\*17** I conclude that the complaint fails to satisfy the requirements of Rule 9(b) regarding the particularity of the misleading character of Frank Pasquerilla's April 1994 forecast. My previous analysis regarding the sufficiency of the allegations as to the representation in Crown's annual report regarding the $1.40 annual dividend, *see supra* § VII.B.1, is inapplicable to Frank Pasquerilla's 1994 forecast because the allegedly inadequately considered data could not have informed Frank Pasquerilla's prediction of April 1994.

The data which Crown allegedly inadequately considered by making its statement in the annual report regarding the $1.40 dividend consisted of the significant capital expenditures related to the sale of the Hess's Department Store chain to the May Company and concomitant obligation to renovate the malls where the May Company would be operating, the LVM reconstruction and renovation, and the commitment by Crown to purchase the Wyoming

Valley Mall and the Middletown Mall. According to the plaintiffs' complaint, the Hess's transaction occurred "[i]n or about October 1994...." Dkt. no. 5, ¶ 54. The $60 million expansion of the LVM became a reality after the occurrence of the December 1994 fire which required that the mall be reconstructed and renovated. *Id.,* ¶ 57. Crown's commitment to purchase the outstanding interest in the two malls occurred in January 1995. *Id.,* ¶ 61. Consequently, none of these events could have been inadequately considered by Frank Pasquerilla before he predicted in April 1994 that Crown would attain an FFO of $1.70 in 1995.

In the absence of any allegations which would demonstrate that Frank Pasquerilla's April 1994 prediction was made without a reasonable basis, plaintiffs' claim fails to satisfy the particularity requirements of Rule 9(b) for this element and will be dismissed with leave to amend.

#### b. Particularity of Scienter Element

Plaintiffs' complaint must also allege with particularity the element of scienter. *Burlington Coat, 114 F.3d at 1418.* My discussion of the inadequacy of the allegations of motive and opportunity behind Crown's alleged misrepresentation regarding the annual dividend of $1.40 are equally applicable to plaintiffs' claim based on Frank Pasquerilla's April 1994 forecast. *See supra* § VII.B.2. Accordingly, plaintiffs' claim that Frank Pasquerilla's April 1994 prediction regarding an FFO of $1.70 in 1995 violated the securities laws also must be dismissed, with leave to amend, for failure to sufficiently allege the element of scienter.

### B. *March 1995 Statements Reported in the Harrisburg Patriot*

The other statement allegedly made by Frank Pasquerilla appeared in the March 22, 1995 *Harrisburg Patriot.* The misstatement was set forth in a section of the business page designated "Briefcase" and consisted literally of three sentences. Dkt. no. 16, exh. I. The article states:
Crown American Realty Trust of Johnstown expects 1995 revenue from operations, a measure of cash flow, to exceed the $1.60 a share it earned in 1994, said Frank J. Pasquerilla, chairman and chief executive. Pasquerilla also said yesterday that Crown, which owns Capital City Mall in Lower Allen Twp. and a number of other shopping malls,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1997 WL 599299 (W.D.Pa.)
(Cite as: Not Reported in F.Supp.)

Page 13

expects to keep its dividend at $1.40 a share this year, the same as in 1994.

**\*18** *Id.* Because this is a forward-looking statement predicting a specific dividend amount for 1995, it is actionable under section 10(b) of the Exchange Act and Rule 10b-5 in the same manner as the statement in the Annual Report expecting an annual dividend for 1995 of $1.40.   *See supra* § VII.A. Therefore, the 12(b)(6) Motion to Dismiss this claim must be denied.

Because this March 1995 statement by Frank Pasquerilla is essentially the same as that which appears in the Annual Report, my conclusion set forth *supra* regarding the adequacy of the complaint's factual allegations under Rule 9(b)'s heightened pleading standard are equally applicable here.   *See supra* § VII.B. 1 and 2.   Plaintiffs' complaint adequately alleges that the forecast was made without a reasonable basis, but it fails to plead sufficient facts that "could give rise to a 'strong' inference of scienter."   Burlington, 114 F.3d at 1422. Accordingly, this claim will be dismissed pursuant to Rule of 9(b), with leave to amend.

IX. *Misstatements Allegedly Made in Analyst Reports and at a REIT Convention Regarding Crown's Ability to Maintain its Annual Dividend of $1.40 in 1995* FN1

> FN1. To clarify, Crown's press release of March 1, 1995 has not been considered as a source of any false and misleading statements regarding the dividend expected for 1995.   The press release announced 1994's results, and there is nothing in that announcement concerning the viability of the $1.40 annual dividend for 1995 or the forecast of the FFO for the year ahead.   *See* Dkt. no. 16, exh. G.

The plaintiffs' complaint avers that, during the class period from March 1, 1995 to August 8, 1995, management represented that Crown would pay a $1.40 annual dividend and that this dividend was safe and "not at risk."   Dkt. no. 5, ¶ 45.   Management's representations in this regard were allegedly reported by market analysts at Alex Brown & Sons on March 1, and by NatWest Securities on March 7. *Id.* Crown management allegedly reiterated these representations at a REIT convention on March 20-21.   *Id.,* ¶ 47.   These representations allegedly "convinced" the market that Crown would continue

to pay a $1.40 annual dividend in 1995, and *The Wall Street Transcript* reported this conclusion on May 8. Dkt. no. 5, ¶ 50.     Based on management's representations, plaintiffs allege that the investment community continued to believe that dividends would not be cut, as evidenced by a Prudential Securities analyst report of June 1, 1995.   Dkt. no. 5, ¶ ¶ 64-65.

