Not Reported in F.Supp.2d                                                                                    Page 2
Not Reported in F.Supp.2d, 2001 WL 799870 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.2d)**

lease").

The second and third leases each require Cardservice to pay for a minimum of 225,000 copies per month. The second lease listed seven copiers to be delivered to Cardservice and the third lease listed five. [FN2] Cardservice alleges that it entered the second and third leases based upon Mr. Karjala's representations that these agreements would supercede the parties' initial agreement. According to Cardservice, the parties agreed that the new leases would not increase its guaranteed minimum copy requirement above 225,000 copies.

> FN2. The seven copiers listed in the second lease were simply identified as "Konica 7060" copiers whereas the five copiers listed in the third agreement were specifically identified by their serial numbers. Cardservice alleges that it never received these five copiers.

**\*2** After signing the second and third leases and receiving new copiers, Cardservice discovered that the new copiers were also incompatible with its needs. It terminated its agreement with IBE by letter of January 20, 2000. Cardservice then learned that IBE had assigned all of its rights to payments under the leases to DLL "and/or Pullman" and that Cardservice had been paying and was expected to continue paying DLL based upon a guaranteed minimum of 675,000 total copies rather than 225,000. The 675,000 guaranteed minimum represented the aggregate guaranteed minimum requirements of the three leases. DLL sued Cardservice in this district as assignee of IBE's rights and Cardservice's counterclaims followed.

Dismissal for failure to state a claim is appropriate when it clearly appears that plaintiff can prove no set of facts to support the claim which would entitle him to relief. *See Conley v. Gibson,* 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); *Robb v. Philadelphia,* 733 F.2d 286, 290 (3d Cir.1984). Such a motion tests the legal sufficiency of a claim accepting the veracity of the claimant's allegations. *See Markowitz v. Northeast Land Co.,* 906 F.2d 100, 103 (3d Cir.1990); *Sturm v. Clark,* 835 F.2d 1009, 1011 (3d Cir.1987). A claim may be dismissed when the facts alleged and the reasonable inferences therefrom are legally insufficient to support the relief sought. *See Pennsylvania ex. rel. Zimmerman v. PepsiCo., Inc.,* 836 F.2d 173, 179 (3d Cir.1988).

DLL and Pullman have moved to dismiss Cardservice's California unfair trade practices counterclaim on the basis of the Pennsylvania choice of law clause and offer no argument in support of the applicability of Pennsylvania law other than this clause. Cardservice argues that the choice of law clause is limited to interpretation of the contract and does not apply to tort claims.

A federal court sitting in diversity applies the choice of law rules of the forum state. *See Klaxon Co. v. Stentor Elec. Mfg. Co.,* 313 U.S. 487, 497, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941); *Kruzits v. Okuma Machine Tool, Inc.,* 40 F.3d 52, 55 (3d Cir.1994). Pennsylvania follows Section 187 of the Restatement (Second) of Conflict of Laws which " 'generally honor[s] the intent of the contracting parties and enforce[s] choice of law provisions in contracts executed by them.' " *Coram Healthcare Corp. v. Aetna U.S. Healthcare, Inc.,* 94 F.Supp.2d 589, 593 (E.D.Pa.1999) (quoting *Kruzits,* 40 F.3d at 55). Not all choice of law provisions, however, are the same. The parties may choose to limit their chosen law to the interpretation and execution of the terms of their agreement or they may draft the provision more broadly to encompass collateral matters arising from the relationship, including tort claims. *See Id.* at 592; *Jiffy Lube Int'l Inc. v. Jiffy Lube of Pa., Inc.,* 848 F.Supp. 569, 576 (E.D.Pa.1994); *Composiflex, Inc. v. Advanced Cardiovascular Sys., Inc.,* 795 F.Supp. 151, 157 (W.D.Pa.1992).

The choice of law clause at issue states that the parties' agreement will be "governed by and construed in accordance with the laws of Pennsylvania." The operative terms "governed by" and "construed in accordance with" are limited to the interpretation and enforcement of the agreement. While the clause encompasses questions of fraudulent inducement, it does not encompass a statutory tort claim for deceptive business practices. *See In re Alleghany Int'l, Inc.,* 954 F.2d 167, 178 (3d Cir.1992) (applying Pennsylvania law to question of whether contract was voidable for fraudulent inducement when contract provision stated it was to be "governed by and construed in accordance with" Pennsylvania law); *Composiflex,* 795 F.Supp. at 157 (California choice of law clause covering "all matters, including, but not limited to, matters of validity, construction, effect or performance" governed trade secrets misappropriation claim).

**\*3** DLL and Pullman also argue that Cardservice's claims for fraudulent inducement are defective for lack of specificity. When pleading fraud or mistake,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                           Page 3
Not Reported in F.Supp.2d, 2001 WL 799870 (E.D.Pa.)
(Cite as: Not Reported in F.Supp.2d)

"the circumstances constituting fraud or mistake shall be stated with particularity." Fed.R.Civ.P. 9(b). Although a defendant's knowledge or other condition of mind may be averred generally, a party alleging fraud must "still allege facts that show the court their basis for inferring that the defendants acted with 'scienter.' " In re Burlington Coat Factories Sec. Litig., 114 F.3d 1410, 1418 (3d Cir.1997). When multiple defendants are accused of fraud, the complaint must also separately allege each defendant's fraudulent conduct. See In re Home Health Corp. of America Sec. Litig., 1999 WL 79057, *20 (E.D.Pa. Jan.29, 1999); Rosenbaum & Co. v. H.J. Myers & Co., 1997 WL 689288, *3 (E.D.Pa. Oct.9, 1997). It is insufficient to attribute individual acts of fraud to all defendant's generally. See Vicom, Inc. v. Harbridge Merch. Servs. Inc., 20 F.3d 771, 777-78 (7th Cir.1994) (allegations that misrepresentations were made with knowledge and consent of all defendants "falls short" of Rule 9(b) standards); Mills v. Polar Molecular Corp., 12 F.3d 1170, 1175 (2d Cir.1993) ("Rule 9(b) is not satisfied where the complaint vaguely attributes the alleged fraudulent statements to 'defendants' ").

Cardservice's fraud claims are predicated on the alleged representations of Howard Karjala and perhaps other unidentified IBE representatives to Don Wilson and perhaps other Cardservice representatives. Cardservice alleges only that DLL "and/or Pullman" were parties to assignments without Cardservice's knowledge. From this one cannot discern DLL's or Pullman's participation in or knowledge of any fraudulent acts. [FN3] The agreement expressly permits IBE to assign its rights and does not require it to notify Cardservice upon doing so. Cardservice has failed to make specific averments of DLL's or Pullman's individual complicity in fraudulent conduct.

> FN3. Cardservice's averments actually suggest that it has no idea what role Pullman assumed with respect to the transactions at issue.

DLL and Pullman finally seek dismissal of Cardservice's claims for declaratory relief. Cardservice seeks declarations that the second and third leases successively superceded the first agreement (count eight), that it never received the five copiers identified in the third lease (count nine) and that defendants breached the third lease agreement by failing to deliver the five copiers (count ten). Cardservice seeks declarations that it has no

obligations with respect to the five copiers identified in the third agreement (count eleven) and defining the rights and obligations of all parties under the various lease agreements (count twelve). DLL and Pullman correctly note that Cardservice's requests for declaratory relief are essentially replicative of the claims and counterclaims comprising the substance of this lawsuit and that resolution of the parties' dispute through the medium of declaratory relief will not simplify the issues. Cardservice correctly notes that the presence of an alternative remedy does not automatically preclude declaratory relief and contends that such relief is appropriate to educate the parties on their rights and obligations.

*4 The decision whether to entertain declaratory relief is within the sound discretion of the court. See 28 U.S.C. § 2201(a) (federal court may grant declaratory relief in cases of actual controversy in which there is an independent basis of jurisdiction) (emphasis added); Wilton v. Seven Falls Co., 515 U.S. 277, 282-83, 115 S.Ct. 2137, 132 L.Ed.2d 214 (1995). A court should exercise its discretion to entertain declaratory actions when doing so will clarify legal relations and serve a useful purpose. See Los Angeles County Bar Ass'n v. Eu, 979 F.2d 697, 703 (9th Cir.1992) (court should consider whether declaratory relief would serve useful purpose, clarify legal relations and terminate controversy); Fort Howard Paper Co. v. William D. Witter, Inc., 787 F.2d 784, 790 (2d Cir.1986)(same). Where a declaratory judgment will not serve a useful purpose, the court may decline to entertain such relief. See Wilton, 515 U.S. at 288; Dominium Mgmt. Servs., Inc. v. Nationwide Housing Group, 195 F.3d 358, 367 (8th Cir.1999) (counterclaims seeking declaration that contract was unenforceable would serve no useful purpose); Aluminum Co. of America v. Beazer East Inc., 124 F.3d 551, (3d Cir.1997); McGraw-Edison Co. v. Preformed Line Products Co., 362 F.2d 339, 343 (9th Cir.1966) (declaratory judgment would serve no useful purpose where it would merely serve to determine issues involved in case already pending); Old Republic Ins. Co. v. Hansa World Cargo Serv. Inc., 170, F.R.D. 361, 386 (S.D.N.Y.1997) (refusing to entertain declaratory judgment request concerning claims raised in remainder of complaint). See also Grand Trunk Western R.R. v. Consolidated Rail Corp., 746 F.2d 323, 326 (6th Cir.1984); Cartier v. Secretary of State, 506 F.2d 191, 200 (D.C.Cir.1974).

Resolution of Cardservice's requests for declaratory judgments would require a determination of the same factual issues which underlie the parties' substantive

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2001 WL 799870 (E.D.Pa.)
(Cite as: Not Reported in F.Supp.2d)

Page 4

legal claims. Insofar as each request is adjudicated discretely, the result would be an unacceptable series of minitrials and unwarranted expenditure of resources. *See Travelers Ins. Co. v. Davis,* 490 F.2d 536, 544 (3d Cir.1972). As the legal and declaratory claims are essentially redundant and adjudication of one would effectively resolve the other, there also would be no practical utility in adjudicating them simultaneously.

**\*5** ACCORDINGLY, this day of July, 2001, upon consideration of the Motion of counterclaim defendants Pullman Bank and De Lage Landen to Dismiss Counterclaims (Doc. # 20), and the response of Cardservice International thereto, IT IS HEREBY ORDERED that the Motion is GRANTED as to Cardservice's fifth, sixth and seventh counterclaims, without prejudice to replead with particularity; is GRANTED as to Cardservice's eighth, ninth, tenth, eleventh and twelfth counterclaims seeking declaratory relief; and, is otherwise DENIED.

E.D.Pa.,2001.
De Lage Landen Financial Services, Inc. v. Cardservice Intern., Inc.
Not Reported in F.Supp.2d, 2001 WL 799870 (E.D.Pa.)

Briefs and Other Related Documents (Back to top)

• 2:00CV02355 (Docket) (May. 05, 2000)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**EXHIBIT 4**

Westlaw.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2001 WL 1178796 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.2d)**

**H**

Briefs and Other Related Documents

Only the Westlaw citation is currently available.

United States District Court, E.D. Pennsylvania.
Kahil GRANT, Plaintiff,
v.
KINGSWOOD APARTMENTS, Morgan Properties,
Doreen Antonucci, Defendants
**No. CIV. A. 01-1523.**

Oct. 2, 2001.

Giles, C.J.

### MEMORANDUM

**\*1** Kahlil Grant ("Grant") filed a complaint with this court seeking compensatory and punitive damages against Kingswood Apartments, Morgan Properties, and Doreen Antonucci, (collectively "defendants"), for violation of the Fair Housing Act, 42 U.S.C. § 3604(b) (Count 1), and for state law breach of warranty of habitability (Count 2), fraud (Count 3), negligence/breach of contract (Count 4), and violation of the Pennsylvania Unfair Trade Practices and Consumer Protection Law ("UTPCPL") (Count 5), 73 Pa. Cons.Stat. § 201. Defendants have moved to dismiss the fraud and UTPCPL claims, Counts 3 and 5 respectively, pursuant to Rule 9(b) of the Federal Rules of Civil Procedure, the claim for punitive damages under breach of warranty of habitability and the claimed violation of the covenant of quiet enjoyment of premises, Count 2, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. For the reasons that follow, defendants' motion is granted.

### I. Facts

The complaint alleges the following facts which the court considers true for the purposes of defendants' motion. In November 1998, Grant, an African-American male, rented an apartment in the Kingswood Apartments. (Compl.¶ 10.) Defendants had advertised the apartment complex as a means to "Experience Quality Living" and as "Comfortable Apartment Homes." (Id.¶ 12.) The lessee is required to sign an acceptance of the rules of the apartment complex. (Id.¶ 14.) One of the rules states that "residents are not permitted to act in any manner that

will interfere with the rights, comforts and convenience of other residents." (Id.¶ 13.)

