and the Debtors' Officers and Directors have dealt with these presumably "independent" Debtors in the year prior to the filing of their chapter 11 petitions as well as during the course of their bankruptcy cases and promulgation of the current Plan. These allegations raise significant concerns about conflict of interest, control over the Debtors and the plan process, potential fraudulent conveyance claims and the possibility that all or a portion of the claims of the Senior Lenders should be equitably subordinated to those of Genesis junior creditors. While the Multicare Committee has now withdrawn the Trustee Motion in exchange for a distribution under the Plan, that withdrawal does not moot the allegations raised therein, nor the Debtors' fiduciary obligations to explore them and, if sustainable, act upon them.

If the Plan is confirmed including releases by Genesis of any and all claims against the Senior Lenders and their Agent, Genesis junior creditors may be denied the right to pursue such relief.

To the extent that the claims raised by the Trustee Motion may be sustainable, the releases effect a settlement of those claims, providing enhanced value to the Senior Lenders and discharge of rights of benefit and value to Genesis junior creditors without their consent. Such a settlement requires the approval of the Court. At the least, the Debtors should be required to prove to the Court at the Confirmation Hearing the propriety of the releases proposed by the Plan and their benefit to the Estate. The Debtors should be required to explain the nature of the claims asserted, the investigation of such assertions, if any, conducted, and the justification for the determination not to pursue such claims. It also is respectfully submitted that Genesis junior creditors should be permitted to conduct discovery on these claims and that any order confirming the Plan should: (i) preserve the right to seek post-confirmation equitable subordination of all or a portion of the

Senior Lenders' claims if justifiable; and (ii) require that the distribution to the Senior Lenders be placed in escrow until such claims are resolved.

### 4. The Plan is not proposed in Good Faith under 11 U.S.C. § 1129(a).

The Plan proposed is only in the best interest of the Senior Lenders and the Debtors' Officers and Directors – who have an incentive to minimize assets and going concern value at this time so as to enable them to capture all present and future value for themselves at the expense of Genesis Noteholders and general unsecured creditors. The Debtors' management has a further incentive in supporting and proffering an undervaluation to insure a low basis for employee stock they are to receive under the Plan. A Plan designed with such ends is not proposed in good faith and, thus, not confirmable under 11 U.S.C. §1129(a).

### 5. The complexity of the issues at confirmation warrants post-hearing briefs and adequate time to prepare closing arguments after the Confirmation Hearing.

Mr. Grimes hereby preserves his continuing right to supplement this Objection through and including confirmation of any plan of reorganization for Genesis.

The Debtors scheduled the Confirmation Hearing on a fast-track basis. The Debtors and other Plan supporters only last week began responding to discovery requests and enabling deposition of relevant witnesses, all of which are continuing at least through the end of the current week. The Debtors continue to produce revised valuations and other data relevant to the Plan.

In addition, the issues raised by this Objection and other objections to confirmation filed to date will require extensive and complicated valuation and other testimony presented by competing

MCM4342.WPD

**AA. 62**

experts at the confirmation hearing. It is likely that the presentation of fact witnesses and expert testimony will consume the full two days this Court has set aside for the confirmation hearing.

Accordingly, Mr. Grimes also respectfully requests that the Court permit the parties to prepare and file post-hearing briefs in support of their positions respecting confirmation of the Plan and to adjourn the Confirmation Hearing after submission of evidence and testimony for at least one week to enable the parties to assess effectively the testimony presented and present to the Court closing arguments that are most likely to assist the Court in its assessment of the facts, competing testimony and arguments presented, especially with regard to valuation of Reorganized Genesis, the effective substantive consolidation of two sets of allegedly independent debtors, and the fairness and necessity of non-debtor release provisions under the Plan.

If the Debtors assert that a delay of confirmation, and thus the effective date, of the merger proposed by the Plan is unduly harmful to the Estates, it is respectfully suggested that confirmation might be bifurcated to separate out, and deal with at a later time, the intra-creditor disputes over valuation, property distribution and Third Party Releases. In the interim, the property to be distributed to the Senior Lenders could be placed in escrow, further assisting the Court, and the Debtors and Committees in fulfilling their fiduciary obligations under the Bankruptcy Code, by subjecting the Proponents' valuations to reality testing prior to an actual distribution of reorganization securities to Senior Lenders pursuant to the Plan.

MCM4342.WPD

6

ARGUMENT

I.

## THE PLAN IS NOT FAIR AND EQUITABLE

The Plan is not confirmable under the "cramdown" provisions of the Code. To confirm a "cramdown" plan over the dissent of Genesis Noteholders, the Plan proponents must demonstrate by clear and convincing evidence[2] that they have satisfied the requirements of 11 U.S.C. §1129(b). To meet these requirements, *inter alia*, the Plan must be "fair and equitable" with respect to each holder of a claim in Genesis Class G5. *Id*

### A. The Senior Lenders are Receiving More than 100% Recovery on their Claims

A plan which provides more than 100% recovery to senior creditors while leaving junior creditors impaired violates the fair and equitable standard and prevents the plan from being "crammed down" over the dissent of a non-accepting junior class. *In re Mcorp Fin., Inc,* 137 B.R. 219, 235 (Bankr. S.D. Tex. 1992), *appeal dismissed and remanded,* 139 B.R. 820 (S.D. Tex. 1992), *rev'd on other grounds,* 160 B.R. 941 (S.D. Tex. 1992). *See also, Corestates Bank, N.A. v. United Chemical Technologies, Inc.,* 202 B.R. 33, 54 (E.D. Pa. 1996); *In re Future Energy Corp.,* 83 B.R. 470, 495 (Bankr. S.D. Ohio 1988); *In re Walat Farms, Inc.,* 70 B.R. 330, 335 (Bankr. E.D. Mich. 1987).

The evidence to be presented at the confirmation hearing will show that the Senior Lenders are to receive more than 100% of their claims under the Plan. The Plan Proponents claim

---

[2] This Circuit has not yet ruled on the standard of proof required respecting 11 U.S.C. §1129(b). It is respectfully submitted, however, that the appropriate standard should be "clear and convincing evidence" in light of the extraordinary circumstances involved where creditors' rights and interests are to be compromised without their consent.

that the Senior Lenders are not receiving value sufficient to pay their claims in full, such that junior creditors, such as Genesis Noteholders, are not entitled to any distribution under the Plan. The Proponents base this assertion on a valuation of Genesis prepared by their financial advisors which, it is respectfully submitted, is predicated on flawed methodologies that, amongst other things, do not produce an enterprise valuation for Reorganized Genesis that accounts for the synergies touted by the Debtors. Rather, the Debtors merely add together the separate valuation of Genesis produced by financial advisors to Genesis to the separate valuation of Multicare produced by financial advisors to Multicare. This fails to recognize the true value of the merged reorganized enterprise and also fails to allocate between them based on proper relative values in determining distributions under the Plan.

The Disclosure Statement reveals, among other things, that Genesis' valuations were based on a review of minimal data, made subject to extensive broad disclaimers and qualifications and, at best, are inconclusive. There also is no indication that Genesis' financial advisors independently verified management's projections upon which they predicate their determination of value or that they sought independent evaluations or appraisals.

The current distribution scheme under the Plan inflexibly locks in potential overpayment to the Senior Lenders. Section 1129(b) requires that the Genesis Noteholders be protected against that possibility.

As the bankruptcy court determined in the *Mcorp* case, this Plan can easily be modified to cap the senior creditors' claims at 100% and prevent a windfall to the Senior Lenders. *Mcorp.*, 137 B.R. at 235. The securities to be distributed to the Senior Lenders under the Plan could be

escrowed until a date certain for determination of their true value and re-distribution as necessary to junior creditors.

B.  **The Plan Violates the Absolute Priority Rule**

The Plan cannot be confirmed where, as here, the Genesis Noteholders are not being paid in full but the Debtors' Officers and Directors, who on information and belief are pre-petition equity interest holders of Genesis, are to receive under the Plan for no additional consideration a distribution of stock, forgiveness of loans, valuable waivers, releases and exculpations, and other value. While purportedly characterized as consideration for their continued employment, these insider shareholders have received retention and other bonuses throughout the Debtors' chapter 11 cases for their continued employment and assistance with the Debtors' reorganization. Accordingly, the payment and forgiveness they are to be provided under the Plan, if provided in consideration for anything, can only be attributable to their pre-petition equity interests. Such distribution violates the absolutely priority rule set forth in 11 U.S.C. §1129(b)(2)(B) and renders the Plan not confirmable over the objection and rejection of Genesis Noteholders. *Bank of America National Trust and Savings Association v. 203 North LaSalle Street Partnership*, 526 U.S. 434, 450-451, 119 S.Ct. 1411, 143 L.Ed.2d 607 (1999); *In re PWS Holding Corp.*, 228 F.3d 224, 229, 238 (3d Cir. 2000).

Moreover, as at least one commentator has shown through analysis of legislative history, "[t]he fair and equitable rule precludes the gratis issuance of reorganization securities to preserve continuity of management." Klee, *Valuation and Cram Down*, SB37 ALI-ABA 455 (1997).

MCM4342 WPD                    9

## II.

### THE PLAN IS PREDICATED UPON AN
### UNLAWFUL SUBSTANTIVE CONSOLIDATION

The Proponents claim to effect through the Plan an innocent sounding "deemed"
consolidation of the Debtors and to do so only intra-murally within each Debtor body. However,
the consolidation effectuated by the Plan is far more pervasive. The Plan effects a pre-merger
substantive consolidation of Genesis and Multicare – improperly and to the detriment of Genesis
Noteholders. While the Plan contemplates the ultimate eventual merger of these two sets of
Debtors upon confirmation, that does not legitimate otherwise illegitimate substantive
consolidation of these sets of Debtors – and their creditors and claims – for the purposes of
distributions pursuant to the Plan.

In the process, and as a result of this unlawful consolidation, the Proponents have
misallocated to Multicare Senior Lenders and junior creditors value belonging to Genesis which
should be distributed to Genesis creditors, wrongfully treating Genesis Noteholders as
subordinated to Multicare Senior Lenders and junior creditors. The harm to Genesis Noteholders
clearly outweighs any arguable benefit of substantive consolidation the Proponents might fashion.

## III.

### THE PLAN CONTAINS UNSUSTAINABLE
### NON-DEBTOR, THIRD PARTY RELEASES

The Plan provides for extremely broad releases, exculpation clauses and injunctions -- for
absolutely **no consideration** -- by both the Debtors and their creditors of any and all claims they
may have against non-debtor third parties -- including the Senior Lenders, their Agent, non-debtor

affiliates, and current and former officers and directors of the Debtors. These provisions are neither fair nor necessary. As such, they are legally insupportable and violate 11 U.S.C. §524(e) and, hence, 11 U.S.C. §1129(a)(1). Accordingly, these provisions must be stricken from the Plan. *In re Continental Airlines,* 203 F.3d 203, 211 (3d Cir. 2000); *In re Greate Bay Hotel & Casino, Inc.,* 251 B.R. 213, 222 (Bankr. D. N.J. 2000)(Wizmur, J.).

