going to end up with about 600 million, so, and that includes exit financing.

The second goal is we've got two companies, the Genesis debtors and the Multicare debtors, and those companies were actually put together in 1977 when Genesis purchased about 43 percent of the stock of Multicare, along with a couple other entities who have since sold their interest. Through management agreements these two companies basically have been operating as one. And by doing that they recognized very significant synergies and very significant value as one. But they, because of the markets and because of the decline in reimbursement on the federal side, they were never able to complete the job and put the two companies together. What this plan does is it does exactly that, it merges the two companies together so rather than relying on management agreements which have to be negotiated periodically and different parties have different interests, we're going to put the companies together to lock in those synergies, to lock in the value that exists today. And you'll hear testimony as we go through the hearing about why that's important.

The other major thing that we did, Your Honor, is despite our view and the view of a lot of the experts you're going to hear from today and perhaps tomorrow, there simply is not enough enterprise value to get around to unsecured creditors if one strictly applies the absolute priority rule.

Now, it was the goal of the debtors from the beginning that we have a plan that was a consensual plan and that we had to find a way to have significant value go to creditors. And that's one of the main accomplishments of this plan. We did it without litigation and we did it, we did it in a way that unsecured creditors not only get something of value today but they get to share in any future appreciation of the value as the company goes forward.

So that's really the essence of the plan, and I'd like to keep those three things in mind because there's lots of details, and sometimes the big picture gets lost.

As a procedural matter, or by way of background, we commenced the cases June 22nd, 2000. On June 5th, almost a year later we filed our disclosure statement and joint plan, modified that a couple of times in the Third and the Fifth and I think right before Your Honor. On July 5th Your Honor approved the disclosure statement and allowed the debtors to commence soliciting acceptances and rejections, which we did.

Poorman Douglas, the voting agent for the debtors, has completed a certification of the tally, and Mr. Shalhoub will be talking about that, but to steal a little bit of his thunder or the best part of his lines, I'm happy to report that all but two classes, and just on the Genesis side, all but two classes that are entitled to vote have actually voted to accept the joint plan, all but two. One of those two classes that voted to reject is actually not going to contest the

confirmation. We have basically found a methodology to reserve
those issues while we try to resolve that on a consensual
basis.  So that leaves only one class, Class G5 which is the
subordinated note holders at Genesis who were entitled to vote
and did in fact vote to reject.

In addition, we have some technical corrections to
the plan.  I suppose you see this at every confirmation
hearing, and I'll go through those in detail.

The plan itself, as I said, it de-levers the company.
There's only about 243 million dollars of restructuring debt
that's going to go on the company, the rest is exit financing,
a small amount of preferred stock, and all of the debt and
preferred stock, as well as a good portion of the new common
stock going to the senior lenders of both cases.  But
notwithstanding the lack of value though, a significant portion
of the common stock and warrants to purchase an even larger
portion of the common stock are going to the unsecured classes.

The plan has the support of all major constituencies,
and I don't mean to make it seem small that G5 didn't vote in
favor of the class. They're an important constituency as well,
and we're going to have to deal with them today.  But in
support of the plan, we have the senior lenders from both
companies and we have the Creditors Committees from both
companies, you know, behind the plan and all of the specs.

Just looking at the agenda today, Your Honor, it

looks like we're probably going to need at least an hour, maybe

an hour and a half of your time to get through everything.

(Laughter)

> THE COURT:  You got that.

> MR. WALSH:  Thank you, Your Honor.

> Well, to get through those few minor things, I'd like

to propose a structure.  I'll do it any way you want, Your

Honor, but this sort of makes some sense to me. That we start

with the solicitation procedures and the tally, move on to

technical amendments, from there talk about the resolved

objections, get everything on the record that people want on

the record, allow people -- namely me but -- to make

preliminary remarks about what's coming up, and then dive into

the testimony. And the debtors will have a number of witnesses

and we believe some of the objecting parties will have

witnesses as well. And then at that time after all the evidence

is in, we take the remaining objections which I count to be

about 11 and deal with them on a one-by-one basis as we go

forward.

> THE COURT:  That's fine.

> MR. WALSH:  That works for you. Thank you, Your

Honor.

> So, starting it off, I will ask Mr. Shalhoub -- wake

up, Paul -- ask Mr. Shalhoub to describe the solicitation

procedures and how we got to the vote.

Colloquy                                    13

THE COURT:  All right.

MR. Shalhoub:  Good morning, Your Honor.  Paul
Shalhoub of Willkie, Farr and Gallagher for the Multicare
debtors.

Your Honor, I would like to thank Mr. Walsh for
letting me do one of the more interesting portions of today's
hearing, namely describing for the Court the noticing that took
place in order to get to today as well as the solicitation
process.

We did, Your Honor, give extensive notice of today's
hearing in accordance with this Court's July 13th Order
approving the disclosure statement.  In this regard,
publication notice was made in seven publications.  Notice was
published in the national editions of the Wall Street Journal,
the New York Times, and the USA Today, and notice was also
published in the local editions of the Boston Globe, the
Baltimore Sun, the Philadelphia Enquirer, and the Tampa
Tribunal, and appropriate certificates of publication have been
filed with the Court.

As far as mailing, the debtors mailed solicitation
packages containing copies of the disclosure statement Order,
the confirmation hearing notice, the disclosure statement and
the plan to many parties. This package was served on the U.S.
Trustee, attorneys for Mellon Bank, attorneys for the Genesis
Committee, attorneys for the Multicare Committee. All entities
have filed proofs of claim. All persons scheduled in amounts

greater than zero dollars.  The transfer agent and the registered holders of the debtor's common stock. All parties have filed a notice of appearance in these cases, the SEC, the IRS, the PPGC and the US Department of Justice.

In addition, holders of claims entitled to vote to accept or reject the plan were provided with a ballot. And holders of claims in unimpaired classes as well as classes deemed to reject the plan were provided with a notice of non-voting status.

Consistent with the disclosure statement Order, substantially all of the voting and non-voting packages were mailed commencing on July 18th of last month. A small number of mailings did take place after July 18th. These fall primarily into four groups of categories. First a small number of creditors that inadvertently didn't receive notice on the 18th, between the 18th and the 31st were provided with the appropriate voting or non-voting package.  Second, with respect to Classes M12, M17, and the holders of the Genesis 9 and 7, 8 bonds and Class G5 so that just that portion of G5. They weren't served on the 18th because the debtors did not obtain the DTC participants listing until about a week after the 18th. They were served with a respective package prior to the end of the month. The indentured trustees for the relevant bond issues, and they all deal with bonds, were served on the 18th. And this group was provided when they were served with the

voting package with a notice that extended their deadline both
for objections to confirmation as well as for voting on the
plan to August 24th.

        The third group of mailing that took place after the
18th related to the Court's ruling that creditors in Class G4
that had voted as of a certain date that may not have received
the GMS's group letter urging them to reject the plan were
provided with new ballots. Consistent with the Court's ruling
on August 3rd, August 6th and August 8th, the debtors mailed
new ballots to each of those parties. They mailed a copy of the
GMS rejection letter urging them to reject the plan. They
mailed a copy of the Genesis Committee letter urging them to
accept the plan, as well as a notice explaining why they were
receiving a new ballot.

        And lastly, on August 10th, voting packages were
mailed to approximately 100 holders of litigation type claims
that originally were provided with a non-voting package. They
were provided with a ballot and a voting package on August 10th
and we extended their deadline to vote on the plan to August
24th as well.

        All these mailings are set forth in detail in the
affidavits of mailing that have been filed with the Court.

        With respect to the actual solicitation of the votes,
as Mr. Walsh referenced, Poorman Douglas was retained as
balloting agent in these cases.  Yesterday the debtors filed a

Colloquy                                          16

declaration of Laura Dibiase, that's D-I-B-I-A-S-E of Poorman

Douglas certifying acceptances and rejections to plan. The

voting declaration sets forth in detail the manner in which the

solicitation was conducted and the procedures that Poorman

followed in receiving and tabulating the votes. Annexed to the

exhibits to the voting declarations are both summaries of the

voting results as well as the detailed voting of reports.

THE COURT:  That certification has not found its way

to me. Do you have an extra copy of it?

