economy is slowing. We do believe the employment rates are
rising. We do believe that the labor shortage, at least in the
unskilled areas, will ease to some extent. And we do believe
the Government payment programs will keep pace with inflation
going forward.

One could argue that was a bit aggressive when you look at
that relationship over the prior three years.

Q.    What about with respect to skilled labor, in particular
nurses?  Are there any sensitivities as to nursing labor costs?

A.    I think it's well publicized that we have a shortage of
nurses in this country. We are using what we refer to agency or
contract nursing at a much greater level than we had
historically. And it will continue to be a risk in this
industry and a concern with respect to financial performance
going forward.

We believe that we can keep pace from an inflationary
perspective and cost with our top line increase in payment
rates.

Q.    Earlier you mentioned an adjustment of 11.9 million
dollars, if my memory serves correct, as to, with respect to
the Multicare/Genesis contract changes.  How is that number
reflected or I should say is that number reflected in the
consolidated projections for the two companies?

A.    That 11.9 million dollars would have no impact on the
consolidated results because it would represent an increase in
or decrease in revenue to Genesis, and a corresponding equal

amount of declining expense at Multicare. So therefore on a
consolidated basis the 11.9 million dollar adjustment would
have no impact. It only has impact as you look at the value of
the cash flow of the individual estates.

Q. Mr. Hager, was any adjustment made for the potential loss
of business associated with Mariner Healthcare?

A. Yes. What we refer to as our base case forecast. We have
assumed that we lose our contract with Mariner Health
facilities effective, beginning effecting October 1st, 2002 in
the forecast. We have assumed that because Mariner Post Acute
Network is in bankruptcy as well, those contracts are
terminable, and they do expire by their term in February of
2002 in any event. It is public that Mariner Post Acute and
Mariner Health Group are attempting to sell their pharmacy
business and we believe ultimately over time the successful
bidder for that pharmacy business will ultimately serve all of
the Mariner beds.

    We did however make an offsetting adjustment in that base
case forecast. We believe that if we did lose the Mariner
business, that we would be more aggressive in the marketplace
to try to fill the excess capacity in certain of our markets.
And therefore we did increase the new bed growth assumption in
the early periods of the forecast to replace the lost Mariner
business to a certain degree.

Q. Mr. Hager, did you ever request a valuation of Genesis and

Multicare on a combined basis?

A.    We did not think that a combined valuation was necessary. We had respective independent financial advisors representing both estate's value of the estates separately.

By way of background, since the merger in 1997, the two companies have been operated as if they were one. There was one operational structure, there was one administrative infrastructure. All of the administrative synergies that we publicly announced in the transaction in 1997 have been realized. So virtually all of the operational purchasing power administrative system synergies have been realized since 1997, the date of the acquisition into the joint venture.

So therefore we felt that it would be reasonable to take the individual valuations and just combine them since the only nominal synergy will be the elimination of the administrative cost of having Multicare not be a public reporting entity going forward, which is relatively small. We didn't believe that would have a material impact on a combined forecast.

Q.    If the additional synergies are relatively small as you've characterized them, why was  the decision made to merge Multicare and Genesis as part of this plan of reorganization?

A.    There is in, from, in my opinion significant value created for both estates by keeping them together. Genesis provides over a hundred million dollars of services to Multicare, and both estates actually benefit by the combined purchasing power

and the presence and the ability to contract with significant
density with significant payers in the marketplace. We have
significant overlap in the skilled nursing facilities in both
companies from a geographical perspective, in southeastern
Pennsylvania, New Jersey, in the New England, Massachusetts,
Connecticut marketplaces.

Q.    Mr. Hager, would you anticipate that the cash flow of the
combined companies after the merger would differ significantly
from the cash flow of the two entities prior to the merger?

A.    I would not.

Q.    In contrast, what do you anticipate would happen to the
cash flows of the two companies if the relationship between the
two were severed going forward?

A.    It's very hard to predict, but clearly there would be
significant disruption on both, in both estates. From a
Genesis perspective it would be likely that we would lose the
pharmacy contract and the therapy contracts, and obviously with
a loss of the management contract, we'd be forced to sever and
reduce our administrative and corporate staff significantly.

     On the other side, Multicare would have the disruption of
trying to create a management infrastructure systems
capabilities in a very very difficult and systems in management
intensive business. And that would be I think they would see
significant disruption in their business.

     In addition, Multicare and Genesis would lose the
marketing benefits of the combined purchasing power of both

organizations.

Q.   Mr. Hager, was exit financing a factor at all in the
decision to merge the two companies?

A.   I think clearly from a financing perspective, looking at
the companies at a combined basis, it was easier to put in
place our exit financing.  Clearly the Multicare assets are
included in the collateral basis as an asset based collateral
based exit facility and the real estate value and the value of
the accounts receivable were included in the exit financing
syndication process.

Q.   Does the proposed plan create a common equity security for
creditors of both estates?

A.   It does.

Q.   And are there any advantages to that in your mind, sir?

A.   I believe there are.  I think most people agree that a
security that is of larger value is likely to have more
interest, more interested buyers and more interested sellers
and you would get a more rational and efficient trading of a
security that has more float and is larger in size. So I think
in this plan with an equity value of 800 plus million dollars
on a combined basis, that is a significant amount of equity
that would allow I believe an efficient trading of the equity
security in the public marketplace.

Q.   I have a few questions on exit financing.  Has the company
arranged for exit financing?

A.    We have. We have received an under written commitment on our exit financing facility.

Q.    And what is the amount of that commitment?

A.    The commitment is for 415 million dollars. It is comprised of a 235 million dollar term loan that will be used to repay the debtor-in-possession financing facility in Genesis and pay administrative expenses. It also includes a 125 million dollar revolving credit facility that can be expanded to 150 million dollars if there is sufficient demand. We expect that that credit facility will be undrawn at the emergent state. It will be necessary for the adequate liquidity for the company to operate in the go forward period.

      Additionally, there is a 55 million dollar delay draw term loan commitment. That commitment is there to be used if Genesis is successful in acquiring the assets of APS, that is the pharmacy business of Mariner, as well as 10 million dollars related to a purchase option that we have the ability to exercise on three facilities that we currently lease.

Q.    Who is providing the exit financing?

A.    The exit financing was underwritten by First Union as well as Goldman Sachs.

Q.    Overall, how much restructuring debt will there be on the combined companies?

A.    The total debt of the combined companies will be 625 million dollars. That was determined by applying a three times

leverage multiple to the anticipated latest 12 months EBITDA
that the combined companies were expected to generate through
June of 2001, and that number was 208 million dollars. And we
have reported our June results and the combined debt and these
did realize that 208 million dollar target.

