Colloquy                                118

A      No, not at all.

Q      And you see that the number there for the pro forma third quarter annualized

EBITDA, you follow down that listing in the middle of that page is 230 million dollars,

do you see that?

A      Yes, I believe that is a number that Goldman Sachs  calculated.  I'm not sure

how they calculated that.  I believe it was an annualization of projected third quarter

2001 results that did include the impact of the Benefit Improvement Protection Act,

for that quarter, as well as the continuation of the service of the Mariner beds at the

current contract price.

         As you can see, as you go to the next column, the 2001 number

declines to 207.9.  And I believe that reduction is primarily reflecting the loss of the

Colloquy

Mariner business and the inflationary impact of cost increases through the rest of 2001.

Q      Could you state how the impact of the Benefit Improvement Protection Act is shown as between those two numbers, the 230 million dollar number and the 207.9 million dollar number?

A      I did not prepare this presentation. But if they annualized the third quarter, which would be for Genesis the April 1st to June 30th quarter, they would have annualized the full impact of the BIPA changes for one year.

The fiscal '01 period only includes the Benefit Improvement Protection Act for six months.

Q      I see. I note that there's a footnote (b) that appears on this page. It states, projections based on information provided in 213, 2001 steering committee presentation. Now does that refer to the steering committee presentation at which GMS Exhibit 2 was presented? I don't know if you have GMS-2 in front of you.

A      Yes.

Q      You do. Are we talking about the same meeting there Mr. Hager?

A      I'm not sure, I didn't prepare this presentation. I can only make an assumption that it was based on the same information.

Q      And you see in that footnote (b), assume; one, no APS acquisition; two, Mariner contract loss; three, Medicare rate adjustment and – four, BBRA, revenue adjustment; five,

start-up facilities; and six, synthetic lease, in EBITDA. Do you see that – that reference?

A      Yeah, I do.

Q      That indicates to you then that the APS acquisition was not assumed in these

Colloquy

numbers, is that correct?

A     That's correct.

Q     And that the Mariner contract loss was assumed?

A     I believe so. What's not clear is when they have assumed the Mariner
contracts are terminated.

Q     Um-hum.

A     And in the forecast, in the plan, we've assumed they
begin -- we begin losing the business October 1st of 2001.

Q     Not October 1st, 2002? I think there my have been some prior testimony on
that.

A     If I did, it was incorrect. It was October 1st of 2001, which is the beginning of
fiscal year 2002. So it wouldn't impact our projections until the 2002 year.

Q     Now there is shown on this chart an EBITDA number for 2002, that makes no
reference to being annualized or projected, it just says 2002, and then you follow
down and it's two hundred twenty-one million point four, is that correct?

A     That's correct.

Q     I'd like to draw your attention to another portion of this Goldman Sachs report.
And -- but first, perhaps you could tell the Court the significance of this meeting.
What role was Goldman Sachs speaking to as they were making this presentation in
early 2001?

A     Early 2001, we were in the process of seeking exit financing. And we went to
a variety of large institutions, institutions both inside and outside our current lending
group. Included in those banks were Chase, Fleet, and Lehman (phonetic) Brothers.

        The significance of this presentation was that Goldman was pitching
their services and the resources of their bank to be an underwriter of our exit

Colloquy

financing.

Q    Goldman had played and does play other roles, does it not, with respect to Genesis, besides the role in exit financing that's being proposed here?

A    They are represented on our steering committee, and they are large investors.

Q    When you say large investors, are they the largest single equity investor proposed for the new company?

A    I believe they will be.

Q    And I think you told the Court before that they will be represented as one of the eight directors in the newly organized company emerging from bankruptcy, if approval is granted?

A    That's correct.

Q    And who will be the individual on the board of directors, designated by Goldman Sachs?

A    Joseph Lanassa (phonetic).

Q    Do you know Mr. Lanassa?

A    I do.

Q    Do you know what his position is within Goldman Sachs?

A    I believe he's a vice president.

Q    Returning your attention to this document, the portion stamped GS-01862, entitled Positioning Genesis in the Capital Markets.

        Do you recall reviewing this particular page at or about the time of the Goldman Sachs presentation that you've testified to?

A    I have a general recollection that they presented this page during that presentation.

Q    Do you agree with the points that are made on this page, that is, the first one,

long-term care is a stable non-cyclical industry?

A       I believe it's a non-cyclical industry, yes. Stable for the current period?  I

would say yes. Obviously, if you take that assessment of stability and look back

three or four years, this industry has gone through a dramatic upheaval.  So, that

comment of being stable is, I think, a comment made relating to the current period,

the very current period.

Q       But the prior instability related to the method of Government reimbursement

for the types of services that are provided by Genesis and Multicare?

A       I think the prior instability was a combination of many factors.  Clearly the

Medicare payment system was individually the largest, but the labor inflation and the

tightening labor markets in this country had a significant impact on the significant

increase in health insurance programs and liability malpractice insurance cost, and

also significant events that effect this industry.

          As did the rising interest rate environment during that period.

Q       Do you agree with the second assertion, second bulleted item, Genesis has

high quality assets located in very attractive markets?

A       I think, for the most part, Genesis has good assets in good markets, yes.

Q       And the -- without reading the entire third bulleted point, the improved industry

backdrop relating to Medicare reimbursement and Medicaid reimbursement, do you

agree with that point?

A       That is consistent with your forecast, too, yes, I would agree with that point.

Q       The next point, institutional pharmacy business is an attractive growth

platform, do you agree with that?

A       Yes, I think it can be.

Q       I think you've described the post bankruptcy capital structure as being a

conservative one, do you agree with that?

A        I think it's a middle of the road capital structure.

Q        And this last point, from a financial and qualitative perspective, Genesis compares well to other players in the industry, such as Beverly Enterprises, and Manor Care, do you agree with that?

A        I believe with some portions of that statement. From a financial perspective, Genesis does compare I'd say more equally with the likes of a Beverly Enterprises, at least our credit ratings would tell me that.

        Our quality and payer mix would tell me that from Manor Care perspective, I think Manor Care has been viewed historically as a leader in the industry and has commanded a premium valuation in the industry.

        They have a different model than Genesis, a more private pay focused model than the Genesis focus on higher acuity patients, and neither of those two companies operate

the -- in the institutional pharmacy business.

        In Genesis that represents virtually 50 percent of its operations.

Q        At the time of this presentation, did you express your comments about Manor Care and whatever inapplicability its experience has to Genesis to Goldman Sachs?

A        I don't recall making any specific comments when this presentation was made.

Q        Do you recall ever disagreeing with this presentation, particularly that last bulleted point?

        MR. STROCHAK: Objection, Your Honor, I think it was just asked and answered. I would express some disagreement.

        THE COURT: I think that -- I think it was.

BY MR. PRIMPS:

Q    I'd like you to just turn to the next page, and just one point there, on the syndication considerations, do you see that?

A    Yes.

Q    Do you recall a representative of Goldman Sachs mentioning the third from the bottom bulleted item, annualizing EBITDA Central to properly reflect current reimbursement environment?

A    I don't have a specific recollection of that bullet point being presented or emphasized in the presentation.

Q    Would you agree that in February of 2001, it was necessary to annualize EBITDA to properly reflect the current reimbursement environment as it existed then?

A    No.

Q    So you disagreed with the Goldman Sachs point as stated there?

A    The purpose of this meeting was for Goldman Sachs to present their qualifications to Genesis. So it was not the forum for me to react and specifically agree or disagree with syndication considerations.

          I do believe it was appropriate for an investor in our new credit facility to consider the impact of the new reimbursement environment under the Benefit Improvement Protection Act. And I believe the proper way to consider that is to evaluate the projections put forth by the company, which were made available to the investors. I think annualizing a given short period of time can give potentially misleading information, positive or negative.

Q    But you don't deny that, as part of this presentation, Goldman Sachs did use an annualized approach, at least as to the set of numbers presented in the middle of the page on GS01854?

A    They did have a column that presented the annualized third quarter projected

Colloquy

third quarter numbers. In their presentations made to us, though, I believe that their view of the cash flow that could be leveraged in this exit financing was not based on forecasted or annualized cash flow, but should be based on the cash flow currently being generated by the business, which we have commonly referred to as LTM, or the cash flow earned, or the EBITDA earned over the latest 12 months.

Q    I'd like to draw your attention and the last point on this document to the GS01867 page, the Goldman Sachs high yield research assessment of long-term care industry. Do you recall reviewing this page at or about the time of the Goldman Sachs presentation that's referred to in the document.

A    Once again, I don't have a specific recollection, but I know Roger Gordon (phonetic), the high yield research analyst was in attendance at the meeting. I do recall his presence. I am assuming he would have commented on this page.

Q    Do you recall Goldman making a -- someone from Goldman stating that in the third bullet point down, our Washington analyst Joan Woodward reviews the passage of BIPA, and the second give-back bill in two years, is a sign that Congress is not interested in cutting Medicaid further, but rather that it is interested in increasing payments and benefits?

A    Once, again, I don't have the specific recollection, but that comment would not surprise me.

Q    Do you agree with that comment, from your experience, both at the time of this presentation and since then?

