Q     Mr. Hager, do you have any sense as to what the process would be for that transaction in order to go from the stage where it is now to consummation?

A     Well, obviously we'd have to reach an agreement to acquire the assets.

Q     There's been no agreement yet?

A     Well, there's no signed agreement. And, I know that process -- as I stated earlier, we hope it is fairly close. We're clearly working hard to get it done. After --

Q     What would happen once an agreement is signed?

A     After it is signed, it's my understanding that we would need approval in our bankruptcy court to pursue the transaction, as would Mariner to sell the asset. And, I understand that process would include a competitive bidding process in their bankruptcy court.

Q     Do you know of any other potential bidders?

A     Yes, we know of one other interested party that has bid on the asset.

Q     And, who is that?

A     It's Omnicare, the leading institutional pharmacy provider in the industry.

Q     Do you have any sense as to whether Omnicare would be able to outbid Genesis for those assets?

A     They are an investment grade rated company and they clearly have much greater resource. If they chose to outbid us on that transaction, we would not be able to compete.

Q     Do you know if the APS -- do you know if the Genesis APS transaction would be subject to any regulatory review before it could be consummated?

A     I believe there's regulatory approval requirements in virtually every state that APS operates in, and I believe that is over 20 states. There would also Hart-Scott-Rodino approval required, and lender approval as well.

Q      Okay. Earlier we saw some projections of increased EBITDA as a result of a

prospective APS transaction. Why were you projecting an increased EBITDA after

the transaction?

A      We would not spend $60M if we didn't think we could buy an asset that would

generate positive cash flow. But, clearly, the majority of the cash flow in the

transaction comes from the synergies of bringing the two companies together. Those

are both purchasing synergies, administrative costs synergies, and the benefits of

closing and merging pharmacies in overlapping markets.

            There is more risk in realizing those synergies than there would be in

the purchase of a historical cash flow, but we do believe that the transaction

increases the value of our pharmacy operations. And, it is important to our estate

and to our business to close the transaction, and we're pursuing that transaction

aggressively.

Q      Over what period of time would those synergies be incorporated into the

company's cash flow?

A      I think we expect that we can realize all of the synergies -- some would be

clearly sooner than others, such as the purchasing synergies, but we believe we

could realize them in about a two year period.

Q      Let me direct your attention, if I could, to GMS Exhibit 4, which I believe was

the rating agency's presentation, and in particular to page 26. It's the page entitled

"Quality Surveys".

A      Yes.

Q      Does the data reflected on this page of GMS Exhibit 4 reflect the financial

condition of Genesis as compared to other companies in the industry?

A      Not necessarily. This would -- these measurement points would just be one --

Colloquy                                                                 181

one measurement point of the quality of the service provided by Genesis as measured against its peers through the state survey process. I would caution anyone to use this as a sole determinant of quality.

And, it doesn't necessarily have a direct correlation to financial performance or financial evaluation, even though, over a long term basis, I would be hopeful that a quality provider would perform better financially as well as operationally.

Q    In the long term care business, would you consider the debtors to be a large organization?

A    Yes, we are reasonably large in size. I would say that we're somewhere in the top five nationally, in that – top five to top seven.

Q    And, what percentage of the long term care industry is comprised of large institutions, the top five or so that you mentioned?

A    I don't recall. I think there are 1.6 million beds. And, I would say that those top five manage – I'm going to guess – in the 200,000 bed range. The top seven might be 250,000, in that range. That's just a – that's a guess.

Q    Uh-huh. And, is it fair to say then that the rest of the industry is comprised of smaller operators?

A    I think this industry, yes, is comprised more of smaller and medium sized regional operators than it is of large pubic companies.

Q    Do you know if smaller operators typically have a higher level of average citations per facility than large operators, like the debtors?

A    I don't think I could make that assessment. I wouldn't know.

Q    Mr. Hager, do you have a sense of the overall magnitude of punitive damages claims that have been asserted against the debtors in these Chapter 11 cases?

A      I do not. And, as I said earlier, I do not believe we have ever paid a punitive damage claim in the history of the company.

Q      Mr. Hager, do you have an understanding as to how the plan treats punitive damages claims that would be covered by insurance?

A      I believe, if they're covered by insurance, they could be paid out under the insurance programs.

              MR. STROCHAK: If I could just ask the Court's indulgence for one moment? (Pause). All right. Your Honor, I think I have no other questions at this point. Mr. Hager, thank you, very much.

              THE COURT: All right. Thank you, Mr. Hager.

              MR. HAGER: Thank you, Your Honor.

              THE COURT: You may step down.

              MR. PRIMPS: Excuse me, Your Honor. I just have a couple of questions that went back to a document that I had put in.

              THE COURT: Last –

              MR. PRIMPS: I'll be very fast.

              THE COURT: Last questions.

              MR. PRIMPS: Okay. Thank you, Your Honor.

                          RECROSS-EXAMINATION

BY MR. PRIMPS:

Q      Mr. Hager, --

A      Yes.

Q      -- very quickly, --

A      I should get up faster next time.

              THE COURT: Yes.

Colloquy

BY MR. PRIMPS:

Q    The quality surveys that were referred to in the document marked as GMS-4, those were presented, were they not, to the rating agencies at a time that you were trying to get an agency rating, isn't that correct?

A    That's correct.

Q    And, that was part of a selling effort on your part, was it not?

A    It was a part of addressing a risk that the rating agencies have clearly identified in our industry, and that is the oversight risk – the risk of, you know, the loss of license, et cetera.  And, we were attempting to present to the rating agencies that our quality results would at least show that our likelihood of that risk or our exposure to that risk would be less than our peers in the industry.

Q    Turning to the APS acquisition, you talk about the competition from Omnicare. And, previously, I think, in the document that was marked as GMS Exhibit 4 for identif – for – you did mention that there would be synergies that you quantified in the acquisition of APS by Genesis, is that correct?

A    That's correct.

Q    Do you know if Omnicare would have the same synergies in buying APS?

A    I couldn't – I couldn't comment on that.

Q    Do you know, therefore, whether Omnicare has the same incentive as Genesis does to acquire APS?

A    I couldn't comment on Omnicare's incentives.

Q    Do you have any idea how Omnicare would value the deal in value in acquiring APS?

                    MR. STROCHAK:  Objection.  Speculation, Your Honor.
                    THE COURT:  Sustained.

Colloquy

MR. PRIMPS: I'll move on -- I'll strike that, Your Honor, and move on to the next question.

BY MR. PRIMPS:

Q    Is -- do you know if Omnicare has a -- has major equity ownership from an institution with the financial muscle of Goldman Sachs?

MR. STROCHAK: Objection, Your Honor.

THE COURT: Sustained.

MR. PRIMPS: I have no further --

THE COURT: All right.

MR. PRIMPS: -- questions, Your Honor. Thank you, Your Honor.

THE COURT: Thank you, Mr. Hager. I think this time you can -- you can make it. Let me reflect our time frame. I have arranged -- since we will have our court recorder having to leave -- that we will have the opportunity to stay through perhaps 5:30, maybe a couple minutes later, which is very tight, I know, probably for the next witness, but we'll give it a shot.

I also note that we're probably going a little slower than we had anticipated. And, I have cleared, in anticipation -- I don't know what everybody's availability is, but I've cleared Thursday, in the event that we need it. So, it is available, just to let you know.

MR. WALSH: Thank you, Your Honor.

THE COURT: All right. Call your next witness, please.

MR. WALSH: Your Honor, the debtors call William McGahan.

THE COURT: Come on up, sir. Place your left hand on the Bible, and raise your right hand.

WILLIAM MCGAHAN, DEBTOR'S WITNESS, SWORN

Colloquy                                          185

THE COURT:  Please have a seat.  Your full name, spell your last
name.

MR. MCGAHAN:  It's William McGahan.  Last name is
M-C-G-A-H-A-N.

MR. WALSH:  Your Honor, I'm a slow talker, but I'm going to speed up,
I promise.

THE COURT:  Perhaps we can dispen -- rely on the information in the
-- I think there was a certification here, was there not, or no?

MR. WALSH:  Yes, and I -- I'm going to --

THE COURT:  In terms of qualification, perhaps we can rely on that?

MR. WALSH:  Maybe I can just short circuit that with just a couple of
questions?

THE COURT:  Certainly.

DIRECT EXAMINATION

BY MR. WALSH:

Q      Mr. McGahan, who is your employer?

A      UBS Warburg.

Q      And, how long have you been at UBS Warburg?

A      Since March of 1999.

Q      What's your position?

A      I'm vice chairman, managing director, and deputy head of our global health
care group.

Q      Prior to UBS, where did you work?

A      Solomon Smith Barney.

Q      What's your educational background?

A    Undergraduate degree at Southern Methodist University, and an MBA from University of Virginia.

Q    As deputy head of the global health care group at UBS, what are your responsibilities?

A    We have a group of a hundred people in corporate finance, and I'm one of the two people who oversee our global health care group. And, my job is principally focused within that group on health care services.

Q    And, how much experience do you have in investment banking?

A    Since the late 1980's.

Q    And, how much of that experience is focused on the health care sector?

A    Virtually all of it.

Q    About how many transactions have you participated in the health care field?

A    Our group, since the beginning of the late *80's has done approximately a thousand transactions.

Q    And, how many did you personally participate in?

A    A good portion, say, a third.

Q    In the sector of the health care industry that we're talking about, which is the long term care sector, how many transactions?

A    I've personally worked on approximately 60 transactions.

Q    In your view, how does UBS compare to other investment banks in terms of size and expertise of a health care group?

A    I believe we have the largest group, and I believe we're the most active group.

Q    Okay. A couple questions about the health care services market.

          MR. WALSH: Your Honor, he's an expert, is that okay?

          THE COURT: I take it —

MR. WALSH: Does anyone object?

THE COURT: -- there is no voir dire? He's welcome to testify as an expert. Go ahead, please.

