## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | : |
| | : |
| Genesis Health Ventures, Inc., *et al.*, | : Civ. Act. No. 05-CV-427 (KAJ) |
| | : Related to Case No. 00-2692 (JHW) |
| Debtors, | : Jointly Administered |
| | : |
| Richard Haskell, *et al.*, | : |
| | : |
| Plaintiffs-Appellants, | : |
| | : |
| v. | : Adv. Pro. No.: 04-53375 (JHW) |
| | : |
| Goldman, Sachs & Co., et al., | : VOLUME II OF V |
| | : |
| Defendants-Appellees. | : |

## DEFENDANTS-APPELLEES' APPENDIX IN SUPPORT OF THEIR BRIEF IN OPPOSITION TO THE APPEAL OF RICHARD HASKELL ET AL. FROM THE MAY 10, 2005 ORDER OF THE BANKRUPTCY COURT

Steven K. Kortanek
Morton R. Branzburg
KLEHR, HARRISON, HARVEY,
BRANZBURG & ELLERS LLP
919 Market Street, Suite 1000
Wilmington, Delaware 19809-3062
(302) 426-1189
        -and-
Sheldon Raab
Eric A. Hirsch
FRIED, FRANK, HARRIS, SHRIVER &
JACOBSON LLP
One New York Plaza
New York, New York 10004-1980
(212) 859-8000

Attorneys for Defendant Goldman,
Sachs & Co.

Russell C. Silberglied (No. 3462)
Jason M. Madron (No. 4431)
RICHARDS, LAYTON & FINGER, P.A.
P.O. Box 551
Wilmington, Delaware 19899
(302) 651-7700
        - and -
Michael F. Walsh
Diane Harvey
Gary T. Holtzer
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
(212) 310-8000
        - and -
Adam P. Strochak
Joanne M. Guerrera
WEIL, GOTSHAL & MANGES LLP
1501 K Street, NW, Suite 100
Washington, DC 20005
(202) 682-7000

Attorneys for Defendant NeighborCare Inc.
(sued herein as Genesis Health Ventures, Inc.)

Daniel K. Hogan (No. 2814)
THE HOGAN FIRM
1311 Delaware Avenue
Wilmington, Delaware  19806
(302) 656-7540
    - and -
Paul Lackey
Michael Aigen
LACKEY, HERSHMAN LLP
3102 Oak Lawn Avenue, Suite 700
Dallas, Texas  75219
(214) 560-2206

Attorneys for Defendant Highland Capital
Management, L. P.


Robert S. Brady (No. 2847)
YOUNG CONAWAY STARGATT &
TAYLOR LLP
1000 West Street, 17th Floor
Wilmington, Delaware  19899-0391
(302) 571-6690
    - and -
Paul V. Shalhoub
WILLKIE FARR & GALLAGHER LLP
787 7th Avenue
New York, New York  10019-6099
(212) 728-8000

Attorneys for Defendant George V. Hager


Teresa K.D. Currier
Peter J. Duhig (No. 4024)
KLETT ROONEY LIEBER &
SCHORLING, PC
The Brandywine Building
1000 West Street, Suite 1410
Wilmington, Delaware  19801
(302) 552-4200

Attorneys for Defendant Mellon Bank, N.A.

    - and -

Richard S. Toder
Menachem O. Zelmanovitz
MORGAN, LEWIS & BOCKIUS LLP
101 Park Avenue
New York, New York  10178
(212) 309-6000

Attorneys for Defendant Mellon Bank, N.A.
with respect to all Plaintiffs other than
Charles L. Grimes, Louis IG Ireland Trust, C.
Yvonne Cooke, Jane G. Brown, Serena R.
Schwartz and Gordon W. Chaplin

    - and -

Steven Russo
SIVE, PAGET & RIESEL, P.C.
460 Park Avenue
New York, New York  10022
(212) 421-2150

Attorneys for Defendant Mellon Bank N.A.
with respect to Plaintiffs Charles L. Grimes,
Louis IG Ireland Trust, C. Yvonne Cooke,
Jane G. Brown, Serena R. Schwartz and
Gordon W. Chaplin

RLF1-2972764-1

UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY

IN RE:                              .    Case No. 00-2692, 00-2494

  GENESIS HEALTH VENTURES          .
  AND MULTICARE AMC, INC.,         .    15 North 7th Street
                            .    Camden, New Jersey  08102
              Debtor,         .
                            .    August 29, 2001
. . . . . . . . . . . . . . . . .    9:05 A.M.

TRANSCRIPT OF HEARING ON MULTIPLE MOTIONS
BEFORE HONORABLE JUDITH H. WIZMUR
UNITED STATES BANKRUPTCY COURT JUDGE

- - - - -

APPEARANCES:

For United States Trustee:      JOSEPH J. McMAHON, JR., ESQ.
                                U.S. Department of Justice
                                Office of the U.S. Trustee
                                844 King Street, Suite 2313
                                Wilmington, DE  19806

For the Debtors:                MICHAEL WALSH, ESQ.
Genesis Health Ventures         ADAM STROCHAK, ESQ.
                                JOANNE GUERRERA, ESQ.
                                GARY HOLTZER, ESQ.
                                Weil, Gotshal & Manges, LLP
                                767 Fifth Avenue
                                New York, NY  101539107

For the Senior Lenders:         MENACHEM O. ZELMANOVITZ, ESQ.
Mellon Bank                     RICHARD S. TODER, ESQ.
                                Morgan, Lewis & Bockius, LLP
                                101 Park Avenue
                                New York, NY  10178

For GMS Group, LLC:             JOHN S. KINSEY, ESQ.
                                WILLIAM G. PRIMPS, ESQ.
                                TIMOTHY J. WALSH, ESQ.
                                LeBoeuf, Lamb, Greene & MacRae
                                125 West 55th Street
                                New York, NY  10026

1200.22

2

Continued:

For Objector:
Charles Grimes

DAVID A. JENKINS, ESQ.
SELINDA A. MELNICK, ESQ.
Smith, Katzenstein & Furlow, LLP
800 Delaware Avenue
Post Office Box 410
Wilmington, DE  19801

For 44 Tort Claimants:

SUSAN MORRISON ESQ.
Wilkes and McHugh, P.A.
One North Dale Mabry Highway
Tampa, FL  33629

For Official Committee of
Unsecured Creditors of
Genesis:

LISA G. BECKERMAN, ESQ.
ROBERT H. PEES, ESQ.
Akin, Gump, Strauss, Hauer &
Feld, LLP
590 Madison Avenue
New York, NY  10022

For AGE:

EDMOND GEORGE, ESQ.
Obermayer, Rebmann, Maxwell &
Hippel
1617 JFK Boulevard
Philadelphia, PA  19103

For JSON Company:

JOHN LEON, ESQ.
Fox, Rothschild, O'Brien &
Frankel
1103 Laurel Oak Road
Voorhees, NJ  08043

For Todd W. Martin, III:

DAVID E. HUDGENS, ESQ.
Armbrecht Jackson, et al
Post Office Box 290
Mobile, AL  36601

For Goff, et al:

JAMES FREEBERY, ESQ.
McCarter & English, LLP
Mellon Bank Center
Post Office Box 111
Wilmington, DE  19899

For Multicare Unsecured
Creditors Committee:

ATHENA FOLEY, ESQ.
Kasowitz, Benson, Towes &
Friedman, LLP
1633 Broadway
New York, NY  10019

3

(Continued):

