Schulte - Direct                                    46

1   producing separate financial statements and the like.  It's a

2   little hard, the context of reorganization case with all the

3   extra professional expense being incurred to know exactly what

4   that number is, but fundamentally as to the operations of the

5   business, the merger has taken place.

6   Q    In forming your valuation analysis, did you consider

7   future acquisitions that the debtors may pursue?

8   A    We didn't assign any value for them, no.

9   Q    And that would include the proposed APS acquisition?

10  A    Correct.

11  Q    And why did you not assign any value to that?

12  A    Well, it's a gleam in the eye.  The APS deal is

13  enthusiastically on the list of things that the management

14  wishes to accomplish.  When they first brought us the deal, we

15  thought it was crazy.  I think we've walked along with them

16  through their due diligence work and see -- understand what

17  they think the benefits will be, but there are two important

18  missing -- three important missing elements in that transaction

19  which is why we didn't quantify it.

20        Number one, will it take place at all?  Omnicare has

21  already made offers for APS, they're well financed, they're

22  independent, and they're there lurking in the weeds, so it's

23  first of all by no means clear that Genesis will achieve the

24  acquisition.  Secondly, and part of the same thing, since it

25  will be a bankruptcy auction, it's anybody's guess what the

1  price is going to be at the end of that auction.  It's

2  imaginable that that deal could be a death trap.  I mean, the

3  price could go beyond levels of reason.  We truly don't know

4  that.

5        And third, and finally, if you look at the enumerated

6  financial benefits of the acquisition in the case that the

7  management has made to the lenders, a substantial fraction of

8  it, from recollection, two-thirds or more, are economies that

9  are expected to be earned through consolidation.  Those won't

10 come free, those won't come on the first day, and by the time

11 they come, there could be offsetting costs and the like, and

12 it's -- I mean, I think it's the management's best stab at

13 estimating, but it's a far cry from a known fact, and the other

14 two points that I've testified to, as well, namely, will there

15 be an acquisition and at what price.

16 Q    Now, you've mentioned earlier that you'd seen some of the

17 other valuation reports.  Specifically, have you reviewed a

18 valuation report prepared by Evercore Partners?

19 A    Yes sir.

20        MR. ZELMANOVITZ:  May I approach the witness, Your

21 Honor?

22        THE COURT:  Sure.

23        MR. ZELMANOVITZ::  Your Honor, I know yesterday,

24 several documents were shown to witnesses, but not marked.  I

25 assume that this will be marked by JMS's counsel, since this is

Schulte - Direct                                        48

1    their witness's document.

2         THE COURT:  I believe we did mark that document.  The

3    -- I believe we marked all of the --

4         MR. ZELMANOVITZ:  Which -- the Evercore Corp. was not

5    marked, Your Honor.

6         THE COURT:  Oh, the Ever -- oh.  Yes, indeed, you're

7    right.

8         MR. ZELMANOVITZ:  Now, I can mark it as a Mellon

9    document or we can just show it to the witness, and I can give

10.  the Court a copy without marking it.

11        THE COURT:  I assume that we will be marking it as we

12   continue with -- yes, so why don't we put a GMS marking on it,

13   if that's appropriate.

14        MR. PRIMP:  That's fine by us, Your Honor.  We were

15   going to wait and introduce it with our expert, but let's --

16        THE COURT:  For identification at this point, GMS-8.

17        MR. PRIMP:  I think that's correct, Your Honor.

18        THE COURT:  All right.

19      (Brief pause)

20   BY MR. ZELMANOVITZ:

21   Q   Mr. Schulte, I place in front of you what has now been

22   marked as GMS-8.

23        MR. ZELMANOVITZ:  And Your Honor, actually, before I

24   get to this, I'd like to move for the admission of Mellon

25   Exhibits 1 and 2 at this time.

1    THE COURT:  In the absence of objection, they may be

2  -- any problem?  All right.

3  BY MR. ZELMANOVITZ:

4  Q    Mr. Schulte, referring to what has been marked as GMS

5  Exhibit 8 --

6  A    Yes sir.

7  Q    Is this the Evercore Partners report that you reviewed?

8  A    Yes, it is.

9  Q    It's clear from your testimony from you report that you

10  differ with Evercore Partners with respect to multiples and

11  valuations and the like, but I would just like you to refer,

12  and I'd like the Court to refer to page 25 of the Evercore

13  report.  At the same time --

14          MR. ZELMANOVITZ:  Your Honor, may I approach the

15  witness?

16      (Brief pause)

17  BY MR. ZELMANOVITZ:

18  Q    Mr. Schulte, I have placed in front of you a document

19  which has been marked as Mellon Exhibit 3.

20  A    Yes sir.

21  Q    Can you tell us what that document is?

22  A    Yes.  The -- my colleagues and I, in reviewing the

23  Evercore report, had some disagreements with it, and we created

24  this exhibit to focus the points of difference as regards

25  recovery so that what it is is the Evercore numbers on page 25,

Schulte - Direct                                    50

1   which is their valuation, the far right-hand column on page 25

2   of their report brought down to a claim recovery amount by the

3   senior lenders, and we have a corrected column which lays out

4   the things that we think are just errors, and not so much

5   judgment call disagreements.  It's just arithmetic mistakes

6   that produced a somewhat different result based upon the

7   multiples they chose with which we disagree, but we didn't

8   touch them.

9   Q    And can you go through with us those errors that you've

10  just referred to?

11  A    Yes sir.  Well, there are really -- there are really four

12  of them.  One is an error against the bank's interest, and the

13  other three are errors that we think favor a different answer

14  from the bank's perspective.  First of all, the driving number

15  evaluation on the page, Evercore uses a 9.4 multiple which

16  purports to be sort of a current period EBITDA.  It's computed

17  based upon the estimated 2001 earnings of the universe of

18  comparable companies.

19         Taking into account what I testified to before, which

20  is the importance of matching the time period with the multiple

21  from which it is derived in making an application of that

22  multiple to come up with some conclusion, one wants to use the

23  current period year earnings for Genesis and Multicare if one

24  is using a multiple derived their way, which is not trailing 12

25  months but current period.

Schulte - Direct                                    51

1    They can -- computed a run rate of 220 million.

2  That's not a number that reflects this year's earnings.  That's

3  a number that's a synthesized year, if you will.  It's a year

4  that will never be.  It's an imaginary 12 months taking today's

5  reimbursement levels, exploiting it to 12 months without,

6  perhaps, future costs and a lot of other things.

7       The earnings base from which it was computed for the

8  comparable companies is estimated 2001 earnings.  On that

9  basis, for Genesis/Multicare combined, the earnings numbered

10  215 million.  This is in a year that ends four weeks from now.

11  It's 215 million, not 220 million.  That provides a valuation

12  difference at their multiple of $47 million.  That's the first

13  correction.

14       Secondly, from an enterprise value, one deducts the

15  pro forma debt and preferred stock in arriving at a valuation

16  of the pro forma common equity.  Evercore saw $25 million in

17  Multicare of cash and reduced the pro forma indebtedness by

18  that, a matter of surplus cash, which would be the right thing

19  to do if that cash were to be left in the company.  However, in

20  the plan of reorganization, that cash is, in fact, distributed

21  to Multicare creditors, and so that's a $25 million further

22  deduction that should be made from enterprise value.  So, our

23  adjustment to their equity value, using their multiple would be

24  a billion 361.

