94

Hurst - Direct

this number, the estimated EBITDA for 2001 against the plan.

Also, asked questions surrounding certain adjustments that we

had made previously to the estimated 2001, as well as to the

five year plan to ascertain the reasonableness of those

adjustments, given the current state of the company.

Q    Mr. Hurst, I'd now like to ask you some questions about

some details of your report, and in particular, on page one of

your report, entitled, Introduction.  In the second bullet

point, there's a reference to a March 19, 2001 presentation.

What does that refer to?

A    In March 19th, we had our first meeting with the bank

group, the senior bank group.  What we prepared then is for

negotiating purposes.  We prepared a presentation to be handed

out at that meeting which puts forth for us a starting point of

negotiations with the bank group.

Q    Okay.  Thank you, Mr. Hurst.  And did that March 19th

document that you just referred to reflect your best estimate

as to the value of Genesis at that point in time?

A    No, it did not.

Q    Okay.  And again, what was the purpose of that March 19th

document?

A    The purpose of the document was again, it was the first

meeting with the senior bank group, and so, it was very much a

negotiations document where we were putting forth an extreme

estimate of value, as well as aggressive assumptions underlying

1    it, so we went as aggressive as possible as to start the

2    negotiation process.

3    Q    Okay.  At that time, in March of 2001, did you personally

4    have a view as to what the value of Genesis on a stand alone

5    basis was at that time?

6    A    Yes, I did.

7    Q    And what was your view?

8    A    My view of Genesis at a stand alone basis in March was

9    approximately a billion three.

10   Q    Okay.  I'd like to move on now and ask you a question

11   about the next bullet point on page one.  There's a sentence

12   that states that Houlihan's current findings are based upon its

13   due diligence and analysis, et cetera, et cetera.  Did

14   Houlihan, in fact, perform due diligence?

15   A    On this report was an update which I've described

16   previously as it relates to the company.  We also updated the

17   market information for the companies that we deemed comparable

18   to Genesis.

19   Q    Okay.  And did you have any discussions with company

20   personnel?

21   A    Yes.  It was -- we had an update discussion with the CFO,

22   George Hager.

23   Q    Okay.  In the 15 or so months since May of 2000, how many

24   conversations have you had with George Hager, to your

25   recollection?

Hurst - Direct

1   A    I'm going to estimate over 15, and probably my staff,

2   probably over 30 with his staff.

3   Q    And wasn't Mr. Hager responsive to your inquiries in those

4   conversations?

5   A    Yes, very responsive.

6   Q    Okay.  I'd like to direct your attention to the second to

7   the last bullet point on page one, and in particular, the last

8   sentence.  There's a statement that reads, "Through the third

9   quarter, the company had EBITDA of 120.3 million, do you see

10  that reference?

11  A    Yes, I do.

12  Q    Okay.  What does that refer to?

13  A    That's the EBITDA for the first nine months of fiscal 2001

14  of 129.

15  Q    Okay.  And what's the source for that?

16  A    That's the company financial statements.

17  Q    Okay.  And there's a reference later in that sense to an

18  estimate of EBITDA for fiscal year 2001 at $162.0 million.  Do

19  you see that?

20  A    Yes, I do.

21  Q    What does that refer to?

22  A    Basically, as I stated before, what we were doing is we

23  were estimating the -- since we were nine months into the year

24  and had an estimate of July on a preliminary basis, we were

25  trying to arrive at the estimate -- estimated EBITDA for 2001,

AA. 452

1    and that's what we've indicated here of 162 million.

2    Q    Thank you, Mr. Hurst.  Can you turn to the next page,

3    entitled, Overview Consolidated.  For the record, that's page

4    two of Committee Exhibit one.  Could you just briefly summarize

5    what the purpose of that page is?

6    A    Again, this summarizes what we just talked about, the

7    current year to date EBITDA, where it is against plan and

8    budget, and then the second bullet point indicates how we

9    arrived at the $162 million.

10   Q    Okay.  Thank you.  And could you turn to page three of

11   your report, entitled, 2001 EBITDA Run Rate.  Could you

12   describe to the Court what the purpose of that page is?

13   A    Well, I think as previously been described by certain

14   individuals, what we've done here is we've taken the $162

15   million estimate EBITDA for 2001, and then made certain

16   adjustments to arrive at what we call it a run rate, some

17   people call it normalize, but this is a run rate number of

18   earnings, and adjusted for things that we found is discussions

19   with the company that might have been a mid-year event that

20   really should have been -- we tried to calendarize it for the

21   full year.

22   Q    Okay.  Thank you.  Turning to pages five through --

23   actually, page five of Committee Exhibit one, entitled,

24   Adjusted Five Year Plan Summary.  What's the purpose of that

25   page?

1    A    What we're showing here is on the top box on page five,

2    this is the base case or this is the company provided five year

3    plan, and we just highlight some high level numbers, and then

4    what we've indicated on the second box is certain revisions

5    that we've made to the five year plan.  We've added, if you

6    will, EBITDA starting at 2002 to 2006.

7    Q    Okay.

8    A    And the basis underlying those additions are included in

9    the following pages.

10   Q    Thank you.  You made reference to a company provided five

11   year plan.  Did the company, in fact, provide you with a five

12   year plan?

13   A    Yes, they did.

14   Q    Okay.  And when did that happen?

15   A    February of 2000.

16   Q    Okay.  And what did you do when you received the five year

17   plan?

18   A    When we received the five year plan, we conducted

19   extensive analysis on the plan.  We broke it out by business

20   unit.  We basically replicated the plan on our own modeling and

21   so that we could run sensitivity.  We looked at the plan on a

22   revenue basis, on an expense basis, and a line basis by the

23   expenses.

24   Q    Okay.  And did you examine any of the assumptions

25   underlying the plan?

1  A    Yes, we did.

2  Q    We ostensibly analyzed the assumptions, both in terms of

3  the historical context and in terms of the projections, and

4  again, on a line item basis and looked for variations and

5  reasonableness underlying the assumptions.

6  Q    Okay.  And just to get a time frame, and I apologize if

7  I've asked this question already, when you -- at what point in

8  time did you receive the five year plan?  Was it before the

9  March 2001 meeting with the banks?

10  A    Yes, it was February.

11  Q    Okay.  Thank you.

12  A    I'm sorry, it was -- it was -- we received it early on in

13  our engagement in 2001.

14  Q    Okay.  Thank you.

15  A    All right.

16  Q    I'd like to ask you a very quick question about what

17  appears on pages six to seven.  Could you just summarize for

18  the Court what the purpose of those pages are, base case

19  adjustment?

20  A    Sure.  What six and seven do is, again, in analyzing the

21  plan on a very detailed line item basis, and as a matter of

22  fact, we went facility base, these are adjustments that, in

23  looking at the projections, we though were adequate to make

24  that in terms of that might -- that you could reasonably make

25  the adjustments, reasonably make to the five year projections.

Hurst - Direct

1  Q   Okay.  Thank you.  And just by way of summary, what is the

2  bottom line number of adjustments that are reflected on -- in

3  the aggregate on these two pages?

4  A   In the aggregate and that's represented on page seven,

5  these adjustments total, and you can see it where it says grand

6  total, about $12.7 million we've increased their 2002 EBITDA

7  by.

8  Q   Thank you.  Thank you.  Turning to page eight of your

9  report, which has been marked as Committee Exhibit one, it's

10  entitled, Comparable Company Analysis, and I would note that

11  there are four companies listed on that page, is that correct?

