Grillo - Direct                                                     142

1    A    Surely.  Your Honor, what we attempted to do in this

2    analysis is to use the information included in the plan to

3    estimate the recovery of the senior creditors claims, including

4    post-petition interest, given a mid point valuation of 2

5    billion 75 million.

6    Q    And could you elaborate on that statement and show the

7    Court how --

8    A    Sure -- happy to do that.  The original plan -- the

9    original valuation included in the plan was 1.5 billion.  The

10   updated valuation, which we're adding the two valuations

11   together provided by UBS and CS First Boston and we now have a

12   $1.75 billion valuation under what I'll call the original plan

13   updated valuation.  The original plan adjusted for market is

14   our best estimate of what would happen if you believe the

15   market generally would have impacted Genesis consolidated in

16   the same way as it impacted the market.  That would provide 1.9

17   billion and then our valuation is 2.75 billion.

18              We've subtracted the net debt.  We've heard prior

19   testimony that questioned that net debt analysis.  We presume

20   the cash on hand at closing was an appropriate offset to the

21   debt and preferred amount.  That is what we believe to be a

22   normal approach to identifying the total value available for

23   distribution.

24              We identified the recovery for the senior lenders,

25   including their notes and preferred at face.  We identified the

AA. 498

Grillo - Direct                                                    143

1    new and common equity.  We did not include in this analysis a

2    dilution factor.  That is an appropriate analysis to

3    incorporate here, and we would say that that would have

4    impacted the recovery by approximately about 3 percent or so.

5    So, the net recovery, including that for the senior creditors,

6    would have been around 102 percent, not taking into account

7    additional adequate protection payments which Mr. Schulte

8    included in his presentation, which if one were to include

9    that, would result in approximately 104 percent payment to the

10   senior creditors.          We don't, for purposes of the

11   presentation Mr. Schulte made, we don't necessarily agree with

12   his adjustment to our valuation using the 214 million times

13   9.4.  We've talked through why we believe the right numbers are

14   there and we've identified why we believe the 25 is an

15   appropriate offset for the net debt and preferred.

16          So, Your Honor, in this context, at midpoint

17   valuation, this implies a recovery of approximately 102 to

18   105.7 percent of total claims, including post-petition.

19   Q    And the lower number, the 105.7 is shown in the Evercore

20   valuation, and again the lower point number results from your

21   analysis of the warrant exercise issue, is that correct?

22   A    That's correct.

23   Q    And is there a graphic description of this creditor

24   recovery -- senior lender recovery shown on page 26?

25   A    Well, on page 26 we just -- we use a bar graph to show

Grillo - Direct                                    144

1   what the recoveries implied under this analysis are, and we use

2   the dot lines to show the claim amount, both including post-

3   petition interest and not including post-petition interest.

4   So, in our valuation you see, and actually in the original plan

5   adjusted you see that both bars penetrate some of the lines or

6   one of the lines at least in one case and both in the other.

7   Q    With the senior lender claims coming in at 1 billion 128

8   million including post-petition interest.  And that's the one

9   dotted line, is that correct, the top?

10  A    That's correct.

11  Q    And the lower dotted line is that $998 million figure

12  which does not include post petition interest?

13  A    That is correct.

14              MR. PRIMPS:  Your Honor, at this time I would ask

15  that GMS-8 be entered as an exhibit in the record?

16              THE COURT:  Absent objection it will be considered.

17              MR. PRIMPS:  At this time I would pass the witness

18  for cross-examination.

19              THE COURT:  All right.

20              MS. GUERRERA:  Joe Guerrera from Weil Gotshal for the

21  Genesis debtors.

22              THE COURT:  Actually, I just noticed the time.  We

23  can go forward now or -- where are we otherwise?  I suspect

24  that there may be several cross-examiners.

25              MR. ZELM:  Possibly, Your Honor.

**AA. 500**

Colloquy                                        145

1          MR. WALSH:  I think our cross-examination will

2   probably be half an hour --

3          MS. GUERRERA:  Half an hour, Your Honor.

4          MR. WALSH:  -- or a little bit longer.  So, maybe it

5   does make sense to take a break.

6          THE COURT:  Yes.  That's fine.  All right.  We --

7          MR. WALSH:  Your Honor?

8          THE COURT:  Yes.

9          MR. WALSH:  Your Honor, before we take the break

10  though, we, I think, did resolve one more objection.  If we

11  could put that on the record --

12         THE COURT:  Certainly.

13         MR. WALSH:  -- so I think that will just take a

14  minute.

15         THE COURT:  Certainly.

16         MR. PRIMPS:  Can the witness step down then and --

17         THE COURT:  Yes, of course.

18         MR. LEON:  Good afternoon, Your Honor.  John Leon,

19  Fox, Rothschild, O'Brien and Frankel, appearing today for

20  objecting creditor JSM Company.

21         Your Honor, Allison Berger of my firm had been

22  handling this matter.  She was admitted pro hac vice in this

23  case.  I represent to the Court our local counsel, Neil

24  Levitsky (phonetic), filed my pro hac vice application last

25  week.

Colloquy                                    146

1    Your Honor, JSM Company filed an objection to

2    confirmation. We have reached an agreement with the debtor

3    which I'd like to place on the record now. Our objection among

4    other things was that our claim was not treated in the plan,

5    and also that the treatment of our construction contract was

6    not clear.

7    The agreement is as follows. The construction

8    contract, which is more particularly identified in the

9    objection, will be deemed rejected as part of the plan

10   confirmation order. The construction lien that is also

11   discussed in our objection will not be discharged or impaired

12   by entry of the confirmation order.

13   We file our rejection damages claim within 30 days of

14   entry of the confirmation order. Within 60 days of the filing

15   of the rejection damages claim, the debtor will file an

16   objection to any of our claims that are filed: rejection

17   damages, unsecured claim, secured claim. If no objection is

18   filed within that 60 day period, the claims will be deemed

19   allowed as filed.

20   The claim -- the secured claim of JSM Company will be

21   treated as a Genesis other secured claim in Class G1, and the

22   debtor will pay that claim in cash in the amount determined by

23   this Court after the filing of the anticipated objection. That

24   amount will be paid within 10 days of the order allowing the

25   claim as secured after that order becomes final, within 10 days

**AA. 502**

1  of it becoming a final order.  These provisions will be

2  incorporated in the confirmation order, Judge.

3          We also agree, but it need not go in the confirmation

4  order, there is an issue with respect to potential additional

5  liens on the property that may impact on our relative rights,

6  and the debtor's attorneys have ordered an updated lien search

7  and have agreed to provide a copy of that to us within five

8  days after receipt.

