Becklean - Direct                                    187

1    please?

2    A    Yes.   My first point states my fundamental assumption

3    about --

4             THE COURT:  Let me just warn you, sir, I see that

5    you're moving around.  Let me --

6             THE WITNESS:  You don't want me to slide off --

7             THE COURT:  -- point out a defect in our witness

8    stand.  Please be careful not to lean back.

9             UNIDENTIFIED:  You have a tort lawyer within 5 or 10-

10   feet over --

11            THE COURT:  I've noted that as well with the angle.

12            MR. JENKINS:  Thank you.  We really don't have any

13   valuation experts to spare, so --

14            THE COURT:  Please continue.

15            THE WITNESS:  Really three points to my conclusion.

16   And what -- I don't think what I've done is awfully complex.

17   My first bullet point is I do believe that I have made the case

18   that the merger will create more value than is reflected in

19   summing the valuations of the two investment banks which is the

20   methodology proposed by the debtors in the disclosure

21   statement.  I think that the value of the combined company is

22   more than they are acknowledging.

23            Second bullet point is I believe, and I've already

24   stated this, that the comparable company analysis is the much

25   better analysis to provide in this instance and the DCF

1  analysis, which is totally subject to the heroic assumption

2  that I mentioned of a terminal value, is much less to be relied

3  on and ought to be viewed as a minimum valuation, not a single

4  point value.

5          And finally, based on our valuation methodology, my

6  conclusion is the value of the merged company ought to be

7  somewhere between $1.7 and $2.2 billion.

8  BY MR. JENKINS:

9  Q    All right.  If you had to select a single number within

10  that range, Mr. Becklean, where would it be?

11  A    I opted not to try and select a single range, but my

12  approach to selecting a single number would be to select one

13  that was at the high end of that range.

14  Q    Why?

15  A    Simply because, I guess as Mr. Schulte said this morning,

16  look out the window.  In the last four months, the valuations

17  of all of the companies in this industry have increased.  As

18  was pointed out yesterday by the Warburg bankers, since they

19  wrote their report in April, there valuation is now $200

20  million higher than it was then.  Multicare valuation is now

21  $50 million higher than when it was done in April.  So, clearly

22  the bias in these valuation is upwards and I would reflect that

23  in my choice of a single point in the range that I've

24  recommended.

25          MR. JENKINS:  Thank you, sir.  Your Honor, I may be

1  finished with Mr. Becklean.  Could I check with my co-counsel,

2  please?  Thank you.

3                    (Brief Pause)

4            MR. JENKINS:  I have no further questions of Mr.

5  Becklean on direct examination, Your Honor.

6            THE COURT:  All right.  Thank you.  Cross-examine?

7            MR. STROCHAK:  Adam Strochak from Weil, Gotshal, Your

8  Honor.

9                    CROSS-EXAMINATION

10 BY MR. STROCHAK:

11 Q    Good afternoon, Mr. Becklean.  Nice to see you again.

12 A    How do you do?

13 Q    Do you have enough water?  Are you okay?

14 A    I'm fine.  Thank you.

15 Q    Terrific.  Thank you.  Now, you're a certified financial

16 analyst, correct, sir?

17 A    Yes, I am.

18 Q    And you've been a CFA since about 1976, is that correct?

19 A    That's correct.

20 Q    And since then you've served as an expert witness on

21 valuation and in one other instance, correct?

22 A    That's correct.

23 Q    Mr. Becklean, I think you've graciously acknowledged that

24 you don't have any particular experience in valuing healthcare

25 companies, correct?

Becklean - Cross (STR)                    190

1    A    Correct.

2    Q    In fact, your specialty is the area of technology,

3    primarily telecom equipment and data communications, correct?

4    A    That's correct.

5    Q    But nevertheless, it's your view that healthcare companies

6    are comparable to technology companies for purposes of

7    valuation, right?

8    A    No, I never said that.  What I basically said was I

9    thought that my expertise was in valuing income streams and

10   cash flow streams that I think that investors buy a stream of

11   earnings, maybe they'd be from technology companies, healthcare

12   companies or consumer products companies.  I think that the

13   expertise that I bring to valuation is fungible across all

14   those.

15   Q    But you never said that healthcare companies are

16   comparable to technology companies for purposes of valuation?

17   A    All I've ever tried to say is give me an income stream and

18   I will value it for you.  Where it comes from is in my mind not

19   relevant.

20   Q    That's fine, but that wasn't exactly the question.  My

21   question was you've never said that healthcare companies are

22   comparable to technology companies for purposes of valuation,

23   is that your testimony?

24   A    If I ever said that I mis-spoke.

25   Q    Do you recall giving a deposition in this matter just two

**AA. 546**

1  days ago?

2  A    Yes, I do.

3        MR. STROCHAK:  Your Honor, if I could approach?  I'd

4  like to hand the witness a copy of his deposition in this

5  matter.

6        THE COURT:  Certainly.

7        THE WITNESS:  Thank you.

8  BY MR. STROCHAK:

9  Q.   Mr. Becklean, let me direct your attention to page 11 of

10  the deposition.

11  A    Okay.

12  Q    And in particular to line 10, and do you recall giving

13  these answers to -- this answer to this question?

14  A    Oh yes.

15  Q    Question, "Are there any particular ways in your mind,

16  sir, that healthcare companies are alike or comparable to

17  technology companies for purposes of valuation?"

18  A    Right.

19  Q    Answer, "Sure."

20  A    Right.

21  Q    Thank you, sir.

22  A    Can I read the next -- can I read the next question?

23  Q    Actually I have a question for you, sir.  Thank you.

24        THE COURT:  But I will, sir, don't worry.

25        MR. STROCHAK:  Go right ahead, Your Honor.  Certainly

Becklean - Cross (STR)                                    192

1  for purposes of clarity I have no objection to that portion of

2  the deposition.

3            THE COURT:  Okay.  And counsel will bring us back to

4  it.  Go ahead.

5            THE WITNESS:  Okay, don't forget to do that.

6  BY MR. STROCHAK:

7  Q    And in fact, Mr. Becklean, it's your view that technology

8  companies and healthcare companies are similar in every respect

9  as businesses except for what they do to make money, is that

10 right?

11 A    That's a broader statement than I would be willing to

12 agree to.

13 Q    Let me just direct your attention to the next portion of

14 your deposition there, and perhaps you could read the answer --

15 the question and answer on -- beginning on line 14 through line

16 19.

17 A    I'd like to do that because the followup to your first

18 question was your second question which was after you asked me

19 if technology companies and healthcare companies are

20 comparable, and I said, "Sure."

21            You said, "What ways are they comparable?"

22            And then I answered, "They make money and they grow

23 and investors primarily are going to pay for future earnings

24 growth."  There are some typographical errors on this

25 transcript, but that's what I said.  "They have earnings, they

**AA. 548**

Becklean - Cross (STR)                                      193

1  have EBITDA, they have cash flows.  They are similar in every

2  respect as a business except for what they do to make their

3  money."  I guess I -- fine.  In the context -- in that context,

4  yes, I agree to that.

5  Q    So they did say that they are similar in every respect as

6  businesses except for what they do to make money?

