Colloquy                                              234

1   with them what we wanted them to report disbursements on a

2   debtor specific basis.

3   Q    And is it your testimony that the debtors agreed at that

4   meeting that the exhibit that they prepared especially for you

5   was an exhibit that would be used to calculate the fees under

6   Section 1930 of the Bankruptcy Code?  Is that your testimony?

7   A    At that meeting, no.

8          MR. HOLTZER:  Thank you.  Nothing.

9          THE COURT:  All right.  Go ahead.

10         MR. MCMAHON:  Your Honor, very quickly.  I would like

11  the Court to take judicial notice of four documents that have

12  not been moved into evidence as well as to move the exhibits

13  which I've introduced into evidence if the debtors have any

14  objection.

15         THE COURT:  I take it there's no objection to the

16  exhibits?

17         MR. HOLTZER:  Your Honor, there's no objections to

18  the exhibits that have been introduced to date.

19         THE COURT:  Right.  That's what I'm talking about.

20         MR. MCMAHON:  Your Honor, I would like the Court to

21  take judicial notice of the -- in each the Genesis and the

22  Multicare cases the debtor's motion to -- motions, excuse me,

23  to maintain existing bank accounts and business forms and their

24  centralized cash management system motions.

25         MR. HOLTZER;  No objection, Your Honor.  They're

**AA. 590**

Primps - Argument                                    237

1    and we'll try to speed up the process if we can.

2            Mr. Walsh?

3            MR. WALSH:  Okay, Your Honor, by my count we're down

4    to ten objecting parties including one or two parties who may

5    not even be here.  However, there are a lot of issues.  So what

6    I would -- what I would propose is I don't think I'm prepared

7    to respond to an argument -- an objection that I haven't quite

8    heard yet, so I think the best thing would be to let the

9    objectors go forward, make their argument, we'll respond, other

10   people who want to respond, and get done with it that way.

11           THE COURT:  Well, I don't want to go argument by --

12   in other words I want to hear from one objector at a time.

13   I'll gladly hear from the objectors first and then take your

14   response to all of them.  I think at this point that would be

15   the most efficient way.

16           MR. WALSH:  Okay, so you're suggesting that all the

17   objectors would go one after another and then -- then we would

18   all respond to everybody at the end?

19           THE COURT:  That's fine, yes.

20           MR. WALSH:  Or -- or along the way?

21           THE COURT:  No.  At the end.

22           MR. WALSH:  At the end.  Okay.

23           THE COURT:  Who will go first by way of objection?

24   GMS, sir?

25           MR. PRIMPS:  Certainly, Your Honor.  William Primps

Primps - Argument                                    238

1   for GMS of the law firm of LeBoeuf, Lamb, Greene & MacRae.

2   Your Honor, I'm going to try to be quite brief.  The time is

3   getting late and you've heard copious evidence, but I think it

4   can be summarized very succinctly.  My August 17th submission

5   certainly argues that we believe that this plan should be

6   rejected because it violates the fair and equitable requirement

7   of 1129B of the Bankruptcy Code.

8          We think that essentially what Your Honor is faced

9   with here, looking at all the evidence, is every expert and

10  every expert's report in this proceeding has conceded that in

11  the LTC and pharmacy markets there has been a fundamental sea

12  change in valuations over the last four months since the time

13  that the data was input that formed the basis of the valuations

14  contained in the disclosure statement.

15         As Mr. Grillo's report, GMS Exhibit 8, shows there's

16  been a 65 percent runup in the composites of those two stocks

17  since the time that the data was put into the disclosure

18  statement.  So the only issue in our mind is the degree of this

19  runup.  Again, going back to the disclosure statement, you're

20  looking at a $1.5 billion enterprise value.  We think that

21  taking midpoints of the CS First Boston and UBS Warburg numbers

22  that that number according to the debtor's own experts runs up

23  to 1.75 billion and Mr. Grillo has put forward the Evercore

24  number of 2 billion 75.  Mr. Becklean thinks there's a higher

25  number, as he said by taking the additional step of using Mr.

Primps - Argument

239

1    Schulte's technique of looking out the window.

2         There's also a hurdle amount that I don't know that

3    that has been formally introduced before Your Honor, but it's

4    something that Mr. Walsh had in his submission number three,

5    Debtor's Table 3 of 2 billion 65.  We think we make that

6    hurdle.

7         Now there have been criticisms of Mr. Grillo and his

8    techniques and how he's arrived at his valuation number and I

9    think that much of the fire has been directed against the use

10   of that $220 million EBITDA number.  But perhaps the only thing

11   I can do now -- because there has been so much testimony on

12   that is simply draw Your Honor's attention to the number of

13   places in the record where there is support for the $220

14   million number and, indeed, support for the conservatism of the

15   use of the 220 EBITDA number.

16        There's the GMS Exhibit 2 and that was a projection

17   that Mr. Hager had worked on of $223,603,000  The GMS-3, the

18   Goldman Sachs documents which, of course, there's been a lot of

19   comment that that should be discounted because it was a selling

20   document and a sales document, that was why right before the

21   luncheon break we brought to Your Honor's attention the number

22   of efforts we've made to bring Goldman Sachs into this

23   courtroom so that they could testify to the numbers appearing

24   in their own documents and the fact that they made a decision

25   not to do so.  That number in GMS-3 is $230 million EBITDA.

1    You heard Mr. Grillo refer to the third quarter

2  report of a $54.9 million EBITDA for the combined enterprise.

3  That appears in GMS Exhibit 5 and again multiply it out by four

4  quarters.  That's very close to being on the money at the $220

5  million level.

6    And the list goes on.  In GMS-12, the Lanassa

7  deposition, there's another Goldman Sachs document, the

8  testimony referring to that appears at -- starting at page 34

9  of Mr. Lanassa's testimony and that's the $222.2 million number

10  and that reappears in GMS Exhibit 11 which Mr. Kinsey asked Mr.

11  Shulte about again, $222.2 million.  We think that this gives

12  ample record support to Mr. Grillo's valuation testimony.

13    There's also, of course, been a concerted attack on

14  the use of a multiple of in excess of nine by Mr. Grillo.  The

15  multiple that it's implied out of his valuation work and a lot

16  of that attack I think is centered around the claim that this

17  is too much akin to the Manor Care implied multiple and Manor

18  Care is, of course, the -- I guess you'd say the Mercedes Benz

19  of the industry as we've heard in the testimony.

20    I think again Mr. Grillo's testimony stands on its

21  own here, but I would refer Your Honor to GMS-3 another Goldman

22  -- the same Goldman Sachs exhibit that had the $230 million

23  EBITDA number in it.  There at page 1862 Goldman is proposing

24  or stating that, "From a financial and qualitative perspective

25  Genesis compares well to other players in the industry such as

Primps - Argument                                    241

1   Beverly and Manor Care." I think there's some, you know,

2   strong record evidence here that although certainly no one is

3   contending that Genesis should have the same multiple as Manor

4   Care, the kinds of discounts being proposed by the debtors are

5   not accurate.

6            Now we know that somewhere north of the $2 billion,

7   an enterprise value number, an improper recovery in excess of

8   the 100 percent of senior creditor amounts would be achieved.

9   We've argued the law in our submission to Your Honor that that

10  should result in a rejection of this plan. We personally think

11  -- or we think that one way to prevent this would be in the

12  award of out of money warrants to the G-5 creditors and that

13  way this development of a higher enterprise value which we

14  think is going to occur, that the improper recovery would be

15  prevented. But for now we think that the remedy here is

16  rejection of the plan and we think that the weight of the

17  evidence, Your Honor, supports that finding.

