1  it's got a fiduciary duty to the creditors. That's just kind

2  of an overlay of what I believe the Court needs to take into

3  consideration when it considers whether a plan is fair and

4  equitable.

5           Well let's look at this plan. The four officers that

6  bought stock that were able to do so by borrowing money from

7  the corporation. Those were the same four officers essentially

8  that guided this entity into insolvency. What happens with

9  them and the money they spent for their stock? The debt gets

10 forgiven. That debt was about 3.4 million dollars and, in

11 fact, they get grossed up another 2.8 million dollars to pay

12 the taxes on that debt that was forgiven. That's a benefit of,

13 you know, 6.2 million dollars. Well, there are creditors in

14 this case and shareholders in this case that get nothing out of

15 this plan. How can it be fair that the officers who guided it

16 into insolvency get that 6.2 million dollars? In addition,

17 they get another two and a half million dollars if the plan's

18 confirmed. There are creditors and shareholders that don't get

19 anything.

20          They get another million and a half dollars in

21 deferred compensation benefits reaffirmed at the same time --

22 now those are unsecured claims against the entity -- at the

23 same time they're getting that, there are unsecured creditors

24 and equity holders in these companies that aren't getting

25 anything. And finally they get golden parachutes of about 6

1    million dollars.  You know, money -- stiff prices to pay when

2    there are other people who aren't getting anything out of this

3    entity.  I don't see how the Court can confirm this plan as

4    fair and equitable under those circumstances.

5              THE COURT:  Thank you, sir.

6              MR. HUDGENS:  Thank you, Your Honor.

7              MR. FREEBERY:  Jim Freebery from McCarter and English

8    on behalf of the GOFF tort claimants.  Your Honor, another

9    advantage of being handed the ball this late in the game is

10   that most of the points are already up on the scoreboard and to

11   that extent, when I came in here two days ago, the GOFF

12   claimants still had three objections to the plan.  At this

13   point, however, two of those objections have been resolved and

14   one has already been argued.  So if Your Honor will allow me to

15   just quickly run through those three arguments and their

16   status, I'll quickly relinquish the podium and sit back on the

17   bench.

18             Our first objection, Your Honor, was that the plan

19   failed to specify treatment of administrative claims of the

20   tort claimants.  Now with the help of Ms. Meises, language has

21   been added, which I do not have in front of me at this point,

22   to the plan which -- the gist of which is that the post-

23   petition tort claims are administrative claims to be paid in

24   the ordinary course of business.  That they will be paid in

25   full without the necessity to file an application and that they

1   will not be subject to any bar date.  So with that

2   understanding and with the new language in the order, that

3   objection is withdrawn.

4        The second objection that the GOFF tort claimants has

5   is that the plan failed to provide adequate insurance

6   information to allow the tort claimants to make an informed

7   decision when voting for the plan.  Also with the help of the

8   debtors and Mr. Marcus we have been able to get more complete

9   detailed information as to the insurance the debtors have and

10  we withdraw that objection.

11       The remaining objection, Your Honor, the one that has

12  already been argued, is that the plan attempts to unilaterally

13  disallow all the punitive damage claims.  Now in the interest

14  of time, I would like to incorporate in our argument the one

15  eloquently and, if I may so, persuasively put forth by Ms.

16  Morrison and by the AGE claimants and just state that any

17  blanket disallowance of these punitive damage claims is

18  improper.  They should go through the disallowance process.

19  They should have a notice hearing and they should be looked at

20  at a factual -- on a case by case factual basis because, as Ms.

21  Morrison pointed out, the Court would have to determine whether

22  the punitive damages are the only means of recovery for some of

23  these individuals, whether the punitive damages are in some way

24  compensatory based on their state law and whether they're

25  insurable or not insurable.  So by adopting their argument and

**AA. 640**

Hayes - Argument                                    287

1    standing by our written objection, we ask the Court to not

2    confirm the plan at this point based on their treatment of the

3    punitive damage claimants.

4              THE COURT:  Thank you, sir.

5              MR. FREEBERY:  Thank you.

6              THE COURT:  Besides this gentlemen coming up, any

7    more objectors who will want to be heard?

8              MR. HAYES:  Briefly, Your Honor.

9              THE COURT:  All right.  Go ahead, sir.

10             MR. HAYES:  My name is Jim Hayes.  I've been a long

11   term shareholder in Genesis.  I own 1000 shares of Genesis in

12   my Credit Suisse First Boston account and 3000 shares in

13   partnership with my father.  Originally I purchased 2000 shares

14   in the partnership account for around $7.00 per share.  A few

15   years ago I sold those, that stock, realizing a loss and a

16   month or two later repurchased 3000 shares for between $2.00

17   and $3.00 per share.  The 1000 shares I have I've held

18   continuously throughout their period.

19             I've listened with interest to the testimony about

20   how investors value stock.  In the case of Genesis, my

21   principal reason for purchasing Genesis was the insider

22   holdings of the officers and directors of the corporation.  An

23   insider publication that I follow had listed Genesis as one of

24   the largest -- had one of the largest holdings of insider

25   shares of any stock on the New York Stock Exchange.  And

1   yesterday I think I heard in testimony that these Genesis

2   officers who were buying the stock were doing so because it was

3   a requirement of their jobs in the company and that the company

4   was loaning these officers money to buy the stock and in this

5   bankruptcy court these loans apparently have been forgiven.

6          I'm here today to explain why I think that the plan

7   should not be confirmed and to request that a shareholder

8   committee now be appointed.  I'm filing pro se and I filed a

9   motion to that effect with the Court.

10         THE COURT:  I did familiarize myself with your

11  motion, sir.

12         MR. HAYES:  The plan before the Court is unfair to

13  the unsecured creditors, subordinated lenders and shareholders.

14  According to the debtor, the creditor allocations in the new

15  Geneses were negotiated based on a Genesis valuation as of

16  April, 2001.  We are told that the secured creditors gave a

17  part of their allocation through negotiations.  And now the

18  debtor has increased its valuation by 250 million dollars yet

19  there have been no new negotiations reported where the creditor

20  is offered a larger allocation to the unsecured creditors or

21  shareholders.  Rejection of this plan will restore the tension

22  needed to promote negotiation for a new fair plan.

23         The plan was seriously flawed from its inception.

24  Since April nursing home healthcare stocks have been the best

25  performing industry from the Investors of Business Daily's

Hayes - Argument                                    289

1    universe of 197 industry groupings.  The experts in this case

2    completed their valuations nearly to the day the Benefit

3    Improvement Act became effective.  The Warburg expert testified

4    that he was in contact with healthcare companies on a daily

5    basis.  Yet these experts ignored the catalyst for improving

6    the market value of nursing home stocks for nearly four months.

7    The debtor nonetheless continued to advocate this flawed plan

8    and obtain this Court's approval to inform creditors and then

9    solicited creditor votes for allocations in the new Geneses

10   based on valuations it now admits, if we are to believe the new

11   valuations, 250 million higher than their valuation in April.

12   And the nexus for these increased valuations, the increase in

13   nursing home stocks had been completed by early July.

14        Clearly the debtor was not responsible in preparing

15   such a flawed plan.  At some point there should be an inquiry

16   as to when UBS Warburg, Credit Suisse First Boston and the

17   debtor knew of the increasing prices for nursing home stocks.

18   When was the debtor apprized of the situation and why, after

19   being informed, did the debtor not withdraw the plan?

