confirmation. In re Bolton, 188 B.R. 913, 915 (Bankr. D.Vt. 1995); In re Shadow Bay

Apartments, Ltd., 157 B.R. 363, 365 (Bankr. S.D.Ohio 1993).

A consensual plan requires the proponent to demonstrate that the plan satisfies all thirteen

elements of section 1129(a), in which case the plan must be confirmed. Beal Bank, S.S.B. v.

Waters Edge L.P., 248 B.R. 668, (D.Mass. 2000). A nonconsensual plan requires the proponent

to prove all but one of the thirteen elements, that all classes consent or are unimpaired, 11 U.S.C.

§ 1129(a)(8), plus the additional requirements of section 1129(b), that the plan does not unfairly

discriminate against dissenting classes and that treatment of such dissenting classes is fair and

equitable. The plan presented here is nonconsensual as to Class G5.

No challenge is posed by the objectors to the compliance by this plan with subsections

1129(a)(2) (proponents' compliance with Bankruptcy Code provisions, including adequate

disclosure);[6] (a)(4) (court approval of payments); (a)(5) (disclosure of management); (a)(6) (rate

of approval); (a)(9) (treatment of priority claims); (a)(10) (acceptance by impaired class); (a)(11)

(feasibility of plan); and (a)(13) (retiree benefits). I conclude that the debtors' plan meets these

requirements. I will review the sections in dispute, including sections 1129(a)(1), (a)(3), (a)(7)

and 1129(b). The dispute raised by the United States Trustee regarding the debtors' compliance

---

[6]     During the confirmation hearings, one objector posed the suggestion that the
debtors, by the disclosure statement references to the synergies to be achieved by the merger of
Genesis and Multicare, failed to reflect that the operational synergies of the companies have
already been effected. However, the debtors' approved disclosure statement fully discloses the
nature of the present operations and management of both debtors. The anticipated synergies
reflect the prospect of enhanced value of the New Common Stock of Genesis by the formal
merger of the two companies.

-5-

with subsection 1129(a)(12) will be subsequently scheduled for resolution. The debtors have escrowed funds to accommodate the United States Trustee's concerns.

I.      11 U.S.C. § 1129(a)(1).

Section 1129(a)(1) provides that:

The court shall confirm a plan only if all of the following requirements are met:

(1) The plan complies with the applicable provisions of this title.

11 U.S.C. § 1129(a)(1).

The phrase "applicable provisions" is not defined. The legislative history reflects that "the applicable provisions of chapter 11 [includes sections] such as section 1122 and 1123, governing classification and contents of plan." H.R. Rep. No. 595, 95th Cong., 1st Sess. 412 (1977); S. Rep. No. 989, 95th Cong., 2d Sess. 126 (1978). See In re Aspen Limousine Serv., Inc., 193 B.R. 325, 340 (D. Colo. 1996); In re Texaco Inc., 84 B.R. 893, 905 (Bankr. S.D.N.Y.), appeal dismissed, 92 B.R. 38 (S.D.N.Y. 1988). The objectors contend that the classification and treatment of punitive damages claimants differently from general unsecured claimants is violative of various Chapter 11 provisions including section 502 and section 510(c). As well, the objectors contend that the provisions of the plan providing for releases and exculpation are violative of 11 U.S.C. § 524(e) and cannot be sustained.

-6-

A.     Punitive Damages Class.

As noted above, Classes G7 and M7 of the debtors' plan provide that Genesis and Multicare punitive damages claimants shall receive no distribution under the plan. The term "punitive damages claim" is defined in the plan as:

> [A]ny Claim against any of the Genesis [and Multicare] Debtors, whether secured or unsecured, for any fine, penalty, forfeiture, attorneys' fees (to the extent such attorneys' fees are punitive in nature), or for multiple, exemplary, or punitive damages, to the extent that such fine, penalty, forfeiture, attorneys' fees, or damages is not compensation for actual pecuniary loss suffered by the holder of such Claim and not statutorily prescribed.

Paragraphs 1.33 and 1.46 of section 1A of the debtors' Joint Plan of Reorganization.

George V. Hager, Jr., Executive Vice President and Chief Financial Officer of the debtors, testified that he knows of no punitive damages awards against the debtors. To his knowledge, no punitive damage awards have ever been recovered against the debtors during his nine-year tenure with the debtors. He acknowledged that punitive damage awards will not interfere with the debtors' reorganization efforts, although such awards might dilute the recovery otherwise received by general unsecured claimants in Class G4.

Several parties, including 44 personal injury and wrongful death claimants represented by the law firm of Wilkes & McHugh, P.A., Michael Goff and various other tort claimants represented by the law firm of McCarter and English, LLP, and the AGE Entities, each of whom

-7-

holds claims in both Classes G4 and G7, have objected to the classification and treatment of the Class 7 Punitive Damages Claimants. They assert that the blanket disallowance of punitive damages claims is improper under 11 U.S.C. § 502, which requires disallowance of claims on a case-by-case basis. They contend that the classification of punitive damages separately from unsecured claims is improper because it has no reasonable business justification, and because the classification amounts to an improper "de facto" estimation of personal injury and wrongful death claims. The estimation of such claims by bankruptcy courts is proscribed under 28 U.S.C. § 157(b)(2). They also argue that the separate classification of punitive damage claims constitutes an unlawful equitable subordination of the claims which is not permitted or justified under 11 U.S.C. § 510(c) or otherwise.

The debtors respond that the classification and treatment of punitive damage claims in Classes G7 and M7 do not constitute equitable subordination, and are not an improper classification, because the distribution to general unsecured creditors (Classes G4 and M4) is attributable to the agreement by the Genesis and Multicare Senior Lenders to give up a portion of value they would otherwise receive to unsecured creditors. The Senior Lenders have determined to eliminate punitive damages claimants from the opportunity to share in the recovery. The debtors claim further that even if there is value to be distributed to unsecured creditors beyond the satisfaction of the Senior Lenders' claims, the punitive damage claims are fundamentally dissimilar from other general unsecured claims, in that they are intended to punish the debtors. In the bankruptcy context, and in particular, in the context of these cases, rather than punishing the debtors, such awards would punish other unsecured creditors by diluting their recovery.

-8-

AA. 689

In resolving this issue, it must first be observed that the plan provides for the recovery of punitive damages to the extent covered by insurance. As well, the plan limits punitive damage claims to those claims that are actually penalties, rather than claims that are otherwise compensatory but may be designated as punitive damages under state statutory schemes.

It has been recognized that bankruptcy courts have the equitable power to limit or disallow punitive damages claims where the claims would frustrate the debtor's reorganization. See, e.g., In re FF Holdings Corp. & Farm Fresh Inc., No. 98-37/38-JFF, 1998 U.S. Dist. LEXIS 10741 (D. Del. Feb. 17, 1998). However, the objectors correctly note that such disallowance has been rejected by the courts where there is no contention that punitive damage claims would interfere with reorganization efforts. Id. In FF Holdings, the exclusion of punitive damages from the debtors' reorganization plan was rejected in the absence of evidence that the claims would frustrate debtors' reorganization. See also In re Hillsborough Holdings Corp., 247 B.R. 510 (Bankr. M.D.Fla. 2000) (post-confirmation quest to discharge punitive damages on the basis of potential negative impact on future operations was rejected); In re Allegheny International, Inc., 106 B.R. 75 (Bankr. W.D.Pa. 1989) (debtor's quest to disallow all punitive claims rejected without prejudice as premature, before claims were liquidated and before a plan of reorganization was submitted). In cases such as In re A.H. Robins Co., 89 B.R. 555, 558 (E.D.Va. 1988), where the debtor's punitive damages exposure was "staggering" and "unpredictable", such claims were disallowed because the impossibility of estimating the liability would have destroyed the debtor's ability to reorganize. See also In re Johns-Manville Corp., 68 B.R. 618 (Bankr. S.D.N.Y. 1986), aff'd in part, rev'd in part, 78 B.R. 407 (S.D.N.Y. 1987), aff'd, Kane v. Johns-Manville Corp.,

843 F.2d 636 (2d Cir. 1988). In contrast, here, there is no factual contention that punitive damage claims would interfere with reorganization efforts. Therefore, there would be no basis to separately classify and disallow punitive damages.

