40. Participation agreement, dated as of November 1, 1999, between Health Resources of Columbus, Inc. and Department of Health & Social Services

41. Participation agreement, dated as of September 1, 1992, between Health Resources of Columbus, Inc. and State of Wisconsin

42. Participation agreement, dated as of March 11, 1998, between Health Resources of Columbus, Inc. and Dean Health Plan

43. Participation agreement, dated as of March 8, 1996, between Health Resources of Columbus, Inc. and Group Health Cooperative

44. Service agreement, dated as of June 21, 2000, between Health Resources of Columbus, Inc. and Country Nurses

45. Service agreement, dated as of November 8, 1999, between Health Resources of Columbus, Inc. and 1 Health Plan

2335334-1

iv

**AA. 932**

UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

```
————————————————————————x
                        :
In re                   :    Chapter 11 Case No.
                        :
GENESIS HEALTH VENTURES, INC., et al.,  :    00-2692 (JHW)
                        :
        Debtors.        :
                        :    (Jointly Administered)
————————————————————————x
                        :
In re                   :    Chapter 11 Case No.
                        :
MULTICARE AMC, INC., et al.,  :    00-2494 (JHW)
                        :
        Debtors.        :
                        :    (Jointly Administered)
————————————————————————x
```

## AMENDMENTS TO DEBTORS' JOINT PLAN OF REORGANIZATION TO COMPLY WITH OPINION ON CONFIRMATION

Genesis Health Ventures, Inc. ("Genesis"), The Multicare Companies, Inc. ("Multicare"), and the other above-captioned debtors and debtors in possession (collectively with Genesis and Multicare, the "Debtors"), hereby file these Amendments to the Debtors' Joint Plan of Reorganization, dated July 6, 2001 (the "Plan"),[1] to Comply with the Court's Opinion on Confirmation.

    1.    Section 5.10 of the Plan (Release of Representatives) is amended by replacing the entire paragraph with the following paragraphs:

        (a)  As of the Effective Date, the respective officers, directors, employees, financial advisors, professionals, accountants, and attorneys of the Genesis Debtors, the Multicare Debtors, and the respective statutory committees of unsecured creditors appointed pursuant to section 1102

---

[1] Unless otherwise defined, capitalized terms used herein shall have the meanings ascribed thereto in the Plan.

of the Bankruptcy Code in the Genesis Reorganization Cases and the Multicare Reorganization Cases shall be released by the Debtors from any and all Claims arising on or after the Commencement Date against them in their capacity as representatives of the Genesis Debtors, the Multicare Debtors, or the statutory committees, as applicable, except (i) for willful misconduct or gross negligence and (ii) as otherwise expressly provided in the order of the Bankruptcy Court, dated February 23, 2001, approving a senior executive retention plan for certain employees of Genesis.

(b)  As of the Effective Date, the respective officers, directors, employees, financial advisors, professionals, accountants, and attorneys of Mellon Bank, N.A., as administrative agent under the Genesis Senior Lender Agreements, the Multicare Senior Lender Agreements, and the Revolving Credit and Guaranty Agreements described in Section 2.4 hereof shall be released by the Debtors from any and all Claims against them in their capacity as representatives of Mellon Bank, N.A.

2.      Section 10.6 of the Plan (Exculpation) is amended as follows:

in the fourth line after the words "agent under" delete the words ", and any lender under".

3.    Except as expressly amended hereby, all other provisions of the

Plan, as modified by the Technical Amendments to the Plan, dated August 27, 2001,

shall remain unaffected and in full force and effect.

Dated: September 13, 2001
       Wilmington, Delaware


WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
(212) 310-8000
Michael F. Walsh
Gary T. Holtzer


-and-

RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
P.O. Box 551
Wilmington, Delaware 19899
(302) 658-6541

By: _____
Mark D. Collins (No. 2981)

ATTORNEYS FOR THE GENESIS
DEBTORS AND DEBTORS IN
POSSESSION


WILLKIE FARR & GALLAGHER
787 Seventh Avenue
New York, New York 10019-6099
(212) 728-8000
Marc Abrams
Paul V. Shalhoub


-and-

YOUNG CONAWAY STARGATT &
TAYLOR
11th Floor, Wilmington Trust Company
P.O. Box 391
Wilmington, Delaware 19899-0391
(302) 571-6600

By: _____
Robert S. Brady (No. 2847)

ATTORNEYS FOR THE MULTICARE
DEBTORS AND DEBTORS IN
POSSESSION

**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| IN RE:                   :<br><br>**GENESIS HEALTH VENTURES, INC., et al.,**  :<br><br>           **Debtors.**      :<br>                   : | **CHAPTER 11**<br>**Case No. 00-2692 (JHW)**<br>**(Jointly Administered)** |
| IN RE:                   :<br><br>**MULTICARE AMC, INC., et al.,**      :<br><br>           **Debtors.**      :<br>                   : | **CHAPTER 11**<br>**Case No. 00-2494 (JHW)**<br>**(Jointly Administered)** |

**MOTION OF OBJECTOR**
**CHARLES L. GRIMES TO AMEND FINDINGS**

Pursuant to Bankruptcy Rules 7052 and 9014, and Fed. R. Civ. P. 52(b), Objector

Charles L. Grimes moves to amend certain of this Court's findings in its decision of September 12, 2001

("opinion" or "Op."), concluding that the proposed joint plan of reorganization by debtors is confirmable.

Mr. Grimes does not seek to overturn the plan of reorganization, but instead only the determination

concerning whether the plan is equitable to him as a member of Class G5 Genesis Senior Subordinated

Note Claims.  The grounds for this motion are as follows:

        1.    As this Court explained in its opinion (Op. at 33), "[t]he issue raised by the objectors

is whether the reorganized enterprise value of Genesis and Multicare, either individually or combined,

provides a recovery to holders of claims in Class G2, the Senior Lenders, that is greater than 100% of their

DAJ1284.WPD

claims. If so, then the plan violates the requirement that the plan be fair and equitable as to the non-consenting Class G5 Genesis Senior Subordinated Note Claims."

2. On page 33 of its opinion, this Court began its determination of that "reorganized value." As this Court there recognized, "[t]he professionals who testified generally agreed that the Comparable Company analysis was the most significant to ascertain enterprise value in this case." That method of valuing a company requires determination of two components, an appropriate earnings level for the company (here, EBITDA) and an appropriate market multiple to apply to those earnings (*Id.*).

