1    of the firm is about it's cheaper to go to Washington than to

2    go home, that's fine, but there's no corroboration for that,

3    and how can the firm possibly -- there wasn't even a voluntary

4    deduction made when that became apparent?  How could an estate

5    possibly be saddled with expenses like that?

6         MR. BARNES:  Your Honor, truthfully we thought it was

7    an acceptable -- it's acceptable -- first let me answer your

8    first issue.  Your Honor, all of our people record their time

9    on a daily basis, and that time is sent to a timekeeper who

10   inadvertently combined certain weeks.  That's -- and in our

11   response we say it was inadvertent combination of multiple days

12   that when somebody keypunched it in, it just went in -- if it

13   was 12/15, 12/16, and 12/17, they just punched in 12/15 three

14   times, and rather than correct it --

15        THE COURT:  Are the original documents available?

16        MR. BARNES:  Yes.

17        THE COURT:  All right.

18        MR. BARNES:  So -- and we tried to address that in

19   our response, and clearly, if Your Honor wants more --

20        THE COURT:  Yes, it wasn't sufficient.  Perhaps the

21   actual time records would be helpful.

22        MR. BARNES:  They're computer files, Your Honor, and

23   we can certainly make a more complete disclosure of exactly

24   who, what, when, where, and why.  That we will do, and we

25   apologize to the Court.

33

1    I believe there was only one incidence where an
2 employee went to Washington rather than fly home, and that
3 expense was less -- was less expensive than a direct flight
4 home, and under our travel policies, it was appropriate, and I
5 understand the Court's concern, and, of course, we will reduce
6 our -- it won't happen again, but I believe it only happened
7 once in this case, Your Honor.

8    THE COURT:  Well, there are some $13,000 of expenses
9 that weren't connected with particular work effort, as I
10 recall.  But here's what I've got.  I really will decline to
11 act on this application until I see those certifications --

12    MR. BARNES:  Fine, Your Honor.

13    THE COURT:  -- because it is a critical part, and it
14 applies to both Multicare and Genesis.  We're looking at it
15 together.  You served both debtors, and the examiner looked at
16 both sets of expenses and hours together, and that's the
17 question.  That's the problem.  So I'm going to hold them -- we
18 can schedule for an omnibus day or the next fee day or whatever
19 makes sense.  What kind of time frame do you need to gather
20 this kind of information?

21    MR. BARNES:  I think we can have it certainly in a
22 week or a week and a half.

23    THE COURT:  All right, so when are we next due to
24 meet?  I think we have the U.S. Trustee issue on October 16th.
25 Perhaps we ought to kick it to the next --

**AA. 974**

34

1      MR. BARNES:  Yes.

2      THE COURT:  -- next one so you have more time to look

3 at it.  I actually have this scheduled for November 2nd, and

4 that actually may be a problem.  I had to schedule another

5 Delaware case for confirmation several days during that time

6 frame, and I wonder if I can move you all to November 5th --

7      MR. BARNES:  That would be fine, Your Honor.

8      THE COURT:  -- at 3:00.  I would appreciate, Mr.

9 Walsh, your -- somebody in your office communicating that to --

10     MR. WALSH:  Can we confirm that to your office, Your

11 Honor?

12     THE COURT:  Indeed.

13     MR. WALSH:  My schedule is clear, but I'd have to

14 check --

15     THE COURT:  If there are unavoidable conflicts, we'll

16 figure out what else to do, but I would prefer to move it.  I

17 need to move it.  I could move it possibly before, but we'll

18 work with that.  But we would then take it up on November 5th

19 at 3:00 along with whatever matters might be on the calendar

20 for this case.  We'll take up both Genesis and Multicare.

21     Let me ask one other question.  Perhaps you can

22 address it.  Indeed there is contention and very substantial

23 travel costs involved here -- 80 and $90,000 and up much more

24 than that.  They actually -- nearly 200,000, as I recall all of

25 it.

35

1    MR. BARNES: Yes, Your Honor.

2    THE COURT: And the examiner wonders, and so do I,

3 about the staffing of this project from the --

4    MR. BARNES: Your Honor --

5    THE COURT: -- the places that you have staff --

6    MR. BARNES: Your Honor should understand that it is

7 not just restructuring services that we did here. We did

8 audit, SEC compliance, statutory reporting for different states

9 on a separate company basis. We did tax compliance, tax

10 planning, reorganization tax planning. We had a significant

11 forensic and litigation engagement that we provided

12 investigatory services to the company as well as substantial

13 restructuring services.

14    THE COURT: Let me ask you, and in terms of the --

15 you have served Genesis and Multicare over the years. Have you

16 not?

17    MR. BARNES: Yes, Your Honor.

18    THE COURT: Were the audit fees incurred here

19 comparable to previous audit fees?

20    MR. BARNES: Absolutely, Your Honor.

21    THE COURT: All right, and indeed I do understand the

22 various -- but do you contend that the personnel used, for

23 instance, in previous audit functions were assembled in the

24 same way from --

25    MR. BARNES: Yes.

**AA. 976**

1      THE COURT:  Why is that?  I mean, in other words,

2  what KPMG does in all of its locations --

3      MR. BARNES:  Well, to the extent that we had local

4  people available that were capable of doing the work or that

5  had familiarity with the company, we used those people.  The

6  audit staff for the most part were out of our Philadelphia

7  office.  In certain instances for certain aspects of the audit,

8  we would have to bring people in, because they had unique skill

9  sets.  We would bring people in from -- for example, from our

10 Harrisburg office to look at compliance.  We have a senior care

11 practice there, and we'd bring people in for compliance with

12 medical rules and operational rules, because that's part of

13 what we do in an examination of the financial statement.

14      Similarly, we had a -- we had restructuring people

15 come in because of their expertise in assembling statement of

16 affairs and schedules in responding to creditors claims.  We

17 reviewed the staffing and the people, where the people were

18 coming from with the client, and in anticipation -- we tried to

19 make -- if Your Honor would look at our -- looks at our monthly

20 bills, we sat down with the client and reviewed who did what

21 and when and how much it cost --

22      THE COURT:  Let me ask --

23      MR. WALSH:  -- and we did take -- we did take fee

24 reductions of about $180,000 I believe in totals in these two

25 cases for the time periods under question, so we did try to be

**AA. 977**

1  responsive to the issues -- some of the issues that Your

2  Honor's raising.

3         THE COURT:  I wasn't able to quantify the access to

4  personnel around the country.  I mean I will -- how many of the

5  people that were used -- the timekeepers -- approximately were

6  from Illinois and Texas and Virginia and North Carolina?