Plaintiffs' consistent reference to the market analyses of third parties is interpreted by the defendants as a securities fraud claim based upon misrepresentations "made by analysts offering their own editorial commentary on the performance of a company or its financial results...."   Dkt. no. 13, at 23.   Defendants then contend that statements by market analysts are not actionable as a matter of law, relying on the Fourth Circuit's decision in Raab v. General Physics Corp., 4 F.3d 286 (4th Cir.1993).

In *Raab,* investors brought a securities fraud claim based upon representations set forth, *inter alia,* in a six-page research report by Goldman Sachs.     The defendants moved to dismiss, arguing that they could not be held liable for the independent statements set forth in the research report.     The Fourth Circuit agreed, noting that the complaint failed to allege who "supplied this information to Goldman Sachs, how it was supplied and how General Physics could have controlled the content of the statement."   *Id.* at 288. It reasoned that:

**\*19** The securities laws require General Physics to speak truthfully to investors;   they do not require the company to police statements made by third parties for inaccuracies, even if the third party attributes the statement to General Physics.     Without control over Goldman Sachs' report, any statement made by General Physics personnel could be taken out of context, incorrectly quoted, or stripped of important qualifiers.   Plaintiffs have thus failed to plead facts from which it could be inferred that General Physics exercised the kind of control over the Goldman Sachs report that would render it liable for statements made therein.

*Id.*

Numerous other courts have reached similar holdings, reasoning that, unless the defendants "sufficiently entangled [themselves] with the analysts' forecasts to render those predictions attributable to it," Elkind v. Liggett & Myers, Inc., 635 F.2d 156, 163 (2d Cir.1980), those forecasts were not actionable.   *Id.;   accord* Suna v. Bailey Corp., 107 F.3d 64, 72-73 (1st Cir.1997), In re Cirrus

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                    Page 14
Not Reported in F.Supp., 1997 WL 599299 (W.D.Pa.)
**(Cite as: Not Reported in F.Supp.)**

_Logic Sec. Litig.,_ 946 F.Supp. 1446, 1465 (N.D.Cal.1996), _Cypress,_ 891 F.Supp. at 1376-78; _Rubin v. Trimble,_ No. C-95-4353 MMC, 1997 WL 227956, *18 (N.D.Cal. Apr.28, 1997); _Shuster v. Symmetricon, Inc.,_ No. 94-20024 RMW, _Fed Sec.L.Rep. ¶ 99,437,_ 1997 WL 269490, *7 (N.D.Cal. Feb.25, 1997), _Padnes v. Scios Nova Inc.,_ No. C 95-1693 MHP, 1996 WL 539711, *10 (N.D.Cal. Sept.18, 1996); _Seagate,_ 1995 WL 66841, *4. Such an entanglement "may occur when officials of the company have, by their activity, made an implied representation that the information they have reviewed is true or at least in accordance with the company's views." _Elkind,_ 635 F.2d at 163. This has come to be known as the "adopt or endorse" test, [FN2] which the Third Circuit approved in _Burlington Coat._ [FN3] To plead an imputation theory with sufficient particularity to avoid dismissal under Rule 9(b), plaintiffs "must (1) identify specific analyst opinions and name the insider who adopted them; (2) point to specific interactions between the insider and the analyst which gave rise to the entanglement; and (3) state the dates on which the acts which allegedly gave rise to the entanglement occurred. _Cirrus Logic,_ 946 F.Supp. at 1465; _accord Raab,_ 4 F.3d at 288; _In re Caere Corp. Sec. Litig.,_ 837 F.Supp. 1054, 1059 (N.D.Cal.1993), _Rubin,_ 1997 WL 227956, *18; _Shuster,_ 1997 WL 269490, *7.

> FN2. It is also possible for liability to attach if a corporate officer or employee makes false and misleading statements to an analyst, who then in good faith incorporates them into his or her report. _See, e.g., Warshaw v. Xoma Corp.,_ 74 F.3d 955, 959 (9th Cir.1996) (a defendant "cannot escape liability simply because it carried out its alleged fraud through the public statements of third parties"); _Cirrus Logic,_ 946 F.Supp. at 1467 ("A company may not lie to securities analysts and avoid liability for its misrepresentations by refusing to adopt the analyst reports incorporating the misrepresentations."). Because a company official spoke, however, this is a form of direct liability and does not involve the imputation of the analyst's statements back to the company. Under such a theory, the plaintiff must "plead with the requisite specificity precisely what misstatements were made by which defendants to which analysts, and precisely how that specific misinformation reached the market through a specific analyst report." _Rubin,_ 1997 WL

227956, *19; _accord Shuster,_ 1997 WL 269490, *7. Mere conclusory allegations will not suffice under Rule 9(b). _Id._ Here, no specific allegation is made that any defendant made any particular statement to any analyst that was false or misleading, with the exception of Frank Pasquerilla's statement alleged to have been made at the REIT convention, discussed _infra._ Thus, to the extent that plaintiffs are proceeding on this theory, it will be dismissed for insufficient particularity under Rule 9(b), with leave to amend, and their claim will be analyzed under an imputation theory.