Over the last two years, Grant complained to the apartment management through

multiple letters and phone calls about excessive noise of tenants who live upstairs from him. (Id.¶ 18.) Defendants failed to enforce the rules to control that noise. (Id.) The majority of the tenants in the apartment complex are white. The tenants who live above Grant are white. (Id.¶¶ 16, 17, 24.) Finally, to avoid noise, Grant left the apartment. (Id.¶ 21.)

### II. Discussion

#### A. Fraud

Defendants argue that Grant has failed to comply with Rule 9(b) of the Federal Rules of Civil Procedure since he has not pled a claim of fraud with the requisite specificity. They aver that plaintiff has failed to allege (1) a specific misrepresentation of material fact; (2) the person or persons who allegedly made the misrepresentations; and (3) that the person who allegedly made misrepresentations did so with fraudulent intent. (Mem. of Law in Supp. of Mot. to Dismiss at 3.) Rule 9(b) of the Federal Rules of Civil Procedure requires that an allegation of fraud be pled with specificity. "In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." Fed.R.Civ.P. 9(b).

Grant alleges that, although defendants represented that they would uniformly enforce the apartment rule requiring all tenants to respect the comfort and peace of other tenants, they refused to enforce this rule for his benefit because he is African-American and the tenants against whom he was complaining are white. (Compl.¶ ¶ 23, 37.) He alleges further that defendants never intended to enforce this rule even though they promised at the signing of the lease that they would. (Id.) To state a claim for fraud, a plaintiff must plead: (1) a specific false representation of material fact; (2) knowledge by the person who made it of its falsity; (3) ignorance of its falsity by the person to whom it was made; (4) the intention that it should be acted upon; and (5) that the plaintiff acted

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                    Page 2
Not Reported in F.Supp.2d, 2001 WL 1178796 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.2d)**

upon it to his or her damage. *Shapiro v. UJB Fin. Corp.,* 964 F.2d 272, 284 (3d Cir.1992). "There is a special kind of proximate cause requirement for fraud and misrepresentation, and plaintiff must demonstrate that a specific statement caused a specific harm." *Sun Co., Inc., v. Badger Design & Constructors, Inc.,* 939 F.Supp. 365, 369 (E.D.Pa.1996) (quoting *Hurt v. Philadelphia Hous. Auth.,* 806 F.Supp. 515, 530 n. 25 (E.D.Pa.1992)). Plaintiff must inject precision and some measure of substantiation into the allegations of fraud specifying who, what, when, where, and how. *See Sun Co., 939 F.Supp. at 369.*

**\*2** Plaintiff has provided no substantiation of his allegations of fraud; namely, that Kingswood management knew, when they permitted plaintiff to sign the lease, that they would not enforce the apartment rule to prevent one tenant from interfering with the rights of another. (Kingswood Rules & Regulations.) The complaint alleges that when plaintiff signed the lease, "he was led to believe that the apartment complex would enforce all of the rules in a fair, effective, and evenhanded manner," and instead "the management had no intention of uniformly enforcing its own rules," or "enforcing the rules against all tenants." (Compl.¶ ¶ 33-37.) These are conclusory allegations with no substantiation, and thus they do not meet Rule 9(b)'s specificity requirement.

Grant attempts to rely on defendants' alleged failure to enforce the apartment rules as proof of fraud. (Pl.'s Answer at 3.) However, as pled, this fraud count really only states a claim for alleged breach of warranty of habitability and a violation of covenant of quiet enjoyment of the premises. In the count for breach of warranty of habitability and violation of covenant of quiet enjoyment of the premises, plaintiff alleges that "[t]he failure of the defendants to enforce the rules and curb the noisy habits of the noisy tenants Breached [sic] the Warranty [sic] of habitability and violated the covenant of quiet enjoyment of the premises." (Compl.¶ 30.) Plaintiff's fraud count rewords this warranty of habitability claim and alleges that defendants had no intention of enforcing the apartment complex rules that forbade the problematic noise, when they implied that they would. (Compl.¶ 37.) In rewording Count 2, plaintiff fails to inject any factual precision or substantiation for a fraud claim as required by Rule 9(b).

In addition, even assuming that defendants did breach a warranty of habitability and a covenant of quiet enjoyment of the premises, "the mere non-performance of an agreement is not evidence of

fraud." *See Sun Co.,* 939 F.Supp. at 369 (quoting *Oxford Indus., Inc. v. Luminco, Inc.,* C.I.V.A.86-6417, 1991 WL 87928, \*4 (E.D.Pa. May 22, 1991)). An unperformed promise does not give rise to a presumption that the promisor intended not to perform when the promise was made, and a fraudulent intention will not be inferred from mere nonperformance. *Oxford Indus.,* 1991 WL 87928, at \*4 (noting that it is well-settled under Pennsylvania law that an oral promise to do something in the future is not a proper basis for a cause of action for fraud). Pleading non-performance is not sufficient to allege a fraud claim.

**\*3 B.** *Violation of Pennsylvania Unfair Trade Practices and Consumer Protection Law*

In Count 5, entitled "Violation of Pa Unfair Trade Practices Act," Grant states that "most or all of the acts alleged above, particularly breach of Warranty [sic] of habitability and false advertising constitute violation of Pa Unfair Trade Practices Act." [FN1] (Compl.57 48.) Defendants argue that the claims under the UTPCPL should be dismissed because the UTPCPL is aimed at fraud prevention and as such, a violation of the UTPCPL must be averred with the same particularity as a fraud claim. (Defs.' Mem. of Law in Resp. at 3.)

> FN1. The UTPCPL statute lists a series of practices that constitute "unfair methods of competition" and "unfair or deceptive acts or practices." 73 Pa. Cons.Stat. § 201-2(4). For purposes of this motion, the court will assume that plaintiff is attempting to allege violations of the UTPCPL based on breach of warranty of habitability and false advertising. It is not clear whether plaintiff is also stating a claim under the "catch-all fraud clause" of the UTPCPL which states "[e]ngaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding." Id. § 201-2(4)(xxi). Count 3 of the complaint is a claim of common-law fraud which appears to be incorporated by plaintiff incorporating all of the above allegations into the count for a violation of UTPCPL. (Id.¶ 47.)

There is no clearly settled Pennsylvania law on the question of whether all claims of a violation of the UTPCPL must be pled with the same specificity as a common-law fraud claim. *Compare Lindstrom v. Pennswood Village,* 417 Pa.Super. 495, 612 A.2d

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                    Page 3
Not Reported in F.Supp.2d, 2001 WL 1178796 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.2d)**

1048, 1052 (Pa.Super.Ct.1992) (finding that all claims of violations of the UTPCPL must be pled with the same specificity as required of common-law fraud) with _Dilucido v. Terminex Intern., Inc.,_ 450 Pa.Super. 393, 676 A.2d 1237, 1241 (Pa.Super.Ct.1996) (finding that plaintiffs are not required to prove elements of common-law fraud for all claims of "unfair methods of competition" and "unfair or deceptive acts or practices" under the UTPCPL). Therefore, this court must predict how the Pennsylvania Supreme Court would decide this issue, based on existing state precedent. _See Comm'r of Internal Revenue v. Bosch,_ 387 U.S. 456, 465, 87 S.Ct. 1776, 18 L.Ed.2d 886 (1967).

This court predicts that, if faced with this precise issue, the Pennsylvania Supreme Court would conclude that all claims of "unfair methods of competition" or "unfair or deceptive acts or practices" under the UTPCPL must be pled with the same specificity as a common-law fraud claim. In so concluding, this court joins the opinion of another Eastern District of Pennsylvania court that has addressed this issue. _See Heller v. Shaw Industries, Inc.,_ No. CIV.A.95-7657, 1997 WL 53516, at *20 (E.D.Pa. Aug. 18, 1997) (holding that to maintain a cause of action under the UTPCPL, plaintiffs must show the essential elements of fraud: (1) material misrepresentation of a material fact; (2) scienter; (3) intention by the declarant to induce action; (4) justifiable reliance by the party defrauded by the misrepresentation; and (5) damages to the party defrauded as a proximate result).

The Pennsylvania Superior Court's panels have not been in agreement as to a precise rule concerning the specificity of pleading required for a claim of a violation of the UTPCPL. One Superior Court panel held that because the UTPCPL is aimed at fraud prevention, all such claims must be pled with the same specificity as required for common-law fraud claims. _See Lindstrom,_ 612 A.2d at 1052. Other Pennsylvania Superior Court panels have differentiated between claims of a violation of the UTPCPL based on its "catch-all fraud provision," 73 P.S. § 201-2(4)(xxi) (2001)," as contrasted to a violation of a provision, such as false advertising. Those panels have held that a UTPCPL claim based on the catch-all fraud provision requires a claim to be pled with specificity pursuant to Rule 9(b) of the Federal Rules of Civil Procedure or Rule 1019(b) of the Pennsylvania Rules of Civil Procedure. _See Prime Meats, Inc. v. Yochim,_ 422 Pa.Super. 460, 619 A.2d 769, 774-75 (Pa.Super.Ct.1993) (stating that the catch-all fraud provision of the UTPCPL requires

proof and pleading of common-law fraud); _Rizzo v. Michener,_ 401 Pa.Super. 47, 584 A.2d 973, 980 (Pa.Super.Ct.1990) (holding that to recover under the catch-all fraud provision of the UTPCPL, the elements of common-law fraud must be proven); _cf. Gabriel v. O'Hara,_ 368 Pa.Super. 383, 534 A.2d 488, 495 (Pa.Super.Ct.1987) (holding that violations of the UTPCPL could be analogized as multiple types of claims such as "passing off, misappropriation, trademark infringement, disparagement, false advertising, fraud, breach of contract, and breach of warranty"); _Dilucido,_ 676 A.2d at 1241 (finding that plaintiffs are not required to prove elements of common law fraud for all claims of "unfair methods of competition" and "unfair or deceptive acts or practices" under the UTPCPL).

*4 _Weinberg v. Sun Co., Inc.,_ 777 A.2d 442, 2001 WL 844463, *1 (Pa. July 26, 2001) [_Weinberg II_ ], is the best indicator of the Pennsylvania Supreme Court's position on whether all claims of violations of the UTPCPL have to be pled with particularity. _Weinberg II_ raised the issue of whether the Superior Court was correct in finding error with the trial court for not differentiating between claims of fraud and false advertising under the UTPCPL. _Id._ at *1. The Superior Court had concluded that plaintiffs who alleged false advertising under the UTPCPL, as opposed to fraud, did not have to show individual reliance and causation. _Weinberg II,_ at *1. That panel based its holding on Superior Court precedent that differentiated between claims of false advertising and fraud-based claims under the UTPCPL and found that the elements of proof differed for the two causes of action. _Id._ (citing _DiLucido,_ 676 A.2d at 1237).

The Pennsylvania Supreme Court overruled the Superior Court decision, _Weinberg v. Sun Co., Inc.,_ 740 A.2d 1152 (Pa.Super.Ct.1999) [_Weinberg I_ ], and held that a private plaintiff must prove reliance and causation in false advertising claims under the UTPCPL. _Id._ at *3. Specifically, the court found that in a private action under the UTPCPL, the underlying foundation is fraud prevention and "nothing in the legislative history suggests that the legislature ever intended statutory language directed against consumer fraud to do away with the traditional common law elements of reliance and causation." _Id._ at *3.

*5 Accordingly, this court finds that a plaintiff must plead a claim of a violation of the UTPCPL with the same specificity as a claim for common-law fraud. As discussed _supra,_ plaintiff has failed to state a cause of action for common-law fraud. Therefore,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2001 WL 1178796 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.2d)**

plaintiff has failed to plead a violation of the UTPCPL sufficiently.

*C. Punitive Damages as a Remedy for a Breach of Warranty of Habitability*

In considering a motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, a court accepts as true all well-pled factual allegations contained in the complaint and draws all reasonable inferences in favor of the non-movant. Only if a court concludes that a plaintiff would not be entitled to relief under any set of facts consistent with their allegations, can a court grant a defendant's motion to dismiss pursuant to Rule 12(b)(6). *Jordan v. Rothschild, O'Brien & Frankel,* 20 F.3d 1250, 1261 (3d Cir.1994).