Moreover, creditors who have voted not to accept the Plan, such as Mr. Grimes, cannot be bound by these releases and injunctions and the Plan should expressly provide for the exclusion of rejecting creditors from the application of any such releases that are not stricken from the Plan. *Nordhoff Investments, Inc. v. Zenith Electronics Corp.,* ____ F.3d ____ 2001 WL 698000 (3d Cir. June 21, 2001), *affirming In re Zenith Electronics Corp.,* 250 B.R. 207 (D. Del. 200), *affirming In re Zenith Electronics Corp.,* 241 B.R. 92, 111 (Bankr. D. Del. 1999)(release of third party claims "cannot be accomplished without the affirmative agreement of the creditor affected"). *See also, e.g., In re West Coast Video Enters., Inc.,* 174 B.R. 906, 911 (Bankr. E.D. Pa. 1994)("each creditor bound by the terms of the release must individually affirm same..."); *In re Elsinor Shore Assocs.,* 91 B.R. 238, 252 (Bankr. D. N.J. 1988)(plan provisions deeming non-debtor proponents and their principals discharged and released prohibited by Bankruptcy Code and relevant case law).

There are important policy reasons for a ban on non-consensual releases of non-debtor parties. In *In re Arrowmill Devel. Corp.,* the Bankruptcy Court for the District of New Jersey extensively examined the law and policy in this area and concluded that such releases would have dangerous consequences:

MCM4342 WPD                                11

[N]ondebtor releases harm third party creditors, and create a further incentive for principals to enter their corporate entities into bankruptcy 'for reasons that have nothing to do with the purpose of bankruptcy law.' As cautioned by a commentator, non-debtor discharge has 'potential for abuse, in which corporate bankruptcy becomes a form of insurance for insiders and thus creates a moral hazard . . . because insiders may be tempted to engage in high risk behavior by the knowledge that they can protect themselves from its consequences by taking the corporation [and not themselves] into chapter 11.'

*In re Arrowmill Devel. Corp.*, 211 Bankr. 497, 506 (Bankr. D.N.J. 1997)(citations omitted).

Moreover, forcing rejecting creditors to relinquish their claims against non-debtor third parties violates express limitations on altering the rights of a creditor to collect from third parties, as provided under Bankruptcy Code section 524(e). *See First Fidelity Bank v. McAteer*, 985 F.2d 114, 118 (3d Cir. 1993); *In re Zenith Electronics Corp.*, 241 B.R. 92, 111 (Bankr. D. Del. 1999).

**IV.**

**THE PLAN WAS NOT PROPOSED IN GOOD FAITH**

In order for a chapter 11 plan to be confirmed, the proponent must prove that the Plan was filed in good faith. 11 U.S.C. §1129(a)(3). The good faith determination turns on whether the Plan "will fairly achieve a result consistent with the objectives and purposes of the Bankruptcy Code." *In re Abbotts Dairies of Pennsylvania, Inc.*, 788 F.2d 143, 150 n.5 (3d Cir. 1986); *In re Zenith Electronics Corp.*, 241 B.R. 92 (Bankr. D. Del. 1999); *In re PPI Enterprises (U.S.), Inc.* 228 B.R. 339, 347 (Bankr. D. Del. 1998); *In re New Valley Corp.* 168 B.R. 73, 80 (Bankr. D. N.J. 1994). Good faith also must be assessed in light of the totality of the circumstances surrounding the development and proposal of the Plan. *Mabey v. Southwestern Elec. Power Co. (In re Cajun Electric Power Co-Op, Inc.*, 150 F.3d 503, 519 (5th Cir. 1998), *cert. denied*, 526

U.S. 1144; 119 S.Ct. 2019, 143 L.Ed. 2d 1031 (1999); *In re Century Glove, Inc.*, 1993 WL 239489 at *4 (D. Del. Feb. 10, 1993).

In assessing whether a plan has been proposed in good faith, Courts have found that plans which attempt to give favorable treatment to an insider without proper justification violate the Bankruptcy Code's section 1129(a)(3) good faith requirement. *See, e.g., In re Wooley's Parkway Center, Inc.*, 147 B.R. 996, 1003 (Bankr. M.D. Fla. 1992)(plan not confirmable where purpose was to get principal 'off the hook' on his guarantee); *In re Sherwood Square Assocs.*, 107 B.R. 872, 877 (Bankr. D. Md. 1989)(attempt to give favorable treatment to insider may violate good faith requirement); *In re Future Energy Corp.*, 83 B.R. 470, 487 (Bankr. S.D. Ohio 1988)("Clearly, an attempt by a debtor in possession to give favorable treatment to an insider is violative of §1129(a)(3)'s good faith requirement"); *In re Smithfield Estates, Inc.*, 52 B.R. 220, 223 (Bankr. D.R.I. 1985)(attempt to give insider favorable treatment "patently unfair" and indicative of "shortage of good faith").

The Plan proposed was designed unfairly to favor the Senior Lenders and the Debtors' Officers and Directors. And the Plan as designed *is* only in the best interest of the Senior Lenders and the Debtors' Officers and Directors – who have an incentive to minimize assets and going concern value at this time so as to enable them to capture all present and future value for themselves at the expense of Genesis Noteholders and general unsecured creditors. The Debtors' management has a further incentive in supporting and proffering an undervaluation to insure a low basis for employee stock they are to receive under the Plan. A Plan designed with such ends is not proposed in good faith and, thus, not confirmable under 11 U.S.C. §1129(a).

MCM4342.WPD                                    13

Moreover, an undervaluation of Reorganized Genesis and, hence, of the reorganization securities to be distributed under the Plan, succeeds in transforming Senior Lenders -- who, as Genesis' counsel noted at the Disclosure Statement Hearing, previously asserted that they are "oversecured" and thus entitled to in excess of $196 million in "adequate protection payments" -- into under-secured creditors comprising a necessary "impaired" accepting class under the Plan. As this Court has duly noted, classification and treatment of classes of claims, artificial or not, remains subject to the statutory "good faith" requirement. *In the Matter of Greate Bay Hotel & Casino, Inc.*, 251 B.R. 213, 238-240 (Bankr. D. N.J. 2000)(Wizmur, J.).

## CONCLUSION

WHEREFORE, for all the above reasons, Mr. Grimes respectfully requests that the Court deny confirmation of the Debtors' Joint Plan.

If the Court determines to approve confirmation of the Plan, Mr. Grimes respectfully requests that the Court expressly provide in any Order confirming the Plan: (i) that the release, exculpation and injunction provisions discussed hereinabove shall be struck from the Plan or, alternatively, at a minimum, that such provisions shall not apply to rejecting creditors such as Mr. Grimes; (ii) that the right of Mr. Grimes and other Genesis Noteholders to investigate and, if appropriate, prosecute the claims asserted in the Multicare Trustee Motion including, without limitation, any claim seeking to equitably subordinate the Senior Lenders, shall be preserved post-confirmation in order to properly resolve issues surrounding intra-creditor distributions under the Plan; (iii) that, pending a determination of such investigation and, if appropriate, litigation, all or a portion of the reorganization securities to be distributed to the Senior Lenders shall be placed in

MCM4342.WPD                          14

escrow; and (iv) provide Mr. Grimes such other and further relief as the Court may find just and

proper under the circumstances.

Wilmington, DE
August 21, 2001

Respectfully submitted,

SMITH, KATZENSTEIN & FURLOW LLP

By: _____

       Selinda A. Melnik (Bar No. 4032)
       David A. Jenkins (Bar No. 932)
       The Corporate Plaza
       800 Delaware Avenue
       PO Box 410
       Wilmington, DE 19899 (Courier 19801)
       Tel: (302) 652-8400
       Fax: (302) 652-8405

       Attorneys for Charles L. Grimes

MCM4342.WPD

15

UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

------------------------------------------------x
:
In re                                           :        Chapter 11 Case No.
:
GENESIS HEALTH VENTURES, INC., *et al.,*        :        00-2692 (JHW)
:
Debtors.                        :
:        (Jointly Administered)
------------------------------------------------x
:
In re                                           :        Chapter 11 Case No.
:
MULTICARE AMC, INC., *et al.,*                  :        00-2494 (JHW)
:
Debtors.                        :
:        (Jointly Administered)
------------------------------------------------x

## DEBTORS' OMNIBUS RESPONSE TO OBJECTIONS
## TO DEBTORS' JOINT PLAN OF REORGANIZATION

TO THE HONORABLE JUDITH H. WIZMUR,
UNITED STATES BANKRUPTCY JUDGE

Genesis Health Ventures, Inc. ("Genesis"), The Multicare Companies, Inc.

("Multicare"), and the other above-captioned debtors and debtors in possession

(collectively with Genesis and Multicare, the "Debtors") hereby respond to various

objections to the Debtors' Joint Plan of Reorganization, dated July 6, 2001 (the "Plan").[1]

A draft of the proposed (i) Confirmation Order and (ii) Technical

Amendments to the Plan, which will set forth certain proposed technical modifications to

---

[1] Unless otherwise defined, capitalized terms used herein shall have the meanings
ascribed thereto in the Plan or the Disclosure Statement for Debtors' Joint Plan of
Reorganization, dated July 6, 2001 (the "Disclosure Statement").

the Plan, will be delivered to Chambers and filed with the Court prior to the Confirmation Hearing.

Of the thousands of the Debtors' creditors affected by the Plan, the Debtors received only a handful of objections to confirmation of the Plan. The objections primarily raise the following issues: (i) the enterprise valuation of the Genesis Debtors' and, to a lesser extent, the Multicare Debtors' enterprise, (ii) the Plan's treatment of tort claimants, (iii) the "deemed consolidation" of the Genesis Debtors and the "deemed consolidation" of the Multicare Debtors, and (iv) the releases under the Plan. The Debtors have set forth below their response to these objections, as well as the few remaining miscellaneous objections not classified above. The Debtors have also set forth below those objections which have been or will be resolved prior to the Confirmation Hearing.

## I. OBJECTIONS BASED UPON VALUATION

### A. The Genesis Debtors' Response to the Objections of GMS and Grimes that the Plan Is Not "Fair and Equitable"

GMS Group LLC ("GMS")[2] and Mr. Charles L. Grimes ("Grimes"), the holder of approximately $20 million in face amount of Genesis Senior Subordinated Notes, assert that the Plan violates the "fair and equitable" requirement of section 1129

---

[2] GMS has been a member of the Official Committee of Unsecured Creditors appointed in the Genesis Reorganization Cases (the "Genesis Creditors' Committee") since its inception. It has recently represented to the Court that it is acting on behalf of holders of approximately $180 million of Genesis's public subordinated notes. GMS has failed to file a verified statement setting forth the information required by Bankruptcy Rule 2019. Moreover, recent discovery has unearthed the fact that GMS and its employees and customers have purchased over $80 million of the Debtors' securities while GMS was a member of the Genesis Creditors' Committee. GMS has not obtained an order from this Court approving such actions.

because the holders of claims in Class G2 (Genesis Senior Lender Claims) allegedly will receive more than a 100% recovery on their allowed claims. While the legal standard asserted by GMS and Grimes is correct, the facts they allege are incorrect. As discussed below, based on the most recent valuation analysis, the Plan provides an 82.36% recovery for the claims in Class G2 – far less than the amount necessary to violate the "fair and equitable" standard.