MR. SHALHOUB:  May I approach?

THE COURT:  Please.  I didn't know what I was asking

for.  Can you summarize the results of the voting in each

class?

MR. SHALHOUB:  I can, Your Honor.

Starting with Multicare, Class M2 which is the

Multicare senior lender claims unanimously voted to accept the

plan.  Class M4 which is the Multicare general unsecured claims

voted to accept the plan with approximately 89.9 percent in

number and 82.1 percent in dollar amount voting to accept.

THE COURT:  I'm sorry.  81.1?

MR. SHALHOUB:  82.7 in dollar amount.

THE COURT:  Go ahead.

MR. SHALHOUB:  Class M5 which is the Multicare

sub-debt unanimously voted to accept the plan.  And Class M17,

the only other Multicare class entitled to vote, also

unanimously voted to accept the plan.

With respect to Genesis, Class G2 which are the Genesis senior lender claims, unanimously voted to accept the plan. Class G4 which are the Genesis general unsecured claims voted to accept the plan with 75.6 percent in number and 80.5 percent in dollar amount voting to accept. Class G17 -- G1-17 voted to accept the plan. There was only one voting person in that class. And as Mr. Walsh referenced, Class G16, G1-16 voted to reject the plan, although we've agreed to reserve issues with respect to that class for another day. And Class G5 voted to reject the plan.

THE COURT: What was the voting in G5?

MR. SHALHOUB: G5, 70.4 percent in amount voted to reject and 85.9 percent in dollar voted to reject. The 85.9 percent represents approximately 182 million dollars. Your Honor will recall that GMS has stated that they represent approximately 150 to 160 million dollars of bonds, and that Grimes represents approximately -- Mr. Grimes represents approximately 25 million dollars. So I think that number is largely composed of those two particular bond holders.

With that, unless Your Honor has any questions.

THE COURT: All right, thank you.

In terms of the technical adjustments to the plan, unless there are specific questions or points that you'd like to highlight, I'm not sure that we need to spend the time to spread on the record these amendments.

Colloquy                                18

MR. WALSH:  That's fine, Your Honor.  Is there anyone in the court who would like a further explanation?  Would you like a brief summary?

THE COURT:  Highlights, if you like.

MR. WALSH:  Highlights.

THE COURT:  Is there anything that we really need to know in terms of the structure of the plan?

MR. WALSH:  No. Some of the unimpaired classes, despite the plan saying that they were unimpaired, decided that they wanted to spell out exactly how they were supposed to be unimpaired, so we do that for a number of classes.  I think they're now unimpaired within a inch of their lives, but if that's what they wanted, that was fine with us.

THE COURT:  Those are specific mortgages and so forth.

MR. WALSH:  Correct.  We did make one little error. We inadvertently left out one of the pieces of collateral for Class G1-17.  Now I didn't think it was that big a deal, it was just the corporate headquarters but that was pointed out and we felt compelled to put that back in.

THE COURT:  All right.

MR. WALSH:  The other thing that I'd like to point out is the plan refers to a settlement with the federal government. And we had always intended that the federal government settlement and the Genesis Multicare settlement will

be integral parts of the plan. But it just took longer to do

that settlement than we anticipated. We finally got that

signed up and the seal lifted in at least some of those cases

on Friday. So rather than trying to sort of jam everybody today

and get that approved as part of the plan, we're going to do

that by separate motion, so we made some technical adjustments

for that.

       That's basically it, Your Honor.

       THE COURT: All right, let's proceed.

       MR. WALSH: Okay. There are a number of objections

that we have resolved that don't require plan changes. So I'll

go through those one by one. People may want to put some

additional statements on the record.

       The first one relates to the synthetic lease lenders.

That's Class G1-17 and Class G2. Your Honor, this -- I need a

little bit explanation here. This instrument, this so-called

synthetic lease, is a technique to keep, to have debt that

actually doesn't show on the balance sheet of a company, even

though for legal purposes, remedial, bankruptcy, et cetera,

it's treated as a financing. But because of that title,

nominal title to the properties, including the corporate

headquarters I might add, are in the name of a third party.

Now as part of the plan we are splitting the claims of those

lenders into two pieces because the collateral does not support

the full amount of their debt. And the deficiency is going to

roll over into Class G2. But the portion that's in G1-17 we're

going to give a new mortgage to.  In order to give the mortgage
though, we need to get the title actually transferred, actually
transferred to the debtor so we can give back the mortgage. So
we don't have to make an adjustment to the plan but we'll be
putting something in the Confirmation Order that authorizes the
nominal title holder today to actually make that transfer.

      Second, we have sort of an ongoing unresolved dispute
with an individual who has had a couple of contracts with the
company.  His name is Mr. Bonfein.  We've been trying to
resolve the issue for quite some time.  We're not quite there
yet.  Some of the issues relate to whether his contracts are
executory or non-executory. And as you know, we're making
decisions as part of the plan as to which contracts we're
assuming or rejecting.  In order not to prejudice him while we
continue to work on that, we've entered into a letter agreement
which basically says that the plan will not prejudice, will
allow us to make a motion to assume the contracts, if we
believe they're executory or reject them in the future, and he
reserves the right to move to force, to compel us to do that,
notwithstanding the fact that the plan gets confirmed. So, I
believe that letter has been filed with the Court under
response from Mr. Krakauer of Sidley & Austin, and I think he's
present in Court.  Are we okay?

      MR. KRAKAUER:  I have it here.

      THE COURT:  All right. Any further expression on

this?

MR. KRAKAUER: No, Your Honor. I filed a description of the letter and I'd just like to file the letter so it's in the court records.

THE COURT: Indeed you may.

MR. WALSH: You thought I was going to forget you. Put you right up front. Okay.

The company as you know, the companies as you know have thousands and thousands of employees, and some significant portion are subject to collective bargaining agreements. We think our working with the unions has been good in this case, but they would like a letter from us confirming that we are assuming the collective bargaining agreements. We of course are willing to do that. The letter will also say that if there are employee disputes under those agreements, that those disputes will just continue in the normal course. I don't know if anyone here is from the union. Okay.

The next resolution is from a taxing authority in a county in Texas. We call it Beksar County (phonetic) but when we called them up to see if we could resolve this, they've never heard of Beksar County. In Texas they call it Behr County. So once we got the pronunciation right, we easily struck a deal. Basically we've agreed to pay them, what, a few thousand dollars, to the extent that they're secured and they've withdrawn their objection.

Now, the Class G1-16 is the other class that voted no

and is the class that we are reserving, where both sides are

reserving the issue for a future day. And the issues, just to

give you a preview, Your Honor, are really pretty simple.  It's

going to be what's the real value of their piece of collateral,

did we peg the note right, did we get the interest rate right,

et cetera. So we are going to basically hold that off for

another day. They're not going to object to the plan.  The

effect of this reservation is that the plan won't be confirmed

as to that one particular debtor. This won't make any effect on

the operations of the company and we think that that's the

smart way to go for that issue.  Is anyone here from Meditrust

or THCI?

          MS. COUNIHAN:  Good morning, Your Honor. Victoria

Counihan on behalf of THCI Company.  Mr. Walsh is correct in

his recitation to the Court. We have agreed on language that my

understanding is going to be inserted into the Confirmation

Order, that basically reserves all of our rights, reserves the

debtor's rights, and specifically lays out four or five

different things that we have brought up in our objection that

we specifically want to be reserved. So as long as this

language is included in the Confirmation Order then I am at

liberty to withdraw our confirmation objection.

          THE COURT:  Very good.

          MR. WALSH:  Your Honor, we had intended to file the

Confirmation Order, but as you can see, we're still making last

minute adjustments. So as soon as it's available we'll get it

to Your Honor as well as file it.

            THE COURT:  Fine.

            MR. WALSH:  In addition we have Class Gl-13. This is

a secured class that is impaired, and after further discussions

with that class, we are actually making some adjustments in how

they're being treated. We are going to give them an additional

$212,000 of I think over a million dollars of arrearages

because we believe the property was worth a little bit more

than our original assessment. We've also agreed that in giving

them a new note, to include a provision in the new note as to,

that would prohibit early payment or prepayment, and that

provision is going to be similar to what they had in the old

note.  I think I've summarized it correctly. Anyone here for

them?