Q.   Mr. Hager, do you believe that the company will be highly
leveraged on emergence from Chapter 11 if this plan is
approved?

A.   I do not think the company will be clearly as leveraged as
it was before.  I don't think three times leverage would be
considered low leverage.  I think it would be once again
probably middle of the road leverage.  I think it is
appropriate leverage in light of the risks that are included in
operating in a long term care business with significant
exposure to Government payment programs.

     We have recently received our credit ratings from both
Moody's and Standard and Poors and we are rated as a single B
credit by both of those rating agencies.

     By contrast, Manor Care, a competitor of ours, is rated as
an investment grade credit with a triple B credit rating.

Q.   How did you determine overall how much restructuring debt
there would be?

A.   Through the negotiation it was driven by one the company's
view of necessary liquidity and coverages that were needed to
service the debt.  But more importantly, there were limitations
being imposed on that leverage by the exit financing

Colloquy                                                                    75

marketplace. And the underwriting of our exit facility required
that our actual leverage be no greater than three times our
latest 12 months cash flow.

Q.    Mr. Hager, how was the restructuring debt allocated
between Genesis and Multicare?

A.    The restructuring debt and the preferred stock were
allocated effectively equally based on the respective cash flow
of both entities.  It is very close to three times cash flow of
both Multicare and Genesis.

Q.    How much do the senior lenders at Genesis get, do you
recall the amount?

A.    Of the rollover notes?  I believe they get 94 million
dollars.

Q.    And at the Multicare level, do you recall?

A.    It'd be 150 plus that would round out to 242 million of
total rollover security.

Q.    What explains the difference between the level of the
rollover debt at Genesis and at Multicare?

A.    Genesis had to finance the repayment of the
debtor-in-possession facility. Genesis paid interest during its
bankruptcy to its secured creditors and it borrowed under the
debtor-in-possession facility to finance those interest
payments.

Q.    Let me switch now to the equity side of the equation.  How
is the equity in the reorganized entity allocated between

Genesis and Multicare creditors?

A.    It was really done based on a pro rata contribution of each one of the estate's equity value to the total.  Genesis Health Ventures in our plan is valued at seven times multiple of cash flow. That seven times was derived as a blended multiple of eight times cash flow for the pharmacy business and six times for the nursing center business.  We used the same six times multiple for Multicare since it's principally a nursing home business.

One enterprise value was determined, we subtracted the leverage three times those cash flow numbers and the remaining result is the equity value of each of the respective estates and we combined those two.

Q.    Mr. Hager, isn't it correct that the values of both Genesis and Multicare have changed since the time when the plan was first formulated several months ago?

A.    I think the value that is being afforded our industry in the public marketplace has changed since that point in time clearly.  I'm not sure that's reflective of improved performance of our sector or other factors that have impacted the perceived value of the healthcare services sector in the public marketplace.

Q.    Does that perceived change in value alter at all the allocation of equity among the Genesis and Multicare creditors?

A.    Based on my review you would get virtually the same answer

since nothing fundamentally has happened in those businesses individually. The valuation has gone up pre-petition rata the same in both estates, and you really get a very similar answer for the equity split between Genesis and Multicare with the new values.

Q.   Mr. Hager, do you think the reorganized entity will be able to pay its debts as they come due and owing after emergence?

A.   I do.

Q.   I think you indicated before that there were some sensitivities or risk factors in the company's financial projections. Do those risk factors in any way present a problem for future debt service for the company?

A.   We do not believe so. We believe that there is sufficient coverage in our credit statistics that would allow for the payment of debt service in the event of negative occurrences such as the elimination of the increased payments from Medicare or the loss of the Mariner -- the Manor Care contract.

Q.   I have a few questions about general organization of the debtors.  How many entities comprise the Genesis debtors as a group?

A.   I don't know the exact number.  In excess of 500 would be a guess.

Q.   Five hundred entities?

A.   Entities.

Q.   Is that both Genesis and Multicare?

A.    Right.

Q.    Prior to the commencement of these Chapter 11 cases, did Genesis and Multicare enter into credit agreements with their senior lenders?

A.    We did.

Q.    Who were the borrowers under those credit agreements in a general sense?

A.    Virtually every subsidiary of Genesis Health Ventures and Multicare were borrowers and guarantors of those credit facilities and all the assets of those subsidiaries were pledged as collateral.  Virtually all the subsidiaries, there are a few exceptions.

Q.    Are there any non-debtor subsidiaries -- excuse me, non-borrower subsidiaries who are debtors in these Chapter 11 cases?

A.    There are several, yes.  I believe there are 14 entities, most of which are inactive or at least with no assets in Genesis, and 43 in Multicare. And once again, the vast majority are inactive or contain no assets.

Q.    Have you done any analysis of what assets those entities may have?

A.    Yes. We've looked at those individual entities to determine if there is any equity value, if there's any assets that exceed the encumbrances on those assets, and I do believe that in the Genesis estate there is one asset, a skilled

nursing facility, with approximately four million dollars of
unencumbered equity value.  In the Multicare estate, I've only
identified one asset with a nominal value which is about
$300,000.

Q.    Mr. Hager, I have a few questions about the debtors' books
and records and financial information systems. As an initial
matter, how do the companies, how do the debtors identify their
accounts payable information or classify their accounts payable
information?

A.    The debtors both in Genesis and Multicare and our
financial systems are organized by operating or business unit,
but by legal entity.

Q.    And in layman's terms, what does that mean? What are
business units?

A.    It would be a location of the pharmacy business, a nursing
home, an assisted living facility, but not necessarily a legal
entity.

Q.    And does each location generally correspond to a
particular legal entity?

A.    In some cases, they do.  In many many many cases they
don't.

Q.    How about with respect to financial information other than
accounts payable, what system of classification is used?

A.    It's the same.  We build our financial consolidations by
operating business unit.

Colloquy                                                                80

Q.   And approximately how many operating business units are
there, if you know?

A.   Hundreds.  Multiple hundreds, I would guess, over 300
operating business units.

Q.   Is there generally any correlation between the name of the
business unit or facility and the legal entity that operates
it?

A.   In some cases there can be.  In other cases, there is a
trading name that is more familiar than the legal entity.  I
couldn't really give you any percentages.  I would say you have
probably a lot of each.

Q.   Can the company determine from its books and records
exactly which legal entity is responsible for any particular
creditor invoice?