A    I believe the balanced budget -- the Balance Budget Refinement Act, BBRA, and the Benefit Improvement Protection Act, are clearly steps in the right direction. And the environment is more positive today than it was in 1997 and 1998 when the new prospective payment system was first implemented.

However, I do have concern that the legislation that increased the payment rights, the Benefit Improvement Protection Act, will terminate 93002 without further legislative action. So I'm not sure I have the same level of optimism on a longer term basis as presented in this slide.

MR. PRIMPS: I have one other question of the witness relating to this document, Your Honor. But at this time, I would ask for its acceptance into the evidence, and the record of this proceeding.

THE COURT: Any objection?

MR. STROCHAK: There's a little foundational objection, Your Honor. It's not the company's document, it's Goldman's document. I think given that the witness testified that it was received and presented at that, I guess there's probably sufficient foundation as a business record, so I guess we wouldn't object at this time.

THE COURT: All right. It will be considered.

MR. PRIMPS: And, Your Honor, I should say that we've been having some discussions about the Goldman Sachs witness who was questioned about this document, and his testimony, I think, by deposition, although there's still some efforts to secure his attendance at tomorrow's hearing, that's Mr. Lanassa, that we'll have his testimony before you and there will be additional foundational material presented there.

THE COURT: All right.

BY MR. PRIMPS:

Q    Finally, Mr. Hager, going back to the chart that we were discussing, showing the pro forma third quarter annualized EBITDA, we looked at that footnote (b), with the assumption of no APS acquisition, and a Mariner contract loss.

Do you recall that a time came when you made a presentation where

Colloquy                                           127

the APS acquisition was assumed and no Mariner contract loss was also assumed?

A       We have been pursuing the acquisition of APS for some time with our financial

advisors, UBS. We have run financial forecasts that would include the retention of

the Mariner business, as well as the impact of the acquisition of APS. However, it

should be noted that, under that revised forecast, we made two changes to our base

case forecast.

        One, we assumed that we would only retain the Mariner contracts at a

revised pricing structure commonly referred to as Medicaid pricing, which reduced

the operating cash flow, or EBITDA, contribution from that contract by approximately

seven million dollars. We also, assuming we would retain those beds, took out the

adjustment we made to our forecast to increase the number of new beds we would

serve by or pharmacies, because we would no longer have the excess capacity that

was assumed under the scenario of losing the Mariner beds.

Q       Do you recall making a presentation to the rating agencies in the very recent

past concerning the company as it was emerging from the bankruptcy process?

A       I do.

        MR. PRIMPS: At this time I would ask that we mark what had

previously been marked as Hager Exhibit 14 in your deposition, Mr. Hager, as GMS

Exhibit 4. I'll hand copies up.

        MR. HAGER: Thank you.

BY MR. PRIMPS:

Q       Mr. Hager, can you state for the Court what this document is?

A       It appears to be the presentation that we made to both Standard and Poors,

and Moody's as we were attempting to receive a rating on both our exit financing. a

general corporate rating, as well as a rating on the rollover securities that will be

issued in connection with the restructure -- our proposed plan.

Q       And was this a separate presentation given one day at Standard and Poors and another day at Moody's?

A       It was.

Q       And to the best of your recollection, this was given sometime in July, is that correct?

A       Either June or July, I don't recall the specific day of the presentations.

Q       I think you testified earlier the company does now have -- has secured a rating from Moody's and Standard and Poors, is that correct?

A       That's correct.

Q       In view of the securing of the rating, do you regard your presentation as being a success -- the one related to this document?

A       Yes, I would.

Q       Just a few things that I think relate to some of what you've testified to earlier today. Mr. Hager, I draw your attention to page 26 of the document, up in the upper right-hand corner, I think this document actually does have its own internal numbering system.

That's a page showing quality surveys, do you see that?

A       Yes, I do.

Q       And the two measurements are average citations per survey, and percentage of deficiency free facilities, do you see those two charts?

A       Yes, I do.

Q       Do those charts depict Genesis as having a generally better than industry average performance in the two areas surveyed. the average citations and percentage deficiency free facilities?

Colloquy

A    They do.

Q    And I'd like to turn to page 48, the impact of the APS acquisition?  Now you were responsible for drafting this document, were you not?

A    Yes, I was.

Q    You were responsible for actually drafting all of GMS Exhibit 4, is that correct?

A    That's correct.

Q    Excuse me, is that GMS Exhibit 3?

THE COURT:  Four.

MR. PRIMPS:  Four.  Thank you, Your Honor.

BY MR. PRIMPS:

Q    And I see the EBITDA number for 2001 that appears in this document is 214.5 million, is that correct?

A    That's correct.

Q    And that ties in with the number that's shown in the disclosure statement that's before the Court right now, isn't that true?

A    I believe so.

Q    And then 2002, you're predicting a 229.7 million dollars EBITDA, is that correct?

A    Yes.

MR. STROCHAK:  What page are you on?

MR. PRIMPS:  I'm on page 48 as shown in the upper right corner.

BY MR. PRIMPS:

Q    Now does that number 229.7 million dollars EBITDA for 2002, does that reflect the impact of the Mariner acquisition and the retention of the -- excuse me, the APS acquisition and the retention of the Mariner contract?

Colloquy

A    No, the 2002 forecast includes approximately 25 percent of the proffer, the EBITDA generated from the Mariner -- serving the Mariner beds.

We assume that we lost them commencing 10/1/01, and we lost 75 percent of the business throughout '02, and as I said, we also made an assumption in this case that we would utilize to some degree the excess capacity from that loss.

So we did add new beds to be served by our pharmacy.

Q    So there was an effort at recouping any loss related to the loss of the Mariner contract, included in this 229.7 million dollar EBITDA figure for 2002?

A    We didn't reflect that we could regain it all, but we did regain some of it, yes.

Q    Going over to the far right column, does that column -- is that column headed by pro forma APS, 2002, with the reference down to footnote (a)?

A    Yes.

Q    Could you explain how the EBITDA -- annual EBITDA number for 2002 of 255.3 million dollars was arrived at in that column?

A    That column reflects the acquisition, I believe, as if it had occurred at the beginning of fiscal '02, 10/1/02, that's my recollection, at least.

It would reflect the retention of the existing Mariner business at Medicaid pricing. It would include the acquisition of the EBITDA currently being generated by APS, which is approximately 4 million dollars on an annualized basis. And it would effect the realization of retained synergies.

Q    You said at the beginning of fiscal '02 at 10/1/02, isn't it 10/1/01?

A    10/1/01.

Q    Okay. So we're not talking about the distant future --

A    No.

Q    -- this is coming up on us soon.

Colloquy                                                    131

A    Based on the status of that transaction, it's obviously not likely that transaction would occur, if it does occur, at anywhere near that date.

Q    Now I draw your attention to page 59 of this exhibit, entitled Credit Strengths. Were you responsible for the drafting of this page, Mr. Hager?

A    I was.

Q    And you believe, as you sit here today, that these factors still apply to the reorganized company as it would emerge from bankruptcy?

A    Yes.

Q    And you drafted that second point, that there is an improving federal reimbursement outlook, that was your best view when you wrote it and you agree with that now?

A    That's clearly the BVRA and the Benefit Improvement Act, represented improving federal reimbursement outlook.

         MR. PRIMPS:  Your Honor, at this time I would ask that GMS Exhibit 4 be admitted into the record?

         MR. STROCHAK:  No objection, Your Honor.

         THE COURT:  All right.

BY MR. PRIMPS:

Q    Well we've seen these optimistic statements made in the Goldman Sachs report and also made in your presentation to Standard and Poors and Moody's, would you say that since the beginning of this year 2001, the overall prospects for the healthcare industry have improved?

A    Improved as compared to what we had experienced over the last three years. Yes. I would like to think that they are stable today, and we are cautiously optimistic that the payment rates that we receive from our various state Medicaid payers and

the Medicare Program, will continue to keep pace with inflation.

I can't sit here and assure anyone that that will, in fact, be the case.

Q        And with the improved prospects that are referred to in these documents with the caveats that you've stated, there has been a revaluation, has there not, in an upward direction of the companies in the healthcare industry, including those providing nursing care facilities and pharmacy services?

A        There has clearly been an increase in value of companies that are in our sector in the public marketplace. I'm not a valuation expert, and I can't comment on whether or not that improved value is a result of the performance of those companies, I don't believe it is.

Or is it a function of the other negative events that have occurred in the marketplace that have made investments in the healthcare services sector more attractive. I believe there is much -- as much to the latter point as there is to the former.

Q        Okay. We've talked from time-to-time about different methods of calculating EBITDA, and normalized EBITDA is a term that's been used in several of the documents. What's your -- do you have a view as to any standardized definition of what normalized EBITDA is, how it's arrived at?

A        I don't think there would be a standard definition of normalization, or normalized EBITDA. We use that concept, as I said, to project for our banks what we felt the future cash flow capability was of the business, reflecting the full year impact of certain changes that had occurred or would occur during fiscal 2001.

Q        Have you heard of the term normalization being used in the sense of taking quarterly results and multiplying those quarterly results times four to reach a normalized annual figure?

Colloquy                                                           133

A      I've heard of people taking three month numbers and multiplying that by four and getting an annualization of a number, yes.