MR. WALSH: Pretty fast.

BY MR. WALSH:

Q      On the health care services market, is that market made up of different sectors?

A      It is.

Q      And, what are they?

A      Well, there's a number of different sectors and sub-sectors. There's the large cap pharmaceutical sector, the specialty pharmaceutical sector, the biotechnology sector. There's medical technology, medical products, payors, hospitals, providers, long term care, et cetera.

Q      And, where do the debtors fit in the health care market? Where do they fit in this -- the various sectors?

A      I'm sorry, I didn't un -- I didn't hear you.

Q      Where does Genesis and Multicare fit -- where do their businesses fit, which sectors are they in?

A      Sure. They're in the long term -- generally in the long term care business and -- as well as the institutional pharmacy sector of health care services.

Q      Over the last several years, has the long term care market experienced significant changes?

A      It's gone through a lot of changes. I started in this business in the late *80's, and Beverly Enterprises was the principle public company. And, it almost went bankruptcy due to the acute labor shortage, primarily nurses, in the late *80's.

And, then, in the early 1990's, a whole wave of companies went public, and we participated in a number of those. And, then, in the mid 1990's, there was great consolidation. And, then there was reimbursement changes in 1997, which caused virtually a majority of the companies to go bankrupt. And, now we have a number of companies merging -- excuse me -- emerging from bankruptcy. So, it has gone through -- that's a lot of change.

Q    That certainly sounds like a lot. How about the institutional pharmacy market?

A    That has as well. You know, that is an ind -- a company -- excuse me -- that is an industry that has had a number of public companies, the most obvious of which is Omnicare. It also had a number of other significant companies at some point. There has been a lot of consolidation in that business, and there's also been a lot of change due to reimbursement changes.

Q    Okay. So, that's sort of setting the stage. Now, what's happening currently in the long term care and institutional pharmacy segments of the market?

A    Well, there's a number of different dynamics which are affecting that market right now. Princ -- one of the main things that are -- is affecting the market is reimbursement changes that have happened over the least year, with price increases going in.

And, additionally, you've got an acute labor shortage in that sector, because, in long term care, about two-thirds of the costs are labor and a big portion of that is nursing. And, there's a big nursing shortage in this country. There's also government reimbursement increases that are sunsetting in the future, and that's a big issues.

And, then, in addition to that, you've got a budget surplus which has evaporated, and Medicare growth which is approximately ten percent a year -- over

the last 12 months. So, you've got -- and, whenever that happens, you've got budget cuts potentially affecting the health care service business. So, there's a lot of change going on in long term care.

Q       Okay. Over the last several months, has the market changed its assessment of long term care businesses?

A       Yeah, well, it's interesting, because the stock market is affected by a lot of different things. One of the things that affects the prices of these securities is not just what's going on in health care services, but also what's going on in other sectors. So, for example, technology has had a huge melt down in their stock prices.

All the dot coms have -- or many of them have gotten -- gone out of business, and Intelecom, which is another area that's had a large price deflation on their stock prices. So, investors are now looking for places to put their money, and health care services looks like a safe harbor for that. So, you've seen stock prices in health care services increase over the last four or five months as these other sectors have had problems.

Q       Is that true of the institutional pharmacy sector as well?

A       It is.

Q       Okay. So, over the last several months, we've seen increases in the stock prices of the companies that are not in bankruptcy, is that correct?

A       Generally, yes. Yeah.

Q       Okay. In your view, are those stock prices likely to increase or the values of those companies likely to increase even further?

A       Well, the future is always difficult to predict. But, you know, we've seen a great run in a number of these stocks. For example, Manor Care has seen their stock rise from high single digits, 8 or $9, to approximately $30 a share. And,

Colloquy

Beverly, similarly, has seen their stock go up by about four-fold.

Now that that's happened and you've had the price increases go in, on the future you see perhaps the -- not only price increases coming out of Medicare, but maybe price declines as the Medicare budget grows faster than the overall budget. You see labor shortages.

So, while there's great demographics in the long term care business, the question is, if you don't have rising reimbursement -- in fact, you might have declining reimbursement -- and you have increased costs, you might have decreased profitability. So, therefore, the future is very uncertain and clearly not, in my view, anywhere near the situation that we've had for the last four or five months.

Q      Okay. I'm going to turn my questions to your evaluation report. You were retained by Genesis, --

A      That's correct.

Q      -- is that correct? What was the scope of your retention?

A      We worked with the company over the last year or so to work with it through this process and produce an evaluation report.

MR. WALSH: Your Honor, I'd like to mark as debtor's exhibit number 1 -- actually Genesis number 1, a UBS Warburg report entitled "Plan of Reorganization, Updated Enterprise Valuation Analysis" dated August 2001.

THE COURT: Indeed. Thank you.

BY MR. WALSH:

Q      Have you seen the report that his now marked Genesis number 1?

A      Yes.

Q      Did you prepare this report?

A      Yes, we did.

Colloquy

Q    What's the purpose of the report?

A    Well, the purpose is to provide an updated enterprise valuation analysis for the company.

Q    Okay. In preparing this report, what methodologies did you use in performing the valuation analyses?

A    Well, we use – principally use three, the comparable company analysis, the discounted cash flow analysis, as well as the precedent transaction analysis. We also looked at some other ways of valuing the company, and we didn't use those, because we didn't think that they were as good as the three that we used here.

Q    Okay. The three methods being comparable company, discounted cash flow, and precedent transactions. Did you use all three of those methods?

A    We did, except, on the precedent transaction analysis, we looked at that, and we assessed the fact that virtually all of those transactions happened before the budget cuts of 1997. So, looking at those transactions would be looking at a comparable group or a group of companies and transactions which is direct to just not applicable to today's market environment. So, we didn't really use that precedent transaction analysis.

Q    What is the comparable company analysis?

A    The comparable company analysis is an analysis where we compare the two segments of Genesis, the long term care business and the institutional pharmacy business, to the other publicly traded companies in those sectors.

Q    Okay. In doing a comparable company analysis, wouldn't it be appropriate to simply look at the stock prices of those companies?

A    No, that's not appropriate. What is appropriate it to look at their enterprise values as a multiple of their cash flow, because stock prices just don't take into

Colloquy                                                          192

account the capital structure, don't take into account other factors that are associated

with the company. That's looking at one component of it, but not the whole picture.

Q        Can you walk me through how you would actually do the analysis?

A        Well, the analysis is -- if you can see, is on page 14 and 15 in this -- in this

presentation. And, what we've done is we've compared the enterprise value to 2001,

2002 EBITDA for the comparable companies in each sectors. And, then we also

compared the adjusted enterprise value which takes into account the leases -- the

sale lease back transactions on these companies' balance sheets to their EBITDAR,

which is EBITDA, but also before rents.

Q        I see. And, there reason you would do EBITDAR as opposed to EBITDA?

A        Is because some of these companies have used off balance sheet sale lease

backs to finance themselves in lieu of debt. So, it would appropriate to look at it both

ways, both taking into account the companies that have not done sale lease backs --

so, in other words, looking at EBITDA, but also looking at EBITDAR.

Q        Okay. I note the page that you are referring the Court to, page 14, has

columns for 2001 P EBITDA and 2002 P EBITDA. I take it that means prospective --

A        Or projected.

Q        -- or projected?

A        Right.

Q        And, why would you look at more than one year?

A        Because -- well, first of all, where we are in the calendar year, which is that

we're in August. And, second of all, the public markets value these companies and

other companies based on their projected financial information. So, just looking at

historical would not be how the marketplace views these companies.

Q        Okay. The multiples that you have here -- and I'm going to just pick one line

at random, Manor Care. As of the date of your report, these are the multiples that the capital markets were putting on Manor Care at the time?

A     Yes.

Q     Okay. How exactly does Genesis compare with Manor Care? And, when I say Genesis, I'm just talking about the long term care portion of a business, not the institutional pharmacy. I know Manor Care doesn't have that business.

A     Manor Care is the premier company candidly in the long term care sector. Manor Care has been -- since it's been public, the company has traded at the highest multiples, without exception, of any other company in the industry. And, one of the reasons for that is you can see -- on page 16 of this analysis, you can see the payor mix.

And, if you look down the column which says HCR, which is Manor Care's stock ticker symbol, Manor Care's payor mix is 40 percent private pay and 28 percent Medicare. And, if you add those two numbers together, that's a frequently used measure of quality which is called the quality mix. And, Manor Care's quality mix is 68 percent of their revenue.

And, again, private and Medicare are reimbursed higher than Medicaid. If you compare that to Genesis, Genesis is 48 percent and -- so Manor Care's quality mix is 40 percent higher than Genesis. And, that's one of the principle measures or how you compare companies in this sector.

Additionally, Manor Care has got a higher margin business. It consistently reinvests in maintenance cap backs, a very high number in their facilities, and it has an investment grade balance sheet. So, you know, Manor Care, for years, has been the premier company in the sector.

Q     So, if I understand this correctly, -- and there's been previous testimony to this

Colloquy                                                194

effect -- Medicaid reimburses the smallest amount, Medicare and the private pay

actually reimburse the largest amount per patient. So, having a larger proportion of

private pay and Medicare per day of patients is a stronger payor mix --

A      Yes.

Q      -- in terms of reimbursement? Okay. Since we're on this page, would you

compare Genesis' payor mix to Beverly?

A      Looking across the page, you can see that Genesis and Beverly -- Genesis is

48 percent in private and Medicare and 52 percent in Medicaid, and Beverly's figures

of Medicaid is very similar, 52 percent to 55 percent. And, then the quality mix is 48

percent to 45 percent. So, Genesis' payor mix is very similar to Beverly's payor mix.

          MR. WALSH: One moment, Your Honor. (Pause).

BY MR. WALSH:

Q      Mr. McGahan, are you familiar with the phrase EBITDAR margin?

A      Yes.