Audio Operator:                    Norma Sader

Transcriber:                       DIANA DOMAN TRANSCRIBING
                                   P. O. Box 129
                                   Gibbsboro, NJ  08026-0129

                                   Telephone:  (856) 435-7172
                                   Fax:        (856) 435-7124

Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

4

INDEX

                    Direct     Cross        Redirect

WITNESSES

FOR THE SENIOR LENDERS:
David Schulte              7 (ZEL)  54 (KIN)

FOR THE COMMITTEE OF
UNSECURED CREDITORS
Patrick Hurst             87 (PEE) 109 (KIN)    116 (PEE)

FOR GMS:
Anthony Grillo           123 (PRI) 148 (GUE)

FOR CHARLES GRIMES:
William L. Becklean      166 (JEN) 189 (SRT)
                                  201 (ZEL)

FOR GENESIS HEALTH VENTURES:
George Hager             204 (STR) 209 (MCM)

FOR THE TRUSTEE:
Jeffrey Heck             224 (MCM) 233 (HOL)

|  |  | Marked | Received |
|---|---|---|---|
| EXHIBITS: |  | 13 | 49 |
| Mellon-1 | Report prepared by Chilmark | 42 | 49 |
| Mellon-2 | Revised pages 20 to 22 | 48 | |
| GMS-8 | Evercore Partners Report | 49 | 53 |
| Mellon-3 | Analysis of Report | | |
| GMS-9 | Presentation to the Steering | 60 | 63 |
|  | Committee of Secured Lenders | 63 | 65 |
| GMS-10 | Memorandum, dated 6/7/01 | 65 | 73 |
| GMS-11 | Negotiation Aid Memorandum | 74 | |
| CG-5 | Genesis Restructuring Overview | 92 | 107 |
| Committee-1 | Presentation Report | 165 | |
| GMS-12 | 8/15/01 Lanassa Deposition | 174 | |
| CG-6 | Becklean Report | | |
|  |  | 214 | |
| UST-1 | Genesis monthly operating report | 214 | |
| UST-2 | Multicare monthly operating report | 231 | |
| UST-3 | 1998 Tax Return | 232 | |
| UST-4 |  | 232 | |
| UST-5 |  | | |

5

<u>INDEX</u> (Continued)

| <u>ARGUMENT</u>: | <u>PAGE</u> |
|---|---|
| By Mr. Primps | 238 |
| By Mr. Jenkins | 242 |
| By Ms. Melnick | 248 |
| By Mr. George | 265, 298 |
| By Ms. Morrison | 274 |
| By Mr. Hudgens | 281 |
| By Mr. Hayes (Pro Se) | 287 |
| By Mr. McMahon | 294 |
| By Mr. Walsh | 299 |
| By Mr. Holtzer | 311 |
| By Mr. Toder | 314 |
| By Ms. Beckerman | 320 |
| By Ms. Foley | 325 |

Colloquy                                    6

(Call to the order of the Court at 9:05 a.m.)

1

2          THE COURT:  Please be seated.  Good morning.

3          MR. WALSH:  Good morning, Your Honor.

4          THE COURT:  Good morning.

5          MR. WALSH:  It seems like just yesterday when we were

6  together.

7          THE COURT:  Indeed.

8          MR. WALSH:  Your Honor, just one technical item.  We

9  had filed our draft, or our confirmation order, and we have

10 copies available for people in the court if they'd like to take

11 a look at it.  So, just let one of my colleagues know.

12         We have completed our witness testimony for the

13 debtor.  We understand that there are two other witnesses by

14 supporting -- by parties supporting the plan, and we propose to

15 go forward with them before we hear from the witnesses opposing

16 the plan --

17         THE COURT:  I --

18         MR. WALSH:  Is that okay?

19         THE COURT:  Yeah.

20         MR. WALSH:  Before I do that, may I hand up our

21 proposed order?

22         THE COURT:  Certainly.

23         MR. WALSH:  Thank you.

24         THE COURT:  Thank you.

25     (Brief pause)

**AA. 362**

Schulte - Direct                                    7

1      MR. ZELMANOVITZ:  Good morning, Your Honor.

2      THE COURT:  Good morning.

3      MR. ZELMANOVITZ:  Menachem Zelmanovitz of Morgan,

4  Lewis and Bockius, on behalf of Mellon Bank, as the agent for

5  the senior lenders.  Your Honor, I'd like to call to the stand

6  Mr. David Schulte.

7      (Brief pause)

8      THE CLERK:  Place your left hand on the Bible, raise

9  your right hand.

10     D A V I D   S C H U L T E,  WITNESS,  SWORN

11     THE CLERK:  Please state your name for the record,

12  spelling your last name.

13     THE WITNESS:  Fine.  My name is David Schulte, S-C-H-

14  U-L-T-E.

15     (Brief pause)

16     THE WITNESS:  Good morning, Your Honor.

17     THE COURT:  Good morning.

18                    DIRECT EXAMINATION

19  BY MR. ZELMANOVITZ:

20  Q    Mr. Schulte, by whom are you currently employed?

21  A    I'm employed by Chilmark Partners --

22  Q    And what is --

23  A    -- spelled C-H-I-L-M-A-R-K.

24  Q    And what is Chilmark Partners.

25  A    Chilmark Partners is an investment banking firm based in

**AA. 363**

Schulte - Direct                                    8

1  Chicago.  Our principal work is in financial organizations and

2  in solvencies.

3  Q    And what is your position at Chilmark?

4  A    I'm its managing partner.

5  Q    Does Chilmark have an engagement in connection with the

6  Genesis and Multicare bankruptcy cases?

7  A    Yes sir.

8  Q    And what is that engagement?

9  A    We are employed by Morgan Lewis as counsel to the agent

10  for the senior secured lenders, both of Genesis and Multicare.

11  Q    And when did that engagement begin?

12  A    Approximately one year ago.

13  Q    Mr. Schulte, would you briefly describe for the Court your

14  educational background?

15  A    Yes.  I have a Bachelor's degree in Economics from

16  Williams College.  I studied for a year at Oxford University,

17  and I have a law degree from Yale.

18  Q    And at Yale, did you earn any special distinction?

19  A    Yes.  I was Editor-in-Chief of the Law Journal.

20  Q    Would you briefly describe for the Court your employment

21  history following your graduation from law school?

22  A    Yes.  I was a law clerk for one year for Mr. Justice

23  Stewart (phonetic) on the U.S. Supreme Court, and I then went

24  to work for Northwest Industries, which was a diversified

25  manufacturing company in Chicago.  I worked there for seven

**AA. 364**

1   years, and then went to Solomon Brothers in 1980 to start their

2   effort in corporate reorganizations.  I was at Solomon Brothers

3   for four years, and then I started Chilmark Partners in 1984.

4   Q     Is it fair to say, then, that since your employment at

5   Solomon Brothers in 1980, you've been involved in

6   reorganizations and insolvency work?

7   A     Yes, almost exclusively.

8   Q     What are your responsibilities as a managing member of

9   Chilmark Partners?

10  A     I'm responsible for all of the work of the firm.  I'm the

11  senior person on each of the assignments that we do and each of

12  the investments that we make, and I have administrative

13  responsibilities, as well.

14  Q     Had you been engaged before to act as an expert witness in

15  connection with other matters?

16  A     Yes, I have.

17  Q     And have you been qualified by other courts to provide

18  expert testimony?

19  A     Yes, I have.

20  Q     Would you please tell the Court the other cases in which

21  you have been qualified as an expert?