25       Then, there's another -- another issue that they

Schulte - Direct                                        52

1    don't quantify which is that the junior classes in both Genesis

2    and Multicare pursuant to the plan received warrants to

3    purchase common stock, and those warrants are at the plan of

4    reorganization value per share.  At these levels of valuation

5    with which, as I've said, we don't fully agree, those warrants

6    would be in the money.  They're only one year long, and so what

7    one ought to do is to treat those warrants as exorcized because

8    they will be worth more than the cost of exorcize.

9           So, we factor in the warrant proceeds.  We don't

10   involve the fancy model building warrant valuation.  Instead,

11   this is just a simple deal that if the company, in fact, is

12   worth in its common equity a billion, 361 million dollars,

13   those warrants are in the money.  They will be exorcized which

14   produces for the company $92.7 million of cash, and then adds

15   to the companies outstanding shares four and a half million

16   shares.

17          So, we go ahead and make those adjustments, as well,

18   giving a resulting adjusted equity value of 45 million 559

19   which -- I'm sorry, of a billion, 454, which divided by the new

20   number of shares produces a value per share of $31.92, rather

21   than the conclusion of $34.96.

22          If you run that through the distribution summary,

23   taking into account this last correction is taking into account

24   the extra post petition adequate protection payments that the

25   lenders have received, the lender recovery turns out to be 99

1  cents.

2  Q    Including post petition interest.

3  A    Including post petition interest.  In the Evercore work

4  there was $130 million recognized as accrued interest at post

5  petition, and we take that into account, and so with interest

6  on their valuation number, it's far higher than ours.  You come

7  up with a 99 cents recovery.

8  Q    And in fact, you gave them credit for the $18 million in

9  additional adequate protection payments.

10  A    Yes.  We've changed the adequate protection payments from

11  196 million in their report to 214 which counts in the extra

12  two months of adequate protection.

13        MR. ZELMANOVITZ:  Your Honor, I'd like to move for

14  the admission of this exhibit.

15        THE COURT:  Without opposition, Mellon-3 into

16  evidence.

17        MR. ZELMANOVITZ:  Thank you.  Your Honor, at this

18  time, I have no further questions.

19        THE COURT:  All right.  Cross-examine.  Do you need

20  more water, sir?

21        THE WITNESS:  I'd love it.  Thank you.

22        MR. KINZEY:  You need someone to carry your papers?

23        MR. ZELMANOVITZ:  I know.  I wasn't expecting all

24  these exhibits.

25        MR. KINZEY:  For the record, again, I'm John Kinzey,

Schulte - Cross                                    54

representing GMS.

CROSS-EXAMINATION

BY MR. KINZEY:

Q    Mr. Schulte, I'm not going to ask you to repeat the voluminous testimony you've already given, but I just want to try to focus in on a few points. So, if I jump around a little bit, you'll excuse me for that.

A    Fine. Thank you.

Q    Let me talk, first, about your comparable company analysis.

A    Okay.

Q    Did you review the reports done by UBS and CS First Boston?

A    Very late in the game, we got them last week.

Q    Okay. How does their comparable company analysis compare to yours in methodology?

A    Well, it's facially identical. There are two important differences, I would say. The answers differ a little bit. I mean, the quantitative answers are all in the same kind of range. One big difference is they all use forward earnings rather than trailing 12 month earnings, and I've talked some about that. We can go back if you want.

         And the second big difference is they use a universe of three comparable public companies and we use more.

Q    Okay. But you -- I know you didn't use the methodology,

1   but would you agree that using a looking forward earnings is a

2   recognized way of estimating value in a comparable company

3   analysis?

4   A    It is an aspect of it, it's not the only way to travel, I

5   guess.

6   Q    But you're not saying -- saying their work is worthless

7   because they use it?

8   A    Oh no, no, no, not at all.  I think that the -- the price

9   that one pays to do it that way is you get a smaller universe

10  of data, and it makes the statistical fit harder to come by.

11  Q    Okay.  And would I be playing the role of devil's advocate

12  correctly if I said on their behalf what you're trying to value

13  is the future so you have the advantage of looking at projected

14  earnings as opposed to --

15  A    Oh, yes.  As I said before, the difficulty in this

16  analysis is all that matters is the future and all you know is

17  the past.

18  Q    Okay.  And they -- to rely on the future, they look at

19  estimates prepared by various stock analysts, is that right?

20  A    That is correct.

21  Q    And there just isn't that type of information available,

22  the three of the companies you were looking at.

23  A    That is correct.

24  Q    So, that's why you chose the different values.

25  A    It was their motivation, correct.

Schulte - Cross                                   56

1    Q    Okay.  And in the process of this, you have to use some

2    estimate of what the multiples are to be applied to the

3    comparable companies' earnings, right?

4    A    Yes.  The data are not self-explanatory, is that what you

5    mean?

6    Q    Yes.

7    A    Yes.

8    Q    And I think you've quite openly put it you're not going to

9    use a Ouija Board to do that.

10   A    A Ouija Board is not the best idea.

11   Q    But would you agree with me that there is some subjective

12   element of judgment involved in that, that you can't derive the

13   appropriate multiple just from a mathematical formula?

14   A    It is -- it's a piece of analysis, and it's not rocket

15   science type analysis.  It is unavoidably judgmental which is

16   again, why we chose to have a broader array of data from which

17   to work, but it is unavoidably judgmental.

18   Q    And is it my -- is it fair to say that the -- if you have

19   to choose a single multiple for a company, it's a -- one in

20   which reasonable minds could differ?

21   A    Oh, sure.  Well, in the trading market for securities, for

22   every buyer there is a seller.  Someone thinks it's worth

23   owning and someone is glad to be rid of it, so, it --

24   absolutely.

25   Q    Okay.  And that's one of the reasons you use a range, is

1  that correct?

2  A    Yes.

3  Q    Somewhere in that range, you hope you capture the exact

4  number.

5  A    Yes.  Fervently hope.

6  Q    Okay.  But it -- in any event, even as to the range, I

7  would -- would you say that reasonable amounts could differ on

8  exactly what the upper end and what the lower end should be?

9  A    Well, I think this is -- I use the analogy of navigation.

10  I think this is navigation with the benefit of tools.  This is

11  not navigation in fog with no compass.  So, I want to be

12  careful, you know, that this is about, you know, I don't know

13  anything about art, but I know what I like, or there are lots

14  of similar efforts.

15  Q    You know it when you see it, that kind of thing.

16  A    That kind of -- exactly.  It's a familiar line.

17  Q    You didn't author that, by the way, did you?

18  A    No.  No.  No, although you may -- you may remember the

19  dissent in U.S. against Krass, in which he wrote, the Court

20  today holds that some poor are too poor even to go bankrupt.

21       The -- it isn't -- that would take us in the

22  direction of the Ouija Board, of kind of anything goes, what

23  the hell, we don't know the future.  Well, then, what's the

24  point of any of this.  But it is absolutely true that

25  reasonable people differ.  It's absolutely true that the ranges

Schulte - Cross                                    58

1  are judgmental.  I think, however, that one can talk

2  intelligently about it, and it isn't -- it isn't anything goes.