12  A   Yes, there is.

13  Q   Okay.  Are those companies that you consider to be

14  comparable companies to Genesis?

15  A   Yes.

16  Q   Okay.  And can you briefly describe to the Court why you

17  selected those particular companies as comparables to Genesis?

18  A   We selected these four companies as comparable because of

19  the nature of their business compared to Genesis.  I won't

20  bother going again into Beverly, Manor Care and Kindred, but

21  clearly those are comparable in the nature of their business to

22  the company's long term care business.  They also have enough

23  following and enough -- they're traded enough with enough

24  volume to indicate that their market price is reflective of a

25  market price.  And the pharmacy -- same with Omnicare.

1   Omnicare, we thought, was in line with and comparable to the

2   NeighborCare, Institutional Pharmacy aspect of Genesis.

3   Q    Okay.  What about HCR Manor Care, how did Genesis compare

4   to that?

5   A    In going through HCR Manor Care, and it's been previously

6   stated and which we agree, HCR Manor Care is clearly the

7   dominant player in the industry.  It's always been regarded as

8   one of the best long term care.  It's traded as such, and we

9   compare to Manor Care on aspects going down through payor mix

10  and what have you that -- that we're not as strong as Manor

11  Care.

12  Q    Okay.  And did have a view as to how the market has

13  historically treated Manor Care in contrast to Genesis?

14  A    Historically, the market has priced Genesis at a discount

15  to Manor Care.

16  Q    Okay.  And can you quantify that discount?

17  A    I believe it's been about a 20 percent discount, so that

18  we would be about 80 percent of HCR Manor Care.

19  Q    Okay.  Thank you.  And very briefly, how does Genesis

20  compare to Beverly?

21  A    Genesis compares -- it's pretty comparative.  There's a

22  lot of differences, and again, I won't -- in the interest of

23  time, I won't go through all the things that have already been

24  discussed, but there's -- you know, on that, it's comparable to

25  Beverly.

1  Q    Okay. And now, I'd like to ask you some questions about

2  page ten of your report, entitled, Valuation Analysis. As a

3  preliminary matter, I would just ask, what were the valuation

4  methodology or methodologies that you used in reaching your

5  conclusion?

6  A    In terms of this analysis of the three valuation

7  methodologies which have been discussed, comparable company,

8  discounted cash flow and a transaction approach, we used the

9  comparable company and discounted cash flow. We didn't use the

10 transaction approach because, frankly, lack of information.

11 That there really hasn't been enough transactions in the long

12 term care since basically the changes that have taken place in

13 the market to warrant a meaningful comparison.

14 Q    Okay. Turning to the top portion of that page and the

15 heading, Comparable Company Analysis, I just have a few

16 questions. There's $163.5 million figure, what does that

17 reflect?

18 A    The 163.5 is reflective of the analysis that we went

19 through on the previous page, on page three. That takes the

20 $162 million run rate -- base case, I'm sorry, and then

21 calculates the run rate at 165 and then makes several

22 adjustments to that.

23 Q    Okay. And there's an 8.5 multiple --

24 A    Right.

25 Q    -- that appears right below that. How did you arrive at a

Hurst - Direct                                      103

1    8.5 multiple?

2    A    Now, remembering that what we did is we looked at the run

3    rate for 2001, end of year.  We looked at end of year 2001

4    which we felt comfortable and thought was appropriate where we

5    were in our business, in the company's business in looking at

6    the ten months of information.  So, we were looking at 2001

7    estimated information for both Genesis and the comparable

8    companies.

9          Based on that, since we were on that representative

10   level of earnings, what we did is we looked at the comparable

11   companies and multiples, and estimated a 2001 basis.  That's

12   indicated on page nine, where we show Beverly, HCR, Kindred and

13   Omnicare's enterprise value, based on a 2001 EBITDA.

14          Based on those numbers, then, and then based on our

15   analysis of both Genesis as they compare to these companies,

16   which again, for brevity, I won't go into, but we've already

17   stated that we believe we're similar to Beverly, similar to

18   Kindred, and would trade at a discount to HCR Manor Care and

19   Omnicare.  The eight and a half multiple, then, lines up with

20   those multiples.

21   Q    There's a reference to a discounted cash flow analysis.

22   A    Right.

23   Q    Is there anywhere in the report where that discounted cash

24   flow analysis is reflected?

25   A    What we do is we provided a summary of the discounted cash

1   flow on page 11.

2   Q    Okay.  And I'm not going to ask you many questions about

3   this with one exception.  I would like to ask you a question

4   about the terminal multiple --

5   A    Um-hmm.

6   Q    -- that's used, and is the terminal multiple reflected on

7   page 11 of your report?

8   A    Yes, it is.  On page 11, if you'll look in the box to the

9   corner right under residual value, you'll see that the terminal

10  value is -- multiple is 7.5.

11  Q    Okay.  And how did you arrive at that terminal value

12  multiple?

13  A    I arrived at the terminal value based on looking at the

14  projections, the additions we've made to the projections, the

15  publicly traded companies, where we traded in relation to them,

16  and then how the market is pricing on a go forward basis.  So,

17  if we were at an eight and a half on a current basis, given the

18  nature of the company and the projections underlying them, we

19  felt that a 7.5 multiple or 1 point decrease was appropriate

20  for Genesis.

21  Q    Okay.  Turning back to page ten, the page on comparable

22  valuation analysis, there's a reference to a concluded

23  enterprise value of $1.375 billion, do you see that?

24  A    Yes, I do.

25  Q    Okay.  How did you -- how did you reach that conclusion?

Hurst - Direct                                    105

1   A    Based on the comparable company analysis and the

2   discounted cash flow was -- based on those estimates of value,

3   I concluded that the value was 1,375,000,000, which is

4   approximately in the mid-point.  It wasn't just simple just

5   taking the mid-point, but I felt comfortable that that was the

6   appropriate concluded value.

7   Q    Okay.  I have just have one more question about the

8   valuation analysis that appears on page ten.  There's a heading

9   that's entitled, Recovery of Unsecured Creditors Under the

10  Plan.

11  A    Right.

12  Q    Could you explain to the Court what the purpose of that

13  section is?

14  A    What this does is it takes the billion, 375 million, which

15  we calculated as the enterprise value on our conclusion, and we

16  subtract off the debt to arrive at the equity, and again, this

17  is just Genesis on a stand alone, and based on the equity value

18  of 904 million, we apply the five and a quarter percent of the

19  equity that the unsecured creditors are receiving, as well as

20  the valuation of the 8.4 percent of the warrants that they were

21  receiving to arriving at our recovery of 74 -- $75 million.

22  Q    Okay.  Now, one other question.  In reaching your

23  conclusion regarding the $1.375 billion enterprise valuation,

24  that's a single point valuation, correct?

25  A    Correct.

Hurst - Direct

106

Q    Okay.  Why did you use a single point valuation?

A    We use a single point valuation in this report for ease of reference to our previous March report.  The previous March report, which was basically for presentation purposes for the negotiating with the bank group, for negotiating purposes we do use a point estimate, and for comparability to that report, we kept with the same format.

Q    Turning to the final page of your report, page 12, summary of claims, could you briefly describe for the benefit of the Court what that section is?