9          THE COURT:  All right.

10         MR. HOLTZER:  Your Honor, may I be heard on that?

11         THE COURT:  Certainly.

12         MR. HOLTZER:  Gary Holtzer, Weil, Gotshal and Manges

13 for Genesis.  The description given by counsel is accurate,

14 although I would like to make one or two adjustments to it.

15 First of all, the agreement presupposes that Your Honor

16 confirms the case because it is treatment that would be

17 afforded in the confirmation order as it relates to this claim.

18         Secondly, Your Honor, what we have here is a

19 situation where Genesis will invariably be assuming a

20 particular ground lease.  That ground lease may or may not have

21 defaults on it that result from mechanics liens placed on the

22 property that is the subject of the ground lease by the

23 creditor in this case.  The creditor is itself a Chapter 11

24 debtor.  The creditor itself has subcontractors who have also

25 placed liens on the ground lease.

1    The sole concern of the debtors is that in curing any

2  defaults under the ground lease that arise from these mechanics

3  liens that the debtors do not pay twice.  And so we will -- we

4  intend to object to the claims in order to preclude that from

5  happening.  Should it occur that there cannot be an agreement

6  amongst the subcontractors and the main contractor in this

7  case, we would propose that Your Honor simply take steps to

8  allow us not to pay twice by either having us escrow the funds

9  or some other procedure.  That's our sole concern.

10    THE COURT:  That's fine.  All right, thank you.

11  We'll reconvene at 1:45.

12    (Lunch Recess)

13    MS. GUERRERA:  Good afternoon, Your Honor.

14    THE COURT:  Good afternoon.

15    MS. GUERRERA:  Again, I am Jo Guerrera from Weil,

16  Gotshal and Manges for the Genesis debtors.

17                    CROSS-EXAMINATION

18  BY MS. GUERRERA:

19  Q    Good afternoon, Mr. Grillo.

20  A    Good afternoon.

21  Q    You're employed at Evercore, is that correct?

22  A    Yes.

23  Q    Evercore doesn't have a healthcare department, does it?

24  A    No, it does not.

25  Q    And Evercore doesn't have a research department, does it?

Grillo - Cross                                                    149

1    A    That's correct.

2    Q    And Evercore never itself issues research reports

3    regarding the healthcare industry, does it?

4    A    That's correct.

5    Q    And you've never written any articles regarding the

6    healthcare industry?

7    A    That's correct.

8    Q    And you've never engaged in any lobbying efforts regarding

9    proposed regulations on the healthcare industry?

10   A    I personally, that's correct.

11   Q    And in the normal course of your business at Evercore,

12   Evercore doesn't regularly check the stock prices of the

13   publicly traded long term care companies, is that correct?

14   A    That's correct.

15   Q    Prior to this case you had never issued a valuation report

16   for a healthcare company, is that correct?

17   A    That's correct.

18   Q    And you've never managed a long term care company, right?

19   A    That is correct.

20   Q    And you've never managed an institutional pharmacy

21   business, is that correct?

22   A    That is correct.

23   Q    You've only worked on this case for a month, correct?

24   A    That's approximately correct.

25   Q    And you've never met with anyone at Genesis to try and

Grillo - Cross

150

1  learn about the company, is that correct?

2  A    That's correct.

3  Q    And you've never met with anybody at Multicare to try to

4  learn about the company?

5  A    That's correct.

6  Q    Now, in preparing your valuation report, which I believe

7  has been marked as GMS-8, you personally only reviewed about 12

8  to 18 documents, is that correct?

9  A    That is correct.

10  Q    Do you have the report up there with you, Mr. Grillo?

11  A    Yes, I do.

12  Q    Can you turn to page 6 of your report?

13  A    Yes.

14  Q    On page 6 I believe you referred to what you call favor

15  economic trends in the healthcare industry, is that correct?

16  A    Can you just direct me more specifically?

17  Q    Sure.  On page 6 you talk about demographic trends --

18  A    Yes.

19  Q    -- being favorable?

20  A    Yes.

21  Q    And I think on page 7 and 8 as well you talk about

22  favorable economic trends, is that correct?

23  A    Yes, that's correct.  Yes.

24  Q    And you don't see any negative economic trends in the

25  healthcare industry, is that correct?

**AA. 506**

1    A    That's correct.

2    Q    You wouldn't consider nursing shortage a negative economic

3    trend?

4    A    Well, just to be specific, I wouldn't view that as a

5    trend.  I would view that as a negative situation as opposed to

6    something that's happening over time.

7    Q    Is that negative situation reflected anywhere in your

8    report?

9    A    Not specifically.

10   Q    Would you consider increasing labor costs a negative

11   economic trend?

12   A    I would consider that a negative impact, yes.

13   Q    And is that listed or referred to anywhere in GMS-8?

14   A    Not that I can recall.

15   Q    And would you consider increasing professional liability

16   insurance costs a negative economic trend?

17   A    Yes.

18   Q    And is that trend reflected anywhere in GMS-8?

19   A    Not specifically.

20   Q    How about the fact that the budget surplus is evaporating?

21   A    That is not specifically incorporated.

22   Q    But you do recognize that that's an economic risk to the

23   future of the healthcare industry?

24   A    Yes, I do.

25   Q    And you do recognize that there is a risk that over time

Grillo - Cross                                    152

1  payors may not be able to pay for their healthcare?

2  A    I take that into account and I understand the fact that

3  there may be questions as to the affordability of the service

4  over time.

5  Q    And is that risk reflected anywhere in GMS-8?

6  A    It's not specifically.  It's indirectly incorporated by

7  virtue of the fact that these risks are the same risk for the

8  comparable companies, and as a result, the market place has

9  taken that into account.

10 Q    On page 6 of your report, as I said, you list a number of

11 what you call favorable trends.  Isn't it true that the only

12 source of information you used for the opinions on the

13 favorable trends expressed on page 6 is a cite to the U.S.

14 Census Bureau?

15 A    That's correct.

16 Q    Can you please turn to page 7 of GMS-8?  At the top of the

17 page you appear to be opining that the legislative environment

18 for the healthcare industry is improving, is that correct?

19 A    Well, the statement is an attempt to express that the

20 reform has taken place and is expected to continue.

21 Q    And isn't it true that the only basis you have for making

22 the statement that you expect the reform to continue are public

23 statements by -- made by the Bush administration?

24 A    That's correct.

25 Q    And you've never met with anybody on Capitol Hill

Grillo - Cross                                                    153

1   regarding prospective legislative relief, is that correct?