7  A    That's fine.

8  Q    Now you were retained by Mr. Grimes to provide an

9  independent judgment of the valuations previously conducted by

10 UBSW and CSFB, correct?

11 A    Right.

12 Q    And you spent about 40 hours or so conducting that review?

13 A    That's about right.

14 Q    In conducting that analysis you reviewed the initial

15 reports of UBSW and CSFB prior to preparing your own report?

16 A    Right.

17 Q    But at the time you prepared your own report you had not

18 yet reviewed the updated valuations provided by UBSW and CSFB?

19 A    That's correct.

20 Q    In preparing your report, sir, I believe you did not do

21 any independent research on the health care industry, is that

22 right?

23 A    That's correct.

24 Q    Let me just turn to a few of your conclusions for a

25 moment.  You concluded that the valuation methodology applied

Becklean - Cross (STR)                               194

1   to Genesis and Multicare is unfair because it fails to reflect

2   the value attributable to the expected benefits of the merger

3   of the two companies, is that right?

4   A    Yes.

5   Q    That's a fair summary of your conclusion?

6   A    Yes.

7   Q    In reaching this conclusion, however, you did not make any

8   independent inquiries into the way Genesis and Multicare are

9   operated today, correct?

10  A    Yes.

11  Q    But you do understand that Multicare has no separate

12  senior management of its own, right?

13  A    Yes.

14  Q    And you do understand that Multicare is managed by Genesis

15  today?

16  A    Yes.

17  Q    And further, sir, you do have an understanding that

18  Genesis and Multicare already have combined many of their

19  operations, is that correct?

20  A    I understand that.

21  Q    Okay, now despite the fact that many of their operations

22  already have been combined it's your conclusion that UBSW's

23  valuation of Genesis is inaccurate because it fails to account

24  for the fact that the combined companies will be stronger after

25  the merger, right?

Becklean - Cross (STR)                                    195

1    A    Yes.

2    Q    Okay, but you don't have any view as to any particular way

3    in which the combined companies would be stronger after the

4    merger because it was not your role in this project to assess

5    that, correct?

6    A    That's correct.

7    Q    Okay, and you have not identified any particular

8    additional synergies that the merger of Genesis and Multicare

9    would create, correct?

10   A    I did not try to do that.

11   Q    Okay, let me focus for a moment on the specifics of your

12   revised company analysis.  Your comparable company analysis

13   utilized both last 12 months EBITDA and fiscal year 2001 EBITDA

14   projections, correct?

15   A    Yes.

16   Q    You would agree, wouldn't you, sir, that it isn't

17   acceptable standard practice to use current fiscal year

18   projections in a valuation, right?

19   A    As part of a valuation, yes.

20   Q    And you, in fact, yourself, used the debtor's projected

21   fiscal year 2001 EBITDA of $214.4 million on a combined basis

22   in performing your valuation analysis, correct?

23   A    That's correct.

24   Q    In your comparable company analysis you used the same

25   comparable companies as UBSW and CSFB, right?

**AA. 551**

Becklean - Cross (STR)                                    196

1    A    Right.

2    Q    And you did not do any independent analysis as to what

3    other comparable companies were out there in the marketplace,

4    right?

5    A    I accepted the fact that UBSW and Credit Suisse had done

6    that for me.  I was not trying to do original research on the

7    health care business.  I accepted what they delivered to their

8    customer.

9    Q    So the focus of your comparable company analysis was to do

10   a mathematical averaging of the discounts that UBSW and CSFB

11   had taken off the comparable company valuation multipliers that

12   they had identified, correct?

13   A    Well, you understand that my assignment was to analyze the

14   reports that had been delivered by the investment bankers and I

15   thought I needed to have an understanding of how they arrived

16   at their multiples and the discounts to those multiples.  So I

17   simply put together a table so I could look at it.

18   Q    And you utilized the technique of mathematical averaging,

19   correct?

20   A    Yes, I did.

21   Q    Rather than bringing any particular expertise regarding

22   the health care industry, your analysis was a mathematical one?

23   A    I didn't think I had any health care expertise to bring to

24   the table in that regard, so I simply accepted their subjective

25   assessments.

Becklean - Cross (STR)                              197

1   Q    That's right.  And you chose your technique based on the

2   assumption that UBSW and CSFB had brought some expertise of

3   their own to bear in applying those -- the discounts that they

4   derived from the multiples, correct?

5   A    That's right.

6   Q    And it would be correct to say, sir, that you did not

7   attempt to apply any qualitative judgment to the analysis of

8   the comparable companies, right?

9   A    None whatsoever.

10  Q    And you are prepared and willing to accept the judgments

11  that were inherent in the UBSW and CSFB reports on the merits

12  of the company's business, right?

13  A    Yes.

14  Q    So if UBSW came to the conclusion that Genesis was more

15  like Beverly, for example, qualitatively, that that would be a

16  conclusion that you'd be willing to accept, correct?

17  A    In fact that's a conclusion that they stated in their

18  report and I am willing to accept that, yes.

19  Q    Okay, now your calculation of Beverly's multiple based on

20  projected 2001 EBITDA is 7.4 times EBITDA, correct?

21  A    What number are we talking about?  Just so we know where

22  we are.

23  Q    I'm talking about the multiple that you derived for

24  Beverly -- Beverly's -- Beverly's multiple based on 2001

25  projected EBITDA and let me direct you to page 14 of your

1   report.

2   A    Yeah, I'm there.  Their apprized value of Beverly 2001

3   projected EBITDA 7.4 times.

4   Q    And that's a 7.4 time multiple, correct?

5   A    Yes.  Well, wait a minute.  That's a calculated number.

6   That's no one's subjected judgment.  That's a calculated

7   number.

8   Q    That's right.  That's your calculation of Beverly's

9   multiple based on 2001 projected EBITDA.

10  A    Right.

11  Q    Based on data that's available out in the public, right?

12  A    Based on hard data, right.

13  Q    Now Mr. Becklean, your comparable company analysis

14  resulted in a range of enterprise values from 1,674,000,000 to

15  2,161,000,000 correct?

16  A    Yes.

17  Q    And the midpoint of that range is 1,917,000,000, correct?

18  A    Yes.

19  Q    Now you also did a DCF analysis, right?

20  A    Yes.

21  Q    But if I understood your testimony correctly I think you

22  said you essentially disregarded the DCF analysis concluding

23  that it really only serves as a floor on any evaluation, is

24  that right?

25  A    That's correct.

Becklean - Cross (STR)                              199

1    Q    So the DCF didn't factor into your final conclusions in

2    the report, correct?

3    A    That's correct.

4    Q    All right, now your final conclusion is a value ranging

5    from 1,700,000,000 to 2,200,000,000, correct?

6    A    Right.

7    Q    And you arrived at that number simply by rounding up the

8    results of your comparable company analysis, right?

9    A    That's correct.

10   Q    Okay, now the midpoint of the rounded up number is

11   1,950,000,000, right?  Did I get the math right?

12   A    I'll give you credit for that, but I think it's 1 billion

13   920.

14   Q    Pardon me?  I'm sorry, I just couldn't hear you.

15   A    I think it's 1 billion 920.

16   Q    The midpoint of 1 billion 700 million --

17   A    Oh, I beg your pardon, no, you're right.  You're correct.

18   You're correct.

19   Q    I do that all the time.  That's hard for me to -- I didn't

20   mean to put you on the spot like that.  Now you have not come

21   to any particular conclusion as to a single value within that

22   range, correct?