18            Thank you.

19            THE COURT: Thank you, sir. Next objector?

20            MS. MELNIK: Thank you, Your Honor. Selinda Melnik

21  for Charles L. Grimes. Your Honor, I would like to address a

22  few of the arguments that we've made in our objection that were

23  responded to by the creditors committee, the debtor and Mellon

24  as agent for the senior lenders, including on the issue of

25  valuation -- and if I could ask Your Honor's indulgence if you

Jenkins - Argument                                    242

1   would give us permission to split the argument a bit and allow

2   Mr. Jenkins to first address the valuation issue and then I'll

3   address the remaining arguments?

4           THE COURT:  That's fine.

5           MS. MELNIK:  Thank you.

6           MR. JENKINS:  Thank you, Your Honor, David Jenkins

7   for objector Charles L. Grimes.

8           There's two questions here.  The first is the

9   valuation of the combined entity and the second is how to break

10  it down between the Genesis and the Multicare creditors.

11  Valuation of the combined entity, only two experts valued the

12  combined entity -- excuse me -- Mr. Becklean was one of them

13  and his report is particularly instructive.  He used the

14  numbers of the company and their representatives.  He did not

15  make up anything on his own.  He used their numbers.  That's

16  why there was very little cross-examination on that because

17  there's nothing you can do.

18          He did make two changes in the comparable company

19  analysis which is the one that he used principally to drive his

20  value conclusions.  Excuse me.  The two principal changes are

21  unlike UBS Warburg he used a valuation analysis based on

22  Genesis's last twelve months results.  And do they criticize

23  that since Mr. Shulte made it very clear that that, in his view

24  was something that was very important to use.

25          The second, and perhaps more important, was his

Jenkins - Argument

243

1   change in the discount numbers.  We have heard voluminous

2   testimony in this courtroom about how Beverly is comparable to

3   Genesis.  Well, if it's comparable to Genesis as a stand alone,

4   Genesis as a combined entity is not going to be a worse

5   company.  Yet UBS Warburg used on average a 10 percent discount

6   to the Beverly multiples.  Mr. Becklean changed that to zero

7   percent based on the testimony in this courtroom.

8        He also changed Manor Care because the relations

9   between Beverly and Manor Care according to UBS Warburg and CS

10  First Boston was ten percent.  Beverly is ten percent.  Better

11  Manor Care is 20 percent better.  Well, as Mr. Becklean

12  explained, those two companies haven't changed in the

13  marketplace.  Nothing that happens in this courtroom or nothing

14  that Genesis does will change the relative valuation of those

15  two companies.

16       If you conclude, therefore, that Beverly is -- should

17  be valued the same without a discount to Genesis, then as a

18  mathematical concept the Manor Care number comes down to 10

19  percent on a discount which is what Mr. Becklean used.  Those

20  two changes result in a valuation that is higher than what UBS

21  Warburg and CS First Boston came out together.

22       Mr. Becklean came out with a range of 1.7 to 2.2

23  billion.  That's in his report.  He explained why on the

24  witness stand that, although he could not pick a number, if he

25  had to be biased towards one end or another, you go towards the

1    top end of the range.

2              Why do you do so?  Well, I think Mr. Shulte said it

3    best.  You look out the window.  What do you when you look out

4    the window?  Well, health care stocks are hot these days.  The

5    competitors, Beverly and Manor Care in particular, their

6    underlining earnings are improving.  The estimates are being

7    updated even recently the  CS First Boston analyst reports

8    yesterday indicated that just in the last month they're

9    improving their estimate earnings for those two companies.

10             There's not much you can invest in.  If you think

11   this is a hot market there's only two or three publicly traded

12   companies.  As a result of that, perhaps as a result of other

13   factors, the valuation of multiple -- excuse me, the valuation

14   multiples of the competitors are going up all throughout the

15   spring and summer.  The result is that the stock prices of the

16   competitors are soaring.  Mr. Hager gave me a hard time about

17   it, but in fact Beverly's stock price as risen by 80 percent

18   between April and August.  And no, you can't put undue weight

19   on that but it's something to look at.

20             What else can you use?  I'll represent that if you

21   look at the stock price changes in the UBS Warburg reports,

22   Manor Care's valuation -- excuse me, a stock price has risen by

23   approximately 50 percent between April and August.  But when

24   UBS Warburg and CS First Boston put their numbers together,

25   what does the combined valuation of the company come up with?

**AA. 598**

Jenkins - Argument                                    245

1  There have been various numbers put in the paper submitted to

2  Your Honor that take these enterprise values and translate it

3  into a assumed stock price for the company.

4       In the initial submissions based on the April reports

5  from the two financial experts, the number was $20 and change.

6  The number now is $23 and change.  That's approximately a 15

7  percent increase.  So those stock prices of competitors are

8  soaring and everything is getting better, they're not giving

9  them much of an upper bump for that.  This is looking out the

10 window to see if the projections -- excuse me, of the alleged

11 results of their experts are appropriate to rely on.  For many

12 reasons we think they are not.

13      Let's look at another thing looking out the window,

14 and that's the company's projections.  Mr. Hager testified that

15 they used to miss their targets routinely and they got

16 cautious, but that's an understandable human reaction if you

17 miss your targets.  But the result is you get conservative.

18 Mr. Hager was criticized by the financial advisors to the banks

19 for -- excuse me, several of those numbers as coming in unduly

20 conservative.

21      There's another reason why you might want to make

22 your numbers conservative and that is they're bonuses.  The

23 bonuses of the senior officers are based upon the financial

24 projections.  Again, it's just normal human nature that you

25 want to make your bonus, you're going to want make those

Jenkins - Argument                                    246

1   projections as reasonable as possible, that is as low as

2   possible. So there are several reasons to believe that the

3   company's projections are conservative.

4            Your Honor doesn't have to decide that, but throw it

5   in in the part of looking out the window. Look what's going on

6   here. The company's projections are probably conservative and

7   everything else in the market is going up, up, up, up, up this

8   spring and summer.

9            The second part is how do you break it down between

10  the creditors. Based on Mr. Becklean's numbers which we rely

11  upon that the valuation should be at the top end of his range,

12  that combined is above, perhaps materially above $2 million.

13  Now all the testimony we've heard is that Multicare as an

14  individual entity has relatively little value. It has no

15  management. It's essentially subordinate to Genesis. This is

16  reflected, we think, in the separate valuations that the --

17  excuse me, that the proponents valuation experts have relied

18  upon in particular. We will accept Mr. Shulte's numbers for

19  Multicare standalone. Mr. Becklean did not do a standalone

20  analysis so we don't have anything there to rely upon. But Mr.

21  Shulte said this morning that $323,000 is the most likely value

22  of Multicare. We will accept that.

23            The result, if you take Mr. Becklean's combined

24  analysis, again you can't use Mr. Shulte's because he didn't do

25  a combined analysis, and subtract Mr. Shulte's number, you get

Jenkins - Argument                                              247

1   a valuation of 1.7 billion, perhaps well over that depending on

2   how high we're going up.  I have not independently determined

3   what the cutoff number is, the so-called hurdle that you have

4   to get over.  I will rely upon the numbers that have been

5   provided to me by the debtors.  They say it's 1.55 billion.

6   The number I've just given, 1.7 billion gets us above that.

7           There's another way to look at how you break down the

8   valuation between Genesis and Multicare and that's the most

9   recent financial results.  If you look in the last quarter and

10  this is based on the -- excuse me -- upon the press releases

11  that were put in evidence, Genesis' most recent quarter,

12  standalone Genesis is about 45 million and Multicare is about

13  $9 million.  That is a five to one ratio which comes out almost

14  the same as the ratio that you get if you use Mr. Becklean's

15  valuations and subtract Mr. Schulte's standalone valuation of

16  Multicare.

17          We heard, only a couple of hours ago, that in its

18  most recent -- in the most recent results, that Genesis is

19  ahead $4 million over its projections and Multicare is behind 4

20  to $5 million.  Genesis is the driver of this value.