20        I became aware of the rising trend in nursing home

21   stocks in early July shortly after my proxy, James McElroy,

22   protested the creditors disclosure of its reorganization plan

23   in July.  I believe that to eliminate shareholder ownership

24   stake without allowing participation, without allowing

25   shareholder participation in the process constituted a taking

Hayes - Argument                                    290

1    without due process as prohibited by the fifth amendment of the

2    U.S. Constitution.  Consequently, I sought to have the U.S.

3    Trustee appoint a shareholder's committee because, in my view,

4    the increasing prices for nursing home stocks added hundreds of

5    millions of dollars to the debtor's estate.  My request was

6    opposed by the debtor's and creditor's counsel in letters to

7    the Trustee and I have copies of those letters.

8            THE COURT:  We'll accept the fact that you attempted

9    to have a committee formed and that that was opposed by those

10   parties.  That's accepted.

11           MR. HAYES:  Another purpose for introducing the

12   letters is -- I mean it seems that either the debtor's or

13   unsecured creditor's counsel were not informed or deliberately

14   sandbagged the trustee.

15           THE COURT:  Well, we're not going to have a whole

16   other trial on what happened with the attempt to appoint an

17   equity security committee.

18           MR. HAYES:  Okay.  Yesterday the debtor's counsel

19   noted that a minimum of eighty percent of the G4, M4 and M5

20   creditors had approved the plan.  Counsel did not indicate

21   where these creditors were informed that there had been a 250

22   million increase in the valuation of the debtor subsequent to

23   their notification of the plan..  Might these creditors react

24   like the G5 creditors and change their vote if fully informed

25   of the improving valuations in Genesis.  If this was a merger

1   and the securities laws applied, the debtor would have been

2   sued by every class action firm in the country if shareholders

3   had not been apprized of a 250 million dollar increase in

4   valuation above what was disclosed in the valuation soliciting

5   votes for the merger -- for an affirmative vote.

6         The debtor should not be asking this Court to affirm

7   this flawed plan where the debtor should withdraw the plan and

8   counsel for the debtor should resign.

9         THE COURT:  Thank you, sir.

10        MR. HAYES:  I'm not finished.

11        THE COURT:  I think what you're doing though is

12  repeating some of the arguments that we've had already.  Is

13  there anything new that you'd like to add?

14        MR. HAYES:  Yes, okay.  All the focus yesterday and

15  today has been how the increasing estimates for Genesis common

16  stock is affecting the recovery of the creditors claims.

17  However, a similar problem exists for the new notes and

18  preferred stock which are allocated exclusively to the senior

19  lenders.  The values for these instruments are based on their

20  face value.  However, market values for these securities could

21  be substantially higher, in this case, would boost the recovery

22  of the senior lenders preferentially to the unsecured and

23  subordinated lenders.  The plan is flawed in that it does not

24  place market values on these instruments in assessing the

25  allocations.

1    THE COURT:  The problem, Mr. Hayes, with that

2  argument is we would need expert testimony to back it up.  In

3  other words --

4    MR. HAYES:  Well, I understand and these been

5  numerous expert's testimony about valuation of the stock.  I

6  mean the same process is involved -- well we did have testimony

7  about valuation of the Genesis bonds in bankruptcy, but we

8  didn't have any of the new --

9    THE COURT:  All right.  What else, sir?

10    MR. HAYES:  As the recovery of the secured creditors

11  approaches or exceeds a hundred percent, the market valuation

12  of these instruments becomes increasingly important.  The Court

13  should not confirm a valuation plan which does not consider the

14  market valuation of the new debt instruments.  This Court

15  should not ratify errors in a flawed confirmation plan and this

16  Court should not get in front of a moving valuation train.

17    Markets are smarter than anyone or a group of

18  experts.  It is wrong to pick one valuation or another when the

19  Court could simply let the market determine the value of

20  Genesis after the company stabilizes sufficiently to make a

21  public offering.  All valuations presented to the Court assume

22  the company is actively traded in the public market.  The

23  senior creditors believe that a public offering for Genesis

24  would be accepted by the market after Genesis completes -- and

25  there was talk -- I had two quarters of financial reporting

1   after the company exits bankruptcy.  Trading prices of the new

2   Genesis could be used to establish the values that can only now

3   be guessed at.

4           Your Honor, it is difficult to see the forest through

5   these valuations and I have an illustration prepared --

6           THE COURT:  Sir, I don't think -- there is no further

7   evidence being taken nor illustration.  We do have a record of

8   the increase in value and certain stocks and so forth.

9           MR. HAYES:  May I present this to the Court?

10          THE COURT:  What is it that you're looking to

11  present?

12          MR. HAYES:  I think it's nicely summarized.

13          THE COURT:  All right.  I'll give you five more

14  minutes at the outset.

15          MR. HAYES:  No, I don't want to discuss it.

16          THE COURT:  They're cartoons.  Anything else, sir?

17          MR. HAYES:  I've had some illustrations that show the

18  market valuation for Genesis could form the basis for a new

19  plan.  Please consider these ideas as a viable alternative to

20  the flawed plan now before the Court.  The appointment of a

21  shareholder's committee would be able to assist in the

22  formulation of a new plan based on the market value of Genesis.

23          THE COURT:  All right, thank you, sir.  U.S. Trustee?

24          MS. MORRISON:  May I now be excused?  I have a -- in

25  a childcare program.

McMahon - Argument                                    294

1        THE COURT:  Indeed, by all means.

2        MR. MCMAHON:  Good evening, Your Honor.  Joseph

3   McMahon for the United States Trustee.  Your Honor, the United

4   States Trustee's objection covered three areas.  I want to go

5   over them briefly.

6            First the debtor releases, without getting into the

7   Zenith Master Mortgage Analysis I just want to say, on behalf

8   of my client, as a general point, that we're troubled by the

9   testimony of Mr. Hager that was elicited by Mr. George with

10  respect to the investigation, or lack thereof, that was done

11  with respect to claims against the entities that the debtors

12  are seeking to release.  If I recall Mr. Hager's testimony

13  correctly, he wasn't aware of any claims, but to the same

14  extent there wasn't an investigation done as to whether there

15  were any claims against the entities that were being released.

16  It's a bit troubling to the extent that the debtors are

17  fiduciaries and they're giving up and/or negotiating away

18  claims, the value of which is essentially unknown.  That was a

19  very troubling aspect of the testimony.

20            Second, with respect to exculpation, with respect to

21  these particular cases the United States Trustee is not

22  contesting exculpating the entities which the debtors are

23  seeking to exculpate for pre-confirmation conduct.  However,

24  the issue of post-confirmation conduct is problematic.  I don't

25  see how we can exculpate entities for acts yet to be taken.  We

McMahon - Argument                                    295

1   have a general idea as to what might happen, but we really

2   don't know what's going to happen in the future.

3               THE COURT:  Let me understand what the U.S. Trustee

4   is not contesting.  Pre-confirmation conduct on the part of --

5               MR. MCMAHON:  Conduct which occurred between the

6   petition filing date up to the date of confirmation.  Most of

7   the actions have gone out on notice.  Parties have had the

8   opportunities to review what going on in the bankruptcy case.

9   There's a problem with exculpating entities for acts yet to be

10  taken and because we don't have the record to evaluate that

11  against.

12              Now, with respect to the case law on the point, I

13  haven't reviewed all of the objectors responses to the

14  objections, but to the extent that any responses cite PWS

15  Holdings or Brunos, the Third Circuit case, I'd simply like to

16  note this for Your Honor.  First, that that opinion was

17  addressed to the issue of the liability of committee members

18  and their professionals and the Third Circuit found that the

19  exculpation provision at issue did not affect their liability.

20  In no way did it address the propriety specifically of post-

21  confirmation exculpation.