The objectors are also correct that the United States Supreme Court holding in <u>United States v. Noland</u>, 517 U.S. 535, 116 S.Ct. 1524, 134 L.Ed.2d 748 (1996) suggests that in the absence of specific statutory direction, a bankruptcy court cannot alter the priority scheme established in the Bankruptcy Code by approving a categorical disallowance of punitive damage claims, even if the resulting dilution of the unsecured creditor recovery would only serve to punish unsecured creditors, rather than to punish the debtors and to deter further misconduct by the debtors. In <u>Noland</u>, the post-petition tax penalty claims asserted by the Internal Revenue Service were specifically designated in 11 U.S.C. § 503(b) as entitled to administrative priority. The Supreme Court determined that the statutory priority afforded to the IRS could not be equitably subordinated on a categorical basis by a bankruptcy court in derogation of the established legislative priority scheme.

Nevertheless, the debtors are ultimately correct that the separate classification and treatment of the punitive damages claims asserted herein is not violative of the Bankruptcy Code in this instance. The debtors are not seeking to subordinate the claims in classes G7 and M7, notwithstanding the erroneous reference to equitable subordination in the original Disclosure Statement.[7] Rather, as the debtors assert in their omnibus response to the objections, the Genesis

---

[7]        Disclosure Statement at 21-27.

-10-

Senior Lenders and the Multicare Senior Lenders have agreed to give up a portion of the value that they would receive, if absolute priorities were enforced, to the holders of unsecured and subordinated claims in classes G4 and G5 and classes M4 and M5. This conclusion is premised upon an assumption, which I agree with and which I will discuss more expansively below, that even if the Genesis Senior Lenders and the Multicare Senior Lenders receive all of the debt and equity distributed under the debtors' plan, the claims of the Senior Lenders would not be satisfied in full. The Senior Lenders have agreed to share the distribution that they would otherwise be entitled to only with classes G4, G5, M4, and M5, and have chosen to omit punitive damages claimants from the agreement. Notwithstanding the resulting difference in the treatment of punitive damages claimants from the treatment of unsecured claimants otherwise, there is no impediment to the agreement.

In fact, such arrangements have been approved in other cases. See, e.g., In re McCorp Financial, Inc., 160 B.R. 941 (S.D.Tex. 1993) (Where a junior creditor received a distribution by agreement from a distribution otherwise due to a senior creditor, the senior creditor may share its proceeds with the junior creditor, even if other junior creditors are left out, as long as the juniors who do not receive a distribution from the senior receive at least as much as they would without the sharing). See also In re SPM Mfg. Corp., 984 F.2d 1305, 1313 (1st Cir. 1993) ("[C]reditors are generally free to do whatever they wish with the bankruptcy dividends they receive, including to share them with other creditors," even if such sharing conflicts with the Code's distribution and priority scheme.).

There is no suggestion that the separate classification of punitive damages claims is improper as a device "to gerrymander an affirmative vote" on the debtors' reorganization plan. In re Briscoe Enters., Ltd., II, 994 F.2d 1160, 1167 (5th Cir.), cert. denied, 510 U.S. 992, 114 S.Ct. 550, 126 L.Ed. 2d 451 (1993).

I conclude that the classification and treatment of Punitive Damage Claims under the debtors' Joint Plan of Reorganization is proper, and overrule the objections thereto.

B.     Release and Exculpation Clauses.

Several creditors object[8] to the release and exculpation provisions contained in the debtors' reorganization plan, as violative of 11 U.S.C. § 524(e).[9] Objectors to the release and exculpation clauses contend that non-consenting creditors are being involuntarily forced to accept the release, and that the releases are offered without consideration from the parties released. They also assert that even if releases are permitted, the necessary factors of fairness and necessity have not been established.

Although some courts have followed a strict interpretation of § 524(e) and do not permit

---

[8]     The objection of the United States Trustee to the release of the Disbursing Agent has been resolved. The Disbursing Agent will be excluded from the Exculpation clause.

[9]     Section 524(e) of the Bankruptcy Code states that "discharge of a debt of the debtor does not affect the liability of any other entity on . . . such debt." 11 U.S.C. § 524(e).

-12-

non-debtor releases and permanent injunctions,[10] those courts that have allowed injunctions or releases rely on the plain language of § 524(e), "noting that the language: does not purport to limit or restrain the power of a bankruptcy court to otherwise grant a release of third parties." In re Master Mortgage Inv. Fund, Inc., 168 B.R. 930, 934 (Bankr. W.D. Mo. 1994) (citing In re Speciality Equip. Corp., 3 F.3d 1043, 1047 (7th Cir. 1993)). Rather, the section "only provides that a discharge of the debtor does not affect the liability of non-debtors on claims by third parties against them for the debt discharged in bankruptcy." In re PWS Holding Co., 228 F.3d 224, 245 (3d Cir. 2000).

The Bankruptcy Code does not explicitly authorize the release and permanent injunction of claims against non-debtors, except in the case of asbestos claims under § 524(a). In re Continental Airlines, 203 F.3d 203, 211 (3d Cir. 2000). Section 105(a) of the Code[11] authorizes

---

[10]    See, e.g., In re Lowenschuss, 67 F.3d 1394, 1401 (9th Cir. 1995), cert. denied, 517 U.S. 1243, 116 S. Ct. 2497, 135 L.Ed.2d 189 (1996)("This court has repeatedly held without exception, that § 524(e) precludes bankruptcy courts from discharging the liabilities of non-debtors."); In re Zale Corp., 62 F.3d 746, 760 (5th Cir .1995)("[A] temporary stay prohibiting a creditor's suit against a nondebtor . . . may not be extended post-confirmation in the form of a permanent injunction that effectively relieves the nondebtor from its own liability to the creditor."); In re Western Real Estate Fund, Inc., 922 F.2d 592, 600 (10th Cir. 1990), modified by, Abel v. West, 932 F.2d 898 (10th Cir. 1991).

[11]    Section 105(a) provides:

The court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title. No provision of this title providing for the raising of an issue by a party in interest shall be construed to preclude the court from, sua sponte, taking any action or making any determination necessary or appropriate to enforce or implement court orders or rules, or to prevent an abuse of process.

-13-

all orders that are necessary and proper to effectuate a reorganization, although it is limited in scope and does not "create substantive rights that would otherwise be unavailable under the Bankruptcy Code." Id. (citations omitted).

In Continental Airlines, the Third Circuit, in addressing the issue of non-debtor releases, declined to establish a "blanket rule" to permit or proscribe non-debtor releases. Instead, the court held open the prospect that "there are circumstances under which [it] might validate a non-consensual release that is both necessary and given in exchange for fair consideration." Id. at 214, n.11. The reservation was made in the context of a comment about the releases and permanent injunctions issued in mass litigation cases such as Robins, Manville and Drexel.[12] While it is certainly unclear whether, in a more typical financial reorganization such as is presented here, non-consensual releases may ever be validated, see, e.g., In re Zenith Electronics Corp., 241 B.R. 92, 111 (Bankr. D.Del. 1999) (holding that releases of non-derivative third-party claims against a non-debtor "cannot be accomplished without the affirmative agreement of the creditor affected"), the Court of Appeals suggested that if a sufficient factual basis for both necessity and fairness are provided, such a limited non-consensual release may be approved. Id. at 214. ("[T]he most flexible tests for the validity of non-debtor releases" look to certain "hallmarks of permissible non-consensual releases--fairness, necessity to the reorganization, and

---

[12]     See In re A.H. Robins Co., 880 F.2d 694 (4th Cir.), cert. denied, 493 U.S. 959, 110 S.Ct. 376, 107 L.Ed.2d 362 (1989); Kane v. Johns-Manville Corp., 843 F.2d 636 (2d Cir. 1988); In re Drexel Burnham Lambert Group, Inc., 960 F.2d 285, 293 (2d Cir. 1992), cert. dismissed, 506 U.S. 1088, 113 S.Ct. 1070, 122 L.Ed.2d 497 (1993).

specific factual findings to support these conclusions").[13]


Section 5.10 of the proposed plan, entitled "Release of Representatives", provides as follows:

> [T]he respective officers, directors, employees, financial advisors, professionals, accountants, and attorneys of the Genesis Debtors, the Multicare Debtors, the respective statutory committees of unsecured creditors appointed pursuant to section 1102 of the Bankruptcy Code in the Genesis Reorganization Cases and the Multicare Reorganization Cases, and Mellon Bank, N.A., as administrative agent under the Genesis Senior Lender Agreements, the Multicare Senior Lender Agreements, and the Revolving Credit and Guaranty Agreements described in Section 2.4 hereof shall be released from any and all Claims against them by the Debtors in their capacity as representatives of the Genesis Debtors, the Multicare Debtors, the statutory committees, or Mellon Bank, N.A., as applicable, except as otherwise expressly provided in the Plan of Reorganization, the Confirmation Order, or the order of the Bankruptcy Court, dated February 23, 2001, approving a senior executive retention plan for certain employees of Genesis.