3. The valuation experts who testified in support of confirmation of the plan attempted to determine a range of valuations for either Genesis separately, Multicare separately or both separately. On the other hand, Mr. Grimes' expert, William Becklean, valued the combined companies, because that is the company whose stock is being distributed as part of the plan of reorganization.

4. It appears from the opinion that one of the principal reasons why this Court accepted the valuation conclusions of debtor's experts over that of Mr. Becklean was due to this Court's conclusion that by valuing the combined companies Mr. Becklean captured the "synergies" that would result from the merger, and that "the potential escalation in value is somewhat speculative as a basis for valuation" (Op. at 39). This determination by the Court is clear error because in the preceding sentence this Court acknowledges that "debtors' disclosure statement recognizes that although Genesis and Multicare have been valued separately because of the separate creditor bodies, the combined entity may realize a higher equity trading value in the public market because the combined company would have a larger enterprise value." Elsewhere (Op. at 5 n.6), this Court recognized (in rejecting an objection that the disclosure statement improperly referenced "to the synergies to be achieved by the merger of Genesis and Multicare")

DAJ1284.WPD

2

that "[t]he anticipated synergies reflect the prospect of enhanced value of the New Common Stock of Genesis by the formal merger of the two companies." If the prospect of enhanced value is sufficiently real to be included in the disclosure statement, how then could it be so speculative that it should not be included in the valuation process? Of course, this Court's determination that essentially all of the value of the combined Genesis/Multicare entity should go to the Senior Lenders means that they will capture almost all of this enhanced value.

     5.    The determination by this Court not to accept Mr. Becklean's valuation may reflect a misunderstanding of his analysis.

     a.    In that analysis, Mr. Becklean did not directly value any synergies resulting from the expected merger of Genesis and Multicare. Instead, he used the EBITDA numbers supplied by Genesis and Multicare and add them together (because it was be the combined company, and not the companies independently, which needed to be valued here) (Tr. 172-73[1] (Becklean)).[2]

     b.    Mr. Becklean then applied multiples to those earnings, and this is where he differed from the experts retained by the debtors. Because the combined Genesis/Multicare obviously would be no less strong than Genesis individually (an assumption no one denied), Mr. Becklean applied multiples obtained from that combined analysis to the EBITDA of the combined companies (Tr. 175; 178-

---

[1]Referenced pages of the transcript of the August 29, 2001 hearing are attached as Exhibit A. These pages will be cited as "Tr."

[2]Therefore, there was no need for Mr. Becklean to contact the debtors' management, as this Court apparently thought he should have (Op. 38).

179 (Becklean)). In obtaining these multiples, Mr. Becklean used the same three comparable companies as debtors' experts: Beverly Enterprises, HCR ManorCare and Omnicare (Tr. at 177 (Becklean)).[3]

(1)     With respect to Omnicare, he used the same discount to the multiple as the debtors' experts (Tr. 181-82 (Becklean)).

(2)     For Beverly Enterprises, this Court found (and all witnesses at trial agreed) that Beverly was the company that most closely resembled Genesis (Op. at 36). Accordingly, Mr. Becklean did not discount the Beverly Enterprises multiple at all (Tr. 180 (Becklean)). Debtor's experts, however, *did* discount (without explanation) the Beverly Enterprises multiple when applying it to Genesis' EBITDA (Tr. 179-180 (Becklean)). This Court, however, apparently misunderstood the approach of debtors' experts, because it stated (Op. at 37) that "the experts testifying on behalf of debtors' plan *applied enhancements to the Beverly multiples*," when exactly the opposite is true. This was clear error on this Court's part, and appears to have contributed to its acceptance of the valuations determined by debtors' experts instead of the one performed by Mr. Becklean.

(3)     For HCR ManorCare, Genesis' expert (UBS Warburg) had discounted its multiple by 10% more than its discount for Beverly Enterprises (19% *v.* 9%) (Tr. 179-80 (Becklean)). Because nothing in this case changed the comparison between HCR ManorCare and Beverly Enterprises, if the true discount for Beverly is 0% (as it should be under this Court's findings) then the

---

[3] Again, therefore, Mr. Becklean's lack of specific expertise in the industry and his having conducted no independent research regarding health care companies is irrelevant (Op. at 38).

DAJ1284.WPD

4

appropriate discount to HCR ManorCare's multiple is 10% (Tr. 181 (Becklean)). Again, no one testified to the contrary.[4]

      6.    Because there is no legitimate basis not to value the companies together, because Mr. Becklean's EBITDA numbers are those of the company's and because his calculations of the multiples to be applied to the combined companies earnings are logically superior to those of debtors' experts, it was clear error not to accept Mr. Becklean's valuation analysis. Accordingly, Mr. Grimes requests that this Court amend its findings to accept that analysis.

      7.    That analysis has a mid-point value of approximately $1.95 billion (Op. at 39). Of course, one then must determine the portion of that value attributable to Multicare. As Mr. Becklean did not perform such a separate valuation, Mr. Grimes has relied upon the valuations performed by debtors' experts. At trial, we suggested the "most likely" valuation proposed by David Schulte, the senior lenders' expert, of $343 million (Tr. 41). Using either that amount or even the mid-point of all the experts' valuations of $399 million (Op. at 39), and subtracting it from the overall valuation leaves a value for Genesis of *at least* $1.56 billion ($1.95 billion minus no more than $399 million).

      8.    Because that latter amount ($1.56 billion) is greater than the amount necessary for the Senior Lenders to obtain a 100% recovery (Op. at 39-40), the reorganization plan proposed by debtors violates the requirement that "the plan be fair and equitable as to the non-consenting Class G5 Genesis Senior Subordinated Note Claims." For the reasons set forth above, it was clear error to determine to the contrary.

---

[4] While this Court apparently disparaged Mr. Becklean's examination "on the numbers already provided," it was just this analysis that revealed the fundamental error in the debtors' experts valuations.

9.    However, as Mr. Grimes explained at the hearing, this fact does not mean the plan

should not be confirmed.  As the proposed plan is *only* inequitable to Class G5, the plan can be salvaged

by escrowing a portion of the stock that would otherwise be obtained by the senior lenders.  Doing so will

allow this Court (which has acknowledged that the valuation analyses conducted here are "not an exact

science" and "requires some level of subjectivity" (Op. at 40)) to avoid that subjectivity and determine what

value the combined entity will realize in the marketplace.