7         MR. BARNES:  We had some -- we had a couple people

8  from Illinois.  At the beginning we had a woman from Texas who

9  -- her forte is assisting companies in assembling statement of

10 affairs and schedules, and that was a major undertaking, and

11 our audit people don't have that expertise, and this particular

12 woman does have that expertise, and she was on the engagement

13 until the statement of affairs and schedules were completed,

14 and then she went on to another one.  We tried to match up the

15 needs of the client and the estate with the skill set of our

16 people, and we try and -- our people don't enjoy traveling, and

17 we really don't like to have them traveling out of town, but

18 it's a part of our job.

19        THE COURT:  The Illinois people had what kind of

20 expertise?  What were they used for?

21        MR. BARNES:  The senior manager from Illinois was a

22 -- spent 16 years doing healthcare and is an accountant and has

23 restructuring experience in healthcare.

24        THE COURT:  And North Carolina?  I may be putting you

25 on the spot.

**AA. 978**

38

1      MR. BARNES:  I just don't recall, Your Honor.

2      THE COURT:  Or Virginia, for that matter?

3      MR. BARNES:  Virginia.  He's a restructuring person,

4  and his -- he has extensive experience in handling vendor calls

5  and critical vendor programs and that type of -- if that's the

6  same gentleman I'm thinking of.

7      THE COURT:  All right.  I would appreciate that

8  amplification.

9      MR. BARNES:  And Your Honor should understand that we

10  don't have a restructuring practice in every city that we have

11  an office.  I mean we are a specialized practice, and we run it

12  as a national practice.  I don't think we're unique in the

13  amount of travel or -- that we expect our people to do or the

14  amount of expenses that we incur in doing this work.  It's a

15  very specialized work, and we do a lot of travel.

16      THE COURT:  Noted.  All right.  Sir?

17      MR. FRIMMER:  Your Honor, I was just going to ask

18  since understandably the focus was on the large item for the

19  ten hours and over charges, which I note in both applications

20  from the examiner's report are about $650,000, and the total

21  application is for slightly over two million, that the debtor's

22  already -- that KPMG's already voluntarily taken a $180,000.

23  Would Your Honor feel it would be inappropriate at this point,

24  since we're pushing off the other piece of this until November,

25  to award some interim amount?  The services were all performed

39

1   many months ago and --

2          THE COURT:  KPMG has gotten paid.  Haven't they?

3          MR. FRIMMER:  Have you?

4          MR. BARNES:  Yes.  Yes.

5          MR. FRIMMER:  Oh, I'm sorry.

6          THE COURT:  Yes, so it's not a question of --

7          MR. FRIMMER:  Okay.

8          THE COURT:  Yes.

9          MR. FRIMMER:  Okay.

10         THE COURT:  It's a question of bottom lining what is

11  an appropriate --

12         MR. FRIMMER:  I'm sorry.  I wasn't aware.

13         THE COURT:  And I am aware.  I read with interest the

14  write offs that were recognized by the examiner in both counts,

15  and as I recall, it is something like 164/170 perhaps with

16  expenses more, so I do understand that, but what I'm concerned

17  about is a -- is to establish a record here, a forthright

18  presentation that can be -- that can explain the discrepancies

19  that are noted in the --

20         MR. BARNES:  Could I just say one more thing, Your

21  Honor?

22         THE COURT:  Sure.

23         MR. BARNES:  The corporate restructuring people are

24  used to daily time reporting in six tenths of an hour.  I will

25  -- I don't believe there's any issue with the veracity of our

**AA. 980**

1  peoples' time, but it's unusual for our other practices to do

2  this, so we have to spend some time training them, but we spend

3  a lot of time making sure that it's right, and I apologize that

4  the time entries were keypunched incorrectly, but I assure you

5  it was only a keypunch error.

6          THE COURT:  Thank you, sir.

7          MR. FRIMMER:  Thank you, Your Honor.

8          MR. BARNES:  Thank you.

9          THE COURT:  I think we're up to Paul Weiss.

10         MR. JOHNSON:  Good afternoon, Judge.  My name is Jeh

11  Johnson.  I'm with Paul Weiss, counsel to Neighbor Care and

12  Genesis and the litigation against Manor Care.

13         THE COURT:  Indeed.

14         MR. JOHNSON:  The arbitration against Manor Care.

15         THE COURT:  Indeed.  As special counsel, and a couple

16  of points.  You've adjusted a bit as well.  I see the

17  interoffice conferencing here.  Again, I'm confident that you

18  worked as a team, and I read with interest your narratives

19  about how the process went forward and how the assignments were

20  made, and there was teamwork at work.  I think just simply to

21  understand that when the firm is -- when people are functioning

22  -- three and four people talking together and each charging

23  their rate, that there has -- there can be an over conferencing

24  in terms -- and I'm -- I guess I'm looking at percentages.

25  This was similar to the Weil Gotshal percentage range, and I

41

1  would be inclined to adjust the $121,000 that was engaged in

2  interoffice conferencing by $20,000.

3          There was a recognized reduction for attendance at

4  hearings of 3690, and one other point of concern.  A paralegal

5  in your office seemed to bill mostly at whole and sometimes

6  half hours and billed upwards of $47,000 in that regard.  It's

7  simply not the one tenth -- the six minutes, and it does -- I'm

8  confident that she put in the time, but it needs an adjustment,

9  because it is incorrect and does reduce the credibility of

10 those numbers.  So I'll make an adjustment of $5,000 in that

11 regard.

12         Word processing is not an acceptable area of expense.

13 I don't think you addressed it in your narrative, but --

14         MR. JOHNSON:  I think as we -- I may have explained

15 last that word processing reflects overtime word processing.

16 We don't bill the client for word processing during the normal

17 business hours.  It's only an after-hour expense.

18         THE COURT:  And here I am with -- as with everybody

19 else, I don't think that an overtime expense is compensable.

20 Sometimes it's couched as overtime secretarial expense.  It

21 seems to me that that is an overhead expense that needs to be

22 encompassed within regular hourly rates, and so I will make an

23 adjustment in that regard.