> FN3. In _Burlington Coat,_ one of the claims was based on a company officer's forward looking "statement during a securities analysts' conference that he was 'comfortable' with analysts' estimates of $1.20 to $1.30 as a mid-range for fiscal 1994 earnings per share." 114 F.3d at 1428. This statement was subsequently reported in the press. The district court dismissed the plaintiffs' claim on the basis that the company could not be liable for the analyst's projection unless the company "expressly 'adopted or endorsed' the analyst's report." _Id._ The Court of Appeals agreed with the use of the "adopt or endorse" test, but disagreed with the way the district court applied it to the facts of the case. _Id._ at 1429. It reasoned that "[t]o say that one is 'comfortable' with an analyst's projection is to say that one adopts and endorses it as reasonable. When a high-ranking corporate officer explicitly expresses agreement with an outside forecast, that is close, if not the same, to the officer's making the forecast." _Id._

The application of the "adopt or endorse" test to the plaintiffs' claim therefore requires us to dissect each analyst's report and the defendants' alleged connection with it. It must then be ascertained whether the corporation "so involved itself in ... projections by outsiders" as to have implied that the representation is true and consistent with the company's views, thereby rendering it actionable under section 10(b) of the Exchange Act and Rule 10b-5. _Elkind,_ 635 F.2d at 163.

A. _March 1, 1995 Analyst Report of Alex Brown & Sons, Inc._

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                      Page 15
Not Reported in F.Supp., 1997 WL 599299 (W.D.Pa.)
**(Cite as: Not Reported in F.Supp.)**

*20 Plaintiffs complaint avers that the defendants represented that the dividend was safe and that this was reported by Alex Brown & Sons' market analysis.  The actual report is a little more than two pages in length and begins with the caption:  "CFO Leaving-Estimates and Rating Revised Downward-Neutral."  Dkt. no. 16, exh.  F.  Immediately below this heading, the analysis sets forth financial information regarding the stock price, earnings data and ratings.  The report's text then begins:

The management team of Crown American Realty Trust, the Johnstown,
Pennsylvania-based regional mall REIT has informed us that Pat Miniutti, Chief Financial Officer, is leaving the Company.     Additionally, *we are lowering* our 1995 Funds From Operations (FFO) estimate ... for the following reasons....
These events do not completely derail the Company's intermediate-to-long-term strategy, and the dividend remains safe.     However, *we anticipate* continued near-term stock price pressure as the investment community absorbs the news of lower earnings estimates and contends with the additional uncertainty with respect to management depth and succession.     Consequently, *we are lowering* our investment rating on the stock to "neutral" from "buy."     Details on *our estimate* and management changes follow.

Dkt. no. 16, exh.  F (emphasis added).

It is clear from this report that management provided the analysts with information regarding the departure of Crown's Chief Financial Officer.  The estimate of the 1995 FFO and the conclusion that "the dividend remains safe," however, were made by the analysts.  The analysts' report begins by noting that management informed the analysts about the management change and then states that "*we are lowering*" our 1995 FFO estimate for certain stated reasons. *Id.* (emphasis added).  The report expresses the analysts' belief that these events would not derail the company's strategy nor affect the safety of the dividend.     It does not, however, provide any information concerning specific interactions between the defendants and the analyst that show any entanglement with, or adoption or endorsement of, the analyst's report, nor do plaintiffs plead any such interaction.     Accordingly, the claim is not sufficiently particularized and will be dismissed under Rule 9(b) with leave to amend.

B. *March 7, 1995 Analyst Report by NatWest Securities*

Plaintiffs' complaint also refers to a March 7, 1995 analyst report from NatWest Securities as evidence that management represented that the 1995 dividend would be covered.     *See* Dkt. no. 5, ¶ 45.     The March 7, 1995 report is two pages in length and is captioned:     "Rating Downgraded from BUY to HOLD." Dkt. no. 16, exh.  H. After a table setting forth financial data regarding the security, the investment summary begins:
Recent discussions with management have led us to lower our 1995 estimate by $0.12 per share. Consensus estimates are too high and we expect that they will be coming down over the coming months, leading us to downgrade our rating on [[Crown]] from BUY to HOLD.

*21 *Id.* It continues with a recitation of Crown's history and a discussion of the company's fourth quarter performance for 1994, specifically predicting that higher interest rates on variable rate debt will negatively impact the FFO. The second page of the report then sets forth eight "bullets" of information concerning the company's financial picture for readers to consider.  The third bullet states:Dividend coverage on a funds-available-for-distribution (FAD) basis will continue to be tight with the payout ratio coming in at approximately 99%.     After deducting an estimated $3.8 million ($0.14 per share) in 1995 related to the REIT's share of tenant improvement costs associated with lease rollovers and new occupancy, as well as recurring capitalized expenditures of a maintenance-like nature from FFO, the dividend appears to be covered.

Dkt. no. 16, exh.  H.

This report fails to detail what information was obtained from discussions with management, from whom the information was obtained, how the information was supplied and the extent to which Crown had any control over the text of the report.     It merely recites that discussions were held with management.     That, without more, is insufficient to meet the Rule 9(b) pleading threshold. *Padnes, 1996 WL 539711, *10.*  Furthermore, the report declares several times that NatWest is responsible for the prediction that 1995 earnings would be lower and the downgrading of Crown's rating from BUY to HOLD. Dkt. no. 16, exh.  H ("have led us to lower our 1995 estimate;" "we expect;" "we are reducing our 1995 estimate").     As a result, the NatWest Securities report cannot be attributed to the defendants either

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                    Page 16
Not Reported in F.Supp., 1997 WL 599299 (W.D.Pa.)
**(Cite as: Not Reported in F.Supp.)**

expressly or impliedly, and liability cannot attach based upon the analysts' conclusion that the dividend would be covered. _Burlington Coat,_ 114 F.3d at 1428-29; _Raab,_ 4 F.3d at 288; _Elkind,_ 635 F.2d at 163. This claim too will be dismissed, with leave to amend, under Rule 9(b).