The Pennsylvania Supreme Court has found that "[p]unitive damages may be awarded for conduct that is outrageous, because of defendant's evil motive or his reckless indifference to the rights of others ... Punitive damages must be based on conduct which is malicious, wanton, reckless, willful, or oppressive." *Feld v. Merriam,* 506 Pa. 383, 485 A.2d 742, 747-48 (Pa.1984). Plaintiff alleges that defendants, because he is black, ignored his complaints and did not stop white tenants from making noise at a level that violated the rules of the apartment complex. (Compl.¶ ¶ 20, 23.) However, plaintiff has not pled that defendants acted intentionally, recklessly, or maliciously. Such is necessary to state a claim for punitive damages. Thus, plaintiff's claim for punitive damages under Count 2, breach of warranty of habitability and violation of covenant of quiet enjoyment of premises, has a pleading deficiency.

### IV. Conclusion

For the above reasons, defendants' motion to dismiss is granted. Plaintiff's claims for fraud under *Count 3* and for violation of the UTPCPL under *Count 5* are dismissed *without prejudice.* Plaintiff may be granted leave to amend these Counts at the close of discovery only if evidence has been adduced to support the essential pleading requirements. If a motion to amend is filed, plaintiff must specify under which subdivision of the UTPCPL, 73 Pa. Cons.Stat. § 201-2(4), he is seeking relief. The claim for punitive damages for breach of warranty of habitability and violation of the covenant of quiet enjoyment, *Count 2,* is *dismissed with prejudice.*

An appropriate Order follows.

E.D.Pa.,2001.
Grant v. Kingswood Apartments
Not Reported in F.Supp.2d, 2001 WL 1178796 (E.D.Pa.)

Briefs and Other Related Documents (Back to top)

• 2:01CV01523 (Docket) (Mar. 29, 2001)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**EXHIBIT 5**

Westlaw.

Not Reported in F.Supp.2d                                                                    Page 1
Not Reported in F.Supp.2d, 2004 WL 724960 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

**H**

Briefs and Other Related Documents
Only the Westlaw citation is currently available.
United States District Court,D. Delaware.
In re: HECHINGER INVESTMENT COMPANY OF
DELAWARE, INC., et al. Debtors.
HECHINGER LIQ. TRUST, Assignee of HSBC
Bank USA, not individually, but solely as indenture
trustee, Plaintiff,
v.
BANKBOSTON RETAIL FINANCE INC.,
individually and as agent for lenders under Amended
and Restated Credit Agreement dated March 18,
1999, and General Electric Capital Corporation,
Defendants.
**No. 99-02261-PJW, Civ. 00-973-SLR.**

March 28, 2004.

Mark Minuti, Michael F. Bonkowski, and Jeremy
Ryan, of Saul Ewing LLP, Wilmington, Delaware,
for Plaintiff, David M. Friedman, Howard W. Schub,
David E Ross, Andrew K. Glenn, Ian D. Katz, and
Marvin C. Peguese, of Kasowitz, Benson, Torres &
Friedman LLP, New York, New York, of counsel.
Teresa K.D. Currier, and Peter J. Duhig, of Kleet
Rooney Lieber & Schorling, P.C., Wilmington,
Delaware, for Defendant BankBoston Retail Finance
Inc. Paul S. Samson, and Jeffrey D. Ganz, of Riemer
& Braunstein LLP, Boston, Massachusetts, of
counsel.
Steven M. Miller, and Carl N. Kunz, III, of Morris,
James, Hitchens & Williams, LLP, Wilmington,
Delaware, for Defendant General Electric Capital
Corporation. John Cambria, Claude D. Montgomery,
and Clay J. Pierce, of Salans, New York, New York,
of counsel.

OPINION

ROBINSON, Chief J.

I. INTRODUCTION

*1 1. This case is an adversary proceeding initiated in
connection with the bankruptcy petition filed by
Centers Holdings, Inc. and its subsidiaries
(collectively "Center Holdings") under Chapter 11 of
the Bankruptcy Code in the United States Bankruptcy
Court for the District of Delaware. The order of

reference has been withdrawn and the case is pending
before this court. (D.I.1)

2. The court has jurisdiction over this action pursuant
to 28 U.S .C. § 1334(b). The case is "related to" the
debtor's bankruptcy estate as it will affect the amount
available for distribution to other creditors in the
bankruptcy proceeding. See In re Pacor, 743 F.2d
984, 994-95 (3d Cir.1984).

3. Plaintiff Hechinger Liquidation Trust, as assignee
of HSBC Bank USA, Inc., alleges two counts in its
complaint against defendants Bankboston Retail
Finance, Inc. and General Electric Capital
Corporation. First, plaintiff seeks an "equitable lien"
in the property of Hechinger Company and its
subsidiaries. Second, plaintiff seeks equitable
subordination pursuant to § 501(c) of the Bankruptcy
Code, 11 U.S.C. § 510(c). Summary judgment
motions were filed by both parties and denied on
December 10, 2002. (D.I.61) Beginning on October
14, 2003, a three day bench trial on the merits was
held. Having considered the evidence and testimony,
the court concludes that plaintiff has failed to prove
by a preponderance of the evidence that it is entitled
to an equitable lien. Pursuant to Fed.R.Civ.P. 52,
these are the court's findings of fact and conclusions
of law.

II. BACKGROUND

4. This case involves a complex series of transactions
resulting in the merger of two do-it-yourself home
improvement retail store chains, the Hechinger
Company ("Hechinger") and Builders Square, Inc.
("Builders Square"). (PTX 45)

5. Giving rise to the present litigation is an indenture
previously entered into in October 1992 by
Hechinger and First Union National Bank of North
Carolina as Indenture Trustee (the "Indenture"). [FN1]
Pursuant to the Indenture, Hechinger issued $100
million of 9.45% senior unsecured debentures in
November 1992 and an additional $100 million of
6.95% senior unsecured notes in October 1993
(collectively, the "Notes"). (Id., ¶ 52-53)

FN1. On January 31, 1997, American stock
Transfer and Trust Company became the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 724960 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

Page 2

Indenture Trustee.

6. The Indenture contained a clause restricting future secured debt (the "Negative Pledge") stating, in part, that

the Issuer will not, and will not permit any Restricted Subsidiary to, create, assume, incur any Indebtedness secured by a Lien on any Operating Property or Operating Asset of the Issuer or any Restricted Subsidiary, whether such Operating Property or Operating Asset is now or hereafter acquired[.]

(PTX 2, § 3.6) The operating assets and property covered by the Indenture's Negative Pledge included all of the merchandise, inventories, furniture, fixtures, all real property and improvements thereon. (*Id.,* § 1.1) The Indenture required that if Hechinger or any of its subsidiaries incurred indebtedness in violation of the Negative Pledge, Hechinger must "effectively provide[ ] concurrently with the issuance, assumption or guarantee of any such Indebtedness that the [Notes] be secured equally and ratably with such Indebtedness." (*Id.,* § 3.6)

**\*2** 7. The Indenture contains a purchase money exception to the Negative Pledge, exempting

[l]iens to secure the payment of all or any part of the purchase price or construction costs in respect of Operating Property or Operating Assets acquired by the Issuer or a Restricted Subsidiary after the date hereof securing Indebtedness, incurred prior to, at the time of, or within 18 months after, the opening for business of any such Operating Property or the acquisition of such Operating Assets, in the aggregate not in excess of the amount expended in the acquisition of such property or properties plus the aggregate amount expended for improvements thereon[.]

(*Id.,* § 3.6(c)) The Indenture also contains a refinancing exception, exemptingthe extension, renewal or replacement of any Lien permitted by subparagraph (b), (c), (d), (e), (f), (g) or (n), but only if the principal amount of Indebtedness secured by the Lien immediately prior thereto is not increased and the Lien is not extended to other property.

(*Id.,* § 3.6(h)) Finally, the Indenture states with respect to the Negative Pledge:Notwithstanding the foregoing provisions of this Section 3.6, the Issuer or any Restricted Subsidiary may create or assume Liens in addition to those permitted by the foregoing provisions of this Section 3.6, and renew, extend or replace such Liens; *provided,* that at the time such creation, assumption, renewal, extension or

replacement, and after giving effect thereto, Exempted Debt does not exceed 10% of Consolidated Tangible Net Assets.

(*Id.*)

8. Between 1984 and 1997, Builders Square operated as a wholly-owned subsidiary of Kmart Corporation ("Kmart"). Beginning in 1996, with the assistance of investment bank Rothschild, Inc. ("Rothschild"), Kmart began exploring options to sell Builders Square. (PTX 45, ¶ 1-6) After being retained, Rothschild solicited several potential buyers for Builders Square including Hechinger.

9. The acquisition of Builders Square by Hechinger was the result of a series of complex transactions which occurred during the period of September 25, 1997 to September 29, 1997 (the "1997 Transactions"). The negotiations for the 1997 Transactions were extensive and at arms length. An investment fund managed by Leonard Green & Partners L.P. ("Leonard Green"), an investment banking firm, was the equity sponsor of the 1997 Transactions. In preparation for the 1997 transactions, GEI II, L.P., a Leonard Green investment fund, formed Center Holdings which subsequently created BSQ Acquisition, Inc. ("BSQ Acquisition") as a subsidiary. Builders Square formed BSQ Transferee Corporation ("BSQ Transferee"). (*Id.,* ¶ 7-8)

10. On September 25, 1997, Builders Square transferred most of its operating assets and liabilities to BSQ Transferee in exchange for one hundred percent of BSQ Transferee's stock and a \$10.7 million promissory note. BSQ Acquisition purchased the stock of BSQ Transferee from Builders Square for \$10 million in cash in addition to a warrant to purchase thirty percent of the stock in Center Holdings. BSQ Transferee became a subsidiary of BSQ Acquisition, and Center Holdings and BSQ Acquisition would ultimately be the parent corporations of the corporate entity operating the Hechinger's-Builders Square home improvement chain. (*Id.,* ¶ 9)

**\*3** 11. On September 25, 1997, BSQ Transferee obtained a \$171 million interim loan from a group of lenders (the "Chase Group") led by The Chase Manhattan Bank ("Chase"). The loan was secured by inventory, accounts receivables and equipment of BSQ Transferee. BSQ Transferee loaned \$110 million to BSQ Acquisition, which used approximately \$100.6 million of the loan proceeds to

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                      Page 3
Not Reported in F.Supp.2d, 2004 WL 724960 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

purchase all of the Hechinger Company public stock from the shareholders, making Hechinger Company a subsidiary of BSQ Acquisition. The Chase Group also loaned the Hechinger Stores Company (a subsidiary of Hechinger) $112 million, $89,599,034.08 of which was used to pay the CIT Credit Corporation. As part of the 1997 Transactions, substantially all of the Builders Square operating assets were transferred to a Hechinger subsidiary, Hechinger Investment Company of Delaware, Inc. ("HICD"), which became the new operating company for the combined entities. (*Id.,* ¶ 12, 14)

12. On September 26, 1997, HICD entered into a permanent loan agreement (the "Permanent Credit Agreement") with the Chase Group. The loan agreement provided for a maximum available credit of $600 million with an initial advance of $243 million to purchase from BSQ Transferee certain operating assets and liabilities originally purchased by BSQ Transferee from Builders Square, which were the subject of the HICD Bill of Sale from BSQ Transferee. [FN2] BSQ Transferee then used part of the $243 million payment to repay the $171 million interim loan from Chase. The Hechinger Stores Company repaid its $112 million loan from Chase using, in part, funds remaining from the initial $243 million advance to HICD. (*Id.,* ¶ 15)

> FN2. Pursuant to the terms of a Bill of Sale, Assignment and Assumption Agreement, entered into as of September 26, 1996, the ("HICD Bill of Sale"), BSQ Transferee sold to HICD
>
> the retail store contents and warehouse and headquarters assets (other than assets consisting of improvements and fixtures) used in [BSQ Transferee's] Business and relating to [BSQ Transferee's] operations of [BSQ Transferee's] Business.
>
> (*Id.,* ¶ 17) The "Business" referred to in the HICD Bill of Sale included substantially all of the operating assets and liabilities from Builders Square, excluding its mortgages and capital lease obligations. (*Id.,* ¶ 18, 19) These assumed operating liabilities totaled approximately $400 million. (*Id.,* ¶ 20)

13. Center Holdings' leasehold obligations concerning the Builders Square properties were governed by several agreements. On September 25, 1997, Kmart and BSQ Transferee entered into a Consent and Undertaking Agreement which permitted further subleases and exercise of options in

the subject matter leases under certain terms and conditions for guaranties to Kmart by all debtors. On September 26, 1997, BSQ Transferee and HICD entered into a rental agreement, sublease and lease. (*Id.,* ¶ 22-24)