The following chart summarizes the claims in Class G2, including postpetition interest at contractual, nondefault rates:

| Calculation of Class G2 Claims | |
|---|---|
| Prepetition Amount | $1,193,460,000 |
| Postpetition Interest (non-default contract rate) | 130,659,200 |
| less: adequate protection payments | (214,638,200)[3] |
| Total | $1,109,481,000 |

The prepetition amounts in this table are from page 17 of the Disclosure Statement. In addition to the prepetition claims of Class G2, it is appropriate to include postpetition interest for two reasons  First, all the claims in Class G5 -- the only unsecured class voting to reject the Plan – are subject to contractual subordination provisions in favor of the Genesis Senior Lender Claims in Class G2. Those contractual provisions expressly provide that the Claims of the holders in Class G5 are subordinate to postpetition interest on senior debt. Second, the Claims in Class G2 are secured by substantially all the assets of the estates of the Genesis Debtors. If, as GMS and Grimes contend, the Genesis

---

[3] Adequate protection payments to Class G2 have been updated through the end of August.

Senior Lender Claims are oversecured, they are entitled to postpetition interest pursuant to section 506 of the Bankruptcy Code.

Under the Plan, the holders of Claims in Class G2 will receive $94,923,000 in New Senior Notes, New Convertible Preferred Stock with a liquidation preference of $31,000,000, and approximately 87.62% of the New Common Stock to be distributed to the creditors of Genesis, assuming the conversion of the New Convertible Preferred Stock and the exercise of the New Warrants issued under the Plan.[4] The following table shows the distribution of equity value to the creditors of the Genesis Debtors under the Plan.

**Distribution of New Common Stock to Genesis Creditors**

| Class | | Number of Shares | % of New Common Stock |
|---|---|---|---|
| G2 shares | | 30,485,079 | |
| G2 conversion of preferred stock | | 1,524,840 | |
| | subtotal | 32,009,919 | 87.62% |
| | | | |
| G4 & G5 shares | | 1,689,147 | |
| G4 & G5 warrants | | 2,835,538 | |
| | subtotal | 4,524,685 | 12.38% |
| | | | |
| | total | 36,534,604 | 100.00% |

By simple arithmetic, the holders of claims in Class G2 will not reach a 100% recovery until their portion of the New Common Stock is worth $1,014,558,000 ($1,109,481,000 in total claims - $94,923,000 in New Senior Notes). The following table shows what the enterprise value of Genesis would have to be for Class G2 to receive a

---

[4] The New Warrants and New Convertible Preferred Stock are assumed to be exercised because the $20.33 per share exercise price specified in the Plan is significantly below the price per share of $23.71 implied by the revised valuation prepared by UBS Warburg, the financial advisor for Genesis. The exercise price is also far below the $30.12 price per share implied by a valuation sufficient to pay Class G2 in full.

100% recovery. All amounts specified in the table are attributable to claims (both

prepetition and postpetition) against Genesis only. No claims against Multicare are

included.

### Distribution of Value Assuming 100% Recovery for Class G2

| Distributions Under the Plan | | Values | % Rec. |
|---|---|---|---|
| Exit Financing (pays DIP fin. and admin exp.) | | 233,000,000 | |
| G1 Debt (reinstated or amended) | | 120,077,000 | |
| Class G2 Recoveries | | | |
| New Senior Notes | 94,923,000 | | |
| New Convertible Preferred Stock[5] | 0 | | |
| New Common Stock | 1,014,558,000 | | |
| total recovery for Class G2 | | 1,109,481,000 | 100.00% |
| Class G4 & G5 Recoveries (equity only)[6] | | 85,763,914 | 18.35% |
| Enterprise Value | | 1,548,321,914 | |
| implied price per share | | $30.12 | |

As the table demonstrates, the holders of Claims in Class G2 will not receive a 100%

recovery unless the enterprise value of Genesis is $1.548 billion ($1,548,321,914).

Under the "fair and equitable" standard, the objection of GMS and Grimes depends

entirely on their ability to prove by a preponderance of the evidence that the value of the

Genesis enterprise is greater than this "valuation hurdle."

The facts will demonstrate, however, that the enterprise value of Genesis

is far from sufficient to provide a 100% recovery to the holders of Claims in Class G2.

According to the Affidavit of William G. McGahan in Support of Confirmation of the

---

[5] As noted above, the preferred stock is assumed to be converted to common stock
because the exercise price is below the implied price per share of the stock.

[6] This amount is net of the $57,646,488 exercise price for the New Warrants.

AA. 77

Debtors' Joint Plan of Reorganization, submitted concurrently herewith, the enterprise value of Genesis, as a standalone entity, is within the range of $1.2 billion and $1.45 billion. The midpoint of this range – $1.325 billion – would provide a recovery of only 82.36% to the holders of claims in Class G2. The midpoint of the range of values established by UBS Warburg is approximately $225 million below the valuation hurdle. Even the highpoint of the UBS Warburg range is approximately $100 million below the valuation hurdle. Mr. McGahan will be available to testify at the Confirmation Hearing and the expert valuation report of UBS Warburg attached to his affidavit will be introduced into evidence at that time.

As a basis for comparison, the following table shows the distribution to the secured and unsecured creditors of the Genesis Debtors under the Plan, using the midpoint of the UBS Warburg range of enterprise values for Genesis. As in the table above, no claims against Multicare have been included.

**Distribution of Value Assuming Genesis Enterprise Value of $1.325 Billion**

| Distributions Under the Plan | | Values | % Rec. |
|---|---|---|---|
| Exit Financing (pays DIP fin. and admin exp.) | | 233,000,000 | |
| G1 Debt (reinstated or amended) | | 120,077,000 | |
| | | | |
| Class G2 Recoveries | | | |
| New Senior Notes | 94,923,000 | | |
| New Convertible Preferred Stock | 0 | | |
| New Common Stock | 818,893,737 | | |
| *total recovery for Class G2* | | 913,816,737 | 82.36% |
| | | | |
| Class G4 & G5 Recoveries (stock & warrants) | | 58,106,264 | 12.43% |
| | | | |
| *Enterprise Value* | | 1,325,000,000 | |
| | | | |
| *implied price per share* | | $24.00 | |

As is readily apparent, the valuation of the Genesis enterprise falls far short of the amount

necessary to violate the "fair and equitable" rule  Stated another way, the price per share

implied by the midpoint of the range of Genesis enterprise values must be off by 23% for

the holders of Claims in Class G2 to receive a 100% recovery ($30.12 per share for a

100% recovery compared to $24.00 per share).

    **B.**    **The Genesis Debtors' Response to the Objections of GMS and Grimes
That the Merger Adversely Impacts the Value of Genesis**

    GMS and Grimes assert that the proposed merger involves a

"misallocation" of shares of New Common Stock from the Genesis enterprise to the

Multicare enterprise to the detriment of the junior classes at Genesis.  They further assert

that such misallocation diverts to the senior lenders of Multicare value that should belong

to Genesis.  They conclude that this alleged diversion of value constitutes a *de facto*

substantive consolidation of Genesis and Multicare and that such a substantive

consolidation is not warranted in these cases.  Grimes also asserts that the Plan was not

proposed in good faith as it was designed to favor the holders of the Genesis Senior

Lender Claims (the "Genesis Senior Lenders") and the Debtors' officers and directors.

    GMS and Grimes are incorrect for several reasons.  First, the allocation of

New Common Stock was based strictly on the relative equity values of Genesis and

Multicare, assuming the new capital structure under the Plan.  The Plan does not divert

value from Genesis to Multicare.  Second, the fact that the creditors of both Debtors are

to receive distributions in the form of New Common Stock of Reorganized Genesis does

not constitute a *de facto* substantive consolidation.  The distribution of New Common

Stock is intended to *benefit* the creditors of *both* estates by creating an equity security that

has a *better* chance of actively trading in the public equity markets. Finally, none of the Genesis Debtors or the Multicare Debtors are actually being consolidated. On the contrary, those entities will continue to exist. The only significant changes are that the Multicare Debtors will become subsidiaries of Genesis and the creditors of the Genesis Debtors and Multicare Debtors will become the new owners of Reorganized Genesis.

The allocation of New Common Stock was calculated by comparing the implied equity value of the two companies. The equity values were determined by taking the midpoint of the enterprise valuation range for each set of Debtors and subtracting the new capital structure allocable to each. For example, as reported in the Disclosure Statement, the midpoint of the enterprise valuation range for the Genesis Debtors, based on the analysis of UBS Warburg, was $1,125,000,000. From that value, the following items are deducted: (i) the portion of the exit financing needed to repay the debtor in possession financing at Genesis (approximately $200,000,000) and pay administrative expenses and priority claims of the Genesis Debtors (approximately $25,000,000), (ii) miscellaneous secured claims against the Genesis Debtors (approximately $120,077,000), (iii) the face amount of the New Senior Notes to be distributed to the Genesis Senior Lenders ($94,923,000), and (iv) the liquidation preference for the New Convertible Preferred Stock to be distributed to the Genesis Senior Lenders ($31,000,000). The balance of $654,000,000 represents the implied equity value of Genesis alone.

Similarly, based on the valuation analysis of CSFB contained in the Disclosure Statement, the midpoint of the range of enterprise values for Multicare was $375,000,000. From that value, the following items are deducted: (i) the portion of the exit financing needed to pay administrative expenses and priority claims of the Multicare

Debtors (approximately $10,000,000),[7] (ii) miscellaneous secured claims against the

Multicare Debtors (approximately $26,318,000), (iii) the face amount of the New Senior

Notes to be distributed to the holders of the Multicare Senior Lender Claims (the

"Multicare Senior Lenders") ($147,682,000), and (iv) the liquidation preference for the

Convertible Preferred Stock to be distributed to the Multicare Senior Lenders

($11,000,000). The balance of $184,000,000 represents the implied equity value of

Multicare alone.

Therefore, Genesis represents $654 million or 78.47% of the combined

equity and Multicare represents $184 million or 21.53% of the combined equity.

Allocation of New Common Stock

| Debtor | Equity Value | % of Total Equity Value | Number of Shares |
|---|---|---|---|
| Genesis Equity Value | $654,000,000 | 78.47% | 32,174,226 |
| Multicare Equity Value | 179,400,000 | 21.53% | 8,825,774 |
| | $833,400,000 | 100.00% | 41,000,000 |

The number of shares in this chart shows the exact allocation used in the Plan and

disclosed in the Disclosure Statement.

As described in the McGahan Affidavit and other affidavits to be filed

with the Court prior to the Confirmation Hearing, the valuation analyses have been

updated in anticipation of the Confirmation Hearing. Due to changes in how the

marketplace values comparable companies, the range of enterprise values for both

Genesis and Multicare have increased. However, since the change in value is not

internal, but is driven by external issues, the increase in value in Genesis and Multicare

---

[7] Multicare has essentially no borrowings under its debtor in possession financing.

has been proportionate. Using the midpoint of the updated range of values for Genesis and Multicare, the percentage allocation would be 78.83% for Genesis and 21.17% for Multicare – almost exactly the same as the percentages used in the Plan and Disclosure Statement.[8]

GMS and Grimes also argue that the merger somehow results in a *de facto* substantive consolidation. Although it is difficult to discern from the objection, the argument appears to be that issuing New Common Stock of Reorganized Genesis to the creditors of both sets of Debtors is equivalent to substantive consolidation. As discussed above, however, the allocation of the New Common Stock of Reorganized Genesis was *pro rata*, based on the equity value supplied by each estate. In fact, the principle benefit of a single issuance of stock is to the creditors of both estates. A single equity security of a larger (combined) company is more likely to have an active trading market than two smaller, separate stock issuances.[9]

Finally, it is important to note that no substantive consolidation is, in fact, taking place under the Plan. As described above, the Plan provides for a merger which will result in the Multicare Debtors becoming subsidiaries of Genesis. As part of that transaction, creditors who would otherwise receive equity of Multicare will receive New Common Stock of Reorganized Genesis instead, based on the allocation described above.