            MS LAWSON:  Yes, I believe that's correct.

            THE COURT:  All right.  Would you identify yourself,

please.

            MS. LAWSON:  Yes, Kim Lawson.

            THE COURT:  All right.

            MR. WALSH:  Okay.  Susquehanna is a company that is

itself in Chapter 11, and Genesis is a major creditor, so they

get the experience on both ends.  Susquehanna has raised the

issue that our plan says that the debtor can exercise setoff

rights.  It's a normal plan provision.  But they wanted us to

make clear that if we were going to do that with respect to

them, that Your Honor would not be giving us the authority to
do it without us getting a lifting of the stay in their case,
which seemed perfectly logical to us. So we made that change in
the Confirmation Order.  Is anyone here from Susquehanna?

We also have some Pennsylvania taxing authorities
that like Behr County, we've agreed to pay them to the extent
that they are secured.  We have a couple of partial, partial
partial resolution.  One of the tort claimants, Mr. Goff,
pointed out in his papers that he was uncertain whether
post-petition tort claims would be discharged by the plan. And
suggested that we take a look at the language that was inserted
into the Vencore (phonetic) Confirmation Order. We looked at
that and we certainly had no intention of taking post-petition
tort claims and discharging them. We think that they should
just be dealt with in the ordinary course, and so we've
included the Vencore language in the Confirmation Order.  Mr.
Goff does have other objections which we'll be dealing with
later.

On the Multicare side, Mr. Shalhoub, are there any?

MR. SHALHOUB:  Just a couple, Your Honor. There's an
Indiana taxing authority like with respect to Pennsylvania and
there's a Pennsylvania taxing authority in Multicare as well.
And we agreed that they would be paid in full to the extent
they have a valid claim.

And with respect to the objection filed by the

Colloquy                                                    25

Massachusetts Housing and Finance Agency, we've agreed the
language to include in the Confirmation Order. That resolves
their objection.

          MR. WALSH:  Okay. The last one is both a tiny
resolution of an issue but a question to the Court. This
involves the United States Trustee. Mr. McMahon suggested that
there were a number of issues that he wanted to raise, one of
which was that we had included in our standard exculpation
clause the disbursing agent, and he told us that he thought
that would be inappropriate. So we have taken that out of the
exculpation clause, so that's one little issue.

          Now, we have a number of other issues with the US
Trustee but I just want to talk about one for a second, because
it affects the timing and you know, where we deal with it
because there's some testimony that's involved.

          We are having what I think is a bona fide dispute
about what the fees are under Section 1930. We're looking to
the debtors that actually make disbursements. I think the US
Trustee is saying well, those really should be allocated to all
the debtors. As you know, we've got like 350 debtors here. So
it can make a very significant difference in the amount of
money, about three and a half million dollars I think in total.

          We would like to resolve this issue for another day.
And we think the best way to do this, and this is just our
suggestion, Your Honor, if we need to do it today we're
prepared to do that. Our suggestion is that we take the full

Colloquy                                    26

amount that the US Trustee says is due and put it into an

escrow account. That way we're protected against overpayment,

the Government is protected, they know that the money is

sitting there, and the confirmation hearing is not burdened

with what I think will be testimony about who's making

disbursements here and who's there and all that stuff.

        That's our proposal.  I know that Mr. McMahon doesn't

think that that quite does it for him, and so I would throw it

to Your Honor.

                THE COURT:  Well, let me hear from him.  Sir?

                MR. McMAHON:  Thank you, Your Honor.

        Your Honor, good morning, Joseph McMahon for the

United States Trustee.  I would briefly dispute Mr. Walsh's

characterization of dealing with this issue at the confirmation

hearing as being burdensome.  If it is burdensome to the

debtors I would simply suggest that the Code makes it that way.

If we look at Section 1129, I believe it's (a)12, it says "that

all fees payable under Section 1930 of Title 28 as determined

by the Court at the hearing on confirmation of the plan have

been paid or the plan provides for the payment of such fees on

the effective date of the plan."

        I think the Code language is fairly clear as to how

Congress would expect the Bankruptcy Courts to deal with this

specific issue.

        Your Honor, in terms of expediting the process for

today, let me suggest that the United States Trustee is willing
to have the matter heard at the end of the valuation testimony.
Certainly, Your Honor, I recognize that there are a number of
parties in interest sitting here today that have no interest in
hearing the debtors and the United States Trustee litigate this
specific issue. I do have a witness present with me, Your
Honor, Jeffrey Hack, who is a bankruptcy analyst from our
office. And what I'd really like to do is deal with the issue
at the confirmation hearing but at a time that Your Honor deems
appropriate in terms of dealing with it.

       With respect to the suggestion of escrowing the
amounts allegedly due would be appropriate, well, I think the
Code language deals with that issue. And second, the fees are
either due or they're not. Now it's kind of like I think we
really have to resolve this issue one way or the other.

       And third, to the extent that Your Honor would deem
it, that any type of escrow would be appropriate, we would
suggest that there would have to be some provision that
interest would be included, accruing at the federal judgment
rate for those fees that are past due and owing.

       THE COURT: Thank you, sir. I'm just looking here,
from your reading of the Code provision. It does suggest a,
more than suggest but expresses a requirement really of
resolving the issue at confirmation at the hearing on
confirmation of the plan. That's pretty specific. Indeed, the

proposal for escrowing is reasonable, but in light of that
clear language, I appreciate the offer of saving it to the end,
I think that's what we will do, but we will hear from your
witness before we're through to try to resolve the issue.

MR. WALSH:  Your Honor, would Your Honor permit -- I
think the fees have to paid as of the effective date, Your
Honor. And we are anticipating to go effective assuming you
confirm the plan through this hearing by the end of September.
I think that we could have a separate hearing dealing with this
issue. And really what we've got here is there's no question we
will pay the fees. We think we have paid the fees.

THE COURT:  There's no question about that.  Was
there another expression on this, sir?

MR. TODER:  Richard Toder, Your Honor, Morgan, Lewis
& Bockins for the senior lenders.  I was going to make a
similar point, that it seems to me that parsing the language,
it would be consistent with subparagraph 12, for the Court to
determine that in fact will make this determination prior to
the effective date and payment will be made at the effective
date.  But since there's a significant window of perhaps three
to four weeks, it just seems that because there are so many
parties, even in the sense of having it at the conclusion of
the hearing, the Court might conclude for example that there
were legal issues that would require briefing. The suggestion
that we might hold up the Confirmation Order because we haven't

come to conclusion on that seems a bit much. One of the things that I've always found is that the Courts have been unique in finding the necessary flexibility under the Code so long as we don't do violence to any particular stricture. I think there's room within this to come with a sensible approach.

MR. WALSH: There is actually at least one case in the Southern District which did say when there was a dispute on what the fees were, that putting the money aside into escrow was an appropriate thing to do. That's <u>In Re: Flatbush Associates</u> at 198 BR 75.

MR. McMAHON: Your Honor, when Congress gives the Bankruptcy Court equitable power, it does so expressly. Quite frankly the Code language is quite clear, and as an expression of the fact that again a lot of people here don't need to specifically hear this argument. We'd be willing to arrange maters in whichever way Your Honor deems appropriate.

THE COURT: Let me reflect that at least to the extent that testimony is necessary, I will hear it. If we can resolve it as a part of the confirmation process, indeed on its face the statute does require it. If it is not possible and it is the only point that is avoiding a Confirmation Order, we'll have to rethink it. Because indeed, the escrowing of monies and the opportunity to pay in full on the effective date, if the decision is that indeed the full amount is due, would be accomplished, which is the primary thrust of the provision.

So we will try to bring it to bottom line, and we'll

see.  Indeed, the broader picture must be reviewed, not to say
that this isn't as important as any other provision of 1129,
but we'll certainly hear the testimony and try to resolve it.

MR. McMAHON:  Your Honor, as a practical matter, I
have my witness here.  What I'd like to do is release that
witness, go back to his work duties --

THE COURT:  Indeed, and we will be able to gauge as
we go how we're doing and I'm sure there will be sufficient
time to notice him of when he might return.

MR. McMAHON:  Okay, thank you very much, Your Honor.