A.   I guess with an extensive amount of work we could
ultimately determine the legal entity, but we operate a
consolidated cash management system. We disburse only out of
three accounts, a Genesis account, a Neighbor Care account, and
a Multicare account. We have a centralized accounts payable
system. As I said, all the financial information is built by
operating unit.  It would take a significant effort to build
any kind of accounts payable valuation by legal entity.

Q.   If you could just illustrate perhaps with an example, what
process would you have to undertake in order to actually go
back and try and identify the particular legal entity that an

invoice was pegged to?

A.    I think you'd actually have to probably reprogram your
entire financial information systems which are very complex.
We process thousands of transactions monthly, to organize those
systems on a legal entity basis.  You then have to attempt to
go back and try to archive historical data for, you'd need to
do it for 15 years to build it up from the beginning of time,
if that data is even available, to get an accurate read of
current AP systems today or AP levels by legal entity.

Q.    Approximately how many creditor invoices does the
companies, do the debtors process every month?

A.    I couldn't guess but it's in the thousands obviously.

Q.    Mr. Hager, could you just briefly summarize how the
consolidated cash management system operates at the debtors?

A.    Sure.  On a daily basis, we receive cash at all of our
individual units typically, and that cash is swept daily.  It
is called in and swept daily into a concentration account.
Both Genesis has a concentration account, Multicare's cash,
because it is a separate estate, is also concentrated
separately. That concentration account then funds a disbursing
account and all checks are processed off of three accounts.
There is the Genesis disbursing account, a separate disbursing
account for Neighbor Care, and a disbursing account for
Multicare.

Q.    When Genesis pays creditors, what name, what company name
appears on the check?

Colloquy                                   82

A.    I believe it's Genesis Health Ventures, Inc. is on the

check.   Neighbor Care Pharmacies, Inc. would be on the check.

I believe Multicare would also be on the check as well.

Q.    That would depend on which of the --

A.    Which entity was disbursing.

Q.    -- which of the three disbursing accounts it came from?

A.    Yes.

Q.    Mr. Hager, do you believe it is reasonable to conclude

that any particular trade creditor thought that they were

dealing with a particular legal entity given --

          MR. GEORGE:  Objection.

          THE COURT:  You're welcome to finish the question.

          MR. STROCHAK:  Thank you, Your Honor.

BY MR. STROCHAK:

Q.    Given the methods by which the company pays creditor

accounts and deals with its accounts payable systems?

          MR. GEORGE: Objection, Your Honor.  I'm not sure how

this witness can testify about what creditors perceive when

they're dealing with this entity.

          THE COURT:  You're correct, I'm going to allow the

answer to the extent that Mr. Hager can help us with it.   In

other words, he may have some perspectives that might be

helpful.  If you can, sir.

A.    Many of our vendors deal with many of our different

operating entities, and I would say it'd be very difficult for

them to determine exactly which legal entity, in many cases
they don't know which legal entity they are dealing with. They
typically know they are dealing with either Genesis Health
Ventures, you know, Neighbor Care, or Multicare at that level
of detail.

Q.    Mr. Hager, if you could just very very briefly add just a
little bit to that last answer, if you could just very briefly
explain the process that you undertake when an invoice comes in
for payment from a vendor.

A.    When an invoice comes in to the company, it would
typically come into the area that procured the service of the
product at the business unit. That business unit individual
would approve that invoice and that invoice then would be
submitted into a corporate consolidated AP processing system.
When that payment was due under the terms, under, in the
system, a check would be cut under one of the three
disbursement accounts, depending on the entity that we were
disbursing for.

Q.    The debtors make public financial disclosures, correct?

A.    We do.

Q.    And are those disclosures made on a consolidated basis or
are they broken down by individual legal entity?

A.    The public disclosures that are made today in Genesis it's
a Multicare Form 10Q and 10K's are as follows.  Genesis and
Multicare are consolidated on the Genesis 10K and 10Q.

Multicare does issue a separate 10K and 10Q itself but that is on a consolidated basis for the Multicare entities.

Q.   Mr. Hager, is there a system for accounting of intercompany accounts payable between the various Genesis debtors?

A.   Yes. Any activity between related entities is accounted for through an intercompany general ledger account that is reconciled on a monthly basis.

Q.   And does that system identify matters by business unit as does the vendor system?

A.   It does.

Q.   And would the same be correct for the Multicare entities?

A.   That's correct.

Q.   Mr. Hager, why did the company or why has the company proposed a deemed consolidation for purposes of the plan of reorganization?

A.   We think it is fair and reasonable to treat all of the creditors on a proportionate basis.  I said many of these creditors serve many of our individual entities.  When we looked at the fact that all of our assets were securing our bank secured creditors, which we believed are impaired in this case, we believed that from the fairest and an efficiency basis, a deemed consolidation was the most effective and best result for all of our creditors.

Q.   Mr. Hager, I want to just turn your attention briefly to some of the release provisions that are provided under the plan

of reorganization and let me just ask you a kind of threshold
question. Are you aware that the plan of reorganization does
propose certain releases?

A.    I am.

Q.    Generally who is getting released under the plan of
reorganization?

A.    I believe the directors, the officers of the corporation,
employees of the corporations, I believe the administrative
agent and the credit facility as well is being released.

Q.    And generally what do these releases provide?

A.    They provide for releases for claims that the debtors
might bring against those groups.

Q.    With respect to releases of members of senior management
including yourself, do they include a release from pre-petition
obligations to repay loans from the debtors for the purchase of
stock?

A.    Those releases do not, but previously in this bankruptcy
there were four officers that did have loans from the
corporation. Those loans were made in connection a Board
mandated stock purchase program. Those officers were required
to own a certain multiple of their salary in company stock and
that was required by the Board and the Board, the company lent
money to the officers to purchase that stock. But that, those
loans have in a previous motion been agreed to be forgiven as
long as the officers continue to be employed by the company for

one year past the effective date of the reorganization.

Q. But the plan itself does include certain releases for senior management and directors, correct?

A. It does.

Q. And why was the decision made to incorporate those provisions into the plan?

A. As part of the overall negotiation process with all the constituencies, the management team is being asked to continue to operate the business going forward. We do not believe personally and I don't believe our constituents and our equity stakeholders would want the management team encumbered by claims of the debtor. It potentially would be distractive and affect the performance of the business and the creation and maximization of value in the post emergence period.

Q. This may be a little awkward question since you are in fact a member of the senior management team, but has there been any investigation of the existence of any potential claims against the debtors' officers and directors?

A. I'm not aware of any.

Q. Are you aware of any pending or threatened claims against either yourself, other members of the senior management team, or the company's directors?