Q      But you don't have a particular method that you would propose as being a standard method for normalization?

A      I don't believe you necessarily need to normalize anything. I believe you should look at the forecast, which are our best estimates of the cash flow, or EBITDA, that the combined businesses will generate in the forecast period.

You shouldn't need to normalize any short period of time, I believe you should reflect comparative numbers for consistent periods over time, which is what we've done in the forecast and the plan.

MR. PRIMPS:  At this time I would like to mark a business wire press release -- two of them actually, if we could mark them consecutively as GMS-5 and GMS-6. I'll hand those up.

And the -- I would suggest that the document that's already been stamped Genesis 5 be remarked GMS-5, just to keep that standard. And the other document would be marked as GMS-6, that had previously been marked as Hager Exhibit 15.

THE COURT:  All right.

MR. ZELMANOVITZ:  If I may, Your Honor, will the other document also be marked?

MR. PRIMPS:  Yes, the Hager 15 has now become GMS-6, and Genesis 5 is now GMS-5.

BY MR. PRIMPS:

Q      Do these -- let's just start with -- I'm going to go a little backwards here and just ask you about GMS-6.

This is a press release that relates to the financial performance in the third quarter of fiscal 2001 of the Multicare companies, is that correct?

A    That's correct.

Q    And is that the most recent public announcement that you're aware of that's been made by company management concerning the financial performance?

A    Yes, it is.

Q    And it states, does it not, in the third paragraph of the release that for the quarter ending June 30th, 2001:

"EBITDA, excluding 4.3 million of debt restructuring and reorganization chart costs and other charges was 9.4 million dollars."

Is that correct?

A    That's correct.

Q    And that's for the -- just stand-alone Multicare?

A    That's the stand-alone Multicare for the quarter ended June 30th, 2001. I would just caution anyone looking at that number, it is not consistent with the presentation in the forecast since it does not include any of the Multicare contract modification changes.

Q    But this number was released concurrently with the filing of your form 10-Q before the SEC, is that correct?

A    Or immediately before, yes.

Q    And the numbers -- does your 10-Q show an EBITDA number for the Multicare companies?

A    You can calculate an EBITDA number from the 10-K, and from a 10-Q.

Q    And that calculation would square with the number appearing in this release, would it not?

Colloquy

A    It should.

Q    Okay. Then referring also over to GMS Exhibit 5, this document reflects third quarter financial performance for Genesis on a stand alone basis, is that correct?

A    No, it's actually not correct. This is Genesis and Multicare on a consolidated basis.

Q    Okay. And the EBITDA number there, is 54.9 million?

A    That's correct.

Q    And that's your most recent quarterly number for the combined entity, is that correct?

A    Yes, it is.

Q    Both of these documents contain quotations from you concerning the EBITDA and financial performance, are those accurate quotations?

A    I believe they are.

        MR. PRIMPS: Your Honor, at this time I would move the admission of GMS-5 and GMS-6 into the record.

        MR. ZELMANOVITZ: No objection, Your Honor.

        THE COURT: All right.

        MR. PRIMPS: And I believe we do have GMS-4 admitted also?

        THE COURT: Indeed.

BY MR. PRIMPS:

Q    I think you stated in your direct testimony there's never been a valuation of the combined Genesis entities, Genesis plus Multicare, is that correct?

A    Not to my knowledge.

Q    Were you part of the decision not to have a combined analysis done?

A    I was part of the decision, clearly, to value the companies distinctly and

Colloquy

combine their valuations for this plan, yes.

Q    And you did not think that that excluded things like synergies and costs reductions by doing it in that fashion?

A    We believe all the operational synergies have been realized since 1997, operating these businesses on a combined basis. They are operated under one management infrastructure, under one administrative infrastructure, one common set of financial accounting and operational information systems.

We realize the purchasing benefits, the marketing benefits, the combined organization today. As I stated earlier, there will be some small administrative savings by eliminating the requirement to have two separate public reporting entities. I do not believe those costs are significant.

Q    So a decision was made to retain separate outside advisors to do the evaluation, one of Multicare done by CS First Boston, and the other of Genesis done by UBS Warburg (phonetic), is that correct?

A    That's correct.

MR. PRIMPS:  I have no further questions, Your Honor.

THE COURT:  All right. Any other cross-examination?

MS. MORRISON:  Yes.

MR. GEORGE:  Your Honor, I just have a couple of follow-up questions.

THE COURT:  You'll get your chance.

MR. GEORGE:  Oh, I'm sorry. I didn't see someone coming. Go ahead.

THE COURT:  Go ahead, counsel.

MS. MORRISON:  May it please the Court.

Colloquy

## CROSS-EXAMINATION

BY MR. MORRISON:

Q    Good afternoon, sir, my name is Susan Morrison, I represent numerous tort claimants in this bankruptcy. And pardon me for asking a question that might have been answered, but what is the status of the negotiations on the APS Pharmacy acquisition?

A    We are continuing to actively pursue that transaction. We believe we are reasonably close to signing an asset purchase agreement. That would, obviously, be subject to approval in both the Genesis and the Mariner bankruptcy courts and subject to a competitive bidding process in the Mariner bankruptcy court.

Q    Is there a letter agreement or letter of intent or memorandum of understanding which is in effect?

A    There is a letter of intent and there are draft asset purchase agreements as well.

Q    Okay. And when you say reasonably close to signing, can you be more specific?

A    I wish I could. I can't.

Q    Has due diligence commenced?

A    Yes.

Q    How far into the due diligence process are you?

A    We've done significant due diligence on the assets.

Q    Do you have -- does Genesis have people on site at APS Pharmacy headquarters evaluating their operations?

A    Not currently, we have in the past gone to their sites to do due diligence at their corporate headquarters.

**AA. 250**

Q     Okay. If you (sic) reasonably close to signing an asset purchase agreement, do you think it would be reasonable for you to ask your valuation experts to discount the possibility of continued business on Mariner facilities?

A     It's a difficult question to answer. I would probably say that that would be an unreasonable request, unless you factored in how much you would have to pay to acquire APS. Because my personal belief is even though there will be no tie-in, is no tie to the current Mariner contracts and the APS acquisition, virtually all of the significant providers other than one that I know of, have one primary pharmacy provider.

Q     So is it your testimony that it is premature, then, to properly valuate Genesis in light of the fact that you have a transaction looming on the horizon, which is subject to imminent execution of an asset purchase agreement?

A     No, I don't think so.

Q     And what -- assuming that transaction takes place and the sale is closed, what is the annual revenue from the APS Pharmacy operation?

A     I believe it's in the range of 240 to 250 million dollars.

Q     Is that an amount you consider significant to the operation of Genesis?

A     It's roughly 10 percent.

Q     Okay. Haven't your lawyers, sir, appeared before this Court asking for permission of the Court to consummate that sale?

A     Not that I'm aware of.

Q     Okay. On the issue of punitive damages, you testified earlier that you would imagine that the personal injury claims include claims for punitive damages. You don't have any personal knowledge, do you, as you sit here today, that -- of the existence or substance of any punitive damage claims that are pending against the

Colloquy

Genesis debtors, do you?

A     I do not.

Q     Okay. Has anyone, to your knowledge, done an analysis of punitive damage claims?

A     I have not seen one.

Q     Has anyone in the risk management department, or in any of your insurers' offices done any evaluation or estimation of punitive damage claims?

A     I'm not sure.

Q     Okay. Then why, sir, did you testify that, in your opinion, it's only fair to creditors that punitive damage claimants not participate in a distribution?

A     I'm not aware that Genesis has ever paid a punitive damage claim, one. I think it would be unfair to the creditors of the Genesis estate if we didn't manage to execute and reorganize this company as soon as possible, as we are paying between three and five million dollars in fees every month that we stay in bankruptcy.

Q     So you would --

A     And --

Q     -- agree with me then -- I'm sorry, I didn't mean to speak over you.

A     And, as I said in my testimony, it is my understanding that punitive damages are awarded to penalize the corporation for actions. If we would include the punitive damage claims in the general unsecured categories, the general unsecured creditors and the bond holders would be penalized, not the corporation.

Q     Okay. Do you think it would be fair to just totally disenfranchise the personal injury tort claimant from participating in a distribution altogether?

A     Would I think that's unfair?

Q     Yes.

Colloquy                                140

A    No, I would not.

Q    Why is that, sir?

A    Because there is no assets in the estate that would allow a claim to be paid.

Q    Are you aware that in some states punitive damages are the only damages available for wrongful death and other serious torts?

MR. STROCHAK: Objection, Your Honor. That calls for a legal conclusion.

MS. MORRISON: I just asked whether he was aware, Your Honor.

THE COURT: It does. If he's aware of it, if Mr. Hager's aware of it.

MR. HAGER: I'm not aware.

BY MS. MORRISON:

Q    Okay. Are you aware that in some states the punitive damages are considered compensatory in part?

A    No, I'm not.

Q    Are you aware that in some states punitive damage awards include damages -- compensatory damages that are too remote for reimbursements and that the damages are used to make the claimant's whole for inconvenience damages and fees?

MR. STROCHAK: Your Honor, just the same objection, I think this is asking for legal opinion and argument.