Q      What does that mean?

A      EBITDAR margin is the EBITDAR, which is defined as earnings before

interest, taxes, depreciation, amortization, and rent, as a percentage of revenues.

Q      Do you have any idea of the comparison of Genesis's EBITDAR margins and,

say, Beverly?

A      Yes. In -- they are here in the back. If you look at -- on page 23, you can see

Beverly's Enterprises EBITDAR margin, which is approximately, say, 13 percent

across that page. And, again, I'm directing you to page 23, which is -- you see

EBITDAR, which is bolded, and then, right below it, EBITDAR margin.

          And, then, if you would like, I can compare it to Genesis'. And,

Genesis' EBITDAR margin, which is on -- earlier in the book, is on page 8, which is

approximately -- on the second line from the bottom, approximately -- call it 9 percent -- 8 to 9 percent.

Q    Okay.

A    Beverly's is higher than Genesis'.

Q    Do you have any idea why that might be?

A    You know, I believe that, you know, there's a number of factors, including, you know, the fact that -- you know, first of all, Beverly has not gone through this process, and I believe that's a factor. I also believe that, you know, Beverly has had, you know, a long history of operating, you know, the facilities as well. It's not a consolidation story as well, and other factors like that.

Q    Can the acuity of the patients have anything to do with the EBITDAR margin?

A    It can, yes.

Q    How does Genesis compare with Kindred? That's the other company you selected, although it's listed on page 16 as Vencore. It's -- that was its pre-bankruptcy name.

A    Well, first of all, Kindred and Genesis are in slightly different businesses. Vencore slash Kindred is also in the long term -- or L-tech business, which is the long term hospital business and -- which is a slightly different business than Genesis and a slightly different reimburse business.

        But, you can see, though, that the payor mix of Genesis and Vencore are quite similar. Vencore is now called Kindred. They changed their name as they emerged from bankruptcy.

Q    So, in this process, you calculated multiples for Manor Care, Beverly, and Kindred. Where can I find that in this report?

A    That is on page 14.

Colloquy

Q    Page 14. Okay. How about institutional pharmacy?

A    On page 14, you can also see that we calculated, in the comparable analysis, the multiples of Omnicare, Omnicare being the principle company that is not either in default or bankrupt in the institutional pharmacy business.

Q    Okay. So, now you've got a set of comparable companies and you have calculated their respect've multiples by the marketplace. How now do you come up with a -- an appropriate multiple for Genesis' long term care business, with respect to Beverly, Kindred, and Manor Care, and the institutional pharmacy on the Omnicare side?

A    Sure. Well, what we did in that -- is summarized on page 27 of the report. And, what we've done is applied what we believe the correct valuation multiple ranges to the corresponding statistics for Genesis' long term care business, as well as their Neighbor Care pharmacy business.

And, what we've used on page 27, as you can see, is a multiple range of Genesis for the long term care of 2001 EBITDA of seven to nine times. And, again, if you look back to page 14, the 2001 EBITDA, that encompasses Beverly of 7.6, Kindred of 6.8, and Manor Care of 10.7. And, again, seven and a half to nine and a half times, 2001 projected EBITDAR, again with the multiples on page 14 of the industry group.

And, then we did the same thing for 2002 for Genesis. Long term care, six and a half to eight and a half, and seven to nine times. And, all of that can be seen on page 27.

Q    If I look at these numbers, Mr. McGahan, it looks like, just for ease of reference, that the valuation multiple for Genesis on the long term care side is roughly what?

Colloquy                                                197

A      On the valuation multiple for Genesis on the long term care side is seven to nine times 2001 EBITDA. And, again, you know, earlier I heard numbers thrown around for Beverly's multiple. Beverly's multiple is 7.6 times 2001, and the range that we used is seven to nine times.

Q      Okay. So, you -- you pegged Genesis' long term care business slightly above Beverly, --

A      Yes.

Q      -- but significantly below Manor Care?

A      Yes.

Q      And, that's for the reasons that you mentioned before about the differences in the companies?

A      Yes.

Q      Okay. Now, how did you -- how did you come up with your valuation range for Neighbor Care, the pharmacy side of the business?

A      Well, a number of companies in that -- there's not a lot of data points there. Omnicare is the principle company that's in the business. There are others, but they're either subsidiaries or they're in default. So, Omnicare is the comparable. Omnicare enjoys significant benefits over our business in terms of scale, in terms of able to do forward buy opportunities, in terms of growing their business. And, it is also considered to be the premier gold standard in their sector.

       And, if you look at their multiple of 10-1, and again applying what we think to be, you know, a discount to that number that is clearly justified in the marketplace, given Omnicare's historical premium valuation to the entire sector, we've applied a range of eight to nine times 2001 figures for Neighbor Care.

Q      I see. Okay. So, now you have a multiple for -- a range in multiples for

Genesis, both the long term care business and the pharmacy business. What do you do with that?

A    Well, we apply them to the relevant statistics for the company. So, for example, on page 27, we've used the number 158.4 for the combined, but then, walking back up, we segmented the businesses into two areas, both the long term care and Neighbor Care, and then we applied the multiples to those two numbers.

Q    Okay. So, this page 27 really is crucial to your report, because, in it, you have derived an enterprise value range using 2001 projected EBITDA, 2001 projected EBITDAR, 2002 projected EBITDA, and 2002 projected EBITDAR.

A    Right.

Q    So, -- and, you think that, in terms of coming up with a value, you need to look at all those data points before you exercise your judgment?

A    Yes.

Q    Okay. How did you arrive at the -- what – the -- just focusing for a second on the 2001 projected EBITDA that's listed in here as $158.4M, how did you arrive at that number?

A    Well, what we did is we worked with the company in developing their projections. And, the company, as we heard earlier from Mr. Hager, produced a budget in the fall of last year. And, what we did is we took those numbers and we talked to the company about their assumptions behind those numbers and their cost trends and other things that they had in there.

And, then what we did is we adjusted those numbers for changes that have occurred since the original budget was prepared. And, those – that information can be found earlier in the book and can be seen on pages 9 and 10.

And, to walk through those changes very briefly, what we did is we

adjusted the 2001 original budget plan for the rate increases we got from BBRA and for the -- and then we added back certain items like the development facilities. We put in there the benefit of the Multicare benefit out of BBRA and the effect on the management fee. The rent decreases we got out of Elder Trust and the like.

And, so, the point of page 9 and 10 was to make the changes to the plan affect both the calendarization of the numbers, as well as the changes that took place over the course of the year to make sure that the numbers that we were using reflected the business.

Q    Okay. And, that builds up to a 169 number?

A    Right.

Q    And, then you -- there are some further changes below that, and --

A    Yeah.

Q    -- would you explain what those are?

A    Sure. I mean, the next number, 2989, just is really the offset to the BBRA full year adjustment line, which is five or six lines up, of 5.9, because what we've tried to do is -- since the 5977 reflects going back to the beginning of the fiscal year, which began October 1 of last year, --

Q    Right.

A    -- we had actually had to back out a quarter in order to make that a calendar number. The second --

Q    And, the reason for that is because Beverly's numbers, and Manor Care's, and Kindred's are all --

A    Reflect the calendar year.

Q    Okay.

A    So, we're trying to create an apples to apples comparison with the other

Colloquy                                    200

comparable companies. And, then the Mariner bed loss, the new Neighbor Care

beds, simply reflects the fact that one of two things are going to happen. We're

either going to have that – we're either going to lose the beds or we're going to have

the Mariner beds repriced down to the Medicaid rate. So, we are losing significant

profitability out of that contract, and those two numbers offset with one another reflect

either one of those two scenarios.

Q    Okay. Just so I understand that, this reflects a Mariner bed loss –

A    Right.

Q    – cost of 13.2 million, offset by an assumption that some of that –

A    Sure.

Q    – excess availability --

A    Maybe I'm going too fast. But, the Mariner bed loss simply reflects that we

lose the Mariner contract and that also the fact that we then have some available

capacity. And, we go out and we sign up new beds, we get new contracts, with that

available capacity.

Q    Are you aware of any particular plan or beds that are identified to fall into that

category?

A    I don't, and that's a big risk in this plan.

Q    I see. The other possibility you mentioned was that the Mariner beds would

be retained, but at a lower rate, a Medicaid rate.

A    Yes.

Q    And, why do you think that that's a possibility?

A    Well, it is a possibility, and my understanding is that – those conversations are

taking place. And, the net effect of the 13.2 million and the positive of getting new

beds is effectively the same number as if we got the Medicaid rate and got a new

contract on the Mariner beds.

Q      Okay. So, if you kept the Mariner beds – but, obviously, there's no excess capacity – then it would be roughly the same as if we'd lost, but went out and got some other beds to fill it up?

A      That's right.

Q      Okay. Okay. Then your conclusion on the valuation of Genesis, based upon the comparable company analysis is what?

A      Well, you – on page 3, we've done the entire valuation summary. The total valuation range we came up with was a billion two to a billion four-fifty. But, just using the comparable company analysis, we came up – just using that methodology, a billion two to a billion five.

Q      The other – the other method here that's listed that you obviously used is discounted cash flow analysis. Can you explain what you do to do a DCF?

A      Sure. And, that's on page 29. And, not to go into – well, I'll go into as much detail as you like. But, essentially, what it does is involves projecting out future cash flows in the business, and those can be seen on page 30. And, then we've segmented those further into the two businesses on page 31 and 32. And, then we discounted those future cash flows back to a present value base using a discount rate to come up with the value today.

Q      And, the discount rate is calculated?

A      Using a weighted average cost to capital, and we've included in here how we calculated that on page 34, 35, and 36.

Q      Okay. Just sort of jumping ahead then, page 3 indicates that your conclusion on the DCF analysis is?

A      A billion one-fifty to a billion four for the discounted cash flow analysis.