22  A     Yes.  The first time in Bankruptcy Court, I was part of

23  the Wicks case in California a million years ago.

24  Subsequently, the Global Marine bankruptcy case in Houston, the

25  Revco bankruptcy case in Akron, Ohio, last year, the Bruno case

Schulte - Direct                                    10

1   here in Delaware, and then in the non-bankruptcy context for

2   Resorts International before the New Jersey Casino Commission

3   some years ago.

4   Q    In each of those cases, did your testimony deal with the

5   issue of valuation in connection with restructurings or

6   insolvencies?

7   A    Yes sir.

8   Q    At this time, I would ask the Court to qualify Mr. Schulte

9   as an expert.

10            THE COURT:  Sir?

11            MR. KINZEY:  May I ask one question on voir dire?

12            THE COURT:  Certainly.

13            MR. KINZEY:  John Kinzey, Your Honor, for the record.

14  I'm representing GMS.

15            MR. KINZEY:  Good morning, Mr. Schulte.

16            THE WITNESS:  Good morning, sir.

17            MR. KINZEY:  One quick question.  Prior to this case,

18  do you recall having any experience in insolvency cases

19  involving healthcare companies?

20            THE WITNESS:  I have not had such experience.

21            MR. KINZEY:  I have no objections to qualifying the

22  witness, Your Honor.

23            THE COURT:  All right.  He may be so qualified.

24            MR. ZELMANOVITZ:  Thank you, Your Honor.

25            (Brief pause)

Schulte - Direct                                    11

1   BY MR. ZELMANOVITZ:

2   Q    Now, Mr. Schulte, in the course of Chilmark's engagement

3   in these cases, did Chilmark perform work relating to

4   ascertaining the value of the debtors?

5   A    Yes sir.

6   Q    And prior to the Chilmark report, which we will get to in

7   a brief moment, could you describe to the Court the valuation

8   work that Chilmark performed?

9   A    Yes.  Well, over the past year, we had been advising the

10  secured lenders of Genesis and Multicare on all of the aspects

11  of the plan reorganization and the negotiation of that plan.

12  Importantly, our work has dealt with capital structure

13  planning, and as part of capital structure planning, one

14  brushes up against the valuation question all the time,

15  importantly, because it was clear from the start in these cases

16  that the senior secured lenders could not be paid back in the

17  form that they originally held, namely, in debt securities, and

18  that a significant fraction of their recovery had to be equity

19  securities.  So, we were circling around the issue of valuation

20  repeatedly in the last twelve months.

21  Q    And in connection with that work, did Chilmark work

22  closely with another firm?

23  A    Yes.  We -- the accounting side of the professional team

24  for the bank lenders was the Apollocano and Manzo firm.

25  They're an accounting firm that specializes in reorganizations,

**AA. 367**

Schulte - Direct                                    12

1    and we work closely with them.

2    Q    What was the focus of the Apollocano and Manzo firm's

3    work?

4    A    It was their job to scrub the numbers on a myriad of

5    topics, explaining to the lending group the company's financial

6    statistics, doing due diligence for the lenders, and in

7    connection with all the matters that came up during the year.

8    Q    Now, did there come a time when Chilmark was asked to

9    conduct a valuation analysis in these cases?

10   A    Yes sir.

11   Q    And to prepare a report as to its conclusions?

12   A    Yes sir.

13   Q    And when were you asked to do that?

14   A    Oh, the request came late spring or early summer of this

15   year.

16   Q    And who made that request?

17   A    Morgan Lewis.

18   Q    And did Chilmark, in fact, conduct such a valuation

19   analysis and prepare a report as to its conclusion?

20   A    Yes, we have.

21       (Brief pause)

22       MR. ZELMANOVITZ:  Your Honor, may I approach the

23   witness?

24       THE COURT:  Please.

25   BY MR. ZELMANOVITZ:

**AA. 368**

Schulte - Direct                                    13

1   Q    Mr. Schulte, I have placed before you what I have marked

2   as Mellon Exhibit one.

3   A    Yes sir.

4   Q    Can you identify that document for us?

5   A    Yes.  This is the report that -- that our firm prepared

6   that we've just discussed.

7   Q    And who prepared this -- who prepared the report?

8   A    I did, along with two of my colleagues.

9   Q    And who are your colleagues who assisted you in preparing

10  the report?

11  A    John Heckle (phonetic) and Kyle Hood (phonetic).

12  Q    Now, would you generally describe for the Court the steps

13  you and your firm took in preparing this report?

14  A    Yes.  As a piece of background, the business of securities

15  valuation is an interesting one, and when applied to a company

16  like Genesis, it's particularly interesting.  If we knew the

17  future, securities valuation would be a piece of arithmetic.

18  It would -- you know, my eleven year old could do it.  What

19  makes it interesting, what makes it difficult is we don't know

20  the future.  We know the past, given good accounting, and we

21  glimpse at the future, and yet, all an investor or any valuer

22  can have is the future.  That's the inherent tension in the

23  process.

24           We started by, and we had this over the course of a

25  year, it wasn't just for this report, but we developed an

Schulte - Direct                                    14

understanding and a sense of the dynamics in this industry, and

in a way, that's a debate between Pollyanna and Cassandra.

Pollyanna says, this is a vital service performed to give care

to elderly people who need it, and as a fraction of the

American population, elderly people are a growing fraction, and

therefore, demand is in the bag. And for any business where

demand is assured going forward, the financial future is, at

least from that perspective, bright.

Cassandra replies, yes, but the demand for the

service is, first of all, grudging. There's not a person, I

would say, in this courtroom who has an elderly relative who

has ever said, yippee, I'm going to a nursing home. This is

people come to nursing homes when they don't have an

alternative. They don't want to go, their families don't want

to send them, and as it turns out, socially, nobody wants to

pay for it.

And so, we have an iron -- and it's also very

expensive. A private pay patient at Genesis pays $200 a day.

There are not many elderly people who with alacrity would check

into a hotel for $200 a day forever, for the rest of their

lives. And most people who go into these nursing homes don't

come out alive unless their benefits run out and they have no

choice.

So, this is a -- it's a melancholy business. This is

a business of need and from a financial perspective, leaving

Schulte - Direct                                    15

1    aside the human dynamic, when people have testified before and

2    I heard the testimony yesterday about the payor mix, what that

3    means is it's expensive and people can't pay for it themselves.

4    And it becomes, then, a business where the revenue stream is a

5    function, not only of the demand which is assured, but of the

6    person who is writing the check, and that's a function of

7    politics, and that's a function of budgetary politics.

8         And what we've seen in the last ten years in this

9    business, good times and bad, owing to decisions made by

10   politicians who are responsive to things in addition to the

11   needs of the population.  I say that as background because it's

12   -- to get giddy about this business is, I think, to ignore the

13   context of the industry.

14        Now, that said, when we look -- when we do valuation,

15   we look at valuation work, recognizing the inherent

16   impossibility of knowing the future.  We look at everything we

17   can.  And there are a number of ways that one does this.  There

18   were four that we attempted here, as has been testified by one

19   of the other people yesterday.  The approach that looks at

20   historical transactions proved irrelevant because when the

21   payment rate structure changed a few years ago, there haven't

22   been any subsequent reported transactions that we could find,

23   so we ignore that one.

24        But then, we looked at the valuation of comparable

25   companies and we looked at discounted cash flow, and we did

AA. 371

Schulte - Direct                                          16

1  something else which we can come to whenever you'd like, which

2  was to look at the market value of the company today, because

3  even though it's a Chapter 11 debtor, there is a market for its

4  securities today, and they're trading at a price, and we looked

5  at all of those things.