3  Q    Oh, no.  I didn't mean to suggest that, and I certainly

4  understand that you've done the best job you could of coming to

5  the -- is the best number you can, but I just wanted to

6  establish that other experts can look at things a little bit

7  different and come to a different conclusion.

8  A    Yes.

9  Q    And it is particularly difficult in the context of a

10  bankrupt company to come up with an appropriate valuation?

11  A    I don't think so.  I think it's particularly difficult in

12  the context of a long term care company because of the profit

13  dynamics that we've heard so much about.  I don't think the

14  fact of a company coming out of Chapter 11, factually in a way

15  is the cleanest kind of company to evaluate because all the

16  trouble has been aired.  I don't think the Chapter 11 mystery

17  is all that significant.

18  Q    It's more --

19  A    I think on the cost of equity, when the stock hasn't been

20  trading and it's an industry that gone like this, that's a

21  little tough.  And we have already talked about why that --

22  that component of discounted cash flow is dicey, but no, I

23  don't think it's conspicuously harder because of Chapter 11.

24  Q    Okay.  But in this particular case, the vagaries of the

25  healthcare industry in producing uncertainties --

1   A    It makes this one difficult.

2   Q    And I think there's a particular difficulty, you

3   testified, with respect to -- to NeighborCare because of the

4   lack of comparables and the uncertainty about whether some of

5   its business will continue?

6   A    NeighborCare has very few -- has relatively few

7   comparables.

8   Q    Let me ask you this.  We did talk about the -- a little

9   bit about the APS acquisition, and you didn't include any

10  figure or any value for the APS acquisition in your report,

11  that's correct?

12  A    Correct.

13  Q    And nothing for the other acquisitions.

14  A    Correct.

15  Q    Do you know whether prior to bankruptcy Genesis had a

16  history of making acquisitions?

17  A    Yes.  The one I -- the one I read most about is the

18  Multicare acquisition, but I think the company was built with a

19  series of acquisitions, yes.

20  Q    Do you know whether there are -- might be attractive

21  merger candidates out there for GMS coming out of bankruptcy,

22  given the state of the industry?

23  A    Not for GMS.

24  Q    I'm sorry, no, we've already found that out, but Genesis

25  --

Schulte - Cross                                              60

1    A    GMS, to my knowledge, is not coming out of --

2    Q    I'm sorry -- I'm sorry, for Genesis coming out of

3    bankruptcy.

4    A    I haven't looked at that.  The industry -- it has been

5    testified, the industry has gone through a consolidation.  It's

6    not beyond the realm of possibility there will be future

7    mergers, but I don't have an opinion about that.

8    Q    If I could, I'm going to go very quickly, Mr. Schulte, for

9    some of the exhibits I showed you at your deposition, and if

10   it's a preparatory matter, I'm going to do the same sort of

11   thing I did there --

12   A    Okay.

13   Q    -- which was essentially just try to get you to identify

14   some number for us, but recognizing that your company wasn't

15   the source for them?

16   A    Yep.

17        MR. KINZEY:  Okay.  Let me ask, if we can first mark

18   -- let me approach, Your Honor --

19        THE COURT:  Yes.

20        MR. KINZEY:  -- as GMS Exhibit A, what was previously

21   marked --

22        THE COURT:  It'll be 9.

23   BY MR. KINZEY:

24   Q    I'm sorry, 9.  What was previously marked as Exhibit 3 at

25   your deposition.

Schulte - Cross                                          61

1    A    Thank you.

2         (Brief pause)

3    BY MR. KINZEY:

4    Q    Okay.  Do you recognize that document?

5    A    Yes, I recognize this or some version of it.  This says

6    draft, I'm not sure if I've seen this very draft or not.  But

7    yes, this is a presentation or draft of a presentation that we

8    were -- we and two of my partners were to make to the -- the

9    Steering Committee of Secured Lenders.  I should point out that

10   it seems to be for a November 15 meeting.  The number on the

11   lower left hand corner which says August 3, 2001 happens

12   because this was produced by some computer in which -- in which

13   it's instructed to date the document for the date at which it

14   was produced, and so --

15   Q    That's the print date, not the production date.

16   A    That's the print date, it's not the production date.

17   Q    Okay.  Would you look at the portion of this document that

18   deals with the APS proposed acquisition.

19   A    Okay.

20   Q    It's -- it starts at page 14 of the internal document

21   numbering.

22   A    All right, I'm looking at page 14.

23   Q    Okay.  And could you tell me why that page and the three

24   following page -- I'm sorry, the two following pages were

25   included in this exhibit?

Schulte - Cross

1   A    Yes.   The -- at this point, the management had identified

2   APS as a transaction that was in the debtor's interest.   We

3   were advising a bank group that was still licking its wounds

4   from the last deal, and asked us with some mixture of

5   trepidation and dismay, a Chapter 11 company making another

6   acquisition?   What is this?   To look at it and to advise them

7   about it, and this is the -- the far -- maybe our first

8   response to the lenders about the potential APS transaction.

9   Q    Okay.   And if you'd look at the second page of that part

10  of the exhibit, page 15?

11  A    Right.

12  Q    There is a arrow point incremental EBITDA for company --

13  A    Yeah.

14  Q    Is that the company's estimate of the additional EBITDA it

15  would achieve as a result of this --

16  A    Yes, that would -- yes sir, that was their then estimate

17  as conveyed to us which we are, in turn, reciting back to the

18  lenders.   An important footnote is subject to due diligence

19  confirmation which we had not done.

20  Q    And have not done at this point, correct?

21  A    No.   That's correct, not any primary due diligence.

22  Q    But that does show, at least, in the company's view, that

23  this would produce an extra --

24  A    That's correct.

25  Q    -- 33.3 million EBITDA?

Schulte - Cross                                    63

1   A    Also, the estimated purchase price --

2   Q    Right.

3   A    -- is the company's best guess at that point about what it

4   would take to make the acquisition.

5   Q    Right.

6          MR. KINZEY:  If I may approach, I'd like to mark --

7   oh, wait, I'll move for the admission of that exhibit 9 into

8   evidence, Your Honor.

9          THE COURT:  Absent objection?  All right.

10         MR. KINZEY:  And if I may, I'd like to show you a

11  document that was previously marked as Exhibit 4 at your

12  deposition.  Your Honor, I'd like to mark this.

13         (Brief pause)

14  BY MR. KINZEY:

15  Q    I'm not so concerned with the cover page of that document

16  because it's only stapled there because that's the way it was

17  produced to us, but would you look at the memorandum following

18  that --

19  A    Yes.

20  Q    -- dated June 7.

21  A    Right.

22  Q    And could you just tell me -- identify that for me for the

23  record.

24  A    Yes.  This is a memorandum that we prepared at the request

25  of Mellon Bank.  I think the occasion was they were being

Schulte - Cross                                    64

1   visited by bank examiners who were looking into however they

2   were carrying the loan or whatever, and the -- we had already

3   seen the -- the plan was on file, that we had seen a draft of

4   it, and the question the examiners put was, well, how can the

5   valuations be what they are in the plan, so Mellon asked us to

6   explain the document they were then going to pass along to the

7   examiners, how such a thing could be.

8   Q    Okay.  And all I want to ask you about this document is if

9   you look at last paragraph on the first page, there's a

10  reference to a combined 2001 run right of EBITDA of 222

11  million?