A    Again, we're summarizing the claims.  We're getting to the total of the administrative secured debt that's effectively ahead of the unsecured of the billion 454.  So, we're looking at that in terms of where the value of Genesis would be in relation to the total claim and how that relates to then what our recovery would be.  And this indicated to us that based on those claims and the valuation that we arrived at, gave us an indication of how good our recovery was.

        MR. PEES:  Your Honor, I'm drawing near the end of my questioning, but lest I forget, at this time I would like to move into evidence Committee Exhibit 1.

        THE COURT:  Absent objection, we'll consider it evidentiary.

BY MR. PEES:

Q    Mr. Hurst, a few wrap up questions.  You've made reference

AA. 462

1  to negotiations with the bank group.  Did you personally

2  participate in those negotiations?

3  A    Yes, I did.

4  Q    Okay.  Could you describe generally your role in those

5  negotiations?

6  A    From the March 19 meeting on there was myself as well as

7  Eric Seagirt (phonetic), who is the managing director in our

8  restructuring group, but the negotiations started basically on

9  the 19th where we presented what we thought from a negotiating

10 posture was the starting point, and then basically throughout

11 the next month - month and a half was involved in negotiating

12 the settlement that we would seek in terms of our committee.

13 Q    And do you have any knowledge as to whether the committee

14 in fact reached a settlement with the debtors and bank group?

15 A    Yes.

16 Q    Okay.  And is that settlement reflected in the Plan of

17 Reorganization to your knowledge?

18 A    Yes, it is.

19 Q    Okay.  What's your understanding of the general contours

20 of that settlement?

21 A    As reflected on page 10, then again this is just for

22 Genesis, it's 5-1/4 percent of the equity as well as 8.4

23 percent of the warrants -- in warrants on Genesis.

24 Q    Okay.  And when you're referring to Genesis, you're

25 referring to Genesis on a stand alone basis, is that correct?

Hurst - Direct

1  A    Genesis on a stand alone basis.

2  Q    Okay.  Just one additional wrap up question.  Going back

3  to the -- your comparable company analysis and your selection

4  of multiples, what sort of health care experience did you draw

5  upon in selecting a multiple?  Can you describe that?

6  A    Aside from the fact that I've been exclusively in health

7  care for the past six years, I've done a number of valuations

8  clearly in the long term care.  We're currently representing

9  Sun.  We represent the Unsecured Creditors Committee in Sun.

10 We represent the Bank Group in MHG. often times referred to as

11 Little Mariner, although we don't like it called that, as well

12 as we represented Advocate which is -- as a debtor which we

13 restructured their bank agreements as well as their -- all of

14 their master leases, and we worked on another publicly traded

15 long term care company recently.  And so it was within the

16 basis of what we see going on both on a historical and a

17 projected basis, and the valuations compared to the public

18 companies that we arrived at, frankly, with a good deal of

19 comfort at the 8-1/2.

20 Q    Drawing upon your experience, do you have a view as to

21 whether the recoveries proposed under the plan to the unsecured

22 creditors are fair and reasonable?

23 A    Yes.  I believe that the -- that they are fair and

24 reasonable.

25       MR. PEES:  Your Honor, at this time I have no further

Hurst - Cross (KIN)                                    109

1    questions of Mr. Hurst.

2              MR. KINZEY:  John Kinzey again for GMS.

3                         CROSS-EXAMINATION

4    BY MR. KINZEY:

5    Q    Good morning, Mr. Hurst.

6    A    Good morning.

7    Q    Mr. Hurst, just so the record is clear, your valuation is

8    of Genesis stand alone without Multicare, correct?

9    A    That's correct.  Genesis stand alone.

10   Q    Have you performed any valuations of the two companies

11   combined?

12   A    No, I have not.

13   Q    You mentioned during your testimony a report you prepared

14   in March 19, 2001 for negotiations with the Bank Group.  Do you

15   recall what your valuation of Genesis standing alone was in

16   that report?

17             MR. PEES:  Your Honor, objection.  I believe that the

18   witnesses has already clearly testified that the document was

19   prepared for negotiation purposes, and under Federal Rule of

20   Evidence 408, that evidence can't be introduced to show the

21   valuation, the liability, damages, etcetera.  It's

22   impermissible.  So, I would object on that ground.

23             MR. KINZEY:  Your Honor, we're not introducing the

24   information about this report which the witness indicated is

25   cross-referenced to this one for the purposes of establishing

Hurst - Cross (KIN)

1   the truth of anything said during settlement discussions. We

2   simply want to compare the methodology he used then to the

3   methodology he used today because we think that bears on his

4   credibility.

5                 THE COURT: Well, there is some concern, some 408

6   concern. Whether or not it is for the truth, that question

7   concerns us more in the arena of hearsay information rather

8   than settlement discussions. If we were to allow information,

9   and in fact we've reviewed it absent objection in other

10  instances, that's for sure, but where the issue is squarely

11  presented, I think counsel objector is correct in terms of

12  opening up those settlement discussions, unless you can

13  establish a foundation that the March analysis was beyond

14  settlement discussions, that it was some kind of valuation or

15  assessment that was offered as a position of Houlihan Lokey or

16  the like.

17                At this point I will sustain the objection on the

18  basis of what we have so far.

19                MR. KINZEY: Your Honor, as I understand Rule 408, it

20  only makes it inadmissible if it's evidence that is presented

21  to prove liability for the invalidity of the claim of the -- or

22  its amount. We're not trying to use this money to -- this to

23  establish the amount of the claim. I really only want to go to

24  the credibility of the witness because the presentation he made

25  in the settlement was so inconsistent with what the approach

1   he's now using in this one, and at least raise the question as

2   to whether that wasn't a result or any change in where he came

3   out in his number as opposed to one really reflects an adequate

4   -- an accurate review of what's going on in the market.

5          MR. PEES:  Your Honor, may I be heard on that?

6          THE COURT:  Please.

7          MR. PEES:  The question that was posed goes to the

8   heart of what can be described as quote, "The liability or

9   value issue in this case".  And I believe Rule 408 of the

10  Federal Rules of Evidence is pretty clear that that's off

11  limits.  He's already testified that the document was being

12  used for settlement purposes and there's nothing in the record

13  to establish that it was a document that had any other use than

14  that.  So, it's basically taking in effect a starting point in

15  negotiations and then trying to bootstrap on some sort of

16  conclusion from that.  So, I think it exceeds the bounds of

17  what's permitted under Rule 408.

18         THE COURT:  Well, I think that it -- you're right to

19  bring the issue closer to an opportunity to admit because the

20  last sentence of Rule 408 provides that the rule does not

21  require exclusion when the evidence is offered for another

22  purpose, that is another purpose besides proving liability for

23  or invalidity of the claim such as proving bias or prejudice of

24  a witness negativing a contention of undue delay or proving an

25  effort to obstruct a criminal investigation or prosecution.

Hurst - Cross (KIN)

Some of those don't concern us, obviously. And credibility may

2   be akin to bias, if you will.

3           Suffice is to say that the witness's testimony that

4   indeed -- I will overrule myself, if you will. I'll allow you

5   to pursue this and to hear about the information in March.

6   That consideration of that information will be tempered by the

7   testimony that indeed it was within a settlement negotiating

8   posture. You may proceed.

9   BY MR. KINZEY:

10   Q    Could you please give me please, Mr. Hurst, the value that

11   you came up with in the March report?

12   A    In the March report, which is really, it's a presentation,

13   it was $1.7 billion.