2   A    That is correct.

3   Q    In the next dash, line under the one we just referred to

4   on page 7 of your report, you state that 2 billion is expected

5   to be provided as relief to the long term care sector under the

6   Benefit Improvement Protection Act of 2000 over the next 5

7   years.  Do you see that?

8   A    Yes.

9   Q    Now, there's a cite at the bottom of that page to a

10  Standard -- article dated June 21, 2001, is that correct?

11  A    Yes.

12  Q    Now, you had never actually read that article before

13  issuing your report, had you?

14  A    That's correct.

15  Q    You are aware that the relief afforded by BIPA Sunset in

16  -- Sunset in 2002 unless there is future legislative action?

17  A    Yes, I am aware of that.

18  Q    And no one has ever provided you any information

19  suggesting that the BIPA benefits will in fact go beyond 2002,

20  is that correct?

21  A    That's correct.

22  Q    Now, you testified that for purposes of your analysis

23  contained in Exhibit 8 that you used a 220 million EBITDA

24  figure for combined Genesis and Multicare, is that correct?

25  A    Yes.

Grillo - Cross

154

1  Q    And in justifying your 220 million EBITDA you stated that

2  the company's projections in the plan are 215 and that the

3  company is 4 million ahead of plan, is that correct?

4  A    I think I testified that that was one of the -- one of the

5  factors that we used in judging whether the 220 was an

6  appropriate number to use.

7  Q    But isn't it a fact that Genesis on a standalone basis is

8  ahead 4 million, but that Multicare is behind 4 to 5 million?

9  A    I believe that is correct.

10  Q    So, isn't it true that on -- as a whole, the company is on

11  plan?

12  A    That's correct.

13  Q    Isn't it a fact that you just exercised a subjective

14  judgment in picking 220 as opposed to another number?

15  A    We used a judgment.  I'm not sure how you would

16  characterize it.  We took into account the four or five

17  examples of our judgment and we incorporated all of them in

18  coming to the 220.

19  Q    And I think on that judgment you had stated during your

20  testimony that you -- to come up with the 220 you also

21  basically just took one quarter's results and multiplied it by

22  4, is that correct?

23  A    That was one of the mathematics, yes.

24  Q    And that was the third quarter results that you did that?

25  A    That's correct.

Grillo - Cross                                          155

1   Q    You are aware that the third quarter results had the

2   highest level EBITDA of fiscal year 01, isn't that correct?

3   A    I believe that is correct.

4   Q    Have you ever spoken to anyone at Genesis regarding its

5   projections?

6   A    No.

7   Q    Have you ever spoken to anyone at Multicare regarding its

8   projections?

9   A    No.

10  Q    So, I take it you've never met with George Hager, the

11  company's CFO to discuss the projections?

12  A    That's correct.

13  Q    Now, in doing your comparable company analysis, you used

14  three comparables for the long term care sector, is that

15  correct?

16  A    Yes.

17  Q    And they are Manor Care, Beverly and Kindred?

18  A    Yes.

19  Q    Let's talk about Manor Care for a second.  Manor Care is

20  the number one company in the long term care industry, is that

21  correct?

22  A    Yes, that's correct.

23  Q    It is valued very high in the market, correct?

24  A    Yes.

25  Q    It has high rates of returns?

Grillo - Cross

1   A    Yes.

2   Q    It has a strong payor mix?

3   A    Yes.

4   Q    In other words, Manor Care is very much less dependant on

5   Medicaid than the other comparable companies?

6   A    That is correct.

7   Q    And of all the possible payors in a company's payor mix,

8   Medicaid is the least advantageous payor?

9   A    That is correct.

10  Q    And that is because state Medicaid has the lowest absolute

11  dollar amount in terms of reimbursements?

12  A    That is usually the case, yes.

13  Q    And also because the states may choose to reduce payments

14  even further in the future?

15  A    Well, there's risk that the states may not be able to

16  afford it and then so the market place is nervous about that

17  risk.

18  Q    Compared to Genesis, aren't Manor Care's operating results

19  much stronger?

20  A    Yes, much stronger, 14 percent versus 9.

21  Q    Now, you don't have an opinion regarding the quality of

22  Manor Care's assets, is that correct?

23  A    Not specifically.

24  Q    Well, let's talk about another comparable company that you

25  used in your comparable company analysis, Beverly Enterprises.

Grillo - Cross                                157

1   Now, Beverly is more akin to Genesis in terms of payor mix,

2   isn't that correct?

3   A    Yes.

4   Q    And Beverly has approximately the same percentage of

5   Medicaid patients as Genesis?

6   A    I think -- I think they have a little bit more, but not

7   materially more.

8   Q    And Kindred, like Beverly and Genesis, has a high

9   percentage of Medicaid patients?

10  A    Yes. I think Kindred is more -- higher than both.

11  Q    Did you assign a multiple of 10.7 to Manor Care?

12  A    Yes, yes.

13  Q    Did you assign a multiple 7.9 to Beverly?

14  A    I believe that's correct.

15  Q    Did you assign a 7.8 multiple to Kindred?

16  A    I believe that is correct, yes.

17  Q    And your range for Genesis was 8.0 to 10.5 times, is that

18  correct?

19  A    For the long term care side, that is correct.

20  Q    For the long --

21  A    Yes, that's correct.

22  Q    So, isn't it correct that the high end of your multiple

23  range for Genesis and Multicare is 10.5, and that's only .2

24  times away from the multiple of the number one company in the

25  long term care industry?

Grillo - Cross                                                 158

1    A    That is correct.

2    Q    Isn't it correct that Beverly, the company that actually

3    has a similar payor mix to Genesis, is outside of Genesis's

4    range on the low end?

5    A    Yes, that is correct.

6    Q    And isn't it correct that the effect of your range of

7    multiples for the debtors is to peg them essentially right in

8    the middle of Beverly and Manor Care?

9    A    That's correct.

10   Q    In fact, isn't the midpoint of your range 9.25 times?

11   A    That's correct.

12   Q    And isn't it true that your reasoning for placing and

13   Manor Care in the midpoint is your belief that there is room

14   for improvement in Genesis's EBITDAR margins relative to

15   Beverly's?

16   A    That's correct.

17   Q    But you haven't done any analysis of the company's EBITDAR

18   margins to arrive at this conclusion, have you?

19   A    We haven't done any detail analysis. We've looked at the

20   company's public documents. We've looked at Genesis's public

21   documents. We've looked at the plan and the plan has the

22   margins for the Genesis consolidated company staying primarily

23   the same, principally the same over the five year period, and

24   we find that unusual. We would expect that there would be

25   improvement in that over that period of time.