23   A    That's correct.

24   Q    And I believe you told me on Monday that it was your view

25   that one could make an argument for a value anywhere in that

1  range, isn't that correct?

2  A    I think -- yeah, I think one could make all kinds of

3  arguments to get wherever you want in that range.

4  Q    And in fact it's your opinion, sir, that the likelihood of

5  a value being at either end of the range depends upon the

6  confidence level in the company's cash flow forecasts, isn't

7  that correct?

8  A    That's one factor.

9  Q    And so it would be fair to assume then that if the

10  company's projections for cash flow are dead on that it's going

11  to come right in -- in right around 214 million of EBITDA for

12  fiscal 2001.  It's most likely then that the company's value

13  will be somewhere close to the middle of your range, correct?

14  A    That's one factor to consider, yes.  On that fact alone

15  that would lead you to that conclusion.

16          MR. STROCHAK:  Thank you, sir.  I have no further

17  questions.  Excuse me, one thing.  Just one second with the

18  Court's indulgence.

19          Thank you, sir.  No further questions.  Thank you,

20  Your Honor.

21          THE WITNESS:  Thank you.

22          THE COURT:  All right, any further questions?

23  Redirect?

24          MR. JENKINS:  The only question I have of Mr.

25  Becklean --

Becklean - Cross (ZEL)                                        201

1        MR. ZELMANOVITZ:  Mr. Jenkins.

2        MR. JENKINS:  I apologize.

3        MR. ZELMANOVITZ:  Thank you.  Menachem Zelmanovitz

4   once again from Morgan, Lewis on behalf of Mellon Bank as Agent

5   for the Senior Lenders.

6                        CROSS-EXAMINATION

7   BY MR. ZELMANOVITZ:

8   Q    Good afternoon, Mr. Becklean.  I'll be very brief.  You've

9   been retained by Mr. Grimes?

10  A    That's correct.

11  Q    And Mr. Grimes has objected to the plan?

12  A    That's my understanding.

13  Q    And your conclusion was a valuation for the combined

14  company of between 1.7 and $2.2 billion, that's correct?

15  A    Yes, that's correct.

16  Q    Now have you done an analysis of creditor recoveries under

17  the plan using that valuation?

18  A    No.

19  Q    So you don't know that in fact the Senior Lenders will not

20  be receiving 100 percent recovery on the midpoint of your

21  valuation?

22  A    Actually the first time I heard a discussion involving

23  that was in court this morning.

24  Q    So you're not aware of that one way or the other?

25  A    No.

Becklean - Cross (ZEL)                                    202

1       MR. ZELMANOVITZ:  Thank you.  No further question.

2       THE COURT:  All right, any other questioners?  Then

3  redirect.

4       MR. JENKINS:  There being none, Your Honor, at this

5  time I will get up.

6                    REDIRECT EXAMINATION

7  BY MR. JENKINS:

8  Q    Mr. Becklean, did you get a chance to read the next

9  question and answer that --

10 A    Yes, I did.

11      MR. JENKINS:  That's all I have, Your Honor.

12      THE COURT:  All right, thank you, sir, you can step

13 down.  Is there any other witness either by way of --

14      MR. JENKINS:  Excuse me, Your Honor, people have been

15 telling me all along.  I have to move the admission of my

16 documents and I'd like to do so now.  I'm used to doing it at

17 the end of my case.  I have six exhibits.  The sixth one was

18 Mr. Becklean's report.  The previous five were either marked

19 for identification yesterday or today.  Number one was --

20 excuse me, may I get them from my seat, Your Honor?

21      THE COURT:  Certainly.

22      MR. JENKINS:  Thank you.

23      THE COURT:  What I'm not sure about, counsel, is

24 whether I have CG-3 and 4.

25      MR. JENKINS:  I thought I handed one up, but if I did

Becklean - Cross (ZEL)                                        203

1   not I can take care of that.

2          THE COURT:  It's very possible, very possible, but if

3   you do have extra copies I would appreciate it.

4          MR. JENKINS:  We will arrange to get one, Your Honor.

5          THE COURT:  Do we need to review what they were, CG-1

6   through 6 or is it possible to put them into evidence without

7   objection?

8          MR. ZELMANOVITZ:  I have no objection other than

9   we're still supposed to get a copy of one of the exhibits that

10  Mr. Jenkins marked.  He didn't have copies given out, but I

11  don't believe I will have an objection.

12         THE COURT:  All right.

13         MR. JENKINS:  We will get those copies, Your Honor.

14         THE COURT:  Then 1 through -- sir, problem?

15         MR. STROCHAK:  I believe we don't have copies of 3 or

16  4 either, so I just want to reserve as to objections until I

17  actually see what they are.

18         THE COURT:  All right.

19         MR. JENKINS:  I will get those, Your Honor.

20         THE COURT:  Very good.  Otherwise we will enter the

21  documents into evidence.

22         MR. JENKINS:  Thank you, Your Honor.  And with that

23  Mr. Grimes' case is concluded.

24         THE COURT:  All right.  Any rebuttal?  I take it

25  there are no further witnesses on behalf of objectors?  Indeed,

Hager - Direct (STR)                                    204

1   I forgot about the U.S. Trustee.  We're up to that and I'll

2   gladly hear from you unless there is a request for rebuttal

3   first on what we've heard so far?

4           MR. STROCHAK:  We do, Your Honor.  We would just like

5   to call Mr. Hager very briefly just on one point.

6           THE COURT:  All right, let's do that and then we'll

7   get to the U.S. Trustee.

8           GEORGE HAGER, DEBTOR'S WITNESS, SWORN

9           THE CLERK:  State your name for the record, spelling

10  your last.

11          THE WITNESS:  Name's George Hager, H-A-G-E-R.

12                      DIRECT EXAMINATION

13  BY MR. STROCHAK:

14  Q   Adam Strochak again from Weil, Gotshal.  Good afternoon,

15  Mr. Hager.  Just a few questions on one issue raised in Mr.

16  Grillo's testimony earlier.  Mr. Hager, could you explain for

17  the Court what are EBITDAR mergin -- margins, excuse me,

18  EBITDAR margins?

19  A   EBITDAR margins are the relationship between the earnings

20  that you generate against revenue.  Give you a simple numerical

21  example, if I had $100 of revenue and my earnings before

22  depreciation, interest, taxes, amortization and rents was $10,

23  I would have $10 of EBITDAR margin and that would be a 10

24  percent EBITDAR margin percentage.

25  Q   Thank you.  Now Mr. Grillo indicated that his rationale

                          **AA. 560**

Hager - Direct (STR)                                205

1   for valuing the debtors at a multiple of cash flow greater than

2   some of the debtor's competitors was because the debtor's

3   EBITDAR margins were lower than those of his competitors,

4   suggesting I think in his words, "Room for improvement." Mr.

5   Hager, as the company's Chief Financial Officer do you agree

6   that the debtor's EBITDAR margins suggest room for improvement

7   or a temporary disadvantage to the company?

8   A    I would actually take strong exception to that. I don't

9   think Mr. Grillo had done anything to evaluate our business.