21  Multicare, to use the analogy, is the caboose.  They're along

22  solely for the ride.

23          Ms. Melnik will explain specifically what we're

24  requesting here, but the overall point we have is that the

25  efforts of the debtors here are -- excuse me -- the proponents

**AA. 601**

Melnik - Argument                                      248

1   of the plan are attempting to reward the Multicare senior

2   creditors by giving too much of the combined valuation to them.

3   And the people who are getting hurt are not the Genesis senior

4   creditors -- it's essentially the same people -- but rather

5   people such as my client, Mr. Grimes, who's a subordinated debt

6   holder.

7        Unless Your Honor has questions, I have nothing

8   further.

9        THE COURT:  Thank you, sir.  Ms. Melnik?

10       MS. MELNIK:  Thank you, Your Honor.  As I stated

11  earlier, what I would like to do is just address in specific

12  some of the responses to our objections that were filed by the

13  debtors, the committee and Mellon to bring a few things to Your

14  Honor's attention.

15       First, I'd like to address something that Mr. Walsh

16  represented in his preliminary statement which was that this is

17  a plan that had the unanimous support of all of the major

18  constituencies and he included amongst those the creditors

19  committee of Genesis.  I believe Your Honor is aware of it, but

20  I would like to bring to Your Honor's attention again, the fact

21  that our understanding is the vote of that committee to support

22  the plan was not a unanimous vote.

23       THE COURT:  I don't think that's what he meant.

24       MS. MELNIK:  Okay.

25       THE COURT:  But in other words to break down within

Melnik - Argument

1   each of those constituencies whether there was unanimous

2   consent, but it's noted.

3           MS. MELNIK:   GMS obviously as a member of the

4   creditor's committee voted against the plan.   Our understanding

5   is that the other members of the committee, which the

6   membership is listed on page 65 of the disclosure statement,

7   include American General and it was brought to my attention

8   today that they have resigned as of yesterday for reasons that

9   we don't know.   Is that correct that they have submitted a

10  resignation?

11          MS. BECKERMAN:   Your Honor, it is correct that they

12  have submitted a resignation.

13          MS. MELNIK:   I don't know what the implications of

14  that are, but I just wanted to bring that to Your Honor's

15  attention.

16          The second issue that I think bears comment at this

17  point for a number of reasons including the fact that in the

18  debtor's proposed findings of fact and conclusion of law they

19  make a statement -- they make a finding that the burden of

20  proof on all issues in 1129A and B, it's on page 7 paragraph

21  3 --

22          THE COURT:   Is that in debtors confirmation brief?   I

23  don't recall that framework for debtors presentation a finding

24  of fact and conclusions of law submission.

25          MR. HOLTZER:   Your Honor, she's referring to the

Melnik - Argument                                            250

1    confirmation order that we --

2             THE COURT:  Oh, the confirmation order.

3             MR. HOLTZER:  The proposed confirmation order, Your

4    Honor.

5             THE COURT:  I see, all right.

6             MS. MELNIK:  It's on page 7 of the submission that we

7    were handed this morning, Your Honor.

8             THE COURT:  Did I hand that back to you.  I think I

9    might have.  No?

10            MR. WALSH:  You might have handed it back to me, but

11   I was actually going to ask you to trade since I gave you the

12   one without any exhibits.  So if I can locate that --

13            THE COURT:  In any event, on page 7 -- go ahead.

14            MS. MELNIK:  In the version I have it's page 7 and

15   it's listed as numerical paragraph 3.  Burden of proof is the

16   heading.  It states the debtors have the burden of proving the

17   elements of Section 1129A and B of the Bankruptcy Code by a

18   preponderance of evidence.  We have asserted in our objection

19   that the standard for 1129B should be clear and convincing

20   evidence based on a number of decisions of numerous courts and

21   we make note there as well that that issue has not been decided

22   in this Circuit, to our knowledge.  The debtors in their

23   response to our objection -- and I believe maybe one of the

24   other responders to our objection -- make the assertion that

25   the correct standard for 1129B is preponderance of the

Melnik - Argument                                    251

1    evidence, particularly with the issue of cram-down in

2    valuation.

3              And I also would assert on the issue of the validity

4    of the proposed releases that that involves the relinquishment.

5    Both of those elements -- their impact is the relinquishment of

6    some serious property rights that otherwise would inure to the

7    benefit of creditors and perhaps others and that, therefore,

8    preponderance of the evidence is insufficient.  And I think

9    that's where those courts that have found the clear and

10   convincing standard more appropriate in 1129B have come out.

11             THE COURT:  The releases that we're talking about --

12   releases can be, indeed, an 1129 question, but they need not be

13   and in large part in this case I don't think they are, are

14   they?  In other words, it's more of an 1129A-1 question, isn't

15   it?  A 524 inquiry?

16             MS. MELNIK:  I agree, Your Honor.  I think they come

17   in all different sizes.  Mellon argues that the releases that

18   we're contesting don't come under 524E and I'll get to that in

19   a quick second.  Yes, definitely they come under 1129A-1 in

20   that respect, but we would also argue that to the extent that

21   they release claims belonging to the estate whose prosecution

22   could bring value into the estate, they do fall under the

23   valuation hurdles within 1129B.  And to the extent they're

24   relinquished and the relinquishment gives up value that

25   otherwise might inure to the benefit of cram-down creditors, I

**AA. 605**

Melnik - Argument                                    252

1    think that issue might appropriately be included in 1129B as

2    well.  And that's not just the third party releases it's the

3    inter-company releases as well, the proposed settlements.

4              THE COURT:  Well, that's a different question maybe,

5    but on the releases of officers, directors, etc., the only

6    evidence we have in this record is that there are none that are

7    known of.  Do we have --

8              MS. MELNIK:  The other -- I'm sorry, Your Honor.

9              THE COURT:  Go ahead.

10             MS. MELNIK:  The other evidence was that none were

11   investigated.

12             THE COURT:  That's correct.

13             MS. MELNIK:  Okay, which is another issue.

14             THE COURT:  Okay.

15             MS. MELNIK:  And my next point is actually the

16   releases, Your Honor.  A couple of things.  It's our position

17   that they are not fair, they're not necessary and under Third

18   Circuit they're not sustainable, in general.  Our additional

19   position is that they affect a settlement that requires Court

20   approval or at the very least, puts on the debtor a burden of

21   proof to show that these were investigated to explain to the

22   Court what the investigation revealed, if anything.  And to the

23   extent that there is some potential viability to the claims

24   that have been raised, that a valuation of whether or not it

25   was in the benefit of the estate to go forward with their

Melnik - Argument                                    253

1   prosecution, what was done in that regard.

2        Instead in their responses to our objection and

3   several of the other objections filed in this case, Mellon and

4   the Genesis Committee and the debtors do a number of things,

5   essentially boiling down to the fact of taking the position

6   that they're in the best interest of creditors.  And we

7   respectfully assert that that's for Your Honor to decide and

8   not for the debtors or the committee or Mellon.

9        I would like to go through some of the points that

10  are raised by the responders to the objectors that I think are

11  important.  In its response Mellon asserts that the releases

12  are an integral part of the compromise embodied in the plan.

13  That's an exact quote.  I don't know the page number.  I

14  apologize.  To me that sounds like a settlement and on that

15  point I would refer back to my previous comment that the burden

16  of proof on whether that such a settlement and compromise is in

17  the best interest of the estate, we would assert has not been

18  met or even shown.