22              THE COURT:  Yes, we did discuss PWS already and, of

23  course, I'll review it again with an eye toward understanding

24  how it applies here.

25              MR. MCMAHON:  Third, two very quick points, Your

McMahon - Argument                                    296

1    Honor, with respect to the quarterly fee issue.  First, to the

2    extent that Your Honor will be issuing the ruling on the

3    confirmation issues that is separate from the quarterly fee

4    issue addressed by the United States Trustee, I think it's

5    appropriate to ensure that the United States Trustee's interest

6    is protected with respect to the monies that are at issue.  I

7    know that the debtors initially proposed the possibility of

8    escrowing for those monies.  And, Your Honor, with the Court's

9    permission, I'd like to propose that the United States Trustee,

10   the office, along with debtor's counsel, work out an

11   appropriate escrow agreement that will cover the amounts that

12   the United States Trustee contests are due and owing.

13           THE COURT:  Certainly.

14           MR. MCMAHON:  And any interest that would accrue at

15   the federal judgment rate and also for fees that will become

16   due at the end of the current quarter.  Therefore, with Your

17   Honor's permission, I'd like to go ahead and do that.  Do we

18   have the agreement of debtor's counsel with respect to that?

19           THE COURT:  I think we did at the outset.

20           MR. HOLTZER:  Your Honor, we did propose and still

21   continue to propose providing an escrow.  We had not discussed

22   what rate the interest would run at in the escrow and any of

23   the other particular areas, but we're happy to work with the

24   United States Trustee to work through an appropriate escrow

25   agreement, Your Honor.

McMahon - Argument

1    THE COURT:  That's fine.

2    MR. MCMAHON:  Second, with respect to the briefing

3  schedule, the plan says that the debtors are going to set the

4  effective date and I don't know what date that's going to be

5  on, but obviously the Code says that the fees have to be paid

6  on or before the effective date.

7    With respect to the briefing schedule, I don't know

8  if Your Honor has any thoughts as to what form that would take,

9  how you would like to handle it.

10    THE COURT:  I thought I'd handle it at the time that

11  I issue an opinion on the confirmation.  A reasonable period of

12  time, relatively short, to address the issues perhaps ten days

13  on each side something like that.  That's what I have in mind.

14    MR. MCMAHON:  Okay.  Would we treat this as a motion

15  to compel whereby the United States Trustee --

16    THE COURT:  It's left over from the confirmation

17  process.  If the case gets confirmed, then it would be in

18  effect a supplemental issue that needs to be resolved that

19  remains open as a part of confirmation.  Confirmation would be

20  complete and effective, but with the reservation of the

21  resolution of that issue.  So, I don't know where that fits

22  into the scheme, but what's your concern?

23    MR. MCMAHON:  Not a concern, Your Honor, I just want

24  to make sure we get it set just so the United States Trustee --

25  I don't walk out of this particular hearing with any type of

1    vague notion as to when the Court is expecting a submission

2    from our office.

3            THE COURT:  I will set a return date for

4    consideration of argument and decision on the issue after the

5    submissions are in when we come back for the confirmation

6    decision, so that you'll be very clear about exactly how we're

7    going to resolve it.

8            MR. MCMAHON:  As of Tuesday.

9            THE COURT:  Or Wednesday; whatever the date is, yeah.

10           MR. MCMAHON:  Thank you very much, Your Honor.

11           THE COURT:  Thank you, sir.  I think we're back up to

12   the debtor.

13           MR. GEORGE:  Your Honor, I'm sorry there was one

14   point that I wanted to mention.  It'll only take one minute.

15   When you approved the disclosure statement, we reserved until

16   this date, the issue about whether under RICO or any other

17   statutory claim that there might be treble damages or attorneys

18   fees awarded as part of that award and, Your Honor, I just

19   wanted to remind you that that was an issue that we preserved

20   till today.  So the argument that I made with respect to

21   punitive damages was really intended to subsume that issue that

22   Your Honor mentioned about attorneys fees being awarded as part

23   of a treble damage award or treble damages themselves.

24           THE COURT:  Noted.

25           MR. GEORGE:  Thank you, Your Honor.

Walsh - Argument                              299

1      THE COURT:  Where do you start?

2      MR. WALSH:  I'm going to start by taking up your kind

3  offer to cool off a little bit.  There are a lot of issues so

4  this is going to be a little haphazard, Your Honor.  With your

5  permission I'd like to share some of the issues with my

6  partner, Mr. Holtzer.  I tried to get him to do it all, but he

7  refused, so I think I'm stuck.

8      I'd like to start off, Your Honor, dealing with the

9  valuation issues.  And yesterday we inadvertently handed out

10 what we call debtor's table number 3, which I meant to hand out

11 at the end of all the valuation testimony, but it's out there

12 so I'm wondering if you have that and if you don't, Your Honor,

13 I can hand up another copy.

14     THE COURT:  I'll take another copy.  I'm sure I do

15 have it, but putting my finger on it right now -- here it is

16 actually.  Thank you.

17     MR. WALSH:  All we're doing here, Your Honor, is

18 basically reporting the bottom line results of the various

19 valuation experts just to try to put things into context.  I

20 broke it up, Genesis only at the top, Genesis and Multicare

21 combined at the bottom.  In each case Chilmark is at the bottom

22 of the range and on the Genesis side only, UBS comes next, then

23 Houlihan a little bit higher, but those valuations are

24 relatively close.  On the bottom we've got Chilmark, again, on

25 the lowest side and then the combination of UBS Warburg and

Walsh - Argument                                                    300

1   CSFB next and then we go to a rather significant jump before we

2   get to Evercore, which is 2075 and Mr. Becklean, which until I

3   heard his testimony, I assumed was going to be in the mid-point

4   of a billion nine fifty.  So I just thought that it would be

5   helpful to the process to see all these experts and if it

6   wasn't for the fact that they have left, I would send them all

7   out into the hall to see if they could duke it out to see if we

8   could resolve this.

9            What I can see from this, Your Honor, is that we have

10  quite a bit of testimony, notably testimony from experts in the

11  healthcare industry, not just valuation experts, that's Mr.

12  McGahn at UBS Warburg, Hal Kennedy at CSFB and Patrick Hurst at

13  Houlihan Lokey about what they feel the valuation is for these

14  companies.  Now, the reason the healthcare information and

15  knowledge is important is because if you look at the

16  comparables, you have Beverly and Kindred and one end and

17  you've got Manor Care at the other and if it was just a simple

18  matter of picking the middle point, then I would be happy to

19  accept Mr. Grillo's expert report because that's all he really

20  did.

21                      (Tape Change)

22

23

24

25

Walsh - Argument                                                301

1          I think what experts are paid to do is to use their

2     knowledge and use their analytical abilities to make a

3     qualitative judgment about what a multiple valuation range

4     should be.  And we have on the case of Chilmark, UBS, CSFB and

5     Houlihan Lokey, their qualitative analysis is that the range is

6     closer to the Beverly valuation not in between Beverly and

7     Manor Care and not all the way up to Manor Care.  That that is

8     key.

9          Why did they come to that conclusion?  Well we've

10    heard testimony about the payor mix, which is one of the most

11    important features of the industry.  And, Genesis' payor mix is

12    roughly the same as Beverly, a little bit better than Kindred.

13         So although I'm being an advocate here, of course,

14    Your Honor, I also truly believe that judgment has to be

15    exercised and I see nothing to really question the judgment of

16    the valuation experts, particularly the ones who are expert in

17    this healthcare sector in choosing the appropriate range.

18         Now, what we do have is Mr. Grillo's report.  And, as

19    I said before, you know, the net effect of what he did was

20    basically to come up right in between Beverly and Manor Care.