In Section 5.10, the releases pertain only to claims that would be asserted by the debtors.

---

[13]      The Continental court noted that the constitutional and statutory bases of bankruptcy subject matter jurisdiction on the issue of release and injunctions must be examined, citing Northern Pipeline Constr. Co. v. Marathan Pipe Line Co., 458 U.S. 50, 102 S. Ct. 2858, 73 L.Ed. 2d 598 (1982) and 28 U.S.C. § 1334.  The court recognized that bankruptcy subject matter jurisdiction can extend to matters between non-debtor third parties affecting the debtor on the bankruptcy case, citing to Celotex Corp. v. Edward, 514 U.S. 300, 308 n.5, 115 S. Ct. 1493, 131 L.Ed. 2d 403 (1995). Id. at 214, n.12. Here, there is a jurisdictional nexus between the releases proposed in favor of non-debtor third parties and the debtors.  As to the debtors' directors and officers, the plan envisions the continuation of current management.  As to the Senior Lenders and their agent Mellon Bank, indemnification clauses against the debtor are implicated.  The pursuit by third parties of claims against the non-debtor releasees may affect the reorganization of the debtors going forward.  See also Pacor, Inc. v. Higgins, 743 F.2d 984, 994 (3d Cir. 1984)("the test for determining whether a civil proceeding is related to a bankruptcy is whether the outcome of that proceeding could conceivably have any effect on the estate being administered in bankruptcy").

-15-

The releases are offered to the officers, directors, employees and professionals of the debtors, the statutory committees of unsecured creditors, and Mellon Bank, N.A., as administrative agent of the Senior Lenders, "as representatives of the Genesis Debtors, the Multicare Debtors, the statutory committees, or Mellon Bank, N.A." In the debtors' Disclosure Statement, the debtors explain that:

> This provision is intended to release all claims of the Debtors, whether arising prepetition or postpetition, and based on any theory (whether negligence, gross negligence or willful misconduct) against these individuals. The release is limited to claims that could be asserted by the Debtors and only applies to claims against such parties in their representative capacity. . . .
>
> The purpose of the release of the Genesis and Multicare personnel is to prevent a collateral attack against those individuals based on derivative actions. . . . The Debtors are not aware of any pending or threatened actions, whether civil or criminal, against the management of the Debtors. However, in order to continue to retain the Debtors' management, it is important that they be relieved of the threat of any derivative actions against them personally by parties in these reorganization cases that may be dissatisfied with the treatment provided in the Plan.
>
> The purpose of the release of the representatives of the other major constituencies in these cases, such as the creditors' committees, is to protect the chapter 11 process for individuals who have contributed to the restructuring process. The Debtors are not aware of any pending or threatened actions against these representatives.

Debtors' Disclosure Statement at 81.

Section 10.6 of the proposed plan, entitled "Exculpation", provides that:

> Neither the Debtors, any Disbursing Agent, the respective statutory committees of unsecured creditors appointed pursuant to section 1102 of the Bankruptcy Code in the Genesis Reorganization Cases and the Multicare Reorganization Cases, Mellon Bank, N.A., as administrative agent under, and any lender under, the

Genesis Senior Lender Agreements, the Multicare Senior Lender Agreements, and the Revolving Credit and Guaranty Agreements described in Section 2.4 hereof, nor any of their respective members, officers, directors, employees, agents, or professionals shall have or incur any liability to any holder of any claim or Equity Interest for any act or omission in connection with, or arising out of, the Reorganization Cases, the confirmation of the Plan of Reorganization, the consummation of the Plan of Reorganization, or the administration of the Plan of Reorganization or property to be distributed under the Plan of Reorganization, except for willful misconduct or gross negligence.

The exculpation clause is limited to claims held by creditors or equity holders which are connected with or arising out of the reorganization cases. The releases are offered to the debtors, the statutory committees, Mellon Bank as agent, and any of the Senior Lenders, as well as their respective members, officers, directors and employees for any act or omission, except for wilful misconduct or gross negligence. Presumably, any pre-petition claims held by consenting or non-consenting creditors or equity interest holders are not implicated by this clause.

To a significant extent, the release provisions in Section 5.10 and 10.6 of the plan mirror the release provisions approved by the Third Circuit in PWS Holding. The pertinent release in PWS Holding provided as follows:

> [n]one of the Debtors, the Reorganized Debtors, New Bruno's, the Creditor Representative, the Committee or any of their respective members, officers, directors, employees, advisors, professionals or agents shall have or incur any liability to any holder of a Claim or Equity Interest for any act or omission in connection with, related to, or arising out of, the Chapter 11 Cases, the pursuit of confirmation of the Plan, the consummation of the Plan or the Administration of the Plan or the property to be distributed under the Plan, except for willful misconduct or gross negligence, and, in all respects, the Debtors, the Reorganized Debtors, New Bruno's, the Creditor Representative, the Committee and each of their respective members, officers, directors, employees, advisors, professionals and agents shall be entitled to rely upon the advice of counsel with respect to their

-17-

AA. 698

duties and responsibilities under the plan.

228 F.3d at 246.

The <u>PWS Holding</u> Court noted that under the release provisions governing post-petition conduct, committee members and professionals remained liable to third parties for willful misconduct or gross negligence. Under 11 U.S.C. § 1103(c), the liability of committee members and their professionals are limited to willful misconduct or <u>ultra</u> <u>vires</u> acts. Therefore, the release in the plan set forth the appropriate standard for liability that would apply to actions against committee members and the entities that provided services to the committee in the event that they were sued for participation in the reorganization, and would not affect the liability of third parties.

No separate analysis was articulated in <u>PWS Holding</u> regarding the standard of liability for the post-petition conduct of officers, directors, employees, advisors, professionals or agents of the debtors, the reorganized debtors or the "Creditor Representative".[14] Nevertheless, the release of all such persons from liability for any post-petition act or omission was approved, except for willful misconduct or gross negligence.

Similarly, here, to the extent that paragraphs 5.10 and 10.6 set forth the applicable standards of liability for persons associated with and providing services toward the

---

[14]    There is no explanation regarding the identity of the "Creditor Representative" mentioned in the <u>PWS Holding</u> release clause. I assume that the Representative resembles Mellon Bank, N.A., as agent for the Senior Lenders herein.

-18-

reorganization of the debtors, the provisions may be approved.

However, in three respects, the Release Clause and the Exculpation Clause in this case appear to extend the provisions of the PWS Holdings release clause. First, as to Paragraph 5.10, the release of the debtors' pre-petition claims against the officers, directors, employees and professionals of the debtors is beyond the post-petition focus of the PWS Holding Corporation release clause. Applying the five-factor test cited in In re Zenith Electronics, Inc., 241 B.R. 92, 110 (Bankr. D.Del. 1999), to determine whether the debtors may release any prepetition claims here,[15] several key components of the factors to be considered are missing, causing the equities to favor rejection of the releases. See Master Mortgage Investment Fund, Inc., 168 B.R. at 935 (No rigid "factor test" should be applied in every circumstance, but rather a fact specific review, weighing the equities in each case.). As to the debtors' management personnel here, there is no

_____

[15]    The Zenith Electronics five-factor test, derived from the case In re Master Mortgage Investment Fund, Inc., 168 B.R. 930, 937 (Bankr. W.D. Mo. 1994), include the following criteria:

(1) an identity of interest between the debtor and the third party, such that a suit against the non-debtor is, in essence, a suit against the debtor or will deplete assets of the estate;

(2) substantial contribution by the non-debtor of assets to the reorganization;

(3) the essential nature of the injunction to the reorganization to the extent that, without the injunction, there is little likelihood of success;

(4) an agreement by a substantial majority of creditors to support the injunction, specifically if the impacted class or classes "overwhelmingly" votes to accept the plan, and

(5) provision in the plan for payment of all or substantially all of the class or classes affected by the injunction.