SMITH, KATZENSTEIN & FURLOW LLP


/s/ David a. Jenkins
Selinda A. Melnik (ID #4032)
David A. Jenkins (ID #0932)
The Corporate Plaza
800 Delaware Avenue
Post Office Box 410
Wilmington, DE 19899-0410 (Courier 19801)
Telephone (302) 652-8400
Facsimile (302) 652-8405

September 14, 2001              Attorneys for Objector Charles L. Grimes

DAJ1284.WPD

6

**AA. 941**

UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY

IN RE:                                . Case No. 00-2692 (JHW)

                                      .
GENESIS HEALTH VENTURES/              .
MULTICARE,                            . 401 Market Street
                                      . Camden, New Jersey 08101
                  Debtors. .          .
                                      . October 5, 2001
. . . . . . . . . . . . . . . . .     . 11:08 a.m.

TRANSCRIPT OF HEARING
BEFORE HONORABLE JUDITH H. WIZMUR
UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES:

For the Debtors:              Richards, Layton & Finger
                              By:  RUSSELL SILBERGLIED, ESQ.
                              P.O. Box 551
                              Wilmington, DE  19810

                              Weil, Gotshal & Manges
                              By:  MICHAEL F. WALSH, ESQ.
                                   ADAM STROCHAK, ESQ.
                                   CHRISTOPHER MARCUS, ESQ.
                                   HANS HWANG, ESQ.
                              767 5th Avenue
                              New York, NY  10153

                              Blank Rome Connelly & McCauley
                              By:  KATHLEEN McDERMOTT, ESQ.
                                   MICHAEL B. SCHAEDLE, ESQ.
                              900 17th St., NW, Suite 1000
                              Washington, DC  20006

Audio Operator:               Norma Sader

Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

DIANA DOMAN TRANSCRIBING, INC.
P.O. Box 129
Gibbsboro, New Jersey 08026

(856) 435-7172   Fax No.   (856) 435-7124

AA. 942

2

APPEARANCES (cont'd.):

For the Debtors (cont'd):

Young Conaway Stargatt & Taylor
By:  ROBERT S. BRADY, ESQ.
1100 N. Market St.
Wilmington, DE  19801

For Official Committee of
Unsecured Creditors:

Kasowitz, Benson, Torres &
  Friedman, LLP
By:  ATHENA FOLEY, ESQ.
1633 Broadway
New York, NY  10019

For Paul Weiss Rifkind
Wharton & Garrison:

Paul Weiss Rifkind Wharton &
  Garrison
By:  JEH JOHNSON, ESQ.
1285 Avenue of the Americas
New York, NY  10019

For Creditors Committee
(Genesis):

Akin, Cump, Strauss, Haver & Feld
By:  LISA G. BECKERMAN, ESQ.
1333 New Hampshire Ave., NW
Washington, DC  20036

For Official Committee of
Unsecured Creditors:

Saul Ewing LLP
By:  MARK MINUTT, ESQ.
222 Delaware Ave., Suite 1200
P.O. Box 1266
Wilmington, DE  19899

For KPMG, LLP:

Greenberg Traurig
By:  RICK L. FRIMMER, ESQ.
Suite 2700 Two Commerce Square
Philadelphia, PA  19103

For Mellon Bank:

Klett, Rooney, Lieber & Schorling
By:  JEFFREY CARBINO, ESQ.
12th Floor, Two Logan Square
Philadelphia, PA  19103

For Multicare:

Willkie Farr & Gallagher
By:  PAUL SHALHOUB, ESQ.
787 7th Avenue
New York, NY  10019

For Objector Charles L.
Grimes:

Smith, Katzenstein & Furlow, LLP
By:  DAVID P. JENKINS, ESQ.
800 Delaware Avenue
Wilmington, DE  19801

3

1    THE COURT:  Please be seated.  Good morning.

2    MR. WALSH:  Good morning, Your Honor.  Your Honor,

3 Michael Walsh for -- Weil, Gotshal & Manges for the Genesis

4 debtors.  Of course, this is a combined omnibus hearing.  I'm

5 assuming, Your Honor, you'll want to do all of the fee-related

6 stuff for both cases at the same time, so maybe it makes sense,

7 if it's okay with you, that we do the uncontested matters on

8 the Multicare fees, because they're only uncontested matters,

9 and then we'll come back and do the uncontested matters on

10 Genesis and then the contested.

11    THE COURT:  That's fine.  You're saying let's save

12 the fees till the end.

13    MR. WALSH:  We could take the fees in the order that

14 they come in the Genesis one and do all the fees together, or

15 we could put them all at the end.  Whatever you prefer.

16    THE COURT:  Let's put them all at the end.  Let's

17 take care of everything else --

18    MR. WALSH:  Okay.  Terrific.

19    THE COURT:  -- and then we'll --

20    MR. WALSH:  So let's start with Multicare.

21    MR. BRADY:  Good morning, Your Honor.

22    THE COURT:  Good morning.

23    MR. BRADY:  Robert Brady on behalf of Multicare AMC,

24 Inc., et al.  Referring to the agenda that was submitted to the

25 Court on October 3rd, the first matter is the debtor's omnibus

4

1  objection to claims.  We have decided to continue that matter

2  over to the next omnibus hearing date as we continue to discuss

3  matters raised by claimants and grant people the necessary

4  extensions of time to file responses.

5          With respect to matters two and three, Your Honor,

6  they are listed as settled.  We are trying to finalize a

7  stipulation with the Kuna estate.  We were unable to reach

8  closure last night on that stipulation, so we'd like to

9  continue that matter over to the next omnibus date where we are

10 confident we will have a stipulation that finally resolves the

11 Kuna matters.

12          THE COURT:  All right.

13          MR. BRADY:  Matters four and five, Your Honor, are

14 listed as uncontested.  Four is stipulation with Travelers

15 Indemnity Company of fixing their claim in the case.  No

16 objections were filed to that, and we have filed a certificate

17 of no objection.

18          And matter five, Your Honor, is a motion to continue

19 certain deadlines in the ADR procedures.  Likewise, Your Honor,

20 that is uncontested.

21          THE COURT:  Do you have those orders?

22          MR. BRADY:  I do.  I can hand those up.

23          THE COURT:  I would appreciate it.

24      (Grimes motion transcribed under separate cover)

25          MR. HAYES:  Your Honor --

**AA. 945**

5

1    THE COURT:  Sir.

2    MR. HAYES:  -- may I comment?

3    THE COURT:  Pardon me?

4    MR. HAYES:  May I comment on --

5    THE COURT:  Who are you, sir?

6    MR. HAYES:  Jim Hayes.  I'm a shareholder in --

7    THE COURT:  You're a shareholder?

8    MR. HAYES:  Yes, I wanted to comment on the testimony

9    or the argument.