24         As with other applications, local travel, overtime

25 transportation, overtime meals, and overtime will also be

**AA. 982**

42

1  deducted.  Let me see if I can bottom line this quickly.

2                            (Pause)

3            THE COURT:  An award of $718,796 will be entered with

4  expenses of -- I'm sorry that this is time consuming but --

5                            (Pause)

6            THE COURT:  Looks like $21,496.65.  Thank you, sir.

7            MR. JOHNSON:  Thank you.

8            THE COURT:  Next is Akin Gump.

9            MS. BECKERMAN:  Good afternoon, Your Honor.

10           THE COURT:  Good afternoon.  There was some agreement

11  about minor -- about some reductions.  I think they amount to

12  2804.50 --

13           MS. BECKERMAN:  Your Honor --

14           THE COURT:  -- and the fees, would you add them up?

15           MS. BECKERMAN:  Your Honor, my calculation was

16  slightly different.  I think I voluntarily reduced on the fees

17  $3,258.50, and then the expenses --

18           THE COURT:  I won't argue with --

19           MS. BECKERMAN:  -- I think I had 278.36, and

20  obviously, some of that reduction goes to some of the things

21  Your Honor's just mentioned about time increments and

22  paralegal's time that was not appropriately kept.  Well, we

23  reduced their time by one fifth --

24           THE COURT:  Yes.

25           MS. BECKERMAN:  -- to account for that --

43

1    THE COURT:  And I didn't --

2    MS. BECKERMAN:  -- and some other rounding problems.

3    THE COURT:  I didn't have other problems with respect

4  to other adjustments in the fee, so we can enter an award of

5  352,662.50.  On the expenses, in addition to the adjustments

6  already made, I don't think you took off -- you didn't I'm

7  pretty sure -- for local travel meals, secretarial overtime,

8  overtime transportation, and overtime meals.

9    MS. BECKERMAN:  No, I did not, Your Honor --

10   THE COURT:  Is that correct?

11   MS. BECKERMAN:  -- so my expenses would have to be

12  adjusted accordingly.

13   THE COURT:  Yes, and I think I can do that.

14   MS. BECKERMAN:  Okay.

15                    (Pause)

16   MS. BECKERMAN:  I'm sure Mr. Golden and Mr. Dizengoff

17  will be anxious to hear what happened to me today.

18   THE COURT:  Sure.

19   MS. BECKERMAN:  I think they're worried about their

20  other case with you, Your Honor.  They've been bugging me about

21  when is this hearing going to happen when you postponed it,

22  because I think they wanted to see how the process worked with

23  the fee examiner, you know, in your Court.

24   THE COURT:  I don't know if you'll put their fears to

25  rest or insight them to make their fears --

44

1     MS. BECKERMAN:  I don't know either, Your Honor, but

2   I think their response is due in a week so --

3     MR. WALSH:  Or perhaps --

4     MS. BECKERMAN:  -- I could certainly prepare them a

5   little bit.

6     MR. WALSH:  Perhaps you'd like to get on the train to

7   Florida with me this afternoon.

8     THE COURT:  As I believe, expenses will be 78,191.84.

9     MS. BECKERMAN:  One nine one 84.  Okay.  I have a

10  blank order, Your Honor, so I'll fill in the blanks and hand it

11  up to you.

12    THE COURT:  All right.  Thank you.

13    MS. BECKERMAN:  Sure.

14    THE COURT:  And then we have Blank Rome.

15    MR. SCHAEDLE:  Good afternoon, Judge.

16    THE COURT:  Good afternoon.

17    MR. SCHAEDLE:  Mike Schaedle for Blank Rome.

18    THE COURT:  I think the main point here is the number

19  of timekeepers -- 94 -- and the number of them that have billed

20  fewer than ten hours.  Now I looked at that, and obviously, a

21  lot of that was supportive services, perfectly appropriate, and

22  with no contest, but some of it was a review, a need to come up

23  to speed to do the particular project that was assigned, and

24  when you have this many timekeepers involved, there's bound to

25  be some of that.

**AA. 985**

1  MR. SCHAEDLE:  Your Honor, my only response would be

2  general and is reflected in our -- in the response that we did,

3  in fact, file, which is that Blank Rome's role with respect to

4  both the Genesis and Multicare debtors is somewhat different

5  than other counsel before Your Honor.  For years the firm has

6  served as general corporate counsel in respect of every aspect

7  of its business, and that role, saving the overarching

8  reorganization needs of the company, was -- Blank Rome

9  continued to fill, and so there are a number of timekeepers

10  who, as they had long before Genesis ventured into a chapter

11  proceeding, Your Honor, who were called on an ad hoc basis for

12  a given entry on a given month to provide discreet legal advice

13  on a point relating to trademark law or healthcare regulatory

14  practice or any number of other issues, and that, Your Honor, I

15  think, as I reviewed the fee auditor's report, seemed to me to

16  be the driving reason why there was a very substantial amount

17  of discreet time kept at least in terms of the number of

18  attorneys who billed.

19  It would not be our practice in -- when we assemble a

20  reorganization team to represent a debtor or a committee, to

21  have that many timekeepers, but when we provide general

22  corporate services on a broad basis, the number of timekeepers

23  does expand in my experience my non-bankruptcy clients and

24  observing others in my firm doing the same, and I think that is

25  the general rationale behind the number of timekeepers shown on

46

1  the application.

2  　　　　THE COURT:  And I appreciate that.  A minor

3  adjustment will be made.  I do understand that this is more in

4  the ordinary course of legal services rendered, and I don't

5  know what kind of scrutiny, although the absence of objection

6  from the debtors clearly signifies that perhaps they would've

7  accepted it as is, but nevertheless, since I'm responsible to

8  review it, I will make a minor adjustment of $15,000 on that

9  point and enter an order for 450,838 and expenses.  I'm taking

10  out the local travel meals and secretarial services, which are

11  minor.  You've already agreed with the 780 and 13 --

12  　　　　MR. SCHAEDLE:  That's correct, Your Honor.

13  　　　　THE COURT:  The 1321 I think was travel time, and

14  we'll leave that -- I'll leave the allowance as it is.

15  　　　　MR. SCHAEDLE:  Thank you, Your Honor.

16  　　　　THE COURT:  But in terms of the expenses, they'll be

17  awarded at -- I got higher than I started with.  That's --

18  　　　　MR. SCHAEDLE:  I'll keep in that vibe, Your Honor.

19  　　　　THE COURT:  Let me try it again.

20  　　　　　　　　　(Pause)

21  　　　　THE COURT:  Twenty-eight thousand 735 dollars and 68

22  cents.