### C. *March 20-21, 1995 Statements at a REIT Convention*

Plaintiffs' complaint alleges that the defendants "reiterated the safety of the $1.40 dividend for 1995" in an effort to assuage any investor concerns about Crown's ability to continue to distribute "high dividend payments." Dkt. no. 5, ¶ 47. They specifically cite statements made by Crown at a REIT convention held in Palm Beach on March 20-21, 1995 as an example of this practice. _Id._ The complaint quotes from an August 11, 1995 story in the _Dow Jones News Service_ which discussed Crown's announcement earlier that week that it would slash its quarterly dividend. Dkt. no. 16, exh. O. The article's second paragraph reports:

"Crown American swore earlier this year that its dividend wasn't at risk," said Steven Hash, a REIT analyst at Lehman Brothers, Inc. The company reportedly told analysts and investors at an industry conference in March that the dividend was safe.

_Id._

The "adopt or endorse" test is inapplicable in this case because the statement that the "dividend wasn't at risk" is not that of the analyst, but is directly attributable to Crown's alleged representation at the REIT convention. _Burlington Coat,_ 114 F.3d at 1428-29. _See also supra,_ n. 2.

**\*22** Although plaintiffs do not allege who the speaker was or what information was specifically conveyed at the convention to foster a belief that the dividend was not at risk, the March 22, 1995 editions of the _Allentown Morning Call_ and the _Harrisburg Patriot_ both report Frank Pasquerilla as the speaker and contain statements he made concerning 1995's expected FFO. _See_ Dkt. no. 16, exh. I, Q. As a result, this is analytically the same claim addressed _supra,_ and will be dismissed with leave to amend. _See_ § VIII.B. To the extent that plaintiffs contend there were other actionable representations beyond Frank Pasquerilla's, plaintiffs will have the opportunity to plead such facts in their amended complaint.

### D. *May 8, 1995 News Story in The Wall Street Transcript*

Plaintiffs also aver that the "market was convinced by defendants' representations that the Trust would continue to pay the $1.40 dividend for 1995." Dkt. no. 5, ¶ 50. As evidence, plaintiffs cite _The Wall Street Transcript_ of May 8, 1995 which reported that Crown could "maintain the current $1.40 a share dividend with its yield of 10.8%." _Id._ The actual report consists of the following single paragraph:

Jonathan Litt and Bradley Hatfield of Salomon Bros. recommend purchase of Crown American Realty (CWN) (N.Y.SE-$13) in the belief the stock is misunderstood and mispriced-undervalued given the firm's prospects for accelerating earnings in 1996 as the retenanting program takes hold. Although management has resolved many investor concerns, others remain, including the availability of capital for its renovation, expansion, and tenanting program, its dividend paying ability; and management succession. After discussions with management, careful review of the company's capital needs, etc. the _analysts believe_ that Crown has adequate resources from a combination of powerful asset sales and existing lines of credit to fund the proposed redevelopment and expansion costs and to maintain the current $1.40 a share dividend with its yield of 10.8%. The analysts estimate that Crown American will earn funds from operations of $1.65 per share in 1995, $1.74 in 1996 and $1.85 in 1997, compared with; $1.58 reported in 1994.

Dkt. no. 16, exh. J (emphasis added).

The prediction that Crown would be able to maintain the current $1.40 dividend was made by the analysts after discussions with Crown's management, and following the analyst's own review of the information available. Therefore, the analyst's prediction cannot be attributed directly to Crown.

Even if the prediction was based solely on information obtained from Crown, the complaint and the analyst's report fail to detail with sufficient particularity any of the information necessary to give rise to an inference that Crown endorsed, adopted, influenced or otherwise entangled itself with either the prediction itself or the foundation upon which it rested. _Raab,_ 4F.3d at 288. In the absence of such factual allegations, the fraudulent character of the statement is not pleaded with sufficient particularity. Furthermore, such a representation, even if imputed to Crown, would have been rendered immaterial in

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                    Page 17
Not Reported in F.Supp., 1997 WL 599299 (W.D.Pa.)
**(Cite as: Not Reported in F.Supp.)**

light of the cautionary language which specifically references concerns by investors regarding Crown's dividend-paying ability and the availability of capital for its renovations, expansions and tenanting program.    See *Trump,* 7 F.3d at 371 (holding that "cautionary statements included in the document may render the challenged predictive statements or opinions immaterial" under bespeaks caution doctrine).    Accordingly, to the extent the plaintiffs have asserted a securities fraud claim based upon representations by management indirectly set forth in the May 8, 1995 article in *The Wall Street Transcript,* such a claim fails and will be dismissed with prejudice.

E. *June 1, 1995 Prudential Securities Analyst Report*

**\*23** Plaintiffs also aver that a June 1, 1995 Prudential Securities analyst report which evinces the market's belief that the dividend was safe arose as a result of the defendants' representations.    Dkt. no. 5, ¶ ¶ 63-64.    The plaintiffs focus upon one portion of the report:
We estimate that Crown will add at least another $20 million of debt this year to meet its capital-spending plans.    The company has little cash on hand.    And *after paying its dividend,* Crown is not likely to have the flexibility to fund this spending internally.    Consequently, the company faces the prospect of incurring more variable debt, along with rolling over its debt due in 1995.

Dkt. no. 16, exh.   M, at 5 (emphasis added).