14. On September 29, 1997, Hechinger Stores Company and Hechinger Stores East Coast Company transferred their operating assets and liabilities to HICD, completing the combination of the Hechingers and Builders Square chains. (*Id.,* ¶ 25)

15. Prior to the 1997 Transactions, Leonard Green conducted substantial due diligence on Hechinger, Builders Square and the do-it-yourself store industry. (D.I. 179 at 693, 695-97, 701-03, 678-87, 689-91) Kmart and its investment banker, Rothschild, also conducted due diligence. (D.I. 180 at 928-33)

16. The Chase Group conducted its own due diligence that included a review of the companies' internal books and records; meetings with management; a solvency opinion from an independent valuation firm; valuation of the inventory; cash flow sensitivity analyses; counsel's opinions that there were no breaches of the Indenture or of any other material agreements; the borrower's certification of no default and full compliance of all loan covenants; and a review of relevant documents and opinions by Chase's counsel. (PTX 27; DTX 18, 37; D.I. 180 at 936-39, 943-45) Chase also obtained post-transaction certifications from Hechinger that there was no default under the Indenture. (DTX 27, 28, 29)

*4 17. Following the 1997 Transactions, Hechinger performed a valuation of the acquired Builders Square assets and liabilities, at fair market value, consistent with GAAP purchase accounting requirements. (D.I. 180 at 782-86, 814-15; D.I. 179 at 367-68, 378-80, 382-83) That valuation determined that the Builders Square assets and liabilities had a net fair market value of $260 million as of September 27, 1997. (D.I. 179 at 382; DTX 78, ex 13) The purchase accounting valuation was audited by KPMG. Plaintiff has not claimed that the post-transaction purchase accounting or the KPMG audit were improper. (DTX 25)

18. On March 18, 1999, defendants refinanced and paid to the Chase Group the full amount outstanding under the Permanent Loan, thereby becoming HICD's senior lenders. Pursuant to a series of agreements, defendants were assigned all of Chase Group's liens and security interests under the Chase Security

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 724960 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

Agreement.

## IV. CLAIM FOR AN EQUITABLE LIEN

19. Under New York law, an equitable lien may be imposed notwithstanding the failure of a creditor and debtor to observe the formalities of perfecting a proper security interest. *See James v. Alderton Dock Yards* 256 N.Y. 298, 303 (1931). Equitable liens have been held to have survived the adoption of the Uniform Commercial Code and, in New York, are liberally applied. *See Albany Sav. Bank, F.S.B v. Novak,* 574 N.Y.S.2d 140, 141 (N.Y.Sup.1991). To obtain an equitable lien, the creditor must demonstrate a clear intent of the parties to create a security interest and knowledge of that security interest by the party against whom the equitable lien is asserted. *See Pennsylvania Oil Products Refining Co. v. Willrock Producing Co., Inc.,* 267 N.Y. 427, 434-35 (1935).

20. Equitable liens arising from a negative pledge in an indenture have only been awarded in a single case. *See Chase Nat. Bank of City of New York v. Sweezy,* 281 N.Y.S. 487 (N.Y.Sup.1931). In *Sweezy,* the court awarded an equitable lien to bondholders in the collateral acquired by a secured creditor finding that the negative pledge had been violated. Critical in that case, however, was the fact that the lender against whom the equitable lien was imposed was also the indenture trustee for the bondholders. *Id.* at 491. [FN3]

> FN3. Since *Sweezy,* only one other New York court has considered the claim of an equitable lien arising from a similar negative pledge clause. *See Kelly v. Central Hanover Bank & Trust Co. v. Kelly,* 11 F.Supp. 497 (S.D.N.Y.1935). The district court in *Kelly* found that even when a secured creditor has knowledge of the debtor's breach of a negative pledge, an equitable lien should not be imposed. *Id.* at 507. Notably, although the Second Circuit remanded to the district court for further findings of fact, the district court subsequently declined to provide additional facts. *Kelly v. Central Hanover Bank & Trust Co. v. Kelly,* 85 F.2d 61 (2d Cir.1936)(remanding for additional findings of fact) *remanded to* 14 F.Supp. 346 (S.D.N.Y.1936)(declining to make further findings of fact).

21. Under the Permanent Credit Agreement, the Chase Group advanced $243 million to finance the merger and to refinance an existing credit facility in the amount of $89,599,034.08. Accordingly, to the extent Builders Square had a value of less than $153,400,965.92, the Chase Group loan would be a breach of the Indenture's Negative Pledge. (D.I.61)

22. Valuation is a mixed question of law and fact. *See Amerada Hess Corp. V. C.I.R.,* 517 F.2d 75 (3d Cir.1975). The Third Circuit instructs that in determining the proper valuation methodology, the court must consider both the purpose of the valuation as well as the property to be valued. *Id.* at 82; *id.* at 88 ("It is axiomatic that the same item may have different 'value' for different purposes."). *See also Powers v. C.I.R.,* 312 U.S. 259, 260 (1941)("The criteria to be employed in determining value necessarily must differ somewhat in respect to the kinds of property to be valued under the statute. A question of law is presented therefore as to the standard to be applied."). In some contexts, there is legal guidance to support the use of a particular methodology. *See, e.g., In re PWS Holding Co.,* 228 F.3d 224 (3d Cir.2000) (concluding that, for purposes of determining solvency under state fraudulent transfer law, a business enterprise valuation taking into consideration the value of the going concern was appropriate); *Mellon Bank, N.A. v. Metro Comm., Inc.,* 945 F.2d 635, 650 (3d Cir.1991) (applying a balance sheet valuation to determine solvency for purposes of 11 U.S .C. § 548); 8 Del. C. 262(h)(defining value of business as "the value of the Company to the stockholder as a going concern rather than its value to a third party as an acquisition" for purposes of shareholder appraisal action).

**\*5** 23. Consistent with the Third Circuit's guidance, the court notes that the purpose of the valuation in the case at bar is to determine whether the Negative Pledge clause was breached and whether defendants, who are strangers to the Indenture, had notice of its breach. This is, at its heart, a dispute between creditors who were secured and those who were not. [FN4]

> FN4. Disputes between secured and unsecured creditors are hardly novel and, to large degree, are the essence of both Article 9 of the U.C.C. and the Bankruptcy Code. In both statutory schemes, lien holders and unsecured creditors generally stand behind secured creditors. There are certain exceptions, such as where the secured interest is fraudulently conveyed or under

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 724960 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

Page 5

circumstances where the law imputes knowledge of the debtors' insolvency to the secured creditor at the time of the transfer of interest. *See* 11 U.S.C. § 548 (2003)(fraudulent transfers) *and* N.Y. Debtor & Creditor Law § 270 et seq. (2003)(Uniform Fraudulent Conveyance Act). Bankruptcy preference actions and fraudulent conveyances, however, are inapposite to the present dispute.

24. In support of its contention that the Negative Pledge was breached, plaintiff proffered expert testimony as to the value of Builders Square in 1997 from the standpoint of an equity investor. At trial and in oral arguments, plaintiff focused on the propriety and reasonableness of its valuation in comparison to defendants' proffered valuations.

25. Dr. Israel Shaked, plaintiff's financial expert, employed two valuation methods to reach the conclusion that Builders Square was worth less than $153 million. The first method employed by Dr. Shaked was a comparable company multiple analysis which values a company based upon publicly traded stock prices of comparable companies in the same industry by deriving multiples for specific indicators of value ("CCM analysis"). [FN5] (D.I. 178 at 144-64) Using these multiples, adjusted for competitive ranking and interest bearing debt, Dr. Shaked concluded that Builders Square had an equity value ranging between negative $374 million to negative $60 million, with a negative value of negative $73.2 million. (*Id.* at 162-64) Dr. Shaked's second method of valuation involved a discounted cash flow analysis to value Builders Square as an on-going concern ("DCF analysis"). [FN6] (*Id.* at 168-88) The result of the DCF analysis was the determination by Dr. Shaked that Builders Square had a negative equity value in excess of negative $500 million. (*Id.* at 168)

FN5. Dr. Shaked selected companies which he first identified as competitors using "standard industrial classification," and then selected from that group companies that: (1) were in the same line of business as Builders Square; (2) had not filed bankruptcy prior to the 1997 Transactions; and (3) had similar characteristics as Builders Square. (*Id.* at 148-51) As a result of this process, Dr. Shaked identified four comparable companies. Dr. Shaked identified three indicators of value based upon the companies' financial data for the twelve

months preceding the 1997 Transactions, including EBIT (earnings before interest and taxes); EBITDA (earnings before interest, taxes, depreciation and amortization); and EBITDAR (earnings before interest, taxes, depreciation, amortization and rent).

FN6. This method identifies future cash flow which is reasonably expected to be generated by a business, and then discounts those future cash streams to obtain their dollar value at the time of the 1997 Transactions.

26. Defendants offered the testimony of two experts as evidence that Builders Square assets exceeded the requirements of the Negative Pledge. Defendants' first expert, Louis Paone, performed a CCM analysis, DCF analysis and a merger and acquisition analysis ("M & A analysis"). (*Id.* at 537-38) Under his CCM analysis, Paone testified that Builders Square had a value of between $350 and $410 million. [FN7] (*Id.*) Under the M & A analysis, Paone testified that Builders Square had a value of between $430 and $500 million. [FN8] Finally, using his DCF analysis Paone testified that Builders Square had a value of between $420 and $480 million. [FN9]

FN7. Mr. Paone relied upon different assumptions in performing his comparable company multiple analysis. First, he did not utilize historical EBITDA and EBIT. Second, he used revenue, adjusted assets and projected EBITDA in his analysis.

FN8. The M & A analysis involved looking at comparable merger transactions to determine a post-merger enterprise value.

FN9. Mr. Paone's discounted cash flow analysis differed from Dr. Shaked's in several respects. First, he relied upon unmodified projections by Leonard Green. (D.I. 179 at 628) Second, he projected substantial changes in same store sales and gross margins. (*Id.* at 529) Third, he projected no increase in labor or rent costs for ten years. (*Id.* at 649) Fourth, Mr. Paone valued Builder Square assets based upon post-merger synergies.

27. Defendants' second expert, Robert Rock, testified that Builders Square had a net asset value of $258 million using an adjusted balance sheet valuation

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 724960 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

method. (D.I. 180 at 817-819) An adjusted balance sheet valuation involves the restatement of balance sheet items based on their market values. Rock relied on the audited financial statements of the company and the audit statements of their auditors. (*Id.* at 816-17)

28. To obtain an equitable lien under New York law, plaintiff has the burden of demonstrating both the breach of the Negative Pledge, as per the court's December 10, 2002 memorandum opinion, and knowledge by the defendants of both the clause and its breach. [FN10] In the absence of the presence of the badges of fraud, to require something less than actual knowledge on the part of defendants would result in the imposition of a duty as between a secured lender and prior unsecured creditors of the debtor. Such a duty, the court finds, does not have a basis in law. *See, e.g., In re Sharp Intern. Corp.,* 302 B.R. 760, 777-81 (E.D.N.Y.2003).

> FN10. In its December 10, 2002 memorandum opinion, the court stated that the "analysis begins with a determination of whether the Negative Pledge clause has been breached. Absent a breach of the Negative Pledge clause, no basis exists to grant plaintiff the equitable remedies requested." (D.I. 61 at 9-10) The law is clear, however, that absent knowledge of a breach, no basis exists to grant the remedy of an equitable lien. Consequently, defendants' knowledge and the proper valuation method to be employed are intertwined.

**\*6** 29. Consequently, while Dr. Shaked's analysis might have been appropriate to establish a breach as between the parties to the Indenture itself, it does not satisfy plaintiff's burden with respect to a stranger to the Indenture. Even if the court were to find that Dr. Shaked's analysis is legally and factually the best valuation methodology under these circumstances and, therefore, the Negative Pledge was breached, his analysis is legally irrelevant to whether the Chase Group had knowledge of the breach.

30. It is uncontroverted that the 1997 Transactions were negotiated in good faith, at arms-length and with reliance upon professional advice and opinions with respect to compliance with the terms of the Negative Pledge. It is uncontroverted that post-merger, Hechinger valued Builders Square's net assets and liabilities at $260 million under GAAP fair market value standards for purchase accounting. It is

also uncontroverted that an independent audit confirmed the post-merger valuation. In the absence of a showing of fraud or bad faith, the court concludes that it would be contrary to principles of equity and law to impair the status of a secured creditor by determining that the valuation methodology used by the parties to the 1997 Transactions was unreasonable or improper. *See Gray v. Cytokine Pharmasciences, Inc.,* C.A. No. 17451 (Del. Ch. April 25, 2002)(concluding that expert valuations by both plaintiff and defendant were unreliable as they were prepared for litigation and instead adopting the valuation of a third-party at the time of the disputed transaction). Even if the court were to adopt plaintiff's expert's testimony with respect to the value of Builders Square, the court finds no evidence that Chase Bank or defendants had actual knowledge of that valuation, that they were under no legal duty to know that valuation and, therefore, there is no basis in law or equity to impose a lien based on that valuation.