---

[8] These percentages are even closer if the additional borrowings under the Genesis debtor in possession financing for the months of July and August are included (78.67% for Genesis and 21.33% for Multicare).

[9] One of the reasons for this is that institutional and individual stock market participants rely heavily on the research and reports of professional market analysts. Those analysts are much more likely to follow and report on a larger company.

The Plan separately provides for a deemed consolidation for distribution purposes only with respect to the value of the Genesis estates to be distributed to creditors of the Genesis Debtors and, separately, with respect to the value of the Multicare estates to be distributed to creditors of the Multicare Debtors. As noted in the Debtors' Memorandum of Law in Support of Confirmation of Joint Plan of Reorganization, dated August 24, 2001 (the "Confirmation Brief"), almost all the Genesis Debtors are obligated on the senior lender debt of over $1 billion. The only way to provide any recovery to individual unsecured creditors of the subsidiaries is to treat all the unsecured debt on a *pro rata* basis – hence the deemed consolidation.

II.    OBJECTIONS OF PERSONAL INJURY CLAIMANTS

   A.    Objections to the Treatment of Punitive Damage Claims

          The following parties have objected to the treatment of Genesis Punitive Damage Claims and/or Multicare Punitive Damage Claims (the "Punitive Damage Claims") under the Plan (the "Punitive Damage Objections"): (a) tort claimaints represented by Wilkes & McHugh, P.A. (the "Wilkes Claimants"), (b) Michael Goff, *et al.* tort claimants ("Goff"), and (c) AGE Institute of Pennsylvania, Inc., AGE Institute of Massachusetts, Inc., AGE Institute of Florida, Inc., Delaware Valley Convalescent Homes, Inc., and AGE Holding, Inc. (collectively, the "AGE Claimants"). The Punitive Damage Objections should be overruled.

          1.    Summary of the Wilkes Claimants Objection

          The Wilkes Claimants assert that the Plan improperly subordinates Punitive Damage Claims and that categorical subordination of Punitive Damage Claims is improper under the Supreme Court's decision in *United States v. Noland*, 517 U.S. 535

(1996). They argue that section 502 of the Bankruptcy Code provides a mechanism for disallowing claims and the Debtors are "short circuiting" the Wilkes Claimants' right to notice and a hearing before this Court before its Punitive Damage Claims are disallowed. They further assert that the court does not have the jurisdiction to estimate personal injury and wrongful death claims for distribution, yet the Plan calls for a "*de facto*" estimation of Punitive Damage Claims in the amount of $0.00. According to the Wilkes Claimants, punishment of a wrongdoer is only one purpose of punitive damages; punitive damages may also exist to reimburse for losses too remote to be considered elements of strict compensation and to make victims whole in consideration for inconvenience and attorneys' fees.

   2.   Summary of the Goff Objection

   Goff also asserts that the "Plan improperly provides for the unilateral elimination, presumably by subordination of punitive damage claims." Goff Objection ¶ 15. Goff states that a "blanket subordination" of Punitive Damage Claims is improper under the Supreme Court's decision in *Noland*: "Courts have consistently held that where punitive damages are unliquidated, there can be no showing as to the effect those claims will have on reorganization. In that circumstance, any blanket prohibition will be inappropriate." Goff Objection ¶ 19. Goff further asserts that the Debtors are attempting to equitably subordinate an entire class without determining any facts on a case by case basis to support the proposition that equitable subordination is appropriate. Goff also objects that disallowing Punitive Damage Claims without going through the Bankruptcy Code's disallowance process also violates section 502(b) of the Bankruptcy Code.

3.    Summary of the AGE Claimants Objection

The AGE Claimants assert that the separate classification of Punitive

Damage Claims is improper because there is no business justification for the separate

classification. They continue that because the Plan only offers a recovery to unsecured

creditors in the form of equity, the inclusion of Punitive Damage Claims in such recovery

does not deprive unsecured creditors of a meaningful cash recovery.

**B.    Debtors' Response To Punitive Damage Objections**

1.    The Plan Does Not Categorically or Equitably Subordinate
Punitive Damage Claims

The arguments set forth in the Wilkes Claimants and Goff Objections,

including their reliance on *Noland*, are misplaced. In *Noland*, the Supreme Court held

that categorical subordination of penalty claims (in that case tax penalties) pursuant to

section 510(c) of the Bankruptcy Code is impermissible. 517 U.S. at 543.

The Debtors are not seeking to *subordinate* the Claims in Classes G7 and

M7.[10] Rather, the Genesis Senior Lenders and the Multicare Senior Lenders have agreed

to give up a portion of the value that they would receive if absolute priorities were

enforced to the holders of unsecured claims in Classes G4 and G5 and Classes M4 and

M5, respectively, as set forth more fully in the Confirmation Brief.

---

[10] Subordination is, by definition, "plac[ing] in a lower rank, class, or position; [or] assign[ing] a lower priority to." BLACK'S LAW DICTIONARY 1439 (7th ed. 1999). The Disclosure Statement inadvertently and erroneously states that Punitive Damage Claims in Classes G7 and M7 will be subordinated to Claims in other Classes. Disclosure Statement at 21, 27. This error is corrected in the Plan, which is the governing document. The Plan correctly states that Claims in Classes G7 and M7 receive no recovery under the Plan from the Debtors. However, such claimants can recover insurance proceeds, if any, in connection with such claims. Plan §§ 4.7, 4.18.

The Plan does not provide for subordination of Classes G7 and M7. If the Plan were subordinating the Claims in Classes G7 and M7, then it would provide that such Claims would be paid only after the Claims in Classes G4 and M4, respectively, have been paid in full. This is not what the Plan provides, however. As described below, and in the Confirmation Brief, the Debtors are properly providing different treatment between general unsecured claims in Classes G4 and M4 and Punitive Damage Claims in Classes G7 and M7.

The Bankruptcy Code *does not* prohibit fair discrimination between classes. As long as a rational basis for the different treatment exists, the law is absolutely clear that the Debtors may provide disparate treatment between Claims in Classes G4 and M4 and Claims in Classes G7 and M7, respectively. To suggest otherwise simply because the result looks similar to subordination is to read the word "unfairly" out of section 1129(b) and deprive the Debtors of their right to effectively reorganize in compliance with the Bankruptcy Code.

Accordingly, the Wilkes Claimants' and Goff's reliance on section 510(c) of the Bankruptcy Code and *Noland* are inapposite.

> 2.    The Plan Does Not Deprive Creditors of Any Rights Afforded by Section 502 of the Bankruptcy Code

The Plan does not violate the rights of holders of Punitive Damage Claims to have their claims "addressed" by this Court under section 502 of the Bankruptcy Code. Interestingly, the Wilkes Claimants first argue that the Debtors have deprived them of a right which the Bankruptcy Code affords them (i.e., to have the Court address their

claims in the allowance/estimation context) and then argue that the Bankruptcy Court

lacks jurisdiction to address/estimate their claims. Wilkes Claimants Objection at 3-4.

In addition to this blatant inconsistency, the Wilkes Claimants and Goff

Objections are both factually and legally incorrect. The Debtors are not seeking to have

the Court allow, disallow, or estimate Punitive Damage Claims. In fact, the Plan

provides that, to the extent Punitive Damage Claims are covered by insurance, holders of

Claims in Classes G7 and M7 may proceed against such insurance. The Debtors have

complied with all sections of the Bankruptcy Code including the requirement in section

1129(b) that the Plan not discriminate unfairly. The Wilkes and Goff Objections further

argue that the Plan violates G7 and M7 claimants' rights to have their claims "addressed"

by this Court under section 502 of the Bankruptcy Code. As noted above, this position is

inconsistent with their earlier argument that the Bankruptcy Court lacks jurisdiction to

address/estimate their claims. *See* Wilkes Objection at pp. 6-7.

The Wilkes Claimants' and Goff's reliance on *In re Allegheny*

*International, Inc.*, 106 B.R. 75 (Bankr. W.D. Pa. 1989) and *In re F.F. Holdings Corp.*

*and Farm Fresh, Inc.*, 1998 U.S. Dist. LEXIS 10741 (D. Del. 1998) is misguided.

Wilkes and Goff cite *Allegheny* and *Farm Fresh* for the proposition that a blanket

disallowance of Punitive Damage Claims is improper. First, as stated above, the Debtors

are not attempting to disallow Punitive Damage Claims. Holders of Class G7 and M7

claims may pursue Punitive Damage Claims and may recover for such claims to the

extent covered by insurance. Second, in both *Allegheny* and *Farm Fresh*, the courts held

that *at that point* in each of the cases, disallowance would have been improper - - *not* that

disallowance in general was improper. *Allegheny* and *Farm Fresh* are, therefore,
inapposite on two separate grounds.

        3.    Separate Classification Is Eminently Reasonable

        As set forth in the Confirmation Brief, the Debtors' separate classification
of Punitive Damage Claims is eminently reasonable. First, the sole reason holders of
general unsecured claims in Classes G4, G5, M4, and M5 are receiving any value under
the Plan is because the Genesis Senior Lenders and Multicare Senior Lenders,
respectively, have determined to allocate a portion of their own recovery to such Classes.
Without this allocation, general unsecured creditors are out-of-the-money and are entitled
to receive nothing. The Genesis Senior Lenders and Multicare Senior Lenders, however,
have determined not to allocate any portion of their recovery to Punitive Damage Claims.
As explained more fully in the Confirmation Brief, senior creditors may give up value to
particular junior creditors without being required to share with all junior creditors. *See In
re MCorp. Fin., Inc.*, 160 B.R. 941, 960 (S.D. Tex. 1993) ("The seniors may share their
proceeds with creditors junior to the juniors, as long as the juniors continue to receive
[sic] as least as much as what they would without the sharing.").

        Second, Punitive Damage Claims are fundamentally dissimilar from other
general unsecured claims. General unsecured claims in Classes G4 and M4 (including
litigation claims) and Classes G5 and M5 are claims based upon actual compensatory
loss, while Punitive Damage Claims in Classes G7 and M7 are intended to punish or
make an example of a wrongdoer. Because the enforcement of punitive damages against
an insolvent chapter 11 debtor only will diminish the return to other unsecured creditors
rather than punish the debtor, disparate treatment of Punitive Damage Claims in Classes

G7 and M7 claims is reasonable. *See, e.g., Novak v. Callahan (In re GAC Corp.)*, 681

F.2d 1295, 1301 (11th Cir. 1982) (in Chapter X case, court held that punitive damages

claim was properly stricken: "[T]he effect of allowing a punitive damages claim would

be to force innocent creditors to pay for the bankrupt's wrongdoing. Such a result would

be inequitable . . . ."); *In re Bi-Coastal Corp.*, 134 B.R. 50, 54-55 (Bankr. M.D. Fla.