THE COURT:  Thank you.

MR. WALSH:  Thank you, Your Honor.  I think that's
very helpful.

Okay, what's next in my structure is basically to
just give a couple preliminary remarks by people who are
interested in doing so before we dive into the evidence.

THE COURT:  Yes, in shortened version.

MR. WALSH:  Yes.

THE COURT:  I have familiarized myself with the terms
of the plan and so forth. Go ahead, please.

MR. WALSH:  Very short. There's several objections,
but the one that I think is going to take up the most time is
the valuation issue. We have two groups of creditors in Class
G4 who basically want to show that -- I'm sorry, G5 that want
to show that the claims in G2 are being made more than in full.

So there will be quite a bit of valuation testimony because most of the recovery for those claims is common stock. So as the enterprise value increases, so will the common stock.

The only thing I want to make a point at now, Your Honor, because I think it's important before we hear all the valuation testimony is that there's a hurdle. In other words, it's possible to calculate what payment in full would be, or what the enterprise value would have to be for payment in full of Class G2. And so, while you're hearing the testimony, you'll be able to sort of gauge, you know, who's coming close or who's below or who's above.

We calculated the hurdle as part of our responsive papers. You may recall charts on page 5 and 6, but just as we were filing our responsive papers, we were looking at one of the expert reports for GMS and saw that rather than calculating it on the basis of Genesis alone, they looked at the whole enterprise, which I think is an equally valid way to do it. So we thought that, again for purposes of putting things into context, it would be helpful just to say what the valuation hurdles are both for if it's Genesis alone because you'll be hearing testimony on Genesis alone, and for the combined entity because G2 gets a piece of the combined entity and what that valuation is.

So, Your Honor, I have two charts here. One is bankruptcy right out of our papers. If I could approach.

Colloquy                                              32

THE COURT:  Thank you.

MR. WALSH:  Number one and number two.

And I have additional copies if anyone wants to see
them, we can hand them out in a second.

THE COURT:  Let the record reflect simply that these
documents are entitled debtor's table one and debtor's table
two.  We won't make them otherwise.

MR. WALSH:  Okay.  The bottom line of the tables, and
then I'm finished with my preliminary remarks is that this,
what I call the hurdle, the break-even point, the 100 percent
for Class G2, we believe is about a 1.548 billion, if you just
look at Genesis alone, and it's 2.065 billion if you look at
the value of the combined enterprise.  So, just to keep this
into perspective as we hear all the valuation testimony.

That's it for preliminary remarks.  I'd like to pass
on the podium to see if anyone else would like to make a
statement.

THE COURT:  Sir?

MR. REID:  I'm sorry.  Just a point of information,
Your Honor.

THE COURT:  Would you identify yourself please for
the record.

MR. REID:  Ira Reid, LeBoeuf, Lamb, Greene & MacRae.

THE COURT:  I guess, hopefully that gate does open.

MR. WALSH:  Part of our strategy.

MR. REID:  Before I begin, because I saw Mr. Walsh

looking at me, I understood that he wanted to make preliminary

remarks now and also deal with remaining objections after

witnesses.  I didn't know whether the intention was for the

various objectors to make preliminary remarks prior to the

introduction of witnesses, which I'm prepared to do, or if the

Court --

THE COURT:  I think it's better perhaps as we take up

each such objection, in turn it would be preferable to hear it

that way. And in terms of other preliminary comments, every

constituent, every party in interest who wants to be heard will

be heard.  I think it's better by way of conclusory remarks

rather than preliminary remarks because we'll certainly have

those as well. So I would -- unless  there is a point that is

crucial to consider at this stage, I would propose to proceed

with witnesses.  Of course, objectors will have the opportunity

to produce witnesses as well.  Thank you, sir.

MR. REID:  Thank you, Your Honor.

MR. GEORGE:  Your Honor, Edmund George for the AGE.

Just so I'm trying to understand the process that we're going

through. The AGE entities' objections, although they deal with

some of the issues that Mr. Walsh mentioned with respect to

enterprise value, there are other objections that go to the

punitive damage classification, the releases.  Is it Your

Honor's intention to take those after the testimony also?

THE COURT:  Yes.

Colloquy                                    34

MR. GEORGE:  Okay.

THE COURT:  All right.  If there are no other
preliminary comments, then let's begin with the witnesses.

MR. WALSH:  Thank you, Your Honor.  Okay.  The
debtors are prepared to put on the case so we have three
witnesses.  George Hager for both debtors, Genesis and
Multicare, he's the chief financial officer.  William McGahn
who is vice chairman of UBS Warburg the financial advisors for
Genesis, testifying as to value. And on the Multicare -- that's
on the Genesis side.  On the Multicare side, Mr. Hal Kennedy,
managing director at Credit Suisse First Boston, financial
advisor for the Multicare debtors.

Before we actually start the testimony though, I
think we have a proffer with respect to KPMG and the
liquidation analysis.  Mr. Shalhoub?

MR. SHALHOUB:  For the record, Paul Shalhoub of
Willkie Farr.

Your Honor, we filed on Friday an affidavit for
Stephen B. Darr of KPMG.  He's a partner in the corporate
recovery practice group at KPMG.  I don't think anyone has
disputed the liquidation analysis in these cases. The affidavit
sets forth that each creditor is going to receive under the
plan more than it would receive in a hypothetical Chapter 7
liquidation.  I'm prepared to do a proffer today if Your Honor
requires that Mr. Darr is in the courtroom.

THE COURT:  Is there anyone who would want to be
heard about that?  Yes, sir?  Your name, please.

MR. HUDGENS:  David Hudgens with Armbrecht Jackson,
LLP representing Todd Martin. We've objected to the plan and
move for appointment of a trustee to consider a number of
things.  We do not believe that all the considerations that
need to be, all the factors that need to be considered in a
liquidation plan have been considered. For example, we don't
believe that there has been a consideration of selling off
portions of the business in the same manner they were acquired.
We also notice in the disclosure statement that the valuation
of the land for the liquidation analysis was 25 to 50 percent
of cost, equipment 10 to 20 percent of cost --

THE COURT:  Well, let's stick with the manner in
which we proceed. What we have is an offer of proof of Mr.
Darr's testimony.  It was only, it meaning his certification,
was only submitted last Friday so you may or may not have had
the opportunity to review it deliberately.  If there is a quest
to cross-examine that information, we should have Mr. Darr take
the stand and present it and then we'll hear from you in terms
of your questioning.  The only question I think is whether we
can accept the certification and report as his direct testimony
and then subject it to cross-examination.  Of course it would
be helpful to me to have an overview from him to help me
through the report, and then to follow it with cross.  I take
it we need to engage in that exercise.  Is that accurate?

Colloquy                                    36

MR. HUDGENS:  We will certainly need cross-examination, Your Honor.

THE COURT:  All right. So we will proceed. We can do that now or we can do it later, at your pleasure.

MR. SHALHOUB:  If I may get it over with now, Your Honor.

THE COURT:  Okay.

MR. WALSH:  The debtors would like to call Mr. Stephen Darr.

STEPHEN B. DARR, SWORN

THE COURT:  Can we dispense with voir dire on qualification of Mr. Darr.  Where do we have the objector?

MR. HUDGENS: That's fine, Your Honor.

THE COURT:  All right. We can go straight to, indeed the certification recites Mr. Darr's qualification and I'm satisfied to qualify him as an expert for our purposes today.

MR. HUDGENS:  Your Honor, are there other copies of the certification?  We didn't receive them in the package that we received.  Oh, thank you very much.

THE COURT:  Go ahead, sir.

DIRECT EXAMINATION

BY MR. SHALHOUB:

Q.   Good morning, sir.

A.   Good morning.

MR. SHALHOUB:  Your Honor, may I approach the

AA. 149

witness?

THE COURT:  Please.

Q.  Mr. Darr, do you recognize that document I just handed to you?

A.  Yes, I do.  It's an affidavit that I signed on August 23rd.

Q.  And are there any exhibits to your affidavit?

A.  Yes, my resume, a copy of a liquidation analysis for both Genesis and Multicare as of March 31st, 2001, along with explanatory notes.