A. No.

Q. Who are the proposed initial members of the Board of Directors of the reorganized company?

Colloquy                                                87

A.    The eight-member Board of Directors will be chaired by our

current chairman, Mike Walker.  And it will also include one of

the Genesis existing board members, Phil Grabino, who has

significant presence in the pharmacy business.  Two of our

investors' institutions will be represented, Goldman Sachs and

Highland Capital.  The remaining four members of the Board are

all healthcare industry chief executive officer operational

individuals.  I think you know their names. They're in the

plan. Their bios are in the plan.  I think it's a Board that

has good industry expertise, expertise and aligned with our

business going forward and also has some continuity with Mr.

Walker and Mr. Grabino.

Q.    And as you indicated, the identity of those individuals

have been disclosed to the public?

A.    I believe they're in the plan supplement.

Q.    Do you know if they've been posted on the company's

website?

A.    I believe they've been posted on the website as well.

Q.    Mr. Hager, are you aware of any punitive damages claims

that have been asserted against the debtors in these Chapter 11

cases?

A.    Yes.

Q.    Are you aware of any punitive damages judgments that have

ever been rendered against the debtors?

A.    No, I'm not aware of any.

Q.    How are punitive damages claims treated under the proposed

Colloquy                                    88

plan of reorganization?

A.   They are included as a separate class in the plan and there's no recovery afforded to that class.

Q.   What was the rationale for treating punitive damages claims in that way?

A.   It was our view that punitive damages are meant to be imposed as a penalty on corporation for whatever the action was.  In this case, when there is significant impairment of all the creditors, including the secured creditors, we did not believe it was fair that the creditors would be penalized for any potential actions that would give rise to a punitive damage claim.  And we did have agreement with the Unsecured Creditors Committee in that assessment.

Q.   Let me just go back to cover a little ground, recover a little ground that we touched on before.  I think you mentioned that the administrative agent for the senior lenders is subject to one of the releases under the proposed plan, is that correct?

A.   I believe that's the case.

Q.   And what was the rationale for including that release in the plan?

A.   Well, the administrative agent has effectively supported the organization and was representing all of the pre-petition secured creditors. From their perspective they are impaired and they are agreeing to grant their value or a portion of their

value to the unsecured creditors. They did not believe it was fair that if some of their value was being granted to the unsecured creditors, that the unsecured creditors could after the fact file a claim against the agent bank representing the pre-petition secured creditors.

Q.   And let me just go back for a moment to claims, potential claims against officers and directors. Are you aware, sir, of any basis for any claim against any of your other, any of the other members of senior management or directors of the company other than yourself of course?

A.   I'm not aware of any, no.

Q.   Mr. Hager, I just want to go back briefly to the projections that you talked about earlier, and I think you indicated that your current projection for fiscal year 2001 EBITDA is a range of 212 to 215 million dollars, is that correct?

A.   That's correct.

Q.   What level of certainty do you have that that prediction will be met for fiscal 2001?

A.   We have ten months of actual results and we're almost through the eleventh month. Nothing is certain but I do have a high level of confidence that our EBITDA for fiscal 2001 will fall somewhere in that range or very close to that range.

Q.   Thank you, Mr. Hager.

        MR. STROCHAK:   Your Honor, I have no further

Colloquy                                    90

questions at this time, but I would ask the Court's permission
to reserve the right to call Mr. Hager back to the stand on
rebuttal.  I do believe he may he able to -- we may need him in
response to various arguments that are made on valuation, but I
wouldn't want to burden the Court with -- I wouldn't want to
take away the punch line before we get the rest of the story
out, if that's okay with the Court.

     THE COURT:  That's fine.

     MR. WALSH:  Mr. Hager may also be needed in
connection with the United States Trustee issues, so.

     MR. McMAHON:  Your Honor, I just want to make that
clear for the record, that given the arrangement that we've
agreed to, Mr. Hager will be recalled by the United States
Trustee and the debtors will agree, both Generis and Multicare
debtors would agree to produce him at the appropriate time on
that specific issue.

     THE COURT:  That's fine.

     MR. STROCHAK:  We will, Your Honor.

     THE COURT:  Yes.  Just for scheduling purposes, we'll
go, assuming that there is some cross-examination, till about
12:30 and we'll take a lunch break at that point.  Is there --
thank you, sir.

     MR. STROCHAK:  I suspect there will be
cross-examination.

     THE COURT:  I suspect there will be as well. Who is

Colloquy                                    91

interested in starting?

                    MR. GEORGE:  I will, Your Honor.

                        CROSS-EXAMINATION

BY MR. GEORGE:

Q.    Mr. Hager, my name is Edmund George and I'm an attorney
for the AGE entities and I want to ask you specifically some
questions about the incentive packages and the releases that
are given to management as well as some of the compensation
issues.

      I understood your testimony to say that at an earlier
point in the bankruptcy there was an improvement, an approval
of the management incentive program by the Bankruptcy Court, is
that correct?

A.    There was an approval of a, for the four senior officers a
severance program that included an agreement to forgive the
loans, at least of three of those four individuals.

Q.    Now would that be Messrs. Howard, Barr, Hager, and
Rubinger (phonetic), are those the four individuals?

A.    Those are the four individuals that had officer loans,
yes.

Q.    And Mr. Howard's loan, was that $871,000 approximately?

A.    I don't recall the exact amount.  It sounds that it was
close to that amount.

Q.    Was yours $853,000?

A.    It sounds a little high but I guess that includes
interest.

Colloquy                                                    92

Q.   And Mr. Barr, a million one hundred thousand dollars, is
that your understanding of what his note was?

A.   I think that includes the accrued interest, if I'm not
mistaken.

Q.   Okay.  Now was there also an agreement to pay any taxes
that any of these individuals might incur as a result of any
forgiveness of income that they would have as a result of the
cancellation of that indebtedness?

A.   There was.

Q.   And was that $708,000 for Mr. Howard?

A.   I don't recall the exact amounts.

Q.   $894,000 for Mr. Barr?

A.   I don't recall.

Q.   And $693,000 for yours?

A.   I don't recall.

        MR. GEORGE:  Your Honor, if I could just approach the
witness perhaps to refresh his recollection.

        THE COURT:  Certainly.

        MR. STROCHAK:  Your Honor, just as a preliminary
matter, I'm not quite sure I see the relevance in this line of
questioning.

        THE COURT:  I don't know which line --

        MR. GEORGE:  Well, Your Honor, he was talking about
releases under the plan of reorganization and I think this --

        THE COURT:  I'll allow it.

Colloquy                                    93

MR. GEORGE:  -- goes to the issue.