MS. MORRISON: I'm just asking him if he's aware, Your Honor.

THE COURT: No -- this is not substantive evidence and even -- or even legal argument, so we understand that. If you're aware of it, Mr. Hager, you're welcome to let us know that. If you're not, likewise.

MR. HAGER: I'm not aware of it.

Colloquy

BY MS. MORRISON:

Q    Okay. Has anyone at Genesis, to your knowledge, done any evaluation of the legal issues related to whether punitive damage claims are insurable or compensable?

A    I'm not aware of any.

Q    Okay. If you assume for a moment that a claimant in a particular state having wrongful death claims against Genesis that that claimant's only recourse is an award of punitive damages, you think it's fair for that claimant not to participate all in a distribution under this estate?

A    I think if that's the case --

        MR. STROCHAK: I'm sorry, just one second. Objection. I think that calls for levels of speculation that go pretty far here, Your Honor.

        THE COURT: It does. And Mr. Hager's sense of fairness in this regard I'm not sure will be the controlling aspect of the decision. Although I fully respect it, of course. But it's a part of the discussion and I'll allow it. Go ahead.

        MS. MORRISON: And, Your Honor, this is cross-examination and he testified about what was fair, so --

        THE COURT: You're welcome to proceed. You're right, there's a limit, but we're close.

        MR. STROCHAK: Thank you, Your Honor.

        MS. MORRISON: I got the hint, Your Honor.

        MR. HAGER: I think that would be a horrible situation, but it's also a horrible situation that our creditors are receiving seven cents on the dollar, so --

BY MS. MORRISON:

Q    Okay.

A    -- so, yes, I believe both situations are extraordinarily unfortunate.

Q    Have you ever participated in any conversations with the management teams at Genesis about preferring trade creditors over personal injury claimants in terms of distribution?

A    No.

Q    Are you aware, during your tenure, or have you, during your tenure as CFO of Genesis, been involved in a situation where Genesis brought, or threatened to bring, any bad faith claims against insurers?

A    I'm not aware of any.

Q    You're not aware personally, or not at all?

A    I'm not aware at all.

Q    Okay. Do you know that, if the underlying claim is extinguished, that a bad faith claim might also be extinguished?

A    I'm not aware of.

Q    Okay.

A    That fact.

Q    So just so we're clear, your testimony today is that, to your knowledge, no one at Genesis has done an analysis of the tort claims to determine whether any aspect of a particular claim includes punitive damage claims that are compensatory in nature as opposed to a penalty, is that correct?

A    Not to my knowledge.

Q    And it's also your testimony that no one has done any analysis to determine the insurability (sic) of punitive damages of claimants in any particular state?

        MR. STROCHAK: Your Honor, asked and answered.

        THE COURT: Indeed. We're over the same ground again.

Colloquy

MS. MORRISON: All right.

BY MS. MORRISON:

Q     In discussing -- and I'm going to defer to counsel, because I'm not a financial person, but I was trying to follow your valuation approach, and you testified about four different times that Genesis supplies a middle of the road approach using a multiple of seven.

The papers that were submitted from UBS Warburg indicate transaction analysis multiples that are quite different than seven.

Are you familiar with the precedent transaction analysis contained in the UBS Warburg papers?

A     I don't recall it specifically.

Q     Okay. There were a number of transactions, including some by Genesis, included in this spreadsheet which had the target company, the acquirer, the date of the acquisition, and then enterprise value multiples that ranged from 5.9 to 13.7, with a median number of 13.0.

How does your multiple of seven fit in there in terms of the appropriate multiple to use for valuation purposes?

MR. STROCHAK: Your Honor, I think we're quite a bit ahead of ourselves here, into the valuation. If the question is, where does seven fall in the range between five and 13, I think we all know the answer to that question.

But I think this inappropriate questioning for this witness.

THE COURT: Well, let me understand. Bringing you back to where the seven comes from in terms of your use of it in your testimony a little while ago.

MR. HAGER: The seven multiple is arrived at by looking at a weighting of the two different primary businesses. We applied an eight multiple for the

Colloquy

pharmacy business and a six multiple for the nursing center business.

THE COURT: Yes, I recall that. But when you say we applied, in what -- where? For what purpose?

MR. HAGER: We took those multiples, multiplied them by the EBITDA to determine enterprise value.

THE COURT: When you say we, do you mean UBS Warburg, do you mean the valuation that is posed in the disclosure statement?

MR. HAGER: That is the valuation process the debtor went through in proposing and negotiating the plan of reorganization. Initially, until we have experienced the recent increase in valuations, both the valuations done by UBS and by CSFB supported the valuations in those ranges. I would argue, because I am not looking at the schedule that is being referred to, the transactions done in the 13 multiple, I would guess, would be done well before the impact of prospective payment.

Our sector has not seen a 13 times valuation multiple for several years. Even the most highly regarded company investment grade credit company in our sector, Manor Care, has somewhere in 10 to 11 valuation multiple, and that's a very recent phenomenon that it's that high.

BY MS. MORRISON:

Q    And what justification do you have for varying from the multiple of nine, in Beverly. You testified numerous times today that Genesis is similarly situated to Beverly in terms of patient mix and other criteria, and yet their multiple is quite a bit higher than the one that you chose?

MR. STROCHAK: Objection, Your Honor, I they're -- we're getting quite a bit ahead of ourselves here. There's some facts in evidence -- or this question

presumes some facts that clearly are not in evidence at this juncture.

THE COURT: What is the source of this nine multiple for Beverly?

MS. MORRISON: Your Honor, he testified earlier today what the ranges were, and I took notes, but the numbers that I'm pulling from are from affidavits that were submitted by debtor's counsel, but I can go back to my notes if you want.

THE COURT: Affidavits from people that we will presumably hear from later on. Indeed, we don't have it of record yet, but if your representation is that they're directly from matters that will be relied on later, you're welcome to ask the question.

The question being, if Beverly has a multiple of nine and the debtor is comparable to Beverly, can you help us to understand your position, nevertheless that the proper multiples are middle of the road seven?

MR. STROCHAK: Your Honor, I certainly appreciate your question, and I would just note that we don't agree with the nine multiple for Beverly and I think Your Honor will hear testimony on that.

THE COURT: Indeed, that is not an established fact in the record. We're assuming that it will be.

MS. MORRISON: And, Your Honor, I can correct the question. Because from my notes of his testimony, he testified that Beverly was in the range of 8.5, Manor Care was considered an outlier at 11.4.

BY MS. MORRISON:

Q    So, based on your prior testimony, where did you come up with seven as being a reasonable multiple, and on what did you base that determination?

A    The information I've seen in the public markets is that Beverly's one year

forward multiple today is approximately 7.8 times, it's less than eight times.

       If I did testify that Beverly's current multiple is 8.5 times, I don't recall that, but I will stand corrected, because I believe in the latest that I've seen is 7.8 times.

       They also said -- I also have stated that the plan that Genesis put forth was based on the valuation multiples that existed at the time we developed the plan and negotiated the plan with the various creditor constituencies. Since that point in time, the valuation multiples have increased.

       I think those increases are reflected in revised valuations that have been put forth by both UBS and CSFB. The debtor did not revise its valuation in the plan.

Q    Okay. Have you done any analysis of personal -- the compensatory portion of personal injury claims, and what happens to personal injury claimants who do not have insurance available to them?

       For example, if a claim were to exhaust policy limits in a particular year, or would be subject to a self insured retention?

A    I never had the reason or the need to do such an evaluation. We have never come close in any policy period from piercing an insurance limit.

Q    Okay. What is your understanding, as you sit here today, of what would happen to a claimant that did not have insurance avail -- a personal injury claim on the compensatory portion of their claim that did not have insurance available to them?

       MR. STROCHAK: Your Honor, just a point of clarification. Is the question what would happen under the plan?

       MS. MORRISON: Yes. The proposed plan?

Colloquy

MR. HAGER: I do not know.

MS. MORRISON: Thank you, I have no other questions.

THE COURT: All right. Sir?

MR. HUDGENS: Mr. Hudgens, again, Your Honor.

CROSS-EXAMINATION

BY MR. HUDGENS:

Q      Mr. Hager, the disclosure statement says, and I believe it's from my understanding it's correct, that Medicare and/or Medicaid reimbursements did not match the cost of providing the services or products for at least some period of time, is that true?

A      Yes, that's true.

Q      And did this industry, or portions of this industry, quit accepting new Medicare or Medicaid patients because of that problem?

A      I think some attempted to, yes.

Q      Okay. And when you say some attempted to, were they unsuccessful in refusing to accept new patients?

A      I believe they were.

Q      And why were they unsuccessful?

A      I can't answer that.

Q      Okay. Did Genesis and Multicare ever attempt to quit accepting new patients?

A      We did not.

Q      Okay. Did you participate in preparing the various SEC filings that Genesis and/or Multicare prepared?

A      I did.

Q      Okay. And did those filings reflect both that there

Colloquy                             148

were -- that this industry was suffering a loss from Medicare and Medicare patients

and that some providers in the industry had quit accepting new patients, or were

attempting to quit accepting new patients?