Colloquy

Q     Okay. And, then your precedent transaction analysis – you explained before that there really are no precedents that are meaningful at this time. So, your conclusion then for the valuation range for Genesis is?

A     Again, on page 3, you'll see that the valuation range is a billion two to a billion four-fifty.

Q     Okay. Did you prepare an earlier report for Genesis on valuation?

A     We did.

Q     Okay. Are there any changes in this report from the earlier report?

A     Yes.

Q     And, what are they?

A     They – the changes that are made are – have been changed since this April of this year, and they principally reflect the changes that have occurred in the marketplace since the report in April was prepared.

MR. WALSH: Your Honor, I'd like to have Genesis number 1 accepted as evidence.

THE COURT: Absent objection, we'll mark it in.

MR. WALSH: And, I have no further direct for Mr. McGahan.

THE COURT: All right.

MR. WALSH: Twenty minutes. Not too bad.

THE COURT: Cross-examine?

MR. KINZEY: Your Honor, I'm John Kinzey, from LeBoeuf, Lamb, representing GMS.

CROSS-EXAMINATION

BY MR. KINZEY:

Q     Mr. McGahan, thanks for your trying to help us by giving a Sunday deposition

in this case.  I'm going to try to move this quickly for you.

A     Thank you, very much.

Q     First of all, you mentioned that you'd done a prior valuation.  Was that for
purposes of the plan?

A     That was in April of this year, and it was an enterprise valuation analysis.

Q     Right.  And, the valuation is from that -- of Genesis from that previous work
were incorporated in the plan documents, is that correct?

A     I believe so, yes.

Q     Okay.  And, how did your evaluation of Genesis change between the April
report and the most recent one that's been marked as Exhibit 1?

A     It increased --

Q     Okay.

A     -- by approximately $200M.

Q     Okay.  If I'm correct, the range that you gave in your first report was 1 to 1.25
billion and the range we're in in Exhibit 1 is 1.2 to 1.45 billion, would that be correct?

A     That's correct.

Q     And, what was the reason for that increase?

A     Because the perception -- principally because the perception in the public
markets about these companies have changed, and we updated the valuation to
reflect that.

Q     Okay.  Did you change any of your data about EBITDAR and earnings income
levels?

A     Yes, because the companies also, you know, continuously changed as well
over that time period.

Q     Okay.  If you'd look back to page 10 of the report.

Colloquy                          204

A       Which report?

Q       Exhibit 1.

A       I don't have that. Is this Exhibit 1?

Q       Yes.

A       Okay. It's not marked that way.

Q       Right. I think we've changed the order in which these were marked since you gave your deposition, just to —

A       Great.

Q       — make it harder for you. But, —

A       You're trying to trick me.

Q       If you'd look at page 10, that part of your report stayed the same from the April report, right, to this one?

A       Again, I don't have the two here, but pretty much so, yeah.

Q       Well, I don't have copies for everyone, but I'd be happy to hand you up one for — the previous version so you can —

A       That would be helpful, if you ask me to compare it to, thanks.

Q       It was marked as UBS 2 —

A       Thanks.

Q       — at your deposition in this case. So, if you look at the two page tens, those are basically identical in the two reports, right?

A       Pretty much so, yes.

Q       Well, is there any difference at all, other than I think you've got some —

A       There's just the bracketed language, but essentially —

Q       The numbers are the same.

A       Yeah.

Colloquy                                                          205

Q      Right. And, those numbers -- the beginning number is taken from the

company's budget for the year 2001, is that correct?

A      Correct.

Q      Okay. And, you've also got some adjustments here. Were those adjustments

based on information that you had gotten from the company as well?

A      Yeah, in discussions with the company.

Q      So, this is all of the company's numbers in this --

A      Well, we had --

Q      -- that you worked -- you got -- that was your source, in any event?

A      What these reflect is discussions with the company and then also the fact that,

you know, we're, you know, -- you know, we're also in contact with a lot of different

companies in the long term care sector about adjustments that they're making. So,

you know, it's both our industry knowledge as well as discussions with them.

Q      Okay. So, to a certain extent, these numbers include input from --

A      We --

Q      -- your team and UBS?

A      We talked to them about this, yeah.

Q      But, ultimately you and the company came to a conclusion that these numbers

were the right ones to use?

A      Uh-huh.

Q      Okay. And, these were starting off with budget projections for the fiscal year

that's about to end in -- at the end of September of this year?

A      Right.

Q      Okay. And, these numbers haven't been updated to reflect actual results for

the first ten months of the year?

A    They haven't, although my understanding is that the company is operating on plant.

Q    Okay. Well, did you — first of all, just so we're clear, the — both of these reports are only the valuations of Genesis standing alone, right, they don't include a valuation from Multicare?

A    This does not include a valuation of Multicare, although, you know, historically the costs associated with the two companies and the synergies are within the two companies' plants.

Q    Right, but you have to go to the -- the book that CS First Boston put together for Multicare and add those two numbers together to get a total enterprise value for the merged company?

A    Right. You have to take First Boston's plan and you have to take our plan, and you have to put it together to get a valuation together. But, my point was that, you know, there was a corporate overhead Multicare that no longer exists. There were CEO's, there was a chief financial officer, there was a board of directors, there was an entirely full senior management staff. All those costs are nowhere in either Genesis or Multicare's, from what I understand.

Q    I understand that, but you didn't do a valuation of the two entities combined, is that correct?

A    No, I did not.

Q    And, this report only reflects the valuation that you placed on Genesis itself, correct?

A    That's correct.

Q    Okay. Were you here this morning when Mr. Hager testified?

A    Yes, I was, —

Colloquy                                                      207

Q     Okay. And, I if got it right —

A     — for the most part.

Q     — he indicated that his current projection for EBITDAR for Genesis alone for the rest of the year, over the full year is 161 to 162 million. Did you hear that testimony?

A     I — I don't remember that. I might have been out of the room at that time.

Q     Okay. Assuming he did testify that, would it be appropriate to just adjust up the $158.4M starting point that you've got on page 10 up to the higher levels that he thinks will be the actual result for the year?

A     If he said that the actual result for the year will be 161 to 162, would it be appropriate to bring that up to — the 158.5 up to that? You know, if he — if that's what he believes now to be the rest — you know, the budget for the year, yes.

Q     Okay. And, we can just scale up your report using that number to get to a little bit higher valuation number?

A     Yeah, I will. But, I would also caution, you know, — you know, the comparables have moved, you know, down over the last, you know, week, you know, so — you know, so are we going to — you know, this is an endless cycle of — because, you know, you have the comparable group, you know, peak — including Medicare, peak about 15 percent higher maybe a month ago.

         And, so, if the comparables have come down, the budget maybe have gone up a million or two dollars. Overall, if you take that into account, you could end up with a lower valuation.

Q     I agree with that. You can't really do this every day, and I wasn't you should have. I just wanted to make sure we all understand what the assumptions are.

Colloquy

A    Okay.

Q    Let me ask you this. You've taken off this adjustment for the Mariner bed loss?

A    Uh-huh.

Q    Okay. The -- that actual loss is not going to occur in fiscal 2001, is that right?

A    That's correct. I don't believe so. I think it occurs not in the fiscal period. But, you know, what we're trying to do on this page 10 is make this comp -- the numbers for the company comparable to the other public companies.

So, for example, if Beverly, or Kindred, or Manor Care had a loss that they could project is going to happen at the beginning of next year -- January of next year, 2002, where they were going to lose $10M EBITDAR. The analysts, what they would do is they would adjust their numbers accordingly. So, we're trying to make this company comparable to the other public companies, even if that those losses o that -- that lost cash flow doesn't occur to another period.

Q    Okay. And, that's the full annualized loss that you anticipate if the Mariner beds go away?

A    Yes.

Q    Okay. Did you hear Mr. Hager testify earlier in the day that, because of the phasing in process, that only 75 percent of the revenue from Mariner will be lost in the first year -- in fiscal 2002?

A    And, then, alternatively, they're not going to show up on the first day and get $5.5 EBITDA under Neighbor Care beds. So, the point is you take the full loss and the full gain, and you back date it to the beginning of the period so you can make it comparable.

Q    But, --

Colloquy

A    And, that's what we've done here.

Q    But, that's so that even the full loss isn't going to be incurred in fiscal 2003, is that correct?

A    You're — maybe I'm not articulating my thought well, which is that, if a company is going to go through a significant change — and this is a significant change, because this company is about to lose a significant level of profitability. What we're trying to do is make this comparable to the other publicly traded companies.

        And, the other publicly traded companies, if they were going to lose something, they would go back to the beginning of the period, and that's how the analysts would look at the companies. And, that's what we're attempting to do here, even if those changes don't occur in the period that we're in.

Q    How about if the company anticipated it was going to have positive developments in the upcoming year, would that analysts take that into account as well and look at the EBITDA?

A    They would, and that's -- they would, and we've done some of that here in terms of the other positive adjustments up top.

Q    Okay. Let me —

        MR. KINZEY: Your Honor, if I may approach, I'd like to show the witness a document that we've marked for identification as his ex — deposition as EBS Exhibit 3, and I guess we're up to — mark it as Genesis Exhibit 7.

        THE COURT: Genesis or GMS?

        MR. KINZEY: I'm sorry. GMS. I'm sorry. I apologize. (Pause).

BY MR. KINZEY:

Q    Mr. McGahan, have you seen that document before?

Colloquy                                                    210

A      Yes, I have.

Q      Can you tell us what it is?

A      Well, it was a document that was put together to review the expected impact
of the APS acquisition.

Q      Okay. And, why was it put together?

A      Well, the company was trying to assess and analyze whether they should
proceed forth in trying to do the APS transaction.

Q      Okay. So, is this something that UBS Warburg prepared at the company's
request?

A      Yes.

Q      Okay. And, can you -- were you involved in preparing this?

A      Me and my team --

Q      And, your staff.

A      -- worked -- yeah.

Q      Could you tell me how you went about doing it?