6  Q    Mr. Schulte, let's turn to the first evaluation method

7  that you mentioned and focus on that for the long term care

8  business, and that would be the comparable company analysis.

9  A    Yes.  Your Honor, I'm looking behind Tab B of this report,

10 it's page -- denominated page four.  Yes sir.

11 Q    Now, would you explain to the Court the steps you followed

12 in performing this analysis?

13 A    Yes.  Again, a word about context because there's been a

14 lot of testimony about the comparable company method.  The idea

15 here is very simple.  Doing it is less simple, but the idea is

16 simple.  It says, if there is a public marketplace which most

17 people who are knowledgeable in this area regard as relatively

18 efficient and able to digest information from disparate source

19 and produce valuations, and if there are, in fact, companies in

20 that universe who are comparable, meaning similar, to its

21 reasoning by analogy, who are like the company in question,

22 then if one analyzes the valuation of those entities, it may

23 shed some light on the valuation that -- of the company in

24 question.

25       We did that.  We amassed sort of a dizzying array of

Schulte - Direct                                    17

1    statistics on Genesis and Multicare.  We had access to the

2    company and its public information, its non-public information,

3    the Apollocano and Manzo reports, and we have laid all that

4    out, Your Honor, behind Tab G in Sections one and two, and all

5    kinds of statistical information.  And then, we put together

6    comparable data on as many public nursing home companies as we

7    could find, and we found six.

8    Q    Now, let me ask you on that point, you've heard testimony

9    from other experts with respect to the long term care business

10   where they utilized three comparable --

11   A    Yes.

12   Q    -- companies.  In your report, you use six.

13   A    Yeah.

14   Q    Could you tell us why you chose to use more companies?

15   A    Well, in principle, doing this work, the more data points

16   there are, the greater one's confidence that some statistical

17   fit is valid.  So, anyone, I think, doing this would be pulled

18   into the direction of looking at as many comparable companies

19   as one could find.

20   Q    Now, by using six rather than the three, did that affect,

21   in an way, the information you utilized in preparing your

22   analysis?

23   A    Well, it turns out that three of the six are not companies

24   where there are readily available estimates of future profit.

25   Forthen (phonetic) Corp., sorry, Kindred, and for Beverly and

1  Manor Care, those are widely followed companies, and there are

2  more or less consensus estimates of the future.  For the other

3  three, which are somewhat smaller, the data are a little harder

4  to come by, and in fact, one of them is part of another

5  company, and we had to do an analysis that de-consolidated it

6  to get the U.S. Nursing Home business out.  And there was just

7  less available in the way of forward information.

8          So, in order to preserve the universe, we chose to

9  use trailing 12 month information, i.e., actual information

10  through June 30, which analytically is a little impure because

11  one can only own the future, can't own the past.  Yet, it's

12  better in the sense that we don't get involved in endless

13  bickering about what the future is, so long as the accounting

14  is good, the, you know, the corpus of data for the companies is

15  publically reported, analyzed, certified actual data.

16  Q    So, to be clear, does the use of, for the last 12 months,

17  historical numbers as opposed to projected numbers, prejudice

18  the analysis in any way?

19  A    No, I think not.  I think what's important is to, then,

20  reapply whatever multipliers, and there's been lots of

21  testimony about multiples.  If one applies the multiples

22  against the correct body of data, i.e., there's no arbitrage of

23  time periods.  If you took a multiple of past earnings and

24  applied it to future earnings, that would be incorrect.  That's

25  making a non-analogous comparison.

1    But to create a multiple on a common body of data for

2    historical earnings and apply it to that same period as

3    historical earnings is accurate unless some particular company

4    in the universe has prospects different from its peer group,

5    something special is happening, whereas other, you know,

6    there's otherwise something unique to the company.

7    But in this case, and we thought about this a lot.

8    In this case, the main event was changing the economic lives to

9    this company or these companies are the new reimbursement rates

10   under Medicare.  They arrived in April of this year for all of

11   the universe, and they're in place for all of the universe, at

12   least through late 2002.  They affect everyone, more or less,

13   the same way.

14       And so, we thought there would be no particular

15   prejudice in using the trailing 12 month data correctly

16   applied.

17   Q    Now, we've heard some testimony yesterday, but I do note

18   that in performing this analysis, you used a term, EBITDAR, and

19   would you explain to the Court how that term differs from

20   EBITDA?

21   A    Yes.  I'll explain why.

22   Q    And just one moment, Mr. Schulte, if you can refer

23   specifically to page 5A of your report.  That may be helpful.

24   A    The idea, Your Honor, in doing this, and in making these

25   refinements is, again, the search for comparability.  In

Schulte - Direct                                    20

principle, the idea of valuation through comparables is to see what the market capitalization of Company A is, vis-a-vis, its profits, and apply that, if it's comparable, to Company B.  I mean, that's the soul of the exercise.

It turns out that, and this is not -- this is true not just in nursing home companies, it's true in hotels and retail stores, but businesses that regularly incorporate real estate as part of what they do, it turns out they finance the real estate in different ways.  And for people who finance the real estate through leases rather than through ownership and mortgage finance, for example, the numbers get different because for that first group, thanks to the accounting profession's definition of what can be expensed and capitalized, the cost of the capital is rent which is shown on the income statement.  One way it's not interest which would be for a mortgage, so what this is about is putting people on equal footing, independently of how they've chosen to finance their real estate.

So, on Page 5A is a simple numbers exercise.  At the top of the page, we have Genesis, this is the long term care portion of Genesis only.  We have their EBITDA, and we add to it their rental expense, arriving at the EBITDAR which is -- so, the R is simply before rent, and we then, apply multiples which we can get to, which we derive from the comps, and to get you to, if you will, an adjusted enterprise value from which

1   you, then, have to deduct the capitalized value of the leases

2   to get to a comparable enterprise value.  That's just the steps

3   to the exercise --

4   Q   So, in that sense, that is to be able to compare companies

5   in the long term care business which own its real estate to

6   companies in the same business which lease their real estate.

7   A   Exactly so.

8   Q   Now, turning back to your analysis, would you tell us how

9   you determined the valuation multiple for each of the

10  comparable companies?

11  A   Yes.  Well, we -- we arrayed the data in the way that I

12  just described, and in this report, there's a summary of that

13  in the statistical part on the back.  It's there in brutal

14  detail.  But on Page 7A, which is again behind Tab B, Your

15  Honor, we lay out, reading from left to right in the columns,

16  the three publicly available comps that you've heard described

17  in testimony yesterday, and the three somewhat smaller -- well,

18  you see from the revenue sizes that not -- not trivial

19  companies, that are also in the nursing home business.

20      Then, in the middle of the page, we took -- we

21  actually found two comparable companies, not just one, for

22  Institutional Pharmacy, Omnicare and NCS HealthCare, and then

23  toward the right of the page we have for Genesis, its long term

24  care business, its institutional pharmacy business, and we have

25  a separate column for Multicare, and a final column for the pro

**AA. 377**

Schulte - Direct                                          22

forma combined company.

And you can see, we have revenues.  All of this is done on a trailing 12 month basis through June of 2001, which is the most recent fiscal period for which public data are available.  Revenues, EBITDAR, rent, EBITDA and the like, and then the enterprise value for each company, as others have testified to, is the value of its equity which is derived from the share price and the number of shares, plus the value of its debt, and added back to it, you'll see the capitalized value of his rent, which gives you the lease adjusted enterprise value, which we found actually takes some of the kinks and variability out of the valuation when you·go to a EBITDAR approach.