12  A    Right.  Right.

13  Q    Was that -- was that a num -- a number for EBITDA which

14  the company gave you some time around June 7, 2001?

15  A    I can't say.  It may have been.  I can't say for sure when

16  we got that number.  What we're doing in this part of our

17  memorandum is summarizing for the Mellon Bank what the

18  company's planned valuation was all about.

19  Q    Okay.  Well, if you used that number in this memorandum,

20  was that your view of what the company's current estimate of

21  EBITDA was?

22  A    No, I don't -- I think that to the extent we had an idea

23  about the run but it was more like 220.  That begs the question

24  of whether you use that number and what multiple you apply it

25  to.

Schulte - Cross                                      65

1   Q    Okay.  But this was information you got from the company

2   sometime in preparation of this.

3   A    Yeah, and valuation that was in the company's draft of

4   their plan of reorganization or disclosure statement, I should

5   say.

6            MR. KINZEY:  And Your Honor, we'd move the admission

7   of that as Exhibit 10.

8            THE COURT:  Absent objection, it may be entered.

9            MR. KINZEY:  Your Honor, I'd like to approach, I'd

10  like to have one more exhibit to share with you.  It's -- we'll

11  mark this GMS-11.  It was --

12           THE WITNESS:  Do you want these back?  Do you want

13  these back?

14       (Brief pause)

15  BY MR. KINZEY:

16  Q    Yes sir.  Do you recognize that document, Mr. Schulte?

17  A    Yes, you showed this to me at my deposition.  It wasn't

18  then familiar to me.  I recognize the look of our work, and

19  sort of our computer output, and I certainly remember it from

20  your showing it to me last week.

21  Q    Okay.  Would -- that's got three different scenarios.  I

22  only want to ask you about the third one on the last page.

23  A    Okay.  On the last page, it's headed, With APS and Bond

24  Holder Valuation.

25  Q    Right.  Can you tell me what that analysis is?

Schulte - Cross                                              66

1   A    Yeah.  This is -- this is a negotiation aid.  At that

2   point, Houlihan, on behalf of the Genesis Unsecured Creditors

3   and Shannon, on behalf of the Multicare Unsecured creditors,

4   had come to the lenders dreaming dreams that never were, and

5   asking for a lot, which is, of course, what they're paid to do.

6   And we were in negotiation, and we were trying to make peace

7   and have a consensual plan come out of it, and so we were

8   trying one after another idea, and in this example, we -- we

9   tried to sort of hang them with their own nonsense, and see the

10  world through the eyes of the valuation that they were, in

11  fact, propounding to us.  So, that's what this is.

12  Q    Okay.  And this, obviously, you don't agree with.

13  A    Right, right.

14  Q    But the assumptions are that the APS deal goes through?

15  A    Oh, yes.  I mean, in 8 and a half multiples, the APS deal,

16  we were -- again, what we were trying to do is say to them, if

17  it's so good, then if we give you this much, look how much it's

18  worth.  That sort of rhetorical nonsense.

19  Q    And what does this show about the recovery of the various

20  constituencies, again, assuming the assumptions are here which

21  we know you don't endorse.

22  A    Well, I won't dignify that by -- without rephrasing the

23  answer, if you don't mind.  What this says is, if all of those

24  things were true, including -- including -- including various

25  hypothetical things, then the bank recovery would be 103 cents

Schulte - Cross                                    67

1   without post petition interest, I think, would be there.

2   Q    Have you seen the Houlihan report that's been prepared

3   this month in connection with this hearing?

4   A    Yes.  I think I saw it last week.

5   Q    And do you know what multiple they ended up selecting in

6   that report?

7   A    I don't recall.

8   Q    Okay.  Finally, let me just ask you one question about

9   Mellon Exhibit 3, which is your analysis of the Evercore

10  report, and just so I understand -- to make sure I understand

11  the methodology, you're assuming that 100 percent of the

12  warrants that'll be issued in connection with the plan will be

13  exorcized?

14  A    Yes, that's right.  The -- just going back to that.  If

15  you take the Evercore valuation as written, and work it through

16  to value of the stock per share, it's $34.96 per share.  The

17  warrants are exorcizable, the number escapes me now, $30 --

18  $20.33 a share.  The warrants have one year of life.  There's

19  not a warrant holder who isn't on vacation, dead or in a coma

20  who would fail to exorcize when the warrants were $15 more than

21  the exorcized price.  Right?

22  Q    Right.  Absolutely.

23  A    Sure.

24  Q    I just want to make sure we understood the math.  It's 100

25  percent exercise.

Schulte - Cross                                    68

1   A    Yes.

2   Q    Okay.  And if I want to cross-examine you on that verb,

3   I'll find somebody in a coma.

4   A    I'm afraid I can direct you to a place where we have some.

5         MR. KINZEY:  Thank you, Mr. Schulte, that's all the

6   questions I have.

7         THE COURT:  Any other cross?

8         MR. JENKINS:  Yes, Your Honor.

9      (Brief pause)

                    CROSS-EXAMINATION

10

11  BY MR. JENKINS:

12  Q    Good morning, Mr. Schulte.  My name is David Jenkins, and

13  I represent Charles Grimes, as one of the objectors here.

14  A    Good morning, sir.

15        MR. JENKINS:  I would like to show you a document,

16  and Your Honor, I apologize, I did not know that Mr. Schulte

17  would be testifying, so I only have two copies of this

18  document.  May I show him one --

19        THE COURT:  Sure.

20        MR. JENKINS:  -- and keep the other, and if it's

21  necessary to do so, we can copy them later.

22        Mr. Schulte, I'm showing you --

23        MR. ZELMANOVITZ:  Your Honor, may I -- may I look

24  over counsel's shoulder, then, at the same time he's --

25        THE COURT:  Indeed.  Why don't you take a moment

1   first to just glance, so that you're situated.

2           MR. JENKINS:  I'll show it to counsel, Your Honor.

3       (Brief pause)

4           MR. ZELMANOVITZ:  May I have a moment?

5           MR. STROCHAK:  Perhaps if counsel could just describe

6   the document so we'd all have the benefit.  That would be very

7   helpful, I think, Your Honor.

8           THE COURT:  I think that would be helpful, yes.

9           MR. JENKINS:  I was going to do so, Your Honor, when

10  I showed it to Mr. Schulte.  It is a document, entitled Genesis

11  Health Ventures Restructuring Overview, bank meeting, January

12  30, 2001.  The Bate stamp number that has been applied in this

13  case is CH, which I think stands for Chilmark Partners, 025755

14  through CH-025766.

15          THE COURT:  All right.  Please proceed.

16          MR. JENKINS:  Thank you, Your Honor.

17  BY MR. JENKINS:

18  Q   Mr. Schulte, I'm handing you the document that I just

19  described.  Actually, the one I'm handing you has slightly

20  different Bate stamp numbers, but I believe it's the same

21  document.  Could you take a look at this document, please, sir.

22  A   Yes sir.

23          MR. ZELMANOVITZ:  Your Honor, if they have different

24  Bate stamp numbers, there are many drafts of each one of these

25  presentations that were in the files we produced.  I think it

Schulte - Cross                                70

1   would be only right if we can, at least, check and verify that

2   the witness is looking at the same document as Mr. Jenkins is.