14   Q    Now, you indicated that the assumptions you made in your

15   testimony this morning in getting that number aggressive, does

16   that mean that you had a basis for them but it was an

17   aggressive basis?

18   A    Extremely. And again, that was a negotiating presentation

19   with the Bank Group. When we did our initial valuation, it was

20   clear to us that there was -- that the value that was coming

21   out could wind up that we would have a 0 percent recovery on

22   the basis of the equity value. Therefore, what we did as in

23   going in the first bank meeting is we took a very aggressive

24   posture and put forth a valuation that the underpinnings of

25   which was extremely aggressive and clearly for negotiating

1   purposes.  That was in no way a valuation.  It was in no way a

2   report that was representative as a valuation that I nor

3   Houlihan would represent as an enterprise value for Genesis at

4   that time.

5   Q    And you had no support, for example, for the EBITDA

6   multiple which you used in that presentation, is that correct?

7   A    The EBITDA multiple that was used in that report, there

8   was not a theoretical underpinning for that multiple.

9   Q    Right. And I believe you testified at the deposition that

10  we took in this case that you used 9.5 as the multiple even

11  though the analysis you did wouldn't support it, isn't that

12  correct?

13  A    Correct.

14  Q    And at the time of that presentation you -- subjective

15  with your thought that a valuation multiple of more -- in the

16  range of seven or eight would have been incorrect, right?

17  A    Right, that the seven or eight, when as the question in

18  terms of what I believed was the multiple, range of multiples

19  at the time in March, I said that it was my estimation that the

20  range of multiples was seven to eight and that the billion 3

21  value that I was coming up with was at the high end of the

22  multiple range.

23  Q    And similarly with respect to your terminal discount

24  number, which you didn't even show in your March report.  That

25  was a very aggressive number that you couldn't -- support for -

Hurst - Cross (KIN)                                      114

1

2   A    And that's the reason why we didn't show it.

3   Q    Now, but you did however think that for example a EBITDA

4   multiple in the seven to eight range would have been reasonable

5   back in March of this year?

6   A    An EBITDA multiple of seven to eight, yes.

7   Q    Right. And a terminal value multiple, say one point below

8   that, would have been reasonable for the discounted cash flow?

9   A    Yeah.

10  Q    And do you know what numbers those would have projected

11  out as of March of last year?

12  A    I -- exactly on the seven to eight multiple on a

13  comparable on a $160 million would have been in the billion 1

14  to a billion 3.  The discounted cash flow at a 10 percent

15  discount rate, I believe with the same multiples adjusting for,

16  and I can get into that in a minute if you'd like, on the

17  projections with the assumptions underlying the projections

18  would have come up with the same value.  Okay?

19           The important distinction, just for clarity sake, one

20  of the things that we also did in the discounted cash flow is

21  we took the company's five year projection and added

22  acquisitions that weren't contemplated nor identified in the

23  projection, and in so doing increased the, you know, the

24  represented EBITDA going forward.

25  Q    That was a point I wanted to ask you about.  Your first

1  presentation included the possibility of potential acquisitions

2  --

3  A    Correct.

4  Q    -- and the most recent one does not, is that correct?

5  A    That is correct.

6  Q    Okay.  Let me ask you this.  Were you aware at the time

7  that you prepared your August evaluation, Exhibit 1, that the

8  committee had settled with the debtor and voted to support the

9  Plan of Reorganization?

10 A    Yes.

11 Q    Did you modify any of the assumptions on multiple rates in

12 your report to produce a report that would come up with a

13 number that would support that decision?

14        MR. PEES:  I'm going to object to the question --

15 which report is being --

16 BY MR. KINZEY:

17 Q    Exhibit 1, Committee Exhibit 1.

18 A    Exhibit 1 being the August report?

19 Q    Yes.

20 A    Are you asking did I adjust my numbers to match the

21 result?

22 Q    That's right.

23 A    Okay, no.

24        MR. KINZEY:  No further questions.

25        THE COURT:  As long as that's clear.  Okay.  Any

Hurst - Redirect

116

1    further questions?

2             MR. PEES:  Your Honor, I have just one question on

3    redirect.

REDIRECT EXAMINATION

4

5    BY MR. PEES:

6    Q    Mr. Hurst, when you were making the March 19th

7    presentation to the Bank Group that had those, what you

8    described as aggressive or exceptionally aggressive

9    assumptions, how did you feel about that?

10   A    I was uneasy doing it because I thought that the position

11   that we were taking pressed what I thought were the bounds and

12   so I was uncomfortable going in.  It was a team decision.  I

13   was uncomfortable going in with that level just because people

14   know that I understand the industry as well as just the point

15   about the -- trying to come up with supporting the 9.5.  If

16   pressed upon during the meeting, I had a concern that I

17   couldn't come up with, like I can now, you know, sit down, go

18   to the companies, do the comparison and come with I believe is

19   the 8.5.  I was uncomfortable because if pressed upon in the

20   same way during the meeting with -- negotiating meeting, I

21   wouldn't be able to do the same with the 9.5.

22             MR. PEES:  Thank you, Mr. Hurst.

23             THE COURT:  Thank you, sir.  You may step down.  All

24   right.  Any further witnesses in support of the plan?

25             MR. WALSH:  Your Honor, I don't believe we have any

1   further witnesses, but before the next witness comes on, I have

2   to correct the record.  I handed you up a copy of what I

3   thought was the final confirmation order.  Apparently there are

4   negotiations still going out in the hall and so they'll be a

5   final final at some point before the hearing ends, I hope.  So,

6   with that --

7               THE COURT:  Well, that's fine.  I can give you a

8   perhaps forewarning that I will not be able to issue a decision

9   immediately after the hearing is over.  I will obligate myself

10  to issue a decision within several days and probably will call

11  you back to fix the time when the decision will be made.  We're

12  talking probably next week, for sure next week. But that's what

13  I have in mind so that I can digest the information that has

14  been submitted and give it deliberation that it deserves.  So,

15  that is my plan.  So, the fact that the order is not finalized

16  won't hold us up today.

17              MR. WALSH:  How about if we shorten the order and

18  take back some of the exhibits?

19              THE COURT:  I'm very sensitive to the need for very

20  prompt consideration and it's even possible that I would be

21  able to -- let's see that I would be able to go through the

22  information by Friday this week.  So, if I can do that, I would

23  certainly want to accommodate the process.  Let's see where we

24  are and how fast we can get through it.

25              MR. WALSH:  Thank you, Your Honor.

Colloquy                                    118

1    THE COURT:  Counsel?

2    MS. MELNIK:  Thank you, Your Honor.  Selinda Melnik

3    for Charles Grimes.  One question as a follow up to Mr. Walsh.

4    Will Your Honor be entertaining post-hearing briefs --

5    THE COURT:  No.

6    MS. MELNIK:  -- from the parties?

7    THE COURT:  No.  I will entertain post-hearing

8    argument.  That is, you're welcome to address the issues that

9    have been posed, but I won't hold the record open for further

10   submissions.

11   MS. MELNIK:  And by that are you suggesting you would

12   entertain written argument, additional written argument, or

13   just the argument here in Court today?

14   THE COURT:  Just the oral arguments in Court, yes.

15   Presumably we will finish today and so I will leave the record

16   open for that argument today, but we'll close the record at

17   that point.