AA. 514

160

Grillo - Cross

1   they're not performing up to a level that Beverly has shown you

2   can perform at with those encumbrances.  So our expectation is

3   that they should be able to have those improvements.

4   Q    But again, you don't any specific recommendations as for -

5   - as to how this particular company can improve?

6   A    That's correct.

7   Q    Have you analyzed the profits per bed of the different

8   comparable companies in your analysis?

9   A    No.

10  Q    In doing your comparable analysis for the institutional

11  pharmacy sector, you used Omnicare as your comparable, is that

12  correct?

13  A    That's correct.

14  Q    And Omnicare is the number one provider in that business,

15  isn't that correct?

16  A    That is correct.

17  Q    And you assigned an 11.1 2000 multiple, isn't that

18  correct?

19  A    That is correct.

20  Q    And you assigned NeighborCare a multiple of 9.5 times to

21  10.5 times, isn't that correct?

22  A    That's correct.

23  Q    And your decision to give NeighborCare only a slight

24  discount from Omnicare is purely subjective, is that correct?

25  A    That's correct.

Grillo - Cross                                    161

1   Q    And isn't it correct that in coming up with your multiple

2   range for NeighborCare, you also took into account your opinion

3   that NeighborCare could improve?

4   A    That is correct.

5   Q    Let's discuss your discounted cash flow analysis.  Isn't

6   it correct that you again use a 220 million EBITDA number as

7   opposed to the company's lower number?

8   A    That is correct.

9   Q    And isn't it correct that you applied a 9.25 times

10  multiple at the termination period which is the midpoint of

11  your valuation range from the comparable company analysis?

12  A    That's correct.  Approximately midpoint.  I don't think

13  it's exactly, but --

14  Q    So if you --

15  A    -- approximately.

16  Q    So if you had come up with an incorrect multiple in the

17  comparable analysis, your DCF analysis would also be flawed, is

18  that correct?

19  A    Yes, that would be correct.

20  Q    Let's take a look at your senior Genesis lender recovery

21  analysis on page 25 of your report, and do you see the line

22  item titled less net plan debt and preferred?

23  A    Yes.

24  Q    And what is the number on that line?

25  A    641.6 million.

1   Q    Now, in calculating the net plan debt, you reduced the net

2   plan debt by 25 million, isn't that correct?

3   A    That's correct.

4   Q    And you did that because you assumed that the 25 million

5   would be available to the company post emergence, isn't that

6   correct?

7   A    That's correct.

8   Q    But isn't it a fact that the 25 million in cash on the

9   balance sheet is being used to class M2 and is not being used

10  to pay the -- pay down the plan debt?

11  A    That's -- I do not know the answer to that.  The plan

12  assumes 25 million in cash on hand at closing.  That's excess

13  cash on hand.  That's cash on hand which we net against debt

14  and preferred.

15  Q    Well, assume for the moment that on page 24 of the

16  disclosure statement, and I'll be happy to show it to you if

17  you'd like, that there is a statement that 25 million on the

18  balance sheet is being used to pay class M2.  If it does -- if

19  that money does not exist on the opening balance sheet, would

20  you still reduce the plan debt as you did on page 25 of your

21  report?

22  A    No.

23  Q    And that would affect your line titled equity value, isn't

24  that correct?

25  A    That's correct.

Grillo - Cross                                    163

1    Q    And that would make the equity value lower by 25 million,

2    isn't that correct?

3    A    That's correct.

4    Q    Bringing your number down to 1.4 billion 8 million?

5    A    That's correct.

6    Q    And in calculating the recovery for senior lenders on page

7    25, you did not take into account -- or you did -- you altered

8    your analysis in taking account the exercise of warrants, is

9    that correct?

10   A    We testified that if you were to take into account the

11   full extent of the warrants there would be a reduction of

12   approximately 3 percent in the recovery.

13   Q    Okay.  Now, your senior Genesis lender recovery analysis

14   is keyed off of the midpoint of your enterprise valuation

15   range, is that correct?

16   A    That is correct.

17   Q    And if your valuation analysis is wrong, your senior

18   Genesis lender recovery analysis would be wrong as well, isn't

19   that correct?

20   A    That is correct.

21            MS. GUERRERA:  I have no further questions on cross.

22            THE COURT:  All right.  Sir?

23            MR. ZELMANOVITZ:  Menachem Zelmanovitz of Morgan,

24   Lewis and Bockius on behalf of Mellon Bank as the agent for the

25   senior lenders.

164

Colloquy

CROSS-EXAMINATION

1

2  BY MR. ZELMANOVITZ:

3  Q   Mr. Grillo, I'll be very, very brief. Who have you been

4  retained by in this case?

5  A    GMS.

6  Q    And GMS is the objector to the plan, is that correct?

7  A    That's correct.

8  Q    Now, isn't it true that based on the low end of your

9  valuation, the senior lenders do not recover 100 percent of

10 their claims?

11 A    That is correct.

12          MR. ZELMANOVITZ:  No further questions.

13          THE COURT:  Anyone else?  All right, thank you, sir.

14          MR. PRIMPS:  That concludes the presentation of GMS -

15 -

16          THE COURT:  All right.

17          MR. PRIMPS:  -- in the evidentiary stage of this

18 proceeding, Your Honor.

19          THE COURT:  Thank you.  Are there any other objectors

20 who wish to present testimony?  Yes, sir?

21          MR. JENKINS:  Yes, Your Honor.  David Jenkins.

22          THE COURT:  All right.

23          MR. PRIMPS:  Your Honor, just one proviso there, and

24 that is that the -- I haven't gotten a response on precisely

25 how we're getting that Lanassa material to you.

Becklean - Direct                                    165

1          THE COURT:  The response is simply to package it as

2    one exhibit and to have it considered globally, isn't that

3    correct, the documents appended to the deposition as well as

4    the deposition.

5          MR. STROCHAK:  That's correct, Your Honor.  Adam

6    Strochak for Weil, Gotshal.  I took a look at it over the lunch

7    break.  It seemed to me that Exhibits 5, 6, 7, and 8 didn't

8    have much relevance.  I don't know if the Court needs to detain

9    itself with those.  Other than that, we have no objection to

10   the exhibits to the deposition.

11         THE COURT:  Do you care about 5, 6, 7, 8?

12         MR. PRIMPS:  We're amenable to omitting them, Your

13   Honor.

14         THE COURT:  All right.  With those omitted, we will

15   accept.  Perhaps a marking is appropriate.  I guess we're up to

16   GMS-9 or no?  No, 12.  Maybe I should have a place too.  What's

17   the date of that deposition?