10  This company's been in existence for 15 years and its primary

11  operators have been in business for more than 20 years.  And

12  obviously in our financial situation we have looked for every

13  place to save money or to enhance revenue.

14  Q    Mr. Hager, is there anything particular about the debtor's

15  EBITDAR margins that suggest to you that Mr. Grillo's analysis

16  is incorrect?

17  A    Well, one of -- when you look at the Genesis strategy

18  which we tried to contrast a little with some of our peers even

19  though we have been grouped with the likes of a Beverly or a

20  KINDRED CARE, Genesis has embarked on a strategy of serving a

21  higher acuity population.  And the evidence of that since that

22  population requires more service, more pharmaceuticals, more

23  medical supplies, more rehabilitation and therapy, is that the

24  per diem payment rates are higher.

25          Now if you would compare Genesis Health Ventures per

**AA. 561**

1    diem payment rates to those of Kindred or Beverly you would see

2    that our per diem revenues are significantly higher than those

3    two peers.  And even though the percentage of our revenue

4    dollar that we drop to the EBITDAR line is lower, the actual

5    cash flow, the dollars per patient day that we generate are

6    comparable to Kindred and in excess of Beverly based on our

7    analysis of the public available data.

8            And so really it is very difficult to compare, you

9    know, performance just based on a statistic of percentage

10   without truly understanding the underlying fundamentals of the

11   strategy and what's driving the relationship of revenue and

12   variable and fixed costs of your patient population.

13   Q    Do you think you will be able to significantly improve

14   EBITDAR margins over the near term?

15   A    I think you've heard testimony from every advisor in this

16   case.  This industry will continue to be impacted by nursing

17   shortages, wage inflation, and albeit more stable, Medicare and

18   Medicaid reimbursement rates today clearly risk with budget

19   surpluses declining, states' surpluses declining, of the

20   ability of those payors to match inflation in their payment

21   rates for the services required.

22           In addition the liability insurance issue, the tort

23   issue is getting worse before it's getting better.  I just do

24   not envision what will drive a growth in margin unless there

25   are some quantum change in Medicare and Medicaid reimbursement

**AA. 562**

Colloquy                                    207

1    rates.

2              MR. STROCHAK:  Thank you, sir.  No further questions.

3    Thank you, Your Honor.

4              THE COURT:  Any further questions?  Thank you, sir.

5    All right, we're up to U.S. Trustee.

6              MR. HOLTZER:  Your Honor, Gary Holtzer for Weil,

7    Gotshal & Manges on this point.  At the outset of the hearing

8    we had discussed coming to the U.S. Trustee's objection to fees

9    and I believe Your Honor had indicated to the extent it was a

10   remaining issue you would decide at that juncture, which is

11   now, I suppose, as to how we would proceed.

12             We would renew our request to the Court that we

13   simply reserve the amount of cash that the U.S. Trustee is

14   indicating are due and owing as fees and be allowed to brief

15   this and prepare for it as a separate hearing, Your Honor?

16   There's a significant amount of interest among a wide variety

17   of cases and we've had -- I've had calls last night from other

18   counsel to other debtors concerned about this particular issue

19   and wanting to be a part of it.

20             We do not, just so we're clear, Your Honor, we

21   received from the U.S. Trustee two spread sheets showing a

22   calculation of fees that the U.S. Trustee would propose that

23   Genesis and Multicare pay.  We do not contest, as long as

24   they're the same as the ones we've seen, the amount that the

25   U.S. Trustee is calculating.  What we contest is the

Colloquy                                    208

1   methodology that the U.S. Trustee is employing to get to that

2   calculation.

3           THE COURT:  Can we -- should we -- do we need to hear

4   presumably a few minutes of testimony since presumably the

5   gentleman who did the calculations is here, to understand the

6   manner of calculations?  Is that an issue?

7           MR. HOLTZER:  Your Honor, I don't believe it's an

8   issue.  The reason it's not an issue is because the manner of

9   calculations goes to the word disbursements in Section 1930 and

10  the U.S. Trustee is offering this Court an interpretation of

11  disbursements based upon disbursements not that the debtor

12  makes from its centralized cash management accounts which are

13  in several debtors, only three I believe, but rather allocated

14  amounts that the Genesis debtors and Multicare debtors have set

15  forth at the special request of the U.S. Trustee on the monthly

16  operating report.

17          And so this entire argument turns on the definition

18  of disbursements.

19          MR. MCMAHON:  Your Honor, just -- United States

20  Trustee, I disagree with debtor's counsel.  I think testimony -

21  - a few minutes of testimony would be helpful both the debtor's

22  witness and from the United States Trustee's witness with

23  respect to clarifying exactly what's going on here.  The fact

24  that there are different debtors, the fact that the debtors do

25  have the capability of breaking down revenue and expenses by

1  each debtor, there are certain factual issues that should be
2  put on the record.
3        THE COURT:  All right, let's spend the time.  I --
4  let me say as I did at the outset, that the final resolution of
5  this issue will not be the point of confirmation or not,
6  notwithstanding the 1129 provision.  Nevertheless to the extent
7  that we can make progress on this issue and see where it
8  stands, that's what I want to do.
9        So yes, indeed, I will hear the testimony that you're
10 offering in connection with this issue.
11       MR. MCMAHON: Thank you, Your Honor.
12       THE COURT:  Please present your witness.
13       MR. MCMAHON:  Your Honor, the United States Trustee
14 would like to call Mr. Hager back to the stand.
15       THE COURT:  Mr. Hager, if you would?  I remind you,
16 of course, that you're still under oath.  Go ahead, sir.
17                    CROSS-EXAMINATION
18 BY MR. MCMAHON:
19 Q    Mr. Hager, good afternoon.
20 A    Good afternoon.
21 Q    Briefly to review, sir, your current position with the
22 debtors is what?
23 A    I'm the Executive Vice-President and Chief Financial
24 Officer.
25 Q    And you've held that position --

Hager - Cross (MCM)                                    210

1          THE COURT:  I think we can get past that.  The record

2    is reflective of Mr. Hager's position.  Go ahead, please.

3          MR. MCMAHON:  Thank you, Your Honor.

4    BY MR. MCMAHON:

5    Q   Mr. Hager, the Genesis and Multicare debtors are on an

6    accrual method of accounting, is that correct?

7    A   Yes, as required under generally accepted accounting

8    principles.

9    Q   And that method has been used since the debtor entities

10   filed the bankruptcy petitions which initiated these cases, is

11   that correct?

12   A   That is correct.

13   Q   And the Genesis and Multicare debtors use of the accrual

14   method of accounting is based in part on IRS requirements, is

15   that correct, sir?

16   A   It is actually based on generally accepted accounting

17   principle requirements, public reporting and Securities and

18   Exchange Commission requirements.

19   Q   Can you account for the revenue of the Genesis debtors and

20   the Multicare debtors?

21   A   I'm not sure I understand the question.

22   Q   Sure.  I'll re-phrase.  The sum total of the revenue for

23   each set of debtors, Genesis and Multicare, you can account for

24   that figure, can't you?

25   A   I can, yes.

Hager - Cross (MCM)                                          211

1   Q    With respect to the way in which revenue is booked, is

2   revenue booked on an entity by entity basis?