19       Mellon also argues that Section 524E doesn't involve

20  the kinds of third party claims that we're talking about, that

21  it really only deals with debtor and co-debtor claims.  Well,

22  we would argue that it does involve and include claims that are

23  derivative of debtor claims and also claims that derive from an

24  indemnification obligation of the debtor.  And to the extent

25  that third parties are implicated in those derivative claims,

Melnik - Argument                                    254

1   they are impacting a release that parties who have voted to

2   reject the plan have not agreed to.  And to the extent that any

3   order granting those releases is entered, it is our position,

4   the position we've taken in our objection, that those releases

5   should be expressly limited to exclude their impact on those

6   creditors who have not voted to accept the plan under Third

7   Circuit law.

8        Also, to the extent that those are -- the claims that

9   we are concerned about are derivative of claims the debtors

10  might have against the numerous third parties, including any

11  right to move for the equitable subordination of the senior

12  lenders, the creditors will be bound by that release even if

13  they have voted to reject the plan.  Again, that's a

14  settlement, is our position, of a claim that has been asserted

15  in this case by, most recently, the Multicare Creditors

16  Committee that Mellon argues was withdrawn with prejudice.

17       Our recollection, and I think the record reflects

18  that the transcript of the disclosure statement hearing, is

19  that that release -- I'm sorry -- that withdraw of the motion

20  was only with prejudice if the current plan of reorganization

21  with the distribution that was given to the Multicare creditors

22  in exchange for that withdraw of their motion, is confirmed.

23  That hasn't happened yet.  So I don't think it's completely

24  accurate to say that it was withdrawn without prejudice.  It

25  was withdraw contingent on confirmation of that distribution to

**AA. 608**

Melnik - Argument

1    the Multicare creditors.

2        Mellon also argues that the release of Mellon itself

3    as an agent, is in consideration for the distribution that the

4    banks are making to Genesis classes 4 and 5, the unsecured

5    creditors and bondholders, which they say is essentially a gift

6    from the senior lenders.  Well, first of all, they have to get

7    past the hurdle we raised about the absolute priority rule.

8    And even given if that is true that that is a gift, that's not

9    a gift that's coming from Mellon as agent for the lenders.

10   Mellon, in this case, served as agent for the senior lenders of

11   Genesis and Mellon served as agent for the senior lenders of

12   Multicare.  The release that they are getting is, in our

13   opinion, for no consideration.  There's no quid pro quo there

14   and as a mere agent they had nothing to give up in

15   consideration.

16        The next point that they make is that the bank should

17   be entitled, and Mellon should be entitled, to the releases

18   because of the indemnification provisions under the pre-

19   petition loan agreements.  And even if those are sustainable

20   and not otherwise attackable, those are two party agreements.

21   Third parties, such as Genesis creditors, never agreed to be

22   bound by those agreements and I don't believe that on the basis

23   of those indemnifications, those releases can, in any way, bind

24   those third parties.

25        Finally, Mellon seems to argue that there would be no

1   distribution to class G5 without those releases and, again, we

2   would assert that that is only true if the valuation shows that

3   they are not getting more than a hundred percent of their

4   claims.

5           With regard to the committee, they essentially argue

6   that the release provisions that apply to the committee should

7   be approved because they're essentially the same provisions

8   that we involved in the PWS Bruno's case that the Third Circuit

9   upheld in its decision not too long ago, I believe 2000.  If

10  you take a look at those provisions, they are not the same

11  provisions.  The provisions in the PWS case, which are set

12  forth in the Third Circuit's decision, include language that

13  are not included in the provisions that are set forth in the

14  plan and in the disclosure statement in this case.  On the

15  Third Circuit specifically said that exculpation and immunities

16  are not blanket vis a vis creditors committee and that the

17  committee and its members do remain liable for wilful

18  misconduct, gross negligence and ultra virus acts.  And,

19  indeed, the PWS release provision recites the wilful misconduct

20  and gross negligence and the Court, Third Circuit and PWS,

21  specifically says that the ultra virus acts as well need to be

22  included in a carve out of total indemnification and

23  exculpation.

24          And in support of that, the Third Circuit looks to

25  Bankruptcy Code Section 1103C and finds that that requires that

Melnik - Argument                                      257

1    and indeed in the PWS case that release provision looks to the

2    duties and responsibilities expressly under 1103C, which this

3    provision in this case does not.

4           Management, with regard to the releases, the officers

5    and directors, the management received -- the debtors and

6    others argue that management received various releases,

7    forgiveness of loans, etc., etc. fairly early on in the case

8    and, therefore, it's the law of the case and Your Honor doesn't

9    have any ability to overturn that.  We would take exception

10   with that, but we would also like to bring to the Court's

11   attention that obviously things change and one of the things

12   that changed is that at the time of the -- our understanding is

13   that the time of the motion for the approval of various

14   employee retention programs, the picture that was being

15   presented in this case was a little bit different.

16          At the disclosure statement hearing Mr. Walsh

17   mentioned that at the beginning of the case the banks asserted

18   that they were over secured and on that basis sought and

19   obtained from Your Honor adequate protection payments.  I think

20   that seeking very expensive employee retention payments in an

21   atmosphere where one is being told that the senior lenders are

22   over secured, is quite different than seeking employee

23   retention payments at a point in time as now where all of

24   sudden we're being told that the banks aren't going to be

25   getting a hundred cents on the dollar for their claims.  And

Melnik - Argument                                          258

1   also that more junior creditors are not going to be paid.

2            We would also argue that the range of benefits

3   inuring to the officers and directors is fairly substantial and

4   comes, as Your Honor was presented today, in many different

5   forms.  And while the creditor's committee, I believe, argued

6   that this is compensation as well for post-confirmation work,

7   with all due respect that work hasn't been performed as yet.

8            Finally, the release of potential claims against

9   management and the officers and directors is asserted to be

10  further compensation for their pre and post-petition and post-

11  confirmation services.  We would argue that they're getting

12  enough already.  We would also argue that their position that

13  having to respond to any claims asserted against them post-

14  confirmation, would detract from their duties and be harmful to

15  the estate, is highly speculative and we believe not relevant.

16           Finally, to the extent that there exists claims

17  against the officers and directors that may or not have been

18  determined or dealt with otherwise in the retention motions,

19  and those claims are being released by this plan, again, we

20  would assert that this is in the nature of a settlement.  It

21  requires meeting a burden of proof that has not been presented

22  to this Court.  As Your Honor pointed out, we heard testimony

23  from Mr. Hager that these were not even investigated, they were

24  certainly raised.  They may not have been asserted formally

25  until the motion for the appointment of a trustee by the

Melnik - Argument

259

1    Multicare Creditors Committee, but they had been asserted in

2    other ways, I believe, through negotiations on information and

3    belief.

4         Again, that requires Court approval.  It's not

5    something for the debtors or the committee or Mellon to say is

6    in the best interest of creditors and that it's our position

7    that there has been absolutely no offering of proof in support

8    of a settlement of those issues.

9         Finally, Your Honor, the last major point that was

10   addressed by the responders to our objection was on the issue

11   of substantive consolidation.  And I want to make perfectly

12   clear, Your Honor, that what we are asserting as the improper

13   substantive consolidation is not how it's being characterized

14   in several of those responses.  All of the supporters and

15   proponents admit that this plan gives rise to a deem

16   consolidation and they assert that in response to our taking

17   the position that there is a substantive consolidation

18   occurring here that hasn't been proven or approved.  That's not

19   the consolidation we're taking about, the internal Genesis and

20   the internal Multicare consolidation.

21        Also, the committee and others argue that we're

22   saying that the post-confirmation merger is an invalid

23   substantive consolidation.  And that's not what we're saying

24   either.