21    And, I have to point out, Mr. Primps, on behalf of GMS, made

22    the point that there was a lot of back and forth about, you

23    know, what was the proper EBITDA, you know.  Was it 220, like

24    Mr. Grillo said or was it 212 to 215 like the company said?

25    Well, with all due respect to GMS, the difference between 215

Walsh - Argument                                    302

1   and 220 at the valuation multiples we're talking about is about

2   $50 million.  Yes, it's significant, but that is not -- that is

3   not what explains the huge discrepancy between the other

4   experts in this case and Evercore.  The real discrepancy here

5   is explained because of the multiple that Mr. Grillo chose.

6   And, the amount of that discrepancy is over $300 million of

7   value above what the debtor's experts have pegged for these two

8   companies.

9           So I guess, to sum up, you know, these issues we have

10  with the Grillo report I think are very, very significant.

11  And, the only thing that Mr. Grillo testified to, to justify

12  putting the debtors in between Beverly and Manor Care, rather

13  than closer to Beverly, is that there is this concept of, well,

14  they may do better in the future because the EBITDAR margins

15  are low.  And, I think that, Your Honor, was rebutted by Mr.

16  Hager's testimony where he said, look, the strategy for this

17  company is high acuity patients, okay.  We make more money,

18  more cash, by handling high acuity patients, so we make more

19  cash per patient than some companies.  But our EBITDAR margins,

20  that is the cash we make for a particular patient, is as good

21  as any of these companies.  But because they're high acuity

22  patients, both the revenue and the expenses are also very high

23  and that pushes down the margin.  So it's not a fair thing, I

24  think, for Mr. Grillo without once contacting Mr. Hager or

25  anyone else at the company to find out, okay, what's the reason

Walsh - Argument                                                    303

1    for the EBITDAR margin percentage difference between you and

2    other companies.  And to focus on that one statistic, which

3    none of the other experts really paid a whole -- you know, put

4    a whole lot of emphasis on in their reports, to boost the

5    multiple of the combined companies above the Beverly level,

6    which is around eight or 7.9 by Mr. Grillo's report, not up to

7    eight and a half, not up to nine, but up to 9.4.

8           So I think that -- I think it just indicates that we

9    have to take Mr. Grillo's report -- and I have the greatest

10   respect for Mr. Grillo.  I've actually worked with him for many

11   years, but I think that this indicates a lack of -- perhaps a

12   lack of understanding of the healthcare market, certainly a

13   lack of understanding of the business of these particular

14   debtors and how they operate.  So I ask the Court to take that

15   into consideration when you're evaluating the importance to put

16   on the Grillo testimony and the Evercore report.

17          On the EBITDA number yet -- it's a $47 million swing.

18   I don't know how you can, you know, ten months into the year

19   when the company says, hey, we're essentially on target to hit

20   our numbers, it's going to be between 212 and 215, to pick 220.

21   Mr. Primps did say there were numbers all over the place.  Mr.

22   Hager testified as to why there were different EBITDA numbers.

23   And, as new events unfolded, you know, EBITDA was adjusted

24   throughout this process.  So I think, again, it would have been

25   better for Mr. Grillo, even though he was only working on this

1   project for about a month, to contact the company and get a

2   better insight on what the EBITDA should be.

3         Now, but where does this all get us?  Even if we're

4   looking at the Evercore result, 2,075,000,000 which again I

5   think is totally unsupported, if you look at that number, by

6   our calculation, that's $10 million over the valuation hurdle

7   for class G2.  That means out of a $2 billion analysis they're

8   saying that the senior secured creditors of Genesis are being

9   paid $10 million too much.  Well, I have to submit, Your Honor,

10   that the error -- the potential error in judgment here, you

11   know, just accepting the Grillo number, it's just too close to

12   call, especially with the other expert reports.  It's just

13   absolutely too close to call to say that this plan doesn't meet

14   the fair and equitable standard.

15         Okay.  I'm looking for confirmation like, did I leave

16   out a really important point.

17         THE COURT:  I will tell you that we do have a time

18   constraint.  I let everybody else talk, and here's the debtor

19   coming forward with their final arguments, but I do have a time

20   constraint.

21         MR. WALSH:  Okay.  I will speed up.

22         THE COURT:  We're talking about another 20 minutes

23   really.

24         MR. WALSH:  Oh, I can do that, I promise.

25         THE COURT:  Great.

1    MR. TODER:  Try to leave at least a minute or two if

2  you could.

3    MR. BECKERMAN:  Yes.

4    MR. WALSH:  You're getting most of the common stock,

5  I think you can live with maybe one minute.

6    MR. TODER:  We would have preferred half.

7    THE COURT:  Let's focus on the argument.  Thank you.

8    MR. WALSH:  GMS has also -- or maybe it's Mr. Grimes

9  or both of them have made the argument that there was unfair

10  allocation.  In other words, they attacked the merger itself.

11  That somehow there was allocation of value from the Genesis

12  senior lenders or to the Multicare senior lenders and that was

13  unfair.  But Mr. Hager testified, I think, quite clearly that

14  the allocation of the stock of new Genesis, between the two

15  entities, was strictly done based upon the equity value of the

16  two companies once you built in the capital structures under

17  the plan.  And, it was the comparison between those two that

18  gave approximately 75 percent on the Genesis side.  It's a

19  bigger company, Your Honor, and about 25 percent on the

20  Multicare side.

21    Now, the values have increased.  There's no question

22  values have increased over this period.

23    THE COURT:  Perhaps I can focus you on a couple of

24  issues that were raised.

25    MR. WALSH:  All right.

Walsh - Argument                                        306

1        THE COURT:  For instance, the management programs,

2   the new programs.  Help me to understand the difference between

3   the package that was approved back in February, I think, and

4   the terms that are in the plan in terms of, for instance, the

5   specifics.  Deferred compensation, for instance, was that a

6   part of the previous package?  I have a shaking of the head in

7   the affirmative.

8        MR. WALSH:  Let me say a couple things about this.

9   It seems to be standard operating -- standard operating

10  procedure in these -- in large cases to go in on day one with

11  -- with a retention package that covers everybody from the

12  chairman CEO all the way down to the bottom man.  This company

13  did not do that.

14       THE COURT:  All right.  We had a revised package

15  approved.  It was noticed to everyone.  It was bottom lined, an

16  order was entered.  What does this plan do that augments that

17  package?

18       MR. WALSH:  Okay.  That package did a number of

19  things, Your Honor.  First of all, the loans of these

20  executives that they essentially were forced to take out in

21  order to purchase stock in order to stay as employees of the

22  company, those loans have been forgiven.

23       THE COURT:  I think I know what it did.  What did it

24  do extra?  What does this do extra?  This plan.

25       MR. WALSH:  Okay.  What is happening under this plan

**AA. 660**

Walsh - Argument                                                    307

1    is that the top executives of the company whose contract

2    -- whose employment contracts have not been assumed, those

3    contracts have been renegotiated.  They are three year

4    contracts.  There was testimony that there is a slight increase

5    in compensation.  So the old contracts are gone, we have new

6    contracts.  You know, there were things in the old contracts

7    that were given up.

8            THE COURT:  When you say that, do you mean not the

9    portions of the package that were approved in terms of

10   forgiving the loans and all of that?

11           MR. WALSH:  No, did not affect that.

12           THE COURT:  Now we're talking about compensation

13   going forward.