-19-

showing that the individual releasees have made a substantial contribution of assets to the reorganization. As in <u>Zenith</u>, the officers and directors of the debtors no doubt made meaningful contribution to the reorganization by designing and implementing the operational restructuring of the companies, and negotiating the financial restructuring with parties in interest. However, the officers, directors and employees have been otherwise compensated for their contributions, and the management functions they performed do not constitute contributions of "assets" to the reorganization. As well, there can be no conclusion drawn that absent such an injunction in favor of debtors' officers, directors and employees, the reorganization has little likelihood of success. It is understood that the debtors wish to retain current management, and seek to avoid potential distractions to management that such litigation might create. However, the rationale offered does not support the release of debtor's management for pre-petition conduct.[16]

Second, Paragraph 5.10 of the debtors' plan does not limit the post-petition liability of all releasees to the applicable standard of liability for the individual affected. For instance, members of the committee and professionals who provided services to the debtors do not remain liable for willful misconduct or gross negligence. As noted above, under <u>PWS Holding Corp.</u>, the

---

[16]    In contrast to the difficulties with the releases of debtors' pre-petition claims against its management, the release of debtors' claims offered to Mellon Bank, N.A., as administrative agent for the Senior Lenders, is an acceptable provision in the context of this case. It is the product of a negotiated restructuring agreement between the debtors and the Senior Lenders. Indemnification provisions in favor of Mellon Bank connect the debtors to Mellon, such that a recovery against Mellon may deplete estate assets. The Senior Lenders have made a noteworthy contribution of assets to the reorganization by the donation of value to Classes G4 and G5. Without the donation, the prospects for the debtors' successful reorganization would be diminished. In terms of impact on non-consenting creditors, it must be recalled that only the debtors' claims against Mellon Bank are released. A balancing of these factors weighs in favor of approval of the releases to Mellon Bank.

appropriate standard for liability for committee members and professionals provides for continued liability for such misconduct. There is no basis offered to extend protections to the debtor and committee releasees for post-petition actions or omissions beyond any applicable standard of liability. To the extent that Paragraph 5.10 extends such protections, it must be modified accordingly.

Third, in Paragraph 10.6, claims asserted by creditors or equity interest holders against any Senior Lenders ("any lender under the Genesis Senior Lender Agreements, the Multicare Senior Lender Agreements, and the Revolving Credit and Guaranty Agreements.") for any act or omission in connection with the Genesis and Multicare Chapter 11 cases and reorganization process are released. Rather than address a standard of liability for releasees in the context of performing services to further a Chapter 11 debtor's reorganization efforts, the Senior Lender release appears to offer to the non-debtor Senior Lenders a release of liability for causes that might be asserted by third party creditors or equity security holders against them in connection with their role as creditors in the case. Such a release must be examined in light of the Third Circuit's reservation in Continental Airlines that "there are circumstances under which [the court] might validate a non-consensual release that is both necessary and given in exchange for fair consideration." In re Continental Airlines, 203 F.3d at 214, n.11.

The question of necessity requires demonstration that the success of the debtors' reorganization bears a relationship to the release of the non-consensual parties, and that the releasees have provided a critical financial contribution to the debtors' plan that is necessary to

-21-

AA. 702

make the plan feasible in exchange for receiving a release of liability. Id. at 215. Unlike the approval of releases in cases such as A.H. Robins, in which "the entire reorganization" of a massive and complex Chapter 11 case "hinged" on the approval of certain releases,[17] the necessity of the Senior Lender releases here is more marginal. Here, the Senior Lenders have made a financial contribution to the debtors in the form of a portion of the equity of the reorganized debtors which would have otherwise enured to the benefit of the Secured Lenders. Whether a feasible plan could have been presented without the Senior Lenders' contribution is uncertain, because the classes of unsecured creditors or Senior Subordinated Noteholders may have received nothing under the plan, in which case they would have been deemed to reject the plan. 11 U.S.C. § 1126(g). The relationship between the success of the Genesis reorganization and the release of claims against the Senior Lenders is premised on the insistence by the Senior Lenders of the inclusion of the releases of third party claims contained in the Exculpation Clause as partial consideration for their contribution. There is nothing in this record to suggest that any causes of action actually exist against the Senior Lenders, or that any non-consenting creditors or equity security holders would pursue such causes. In return for the financial contributions made, the Senior Lenders are receiving most of the debtors' enterprise value, which includes the potential increase in the value of the merged and reorganized debtors.

As to the fairness of the releases to the Senior Lenders, the issue is whether non-consenting creditors were given reasonable consideration in exchange for the release. Continental, 203 F.3d at 215. One could conclude that the non-consenting creditors here,

---

[17]    In re A.H. Robins Co., Inc., 880 F.2d at 702.

-22-

particularly the objectors who hold claims in Classes G4 and G5, will receive fair consideration for their claims under the plan as proposed, at the level of a dividend of approximately 7.34%, particularly because their claims were out of the money otherwise.

However, even if the threshold Continental criteria of fairness and necessity for approval of non-consensual third-party releases were marginally satisfied by these facts, the broader context of the Continental discussion of such releases requires rejection of the Senior Lender releases proposed in Paragraph 10.6. In Continental, the court noted that the "permissive view" of other Circuits which approved such non-consensual releases was only applied "in the context of extraordinary cases" like Robins, Manville and Drexel Burnham. Id. at 212. The Continental court cited cases which warned against the exercise of "unfettered discretion to discharge non-debtors from liability," and explained "that a permanent injunction limiting the liability of non-debtor parties is 'a rare thing' that should not be considered absent 'a showing of exceptional circumstances' in which several key factors are present." Id. at 213, n.9. (citations omitted). Several bankruptcy court decisions from the Third Circuit which have rejected non-consensual releases of non-derivative third party claims against non-debtors, including Zenith Electronics, supra, were also cited. Id. at 214. By these references, the message of Continental appears to be that the type of financial restructuring plan under consideration here would not present the extraordinary circumstances required to meet even the most flexible test for third party releases.

As to the release and exculpation clauses, I conclude that paragraphs 5.10 and 10.6 of the plan may be approved, if the provisions are modified as follows:

-23-

1.    Paragraph 5.10

   a)  The release of the debtors' pre-petition claims against officers, directors, employees and professionals of the debtors must be stricken.

   b)  The release of Mellon Bank, N.A., as agent for the Senior Lenders, may be approved.

   c)  The post-petition liability of the releasees (except Mellon Bank) is limited to the applicable standard of liability for each individual releasee.

2.    Paragraph 10.6

   The release of third-party claims against the Senior Lenders must be stricken.

II.    <u>11 U.S.C. § 1129(a)(3)</u>.

Section 1129(a)(3) requires that:

The plan has been proposed in good faith and not by any means forbidden by law.

11 U.S.C. § 1129(a)(3).

The Code does not define "good faith" in the § 1129(a)(3) context.  Courts have found a plan to be proposed in good faith where the plan:  (1) fosters a result consistent with the Code's objectives, <u>In re Block Shim Dev. Co.- Irving</u>, 939 F.2d 289, 293 (5th Cir. 1991); <u>In re Madison Hotel Assocs.</u>, 749 F.2d 410, 425 (7th Cir. 1984); <u>In re Resorts Int'l, Inc.</u>, 145 B.R. 412, 469 (Bankr. D.N.J. 1990); (2) the plan has been proposed with honesty and good intentions and with

-24-

a basis for expecting that reorganization can be effected, In re Koelbl, 751 F.2d 137, 139 (2d Cir.

1984); In re Sound Radio, Inc., 93 B.R. 849, 853 (Bankr. D.N.J. 1988), aff'd in part, rev'd in

part, 103 B.R. 521 (D.N.J. 1989), aff'd, 908 F.2d 964 (3d Cir. 1990) and (3) there was

fundamental fairness in dealing with the creditors, In re Stolrow's Inc., 84 B.R. 167, 172 (9th Cir.

BAP 1988).

The determination of good faith must be based on the totality of the circumstances. In re

Cajun Elect. Power Co-op., Inc., 150 F.3d 503, 519 (5thCir. 1998), cert. denied, 526 U.S. 1144,

119 S.Ct. 2019, 143 L.Ed.2d 1031 (1999); Beal Bank, S.S.B. v. Waters Edge L.P., 248 B.R. 668,

688 (D.Mass. 2000); In re Holley Garden Aparts., Ltd., 238 B.R. 488, 493 (Bankr. M.D.Fla.

1999). The issue of good faith looks to the purposes that would be achieved by the plan.

Several of the objectors suggested that the speed with which the debtors pursued the

presentation of the reorganization plan, the approval of the disclosure statement, and the

confirmation hearings evidence the bad faith of the proponents. The suggestion appears to be

that in light of the increases in value experienced in the health care industry by various

companies during the last six months, the deal that was consummated with the Senior Lenders,

which presupposes that the Senior Lenders are undersecured, might fail if the enterprise value of

the debtors continues to rise.