10    THE COURT:  It's unusual, but come on up.

11    MR. WALSH:  Your Honor, while he's coming up, just

12    one of my colleagues just did note it from the transcript, Mr.

13    McGann did testify as you remembered.  That Beverly in some

14    ways is better than Genesis, and that's in the transcript at

15    page 195.

16    THE COURT:  Thank you, sir.  Sir?

17    MR. HAYES:  Your Honor, on the issue of the discount,

18    of the multiple to Beverly, Warburg in their April analysis --

19    if you look at the multiple used on the low end and the

20    multiple they used on Beverly, it was about a two percent

21    discount.  When they testified about their updated version,

22    they testified that the reason they were updating was because

23    of the improvement in stock price, and that was the only

24    reason.

25    But mysteriously, the discount widened from like a

6

1  two percent discount to a nine or ten percent discount, and

2  that was never explained, but if you go back and look at their

3  April valuation, it's only a two percent multiple.

4      The second point. In calculating the recoveries, I

5  think instead of looking at the enterprise value of Genesis,

6  you need to look at the allocations that are actually got by

7  the various parties, and if you look at the Genesis senior

8  lenders, for example, 60 percent of their allocation or almost

9  two thirds is in stock of the new Genesis, whereas, Multicare,

10 less than half of their allocation is in stock.

11     So I think you have to use the enterprise values to

12 impute a stock price, and then use that stock price to

13 calculate the recoveries based upon the allocations. In this

14 case the Genesis senior creditors have an allocation like 30

15 million shares, and the Multicare senior creditors have an

16 allocation of seven million shares, so if you determine -- if

17 you use a number like Mr. Hecklean's number, I think it works

18 out to like $32 a share, and so if you use the $32 a share,

19 multiply that by the 30 million shares, and then you add in the

20 amount for the notes, I calculate it out to 110 percent

21 recovery for the Genesis senior creditors.

22     THE COURT: Thank you, sir. Let me reflect that

23 indeed on reconsideration we're looking for new evidence or

24 manifest error -- clear error.

25     MR. JENKINS: Your Honor, I hate to interrupt, but

7

1  could I have a brief reply to several of Mr. Walsh's points?

2  THE COURT:  Last chance.  Go ahead.

3  MR. JENKINS:  All right.

4  THE COURT:  A couple minutes.

5  MR. JENKINS:  I'm sorry.  I thought would get that

6  opportunity after the gentleman spoke.  There are four brief

7  points.

8  Number one.  The first point I made, why you value

9  the companies together and not separately -- and Mr. Walsh

10 explained it -- the hope that the stock of the combined company

11 will trade better than stock of smaller companies.  He says

12 there's no way to quantify that.  Yes, there is.  You can add

13 the companies together as opposed to valuing them separately.

14 Number two.  I now understand from Mr. Walsh they

15 conceded that they do -- they did discount the Beverly multiple

16 in order to get the bottom end of the range of Mr. McGann's

17 analysis.  That is different from what they put in their

18 papers.

19 His explanation as to why they did that, with

20 respect, makes no sense.  You're getting the bottom -- you're

21 supposed to be discounting or putting addition to each

22 comparable company to make it as close to Genesis as possible.

23 The conclusion was throughout trial that Beverly and Genesis

24 were very comparable companies.  There should be no discount.

25 We all agree that Manor Care is a better company, so

8

1  everybody discounted it.  You've already put that discount in

2  when you're -- before you get to the top end of the range.  Now

3  you've got the top and the bottom end of the range.  You've

4  already put the discounts in, which you say makes those

5  companies comparable to Genesis.  You have a range.  You take

6  the midpoint of the range.  It is -- I heard no testimony, and

7  I don't think it's appropriate to say, "Oh, well, we want to

8  get closer to the bottom end of the range, therefore, we're

9  going to fix the numbers."

10           THE COURT:  I don't think that's what I heard.  That

11  isn't what I heard.

12           MR. JENKINS:  All right.  Well, I believe that's what

13  Mr. Walsh was trying to intimate there, but in any event, if

14  you have -- if your multiples are discounted where you think

15  are appropriate, you've got a range, and that's the range you

16  have to live with, and that's -- and that is not what they said

17  they were doing.

18           THE COURT:  I understand what you're saying.  I'm not

19  sure I can apply it effectively in this context.  You will

20  acknowledge that there were several different precise multiples

21  for Beverly, let's say, based on the different assessments,

22  2001 EBITDA and so forth.

23           MR. JENKINS:  Yes, ma'am.

24           THE COURT:  What is your memory of those four

25  multiples of Mr. Walsh's as he explained it?

**AA. 949**

9

1    MR. JENKINS: Well, I don't have a memory, but

2 they're on the piece of paper. It's on page 27 of Mr. -- of

3 the UBS Warburg report. I can read them into the record, if

4 that's appropriate. Precisely what -- I did two of them

5 before. There's two more that I didn't read, but again,

6 discounts were taken with respect to the Beverly multiple all

7 consistently across the line, and each of them -- there was a

8 calculated Beverly multiple. Mr. Walsh is right. It's

9 calculated initially, and then there's a discount off of that.

10 He used a discount on Beverly. McGann did on all four earnings

11 levels, if you will. There's no dispute about that, comparing

12 page 15 and 27, and that, based on the testimony at trial, is

13 inappropriate.

14    THE COURT: Thank you, sir.

15    MR. JENKINS: The only other point I wanted to make

16 was on the orphan business. That is we describe Multicare as

17 an orphan business. Yes, that's exactly how we view it, and

18 that's what the testimony at trial was very consistent on.

19 That it is an orphan business and should be treated as such.

20 Thank you, Your Honor.

21    THE COURT: Well, back to where I was. We're looking

22 at clear error, and in an -- the precise issue that is the

23 point of contest here is the valuation question. It permeates

24 several aspects of the results that we achieved, particularly

25 the question of the fair and equitable treatment of G5, Mr.

10

1  Grimes, and others in that class who did not vote for the plan.

2         The question of valuation, as I attempted to describe

3  in the opinion, is a subjective one, is a fluid one.  The

4  arguments that have been advanced on behalf of Mr. Grimes are

5  -- certainly have merit.  There may be other ways to look at

6  the valuation issues than the ones that I chose to look at.