23  　　　　MR. SCHAEDLE:  Very good, Your Honor.  Your Honor, in

24  connection with the provision of an order, I was traveling this

25  week and detained on trial.  Would it suit Your Honor if we

47

1  submitted a revised form of order in chambers or --

2          THE COURT:  That would be fine.

3          MR. SCHAEDLE:  Very good, Your Honor.

4          THE COURT:  Thank you.  I think we're up to

5  Multicare.  Is that correct?

6          MS. BECKERMAN:  I think there's one other matter,

7  Your Honor.  Houlihan Lokey's application is on your agenda.

8          THE COURT:  Actually, yes, it is, and I don't have a

9  report from the fee examiner on that application.

10          MS. BECKERMAN:  I think, Your Honor, that -- I'm just

11  surmising, and it's really just my guess, that the fee examiner

12  didn't end up doing a report on Houlihan Lokey or, for example,

13  either the debtor's investment banker, UBS, because of the fact

14  that they charge flat monthly fees, Your Honor, that are set,

15  and that were improved by this Court actually originally under

16  328, so that obviously they can't be disturbed unless there's

17  circumstances that show that they were improvidently granted,

18  and the --

19          THE COURT:  Indeed I specifically accepted, as I

20  recall, the flat fee kind of --

21          MS. BECKERMAN:  Right.

22          THE COURT:  -- application.  Let me review that

23  application.  I did miss it.  If I have any questions, I'll

24  reach out.  Otherwise, I'll be able to enter an order.

25          MS. BECKERMAN:  May I tender an order for you on

48

1  that, so that if you do decide to grant it, it does reflect the

2  full amount?

3          THE COURT:  Certainly.

4          MS. BECKERMAN:  I need to make the changes, and

5  here's my order, Your Honor.

6          THE COURT:  All right.  Thank you.

7          MS. BECKERMAN:  That's mine, and here's one for you.

8          THE COURT:  All right.

9          MS. BECKERMAN:  Thank you.

10         THE COURT:  Thank you.

11         MS. BECKERMAN:  I especially appreciate that, Your

12  Honor, because it deals with the period from July to December,

13  so obviously, their hold back amount for that -- they haven't

14  been paid for it, and obviously, we're now almost in -- you

15  know, in October, so it's been a long period of time.

16         THE COURT:  All right.  I'll be glad to direct my

17  attention to it.

18         MS. BECKERMAN:  Thank you.  I'm sure they would

19  appreciate that.

20         THE COURT:  All right.  We're up to Multicare.  I

21  think Blank Rome is listed first.

22         MR. SCHAEDLE:  Good afternoon again, Your Honor.

23         THE COURT:  Let's -- I don't recall if there was any

24  difference here.  I think you commented that you would de-lump,

25  but --

49

1    MR. SCHAEDLE:  If Your Honor wishes, we do have for

2 both cases interlineated invoices that we can submit.

3    THE COURT:  I'm fine with it.  We'll leave it.  There

4 was expression regarding multiple professionals in attendance

5 upwards of $12,000 in various hearings, or I'm not sure what --

6 conferences perhaps?

7    MR. SCHAEDLE:  I would think, Your Honor, that in

8 respect of this phase of the cases, that the conferencing that

9 occurred likely occurred in respect of a number of substantial

10 real estate transactions that involved an elder trust.  I'm not

11 entirely certain, Your Honor, but again, you know, I rely on

12 the verbiage in my response, it's been articulated by Your

13 Honor from the Court that such conferencing is appropriate in

14 order to strategize and in order to appropriately task among

15 attorneys working in tandem and certainly on Multicare.  In

16 particular, our real estate group was working on significant

17 and substantial projects.

18    THE COURT:  Yes, I believe that your firm had the

19 laboring oar on the elder trust transaction.  What I'm missing

20 here is the -- where I'm starting from.  It's over here.

21    MR. SCHAEDLE:  You are -- the same --

22    THE COURT:  I have it now.

23    MR. SCHAEDLE:  -- range of fee app's, Your Honor.

24 It's from November 1st, 2000 through March 31st, 2001.

25    THE COURT:  Yes, I just didn't have the numbers on my

1  sheet, but I have them now.

2        MR. SCHAEDLE:  Very good.

3        THE COURT:  I will -- I see that there is some -- I

4  think one item of voluntary adjustment.

5        MR. SCHAEDLE:  Correct, Your Honor.  I believe that

6  we offered up split travel time, an adjustment for time that

7  appeared to administrative in nature and travel expense plus an

8  additional thousand dollars in light of the complexity of the

9  fee application for a total adjustment offered on both -- in

10  the aggregate on both the expense and fee side of $4,646.86.  I

11  think the expense adjustment of that was $975.

12        THE COURT:  Okay.  I think that the calculation is

13  that on the fee it's 188,144.75.

14        MR. SCHAEDLE:  Very good, Your Honor.

15        THE COURT:  And on the expenses --

16                      (Pause)

17        THE COURT:  -- 4960.25.

18        MR. SCHAEDLE:  Very good, Your Honor, and likewise,

19  I'll submit a revised form of order covering these fee

20  applications, Your Honor, in chambers, if that's acceptable.

21        THE COURT:  Thank you.

22        MR. SCHAEDLE:  Your Honor, if I may be excused?

23        THE COURT:  Certainly.

24        MR. SCHAEDLE:  Thank you.

25        THE COURT:  Then we have Willkie Farr.

51

1    MR. SHALHOUB:  Good afternoon, Your Honor.  Paul

2  Shalhoub of Willkie Farr.

3    THE COURT:  I see that this application is largely

4  reasonable.  I'm trying to understand my comments about it.

5  There's two minor adjust -- minor comments.  In terms of vague

6  entries, there was listed about $12,000 wroth of -- I did go

7  through and found about 25 hundred dollars' worth of entries

8  that I really couldn't rule on in any kind of reasonable

9  fashion, and in -- on the -- in the category of, if you will,

10  under ten hours, a particular series of entries by a Mr. or Ms.

11  Klotz dealing with review of plan and discussions re: claims

12  and sort of out of nowhere and not knowing anywhere either

13  seemed to be inappropriate.