This single segment of Prudential Securities seventeen-page report does not convey a belief that the dividend will be paid.    To the contrary, it projects what Crown's financial status is likely to be after the dividend is distributed.    This cautionary tone is consistent with the tenor of the entire document, which is not committed to convincing the investment community of the safety of Crown's dividend, but instead begins by noting "Rating:   HOLD (High Risk)."    *Id.* In short, the June 1, 1995 analyst report does not impart any assurances whatsoever that the 1995 annual dividend will remain at $1.40.    Thus, no securities fraud claim based on this report can lie, and the claim will accordingly be dismissed with prejudice.

X. *Misstatements in Crown's March 1, 1995 Press Release and 1994 Annual Report Regarding the Source of Funding for the Renovation and Upgrading*

*of the LVM after the December 1994 Fire*

Plaintiffs allege that Crown's March 1, 1995 press release and 1994 Annual Report contained misleading statements regarding the source of the funding for the LVM improvements.    The plaintiffs aver:
Ostensibly, in connection with the fire damage, the March 1, 1995 press release disclosed plans for refurbishing the Logan Valley Mall, including the expansion of certain anchor tenant cites [sic].    The shareholder letter in the 1994 Annual Report downplayed the effects of the fire, reporting that the Logan Valley Mall opened the "very next day" and "within three days some of the burned out tenants began reopening in temporary spaces in other areas of the mall."    Significantly, the defendants reported and re-iterated that:
One important aspect of this tragedy is that the damaged portion of the mall was covered by property and business interruption insurance.    **Accordingly, the fire will not have any material effect on future operating results until normal recovery is completed.**    [emphasis added in complaint.]
This created the misleading impression that any renovation or upgrading of this facility would largely be covered by insurance proceeds and have no effect on the Trust's operation.

Dkt. no. 5, ¶ 58 (quoting 1994 Annual Report, at 6).    Plaintiffs' further aver that the defendants "materially misled the investment community by suggesting that insurance would be adequate to reconstruct the destroyed assets [at the LVM]."   Dkt. no. 5, ¶ 59.

**\*24** This claim fails, quite simply, because the very documents on which plaintiffs rely lend it no support.    In Crown's 1994 Annual Report, defendants clearly state:
We expect to begin rebuilding this mall in Spring 1995 and look forward to a *bigger* and *better* Logan Valley Mall in Spring 1996.    One important aspect of this tragedy is that the *damaged portion* of the mall was covered by property and business interruption insurance.    Accordingly, the fire will not have any material effect on future operating results until normal recovery is completed.

Dkt. no 16, Exh. A, at 6 (emphasis added).    Later in the report, defendants note that approximately twenty burned-out tenants could be accommodated in the undamaged portion of the mall.   *Id.* at 9.    Finally, the report states that "[t]he Company is evaluating various reconstruction plans for the destroyed portion of the mall and is also considering expanding and

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                           Page 18
Not Reported in F.Supp., 1997 WL 599299 (W.D.Pa.)
**(Cite as: Not Reported in F.Supp.)**

renovating the mall. Funds for the expansion and renovation of the mall would come from property insurance proceeds and mortgage financing...." *Id.* at 28-29. *See also* dkt. no. 16, Exh. C, at 12 (Form 10-Q, reciting that the "costs of rebuilding and expanding the fire-damaged Logan Valley Mall will be funded from the property insurance proceeds and a new mortgage....") The only reasonable interpretation of this language is that part of the LVM was damaged by fire and was to be rebuilt with insurance proceeds, and that Crown intended to expand and upgrade the mall in the process, in part at its own expense.[FN4] No representation was made that the LVM upgrade would "largely" be covered by insurance proceeds; any interpretation to that effect comes from plaintiffs' strained reading of these documents, not defendants' misrepresentations. Hence, this claim fails and will be dismissed with prejudice.

> FN4. To some degree, it is possible that some of the LVM improvements were "covered" by the insurance proceeds. For example, if some of the burned-out space was architecturally outdated, some or all of the cost of rebuilding it to contemporary standards might well be funded by the insurer as part of the reconstruction. On the other hand, the cost of enlarging or modernizing other portions of the mall would be Crown's responsibility.

XI. *Omissions Regarding the Extent of Planned Capital Expenditures for the LVM Restoration, Expansions of Other Malls, Renovations at Malls Where Hess's Was Replaced by the May Company, and the Purchase of the Remaining Interests in the Wyoming Valley and Middletown Malls*

In 1994, Hess's, which operated department stores in sixteen Crown malls, was sold to May Department Stores and The Bon Ton. Plaintiffs aver that Crown misled investors by implying, in the 1994 Annual Report and in a March 1, 1995 press release, that the May Company had committed to spend $80 million renovating those malls, while failing to disclose that Crown had committed to spend millions of dollars to make these improvements. Dkt. no. 6, ¶ 54-56.

Once again, the documents upon which plaintiffs rely belie their contentions. The 1994 Annual Report states explicitly in its "Letter to Our Shareholders" regarding additional growth that "[i]n five malls, where the May Company is replacing Hess's, *the stores* will be completely renovated and expanded at

the expense of the May Company." Dkt. no. 16, Exh. A, at 6 (emphasis added). In the same paragraph, defendants also announced their plans to expand two other malls. *Id.* The Financial Statement attached to the Annual report also noted Crown's commitment "to renovate the mall where the leased [May] store is located." *Id.,* 40. In addition, Crown disclosed in its Form 10-Q filing for the period ending March 31, 1995 that "[m]anagement expects to expand and/or renovate its existing malls in the future." Dkt. no. 16, Exh. C, at 12. Crown pointed out that funds for these improvements would "be financed by either new loans or the Company's issuance of additional shares." *Id.* Finally, in its Form 10-K filing for the period ending December 31, 1994, defendants stated clearly that they planned to meet their objectives of paying dividends and achieving capital appreciation by, *inter alia,* "where deemed appropriate, renovations and expansions of [mall] properties." Dkt. no. 16, Exh. B, at 4.