### V. CONCLUSION

31. The court concludes that plaintiff has failed to prove by a preponderance of the evidence that it is entitled to an equitable lien and, therefore, judgment will be entered in favor of defendants.

D.Del.,2004.
In re Hechinger Inv. Co. of Delaware, Inc.
Not Reported in F.Supp.2d, 2004 WL 724960 (D.Del.)

Briefs and Other Related Documents (Back to top)

• 2004 WL 943555 (Trial Motion, Memorandum and Affidavit) Post-Trial Sur-Reply Brief of Defendants Fleet Retail Finance, Inc. and General Electric Capital Corporation (Feb. 04, 2004)
• 2004 WL 943556 (Trial Motion, Memorandum and Affidavit) Post-Trial Reply Brief for Plaintiff the Hechinger Liquidation Trust (Jan. 16, 2004)
• 1:00CV00973 (Docket) (Nov. 17, 2000)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**EXHIBIT 6**

**Westlaw.**

Not Reported in F.Supp.2d                                                                    Page 1
Not Reported in F.Supp.2d, 2002 WL 31667861 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

**H**
Briefs and Other Related Documents
Only the Westlaw citation is currently available.
United States District Court,D. Delaware.
LIAFAIL, INC., Plaintiff and Counterclaim
Defendant
v.
LEARNING 2000, INC., James Richard Story, III,
individually, Antonio Santini, individually, ILC, Inc.,
SFD, Inc,. and S & S Enterprises, Defendants and
Counterclaim Plaintiffs and Third-Party Plaintiffs,
v.
Frank STUCKI, Third-Party Defendant.
**Nos. C.A.01-599 GMS, C.A.01-678 GMS.**

Nov. 25, 2002.

MEMORANDUM AND ORDER

SLEET, J.

I. INTRODUCTION

*1 On June 5, 2001, the plaintiff and counter-claim
defendant, Liafail, Inc. ("Liafail") filed a complaint
in the United States District Court for the Western
District of Kentucky, setting forth various contractual
theories of liability. The United States District Court
for the Western District of Kentucky transferred this
case to the United States District Court for the
District of Delaware on August 29, 2001. This case
became Civil Action Number 01-599-GMS.

On October 9, 2001, Learning 2000, Inc ("L2K")
commenced Civil Action Number 01-678-GMS in
the United States District Court for the District of
Delaware. In that complaint, L2K alleges that Liafail
violated, *inter alia*, Section 43 of the Lanham Act, 15
U.S.C. § 1125(a); Section 2532 of the Delaware
Uniform Deceptive Trade Practices Act, and the
Anti-Cybersquatting Consumer Protection Act, 15
U.S.C. § 1125(d).

By stipulation of the parties, the court consolidated
Civil Actions 01-599-GMS and 01-678-GMS on
November 2, 2001.

Presently before the court is L2K's motion for
summary judgment on all counts of Liafail's amended
complaint. For the following reasons, the court will

grant this motion in part and deny it in part.

II. STANDARD OF REVIEW

The court may grant summary judgment only if there
are no genuine issues of material fact and the moving
party is entitled to judgment as a matter of law. FED.
R. CIV. P. 56(c). An issue is "genuine" if, given the
evidence, a reasonable jury could return a verdict in
favor of the non-moving party. *See, e.g., Abraham v.
Raso, 183 F.3d 279, 287 (3d Cir.1999)* (citing
*Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-
51 (1986)); Lloyd v. Jefferson, 53 F.Supp.2d 643, 654
(D.Del.1999)* (citing same). A fact is "material" if it
bears on an essential element of the plaintiff's claim.
*See, e.g., Abraham, 183 F.3d at 287; Lloyd, 53
F.Supp.2d at 654.* On summary judgment, the court
cannot weigh the evidence or make credibility
determinations. *See Anderson, 477 U.S. at 255*
("Credibility determinations, the weighing of the
evidence, and the drawing of legitimate inferences
from the facts are jury functions, not those of a judge,
whether he is ruling on a motion for summary
judgment or for a directed verdict ."); *International
Union, United Auto., Aerospace & Ag. Implement
Workers of America, U.A.W. v. Skinner Engine Co.,
188 F.3d 130, 137 (3d Cir.1999)* ("At the summary
judgment stage, a court may not weigh the evidence
or make credibility determinations; these tasks are
left to the fact finder."). Instead, the court can only
determine whether there is a genuine issue for trial.
*See Abraham, 183 F.3d at 287.* In doing so, the court
must look at the evidence in the light most favorable
to the non-moving party, drawing all reasonable
inferences, and resolving all reasonable doubts in
favor of that party. *See, e.g., Pacitti v. Macy's, 193
F.3d 766, 772 (3d Cir.1999).* With this standard in
mind, the court will now describe the facts leading to
the motion presently before the court.

III. BACKGROUND

*2 Liafail is the owner of the "Lifetime Library," a
series of multimedia programs that allow students to
master skills in reading, writing, math, and other
subjects at their own pace. In January 1997, Liafail
and SFD, Inc. ("SFD") entered into an Exclusive
Distribution Agreement and Agreement of Sale of
Software (the "Original Agreement"). Under the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                  Page 2
Not Reported in F.Supp.2d, 2002 WL 31667861 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

Original Agreement, Liafail granted SFD the exclusive right to distribute "Lifetime Library" software in exchange for royalty payments. The Original Agreement also contemplated the eventual sale of title to the "Lifetime Library" software to SFD once SFD paid a threshold amount of royalties to Liafail.

Because disputes arose between the parties regarding their rights and obligations under the Original Agreement, Liafail and L2K entered into an agreement on May 12, 2000 ("the May 12 Agreement"). This agreement was to serve as a basis for a formal agreement to be drafted jointly by each of the parties' attorneys. Pursuant to the agreement, at a May 24, 2000 meeting of the 1.2K Board, Frank Stucki, Liafail's President and Keith Hanson, Liafail's Vice President, were elected to the L2K Board and began serving immediately.

The more "formal" agreement contemplated by the parties became embodied in the Agreement and Release of August 15, 2000 (the "Second Agreement"). The Second Agreement terminated the Original Agreement, restructured the relationship between the parties, and released and discharged L2K from claims Liafail might have had under the Original Agreement, or any other agreements or understanding predating the Second Agreement.

The parties again restructured their relationship on September 27, 200 when Liafail and L2K, among others, entered into the Asset Purchase Agreement ("APA"). The APA provided, among other things:
[t]hat the Original Agreement and the Second Agreement, to the extent not previously terminated or superseded, are hereby terminated and superseded. All rights and obligations of the parties with respect to the subject matter thereof shall be governed by this Agreement along with the License Agreement and the License Amendment.

APA § 6(1)(i).

Under the APA, Liafail agreed to transfer its interest in the "Lifetime Library" software to L2K upon payment of a sum of money. The APA contemplated, but was not conditioned upon, an Initial Public Offering ("IPO") of L2K stock. L2K was obligated to purchase the software only if the closing of the L2K stock IPO took place on or prior to June 30, 2001. Finally, the APA reflected Liafail's agreement to release and discharge L2K from any and all claims arising from any agreement or understanding which predated the APA.

Simultaneously with the APA's execution, Liafail and L2K entered into a License and Royalty Agreement (the "License Agreement"). In the License Agreement, Liafail agreed to license the Lifetime Library software to L2K pending the closing of the APA. In addition, the parties executed an Amendment to the License and Royalty Agreement (the "Amendment"). This Amendment was to become effective on July 1, 2001, if the APA did not close. L2K maintains that both parties anticipated that L2K would continue to sell the Lifetime Library as evidenced by their agreement to negotiate a new license agreement in good faith. Pending the execution of such an agreement, the Amendment stated that L2K could continue to sell the Lifetime Library software on a non-exclusive basis until it successfully fulfilled the contracts that existed as of June 30, 2001.

### IV. DISCUSSION

#### A. Count One-Recission

*3 In Count I of the complaint, Liafail seeks to rescind the Second Agreement and the APA based upon: (1) L2K's alleged material breaches of the Agreements; (2) L2K's alleged material misrepresentations inducing Liafail to enter into those Agreements; and (3) an alleged failure of consideration. The court will consider each argument in turn.

#### 1. Material Breach

It is well-settled that a material breach of a contract gives the non-breaching party the right to rescind that contract. *See e.g. Saienni v. G & C Capital Grow, Inc.,* 1997 WL 363919, at *2 (Del.Super. May 1, 1997); *Sheehan v. Hepburn,* 138 A.2d 810, 812 (Del. Ch.1958). To establish a breach of contract claim, the plaintiff must identify facts in the record to prove (a) that it suffered a legally cognizable injury; and (b) that this injury was proximately caused by the defendant's alleged conduct. *See Great Lakes Chem. Corp. v. Pharmacia Corp.,* 788 A.2d 544, 549 (Del. Ch.2001).

In the present case, it is undisputed that both the Second Agreement and the APA expressly required L2K to exercise its best efforts in consummating its Public Offering. Liafail now argues that L2K did not

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                              Page 3
Not Reported in F.Supp.2d, 2002 WL 31667861 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

use its best efforts, and therefore, breached the contract. The court recognizes that whether a party has exercised its best efforts is a fact intensive inquiry. *See* *Brown v. The Buschman Co.,* 2002 WL 389139, *5 (D.Del. March 12, 2002).* Notwithstanding this fact, however, Liafail has not demonstrated that it can meet the other necessary elements to establish a breach of contract. Specifically, it has failed to identify any competent evidence to demonstrate that is has suffered a legally cognizable injury and that this injury was proximately caused by L2K's alleged conduct. Instead, Liafail purports to rely on its damages expert's report for the proposition that, "the materiality of L2K's failure to use its best efforts is evidence in that, as a result of the delays occasioned by its lack of organization and existing resources, L2K missed the opportunity to pursue the transaction which served as the basis for the contract." Liafail's Answer Brief at 18 (citing Finch Report at 8-11.).

Upon review of the cited portion of the report, however, it is apparent that the expert merely opined that, "L2K was deficient in certain fundamental areas that would have made them more attractive to external investors and made their IPO more viable." Finch Report at 8. This opinion alone, however, fails to raise a factual issue with regard to injury and causation. [FN1] Indeed, L2K has provided deposition testimony from Liafail's own 30(b)(6) witness Michelle Moreno that the unfavorable market conditions could have prompted the underwriter to call off the IPO. *See* Deposition of Michelle Moreno at 159-161. Thus, because Liafail has not established the existence of each of the essential elements of this count, the court must grant L2K summary judgment.

> FN1. Because the court has determined that the aforementioned sentence in the expert report is insufficient to raise a factual issue, it will deny L2K's motion to strike this sentence as moot.

### 2. Fraud in the Inducement

**\*4** Liafail's alternative ground for recission of the Second Agreement and the APA rests upon its claim for fraud or material representation in the inducement of those contracts. Fraud and/or material representation in the inducement of a contract is a well-established basis for recission in Delaware. [FN2] *See e.g., Norton v. Poplos,* 443 A.2d 1, 4 (Del.1982). To prevail on this claim under Delaware law, Liafail bears the burden of proving each of the following

elements: (1) there was a misrepresentation; (2) L2K knew or believed the representation was false or made with reckless indifference to the truth; (3) the misrepresentation induced Liafail to enter into the APA; (4) Liafail's reliance on the misrepresentation was reasonable; and (5) Liafail was damaged as a result of its reliance on the misrepresentation. *See e.g., Associated/Acc Int'l, Ltd. v. DuPont Flooring Sys. Franchise Co.,* 2002 U.S. Dist. LEXIS 6464, at * 14-15 (D.Del. Mar. 28, 2002). For the following reasons, the court concludes that Liafail's claim on this ground must fail.

> FN2. Pursuant to Section 13(c) of the APA, "[t]his Agreement shall be construed and enforced in accordance with the laws of the State of Delaware, without regard to its principles of conflicts of laws."