1991) ("the [Bankruptcy] Code traditionally has not favored [penalty claims because

allowance of such claims] punishes innocent parties, i.e., the entire body of creditors, and

not the actual wrongdoer who deserves the punishment and is the entity which the statute

intended to deter and punish."); *In re Hillsborough Holdings Corp.*, 218 B.R. 617, 620

(Bankr. M.D. Fla. 1991) ("to enforce the punitive damages would serve more to punish

the debtor and thus . . . to the extent [the] claim is based on punitive damages, the . . .

claim should be disallowed").

        4.    Inclusion of Punitive Damage Claims in Classes G4 and M4
            Would Dilute the Recovery to General Unsecured Creditors

       The AGE Claimants argue that allowing Punitive Damage Claims to

participate in the portion of value or the "pot" which the Genesis Senior Lenders and

Multicare Senior Lenders have allocated to the recovery of Classes G4, G5, M4, and M5,

respectively, will not deprive unsecured creditors of a meaningful cash recovery because

unsecured creditors are only receiving stock. This statement could not be more

erroneous. Regardless of whether the "pot" for unsecured creditors is cash or equity,

there is a sum-certain to be distributed *pro rata* to general unsecured creditors. It is

without question that adding more unsecured creditors or claims to a class of creditors

will dilute the "pot" and, therefore, decrease the *pro rata* distribution of shares of equity

per unsecured claim. The shares of equity have a cash value which unsecured creditors,
if they are so inclined, may realize by selling the shares of Reorganized Genesis after
they receive them under the Plan. Fewer shares means a lower cash value.

## III.  OBJECTIONS TO DEEMED CONSOLIDATION

### A.  Objections to Deemed Consolidation

The following parties have objected to Section 5.1 of the Plan (Deemed
Consolidation of Debtors for Plan Purposes Only) (the "Deemed Consolidation
Objections"): (a) GMS, (b) Grimes, (c) Odessa Packaging ("Odessa"), and (d) the AGE
Claimants. The Deemed Consolidation Objections should be overruled.

#### 1.  Summary of the GMS Objection

GMS objects that the Plan does not merely constitute a "deemed"
consolidation of the Genesis Debtors into a single entity and the Multicare Debtors into a
single entity for purposes of distribution under the Plan, but rather the merger of
Reorganized Genesis with Reorganized Multicare results in a *de facto* substantive
consolidation through the misallocation of value from the Genesis Debtors to the
Multicare Debtors for the benefit of Multicare creditors and to the prejudice of Genesis
creditors. GMS contends that the facts of these cases, including the synergies and
efficiencies described in the Disclosure Statement, do not warrant substantive
consolidation in light of the significant prejudice to Genesis creditors resulting from the
misallocation of value in connection with the merger.

#### 2.  Summary of the Grimes Objection

Grimes objects that the Plan misallocates value between the Multicare
Debtors and the Genesis Debtors as well as among their creditors. He asserts that

although the Multicare Reorganization Cases and the Genesis Reorganization Cases were commenced and administered independently, their reorganizations unconventionally are being conducted through a joint plan whose asserted justification is that these two sets of debtors ultimately are to be merged to create a single Reorganized Genesis upon confirmation. However, according to Grimes, the Plan effects unlawfully, without substantiation and justification, a substantive consolidation of the estates of these separate debtors for the purpose of distribution under the Plan prior to the confirmation merger to the detriment of Genesis junior creditors. Grimes continues that the Court is being asked to approve an unlawful conveyance of Genesis value to Multicare creditors, including the Multicare Senior Lenders, for no consideration.

3.    Summary of the Odessa Objection

Odessa objects to the deemed consolidation on the basis that, as a vendor to several of the Genesis Debtors' NeighborCare pharmacy subsidiaries ("NeighborCare"), it relied on its general knowledge and credit histories with pharmacies to extend credit terms to NeighborCare. Odessa asserts that it was not aware that the various NeighborCare entities were owned by Genesis, "a company that is in the nursing home business, an industry with a completely different credit history." Odessa Objection ¶ 3. It further asserts that all of its "dealings were with Neighborcare and all checks received for payment of goods sold came from Neighborcare." *Id.* Odessa asserts that vendors to NeighborCare should not be grouped with other entities, including Genesis and Multicare. *Id.* ¶ 6. According to Odessa, under the "'taxi cab' theory of law, each entity is formed so that liabilities created by one entity cannot affect the viability of other entities." *Id* ¶ 7. Odessa continues that if "Neighborcare could not pay its bills, a vendor

would not be able to demand payment from its parent; in the reverse, a liability of an entity that can be met by that entity, should be met in its entirety, before funds are siphoned off to meet obligations of another entity." *Id.*

### 4.    Summary of the AGE Claimants Objection

The AGE Claimants object that the Plan improperly calls for the substantive consolidation of the Genesis Debtors' and Multicare Debtors' bankruptcy estates, and that no formal motion requesting this relief has been made, nor is it envisioned that one will be made. AGE Claimants Objection ¶ 11. The AGE Claimants dispute the Genesis Debtors' allegations that there are record keeping issues, which prevent the estates from being separately administered and demand strict proof of this allegation. *Id.* ¶ 12. They assert that the Plan is not fair or equitable in its treatment of unsecured creditors in that it impermissibly redirects the value in the entities to the Genesis Debtors' secured creditors by virtue of the deemed consolidation. *Id.* ¶ 13.

### B.    **Debtors' Response to Objections**

#### 1.    The Proposed Deemed Consolidation Is Not the Equivalent of the Substantive Consolidation or Merger of Genesis and Multicare

Both GMS and Grimes appear to have the mistaken view that the proposed deemed consolidation of the Genesis Debtors and of the Multicare Debtors is a euphemism for the merger of Genesis and Multicare. This reflects a total misunderstanding of Section 5 of the Plan. Section 5.1(a) of the Plan proposes to consolidate the Genesis Debtors solely for purposes of voting and distributions to Classes G2, G4, and G5. Stated differently, the Plan proposes to treat the Genesis Debtors as a single legal entity in order to make distributions to these three Classes of Claims against

the Genesis Debtors. This deemed consolidation of the Genesis Debtors is totally distinct from any other provision in the Plan relating to the Multicare Debtors.

Section 5.1(b) of the Plan proposes to consolidate the Multicare Debtors solely for purposes of voting and distributions to Classes M2, M4, and M5. That is, the Plan proposes to treat the Multicare Debtors as a single legal entity in order to make distributions to these three Classes of Claims against the Multicare Debtors.

Thus, the deemed consolidation of the Genesis Debtors is completely separate from the deemed consolidation of the Multicare Debtors. There is absolutely no deemed or substantive consolidation between the Genesis Debtors and the Multicare Debtors.

GMS and Grimes are mixing apples and oranges by objecting to the deemed consolidation prior to the merger of Genesis and Multicare. The merger is not a *de facto* substantive consolidation for the reasons set forth above.

        2.    The Facts of These Cases Warrant Deemed Consolidation

As discussed in the Confirmation Brief, the deemed consolidation of the Genesis Debtors and of the Multicare Debtors is warranted in light of the criteria established by the courts in considering the propriety of substantive consolidation.

Odessa's objection is based on its assertion that it dealt with NeighborCare and was unaware that NeighborCare was owned by Genesis. In fact, Odessa did not really know to which Debtor it was providing services. There are twelve subsidiaries of NeighborCare Pharmacy Services, Inc., the corporate parent of all the NeighborCare entities, ten of which include the word "NeighborCare" in their names (i.e., there are eleven entities which include the word "NeighborCare" in their names). Odessa sent

invoices to "NeighborCare" at numerous addresses. The facilities at those addresses were owned by various legal entities. Payments made to Odessa were all made by check written by NeighborCare Pharmacy Services, Inc.

In addition, each of the Genesis Debtors who are "NeighborCare" entities that Odessa dealt with are obligors on over S1 billion of Genesis Senior Lender Claims and have pledged substantially all their assets to secure such obligations. A simple UCC search would have uncovered these liens. The law is well-established that the presence of intercompany guarantees negate the claim of separate reliance on creditors. *See Bruce Energy Centre Ltd. v. Orfa Corp. of Am. (In re Orfa Corp.)*, 129 B.R. 404, 415 (Bankr. E.D. Pa. 1991) ("the presence of inter-company guarantees . . . are indicative of an interrelationship of companies within a larger enterprise, and negate the claim of separate reliance on creditors"); *In re Murray Indus., Inc.*, 119 B.R. 820, 827 (Bankr. M.D. Fla. 1990) ("it is impossible to determine the respective liabilities of the several subsidiaries on the . . . loans, which liabilities were not only guaranteed by the subsidiaries, but whose assets were also pledged as security for these loans"); *see also In re Affiliated Foods, Inc.*, 249 B.R. 770 (Bankr. W.D. Mo. 2000) (factors developed by courts include existence of parent and intercorporate guarantees on loans); *Simon v. New Ctr. Hosp. (In re New Ctr. Hosp.)*, 179 B.R. 848 (Bankr. E.D. Mich. 1994) (substantive consolidation may be warranted if certain critical elements are found, including existence of parent and intercorporate guarantees on loans). This legal principle trumps any so-called "taxi cab" theory of law asserted by Odessa. Odessa Objection ¶ 7. Thus, Odessa's objection should be overruled.

The AGE Claimants' objection should be overruled as well. The AGE
Claimants question the Debtors' assertion in the Disclosure Statement regarding the
entanglement of the Genesis Debtors' affairs and books and records and demand strict
proof of this allegation. The Genesis Debtors consist of Genesis and 152 of its direct and
indirect subsidiaries. There is little correlation between the names of their eldercare
centers and the names of the legal entities that technically own such facilities. Because of
the organization of their books and records, the Court permitted the Genesis Debtors to
file their statement of financial affairs, schedules of assets and liabilities, and schedules
of executory contracts and unexpired leases on a partially consolidated basis. As
described more fully in the Disclosure Statement and the Confirmation Brief, the books
and records of the Genesis Debtors reflect a large amount of intercompany claims; it
would be extremely difficult to reconcile such claims without embarking on an enormous
effort, the cost of which would undoubtedly diminish the return for all creditors with no
appreciable benefit. Moreover, the Genesis Debtors' business units operated as
integrated units, without all the formalities of separate corporate entities. For the reasons
stated above, the Plan does not impermissibly redirect value to the holders of the Genesis
Senior Lender Claims by virtue of the deemed consolidation.

## IV.    OBJECTIONS TO THE RELEASES AND EXCULPATION

### A.    Objections to Release and Exculpation Provisions

The following parties have objected to either or both of Section 5.10
(Release of Representatives) (the "Releases") and Section 10.6 (Exculpation) (the
"Exculpation") of the Plan (collectively, the "Release Objections"): (a) GMS, (b)

**AA. 95**

Grimes, (c) the Wilkes Claimants, (d) the AGE Claimants, and (e) the Office of the United States Trustee (the "U.S. Trustee"). The Release Objections should be overruled.

### 1.    Summary of the GMS Objection

GMS objects to the Releases on the grounds that the Debtors have failed to demonstrate that the Releases are warranted under the circumstances. GMS Objection at 8.