Q.  Are you an attorney, Mr. Darr?

A.  No, I'm not.

Q.  Do you understand why a company that's operating in Chapter 11 would perform a liquidation analysis?

A.  Yes, I do.  Under the so-called best interest tests, each class of creditors is entitled to receive under a plan of reorganization at least as much as it would receive under a hypothetical Chapter 7 liquidation. And that is the purpose for which this liquidation analysis was prepared.

Q.  Who prepared the liquidation analysis?

A.  The debtor prepared the liquidation analysis with KPMG's assistance.

Q.  And what was KPMG's role in the preparation?

A.  Basically we explained to both debtors the necessity for the liquidation analysis, assisted them in identifying assets

Colloquy                                                    38

that were available for the probable method of liquidation
under a hypothetical Chapter 7, provided them with information
as to what the estimated costs would be under a hypothetical
Chapter 7 liquidation, and finally we assisted the, both
debtors in assembling and compiling the information.

Q.    In your prior experience have you participated in
connection with the preparation of liquidation analyses for
other debtors?

A.    Yes, I have.  Very numerous ones.  I've been doing
corporate recovery work for about 20 years.  Most notably I've
done or supervised or assisted in liquidation analysis for a
number of healthcare companies that's outlined in my affidavit.
If I can refer to it, it includes Care Matrix Corporation,
Frontier Health Group, Olympus Healthcare Group and the Newport
Hospital.  Newport Hospital is actually a Chapter 7 liquidation
where I was the Chapter 7 trustee and liquidated the company.

Q.    And do the liquidation analyses that are attached to your
affidavit, are they the same analyses that were attached to the
disclosure statement?

A.    They're on the same basis but they're not exactly the
same.  The disclosure statement was based on accounting figures
asa of December 31st.  In anticipation of today's hearing we
updated the information to have it based on accounting numbers
as of March 31st, 2001.  But the basis for presentation and the
basis of the calculations is the essentially the same.

Q.    And did your conclusion change?

A.    No, it did not.  The estimated liquidation values changed
very little between March 31st and -- or December 31st and
March 31st, 2001.

Q.    Is your ultimate conclusion or is the ultimate conclusion
of the liquidation analyses that the best interest test is
satisfied or not satisfied?

A.    My conclusion is that the best interest test is satisfied
by the plan.

Q.    And is this the case with respect to both the Genesis
debtors and the Multicare debtors?

A.    Yes.

Q.    And do you believe the analysis fairly and accurately
represents recoveries that would be available in a Chapter 7
liquidation?

A.    I believe it's a reasonable representation of what might
be recovered in a Chapter 7 liquidation, yes.

Q.    And could you direct where in the affidavit or in the
analysis that the summary that the best interest test is
satisfied?

A.    Well, the issues placed for Genesis is on the page titled
liquidation analysis. The net estimated proceeds available for
distribution after estimated Chapter 7 administrative claims
were paid is between 427 million and 693 million dollars. When
you compare that to the secured claims outstanding of a
billion, almost a billion five hundred million, it's clear that

under a Chapter 7 liquidation all of the assets, all of the
proceeds from liquidating the assets would go to pay the
secured claims and there would be nothing left for either
Chapter 11 administrative claims, pre-petition priority claims,
or unsecured claims. There'd be no recovery to any of those
classes.

And the same holds true with respect to Multicare except
the numbers are a little bit different. The liquidation
proceeds are estimated to range net of Chapter 7 administrative
costs to range between 131 million and 207 million, and there
are total secured claims outstanding against those proceeds of
470 million. So again, there would be no recovery for
administrative, priority or pre-petition unsecured claims.

      MR. SHALHOUB: No further questions, Your Honor.

      THE COURT: All right. Identify yourself again,
please, sir.

      MR. HUDGENS: My name is David Hudgens. I'm
representing Todd Martin.

CROSS-EXAMINATION

BY MR. HUDGENS:

Q.  Mr. Darr, you may have to suffer with me a little bit
because I received your affidavit two or three minutes ago. I
believe it arrived at my office after I left coming here.

In your affidavit, you said you reviewed, discussed and
tested for reasonableness the assumptions and various

underlying estimates of liquidation values of specific assets
and cost categories. Do you recall?

A.    Yes.

Q.    Can you tell me what you did to review and test for
reasonableness the assumptions made in your analysis?

A.    Basically we compared them to liquidation sales of other
healthcare companies. We looked at other sales of healthcare
companies.  Clearly we didn't test the assumptions on either
Genesis or Multicare's analyses by going out and seeing what we
could get for an asset.  We basically related it to information
that was publically available from other cases both in and out
of bankruptcy.

Q.    So you did no market testing?

A.    No, sir.

Q.    I also notice that you have assumptions that various
sectors of the business would be sold off as ongoing
enterprises. For example, the pharmacy and medical supply
services and as a separate category, physical speech and
occupational rehabilitation services?

A.    Yes.

Q.    And I think there are several others. Did you assume that
that entire block of services would be sold as one ongoing
enterprise?

A.    Yes.

Q.    Did you --

Colloquy                                                    42

A.    I'm sorry.  We assumed that each one of those.

Q.    I'm sorry, my question was not clear. Did you give any
consideration to breaking those blocks down and selling the
blocks off in smaller chunks?

A.    No, because we didn't believe that it would impact the
multiples significantly by selling them off in piecemeal
fashion.

Q.    Did you look to see whether the debtors acquired those
services as a entire group or whether they acquired them kind
of piece by piece?

A.    We did not do a specific review to see how the pieces were
acquired by the debtors.

Q.    So you didn't do any analysis to see whether the same
method they acquired the services would be the best method of
selling them off?

A.    Well, we did assess the best method of selling them off
and we believe that it was the best method of selling them off
was piecemeal.

Q.    What did you do --

A.    Piecemeal.

Q.    Piecemeal as --

A.    Lines of business but not breaking up the lines of
business into further divisions.

Q.    Okay. Even though the debtor had acquired those lines of
business in small pieces, hadn't it?

A.    That's correct.

Colloquy                                    43

Q.   Okay. Did you do any testing for value of the different

hard assets? For example, the buildings and land?

A.   I'm sorry, the buildings --

Q.   Buildings and land.

A.   To the extent that we did look at other cases in terms of

liquidation values of buildings, et cetera, but most of the

land and buildings were going to be sold as part of the ongoing

businesses, and what was left over was not significant.

Q.   When you said you looked at other cases, do you mean other

liquidation cases?

A.   Other liquidation cases, yes.

Q.   Of other companies?

A.   Yes.

Q.   Okay. You did not try and obtain a value for any piece of

land or any building owned by the debtors, did you?

A.   No, we did not.

Q.   Did you review to determine whether either the debtor or

any of its creditors had appraisals or other valuation reports

for any land or buildings?

A.   We did ask if the debtor had any appraisals and we were

told that there were none for the, or we couldn't find any, or

the debtor couldn't find any. And when I say debtor I mean both

debtors.

Q.   But you know that the debtor had been through a series of

financings over the course of recent years, didn't you?

A.   Yes, but we didn't believe that those appraisals would necessarily have been appropriate because of the change in the economic climate in the healthcare industry.

Q.   But you didn't even review those appraisals, did you?

A.   No.

Q.   Did you review any of the buildings or land to see if they were suitable for uses other than the healthcare industry?

A.   I know we considered certain of the buildings such as the office building in Kenneth Square, but in terms of past experience in the healthcare industry, it's very difficult to convert a nursing home into anything else.

Q.   But you didn't look at any specific properties?

A.   No.

Q.   Do you know how many pieces of property the debtors --

A.   I'm sorry, could you repeat that question.

Q.   Do you know how many separate parcels of property the debtors collectively own?

A.   I don't recall.

Q.   Do you know any estimation of how many pieces of property?

A.   I just don't recall.

Q.   Okay. Did you do any valuation of claims that the debtor might have against its officers and directors?

A.   No, I did not.

Q.   Did you discuss any such claims with any of the debtors?

A.   I believe we discussed it with counsel. Excuse me, I

believe we discussed it with counsel as to whether or not we should put preference and avoidance actions and other similar type issues in the liquidation analysis and we determined that we would not.

Q.    Well, how about as opposed to preference and avoidance actions, direct actions by the debtors against the officers and directors for their acts?