BY MR. GEORGE:

Q.    Sir, I'd ask you to look at paragraph 9 of the motion that
was filed by the Genesis debtors in this case, motion of
debtors pursuant to Section 105 approving and authorizing
establishment of retention program for senior executive. Do you
see I've underlined some numbers here.  It says next to Mr.
Howard 871,000, 1,100,000 to Barr, 853 to Hager, do you see
that?

A.    I do.

Q.    And that the Rubinger note is 673,000, correct?

A.    That's correct.

Q.    And as well at paragraph 19 it talks about a provision
that they call a gross up, and it talks about payments to Mr.
Howard of 708,000, to Mr. Barr of 894,000, to Mr. Hager
693,000, and Mr. Rubinger -- am I pronouncing that correct?

A.    Rubinger.

Q.    Rubinger, 547,000?

A.    That's correct.

Q.    And there is an incentive program provided for in the plan
of reorganization, is there not, that would be payable to
certain of these individuals on emergence from bankruptcy?

A.    There is.

Q.    And under that incentive program, Mr. Walker would get a
million one hundred and twenty-five thousand dollars after

today, right, if the plan were confirmed today?

A.   I don't recall the specific amounts.

Q.   Do you know what you would get?

A.   I do not actually know the exact amount.

Q.   Well, if I were to tell you it was $350,000 would you have reason to dispute that sitting here today?

A.   I would.

Q.   And do you know whether Mr. Harold and Mr. Barr are also supposed to receive a half a million dollars in incentive compensation if the plan goes effective?

A.   My recollection is the amounts were somewhat less than that.  My recollection was at least for Mr. Howard, Mr. Barr and myself, those amounts were set at 85 percent of our comp levels, to be further adjusted down based on the timing of when the company emerged from bankruptcy.

Q.   I'd ask you to look at paragraph 16, sir, if the document that we've identified for the record, the motion to approve the management incentive, particularly I'm looking at this provision that talks about executives will receive incentive payments. Could you read those to the Court and the amounts?

A.   Walker $1,125,000, Howard 500,000, Barr 500,000, Hager 350,000.

Q.   Does that refresh your recollection of what you were supposed to get?

A.   I actually thought they were changed subsequent to that,

but I'm not sure.

Q.    Now there's also a deferred compensation package that's being assumed as a result of the confirmation of the plan, is there not?

A.    That is my recollection, yes.

Q.    And as a result of that deferred compensation assumption agreement, Mr. Walker will receive $1,118,000, do you understand that to be true?

A.    I think that's approximately the amount, yes.

Q.    Mr. Howard $217,476?

A.    I'm not sure of the exact amount there.

Q.    Do you know that yours is $117,000?

A.    I believe that was the amount, yes.

Q.    And how about Mr. Barr, do you know what he's going to receive?

A.    I do not.

Q.    And isn't it also true that as a result of the plan going effective, that all of those individuals are receiving raises?

A.    I don't think that's the case, no.

Q.    Is Mr. Walker's salary increasing as of the effective date of the plan?

A.    I believe it is.

Q.    From 600,000 to 800,000?

A.    I believe it's from 750,000 to 850,000, but I'm not sure.

Q.    Okay. And how about your compensation, is it increasing?

A.    Yes.

Colloquy                                                    96

Q.   What is it increasing from to?

A.   $350,000 to 400,000.

Q.   And do you know whether Mr. Barr is getting an increase in his compensation?

A.   I don't believe so.

Q.   And how about Mr. Howard?

A.   I don't believe so.

Q.   Now, you were asked specifically about whether there were any claims against any individual officers of the company or directors.  Did Genesis retain anybody for the purposes of making analyses of those claims?

A.   I'm not aware of any.

Q.   Did you or anyone else at the company assign somebody to do that?

A.   Not to my knowledge.

Q.   So when you testified earlier about you not being aware of any of those claims, what investigation did you do to determine whether there were any such claims?

A.   I've done no investigation.

Q.   So how do you know whether there were any claims that were being released?

A.   I didn't say I knew.  I said I was not aware of any.

Q.   But you didn't ask anybody to look, correct?

A.   That's correct.

Q.   Well, how would you become aware of them unless you

investigated them?

        MR. STROCHAK:  Objection, Your Honor.

        THE COURT:  Sustained.

BY MR. GEORGE:

Q.   Are you familiar with the terms of the plan of
reorganization generally?

A.   I am.

Q.   And were you involved in any way in putting the plan of
reorganization together?

A.   I was.

Q.   And did you testify earlier that the assets were all liens
to the secured creditors?

A.   I said the vast majority of the assets I believed, I
believe I said the vast majority of the assets or substantially
all the assets were liens to the secured creditors.

Q.   But there were in fact some assets that weren't liened at
all, correct?

A.   There are, yes, I think some assets not liened at all.

Q.   And pursuant to this plan, and as a result of the plan, at
confirmation those properties would become encumbered with the
liens of the exit facility financier, correct?

A.   Not having determined that finally yet, since we haven't
fully documented the new exit facility, I can't answer that
question specifically but I would expect that those nominal
other assets that aren't liened would be liened by the new exit

facility.

Q.   Now, are you familiar with the provision of the disclosure
statement that talks about exceptions to the liens of the
secured creditors?

A.   I'm not sure what you're specifically referring to.

Q.   Well, let me --

        MR. GEORGE:  Your Honor, if I could approach the
witness, I have a copy of the disclosure statement.

Q.   And specifically I'm referring to page 11.

     Have you had an opportunity to look at that, Mr. Hager?

A.   Is there a specific section you want me to look at?

Q.   It's only about a paragraph and a half here.

A.   Yes.

Q.   Now that seems to indicate that there was about $4,200,000
in assets that are not liened to the secured creditors in this
case, correct?

A.   That's correct.

Q.   And the statement that was made by the debtor in the case
indicates that as the analysis indicates, Classes G4 and M4
would receive small recoveries in a non-consensual
restructuring.  Did you see that?

A.   I did.

Q.   Do you agree with that today, sitting here?

A.   Yes.

     I believe those recoveries would be less than the
recoveries that they're currently receiving under the plan.

Colloquy

Q.    They would be less than what they're receiving but
nonetheless there would be a distribution, correct?

A.    Yes, a small distribution.

Q.    Now we've talked about punitive damage, at least your
counsel asked you about punitive damage claims. Do you remember
that?

A.    Yes.

Q.    And the reason that the Genesis debtors filed bankruptcy
was not because of any punitive damage claim that was
adjudicated with them, against them, isn't that correct?