A        I don't think what other providers are doing as isolated as that activity might

have been, is a necessary disclosure in our form 10-K or 10-Q's. On the former

question, I believe that there was adequate disclosure in the risk factor sections of

those documents regarding the adequacy and the future adequacy of the payment

programs from third party payers such as Medicare and the Medicaid programs.

Q        Okay. In general what disclosures were made?

A        They're all part of the public record. If you want --

           THE COURT: About what, sir?

           MR. HUDGENS: About the risk factors that he's just testified were

disclosed.

           THE COURT: All the risk factors?

           MR. HUDGENS: About that sector of the industry, or those payment

problems.

BY MR. HUDGENS:

Q        Did the disclosure statements reflect that the industry could not provide the

services for the amount of the reimbursement?

A        I believe -- this is a recollection, that the risk factor section of our 10-K's state

that there can be no assurances into the future that we will be able to provide the

services at the reimbursement -- at -- you know, at a cost level that is less than the

reimbursement rates.

Q        Okay. You said you did not believe it was necessary to disclose that some

other providers were either not accepting new patients or were trying not to accept

Colloquy

new patients, didn't you? Wasn't that your testimony?

A    Yes.

Q    Okay. And there was no disclosure that, naturally, since that wasn't disclosed, there was no disclosure that despite the fact that others in the industry might be trying not to accept new patients, that Genesis was still accepting them, was there?

MR. STROCHAK: Your Honor, this sounds very much like a disclosure statement. Objection.

MR. HUDGENS: No –

MR. STROCHAK: I would object to it.

THE COURT: It's an SEC disclosure statement objection, I'm not sure where it's going either.

MR. HUDGENS: Well, Your Honor, it's not a disclosure statement objection. One of the – I represent a client who relied on Genesis disclosure statements. We believe those disclosure statements were incorrect. We believe that the entities have claims against the officers and directors for pursuing a course of action that the rest of the industry

was -- had abandoned. And we also believe that our particular client has individual claims against the officer and directors related to that failure to disclose.

And if you recall earlier, I asked questions about whether there was a was an evaluation of claims against the officers and directors. And the testimony was there was not.

THE COURT: Um-hum. So your proposal is that these questions relate to the nature of the releases?

MR. HUDGENS: Well they relate to the valuation, because if the entities have claims against the officers and directors, then that effects the valuation.

They also do effect the release provisions, and I have one question of the witness about the release provisions related to that.

I think we've about exhausted the line of questioning anyway, but --

THE COURT: All right. Please --

MR. HAGER: Just by way of clarification, my response to your question on others in the industry that attempted not to serve certain patients was well publicized in the Wall Street Journal.

BY MR. HUDGENS:

Q      Just one other question on that problem before we get to the release. Is one of the problems that once you've accepted a patient, you can't quit providing services to them?

A      That is one issue that you deal with in this industry, sure.

Q      Okay. In fact, federal and/or state law may prohibit you from discontinuing services to them, correct?

A      That's correct. It also may prohibit you from denying admission in certain states.

Q      You testified earlier about the release provisions, that there were not provisions that released the claims of third parties against officers and directors, do you recall that?

A      That's my understanding, yes.

Q      Okay. Does that also mean that there are no release provisions that would release claims by current equity holders against officers and directors?

A      I don't know the answer to that question.

Q      Okay. Mr. Hager, do you recall how much you paid for the stock that you borrowed money to purchase and for which you obtained an $853,000 debt relief?

Colloquy

A     I believe between 25 and $27 a share.

Q     Well do you know how much cumulatively you paid for that stock? I don't know how many shares you had, so --

A     I believe that amount represents the original principal amount of the loan, which was six hundred and some thousand dollars, plus interest.

Q     So the entire amount you paid for that stock was included in that loan?

A     That's correct.

Q     Okay. And you essentially got that money back, because you were relieved of all the debt, correct?

A     I got nothing back. The stock is not worth anything.

Q     Well, but what you did is you were not out of pocket for that stock after that debt relief, were you?

A     No. I was not.

Q     Unlike my client, who paid --

          THE COURT:  Sustained.

          MR. STROCHAK:  You're one step ahead of me, Your Honor.

          MR. HUDGENS:  I had to get it in, though. That's all I have, Your Honor.

          THE COURT:  One moment, Mr. George, we'll exhaust the other questioners.

          MR. JENKINS:  Good morning, Your Honor, David Jenkins for objector Charles Grimes.

          THE COURT:  Please proceed.

                    CROSS-EXAMINATION

BY MR. JENKINS:

Colloquy                                          152

Q      Good afternoon, Mr. Hager, I'm David Jenkins, I represent Charles Grimes,

one of the objectors here.  You know Mr. Grimes, correct?

A      I do.

Q      You've talked to him on many occasions, correct?

A      That's correct.

Q      All right.  I need to follow-up on a couple of points you raised in your testimony

either this morning or this afternoon.  The first is the last 12 month EBITDA for

combined Genesis, was I correct in understanding that that amount is $208 million?

A      That's correct.

Q      And this is through June 30th -- excuse me -- this is through June 30th, 2001,

correct?

A      That's correct.

Q      All right.  Let me turn to something else you testified to, I believe it was this

morning, I believe you testified that you and some of the other senior officers of

Genesis have a financial incentive for seeing that the bankruptcy proposal goes

through, is that correct?

A      That's correct.

Q      Am I correct in understanding that you will bear financial penalties in this

incentive proposal if the bankruptcy approval is delayed beyond this week?

A      That's correct.

Q      All right.  As a percent of your bonus, if you will, how large are those

penalties?

A      My recollection is, the penalties are seven and a half percent of the incentive

payment per month for a maximum of two months.

Q      All right.  So you risk losing a total of 15 percent of your bonus payment for

seeing the bankruptcy through, correct?

MR. STROCHAK: Your Honor, could I just note for the record that the bonus payment that has been approved by the Court requires -- happens on the effective date and so there's no way, even if you approve the plan today, that seven and a half percent wouldn't already come off.

So he doesn't have seven and a half percent of risk -- I mean 15 percent at risk, he has seven and a half percent at risk, just for the record.

THE COURT: Okay.

MR. JENKINS: All right. I'm accepting the witnesses testimony, Your Honor, not counsel's.

MR. HAGER: I didn't know they were different.

MR. JENKINS: They were.

THE COURT: The documents, I guess, will control on that point. Go ahead.

MR. JENKINS: Right. That's why he got up.

BY MR. JENKINS:

Q    Do you have any performance bonuses, Mr. Hager?

A    There is an incentive compensation program available to all of the officers and managers of the company, and I participate in that program.

Q    All right. Is the -- I assume there's some sort of base level of performance that has to be reached before you share in any of the bonuses, is that correct?

A    That's correct.

Q    All right. Is that base level of performance tied in any way to the EBITDA projections for Genesis?

Colloquy                                          154

A       It is tied to the original management budget.

Q       And there's been a lot of testimony about budgets, and I'm sorry, I just lost some of that. Which is the original management budget?

A       It's the budget prepared -- completed October of 2000 for the fiscal year ended September 30th, 2001.

Q       And for Genesis, what was the project EBITDA for fiscal year 2001 in that budget?

A       Genesis stand-alone, or Genesis and Multicare combined?

Q       Why don't you give me both if you have them in your memory.

A       Okay. I believe the numbers were 170 million dollars for Genesis, and 42 million dollars for Multicare. That is before any adjustment for a synthetic lease, for a total EBITDA in the management budget of 212 million dollars.

Q       All right. Thank you. Have your performance bonuses been adjusted at all for any changes in the so-called management budget?

A       No.

Q       Mr. Hager, to your knowledge, has either Genesis or Multicare, or the combined entities, been approached by any potential purchasers?

A       Not that I'm aware of.

Q       All right. Would you be aware of that if it occurred?

A       I should be.

Q       All right. This morning you testified that, historically, Genesis had not met it's EBITDA projections, do you recall that, sir?

A       I do.

Q       All right. Have you ever been -- I supposed accused is the wrong word, but have you ever been told that you -- your numbers were actually too conservative, by

Colloquy

anyone?

A      I'm not sure what numbers you're referring to.

Q      All right. Let's see what I can do with documents.

        MR. JENKINS: Your Honor, may I approach the witness and hand him

a document?

                THE COURT: Certainly.

                MR. JENKINS: Thank you.

BY MR. JENKINS:

Q      Mr. Hager, I've handed you a document that was produced to us —

                MR. JENKINS: Excuse me. Of course. I apologize.

                MR. STROCHAK: Thank you.

BY MR. JENKINS:

Q      Mr. Hager I'm handing you a document that was produced to us, by us I mean

Mr. Grimes and other objectors during the course of discovery, it's entitled Genesis

Health Ventures, Inc. and the Multicare Companies, Inc. It's a report to counsel in

the lender group dated February 4th, 2000, and it's by Politano and Manzo

(phonetic), LLC.

                Do you see that on the cover page, sir?

A      I do.

Q      Do you know who Politano and Manzo, LLC is?

A      Yes, I do.

Q      Who are they

A      They are the financial advisors for the secured —

pre-petition secured creditors.

                MR. ZELMANOVITZ: Not that I don't know what the document is, we'd

Colloquy                                                          156

like to have a copy as well.