A      Sure. If you look on page 1, what we did first of all was look at, you know, if
we would lose business. And, again, revenue EBITDA impact in losing the Mariner
business is more clearly stated on page 2. And, you can see there that reduction
due to lost business is 11 million in 02 and 15 million in 03.

Q      Before you go on, though, doesn't --

                MS. GUERRERA: Your Honor, --

                MR. KINZEY: Excuse me.

                MS. GUERRERA: Your Honor, I would just ask counsel to let the
witness finish his answer before interrupting him.

                THE COURT: Certainly.

Colloquy                                211

MR. KINZEY: I'm sorry. I wanted to ask him something that was on page 1, and I thought it would be easier before we got going.

THE COURT: And, why don't you do that?

MR. KINZEY: Okay.

BY MR. KINZEY:

Q      Just a — just before you go onto page 2, on page 1, is that also reflecting that 75 percent of the lost revenue will be experienced in the first year, fiscal 2002?

A      I just want to reorient myself here. Yeah. Excuse me. In this chart here?

Q      Right.

A      This was done a while ago. Yes, that's what it says, that — percent of year impacted, is that what you're referring to?

Q      Right.

A      And, what was the question? I'm sorry.

Q      I'm sorry. That — does that show that the — only 75 percent of the impact in the first year, fiscal 2002?

A      I don't — I have to look through this entire document and get more familiar with this. But, I think what it's saying that there's a timing of the impact of the lost business.

Q      Right. It all — doesn't all end on day one —

A      That's correct.

Q      — in the fiscal year? Okay. So, you'll continue to have at least some portion of your revenue from these contracts during fiscal 2002, even if it goes away?

A      And, that's — yeah, that's what this page says as of April of this year.

Q      Yeah.

A      And, I would also point out — but, you know, if, you know, what you're trying to

Colloquy                                212

say is there's going to be revenue and all that from the Mariner beds in 02 versus --

these were done for two completely differently reasons.  One was the operational

cash flow impact of the business, and this other report, which is the updated

enterprise value, was done to make -- to ask the question how the public company

would view Genesis as compared to the other companies.

    And, they don't -- if your business is all going to go away, -- if I have a

business which is going to evaporate half way through 02, the public doesn't give any

multiple valuation credit to that.

Q    But, how about if your business is going to grow 12 percent over the next year,

wouldn't the public give some impact to that?

A    I'm sorry?

Q    Suppose there was a good basis for projecting that your business was going

to increase by 12 percent in the following fiscal year?

A    And, that's reflected in the multiples, yes.

Q    Right.

A    And, you know, on all -- all the public companies have multiples which reflect

future growth in their numbers.

Q    Okay.  Well, let's go on through your analysis.  I interrupted you when you got

into page 2.

A    Which one are we on, page 2?

Q    Yeah.

A    Okay.  And, then there's the impact of the acquisition of APS on page 3.  And,

then their deal synergies on page 4.  And, then cumulative annual impact of those on

page 5.  And, then other things in the back.

Q    Okay.  Let's talk about the deal synergies on -- first on the quarterly page.

Colloquy

A    Which page are you on?

Q    It's page 4.

A    Okay.

Q    Okay. How are those numbers developed?

A    They were developed in discussions with the management team of Genesis.

Q    And, did your group at UBS have input into putting those numbers together?

A    Yeah, we had discussions and give and take back and forth.

Q    Okay. And, what do these synergies reflect?

A    They reflect cost savings, and site closings, and better bad debt management, and all sorts of things.

Q    Okay. You also are factoring in here, are you not, the increase in the payment rate?

A    Yes, I believe so, although I — I do that from memory, not from the line item you're pointing me to. Where is that on page 4?

Q    The four — under revenue impact, the fourth line down, B, revenue transfer, NC to Mariner.

A    I believe that's what — I — you know, I forget. And, we did this in — in, I guess, March of this year. And, — so, you know, I just forget every single line item, so —

Q    That's okay. That's okay. Let's just talk generally though. These are basically costs of — revenue impacts and cost savings you can generate, —

A    Yes.

Q    — as a result of the APS deal, if it goes through?

A    Right.

Q    Okay. And, then that's on — for quarterly purposes for 2002 through 2 — part of 2003?

Colloquy                                                    214

A     Yes.

Q     Again, for the fiscal years?

A     Yes.

Q     And, then the next page is the same set of analyses, just going forward up through 2006?

A     Correct.

Q     And, 2006 is a period of the company's existing business plan and budget, is that correct?

A     That's right.

Q     And, then what's the last page, the recovery matrix impact?

A     Well, again, you're asking me financial report trivia questions here, --

Q     Yes.

A     -- but let me see if I can recall. You have the normalized 2001 EBITDA run rate of 169.2. The reduction in Mariner contract loss, which again is the impact of either the Medicaid rate or losing of the business. And, then you have the APS acquisition, Medicaid price reduction and synergies. So, what they're trying to do -- I think we were trying to do back then is using our best estimates of what the effect of the acquisition of APS would do to our EBITDA. And, again, this is without looking at the impact of the costs associated with the acquisition.

Q     Okay. If the --

A     This clearly would be a very good acquisition and one I would recommend the company do, if it is able to do it.

Q     Okay. And, you said reflect on costs. If the company buys APS with debt, it won't impact EBITDAR, right?

A     Not EBITDA, but it will impact, you know, for the total cost, the enterprise

Colloquy                                          215

value.

Q      Well, the enterprise value or the -- or just the way the all -- that's allocated between --

A      Well, if we pay cash, you know, and -- you know, we'll take a look at -- we'd have to do the analysis of the EBITDA times the multiple. And, then we'd have to look at the enterprise value, which again would have the increase of the debt associated with the acquisition price.

Q      Right. But, if you borrow $42M and spend $42M to get it, doesn't that wash in terms of the --

A      No, no, no, the enterprise value --

Q      -- enterprise --

A      -- is -- you know, is -- the value of an -- how you calculate enterprise value is all of your debt, plus your equity value together. That's your -- so, if you spend cash, that would affect your enterprise value.

Q      Oh, I -- and I see what you're -- but, you're saying, though, that if we take the additional EBITDA times whatever multiple you're applying, that gets the enterprise value up, and then you've got to worry about the debt that you've put on to get it.

A      Correct.

Q      Right. Okay. And, if you'd just help me for one more minute by looking back at page of the other exhibit where you've the --

A      Which one are we on now?

Q      Back to the -- Exhibit 1.

A      One, got it.

Q      The 169,203 that's here on their Exhibit 1 is the same normalized 2001 EBITDA that you started with for purposes of your evaluation?

Colloquy

A    Which number are you looking at? I'm sorry.

Q    If you look at page —

A    Ten, I got that.

Q    — 10. That's the same figure for normalized 2001 EBITDA run rate.

A    The 169,203?

Q    Right.

A    Right.

Q    That's on both documents, right?

A    Yeah, and what — and what that number is is for — you know, not without

subtracting the — this is — this one is looking at it in a fiscal period, this one is looking

at it calendar period, amongst other chang — you know, other —

Q    Okay.

A    — apples and oranges issues.

Q    But, you've got one showing what happens — for the Mariner contract loss,

you have an adjusted normal 2001 EBITDA run rate of 155,961, right?

A    Right.

Q    And, then what you show —

A    For the fiscal period.

Q    — for the fiscal period -- if you do the acquisition, you come up with a

normalized 2001 EBITDA run rate of 175,000,014, right?

A    That's correct. If — this is for the fiscal period, if it was done in April.

Q    Okay. And, you've testified that this transaction, if the company would do it,

would be a favorable development for the company?

A    If the company is able to get APS, you know, in — and, by the way, I might add

that they've been trying to do this acquisition for some time, because we're in the

situation we are, and the seller is in a situation where they are in a similar spot that we are in, if that made any sense at all.

But, you know, this is an acquisition which I would recommend the company do, but it's got -- you know, this is going to be a situation where we have a big competitor out there who wants to bid on this, in my opinion, and that, for us to outbid it, it's going to be very problematic. And, this is also competitive -- it doesn't want Neighbor Care to really get on their feet and be a successful company. I mean, they're going to do everything they can possibly do to compete with us. So, it's not lost on them that this would have a severe financial impact on our company if we don't win.

Q    Did you do an evaluation for Genesis using the second adjusted normalized 2001 EBITDA run rate of 175 --

A    I don't --

Q    -- that's shown on here?

A    I believe so, no.

Q    Did you include any value ascribed to the APS transaction in the evaluation that you've done, the company's Exhibit 1?

A    No. And, the reason for that is that we have to beat out Omnicare. We have to -- you know, this is a business that will be auctioned. And, we have to beat them. It's a company that's an investment grade company that, in my view, wants to win this asset. And, in going to war with a company that's better armed than us makes this a -- you know, an EBITDA run rate, which, in my view, is highly contingent.

Q    And, what would you mean by highly contingent?

A    Meaning that it is a very good chance that we don't end up buying the company.

Q     But, there isn't absolutely no chance that you'll – APS will eventually be

acquired?  You're not saying you should just – the company should just forget about

it too, are you?

A     No, there's also – I – you know, – yeah, I mean, if you want to get into

hypotheticals, there's all sorts of hypothetical things that could happen to the

company, but – and this is one of them.

Q     Okay.  And, that would have a positive effect on the company's value, if it

should occur, –

A     Yes.

Q     – is that your opinion?

A     Yes.  I mean, if we are able to buy this company, that would help us.

Q     Okay.  That's fine, Mr. McGahan.  That's all the questions I have, and I

appreciate your help.

A     Thanks.

          THE COURT:  All right.  Thank you, sir.  Other questioners?  Sir?

          MR. JENKINS:  Yes, Your Honor.  (Pause).