And then, at the bottom is an important set of reference points.  We have what look to be the main profitability discriminators.  We have the EBITDAR margin, which is simply the pre-tax cash flow before rent divided by the adjusted capa -- divided by revenues, excuse me.  Then, we have the adjusted after tax return on capital, which is done in the same way that I just described.  I can go back to it if you need to.  And then, we have the payor mix which you've had a lot of testimony about, because Medicaid reimbursements are at a substantially lower rate than the other payment streams into the nursing home, and that turns out to explain some things about the premier companies and the less valued companies.

Q    How do you then determine what multiple to assign to the

AA. 378

Schulte - Direct                                    23

1  debtor's long term care business?

2  A    Well, it's an analytic process in which we looked at

3  everything and tried to really read the mind of the market.

4  Let's start at the second row on the page, lease adjusted

5  enterprise valued at EBITDAR.  And when you look at this,

6  you'll see that once you've taken out the variability owing to

7  the different way in which companies finance their real estate,

8  but for Manor Care, which is much higher, you'll see that the

9  other -- the multipliers for the all the other five -- they

10  have five other companies, are between six and 8.4.  Manor Care

11  is 11.4 which is conspicuously higher.  The question is where

12  does one place Genesis within that.  It isn't good enough to do

13  it with a Ouija Board or by picking jelly beans out of a jar.

14  This is supposed to be a search for real financial

15  comparability.

16          We look at EBITDAR margin, for example, the first --

17  it's in the middle of the page, and it's the first

18  discriminator time tied to profitability.  Multicare, for the

19  trailing 12 months, had a margin of 9.6 percent, and Genesis,

20  9.9 percent.  If one looks at the comparable universe, that's

21  lower than any of the six but for Extended Care which we have

22  at nine and a half percent, but it's right -- it's near the

23  bottom of the pile.  That's a clue about where within a range

24  Genesis would belong on a comparable basis.

25          Similarly, looking at the adjusted after tax return

Schulte - Direct                              24

on capital, no company in the industry is very good here, but
Genesis at 3.9 percent and Multicare at 3.2 percent are very
bad.  They are, again, at the bottom of the pile, but for
Extended Care at 3.1 percent.  Those are arguments for putting
Genesis toward the low end of the valuation range rather than
the high end, because this is about relative profitability and
about relative valuation.

          Looking then at payor mix, the shorthand for this --
Medicare is a tough one because Medicare rates vary a lot with
the acuity and the amount of medical care built into the
service, but looking at Medicaid as the least profitable source
of revenue for a nursing home company, the Medicaid fraction of
revenues for Manor Care is absolutely at the low point, 33
percent.  You'll see that most of the other companies are in
the 40's to 50's.  Beverly is a bit on the outside at almost 62
percent of the revenue mix, and then coming over to Genesis and
Multicare, 49.8 percent for Genesis, 44 and a half percent for
Multicare, which I would say puts them sort of in the pack and
certainly does not give them any claim to the multiple of Manor
Care.

          The occupancy statistics for most of the companies is
fairly similar, it's in the high 80's, low 90 percents.  Our
conclusion, looking at all of this, is that if one were
situating Genesis and Multicare in the universe of nursing home
companies, they would be somewhere in the middle of the pack,

1  middle to low end of the pack on relative profitability.

2          We took the range, we gave you a range of values that

3  we deduced from this exercise, and for the range we described

4  all of the non Manor Care companies.  A low point of six, this

5  is EBITDAR multiple, and a high point of 8.4, which on the page

6  three summary is where we arrive at the valuation for the long

7  term care business of Genesis and for the long term care

8  business -- and for the business of Multicare.  That is for

9  Genesis a low end value of 407 million, long term care business

10  only, a high end value of 624 million, and for Multicare, a low

11  end number of 269 million and a high end of 416 million.

12          And that's not the end of the inquiry for Genesis

13  because there is fully half the business, a bit more than half

14  the business is pharmacy.  That makes Genesis quite a unique

15  company because there's no peer that we could find that has

16  anything like that intense contribution for pharmacy, and the

17  pharmacy business is a better business than the long term care

18  business.

19          In the middle of the page, we have two columns for

20  Institutional Pharmacy.  Omnicare, which is the market leader,

21  has an enterprise valued EBITDA multiple of 11.7.  This is,

22  again, all trailing 12 months for June 30, and NCS HealthCare,

23  6.8.  The -- on the profitability ratios, the EBITDAR margin

24  for Omnicare is 12 percent, and its after tax return on capital

25  is 17.4 percent.  That's -- that's an A -- that's an A grade in

1    American enterprise.  I mean, that's a for real company with a

2    real rate of return on capital.  NCS HealthCare is a much

3    weaker competitor.  Its return on capital is 5.4 percent; it

4    sort of looks like a nursing home.

5            When you come over to Genesis business, which is the

6    second column under the heading, Your Honor, Genesis, the

7    adjusted return on capital for Genesis pharmacy business is

8    13.8 percent which is very respectable.  It's not as good as

9    Omnicare, and the profit margin on sales, 7 and a half percent,

10   is not as good as Omnicare's 12, but it's pretty good.  And we

11   then, in looking at the range of values, this is -- the

12   comparability approach for Institutional Pharmacy is

13   frustrating because there are only two data points of

14   independent, public companies, and one is a better company than

15   ours and one is a worse company than ours.

16           This is a little bit more subjective than I like in

17   doing this, but the thing that tipped the scales, we arrived at

18   a multiple higher -- closer to Omnicare's than NCS

19   HealthCare's.  As we did this, in fact, we used a multiple for

20   the pharmacy business, a range of 9.0 to 9.5 times trailing 12

21   months EBITDA.  What kept us down was, first of all, it's not

22   as good a company as Omnicare on profitability.

23           But also, the loss of the Mariner bids or at least

24   the decline in profitability for the Mariner business, which

25   you heard testimony about yesterday, is -- what that's about is

Schulte - Direct                                    27

1  that Genesis is presently enjoying reimbursement rates from

2  that customer per contract higher than the Medicaid rates and

3  higher than anybody's new contracts.  And just for sure,

4  they're either going to lose the business or lose some of that

5  revenue.

6       That business is 15 percent of the cash flow of

7  Genesis' pharmacy business.  Couldn't ignore that in taking

8  into account in valuation.  It's a wild card.  It's part of the

9  basis of this APS potential acquisition, which I'm sure we'll

10  get into later.  So, in any event, our conclusion was to use a

11  multiple range for the pharmacy business higher than NCS

12  HealthCare but lower than Omnicare.  We chose 9 to 9 and a half

13  times trailing 12 month EBITDA which gives us the result on

14  page three of the range of 762 million at the low end and 804

15  million at the high end for the pharmacy business of Genesis.

16       And then you can see that we've totaled the two

17  portions of the business to come up with a value range for

18  Genesis of 1.1 billion on the low end, 1.4 billion on the high

19  end, the mid point of which is $1.3 billion, which is our most

20  likely answer.

21  Q   That's Genesis alone?

22  A   Yes.

23  Q   And for the combined Genesis and Multicare?

24  A   Again, doing the totals for the combined Genesis and

25  Multicare, we get a low end value of a billion four and a high

Schulte - Direct                                    28

1   end value of a billion eight, the mid point of which is a

2   billion six.