3            THE COURT:  Then, let's have a reflection of exactly

4   what the witness is looking at in terms of the Bate stamp that

5   appears on the document that he is looking at.

6            MR. JENKINS:  Thank you, Your Honor.  Let me read

7   that into the record, please.  I have only one question for him

8   on the document, and it's on -- and that paragraph is

9   identical.  I checked that.  The document I've handed to Mr.

10  Schulte is Bate stamp numbers GEN, which I believe is Genesis,

11  C00921 through 00933.

12           THE COURT:  All right.

13           MR. JENKINS:  Let me just inform counsel the

14  paragraph I'm going to look at so you can verify it's the same

15  thing.

16       (Brief pause)

17  BY MR. JENKINS:

18  Q    Let me return to the  --

19  A    Yes sir.

20  Q    Have you seen this document before?

21  A    Yes, I probably have.  Right.

22  Q    This was a document prepared by Chilmark Partners, your

23  firm, correct?

24  A    Yes, and the title says it was for the bank meeting on

25  January 30th, not steering committee, but the larger bank

1  group.

2  Q    All right.  Did you have a role to play in the preparation

3  of this document?

4  A    I'm sure I reviewed it at the time.  I probably didn't

5  write the words.

6  Q    All right.  Could you turn to page two, sir, please?

7  A    Yes, I have it.

8  Q    And you'll see that there's a -- well, the title at the

9  very top is called Restructuring Overview, do you see that,

10 sir?

11 A    I do.

12 Q    And underneath that, reasons for Genesis and Multicare to

13 get out -- excuse me, to get out of bankruptcy.  Do you see

14 that?

15 A    Yes sir.

16 Q    The first bullet point arrow, what have you, underneath

17 that says, "no compelling reason to be in Chapter 11 now, other

18 than compromising liabilities - this is the work of a plan of

19 reorganization."  Do you see that, sir?

20 A    I do.

21 Q    All right.  I'm using that as a focus for my questions,

22 Mr. Schulte.  What reasons did you understand -- withdrawn.

23 It's a poor question.  Why did Multicare initially go into

24 bankruptcy, Mr. Schulte?

25 A    They -- my impression is, I wasn't involved at the time of

Schulte - Cross                                    72

1   the filing, but the companies were filed at the same time

2   because they had too much debt.

3   Q    All right.    And this was particularly true of Multicare,

4   correct?

5   A    I don't know which was more bust than the other.

6   Q    All right.    In particular, if you can focus on the

7   subordinated debt of Multicare, to your understanding, it was

8   completely under water at the time of filing, correct?

9   A    I think on both sides of house, the subordinated debt was

10  completely under water.

11  Q    Right.    It was your understanding, however, that between

12  Genesis and Multicare at the time of filing, Multicare was the

13  more serious financial situation, correct?

14  A    I don't remember that we paid any systematic attention to

15  the condition of the debtors at the time of the filing.    We

16  came along two or three months later, so I think I'd be

17  speculating to answer that.

18  Q    All right.    And your understanding as of January 30, 2001

19  was that there was no -- there was no reason at that time for

20  Genesis and Multicare to stay in bankruptcy other than to get

21  rid of its outstanding liabilities, correct?

22  A    Well, right.    There was no business need but for the fact

23  that the work of the plan of reorganization had to be

24  accomplished.

25  Q    All right.

Schulte - Cross                                    73

1    (Brief pause)

2         MR. JENKINS:  Your Honor, I may be through with Mr.

3    Schulte.  Could I ask my client, Mr. Grimes, a question,

4    however?

5         THE COURT:  Sure.

6         MR. JENKINS:  Thank you.

7    (Brief pause)

8         MR. KINZEY:  Your Honor, John Kinzey again, I have

9    apparently developed an annoying habit, but I believe I

10   neglected to move our exhibit 10 into evidence, so if I could

11   do that at this time.  I believe I may be a candidate for a

12   Genesis treatment pretty soon.

13        MR. JENKINS:  No objection.

14        THE COURT:  Perhaps that was 11?

15        MR. KINZEY:  Eleven.  We were thrown off.  I didn't

16   realize that everybody --

17        MR. ZELMANOVITZ:  Your Honor, just to avoid having to

18   ask further questions, I think on number 11, if Your Honor

19   would note that the date there is August 3, 2001, and that's

20   the result of the same computer production as Mr. Schulte, I

21   think, testified to earlier.

22        THE COURT:  All right.

23        MR. JENKINS:  Your Honor, I have no further questions

24   of Mr. Schulte.

25        THE COURT:  Do I understand that we're to mark this

**AA. 429**

Schulte - Cross

1   January 30, 2001 submission?

2         MR. JENKINS:  I suppose for -- at least for record

3   purposes, we should do so as CG-5, Charles Grimes 5.

4         THE COURT:  Actually, I only have two previous,

5   unless I'm missing something.

6         MR. JENKINS:  Yes, indeed.  Because we first Boston

7   cross-examination, I marked as both 3 and 4 together.  They're

8   two documents that I marked.  They were two research analysts.

9         THE COURT:  All right.  I'm sure the record will

10  establish that.  For identification then, CG-5.

11        MR. JENKINS:  Yes, ma'am, and during our case, I will

12  decide which of these I want to move into evidence, and we'll

13  see if their objections cover court rules.

14        THE COURT:  All right.

15        MR. ZELMANOVITZ:  I would just ask that counsel

16  provide us with a copy of whichever one he's going to, in fact,

17  move into evidence.

18        THE COURT:  That's fine.

19        MR. JENKINS:  Obviously, we will do so, Your Honor.

20  Thank you.

21        THE COURT:  All right.

22        MR. JENKINS:  Thank you, Mr. Schulte.

23        THE COURT:  Any other questions, redirect or the

24  like?

25        (Brief pause)

**AA. 430**

Schulte - Cross                          75

1        MS. MORRISON:  Good morning, Your Honor.

2                    CROSS-EXAMINATION

3   BY MS. MORRISON:

4   Q    Good morning, Mr. Schulte.  My name is Susan Morrison, I

5   represent some tort claimants in this case, and you'll have to

6   excuse me, because I'm not a financial person so I may misstate

7   a question.  I'm just going to ask you a few, and they're

8   pretty simple.

9   A    Okay.

10   Q    With regard to the comparable company analysis, you said

11   that there were not many other companies available to you.  Why

12   did you not consider the data from Phar-America?

13   A    I can't say.  I don't know.

14   Q    Do you know what Phar-America is?

15   A    I do not.

16   Q    Okay.  Phar-America is one of the leading institutional

17   long term care pharmacies that's owned by Bergen-Brunswick.  It

18   was acquired by Bergen-Brunswick in the last 18 months.

19   A    Oh, the Bergen-Brunswick name is familiar.  I can answer

20   that then.

21   Q    Okay.

22   A    Originally, when we started doing our valuation work, we

23   included Bergen-Brunswick as a comp -- comparable.  But the

24   problem is I don't think they report Phar-America separately,

25   and Bergen-Brunswick is, itself, principally a drug wholesaler,

Schulte - Cross

1  and its business was too disparate to count it.

2  Q   What about the acquisition within the last 18 months of

3  Phar-America which was publicly traded by Bergen-Brunswick?

4  A   Yeah.  I understand the question.  I can't answer why --

5  why --

6  Q   Are you --

7  A   On that one, I'll say my colleagues chose to ignore it.

8  Q   Okay.  Are you aware that within the last 12 months that

9  Extended Care has sold homes in Florida to Tandem?

10  A   No.

11  Q   Are you aware that National Healthcare in the last 12

12  months has sold all of its 20 Florida facilities?