18   MS. MELNIK:  Thank you.

19   THE COURT:  All right.  Then can we proceed with

20   other witnesses?

21   MR. PRIMPS:  Your Honor, on behalf of GMS, William

22   Primps of the firm of LeBoeuf, Lamb, Greene and MacRae.  We

23   have expert testimony in the person of Mr. Grillo to put on and

24   sponsor the report which has been put in.  But before we do

25   that, to complete the foundation of our factual record, we have

**AA. 474**

1   a deposition -- excuse me.  The copies of it and its associated

2   exhibits of Mr. Joseph Lanassa of the Goldman Sachs firm whose

3   -- in the name of both.  Him and his firm has been mentioned

4   before.

5          There has been negotiation among counsel as to how

6   this document should be received.  But I think before we talk

7   about the reception of the Lanassa deposition into evidence,

8   there does need to be some showing under the Federal Rules of

9   Civil Procedure of his unavailability.  And I wanted to say

10  that we have diligently attempted to procure his availability

11  at today's hearing.

12         Through negotiation with his counsel, the firm of

13  Skadden Arps in New York City, as well as putting Mr. Walsh on

14  notice, not that we're saying Mr. Walsh is in control of this

15  witness, we were informed that he was going to be on vacation

16  this week.  My partner, Mr. Kinzey, wrote back to the Scad and

17  Arps firm to say that a number of us have had to alter our

18  vacation plans because of this proceeding and that in light of

19  the equity ownership of Goldman Sachs and Mr. Lanassa's

20  prospective position on the Board of Directors in the new

21  company, we felt it was incumbent on him to be here.

22         We wanted to have Your Honor have the benefit of his

23  testimony and of his presence.

24         THE COURT:  Well, let me -- perhaps I can have an

25  offer of proof even before we establish the predicate, you're

Colloquy                                    120

1    quite correct, of considering this deposition.  Are there

2    disputed facts that you would propose to establish by the use

3    of this deposition?

4             MR. PRIMPS:  Your Honor, we wanted the witness here

5    because of two EBITDA numbers that have come up repeatedly.

6    One is the $222.2 million normalized EBITDA number that's in a

7    Goldman Sachs report that Mr. Lanassa and his assistant

8    authored in July of this year; and another is the $230 million

9    EBITDA number that was, I believe, has been already accepted

10   into evidence.  I mean, the document containing that in the

11   GMS-3 exhibit that was introduced yesterday.

12            THE COURT:  All right.

13            MR. STROCHAK:  Your Honor, Adam Strochak from Weil

14   Gotshal for the Genesis debtors.  There really is no dispute

15   that the witness is unavailable.  He's not available to be here

16   in Court today.  Counsel had the opportunity to take his

17   deposition 10 days or so ago at the onset of our very expedited

18   discovery process, so we would have no objection to the

19   introduction of the deposition for whatever they want it for in

20   that respect.  I guess -- I see a rather large stack over

21   there, so I'm assuming that Mr. Primps would like to introduce

22   some of the exhibits as well.  I think we'd like to have an

23   opportunity to review them.  We've looked at the deposition

24   transcript, but not quite so carefully at each separate

25   exhibit.

Colloquy                                    121

1          So, with that I guess we would just stipulate that

2    Your Honor could have the transcript of the deposition and read

3    it at the Court's convenience, and Mr. Primps can make whatever

4    arguments he likes.

5          THE COURT:  All right.  Sir?

6          MR. ZELMANOVITZ:  Your Honor, just for the sake of --

7    this is Menachem Zelmanovitz, Morgan, Lewis & Bockius on behalf

8    of the Mellon organization for the senior lenders.  I would

9    like to note for the record that Mr. Lanassa in fact agreed to

10   move up his deposition because of his vacation plans, submitted

11   the deposition.  Throughout the deposition there was no word of

12   his having to appear as a witness.  And although I don't know

13   when he left for vacation, it was my understanding that he was

14   already on vacation when for the first time GMS raised the

15   point of asking -- asked for him to be a witness at his hearing

16   and he was no longer available for that reason.

17         We have told counsel for GMS that we have no

18   objection to the entire transcript going in.  And in fact, the

19   specific EBITDA numbers that counsel is referring to were

20   testified to during the deposition, and by the way, the source

21   of that information as Mr. Lanassa testified, as counsel knows,

22   was not Goldman Sachs, but it was the numbers that Goldman

23   Sachs obtained from the company in one way or another.  And as

24   we all know, Mr. Hager testified at length about the company's

25   EBITDA.  But again, as I said, we have no objections to the

Colloquy                                           122

1    transcript going in.

2              THE COURT:  All right.  Then I guess there is no

3    contest.  Will you direct me to particular portions of the

4    deposition or do you wish the entire deposition to be

5    considered?

6              MR. PRIMPS:  We designated certain portions of it,

7    Your Honor, and then there were counter designations that Mr.

8    Strochak proposed, and then I think Mr. Zelmanovitz was going

9    to counter designate.  But at that point, it's not that lengthy

10   a document.  It's approximately 50 pages of testimony.

11             THE COURT:  That's fine.

12             MR. PRIMPS:  We'll refer to it on oral argument.  The

13   one thing that I think as a matter of housekeeping that has to

14   be done to prevent confusion, the deposition exhibits, and

15   there were 12 of them I believe, were marked -- or no, there

16   were 11 of them, were marked GMS 1 through 11, and we already

17   have a number of GMS documents, and to prevent -- we'll just

18   add 11 to each of the numbers.  GMS 1 here would become GMS 12.

19             MR. ZELMANOVITZ:  -- necessary to mark all of them as

20   exhibits now because we'll leave the transcript exhibits

21   together for the Court --

22             THE COURT:  I think --

23             MR. PRIMPS:  However Your Honor wants to --

24             THE COURT:  I think that's fine.  We can in effect

25   mark the entire package as one exhibit so that the record is

Grillo - Direct                                                123

1  clear, but the attachments that went along with the deposition

2  will simply be a part of the single exhibit.

3          MR. PRIMPS:  Would Your Honor accept then the -- or

4  should we have it reviewed by counsel before we present it up?

5          MR. STROCHAK:  If I could just suggest, Your Honor,

6  so as not to delay the proceedings, perhaps we could over the

7  lunch break take a look at the individual exhibits to the

8  deposition.  If we have any objections to those, we'll call

9  those to the Court's attention after the lunch break

10          THE COURT:  That's fine.  No problem.

11          MR. PRIMPS:  Thank you very much, Your Honor.

12          THE COURT:  All right.  Then we can proceed with your

13  expert witness.

14          MR. PRIMPS:  Thank you.  At this time, Your Honor,

15  GMS would like to call Anthony Grillo as a witness.

16  A N T H O N Y   G R I L L O, WITNESS, SWORN

17          THE CLERK:  Please state your name for the record,

18  spelling your last name.

19          THE WITNESS:  Anthony Grillo.  Grillo, G-R-I-L-L-O.

20                    DIRECT EXAMINATION

21  BY MR. PRIMPS:

22  Q    Good morning, Mr. Grillo.  I see it's still morning.

23  Could you state your name and address for the record?

24  A    Yes.  Anthony Grillo, Pleasantville Road, New Vernon, New

25  Jersey.

Grillo - Direct

124

1    Q    Thank you.  Mr. Grillo, did there come a time when you

2    were engaged to write a report and give testimony in this

3    matter?