18         MR. PRIMPS:  It is August 15, 2001, Your Honor.

19         THE COURT:  All right, thank you.  Please come up.

20         MR. JENKINS:  Thank you, Your Honor.  Good afternoon

21   again, Your Honor.  David Jenkins for objector Charles L.

22   Grimes, and we call our one witness, Mr. William R. Becklean.

23   W I L L I A M   B E C K L E A N,  WITNESS, SWORN

24         THE CLERK:  Please state your name for the record,

25   spelling your last name.

Becklean - Direct                                         166

THE WITNESS:  William L. Becklean, B-E-C-K-L-E-A-N.

DIRECT EXAMINATION

1

2

BY MR. JENKINS:

3

4   Q    Good afternoon, Mr. Becklean.

5   A    Good afternoon.

6   Q    You may want to move the --

7   A    Actually it says please don't touch it, so I'll leave it

8   just the way it is.

9   Q    Okay.  Before we begin on your analysis, let's get a

10  little background of where were you educated, Mr. Becklean?

11  A    I have a Bachelor's Degree in Electrical Engineering from

12  Yale University and a Master's Degree in Business

13  Administration from Harvard.

14  Q    All right.  When did you get your degree from Yale?

15  A    1958.

16  Q    When did you get your MBA from Harvard?

17  A    1968.

18  Q    At either of those institutions, did you receive any

19  honors?

20  A    I was a Baker Scholar at Harvard Business School and

21  graduated with high distinction.

22  Q    Thank you.  I notice a gap in your education history

23  between the time you were at Yale and between the time that you

24  graduated from Harvard.  How long were you at Harvard, by the

25  way?

1    A    Two years.

2    Q    All right.  That leaves an eight year gap.  Where were you

3    during those eight years?

4    A    I spent four years as an officer in the Navy, temporary

5    assignment to the U.S. Atomic Energy Commission, and another

6    four years as a civilian employee of the Navy, all eight years

7    on the staff of Admiral Rickover (phonetic) who ran the Navy's

8    nuclear propulsion program.

9    Q    All right.  Without getting into extensive detail, can you

10   describe briefly to the Court what you did on the staff of

11   Admiral Rickover?

12   A    We managed the Navy's entire nuclear propulsion program.

13   Q    All right.  Let's turn now to your work background.  Can

14   you briefly tell me from 1968 to the present where have you

15   worked?

16   A    I've been engaged in the security analysis in investment

17   banking business for that whole period of time, initially with

18   a company whose name was originally Bashe (phonetic), became

19   Bashe, Holsey (phonetic), Stewart, Shields, eventually was

20   acquired and became part of Prudential.  And I don't know where

21   it is now.  Subsequent to that I worked for 10 years at Kidder

22   Peabody, both in investment research and the investment banking

23   side of the business.  That was subsequently acquired by GE and

24   then Paine Webber, and in fact now must be part of UBS Paine

25   Webber.  And I spent 10 years after that at a regional firm in

Becklean - Direct                                             168

1   Boston called Tucker Anthony, and from there, the last two

2   years as a managing director of technology research at Sun

3   Trust Equitable Securities.

4   Q    Are you still at Sun Trust Equities?

5   A    No.  Our Boston office was closed the middle of July and

6   I'm currently an independent consultant.

7   Q    Okay.  How old are you, Mr. Becklean, by the way?

8   A    I'm 65.

9   Q    All right.  Thank you.  During your career, have you

10  specialized in one area of securities analysis as opposed to

11  others?

12  A    Yeah.  My specialty has always been high technology

13  companies, primarily with emphasis on telecommunications and

14  data communications equipment.

15          MR. JENKINS:  With that, Your Honor, I offer Mr.

16  Becklean as a financial expert.

17          MR. STROCHAK:  No objection, Your Honor, although I

18  must say it does seem to me that we're getting near the end of

19  the universe of potential healthcare valuation experts.

20          THE COURT:  Sounds that way.  All right.  We'll

21  certainly hear from Mr. Becklean.

22          MR. JENKINS:  And we will address that point, Your

23  Honor, almost immediately.

24  BY MR. JENKINS:

25  Q    Mr. Becklean, what was your assignment in this case?

AA. 524

Becklean - Direct                                                    169

1  A    My assignment -- I beg your pardon.  My assignment was to

2  review and evaluate the proposed valuations which were

3  underlying the proposed merger between Genesis and Multicare to

4  form a reorganized Genesis.

5  Q    All right.  What business or businesses are Genesis and

6  Multicare in?

7  A    They're in the healthcare business.

8  Q    All right.  Picking up on Mr. Strochak's point, I did not

9  hear in your description of your career anything to do with

10 healthcare analysis.  Do you believe someone with your

11 background can adequately analyze the material in this

12 assignment?

13 A    I believe I can and I make no pretense of being a

14 healthcare analyst or bringing any particular expertise related

15 to the healthcare industry.

16 Q    All right.  What --

17 A    I think --

18 Q    Excuse me.

19 A    I think my expertise is in valuating income streams.

20 Fundamentally investors value earnings and earnings growth and

21 I, in the course of my review and evaluation, as you will see

22 as we go through it, have made no I would say subjective

23 judgments on the quality of these businesses as healthcare

24 businesses.  I have been willing to adopt the assumptions made

25 by the investment bankers hired by the respective companies and

Becklean - Direct                                        170

1  the company in terms of the fundamental assumptions about the

2  business.

3        I think that expertise, industry expertise of an

4  analyst primarily is used to develop cash flow and earnings

5  projections and understand the risks associated with those.  My

6  expertise that I bring to this case and to this assignment

7  specifically, I believe was the ability to value income and

8  cash flow streams.

9  Q    All right.  Thank you.  I may have interrupted you a

10 minute ago when I was asking what you did, so let me continue

11 on that.  What did you do to complete your assignment?

12 A    Well, the first thing I did was I reviewed three -- I

13 relied primarily on three documents.  One was the disclosure

14 statement.  The other two documents were the reports delivered

15 on Genesis by Warburg and on Multicare by Credit Suisse First

16 Boston.

17 Q    And which reports were these by Warburg and Credit Suisse

18 First Boston?

19 A    They were the reports in the April time frame.  I also

20 used access to public information as regards 10 Q's, 10 K's,

21 quarterly reports, other publicly available information

22 Q    All right.  Since the time that you prepared your report,

23 have you had an opportunity to review the updated Warburg and

24 Credit Suisse First Boston reports?

25 A    I saw those for the first time the beginning of this week.

Becklean - Direct                                                171

1   Q    All right.  By the way, let me just backtrack for one

2   question.  Who hired you for this assignment?