3   A    As I stated in my testimony yesterday, we actually

4   maintain the financial records of the company on an operating

5   unit or a business unit basis.  It's really not on a legal

6   entity basis.

7   Q    And the operating unit basis would encompass a group of

8   individual debtor entities under the umbrella of each operating

9   line of business, is that correct?

10  A    That's correct.

11  Q    Do the Genesis and Multicare debtors each prepare and file

12  federal tax returns on an annual basis?

13  A    They do.

14  Q    And do those debtors report revenue on an entity by entity

15  basis in their federal tax returns?

16  A    They do.

17  Q    Will you please explain to me how the Genesis and

18  Multicare debtors book their expenses respectively?

19  A    Financial records, as I said, are maintained on an

20  operating unit basis.  There are both revenue and expense

21  journal entries recognized monthly, recorded by a series of

22  accountants and system entries from payroll systems, accounts

23  payable systems, billing systems, to generate financial

24  statements, the income statement, and the balance sheets of

25  each respective operating unit on a monthly basis.

AA. 567

Hager - Cross (MCM)                                   212

1   Q    Is there a separate ledger account for each individual

2   debtor entity?

3   A    No, there is not.

4   Q    In terms of booking the expenses in terms of a

5   debit/credit entry, in term -- in accounting jargon, you would

6   debit the expense and credit a due/to/from account, would that

7   be an accurate description of the way in which the debtors book

8   their expenses?

9   A    Actually there's a variety of ways -- the way expenses can

10  be booked.  An expense booked out of the accounts payable

11  system would be a debit to the expense and a credit to the

12  accounts payable, general ledger account.  If there was an

13  accrued liability would be a debit to an expense and a credit

14  to an accrued liability.  Could be amortization expense,

15  depreciation expense, that would affect a different balance

16  sheet account and different expense line items.

17        So there are a significant number of ways in which

18  expenses are recognized and different balance sheet accounts

19  that are the offsetting entry for those expense recognitions.

20  Q    Sir, you just previously testified momentarily ago that

21  the debtors as part of the process of filing federal tax

22  returns do have the ability to break out revenue on an entity

23  by entity basis, correct?

24  A    That's correct.

25  Q    Both the Genesis and Multicare debtors do have the ability

**AA. 568**

Hager - Cross (MCM)                                        213

1   to break out expenses on an entity by entity basis as well for

2   federal tax reporting purposes, is that correct?

3   A    For tax purposes we need to perform a series of

4   allocations, able to align expenses to legal entity since many

5   expenses are not necessarily recognized on the legal entity

6   ledger, since there is not a ledger for every legal entity.  So

7   there needs to be an allocation for tax purposes.  Those

8   allocations are done once a year.

9   Q    To insure that I understand your testimony correctly, sir,

10  there are certain expenses which are attributable to one debtor

11  entity as opposed to another, is that correct?

12  A    Well, I'll give you an example.  The corporate expense,

13  myself, for example, I am recognized on the corporate entity,

14  but we do need to allocate for tax purposes the corporate

15  expense to all of the operating business units.  That

16  allocation occurs once a year at the time we prepare tax

17  purposes based on consistent and acceptable methods of

18  allocating those expenses amongst those legal entities.

19  Q    The debtor's cash management system is centralized, is

20  that correct?

21  A    It is.  We have three primary accounts payable disbursing

22  accounts, one at Genesis, one at NeighborCare, our pharmacy,

23  and one at Multicare.  We also have similar payroll disbursing

24  accounts for each of those three entities as well.

25  Q    And why is the debtor's cash management system

Hager - Cross (MCM)                                        214

1   centralized?  Is it for internal control reasons?

2   A    Internal control and efficiency are the two primary

3   reasons.

4   Q    Are you familiar with the debtor's monthly operating

5   report, sir?

6   A    I haven't reviewed them in some time.  I was involved in

7   the initial development of those reports, yes.

8          MR. MCMAHON:  If I may, Your Honor, I'd like to mark

9   two exhibits right now and approach the Court and the witness.

10         THE COURT:  All right.  Trustee 1 and 2.  Thank you.

11         MR. MCMAHON:  For identification purposes, Your

12  Honor, excuse me, I'd like to mark these documents as -- for

13  the Genesis monthly operating report which would be Exhibit

14  UST-1 and Multicare would be Exhibit UST-2.

15         THE COURT:  Fine.

16  BY MR. MCMAHON:

17  Q    Mr. Hager, can you explain to me how you are familiar with

18  the debtor's monthly operating -- the formation of the format

19  of the debtor's monthly operating reports?

20  A    At the inception of the case we had entered into

21  discussions with U.S. Trustee's office to agree upon the

22  formats and at what level of detail we would prepare our

23  monthly operating reports.  And there were certain negotiations

24  as to form and content and I was involved in those discussions.

25  Q    Can you please turn to -- on Exhibit UST-1 the page

Hager - Cross (MCM)

215

1    Supplemental Exhibit to MOR-1A?

2    A    This is in Genesis Health Ventures?

3    Q    Yes, that is correct.  Now at the top of that page, sir,

4    there's a paragraph that indicates that the debtors disbursed a

5    certain amount from their bank accounts and then the next

6    sentence reads, "In accordance with requests from the United

7    States Trustee the following is an allocation of those amounts

8    among the respective debtors."  Do you have an understanding as

9    to how the allocation amounts which are detailed in this

10   particular monthly operating report were arrived at?

11          THE COURT:  I'm not sure I'm with you on your page.

12   Can you describe again where you're reading from?

13          MR. MCMAHON:  Sure.  Excuse me, Your Honor.  I'm on

14   the page entitled Suppl -- it's the first page of Exhibit

15   entitled Supplemental Exhibit to MOR-1A.

16          THE COURT:  I see.  Please continue.

17          THE WITNESS:  It's my understanding at the request of

18   the U.S. Trustee to complete this information we have put forth

19   programming changes to our accounting systems to track

20   disbursements out of both the payroll disbursing accounts and

21   the accounts payable disbursing accounts in an attempt to

22   allocate those disbursements to the legal entities.

23   BY MR. MCMAHON:

24   Q    In other words, correct me if I'm wrong, sir, there was a

25   certainty the disbursements and which you're referring to were

**AA. 571**

1  coded in a way so that they would be associated with a

2  particular debtor entity, is that correct?

3  A    I think they were coded in a way that ultimately could

4  have been -- you could allocate to a debtor entity, yes.

5  Q    And the amount set forth on Supplemental -- the

6  Supplemental Exhibit to MOR-1A represent the debtor's

7  allocation of the total amount disbursed, is that correct?

8  A    That is correct.

9  Q    Turning to Exhibit UST-2 -- I'm going to turn to the page

10 entitled Supplemental Exhibit to MOR-1A again.  Do you have

11 that page in front of you, sir?  Is it your understanding that

12 the -- strike that.  Do you have an understanding with respect

13 to the Multicare debtors as to the reason why this particular

14 exhibit is part of the monthly operating report?

15 A    I believe it was at the request of the U.S. Trustee.

16         THE COURT:  I gather it's the same for both exhibits,

17 correct?

18         MR. MCMAHON:  They're virtually identical that's the

19 reason why I just want to confirm that with the witness.