25        THE COURT:  What are you saying then?

Melnik - Argument                                                    260

1    MS. MELNIK: Here's what we're saying. What we're

2  talking about is the merger that is going to incur in a nano-

3  second on the effective date of the plan that will result in

4  securities of the reorganized Genesis and those securities are

5  essentially the property to be distributed to creditors under

6  the plan. What we believe is happening here is form over

7  substance. The debtor can't have it both ways. To argue that

8  all of the synergies that could possibly occur through the

9  merger of these companies has already occurred since 1997 --

10  you know, that brings up the question why bother with merger.

11  Why didn't you do it before they said they had to go into

12  Chapter 11 to do the merger? But they're going to do the

13  merger a nano-second after the confirmation becomes effective.

14  And they're giving Multicare creditors Multicare stock,

15  essentially reorganized Multicare stock, and then merging that

16  entity in a nano-second after confirmation into Genesis.

17    THE COURT: What's wrong with that from the

18  standpoint if we understand the proposal, that it seeks to

19  allocate the debt and equity, the new debt and equity, in a

20  proportional way?

21    MS. MELNIK: We believe it doesn't, Your Honor, for

22  the reasons that were discussed before and also because the

23  allocation -- well, there are a number of things. First of

24  all, just the allocation in and of itself. Mellon represents

25  in its response to our objection that the allocations under the

1   plan were the result of arm's length negotiations.  The problem

2   we have with that is that you've got two arms and one body.

3   There was one body that was the senior lenders or their agents

4   negotiating on their behalf and the right arm and the left arm

5   disagreed -- I mean agreed and shook hands.  I think that's a

6   fairly unique definition of an arm's length negotiation.

7           THE COURT:  Do I have any evidence on this record to

8   reflect that the proportionate distribution of a debt and

9   equity to Genesis versus Multicare creditors is improper, is

10  out of whack, is inappropriate?

11          MS. MELNIK:  Yes, I think Mr. Jenkins specified a

12  number of areas that had to do with the valuations that were

13  done of Multicare and Genesis.  I think you also have testimony

14  on the liquidation valuations that were presented to Your Honor

15  yesterday that showed that the assets -- one of the points that

16  came out is that the appraisals and other things that had been

17  utilized by the banks in the pre-petition stage were considered

18  by the debtor's financial advisor to be so out of date they

19  couldn't even use them.

20          I think you heard testimony today from Mr. Hager that

21  talks about an incredible commingling of assets as well as

22  liabilities amongst these debtor groups.  The debtors have

23  utilized the argument that certainly internally amongst these

24  groups, if not together, they couldn't separate things out and

25  that's why they've done a deem consolidation, at least on the

Melnik - Argument                                      262

1   vertical, in the vertical sense.  And as the committee cites

2   the Fifth Circuit of <u>Babcock and Wilcox</u> recently finding that

3   its substantive consolidation occurs when assets and

4   liabilities of separate and distinct legal entities are

5   combined in a single pool and treated as if they belong to one

6   entity.

7              There's a pool of assets here, that's reflected by

8   the reorganized Genesis and the stock that's going to be

9   distributed based on that reorganized Genesis.  There are

10  elimination of inter-company claims which is another point that

11  the Fifth Circuit and the Second Circuit recently looked to in

12  terms of substantive consolidation, and liabilities are being

13  satisfied from a common font.  I don't know, based on the

14  liquidation valuation testimony that was presented in this

15  Court, whether indeed the allocations are valid.  I don't think

16  this Court has any way to determine that.

17             THE COURT:  All right, anything else?

18             MS. MELNIK:  Your Honor, just in closing, we believe

19  from the evidence that's been presented to Your Honor, that the

20  purpose of the bankruptcy filing of both of these sets of

21  debtors was designed to wipe out the sub-debt and the unsecured

22  debt prior to effecting the merger that was contemplated ab

23  initio and in the process to release several sets of claims

24  both of the debtors and against the third parties might have

25  against the banks and management.  We haven't heard of any

AA. 616

Melnik - Argument                                      263

1   other justification that's been presented in this case.

2        THE COURT:  The fact that there was -- I don't know -

3   - 1.8 billion dollars of secured debt would not have done it?

4        MS. MELNIK:  Well, they were over secured at the

5   inception of the case, according to them, and they got adequate

6   protection payments from Your Honor and a number of other major

7   expenditures came out of that estate right off the top.  And I

8   think you've heard evidence about how those debtors have

9   performed since then and what's available at the exit line.

10  And speaking of the exit line, in terms of the valuations I

11  think all those numbers can be juggled six ways to Sunday, as I

12  think Mr. Schulte or someone else said today, the approach is

13  unavoidably judgmental.  And they can be juggled many ways for

14  the reasons that were stated previously to show lower

15  valuations to meet the goals that we think were the goals at

16  the inception of this case.

17        It's our position that the only way to show true

18  value of reorganized Genesis common stock is how the

19  marketplace will value it, which we won't see till the merger

20  occurs.  Mellon cites a case from the Northern District of

21  Illinois that stands for the position that you can't take into

22  account the valuation of stock post-merger if you're valuing

23  that stock prior to the merger.  And that case addresses

24  appraisal rights of minority shareholders in a buyout situation

25  before a merger goes forward.

1       We found, at least one case, that I just want to

2  bring to Your Honor's attention, that seriously discredits and

3  takes issue with that position.  Your Honor, it's Lawson,

4  Martin, Wheaton, Inc. v. Smith.  It was decided July 14th, 1999

5  by the Supreme Court of New Jersey and the cite is 160 N.J.

6  383, 734 A.2d 738.  That court remanded to the lower court and

7  instructed that court to do a post-merger valuation for the

8  purpose of determining the distribution to those buyout

9  objecting minority shareholders.  We don't take a position on

10  whether that situation is wholly analogous to this, but as

11  Mellon raised it in support of their position, we thought Your

12  Honor should know about this other case.

13       Because we believe that true value doesn't occur

14  until the merger and the marketplace puts a value on it, and

15  because we see this distribution of reorganized Genesis stock

16  amongst the classes as an intra-creditor dispute, while we

17  would sit with GMS and says yes, our best wish is for you to

18  reject the plan, Your Honor.  But short of that, we don't see a

19  reason why that merger can't go forward and all of the other

20  distributions under the plan be made including a distribution

21  of all but ten percent of the stock that would be going to the

22  senior lenders of Genesis and ten percent of the stock that

23  would be going to the senior lenders of Multicare and have

24  those two sets of stock be placed in escrow until a point in

25  time when the market sets a value.  I believe at his deposition

1    Mr. Hager testified that that kind of -- they can't get listed

2    on the New York Stock Exchange until they've gone through a

3    quarter --

4            MR. HOLTZER:  Objection, Your Honor, that's not in

5    evidence.  The deposition is not in evidence.

6            MS. MELNIK:  Oh, I'm sorry.

7            THE COURT:  Indeed it's not.

8            MS. MELNIK:  I don't know when that date is, Your

9    Honor, let me say that.  We can pull forward or have -- I'm

10   sure we have tons of investment bankers here who could tell you

11   better than I could when an appropriate date of when the market

12   values a stock upon a merger.  But that is one recommendation

13   that we would make, Your Honor, that we would like you to

14   consider as a possible resolution of this intra-creditor

15   dispute.  Thank you.