14           MR. WALSH:  The -- we never asked for a retention

15   program for the senior executives.  You know, if you just stay

16   six months you get another payment.  Stay six months.  What we

17   did do is we got approved a restructuring bonus, okay, and that

18   was in the February time frame.  So that's all behind us.  What

19   these people are getting, they're getting new contracts.  And,

20   frankly, if they don't get new contracts, that's to the

21   detriment of the debtors because the debtors want to retain

22   these individuals.  Okay?  As part of those contracts there is

23   going to be an allocation of common stock.  It's a stock grant.

24   And, I don't remember the exact amount that's going to the

25   senior executives, but the amount of stock for, I think, up to

**AA. 661**

1  130 employees is like $750,000 shares.  And, that's to be

2  allocated by the new board.

3          Now there are -- some portion of that --

4          MR. HAGER:  Stock is 43 --

5          MR. WALSH:  Pardon?

6          MR. HAGER:  Stock is 43 --

7          MR. WALSH:  43.

8          MR. HAGER:  For the stock.

9          MR. WALSH:  Okay, I'm sorry.  The stock is for 43 of

10  the managers of the company.  Some portion of that, I believe,

11  is included in the new contracts for the senior management, but

12  I don't have those numbers at my fingertips.  They're in the

13  contracts that are filed with the plan supplement.

14          In addition, there is a management incentive program

15  that will be put into place for this time the top 130 -- top

16  130 managers, which will allow the board basically to allocate

17  options to management as incentive.  In many ways it's a fairly

18  standard stock incentive program to incentivize (sic) managers

19  to work harder, to get the value of the company higher so --

20  and that they will share in that value by exercising those

21  options.

22          THE COURT:  Uh-huh.  All right.  Let me ask you to

23  address the punitive damages issue.  Indeed we had a record

24  devoid of any special significance in this case, in fact, any

25  significance in this case of punitive damages awards.  Why

Walsh - Argument                                                            309

1  should we, why would we, retain such a class and such a

2  treatment for that class?

3         MR. WALSH:  Well, basically, Your Honor, we are --

4  we, this industry is in an environment that's facing larger and

5  larger awards for personal injury and wrongful death.  This is

6  happening in specific areas of the country.

7         THE COURT:  Do you propose that the danger of

8  punitive damages is somehow escalated in recent times and the

9  debtors need to be safeguarded against that prospect?  In other

10 words, the insurance is in place for the personal injury and

11 wrongful death claims; correct?  There is assertion by the

12 debtors that there is likelihood of full coverage; correct?

13        MR. WALSH:  That's correct.  And, I also assert to

14 the extent the insurance covers punitive damages, which I

15 believe is a state by state determination, that insurance is

16 available for that and we're not trying to --

17        THE COURT:  So why a special provision in this

18 regard?

19        MR. WALSH:  Well, a couple of reasons.  The first

20 reason is without knowing the magnitude of the claims and how

21 long it will take to determine what the magnitude is, the

22 distributions for unsecured creditors could be held up

23 literally for years, okay?  So putting them into the general

24 unsecured class creates a real distribution problem.

25        Second, and I think this is more important, what we

**AA. 663**

Walsh - Argument                                          310

1   have before Your Honor is a settlement where the senior lenders
2   are giving up significant value to junior classes, okay?  Based
3   upon our valuations, senior lenders are far from being paid in
4   full.  If you apply the strict -- a strict interpretation of
5   the absolute priority rule, --

6        THE COURT:  I understand your point, yes.

7        MR. WALSH:  -- no unsecured creditors would get a
8   penny in this case, okay?  We have a deal.  We worked very,
9   very hard to orchestrate and effectuate a deal which gets --

10       THE COURT:  What would be the impact on senior
11  lenders from their vantage point if the pool of unsecured
12  creditors was augmented by any punitive damages awards that
13  were not covered by insurance?

14       MR. WALSH:  Well, I think there's a couple -- there's
15  a couple, Your Honor.  First of all, because this is a
16  settlement, okay, this is a negotiation with unsecured
17  creditors, okay, if unsecured creditors have no idea, you know,
18  whatever they're negotiating for, you know, whether it's for
19  $500 million of claims or $3 billion of claims, because of
20  punitive damages it makes it very -- it makes it hard to strike
21  a deal, okay?  So as part of the negotiations the seniors said,
22  all right, we will give you, that is all creditors with claims
23  based upon claims that are compensatory in nature, this is what
24  we will give you.

25       THE COURT:  I understand your argument.

**AA. 664**

1    MR. WALSH:  Okay.

2    THE COURT:  What about the releases?

3    MR. WALSH:  Before I swit -- you know, leave that, I

4  think that that kind of allocation is supported by the case

5  laws.  It's in our brief.  The Emcorp (phonetic) case and SPM,

6  that it is appropriate for seniors to allocate value that would

7  otherwise come to them to particular classes, even if it leaves

8  someone else out.

9    But what's different about this situation is that

10  there is a real policy reason for leaving this out.  Why dilute

11  the recovery for people that are -- that need to be compensated

12  by punitive damage awards which are meant to punish company --

13    THE COURT:  What about the fact that punitive

14  damages, it is alleged, may in some places be comprised of

15  compensatory damages, in effect?

16    MR. WALSH:  We would state, Your Honor, that no

17  matter what it's called under state law, if it is compensatory

18  it goes in Class G4.

19    THE COURT:  So in other words, you would qualify the

20  class by punitive damages that are penalties rather than --

21    MR. WALSH:  Absolutely.

22    THE COURT:  -- punitive damages that are compensatory

23  or anything else?

24    MR. WALSH:  That are not compensatory for actual

25  pecuniary loss suffered by the holder of such claim and not --

1      COUNSEL:  It's in the plan.

2      THE COURT:  It's in the plan.

3      MR. WALSH:  It's right in the plan.

4      THE COURT:  All right.  What about releases?

5      MR. WALSH:  May I --

6      MR. HOLTZER:  Your Honor, may I be heard on the

7  releases?

8          THE COURT:  Sure.

9      MR. HOLTZER:  For the record, Your Honor, Gary

10  Holtzer, Weil, Gotshal & Manges, for Genesis.  Your Honor, the

11  releases that have been raised have been raised in two

12  contexts, one is the exculpation provision, the second is the

13  releases.  If I might start with the exculpation provision

14  first, I think it's very straight forward.  The argument that's

15  been put forward somehow is that the exculpation provision in

16  this plan is somehow broader than the exculpation approved by

17  the Third Circuit in the Brunos decision.  That's, in fact, not

18  true.

19          In fact, the exculpation provision in this plan is

20  narrower than the one approved by the Third Circuit because the

21  words "related to" have been taken out of the exculpation

22  provision in this plan.

23          THE COURT:  Is there an issue of post-confirmation

24  conduct?

25          MR. HOLTZER:  Your Honor, the Third Circuit's

1    decision in <u>Brunos</u> also addresses that issue by simply

2    confirming that all that that exculpation provision does is set

3    forth the standard for what the test is if the behavior is

4    outside of the exculpation provision.  So to the extent that it

5    includes a provision in there for willful misconduct or gross

6    negligence, that's the standard anyway.  And, so whether it's

7    past or future or now, it's all the same.  And, so it doesn't

8    really matter.  And, the Third Circuit said that expressly in

9    <u>Brunos</u>.

10               THE COURT:  All right.

11               MR. HOLTZER:  On the releases, Your Honor, we have

12   been through a confirmation hearing now where there have been

13   repeated statements made concerning the debtor's management and

14   its motivations for taking this company out of Chapter 11 now.

15   We haven't really responded to them, although I have to tell

16   you it's been very difficult not to respond to them.  The

17   management is here in the courtroom.  They've heard all these

18   comments.  We do not believe they're fair comments at all.