I will decline to assign bad faith motives to the debtors on this record for moving the case

to confirmation promptly. Barring extraordinary factors, a prompt confirmation process must be

-25-

lauded. I am convinced that the proposals presented in the plan of reorganization were intensely negotiated over a substantial period of time, and the prospect of a prompt confirmation process certainly enhanced the value of the resolution to most of the parties in interest. The continuing accrual of administrative expenses alone serves as enormous incentive for a speedy exit from the Chapter 11 process.

The objectors also suggest that the plan only serves the interests of the Senior Lenders and the debtors' directors and officers, all of whom have incentive to minimize the going concern value at this time to enable them to capture all present and future value for themselves at the expense of subordinated debt and general unsecured creditors. Again, I will decline to assign bad faith motives to the debtors on this ground. After vigorous scrutiny of the evidence presented at the confirmation hearings, I am convinced that the Senior Lenders are undersecured, and that the treatment of junior creditors and equity security holders proposed in the plan is consistent with the fair and equitable requirements for confirmation. It is certainly possible that the industry may continue to experience gains, but negative trends are also noted. The debtors' present financial posture was presented fully and fairly. The plan fosters Bankruptcy Code objectives of affording value to creditors according to their status in the case and according to prescribed priorities.

I conclude that the debtors have met their burden of proof to establish that their plan of reorganization has been proposed in good faith. I am convinced that the reorganized financial structure is presented to maximize the economic viability of the various entities, that the plan has a reasonable likelihood of achieving the results intended, that the plan has been proposed with

honesty and good intentions, and that it deals with creditors with fundamental fairness.

III.    11 U.S.C. § 1129(a)(7).

Section 1129(a)(7) provides in pertinent part that:

With respect to each impaired class of claims or interests -

> (A) each holder of a claim or interest of such class -
>
> (i) has accepted the plan; or
>
> (ii) will receive or retain under the plan on account of such claim or interest property of a value, as of the effective date of the plan, that is not less than the amount that such holder would so receive or retain if the debtor were liquidated under chapter 7 of this title on such date.

11 U.S.C. § 1129(a)(7).

This section encompasses the "best interest of creditors" test, which mandates that the holders of claims or interests comprising an impaired class either unanimously accept the plan, or receive, in terms of present value, an amount not less than they would receive in a liquidation of the debtor under Chapter 7 occurring on the plan's effective date. The court must independently determine the value of the distributions under the plan in order to ascertain whether this requirement is satisfied, utilizing information that the proponent must provide. In re Tranel, 940 F.2d 1168, 1172 (8th Cir. 1991); In re Montgomery Court Apts. of Ingham County, Ltd., 141 B.R. 324, 330-31 (Bankr. S.D.Ohio 1992); In re Mortgage Investment Co., 111 B.R. 604, 615 (Bankr. W.D.Tex. 1990). The focus under this section is upon each holder of a claim, as distinguished

-27-

**AA. 708**

from the class in which the claim is placed.  In re Elsinore Shore Assoc., 91 B.R. 238, 269

(Bankr. D.N.J. 1988).  The proponent of the Chapter 11 plan has the burden to show compliance

with the best interests of the creditor test.  In re American Family Enters., 256 B.R. 377, 403

(D.N.J. 2000); In re Global Ocean Carriers Ltd., 251 B.R. 31, 46 (Bankr. D.Del. 2000).


Stephen B. Darr, a partner in the Corporate Recovery practice of KPMG, LLP, testified

that KPMG assisted the debtors in performing a liquidation analysis on debtors' assets to test

what creditors would receive if the assets were liquidated in a Chapter 7 mode.  He opined that

the most likely manner of liquidation to maximize recovery from the sale of debtors' assets is to

sell the assets as lines of business in an operational mode.  He acknowledged that he did not

consider hard assets, such as real estate and equipment, except on a corporate level, although he

explained convincingly that the best way to value the potential sale price of an operational

business is to measure cash flow and to apply an appropriate multiple.  He also acknowledged

that he did not consult any appraisals, and had no knowledge of whether any causes could be

asserted by the debtors against their directors and officers.  Notwithstanding these

acknowledgments, Mr. Darr's conclusion that the "best interest of creditors" test is met in these

cases is convincing.  As to Genesis, the range of net estimated proceeds available for distribution

is $427 million to $692 million.  With DIP financing, various mortgage claims, and Senior

Lender claims, the total body of secured claims would amount to $1.488 billion.  Miscalculations

of over $800 million would be required to defeat the debtors' presentation as to Genesis.


Similarly, as to Multicare, the net estimated proceeds available for distribution is $131

-28-

million to $207 million.  The total secured claims approximate $470 million.  Any miscalculation is amply accommodated by the gap of over $250 million.  Under both liquidation analyses, there would be no distribution to administrative, priority, and general unsecured creditors.

I conclude that the debtors have met their burden to establish compliance with § 1129(a)(7).

IV.     11 U.S.C. § 1129(b)(2).

Where, as here, at least one impaired class of claims has not consented to the proposed plan, the "cram down" provisions of 11 U.S.C. § 1129(b)(1) come into play.  The cram down provisions require confirmation "if the plan does not discriminate unfairly, and is fair and equitable" with respect to each impaired non-consenting plan.  11 U.S.C. § 1129(b)(1).  Each of these requirements is reviewed herein.

A.     Unfair Discrimination.

The concept of unfair discrimination is not defined under the Bankruptcy Code.  Various standards have been developed by the courts to test whether or not a plan unfairly discriminates.  In re Dow Corning Corp., 244 B.R. 705, 710 (Bankr. E.D.Mich. 1999), aff'd, 255 B.R. 445 (E.D. Mich. 2000).  The hallmarks of the various tests have been whether there is a reasonable basis for the discrimination, and whether the debtor can confirm and consummate a

-29-

plan without the proposed discrimination. See, e.g., In re Ambanc La Mesa L.P., 115 F.3d 650, 656 (9th Cir. 1997), cert. denied, 522 U.S. 1110, 118 S. Ct. 1039, 140 L.Ed.2d 105 (1998).

> One court has adopted a modified test for unfair discrimination, which gives rise to:
>
> a rebuttable presumption of unfair discrimination ...where there is: (1) a dissenting class; (2) another class of the same priority; and (3) a difference in the plan's treatment of the two classes that results in either (a) a materially lower percentage recovery for the dissenting class (measured in terms of the net present value of all payments), or (b) regardless of percentage recovery, an allocation under the plan of materially greater risk to the dissenting class in connection with its proposed distribution.

In re Dow Corning Corp., 244 B.R. 696, 702 (Bankr. E.D.Mich. 1999) (adopting the test proposed in Bruce A. Markell, "A New Perspective on Unfair Discrimination in Chapter 11", 72 AM.BANKR.L.J. 227 (1998)).

As discussed above in the context of 1129(a)(1), Classes G7 and M7 are dissenting classes, because they are not receiving any distribution under the plan and are deemed to reject under 11 U.S.C. § 1126(g). Other classes of the same priority, Classes G4 and M4, the classes of general unsecured claimants, are receiving a distribution under the plan. Nevertheless, the presumption that the plan is therefore unfairly discriminatory is rebutted. As noted above, the recovery by Classes G4 and M4 of a dividend in the form of New Common Stock and Warrants is based on the agreement of the Senior Lenders to allocate a portion of the value they would have otherwise received to Classes G4 and G5. The disparate treatment between Classes G4 and G7 and Classes M4 and M7 is a permissible allocation by the secured creditors of a portion of the

-30-

distribution to which they would otherwise be entitled, rather than unfair discrimination against Classes G7 and M7 by the proponents of the plan. See, e.g., In re SPM Mfg. Corp., 984 F.2d 1305 (1st Cir. 1993); In re McCorp Financial, Inc., 160 B.R. 941 (S.D. Tex. 1993).