7  The overwhelming and convincing and credible and competent

8  evidence presented at trial supports still the conclusions that

9  I reached at trial.

10        Indeed I am convinced by Mr. Walsh's comments, as we

11 directed our attention specifically to the multiples question,

12 that the manner of arriving at an appropriate multiple by the

13 debtors' experts and others who testified on behalf of the plan

14 was appropriate, and that the ultimate conclusion reached that

15 the Genesis valuation was in the neighborhood of one point

16 three three billion is supportable from the standpoint of the

17 expert testimony that we had.  Can there be disagreement with

18 that result?  Of course, there is disagreement.  There is

19 contention that the multiples were not applied properly, that

20 the EBITDA's were not effectively combined and the like.  I

21 stand by the result that I reached.  I do not believe that it

22 constitutes clear error.  Perhaps someone else will think so,

23 but at this level I will accept, for the reasons that I laid

24 out in the opinion, the valuation arrived at in that opinion,

25 and I will deny the motion for reconsideration on this record.

**AA. 951**

11

1  I think we can continue.

2        MR. WALSH:  Thank you, Your Honor.  The last

3  contested matter -- and before we get to the fun part of fees -

4  - is debtor's objection to the proofs of claim of Mr. Steven

5  Scherfel, and with your permission, Your Honor, I would like to

6  turn this over to Ms. Katie McDermott from Blank Rome who's

7  taking the lead on this.

8        THE COURT:  All right.

9        MS. McDERMOTT:  Good afternoon.  I think we've just

10  hit the noon hour.

11        THE COURT:  Indeed.

12        MS. McDERMOTT:  Thank you again for the opportunity

13  to appear in your courtroom.

14        THE COURT:  This is couched, counsel, as an objection

15  to the proof of claim, and clearly, we have a substantial

16  contest, and clearly as well I think, to me anyhow, it won't be

17  resolved today in terms of the merits of the controversy.  What

18  is your vision of how we should resolve the proof of claim.

19        MS. McDERMOTT:  Okay.  Thank you, Your Honor.  I

20  think that I understand exactly your question.  It seems to me

21  there's a couple of issues.  One is the issue of jurisdiction.

22  Because Mr. Scherfel has suggested that with respect to the

23  proof of claim, he consents to the jurisdiction of this Court,

24  particularly for discovery, however, he wants to still have a

25  jury trial.  Then there is a parallel U.S. District Court case

**AA. 952**

12

1 that was filed in the District of New Jersey earlier that we've

2 all known about.  It's been -- the debtor, Genesis, has known

3 about this case when it was lifted from partial seal.

4 Actually, it's over a year ago now, so this has been a case

5 known to us in District Court.

6          THE COURT:  There was pending -- I noticed in the

7 papers argument advanced that the State did not apply to that

8 matter.

9          MS. McDERMOTT:  Correct.  Well, I think that's

10 correct, Your Honor.  At the time that we were served with the

11 complaint and had a responsive pleading due we filed the line

12 advising the U.S. District Court that the debtor was in

13 bankruptcy, and that we believe that the automatic stay

14 provisions -- we assumed or presumed that they apply.

15          Then there was a letter objection in on that issue,

16 and then I filed a reply memorandum in U.S. District Court

17 advising of our position that an objection to lift stay should

18 be filed in Bankruptcy Court and before Your Honor and also

19 advising that some of the exceptions for lift stay that have

20 been argued in the particular context of these types of cases,

21 which is a False Claims Act case, should not apply in this

22 particular situation, and that's the whole police power

23 exception which we briefed.

24          Now, we've not heard anything from U.S. District

25 Court on that particular matter.  At the same time those

**AA. 953**

13

1   initial pleadings or letters were presented to the Court on the

2   pending False Claims Act case parallel in basically a dueling

3   form, if you will.  Proof of claim was objected to and started

4   to proceed in the course through here.  So we do have a

5   situation where the jurisdiction of this Court has been invoked

6   with caveat it appears, and nevertheless, we are seeking to

7   have the claim adjudicated here.

8              THE COURT:  But you are.

9              MS. McDERMOTT:  Yes.  Ultimately, Your Honor, yes,

10  because I think our position would be that to the extent the --

11  what Mr. Scherfel has also called a relator in qui tam, so if

12  we slip and say relator, we're just referring really to the

13  plaintiff or the individual presenting the proof of claim.

14             We think this is the best forum to attempt to resolve

15  the proof of claim issues for several reasons.  First of all,

16  he sought the jurisdiction and resolution of the proof of claim

17  in this particular jurisdiction.  This Court is very familiar

18  with at least many of the issues that may have to be addressed

19  not specific to the claim.  It's a False Claims Act claim, but

20  for example, if there's an argument on a right to jury trial

21  where someone has invoked the jurisdiction of this Court, there

22  is -- this Court can find that it can adjudicate the case here,

23  and that it would actually affect the estate and the

24  distribution plan, if you will, if we are to send this matter

25  off into U.S. District Court to go through 24 months of

14

1  whatever happens U.S. District Court in terms of these issues.

2           The U.S. District Court case is not ready for trial.

3  It's not even had a preliminary briefing.  We realize that some

4  of the issues that we would normally bring in U.S. District

5  Court -- motion to dismiss, motion for more definite statement,

6  and things of that nature -- you know, the more traditional

7  pattern of litigation, if you will, are not necessarily in the

8  best interest of the estate if we can address the merits in

9  this jurisdiction -- this Court.

10          THE COURT:  Understood.  Thank you.

11          MS. McDERMOTT:  Thank you.

12          THE COURT:  Mr. Scherfel.

13  (Mr. Scherfel's matter previously transcribed under separate

14  cover.  Transcript continues as follows:)

15          MR. SILBERGLIED:  One of the benefits of preparing

16  the agenda letter is you get to put yourself first I suppose.

17          THE COURT:  Let me say a word first as we engage in

18  this process that's not fun for anybody.  Some of the responses

19  I received from the fee examiner -- to the fee examiner's

20  report perhaps, let me suggest, misunderstood the role of the

21  fee examiner.

22          The fee examiner is not an objector to fees.  The fee

23  examiner is simply a tool for me to review fee applications.

24  You can well -- I mean you know better than I the breadth and

25  extraordinarily lengthy process that that entails, and I had

**AA. 955**

1  occasion to use fee examiners before and found it very helpful

2  and found it frankly very helpful this time, sometimes to point

3  out everything that's right with the application, sometimes to

4  highlight what's wrong or what I should look at.

5       When a fee examiner says there is this much lumping,

6  he doesn't say you should take off this much.  He says you'll

7  be able to direct your attention to this kind of aspect that's

8  often highlighted in the case law about problems that come up

9  with fee applications in a much easier way than you would be

10 able to otherwise and to quantify it and categorize it and so

11 forth, and that's all it is.