14    And so I would propose to adjust for the 45 hundred

15  dollars that would comprise those two areas, but otherwise, I'm

16  prepared to enter an award, and that award would be 248,288.50.

17  On the expenses, as you've heard me discuss the set of expenses

18  -- local transportation, local meals, overtime, and the like --

19  1223.23 would be deducted from the 10,188.56 to arrive at

20  8965.33.  Thank you.

21    MR. SHALHOUB:  Thank you, Your Honor.

22    THE COURT:  Kasowitz, Benson.

23    MS. FOLEY:  Good afternoon, Your Honor.

24    THE COURT:  Good afternoon.

25    MS. FOLEY:  Athena Foley from Kasowitz, Benson.

52

1    THE COURT:  Okay.  We had another instance of billing

2  in hourly increments here.  Nineteen days at eight hours

3  precisely.  This person billed $99,000 on this application and

4  did that mostly in hours -- in increments of hours, sometimes

5  half hours -- mostly hours -- and it does require some

6  adjustment, because it does represent a rounding off and the

7  like.  I'll make an adjustment of $15,000 in that regard.

8    There was an accommodation -- a voluntary

9  accommodation for travel time.  I did look closely at the

10  research here.  There was a very large amount of research, and

11  I fully understand that the vast majority of that research had

12  to do with security interests in the many jurisdictions, the

13  perfection of those security interests, and that it was the

14  role of counsel for the Committee to accomplish that review.

15    MS. FOLEY:  Yes, Your Honor, the debtors in

16  connection with receiving their DIP financing waived any right

17  to challenge those liens.  As Your Honor is well aware, the

18  Committee's constituents did not have a whole lot to go on

19  during the case and devoted substantial resources to reviewing

20  the bank's liens, which was an enormous project and ultimately

21  Your Honor did not get to entirely see the fruits of those

22  labors, because we reached a settlement.  After all our work --

23  I'm sure the banks and the debtors would take issue with this,

24  but we ultimately found about $100 million of assets where the

25  bank's liens in our view were not properly perfected, and it

53

1  was a major component of the settlement that we were ultimately

2  able to reach.

3      THE COURT:  Well, that's certainly impressive.  I did

4  see that some of the research time, a relatively small portion

5  of it, was spent in 548.  A motion to appoint Trustee,

6  Creditors Committee suits, and the like, things that are more

7  sort of commonplace, so I'll make -- and indeed that's -- it's

8  not inappropriate to research even issues that pertain to us

9  regularly for the purpose of updating ourselves and

10 representing an argument and so forth.  Sometimes what I

11 particularly look for in that regard is whether there's a

12 learning curve for younger associates involved or the like, and

13 I don't know.  It was hard to tell but --

14     MS. FOLEY:  Some of that research, Your Honor, was I

15 think better utilized later on in the fee period after what is

16 covered by this fee auditor's analysis, since we ultimately did

17 bring the motion to appoint the Trustee.

18     THE COURT:  I'm certainly aware of that, and I recall

19 it, of course, and it was a part of the process of moving the

20 case forward.  I'm aware of that as well.  I will make an

21 adjustment of $5,000 in that area.  There was -- the other two

22 adjustments which were voluntary were 47 hundred dollars so

23 that the total adjustment would be 24,700.  That would --

24 sorry.

25                    (Pause)

**AA. 994**

54

1    THE COURT: Four eighty-four 33. And in terms of

2 expenses for the things that we've talked about, it's a total

3 of 1140.64, which will be taken off the 96,739 --

4                         (Pause)

5    THE COURT: -- for a total of 95,598.36.

6    MS. FOLEY: Thank you, Your Honor.

7    THE COURT: Thank you.

8    MS. FOLEY: If I may, I'd like to submit a revised

9 order to chambers.

10    THE COURT: Fine.

11    MS. FOLEY: Thank you.

12    THE COURT: Okay. I think -- what's next? We're up

13 to Young Conaway.

14    MR. BRADY: Good afternoon, Your Honor. Robert Brady

15 on behalf of Multicare and Young Conaway in this instance.

16    THE COURT: I think maybe the examiner liked your

17 application best --

18    MR. BRADY: Oh.

19    THE COURT: -- of everybody. There's the least

20 amount of comment. You indicated I think in your response that

21 as to undocumented expenses, you did have those invoices

22 available. Refresh me in terms of what kinds of expenses we

23 were talking about there.

24    MR. BRADY: Your Honor, these are typical expenses of

25 what I would call the local Delaware counsel. We handle all of

55

1   the services, so they're Federal Express, courier, and postage.

2   What we do, Your Honor, and so far this has been acceptable to

3   the Delaware courts, is we attach to our applications summaries

4   of the expenses that list all of the relevant information.  It

5   provides an invoice number, a who requested it, the date the

6   invoice was paid, and the amount, and then the basis for that.

7           We do have the actual invoices.  Unfortunately, our

8   firm is in the process of moving, and we've been in the process

9   of moving for several months since it keeps getting delayed,

10  and the actual invoices have been boxed up and are off site.

11  We could pull those, Your Honor, but --

12          THE COURT:  I won't require it.  I'll certainly

13  accept that summation.  The only adjustment is a $23 expense

14  for meals which will bring --

15          MR. BRADY:  I told Mr. Shalhoub if you cut that, I

16  would not buy him bagels anymore --

17          THE COURT:  That's it.  No more bagels.

18          MR. BRADY:  -- before we go to hearings.

19          THE COURT:  You can buy him bagels.  It just has to

20  come out of your pocket.  Eighteen thousand 903.59 will be the

21  expense.  Sixty-eight 307.50 for the award.  Thank you.

22          MR. BRADY:  Thank you, Your Honor.

23          THE COURT:  I think that does it.  Did I miss

24  anybody?

25          MR. MINUTI:  Your Honor, if I could, Mark Minuti from

**AA. 996**

56

1  Saul Ewing.  I think Your Honor missed me only because my

2  application fell below the range at which the fee examiner

3  would review it.

4         THE COURT:  And I didn't catch you on the agenda

5  either, but I'm sure I missed it.