**\*25** It is abundantly clear that Crown disclosed its intent to renovate and upgrade its mall properties at its own expense, and that the defendants never stated or implied that the May Company would be paying for any renovations or expansions, except to May's own stores. Only by improperly reading the word "stores" as "malls" can it even be argued that defendants misled investors into believing that the May Company undertook such an obligation. Accordingly, this claim too will be dismissed with prejudice.

Plaintiffs also aver that defendants failed to disclose their planned purchase of the remaining interests in the Wyoming Valley and Middletown Malls from Crown Associates and First Union National Bank. To the contrary, these plans were disclosed as far back as August 9, 1993, when Crown issued its Prospectus in connection with its initial public offering. Dkt. no. 16, Exh. E, at 9 (purchase of Crown Associates' interest). This transaction was disclosed again in Crown's December 31, 1994 Form 10-K filing. Dkt. no. 16, Exh. B, at 2 (purchase of First Union's interest, noting approval of transaction by Crown's independent trustees). There is simply no factual support for plaintiffs' claim of fraudulent nondisclosure, and it will therefore be dismissed with prejudice.

XII. *Omissions Regarding the Ability to Continue to Leverage Assets*

Plaintiffs aver that Crown failed to disclose material

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                    Page 19
Not Reported in F.Supp., 1997 WL 599299 (W.D.Pa.)
**(Cite as: Not Reported in F.Supp.)**

information regarding its ability to continue to leverage assets as a means of obtaining working capital to meet its obligations. They break this contention down into two sub-allegations: (1) that Crown failed generally to disclose that "the fair market value of at least certain of the existing REIT properties was significantly below cost basis," dkt. no. 5, ¶ 66, and (2) that Crown failed to disclose that, because of the planned sale of certain properties, it "would have to incur a significant charge to earnings" at the time the decision to sell was made. Dkt. no. 5, ¶ 70. This information was material, according to the plaintiffs, because the investment community believed that Crown would obtain additional capital by leveraging its assets instead of reducing its dividend. Any factors adversely affecting Crown's ability to borrow would therefore jeopardize the safety of its dividend. Dkt. no. 5, ¶ ¶ 63, 66, 70.

It appears, from a generous reading of their complaint, that plaintiffs theorize that Crown failed to disclose this information in order to enhance its "access to further funding by means of increased debt...." Dkt. no. 5, ¶ ¶ 67 and 70. Plaintiffs' complaint acknowledges, however, that Crown's ability to borrow was already affected by the fact that its debt-to-market capitalization ratio had exceeded 50% and was nearing 60%. Dkt. no. 5, ¶ 67.

While this theory has sufficient plausibility to allow it to survive the defendants' l2(b)(6) motion, it does not clear Rule 9(b)'s hurdle for alleging scienter. Plaintiffs' allegations are tantamount to an assertion that the driving force behind Crown's failure to disclose this information was its desire to improve its financial picture to enhance its ability to finance further capital improvements. The Second Circuit has held that such a motive, without more, is inadequate to satisfy the heightened pleading standard of Rule 9(b). *See Chill v. General Electric Co., 101 F.3d 263, 268 (2d Cir.1996)* ("motive to maintain the appearance of corporate profitability or of the success of an investment, will naturally involve a benefit to a corporation, but does not 'entail concrete benefits....' "); and *San Leandro, 75 F.3d at 814* ("We do not agree that a company's desire to maintain a high bond or credit rating qualifies as a sufficient motive for fraud in these circumstances...."). *See also Marksman Partners, L.P. v. Chantal Pharmaceutical Corp., 927 F.Supp. 1297, 1310 (C.D.Cal.1996)* ("the 'generic motive' of increasing capital is not enough...."). In the absence of additional allegations which would distinguish this motive from that which could "be imputed to any

publicly-owned, for profit endeavor[,]" *Chill, 101 F.3d at 268*, needing to leverage its assets for further capital, plaintiffs' theory of motive fails to give rise to a "strong inference" of a motive to commit fraud. Therefore, this claim, like plaintiffs' claim based on the alleged misrepresentation in Crown's Annual Report, must be dismissed for failure to adequately plead scienter as required by Rule 9(b). *See supra,* § VII.B.2.

**\*26** Plaintiffs' theory also falls short under Rule 9(b) because it fails to allege a sufficient opportunity to commit fraud. Under *Shields,* a plaintiff must plead "*both* motive and opportunity to commit fraud.... Opportunity would entail the means and likely prospect of achieving concrete benefits by the means alleged." *25 F.3d at 1130* (emphasis added); *Burlington Coat, 114 F.3d at 1422.* With regard to plaintiffs' averment that Crown failed to disclose the discrepancy between the cost basis of its properties and its current fair market value, plaintiffs' allegations fail to establish how the failure to disclose this information would improve Crown's ability to obtain further capital by leveraging its assets. Banks, particularly in the case of sophisticated commercial property transactions, rarely determine whether and how much to lend based upon a borrower's self-serving valuation of an asset, be it tied to the cost basis or what that borrower deems as the fair market value. Instead, commercial lenders ordinarily conduct their own appraisals in order to determine a property's value. *See Glenn G. Munn, et. al., Encyclopedia of Banking and Finance* 684 (9th ed.1991). Thus, there would appear to be no realistic opportunity to enhance Crown's financial picture for purposes of incurring additional mortgage debt by disclosing one method of valuation over another. [FN5] *Cf. Shields, 25 F.3d at 1130* (where review of misstated loan portfolio would normally occur in regular course of bank business, opportunity was not sufficiently pleaded).