When pleading fraud, "the circumstances constituting fraud ... shall be stated with particularity." FED. R. CIV. P. 9(b). "This means the who, what, when, where, and how: the first paragraph of any newspaper story." *DiLeo v. Ernst & Young,* 901 F.2d 624, 627 (7th Cir.1990). Liafail's fraudulent inducement claim falls far short of meeting this standard because it fails to identify, with the required specificity, when, by whom, to whom, and under what circumstances, the alleged false statements were made which induced Liafail to enter into the APA. Indeed, it is only in Liafail's answer brief to the present motion that it suggests, without citations to any supporting source, what it believes the fraudulent misrepresentations were. [FN3] Such conclusory allegations, which appear for the first time in an answer brief on summary judgment, are not sufficient to satisfy Rule 9(b)'s mandate. [FN4] *See Schaller Tel. Co. v. Golden Sky Sys.,* 298 F.3d 736, 746 (8th Cir. July 31, 2002). Finally, even were the court to accept these statements, Liafail has failed to provide evidence as to who, when, and how the alleged statements were made. In light of this conclusion, the court need not address the remainder of Liafail's arguments as to why summary judgment would be inappropriate since each of those arguments assumes a properly pled fraud claim. Accordingly, the court will grant summary judgment on this claim.

> FN3. Specifically, Liafail now contends that it is suing on the following representations: (1) that L2K had not disclosed ownership of the Library to the underwriters when it solicited the opinions it passed on to Liafail;

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2002 WL 31667861 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

(2) that L2K had never defined or disclosed its capital structure and misled Liafail as to the ownership of its stock; (3) that L2K did not have the wherewithal to provide complete financial information; (4) that L2K had secured the participation of various directors; and (5) that L2K had no reasonable belief that it could successfully pursue an IPO. *See* Answer Brief at 28. Liafail has not provided any further detail regarding these alleged misrepresentations.

FN4. Furthermore, Liafail's conclusory allegations that unspecified communications induced it to enter into the APA are inherently suspect because Nicholas Quinn, Liafail's CEO and director, could not identify a single false or misleading statement that L2K made in order to induce Liafail to enter into the APA. *See e.g.,* Deposition of Nicholas Quinn at 107-108, 119, 140.

### 3. Failure of Consideration

The express terms of the APA state that:
in consideration of the mutual promises and covenants set forth herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree ...

APA at 1. As a final alternative ground for its recission claim, however, Liafail nevertheless alleges that there was a failure of consideration. Specifically, Liafail argues that, if the APA enabled L2K to avoid all of its liability under the Original Agreement, and to also avoid its obligation under the Second Agreement to pay a minimum $4 million regardless of the outcome of the IPO, then Liafail received, and L2K gave, nothing of value in the APA beyond that to which Liafail was already entitled in the Second Agreement. Liafail maintains that, in such a circumstance, the recital of consideration contained in the APA could not preclude Liafail from canceling it based on a failure of consideration. *See* 32A C.J.S. Evidence § 953 (noting that "a recital in a written instrument as to the payment or receipt of the consideration is not conclusive ... and may be contradicted, modified, or explained."). The court must disagree that there was insufficient consideration.

**\*5** Valid consideration confers a benefit upon the promisor or causes a detriment to the promisee and must be an act, forbearance, or return promise

bargained for and given in exchange for the original promise. *See e.g. First Mortg. Co. of Pa. v. Federal Leasing Corp., 456 A.2d 794, 795 (Del.1982).* According to the terms of the APA, L2K's legal detriment consisted of, among other things, its release of all claims arising out of the Original Agreement and the Second Agreement. *See* APA Section 6(1)(iii), (iv), (v), and (vii). Furthermore, it has long been established that the release of a dispute is legal consideration. *See* Restatement (Second) of Contracts § 74 (1981). Accordingly, L2K is entitled to summary judgment on this claim.

### B. Count Two-Breach of the 1997 Agreement

Liafail next alleges that L2K breached the parties' 1997 Original Agreement. However, if the language of a contract "clearly establishes a release from liability, 'the presumption is that the parties executing such a formal agreement intended what they said." ' *Conley v. Dan-Webforming Int'l. A/S (Ltd.), 1992 WL 401628, at \*10 (D.Del. Dec. 29, 1992).* In the present case, the APA provides, in relevant part:
Section 6(1) *Prior Agreements.* Upon execution of this Agreement, the parties hereby agree:
(i) That the Original Agreement and the Second Agreement, to the extent not previously terminated or superseded, are hereby terminated and superseded. All rights and obligations of the parties with respect to the subject matter thereof shall be governed by this Agreement with the License Agreement and the License Amendment.
(ii) Liafail hereby releases, discharges and acquits L2K, its successors and assigns, and its management, agents, servants and employees, from any and all payments, monies, claims, demands, actions, liabilities, damages, costs, expenses, Royalties, and division of Net Profits arising out of the Original Agreement, the Second Agreement or any subsequent agreements or undertakings between the parties prior to this Agreement, except for the License Agreements.

Frank Stucki confirmed at his deposition that all parts of the 1997 Agreement were encompassed and intended to be terminated by the APA. *See* Deposition of Frank Stucki at 141-142. Liafail's understanding as to the effect of this release is further confirmed by discussions between Liafail's president, Frank Stucki, and vice president, Keith Hansen ("Hansen"), about the prospects of success on a breach of contract claim under the 1997 Agreement.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2002 WL 31667861 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

Specifically, at his deposition, Hansen testified that they discussed

the fact that, gee, we provided releases when Learning 2000 had really violated the first contract right and left, owed us money every place. We released them from that responsibility on the basis of promises that they made that we would have an IPO and everything would be fixed. They didn't hold up their end. Now we're sitting without an IPO and we have released them. So we don't have a basis to go back for damages under the first contract.

**\*6** Deposition of Keith Hansen at 185. Frank Stucki confirmed that he and Hansen discussed his concern that Liafail might not be able to sue L2K for damages under the Original Agreement because Liafail had given L2K releases in the APA. *See* Deposition of Frank Stucki at 132-133. He further testified that this reflected his understanding about how the release worked. *See id.*

Notwithstanding this clear intent to release any claims pre-dating the APA, Liafail now wishes to be relieved from the bargain that it has struck "in light of L2K's fraudulent inducement ." As the court discussed above, however, Liafail has failed to state a fraud claim. Accordingly, the court will grant L2K's motion for summary judgment on this claim.

### C. Count Three-Fraud

As discussed in Section IV.A, *supra,* Liafail has failed to identify any alleged fraudulent statements with the required specificity in its pleadings. Thus, the court is constrained to grant L2K's motion for summary judgment on this claim.

### D. Count Four-Negligent Misrepresentation

In any negligence cause of action, the plaintiff must establish that: (1) the defendant owed a duty; (2) the duty was breached; and (3) the breach was the proximate cause of damages. *See generally* W. PAGE KEETON ET AL., PROSSER AND KEETON ON THE LAW OF TORTS § 30, at 164-165 (5th ed.1984). In the present case, Liafail alleges that L2K "supplied Liafail with false information regarding the financial condition of the company, the feasibility of a public offering and/or their intentions with regard to the offering." Amended Complaint at ¶ 133.

Liafail has not, however, proffered any evidence with regard to whether the alleged misrepresentations

proximately caused damages to Liafail. If Liafail does not demonstrate "a pecuniary loss caused by" the alleged negligent misrepresentation, its claim "must fail." *Darnell v. Myers,* 1998 WL 294012, at *5 (Del. Ch. May 27, 1998). As Liafail has not raised a genuine issue of material fact that it has suffered damages and that those damages were causally related to actionable misrepresentations, the court must grant summary judgment in L2K's favor.

### E. Count Five-Breach of the APA

L2K's motion for summary judgment on this claim depends on the alleged failure of various conditions. In response, Liafail has alleged that all the items L2K identifies as conditions precedent were in fact fulfilled, waived, or prevented from occurring by L2K's own actions.

One of the conditions precedent that would have to have been fulfilled before L2K's obligations matured was that Liafail would enter into certain agreements within seven days of the APA's effective date. At his deposition, Frank Stucki admitted that, while Liafail had not entered into those agreements within the seven days, it was because L2K had granted Liafail an extension. *See* Deposition of Frank Stucki at 199-201. His counsel, who would have handled the agreement negotiations, also had this understanding. *See* Deposition of Russel Holloway at 154, Deposition of Susan Neumeyer at 266. In fact, Susan Neumeyer testified at her deposition that this belief was reinforced by the participation of the attorneys handling the IPO in the negotiations. *See* Deposition of Susan Neumeyer at 204. These negotiations took place without any indication that L2K considered the delay a material breach of the agreement, or that the attorneys themselves considered it in any way material to the success of the IPO. *See id.* Thus, there remains a genuine issue of material fact with regard to whether the agreements were material requirements of the APA.

**\*7** L2K next claims that its obligation to go forward with the transaction was contingent on the correctness and truth of Liafail's representations. To the extent that any of Liafail's representations or warranties failed, L2K would no longer have an obligation to go forward with the transaction. L2K now argues that Liafail's actions in the current lawsuit breached the representations it made in the APA that, *inter alia,* Liafail had received sufficient consideration and that the parties desired for their relationship and respective rights and obligations to

Not Reported in F.Supp.2d                                                                                                         Page 6
Not Reported in F.Supp.2d, 2002 WL 31667861 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

be governed by the APA. Liafail in turn contends that it was only L2K's revelation that it never intended to honor its commitments and its alleged misrepresentations of various facts which led Liafail to "disavow" its obligation to abide by these statements. Were the court to credit L2K's argument on this point, it would have to find against Liafail, as the court has already granted L2K's motion for summary judgment on the fraud and negligent misrepresentation claims. However, the court need not reach this decision as it finds L2K's contentions on this point to be frivolous. L2K's obligations to perform would have matured, if at all, well before this lawsuit commenced. Thus, it cannot use Liafail's current representations as an excuse for its alleged failure to perform.

L2K next argues that it was not obligated to consummate the transaction until it was, in its sole discretion, satisfied with the results of its due diligence review of the assets. L2K now contends that the record is devoid of any competent evidence demonstrating that it was afforded an opportunity to complete a due diligence review of the assets, and satisfy itself as to the sufficiency and accuracy of the review. In response, Liafail maintains that, in the two years L2K served as its distributor, it had ample time and opportunity to perform its due diligence. Moreover, it argues that L2K has not pointed to one instance in which Liafail refused to provide L2K with requested information. Indeed, Liafail asserts that it gave L2K full access to the Lifetime Library, even to the extent of turning over the source code for the new product. *See* Deposition of Frank Stucki at 59-60. On these contested facts, the court cannot determine the effect of this alleged condition precedent. Thus, to grant summary judgment on this ground would be improper.

L2K further contends that it was not obligated to proceed with the IPO unless certain market conditions existed. However, no particular market conditions had to exist before L2K was obligated to make a good faith attempt to ready the company for moving forward in accordance with the parties' joint plans. The court thus finds L2K's argument on this point unavailing.

L2K next offers that, before the IPO could proceed, the lead underwriter had to retain co-managers for the IPO. In turn, Liafail offers deposition testimony that three co-managers remained "in the mix" at the time the IPO preparations were halted. *See* Deposition of Michelle Moreno at 160, 172. Moreover, Liafail argues that, while a co-manager would have been

desirable, nothing in the APA conditioned any obligation on the hiring of a co-manager. Thus, the court will not grant L2K's motion for summary judgment on this ground.

*8 With regard to L2K's remaining two arguments, namely that Liafail's audit was not completed and the Lifetime Library's relationship with certain companies had not been clarified, the court finds these arguments unpersuasive as well. Liafail submits that its audit was conducted by Ernst & Young, the accountants engaged to do so by L2K. According to the record, Ernst & Young indicated that it did not require any further information from Liafail. *See* Deposition of Susan Neumeyer at 179, Deposition of Frank Stucki at 666. Frank Stucki further testified that L2K had "called off" Ernst and Young. *See* Deposition of Frank Stucki at 213. Liafail was not informed that Ernst & Young needed any further information, and in fact, Ernst & Young testified that it too had set aside this question pending resolution of issues for which L2K had yet to provide information. *See* Deposition of Clint Adams at 322. Similarly, with regard to the Library's relationship with two companies, Liafail argues that it obtained signed extensions in the form suggested by L2K's attorneys after working with the attorneys for a long period of time. *See* Deposition of Susan Neumeyer at 203, 264-265. In light of these contested issues, the court concludes that summary judgment on this claim would be inappropriate.

### F. Counts Six, Seven and Eight-Lanham Act, Common Law Trademark Infringement and Unfair Trade Practices/Unfair Competition

To prevail on these claims, Liafail must demonstrate that: (1) L2K used a false designation; (2) that such use of a false designation occurred in interstate commerce in connection with goods and services; (3) that such false designation is likely to cause confusion, mistake or deception as to the origin, sponsorship, or approval of L2K's goods or services by another person; and (4) that Liafail has been or is likely to be damaged. *See* AT & *T Co. v. Winback & Conserve Program, Inc.,* 42 F.3d 1421, 1428 (Fed.Cir.1994); *see also Major League Baseball Promotion Corp. v. Colour-Tex, Inc.,* 729 F.Supp. 1035, 1039 (D.N.J.1990) (noting that the same elements apply to federal and common law trademark infringement claims, as well as unfair competition claims).