### 2.    Summary of the Grimes Objection

Grimes objects that the Plan unfairly provides to the Genesis Senior Lenders, their Agent, and the Debtors' officers and directors sweeping and improper releases and exculpations for no consideration, which are involuntarily forced upon the holders of Genesis Senior Subordinated Note Claims and effect an unlawful discharge in violation of section 524(e). He asserts that creditors who voted to reject the Plan cannot be bound by the Releases. He continues that the Release and Exculpation also may further deny Genesis junior creditors the right to properly explore, and if justified act upon, contentions asserted in the motion filed by the Multicare Creditors' Committee for appointment of a trustee, which was ultimately withdrawn. Grimes also asserts that to the extent the claims raised in this motion are sustainable, the Releases effect a settlement of those claims, providing enhanced value to the Genesis Senior Lenders and discharge of rights of benefit and value to Genesis junior creditors without their consent, which would require Court approval. Grimes states that the Debtors should be required to prove at the Confirmation Hearing the propriety of the Releases and their benefit to the estates, and should be required to explain the nature of the claims asserted, the investigation of such assertions, if any, conducted, and the justification for the determination not to pursue

such claims. Grimes continues that Genesis junior creditors should be permitted to

conduct discovery on these claims and the Confirmation Order should (i) preserve the

right to seek postconfirmation equitable subordination of all or a portion of the Genesis

Senior Lenders Claims if justifiable, and (ii) require that the distribution to the Genesis

Senior Lenders be placed in escrow until such claims are resolved.

### 3.    Summary of the Wilkes Claimants Objection

The Wilkes Claimants object to the Releases on the grounds that the

Releases operate to preclude them from commencing post-Effective Date actions against

the releasees and that the Releases exceed the Court's jurisdiction and authority. Wilkes

Objection ¶ 3. The Wilkes Claimants also object to the Exculpation as overbroad. *Id.*

¶ 4.

### 4.    Summary of the AGE Claimants Objection

The AGE Claimants object to the Releases as not authorized under the

Bankruptcy Code under the circumstances. The AGE Claimants also contend that the

mere existence of the Releases indicate that the Plan is not proposed in "good faith" and

that the Releases afford no appreciable benefit to the estates. The AGE Claimants also

object to the Releases because the Releases would include claims by the Debtors for

loans made to management. The AGE Claimants believe that the claims to be released

have never been fully disclosed to creditors and are unfair in light of the New

Management Incentive Plan. Age Claimants' Objection at 3-4.

### 5.    Summary of the U.S. Trustee Objection

The U.S. Trustee submits that the Releases should not be granted unless

the Debtors meet their burden of proof. U.S. Trustee Objection ¶ 11. The U.S. Trustee

also objects to the scope of the Exculpation as overbroad. The U.S. Trustee requests that the language of Section 10.6 of the Plan be narrowed to exclude the Disbursing Agent and "administration of the Plan ... or property to be distributed . . . ." *Id.* ¶ 15.

### B.   The Release Objections Should be Overruled Because the Releases and the Exculpation Are Wholly Justified Under the Circumstances

#### 1.   Jurisdiction and Authority

Contrary to the Wilkes Claimants' and AGE Claimants' contentions, this Court has subject matter jurisdiction to approve the Releases and the Exculpation. 28 U.S.C. 1334(b), 157(a). *See In re Arrowmill Dev. Corp.*, 211 B.R. 497, 502 (Bankr. D.N.J. 1997) (court found subject matter jurisdiction to release nondebtor contributor to plan because such contributions of funds would have a "direct effect on the assets of the estate as well as an effect on the allocation of assets among the creditors") (citations omitted); *In re Monarch Capital Corp.*, 173 B.R. 31, 37-38 (D. Mass. 1994), *aff'd*, 65 F.3d 973 (1st Cir. 1995) (plan release was core proceeding).

In addition, this Court has the authority to approve the Releases and the Exculpation provisions. Section 105 of the Bankruptcy Code provides an appropriate statutory base for the exercise of the Court's powers to approve the Releases and the Exculpation. *See, e.g., In re PWS Holding Corp.*, 228 F.3d 224 (3d Cir. 2000) (affirming Bankruptcy Court's approval of release provisions). Section 524 of the Bankruptcy Code does not prohibit a debtor from granting a release of claims it has against a third party. *In re Greate Bay Hotel & Casino, Inc.*, 251 B.R. 213, 222 (Bankr. D.N.J. 2000) (citing *In re Continental Airlines*, 203 F.3d 203 (3d Cir. 2000).

**AA. 98**

2.    Releases

The Plan does not contain any releases or extinguishment of claims held by third parties against non-Debtor entities (i.e., third party releases), other than the releases in favor of the Debtors' corporate affiliates by the Genesis Senior Lenders and Multicare Senior Lenders set forth in Section 5.9. Under Section 5.10 of the Plan, the Debtors are releasing claims *the Debtors may have* against, among others, their officers and directors, the members of the Genesis Creditors' Committee and Multicare Creditors' Committee, and the administrative agent under the Genesis Senior Lender Agreements and Multicare Senior Lender Agreements. Thus, Grimes' contention that creditors who have voted to reject the Plan cannot be bound by the Releases is inapposite.

The Debtors submit that the Releases are proposed in good faith, fair, necessary to the Debtors' reorganization, and in favor of parties that share an identity of interest with the Debtors. *Continental*, 203 F.3d at 214. First, the officers and directors receiving Releases all share an identity of interest with the Debtors. The Genesis Senior Lenders and Multicare Senior Lenders, in allocating a portion of their distributions to Classes G4, G5, M4, and M5, and the Genesis Creditors' Committee and Multicare Creditors' Committee, which were instrumental in formulating the Plan, similarly share an identity of interest in the Debtors in seeing the Plan succeed and the Debtors reorganize. *See In re Zenith Elecs. Corp.*, 241 B.R. 92, 110 (Bankr. D. Del. 1999).

Second, all the parties receiving Releases under Section 5.10 have made substantial contributions to the Debtors' reorganization. The Debtors' employees, officers, and directors formulated and will implement the Plan. The Genesis Senior Lenders and Multicare Senior Lenders have funded the distributions to Classes G4, G5,

M4, and M5 and compromised their claims. The Genesis Creditors' Committee and

Multicare Creditors' Committee have negotiated the Plan and assisted in the confirmation

of the Plan.

Third, the Releases are integral to the Plan. The officers, directors, and

employees are necessary to the continued success of Reorganized Genesis and require the

protection afforded by the Releases to assure they are not distracted by litigation by the

estate. The Releases are also an integral part of the Genesis Senior Lenders' and

Multicare Senior Lenders' agreement to allocate a portion of their distributions to

unsecured creditors.

The AGE Claimants contend that the Releases are improper because they

release loans made to management. The Releases specifically carve out the release of

certain loans made to management to purchase stock. Plan § 5.10. Notably, the AGE

Claimants' contentions concerning the forgiveness of the management loans is barred by

the doctrine of the law of the case. Pursuant to an order of this Court (the "Senior

Executive Retention Order"), dated February 23, 2001, the Court approved the releases of

certain loans made to senior management upon the first anniversary of the Effective Date

of the Plan. The Senior Executive Order has become a Final Order.

Similarly, the AGE Claimants' contention that the claims to be released by

the Releases have never been disclosed and are unfair in light of the New Management

Incentive Plan are equally without merit and should be overruled. As set forth in the

Disclosure Statement, the Debtors are not aware of any pending or threatened actions,

whether civil or criminal, against management of the Debtors. Disclosure Statement at

80. Furthermore, the Releases are not unfair in light of the New Management Incentive

Plan which consists of grants of New Common Stock and New Warrants. These grants

of stock and warrants are, like the distributions to unsecured creditors, an allocation of

enterprise value otherwise distributable to the Genesis Senior Lenders and Multicare

Senior Lenders. Accordingly, the AGE Claimants Objection should be overruled on

these points.

        Based upon the foregoing, the Debtors submit that the Releases should be

approved.

        3.    Exculpation

        The Plan contains the very same exculpation provision which was

approved by the Third Circuit in *In re PWS Holding Corp.*, 228 F.3d 224 (3d Cir. 2000).

Based upon discussions with the U.S. Trustee, the Debtors have agreed to modify the

Plan to remove the Disbursing Agent from the Exculpation. The Debtors submit that the

Exculpation provision is wholly appropriate and that the balance of the U.S. Trustee

Objection should be overruled.

## V.    U.S. TRUSTEE OBJECTION

        The U.S. Trustee Objection indicates that one or more of the Debtors have

failed to pay quarterly fees in accordance with 28 U.S.C. § 1930(a)(6). The U.S. Trustee

Objection is based on their incorrect interpretation of the word "disbursements" in 28

U.S. § 1930 (a)(6), using the accrual method of accounting to attribute actual

disbursements made by certain Debtors to other Debtors in the jointly administered case,

resulting in additional fees owed. The Debtors are unaware of any reported cases where

the U.S. Trustee's interpretation of the word disbursement was used to allocate amounts

of disbursements based on the accrual method of accounting among debtors in a jointly

administered case. The Debtors dispute any portion of the fees that the U.S. Trustee

alleges are owed to the extent they are calculated using this inapplicable methodology.

The Debtors propose to satisfy section 1129(a)(12) of the Bankruptcy Code by depositing

into escrow the disputed portion of the fees the U.S. Trustee contends the Genesis

Debtors and Multicare Debtors owe as of the Confirmation Hearing. *In re Flatbush*

*Assocs.*, 198 B.R. 75 (Bankr. S.D.N.Y. 1996) (court ordered debtor to escrow disputed

amount of fees owed under 28 U.S.C. § 1930 to satisfy section 1129(a)(12), pending

resolution of the dispute). Accordingly, the U.S. Trustee Objection should be overruled

to the extent that it requires anything further in order to satisfy 11 U.S.C. § 1129(a)(12).

## VI.    OBJECTIONS FROM STOCKHOLDERS

### A.    Objections to the Plan by Stockholders

The following stockholders have objected to the Plan (the "Stockholder

Objections"): (a) James J. Hayes ("Hayes"), (b) Todd W. Martin, III ("Martin"), and (c)

Steven T. Sapperstein ("Sapperstein"). The Stockholder Objections should be overruled.

#### 1.    Hayes Objection

Hayes, a holder of Genesis Common Stock Interest, objects to the Plan in

the guise of a motion requesting that an additional statutory committee of equity security

holders be appointed in these chapter 11 cases. Hayes asserts that the appointment of

such a committee is necessary because of the number of holders of Equity Interests

represented by Genesis's common and preferred stock and the complexity of the chapter

11 cases. He further asserts that the cost of appointing a committee does not outweigh

the need to furnish adequate representation for equity security holders and that such cost

may be justified if the Debtors are not hopelessly insolvent. Additionally, Hayes submits

that shareholders believe the Genesis stock has value and if an equity security holders committee is not able to establish that there is sufficient value in the estates to provide a benefit to holders of Equity Interests, none of the committee's expenses should be charged to the estates.

### 2.    Martin Objection

Martin, a holder of common stock of Genesis, objects that the Plan fails to take into account a fair value of the Debtors' assets, including the value of the real property owned by the Debtors or in which the Debtors own an interest. He also objects that the Plan fails to take into account claims of the Debtors against their current and former officers and directors, including claims for mismanagement, self-dealing, and conflicts of interest. If the Debtors' assets are properly valued, positive shareholder's equity will exist and the shareholders will be entitled to retain interests in the Debtors. In connection therewith, Martin has filed a motion to appoint a trustee in these cases to consider whether (i) these cases should be converted to a case under chapter 7, (ii) the Plan is in the best interest of the Debtors as opposed to the best interest of the Debtors' officers and directors, and (iii) the Debtors should prosecute claims against the Debtors' current and former officers and directors.