A.    No, we did not include those in the analyses.

Q.    You don't have any idea whether any of those exist or what they would be valued at if they existed, do you?

A.    No, sir.

Q.    When I talked about buildings and land, and we talked about the things you didn't do, I assume you did not do any of those things with regard to equipment either, did you?

A.    Most of the equipment would have been sold under the assumption that the profitable operations were sold as a going concern. The remaining equipment we looked at.  I did talk with some auctioneers as to what it was, could be assumed would be a representative recovery on them.

Q.    Of the, what, I'll call excess equipment?

A.    Yes, but I mean --

Q.    But not of all the equipment, did you?

A.    No.

Q.    And you didn't do any analysis of just going out and selling negotiated sales of the equipment, did you?

A.    No, we did not.

Colloquy                                    46

Q.   Do you know what the construction in progress is?

A.   I don't recall just now.

Q.   Do you know how the value for it was reached?

A.   I'd have to go back and look. I don't recall.

         MR. HUDGENS:   I believe that's all I have of this

witness, Your Honor.

         THE COURT:   All right. Redirect?

         MR. SHALHOUB:   Yes, sir. Just a couple of additional

questions, Your Honor.

         THE COURT:   Sure.

                    REDIRECT EXAMINATION

BY MR. SHALHOUB:

Q.   Mr. Darr, could you turn to page 1 of Exhibit B of your

affidavit.

A.   Yes, I have it.

Q.   Approximately a little more than halfway down the page,

there's a column to the right hand side that has a heading

"estimated recovery"; do you see that?

         THE COURT:   Exhibit D?

         MR. SHALHOUB:   Exhibit B as in baby.

         THE COURT:   Yes.

A.   Yes, I see that.

Q.   Could you tell me the number that is estimated for

proceeds available for distribution, the range of numbers?

A.   427 million on the low side to 693 million on the high

side.

Q.    And a little further down on the page there's a line item
for total secured claims; do you see that?

A.    Yes, I do.

Q.    And could you tell me the estimated balance for the total
secured claims?

A.    A billion four hundred eighty-eight -- a billion four
hundred eighty-nine million dollars.

Q.    So approximately how much would this liquidation analysis
have to be off by in order for creditors to not receive under
the plan what they otherwise would receive in a liquidation?

A.    Between a hundred and 200 percent.

Q.    Could you put that in dollar amounts for me?

A.    I would have to be off by between 800 million and a
billion dollars approximately.

Q.    And could you turn please to page 1 of Exhibit C.

A.    Yes.

Q.    The Multicare liquidation analysis?

A.    Yes, I have it.

Q.    Again, approximately halfway down the page there's net
estimated proceeds available for distribution?

A.    The estimates range from a low of 131 million to a high of
207 million.

Q.    And again, could you find on this page the net balance of
the total secured claims?

Colloquy                                    48

A.    It's approximately 470 million dollars.

Q.    So with respect to Multicare, how much would this liquidation analysis have to be off by in order for creditors, unsecured creditors to not receive distributions under the plan that would exceed what they would receive in a Chapter 7 liquidation?

A.    Between 250 million to 325 million dollars.

        MR. SHALHOUB:  I have no further questions, Your Honor.

        MR. TODER:  Your Honor, may I ask some questions?

        THE COURT:  Certainly.

        MR. TODER:  In your experience --

        THE COURT:  Your appearance please.

        MR. TODER:  I apologize. Richard Toder, Morgan, Lewis & Bockins.

                        CROSS-EXAMINATION

BY MR. TODER:

Q.    In your experience, if equipment is sold separate from the underlying business, is it likely to derive more or less than if it is sold as part of an ongoing business?

A.    It's likely to receive much less.

Q.    And is it your testimony based on your experience in the healthcare industry that a sale of the lines of business as you outlined is more or less likely to maximize recoveries as distinguished from sales of individual facilities?

Colloquy                          49

A.    It's more likely.

Q.    Thank you.

       THE COURT:  Let me ask you, sir.  Indeed, you have
focused on the sale of operating entities, and the --
presumably some of the property plant and equipment, book value
numbers and the, perhaps the good will numbers might be
incorporated in the sale of operating entities, would it not?

       THE WITNESS:  That's correct, Your Honor.

       THE COURT:  How did you calculate those numbers, that
range of numbers for the sale of operating entities?

       THE WITNESS:  Your Honor, what we did was we took the
operating businesses that were generating positive results of
operations that were profitable, and in discussions with the
financial advisors, we did determine what they were using for
multiple in their estimates, and that was a range at that time
of six to seven times earnings, which is reasonable in relation
to my experience in the healthcare business.  And said, that's
what they would be worth in a going concern arm's length
transaction.  And then we said but in a Chapter 7 you're not
going to realize as much as you would because of the time
pressures and because everybody would know that the trustee
would be under some pressure to sell them.  And we assumed I
think a six month sale process, and based on that we
discounted, we took the earnings, applied a multiple of six to
seven times earnings and then discounted it from 30 to 50
percent to come up with the high and the low ranges.  So a

Colloquy                                50

trustee, under the hypothetical Chapter 7 you would receive

between 50 and 70 percent of the fair market value in a long

drawn out process.

THE COURT:  And that was only the profitable ongoing

enterprises?

THE WITNESS:  Yes, because we did not believe that

the unprofitable enterprises, and there are very few of them,

but the unprofitable enterprises, there was no method of

valuing them other than to say a liquidation piecemeal.

THE COURT:  And that would be accounted for, let's

say in the property, plant and equipment numbers?

THE WITNESS:  Yes, Your Honor.

THE COURT:  All right. Did I generate any questions,

sir?

MR. HUDGENS:  You didn't, but other counsel did.

Well, you may have also.

THE COURT:  Go ahead.

RECROSS-EXAMINATION

BY MR. HUDGENS:

Q.   Mr. Darr, going to the judge's questions first I guess.

On the liquidation analysis, you didn't give any value to good

will though, did you?

A.   No. We wouldn't do that in this type of an analysis.

Q.   I understand but I just wanted to be clear.

Do you know where all the various properties of the

Colloquy                                        51

debtors are located?

A.    Generally I know that they're located throughout a
multitude of states but I have not visited them.

Q.    And do you know when the various properties were acquired
by the debtors?

A.    No, I do not.

Q.    Do you know the rate of inflation of real property
including improved real property in any of those locations over
the period of time that the debtor has owned the property in
those locations?

A.    No, I do not.

Q.    This liquidation analysis though assumes, actually assumes
a depreciation of 50 to 75 percent, doesn't it?

A.    I'm sorry, can you direct me to what you're specifically
looking at?

Q.    I'm looking at page 5 talking under paragraph G2, the
liquidation recovery as a percentage of cost is assumed to be
the following, buildings and land 25 to 50 percent?

A.    That's only in the corporate division. That's not the
operating expenses, the operating divisions.

Q.    And what assumption is made on the operating divisions?

A.    Again, we valued the operating divisions as a going
concern and used the multiple of six to seven percent and then
discounted them. So that, the bulk of the fixed assets would be
sold as part of the going concern.

Colloquy                52

Q.   The bottom line answer though is nothing, right?  You --

A.   No.

Q.   You didn't consider a separate sale of the building and land, right?

A.   That's correct. We did not consider a separate sale of the building and land.

Q.   So you didn't try and place any value on it for those purposes?

A.   No, because that wouldn't be the way you would liquidate it under a Chapter 7.

Q.   Do you know how you would liquidate it under a Chapter 7?

A.   I have a good idea.

Q.   Do you know whether it could have been liquidated in a Chapter 11?

A.   It could have been liquidated in a Chapter 11.

        MR. HUDGENS:  That's all, Your Honor.

        THE COURT:  All right.  No further questions, thank you, sir.  You may step down.

        THE WITNESS:  Thank you, Your Honor.

        THE COURT:  All right.  We can continue. Thank you.

        MR. WALSH:  Your Honor, our next witness is Mr.

George Hager, and my colleague, Mr. Adam Strochak will take him through direct.

                GEORGE HAGER, SWORN

        MR. STROCHAK:  Good morning, Your Honor. Adam

Strochak, Weil, Gotshal and Manges for the Genesis debtors.