A.    That's correct.

Q.    And as we sit here today, do you know what the extent of
any punitive damage liability is that the Genesis debtors may
have?

A.    I do not.

Q.    Do you know of any specific punitive damage claims other
than the punitive damage claims made by the AGE entities in
their counterclaims against Genesis?

          THE COURT:   Could you repeat that question please.

          MR. GEORGE:   I'm sorry, Your Honor.

BY MR. GEORGE:

Q.    Sitting here today, sir, do you know of any punitive
damage claims other than the punitive damage claims raised by
the AGE entities in their counterclaims against Genesis in the
lawsuit in Delaware?

Colloquy                                        100

A.    Not specifically.  I would imagine that some of our
general liability claims would include punitive damages, but
I'm not familiar with the specifics of those claims.

Q.    Well, do you have knowledge of any particular punitive
damage claim that would be in a position where if it were fixed
that it would cause the debtor to have difficulty in going
forward with its plan post confirmation?

A.    Not that I'm aware of.

Q.    So this case isn't like a case where, like the Dalkon
Shield case for example, where there are multiple punitive
damage claims that have taken money away from the Genesis
estates?

            MR. STROCHAK:  Objection, Your Honor.

            THE COURT:  I'll allow it, if you can answer it.

A.    I have no knowledge of that case.

Q.    Do you know whether there are severe punitive damage
claims in this case that caused the Genesis debtors financial
difficulty?

A.    There were not.

Q.    Now with respect to the releases, from your understanding
of the plan, is there any provision that would release the
claims of third parties against the managers, officers or
directors of the Genesis debtors or the Multicare debtors?

A.    No.

Q.    So the claims, as you understand it, of third parties

Colloquy                    101

against any individual officer or director would not be
affected by this plan?

A.    That's my understanding.

        MR. GEORGE:  I don't have anything further for this
witness, Judge.

        THE COURT:  All right.  Further questioning, sir?

        MR. PRIMPS:  Your Honor, my name is William Primps.
I represent GMS and I'm here with my colleague, Mr. Reed, we
could introduce our team now but perhaps we can hold on that.
I do have questions for Mr. Hager.  But of course we, as
representative of GMS, we are objecting to the plan and I had
an inquiry as to whether anyone who might be a proponent of the
plan might have some questions now just so we're not backing up
and having to recross-examine off of any questions designed to
elicit support for the plan.

        THE COURT:  That is fine.  That's perfectly
appropriate.  Are there proponents who wish to question Mr.
Hager?

        MR. TODER:  I just have two questions, Your Honor.
Richard Toder, Morgan, Lewis & Bockins.

                    CROSS-EXAMINATION

BY MR. TODER:

Q.    Mr. Hager, when you were describing the release provisions
of the plan, is it correct that also includes releases for
members of the statutory committee?

                    **AA. 214**

Colloquy                                   102

A.    I believe so, yes.

Q.    Is it also correct that the pre-petition credit agreements
and the DIP credit agreement contain provisions of the
indemnity by the debtors or borrowers if causes of action are
asserted against the --

A.    I believe they did.

Q.    Thank you.

        THE COURT:  Any other proponents who have questions
of Mr. Hager?  All right.

        MR. PRIMPS:  Thank you, Your Honor.

                          (Pause)

        MR. PRIMPS:  Excuse me, Your Honor.  I just needed
just a minute there to pull a few papers together.

        THE COURT:  No problem.

                    CROSS-EXAMINATION

BY MR. PRIMPS:

Q.    Good morning, Mr. Hager.  I guess it's afternoon by now.

A.    Good afternoon.

Q.    We met last week for the first time, didn't we, in a
pre-hearing deposition?

A.    We did.

Q.    I thought I'd follow up on your testimony this morning and
perhaps pursue a few of the points and matters that were raised
at that last meeting that we had.

      You did state that you played a role in the drafting of
the disclosure statement that's been filed in this matter, is

Colloquy                              103

that correct?

A.    I did.

Q.    And you signed that disclosure statement, isn't that
correct?

A.    That's correct.

Q.    And the disclosure statement does speak in terms of the
synergies that will be achieved by this merger, does it not?

A.    It does.

Q.    And I believe that counsel for the debtor this morning,
you were here this morning to hear Mr. Walsh's opening remarks,
isn't that correct?

A.    I was.

Q.    And you heard him refer to the synergies that would be
achieved by the merger, is that correct?

A.    I don't recall the specific comments, but.

Q.    Now, your counsel talked about a hurdle number in terms of
enterprise value I think it was, and a sheet was handed out.
Did you see that sheet?

A.    I did not see the sheet that was handed out but I have
seen calculations of a hurdle value.

Q.    Did you see that that number was two billion sixty-five
million dollars?

        MR. PRIMPS:  If I could approach the witness, Your
Honor.

        THE COURT:  Certainly.

Colloquy

A.    Thank you.

Q.    It appears on debtor's table 3?

A.    Yes.

Q.    Did you play any role in the calculations that appear on debtor's table 3?

        THE COURT:  Table 3 or table 2?

        MR. PRIMPS:  I'm looking at the valuation hurdle --

        MR. WALSH:  Your Honor, we have not actually handed out table 3 yet.  It's possible that some people had picked that up inadvertently.  We've handed out table 1 and table 2 at this point.

        THE COURT:  So I don't have table 3.  If you'd like me to consider it --

        MR. PRIMPS:  I would, Your Honor.

        THE COURT:  All right.

        MR. WALSH:  Well, Your Honor, the, let me just put it in perspective.  I have no problem dealing with this.  What table 3 is supposed to show after all the valuation testimony is where the various experts came out.  So I thought that it would be useful for everybody to have a summary after we heard the testimony.  So we can bring out this testimony first or hand out the table first, but I thought it would be more accurate if we heard the testimony first.

        THE COURT:  Well, now we understand what the purpose of it is and we'll keep that in mind.  I guess if there is

Colloquy        .                        105

questioning about it now, I don't see a problem with it. So, do
you have copies of -- do you need copies of things?  Do you
have enough copies of table 2 to distribute?

        MR. HUDGENS:  I'm afraid I'm operating at the same
disadvantage because I've got 1 and 3 also.

        THE COURT:  All right, if you would, just perhaps
since we're not talking about 2, at the lunch break you're
welcome to distribute 2. Go ahead, sir.

        MR. PRIMPS:  Thank you, Your Honor.