        THE COURT:  All right.

        MR. JENKINS:  Certainly.

        MR. STROCHAK:  Mr. Kohn will accuse us of saving trees, Your Honor.

        THE COURT:  That's for sure.

BY MR. JENKINS:

Q    Have you ever seen this document before, Mr. Hager?  Take your time to look through it if you need to.

A    I can't recall whether this was shown to me at my deposition last week or not. But other than that, I have never seen this document.

Q    All right.  Well let's turn to several pages here and see if you were ever told any of the information on those pages.  Could you turn to page 12, please?

        THE COURT:  I'll take an extra copy.

        MR. JENKINS:  I'm sorry, Your Honor.

        THE COURT:  Thank you.

        MR. JENKINS:  I'm used to dealing with exhibits.

        THE COURT:  For identification we'll call it CG, for Charles Grimes, one.

        MR. JENKINS:  That will be fine, Your Honor.

        THE COURT:  Go ahead.

BY MR. JENKINS:

Q    Are you on page 12, Mr. Hager?

A    Yes.

Q    All right.  If you could look down at the -- they're arrows, they're not really bullet points, but the third arrow states that cash budget was conservative by over 10

million dollars per month on average. Do you see that, sir?

A     I do.

Q     Has anyone from Politano and Manzo, or, indeed, anyone else, ever told you that the cash budget, and I believe this is the period July through December, 1999, was conservative by over 10 million dollars per month on average?

A     I don't recall.

Q     All right. It's possible that they could have told you, correct?

A     I don't recall them telling me that.

Q     All right. We'll leave it there. Let's turn to the page 13 the next page, and, again, this is for the period July through December, 1999. Do you see the top arrow, sir, which states:

        "Management stated that the budget was intended to be conservative by design in order to allow management a targeted revolver availability of 15 million to 20 million dollars each day."

        Do you see that, sir?

A     I do.

Q     And have you ever told anyone, anywhere, that the budget -- any budget by Genesis was intended to be conservative by design?

A     I don't recall. I don't even recall what budget this is referring to.

Q     I understand. You are the chief financial officer of Genesis, correct?

A     I am.

Q     All right. And you are the person most likely within Genesis to be talking about financial information of Genesis with someone such as Politano and Manzo, correct?

A     That's correct.

Q     And if someone within -- and I assume you have a department, people

working for you?

A      I do.

Q      And if someone within your department was to tell someone like Politano and

Manzo that a budget was conservative by design, they would have cleared that with

you first, correct?

MR. STROCHAK:  Objection, Your Honor, it's speculation.

THE COURT:  Sustained.

MR. JENKINS:  All right.  Thank you, Your Honor.  Let me try a different

question on that, Your Honor.

BY MR. JENKINS:

Q      The way you run your department, Mr. Hager, would you allow a subordinate

to be telling someone such as Politano and Manzo that budgets were conservative

by design, without clearing that information with you first?

A      I don't control everything that my senior vice presidents, I have several senior

vice presidents and a very large organization that do have a lot of responsibility.  I

can't say that I'm informed of every statement they would make to the multitude of

financial advisors -- or advisors that have been at Genesis for the last 18 months.

Q      All right.  We'll leave it there.  If you could turn to page 14, please, Mr. Hager,

you'll see the third arrow down is what I'm interested in.  It states:

"Over the past six months, actual receipts approximated budget

(approximately a one percent variance), while disbursements posted a 4.6 percent

variance.  The disbursement variance is due to conservative forecasting by

management."

Do you see that, sir?

A      I do.

Q    Again, did anyone from Politano and Manzo ever express this opinion to you?

A    Not that I can recall.

Q    All right. Two other areas, Mr. Hager. In the way Genesis calculates its EBITDA, are nonrecurring items excluded from EBITDA?

A    Typically, yes.

Q    All right. Let me touch on a couple of things that might be coming up connection with this reorganization. Just, for example, are any bonuses that will be received by executives for successfully getting the bankruptcy plan through, would that be excluded from EBITDA?

A    We would make a presentation of EBITDA that would exclude those costs and tie those costs to the restructuring process, yes.

Q    All right. To go larger than that, I assume that there are other costs involved in this restructuring process, correct?

A    That's correct.

Q    Are all such restructuring costs being excluded from the EBITDA as calculated by Genesis?

A    That's what we attempt to do, yes.

Q    All right.

        MR. JENKINS: Your Honor, I have one more area that requires me getting some bulky documents from my seat. May I go back to get them?

        THE COURT: Of course.

        MR. JENKINS: Thank you.

                        (Pause)

BY MR. JENKINS:

Q    Mr. Hager for this next line of questioning, I'm going to have to show you or

Colloquy                                    160

refer to a series of documents. But I think you've seen them all or are familiar with them already.

The first is the disclosure statement prepared by Genesis for this proceeding. you were intimately involved with the preparation of that document, correct?

A    That's correct.

Q    All right. Do you recall that in the disclosure statement, the approximate projected value of Genesis' new common stock was set forth as $20.33?

A    Yes.

Q    All right. And that disclosure statement was based upon — withdrawn. The valuation assumptions in that disclosure statement were based upon the initial valuation work done by UBS Warburg and CS First Boston, correct?

A    That's correct.

Q    And this valuation work had been done in approximately April of 2001, correct?

A    I believe so.

Q    All right. You probably don't, but I have to ask you the question anyway. Do you recall what the — withdrawn. Do you recall in their valuation work that both UBS Warburg and CS First Boston, as one of their comparable companies relied upon Beverly?

A    I believe they both did.

Q    Right. And you have testified this morning that you think Beverly is a good comparison for Genesis, correct?

A    As I stated earlier, a component of Beverly Enterprises is comparable to a

Colloquy                                                    161

component of the combined Genesis, Multicare organization.

Q      Right.  And the portion -- I'm sorry, did I interrupt you?

A      And there are significant differences.  Beverly is not in the institutional
pharmacy business.

Q      Right and historically, institutional pharmacy business -- withdrawn.  This past
year, the institutional pharmacy business has enjoyed higher multiples in the
long-term care business, correct?

A      I'm not sure I can make that comment.  I don't know.

Q      All right.  We'll leave that for someone else.  Do you recall what the price per
share of Beverly was that UBS Warburg and CS First Boston relied upon in doing
their comparable company valuations, in their initial report?

A      I don't.

Q      All right.

       MR. JENKINS:  Your Honor, may I approach the witness with a
document?

       THE COURT:  Indeed.  Let me suggest trying to jump ahead.  If,
indeed, I assume we are going to have witnesses from UBS Warburg and/or --

       MR. WALSH:  That is a little bit of an issue.  We have a Bill McGahan
from UBS Warburg who will be going next.  I'm not sure if he's available tomorrow.
So I was hoping to get him in --

       THE COURT:  Indeed, do these questions, are they better framed to
that witness rather than Mr. Hager?

       MR. JENKINS:  No, ma'am, I'm solely relying -- I can understand why
Your Honor would ask that.  If this was a question about --

       THE COURT:  Then go ahead.  Let me not --

Colloquy

MR. JENKINS: Right.

THE COURT: Go ahead.

MR. JENKINS: May I approach the witness with a document, Your

Honor?

THE COURT: Certainly.

BY MR. JENKINS:

Q    Mr. Hager, I'm going to hand you a copy of the initial UBS Warburg evaluation

report in this matter. I only need it for looking at one page. If you could look at page

14, please, of that document?

MR. JENKINS: Your Honor, may I pull the easel --

THE COURT: Certainly.

MR. JENKINS: -- so that everybody in the audience.

MR. TODER: If I can make a suggestion, just move it back over.

MR. JENKINS: All right. My apologies.

BY MR. JENKINS:

Q    What was the price per share of Beverly Enterprises listed there, Mr. Hager?

A    Six dollars and thirty-three cents.

Q    And what is the price as of?

A    April 6th.

Q    All right. Let's do that. For those that can't see, I'm writing $6.33 in the chart.

And that's April 6th.

MR. TODER: Your Honor, just a suggestion, if we put the easel there,

then everybody might be able to see it. I'm sure it's fascinating and I'd like an

opportunity --

THE COURT: I can understand your desire not to miss a thing. Go

ahead.

    COUNSEL:  That's the best I can --

(Laughter by all)

    MR. JENKINS:  I'm going to have to displease somebody.

    MR. TODER:  You could be the greater good for the greater number.

    THE COURT:  We'll leave it at that.

    MR. JENKINS:  We could probably make a small improvement.  Mr.

Hager's was a pain in the neck just a little bit then -- did Your Honor see this?

    THE COURT:  Indeed.  It's amazing what collective minds can do.

    MR. JENKINS:  Courtroom choreography.

    COUNSEL:  Could you maybe move it back about 10 feet?

    COUNSEL:  Why don't you do it in black so people can see this.

BY MR. JENKINS:

Q    Mr. Hager, given your knowledge of your competitors, would you happen to

know what Beverly Enterprises stock prices today,

this week, last week, anytime during this period?

A    I thought you --

    MR. JENKINS:  May I approach Mr. Hager with another document,

Your Honor?

    THE COURT:  Certainly.