                    CROSS-EXAMINATION

BY MR. JENKINS:

Q     Good afternoon, Mr. McGahan.  My name is David Jenkins, and I represent

Charles Grimes, one of the objectors here.  I have only a handful of questions to ask

you.  Let me start with your conversations with Mr. Hager.  Do I correctly understand

that, in connection with determining the appropriate projections to use for your work,

you discussed the company's projected budget with Mr. Hager and his staff?

A     Yes.

Q     In that connection – well, let me back up.  Did you note, in analyzing the

company's results from operations, that they were budgeting for a substantial

increase in the liability insurance costs over what had been historically accepted for

several years?

A       I believe that's the case, yes.

Q       All right.  Did you have any conversations with Mr. Hager as to the

appropriateness of those substantial increases in liability insurance costs?

A       We did.  You know, I've been doing — I talked to health care service

companies all over this country and — all the time, every day.  That's my job.  And,

without exception, companies in the health care service business are — experienced

increases in their liability costs.

Q       All right.  Did you personally or did any member of your staff do any analysis of

Genesis' projected liability insurance costs to see if they were in line or out of line

and competitive, in your experience?

A       I didn't.  Again, the only thing that I do every day is I talk to the company

CEO's who are constantly complaining about their liability costs going up.

Q       Right.  But, I think the answer to my question is you and, to your knowledge,

members of your staff did not compare Genesis' expected liability insurance costs

with anyone else in the industry, --

A       That's correct.

Q       -- correct?  Do you have your report in front of you?  I assume so.

A       I assume so, yes.

Q       All right.  What do you consider your report, by the way?

A       The updated enterprise valuation analysis dated August 2001.

Q       All right.  Let's look at that.

                        (Tape  change)

Colloquy

Q      Could you turn to – as soon as I find it – could you turn to page 15 please. Are you there, sir?

A      I am.

Q      All right. Do you see at the bottom that you have -- I say you -- UBS Warburg has performed an analysis of Genesis' financial results based on the last 12 months ending 12/31/2000. Do you see that sir?

A      Yes, I do.

Q      All right. Did you make any effort to update the last 12 months numbers through say 6/30/2001?

A      Well, we have used all sorts of different things to compare and let me just say that the most appropriate way that these companies are valued in the marketplace and the purpose of this page is that securities analyst and stockholders in our view look at 2001 projected and 2002 projected, i.e., what's gonna come. So what we're looking at, and what this page is designed to do, is look at the enterprise values principally as multiples of 2001 projected and 2002 projected EBITDA and EBITDAR.

Q      That was interesting, but I don't think it answered my question. If you could listen to my question please, I think we can move a lot quicker. Did you or any member of your staff update the last 12 months results for Genesis through June 30th, 2001?

Colloquy                                      221

A    Let's see if we did that. Well, we didn't do it on this page.

Q    Right. You didn't do it anywhere in your report did you, sir?

A    Let me look. I don't see it, no.

Q    Right. Those numbers are available -- by those numbers I mean Genesis' last 12 months results through 6/30/2001, they're available to you, correct?

A    Yeah, well we have them quarterly in the back. I mean we have actually more in-depth analysis because we go through quarter by quarter on page, you know, 42, 43, 44, you know, in the percentages. So I don't know what you're getting at.

Q    All right. Let's go back to my question because I think, again, you did not answer it. Again, if you could listen to my question please, sir.

        MS. GUERRERA: Your Honor, I really just think the commentary --

        THE COURT: I agree. Just ask the question. See if you can agree. Cut the commentary please.

        MR. JENKINS: I'm sorry, Your Honor, but he has not answered my last two questions.

        THE COURT: Well he's trying to. Go ahead, try again.

BY MR. JENKINS:

Q    The Genesis results for the last 12 months ending June 30th, 2001 were available to you, correct?

A    Yes, and they're in here.

Q    They are not on page 15, are they?

A    They're not. They're in the back and they're even more precise 'cause they're broken down quarterly.

Q    Okay. Where are -- those pages you mentioned, which were they again, sir?

A    Sure. If you look on page 42 you have Genesis' business quarterly going

Colloquy                                                      22.

back to 1998 and the long term care business on the right hand column going back
quarterly to 1998.

Q     Right. And the last quarter you have there is through 12/31/2000.

A     12/31 correct.

Q     Again, on pages 42, 43, and 44 you have not updated Genesis' numbers
through 6/30/2001.

A     Correct.

Q     Thank you. Let's turn to page 27. In performing the valuation analysis you did
on this page, you did not use, as one of your basis, Genesis' results from the last 12
months correct?

A     That's correct. We used the 2001 projected numbers and the 2002 projected
numbers.

Q     Right. Would you agree with me, sir, that it is standard in the valuation
industry, when doing a valuation analysis such as the one you did, to use the
multiples on top of the last 12 months results of the subject company?

A     I wouldn't agree with you that that's standard all the time, no.

Q     All right, but it's certainly done a great deal isn't it?

A     A lot of different things are done.

Q     Okay. Indeed it was done in this case by CSFB with respect to Manor Care,
correct?

A     I don't know. I didn't do their report.

Q     Right, and you haven't looked at their report?

A     I have glanced at it, but I have not studied it.

Q     All right. Did your firm do an analysis of what the enterprise value would be if
you used Genesis' last 12 months reported financial numbers?

Colloquy

A     No.

Q     All right.  I think we're done with your report.  Two other things.  Do you know a Howard G. Kapeck from UBS Warburg?

A     Yes.

Q     He does research in the healthcare industry I presume, is that correct?

A     He does.

Q     Did you -- in the course of your or your group's work, did you happen to look at the research recommendations that UBS Warburg was doing in the healthcare industry?

A     We talk to Howard all the time.

Q     All right.  Let me show you a document.  It was produced to us in this litigation. It's a February 7th, 2001 UBS Warburg analysis of Beverly Enterprises.  May I approach the witness, Your Honor.

          THE COURT:  Certainly.

          MR. JENKINS:  May I give Your Honor a copy as well?

          THE COURT:  All right.

          MR. JENKINS:  And I have others here for interested parties.

          THE COURT:  Would you like this marked for identification?

          MR. JENKINS:  It probably be easiest -- I think it's CG-2 because I think it's the second document I've actually shown.

          THE COURT:  All right.

BY MR. JENKINS:

Q     Have you ever seen this document before, Mr. McGahan?

A     Howard puts these out all the time so I don't know whether I've seen this before.

Colloquy                                           224

Q    All right. If you could look at the first paragraph please, indeed the last sentence of the first paragraph. Let me back up and say, as you can see this refers to Beverly Enterprises, Inc., correct?

A    Correct.

Q    All right. If you could look at the first paragraph and the last sentence it states, "With an approving sector outlook, structural changes which should improve profitability and a relative valuation discrepancy, we reiterate our buy and maintain our price objective of $10.00." Do you see that, sir?

A    Hm-hmm.

Q    Haven't you noticed that in research reports such as this the price objective is typically for the next year, correct?

A    Not necessarily. I mean you can have a price objective for much shorter time or, you know, not necessarily.

Q    Are you familiar with the recent stock price of Beverly?

A    Yeah, we have it in our plan of reorganization.

Q    And where is that?

A    It's on page 15. It's $10.70 for Beverly so it looks like Howard was correct.

Q    All right. Well, we'll see about that in a second. At what date was that $10.70?

A    It was as of August 6, 2001.

Q    Do you know what Beverly's stock has done since then?

A    I haven't been in front of a computer for the last few days, but my understanding is it's around $11.00 'cause you put it up there before.

Q    It's about $11.45. That would indicate that your firm has been materially short in its estimates of where Beverly's stock would go.

**AA. 337**

Colloquy                                        225

A       Well this was February 7th of 2001. In fact, I would say that he was entirely accurate because he says buy the stock at $8.25 and that was the right thing to do.

Q       But in his target price he said was $10.00, it's gone up to higher than that.

A       He doesn't have --

        THE COURT: You can draw those conclusions. Go ahead.

BY MR. JENKINS:

Q       Last point, Mr. McGahan, Paine Webber is part of UBS Warburg right now, correct?

A       It is. Well, it's part of UBS not -- well, whatever.

Q       It's an affiliated company with your firm, correct?

A       It's part of the family of companies.

Q       All right. And UBS Paine Webber views this as a good time to buy in the stock market, correct, in general?

A       Pardon me?

Q       UBS Paine Webber views right now is a good time to buy in the stock market, correct?

A       According to the ads that I read in the Wall Street Journal, yes.

Q       Right, and you've seen their full page ads in the Wall Street Journal in which they say we believe that the S&P 500 will raise fifty percent by the end of 2002.

A       I saw those headlines.

        MR. JENKINS: Thank you. I have no further questions of Mr. McGahan, Your Honor.

        THE COURT: All right.

        MR. JENKINS: Your Honor, if I may ask your indulgence. I believe I've got over in evidence your Exhibit 7 and --

AA. 338

THE COURT: If there's no objection, we can enter.

MR. HUDGENS: Your Honor, David Hudgens, again. I believe I'll be real quick.

BY MR. HUDGENS:

Q      You've been talking about on-going enterprise valuations, right?

A      Yes.

Q      You've done nothing for liquidation analysis or liquidation values, have you?

A      No, that's not what we've done.

Q      Okay, and I believe when they had hearings on the disclosure statement they were relying on the March or April report you did?

A      I'm sorry?

Q      When were you engaged to update the April report you did?

A      Well, it's dated as of August 2001 so, you know, we started just prior to that.

Q      So sometime in August probably?

A      Probably maybe July, you know.

Q      Late July or August?

A      July or August, yeah.

MR. HUDGENS: Okay, thank you.

THE COURT: All right. Any redirect?

MR. WALSH: I just want to follow up on a couple of questions.

REDIRECT EXAMINATION

BY MR. WALSH:

Q      Mr. Kinzey asked you a number of questions about APS —

THE COURT: Would you — you need identification, sir, again.