3   Q    Now, you did not use -- well, let's back up a moment.

4   Could you explain to us what a run rate or a normalized EBITDA

5   or EBITDAR is?

6   A    Sure.  This is highly relevant to any forward valuation of

7   a company.  We looked at it a lot in trying to map out a proper

8   capitalization for the debtors because what that is -- what

9   that asks is the question, how are they doing now.  You know,

10  not how did they do, not how does their budget say they're

11  going to do, but how are they doing.  It's a pretty good

12  question.

13            And so to do a run rate, it's really sort of an

14  extrapolation from the most recent month or quarter, taking

15  into account what's known that may not have been fully analyzed

16  in historic numbers, and taking into account what's known that

17  may yet be coming that obviously hasn't been captured in

18  historical numbers.  That's what a run rate is.

19  Q    Now, did you use a run rate or a normalized EBITDAR for

20  the debtors in your valuation?

21  A    In -- we didn't -- well, no, not specifically.  We didn't

22  in the comparable company information because to do it would

23  have been mixing time periods.  We found the most satisfactory

24  data looking at trailing 12 month statistics.  It's highly

25  relevant, and if one had run rate, you know, data that you were

Schulte - Direct                                     29

1   confident in for all of the comparable companies, that would

2   surely be a better approach, but nobody's got that.  We surely

3   couldn't come up with that.  I dare say, no one else has

4   either.  So, we were more attracted to a better universe of

5   data, and therefore, did the historicals.

6        Once you derive a multiple looking backward in a

7   trailing 12 months earnings, you must apply it to earnings from

8   the period from which you derive the multiple.  Otherwise,

9   you're mixing time periods and, for example, if earnings are

10  rising, you're going to get the wrong answer because you're

11  applying too low a multiple.  If earnings are falling, then you

12  get the wrong answer because you're applying too high a

13  multiple.  So, it's terribly important to be consistent as to

14  time period.

15  Q    By the way, could you tell us where you obtained the

16  information which respect to the debtor's trailing 12 months

17  EBITDA or EBITDAR?

18  A    Yes, from the debtor's public and non-public information,

19  from the work of Apollocano and Manzo.  We were in monthly

20  meetings with the debtor and receiving presentations all

21  through the last year.

22  Q    Okay.  Now, let's turn to the second of your

23  methodologies, which is the discounted cash flow analysis.

24  A    Yes sir.

25  Q    I believe it begins on page 8 of your report.

1  A    Yes, it's Tab C, Your Honor.

2  Q    Would you explain to the Court what is entailed in

3  preparing or performing the discounted cash flow or DCF

4  analysis?

5  A    Okay.  In a perfect world, this is the only true faith.

6  In a perfect world, the value of any capital asset, including a

7  corporation, including a business, is today's present value of

8  the cash flows that will be earned in the future.  That's what

9  any capital asset is worth.  The -- and the technique that --

10 the arithmetic that one would use is to discount the future

11 cash flows back to the present at a discount rate, and that

12 would be perfection.  I mean, that is truly, in principle, the

13 best way to evaluate any security, any business, any capital

14 asset that produces profit.  It would be a bad way to do

15 certain other things; minerals in the ground you'd do perhaps

16 differently.  Okay.

17        The problem is the future, and the analysis is only

18 as good as one's estimate of the future and as only as good as

19 one's ability to create appropriate discount rate.  That's hard

20 for any business.  Rate war and buffet line is all estimates

21 are difficult, particularly those involving the future.

22        In this industry, given the massive changes in

23 adequacy or inadequacy of the payment stream, the payment mix,

24 I don't think anyone's forecast are worth a damn.  And kind of

25 -- not the companies, with greatest respect to the company, we

Schulte - Direct                                    31

1    are in a Chapter 11 case.  And that happened, in part, because

2    they paid a billion and a half dollars for Multicare.  So --

3    and today is worth $400 million or some number like that.

4         Things change massively in this business, and so this

5    technique which is really the best, if one had a good view of

6    the future.  We did, and we tried to cope, analytically, and we

7    can go through it in detail, if you want, with those vagaries

8    but within the confines of the analysis.  But it's a little

9    dicey.

10   Q    Okay.  In your DCF analysis, what was the source for the

11   estimate of future cash flows that you used?

12   A    Yes.  For lack of anything better, we used the company's

13   business plan.

14   Q    Okay.  But did you believe that the -- that business plan,

15   at least, a reasonable estimate of future profits?

16   A    Well, it's probably most accurate in the early years.  You

17   know, it's probably most accurate about tomorrow and less

18   accurate as time goes along.  In fact, even in the time since

19   it was created, the estimates for this year have moved around

20   some, and I dare say the estimates for next year will have

21   moved around some, too.  That's not taking any particular

22   criticism of the management.  This is a very difficult business

23   to forecast because of the variability in revenues.

24   Q    Now, I see that you used five years of projected earnings,

25   is that because the business plan goes out for five years?

Schulte - Direct                    32

1   A    That's correct.  We put in here on pages 9 through 11, we

2   laid out the numbers in the companies business plan, first,

3   Genesis alone; second, Multicare, and then third, the combined

4   company.

5   Q    Now, in your DCF analysis, at what rate did you discount

6   back to the present the future cash flow?

7   A    We bracketed the cost of capital between 9 percent and 11

8   percent.  The derivation for that is in here.  We gave the

9   Court a page that may be helpful, page 12, on the weighted

10  average cost of capital.  A word about what this is.  It's

11  easier to say than to know the meaning of.  The weighted

12  average cost of capital, it's very important, too, in analyzing

13  this industry, Your Honor.  The weighted average cost of

14  capital is the opportunity cost of the capital provided to the

15  enterprise, adjusted for risk.

16          What that means for debt is relatively simple.  It's

17  the rate of interest they pay.  It means that a lender would be

18  willing to lend the company at a stated rate of interest

19  instead of lending that same money to somebody else because he

20  feels, on a risk adjusted basis, that it's appropriate.  That's

21  a market -- that's what we mean by a market rate of interest.

22          For the cost of equity, it's more difficult.  The

23  cost of equity is the same idea.  It is the opportunity cost

24  for an investor investing in this stock rather than some other

25  stock, adjusted for risk.  Investors can put their money in all

Schulte - Direct                                    33

1   kinds of things, ranging from government bonds which are the

2   riskless end of the spectrum, all the way to venture capital

3   investments which are, perhaps, the riskiest part of the

4   spectrum, and the cost of equity to this company or to any

5   particular company is supposed to be the opportunity cost of

6   equity capital for that company.

7            Here, because this company has been in Chapter 11

8   because the industry has seesawed so much, we've frankly coped

9   out, and we used a normal range of equity returns, 12 percent

10  to 15 percent, which is what produces the range of weighted

11  average cost of capital. I've seen in some of the other

12  reports that you've shown me in the last week, people use cost

13  of equity as high as the 20, 22 percent neighborhood.

14           I think that's defensible because this is an industry

15  that mostly went bankrupt, and it would not be a craziness to

16  say that investors -- to put equity capital in here would

17  require a surplus rate of return. We didn't do that, it would

18  have driven the values down by a lot more, and I think it's --

19  I think that's really throwing a dart at the moment to come up

20  with a cost of equity for this company.

21  Q    Okay. In addition to discounting back to the present the

22  future cash flow, what else did you do in performing this

23  analysis?

24  A    Well, there is a business of exit multiples. We haven't

25  had a lot of testimony about that, but it -- we show you

Schulte - Direct                                    34

1   something about this on page 13. If you look, Your Honor, in

2   the middle of the page, we have something called value of free

3   cash flow (present values), and we have bracketed cost of

4   capital, as I said, between 9 and 11 percent, but let's look at

5   the mid point of 10 percent for ease of discussion.