13  A   No, but if I were aware of it, I would discount it because

14  Florida is a tough state for reimbursement.  I would not regard

15  a Florida transaction as governing the full value of either

16  Genesis or Multicare.

17  Q   But you didn't consider those transactions.

18  A   Not specifically, no.

19  Q   Okay.  You testified earlier that it is your assumption

20  that the potential acquisition of APS by anybody is going to

21  occur by bankruptcy auction.  What's the basis of that

22  assumption?

23  A   Conversations between Genesis and the Mariner people,

24  their professional advisers, their counsel.  There's a letter

25  of intent that's been signed.  I think it's an agreed

1  procedure, an understood procedure.

2  Q    And the letter of intent has been signed between which

3  entities?

4  A    Between Genesis and Mariner, I believe.  I've not read it,

5  but I believe that's right.

6  Q    And the letter of intent is relative to the acquisition by

7  Genesis of APS?

8  A    Correct.

9  Q    Okay.  Do you know the date of that instrument?

10 A    No.  It would have been in the last 12 months, but I don't

11 have a specific --

12 Q    And do you know the terms of that proposed sale?

13 A    The contemplated price is what we have in here, 40

14 something million or $50 million, but no, I've not read it.  I

15 should simply limit my answer to saying I've not read it.

16 Q    Okay.  And you're not aware of any other similar letter of

17 intent in existence between Mariner and Omnicare, are you?

18 A    Well, they couldn't have but one because there's bid

19 protection involved in the letter.  The question that was put

20 to the secured lenders which came from the Mariner side is,

21 would Genesis like to step up to this price at which the

22 company will sign a letter, create bid protection, and you can

23 then be stalking horse for the auction is the way I've

24 repeatedly heard it characterized.

25 Q    So, it's your testimony that Genesis is being used by

Schulte - Cross

Mariner as stalking horse?

2  A    Well, I think that it's probably a valid effort by Mariner

3  to sell, and it's certainly a valid effort by Genesis to buy,

4  but bankruptcy auctions are inherently open.  I don't know what

5  more to say about it than that.

6  Q    Has your firm done any independent research as to whether

7  a Rule 9019 motion could be filed to approve --

8  A    No.

9  Q    -- the acquisition by Genesis of APS?

10  A    No.

11  Q    Are you aware that that type of Court approval has been

12  obtained by others seeking to buy assets out of bankruptcy?

13              MR. ZELMANOVITZ:  Your Honor, objection.

14              THE COURT:  Sustained.  You're welcome to argue that

15  point.

16              MS. MORRISON:  Okay.

17  BY MS. MORRISON:

18  Q    You adjusted your figures for the potential loss of the

19  Mariner bids, is that correct?

20              THE COURT:  I'm sorry.  I missed the question.

21  BY MS. MORRISON:

22  Q    I believe the witness testified that he had adjusted for

23  the potential loss of the Mariner bid, is that correct?

24  A    It is not correct.  I didn't testify to that.  What I said

25  was that in evaluating the exit multiple, using discounted cash

1    flow technology in evaluating the exit multiple to assign, we

2    took into account the perspective loss of a significant portion

3    of the Institutional Pharmacy cash flow, owing to the potential

4    loss of the Mariner business or repricing downward of the

5    Mariner business, but I -- we did not make any numeric

6    adjustment for that in the discounted cash flow work.  Where we

7    depend upon the company's business plan, we implicitedly take

8    into account whatever they had quantified for that event.

9    Q    Okay.  And you testified earlier that the exit multiple

10   determines the whole game, isn't that right?

11   A    The exit multiple is a very big component of discounted

12   cash flow valuation.

13   Q    So, you'd agree with me, wouldn't you, that it would be

14   premature to definitively quantify the exit multiple without

15   knowledge of what's going to happen in this APS transaction?

16   A    No, I don't think that's -- that's what I would agree to

17   at all.

18   Q    Don't you think that if Genesis is successful in acquiring

19   APS that the exit multiple would change?

20   A    No.  It could change downward if they overpay.

21   Q    But it could change upward, isn't that correct?

22   A    Yes, and we could all be hit by a meteor tomorrow or

23   Congress could decide to double reimbursement rates.  The

24   future is wide open.

25   Q    So, is it your testimony that -- that market analyses are

Schulte - Cross                                    80

1    useless?

2    A    No.  It's my testimony that valuations are conducted at a

3    point in time on then known truths.

4    Q    All right.  You used six companies in your comparative

5    analysis, and each of those six companies survive the effects

6    of the prospective payment system.  What happened to Genesis?

7    A    Well, one of them, Kindred, now, formerly Vencore Ventas,

8    has just finished its bankruptcy case.  Another one, which is

9    -- I'll take a look to get the name right for you, Harborside

10   has bonds trading at 62 cents, and it's anybody's guess whether

11   they will miss the dogcatcher or not.  At least, Beverly and

12   Manor Care, I don't enough -- and Manor Care has very low

13   leverage compared to the others, very high coverage of fixed

14   charges.  Why Beverly has missed the dogcatcher and the extent

15   to which they have, they may have taken in private investment

16   or something, I just don't know.

17   Q    Well, you've neglected to mention Extended Care.

18   A    Extended Care is part of a bigger company.  Extended Care

19   is owned by a Canadian company or it was owned by a company

20   which has Canadian nursing homes and owns a significant

21   interest in a life insurance company.  So, that's -- that's a

22   different breed of cat.

23   Q    Well, they own over 300 nursing homes --

24   A    Yes.

25   Q    -- in the United States, am I correct?

**AA. 436**

Schulte - Cross                                           81

1   A    In the United States, as well, that's right.

2   Q    And the data that you've included, does that include the

3   Canadian reimbursement information?

4   A    No, we -- no, we made adjustments for that as best we

5   could.  We've taken out the value of the life insurance

6   company, we tried to -- to separate out the earnings from the

7   U.S. and the earnings from Canada, so what's in here, as best

8   we could calculate it, was U.S. only, but if you ask the

9   question why has Extended Care avoided, which I thought, A, I

10  don't know for sure, but it's just a different animal.  It's

11  not wholly responsive to the U.S. government repayment regime.

12  Q    So, your comments earlier about the Canadian component and

13  the other issues relative to Extended Care of Canada are

14  irrelevant to the statistics that you've included in your

15  analysis?

16  A    They've been -- yes, they've been washed out of the

17  statistics and our analysis, yes.

18  Q    And you're aware, are you not, that in the Vencore, now

19  known as Kindred, reorganization, that Vencore had significant

20  Medicare fraud and reimbursement problems leading to their

21  Chapter 11 filing?

22  A    I don't know about that.

23  Q    You're not aware that -- of the settlement between Vencore

24  and the government?

25  A    Correct.

Schulte - Cross                                        82

1   Q    For Medicare reimbursement.  Okay.  So, the next question

2   is what happened to Genesis?  Where did the money go?

3   A    I'm not a good enough historian of these cases to answer

4   that question.