4    A    Yes.

5    Q    Could you state the circumstances of that request for your

6    report and testimony?

7    A    Yes.  I received a call from Mr. Ira Reid and Mr. Tim

8    Walsh of your law firm asking whether or not we'd be capable

9    and interested in doing that.

10   Q    And when you say we, are you referring to your

11   professional firm?

12   A    Yes, that's correct, Evercore.

13   Q    And could you describe for the record the nature of

14   Evercore's business?

15   A    Surely.  Evercore is a small investment bank,

16   approximately 75 people in total, involved in four lines of

17   business, two advisory and two principal.  We have a

18   restructuring advisory practice which I'm the head of as well,

19   a merger and acquisition practice, and two principal groups,

20   one of which is a leverage buy out private equity group, and

21   the fourth is the second of the principal groups is a venture

22   capital group as well.

23   Q    Now, have you been engaged before to give testimony

24   relating to restructuring or bankruptcy matters?

25   A    Yes.

Grillo - Direct                                              125

1  Q    And could you tell the Court what those instances have

2  been?

3  A    The one in particular that I recall, we were representing

4  the bondholders in a bankruptcy in Texas called -- excuse me,

5  in Chicago entitled Envirodine (phonetic) and we were the

6  expert witnesses in a fraudulent conveyance testimony.

7  Q    And you were qualified and accepted as an expert in that

8  case?

9  A    That's correct.

10 Q    Could you also state for the Court your educational

11 background beginning with high school?

12 A    Yes.  Seaton Hall Prep in South Orange, New Jersey;

13 Rutgers College, New Brunswick, New Jersey.  I received a B.A.

14 in economics and I was a Henry Rutgers scholar at Rutgers

15 College.  And I received my Master Degree at the Wharton

16 School, an M.B.A. in finance.

17 Q    And upon your graduation from the Wharton School, could

18 you sketch out for the Court your professional experience?

19 A    Yes.  For the first several years I was a certified public

20 accountant with the firm of Coopers and Lybrand in New Jersey,

21 and thereafter started a 20 year period of working with

22 restructuring companies, starting initially as a bank officer

23 for Manufacturers Hanover Trust Company and acting as an

24 advisor and cofounder of the advisory group of Blackstone in

25 1991 for approximately 8 years.  Most recently I just commenced

Grillo - Direct                                    126

1    starting a restructuring group for the Evercore firm.

2    Q    And could you describe the restructuring practice of the

3    Blackstone Group that you were involved in?

4    A    The restructuring practice was one in which we advised

5    companies and their creditors when each were having discussions

6    or negotiations regarding troubled companies and the like.

7    Q    How large was that practice?

8    A    Well, it started out as two individuals.  Arthur Newman

9    and myself started that practice in 1991 and when I left had

10   about 25 people.  It is considered one of the top practices on

11   Wall Street.

12   Q    Now, the report that you produced after your discussions

13   with Mr. Walsh and Mr. Reid of my firm, that has already been

14   marked as GMS-8 during the testimony of Mr. Schulte.  I'd like

15   to hand you a bound copy of that.  Perhaps Your Honor would

16   like the fancier version?  It may be easier to read.

17              THE COURT:  All right.  Thank you.

18              MR. WALSH:  Bill, could we have a fancy one too?

19              MR. PRIMPS:  Sure.

20   BY MR. PRIMPS:

21   Q    Mr. Grillo, I've just handed you an original bound version

22   of the document that previously has been marked as GMS-8 and

23   I'd like you to describe to the Court what you and your firm

24   did in preparing this report.

25   A    Well, as I indicated, we had been asked by GMS to look at

**AA. 482**

Grillo - Direct                                127

1   what's happened in the long term care sector in particular, and

2   in particular what's happened in the sectors that Genesis is

3   competing in, both long term care and the institutional

4   pharmacy business.  So, we looked at the public companies that

5   competed in those arenas and we assessed their activity and

6   their comparability to the underlying businesses of Genesis.

7   Q    And were you assisted by other professionals in your firm

8   in preparing this report?

9   A    Yes.

10  Q    And who were those professionals?

11  A    John Fitzsimmons, Sam Banerge (phonetic), Chris Albergo

12  (phonetic) and Philipe Oguidi (phonetic).

13          MR. PRIMPS:  Your Honor, at this time I would proffer

14  Mr. Grillo as an expert in restructuring and company valuations

15  in bankruptcy.

16          MS. GUERRERA:  Your Honor, Jo Guerrera for Weil,

17  Gotshal and Manges for the Genesis debtors.  We have no

18  objection to Mr. Grillo being qualified as an expert or we have

19  no objection to the admission of his report, however, we do

20  reserve the right to question Mr. Grillo on what we view is his

21  lack of experience in the healthcare industry in particular.

22          THE COURT:  Noted.

23          MR. PRIMPS:  That will be reserved for cross-

24  examination, Your Honor.

25          THE COURT:  All right.  Mr. Grillo is welcome to

Grillo - Direct                                    128

1    testify.

2              MR. PRIMPS:  Thank you.

3    BY MR. PRIMPS:

4    Q    Mr. Grillo, I think probably the best way to present the

5    information in your report to the Court is to start at the

6    beginning and touch upon the background and your overview of

7    the long term care and pharmaceutical businesses.  Could you

8    speak to that section of your report?

9    A    Surely.  Your Honor, if you would, I'd ask you to look to

10   page 8.  That might be helpful.  One of the first things we did

11   was to look at what happened over the recent past in the long

12   term care market as well as the institutional pharmacy market,

13   and I think it's, other than Mr. Schulte having a more expanded

14   universe, I think all of the financial advisors in this case

15   were relatively consistent in their use and consideration of

16   the comparables on the long term care side, and those were

17   Kindred, Manor Care and Beverly.  And we looked at those

18   companies and their stock price over the last four months and

19   we used the April 1 time frame as a reasonable time to start

20   looking at those companies, and on average, those companies

21   increased quite dramatically over that period of time.  Kindred

22   in particular increased the most.  They had just come out of

23   bankruptcy.  Their stock price at initial inception of the

24   bankruptcy completion was in the $20 per share range.  That

25   share price now is around $58 a share.

1    There clearly was a significant uptake in the value

2  of that enterprise over that period of time.  But apart from

3  the increase for that company, as well, the other long term

4  care companies increased in value very dramatically.  And over

5  that four month period, on average, those companies increased

6  by about 100 percent.  They on average increased that

7  significantly.

8  Q    If I could just stop you for a moment.  You referred to

9  page 8 of your report and this approximate 100 percent increase

10  in the period starting in April.  That's depicted in the chart

11  on the upper left portion of that page?

12  A    That's correct.  And we characterize that as a long term

13  care and we footnote as it the Beverly Manor Care and Kindred

14  Care composite.  We included -- those are -- averages.  They

15  are not weighted averages.  But they are meant not in a

16  statistical way to provide particular guidance to the Court.

17  It is more of an indication of what happened in this market

18  place over that period of time.  I would dare say none of the

19  financial advisors could have, would have, might have expected

20  those kinds of increases over the four months, but they did in

21  fact happen.

22    In addition we looked at the pharma -- in effect the

23  pharma industry.  That really is a, unfortunately, a one

24  company sort of comparison.  It is Omnicare.  That increased

25  much more modestly.  That increased, we believe, around 12

Grillo - Direct                                    130

1   percent over that period.