3   A    I was hired by Charles Grimes.

4   Q    Did you know Mr. Grimes prior to this assignment?

5   A    Yes, I -- yes, I did.

6   Q    How long have you known him?

7   A    I've known Mr. Grimes for 45 years.

8   Q    You touched on this a moment ago, but let me get into it

9   further before we get on to your actual report.  What sort of

10  agreements, if any, did you have with the Warburg and Credit

11  Suisse First Boston approaches?

12  A    I agree on the -- specifically on the Warburg and the

13  First Boston reports.

14  Q    Yes.

15  A    I agree with -- I agree with the evaluation technologies

16  that they applied.  In other words, I agree with using

17  comparable company analysis, discounted cash flow analysis, and

18  comparable transaction analysis of which the third is

19  immaterial because they didn't use it, but I fundamentally

20  agree in using both of those techniques.

21  Q    All right.  Did you have any other agreements with their

22  approaches or methodologies?

23  A    I -- it was not necessarily an agreement, but I was

24  willing to accept the comparable companies that they selected

25  in the comparable company analysis and I took at face value,

AA. 527

Becklean - Direct                                              172

1   without trying to verify it in any way, the cash flow

2   projections which were in those reports, which the reports

3   asserted come from management.

4   Q    Just so we're clear on this, did you change in any way the

5   cash flow projections that you found in the Warburg and Credit

6   Suisse First Boston reports?

7   A    No, I didn't.

8   Q    Did you have any disagreements with the methodology or

9   approach Warburg and Credit Suisse First Boston in their

10  reports?

11  A    Well, I have a -- I have some disagreements in the

12  application of the techniques, but those relate primarily to

13  the overall valuation methodology being applied to the combined

14  entity.

15  Q    Could you explain that please?

16  A    Yes.  As stated in the disclosure statement, the

17  methodology that's being used to value Genesis was to value

18  each of the two independent companies as an independent stand

19  alone company.  That would be Genesis and Multicare.  The

20  methodology was to value each one of those independently and

21  then add those independent valuations together to give you the

22  valuation of the total combined entity.

23  Q    Did you disagree with that approach?

24  A    I do disagree with that approach.

25  Q    Why?

AA. 528

Becklean - Direct                                           173

1    A    Because I don't believe that that methodology reflects the

2    full value of the combination of these two companies.  I think

3    that -- I think that the Warburg and the CSFB valuations very

4    clearly value these as independent stand alone companies and

5    penalize them as independent stand alone companies, whereas the

6    disclosure statement very clearly states that the objective of

7    merging the two companies is to provide a -- that will create a

8    value in the total entity that's larger than the sum of the

9    two.

10   Q    You testified just a moment ago that you believe that the

11   Warburg and the Credit Suisse First Boston approaches penalize

12   the companies.  Could you explain that please?

13   A    Well, I think yes.  I mean, and you have to get sort of

14   specific to do that, but I think they do it in, primarily in

15   the selection of the multiples that are being applied in the

16   comparable company analysis, and in the case of one of the

17   valuations in the selection of the weight of average cost of

18   capital in the DCF calculation.

19        MR. JENKINS:  All right.  Maybe this will best wait

20   until we look at your report.  Let me turn to your report, Mr.

21   Becklean.  Your Honor, may I approach the witness with a copy

22   of his report?  Your Honor, I have a copy for the Court.  Your

23   Honor, Mr. Becklean has asked for a glass of water.

24        THE COURT:  Of course.

25        MR. JENKINS:  Thank you, Your Honor.

Becklean - Direct                                        174

1    BY MR. JENKINS:

2    Q    Do you have your report in front of you, Mr. Becklean?

3    A    Yes, I do.

4              MR. JENKINS:  I suppose for the record we should mark

5    this as CG Exhibit Number 6, Your Honor.

6              THE COURT:  Indeed.

7    BY MR. JENKINS:

8    Q    Mr. Becklean, could you identify this document, please?

9    A    Yes.  This is the document I prepared in fulfillment of

10   the assignment that I accepted from Mr. Grimes.

11   Q    All right.  We've heard a lot of valuators today and

12   yesterday, so I don't think it's necessary for you to go into

13   deep background of how one does evaluation, but I think it

14   would be useful if you could explain to the Court, using page

15   numbers in your report if helpful, what you did to complete

16   your assignment from Mr. Grimes.

17   A    I'd be happy to do that.  I think that the best place to

18   start is probably on page 9 in which I describe the methodology

19   or the technique that was used by the investments banks to

20   value both Genesis and Multicare.  They both used current

21   company valuations of publicly traded companies on a comparable

22   company analysis.  They both used the combination of actual and

23   forecast numbers to derive key financial ratios that relate

24   selected operating -- to enterprise value.  Discounts were

25   applied to those.  The discounted ratios were then applied to

1   the Genesis and Multicare financial numbers to derive

2   enterprise values for each company on a stand alone basis.

3          By the way, I think I would add that the explanation

4   that Mr. Schulte gave this morning of the application of those

5   procedures, I couldn't have done any better.  I mean, I think

6   he did a terrific job of explaining how that's done, and I

7   would simply say I did -- I tried to do exactly the same thing.

8   Q    All right.  Now, on page 9 you set forth what Warburg and

9   Credit Suisse Firs Boston did in their comparable company

10  analysis.

11  A    Right.

12  Q    What -- I'm sorry.

13  A    Let me tell you the differences then as I went through

14  that.

15  Q    Terrific.

16  A    We used the same comparable company valuation technique.

17  We apply the technique only to the merged company, and to get

18  the statistics for the merged company, we simply added the

19  forecast, the financial forecast, together for the two

20  companies, Multicare and Genesis, and did not attempt in any

21  way to enhance those forecasts which presumably came from the

22  company.

23          We also updated the calculated enterprise values of

24  the comparable companies to reflect their current stock prices

25  and debt structure as of the 17th of August.

Becklean - Direct                                    176

1   Q   Let me stop you there, Mr. Becklean.   Is there a page in

2   your report on which you set forth what you were just

3   testifying to in terms of an overview?

4   A   I would say that the best overview is on page 14 which is

5   called comparable company analysis in which the top part of

6   that chart shows the fundamental statistics on the comparable

7   companies.

8   Q   All right.  I'm sorry.  I interrupted you in the middle of

9   describing what you did and the differences between your

10  technique and the Warburg/Credit Suisse First Boston

11  techniques.