20 BY MR. MCMAHON:

21 Q    Sir, with respect to the monthly operating report we have

22 marked as Exhibit UST-2 would your testimony with respect to

23 the allocation -- the allocations, excuse me, set forth on

24 Supplemental Exhibit MOR-1A be the same as it was with respect

25 to the Genesis debtors?

Hager - Cross (MCM)                                              217

1    A    It is.  I would just want to clarify one point.  It is my

2    understanding that the payment of fees required to the U.S.

3    Trustee during the case has not been based on the Supplemental

4    Exhibit to MOR-1A, but actually MOR-1A.  It's actual

5    disbursements out of disbursing accounts and the in pressed

6    accounts of the debtor entities.

7    Q    So you -- sir, with respect to that answer, you're

8    referring to payments that the debtors have made to date?

9    A    That's correct.

10   Q    Sir, there are a large number of debtor entities involved

11   in these Chapter 11 cases, correct?

12   A    There are.

13   Q    Each of them has a separate legal existence, is that

14   correct?

15   A    That is also correct.

16   Q    Up to the date of this hearing have either of the debtors

17   moved to substantively consolidate the estates of either the

18   Genesis or the Multicare debtors to your knowledge?

19   A    There was consideration.  The reason why we have the

20   number of legal entities that we do have is primarily due to

21   the fact that the company was built, as heard through the last

22   two days, to a great extent through acquisition.  In many cases

23   the legal entity structure has been retained primarily because

24   of a significant disruption in the business resulting from

25   licensor change if you attempt to change your legal structure.

**AA. 573**

Hager - Cross (MCM)                                          218

1    So in many cases in this industry a licensor change a

2    disruption has prevented most companies in our sector, as I

3    understand it, from making their capital structure or their

4    legal structure more efficient.

5    Q    Going back to my question, sir, the debtors have not

6    actually filed a motion up until today -- I mean as of today to

7    substantively consolidate the debtor's estates, have they?

8    A    We have not.

9              MR. MCMAHON:  Your Honor, may I have a moment to

10   consult?

11             THE COURT:  Sure.

12   BY MR. MCMAHON:

13   Q    Sir, you used the same allocation with respect to the

14   monthly operating report that you would do for the tax return,

15   is that correct?

16   A    I wouldn't say that -- no, I wouldn't say that's correct

17   at all.

18   Q    Could you explain to me how it would be different?

19   A    I believe the allocation in the Supplemental MOR schedule

20   is only an allocation of disbursements to the accounts payable

21   system as agreed upon with the U.S. Trustee.  The allocations

22   required to prepare the tax returns at the legal entity level

23   require many more allocations.  I mentioned one, the allocation

24   of corporate expense.  There's an allocation of certain other

25   inter-company charges.  I probably couldn't list all of the

Hager - Cross (MCM)                                          219

1  other allocations that need to be made to complete the tax

2  returns at the individual legal entity level.  But it's

3  significantly greater than the Supplemental MOR allocation.

4  Q    A number of the debtors, both the Genesis and Multicare

5  debtors are operating entities, would that be correct?

6  A    That's correct.

7  Q    Some of them have utilities -- the utility expenses?

8  A    They do.

9  Q    Some of them have specific suppliers, would that be

10 correct, sir?

11 A    I would say some of them probably have suppliers.  I would

12 say the majority of our suppliers view themselves as supplying

13 the Genesis organization and don't necessarily make a

14 distinction or credit a valuation of the individual entities.

15 They look toward Genesis Health Ventures for NeighborCare or

16 Multicare.

17 Q    How would specific expenses like utilities and suppliers,

18 supplies a particular debtor entity incurs be booked?

19 A    Utility expenses, as the bills would come in, would be

20 identified to the business unit that the utility bill related

21 to and the expense would be recorded on that general ledger.

22 To the extent that general ledger ultimately is consolidated

23 into a different legal entity for purposes of tax return

24 preparation, that could happen as well.  But the business unit

25 will record the direct utility expense as required by the bill.

Hager - Cross (MCM)                                    220

1   Q    How about with respect to supplies, specific suppliers?

2   A    The same, as the supply comes in the business unit would

3   receive a bill typically if business unit ordered the supply.

4   They could code the account payable.  The invoice would be sent

5   to the corporate accounts payable process and go through the

6   normal payment and disbursement process out of the corporate

7   disbursement account.  That expense would be recognized on that

8   business unit.

9   Q    In the course of their accounting, sir, do the debtor

10  entities, the Genesis and/or the Multicare debtors use

11  due/to/from accounts?

12            THE COURT:  I'm sorry, sir?

13            MR. MCMAHON:  I'm sorry, I'll repeat the question,

14  Your Honor.

15  BY MR. MCMAHON:

16  Q    In the course of their accounting do the debtor entities,

17  either the Genesis or the Multicare debtors use due/to/from

18  accounts?

19            MR. HOLTZER:  Your Honor, I'm not sure where we're

20  headed in this, but we agreed to have Mr. Hager testify.  I

21  just wanted to get some sense of how long we're going to go.

22  We were going to try to finish today.

23            THE COURT:  Indeed we will finish today.

24            MR. MCMAHON:  I'm wrapping up my testimony of Mr.

25  Hager and I will call Mr. Heck briefly.

Hager - Cross (MCM)

221

1       THE COURT:  All right.

2       THE WITNESS:  We do have due/to due/from accounts.

3  Those are accounts used to identify amounts due to an from

4  related entities in the Genesis and/or Multicare structure.  So

5  to the extent there would be a loan from one company to another

6  on advance or distribution or a contribution, it would

7  typically be accounted for in the due/to due/from account.

8  BY MR. MCMAHON:

9  Q    Are due/to/from accounts used to upstream cash from the

10  subsidiary to the parent level or to the business unit level?

11       MR. HOLTZER:  Your Honor, I'm not sure what we're

12  talking about when we talk about subsidiaries.  If you saw a

13  picture of these debtors, there are 150 or so on one side, on

14  the Genesis side, and another 200 plus on the Multicare side.

15       THE COURT:  All right.

16       MR. MCMAHON:  It's a -- you know, it's a general

17  question designed to determine whether or not, you know, the

18  debtors account for -- have due/to/from accounts assigned to a

19  specific debtor entity as opposed to the business unit level,

20  Your Honor.

21       THE COURT:  Can you answer that question?

22       THE WITNESS:  Yes, they're not assigned to the legal

23  entity.  They're assigned to the business unit but they're tied

24  to the financial accounting systems.  So those due/to due/from

25  accounts do track cash movements both up streaming and down

Hager - Cross (MCM)                                   222

1  streaming between operating units within business units within

2  the Genesis and Multicare structures.

3  BY MR. MCMAHON:

4  Q  ·  And for federal tax reporting purposes, sir, would you

5  have an ability to break out on an entity by entity basis the

6  inner company amounts reflected in the due/to due/from

7  accounts?

8  A    I can't answer that question specifically.  I would

9  imagine that we would have to be able to do to some degree

10  allocate any expenses that flow through the inter-company lines

11  into the legal entity for tax purposes.  But those due/to

12  due/from balances in many cases will include transactions that

13  do not have any tax implications, such as capital

14  contributions, dividends, et cetera.