16           THE COURT:  Thank you.

17           MR. GEORGE:  Thank you, Your Honor, Edmond George,

18   Obermayer, Rebmann, Maxwell and Hippel on behalf of the AGE

19   Entities.  Your Honor, having been in court for the last two

20   days and probably not being one of the more significant players

21   in the case, some of the things that I've heard over the past

22   couple of days have struck me as curious and somewhat

23   confusing.  But the most confusing thing to me is how the

24   debtor has backed off from some of the statements that they've

25   made in their disclosure statement about how great this merger

George - Argument                                    266

1   was going to be for creditors.  For example, on page 76 of the

2   disclosure statement they say, "In summary, the security the

3   creditors are entitled to receive under the proposed scenario

4   incorporates the value of the combined Multicare and Genesis

5   estates.

6          It is the position of both debtors that through the

7   preservation of the common infrastructure purchasing power,

8   access to capital and opportunities for administrative cost

9   reduction, value is created which exceeds the value that each

10  company would realize independently."  But yet when they

11  brought their experts here and it seems to me that the debtors

12  position is that the more people that say it, the more true it

13  becomes because I do believe that the testimony was in large

14  part cumulative and duplicative.

15         But there is a real question in my mind whether this

16  solicitation was made in good faith because creditors who read

17  that disclosure statement were under the impression that this

18  merger was going to add value to this combined entity.  But all

19  the testimony from all of the debtor's experts in this case

20  seem to say that the sum is no greater than the two individual

21  parts and that seems disingenuous --

22         THE COURT:  I will tell you that's not how I

23  understood it, although clearly you're right to focus on that

24  provision in the disclosure statement from the standpoint of

25  operational synergies.  We do understand that much or all of

1   that has been accomplished and that is somewhat misleading,

2   that is, the statement that you've read.  Whereas what I

3   understand is proposed here by way of enhanced value is the

4   capitalization opportunities, the worth of equity of a larger

5   operation, that kind of merger value.

6           MR. GEORGE:  And, Your Honor, that may be something

7   that you, with all due respect, as the Judge and me as a

8   bankruptcy lawyer with some years of experience would

9   understand, but I think if you read it, that's the impression

10  that's intended to be given there that there is synergies that,

11  as a consequence, would increase the value of the combined

12  company and that's why the stock has a benefit to unsecured

13  creditors because once they get the stock, there's going to be

14  an increased value.  But no one's spoken about that and strange

15  credulity that in this combination where these savings in

16  administration costs are being procured, that there's

17  absolutely not one dollar in increase.

18          And it's AGE's position, Judge, that this transaction

19  is, in large part, being driven by the secured creditor in this

20  case and that, I think, can be viewed as far back as February

21  when Your Honor entered the order on the management incentive

22  compensation program.  Back then they said we want to be out

23  before October 31st and if you do management, you're going to

24  get an incentive.  Well here we are two days before the end of

25  the month and miraculously we're here.

George - Argument                                    268

1          The plan as we see it, Judge, is unfair.  It's unfair

2     to creditors and part of the unfairness is some of the issues

3     that I raised with Mr. Hager and they go to the compensation

4     that's being provided to management in this case.  Your Honor,

5     with the combination of the monies that are being either paid

6     directly to the management of the debtors or being forgiven to

7     them by way of debt relief and in the gross ups that are being

8     paid to these people to pay the taxes on the forgiveness.  I

9     don't think there's any justification for that in a case where

10    creditors are getting less than seven cents on the dollar.

11         These managers, these operators of the company, are

12    getting a hundred percent on their pre-petition claims that

13    relate to deferred compensation, as we heard.  They're getting

14    a big bonus for coming out of bankruptcy, just the fact of

15    coming out of bankruptcy.  None of it tied to performance and

16    our position is, Judge, is that management has done what the

17    bank group has wanted them to do to get this case where it is.

18    And it's ironic that the valuation that has come in is so close

19    to the bank debt.

20         I think that the testimony of the objectors in this

21    case more accurately portrays what the value of this entity is

22    on a combined basis.  Rather than go back over that, I'll let

23    my colleagues discussion on that be the word of the day from

24    AGE's standpoint.

25         Your Honor, we believe that there has been an effort

1   by the debtor and the bank group to suppress the value of the

2   company in order to keep unsecured creditors out of the money

3   in this case and we don't think that's fair and we think that

4   it's ironic that not one of the experts in this case opined

5   about the value of this company on a combined basis.  And I

6   think Your Honor has to ask the question why wouldn't they do

7   that.  If what creditors are being asked to take are shares in

8   a merged company, why aren't we finding out what the value is

9   on a combined basis.  I think that's a question that Your Honor

10  has to ask.

11          Your Honor, with respect to the specific provisions

12  of the plan that we objected to, I think they can be summed up

13  as the issues that relate to the releases and the punitive

14  damage claim.  We asked Mr. Hager about punitive damages when

15  he was on the stand and he said that not only has Genesis never

16  had one adjudicated against him, that he was unaware of the

17  existence of any that weren't covered by insurance.

18          There's a case that was in the District of Delaware

19  called In Re F&F Holdings.  It's a February 17th, 1990 case.

20  It is Lexis case, Judge, 1998 U.S. District Lexis 10, 741 and

21  that's Judge Farnan.  And he says, "That the bankruptcy courts

22  neither prohibit or mandate the allowance of punitive damages.

23  However, courts have the equitive power to limit or disallow

24  punitive damages where the claims would frustrate the debtor's

25  reorganization," and they make reference to the AGE Robbins

George - Argument                                      270

1   case which is found at 89 BR 555.  And in this case, the F&F

2   case, the Court said, "The Court believes it would be premature

3   to disallow punitive damage claims against the debtors.  There

4   are only two claimants with punitive damage against the state,

5   neither of which have been liquidated.  Morever, the debtors do

6   not contend that allowance of these punitive damage claims

7   would significantly hamper their reorganizational efforts.

8   Accordingly, the Court will sustain C. Finn's objection to the

9   exclusion of punitive damages under the plan."

10          There has been absolutely no testimony, Judge, that

11  this is a case like the AGE Robbins case or other cases where

12  there are massive torts and punitive damage claims.  It's

13  simply not the case here and to say that punitive damage

14  should, out of hand, just be dismissed because the bank group

15  doesn't feel that they should participate with other unsecured

16  creditors, it's unfair.  We think it's inappropriate and we

17  think it's not permitted.

18          There's another case, Your Honor, that I point to

19  Your Honor and it's Allegheny International, Inc. and it's

20  reported at 106 BR 75.  And in that case the court, and it's

21  Judge Consetti (phonetic) in Pittsburgh, he says, "The Court

22  has far reaching powers to sift the circumstances surrounding

23  any claim to see that injustice or fairness is not done in the

24  administration of the bankruptcy state."  And then he makes

25  reference to the Robbins case.  He says, "The Court recognizes

**AA. 624**

1  the wild card characteristics are punitives." But in that

2  respect, Judge, he says, "In this case there appears to be no

3  extraordinary punitive damage claims, nor do the pending

4  punitive damage claims implicate any inherently dangerous

5  products or otherwise affect the debtor's ability to

6  reorganize." And, Your Honor, that seems to be the theme of

7  these cases that talk about punitive damages.

8        In those instances where the punitive damages are

9  monumental and if the allowance of them would prevent the

10 estate from going forward with the confirmation of its plan,

11 then, in that instance, I can see both the business

12 justification and a legal basis for it. But under the facts of

13 this case, Judge, and I would indicate that the debtor did not

14 propound any evidence about this issue, that there's absolutely

15 no information from which the Court could rule that that

16 separate classification of punitive damages for the other

17 members of the G4 classes in the Genesis estate is appropriate.

18        The other issue, Judge, and the language of the plan

19 and disclosure is not, in my opinion, a model of clarity on the

20 issue, but we, the AGE Entities, have filed RICO claims against

21 the Genesis entities which are being litigated in Delaware in

22 the District Court. And, Your Honor, when I objected to the

23 disclosure, the objection that I made at that point was that it

24 was inappropriate to grant a third party release because I

25 believe that the AGE Entities may have claims against Mr.