19   This management team has hung together throughout a very

20   difficult bankruptcy to try to get this company out as quickly

21   as possible.  It did not do it because it was self-interested

22   or motivated, for any other reasons other than the fact that

23   being out of bankruptcy is a lot better than being in

24   bankruptcy.  And, so, I won't say anymore about the allegations

25   that have been made in that regard.

Toder - Argument                                                    314

1          The releases themselves, Your Honor, we think are
2   well founded.  We think they meet with this Court's test set
3   forth in Greate Bay and in Continental and in Zenith.  I will
4   tell you that they satisfy all of the master mortgage tests,
5   including the identity of interest between the debtors and any
6   third parties that are given releases here.  I would note for
7   Your Honor there are no third-party releases in this plan, only
8   the release of the debtors direct claims against third parties,
9   so they fall outside of those cases.  And, any allegations made
10  or colloquy from counsel that indicate they are third-party
11  releases are simply wrong.
12          Secondly, the releases in this plan were made to
13  individuals who made substantial contributions in this case,
14  either to officers or directors or employees who worked extra-
15  ordinarily hard throughout the case and to the committees and
16  the banks who helped formulate what is, absent one class voting
17  against the plan, a consensual plan.  And, I would note that
18  for the record.
19          In addition, Your Honor, one of the master mortgage
20  tests is that the plan provide significant recovery to those
21  that would not have received a recovery.  The testimony in this
22  case would show, based upon the values that the debtors put
23  forward, that the banks have provided $90 million of value to
24  those who would have received nothing absent a deal.
25          I'll let the banks respond more clearly to their own

AA. 668

Toder - Argument                                              315

1    release provisions.  I'm not sure that I have anything else to

2    add other than that which is in our papers already.

3            THE COURT:  Indeed.  Thank you.

4            MR. TODER:  I'm going to be very brief.

5            THE COURT:  All right.

6            MR. TODER:  I promise.

7            THE COURT:  We have one --

8            MR. HOLTZER:  Is that the end of your questions for

9    the debtor?

10           THE COURT:  Yes, yes.  Thank you.

11           MR. TODER:  Richard Toder, Morgan, Lewis & Bockius,

12   for the much maligned senior lenders acting through Mellon.

13   Just a precatory comment.

14           THE COURT:  You're the good guys.

15           MR. TODER:  No, I don't say that, but we're not the

16   bad guys is the way I would put it.  And, the other thing I

17   would say to you is that I heard an argument today that I've

18   never heard in 35 years before, which is that it is a bad

19   thing, it's a breach of fiduciary duty to put forth a plan

20   sooner, rather we should wait and wait.  I don't have to spend

21   a lot of time on that.  Those are, I would suggest, none

22   bankruptcy arguments that don't really fit.

23           But suffice it to say that the timeliness of getting

24   a plan and the suggestion that it's wrong -- that the Court was

25   wrong to approve a situation where bonuses are predicated in

1  large measure on how quickly we get out of bankruptcy, it just

2  turns everything upside down.  The banks recognize through long

3  and hard experience, as do all experienced practitioners in

4  these courts, that the longer a case stays in bankruptcy, the

5  more there is a deterioration in value.  It's that very desire

6  to get out sooner which leads to a lot of the decisions that

7  have been made here.  An obvious point, I won't belabor it.

8           But let me just mention one or two points and then

9  I'll go right to the release point.  If there is one thing we

10  learn from the six investment bankers, and that's a record as

11  far as I'm concerned, this routine, and it was certainly a lot

12  of fun, don't get me wrong -- (Laughter) -- a special

13  opportunity, as they say on Saturday Night Live, but if there's

14  one thing we learned, it's an inexact science at best, because

15  we're dealing with the future projections and all sorts of

16  estimates and so forth.  But if there is one thing I've learned

17  in 35 years in bankruptcy, it's this:  it always turns out

18  worse than you expect because stuff happens.  And, so the

19  suggestion that the debtor was acting conservatively, I would

20  say, right, that's exactly the right approach.  I don't want

21  pie in the sky routines.  That's inconsistent with the common

22  sense and experience of this Court and practitioners before it.

23  So there's nothing wrong with that were it true.

24           Exhibit 3 is actually a nice sort of shorthand to say

25  that all of the investment bankers, even the two that are

Toder - Argument                                    317

1    opponents, if you look at the midpoint, come out and suggest

2    that there's no issue here, with respect to more than 100

3    percent.  So that's that point.

4           Now, just a slight word on APS.  It's been suggested

5    that what we ought to do is gross things up because -- all

6    right.  I don't have to spend a lot of time on that, thank you.

7    The 800 pound Gorilla is waiting, I agree.  Okay.  (Pause)

8           Releases.

9           MR. WALSH:  For the record, I would like Mr. Toder to

10   identify who the Gorilla is.

11          MR. TODER:  Oh, I'm sorry, you know who I'm referring

12   to.

13          THE COURT:  Go on.

14          MR. TODER:  I'm -- please.  Okay.  On the releases

15   point, and specifically, there have been a number of

16   suggestions.  I concur completely, no third-party releases, no

17   third-party actions, causes of action are impacted at all.

18   It's perfectly clear it's by the debtors.  Okay.  If somebody

19   has rights that are only derivative of debtors, then they

20   deserve to lose it.  That's the debtors.  But if they have a

21   personal cause of action, it remains.  There's nothing here

22   intended to do away with that.  So that part's easy.

23          Small points, Your Honor.  And, I would just refer

24   you to our response, if you will.  524E by its terms refers to

25   an obligation of the debtor, which is, in effect, held by a

1   third party, a co-obligor situation.  Judge Case (phonetic), we

2   have it as an exhibit, a well respected, as you know, jurist,

3   has written on this.  We've set forth the case in the -- as an

4   appendix.  I think it's just right, at least in so far as

5   Mellon, we don't have the 524E problem.  If we had 524E, we

6   satisfied.  The indemnification, and it was George Hager's

7   testimony on that in response to my question about whether the

8   pre-petition creditor agreements and the DIP creditor

9   agreements all contained indemnification language.  That's

10  relevant to the inquiry under the standard test in the Third

11  Circuit if you're under 524E because the essence of it is that

12  since these obligations survived termination of the agreements

13  themselves it becomes, in effect, an expense of the debtor.

14  And, that's relevant, therefore, in why you would give the

15  agent a pass.  Okay?  That's part of it.

16          The idea that the agent isn't giving up consideration

17  here because it's the lenders that are giving up consideration

18  in terms of the monies that are being made available to lesser

19  classes -- I mean lesser not in the pejorative sense, but just

20  under the distributory scheme.  That's not right.

21          MS. BECKERMAN:  Thank you for that.

22          MR. TODER:  That's not correct, because under the

23  credit agreements, each of the lenders is responsible to the

24  agent to indemnify the agent if the agent has to pay an amount

25  by virtue of acting as the agent.  So it is, in fact,

1   consideration by the lenders that is being advanced by the 524E

2   release here, if it's a 524E release. Okay? Almost.

3          The last point. I would submit to Your Honor that

4   this is a classic situation where the system worked. And, by

5   that I mean, what does the code do but encourage all the major

6   constituencies to sit down and cut a deal because of

7   uncertainties, et cetera. Well, that's what happened here. We

8   had three negotiations that went on. In the first one, the

9   banks, the senior lenders and the debtors argued over, among

10  other things, value. They worked it out. Genesis Committee

11  said, uh-uh, no good. So there was a second negotiation and

12  the tab went up. Still no good.