      B.    Fair and Equitable.

Subsection 1129(b)(2) provides that "the condition that a plan be fair and equitable with respect to a class includes the following requirements." 11 U.S.C. § 1129(b)(2) (emphasis added). The statute offers illustrative ways to satisfy the fair and equitable standard for classes of secured and unsecured creditors, as well as for a class of interests. With respect to unsecured claims, § 1129(b)(2)(B) provides that a plan may be confirmed notwithstanding the dissent of a class of unsecured creditors if the plan does not offer a junior claimant any property before each unsecured claimant receives full satisfaction of its allowed claim. 11 U.S.C. § 1129(b)(2)(B). This portion of § 1129(b) is often referred to as the "absolute priority rule". See Bank of America National Trust & Savings Ass'n v. 203 North LaSalle St. Partnership, 526 U.S. 434, 119 S. Ct. 1411, 143 L.Ed.2d 607 (1999). See also In re Bonner Mall Partnership, 2 F.3d 899, 912 (9th Cir. 1993) (section 1129(b)(2) "expressly leaves room for additional factors to be considered in applying the principle in other particular circumstances"). A corollary of the absolute priority rule is that a senior class cannot receive more than full compensation for its claims. In re McCorp. Financial Inc., 137 B.R. 219, 325 (Bank. S.D. Tex. 1992).

Four issues are raised by the objectors regarding the "fair and equitable" requirement,

including the following:

1. The Senior Lenders are receiving more than full compensation for their claims.

2. The Management Incentive Plan improperly distributes equity to management and is otherwise excessive.

3. The "deemed consolidation" and subsequent merger of Genesis and Multicare are improper under principles governing substantive consolidation, and represent a misallocation of value from Genesis debtors to Multicare debtors to the benefit of Multicare creditors and the detriment of Genesis creditors.

4. The failure of the plan to offer some value to the common shareholders should defeat confirmation of the plan.

1. Recovery by Senior Lenders.

The issue raised by the objectors is whether the reorganized enterprise value of Genesis and Multicare, either individually or combined, provides a recovery to holders of claims in Class G2, the Senior Lenders, that is greater than 100% of their claim. If so, then the plan violates the requirement that the plan be fair and equitable as to the non-consenting Class G5 Genesis Senior Subordinated Note Claims.

Various valuations of the reorganized enterprise value of the debtors were offered in support and in opposition to the plan. The methodologies utilized, primarily the Comparable

-32-

AA. 713

Company analysis[18] and the Discounted Cash Flow method,[19] were similarly applied by the experts. The professionals who testified generally agreed that the Comparable Company analysis was the most significant to ascertain enterprise value in this case. The key components of the Comparable Company analysis are budgeted projections of earnings before interest, taxes, depreciation and amortization ("EBITDA"), and the selection of the appropriate multiple to apply to EBITDA to arrive at enterprise value.

        a)     EBITDA.

As to the appropriate level of projected EBITDA, Chief Financial Officer George Hager testified that for fiscal year 2001 (October 1, 2000 through September 30, 2001), the budgeted EBITDA for the two companies, a "middle of the road" projection, was in the range of $212 million to $215 million. Mr. Hager testified that the actual results for the first 10 months of the 2001 fiscal year were on target with budget projections. A host of positive developments, such as legislative changes, effective April 1, 2001, which increased debtors' revenues, as well as continuing industry challenges, such as the shortage of skilled nursing staff, were considered. Not considered was the potential impact of a proposed acquisition by the debtors of a company

---

[18]     The Comparable Company analysis requires a comparison of the enterprise value of selected public companies to their performance levels (EBITDA) to arrive at a benchmark multiple. Subjective assessment of how the comparable companies compare with the target company is required.

[19]     The Discounted Cash Flows analysis determines the cash flows that would be available to a potential investor, based on a required rate of return, to determine net present value.

known as APS, from the Mariner debtors.  The Mariner cases are also pending before the Delaware bankruptcy court.  The debtors have entered into a letter of intent to purchase APS.  If the purchase is consummated, the potential for an increase in the debtors' EBITDA is strong. However, another prospective purchaser, Omnicare, Inc., may defeat the debtors' bid.  The actual consummation of the transaction was deemed too speculative for inclusion as a basis for the calculation of a forecast EBITDA for valuation purposes.

The objectors, particularly GMS, Inc., introduced various documents that suggested that the $215 million 2001 EBITDA utilized by the valuation experts to support the plan was too low. Actual 1999 EBITDA figures for the two companies exceeded $299,000,000.  However, Mr. Hager explained that dramatic changes had taken place in the industry since the end of Fiscal Year 1999, including an annual $20 million reduction due to the continued phase- in of the Prospective Payment System initiated by Congress in 1997, significant increases in the cost of health insurance ($13 million) and liability insurance ($6 million), and a substantial decline in pharmacy margins ($20 million to $25 million).

GMS produced other indications that the EBITDA forecast utilized for valuation purposes should be higher.  In a February 2001 presentation to the steering committee for Senior Lenders prepared by debtors' counsel, with the participation of debtors' management, "normalized 2001 EBITDA", reflecting the annualization of increased payments under the Medicare, Medicaid, and SCHIP Benefits Improvement and Protection Act[20], and "adjusted

---

[20]     Pub.L. 106-554, 114 Stat. 2763 (Dec. 21, 2000).

normalized 2001 EBITDA", reflecting certain adjustments, were noted at $223,603,000 and $231,403,000 respectively. The numbers used in the presentation were picked up by a Goldman Sachs presentation to the debtors dated February 28, 2001. In a presentation by debtors' management to several ratings agencies during June and July 2001, including Standard & Poor's and Moody's, the projected EBITDA for 2001 was noted at $214,500,000, while the projected EBITDA for fiscal year 2002 was noted at $229,700,000, without the potential APS acquisition. In certain negotiating documents utilized by Chilmark Partners, the financial advisor to the Senior Lenders, Chilmark reflects that it was "provided" with a combined 2001 EBITDA run rate of $222 million, although the actual source of the EBITDA number used is not certain. As well, the objectors contend that third quarter results for Genesis and Multicare ($54,900,000 for Genesis and $9,400,000 for Multicare) might support a higher EBITDA forecast.

Debtors' management, through George Hager, acknowledged that the overall prospects for the health care industry have improved this year, and that an upward re-valuation of health care companies is appropriate. However, the experts who testified did revise their valuations upward since they issued their reports in March and April 2001. The fixing of a projected EBITDA for the companies is largely a matter of judgment, and the judgment exercised by management in this regard appeared to be balanced, taking into account both positive and negative forces and trends. Many of the cited references were produced in various negotiating postures, in which context the reliability of specific numbers is generally more suspect. The experts agreed that budget projections of EBITDA are most commonly used for valuation purposes. The fact that the debtors' actual results are on target with 2001 budget projections for

-35-

AA. 716

the first ten months of the fiscal year confirms the reasonableness of the management projections.

      b.    <u>Appropriate Multiple</u>.

The selection of the appropriate multiple to apply to EBITDA to arrive at the debtors' reorganized enterprise value is a subjective exercise, requiring an analysis of comparable companies to the debtors. The experts generally agree that as to the long-term health care operations of the Genesis and Multicare businesses, the two publicly traded entities of Beverly Enterprises and HCR ManorCare are most similar to the debtors' operations. Of the two, Beverly Enterprises most closely resembles the debtors, from such points of comparison as the sources of revenues, known as the "payor mix", and EBITDA margins achieved. HCR ManorCare is the premier public company providing long-term healthcare services, with a more favorable payor mix, higher EBITDA margins and a higher quality of assets than either the debtors or Beverly. As to the institutional pharmacy business of Genesis, known as Neighborcare, the only comparable company is Omnicare, Inc., which is superior to Neighborcare in its financial performance.

Utilizing the 2001 and 2002 projected EBITDA, the experts testifying on behalf of the debtors' plan applied enhancements to the Beverly multiples (in the range of approximately 7.9), but substantially discounted the ManorCare (10.7) and Omnicare (10.1 to 11.1) multiples.

The multiples utilized by the experts testifying on behalf of the objectors were shown to

be substantially inflated and unrealistic. Unlike the financial advisors who testified on behalf of

the debtors, two of whom have had extensive health care industry expertise, and all of whom

have studied the debtor companies for many months, with full access to debtors' management,

both experts who testified for the objectors had little or no experience with the long-term health

care industry, had only up to about one month to devote to this assignment, had no contact with

debtors' management in preparing their opinions, and obtained their information from public

sources. On behalf of GMC, Anthony Grillo, from Evercore Partners, L.P., opined that an

appropriate multiple to utilize for the long-term health care segment of the debtors' business is

9.4, a mid-point between HCR ManorCare and Beverly. Notwithstanding his recognition that

Genesis and Multicare are most comparable to Beverly, which actually has an earnings rate that

is higher than that of Genesis, Mr. Grillo opined that the lower Genesis earning rate may be

temporary, and that the market place might apply a higher multiple to Genesis because

improvements in the financial performance of the debtors would be expected.