12      And in many cases, as I reviewed this, if the fee

13 examiner said, "I think this is too vague," I looked at it, and

14 I said, "No, I really don't think so.  It's not too vague," or,

15 "I can understand the lumping.  It's not an -- I can assess the

16 reasonableness of the entries even though there were several

17 ladders discussed, and so forth."

18      On the other hand, sometimes -- and, you know, in a

19 couple of instances there were very important aspects that were

20 drawn -- pulled out from those applications that I am anxious

21 to take up today, and that is the real purpose.  We --

22 sometimes as we review the -- as I reviewed all of the reports

23 and responses and so forth, it got very trivial.  I mean when

24 we're talking about hundreds of thousands of dollars or

25 millions of dollars, and then we focus on $36.23, it becomes

**AA. 956**

16

1  very, very trivial, and that's I guess just a byproduct of the

2  process, because the fee examiner is very precise, and so at

3  least in the functions that it has.

4          Anyhow, I wanted to preface review with those

5  thoughts.

6          MR. SILBERGLIED:  Thank you, Your Honor.

7          THE COURT:  In terms of the Richards Layton

8  application, the putting together of the kind of photocopying

9  bill that was recognized by the firm as somehow billed in error

10  and the accounting back in, the under bill, and the couple of

11  minor adjustments otherwise, we were talking about an

12  adjustment of $13,320.60.  That counts in the under bill, the

13  over bill, the travel, the photocopying, the -- and a couple of

14  the -- in many of the applications in under expenses there were

15  business meals, overtime expenses, and I don't think that those

16  are appropriate, so I did take them out of this.  That's 204.34

17  and 179.50.

18          MR. SILBERGLIED:  Your Honor, I don't want to spend a

19  lot of time about 204 and 175.50.  I will note that these were

20  explained in full the last time we had fee application hearings

21  before Your Honor, and Your Honor actually granted them the

22  last time around.  I don't want to rehash those arguments if

23  Your Honor doesn't want to hear them, because it's $300, but I

24  would hope that for the reasons that I argued last time that

25  were accepted by Your Honor last time, they'd be accepted

1  again.

2       THE COURT:  I guess I've come a long way since then.

3  I don't know.  I certainly would like to be consistent, and

4  perhaps I thought that the Delaware procedure -- the Delaware

5  acceptable expenses were -- incorporated these types of

6  expenses as a -- in a normal course, and I'm certainly not

7  ready to argue with that, and I did consult the rules, and they

8  don't really give me guidance in terms of these types of

9  expenses.

10       To me they're overhead expenses.  I will look back at

11  my comments in connection with that last hearing, and if I need

12  to add back the 204 and the 179, I'll do that, but I really

13  start from the premise that they are overhead expenses and not

14  to be compensated in this scenario.

15       There are two aspects of your application which are

16  repeated in other applications as well.  One has to do with

17  computerized research, and I don't know that we took this up

18  last time.  I don't recall it.

19       MR. SILBERGLIED:  I don't believe we did.

20       THE COURT:  And there -- many of the firms have

21  explained that they pay a flat fee for their access to Westlaw

22  and Lexis, and that they charge their clients a discount in fee

23  in connection with the standard fees otherwise chargeable to

24  clients to represent the amount of computer research charge

25  that will be assessed, and that probably comes to a bottom line

1   that equates to actual cost, but it is an actual cost.

2   Wouldn't a process where the actual cost expended by the firm

3   -- let's say for argument sake $10,000 in a given month -- what

4   do I know?  It could be a lot more than that -- were

5   apportioned among the clients in terms of their usage?

6   Wouldn't that be the reflection of the actual cost?

7           MR. SILBERGLIED:  The problem with that, Your Honor

8   -- that is undoubtedly correct.  The problem is how much time

9   and expense does each firm have to go through to make that

10  calculation?  Richards, Layton, and Finger is the firm of 110

11  lawyers, which while smaller than some of the other firms

12  around here, is still a significantly large firm with -- I

13  don't even want to guess how many clients that we're doing

14  legal research for.  To run that kind of number to judge each

15  of our thousands of clients and how much time each of those

16  thousands of clients were billed each month for legal fees, run

17  the division, and so on and so forth, particularly when

18  attorneys in other departments may not get out their bills as

19  regularly as the bankruptcy attorneys do, because they're not

20  going through a Court process, I think it would be

21  prohibitively time consuming, expensive, and would not enable

22  us to get in monthly fee applications on a timely manner.

23          THE COURT:  Let me reflect that it is a negligible

24  charge in this application, and I'll leave it alone.  The idea

25  of computerizing that process and simply making it happen

20

1  delivery?

2          MR. SILBERGLIED:  Yes, Your Honor.  I think we've now

3  submitted that for documentation.  Obviously, the reason why

4  Richards Layton's courier and delivery bills may be higher than

5  other firms is, because all the filings go out of my office.

6          THE COURT:  I understand that.  You have submitted

7  those.

8          MR. SILBERGLIED:  I believe they're attached to this

9  application -- to this response that is.

10         THE COURT:  All right, then that'll suffice.  Then

11  we'll enter a -- an award of $153,284.90.  Actually, I mixed

12  some of those expenses with the allowance, so that's not

13  exactly correct.

14         MR. SILBERGLIED:  I believe, Your Honor -- and I have

15  a form of order that doesn't have the $300 of business meals

16  account.  I think it was attached actually to our response.

17  Excuse me.

18         THE COURT:  What did you take off?

19         MR. SILBERGLIED:  Everything that's in the

20  application -- the $14,000 inadvertently over billed, Xeroxing,

21  the point two hours of my business travel that were at my

22  regular rate rather than half.

23         THE COURT:  Right.  What is the total that you've

24  reached?

25         MR. SILBERGLIED:  We had a total of $168,320 in fees

**AA. 961**

21

1  and 75,000 -- am I going too fast?  I apologize.

2  THE COURT:  No, but how did you end up with a larger

3  amount than you asked for originally?

4  MR. SILBERGLIED:  Because that was the fees portion,

5  and as the examiner pointed out, we under billed the estate by

6  about 15 hundred dollars, and the under billing was more

7  significant than what the examiner pointed out was over billed,

8  and, therefore, it's a higher number.  The expenses, however,

9  is a lower number, and that we calculated as $75,780.19.  That

10  is not taking into account the $300 business meals that Your

11  Honor just identified however.

12  THE COURT:  Okay.

13  MR. SILBERGLIED:  And I didn't get the precise

14  number.  It was about 300.