6         MR. MINUTI:  Your Honor, I guess I'm easy to forget

7  given that the -- this application covers a period of August of

8  2000 through March of 2001, and the total -- it looks like the

9  total fees and expenses are in the $17,000 range.  If Your

10  Honor doesn't have it in front of you, I'm certainly happy to

11  have Your Honor pull the application.  It's docket number 840,

12  and what Your Honor will see is that we are local counsel for

13  Kasowitz Benson representing the Committee in Multicare, and

14  consistent with that, you'll see a typical what I'll call local

15  counsel time which would be reviewing pleadings, attending

16  hearings, and so on.  So I'm happy to answer any questions Your

17  Honor has once you review the application.  I didn't want to

18  get lost in the shuffle.

19         THE COURT:  Very good.  I'll make a note to review

20  it.  If I have any questions, I'll probably simply drop you a

21  note to reflect what the question is rather than call you back

22  for the -- just that purpose.

23         MR. MINUTI:  Very well.  Thank you, Your Honor.

24         THE COURT:  Is there anything else today?

25         MR. WALSH:  Your Honor, we didn't bring an order with

57

1   us to interlineate.  May we submit one to chambers?

2          THE COURT:  Certainly.  If you would like to spend

3   another moment, I could -- I think I left open the calculation

4   of Weil Gotshal expenses.

5          MR. WALSH:  Oh, I thought I was going to get by that

6   one.

7          THE COURT:  Yes, it's just a series of numbers.  I

8   mean I'll -- how about if I calculate it and let your office

9   know what it is --

10          MR. WALSH:  That would be fine.

11          THE COURT:  -- and rather than keep you here any

12   longer?  If there's nothing else, the matter is adjourned.

13   Thank you.

14          ALL:  Thank you, Your Honor.

15                      *  *  *  *  *

16                      **CERTIFICATION**

17          I, PATRICIA C. REPKO, certify that the foregoing is a

18   correct transcript to the best of my ability, from the

19   electronic sound recording of the proceedings in the above-

20   entitled matter.

21

22   _Patricia C. Repko_                    Date:  October 14, 2001

23   PATRICIA C. REPKO

24   DIANA DOMAN TRANSCRIBING, INC.

**AA. 998**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

In Re:  Genesis Health

                    Debtor

_____

Charles L. Grimes                    )
                    appellant        )
                                     )
          v.                         )    Civil Action No. 01 - 734 UNA
                                     )
Genesis Health                       )
                    appellee         )
                                     )    Bankruptcy Case  00 - 2692
                                     )

### Notice of Docketing

A Notice of Appeal of the following order of the Bankruptcy
Court on 09/20/01 was docketed in the District Court on
November 13, 2001.

Findings of fact, conclusions of law, and Order confirming Debtors
Plan entered on 9/20/01.  Opinion on confirmation signed by Court
on 9/12/01.  Bankruptcy Court's denial from the bench of motion
of objector Charles L. Grimes to amend findings contained in
confirmation Opinion during hearing on such motion held before
the Bankruptcy Court on 10/5/01.

Please place the civil action number and caption listed above on
all papers concerning this matter.  Part VIII of the Bankruptcy
Rules apply.  Any attorneys of record who are not members of the
Bar of this Court shall associate with local counsel in accordance
with District of Delaware Local Rule 83.5.

                         Peter T. Dalleo
                         Clerk of the Court

                    BY: _Ua Cl_____
                         Deputy Clerk

Date: 11/13/01

To: ✓Bankruptcy Court
     David A. Jenkins, Esq.
     Mark David Collins, Esq.

     Patricia A. Staiano, Trustee
                              AA. 999

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| IN RE: | : | **CHAPTER 11** |
| | : | **Case No. 00-2692 (JHW)** |
| **GENESIS HEALTH VENTURES, INC., et al.,** | : | **(Jointly Administered)** |
| | : | |
| Debtors. | | |

| | | |
|---|---|---|
| IN RE: | : | **CHAPTER 11** |
| | : | **Case No. 00-2494 (JHW)** |
| **MULTICARE AMC, INC., et al.,** | : | **(Jointly Administered)** |
| | : | |
| Debtors. | | |

### MOTION OF CHARLES L. GRIMES FOR PARTIAL STAY
### PENDING APPEAL OF ORDER CONFIRMING DEBTORS' JOINT PLAN
### OF REORGANIZATION UNDER CHAPTER 11 OF THE BANKRUPTCY CODE

Charles L. Grimes moves pursuant to Rule 8005 of the Federal Rules of Bankruptcy Procedure

for a partial stay of this Court's order dated September 20, 2001 confirming the debtors' Joint Plan of

Reorganization (the "Confirmation Order") pending Mr. Grimes' appeal from the Confirmation Order. The

grounds for this motion are set forth in Mr. Grimes' opening brief filed contemporaneously with this motion.

Date:   October 11, 2001              SMITH, KATZENSTEIN & FURLOW LLP

                                      /s/ David A. Jenkins
                                      David A. Jenkins  (Bar No. 932)
                                      Selinda A. Melnik  (Bar No. 4032)
                                      800 Delaware Avenue
                                      Post Office Box 410
                                      Wilmington, DE 19899-0410 (Courier 19801)
                                      Telephone (302) 652-8400
                                      Facsimile (302) 652-8405
                                      E-mail:  DAJ@skfdelaware.com

MCG3582.WPD>00511

SAMelnik@skfdelaware.com
Attorneys for Appellant Charles L. Grimes

MCG3582.WPD>00511

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| IN RE: | : | **CHAPTER 11** |
|  | : | Case No. 00-2692 (JHW) |
| **GENESIS HEALTH VENTURES, INC.,** et al., | : | (Jointly Administered) |
|  | : |  |
| Debtors. | : |  |
|  | : |  |
| IN RE: | : | **CHAPTER 11** |
|  | : | Case No. 00-2494 (JHW) |
| **MULTICARE AMC, INC.,** et al., | : | (Jointly Administered) |
|  | : |  |
| Debtors. | : |  |
|  | : |  |

**OPENING BRIEF OF CHARLES L. GRIMES IN SUPPORT OF HIS MOTION FOR A
PARTIAL STAY PENDING APPEAL OF ORDER CONFIRMING DEBTORS' JOINT
PLAN OF REORGANIZATION UNDER CHAPTER 11 OF THE BANKRUPTCY CODE**

Dated: October 11, 2001

SMITH, KATZENSTEIN & FURLOW LLP
David A. Jenkins  (Bar No. 932)
Selinda A. Melnik  (Bar No. 4032)
800 Delaware Avenue
Post Office Box 410
Wilmington, DE 19899-0410 (Courier 19801)
Telephone (302) 652-8400
Facsimile (302) 652-8405
E-mail:  DAJ@skfdelaware.com
          SAMelnik@skfdelaware.com
Attorneys for Appellant Charles L. Grimes