> FN5. Even if Crown's bankers *did* rely only on historical cost, the nondisclosures would not state a cause of action. Under such a scenario, according to plaintiffs' theory, the banks would be deceived into lending enough money to fund Crown's renovation and expansion plans because they would mistakenly believe that the mall properties were worth more than their true values. Crown would therefore be able to make its improvements without cutting its dividend, and the investment community would not

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1997 WL 599299 (W.D.Pa.)
**(Cite as: Not Reported in F.Supp.)**

have been misled (even though the banks were).

Plaintiffs' theory regarding Crown's failure to disclose the significant charge to earnings that would be taken once it determined to sell certain properties suffers from the same defect. This allegation centers around the different ways Generally Accepted Accounting Principles (GAAP) treat real property held for sale as opposed to property held on a "going concern" basis. According to plaintiffs, Crown held certain properties which it had capitalized on its books according to the estimated net present value of future earnings. When Crown decided to sell these assets, it was required to write down their values to fair market and incur a significant charge to earnings. Plaintiffs aver that Crown failed to disclose in advance the necessity for this write-down because it would negatively affect Crown's ability to borrow money, although they fail to plead how this negative effect would come about. Dkt. no. 5, ¶ 70.

As noted earlier, however, lenders normally are interested only in a current and potential future value of the property when deciding whether and how much to lend in a secured mortgage transaction. They have little or no interest in auditor-required accounting entries that have no material impact on the borrower's ability to fulfill its obligations. Simply put, sophisticated lenders know the difference between the write-down of uncollectible accounts receivable or unsalable inventory, on the one hand, and a non-cash journal entry with no effect on funds from operations, on the other. The former represents a material change in the financial prospects of the company; the latter may not. Absent some specific allegation of the banks' reliance on Crown's internal accounting valuations (for example, that the banks would no longer be willing to lend because the write-downs materially worsened Crown's debt to equity ratio) there is no reason why those banks would care if the write-down were disclosed, and thus no reason why the reasonable investor would care.

**\*27** Alternatively, plaintiffs may satisfy the heightened pleading standard applicable to scienter by factual allegations identifying "circumstances indicating conscious or reckless behavior by defendants...." 114 F.3d at 1422. Plaintiffs' allegations also fail in this regard as I concluded earlier that they aver nothing more than "mere negligence [which is] not demonstrative of a conscious effort or a recklessness...." *Supra* § VII.B.2.b at 24.

Accordingly, plaintiffs' claim that Crown failed to disclose material information regarding its ability to continue to leverage its assets will be dismissed pursuant to Rule 9(b) with leave to amend. FN6

> FN6. It may be that my analysis of this claim was unnecessary inasmuch as these allegations merely provide further support for the plaintiffs' earlier assertion that the defendants inadequately considered certain data in making the forecasts of $1.40 dividend and $1.70 FFO for 1995.

XIII. *Plaintiffs' § 20(a) Claims*

Plaintiffs have also asserted claims under § 20(a) of the Securities Act, alleging that the individual defendants were "controlling persons" of Crown and should therefore be held secondarily liable for Crown's primary violations under § 10(b). Dkt. no. 5, ¶¶ 89-91. Because I have concluded that the § 10(b) claims must be dismissed, the § 20(a) claims fall as well and will be dismissed without prejudice to their reassertion should plaintiffs successfully re-plead their § 10(b) allegations. *See Shapiro v. UJB Fin. Corp.*, 964 F.2d 272, 279 (3d Cir.1992).

XIV. *Conclusion*

An appropriate order follows.

ORDER

AND NOW, this 15th day of September, 1997, consistent with the foregoing opinion, it is hereby

ORDERED AND DIRECTED that:

1. The defendants' Motion to Dismiss, docket no. 12, is GRANTED IN PART and DENIED IN PART as follows: (a) plaintiffs' claim based upon Crown's 1994 Annual Report statement expecting $1.40 annual dividend in 1995 is dismissed pursuant to Federal Rule of Civil Procedure 9(b) with leave to amend; (b) plaintiffs' claim based upon Frank Pasquerilla's April 1994 forecast of $1.70 FFO in 1995 is dismissed pursuant to Federal Rule of Civil Procedure 9(b) with leave to amend; (c) plaintiffs' claim based upon Frank Pasquerilla's March 1995 statement that Crown expects to keep its annual dividend at $1.40 is dismissed pursuant to Federal Rule of Civil Procedure 9(b) with leave to amend;

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                         Page 21
Not Reported in F.Supp., 1997 WL 599299 (W.D.Pa.)
**(Cite as: Not Reported in F.Supp.)**