In its motion, L2K argues that summary judgment is

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2002 WL 31667861 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

appropriate because: (1) Liafail has failed to demonstrate any evidence of damages; (2) L2K has an exclusive license to use the term "Lifetime Library;" and (3) L2K is not selling the product unless the sale is pursuant to contracts existing as of June 30, 2001. For the following reasons, the court concludes that genuine issues of material fact exist.

Liafail has adduced evidence that L2K itself recognizes the "Lifetime Library" as Liafail's trademark. *See* Deposition of Richard at 217; Deposition of Russel Holloway at 76. Furthermore, and as the court recognized in its October 23, 2002 Memorandum and Order, Liafail has pointed to evidence demonstrating that its educational software product was developed and marketed as the "Lifetime Library" long before L2K had any involvement with the product. *See* October 23, 2002 Memorandum and Order at 8. Moreover, Liafail argues that L2K's right to use the Lifetime Library name as a licensee only applied if it used the name in accordance with a valid agreement between the parties. Liafail contends that, although there is no valid agreement in effect between the parties, L2K nevertheless continues to sell the library. In turn, L2K maintains that, as the exclusive licensee, it was the entity that brought Lifetime Library "its claim to fame" and that it continues to act in accordance with the parties' Amendment to License and Royalty Agreement. *See* Amendment to License and Royalty Agreement § 3 (stating that, [n]otwithstanding anything to the contrary in the License Agreement, L2K may continue to sell the Licensed Product on a nonexclusive basis but only to fulfill L2K's contracts existing on June 30, 2001, or if earlier, on the date of the termination of the [APA]."). Liafail, however, points to Russell Holloway's deposition testimony that L2K is currently selling to customers based on word of mouth and referrals from existing customers. *See* Deposition of Russell Holloway at 52. In light of these contested factual issues, the court concludes that a grant of summary judgment on this count would be improvident.

G. Counts Nine and Ten-Interference and Tortious Interference

**\*9** To state a claim for tortious interference, the plaintiff must prove that: (1) a valid contract existed, (2) the defendants knew of the contract, (3) the defendants undertook an intentional act that was a significant factor in causing a breach of the contract; (4) a lack of justification for the defendant's action; and (5) injury as a result of the intentional acts. *See*

*Cantor Fitzgerald, L.P. v. Cantor,* 2000 WL 307370, at \*24 (Del. Ch. March 13, 2000).

L2K argues that summary judgment is appropriate on this claim because Liafail cannot identify "a specific contract or potential business opportunity" that was compromised by L2K's representations. *Kirkwood Kin Corp. v. Dunkin Donuts,* 1997 Del.Super. LEXIS 30, \*43 (Del.Super.1997). Specifically, L2K contends that neither Liafail, nor its 30(b)(6) witness, has identified the specific representations at issue, nor has either of them proffered evidence to show that these representations in fact thwarted a specific contract or business opportunity. For the following reasons, the court must agree.

The business relationships that Liafail has identified with respect to these counts are Kentucky Educational Television ("KET"), the United States Army, and Northwest Technical College. Liafail designated Frank Stucki as its Rule 30(b)(6) witness with respect to Liafail's tortious interference claim. Frank Stucki had no knowledge of Liafail's claim regarding Northwest Technical College. Nor did Liafail provide a basis for that claim in its Answer Brief. Thus, the court will grant summary judgment on any claim of interference or tortious interference with regard to Northwest Technical College.

When asked to identify the alleged interfering statements on which Liafail's claim with respect to the United States Army is based, Frank Stucki testified that L2K "made no statements to the Army." *See* Deposition of Frank Stucki at 1335-1336. He further states that the allegation with regard to the Army is based solely on the fact that a meeting took place between the Army and L2K. *See id.* at 1335-1336. Liafail has "no information whatsoever what was said by [L2K] to the Army at that meeting." *Id.* at 1335-1338. Finally, Frank Stucki could not identify a single false verbal or written statement that L2K made to the Army. *See id.* at 1354-1355. Although Liafail points to William Haynes' ("Haynes") testimony that he admitted to forwarding information to an Army representative and arranging for a demonstration of the product, this purported evidence fails to even arguably demonstrate that L2K compromised Liafail's relationship with the Army.

Finally, with respect to its KET claims, Frank Stucki testified that L2K "implied" to KET that Liafail and L2K "were best of friends" and that L2K "had sold 20-some million dollars worth of software to Gateway and that they were expanding their business operations." Deposition of Frank Stucki at 1339-

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2002 WL 31667861 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

1340. He had no further information to provide on the KET allegations. Liafail now argues, however that Haynes testified that he and Holloway had met with KET about a new video series that KET had developed. *See* Deposition of William Haynes at 162-163. This alleged meeting, however, without more, does not begin to satisfy Liafail's burden of establishing a genuine issue of material fact with regard to each of the elements of this claim. Accordingly, the court concludes that summary judgment is appropriate.

### H. Count Eleven-Business Defamation

**\*10** Liafail's business defamation count asserts that the "[d]efendants have made false statements to others about Liafail." Amended Complaint at ¶ 207. However, the court finds that there exists no genuine factual dispute regarding the falsity of those statements because Liafail has failed to identify the statements. Nor has it identified to whom, by whom, or when those statements were made. Nevertheless, it contends that these unidentified statements to unidentified persons have "harmed Liafail's standing in the marketplace and created confusion." *Id.* at ¶ 208. Liafail further asserts that these statements have "maligned [its] business reputation and inflicted injury on Liafail." *Id.* at 211. As Liafail has failed to adduce any evidence whatsoever of even one such false statement, the court must grant summary judgment on this count.

### I. Count Twelve-Injurious Falsehood

Liafail next asserts that, as a result of L2K's alleged false statements, it has been deprived of business relationships with Microsoft, Compaq, and the Army. *See* Deposition of Frank Stucki at 1353-1354, 1357. However, Frank Stucki also admitted at his deposition that Liafail is not aware of "a single" false verbal or written statement made by L2K to Microsoft, Compaq, or the Army. *Id.* at 1354-58. Nor does Liafail point to any such evidence in its responsive papers to the present motion. The court will, therefore, grant summary judgment on this ground.

### J. Count Thirteen-Conspiracy

The only argument raised by L2K with regard to Liafail's conspiracy claim is the alleged absence of any other substantive claim. However, as the court has found genuine issues of material fact on several of Liafail's counts, it must allow the conspiracy claim to also proceed.

### K. Count Fourteen-Conversion

Conversion is the "wrongful exercise of dominion over the property of another, in denial of his right, or inconsistent with it ." *Acierno v. Preit-Rubin, Inc., 199 F.R.D. 157, 165 (D.Del.2001)* (citation omitted). In order to establish a successful conversion claim, Liafail must establish that, at the time of the alleged conversion: (1) it held an interest in the property; (2) it had a right to possession of the property; and (3) L2K converted the property. *See Arnold v. Society for Sav. Bancorp. Inc., 678 A.2d 533, 536 (Del.1996).*

In the present case, Liafail contends that the property that has allegedly been taken away from it, and over which L2K has allegedly exercised dominion, are sales of the Lifetime Library. In support of this proposition, Liafail argues that "[e]ach such unauthorized sale deprives Liafail of that sales opportunity, thereby causing damages." *See* Liafail's Answer Brief at 37. It then concedes that, "Liafail certainly retains some control over its asset, the Lifetime Library tradename, source code, and related intellectual property...." *Id.* Nevertheless, it concludes its four sentence response on this count by summarily stating that, "L2K's actions [are] inconsistent with Liafail's right to determine the use of this property [and] satisfy the elements of conversion in a manner sufficient to preclude summary judgment." *Id.*

**\*11** Given that Liafail has admitted that it still retains at least some control over its asset, the court is unpersuaded that there remains a genuine issue of material fact with regard to whether L2K has converted the property. Nor does Liafail's summary response cite to any evidence, competent or otherwise, which would raise such an issue. Specifically, Liafail has not identified any sale made by L2K over which L2K exercised improper dominion. As such, the court concludes that Liafail has failed to meet its burden of establishing the elements required for a claim of conversion.

### L. Count Fifteen-Duty of Good Faith

Liafail next contends that, as the exclusive distributor of Liafail's product, "L2K owed [it] a duty to act in good faith to maximize the value of the Lifetime Library and the profits to Liafail." Amended

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                                     Page 9
Not Reported in F.Supp.2d, 2002 WL 31667861 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

Complaint at ¶ 231. In support of this argument, Liafail recites the unimpressive proposition that Delaware recognizes the duty of good faith and then states, "[t]his principle appears so obvious as to require little discussion...." Liafail's Answer Brief at 38. It then immediately ends its discussion of this issue by stating that, "Liafail has raised ample evidence of bad faith and must, therefore, be afforded the opportunity to present this claim to a jury." *Id.* Notwithstanding Liafail's confident language, it has failed to point to any evidence to support its claim. Thus, in light of Liafail's boilerplate arguments on this point, the court will grant summary judgment in L2K's favor.

### M. Count Sixteen-Alter Ego

To prevail on an alter ego claim under Delaware law, L2K must first show that the parent and subsidiary "operated as a single economic entity." *Harper v. Delware Valley Broadcasters, Inc.,* 743 F.Supp. 1076, 1085 (D.Del.1990), *aff'd* 932 F.2d 959 (3d Cir.1991). L2K must also demonstrate that an "overall element of injustice or unfairness ... [is] present." *Id.* Effectively, "the corporation must be a sham and exist for no other purpose than as a vehicle for fraud." *In re Sunstates Corp. Shareholder's Litig.,* Del. Ch. 788 A.2d 530, 534 (Del. Ch.2001).

The United States Court of Appeals for the Third Circuit has set forth several considerations for a court to consider in determining whether a "single economic unit" existed. *See United States v. Pisani,* 646 F.2d 83, 88 (3d Cir.1981). These considerations are as follows: (1) undercapitalization; (2) failure to observe corporate formalities; (3) nonpayment of dividends; (4) the insolvency of the debtor corporation at the time; (5) siphoning of the corporation's funds by the dominant stockholder; (6) absence of corporate records; and (7) the fact that the corporation is merely a facade for the operations of the dominant stockholder or stockholders. *See id.* Moreover, the situation must present an element of injustice or fundamental unfairness. *See id.* However, the *Pisani* list of factors is not conjunctive, nor is it an exclusive list. *See Galgay v. Gangloff,* 677 F.Supp. 295, 299-300 (M.D.Pa.1987).

**\*12** Liafail first points to Story's deposition testimony wherein he conceded that "ILC" is a "shell corporation" owned by Santini and himself. As the Fourth Circuit has recognized, however, this testimony is insufficient to demonstrate a disregard of corporate formalities such that would justify piercing the corporate veil. *See Huennekens v. Reczek,* 43 F.ed Appx. 562, 567 (4th Cir.2002)) (finding the fact that an individual capitalized a shell corporation to be insufficient).

Liafail next purports to offer Anthony Santini's deposition testimony for the proposition that he left virtually all of the decision-making to Richard Story. *See* Liafail's Answer Brief at 38 (citing Santini at 38-41). After reviewing the cited excerpts of Santini's deposition testimony, the court finds no support for Liafail's assertion that he testified in such a manner. Accordingly, it will afford this "fact" no weight.

Liafail next cites Richard Story's deposition testimony for the proposition that he and Santini were accused of mismanaging L2K. *See id* (citing Story at 257). The court again disagrees that Story so testified. Indeed, Story merely testified that he and Santini expanded the board of directors to avoid micromanaging the company. *See* Deposition of Richard Story at 257. This can hardly be construed as "mismanagement." Thus, the court again declines to credit Liafail's statements in this regard.

Again, citing Santini's deposition testimony, Liafail asserts that Story had free reign to run the company. *See* Liafail's Answer Brief at 38. Santini actually testified, however, that he told Story "to go ahead, do whatever he [Story] needed to do" and that Santini was not involved in "negotiating the deal between Learning 2000 and Liafail." *See* Deposition of Anthony Santini at 11, 14-16. The court is again not persuaded that this testimony raises any factual issues as it is within a board's prerogative to delegate negotiations to the chairman of the board in a valid exercise of its business judgment. *See e.g. State of Wisconsin Inv. Bd. v. Bartlett,* 2000 WL 238026, at *4 (Del. Ch. Feb. 24, 2000).