### 3.    Sapperstein Objection

Sapperstein, a holder of Genesis common stock, objects that Genesis and Multicare will "merge as a reorganized entity and be profitable" and questions "how can they survive apart and together without having some intrinsic value while bankrupt, and if so why do the common shareholders get nothing." He asserts that a complete buyout

for each by a third party, or another plan that recognizes both debtors and common stockholders, would be more acceptable.

**B.    Debtors' Responses to Stockholder Objections**

    1.    Hayes Objection/Motion to Appoint Equity Security Holder <u>Committee</u>

    The appointment of an additional committee of equity security holders of Genesis is unnecessary and would only serve to drain the resources of the Debtors' estates and unduly delay these cases at a crucial phase when the Debtors are preparing to emerge from their chapter 11 cases.

    Section 1102(a) of the Bankruptcy Code provides that the Court may appoint an equity committee if equity security holders are not receiving adequate representation. The inquiry into the need for the appointment of an additional committee is fact specific. *Victor v. Edison Bros. Stores ( In re Edison Bros. Stores, Inc.)*, No. 95-1354, 1996 WL 534953 (D. Del. Sept. 17, 1996). The burden is on the moving party to establish the facts that clearly demonstrate that the appointment of an additional committee consisting of equity security holders is "necessary." *Id.* at *4 (party seeking equity committee has "the initial burden of developing a factual record to demonstrate the need for adequate representation.") (citations omitted). The determinative factors to be considered are set forth in *In re Kalvar Microfilm, Inc.*, 195 B.R. 599 (Bankr. D. Del. 1996):

    a.    Whether the shares of the debtor are widely held and publicly traded;

    b.    The size and complexity of the chapter 11 case;

    c.    The delay and additional cost that would result if an equity committee was appointed;

d.    Whether the debtor was insolvent;

e.    The timing of the motion; and

f.    Other relevant factors.

*Id.* at 600.

Although the Debtors are engaged in large, complex chapter 11 cases, and have issued shares that are widely held and publicly traded, consideration of *all* the factors, as well as the particular facts of these cases, makes apparent that Hayes' request to appoint an equity committee should be denied and his objection to the Plan should be overruled.

These chapter 11 cases have been pending for over one year. The Genesis Debtors have worked diligently with the Genesis Creditors' Committee and representatives of the Genesis Senior Lenders on the formation of the Plan. The Confirmation Hearing is scheduled for August 28, 2001. At this point, the formation of an equity securities holders committee would only delay confirmation of the Plan and the resultant distributions to creditors since a shareholders' committee would need a significant amount of time to review and test the assumptions and analysis which form the basis for the Plan in the futile hope that it could discover that there is sufficient value in the Genesis enterprise to provide some recovery to stockholders. As discussed in the Confirmation Brief and above, the Debtors, the Genesis Creditors' Committee, and the Genesis Senior Lenders have all retained financial advisors to evaluate the Debtors' businesses and prospects. The analysis prepared by those experts is consistent and indicates that the Debtors are hopelessly insolvent (by hundreds of millions of dollars). The Debtors do not believe that there is any conceivable scenario under which existing

shareholders would be entitled to receive any property under a plan of reorganization. As discussed above, there is insufficient value to provide 100% recovery to the holders of secured claims in Class G2. The amount of excess enterprise value that an equity securities holder committee would have to establish in order for Equity Interests to receive any recovery would be astounding. Therefore, there is no interest to be protected by the appointment of a committee of equity security holders.

Hayes's request simply is not timely and, if granted, would prejudice the rights of thousands of creditors. In *Kalvar*, for example, the Bankruptcy Court for the District of Delaware denied a belated motion for the appointment of an official committee of equity security holders. In making its decision, the court pointed to the lengthy process of chapter 11 case and the late timing of the motion. The debtor had already commenced restructuring negotiations; the movant was aware of the ongoing process of the debtor's restructuring; the debtors had engaged in substantial negotiations; only after the debtor had presented a plan of reorganization did the movant request appointment of an equity committee; and the movant had failed to explain why it did not contact the debtor during the restructuring process about its valuation concerns. *Kalvar* at 601. The court concluded, the "late timing of the motion ties in to the only remaining purpose of an equity committee in this case, which would be to object to confirmation, and litigate the valuation issue." *Id.* at 601.

Similarly, Hayes' motion to appoint a committee of equity security holders appears at the eleventh-hour of these chapter 11 cases. During the over one year these cases have been pending, equity security holders, including Hayes, have had access to all the information that the Debtors are required to disclose to the public and its equity

AA. 106

security holders pursuant to the securities laws and other applicable statutes, rules, and regulations. The equity security holders of Genesis have not been deprived of information that they would otherwise be entitled to and have not in any way been prejudiced by the administrative process of the chapter 11 statutory scheme. Indeed, the equity security holders' access to financial and operating information is enhanced by virtue of the disclosure requirements of the Bankruptcy Code, the Bankruptcy Rules, and the requirements of the Office of the United States Trustee. In addition to the multitude of public filings required under the securities law and related statutes, rules, and regulations, the Debtors are required to file monthly operating reports, including cash flow statements and other financial information, with the Office of the Untied States Trustee. Pursuant to provisions of the Bankruptcy Code, the Debtors have filed with the Court their schedules of assets and liabilities, statements of executory contracts, and statement of affairs. Thus, there more information has been made available to equity security holders since the Commencement Date than prior to the commencement of these cases.

Hayes cannot escape the fact that his request to appoint a statutory committee of equity security holders materializes just at the moment when the Debtors are preparing to exit from chapter 11. Indeed, Hayes admits that the "motion also constitutes an objection to the confirmation of the Plan of Reorganization." Just as in *Kalvar*, the aforementioned costs and delay cannot be justified in light of this purpose. Accordingly, Hayes's motion to appoint a committee of equity security holders should be denied and his objection to the Plan overruled.

2.    <u>Martin Objection/Motion to Appoint Trustee</u>

Martin's unrealistic hope that positive shareholder equity can exist must be rejected for the reasons set forth above.

Martin's request to appoint a trustee in these chapter 11 cases is based upon his assertions of the existence of potential assets (sufficient for shareholders to retain interests in the Debtors) and potential claims against the Debtors' management. However, Martin fails to offer even a scintilla of concrete evidence for the existence of such hoped-for assets and would-be claims. The Debtors submit that no cause exists which warrants the appointment of a trustee, and such appointment is not in the best interests of the Debtors' estates, their creditors, or their equity security holders. Rather than burden these chapter 11 cases with unnecessary expense and delay, this Court should overrule Martins' objection to the Plan and deny Martin's motion to appoint a trustee.

Section 1104(a) of the Bankruptcy Code provides the grounds for a court to appoint a trustee. Pursuant to subsection (1), a trustee may be appointed solely for "cause," and pursuant to subsection (2), a trustee may be appointed only if the displacement of management is in the interests of the estate, its creditors, and shareholders. 11 U.S.C. § 1104(a). A request for the appointment of a trustee under either subsection places the burden of proof on the movant to demonstrate the need for such appointment. *See In re Sharon Steel Corp.*, 871 F.2d 1217, 1226 (3d Cir. 1989). Because there is a strong presumption in chapter 11 cases that the debtor should continue in control and possession of its business, the appointment of a trustee is seen as an extraordinary remedy justified only by "clear and convincing" evidence. *See id.* at 1225-56; *Wilmington Trust Co. v. Aardvark, Inc. (In re Aardvark, Inc.)*, 1997 WL 129346 (D.

**AA. 108**

Del. 1997). Where the movant makes mere allegations or fails to substantiate the need

for appointment of a trustee with concrete evidentiary submissions, a motion pursuant to

section 1104(a) must be denied. *In re Justice Hospitality Props., Inc.*, 86 B.R. 261, 266-

67 (Bankr. M.D. Fla. 1988) (mere allegations of conflict of interest between

management, debtor, creditors and, shareholders insufficient to appoint a trustee).

      Martin does not indicate which subsection of section 1104(a) allegedly

justifies displacement of the Debtors in favor of a trustee. Instead, Martin's motion and

objection present conditional hypotheses in an attempt to formulate possible theories of

potential value and would-be claims. These meager evidentiary suppositions are

woefully inadequate to carry the heavy burden of proof required for appointment of a

trustee. Notwithstanding such evidentiary omissions, the facts of these cases do not

support the legal conclusions necessary to appoint a trustee under either section

1104(a)(1) or 1104(a)(2) of the Bankruptcy Code.

      Finally, just as with Hayes's request to appoint a committee of equity

security holders, Martin's request to appoint a trustee also happens to materialize just at

the moment when the Debtors are preparing to emerge from their year-long chapter 11

cases. The timing of Martin's request is dubious, and the attendant costs and delay of

appointing a trustee in these cases are not acceptable in light of Martin's failure to carry

his burden as to the necessity of a trustee. Martin's motion to appoint a trustee in the

Debtors' cases should be denied and his objection to the Plan overruled.

      3.    <u>Sapperstein Objection</u>

      Sapperstein's objection should be overruled for the reasons set forth

above. Moreover, he has put forth no evidence that a third party would purchase the

**AA. 109**

Debtors for a price that would be high enough to provide some recovery for holders of Equity Interests.

## VII.    MISCELLANEOUS OBJECTIONS

### A.    Miscellaneous Objections to the Plan

#### 1.    JSM Company

JSM Company ("JSM") objects to the Plan because the Debtors have not been prosecuting their motion (the "Motion to Reject") to reject their construction contract with JSM (the "JSM Contract") and, therefore, it is unclear whether the current status of the Motion to Reject is sufficient to prevent the automatic assumption of the JSM Contract. JSM also objects because the Plan does not properly identify the treatment to be afforded to JSM's secured claim.

### B.    Debtors' Responses to Miscellaneous Objections

#### 1.    JSM

The Plan provides that all executory contracts and unexpired leases to which any of the Debtors are parties shall be assumed on the Confirmation Date unless, *inter alia*, such contract or lease "is the subject of a separate motion to assume or reject filed under section 365 of the Bankruptcy Code by the Genesis Debtors or Multicare Debtors prior to the Confirmation Date." Plan § 8.1. Because the Debtors filed the Motion to Reject prior to the Confirmation Date, it is clear that the JSM Contract will be rejected. Moreover, the Debtors are prepared to re-notice the Motion to Reject for hearing on the next available omnibus hearing date or any subsequent omnibus hearing date that is mutually convenient for the Debtors and JSM.

The Debtors have communicated to JSM that, to the extent JSM's claim is Allowed as a Secured Claim, the Debtors shall pay such Allowed Secured Claim in cash in full on the date such Claim becomes Allowed. The Debtors' proposed exit financing facility will provide the Debtors with the ability to pay such claim. Thus, any secured claim JSM has will be unimpaired.