Colloquy                                53

DIRECT EXAMINATION

BY MR. STROCHAK:

Q.   Good morning, Mr. Hager.

A.   Good morning.

Q.   Are you an officer of the debtor, sir?

A.   I am.

Q.   What positions do you hold?

A.   I am the executive vice president and chief financial
officer.

Q.   How long have you been with the companies?

A.   I joined Genesis in 1992.

Q.   Do you work at the company's headquarters in Kenneth
Square?

A.   I do.

Q.   And where do you live, sir?

A.   I live in Haddonfield, New Jersey.

Q.   Could you just briefly summarize your educational
background, please?

A.   Yes.  I have a Bachelors in economics from Dickinson's
College and an MBA from Rutgers Graduate School of Management.

Q.   What are your employment responsibilities, Mr. Hager?

A.   I've been the chief financial officer at Genesis since I
joined in 1992.  Under that responsibility I have all
controllership functions, treasury functions, internal audit,
IS functions, tax functions, are the major areas of

responsibility.

Q.    To whom do you report within the company?

A.    I report directly to the chief executive officer and
chairman of the company, Mike Walker.

Q.    Mr. Hager, did you have any particular responsibilities
with respect to these Chapter 11 cases?

A.    Yes.  I was given the primary responsibility of managing
all of the activities directly dealing with the reorganization
process, including dealing with the development of the plan's
reorganization, the financial forecast, negotiating with the
various constituencies, the Creditors Committees of both
Genesis and Multicare.

Q.    Mr. Hager, what generally is the debtor's business?

A.    The debtors are primarily operate two business lines. The
operation of long term care facility servicing the needs of the
elderly population, principally in five markets on the east
coast of the United States.

Secondly, a subsidiary of Generis Health Ventures,
Neighbor Care, operates an institutional pharmacy business.  It
is the third largest institutional pharmacy in the country.

Q.    Mr. Hager, does Multicare have an institutional pharmacy
business?

A.    It does not.  Multicare actually sold its institutional
pharmacy business to Genesis approximately three months after
Multicare was acquired into the joint venture in 1997.

Q.    With respect to the long term care business, who were the
debtor's main competitors in that business?

A.    I would say that our business and the healthcare business
in general is a local business, so you compete in each
individual market. Generally from a public market perspective,
Genesis would be grouped with companies like Beverly
Enterprises, the newly emerged Kindred Healthcare, formerly
Vencore, currently companies still in Chapter 11, Mariner
Health, Mariner Post Acute Network, Sun Health, Integrated
Health Services, as well as Matter Care.

        Also, the institutional pharmacy component of our
business, our competitors would be Omni-Care and NCAS, both
public companies, and Pharmerica, a subsidiary of Bergen
Brunswick.

Q.    Mr. Hager, as a part of your responsibilities at the
companies, do you monitor the financial performance of the
debtors' major competitors?

A.    I really don't spend a lot of time in monitoring it in
detail the performance of our competitors.  Obviously, the
competitors are public companies. We see their press releases
and we look at those at a high level to see how we're
performing against our peers in the industry.

Q.    What are some of the factors that affect financial
performance in the long term care business?

A.    The long term business is, you look at the operation of a

Colloquy                  .                    56

skilled nursing facility, the vast majority of our payments

come from government sources. Over 65 percent of our patients

are on the Medicaid programs in the states we operate in, and

approximately 14 percent of our patients are covered by

Medicare. So as you can see, a significant component of our

revenue source comes from government sources. So the adequacy

of those payment rates, whether or not those payment rates

match, the underlying cost inflation of our industry is a

critically important component of the financial performance of

the skilled nursing facility.

On the cost side, the vast vast majority of the cost in a

skilled nursing facility are fixed and they are labor related,

primarily nursing.

Q.    Mr. Hager, are you familiar with the term payer mix?

A.    I am.

Q.    Could you just briefly explain what payer mix means in the

context of the long term care business?

A.    Payer mix is intended to represent the payment sources of

your patients or customers. As I said, in Genesis case,

Medicaid would be our largest percentage payer, with Medicare

being, and our private payment sources being second and third.

Typically, the industry classifies payer mix in three

broad categories; Medicaid, Medicare and private and other. And

private would include all of the other payment sources, not

only people paying out of their own pocket but also commercial

insurance, managed care payers, et cetera.

Q.   With respect to payer mix, how do the debtors compare to
their main competitors in the long term care business?

A.   My latest recollection of the public information would
tell me that we compare very closely to the likes of a Beverly
Enterprises or a Kindred Healthcare or Mariner Post Acute
Network.  Manor Care would be an outliner in our sector. They
have employed a strategy very different than ours, primarily
focused on a private paying population so you'll see that their
payer mixed is significantly more weighted to a private payment
source than is Genesis or many of our other competitors.

Q.   What's the current relationship between Genesis and
Multicare?

A.   Genesis owns 43 percent of Multicare as it did when
Multicare was acquired as a preexisting public company by a
joint venture.  It was acquired by Genesis and two private
equity sponsors, the Cypress Group and the Texas Pacific Group.

     We continue to own that 43 percent interest.  At the point
in time of that acquisition by the joint venture, the joint
venture entered into a management agreement with Genesis and
Genesis manages all the operational and financial affairs of
Multicare under a management agreement.

     In addition, as I stated earlier, Genesis acquired the
pharmacy business of Multicare and we provide pharmacy services
to Multicare as well. Genesis also provides rehabilitation
therapy services to Multicare.

In November of 1999, the relationship with Cypress and TPG
was restructured and they converted their investment in
Multicare to an investment in Genesis preferred stock. They
also made an equity investment at that point in time in Genesis
Health Ventures.

At the point in time of that renegotiation, Genesis
received an option to acquire the remaining 57 percent of
Multicare for I believe two million dollars.

Q.   Mr. Hager, are Cypress and TPG receiving any distributions
under the proposed plan of reorganization?

A.   They are not.

Q.   When were the contracts between Genesis and Multicare
first put into place?

A.   Well, clearly the management contract was put in place at
the time of the acquisition of the joint venture which I
believe is October 1997. The pharmacy agreements principally
were in place when Genesis acquired the pharmacy business from
Multicare. They were serving the majority of their own
facilities through their own pharmacy.

And the rehabilitation therapy contracts were put in place
I believe for the most part during calendar 1999.

Q.   Were any changes made to the contractual relationships
between Genesis and Multicare during the course of these
Chapter 11 cases?

A.   There was no change in the contractual relationship made,

Colloquy

but when both companies filed Chapter 11 it was considered important to retain an independent restructuring officer for Multicare which was done. Her name was Beverly Anderson, who had no contact with either company prior to that appointment. She was also appointed to the Multicare Board, and at that point the Multicare Board consisted of Beverly Anderson, myself, Mike Walker and Rick Howard, Rick Howard being the vice chairman of Genesis.

One of Beverly Anderson's duties was to evaluate the contractual relationships between Genesis and Multicare and determine whether or not if Multicare could get in a competitive market situation better rates for services. Those evaluations were done. Beverly Anderson was supported by an independent financial advisor, Ernst & Young. The results of those negotiations were that the payment rates charged by Genesis to Multicare were reduced by approximately 11.9 million dollars. Those reduction in payments are reflected in the operating cash flow and evaluations of each of the respective individual states.

Q.    Were the new prices actually put into effect?

A.    They were not.

I will add that on a cash flow basis, the cash that is exchanging hands on a monthly basis between Genesis and Multicare is reflective of the revised contractual rates.

Q.    Mr. Hager, did Genesis and Multicare have any claims against each other in these Chapter 11 cases?

A.   When both Genesis and Multicare filed, Multicare owed
genesis approximately 56 million dollars for services provided
primarily pharmacy, medical supply and rehabilitation therapy
services.

In addition, under the management agreement that was
signed in 1997, it was a six percent of revenue management
agreement, four percent was paid in cash and two percent was
deferred and subordinated. That deferred subordinated payment
could only be paid if Multicare achieved certain leverage
levels.  It never achieved those levels. The deferred
management fee was approximately 35 million dollars.

Multicare also alleged certain claims against Genesis as
well.