BY MR. PRIMPS:

Q.   Again, showing you debtor's table 3, Mr. Hager, did you
play any role in the drafting of that table?

A.   I reviewed the calculations.

Q.   And you believe it's essentially accurate as far as your
review indicated?

A.   I believe yes, it's essentially accurate.

Q.   That's the debtor's position, is that correct?

A.   That's correct.

        MR. PRIMPS:   I just thought we ought to have that in
the record because there will be a number of figures that we're
talking about this afternoon and the Court I think ought to be
aware of some of these bright line cutoff figures.

Q.   Now another figure that we talked about in your deposition
was the EBITDA number that was projected in the disclosure
statement, is that correct?

Colloquy

A.    That's correct.

Q.    And the unified EBITDA number for the two enterprises, Genesis and Multicare, for the year 2001, appears at page 50 and that's $214,457,000, is that correct?

A.    I believe that's correct, yes.

Q.    And that resulted from an addition of EBITDA numbers appearing at page 45 of the plan for Genesis for 2001, that's 158 million dollars, added to the Multicare number of 56 million dollars appearing at page 48 of the plan, is that correct?

A.    They sound correct, yes.

Q.    And I think you testified previously you assisted in the preparation of those numbers?

A.    I did.

Q.    Your office actually produced the numbers upon which those EBITDA projections are based, is that correct?

A.    Well, the forecasts were prepared by myself and my staff as well as the resources of UBS and Credit Suisse First Boston in the preparation of the projections.

Q.    Those numbers were prepared early this year, is that correct?

A.    Yes.

Q.    In the January/February time frame?

A.    Yes, that's I think an appropriate time frame.

Q.    Now, there are other EBITDA numbers that have been produced since the company filed for Chapter 11 protection,

Colloquy

isn't that correct?

A.    Yes.

Q.    Going back to the start when the, in July of 2000 when a debtor-in-possession credit facility was being arranged, there were EBITDA numbers that were projected at that point, isn't that correct?

A.    That's correct.

Q.    Just so we're talking about the same numbers and the same document, I'd like to show you the document that was marked as Hager Exhibit 4 in your deposition --

        MR. PRIMPS: And Your Honor, could I provide the Court with a copy?

        THE COURT:  Certainly.

        Let's start to mark particular exhibits because the record should be clear. This can be -- is it GMS-1 perhaps?

        MR. PRIMPS:  I think that would make sense, Your Honor.

        THE COURT:  All right.

        MR. STROCHAK:  Excuse me, do you have an extra copy by any chance.

        MR. PRIMPS:  It was Hager Exhibit 4 in the deposition.  Oh, I guess we do have an extra.

BY MR. PRIMPS:

Q.    Drawing your attention to this document that's now been marked as GMS-1, could you state the role that you played in

Colloquy                                              108

drafting this document, if any?

A.    Well, the majority of this document would have been
drafted by the agents who were syndicating the
debtor-in-possession finance facility.  Myself and my staff
would have provided all of the factual input with respect to
the company information and the financial information.

Q.    And this was -- I think you testified this document was
prepared by Mellon Bank, is that correct?

A.    I believe so.

Q.    And your organization provided financial information in
it, isn't that correct?

A.    That's correct.

Q.    I'd like to draw your attention to the page that was
stamped GS which indicates I think it was produced by Goldman
Sachs, GS2674.  And actually the page right before that as
well, GS02673.  Do you see the GS2673 the EBITDA number shown
for 1999 in the right hand column?  EBITDA appears in the
middle of the page. And that's 226.3 million dollars, is that
correct?

A.    That's correct.

Q.    And then on the following page for Multicare, do you see
the EBITDA number appearing for 1979 -- excuse me, 1999 there
which is 73.3 million dollars, you see that?

A.    I do.

Q.    Does that indicate that a combined EBITDA number for these

Colloquy                          109

two enterprises, Multicare and Genesis, in July of 2000 was
being shown as $299,600,000?

A.    That was the 1999 EBITDA?

Q.    Yes.

A.    Yes.

Q.    And you didn't at the time that this was being presented,
you didn't raise any objection about the size of that number,
did you?

A.    I don't recall if I did.

Q.    Now in that same January/February period that you were
describing as being the time when the 214 plus million dollar
EBITDA figure was being included in the disclosure statement,
there's also numbers being presented for example to a steering
committee for senior lenders, do you recall that?

A.    We met with our steering committee for senior lenders
monthly. We presented financial information at I believe every
one of those meetings.  I'm not sure specifically what you're
referring to, but there was financial information prepared for
that group monthly.

        MR. PRIMPS:  Your Honor, I'd ask to have marked as
GMS Exhibit 2, a February 13, 2001 document with the Weil,
Gotshal and Manges logo on it.  Genesis Health Ventures, Inc.,
meeting with the senior committee for the senior lenders.

        THE COURT:  All right.

        MR. PRIMPS:  And, Your Honor, could I ask based on

Colloquy                                          110

the testimony given that you would receive the GMS Exhibit i
into evidence?

THE COURT:  Absent objection, is there any?

MR. STROCHAK:  Just relevance, Your Honor.  It
contains projections for 1999 which I don't see how they're
relevant to 2001.

MR. PRIMPS:  It also has projections beyond 1999,
Your Honor.

THE COURT:  Will those be the focus of our attention?

MR. PRIMPS:  I think we're setting some background
here for how these numbers fluctuate, Your Honor.

THE COURT:  I'll allow it.  Obviously if it doesn't
ultimately pertain, I won't have basis to consider it but for
these background purposes I will allow it into evidence.

MR. PRIMPS:  Thank you, Your Honor.

Your Honor, I'm showing the witness a copy of GMS-2,
a document that was previously marked as Hager Exhibit 9 during
Mr. Hager's deposition.

THE COURT:  I see this is a duplicate of GMS-1.
Perhaps someone else can benefit from it.

BY MR. PRIMPS:

Q.   Mr. Hager, have you had a chance to look at GMS-2?

A.   I have.

Q.   Can you --

MR. STROCHAK:  Excuse me, I'm sorry.

Your Honor, just a preliminary objection to this

Colloquy                         111

document. This document was created in the course of settlement
negotiations and negotiations over the plan, so there is a
potential Rule 408 objection over it.  I think we've analyzed
it and we believe it would be appropriate to have Mr. Hager
review it and testify about it, but we just want to, with the
agreement that it wouldn't be a waiver of any other potential
Rule 408 objection that might arise with other documents.

THE COURT:  Noted.

MR. PRIMPS:  We can argue the 408 point at an
appropriate time, Your Honor.

THE COURT:  Indeed.

MR. PRIMPS:  I would just mention that there have
been 408 documents that have been marked in depositions in this
matter and it seems that when law firms are interested in doing
that, they can put the stamp on the document and it wasn't done
here, but we'll argue the point of it, if necessary.