BY MR. JENKINS:

Q    The document I'm approaching you with is a report prepared by Evercore

Partners.  This is the valuation expert retained by GMS, the objector referred to by

Mr. Prince (phonetic).  Have you seen this document before?

A    I believe so, yes.

Colloquy                                164

Q      Could you turn to page 12 of that document please, Your Honor.  Excuse me,
Mr. Hager.  Could you tell me what the stock price for Beverly is on that page?

A      Yes, it's $11.45.

Q      Eleven forty-five.  And I think you'll see that there's a footnote telling what date
the stock price is as of.  Could you tell me that, please?

A      August 22nd, 2001.

Q      Right.  All right.  Mr. Hager, could you tell me what percent increase that
represents for Beverly Enterprises stock between April 26th and August 22nd?

            MR. STROCHAK:  Objection, Your Honor, I think it's a little unfair to ask
the witness to calculate a percentage.

            THE COURT:  It's a mathematical calculation we could all eyeball it.

            MR. JENKINS:  I have a calculator.  Would you like a calculator, Mr.
Hager?

BY MR. JENKINS:

Q      Would you tell me the percent increase in stock price in that four and a half
month period?

A      Eighty-one percent.

Q      I'm writing that up here too, all right?  And the fourth number I'm adding here is
the initial assumed stock price from your disclosure statement which is $20.33.

            The last calculation I'd like to you perform, Mr. Hager, is to tell
everybody what happens if you take $20.33 as of your initial report, and increased it
by 81 percent?

A      Why would you do that?

Q      Because I'm asking you to.  Because I'm asking you to, sir.

A      Well I'll be glad to run a calculator for you.

AA. 277

Colloquy    165

Q    Thank you.

    MR. STROCHAK:  Your Honor, I've decided I would like it back --

    (Laughter)

    MR. JENKINS:  I can understand why he doesn't want to see this.

    MR. HAGER:  Thirty-six dollars and eighty cents.

BY MR. JENKINS:

Q    Thirty-six eighty-six?

A    Thirty-six dollars and -- I think it was eighty.

Q    I'll give you eighty.  Thank you.

    MR. JENKINS:  Oh, I could do more, I'll leave the rest for argument. That is all the questions I have for Mr. Hager.

    THE COURT:  All right.  Any other besides Mr. George, any other questioners?  All right.

    MR. McMAHON:  Thank you, Judge.

    MR. JENKINS:  Excuse me Your Honor just a minute while I move my documents back.

    MR. McMAHON:  Your Honor, I have a few questions of Mr. Hager related to the release and exculpation provisions.

CROSS-EXAMINATION

BY MR. McMAHON:

Q    Mr. Hager, the debtors of both the Genesis and Multicare debtors have retained a number of professionals in these bankruptcy cases, correct?

A    That's correct.

Q    And in conjunction with the debtor's employment of those professionals, they entered into various agreements with respect thereto, correct?

Colloquy    166

A    That's correct.

Q    Sitting here today, can you tell me specifically which professionals agreements contain indemnification provisions and which don't?

A    I cannot.

Q    But it is your understanding, sir that there may be certain professionals that have been retained in these bankruptcy cases with which the debtors do not have agreements to indemnify them, is that correct?

A    I'm not sure.

MR. McMAHON:  Thank you, Your Honor.  No further questions.

CROSS-EXAMINATION

BY MR. GEORGE:

Q    Mr. Hager, in addition to the forgiveness of the notes, the gross up as the term was used in the incentive -- in the management incentive program, the incentive bonus that is disclosed in the plan and the deferred compensation is there also a severance that's been -- that's a part of the package for management?  Severance package?

A    There are severance provisions in the employment agreements if management is severed.

Q    And what is your understanding of how much you would be entitled to in the way of severance if, in any event, that you were either terminated or you left for good reason, do you understand how that works?

A    You say good reason, I don't have the ability just to leave the organization and get paid a severance.  I would receive nothing if I left.

Q    Well --

MR. STROCHAK:  Your Honor, I just note that the employment

Colloquy

agreements are in the plan supplement and the documents will speak for themselves. I'm not sure the witness could recount ever provision.

THE COURT: It's noted.

BY MR. GEORGE:

Q      Well, isn't it fair --

MR. GEORGE: I'm sorry, Your Honor.

BY MR. GEORGE:

Q      Isn't it fair to say that you're entitled to three times severance if you're either terminated or if you leave for, and

and it's in quotes, "Good Reason" with a capital G, capital R?

(Tape change)

A      That's the Good Reason as defined in the agreement.

Q      Correct. Do you understand that to be the case, that you get three times your base salary?

A      Yes, plus three times any cash incentive payments made.

Q      So, with respect to Mr. Hager, he would get about $2.4M, would that be correct, in the way of severance?

A      I don't think so.

Q      Well, if it's three times his salary, isn't his salary supposed to be $800,000

Colloquy

under the plan?

A    I thought you said Mr. Hager.

Q    Oh, I'm sorry.

A    His salary is $400,000.

Q    Okay. What is Mr. Walker's severance, do you know what that is?

A    I would assume it's three times $850,000, plus whatever cash incentives Mr. Walker received in the prior three year period?

Q    And, how about Mr. Barr, do you know what his severance would be?

A    I assume it would be three times $500,000, --

Q    I'm sorry. I misspoke --

A    -- plus cash incentives.

Q    -- when I said Mr. Hager. I was referring to Mr. Walker. How about your severance?

A    I would be three times 400,000.

Q    Plus any cash --

A    Incentives.

Q    -- incentives?

A    Yes.

Q    Now, --

A    We would all be bound by non-competition agreements to receive those payments.

Q    Now, with respect to the claims -- the unsecured claims against the Genesis bankruptcy estate, do you happen to have the disclosure and plan in front of you?

A    I do not.

Q    Okay.

Colloquy

MR. GEORGE:  Your Honor, if I could just approach the witness for a moment?

BY MR. GEORGE:

Q      I'm referring to page 19 of the disclosure statement.  Could you look at that for me, please?  (Pause).  Mr. Hager, are you familiar with the -- the numbers that are inserted in the plan on page 19 under the type of claim, under heading number 4 on that page.  It says, "Type of claim, suppliers, and vendors, mortgage deficiency claims, and swap deficiency claims," do you see that?

A      Yes.

Q      Did -- where those numbers provided by you or someone under your direction and control?

A      Yes.

Q      Can you tell us what the mortgage deficiency claims are and who they belong to?

A      'I do not have the specific mortgage amounts and specific properties, but they represent, for the most part, negotiated, even though they're not all completed.  We do have one objection -- I think it's G-116 -- that has objected to our proposal.  But, these amounts represent the difference between the face amount of the mortgages and the proposed new mortgages to be issued in the reorganization.

Q      Now, is it your testimony that they would relate to claims that would be in G-1-1 through G-1-17?

A      Yes.

Q      Could you look at page 15, please, the very top?

A      Yes.

Q      It actually starts on the prior page, 14.  It says, "The obligations of the Genesis

debtors under the Synthetic Lease as secured by the property identified above and

by all the property of the Genesis debtors that secure the claims in class 2.

Therefore, the deficiency claims of holders in class G-1 through 17 are part of class

G-2."

A       Is -- the deficiency claim of the Synthetic Lease lenders -- only the Synthetic

Lease lenders, G-1-17, just that one --

Q       Oh, I see.

A       -- creditor is included in class G-2.

Q       So, the seven --

A       The remaining deficiency claims for G-1-1 through G-1-16 would be included

in class G-4.

Q       So, is it your testimony that presently there are objections to these mortgage

deficiency claims?

A       I'm aware of one.

Q       And, do you know how much that deficiency claim is that is subject to that

objection?

A       I believe it's approximately two and a half million dollars.

Q       And, do you know who holds that claim?

A       It's G-1-16.

Q       G-1-16, Rittenhouse Pine Center?

A       Yes.

Q       Well, doesn't it say, on page 14, that that estimated recovery on that claim is

at 100 percent?  I'm looking at page 14, G-1-16.  It says, "Entitled to vote, yes.

Estimated recovery, 100 percent."  Do you see that?

                MR. STROCHAK:  Your Honor, this is estimated recovery on the

Colloquy

secured portion of the claim, just so we're all clear on that.

    THE COURT:  It says unsecured deficiency of 1.69.

    MR. GEORGE:  No, the next --

    THE COURT:  Oh, I'm sorry.  I'm looking at the wrong -- no, that's right.

    MR. GEORGE:  No, it does, Judge, but I -- I appreciate counsel's input.
Unfortunately, I wish he were on the stand when he was making those statements.
I'm trying to get information from the witness, but I appreciate it.

BY MR. GEORGE:

Q    How about the swap deficiency claims, 11,257,000?  Can you explain to us
what those claims are?

A    Yes.  Genesis had entered into certain interest rate protection agreements that
were, to a degree, secured under the credit facility and, to a certain extent, were not
secured.  So, there is a $17M plus claim in the class G-2 and a deficiency claim of
$11.2M in class G-4.

Q    And, has that claim been fixed?

A    Yes.

Q    The unsecured deficiency claim has been fixed?

A    Yes.

Q    And, now it says, "Other, $10M".  Can you tell us who those claims are?