MR. WALSH: I'm sorry. Michael Walsh for Weil, Gotshal & Manges for

Colloquy                                    227

the Genesis debtors. I was referring to Mr. Kinzey who represents GMS.

BY MR. WALSH:

Q      Mr. Kinzey asked you a number of questions about the APS transaction and your report had the effect of the transaction, but at this time do you have any idea what it would cost Genesis to purchase APS?

A      No, and the reason for that is it's going to be subject to an auction and we've got a competitor against us that number one, has more resources; number two, doesn't want to see us succeed. So, therefore, I don't know how much it's gonna cost.

Q      But whatever price it is, wouldn't that somehow have to be offset against the benefits in that report?

A      If we pay, we could pay -- whatever price we pay has to be viewed against the benefits that we are gonna get out of the synergies in the deal.

Q      In your view, if whoever purchases APS, while there might be synergies, wouldn't that purchase price be the best determinate of the value of APS?

A      Yes.

Q      Willing buyer, willing seller, okay. I want to ask you one question on questions that Mr. Jenkins, who represents Charles Grimes, was asking. He was focusing on updating the last 12 month's numbers. You're aware that the 10Q's, the quarterly reports filed by the company, are typically filed well after a quarter?

A      Yes.

Q      It's roughly --

A      45 plus days or 45 or so days which would make the June quarter available August the 15th.

Q      Okay. If the June quarter was due August the 15th and you're doing your

report in late July and August, is that a possible explanation for why those numbers were not updated?

A       Yes.

        MR. JENKINS: Excuse me, Your Honor, that's a leading question.

        THE COURT: Indeed it is, but it's also explanatory. The objection's overruled.

        MR. WALSH: I'll try to be more careful, Your Honor. A       And I'll try to remember the calendar months.

BY MR. WALSH:

Q       In your view, would updating these numbers be material — the historical numbers, be material to your conclusions on valuation?

A       They would have nothing to do with our valuation.

        MR. WALSH: Okay, that's all I have, Your Honor.

        THE COURT: Why is that, sir?

        THE WITNESS: Because our numbers are — our comparable companies and our discounted cash flow are looking at 2001 and 2002 for the comparables which is primarily the projected for the rest of this year and next year. And the discounted cash flow is the future years beyond 2002. So our analysis is looking forward because that's how the companies are valued by the public market. So looking backwards is where you've been and it's not how the companies are valued.

        THE COURT: All right. Thank you, sir, you may step down.

        THE WITNESS: Thank you. Should I just leave these here?

        THE COURT: Indeed. Is there —

        MR. MUNDIYA: Next witness?

THE COURT: I don't think we're going to get to the next witness today. Is there a problem?

MR. MUNDIYA: Small problem. Mr. Kennedy is on vacation. He's a CSFB witness here today. I think I can get him on and of in ten minutes.

THE COURT: I'll give you ten minutes.

MR. MUNDIYA: For the record, Tariq Mundiya for the Multicare debtors.

THE COURT: Why don't you spell it.

MR. MUNDIYA: T A R I Q  M U N D I Y A.

THE COURT: I must tell you I've heard these promises before. The reality is that we're actually not only going to impose but we're actually running out of tape for the day I've just been told. So we do have a limit. If we don't make it, we don't make it and we'll just have to stop.

MR. MUNDIYA: In light of Mr. McGahan's testimony I think we can keep this pretty short.

THE COURT: Let's give it a shot.

MR. MUNDIYA: Thank you.

J. H A L I S E Y  K E N N E D Y, SWORN

THE COURT: Please have a seat. Your full name. Spell your last name please.

THE WITNESS: J. Halisey Kennedy, K E N N E D Y.

THE COURT: And spell Halisey please.

THE WITNESS: Halisey, H A L I S E Y.

THE COURT: Thank you.

DIRECT EXAMINATION

Colloquy                                           23C

BY MR. MUNDIYA:

Q    Good afternoon, Mr. Kennedy, by whom are you employed, sir?

A    Credit Suisse First Boston.

Q    And how long have you been employed by Credit Suisse First Boston?

A    Since November.

Q    And where were you employed prior to that?

A    Donaldson, Lufkin and Jenerette.

Q    Okay, and prior to Donaldson, Lufkin and Jenerette, where were you employed?

A    Drexel Burnham.

Q    Okay, when did you join Drexel Burnham?

A    1984.

Q    Okay, and prior to that you were at business school?

A    Yes.

Q    Okay, where did you graduate from, sir?

A    Harvard Business School.

Q    Has Credit Suisse been involved in these bankruptcy proceeding, sir?

A    Originally we were retained – DLJ was retained. DLJ was acquired by Credit Suisse in November.

Q    Okay, and who else has been on the Credit Suisse team working on this assignment?

A    Graham Barnette who's a director in our healthcare group, Jason New and Ben Barnette who are members of the restructuring group.

Q    Mr. Kennedy, have you ever testified as an expert in a Chapter 11 case?

A    Yes.

Colloquy                                    231

Q    Okay, in what cases?

A    Anacom – let's see – Innovative Clinical Solutions.

Q    Have you reviewed Multicare's business plan and financial projections?

A    Yeah.

Q    Okay, and have you -- when I say you I mean Credit Suisse -- advised
Multicare regarding valuation issues?

A    Yes.

Q    Are you the person most familiar at Credit Suisse with this engagement?

A    Yes.

Q    Okay, all right. In connection with the company's formulation of the plan
before the Court, did Credit Suisse determine the enterprise value of Multicare on a
stand alone basis?

A    Yes.

Q    And what was the purpose of that valuation, sir?

A    It was in formulating the plan of reorganization.

Q    Okay, and was your valuation first performed?

A    In March of 2001.

Q    And were there updates done?

A    Yes.

Q    And what is the most recent valuation that Credit Suisse has done, sir?

A    August 23rd, 2001.

            MR. MUNDIYA: May I approach the witness, Your Honor?

            THE COURT: I take it there is no need to voir dire that the
qualifications are not questioned and that Mr. Kennedy may be qualified. Hearing
nothing I will qualify him. Thank you. G-2, Genesis 2 that is.

MR. MUNDIYA:  Maybe we can call this Multicare 1.

THE COURT:  Excuse me.  For sure.

BY MR. MUNDIYA:

Q      Mr. Kennedy, what is Credit Suisse's opinion or determination of Multicare's

enterprise value as of August 23, 2001?

A      We have a range of 375 million to 475 million.

Q      And where in your report is that identified, sir?

A      You can see it on page 15.

Q      And what methodology, sir, did you use in coming to this range of valuation?

A      We looked at comparable company analysis and we also did a discounted

cash flow.

Q      Okay, and this is a valuation that was done in August.  How did it differ

principally from the valuation that you first did in March?

A      The principal change was updating the comparable companies.

Q      Okay, and where in this report are the reasons set forth for the increase in

valuations?

A      Pages 5 and 6.

Q      And do these pages accurately reflect the reasons why  there has been an

approximate fifty million dollar change in your range of values between March and

August, sir?

A      On page 5 we outline what we think are the reasons that can be attributed to

the increase in the stock prices in the sector.  On page 6 we lay out what the

changes have been in the actual comparable companies.

Q      I see.  Could you very briefly explain to us the comparable public company

analysis that Credit Suisse did in connection with your valuation?

A      We looked at three companies, Beverly, Kindred and ACR Manor Care. For

many of the same reasons you heard from Bill McGahan, we felt that Beverly was

probably the most comparable and in looking at the comparable analysis you'll see

that Beverly and Kindred actually traded relatively comparable multiples. ACR Manor

Care has always traded at a fairly substantial premium to the sector and historically

has traded to a premium. So we felt Beverly and Multicare were the most relevant

comparable companies. We also focused on looking at 2001 -- multiples of 2001 and

2002 earnings, again, feeling that most valuations are done on forward earnings

forecast.

Q      I see. And how did the margins for Beverly and Vencore compare to the

margins of Multicare, sir?

A      Beverly has similar -- more similar margins to Multicare than ACR Manor Care.

Kindred's very difficult given that it's just emerging from bankruptcy. Their reported

numbers the EBITDAR multiples comparable, the EBITDA multiples not that

comparable. Although as you also heard previously, the payer mixes are more

comparable for Beverly and Kindred than they are for ACR Manor Care.

Q      Okay. Can I direct your attention to page 16 of your August 23 report, sir?

A      Yes.

Q      And does this page accurately reflect, in your view, the difference in margins,

EBITDAR and EBITDA margins for Manor Care, Beverly and Vencore?

A      Yes.

Q      And is it your testimony, sir, that the margins for Multicare are more

comparable to the margins for Beverly than they would be for Manor Care?

               MR. GEORGE: Objection, leading.

               THE COURT: Sustained.

Colloquy                                                    234

BY MR. MUNDIYA:

Q     Mr. Kennedy, what projected EBITDAR number did you use for Multicare for the year 2001?

A     56 million.

Q     And how was that number arrived at?

A     It was part of the financial projections developed with the company.

Q     Okay, and you heard today some testimony that maybe the numbers are going to come in lower. Did you hear that?

A     Yes.

Q     How would that affect your valuation?

A     I think given the margin of error, probably not have an impact on it.

Q     You also did a discount cash flow analysis, is that correct?

A     Yes.

Q     Okay, and is that reflected in this report, sir?

A     Yes.

Q     Okay, and where in this report is that reflected?

A     On page 19 — 19 and 20.

Q     Okay, and what was Credit Suisse's determination as to the valuation range of Multicare based upon the DCF analysis that you did, sir? And if you want to turn back to page 15, that may help.

A     We had done a different methodology earlier and discovered an error in that methodology so we redid it both ways which leads to a fairly wide range of values, but I would put the most weight on the values between 372 and 444.

Q     Okay, and the error that you discovered was an error in what, sir?

A     In determining the pre-cash flow.

Colloquy                                                    235

Q    Okay. Now Credit Suisse also issued a report on August 8th, is that correct?