6           If we went back a few pages, you would see the free

7   cash flow for the company in each of the enumerated plan years.

8   If one discounts only that enumerated stream of cash flows for

9   five years time at 10 percent, it provides a present value

10  answer of $242 million. Well, we're talking about billion

11  dollar valuations. Where does the rest of the value come?

12          Well, the rest of the value comes because in the year

13  2006, that's merely the horizon of the company's business plan,

14  it's not the end of the life of the enterprise. It would be

15  assumed that at the end of 2006, we still have a profitable

16  business with a remaining long term future. The long term

17  future needs to be captured in a discounted cash flow. This is

18  not a machine that wears out by 2006 and you throw away.

19          What's called the terminal value is a shorthand for the

20  remaining future of the business, and if you look in the table

21  above that says terminal values, on the line that says 10

22  percent, you will see that the answer to the question, what is

23  the remaining future of the business, as we depict it, can be

24  between $500 million and a billion dollars, depending upon what

25  you assume, but in any case, significantly more than the

1  present value of the enumerated cash flows during the period of

2  the business plan, i.e., be careful about exit multiples

3  because they are the whole game in arriving at the answer.

4  It's so easy to, you know, pick one, but by just picking one,

5  you're really determining the answer to the question.

6       In the case of our work, we were motivated highly and

7  analytically by the poor return on invested capital in this

8  business, vis-a-vis, the weighted average cost of capital.  If

9  we go back to the page of comparables, which is number 7A

10 behind Tab B, I remind you that adjusted for leases, the return

11 on capital for Manor Care, the stellar performer, is only 7

12 percent.  For our debtors, it's 4 percent for the Genesis, the

13 long term care business is 3.9 to be exact, and 3.2 for

14 Multicare.

15      Well, if the opportunity cost of capital is 10

16 percent and the company is earning 3, a moment's thought will

17 tell you that company can't attract capital because the capital

18 earns less than it costs.  Now, the way that plays out is real

19 life, you can see, vividly, the fortunes of the dot com

20 universe over the last two years.  Companies came out with high

21 expectations, high promised eventual profits and they raised

22 money and there were initial public offerings, and we remember

23 reading that stocks doubled and tripled, you know, the first

24 day, and if your broker didn't get into one, he was a bad guy

25 kind of thing, and now they've fallen to earth.

Schulte - Direct                                    36

1    Why?  Because they can't finance -- they've run out

2    of money.  They can't produce.  They haven't yet or didn't

3    promise to produce a return on capital adequate to justify a

4    next round of equity financing.  They couldn't finance, so they

5    went broke.

6        If this industry doesn't get its return on invested

7    capital up to a point where it is profitable for savers to

8    invest their savings in it, it will go broke again.  That's why

9    when you factor it against the variability of the government's

10   role in reimbursement, you have to conclude that the future of

11   this industry is ambiguous, at best.

12       In any event, when we looked at all of that, we

13   concluded to assign an exit multiple.  We give you ranges, I

14   mean, it's the -- it's one of the things people like us do, and

15   the range of exit multiples of 6.5 to 8.5 roughly brackets the

16   universe of contemporary valuation multiples.  We chose the

17   lowest of the lot, 6.5, to give some analytic weight to the

18   points I just made to you.

19       If pushed, I would be equally happy to go lower.  I

20   mean, we have a chart in here called capitalized notepad.  What

21   that means -- that's what you do, analytically, when you see a

22   company whose return on capital is not better than its cost of

23   capital.  And what that says is whatever the growth is going

24   forward, it's not valuable to capital owners because it doesn't

25   produce a return above the opportunity cost.  So, it treats the

Schulte - Direct                              37

1   future as a constant, as an annuity, and in just discounts,

2   which would give you for the combined companies a terminal

3   value of $686 million.

4           We chose to use, instead, a more conventional exit

5   multiple of 6.5, and so we use a terminal value of a billion

6   dollars.  That's a few hundred million dollars higher, and so

7   we wind up with a billion and a half dollar enterprise value,

8   and that's because the task before us isn't just to give you

9   our sense of true intrinsic value, it's to give you some kind

10  of an estimate of what the market will price the company at,

11  and so we're stuck with the market prices all of which we feel

12  that are a bit fancy.

13  Q    Just to review with you one more time the capitalized

14  notepad, if you were to use that for determining the terminal

15  value, you would have resulted in a much lower number, is that

16  correct?

17  A    Yes, we would have had an enterprise value for the

18  combined companies of about a billion dollars on this approach,

19  but we thought that from the point of view of anticipating how

20  the market will likely price these securities, the market is

21  more excited about this company than that, and so we chose to

22  ignore that one.

23  Q    Now, you concluded, therefore, in your DCF calculation,

24  the company had a value of approximately what, and where does

25  that appear in your report?

Schulte - Direct                                    38

1    A    Well, the DCF calculation that was selected was a billion

2    463, and if you look back to page 3, we had come up with a

3    range, using comparable company analysis that it was a billion

4    one to a billion four, and we -- I'm sorry, for the total

5    company, it was a billion four to a billion eight.  The DCF

6    answer lay within that range, so we made no separate point

7    about it.

8    Q    Now, was there a third valuation method that you employed

9    in your analysis?

10   A    Yes.

11   Q    And would you describe the process you filed in utilizing

12   that method?

13   A    Yes.  I noticed that other people didn't do this.  This

14   takes the approach to weather forecasting where you look out

15   the window.  If the question -- the question that we're asked

16   to answer is, what's the value of the company, meaning what's

17   the fair market value of the company, meaning what's the value

18   at which buyers and sellers would agree to trade securities.

19   It happens that this company has been in Chapter 11 for a year,

20   has had its plan and disclosure statement on file for months,

21   and there has been massive trading in the bank debt and the

22   bonds of the company over this period, and there's a market.

23        And one can blink the reality of that market and

24   ignore it and go to a blackboard and, you know, debate betas

25   and the like, or one can look out the window.  I don't rely on

**AA. 394**

1   this exclusively, but we looked out the window, and we've been

2   following the pricing of securities.  More or less through the

3   case, there are people who quote -- quote these things all the

4   time.  We checked a few of those sources, and the answer comes

5   out on page 17.

6          What we do on page 17 is for Genesis and Multicare,

7   separately, and then on the next page, together, we have them

8   to take the claims of the company, what the market value of

9   those claims is to the extent that those quoted mark, you know

10  what I mean, in the other secured claims of the company, we

11  simply put in a hundred cents on the dollar because the plan

12  treats them as unimpaired.

13         But for the impaired classes which are the senior

14  lender claims, the general unsecured claims and the senior

15  subordinates, we take the quoted values and apply those to the

16  size of the claim and come up with a market value column which

17  gives you a billion, 245 million for Genesis, which expressed

18  as a multiple of trailing 12 month EBITDA is 7.9.

19         And just as a footnote, that's kind of interesting

20  because what we came up with, using comparable companies for

21  Genesis alone, again, as an EBITDA multiple of trailing 12

22  months, was a range between 5.5 and 8.5.  So, here's the market

23  giving a 7.9 that frankly gave us some comfort in the analysis,

24  and for Multicare, the answer comes out as an all end value of

25  414 million, which as an EBITDA multiple is 8.5.  We had come

Schulte - Direct                                        40

1    up with a range for Multicare of 5.5 to 8.5, and once again,

2    these are all -- it's like doing navigation.