5   Q    Well, you testified that history is -- is what you have

6   based -- or historical data is what you've based your analyses

7   on.  Have you no opinion as to why Genesis is in the financial

8   situation that it's in today when five of its comparably

9   compared companies are not in the same situation?

10. A    Oh, oh, I see what you're getting at.  I don't think

11  you're right on the facts in asking that question, under the

12  impression that of eight publicly traded nursing home

13  companies, five have gone through Chapter 11 reorganization or

14  are still going through.

15  Q    Well, we're only talking about the ones that --

16  A    There are three --

17  Q    -- are on your study, sir.

18                  MR. ZELMANOVITZ:  Your Honor, Your Honor, let --

19                  THE COURT:  One moment, please.

20                  MR. ZELMANOVITZ:  The witness isn't finished his

21  answer.

22                  THE COURT:  Indeed, and that was being done.  Go

23  ahead.

24                  MS. MORRISON:  I apologize, Your Honor.

25                  THE WITNESS:  In -- for example, we didn't stress it

**AA. 438**

1  from an valuation perspective, but in our -- well, maybe I just

2  reperched it from this last report.  In an earlier version of

3  the work, we had included three bankrupt nursing home

4  companies.  We looked at literally all the public ones we could

5  find.  We excluded -- I guess what survived in this report is

6  just the non-bankrupt average.  We excluded the bankrupt ones

7  from the analysis because the numbers were too dicey.  Their

8  liabilities hadn't been framed out.  They hadn't been through

9  disclosure statements yet, and it just wasn't trustworthy data,

10 but we looked at all of them, and most of them have gone

11 through Chapter 11.  Genesis is one of -- see, the better

12 question is how have Beverly and Manor Care avoided it, rather

13 than why did it happen --

14 Q    Like Extended Care and Harbor Care and Kindred.  They've

15 all -- well, not Kindred but --

16 A    Yeah, not Kindred, not the other three, but --

17 Q    -- but five out of the six have avoided it, isn't that

18 correct?

19 A    It's an argumentative question.  I don't know the answer.

20 Q    Okay.  When were you -- when was your --

21 A    Sorry.

22 Q    Thank you for being the judge also.

23        THE COURT:  I think I'll go home.

24        THE WITNESS:  Sorry, counselor.

25        MR. WALSH:  That was good.  Objection sustained.

Schulte - Cross                    84

THE WITNESS:  That's sustained.  Thank you.

BY MS. MORRISON:

2  Q    Now, you made me lose my whole train of thought.  I think

3  that was the intent.  When was Chilmark Partners engaged by

4  Mellon Bank, first engaged?

5  A    Approximately in August of 2000.  Not by Mellon Bank, by

6  counsel.

7  Q    By counsel.  And your first engagement was in connection

8  with the valuation relative to the Chapter 11?

9  A    There's was only one engagement letter that's ever been

10  signed, and it was a far broader mission than that.  I think at

11  the start, it was principally advice to the lenders in the

12  conduct of negotiations toward a plan of reorganization, to

13  include valuation, capital structure planning and the other

14  things that we do.

15  Q    Okay.  Do you have any opinion as to where Genesis went

16  wrong in the context of its -- the operation of its business to

17  get it into the dire financial straits that it's in today?

18  A    Other than what I've testified to, no, I think the

19  conspicuous common thread through all the Chapter 11 long term

20  care companies is the change in reimbursement rates.  Plainly,

21  that didn't bankrupt 100 percent of the industry, so there are

22  other things to be discussed.  I'm not knowledgeable enough to

23  answer your question better.

24  Q    Are you aware -- I'm sorry, I didn't mean to speak over

Schulte - Cross                                                85

1  you.  Are you aware of the government accounting report, dated

2  March of 2000, which indicates that reimbursement rates are not

3  the reason that the nursing home industry has filed for Chapter

4  11 protection?

5  A    I read a GAO --

6          MR. STROCHAK:  Your Honor, I think it's a --

7          THE COURT:  One moment, please, sir.

8          MR. STROCHAK:  Pardon me.  I think it's a best

9  evidence objection.  If he's going to be asked about the

10 report, I think he should --

11         MS. MORRISON:  I just asked him if he was aware, Your

12 Honor, and he's an expert on these matters, so --

13         THE COURT:  I'll allow it.  Are you aware, sir?

14         THE WITNESS:  I don't know the March report.  I read

15 a September report, I thought, from the GAO on this subject.

16 It was pretty defensive about the role of the government and

17 far more accusatory about the role of the industry, but did

18 allow as how the transition from cost plus to perspective pay

19 and the transition to fixed rates had caught a number of

20 companies with costs above the average, in particular, those

21 companies that had a significant component of services, not

22 just hospitality, like respiratory and infusion therapy and --

23 BY MS. MORRISON:

24 Q    A big discussion of therapy companies and the acquisition

25 by long term care companies of the full panoply of therapy

**AA. 441**

Schulte - Cross                                                86

services, correct?

A    But the GAO -- yeah, the GAO report points the finger at

reckless acquisition, at undisciplined spending. I mean, it's

a, you know, it's a -- it is on the part of the government an

apology for having largely bankrupted the industry.

Q    Do you consider that Genesis is guilty of reckless

acquisition in the context of the Multicare acquisition?

A    No, I wouldn't use that -- hindsight is a wonderful thing.

Q    Could you answer the question?

A    I have no opinion.

           MR. ZELMANOVITZ:  Your Honor, asked and answered.

           THE COURT:  Asked and answered now, for sure.

           MS. MORRISON:  Thank you.  I have no more questions.

           THE COURT:  Thank you, Ms. Morrison.

           MS. MORRISON:  Thank you, Judge.

           THE COURT:  Any other questioning, redirect?  No.

           MR. ZELMANOVITZ:  No redirect.

           THE COURT:  All right.  Thank you, sir.

           THE WITNESS:  Thank you, ma'am.

           THE COURT:  You may step down.  At this point,

perhaps a ten minute break would be appropriate.

           MR. ZELMANOVITZ:  Thank you, Your Honor.

      (Recess)

           THE COURT:  All right.

           MS. BECKERMAN:  Good morning, Your Honor.

Hurst - Direct                                              87

1    THE COURT:  Good morning.

2    MS. BECKERMAN:  Lisa Beckerman from Akin, Gump, on

3    behalf of the Genesis Unsecured Creditors Committee.

4    THE COURT:  Yes.

5    MS. BECKERMAN:  Your Honor, I'm going to be turning

6    the podium over to my partner, Robert Pees, who's here with me

7    in court, and we're going to be calling our financial adviser,

8    Patrick Hurst, to testify in support of the plan.

9    THE COURT:  Thank you.

10   MR. PEES:  Thank you, Your Honor, and for the benefit

11   of the court reporter, my name, again, is Robert Pees of the

12   law firm of Akin, Gump, Strauss, Hauer and Feld, counsel to the

13   official Committee of Unsecured Creditors in the Genesis case.

14   And at this time, Your Honor, I'd like to call Patrick Hurst to

15   the stand.

16   THE COURT:  All right.

17   THE CLERK:  Place your left hand on the Bible and

18   raise your right hand.

19   P A T R I C K   H U R S T,   WITNESS,   SWORN

20   THE CLERK:  Please state your name for the record,

21   spelling your last name.