2   Q    And that's the line below the LTC on that same charge,

3   just on the left corner?

4   A    That's correct.  And the box on the upper right corner

5   which shows a composite is an attempt by us to look at what the

6   increase might have been if you presume that the valuation for

7   Genesis should be weighed at 60 percent long term care, 40

8   percent institutional pharmacy because the EBITDA's are

9   generally in that ratio.

10  Q    And if you do weight in that percentage or in that

11  proportion, you don't get the 100 percent run up that you get

12  in the other chart.  What's the run up that you get --

13  A    It's about 65 percent gain over that period.  So, this

14  sheet, Your Honor, is meant to give a background to the

15  discussion of the extent and manner in which the market's

16  changed since April 1.

17  Q    And you did try, did you not, in your report to give

18  background and reasons for this market run up some of the

19  points that are raised --

20  A    Yes, we did.  We talked about the fact that the markets

21  are strong for healthcare, that parties are interested and

22  investors are quite interested in the healthcare market today.

23  It is viewed as a much more promising area of investment than

24  it was over the last couple of years and it's much more

25  promising than some other sectors of the market generally.

Grillo - Direct                                                    131

1   Q    Excuse me.  After you looked at these comparables and you

2   looked at these market trends, what did you do next in your

3   analysis?

4   A    Well, we looked again -- for a background we just -- we

5   wanted to see what happened to the EBITDA multiples over that

6   period of time as well.  Your Honor, looking at a stock price

7   from a point in time to another is a first level analysis.  The

8   second level analysis is to look at what actually happened to

9   the multiples of those companies over that period of time

10  because earnings of those companies would have or could have

11  changed over that period of time.  In these cases, they in fact

12  did.  The earnings capacity of each of the comparables improved

13  over that period of time.  So, the EBITDA multiple is not --

14  the increase in the EBITDA multiple should not be and was not

15  as great as the raw stock price increase over that period of

16  time.

17              And pages 12 through 15 are our attempt to look at

18  the comparables that were used by the financial advisors for

19  Genesis and Multicare and identify what happened to their

20  EBITDA multiples over that four month period.  And for

21  instance, Your Honor, I'll just direct your attention to page

22  13 as an example.  What we attempted to do on this sheet is to

23  look at the comparable companies that -- used in their analysis

24  and at the time when they did their first analysis, I don't

25  believe they used Kindred.  I don't believe it was available

Grillo - Direct                                    132

1    for an analysis or to be incorporated at that time.

2         The original, which is the lower half of the chart,

3    Your Honor, it says comparable trading analysis as of 4/6/01,

4    when Your Honor looks at the EBITDA multiples on a projected

5    2001 basis at that time, one would have calculated on a pure

6    arithmetic basis that the average of those multiples was

7    approximately 8 percent.

8         Looking at it at the current time, which the date of

9    this analysis is April -- excuse me, August 22nd, when you look

10   at that analysis based upon projected 2001, the multiple at

11   that time, the more recent time, is 9.9 times, 9.9 times, the

12   arithmetic average.

13        Again, this is not meant to be a statistical

14   analysis, but over that period of time it does provide an

15   indication that the multiples increased by approximately 1.9

16   times, which depending upon which EBITDA dollar amount one

17   uses, implies that the value of the enterprise of Genesis, the

18   combined enterprise of Genesis, would have increased by

19   approximately $400 million over that period of time, if you

20   believe that they are reasonably comparable to each other.

21   Q    Now, in terms of these comparable multiples, were there

22   other things that you did to check the validity of the EBITDA

23   multiple increase of 1.9?

24   A    Well, we looked at the -- we looked at the most recent and

25   the more recent research reports for each of the companies and

Grillo - Direct                                    133

1    identified what the research reports and what the analyst

2    generally viewed as the most recent and most reasonable EBITDA

3    forecast for those companies.  So what happened over the time

4    is as things improved in the healthcare sector generally and as

5    earnings increased, parties, analysis, took that into account,

6    increased their EBITDA's raw dollar amount and therefore

7    increased some of their estimates of earnings per share.   That

8    caused parties to be potentially more interested in the stock.

9    That in fact, we believe, caused some of the value -- the stock

10   price run up.

11   Q    How did you use then this analysis of the increase in

12   multiples in your valuation analysis?

13   A    Well, we then did a separate and distinct.  Those charts,

14   which I indicated to the Court, were meant to be representative

15   of value increases over a very short period of time for these

16   markets.  We then looked at -- we looked at the -- we basically

17   did the same kind of analysis that many of your other parties

18   looked at.  Your Honor, you've heard from four individual

19   financial advisors who have spoken to the fact of looking at at

20   least three, Mr. Schulte used four methodologies, but three

21   methodologies were consistently used to comparable company

22   analysis to discounted cash flow analysis and the transaction

23   analysis.  We used three as well, and we eliminated the

24   transaction analysis as well because we believe that the period

25   of time that was covered for any transaction is not an

**AA. 489**

Grillo - Direct                                    134

1  appropriately comparable period given the changes in the

2  reimbursement rates and the changes in fundamental business

3  from then to now.  So, we looked at comparable company analysis

4  and we did a discounted cash flow as well.

5  Q    And where are the results of that analysis?  Where do they

6  appear in your report?

7  A    Well, we have on page 20, we have a valuation based upon

8  our EBITDA and EBITDAR analysis.  The range of value we

9  concluded for the EBITDA analysis is 1 billion 881 to -- excuse

10  me, $2.3 billion.  And the EBITDAR analysis is 1 billion 881 to

11  $2.342 billion.

12  Q    And what do you do with those two ranges then to further

13  your analysis and valuation of these companies?

14  A    Well, we performed the discounted cash flow analysis and

15  we did it in quite the same way as most of the other financial

16  analysts advisors did as well.  We did, however, make a couple

17  of changes that the Court should be aware of.  We -- when we

18  looked at these analysis, Your Honor, we've taken into account

19  and we should step back a second.  Clearly the issue of what

20  the EBITDA for the current period is a relevant issue.

21         There has been material testimony regarding 214, 222,

22  230 and other numbers.  We attempted to estimate what the true

23  earnings capacity of this business is today.  And when we

24  looked at our comparable multiples, we used a 2001 multiple for

25  each of those companies.  And Your Honor, the dates are

**AA. 490**

Grillo - Direct                                                135

1    relatively important just to get the subtleties of this because

2    none of the other experts speak to the need to be comparable.

3    Those multiples are for a 12/31/01 date for the comparables.

4         We chose a $220 million earnings capacity for Genesis

5    combined, and we did that looking at several pieces of

6    information.  We looked at the latest quarter which had a 55 --

7    approximately a $55 million EBITDA number annualized.  That

8    gets you to about $220 million.  We looked at the 214 in the

9    company's plan and we also took into account some of the

10   Houlihan analysis that were helpful in identifying the company,

11   Genesis side being ahead of the plan by about $4 million for

12   the three-quarter period, which if you annualized that would

13   get you closer to a number that when added to the 214 gets you

14   to 220.

15        We looked at the -- we looked at the company's

16   forecast for EBITDA in the third quarter fiscal -- excuse me,

17   the third quarter of fiscal 2001, which we believe is in the

18   mid-50's as well, annualized is a $220 million number.  We

19   looked at the three quarters forecasted for fiscal year 2001

20   and then we took into account that if you used the December

21   quarter into 2001, which is actually in fiscal 2002, and you

22   take into account the improvement in the business from 2001 to

23   2002, that is likely -- that's estimated to be in the $5

24   million range, and as a result of that, when you add the 5

25   million to the 214, you get for a calender year 2001 around

Grillo - Direct                                        136

1   220.