12  A   That's fine.

13  Q   Could you continue, please?

14  A   I can.  Now of course, once you have updated those

15  numbers, you arrive at on the right hand side of the upper

16  portion of page 14, you will see calculated valuation multiples

17  which are the valuation multiples that simply result by doing

18  the division of the financial statistics you're looking at,

19  whether it be EBITDA, EBITDAR and the projected numbers over

20  the enterprise values.  So that's really just a calculation.

21          And the way the investment bankers then used those

22  numbers was to discount those based on the relative qualities

23  of the two different companies.  So, my second -- the second

24  piece of the analysis was to analyze the discounts that they

25  applied.  And that's done on my page number 15, which is the

Becklean - Direct                                    177

1   next page where you'll see a table that says the analysis, the

2   discounts applied in comparable company valuations by

3   investment banks.

4           So, in order to try and make some sense out of the

5   discounts that they were applying after you got the calculated

6   numbers on the comparables, I simply did another tabulation

7   which is shown here.  And for the UBS Warburg report and the

8   CSFB report, I have listed for Manor Care, Beverly, Omnicare

9   and for CSFB Manor Care and Beverly, the calculated multiples

10  or ratios that are a pure calculation.

11          The figure that says used are the actual ratios that

12  were used by the appropriate investment bank in getting --

13  basically hair cutting those ratios, getting a number they're

14  going to apply to Genesis in the case of Warburg, or Multicare

15  in the case of CSFB.  And the bold face numbers represent the

16  actual magnitude of the discount that they've taken.

17  Q    These are the bold face numbers on the same line as the

18  word discount, is that correct?

19  A    Discount.  So, what it says is that on the 2001 projected

20  EBITDA for Manor Care, which is really the high end valuation

21  which we all acknowledge, they discounted the multiple of 8.9

22  times by 21 percent to get a figure of 7.0 times.  And that's

23  true throughout this whole chart.

24          And the one thing I discovered as I went through the

25  chart, and I tried to go back through their reports and

Becklean - Direct                                    178

1    reconstruct sort of how you get to the discounts, and how do

2    you get from the calculated number, how do you make an

3    adjustment to an appropriate multiple to apply to Genesis?  And

4    my first approach to that was simply lay out a table of numbers

5    and look at it.

6         The first thing that I observed was they were a

7    little bit all over the map.  There was not a lot of

8    consistency to them, and I tried to go back and discover, you

9    know, kind of where those discounts came from.  And that led me

10   to one of the assertions which was that when I say that I don't

11   think that you get a fair valuation of the combined companies

12   when you do an individual stand alone valuation of each of

13   these, it really involves the selection of multiples that

14   you're going to apply and how you come about those discounts.

15        To the best of my ability, as I went back through the

16   Warburg report, it looked to me like they were not giving

17   Genesis any benefit in terms of the multiple discount for the

18   synergy that was being gained from putting it together with

19   Multicare.  And I'm not arguing that the cash flows ought to be

20   any different, but I think there ought to be more credit given

21   in the multiple discounts.  I don't think you should take the

22   same multiple discount on a stand alone Genesis as you take on

23   a Genesis which by the assertion in the disclosure statement

24   says by putting these two companies together, they're both

25   going to be stronger companies.

Becklean - Direct

179

1    So, my fundamental argument is, I don't think you can

2 take the same discount you would take on a stand alone company

3 as you would take on a Genesis once it is merged into the

4 combined company.  And the same argument applies to the CSFB

5 discount calculation.

6    So, let me just go on and summarize what I did with

7 this chart.  The next two columns to the right, both in bold

8 face type, again we're on page 15 of my report, says low

9 average discount.  So, what I simply did for the low discount

10 on Beverly happens to be the low end of the -- of the multiple

11 range anyway, I averaged the 2 percent and 13 percent and got

12 7.4 percent.  For the high end multiple, which is Manor Care, I

13 averaged the discount that they used at the high end and got 18

14 percent.  I did the same thing for Omnicare, and I did the same

15 thing for the CSFB, you know, high and low for Manor Care and

16 Beverly.

17    So, I then basically said on a combined basis, what

18 sort of a discount did the investment bankers apply to the long

19 term care portion of the business.  So I did a weighted

20 average, weighted on the basis of 2000 EBITDA of the low

21 average discount for both Warburg and  CSFB and arrived down at

22 the bottom with an average figure of 9 percent is the average

23 discount they applied to the calculated multiple for the long

24 term care component of the business.

25    And I did the same thing for the high discount in the

**AA. 535**

Becklean - Direct                                180

1  long term care -- turned out to be 19 percent, which by the

2  way, happens to be pretty consistent with other testimony I

3  heard this morning that, you know, the applicable discount to

4  Manor Care was like a 20 percent figure.  So, it all seems to

5  hang together.  Then for the pharmacy component there was only

6  comparable company, Omnicare.  Those came out 26 percent and 15

7  percent.

8          Then the next question in my mind was, okay, since

9  these represent the discounts that they've applied, what kind

10  of discount should I apply to the combined companies?  And to

11  make that decision, I go back to the disclosure statement which

12  -- no, it's not the disclosure statement.  It is primarily the

13  Warburg report.  But other testimony I've heard throughout the

14  last two days that I've sat in this courtroom, and that is once

15  these two companies have been combined, it ought to be a

16  company of the relative quality of a Beverly Enterprises.

17          So, if it's going to be a company that's comparable

18  to Beverly, it strikes me that the discount to Beverly's ratios

19  ought to fundamentally be zero.  If it's going to be like

20  Beverly, why wouldn't it have the same ratios that a Beverly

21  has.  That's what comparability means in my mind.  So, I

22  adjusted the 9 percent average figure that was being used by

23  the investment banks to 0 percent.  You can see discount

24  selected for -- beg your pardon, our analysis, long term care

25  component.  I took the 0 percent.

Becklean - Direct                                                181

1        Then there was the question of, you know, what did I

2   do with the high end discount, and I used the following logic.

3   Since there's fundamentally no change in the relationship

4   between Beverly and Manor Care, I mean, this transaction is not

5   going to affect the relative strength of those two companies,

6   they differed in the discounts that were being applied by the

7   investment bankers by 10 percentage points, I said I'll keep

8   the same 10 percentage point spread in the discounts.  I

9   assigned them a 10 percent discount.

10        So, I went back then to my comparable company

11   valuation and I applied a 0 percent discount to the ratios I

12   calculated for the high end of the range and I applied a 10

13   percent discount to the ratios that were calculated -- I beg

14   your pardon.  That was for the low end of the range, 0 percent,

15   and a 10 percent discount for the high end of the range.  And

16   that was the way I generated the multiples by which I then

17   derived enterprise value for the combined company.