15           MR. MCMAHON:  I have nothing further for Mr. Hager,

16  Your Honor.

17           THE COURT:  Any questions, Mr. --

18           MR. HOLTZER:  Your Honor, very briefly.

19                    REDIRECT EXAMINATION

20  BY MR. HOLTZER:

21  Q   Mr. Hager, you testified that Genesis and Multicare have

22  been paying their U.S. Trustee fees according to the

23  disbursements that were actually made.  Could you describe what

24  you mean by that in the accounts that the fees were paid in

25  connection with?

AA. 578

Hager - Cross (MCM)                                    223

1   A    Yes, the debtor entities are identified on the MOR

2   Schedule 1A and if you look at that you'll see that there are,

3   you know, simply just one or two large disbursement numbers.

4   They represent the entities that own the disbursement accounts.

5   They said there are two large AP disbursement accounts in

6   Genesis, Genesis and NeighborCare, and one in Multicare.  And

7   there are smaller numbers in the remaining debtor entities

8   typically and those represent disbursements out of impressed

9   accounts as they're impressed accounts at the individual

10  operating unit levels and we actually have to roll those up

11  into legal entity as well for purposes of this report.  They

12  represent payroll changes and smaller emergency payments and

13  distributions and disbursements.

14  Q    And to date, Mr. Hager, you've been paying the fees based

15  upon disbursements from those accounts?

16  A    That's correct.

17  Q    And do you have any idea of the amount of fees you've paid

18  to the U.S. Trustee to date during the course of this case?

19  A    My recollection between both companies is approximately

20  $700,000, but that's a --

21  Q    You're probably a couple hundred thousand dollars high,

22  but if I were to ask you to estimate according to the U.S.

23  Trustee's calculation what your fees would be in this case to

24  date, do you have any idea of the magnitude?

25  A    My understanding it's three and a half million dollars.

Heck - Direct (MCM)                                                224

1          MR. MCMAHON:  No further questions, Your Honor.

2          THE COURT:  All right, thank you, Mr. Hager.  Your

3  next witness?

4          MR. MCMAHON:  Your Honor, I'd like to call Mr.

5  Jeffrey Heck to the stand.

6          THE COURT:  All right, sir.

7          JEFFREY HECK, TRUSTEE'S WITNESS, SWORN

8          THE CLERK:  Please state your name for the record,

9  spell your last name.

10          THE WITNESS:  Jeffrey Hogan Heck, H-E-C-K.

11          THE CLERK:  Thank you.

12                      DIRECT EXAMINATION

13  BY MR. MCMAHON:

14  Q    Mr. Heck, can you briefly tell me what your educational

15  background is?

16  A    I have a Bachelor's in Science degree from King's College

17  in Wilkes-Barre, Pennsylvania.

18  Q    Do you hold any professional certifications?

19  A    I'm certified as a certified fraud examiner.

20  Q    And which organization issues that certification?

21  A    It's a national association.

22  Q    When did you receive that certification?

23  A    October of 2000.

24  Q    Can you briefly describe for me your work experience after

25  graduating from college?

Heck - Direct (MCM)

225

1    A    I graduated college in 1987 and began employment as an

2    auditor with a defense contract audit agency.  In 1992 I

3    proceeded to take a position as an auditor with the Department

4    of Justice, Office of the Inspector General, and in 2000 I

5    became a Bankruptcy Analyst with the Office of the United

6    States Trustee.

7    Q    You indicated you're a Bankruptcy Analyst.  What are the

8    responsibilities of a Bankruptcy Analyst with respect to

9    Chapter 11 cases?

10   A    The responsibilities of an analyst are varied.

11   Specifically in 11 cases we conduct initial debtor interviews

12   with debtors at the onset of a bankruptcy case so that we, as

13   the analyst, can get an understanding of the debtor to

14   understand how their financial systems are set up, to

15   understand the ownership structure of the entities.  We also go

16   over the reporting requirements with the debtor through monthly

17   operating guidelines.  These guidelines are very broad and we -

18   - they're malleable so that we can work with the debtors

19   depending upon their specific circumstances to be less

20   burdensome to the debtor in their monthly reporting

21   responsibilities.

22   Q    What is a monthly operating report?

23   A    A monthly operating report is a compilation of financial

24   reports that the debtor prepares under risk of perjury that

25   include a balance sheet, an income statement, a statement of

**AA. 581**

Heck - Direct (MCM)                                    226

1   cash receipts and disbursements, a aging of accounts

2   receivable, an aging of accounts payables, and a -- four

3   questions regarding the transfer of assets.

4   Q    It's a form of self-reporting by a particular Chapter 11

5   debtor, is that correct?

6   A    Yes, it's self-reporting and, as I said before, we work

7   with the debtors based on their financial systems to lessen the

8   burden on them, specifically in this case traditionally since

9   the case was substantively consolidated they had in the Genesis

10  instance I believe 153 debtors.  We would normally request

11  separate operating reports by debtor.  With this debtor they

12  indicated to us that to be more meaningful to their creditor

13  body they would prefer to file by line of business.  We were

14  agreeable to that and we did allow the debtors to submit

15  operating reports by line of business which is evidenced by the

16  exhibit.

17       The one thing we did request of the debtor is that

18  they provide disbursements on a debtor by debtor basis.  This

19  we discussed with the debtors at the initial debtor interview

20  which I was part of.  They initially intended to present only

21  the disbursements from a cash management system and their

22  impressed accounts.  We have correspondence back to the debtor

23  which said that was not our understanding based on your

24  presentations at the IDI  We want the disbursements --

25       MR. HOLTZER: Objection, Your Honor, to the extent

AA. 582

Heck - Direct (MCM)

227

1    the testimony indicates what's in correspondence.  We would ask

2    the witness not to reflect on that.  The documents would speak

3    for themselves.

4            THE COURT:  I'll allow it.  If there's a difference

5    of opinion about it, I'll consider it.  Go ahead, sir.

6            THE WITNESS:  If I can continue, thank you, Your

7    Honor.  The letter back to the debtor said we did not want just

8    the impressed accounts.  We wanted disbursements on a debtor by

9    debtor basis.  I spoke with a representative of KPMG, Rhonda

10   Culum, who indicated to me that she was performing the cross

11   walk to get for us the information to present on a debtor

12   specific basis.  The debtor expressed to us at the IDI that

13   they did utilize a due-to due-from account to account for

14   expenses.  When the subs incurred or received an invoice they

15   would debit an expense, credit a due-from.  The parent would

16   then debit the due-from, credit the payable.  If the flow of

17   that transaction is that the due-to due-from on the parent is

18   in part the responsibility of the sub-entities,  That due-to-

19   from is not all of the parent's responsibility.

20           So the disbursements from the cash management system

21   are not disbursements solely of the entity to which that

22   account is titled.  If we requested the debtor to do a

23   breakdown of all of the due-to due-from accounts I'm sure it

24   would be voluminous and it would be a monstrous undertaking

25   which they couldn't do and it would be an extreme burden.  As a

Heck - Direct (MCM)                                           228

1    compromise to the debtor we did allow them to do the

2    allocation. We did not question the allocation. We accepted

3    it on face value. But as we just heard in testimony the

4    allocation does not include the corporate allocations which are

5    part of the tax return. So I would offer that we are receiving

6    disbursements by debtor entity, but these disbursements are, in

7    fact, understated since they do not include corporate

8    allocations that would go back to the individual debtors.