George - Argument

272

1   Walker, Mr. Hager and possibly the bank group and other members

2   of the board of directors of Genesis.  And in this case, Your

3   Honor, there's been absolutely no record established, no record

4   evidence established either for the need for that release or

5   the propriety of that release under these circumstances.

6        And, Your Honor, I would ask Your Honor and I'm sorry

7   to be rushing through this.  I hope that I'm not going too

8   fast, but the Continental II case, 203 Fed.3d. 203, talks about

9   releases of this type.  And they say that releases of non-

10  debtor parties are regarded with great disfavor and that there

11  must be factual evidence in the record to support the

12  conclusion that the released and permanent injunctions are the

13  key -- the word key -- to Continental debtors reorganization or

14  that the Continental debtors would be unduly burdened.

15       Now, Judge, here there's been absolutely no

16  indication that that's the case.  All they've said is that we

17  want these releases.  There's not been any testimony on the

18  record that there's been one of these lawsuits filed.  There's

19  not any testimony that even if any such lawsuit was filed that

20  anybody is being burdened by it or that there's inability to go

21  forward with the business of the debtor at hand because of it.

22  And there is absolutely no evidence on the record to support

23  it.

24       And, Your Honor, I think I don't have to repeat to

25  Your Honor what the standard is, is that there has to be a

George - Argument                                                273

1   showing that there's a fairness element involved.  There has to

2   be a showing that there's necessity for such an injunction.

3   And I submit, Judge, that even under a flexible approach which

4   the Court would be required to take with respect to these

5   matters, that there is no justification for a release in this

6   case of any party, particularly the bank group and the

7   individual officers and directors of the company.

8          Your Honor, in sum, our feeling, the AGE Entities

9   feeling, is that the debtor has suppressed the value of the

10  assets of its company on a combined basis for the purpose of

11  precluding unsecured creditors, like AGE, from getting a

12  meaningful distribution.  We don't believe that it's fair and

13  equitable.  We don't think it's in the best interest of the

14  unsecured creditors that the plan be confirmed.  We feel that

15  the plan violates 1129A in that it is not proffered in good

16  faith and that it violates the provisions of the Bankruptcy

17  Code dealing with separate classifications and that the

18  classification is not grounded in any business judgment.

19         The one statement that was made by, I believe, the

20  bank group in response to the objection that we filed was that

21  any money that unsecured creditors are getting in this case

22  it's coming from the bank group anyway so since the creditors

23  are out of the money, they don't really have any reason to

24  complain in this case.  Well, Judge, we submit that there is

25  value in this case and that the experts that were propounded by

Morrison - Argument                                              274

1   the debtor in this case should not be relied upon by this

2   Court.  We believe that the unsecured creditors are not being

3   fair and we would urge Your Honor to not confirm this plan.

4          THE COURT:  Thank you, sir.

5          MR. GEORGE:  Thank you, Your Honor.

6          THE COURT:  Other objectors.

7          MS. MORRISON:  Good afternoon, Your Honor, Susan

8   Morrison on behalf of 44 tort claimants.  In the interest of

9   time I'm going to adopt the well reasoned arguments of counsel

10  for the objectors on the issues of third party releases and

11  valuation and will only supplement where I have something

12  unique to say.

13          On the issue of third party releases, as you know

14  Your Honor, we represent the very parties in this case who are

15  the most injured and those are persons who have suffered losses

16  of limbs, losses of life at the hands of the debtors.  And in

17  the context of the proposed plan, the debtors are seeking to

18  exculpate themselves in total from liability for maiming, and

19  killing in some cases, the very wards that they were charged

20  with protecting in the contexts of the operation of the nursing

21  home businesses without any justification -- as counsel pointed

22  out -- without any testimony to support the need for such a

23  classification.  We consider this classification to be unfair

24  and we consider the debtors categorization of punitive damage

25  claims to be disparate in impact.

1    In the classification G7 which includes punitive

2  damage claims, the debtor has lumped together, in one fell

3  swoop, all persons having claims that are considered punitive

4  without any differentiation between those that are insured or

5  uninsured or compensable or purely punitive in nature.  And

6  debtor's remarks are oh well we tried to work with you,

7  counsel, when you objected to our classification at the

8  disclosure statement.  It's not my place to tell the debtor how

9  he can address in a definition the variations in the laws on

10  punitive damages and the insurability of punitive damages both

11  the classification of the damages as being exemplary or

12  compensatory and the insurability of those damages in every

13  state.

14    Frankly, I don't know, as I stand here today, the

15  vagaries of the various laws on those issues.  I know a few.  I

16  know as I mentioned in my cross-examination of Mr. Hager, that

17  in the state of Alabama, for example, that a wrongful death

18  claimant is limited solely to punitive damages and those claims

19  are considered compensatory.  Likewise in the state of Texas a

20  punitive damage claim is a hybrid of both a penalty and an

21  inconsequential damage component, if you will, and attorneys

22  fees.  In other states attorneys fees are awarded as part of

23  the punitive damages as opposed to as a separate claim.

24    So I don't frankly think that the debtor could come

25  up with a definition that would put, fairly put, the proper

Morrison - Argument                                    276

1    sets or subsets of punitive damage claimants in one particular

2    class.  And, therefore, it is our position that because of the

3    disparate treatment of punitive damage claimants, that in

4    addition to the fact that the subcategorization is unnecessary

5    and an unfair classification in the first place, that there has

6    been no showing by this debtor to justify the disparate

7    treatment of those persons within class 7.

8           On the issue of valuation and without getting into,

9    again, I adopt everything that the objectors have said, but

10   also I think it's interesting to note, Your Honor, the timing

11   of this plan.  While it is certainly a laudable goal under

12   other circumstances for a debtor to submit a plan of

13   reorganization early in the reorganization process, I think

14   it's telling that Genesis is rushing to the table with a plan

15   when all of its constituents have taken, you know, companies

16   that have gone in earlier than Genesis and are still in

17   bankruptcy.  Vencore went in in September of '99 and they came

18   out in April of 2001.  Mariner went in in January of 2000 and

19   they don't have a plan on the table yet.

20          I think it's telling, Your Honor, in the context of

21   bad faith.  This plan is being railroaded through by the

22   secured creditors.  Why?  For the reason that the valuation

23   testimony that you heard today based on 12 month historical

24   figures, which under other circumstances would be perfectly

25   appropriate, was orchestrated with the intent that this Court

1   not consider the drastic change in the long term care market

2   which has occurred in the last two quarters.  I think it's also

3   telling that Mr. Hager testified that the APS deal is in the

4   works and I believe his testimony was that there was no letter

5   of intent signed which was contradicted by Mr. Schulte who said

6   that there was, in fact, a letter of intent and that there was

7   no similar letter of intent with Omnicare because they had an

8   exclusive deal.

9         Now, why don't we wait until that deal closes instead

10  of just assuming that it will never close because of all these

11  speculative contingencies with, you know, Omnicare submitting a

12  bid and auction processes and things that are purely

13  speculative in nature.  What is the reason that we are rushing

14  here to have this Court approve a plan before we know whether

15  Genesis will be the successful bidder or purchaser of APS and

16  before we have historical data, six months from now, on what

17  the impact of that transaction is on revenues, earnings and

18  EBITDA and the like?  And I suggest that the testimony of

19  debtor's witnesses, coupled with their experts, coupled with

20  the timing of this plan, justify this Court rejecting the plan

21  on the basis of bad faith.