13         There was a third negotiation with the Multicare

14  Committee. We worked out an agreement and then the Genesis

15  Committee came back and said, no, no, that's not enough. If

16  they're getting a little more than we want a little more. So

17  in point of fact, we had to increase the tab yet again. Now,

18  is that relevant? Sure it's relevant, because that's what the

19  code encourages everybody to do. So if there was even a

20  chimera of a doubt as to the outcome, and it's close, then by

21  God the system worked and we ought to honor and validate it,

22  not do otherwise.

23         I'm sorry, Your Honor, to take so long. I promised

24  it was quick.

25         THE COURT: Thank you, sir.

1          MS. BECKERMAN:  Good evening, Your Honor.

2          THE COURT:  Good evening.

3          MS. BECKERMAN:  Lisa Beckerman on behalf of the much

4    maligned Genesis Creditors Committee.  I'm sorry that Ms.

5    Morrison had to leave because I did really want to address her

6    comment about breach of fiduciary duties because I do think

7    that was a little uncalled for.

8          Your Honor, I think as Mr. Walsh properly addressed

9    in his discussion of the punitive damages, the reason that from

10   our perspective that's an appropriate way to treat the process

11   is because the definition under the plan does cover

12   compensatory damages.  Whatever the State Court calls for our

13   claims purposes, if they're compensatory, they fall into the G4

14   class.  If they're not and they're truly punitive and meant to

15   punish, they're in the G7.

16         Based on our understanding, Your Honor, of the

17   situation, we think that that's a fair and equitable situation

18   to try to discriminate in that way.  I understand that it's

19   unusual but we don't think it's fair to punish other unsecured

20   creditors who haven't contributed to the wrongdoing by virtue

21   of those punitive damages.  Otherwise, people who had the

22   benefit of those punitive damages would obviously receive

23   additional recoveries that other people who didn't have those

24   types of claims against the debtor's estate wouldn't be

25   entitled to receive in the G4 class because they don't have the

**AA. 674**

Beckerman - Argument                                      321

1    benefit of being able to get punitives… And, I don't think

2    that it's a fair thing for the other creditors, so that's an

3    understanding of that.

4            Another thing people haven't mentioned that I'm going

5    to point out to Your Honor is, time is important.  People have

6    said that there's a conspiracy and that's why the process was

7    moving quickly.  Your Honor, the things that people have

8    ignored is Mr. Hager testified that professional fees run $3

9    million a month in this case.  Mr. Toder has been kind enough

10   not to mention it but we're only too aware of it, that his

11   adequate protection payments run anywhere from 5 to $7 million

12   a month.  So unfortunately, one of the things that we

13   considered when we were balancing the situation is the

14   situation of delay.  And, we -- I think our view point was that

15   delay has good and bad points.  It's true that you could sit in

16   bankruptcy for a lot of years and maybe the value would go up.

17           THE COURT:  Yes, let me dispense with that point as

18   well, although clearly there have been significant changes in

19   the marketplace in the last four months.  And, of course, that

20   will have to be considered as I view the valuation information,

21   the disclosure statement, the arguments that have been made.

22   One aspect that will not be considered is the quickness of the

23   reorganization process relatively speaking, and any suggestion

24   that that was somehow bad faith.  That --

25           MS. BECKERMAN:  Your Honor, there's a couple of other

1  things that I think have gone on in this thing, and maybe just

2  because I've been in this case from the first day my memory is

3  a little better than some people's.  So I just want to bring a

4  few things out to your attention.  Number one, Your Honor, I

5  think Mr. Walsh was correct when he discussed, for example, the

6  process that went on here with respect to the management

7  retention situation.  We did early on in the case do a

8  retention program for very low level -- lower level employees

9  but not for the top four employees.  Mr. Walsh, in fairness,

10  did not seek that type of relief in this case until we were in

11  this case for many months, back in February, Your Honor may

12  remember.  This case was filed in June, that is a little

13  unusual.

14         And, in fact, we had the repeated and extensive

15  negotiations as undoubtedly you'll hear about when we do our

16  fee examiner reports in front of you in a couple of -- and our

17  responses to them in a couple weeks, but you may recall that

18  the timing element of that -- of that arrangement was something

19  that we actually negotiated as Creditors Committee.  And, the

20  reason that there were discounts as time went on for

21  management's bonuses is because of the time constraints and the

22  detriment with the interest clock -- that's what I'll call it,

23  the interest clock, to unsecured creditors in having a higher

24  and higher hurdle rate if there's a delay.  And, that was

25  something that we had discussed and negotiated.

Beckerman - Argument                                    323

1          Another point I wanted to address, Your Honor, that I

2    think relates to that is on day one of this case or shortly

3    thereafter, within a month, there was a final DIP order

4    entered.  That DIP order did certain things.  It provided that

5    the debtors were obviously taking certain positions with

6    respect to the claims of the senior lenders.  It provided that

7    to the extent anybody else had a claim of any kind whatsoever

8    against the senior lenders, that they had to raise it by a date

9    or forever hold their piece.  I would say Mr. Toder and I

10   probably extended my deadline for nine months.  We went through

11   an extensive negotiation of any potential claims against the

12   lenders.  There is a stipulation on file which carves out the

13   only things that we found that were at all remotely relating to

14   the senior lenders as matter of public record.  And, I wanted

15   to point out that that related to just two pieces of real

16   property.  We found some potential imperfections of liens and

17   some potential preference -- potential, Your Honor.

18          THE COURT:  Well, we're talking about debtors'

19   opportunities to pursue those claims and that's clearly gone.

20   But we're not talking about any third party --

21          MS. BECKERMAN:  No, that is correct, Your Honor.  But

22   I am just pointing out to you that, in fact, with respect to

23   the debtors giving a release to the lenders, I'm explaining to

24   you that we have obviously done this investigation and it's a

25   matter of public record that that's true.  So I just want you

Beckerman - Argument                                    324

1   to understand that.

2           THE COURT:  All right.

3           MS. BECKERMAN:  Because I think there's been a lot of

4   discussion about supposedly potential claims that might exist.

5   I also want to note that it has been a matter of public record

6   as well in this case that there are other things that have come

7   up during the course of this case where we have investigated

8   things.  And, Your Honor may recall, I think very early on when

9   you took the -- got this case, we had the Elder Trust

10  settlement, which was quite complicated.  And, you may remember

11  that that was complicated by the fact that there had been sales

12  of assets to Elder Trust when it was formed by lots of people,

13  including Genesis, and that there's the same common chairman.

14  Those types of related party transactions we investigated at

15  great length.  You may recall that when I addressed Your Honor

16  at the time that we looked very carefully at whether the lease

17  arrangements and the prices that were paid seemed to be fair

18  value -- the leases that the debtor took back on those sale

19  lease-back transaction seemed to be fair value.

20          THE COURT:  Yes.

21          MS. BECKERMAN:  So I just want you to understand that

22  the concept that there's been no investigation of anything

23  going on in this case is just simply not accurate.

24          THE COURT:  I do understand that.

25          MS. BECKERMAN:  So I do want you to understand that.

Foley - Argument

325

1  I can't say to you that I've investigated every single

2  potential cause of action that the debtors' could possible

3  have.  I can tell you that we've definitively looked at

4  solvency during the course of this thing at various points when

5  there were different acquisitions to see if we thought we had

6  valid claims.  We were satisfied that we didn't and that's why

7  we did not pursue those.