The opinions expressed by Evercore Partners were substantially discredited, largely

because Mr. Grillo lacked health care industry expertise to support his subjective evaluations.

He acknowledged that his report did not take into account certain negative trends in the industry,

including a severe nursing shortage, increasing labor costs, increasing professional liability costs

and risks associated with the reduction of the federal budget surplus. He acknowledged that his

assessment of the institutional pharmacy sector of Genesis, i.e., Neighborcare, was compared to

the premier pharmacy company, Omnicare, in a "purely subjective manner", without previous

experience with the industry. Even if all of the judgments applied by Evercore Partners were

affirmed, it was shown that Evercore Partners committed certain errors in its calculations.[21] With the corrections inserted, even if the increased multiples relied upon by Evercore Partners, which were not credibly supported, were retained, the Senior Lenders would receive a 99% recovery on their claims.

Charles Grimes, another objector in Class G5, offered the expert testimony of Robert Becklean, an independent consultant who has known Mr. Grimes for 45 years. Mr. Becklean opined that the two companies, Genesis and Multicare, must be valued together to achieve the full value of the combination. The range assigned by Mr. Becklean to the valuation of the combined companies is $1.7 billion to $2.2 billion. He opined that he would select the high end of the valuation because of the favorable market performance of health care industry stocks in recent months.

As with Evercore, Mr. Becklean conducted no independent research regarding health care companies, had no specific expertise in the industry, and had no contact with debtors' management in preparing his report. He specializes in the high technology industries of telecommunications and data communications. He supported his opinions by reflecting that he exercised no qualitative judgments but only imposed calculations on the numbers already provided. As to Mr. Becklean's opinion that the companies should be combined to achieve full value, the debtors' disclosure statement recognizes that although Genesis and Multicare have been valued separately because of the separate creditor bodies, the combined entity may realize a

---

[21]      Mellon Exhibit 3.

higher equity trading value in the public market because the combined company would have a larger enterprise value. However, the potential escalation in value is somewhat speculative as a basis for valuation. Most significantly, Mr. Becklean acknowledged that if the debtors' budgeted projections were utilized, by his calculations, the mid-range enterprise value to be achieved would be approximately $1.95 billion. For the combined Genesis and Multicare companies, an enterprise value of $2.064 billion would be required to reach a 100% recovery by the Senior Lenders. See Debtors' Table 2.

The valuations presented for Genesis ranged from a midpoint of $1.3 billion (Chilmark Partners) to $1.325 billion (UBS Warburg) to $1.375 billion (Houlihan Lokey Howard and Zukin). For Multicare, the valuations ranged from a midpoint of $373 million (Chilmark Partners) to $425 (Credit Suisse/First Boston). The combined valuations approximate $1.750 billion. The valuations reflect an upward adjustment to account for more favorable market conditions for health care industry stocks in recent months. To reach a 100% recovery for the Senior Lenders in Class G2, including post-petition interest through August 2001 under 11 U.S.C. § 506(a), the enterprise value of Genesis would have to be at least $1,462,558.[22] Using the midpoint Genesis enterprise value of $1.33 billion and taking into account the repayment of DIP financing, administrative claims and other secured debt, there would be $977 million available to pay to Senior Lenders, representing a recovery of approximately 88% to Genesis

---

[22]    Exit Financing (DIP Financing and administrative expenses)    $   233,000,000
        Other Secured Debt (Class G1)                                $   120,077,000
        Senior Lenders (Class G2)                                    $1,109,481,000
                                                                     $1,462,558,000

Senior Lenders on their claims.

In evaluating the various opinions offered to establish valuation, I readily recognize that the process of valuation is not an exact science, and that ranges of value, with identified mid-points, are customarily utilized. I also recognize that the valuation process requires some level of subjectivity. The weight to be afforded to valuation opinions is enhanced by the level of expertise in the subject industry, and the opportunity of the expert to understand the subject of the valuation. In both respects, the debtors' experts offered superior credentials. Their conclusions were premised on reasonable assumptions arrived at after substantial research and inquiry. On this record, I can readily conclude that under the debtors' plan, the Senior Lenders will not recover 100% of their claims. Accordingly, there is no violation of the absolute priority rule.[23]

    2.    Management Incentives.

The objectors contend that the proposed plan violates the absolute priority rule of § 1129(b)(2)(B) and is otherwise not fair and equitable, because the Genesis officers and directors will receive under the plan, for no additional consideration, a distribution of stock, forgiveness of loans, valuable waivers, releases and exculpations and other value, in essence on

---

[23]    The question of the appropriate burden of proof to apply to a § 1129(b)(2) analysis was raised at confirmation hearings. In reaching my decision herein, I rely on the premise that the proponent must show that a plan is fair and equitable by a preponderance of the evidence. In re Briscoe Enterprises, Ltd., II, 994 F.2d 1160, 1165 n.26 (5th Cir.), cert. denied, 510 U.S. 992, 114 S.Ct. 550, 126 L.Ed.2d 451 (1993).

account of their prepetition equity interests, whereby other equity holders will receive nothing.
The objections to that management incentives provided for in the plan must be overruled for
several reasons.

First, I have already approved certain management benefits to which objection is made,
such as the forgiveness of loans. A Management Incentive Program for the top four executives
was approved by this court prior to the confirmation proceedings by order entered February 23,
2001. The approved program provides for incentive payments to be made on the Effective Date
of a Plan of Reorganization. If the Effective Date was August 31, 2001, the aggregate amount of
such payments would have been approximately $2.1 million. A later Effective Date results in a
decrease of 7.5% (up to a maximum decrease of 15%) for each month delayed. The program also
provides for severance protection, the assumption of certain deferred compensation arrangements
and the forgiveness of certain loans that three of the executives incurred in order to purchase
Genesis stock in compliance with a prepetition Board of Directors requirement. The forgiveness
is to occur on the earlier of the first anniversary of the Effective Date or the termination of the
executive's employment. The forgiveness also includes an agreement to pay any taxes due from
the executives due to such forgiveness. The aggregate amount of such loans is approximately
$2.5 million. The Creditors Committee is correct that the terms of the final order entered in
February 2001 cannot be disturbed by an objection to confirmation of the debtors' reorganization
plan, which is presented six-months following the entry of the final order.

Second, the additional management benefits provided for in the plan are derived from

value otherwise allocable to the Senior Lenders. Under the proposed plan, the New Management Incentive Plan will provide for grants of 750,000 shares of New Common Stock allocated among 43 management employees of the reorganized Genesis. The plan also provides for options to purchase 3,480,000 shares of New Common Stock allocated to 129 management employees. The option exercise price will be $20.33 per share. The exact amount of shares and options to be allocated to each employee and the establishment of a vesting period will be determined by the new board of directors for the reorganized Genesis or pursuant to an agreement with the steering committee for the holders of the Genesis Senior Lenders Claims and the Multicare Senior Lender Claims.

As of the Effective Date, the reorganized Genesis will also enter into long term employment agreements with its top four senior executives. The four senior executives will be provided with automatically renewing three year employment terms, absent advance notice. In addition, the executives will be entitled to incentive compensation, to be determined by the new board of directors for the reorganized Genesis, in an amount not to exceed 50% of their respective base salaries.[24]

The objectors are correct that the new Management Incentive Plan, while characterized as consideration for continued employment, borders on payments to management on account of their pre-petition equity interests, particularly in light of the generous retention package

---

[24]    The base salary for Michael Walker, CEO and Chairman of the Board is $850,000; for Richard Howard and David Barr, Vice Chairmen, $500,000, and for George Hager, Jr., Executive VP and CFO, $400,000.

previously approved for the executives during the pendency of the case.   Such an allocation might indeed be violative of the absolute priority rule, in light of the relatively small dividend proposed to be paid to unsecured creditors, and the extinguishment of equity interests otherwise. Nevertheless, as I have determined with respect to the proposed distribution to unsecured creditors, the issuance of stock and warrants to management represents an allocation of the enterprise value otherwise distributable to the Senior Lenders, which the Senior Lenders have agreed to offer to the top executives as further incentive to them to remain and effectuate the debtors' reorganization.  The Senior Lenders are free to allocate such value without violating the "fair and equitable" requirement.  The objections to the New Management Incentive Plan are overruled.