15  THE COURT:  I'll give it to you in a moment.

16  (Pause

17  THE COURT:  Seventy-five 396.35.

18  MR. SILBERGLIED:  I'm sorry.  Seventy-five 396 --

19  THE COURT:  Point three five.

20  MR. SILBERGLIED:  Would Your Honor prefer if I just

21  interlineate that over the order and hand it up?

22  THE COURT:  That's fine.

23  (Pause)

24  THE COURT:  Thank you.

25  MR. SILBERGLIED:  Thank you, Your Honor.

22

1    THE COURT:  Next I think is Weil Gotshal.

2    MR. WALSH:  Your Honor, before you start, what you

3  say, of course, is going to make a difference and whether I get

4  on the train going north to my partners or south to the border.

5  I just want to let you know that.

6    THE COURT:  All right.  I will keep that in mind as

7  we go.  In this application there were areas -- there was some

8  voluntary reduction -- some areas of concern, long billing

9  days, 16 days over 12 hours, and the like.  Of course, we know

10  what that's -- that's over -- ten hours was $276,000.

11    MR. WALSH:  That's actually -- I think -- I think

12  that's confusion in the report.

13    THE COURT:  Okay.

14    MR. WALSH:  The way -- I looked at that schedule

15  personally, and I think the way the fee examiner put it

16  together, if someone, for example, my partner Mr. Holtzer,

17  billed ten point one hours, the full ten point one is in those

18  numbers not the point one.

19    THE COURT:  Correct.

20    MR. WALSH:  Okay, so the total --

21    THE COURT:  Oh, yes.

22    MR. WALSH:  Oh, okay.

23    THE COURT:  No, I --

24    MR. WALSH:  Okay.

25    THE COURT:  Yes, I --

**AA. 963**

23

1      MR. WALSH:  So this is not 275.  It's really like

2  $30,000.

3      THE COURT:  I think that's probably right.  Yes, and,

4  of course, we understand the problems with that especially when

5  we get over 12 hours, and the idea of breaks and lunch and so

6  forth.  A 12-hour day, a 14-hour day really is a 16-hour day or

7  the like, and the -- that kind of billable time over that

8  extended period is difficult to compensate.  I'll make an

9  adjustment of $15,000 on that aspect.

10      MR. WALSH:  Excuse me, Your Honor?

11      THE COURT:  Fifteen thousand.  There was one instance

12  of increased weight.  Clearly, firms are permitted to increase

13  their rates through the course of a case.  In one instance it

14  was focused on by the examiner, and I agree, there was a rate

15  increase of 40 percent from 300 to 420 resulting in a $51,000

16  increase in the amount of fees built.

17      MR. WALSH:  Those are rates for Michele Meises, who's

18  a senior associate working on the case.  In the beginning

19  portion of the case her regular billing rate was 400 and -- I

20  think it was 420 -- 375.  It was 375, because --

21      THE COURT:  Did he note it in -- was it noted

22  incorrectly, because the --

23      MR. WALSH:  Well, no, there's information -- this is

24  why we said in our response, which may have been a little bit

25  on the harsh side, so I understand you earlier comment.  We

24

1  noted in our response that there was no effort to, you know,

2  communicate it with us to see if there were even just

3  mechanical issues here.

4          THE COURT:  Well, there is an opportunity to respond.

5  I think that we're all better off to have the examiner deal

6  with the paper, not try to figure out what the answer is,

7  because really that's my job, and although some of it could be

8  gotten closer to --

9          MR. WALSH:  I understand.

10         THE COURT:  -- if they did that, we would spend a lot

11 more money of the estate doing it as well so --

12         MR. WALSH:  I understand, Your Honor.  The -- Ms.

13 Meises at the early point in the case, because of a staffing

14 shortage on our part, was doing in our view in reviewing the

15 BSR's and billing that we do every month.  In our view she was

16 doing -- had to do mid-level associate work, so since we review

17 all these and regularly take out hours which is why this

18 process is so painful, because it's on top of that, we felt

19 that for that period of time we adjusted her rate downward to

20 $300 an hour for the level of work she was doing but --

21         THE COURT:  I didn't see that in your response.  In

22 other words -- or I missed it.  Are you saying that she really

23 had an hourly rate of 375 --

24         MR. WALSH:  Yes, her rate at that time was 375.

25         THE COURT:  -- but it was voluntarily reduced?

25

1    MR. WALSH: That's correct.

2    THE COURT: All right. Interoffice conferencing.

3  That is the amount that was billed by more than one person,

4  about $330,000 or 17 percent of the total application.

5  Clearly, again, there is need for extensive interoffice

6  conferencing in a case this size. People are working on all

7  aspects of the case and so forth, but it seems to me that an

8  adjustment is appropriate for that area to recognize that there

9  was a lot of conferencing.

10    MR. WALSH: Can I give that a shot?

11    THE COURT: Sure.

12    MR. WALSH: Okay. Throughout this case -- and that's

13  not just the application period but up through today -- the

14  team that I put together basically worked on 250 to 300 major

15  projects, and that doesn't include the day-to-day

16  correspondence, the day-to-day questions that we get from

17  personnel at the company, which is not just the CEO and CFO,

18  etcetera. You know, people at all levels call and very often,

19  you know, we have to do a little research or whatever. These

20  projects don't include that. That also doesn't include the

21  normal stuff that we do when creditors call, of which we had,

22  you know, quite a significant number of those calls. So simply

23  coordinating those tasks is a major, major undertaking, and I'm

24  not disputing you may be concerned and may want to make an

25  adjustment, but when we reviewed it, we really did think that

26

1  it was -- it was appropriate.

2            For example, in major projects you may have had more

3  than one attorney working on it, and to say they can't talk to

4  each other would actually turn out to be counterproductive for

5  the client.

6            THE COURT:  Of course, it would.  I'll make a $50,000

7  adjustment on that aspect.  In terms of the -- and we've

8  discussed this before, and help me to focus on where we ended

9  up.  In terms of the projects -- and some of these things

10 overlap obviously.  The projects include interoffice

11 conferencing, so I'll take care if we need to adjust anything

12 here.

13            But as I look at it, over $350,000 was spent on the

14 Manor Care issues.  Generally, in opposition to the lift stay

15 motion, $74,000 for the hearing and 44,000 for the motion to

16 reconsider.  We did discuss, did we not, before the enormous

17 resources that were applied in light of particularly -- I mean

18 litigation counsel was in place for Manor Care -- for the Manor

19 Care arbitration.  What we were dealing with -- and indeed it

20 was a critical issue for the debtor.  I understand that -- or

21 the debtors.

22            MR. WALSH:  And still is.

23            THE COURT:  And still is, but how can I understand

24 this massive application of resources to this isolated issue?