MCG3581.WPD

MCG3581.WPD

2

## TABLE OF CONTENTS

<u>**PAGE**</u>

TABLE OF CONTENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . i

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

NATURE AND STAGE OF THE PROCEEDINGS . . . . . . . . . . . . . . . . . . . . . . 1

SUMMARY OF ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

      I.    MR. GRIMES IS ENTITLED TO A STAY PENDING APPEAL . . . . . . . . . . . 6

          A.   Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

          B.   Legal Standard for Granting a Stay . . . . . . . . . . . . . . . . . . . . . . . . 7

              1.   Likelihood of Success on the Merits . . . . . . . . . . . . . . . . 8

              2.   Irreparable Harm to Mr. Grimes . . . . . . . . . . . . . . . . . . . 12

              3.   Lack of Harm to Other Interested Persons . . . . . . . . . . . . 13

              4.   The Public Interest Favors a Stay . . . . . . . . . . . . . . . . . . 13

          C.   No Bond is Necessary Under the Circumstances . . . . . . . . . . . . . . 14

      CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

MCG3581.WPD

i

# TABLE OF AUTHORITIES

**CASES**                                                                                    **PAGE(S)**

*Evans v. Buchanan,*
    435 F.Supp. 832 (D.Del. 1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 13

*Floyd v. Clark,*
    266 B.R. 61 (E.D.Pa. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Hilton v. Braunskill,*
    481 U.S. 770 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*In re Charles & Lillian Brown's Hotel, Inc.,*
    93 b.R. 49 (Bankr. S.D.N.Y. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*In re Chateaugay Corp.,*
    998 F.2d 322 (2d Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*In re City of Bridgeport,*
    132 b.R. 81 (Bankr. D.Conn. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*In re Continental Airlines,*
    91 f.3d 553 (3d Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*In re Crystal Oil Co.,*
    854 F.2d 79 (5th Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*In re Moreau,*
    135 B.R. 209 (N.D.N.Y. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*In re Paolo Gucci,*
    105 F.2d 837 (2d Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*In re Primary Health Sys., Inc.,*
    C.A. No. 99-622-SLR,
    Robinson, J. (D.Del. Oct. 13, 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 9

*In re Roberts Farms,*
    652 F.2d 793 (9th Cir. 1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*In re Roth American, Inc.,*
    90 B.R. 94 (Bankr. M.D.Pa. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

**CASES**  *(continued)*                                                                                   **PAGE(S)**

*In re United Merchants and Mfrs., Inc.,*
    138 B.R. 426 (D.Del. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 14

*In re X-Cel Constructors of Delaware, Inc.,*
    76 B.R. 969 (D.N.J. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*In re Zenith Elecs. Corp.,*
    250 B.R. 207, 214 (D. Del. 2000) (Zenith I),
    aff'd *Nordhoff Invs., Inc. v. Zenith Elecs. Corp.,*
    258 F.3d 180 (3d Cir. 2001) (Zenith II) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6-7, 12, 14

**OTHER AUTHORITIES**

11 U.S.C. § 1129(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 12

Bankruptcy Rule 8005 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 14

MCG3581.WPD

iii

## NATURE AND STAGE OF THE PROCEEDINGS

On September 20, 2001, this Court entered an order (the "Confirmation Order") confirming the Joint Plan of Reorganization under Chapter 11 of the United States Bankruptcy Code filed by debtors Genesis Health Ventures, Inc. ("Genesis"), Multicare AMC, Inc. and affiliates of both (the "Plan") (D.I. 338582335). Charles L. Grimes ("Mr. Grimes"), a holder of Senior Subordinated Notes issued by Genesis and thus a Class G5 creditor of Genesis[1], had objected to confirmation of the Plan on several grounds, including that the Plan was not fair and equitable to all Class G5 Creditors because it seriously undervalued the Reorganized Genesis for purposes of Plan distributions[2] (D.I. 338582172).

On September 12, 2001, this Court issued an Opinion on Confirmation (the "September 12 Opinion") overruling Mr. Grimes' objection and concluding that the Plan was confirmable subject to certain modifications (D.I. 338582317).  On September 14, 2001, Mr. Grimes filed a motion to amend the findings of the September 12 Opinion to the extent those findings related to Mr. Grimes' claims regarding the proper valuation of the reorganized entity (D.I. 338582323-24).  Before  ruling on the motion to amend, this Court issued its Confirmation Order.

Thereafter, on September 24, 2001, Mr. Grimes filed a Notice of Appeal from the Confirmation Order.  On October 5, 2001, the Bankruptcy Court held a hearing on Mr. Grimes' motion to amend and orally denied that motion.[3]  Mr. Grimes now seeks a partial stay of the Confirmation Order

---

[1] Unless otherwise defined here, capitalized terms shall have the meanings set forth in the Plan.

[2] Mr. Grimes' objections included several other grounds, none of which will be at issue on this appeal.

[3] A transcript of the October 5, 2001 hearing has been requested, but is not yet available.  Mr.
(continued...)

to prevent debtors from distributing 10% of the total amount of stock to be distributed to Senior Lenders

under the Plan pending appeal by Mr. Grimes.

---

³(...continued)
Grimes will be filing shortly a new Notice of Appeal to include the Bankruptcy Court's October 5, 2001
order.

MCG3581.WPD                                    2

## SUMMARY OF ARGUMENT

Mr. Grimes is entitled to a partial stay of the Confirmation Order to the extent necessary to protect his ability to pursue an appeal. The four factors considered by the courts in reviewing a request for a stay weigh in favor of granting Mr. Grimes' request. Mr. Grimes has shown a likelihood of success on the merits; irreparable harm to him in the absence of the partial stay; and no harm to debtors, other interested persons or the public as a result of the stay. In addition, the public interest favors a stay in that it will preserve the Court's ability to review and determine the legitimacy of debtors' plan of reorganization. Because there is no potential harm to the adverse parties from the partial stay requested, there is no need for Mr. Grimes to post a bond in support of his request.