(d) plaintiffs' claim based upon Frank Pasquerilla's statements made at a REIT convention in March 1995 regarding the safety of the $1.40 dividend is dismissed pursuant to _Federal Rule of Civil Procedure 9(b)_ with leave to amend; (e) plaintiffs' claims based upon misstatements by Crown's management regarding Crown's ability to maintain its annual dividend of $1.40 as reported by the Alex Brown and NatWest securities analyst reports are dismissed pursuant to _Federal Rule of Civil Procedure 9(b)_ with leave to amend; (f) plaintiffs' claims based upon misstatements by Crown as reported by the _Wall Street Transcript_ and the Prudential Securities analyst report are dismissed with prejudice pursuant to _Federal Rule of Civil Procedure 12(b)(6)_; (g) plaintiffs' claim alleging misstatements by Crown regarding the source of funding for the renovation and upgrading of the Logan Valley Mall is dismissed with prejudice pursuant to _Federal Rule of Civil Procedure 12(b)(6)_; (h) plaintiffs' claim alleging that the defendants misled investors by failing to disclose information regarding the extent of the capital expenditures to which Crown was committed is dismissed with prejudice pursuant to _Federal Rule of Civil Procedure 12(b)(6)_; (i) plaintiffs' claim alleging that the defendants misled investors by failing to disclose material information concerning Crown's ability to continue to leverage assets is dismissed pursuant to _Federal Rule of Civil Procedure 9(b)_ with leave to amend; and (j) plaintiff's § 20(a) claims are dismissed without prejudice.

**\*28** 2. Plaintiffs shall file an amended complaint on or before October 10, 1997.

3. Plaintiffs' Motion for Class Certification, docket no. 7, is DENIED as moot.

W.D.Pa.,1997.
In re Crown American Realty Trust Securities Litigation
Not Reported in F.Supp., 1997 WL 599299 (W.D.Pa.)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**EXHIBIT 3**

Westlaw.

Not Reported in F.Supp.2d                                                                                    Page 1
Not Reported in F.Supp.2d, 2001 WL 799870 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.2d)**

**H**
Briefs and Other Related Documents
Only the Westlaw citation is currently available.
United States District Court, E.D. Pennsylvania.
DE LAGE LANDEN FINANCIAL SERVICES,
INC.,
v.
CARDSERVICE INTERNATIONAL, INC.,
v.
International Business Equipment, Inc., De Lage
Landen Financial Services, Inc., Pullman Bank &
Trust Co. and Howard Karjala.
**No. CIV. A. 00-2355.**

July 12, 2001.

MEMORANDUM ORDER

WALDMAN.
**\*1** Plaintiff De Lage Landen Financial Services Inc.
("DLL") filed this action seeking to recover allegedly
overdue lease payments. Defendant Cardservice
International, Inc. ("Cardservice") filed
counterclaims against DLL and the third-party
defendants, International Business Equipment, Inc.
("IBE"), Pullman Bank and Trust Company
("Pullman") and Howard Karjala. Cardservice's first
counterclaim is against all parties, except Pullman,
for violation of the California unfair trade practices
law. Its fifth and sixth counterclaims are for
fraudulent inducement against all parties except
Pullman. Its seventh counterclaim seeks rescission of
all lease agreements on the basis of fraud against all
parties except third-party defendant Howard Karjala.
Counterclaims eight through twelve seek declaratory
relief against all parties. Presently before the court is
the motion of DLL and Pullman to dismiss the counts
against them pursuant to Fed.R.Civ.P. 12(b)(6) and
9(b).<sup>FN1</sup>

> FN1. IBE and Mr. Karjala have never been
> served in this action and have not appeared
> or otherwise waived service. Counsel for
> Cardservice filed a "certificate of service"
> last November stating that its answer with
> counterclaims had been served by mail
> "upon counsel for plaintiff." This is clearly
> insufficient to effect service upon third-party
> defendants. See Fed.R.Civ.P. 14(a).

Jurisdiction is based upon diversity of citizenship.
The court exercises supplemental jurisdiction over
defendant's counterclaims against third-party
defendants.

The pertinent facts as alleged by Cardservice are as
follow.

On July 23, 1998, Cardservice and IBE entered a
lease agreement pursuant to which IBE leased
photocopiers ("copiers") to Cardservice on a cost-
per-copy basis, with a guaranteed minimum of
225,000 copies per month. The lease agreement
granted IBE the right to assign all of its rights under
the agreement, without its obligations. The lease
agreement also contains a choice of law clause which
states "[t]his agreement has been made in Berwyn,
Pennsylvania and ... is governed by and construed in
accordance with the laws of Pennsylvania."

Although the lease agreement contains a disclaimer
of all warranties, including that of fitness for a
particular purpose, Cardservice alleges that IBE
assured it upon entering the agreement that the
copiers were compatible with Cardservice's software
programs. IBE further assured Cardservice that its
obligations under the agreement were limited to its
minimum copy requirements and that it could receive
as many copiers as it needed. Cardservice does not
identify who at IBE initially made these
representations.

After signing the lease agreement but before the
copiers were delivered, Cardservice was visited by
Mr. Karjala, an IBE sales representative, who
reiterated that the copiers would meet Cardservice's
needs and that they could receive additional copiers
with no further obligations. Shortly after receiving
the copiers, Cardservice discovered that they were
not compatible with its software applications. After
unsuccessfully attempting to remedy the problem,
Mr. Karjala met with Don Wilson, Cardservice's
Controller, to discuss replacing the incompatible
copiers with new copiers. At this time Mr. Karjala
reassured Mr. Wilson that Cardservice was only
responsible for the 225,000 minimum copies
regardless of the number of copiers it received.
Cardservice subsequently entered two new
agreements with IBE, dated October 6, 1998
("second lease") and November 30, 1998 ("third

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.