Furthermore, contrary to Liafail's suggestion, the record does not establish that Story, or anybody else at L2K, attempted to "create the impression of solvency" or that there was any threat of insolvency during the relevant period of time. Although the record does reflect that some employees' salaries were deferred at some point in time, Liafail's theory that this was related to insolvency is mere speculation unsupported by any facts. As such, this speculation will not preclude the entry of summary judgment.

With regard to Liafail's statement that Story "was repaid his initial $100,000" loan to L2K, the court is unclear as to how this fact entitles Liafail to pierce L2K's corporate veil. Were Liafail's theory to be

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                Page 10
Not Reported in F.Supp.2d, 2002 WL 31667861 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

correct, no corporation could pay its debts without running into the risk of alter ego liability.

**\*13** Liafail next points out that L2K improperly "routinely" made payments on Story's American Express card and transferred large sums of cash to other entities owned by Story and Santini. However, the mere making of payments and transfers alone does not create alter ego liability. *Cf Canario v. Lidelco, Inc.,* 782 F.Supp. 749, 760 (E.D.N.Y.1992) (finding that purchasing a private airplane with corporate funds, taking personal income tax deductions for the airplane's depreciation while the corporation paid for its upkeep, and keeping all profits upon the airplane's sale "does not ... rise to the level necessary to pierce the corporate veil."). Nor does Liafail identify any facts from which the court, or a jury, could reasonably determine that either of these actions were improper.

Finally, Liafail contends that L2K was unable to produce a set of corporate documents or resolutions which did not suffer from "glaring inconsistencies" and that it could not explain its capital structure. *See* Liafail's Answer Brief at 38 (citing Thompson at 122-134, Adams at 26, 53-54, 59, 87, 110-111). Conversely, L2K argues that Julie Thompson testified that: (1) she produced the documents requested of her; (2) there were no pieces of information that were requested of her that she was unable to provide; and (3) everything Ernst & Young asked for, she was able to give them. *See* Deposition of Julie Thompson at 122, 124. With respect to Clint Adam's testimony, the only outstanding documents as of the time the underwriter called off the IPO were up-to-date board minutes and board minutes showing that a number of stock options and warrants had been issues. *See* Deposition Testimony of Clint Adams at 53-54, 87, 110-111.

Moreover, when the IPO was aborted, Ernst & Young stopped working on its audit. Thus, it is hardly surprising that its due diligence of L2K's records was left somewhat incomplete. Accordingly, even crediting Liafail's evidence that the corporate records may have been in imperfect form, the court concludes that, in light of the dearth of evidence on this count, it is constrained to grant summary judgment in L2K's favor.

### N. Count Seventeen-Unjust Enrichment

Liafail next asserts that L2K has engaged in "extra-contractual actions" from which it has profited to Liafail's detriment. Liafail does not dispute the long-recognized principle that a plaintiff cannot recover on an unjust enrichment theory where the parties' relationship is governed by an express contract. *See e.g. Chrysler Corp. v. Airtemp Corp.,* 426 A.2d 845, 854 (Del.Super.Ct.1980). Its argument that the present case falls outside this principle because the alleged actions are "extra-contractual" is unavailing. Rather, it is clear that, in this litigation, Liafail merely disputes which contract governs the relationship between the parties and whether that contract was breached. It does not dispute the existence of a contractual relationship. Therefore, recovery under an unjust enrichment claim is precluded as a matter of law.

### O. Count Eighteen-Injunctive Relief

**\*14** L2K contends that this count must fail because Liafail cannot establish a right to relief under any of the substantive causes of action. However, because the court has determined that genuine issues of material fact exist with regard to a number of Liafail's claims, L2K's argument on this point must fail.

### V. CONCLUSION

Following a careful review of the record before it, the court has concluded that factual issues remain with regard to Counts Five, Six, Seven, Eight, Thirteen, and Eighteen. The court will grant summary judgment in L2K's favor on the remaining counts.

On a final note, as the court found it unnecessary to reach the portion of Shawn Kiehn's Affidavit which L2K now asserts is inadmissible hearsay, the court will deny L2K's motion to strike it as moot.

For the foregoing reasons, IT IS HEREBY ORDERED that:
1. L2K's Motion for Summary Judgment (D.I.253) is GRANTED in part and DENIED in part.
2. L2K's Motion to Strike Finch's Report (D.I.297) is declared MOOT.
3. L2K's Motion to Strike the Affidavit of Shawn Kiehn (D.I.300) is declared MOOT.

D.Del.,2002.
Laifail, Inc. v. Learning 2000, Inc.
Not Reported in F.Supp.2d, 2002 WL 31667861 (D.Del.)

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2002 WL 31667861 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

Briefs and Other Related Documents (Back to top)

- 1:01CV00678 (Docket) (Oct. 09, 2001)
- 1:01CV00599 (Docket) (Sep. 04, 2001)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**EXHIBIT 7**

**Westlaw.**

Not Reported in A.2d                                                Page 1
Not Reported in A.2d, 1993 WL 390469 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

**H**
Only the Westlaw citation is currently available.
UNPUBLISHED OPINION. CHECK COURT
RULES BEFORE CITING.
Superior Court of Delaware.
PLAYTEX, INC.
v.
COLUMBIA CASUALTY.
Submitted: Sept. 10, 1993.
Decided: Sept. 20, 1993.

Walter L. Pepperman, II, Irving Morris, Kevin Gross, Stephen P. Casarino, Nancy E. Chrissinger.

DEL PESCO, Judge.
**\*1** Plaintiffs Playtex FP, Inc., et al. ("Playtex") have moved for partial summary judgment on defendant Columbia Casualty Company's ("Columbia") Counterclaims and affirmative defenses grounded in fraud and misrepresentation. In addition, Playtex seeks summary judgment on the defense that the losses at issue are not occurrences under the terms of the primary policy.

**I. FRAUD/MISREPRESENTATION ISSUES**

The specific components of the fraud claim are set forth in Columbia's counterclaim. Paragraph 99, which includes a representative statement of the claim, alleges [FN1]:

> FN1. The counterclaim also alleges that these false material misrepresentations and omissions of material fact were made with knowledge of their falsity or made with reckless indifference to the truth, that they were made with an intent to induce Columbia to act in reliance thereon, and that Columbia acted in justifiable reliance on the misrepresentations and has been damaged as a result of such reliance. The counterclaim further alleges that ESMARK and PLAYTEX breached their duty of ordinary care when they negligently misrepresented the matters set forth in the insurance specifications. Additionally, the counterclaim alleges that the actions taken by ESMARK and PLAYTEX constitute a

breach of the insurance contract to refrain from concealing or misrepresenting any material fact or circumstance concerning the insurance provided.

99. At the time ESMARK and PLAYTEX through James [the insurance broker] sought and secured the Policy from COLUMBIA, ESMARK and PLAYTEX: (a) deliberately failed to disclose to Columbia the full facts concerning the relationship between the PLAYTEX Tampons and TSS; (b) deliberately failed to disclose in the Specifications the procuring of the Recall Insurance Policies ...; (c) deliberately failed to disclose the increased deductibility provision in the Second Recall Insurance Policy over the deductibility provision in the First Recall Insurance Policy ...; (d) deliberately failed to disclose the "distinct problems" James encountered "with the placement of the ... coverage" of the Second Recall Insurance Policy ...; (e) deliberately failed to disclose the unlikelihood that ESMARK and PLAYTEX could secure Recall Insurance covering the withdrawal of the PLAYTEX Tampons from the market which would cover ESMARK and PLAYTEX after the expiration of the Second Recall Insurance Policy ...;(f) deliberately failed to disclose the likelihood ESMARK and PLAYTEX would withdraw the PLAYTEX Tampons from the market in the policy year of the Second Recall Insurance Policy, i.e., in the period May 1, 1984, through April 30, 1985, a portion of which period coincided with the first seven months (i.e., October 1, 1984, through April 30, 1985) of the Policy ESMARK and PLAYTEX through James sought COLUMBIA to issue, in order to collect the money from the insurance carriers on the Second Recall Insurance Policy to avoid the adverse effect on ESMARK's "earnings per share" from the withdrawal of the PLAYTEX Tampons from the market ...; (g) deliberately failed to disclose PLAYTEX's intent since 1983 to withdraw the PLAYTEX Tampons from the market ...; and (h) deliberately failed to disclose the fact the Specifications was [sic] materially false and misleading in their material omissions and misrepresentations....

The 1984 specifications contained the following general comment regarding Toxic Shock Syndrome:
TOXIC SHOCK SYNDROME
*Toxic Shock Syndrome (TSS) is a rare disease caused by a bacteria called staphyloccus aureus.* Although

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 1993 WL 390469 (Del.Super.)
(Cite as: Not Reported in A.2d)

Page 2

this bacteria has been known for many years and is found naturally somewhere on the bodies of most people, it is believed by many scientists that TSS is caused by a new strain of bacteria which is producing toxins that have never been identified before.

**\*2** It has been reported that between 5% and 15% of women carry staphyloccus aureus as part of the natural flora of their vaginas. Several scientists claim to have isolated the TSS toxin. They are now working to try to confirm this and to develop a cure for the disease.

Recent reports from the CDC indicate that approximately 83% of all TSS ever reported have occurred in menstruating females. In 1982, the number of non-menstrual cases was approximately 22%. Cases have also been reported in menstruating women who use pads rather than tampons. Estimates of the incidence rate of TSS vary between 6 and 17 cases per 100,000 menstruating women per year.

In late June of 1980, United States Centers for Disease Control (CDC) announced that they had found a statistical association between tampon use and TSS. Since that time, the State Health Departments of Utah, Wisconsin and the Tri-State area of Minnesota, Wisconsin and Iowa issued reports reaching similar conclusions. Subsequent evaluation by experts and consultants has shown that there were several substantial errors in all of the studies that have rendered them scientifically invalid. Some scientists claim that TSS primarily affects younger women; however, women of all ages have had TSS. Some scientists also claim that there is a greater risk of contracting TSS by use of tampons that are made with higher absorbent materials, but all types and all brands of tampons have been reported to be associated. The CDC continues to disagree that there is any increased risk of TSS with increased absorbency of tampons. Certain microbiologists claim to have found that certain tampons with increased absorbency increase the amount of TSS toxin production. This matter is still under investigation. Most often, a TSS patient will require a limited hospital stay of one to two weeks and most women recover fully. The death rate among cases when first reported was approximately 10%; however, there has been a declining mortality rate (approximately 5% in 1983), as well as a steadily declining number of reported cases.

The specifications then describe the fact that claims are handled through national coordinating counsel. They note that approximately 599 lawsuits had been brought against Playtex as of May 31, 1984. The specifications break down the distribution of claims by year: Pre-79 through the 83-84 policy year. They offer an analysis regarding the disposition of the cases filed and provide a summary of the outcome of the three cases that had been tried. The specifications explain the TSS reporting procedure and the reserving procedure which is handled independently through Crawford & Company. A copy of the package label and warning used prior to the effective date of the FDA mandatory wording is provided, as well a copy of the label and warning mandated by the FDA and in use at the time the specifications were submitted. The specifications then describe over 50 cases still open which involve TSS claims with a characterization of the injury including death and brain damage.

**\*3** The 1985 specifications contain, *inter alia,* the following information:

*Product Withdrawal and Reformulation*

In April 1985, Playtex eliminated polyacrylate from its tampons in an effort to eliminate any controversy that might exist associated with the use of this fiber in Playtex Tampons. A recent scientific study by researchers at Harvard University Medical School concluded that polyacrylate, a high-absorbency tampon material, may, under laboratory conditions, govern the relationship between tampons and the production of a toxin identified with TSS. The Harvard study and the decision in the *O'Gilvie* case discussed below were the primary reasons for the decision to eliminate polyacrylate.

A voluntary exchange program was initiated to replace all polyacrylate tampons, in wholesale and retail channels of distribution and in the possession of consumers, with new Playtex Tampons made with regular rayon. By changing the fiber, it resulted in a reduction of approximately 30% in absorbency for Playtex Super and Super Plus Tampons (Playtex Regular Tampons have been made with regular rayon since 1984).

We enclose for underwriters review and information (at the end of this section), a copy of the March 29, 1985 FDA Talk Paper issued, by the Agency, immediately after the Playtex product withdrawal announcement.

The discussion of the O'Gilvie case is, in part, as follows:

In January and February, 1985, the most recent Playtex TSS case, *O'Gilvie* (1983) was tried in Federal District Court in Wichita, Kansas. This case involved the death of a 21 year old mother of two where the diagnosis of TSS was not disputed. The

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.