## VIII. OBJECTIONS WHICH HAVE BEEN RESOLVED

The Debtors have reached, or expect to reach, a resolution of the following objections to the Plan prior to the Confirmation Hearing: (a) the portions of the Goff Objection other than with respect to Punitive Damage Claims, (b) Bexar County, (c) the Commonwealth of Pennsylvania, Department of Labor and Industry, Bureau of Employer Tax Operations, (d) THCI Company LLC ("THCI"), (e) Susquehanna Center, Inc., (f) Commonwealth of Pennsylvania, Department of Revenue, (g) Indiana Department of Revenue, and (h) Massachusetts Housing Finance Agency.[11]

## CONCLUSION

Pursuant to section 1129 of the Bankruptcy Code, as demonstrated by this Response and the Confirmation Brief submitted herewith, the objections are without merit and are legally and factually insufficient to deny confirmation of the Plan. The Plan has been accepted by the classes of creditors which hold the economic interests in the Debtors' assets and properties. Because the enterprise value of the Debtors is insufficient to satisfy the claims of the Genesis Senior Lenders and the Multicare Senior Lenders, holders of Equity Interests cannot participate in the Debtors' reorganization and

---

[11] The Debtors reserve their rights to respond to these objections at the Confirmation Hearing in the event such resolutions are not reached.

the Debtors' unsecured creditors would not be entitled to participate absent the

distributions afforded to them under the Plan. The Plan complies with sections 1129(a)

and (b) of the Bankruptcy Code and should be confirmed in the interests of creditors and

the rehabilitation of the Debtors' businesses.

WHEREFORE, the Debtors respectfully request that the objections be

overruled, that the Plan be confirmed, and that they be granted such other and further

relief as is just.

Dated: August 24, 2001
       Wilmington, Delaware


WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
(212) 310-8000
Michael F. Walsh
Gary T. Holtzer

-and-

RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
P.O. Box 551
Wilmington, Delaware 19899
(302) 658-6541

By: _Mark D. Collins_
Mark D. Collins (No. 2981)
Russell C. Silberglied (No. 3462)

ATTORNEYS FOR THE GENESIS
DEBTORS AND DEBTORS IN
POSSESSION


WILLKIE FARR & GALLAGHER
787 Seventh Avenue
New York, New York 10019-6099
(212) 728-8000
Marc Abrams
Paul V. Shalhoub

-and-

YOUNG CONAWAY STARGATT &
TAYLOR
11th Floor, Wilmington Trust Company
P.O. Box 391
Wilmington, Delaware 19899-0391
(302) 571-6600

By: _Robert S. Brady By RCS_
Robert S. Brady (No. 2847)   with permission
ATTORNEYS FOR THE MULTICARE
DEBTORS AND DEBTORS IN
POSSESSION

1

UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY


IN RE:                          :      Case No. 00-2692, 00-2494
                                :
  GENESIS HEALTH VENTURES   :      15 North 7th Street
  AND MULTICARE AMC, INC., :      Camden, New Jersey  08102
                                :
        Debtors.              :      August 28, 2001
----------------------------          9:33 A.M.



TRANSCRIPT OF HEARING
BEFORE THE HONORABLE JUDITH H. WIZMUR
UNITED STATES BANKRUPTCY COURT JUDGE



APPEARANCES:


For Debtors:              Weil, Gotshal and Manges
 (Genesis)                By:  MICHAEL WALSH, ESQ.
                                 ADAM STROCHAK, ESQ.
                                 GARY HOLTZER, ESQ.
                                 MICHELE MEISES, ESQ.
                                 JOANNE GUERRERA, ESQ.
                          767 Fifth Avenue
                          New York, New York  10153

For Debtors:              Richards, Layton & Finger
 (Genesis)                By:  DEBORAH E. SPIVACK, ESQ.
                          One Rodney Square
                          Wilmington, Delaware  19899


Audio Operator:           NORMA SADER


Transcribed by:           DIANA DOMAN TRANSCRIBING

AA. 113

2

P.O. Box 129
Gibbsboro, New Jersey  08026-0129
(856) 435-7172
FAX:  (856)  435-7124
EMAIL:  Doman5123@snip.net

Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

APPEARANCES: (continued)

For Debtors:            Young, Conway, Stargatt & Taylor
 (Multicare)            By:  ROBERT S. BRADY, ESQ.
                        11th and Market Streets
                        Wilmington, Delaware  19802

For Debtors:            Willkie, Farr & Gallagher
 (Multicare)            By:  PAUL SHALHOUB, ESQ.
                             TARIQ MUNDIYA, ESQ.
                        787 7th Avenue
                        New York, New York  10019

For Creditors:          Akin, Gump, Strauss, Hauer & Feld, LLP
 (Genesis Committee)    By:  MARK TAYLOR, ESQ.
                             LISA BECKERMAN, ESQ.
                             ROBERT PEES, ESQ.
                        1333 New Hampshire Avenue, NW
                        Washington, DC  20036

For Creditors:          Kasowitz, Benson, Torres & Friedman
 (Multicare Committee)  By:  ATHENA FOLEY, ESQ
                        1633 Broadway
                        New York, New York  10019

For Creditors:          Saul Ewing, LLP
 (Multicare Committee)  By:  MARK MINUTI, ESQ
                        Centre Square West
                        1500 Market Street, 38th Floor
                        Philadelphia, Pennsylvania  19102

For Senior Lenders:     Morgan, Lewis & Bockins, LLP
                        By:  RICHARD TODER, ESQ.
                             MENACHEM ZELMANOVITZ, ESQ.
                        101 Park Avenue

AA. 114

New York, New York   10178

For THCI:                    Greenberg, Traurig, LLP
                             By:  VICTORIA W. COUNIHAN, ESQ.
                             1000 West Street
                             Wilmington, Delaware   19801

For Quaker Capital:          Werb & Sullivan
                             By:  KIMBERLY C. LAWSON, ESQ.
                             300 Delaware Avenue, 10th Floor
                             Wilmington, Delaware   19801


APPEARANCES:  (Continued)

For GMS Group:               LeBoeuf, Lamb, Greene & MacRae
                             By:  WILLIAM G. PRIMPS, ESQ.
                                  IRA A. REID, ESQ.
                                  JOHN S. KINZEY, ESQ.
                             125 West 55th Street
                             New York, New York   10019

For AGE:                     Obermayer, Rebmann, Maxwell
                             By:  EDMUND M. GEORGE, ESQ.
                             1617 JFK Boulevard
                             Philadelphia, Pennsylvania   19102

For Todd Martin:             Armbrecht, Jackson, LLP
                             By:  DAVID E. HUDGENS, ESQ.
                             P.O. Box 290
                             Mobile, Alabama   36601

For Becklean:                Smith, Katzenstein & Furlow, LLP
                             By:  DAVID A. JENKINS, ESQ.
                                  SELINDA A. MELNIK, ESQ.
                             800 Delaware Avenue
                             Wilmington, Delaware   19801

For U.S. Trustee:            United States Department of Justice
                             Office of the United States Trustee
                             By:  JOSEPH J. McMAHON, JR., ESQ.
                             J. Caleb Boggs Federal Building

4

Suite 2313
Wilmington, Delaware   19806

I N D E X

| WITNESSES | VOIR DIRE | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|---|
| **FOR THE DEBTORS** | | | | | |
| STEPHEN DARR | | 36 | 41,48 | 46 | 50 |
| GEORGE HAGER | | 52 | 91 | 185 | 197 |
| WILLIAM MCGAHAN | | 200 | 222 | 252 | |
| J. HALISEY KENNEDY | | 256 | 263 | | |

| EXHIBITS | | IDENT. | EVID. |
|---|---|---|---|
| GMS-1 | Document | 108 | 110 |
| GMS-2 | 2/13/01 document | 110 | 115 |
| GMS-3 | Document | 116 | |
| GMS-4 | Presentation | 130 | 135 |
| GMS-5 | Press Release | 137 | 140 |
| GMS-6 | Press Release | 137 | 140 |
| CG-2 | Document | 249 | |
| CG-3 | Report | 267 | |
| CG-4 | Report | 268 | |

Colloquy                                                                    6

THE COURT:  Please be seated.  Good morning, ladies and gentlemen.  Good morning.

MR. HOLTZER:  Good morning, Your Honor.  Gary Holtzer, Weil, Gotshal and Manges for the debtors.

THE COURT:  Yes. As we get started on confirmation hearings, I would ask all counsel who address the Court to please identify themselves for record purposes.  Please proceed.

MR. HOLTZER:  Your Honor, if I could have just a moment.  My partner, Mr. Walsh, is out in the hall with counsel for the bond holders on one small matter.

(Pause)

MR. WALSH:  Good morning, Your Honor.

THE COURT:  Good morning.

MR. WALSH:  For the record, I'm Michael Walsh from Weil, Gotshal and Manges on behalf of the Genesis debtors.  And I guess my watch is five minutes behind yours so I apologize for the little bit of a delay.

With me today from Weil, Gotshal I have my partner, Gary Holtzer, as well as Michele Meises, Adam Strochak and Jo Guerrera.

MS. GUERRERA:  Good morning, Your Honor.

THE COURT:  Good morning.

MR. WALSH:  If things go well, they're going to take the burden of today's hearing.  I say that hopefully as also a hint to them.  Also for the Genesis debtors, Debbie Spivack

from Richards, Layton, our local counsel.

        MS. SPIVACK:  Good morning, Your Honor.

        MR. WALSH:  For the Multicare debtors, from Willkie Farr we have Paul Shalhoub and Tariq Mundiya.

        MR. SHALHOUB:  Good morning, Your Honor.

        MR. WALSH:  Their local counsel from Young Conway, Robert Brady.

        MR. BRADY:  Good morning, Your Honor.

        MR. WALSH:  From the Genesis Creditors Committee, from Akin, Gump, Lisa Beckerman, Robert Pees, and Mark Taylor.

        MS. BECKERMAN:  Good morning, Your Honor.

        MR. WALSH:  From the Multicare Creditors Committee, from Kasowitz, Benson firm, Athena Foley.

        MS. FOLEY:  Good morning, Your Honor.

        THE COURT:  Good morning.

        MR. WALSH:  And her local counsel, Mark Minuti from Saul, Ewing.

        MR. MINUTI:  Hello, Your Honor.

        MR. WALSH:  I also believe that we have counsel for the senior lenders in both the Genesis and Multicare cases, Mr. Richard Toder and Mr. Menachem Zelmanovitz from the Morgan, Lewis firm.

        MR. TODER:  And Jack Cardeno.

        MR. WALSH:  Thank you, Richard.

        Your Honor, this case has not been especially long. I mean, I remember in the old days we would go for six or seven

Colloquy                                  8

years and finally get to confirmation.  Matter of fact, it may be a record for a long term care company, not by a huge amount, but if we're successful today it will be a little bit of a record.

If I had to characterize the case, and I hope you would agree, it's really been remarkably consensual. We've had a lot of the disputes we've been able to resolve by agreement through the case.  We came close to some very serious trustee litigation with the Multicare Committee but we've managed to resolve that. And we're here today because we have a consensual deal from all the major constituencies and all the parties that have made sacrifices basically for this day to happen. So I'm very pleased to be here, although I'm not sure I personally will last the length of this hearing, given the number of people in this room.  But we'll see about that.

THE COURT:  Before you continue, counsel, anyone who is -- there may be a couple of places to fill in and you're welcome to do it, be it in the jury box or anywhere you can find. Feel free to find a place if you can.

Go ahead, Mr. Walsh.

MR. WALSH:  Thank you, Your Honor.  Your Honor, the major goals of the plan before you -- I think there are three of them.  One is to significantly de-leverage the company. That's what Chapter 11 is all about. We're taking about over two billion dollars of debt and the companies together are