Q.   Have you reached any resolution of these claims?

A.   Yes. We entered into negotiations with Multicare, both
sides represented by counsel, and we agreed to settle the
claims against each other with no payments being made to either
estate. Being that that was a prudent approach in light of the
expected recovery which we did not believe would be significant
for the Genesis unsecured claims, we believe both estates would
benefit by an efficient resolution to the claims against each
other as opposed to any lengthy litigation.

Q.   Could you just elaborate for a second why you thought the
recovery in those claims would be insignificant?

A.   Well, we saw obviously daily the level of cash flows that

were generated by both estates, and we could see how our

respective businesses were being valued both in the public and

private domain. We did not believe based on that level of cash

flow and valuation that there would be a material recovery to

the unsecured creditors in either estate.

Q.   Mr. Hager, I just want to turn your attention to a few

questions about the debtors' financial projections underlying

this plan of reorganization.  And I'll start with just a few

background questions.

     When does the debtors' fiscal year begin and end?

A.   We're September 30th year end.

Q.   So does that mean we're in fiscal 2001 today?

A.   We are.  We are approaching the end of fiscal 2001.

Q.   Does the company prepare an annual budget?

A.   It does.

Q.   Could you just briefly summarize the budget process for

me?

A.   I would describe the budget process as a ground up

process. Each individual operating unit, that's each individual

nursing center or assisted living facility, pharmacy unit,

built its budget from the ground up, pay period by pay period,

payment source by payment source.  That process is consolidated

and reviewed with our Board typically very close to the end of

the fiscal year end or the beginning of the new budget year.  I

believe this year's budget, the 01 budget was completed very

Colloquy                                                    62

early in October.

Q.   As a general matter, does the comp ny anticipate that it
will actually achieve the numbers in the budget?

A.   Historically I would say it has been my experience at
Genesis that Genesis has had very lofty targets in its budgets,
setting high expectations for its managers, as that is the
basis for our evaluation of performance. We have traditionally
not achieved our historical budget levels.

Q.   Does the fiscal 2001 budget which you prepared last
October contain a projection for earnings before income --
excuse me, earnings before interest, taxes, deprecation, and
amortization or EBITDA?

A.   It does.

Q.   In the October budget what was the target EBITDA for the
companies?

A.   I believe the consolidated target EBITDA for the companies
was approximately 212 million dollars.

Q.   How does that break down between Genesis an Multicare if
you recall?

A.   I believe Genesis was approximately 170 million and
Multicare was 42 million dollars.  Obviously they did not
reflect any of the contract renegotiation issues that we talked
about.

Q.   And if I understand what you said before, as we're
approaching the end of fiscal 2001, are there actual results in
place -- for how many months are actual results in place now

Colloquy                                    63

for 2001?

                    (Tape #1 ends; Tape #2 begins)

     And what is your projection for EBITDA for the full year
fiscal 2001?

A.    Obviously we're going to have to estimate where we think
the months of August and September will come out, but through
ten months we are tracking on a consolidated basis behind that
forecast not dramatically.  I believe Genesis numbers will come
out actually in the 161 to 162 million dollar range and that
Multicare numbers will come out in the 51 to 53 million dollar
range.

Q.    And I think if my math is correct, that's a consolidated
range of 212 to 215, is that right?

A.    That's correct.

Q.    Mr. Hager, what are the, what is the projected EBITDA,
2001 EBITDA -- let me restate it this way.  Is there a
projected 2001 EBITDA that is incorporated into the assumptions
in the plan of reorganization?

A.    There is.

Q.    And what is that number, sir?

A.    It's I believe slightly less than 215 million dollars.

Q.    Could you tell me how you derive that number?

A.    The number is derived, go back to the beginning of
calendar 2001, we had seen at that point two months of actual
results against our budget. We had seen our centers, other care

centers, nursing home division, operating under budget at that point, not meeting its census targets. We saw our pharmacy business also not operating at budget levels. However, we saw our rehab business exceeding our original budget targets.

In addition there was some legislative changes. We were now able to at least estimate the impact of the newly signed Benefit Improvement Protection Act on our business, and that was due to be effective April 1st of 2001.

In addition we had completed some renegotiation of some managed care contracts with significant payers primarily in our Midatlantic region, Pennsylvania, and New York, Independence Blue Cross, US Healthcare, Horizon, all familiar names to people in this area. So we reflected all of those issues that now we knew or were fairly certain of that would affect the 2001 results that were not considered in the original formation of the 2001 budget.

Q. And did you come to some conclusions based on that updated information?

A. I believe the end result was that we reduced our budget in total on a consolidated basis to about 207 million dollars.

Q. In the course of the process of formulating and negotiating a plan of reorganization, did you make any other projections as to 2001 EBITDA?

A. Well, since we were under performing to the budget and obviously wanting to demonstrate to our creditors what we

thought the longer term cash flow potential was in the
organization, we actually ran calculations. We used the concept
or the name normalized and we calculated what we called
normalized 2001 EBITDA reflecting the full year impact of
certain of those changes that I just discussed like the Benefit
Improvement Protection Act that wouldn't impact us for the
entire fiscal 2001.  The intent of that presentation was to
present the EBITDA on a future basis at a level that we were
hopeful that we could achieve sometime in fiscal 2002.

Q.    Earlier, Mr. Walsh mentioned the synthetic lease facility.
Could you just briefly explain how the synthetic lease facility
affected the financial projections that underlie the plan of
reorganization?

A.    Sure.  In the historical financial statements, when the
original budget numbers that are presented, the 170 million
dollars for Generis, we had a synthetic lease facility that we
recognized as rent expense.  Under this plan, that lease will
be converted into debt and the assets will be owned by Genesis
Health Ventures.  Therefore, the rent expense associated with
the synthetic lease which is approximately 7.8 million dollars
a year at Genesis, needs to be added back to the EBITDA.

      So when you look at our revised budget of 207 million
dollars off the original 212 million dollars on a consolidated
basis, to get to the approximate 215 million dollars of EBITDA
in the first year forecast, you need to add the 7.8 million
dollars of rent expense related to the synthetic lease back.

Colloquy                                      66

Q.   Now the 215 number you referred to on a consolidated

basis, how does that break down between Genesis and Multicare

if you recall?

A.   I believe the, in the original forecast we were expecting

Genesis to do approximately 158 million dollars, and I believe

Multicare in the neighborhood of 57 million dollars.

Q.   I believe you mentioned earlier that you made some

adjustments based on changes in government reimbursement rates

under new legislation. Could you just briefly elaborate on the

rationale for those changes?

A.   Well, there is new law, new payment program for our

industry as it relates to the Medicare population that's

effective April 1st. That law was passed and covers actually

only an 18-month period. If we do not receive new legislation,

those payment increases will cease November 30th of 2002.  But

with the new law passed, we estimated the impact of those

payment rates on our Medicare population, between both estates

we serve almost a little over one million Medicare patient days

per year and our payment rates were increased by a little less

than $21 per patient day. So it was approximately a 21 to 22

million dollar impact for a full year, and in fiscal 2001 we

would realize half of that increase.

Q.   As an overall matter, how would you characterize the

company's EBITDA projections?

A.   We attempted to put forth what I would call a middle of

Colloquy

the road forecast. We knew that these forecast would be the basis of the debt that would be put on the reorganized entity and we wanted to obviously assure ourselves that in light of the risk in government payment programs, that we would be able to service the debt in the post emergence period. Our forecasts do contain two relatively material risks. We are in litigation on a major contract in the pharmacy business with one of our competitors, Manor Care. It's approximately 100 million dollar book of business and Manor Care is alleging that they do have a right to terminate that contract. That is subject to an arbitration proceeding that recently was completed. We do not have any result of that hearing.

Secondarily, we also have forecasted that the increased payments from the Benefit Improvement Protection Act will continue through the entire forecast period despite the fact that the current legislation would have those payments expire November 30th of 2002.

Q. Did the projections have any sensitivities on the expense side of the equation?

A. We have assumed in these forecasts that the Medicaid and Medicare payment rates will increase at approximately the same level as our cost. Now over the past three years we have not seen that relationship. Our labor costs have increased between six and eight percent and our Medicaid payment rates have increased less than five percent. But we do believe that this