THE COURT:  All right.

BY MR. PRIMPS:

Q.  Could you tell the Court, Mr. Hager, what this document
is, GMS-2?

A.  It was a document that the debtors presented to the
steering committee for the senior lenders in February with a
preliminary proposal for a plan of reorganization.

Q.  And did you play a role in the drafting of this document?

A.  I did.

Q.   Tell the Court what that role was.

A.   With the assistance of counsel, myself and my staff were the primary architects of this document.

Q.   And did you make a presentation based on this document?

A.   We did.

Q.   You personally?

A.   I was involved in the presentation. I believe I made the majority of this presentation.

Q.   And in this presentation, I see that there is a page 3 and I'd ask you to turn to that page. And do you see at the top of the document there at page 3, the numbers for adjusted normalized EBITDA?

A.   Yes.

Q.   Now those are preceded, are they not, at the top of that chart with a normalized 2001 EBITDA, do you see that?

A.   Yes.

Q.   And the normalized 2001 EBITDA number, was that prepared by your office?

A.   It was.

Q.   And the consolidated number for the two companies is $223,603,000, is that correct?

A.   That's correct.

Q.   Could you tell the Court what normalized EBITDA is?

A.   I doubt you'll see a definition of normalized in the accounting or financial reporting world. The concept that we

were trying to put forth as we were negotiating with our senior
committee, steering committee, was the EBITDA potential of the
organization as we look forward into 2002 reflecting the full
year impact of certain legislative and contract changes that
were to occur partway through fiscal 2001, the largest of those
adjustments was the Benefit Improvement Protection Act.  It
also did things like make an assumption that the few facilities
that we had in startup phase that were losing money would
achieve their stabilized level of cash flow. This was really a
concept of what the cash flow potential of the organization was
based on the payment rates and the stabilized value or
stabilized cash flow potential of our startup facilities, and
any other contract changes that occurred like the managed care
contract, the re-negotiations partway through 2001.

Q.    So your testimony is that a normalized EBITDA number has a
forward looking element to it?

A.    Yes, it does.

Q.    And here the specific term is used, normalized 2001
EBITDA. What relationship to the year 2001 does that EBITDA
number of consolidated 223 million six hundred and three have?

A.    What relationship?

Q.    Yes.

A.    Is it higher or is it lower?

Q.    You're using 2001 in the same line with the word
normalized.  How does that relate to the year 2001?

A.    We used the expected 2001 EBITDA for fiscal 2001 and

adjusted that for certain items that we would realize in 02,

the largest being the full year impact of the payments from the

Benefit Improvement Protection Act.

Q.   And the adjusted normalized EBITDA number there is higher

than the 223,603,000, it's 231,403,000, is that correct?

A.   That's correct.

Q.   And that reflects the synthetic lease adjustment, does it

not?

A.   Yes, the 7.8 million that I previously discussed.

Q.   Now you've stated that there's a relationship to the year

2002 that exists with these statements of normalized and

adjusted normalized EBITDA on the first line, normalized 2001

EBITDA.  Is it stated anywhere on this document that there's

that relationship to the year 2002?

A.   Not that I'm aware of.

        MR. PRIMPS:  Your Honor, at this time I'd like to,

based on the testimony, move the acceptance into evidence of

the document marked GMS-2.

                MR. STROCHAK:  No objection, Your Honor.

                THE COURT:  All right.  GMS-2 into evidence.

                Perhaps this might be a --

        MR. PRIMPS:  We're about ready to get into another

fairly long document.

                THE COURT:  Then fine.  Let us take a lunch break.

We will reconvene at 1:45.

Colloquy                                    115

MR. PRIMPS:  Thank you, Your Honor.

THE COURT:  Thank you.

(Lunch recess)

(On the record)

THE COURT:  All right, Mr. Hager, I remind you of course that you're still under oath. We're continuing with cross.

MR. PRIMPS:  Thank you, Your Honor.

At this time I would mark as GMS Exhibit 3 a document which actually in a deposition, Your Honor, has already been marked as GMS Exhibit 3 but perhaps Your Honor wants to put the stamp on.

THE COURT:  Thank you.

BY MR. PRIMPS:

Q.  Have you had a chance to look at the document marked GMS Exhibit 3, Mr. Hager?

A.  I have.

Q.  And can you state for the record what that document is?

A.  I believe it is a document presented to us by Goldman Sachs when we were in the process of looking for exit financing.  We visited their offices in that process.

Q.  And you were present for a presentation made by certain members of the Goldman Sachs team, is that correct?

A.  Yes, that's correct.

Q.  And the Goldman Sachs team is shown on the second page of

Colloquy                           116

this document, is that correct?

A.   That's correct.

Q.   And do you recall who on that team participated in this
presentation?

A.   I believe that Gary Moss and Gwen Deloche (phonetic) gave
a majority of the presentation.  Roger Gordon, a high yield
research analyst I believe also made some comments at that
meeting.

Q.   I see Joseph Lanassa (phonetic) is listed in the part of
the pie chart that I think is entitled bank loan investing. Was
he -- did he make any presentation?

A.   I don't believe so.

Q.   Do you know if he was at the meeting?

A.   I believe he was present for a portion of the meeting.

Q.   Did you find the presentation by these members of the
Goldman Sachs team to be a professional and of high caliber?

A.   It was a professional presentation, yes.

Q.   I draw your attention to the section of the report bearing
the Bate stamp number GS01854.  Do you see that page?

A.   I do.

Q.   And that page contains certain EBITDA numbers, does it
not?

A.   It does.

Q.   Do you recall this page being presented during the course
of this presentation that you were present at?

—

A.    I don't have a specific recollection of a detailed presentation of this page.

Q.    Do you recall seeing this presentation in the form of a handout at that meeting at Goldman Sachs that you just referred to?

A.    Could you repeat that question, please?

Q.    Yes. Do you recall seeing the figures on this sheet at the Goldman Sachs presentation that you just testified about?

A.    I don't have a specific recollection of reviewing this page as part of the presentation.

Q.    Do you have any reason to believe that this was not included in the materials presented to you at the Goldman Sachs presentation?

A.    No, not at all.

Q.    And you see that the number there for the pro forma third quarter annualized EBITDA, if you follow down that listing in the middle of that page, is 230 million dollars, do you see that?

A.    Yes, I believe that is a number that Goldman Sachs calculated. I'm not sure how they calculated that. I believe it was an annualization of projected third quarter 2001 results that did include the impact of the Benefit Improvement Protection Act --

(Tape #2 ends)