A    I do not have a specific recollection of the amounts in that figure.

Q    Now, did the Genesis debtors litigate the swap deficiency claims, the amount
of those, or were those agreed to?

A    We negotiated a settlement.

Q    And, how about the mortgage deficiency claims, did you litigate those or settle
those?

A       We negotiated and settled all of those except the one that's still objecting.

Q       Now, you --

A       And, in certain --

Q       -- understand that --

A       -- in certain cases, we did return collateral.

Q       And, you understand that the inclusion of those claims in this class has a dilutive effect on the distribution to class 4 creditors, correct?

A       Yes.

Q       And, how are these claims different than a punitive damage claim with respect to how they dilute the distributions to the other remaining G-4 creditors?

A       These claims are claims of creditors.  They are not claims that are meant to penalize the corporation for certain actions.

Q       So, the reason for this effort classification is not that they dilute, so much as that they are intended to punish the company?

A       I believe that's what my testimony was, yes.

Q       Now, you testified about some qui tam litigation.  Now, were you here in court when the Court directed that certain qui tam information be provided to the parties?

        MR. STROCHAK:  Your Honor, I don't recall any testimony about qui tam litigation.

        THE COURT:  Not today, no.  I think that you're talking about other proceedings -- previous proceedings in which --

        MR. GEORGE:  No, I think --

        THE COURT:  -- we discuss --

        MR. GEORGE:  -- it was counsel, Judge, that actually  mentioned the qui tam.

MR. STROCHAK: Well, if I was testifying before, I'd like to continue, Your Honor.

MR. GEORGE: Hey, why not. Why break a trend, Judge, right?

MR. STROCHAK: I think I announced this morning that we did have finally a settlement with the Government on four qui tams. That -- it was my understanding that the seal had been lifted, and that we did have copies of those -- of that settlement available for anyone who is interested. We're not seeking approval of the settlement under the plan. We'll file a separate motion.

THE COURT: I understand.

MR. GEORGE: Well, that's fine, Judge. That's really what I would like to see. If we could see it before tomorrow, that would be terrific. And, I can -- and -- my examination --

THE COURT: The nature of the settlements?

MR. GEORGE: Your Honor, as I understand, one of the issues that we raised at the disclosure issue was what effect continued qui tam litigation would have, what the obligations would be. And, Your Honor had indicated that that would be a confirmation issue and, I think, directed the debtor to turn over that qui tam information when it was unsealed. And, so, we'd like to see that before tomorrow.

THE COURT: That's fine.

MR. GEORGE: I don't have anything further then, Your Honor.

MR. STROCHAK: I would just note, Your Honor. I believe the amount of the settlement has been disclosed in discovery prior to the confirmation hearing.

THE COURT: Noted. Any redirect?

MR. STROCHAK: Yes, Your Honor, we do have some redirect.

THE COURT: Go ahead.

Colloquy

REDIRECT EXAMINATION

BY MR. STROCHAK:

Q   Why don't we start over here, Mr. Hager. For the record, Adam Strochak, from Weil, Gotshal. Mr. Hager, is it a – in your knowledge, a generally accepted valuation methodology to trace the percentage change and the stock price of a comparable company over a four month or so period of time, and then just multiply that percentage times the imputed stock value at the time the plan was proposed?

A   I have never seen that done before in my life. I mean, if you had a broader, you know, sample of – of industry participants where equal or comparable fundamentals occurring during the comparison period, that might have some relevance. You'd also want to ensure that the beginning point was on the same basis, from a valuation perspective, that was reflected in the original $20.33.

Q   So, you'd probably also want to know, if I understand you correctly, whether there had been a corresponding 81 percent increase in the cash flow of the company, correct?

A   Not only the in the cash flow, but it's also possible and, I think, probable that the $20.33 was based on a seven times valuation multiple. I believe that the $6.33 was based on a dramatically lower multiple than seven times.

So, part of that increase could just be the increase to get $20.33 up to a comparative valuation multiple. In addition, you would expect, unless there were some underlying
– some other underlying fundamental changes in the marketplace, that there was some significant event that would result in an 81 percent increase.

Q   What about the capital structure of the company, is that reflected in this analysis?

Colloquy

A    It wouldn't be, and obviously that would be an important consideration, how much equity and debt were represented on the peer group that's being analyzed.

Q    So, if there had been changes in the Beverly Capital structure, that wouldn't be reflected in this analysis?

A    That's correct.

Q    Thank you, very much.  Mr. Hager, earlier there were some questions about the management — executive retention program.  And, I believe Mr. George asked you a question about the amount of the incentive compensation that you were receiving?

A    That's correct.

Q    That's correct?  And, I believe he read from the motion that was filed for Court authority — filed in this case for Court authority to establish the executive retention program, correct?

A    I believe so.

Q    'And, do you recall what the amount of the executive incentive compensation was for yourself was in — as reflected in the motion that was filed before the Court?

A    I believe is $350,000.

Q    Was that the final number that the Court approved?

A    That wasn't my recollection.  That's why I reacted the way I did when I was shown that document.

MR. STROCHAK:  May I approach the witness, Your Honor?

BY MR. STROCHAK:

Q    Mr. Hager, let me just direct you to a copy of the order of this Court dated February 23rd, 2001.  If you could just look briefly at the schedule, the attachment to the back.  Does that reflect the number that was approved by the Court?

A      Yes, and that reflects my recollection.  My retention payment is $297,500.

Q      And, what was the reason for the change between the time the motion was filed and the actual number approved by the Court?

A      It was based on a negotiated agreement with the Unsecured Creditors Committee of Genesis.

Q      Okay.  I believe Mr. George asked you a question about deferred compensation.  And, what does — is there any deferred compensation that's being paid to you and other officers of the company?

A      Several officers of the company elect to not get paid their salary, and it is deferred and accrued as a liability on the balance sheet.  That's what the deferred compensation represents.  It is nothing other than the election of the officer not to be paid his current salary level.

Q      Does that reflect — does the defer — and are there deferred compensation payments being made?

A      I believe what has happened in the bankruptcy is that, since the officer is a creditor, because he has been paid his salary, those amounts have been affirmed to be paid to the officer.  The officers will be paid for the salaries that they weren't paid in the pre-petition period.

Q      Would it be correct to say that that's money that had already been earned

A      Absolutely.

Q      Okay.  Mr. Hager, how long has it been since you and the other senior managers at the debtors received a pay increase — an increase in base pay?

A      I'm not sure.  I believe it was 1998 or 1999.

Q      Let me turn to administrative claims in this bankruptcy.  Mr. Hager, do you know — do you have an approximation of the amount of administrative and priority

Colloquy

claims against the Genesis debtors in these Chapter 11 cases?

A    I believe there are approximately $25M of administrative and priority claims against the Genesis estate.

Q    Uh-huh. Mr. George, I believe, asked you a few questions regarding assets that may be in the estates of the debtor non-borrower subsidiaries of Genesis. Do you recall what that amount is?

A    I believe the amount is approximately $4M in the Genesis estate of unencumbered equity value in the debtor non-borrower entities.

Q    And, given the level of administrative and priority claims against the Genesis debtors, would those assets be sufficient to pay general unsecured creditors?

A    They would not.

        MR. STROCHAK:  (Pause). I ask the Court's indulgence for one moment. I'm just going through my stack of exhibits. (Pause).

BY MR. STROCHAK:

Q    I believe – do you still have the exhibits in front of you, –

A    Yes.

Q    – GMS Exhibit 1?

A    This document?

Q    Is that GMS number 1?

        MR. STROCHAK:  GMS Number 1 in evidence, Your Honor. I believe GMS number 1 refers to 1999 EBITDA number. I'm just flipping for the location. (Pause).

A    *73 and *74.

Q    Thank you, very much. And, that had a 1999 EBITDA number of – is it 226?

A    It's 226 for Genesis and 73 million for Multicare, for 299 million.

Q    What's happened generally to the financial conditions in the industry since the end of the Genesis and Multicare debtors' 1999 fiscal year?

A    Well, our forecast obviously have EBITDA on a combined basis of 215 million down from 299 million in 1999. There have been several dramatic events in the industry. First, we've talked about the new prospective payment system through 1999. It was only our first year of the impact of prospective payment. That system was phased in over four years, and there was approximately a $20M reduction per year in our Medicare payments as a result of the phase in of the PPS system.

In addition, as I've stated earlier, we have seen significant inflationary costs increases in our health insurance programs, approximately $13M on the annualized basis. We have also seen significant increases in liability insurance costs, approximately $6M on an annualized basis. We have seen reductions in the maximum payments allowed under the federal upper limits for drugs, approximately $6M a year.

Because of prospective payment and the renegotiation of all of the pharmacy contracts with our pharmacy customers, we've seen approximately a two and a half percentage point decline in our pharmacy margins, which has approximately a 20 to $25M impact on our earnings. Those just some of the issues that we've had to deal with, not to mention labor inflation that has exceeded our payment rates from the various governmental programs.

Q    There were a few questions before about the proposed APS transaction. And, my recollection, from your direct testimony, was that APS is the institutional pharmacy business of Mariner, is that correct?

A    I believe it's owned by both Mariner Post Acute Network and a portion by Mariner Health Group.