A    Yes.

Q    And what was the valuation range for Multicare in the August 8th report?

A    375 to 475.

Q    And what is the valuation range in the August 23 report?

A    375 to 475.

Q    And so, in your opinion or in your determination, there has been no change in your valuation range between those two days?

A    No.

      MR. MUNDIYA: Nothing further, Your Honor.

      THE COURT: All right.

      MR. MUNDIYA: Your Honor, I'd like to move this into evidence.

      THE COURT: Any objection? May be considered evidentiary.

      MR. MUNDIYA: I'm sorry, when I say this I mean the discussion materials regarding the Multicare Companies, Inc. dated August 23, 2001.

      THE COURT: Multicare 1.

      MR. MUNDIYA: Multicare 1.

      THE COURT: Indeed.

      MR. MUNDIYA: Thank you.

      THE COURT: Cross-examine.

           CROSS-EXAMINATION

BY JOHN KINZEY:

Q    Mr. Kennedy, John Kinzey, LeBoeuf Lamb representing GMS. Just to be clear, your valuation is only the Multicare Company, correct?

A    That's correct.

Colloquy                                                                                           236

Q      Have you prepared any valuation of Multicare and Genesis combined?

A      No.

Q      Okay, and the source for your information about the company's cash flows
and EBITDAR is from the company, is that correct?

A      We worked with the company in developing financial projections.

Q      And you produced two reports dated in August, is that correct?

A      That's correct.

Q      The second one in addition to correcting the error in the cash flow, discounted
cash flow analysis, did you also change your analysis of the comparable companies?

A      Since we were updating our analysis, we used the most current stock prices.

Q      Okay, and that resulted in some of the ranges of estimated value for some of
the approaches on comparable companies going up, is that correct?

A      Some went up, some went down actually.

Q      Can you tell me which ones went down?

A      The LTM valuations actually went down I believe.

Q      Do you have a color copy of your exhibit in front of you?

A      Not in front of me.

Q      Okay, can I ask you to take a look at this one and if I may, Your Honor,
because I'd like to understand a little better what these colored shadings mean on
that page.

              THE COURT:  What page is that?

              MR. KINZEY:  Page 10 — I'm sorry 15.

              THE WITNESS:  I actually have a color copy of the 23rd report.  So is
that what you wanted?

              THE COURT:  Pardon me?

Colloquy

MR. KINZEY: Does the Court have the colored copies.

THE COURT: Yes, I do.

BY MR. KINZEY:

Q      What are those blue and black codes?

A      The black shading represents the data points implied by the difference between Beverly and Kindred. The blue shading is ACR Manor Care. The difference between whether it's Beverly or Kindred and ACR Manor Care.

Q      Okay, and I take it -- when I asked you at your first deposition whether you thought that the discounted cash flow method or the comparable company method was the most reliable in this particular case. Would you like to revisit that question based on the calculations that you've done?

A      Well I think I stated that we probably put more emphasis on the 2001, 2002 multiples although we did take into account the impact of the discounted cash flow.

Q      And when you properly calculate -- correct the error in the perpetual discounted cash flow number, you've dropped beyond a lot, did that lead you to think that that particular approach was inaccurate in this case?

A      Yes.

Q      Okay, and is that why you did the terminal EBITDAR -- I'm sorry terminal value cash flow?

A      Yes.

Q      And that's something you didn't even consider the first time around, is that correct?

A      We did it with a perpetual growth rate the first time.

Q      Okay. Did any of these revisions and some of the ways some of the numbers moved around on the comparable companies, give you any consideration whether

you ought to change the range in which you would valuate the company between

375 and 475?

A    I think that we affirmed our view that we had an appropriate range.

Q    Did you have a range for the report you prepared back in March?

A    Yes.

Q    Okay, and what was the range there?

A    Let's see. I believe it was 325 to 425.

Q    Let me just ask you to take a look, if I may, at that particular report just confirm

the numbers you just gave us, 325.

A    Yes.

MR. KINZEY: Thank you. I have no further questions.

THE COURT: No further questions? Anybody else. Again, for the

record, Mr. Jenkins if you would.

CROSS-EXAMINATION

BY MR. JENKINS:

Q    Good afternoon, Mr. Kennedy. My name is David Jenkins and I represent

Charles Grimes, one of the objectors here. I have two areas to ask questions on.

The first is on your report. Do I understand correctly, Mr. Kennedy, that one of the

methodologies that your firm used in valuing Multicare was based upon the last 12

months reported financial results of the affected companies?

A    We presented that in our analysis. We gave it very little weight.

Q    It doesn't say in your report anywhere that you gave it very little weight, does

it?

A    No.

Q    Okay. Second area. You know John Hindalong (phonetic) I assume?

Colloquy                                                  239

A    Yes.

Q    He is a research analyst at Credit Suisse First Boston in the healthcare area,
correct?

A    Yes.

Q    In connection with the work you and your team did for this proceeding, did you
happen to look at any of the research analyses that Mr. Hindalong or members of his
staff performed on such companies as Manor Care and Beverly?

A    No.

Q    All right.

        MR. JENKINS:  Your Honor, may I approach the witness with two
documents please?

        THE COURT:  Certainly.

BY MR. JENKINS:

Q    I have two documents for you Mr. Kennedy.  I take it, Mr. Kennedy, you've not
seen either of these documents before.

A    No.

Q    Okay.  If you could look --

        MR. JENKINS:  Excuse me, Your Honor, for identification purposes,
may I mark the -- I'm sorry I need to go back.  The first document is dated July 27th,
2001 and is a Credit Suisse First Boston or appears to be research report on Manor
Care.  Can I have that marked as CG-3 please?

        THE COURT:  Certainly.

        MR. JENKINS:  And I like to mark the other one as CG-4.

        THE COURT:  All right.

        MR. JENKINS:  The other one being a July 31st, 2001 Credit Suisse

Colloquy                                240

First Boston search report on Beverly.

BY MR. JENKINS:

Q    Mr. Kennedy, let's look at them one at a time. On exhibit 3 the one concerning

Manor Care, could you look at the last paragraph at the bottom or – excuse me -- the

last paragraph but one at the bottom above the financial information. It's the

paragraph that begins, "We are raising our 2001 EPS estimates to 113." Do you see

that, sir?

A    No.

Q    All right.

A    Is it one of your underlined – oh, okay, yeah, yes, I see it.

Q    All right. Were you aware your firm was raising the earnings per – let me drop

back – EPS is earnings per share, correct?

A    That's right.

Q    Were you aware that your firm was raising, about a month ago, the earnin

per share estimates of Manor Care?

A    No.

Q    All right. The last sentence in the same paragraph states, "We are introd

a 2002 EPS estimate of a dollar, 30 cents representing a 15 percent year over

growth." Were you aware that your firm was estimating a 15 percent year over

growth in the earnings per share of Manor Care?

A    No.

Q    All right. Let me turn to the other document.

A    Well I would say if we had these earnings estimates, it would actually lor

the multiples.

Q    All right. Thank you for that, but that was not a question I asked you. If

Colloquy

Counsel wants to ask you that, he may do so. Let's turn to the other document.

Again, the last paragraph right before the financial information starts, "We are

bumping up our 2001 EPS estimates." Do you see that?

A     Yes.

Q     All right. "We are bumping up our 2001 EPS estimates to forty-six cents from

forty cents reflecting the exclusion of the Florida depreciation and new management

guidance." Were you aware that this was being done by the research analyst in your

firm?

A     No.

Q     All right. Then again, "We are introducing a conservative 2002 EPS estimate

of fifty-two cents reflected increases from the Florida asset sale." Were you aware

the research analyst in your firm was doing that?

A     No.

          MR. JENKINS: All right. I have no further questions for Mr. Kennedy,

Your Honor.

                    THE COURT: All right. Anybody else?

                    MR. MUNDIYA: One question, I can't resist.

                    THE COURT: Go ahead.

BY MR. MUNDIYA:

Q     Mr. Kennedy, you said if you had been aware of what's been marked as

Grimes 3, you would've lowered the multiple. Why is that, sir?

A     Well what I have to check is we took a composite estimate of earnings — we

use a composite estimate of earnings forecast. It's a compilation of a number of

analysts on Wall Street. It's possible that these estimates are part of that

compilation. We don't use our own analyst exclusively. But should — if including him

Colloquy                                              242

would've raised the estimated EBITDA forecast, given that we use the current market

value of enterprise value, you're actually increasing the denominator which actually

lowers the multiple.

        MR. MUNDIYA:  Thank you, Mr. Kennedy.  I have no further questions.

        THE COURT:  All right.  Thank you, sir.  Not too far off.  You have a

concern, sir.  You may step down.  Yes, sir?

        MR. MCMAHON:  Before we conclude today, Your Honor, I had a

witness present here for the quarterly fee issue who I sent back to the U.S. Trustee's

office.  I was wondering if it would be possible to gauge perhaps tomorrow --

        THE COURT:  I don't know.  I don't think it is possible to tell you the

truth.  Frankly I would like to start at nine unless that's a terrible problem for anybody.

        MR. WALSH:  That's a good idea.

        THE COURT:  And I think that you might consult with the number of

witnesses intended to be produced and the like.  I think that once you understand

who's going to be called, a couple of hours notice could easily be arranged so that

your witness could get here from wherever he's coming.  I would suggest some

discussion about who's left.  We recommence at nine a.m.  Thank you.

        MR. WALSH:  Your Honor, one question.  Would it be possible for us to

leave these materials.

        THE COURT:  Indeed, indeed, certainly.

        (End of proceeding)

* * * * *

C E R T I F I C A T I O N

"We certify that the foregoing is a correct transcript from the record of proceedings in

the above-entitled matter.

Colloquy

_____          _____

SANDRA CARBONARO                   JOSETTE JONES

_____          _____

FRANCIS MARISTCH                   ANNA MARIE D'AIUTOŁO