3              You know, you take multiple sightings.  There's dead

4    reckoning, there's celestial navigation, there's reading the

5    charts.  You know, maybe you have a GPS system if you're lucky.

6    There are multiple ways of figuring out where you are.  And we

7    looked at all of them, and I -- we put this in here because I

8    think it's relevant and it gets you to an interesting sort of

9    confirmatory place.

10   Q    The multiple range you found in your own analysis of

11   Genesis that you say was 5.5 to 8.5, was that for Genesis long

12   term care alone --

13   A    I'm sorry, Genesis long term care alone.

14   Q    And the combined, if Genesis in the pharmacy business?

15   A    Long term care alone, I have to get the -- the equivalent,

16   I'm sorry, thank you, the equivalent multiple for all of

17   Genesis which would correspond to the market, I'm reading from

18   page 3, is the reorganization value on an EBITDA basis, I

19   guess, for the whole company is between 6.9 and 8.9.

20   Q    Okay.

21   A    And on page 18, you will see that it comes out at 8.0.  Is

22   it conclusive?  No.  Is it confirmatory?  Yes, I think so.

23   Q    In your opinion, is the fact that Genesis and Multicare

24   are currently in Chapter 11 a basis by which to discount this

25   method?

**AA. 396**

1  A    Well, perhaps a touch.  There's a remaining uncertainty as

2  to how this hearing will come out, and will the plan on file be

3  confirmed, so I'd say that there would probably be some

4  moderate depressing effect on that, but these things have been

5  out there and disclosed for a long time.

6  Q    And in fact, the result comes within the range that you

7  found for your comparable company analysis, is that correct?

8  A    That's correct.

9  Q    Now, just summarizing and referring back to Page, I

10 believe it's 3 of your report?

11 A    Yes sir.

12 Q    Could you tell us what your conclusion is as to the most

13 likely valuation of Genesis alone, long term care business and

14 pharmacy business together?

15 A    Yes.  The most likely Genesis combined valuation is $1.3

16 billion.

17 Q    And what is the most likely valuation that you found or

18 conclusion as to Multicare?

19 A    The most likely valuation would be $343 million.

20 Q    And for the combined Genesis and Multicare?

21 A    $1.6 billion.

22 Q    Now, in addition to valuation, does your report provide

23 any other analyses?

24 A    I'm not sure I understand the question.

25 Q    Specifically, let me refer you to pages 20 to 22 of your

Schulte - Direct                                          42

1   report.

2   A    Oh, yes.  Thank you.  The -- on pages 20 and 22, this is

3   akin to what Mr. Walsh did yesterday when handing the Court

4   tables of the hurdles, there's a point to this hearing, and the

5   question is, is fair and equitable, and so we took the range of

6   the valuations and applied them to the plan recoveries to give

7   the benefit of a recovery calculation by class of creditor in

8   the plan.  On page 20 is the low end of the valuation.  For

9   purposes of discussion, perhaps we should read from page 22

10  which is the high end of the valuation.

11  Q    If -- if you would wait one moment, Mr. Schulte, I'd like

12  to show you a new document.  Your Honor, may I approach the

13  witness?

14          THE COURT:  Sure.

15      (Brief pause)

16  BY MR. ZELMANOVITZ:

17  Q    Mr. Schulte, I've handed you what has been marked for

18  identification as Mellon Exhibit 2.  Can you identify that

19  document for us?

20  A    Yes.  This is a revision to the pages 22 through 24 of the

21  -- of the plan that we prepared.

22  Q    You said 22 to 24, is that --

23  A    I'm sorry, 20 through 22.  Forgive me.

24  Q    Now, what updated or revised information does Mellon

25  Exhibit 2 include?

AA. 398

1   A    We realized in preparing for this hearing that in the

2   report we had taken into account only of adequate protection

3   payments through the end of June.  And here we are at the end

4   of August, and so, we updated this to take into account the

5   adequate protection payments received in July and August.  In

6   other respects, it's the same.

7   Q    Now, I believe you testified that you utilized your range

8   of valuations that you had come -- had found in applying this

9   analysis, is that correct?

10  A    That is correct.

11  Q    Okay.  Can you tell the Court with respect to each one of

12  the valuations what you have concluded as to the recovery by

13  the senior lenders, and that's total recovery by the senior

14  lenders, from Genesis alone?

15  A    All right.  I'm looking at the top part of the first page

16  at the low end valuation, what we deem to be conservative, of a

17  billion, 438 million dollars.  If you look at the top section

18  of the page, it says Class G-2, the senior lender claims, and

19  in the far right-hand column, the calculated recovery is 74.8

20  cents before taking into account post petition interest.

21        What this does is it, in effect, it deems the

22  adequate protection payments.  It's a deemed recharacterization

23  of the adequate protection payments as payment against claim

24  rather than post petition interest.  It counts as money

25  received but recharacterizes it, and on that basis, it's

Schulte - Direct                                    44

1  recovery of 74.8 cents.

2         And similarly, if you go to the most likely case,

3  with the all end valuation is a billion 641 million, that

4  statistic meaning the senior secured lender recovery, leaving

5  aside post petition interest is 87.4 cents.  It's on that top

6  part of the second page, Your Honor.  There's a column on the

7  right called total, which the dollar recovery is $969 million

8  against a claim of $1,909,000,000.  Perhaps, take a second just

9  to walk through the elements of that recovery.

10        In the first column, just to get you to the total of

11  the 969 million, $130 million of adequate protection payments

12  will have been received through the end of August.  The plan

13  gives the senior secured lenders no cash.  The plan gives them

14  $94.9 million of new debt, which we assume would be par debt,

15  debt that's worth its full face amount.  It gives those same

16  lenders $31 million face amount of preferred stock, which we

17  take, it's a liquidating value of $31 million for this purpose,

18  and it gives the lenders 30,485,000 shares and no warrants in

19  the new merged, pro forma merged entity.

20        The value of that is driven by the enterprise value

21  that the page is about, namely, the $1,600,000,000 number.  If

22  you add the dollar values of those across, there's the full

23  recovery including adequate protection receipts, and for this

24  purpose, there's no computation of post petition interest, $969

25  million or 87 cents.

Schulte - Direct                                    45

1    Q    And even the most optimistic, the high end of the range,

2    what would be the total recovery?

3    A    In the high end valuation, a billion, 844, the high end

4    recovery for Class G2 is $1.1 billion, which is 99.7 percent,

5    again, without post petition interest.

6    Q    So, that's even before any payment of post petition

7    interest, it's only a recovery under 100 percent.

8    A    Yes, and that's at the high end of the valuation.

9    Similarly, while we're on this page, if I could, the Class G5,

10   the senior subordinated claims, the objecting class, on this

11   high end valuation is receiving $56.7 million worth of

12   securities, or a 14.7 cent recovery, notwithstanding the

13   failure of Class G2 to be paid in full with or without post

14   petition interest.

15   Q    Now, turning to a different or a related topic, Mr.

16   Schulte, in performing your evaluation analysis, did you

17   believe that the combined Genesis/Multicare was entitled to an

18   enhanced or increased enterprise valuation because of the post

19   confirmation merger of the two entities?

20   A    No.

21   Q    And can you tell us why not?

22   A    The entities have, for all relevant business purposes,

23   been merged for a few years now.  They operate together.  Any

24   benefits of marketing, purchasing have been realized.  The

25   professional expense might go down some if they could stop