22   THE WITNESS:  Patrick Hurst, H-U-R-S-T.

23   DIRECT EXAMINATION

24   BY MR. PEES:

25   Q    Mr. Hurst, what do you do for a living?

1    A    I'm a managing director and head of healthcare at the

2    investment banking firm of Houlihan, Lokey, Howard and Zukin.

3    Q    Okay.  And could you generally describe what Houlihan,

4    Lokey, Howard and Zukin is?

5    A    We're an investment banking firm, and I have three major

6    lines of business, if you will.  Financial advisor where we

7    would perform valuations, for the most part.  We have an

8    investment banking side that does by side sell representations,

9    as well as raising money, and we have a financial restructuring

10   group.

11   Q    And what are your job responsibilities at Houlihan Lokey?

12   A    As head of the healthcare group, I do all the

13   administrative aspects of running the group, as well as oversee

14   the project administration, work on a lot of the engagements,

15   as well as kind of chart the direction for the group, keeping

16   in line with industry trends.

17   Q    And how long have you headed the healthcare group at

18   Houlihan Lokey?

19   A    I started the group at the company about six years ago.

20   So, when I headed it, it was myself.

21   Q    Okay.  And in the last six years, have you focused on

22   industries other than the healthcare industry?

23   A    No, and I focus entirely on healthcare and within

24   healthcare because healthcare is really divided between two

25   areas, life sciences and services, and services really being

1  more the provider end of hospitals, home care, physicians, long

2  term care, assisted living.  I focus entirely on the provider

3  side.

4  Q    Thank you.  And while at Houlihan, have you performed any

5  valuation analyses of healthcare companies?

6  A    For the last six years in terms of healthcare valuations,

7  I probably performed over 100.

8  Q    Okay.  Could you briefly summarize for the Court your

9  educational background?

10  A    I was undergraduate from Marquet University with a

11  specialty in Finance, and an MBA from the University of

12  Wisconsin, with a specialty in Finance.

13  Q    Thank you.

14        MR. PEES:  Your Honor, at this time, I'd tender Mr.

15  Hurst as a qualified expert.

16        MR. GEORGE:  Your Honor, could I have an offer of

17  proof of what the testimony is?  If it's valuation testimony,

18  we've already had two witnesses.  I think the last witness was

19  actually almost redundant of the first witness, and I think the

20  rules would dictate that if this is just rehash of the same

21  type of testimony, it may not be helpful to Your Honor, so

22  perhaps we could have an offer of proof of what this is about.

23        MR. PEES:  Mr. Hurst will testify as to his view as

24  to the value of Genesis Health Ventures on a stand alone basis.

25  I realize that there have been a number of experts who have

Hurst - Direct                                                    90

1   testified, Your Honor, and I'll try to keep it short.

2               THE COURT:  Um-hmm.  So, we should be concerned about

3   the cumulative nature of it?  Should not be?

4               MR. PEES:  Well, Your Honor, there are slight

5   variations in the bottom line conclusions of the various

6   experts, and Mr. Hurst works for a financial advisor that is

7   advising a constituency that is very differently situated than

8   say the constituency of the bank group which was being advised

9   by Chilmark and Mr. Schulte who just testified.  So, it's a

10  slightly different perspective, but I'm more than happy to keep

11  it short.

12              MR. WALSH:  I think one other point, Your Honor,

13  although maybe the testimony can be, you know, shortened, of

14  all the valuation experts that you've heard and are going to

15  hear, only two of them spend all their time in the healthcare

16  sector, that's Mr. McGahn for the debtors, and Mr. Hurst.  So,

17  I think it's important, at least, to -- you know, that his view

18  be part of the record.

19              THE COURT:  I'll allow it.  Go ahead, sir.

20              MR. PEES:  And I take it that there are no objections

21  to his qualifications as an expert.

22              THE COURT:  I take it that's the case.

23              MR. PEES:  Okay.

24              THE COURT:  He may testify as an expert.

25              MR. PEES:  Thank you, Your Honor.

**AA. 446**

Hurst - Direct                                    91

1  BY MR. PEES:

2  Q    Mr. Hurst, very briefly, what role does Houlihan Lokey

3  have in the Genesis Health Ventures bankruptcy case?

4  A    We're a financial adviser to the Official Unsecured

5  Creditors Committee.

6  Q    And how long has Houlihan Lokey been advising the Official

7  Creditors Committee?

8  A    Since its inception in July of 2000.

9  Q    Okay.  And prior to that date, did Houlihan Lokey have any

10 role with respect to analyzing Genesis Health Ventures?

11 A    We were engaged in May of 2000 by an informal group of

12 note holders to -- as their financial advisor regarding

13 Genesis.

14 Q    Okay.  And do you recall -- recall who was in that

15 informal group of note holders?

16 A    American Express, American General, Federated, I believe

17 Goldman Sachs, and GMS.

18 Q    And since May of 2000, have you personally been involved

19 in reviewing the financial performance and operating results of

20 Genesis Health Ventures?

21 A    Yes, I have.

22 Q    Okay.  And could you describe the nature of that

23 involvement?

24 A    Initially, our involvement was to familiarize ourselves

25 with the company, its operations in both the Institutional

AA. 447

Pharmacy and the long term care, where the facilities were

situated, the financial reporting, management, getting a firm

understanding of the operations, and then looking as back as

historical was meaningful, looking at the current operations in

terms of both operating performance and financial, looking at

budgets when they were prepared, looking at the plan,

continuously assessing plan against budget, and then analyzing

the five year plan when it was available.

Q    Thank you, Mr. Hurst.

MR. PEES:  At this time, Your Honor, I'd like to mark

-- have marked for identification as Committee Exhibit 1, a

document entitled, Presentation to the Official Committee of

the Unsecured Creditors of Genesis Health Ventures, August 21,

2001.  May I approach, Your Honor?

THE COURT:  Please.  Thank you.

MR. PEES:  And Your Honor, I would note for the

record that in the interest of time, I've shared that exhibit

prior to coming up here with the various counsel who have

actively examined valuation experts, so I think everyone has a

copy.  I have an extra copy if someone else would like one.

BY MR. PEES:

Q    Mr. Hurst, I believe you testified that since May of 2000

you've been reviewing the financial performance and operating

results of Genesis Health Ventures.  Have you now reached any

conclusion as to the current value of Genesis Health Ventures

1  on a stand alone basis?

2  A    Yes, I have.

3  Q    And what is your conclusion?

4  A    Conclusion of value, enterprise value of Genesis on a

5  stand alone basis at 1,375,000,000.

6  Q    And Mr. Hurst, is that conclusion reflected in the report

7  that's been marked as Committee Exhibit one?

8  A    Yes, it is.

9  Q    Okay.  And is the support for that conclusion also

10  reflected in that report?

11  A    The basis is in the context of the report.

12  Q    Okay.  I now would like to ask you some questions about

13  that report.  First of all, how did you go about preparing the

14  report?

15  A    Since we have been familiar with the company for the past

16  12, 15 months, for this report, what we did is we updated the

17  financial information for the company for the June time period,

18  as well as had conversations with the CFO and controller of the

19  company to get an understanding of the preliminary July

20  numbers, as well as what the company's estimates for August and

21  September would be.

22          We asked questions surrounding that in terms of

23  issues that we had known to exist in the past, and then, looked

24  at that against the plan, and noting where it was coming out

25  with regards to the plan, ask the company questions surrounding