2          So, absent our ability to be inside the company, and

3   unfortunately I haven't had the pleasure of having as many

4   conversations with the company which I would have loved to do,

5   as some of the other advisors, we've taken as best as we could

6   analytical approaches to try to come to a, I'll call it

7   triangulation of what the earnings capacity is.

8          Using the 220, now back to our original commentary,

9   using the 220 we then did a discounted cash flow using that as

10  the basis.

11  Q      And where does that analysis appear in your report?

12  A      That is on page 23.

13  Q      And what is the result of the discounted cash flow

14  analysis using the $220 million earning capacity of the

15  company?

16  A      We estimate that the value lies between 1 billion 889 and

17  2 billion 147.  Those are the lowest and the outermost -- the

18  highest values under a weighted average cost of capital of 9 to

19  10 percent and an exit multiple in the 8-1/2 -- excuse me, 8-

20  3/4 to 9-3/4 range.

21  Q      And where do those appear on page 23?  Can you direct the

22  Court?

23  A      Those are in the lower black box which are included for

24  your review.

25  Q      And how does the discounted cash flow analysis valuation

AA. 492

Grillo - Direct                                137

1  of the company compare with the comparable trading analysis?

2  A    It is somewhat lower.

3  Q    Can you continue in telling the Court how you came to a

4  conclusion in reconciling the numbers given by the discounted

5  cash flow and the comparables?

6  A    Sure, I'll do my best.  One of the things which the Court

7  has heard over and over again and it is quite a difficult

8  analysis to do, is that what we have before us is mathematics

9  and most of us learn the mathematics that are needed for this

10 business quite early in our careers.  And the mathematics is

11 crucial and important and you do the best job you possibly can

12 with the mathematics and the statistics.

13      But one thing that hasn't been brought up in this,

14 you know, discussion today, at least I don't believe it is, is

15 a point that I think is relevant.  The advisors all have

16 historically conceded I think, maybe conceded is wrong word,

17 argued, articulated, that they believed there's really no

18 question that the company is comparable to Beverly.  And I

19 think that folks might challenge whether or not we believe

20 Genesis is comparable to Manor Care.  And in our comparables we

21 use a multiple that's between Beverly and Manor Care, and

22 there's some challenge as to whether or not that's appropriate

23 given the star like quality of Manor Care.

24      Your Honor, I'd like to try to articulate as best I

25 can the difference between a permanently different earnings

Grillo - Direct                                    138

1   capacity of a company and a temporarily different earnings

2   capacity of a company and it is a subtle point, but believe me,

3   in my prior experience when we buy companies, if we did --

4   whether we did it the right way or the wrong way, made

5   mistakes, made money, you always looked at whether or not the

6   company you're buying is permanently disadvantaged to the

7   comparable company.

8           And one of the things which the parties before us

9   have indicated is that Beverly is a comparable, and I readily

10  admitted that Beverly is a comparable, and to some extent it

11  has a, you know, less advantageous payor mix, but -- let us for

12  argument sake stipulate that Beverly from a payor mix is

13  comparable.

14          All of the advisers have indicated that the earnings

15  rate for Beverly is much higher than Genesis, and by virtue of

16  that, Genesis should be worth less.  It is as if the less you

17  earn, the less you're worth.  Well, I know this will sound

18  obviously different than many of the other folks, but in fact,

19  if a company is earning less because of a temporary reason, a

20  reason that can be rectified, a reason that can be fixed,

21  something that can be improved over time, parties will pay more

22  for that.  Parties will pay a higher multiple for that than

23  they would otherwise pay because they expect improvements to

24  occur over time.

25          And while I haven't had a lot of time to go visit,

1   and I wish I could have visited some of these facilities, it

2   does not appear from my standpoint that the Genesis basket of

3   assets is so permanently disadvantaged.  They are primarily, to

4   my understanding, on the east coast.  Beverly has a whole

5   basket of assets in central United States that are earning much

6   less of EBITDA and EBITDAR than the others.

7          So, we articulate an argument that says Genesis over

8   time will not stay as a permanently disadvantaged company

9   versus Beverly.  All of the parties have indicated on the long

10  term care side that Genesis has been earning 8 - 9 percent of

11  revenue in EBITDA -- in EBITDAR.  The Beverly company earns 12

12  to 13 percent.  Arguably we believe that that 2 percent to 3

13  percent over time will be mitigated.  It will be mitigated

14  because management won't stay in the same place it was.  It

15  will be mitigated because the Board of Directors is coming on

16  and they believe they will do a good job and attempt to improve

17  things.

18         We think that that mitigation is a reason why the

19  market place may and will value this company slightly higher

20  than what people would eyeball judgment wise the multiple to

21  be.  And that's how we concluded that the valuation was more in

22  the middle of the range of Beverly to Manor Care than at the

23  Manor -- excuse me, at the Beverly level.

24  Q    How long will that mitigation process take in your

25  opinion?

1   A    I do not know.  I think that that mitigation process is

2   not a short term process.  It is not a one year process.  It is

3   likely to happen over several years.  Two to three years is my

4   best guess if I were to have to make a guess.

5   Q    But it's your testimony that the market place will take

6   that mitigation process into effect in the valuation of a new

7   company?

8   A    It is my testimony that the market place will judge

9   whether or not the difference is a permanently impaired, a

10  permanent difference, and I don't believe that based upon what

11  I know with regard to Beverly and Genesis that it should be a

12  permanent difference.

13  Q    Now, is there a place in your report where you come to a,

14  let's say bottom line figure where the analysis both under the

15  discounted cash flow and in comparables is melted together into

16  your company's best estimate of the enterprise value of Genesis

17  and Multicare?

18  A    Yes.  On page 10 we identify the, sort of the outermost

19  ranges or end points of the range of our valuation, and that is

20  between 1.9 billion and 2.250.

21  Q    And just so the Court can have the sort of benchmarks for

22  how that is developed, now each of the Evercore valuations, be

23  they low, mid or high, is based on the $220 million EBITDA

24  number, is that correct?

25  A    That's correct.

1   Q    And then you're applying the multiples that appear in the

2   far right hand column there on page 10?

3   A    Well, that's the applied multiple if you -- if you look at

4   the underlying analysis, we have ranges that are the end result

5   of the mathematics and the judgment that we've used, and these

6   are the judgments of all of that composite work.

7   Q    And how does that -- the highest multiple then that's

8   implied out of these valuations is 9.4, is that correct?

9   A    That is correct.

10  Q    How does that compare with Manor Care's EBITDA multiple to

11  your knowledge?

12  A    Well, it's beneath Manor Care by approximately one, more

13  than one actually.

14  Q    Now, I'd like to turn from your valuation summary and ask

15  you some questions about how you've applied that valuation

16  summary to the creditor recovery analysis.  Is there anything

17  more you want to say in terms of describing the valuation work

18  and analysis that you and your firm have done?

19  A    I don't believe so.

20  Q    Okay.  The creditor recovery analysis appears, does it

21  not, the first substantive part of that, at page 25 of your

22  report?  Do you see that?

23  A    Yes, that's correct.

24  Q    And could you describe to the Court how you arrived at

25  this analysis?