18        I also used the same methodology as the investment

19   bankers in separating out the long term care component of the

20   business, which was the long term care part of the Genesis

21   business and Multicare added together, and I kept the

22   NeighborCare pharmacy component separate, and in fact chose not

23   to differ whatsoever with the judgment on the part of the

24   investment bankers of a 26 percent low average discount and a

25   15 percent average discount to the high end.  So, I simply kept

AA. 537

1  those numbers taking the -- having no other -- having no other

2  judgment to bring to --

3  Q    All right.  Once you -- I think you may have touched on

4  this briefly, but we should probably tie it together.  Once you

5  had these discounts, where in your report did you do something

6  with these discounts?

7  A    That's going back to page 14.

8  Q    All right.

9  A    Where it says comparable company analysis.  And that's the

10 analysis that is shown down below where I actually looked at

11 two different parameters.  I looked at last 12 months EBITDA

12 and last 12 months EBITDAR and the 2001 projected EBITDA AND

13 EBITDAR.

14 Q    All right.  Now -- excuse me.  Let me just stop you there,

15 Mr. Becklean.

16 A    Yes.

17 Q    Why did you choose those financial -- those pieces of

18 financial information as opposed to any others?

19 A    Well, it is my belief, and I believe that Mr. Schulte this

20 morning said exactly the same thing, that the more data points

21 you have, the better, and in fact, as I recall from his

22 testimony, he made a pretty strong case to use last 12 months

23 data as opposed to forecast data because it's hard actual data.

24 I mean, it's the only real set of numbers that you've got.  The

25 projections are subject to all kinds of subjective, you know,

Becklean - Direct                                    183

1    guesses.  I chose to accept them as they were, but they clearly

2    are projections with which one could potentially raise one or a

3    number of questions.

4          But at the time that I did this analysis, the only

5    numbers that I had available were the last 12 month numbers and

6    the 2001 projected numbers.  Now, it was -- it became apparent

7    to me when I saw the updated reports from Warburg and CSFB that

8    they had received 2002 projected numbers from the company, but

9    I did not have access to those and I have not included those.

10   Had I had access to those, I would have put them into the

11   report.

12         Now, one thing I would note, and it came up yesterday

13   in the testimony from the two bankers that presented their

14   reports, Warburg did not use EBITDA numbers at all, although

15   this morning Mr. Schulte argued -- I see some questioning looks

16   on people's faces --

17   Q     You said they did not use EBITDA numbers at all?

18   A     They did not use EBITDA numbers in their evaluation.  They

19   calculated the EBITDA ratio, but I mean -- I beg your pardon.

20   Let me correct myself.  I meant last 12 month data.  Thank you.

21   They did not use last 12 month data at all.  The CSFB banker

22   did use last 12 month data, but fundamentally he said he tended

23   to disregard it.  I think that was directly contradicted this

24   morning by Mr. Schulte who made the argument that last 12 month

25   data is the best data to work with and there are inherent

Becklean - Direct                                    184

1    issues when you start looking at projections.

2           So, short story out of a long discussion is I used

3    the last 12 month EBITDA and EBITDAR, the 2001 projected EBITDA

4    and EBITDAR as the best set of numbers that I had available to

5    me.

6    Q    All right.  Have you now finished your explanation to the

7    Court of how you performed your comparable company analysis?

8    A    I have.

9    Q    All right.  You testified some minutes ago that you did a

10   second analysis, a so called discounted cash flow analysis.

11   Could you explain briefly what you did there, again,

12   pinpointing to the report if that is helpful.

13   A    Yes.  My discounted cash flow analysis is shown on page

14   20.  A summary of it is shown on page 19.  The summary results

15   are shown on page 19.  I performed a standard discounted cash

16   flow analysis.  There is a weighted average cost of capital

17   calculation that's shown on page 21.  I ended up using a 10

18   percent weighed average cost of capital, which is pretty much

19   consistent with all the other reports that I've seen here, so I

20   take no issue of that whatsoever.

21          I do take issue with one thing.  By the way, in the

22   cash flows that I use were generated simply by adding the cash

23   flows from the two companies that I got from the investment

24   banking reports.  They were the projections given to the

25   bankers by the company.  So, I did not adjust those in any way.

Becklean - Direct                                      185

1   Those are numbers everyone is working with.

2        The one -- part of this calculation that I took some

3   issue with, and Mr. Schulte addressed the same thing this

4   morning, I believe it was Mr. Schulte, that is the -- of this

5   calculation to your selection of the terminal value to apply to

6   the final five year EBITDA.  He represented that it reflected a

7   big part of the calculation.  I'll tell you it represents about

8   70 percent of calculation.

9        So, the terminal value that you assume in this case

10  at year five, which was what all the other EBITDA analysis that

11  I have seen in connection with this case use, that figure at

12  year five of a terminal value which you get by applying a

13  multiplier to the last year's cash flow, that ultimately

14  represents 70 percent of the present value that you end up

15  calculating.  So, that is what I call an heroic assumption.  It

16  basically drives everything, which is why I tend and other

17  people tend to discount, if you'll forgive -- the value of a

18  DCF calculation because there's just -- there's one big

19  assumption in there that's just huge and you can see the range

20  that it drives.  A lot of numbers have been floated around --

21  every report, these -- the numbers that they use for the

22  terminal value EBITDA multiple in a DCF calculation have been

23  pretty broad.  I showed the full range.  I basically looked at

24  the --

25  Q    What page, Mr. Becklean, please?

1   A    We're still on page -- we're still on page 20.

2   Q    Okay.

3   A    You can see that the terminal value EBITDA multiples that

4   I basically chose to look at range from 6.5 times to 10 times.

5   And the reason for my selection of that range is it represents

6   the current last 12 month EBITDA to enterprise value multiples

7   of the comparable companies which range from 7.7 to 11.6 times.

8   So, I just carved off roughly 10 percent at each end and then

9   looked at the potential range you could select.

10             I basically opted in my conclusion to say that I

11  think that the DCF calculation provides a fundamental for that

12  ought to represent the fundamental minimum valuation of any of

13  these companies, but shouldn't provide a limit to the upside.

14  I think that the comparable company valuation ought to be given

15  a lot more consideration and has more merit than the DCF

16  calculation.

17  Q    All right.  You mentioned your conclusions.  I'm sorry,

18  let me back up.  Have you now finished your explanation to the

19  Court of what you did in connection with your discounted cash

20  flow analysis?

21  A    Yes, I have.

22  Q    All right.  You mentioned conclusions a minute ago.  Is

23  there conclusions somewhere in your report?

24  A    I have a conclusion page on page 22.

25  Q    All right.  Could you explain what your conclusions are,