9    Q    Mr. Heck, I'm going to present you with a copy of Exhibit

10   UST-1 and UST-2. Just so the record is clear, Mr. Heck, what

11   is an IDI?

12   A    An IDI is an initial debtor interview which is conducted

13   in most instances at the early onset of a case.

14   Q    And when was the IDI for the Genesis debtors? When did

15   that occur?

16   A    It was conducted on-site at the debtor's location on

17   August 15th of 2000.

18   Q    And who was present at that meeting?

19   A    Myself, senior bankruptcy analyst Linda Logan, Carley,

20   Jeffrey Bookman, bankruptcy analyst, Mr. McKean from the debtor

21   and a number of other debtor representatives.

22   Q    And after the IDI, the initial debtor interview was

23   concluded, did the Office of the United States Trustee and the

24   Genesis debtors come to an agreement regarding the form which

25   the MORs, the monthly operating reports would take?

Heck - Direct (MCM)

229

1  A    We did.

2  Q    What was that agreement?

3  A    We received correspondence from Mr. McKean dated August

4  17th laying out essentially the same format where the monthly

5  operating report is.  You would present it to me.  One issue

6  that we took exception with there was the impressed accounts as

7  disbursements for each of the subsidiary debtors.  We had

8  indicated that if he had a problem with our concern that it not

9  reflect just impressed accounts, please contact us.  We did not

10 receive further correspondence.  I did receive the subsequent

11 phone call from Rhonda Culum from KPMG.  She indicated they

12 were doing the cross-walk to get the disbursement information

13 on a debtor specific basis.  And that's what resulted in this

14 monthly operating report.

15 Q    And the agreement you indicated is reflected in the

16 supplemental exhibit to Monthly Operating Report 1-A.  That's

17 marked -- that is contained in Exhibit UST-1, is that correct?

18 A    Yes, the supplemental is correct.

19 Q    And with respect to the Multicare debtors, do you have an

20 understanding as to whether or not the understanding which the

21 Office of the United States Trustee had with the Genesis

22 debtors was matched by them?

23 A    They indicated they would apply the same methodology to

24 the Multicare as the Genesis debtors.

25 Q    Have the Genesis debtors provided copies of any tax

**AA. 585**

Heck - Direct (MCM)                                    230

1   returns to the Office of the United States Trustee?

2   A    Yes, we did receive a copy of the 1998 tax return.

3            MR. MCMAHON:  I'd like to authenticate that document

4   right now, Your Honor.

5            THE COURT:  The tax return?

6            MR. MCMAHON:  Yes.

7            THE COURT:  Is there any -- all right.

8            MR. TODER:  Your Honor, would it be fair -- and I

9   apologize -- would it be fair to get an understanding of about

10  how long Mr. Heck will be?  And what I'm reflecting, if I may,

11  and I do with some trepidation, we have a room filled with

12  people who are billing a great deal of money to this estate,

13  among other things --

14           THE COURT:  You might reach the U.S. Trustee

15  difference --

16           MR. TODER:  I've given up that hope many years ago.

17  But suffice it to say -- to find out how long because it might

18  be sensible --

19           MR. MCMAHON:  Your Honor, I will conclude within

20  three to five minutes.

21           THE COURT:  All right, you've got five minutes.

22  BY MR. MCMAHON:

23  Q    Do you recognize what the document you are holding is, Mr.

24  Heck?

25  A    Yes, it's a 1998 tax return.

Heck - Direct (MCM)

231

1          MR. MCMAHON:  Your Honor, I would like to mark this

2     document as Exhibit UST-3.

3          THE COURT:  Fine.

4     BY MR. MCMAHON:

5     Q    How was that document provided to the Office of the United

6     States Trustee?

7     A    It was provided to Jeffrey Bookman, the bankruptcy analyst

8     in our office.  It came under correspondence that was not

9     dated.

10    Q    Did you review that document prior to the hearing?

11    A    Yes.  We reviewed the document initially on the onset of

12    the case because it represents historical data of the debtor.

13    It gives us based on affiliation schedules the ownership

14    structure of the debtors, who the parent company is, what the

15    parent owns, and it includes consolidating schedules which show

16    individual expenses and payables that would be recorded for tax

17    purposes by each of the individual debtors.  It includes inner-

18    company balances on those schedules as well.

19         THE COURT:  All right.

20         MR. MCMAHON:  Your Honor, I'd like to mark another

21    two documents Exhibits UST-4 and 5.

22         THE WITNESS:  Do you have a copy for me?  I need to

23    see the one that he has, please.

24         MR. MCMAHON;  Sure.

25         THE COURT:  Go ahead.

Heck - Direct (MCM)                                    232

1       MR. MCMAHON:  I'm going to mark the Genesis exhibit

2   as Exhibit UST-4.

3   BY MR. MCMAHON:

4   Q    Mr. Heck, can you take UST-4 and explain to me what it is?

5   A    Based on the monthly operating reports submitted by the

6   debtors, we take the information -- I specifically take the

7   information from the Supplemental Exhibit MOR 1-A which are the

8   disbursements.  I entered that into our automated case

9   management system as presented by the debtors.  That

10  information is then uploaded into another system which

11  generates the bill for the debtors based on the disbursements.

12       The exhibit presented shows what has been billed to

13  the debtors based on the information put into the system.

14  Q    And you said billed to the debtors, that's for the

15  entirety of the case, is that correct?

16  A    Through May -- it's the information from the monthly

17  operating reports through May of 2001.  We have worked with the

18  debtor and we have provided them additional time for submitting

19  operating reports.  Traditionally they're due 20 days after the

20  end of the month.  The debtor requested additional time.  We

21  offered that to the debtor in another effort to work with them

22  in getting this information to us correctly and accurate.

23       THE COURT:  Any other questions, counsel?

24       MR. MCMAHON:  Yes, Your Honor, just briefly.

25  BY MR. MCMAHON:

Heck - Cross (HOL)                                    233

1    Q    With respect to Exhibit UST-5 can you explain to the Court

2    what that document is?

3    A    That's also a summary of the fees that were billed to the

4    debtor based on the information inputted into the ACMS system,

5    uploaded into the billing system, and it's the status of what

6    was billed versus paid and what is owing based on that system.

7    Q    And do you have an understanding as to whether or not

8    those figures are based on the supplemental exhibit to MOR 1-A

9    which is contained in the Multicare operating report?

10   A    These were based on the Supplemental Exhibit MOR 1-A for

11   both Genesis and Multicare debtors.

12            MR. MCMAHON:  I have no further questions for Mr.

13   Heck.

14            THE COURT:  All right, thank you, sir.  Any

15   questions, sir?

16            MR. HOLTZER:  Your Honor, I only have one question.

17                        CROSS-EXAMINATION

18   BY MR. HOLTZER:

19   Q    Mr. Heck, is it your testimony, just so that we're clear,

20   that at the meeting you mentioned in your testimony with the

21   debtors, that the debtors agreed that this special exhibit that

22   they created at your request would be used to calculate their

23   fees under Section 1930 of the Bankruptcy Code?  Is that your

24   testimony?

25   A    Is that my -- we met with the debtors and we discussed