22        On the issue of the punitive damage subordination, we

23  raised in our objection that, according to the United States

24  Supreme Court in the recent case of United States v. Noland,

25  that the debtors attempting to categorically subordinate

Morrison - Argument                                    278

1   punitive damage claims, which violates the mandate of <u>U.S. v.</u>

2   <u>Noland</u>.  In response the debtor said oh we didn't really mean

3   equitable -- we didn't mean to subordinate punitive damage

4   claims notwithstanding that we say that in page 21 of our

5   disclosure statement, that was a typo and it doesn't say that

6   in the plan.  What it says in the plan is punitive damage

7   claimants will receive nothing.  It doesn't say anything about

8   subordination and the debtors are relying on the fact that the

9   plan document controls.

10          Well, it seems awfully convenient that the debtor can

11   ignore its subordination argument once I raised <u>U.S. Noland</u> and

12   simply say that it's a typo and, you know, the ultimate

13   document is the one that controls.  In fact, the <u>U.S. v. Noland</u>

14   case is apposite notwithstanding the debtor's attempt to

15   distinguish it in their papers.  In that case the Supreme Court

16   considered equitable subordination of a tax penalty.  It

17   discussed at length the Fifth Circuit case of <u>In Re Mobil Steel</u>

18   which was highly cited for the issue of equitable subordination

19   and the fact that it's only appropriate in situations where a

20   creditor has engaged in bad conduct, pretty much.  There've

21   been a whole plethora of cases that have discussed what the

22   type of conduct which would justify equitable subordination

23   would be and they basically involve fraud, self-dealing on the

24   part of insiders and so forth.

25          In this case, you know, we've kind of flip flopped

1    the law.  We have people who are innocent incompetents, in most

2    cases, who have themselves sustained personal injuries, and in

3    some cases wrongful death, at the hands of the debtors and yet

4    they are being penalized and punished by being entirely

5    disenfranchised without any showing, without any showing of

6    inequitable conduct or bad conduct or anything else, simply by

7    the debtor suggesting that they had a typo in their disclosure

8    statement and that the United States Supreme Court mandate on

9    this issue is inapposite because it's a tax penalty as opposed

10   to a punitive damage claim.

11           I suggest, Your Honor, that all of the cases cited by

12   debtor to support the subordination or disallowance of punitive

13   damages pre-date the Noland opinion.  And since the Noland

14   opinion there have not been any, to my knowledge, cases which

15   distinguish that opinion in the context of bankruptcy punitive

16   damage disallowance or subordination.

17           With regard to the debtors position that this deal

18   cut between senior lenders and the committee, is consensual and

19   it doesn't involve any violation of Bankruptcy Code because

20   it's a side deal among creditors, I would respectfully suggest

21   that the committee, if that's the case, breached its duty to my

22   clients who are constituents of the committee, notwithstanding

23   that the proposed plan considers my claimants, my punitive

24   damage claimants, to be some sort of disenfranchised group.

25   Unless and until there's a confirmation of that plan, my

1    clients are unsecured creditors and the committee has an

2    obligation to act on behalf of all unsecured creditors not just

3    the ones that sit on the committee.  And, in that context, I

4    think that the committee has breached its obligation to

5    punitive damage claimants by completely sacrificing them to the

6    lambs and suggesting that they be disenfranchised so that the

7    remaining body of unsecured creditors could receive an enhanced

8    distribution under the plan.

9             On the issue -- again, counsel mentioned this so I'll

10   only mention it very briefly, Your Honor.  The testimony is

11   that the debtor doesn't believe that there are any punitive

12   damage cases.  In fact, Mr. Hager said in his tenure with the

13   company, which is over a decade, he's never seen one.  If

14   that's the case, coupled with the disclosure statement

15   references on page 21 of debtor's counsel that notwithstanding

16   that several proofs of claim have been filed concerning

17   personal injury or wrongful death claims that include punitive

18   damages, that the Genesis debtors do not believe that there

19   will be any allowed claims in this class.  So this is much ado

20   about nothing, Your Honor.  We think there's no justification

21   for the subordination disallowance, whatever they want to call

22   it, and that coupled with the fact that we think that this

23   company has been undervalued, that the debtors have not met

24   their burden, even under the preponderance standard of showing

25   that there is insufficient equity to distribute to the

1  unsecured creditors, and for that reason we think that the plan

2  should be rejected.

3         THE COURT:  Thank you.

4         MR. HUDGENS:  Your Honor, David Hudgens.  I think one

5  advantage of coming late to the game is I'll necessarily be

6  short.  I think the debtor in this case has failed to meet the

7  statutory requirements for confirmation of this plan.  In order

8  for you to confirm this plan, there has to be a liquidation

9  analysis because the Code requires you to consider other things

10 in relationship to the liquidation analysis.  The only thing

11 the debtor did was put on a witness who purported to give a

12 liquidation analysis that considered one manner of selling the

13 business in a consolidated fashion as far as all the different

14 legal entities that existed, although he segregated those sales

15 into kind of lines of business.

16        Well there hasn't been a consolidation of all those

17 individual legal entities in this case.  We have no idea what a

18 liquidation analysis would show if you took the legal entities

19 that exist now and considered liquidation of all those separate

20 entities and saw what the results were.

21        In addition, that expert testified that he never even

22 looked at appraised values of the company's property in

23 considering that liquidation analysis.  He doesn't know the

24 only piece of property that there was a value given for was the

25 corporate offices and it was valued at between 25 and 50

1  percent of cost, but there was no testimony about why it was

2  valued at between 25 and 50 percent of cost.  There could be

3  extremely unusual circumstances where corporate offices could

4  lose that much value, but common sense tells you they probably

5  didn't.  So the only time they used value for a piece of

6  property, they used, what from all appearances is, an extremely

7  unrealistic value without ever looking to see if there was an

8  appraisal of the property.

9           Now, he gives the excuse that well they're dated, the

10 appraisals are dated.  But when I asked him about it, he never

11 looked to see when they were done.  He didn't know.  He'd never

12 considered that.  Now I submit that one of the reasons that

13 that analysis was never done is because there's this senior

14 lender out there that's got a security interest in a whole

15 bunch of stuff and that senior lender or the secured lenders in

16 most bankruptcies would be looking at that.  But in this case

17 they don't have any incentive to.  Why?  Because they're

18 getting essentially all the stock of the corporation any way.

19 They're going to get what they want without ever having to go

20 through the analysis that the Code requires.  I believe the

21 debtor has just failed to meet the statutory requirements of

22 setting forth to liquidate a realistic liquidation analysis for

23 these debtors.

24          The next place I think there are problems is the

25 disclosure statement and I realize there's been a hearing in

1    which the disclosure statement was approved, but that

2    disclosure statement is the basis for people deciding how to

3    vote on this plan.  We get in here a month after the disclosure

4    statement is sent out -- roughly a month after the disclosure

5    statement is sent out -- and every expert testified that the

6    company was worth roughly 250 million dollars more than that

7    disclosure statement said the company was worth.  That's

8    roughly 15 to 20 percent increase in value of the company over

9    the values given in the disclosure statement.

10         Now, I believe that the values given in the

11   disclosure statement weren't even accurate when the disclosure

12   statement was sent out because I believe most of the runup in

13   the stock occurred before the disclosure statement was sent

14   out.  But even if the disclosure statements were accurate when

15   they were sent out, this Court should consider that by the date

16   of the confirmation hearing the value of the entity was 15 to

17   20 percent more than the disclosure statement showed.  I don't

18   see how this Court can approve a plan where votes were

19   solicited on disclosure statements where there's such a

20   disparity in value.

21         And my final point is that a plan has to be fair and

22   equitable.  And I think in considering that requirement, the

23   Court has to take into consideration that the officers and

24   directors of a corporation have a fiduciary duty to the

25   shareholders.  In addition, once the corporation is insolvent,