8      THE COURT:  Ms. Beckerman, I'm running out of time.

9  I'm out of time completely.

10      MS. BECKERMAN:  Thank you, Your Honor.

11      THE COURT:  Thank you.

12      MS. FOLEY:  Your Honor, I truly have ten seconds.

13      THE COURT:  Okay.  Your appearance, please?

14      MS. FOLEY:  Athena Foley from Kasowitz, Benson, Tores

15  and Friedman, on behalf of the Multicare Unsecured Creditors

16  Committee.  And, I just didn't want us to get lost in the

17  shuffle.  You've heard a lot over the last couple days from

18  various creditors at the Genesis level and I just didn't want

19  it to be forgotten that there is creditors at the Multicare

20  level with very significant financial interests in this case

21  who have voted in support of the plan.  The Multicare Committee

22  had gone through a very long and arduous process with the bank

23  group, with the Multicare debtors, the Genesis debtors and at

24  long last was able to reach a settlement that the debtors have

25  accurately incorporated into a plan.

326

1    THE COURT:  Well, I'm certainly aware that the M4

2    Committee voted in favor of -- or not only the committee but

3    the creditors themselves.

4    MS. FOLEY:  Yes, M4 and M5 I believe was even

5    unanimous.

6    THE COURT:  All right.

7    MS. FOLEY:  I did want to just note for the record

8    that along the way, both during negotiations and during the

9    confirmation hearings, we have not agreed with all of the

10    debtor's valuations and different financial aspects, but we are

11    very satisfied with our settlement and urge you to confirm the

12    plan.

13    THE COURT:  Thank you.  Let me contemplate issuing

14    decision --

15    MR. WALSH:  Your Honor, just technically, may we rely

16    on our papers for the rest of the requirements of 1129?

17    THE COURT:  Oh of course, of course, please.  Next

18    Wednesday at 11:00 in this courtroom and I'll be prepared to

19    issue an opinion.  And, I thank you all.

20    COUNSEL:  Thank you, Your Honor.

21    (Court adjourned)

22    * * * * *

23

24

25

**AA. 680**

327

# C E R T I F I C A T I O N

"We certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

_____          _____
MARY SWEENEY                              DONNA MORRISSEY

_____          _____
PATRICIA HALLMAN                          ANNA MARIE D'AIUTOLO

_____
DIANA DOMAN                DATE"

FOR PUBLICATION

# UNITED STATES BANKRUPTCY COURT,
## DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In the matter of | : | Case No. 00-2692/JHW |
| | | **(Jointly Administered)** |
| Genesis Health Ventures, Inc., et al. | : | |
| Debtors | : | |
| | : | |
| In the matter of | : | Case No. 00-2494/JHW |
| | | **(Jointly Administered)** |
| Multicare AMC, Inc., et al. | : | |
| Debtors | : | |
| | : | **OPINION ON** |
| | : | **CONFIRMATION** |

**HONORABLE JUDITH H. WIZMUR:**
(U.S. Bankruptcy Court, District of New Jersey, Sitting by Designation)


Presented here is the proposed confirmation of the debtors' joint plan of reorganization.

For the reasons expressed herein, I conclude that the plan is confirmable, subject to the

modifications noted herein.


## FACTS AND PROCEDURAL HISTORY


The Genesis debtors[1] and the Multicare debtors[2] are leading providers of healthcare and

---

[1]      The Genesis debtors include Genesis Health Ventures, Inc., a Pennsylvania
Corporation, the parent debtor, and 153 legal entities listed in Schedule A of the Plan of

-1-

support services to the elderly. They operate inpatient facilities in 5 regional areas of the United States, as well as a national pharmacy and medical supply business. In 1997, Genesis Health Ventures, Inc. ("Genesis"), along with other entities, acquired the Multicare Companies, Inc. Genesis now owns 43.6% of the common stock of the Multicare parent company. Genesis manages Multicare through a comprehensive management agreement which includes all operational, financial and administrative responsibilities. Multicare has no management or administrative infrastructure of its own.

The Genesis and Multicare debtors filed their separate Chapter 11 bankruptcy cases on June 22, 2000. The Genesis debtors' pre-petition indebtedness to the Senior Lenders is approximately $1.2 billion, and is secured by liens on substantially all of the Genesis debtors' assets. The Genesis debtors are also indebted for approximately $80 million in general unsecured claims and approximately $387 million in subordinated debt. The Multicare debtors' pre-petition indebtedness to the Senior Lenders in approximately $443 million, also secured by liens on substantially all of Multicare debtors' assets. The Multicare debtors are indebted for approximately $26.4 million in general unsecured claims and approximately $258 million in subordinated debt.

The debtors' Joint Plan of Reorganization was filed on July 6, 2001. The plan divides

---

Reorganization.

2     The Multicare debtors include Genesis ElderCare Corporation, a Delaware Corporation, the parent debtor, and 197 legal entities listed in Schedule B of the Plan of Reorganization.

-2-

**AA. 683**

Genesis claims into 11 classes, and Multicare claims into 8 classes. The Senior Lender claims in each case (Classes G2 and M2) will receive cash, some of which has already been paid as adequate protection payments, New Senior Notes, New Convertible Preferred Stock and most of the New Common Stock in the reorganized Genesis Company. The general unsecured claimants in both cases (Classes G4 and M4) will receive New Common Stock, estimated in the debtors' Disclosure Statement to approximate a dividend of 7.34%, exclusive of the value of the New Warrants, which will also be distributed to these classes. Genesis and Multicare Senior Subordinated Note Claims (Classes G5 and M5) will receive the same percentage of distribution as general unsecured claimants. In both cases, punitive damages claims are separately classified (Classes G7 and M7), with no distribution except to the extent covered by insurance. All preferred and common stock interests in both companies are extinguished.

For purposes of voting and distribution under the plan, the debtors' reorganization plan contemplates the deemed consolidation of all of the Genesis Debtors as a single legal entity, and all of the Multicare Debtors as a single legal entity. Following the deemed consolidations, the common stock of Multicare will be canceled and New Common Stock of the reorganized Multicare will be deemed to be allocated to Multicare creditors. Genesis and Multicare will then merge. The creditor bodies of Multicare and Genesis will receive a proportionate share of the New Common Stock of the Reorganized Genesis.

All impaired classes in both cases voted to accept the plan, with the exception of Class 5,

Genesis Senior Subordinated Note Claims, which rejected the plan.[3]

Hearings on the confirmation of the plan were held on August 28 and August 29, 2001.
Many of the filed objections were resolved.  The primary objectors remaining are Class G5
claimants, including GMS Group LLC[4] and Charles Grimes[5], several G4, G7, M4 and M7
claimants, including certain tort claimants and the AGE Institute entities, the United States
Trustee, and several shareholders, including James Hayes, Steven Sapperstein and Todd Martin.

## DISCUSSION

To confirm a proposed Chapter 11 plan of reorganization, the proponent bears the burden
of establishing the plan's compliance with each of the thirteen elements of 11 U.S.C. § 1129(a).
In re Gulfstar Indus., Inc., 236 B.R. 75, 77 (M.D.Fla. 1999).  Creditors objecting to the proposed
plan bear the burden of producing evidence to support their objection.  In re Shortridge, 65 F.3d
169, 1995 WL 518870 (6th Cir. 1995) (Unpublished opin.); In re Goddard, 212 B.R. 233, 239 N.7
(D.N.J. 1997).  The Code imposes an independent duty upon the court to determine whether a
plan satisfies each element of § 1129, regardless of the absence of valid objections to

---

[3]       In Class G5, 200 ballots accepted the plan (29.54%), in the amount of
$30,000,000 (14.11%).  477 ballots rejected the plan (70.46%), in the amount of $182,588,000
(85.89%).

[4]       The GMS Group LLC acts on behalf of holders of approximately $170 - $180
million in Genesis senior subordinated debt in Class G5.

[5]       Charles Grimes is the holder of approximately $20 million in Genesis senior
subordinated debt in Class G5.

-4-