       3.     Deemed Consolidation and Merger.

As noted above, the debtors' plan proposes the deemed consolidation, for voting and distribution purposes, of all of the Genesis Debtors as a single legal entity, and all of the Multicare Debtors as a single legal entity.  Following the issuance of New Common Stock in the reorganized Multicare to Multicare creditors, Genesis and Multicare will merge, with creditors of each case entitled to receive a proportionate share of the New Common Stock of the reorganized Genesis.

The objectors contest the proposed merger of the reorganized Genesis and reorganized Multicare entities to effect "a de facto substantive consolidation," which the objectors claim

-43-

misallocates value from Genesis to Multicare, to the detriment of the Genesis creditors.

The deemed consolidation of each set of entities is akin to substantive consolidation. "Substantive consolidation usually results in, inter alia, pooling the assets of, and claims against, the two entities; satisfying liabilities from the resultant common fund; eliminating inter-company claims; and combining the creditors of the two companies for purposes of voting on reorganization plans." In re Augie/Restivo Baking Co., 860 F.2d 515, 518 (2d Cir. 1988). "The sole purpose of substantive consolidation is to ensure the equitable treatment of all creditors." Id. See also In re Cooper, 147 B.R. 678 (Bankr. D.N.J. 1992) (joint administration benefits case administration without affecting the creditors while substantial consolidation ensures the equitable treatment of the creditors). "Substantive consolidation should be considered with extreme caution and granted only in extraordinary situations." In re United Stairs Corp., 176 B.R. 359, 368-69 (Bankr. D.N.J. 1995).

The D.C. Circuit has developed a three-part test under which the moving party must show:

> (1) a substantial identity between the entities to be consolidated;
>
> (2) that consolidation is necessary to avoid harm or to achieve some benefit; and
>
> (3) in the event that the creditor shows harm, that the benefits of consolidation "heavily" outweigh the harm.

In re Auto-Train Corp., 810 F.2d 270, 276 (D.C. Cir. 1987). The "first part of this analysis mirrors that used by courts to determine whether corporations are alter egos of one another. The

-44-

second and third parts of the analysis require balancing the benefits and harms of substantive consolidation." In re New Center Hospital, 187 B.R. 560, 568 (E.D.Mich. 1995). This approach was also adopted by the Eleventh Circuit in Eastgroup Properties v. Southern Motel Assoc., Ltd., 935 F.2d 245, 249 (11th Cir. 1991) (movant must demonstrate: "(1) there is substantial identity between the entities to be consolidated; and (2) consolidation is necessary to avoid some harm or to realize some benefit"). See also In re Reider, 31 F.3d 1102 (11th Cir. 1994); In re Giller, 962 F.2d 796 (8th Cir. 1992).[25]

Here, the debtors have shown both substantial identity between the entities to be consolidated, and benefit to the creditors to be achieved by the consolidation. The Genesis entities operate as business units, including units for inpatient services, pharmacy and medical supplies, rehabilitation services and management services. These business units operate as separate, integrated units, without the formality of separate corporate entities. A central cash management system is maintained for all of the entities, through which most revenues are received and accounts are paid. The Senior Lenders hold debt that is secured by substantially all of the Genesis entities. Inter-company guarantees for single claims exist among the Genesis entities.[26]

---

[25]     A substantially similar test was adopted by the Second and Ninth Circuits, which focuses on the reliance by creditors on a single economic unit, and the entanglements of the debtors such that consolidation will benefit all creditors. In re Augie/Restivo Baking Co., 860 F.2d at 518; In re Bonham, 229 F.3d 750, 766 (9th Cir. 2000).

[26]     Substantially the same factual circumstances are presented in the Multicare cases.

-45-

The deemed consolidation of the debtors will achieve substantial benefit for Genesis creditors. Inter-company claims will be eliminated from the treatment scheme, as well guarantees of the obligations of one Genesis debtor by another Genesis debtor. In addition, each claim filed in Classes G2, G4 and G5 against any of the Genesis debtors will be considered as a single claim against the consolidated Genesis debtors. In light of the indebtedness of nearly all of the Genesis debtors to the Senior Lenders, the only way to provide any recovery to individual creditors of the subsidiaries is to treat all unsecured creditors on a consolidated pro rata basis. The deemed consolidation will not affect the legal and organizational structure of the reorganized debtors.

As to the proposed merger between Genesis and Multicare, the objectors contend that value belonging to the Genesis junior classes is being used to defray losses by the Multicare Senior Lenders, who are substantially the same entities as the Genesis Senior Lenders. However, no evidence was produced by the objectors to support the contention of the misallocation of value from Multicare creditors to Genesis creditors. Rather, the debtors demonstrated that the allocation of Genesis New Common Stock is based strictly on the relative equity values of Genesis and Multicare on a pro rata basis, assuming the new capital structure proposed in the plan. There is no diversion of value from Genesis to Multicare, or substantive consolidation of the two entities. The objections to the deemed consolidation and merger of the debtors is overruled.

A corollary of the objectors' position on substantive consolidation is their opposition to

-46-

the settlement reached as part of the reorganization plan between Genesis and Multicare to relinquish pre-petition claims against each other. According to the objectors, Genesis holds a contract claim against Multicare of approximately $109 million, while Multicare's claims and defenses against Genesis are unspecified and uncertain.

Settlements are favored in bankruptcy because they serve to minimize litigation, provide a means for efficient resolution of disputes, and help to expedite the administration of the bankruptcy estate. In re Martin, 91 F.3d 389, 393 (3d Cir. 1996); In re Edwards, 228 B.R. 552, 568-69 (Bankr. E.D. Pa. 1998); In re Mavrode, 205 B.R. 716, 719 (Bankr. D.N.J. 1997). In determining whether or not to approve a settlement, the court must consider whether the settlement is "fair and equitable" and in the "best interests of the estate." In re Martin, 212 B.R. 316, 319 (B.A.P. 8th Cir. 1997). In the normal course, "the court [will] defer to the trustee's judgment so long as there is a legitimate business justification." In re Martin, 91 F.3d at 395. See also In re Dow Corning Corp., 198 B.R. 214 (Bankr. E.D. Mich. 1996); In re Sanner Contracting Corp., 181 B.R. 465 (Bankr. D. Ariz. 1995). If the settlement "falls below the lowest point in the range of reasonableness," it should be rejected. In re Edwards, 228 B.R. at 569.

Here, the settlement between Genesis and Multicare advances the interests of each creditor body. Even if Genesis would be successful in establishing its claims against Multicare, following expensive and time-consuming litigation, an outcome that is not certain, the asset base available to Genesis creditors would not change. Genesis would hold an unsecured claim against Multicare, which would be subordinated to the Multicare Senior Lenders. I conclude that the

-47-

settlement is fair and equitable and in the best interest of both estates.

4.    Shareholder Objections.

Steven Sapperstein, James Hayes and Todd Martin, all Genesis common stock shareholders, object to the confirmation of the debtors' joint proposed plan. Sapperstein objects to the reorganized debtors emerging from bankruptcy without affording some value to the common shareholders. He asserts that a buyout by a third party or another plan that recognizes the common stockholders would be more acceptable. He has not offered any evidence that such a third party exists or that a high enough offer could be tendered to afford a recovery to equity interests. His objection is unsupported and overruled.

James Hayes objects to the plan and moves for the creation of an additional committee of equity security holders to explore the possibility of finding additional equity value. He contends that the shareholders believe that the Genesis stock has value, and that if the new committee is unable to show a benefit to the equity interests, the costs of the committee should not be charged to the estate.

In a similar vein, Todd Martin objects that the plan fails to take into account a fair value of the debtors' assets. He seeks to have a trustee appointed to consider whether the cases should be converted to Chapter 7, whether the plan is within the best interests of the debtors as opposed to the best interests of the officers and directors of the debtor, and whether claims for

-48-

mismanagement by the current and former officers and directors should be pursued.

Both objections are untimely and unrealistic and at this point, would only serve to unduly delay these cases. The motions for a trustee and/or another committee come at the point of confirmation of the debtors' plan. Neither objector has offered any evidence of the existence of value beyond the position of Senior Lenders and junior creditors. I have concluded that the debtors are insolvent and that there is no possibility of a recovery for equity interests. At this late date, the appointment of additional professionals and their associated administrative costs cannot be viewed as a benefit to the debtors' estates. The objections are overruled and the related motions denied.

For the reasons expressed, I conclude that the debtors' plan may be confirmed, if modified in accordance with this opinion.

Dated:  September 12, 2001

JUDITH H. WIZMUR
U.S. BANKRUPTCY JUDGE

-49-

AA. 730