25            MR. WALSH:  Okay.  In the context of the debtor's

27

1  business, the pharmacy business, the debtor's biggest customer

2  is Multicare.  The debtor's second biggest customer is Manor

3  Care.  Okay?  So trying to work through all the complexities of

4  the relationship -- and it wasn't just the contract -- there is

5  a whole host of issues that -- between the parties relating to

6  extensions of the contract, non-compete, or damages for non-

7  compete, issues on the billings on the contract, what's the

8  proper way to deal with this in bankruptcy.

9        We had disputes going on just about every single

10  month on billings that we helped the company resolve, so the

11  focus on this I know is large, but in the context of what you

12  would expect for a full-blown litigation on this issue, I don't

13  think it's overly large, especially given the significance of

14  not just the contracts but all the relationships between Manor

15  Care and the debtors in this case.

16        THE COURT:  Then taking out the general Manor Care

17  and focusing only on the motion to lift stay, we're talking

18  about over $200,000 to oppose that motion.  That includes the

19  reconsideration, but issues involved in that kind of motion are

20  not that complex.  I mean they're very well known to all of us.

21  They're fairly routine.  The import of this was substantial,

22  but can we justify $200,000 for a defense of a motion to lift

23  stay?

24        MR. WALSH:  Your Honor, I think I feel very

25  comfortable about this.  This is -- these contracts don't just

**AA. 968**

28

1  live in a vacuum.  This is an ongoing relationship and a very

2  significant relationship of the debtor's.  In order to assess –

3  – and the contracts have very unusual features in them.  In

4  order to assess what's the best strategy of going forward,

5  which we ultimately, you know, tried to bring to Your Honor in

6  terms of assuming the contract, we had to look at a great many

7  items.  I recognize that the fees are high, Your Honor, but

8  this is probably the company's most important single contract,

9  yet they were just riddled with issues.

10         THE COURT:  It's such a tough task to second guess

11  and to review in hindsight and so forth, but to sort of -- to

12  bring it a little bit into line on this category, I'll deduct

13  $25,000 to accommodate the fact that the hearing alone was

14  charged at about 74,000 and the like.

15         In terms of the $19,600 spent for response to fee

16  examiner, now I recall that there was opposition filed, and

17  clearly, the -- your -- the firm may be compensated for

18  opposing the fee examiner.  It was certainly a part of the

19  case.

20         MR. WALSH:  There's one other aspect there.  Your

21  Honor, not knowing your state of mind and, you know, what you

22  intended to do with the fee examiner, we have had unpleasant

23  experiences with fee examiners in other cases, so when you made

24  that decision, but we had not yet heard what you were thinking

25  about, we spent some time talking to the company and to various

1  other parties in the case to see if there was an alternative

2  methodology that could give you comfort about the fees

3  themselves without doing a fee examiner.

4        And so I think a significant amount of that time was

5  spent in talking with the senior lenders and the Creditors

6  Committee, etcetera, about coming up with an alternative, which

7  we did propose, and you did not accept, but it was not simply

8  opposing this.  We were actually trying to be constructive and

9  come up with a fee committee I think our suggestion was.

10        THE COURT:  Yes, I think I remember that.  Well, have

11  principal.  I think a $5,000 reduction will be made there just

12  to reflect upon a reasonable allocation of energies to the

13  question.  I do understand the concern.

14        In terms of expenses, there was minor adjustment

15  which you've agreed with.  Research here is a larger factor.

16  We're talking about a $46,000 -- and it's the same question we

17  discussed a moment ago.

18        MR. WALSH:  Which you were reconsidering I thought.

19        THE COURT:  No, I'll leave it alone.  I've got to be

20  evenhanded, of course, and in that vain as well, I will delete,

21  unless I go back and rethink it, the local travel, local meals,

22  overtime, transportation, overtime meals, special secretarial

23  services, document processing, and binding services.  All of

24  which -- probably all of it is something like $15,000, but I

25  can quickly -- the ones that you agreed to take out -- 165,

30

1  30.18, 130.10, 191, then the other expenses.

2          MR. WALSH:  Your Honor, a question?

3          THE COURT:  Sure.

4          MR. WALSH:  In our response we offered a voluntary

5  reduction of I think 15 or so thousand dollars, and we actually

6  did tag it to the Manor Care piece.  Is your reduction on top

7  of that or --

8          THE COURT:  No, I'll disregard that.

9          MR. WALSH:  Okay.

10          THE COURT:  Sure.  I understand that.  I lost the

11  calculation.  Let me get the fee, and perhaps I can calculate

12  the expense later on.  The fee I've said will be adjusted by

13  85,000, so it's 1,923,647 minus 1,838,647, and I will bottom

14  line the expense --

15          MR. WALSH:  Thank you, Your Honor.

16          THE COURT:  -- at the end of the day.  Thank you.

17  KPMG.

18          MR. FRIMMER:  Good afternoon, Your Honor.

19          THE COURT:  Good afternoon.

20          MR. FRIMMER:  Rick Frimmer from Greenberg Traurig for

21  KPMG.  This is Steven Barnes, a partner with KPMG.

22          MR. SILBERGLIED:  Your Honor, before they do that, as

23  much as this is exciting to everybody else, is it possible that

24  I be dismissed, since ours was already ruled upon?

25          THE COURT:  Of course.

**AA. 971**

1        MR. SILBERGLIED:  Thank you, Your Honor.

2        THE COURT:  This I will tell you was the most

3  troubling application, and the focus of my attention was the

4  hours of entry over 15 -- 15 hours and over with entries of 44

5  hours for the day and 24.5 hours for the day.  I will require

6  KPMG to provide certifications for each of the timekeepers who

7  have noted time 15 hours or more to -- for instance, those over

8  24 hours to reflect exactly what the hours were, when they were

9  -- when the time was put in, what days, what the nature of the

10 error was.

11       With respect to the others, the description of what

12 they did, where they did it, how they did it, what kind of day

13 they had, obviously it's almost a year ago, and they can resort

14 only to their time records, but the best that they can do to

15 help me to understand the -- frankly, the credibility of that

16 presentation.

17       MR. BARNES:  Yes, Your Honor.

18       THE COURT:  It disturbs me a great deal, because, of

19 course, that kind of information was only pulled out of the

20 voluminous applications by a reformatting and so forth and

21 easily get lost -- and easily have been a mistake certainly,

22 but it's a big mistake, and I think that it needs to be

23 addressed very directly and very carefully.  As well, the

24 expense side of weekend in Washington with significant others

25 at the expense of the estate, I don't care what the procedure