MCG3581.WPD

3

## STATEMENT OF FACTS

Mr. Grimes is the holder of approximately $20,000,000 in face amount of 9 3/4% Senior Subordinated Notes due 2005 issued by Genesis and thus the holder of a Class G5 Senior Subordinated Note Claim. Mr. Grimes objected to confirmation of the Plan submitted by Genesis (and the other debtors) on the basis that the Plan violates 11 U.S.C. § 1129(b) because it is not fair and equitable to the holders of the Class G5 Senior Subordinated Note Claims (the "Class G5 Noteholders"). Specifically, Mr. Grimes argued that the Plan provides more than 100% recovery to the Senior Lenders, while the Class G5 Noteholders (such as Mr. Grimes) will receive only a few pennies on the dollar for their claims. Mr. Grimes contended that the Senior Lenders' recovery of more than 100% of their allowable claims resulted from the debtors having employed incorrect methodologies which materially understated the enterprise value of the merged Reorganized Genesis, and hence the value of securities to be distributed to the Senior Lenders under the Plan.

Rejecting Mr. Grimes' contentions, this Court confirmed the Plan, and subsequently denied Mr. Grimes' motion to amend. This latter motion did not seek to overturn the Plan, but instead asked the Court to amend its determination that the Plan is equitable to Mr. Grimes as a Class G5 Noteholder. Specifically, Mr. Grimes requested that the Court amend its findings with respect to the correct valuation of the reorganized enterprise value of Genesis. Mr. Grimes contended that if his motion to amend were granted, the Court could salvage the Plan by simply escrowing a portion of the stock that would otherwise be obtained by the Senior Lenders pending a determination of the actual value of the reorganized entity as determined in the marketplace.

Mr. Grimes intends to appeal the Confirmation Order on the grounds that the Court erred in accepting the valuation of the Reorganized Genesis submitted by debtors, and concluding based on that valuation that the Senior Lenders were not receiving a recovery greater than 100% of their claims. Under the Plan as confirmed, however, the debtors may at any time proceed to distribute all of the stock to the Senior Lenders in the manner provided by the Plan.[4] Should that happen (and Mr. Grimes does not know when it might occur), the possibility exists that Mr. Grimes' appellate rights will be rendered meaningless by the doctrine of equitable mootness, thus depriving Mr. Grimes of his due process rights to an appellate review of the Confirmation Order.

For these reasons, Mr. Grimes now seeks a partial stay of the Confirmation Order, specifically requesting that the Court enter an order requiring debtors to hold in escrow at least 10% of the stock otherwise to be distributed to the Senior Lenders under the Plan pending appeal.

---

[4]Mr. Grimes has been informed by one of the senior officers of Genesis that some stock has been distributed, but much of it still has not been issued.

MCG3581.WPD                                      5

<u>ARGUMENT</u>

I.    <u>MR. GRIMES IS ENTITLED TO A STAY PENDING APPEAL</u>

    A.    <u>Introduction</u>

       Bankruptcy Rule 8005 permits the Court to grant a stay of execution of an order, including a Confirmation Order, pending an appeal. *In re Zenith Elecs. Corp.,* 250 B.R. 207, 214 (D. Del. 2000) (*Zenith I*), aff'd *Nordhoff Invs., Inc. v. Zenith Elecs. Corp.,* 258 F.3d 180 (3d Cir. 2001) (*Zenith II*). Numerous courts have emphasized the critical role of a stay in such cases, most recently the Third Circuit in *Zenith II*. In that case, the Third Circuit upheld the dismissal of an appeal from a confirmation order on the grounds that the doctrine of equitable mootness barred the appeal where the debtor had substantially completed consummation of its plan of reorganization prior to disposition of the appeal. 258 F.3d 180.

       As explained by the Court in *Zenith II,* the equitable mootness doctrine prevents an appellate court from unscrambling a plan of reorganization when the appealing party should have acted before the plan became difficult to retract and his failure to do so makes it inequitable to reverse the order from which the appeal is taken. 258 F.3d at 185-87. Although some of the transactions in *Zenith II* could have been reversed at the time of the appeal and the debtor failed to notify at least one of the appellants that the plan had been confirmed prior to consummating certain transactions, the Third Circuit nevertheless held that the doctrine applied, relying to a large extent on the fact that the appellants failed to request a stay of execution of the confirmation order upon learning of it. *Id.* at 184-88. The concurring opinion further stressed the importance of a stay pending appeal stating: "If the appellants had promptly applied for a stay with or without posting a bond, when they finally got word of what the bankruptcy court had done, I would view this appeal differently." 258 F.3d at 191. *See also In re Continental Airlines,* 91 F.3d 553, 561-

MCG3581.WPD                                    6

62 (3d Cir. 1996) (noting that parties may seek to preserve the status quo by obtaining a stay under Rule

8005 and that "the party who appeals without seeking to avail himself of that protection does so at his own

risk" of having his appeal dismissed as equitably moot (quoting *In re Chateaugay Corp.*, 988 F.2d 322,

326 (2d Cir. 1993)); *In re Crystal Oil Co.*, 854 F.2d 79, 82 (5th Cir. 1988) (finding a claim inequitable

because appellant made no effort to obtain a stay); *In re Roberts Farms,* 652 F.2d 793, 796 (9th Cir.

1981) (suggesting strong policy reasons support the need for a stay pending appeal to avoid risk of

mootness and dismissing appeal where appellant made no effort to obtain a stay); *In re Charles & Lillian*

*Brown's Hotel, Inc.,* 93 B.R. 49, 53 (Bankr. S.D.N.Y. 1988) ("We note the critical role a stay pending

appeal plays, not only in maintaining the status quo, but in preserving the right to a review on the merits");

*In re Paolo Gucci,* 105 F.3d 837, 840 (2d Cir. 1997) (alerting district courts to importance of stays

pending appeals from bankruptcy orders and the possibility that denial of stay may substantially limit right

to appeal).

        The courts having essentially obligated parties appealing a bankruptcy confirmation to

request a stay of the confirmation order in order to avoid dismissal of the appeal, it is logical to conclude

that such requests must be given serious consideration as necessary vehicles for the protection of appellate

rights.

## B .   Legal Standard for Granting a Stay

        A motion to stay pending appeal is addressed to the discretion of the Court. *In re United*

*Merchants and Mfrs., Inc.,* 138 B.R. 426, 430 (D. Del. 1992). The Courts apply four factors in

considering whether to grant a request for a stay pending an appeal: (1) the likelihood that appellant will

prevail on the merits of his appeal; (2) the likelihood of irreparable injury to appellant in the absence of a

MCG3581.WPD