stay; (3) the lack of substantial harm to other interested persons; and (4) the public interest in a stay. *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987); *Floyd v. Clark*, 266 B.R. 61, 63 (E.D. Pa. 2001); *In re City of Bridgeport*, 132 B.R. 81, 83 (Bankr. D. Conn. 1991); *In re Roth American, Inc.*, 90 B.R. 94, 95 (Bankr. M.D. Pa. 1988); *In re X-Cel Constructors of Delaware, Inc.*, 76 B.R. 969, 970 (D.N.J. 1987).

Each of these factors need not be given equal weight, but is to be used as a guide to assist the Court in making an individualized judgment as to the need for a stay. *Hilton*, 481 U.S. at 776, *City of Bridgeport*, 132 B.R. at 83. *See also Roth American*, 90 B.R. at 95 (no one factor determines the outcome, rather "proper judgment entails a 'delicate balancing of all elements'") (citations omitted). In reviewing each of these factors, the Court must balance the interests of the movant against the interests of the other parties and the public. *Evans v. Buchanan*, 435 F. Supp. 832, 844 (D. Del. 1977). The balancing of these factors demonstrates that the issuance of a stay is appropriate here.

### 1.    Likelihood of Success on the Merits

While this first factor requires an appellant to show a likelihood of prevailing on the issue presented on appeal, it does not require the Court to conclude that its original decision was wrong. *Evans*, 435 F. Supp. at 843-44. Rather, this factor may weigh in favor of a stay where a showing is made that the appeal raises legitimate, serious questions. *Id.* For example, in *In re Primary Health Sys., Inc.*, C.A. No. 99-622-SLR, slip op. at 6, Robinson, J. (D. Del. Oct. 13, 1999) (attached as Ex. A), the Court found that movant satisfied this factor where an appeal raised legitimate questions as to the value of a creditor's claim in bankruptcy.

MCG3581.WPD

8

**AA. 1014**

Here, as in *Primary Health*, Mr. Grimes' appeal involves serious questions concerning the value of the reorganized debtor and the result afforded certain claims. Specifically, the appeal addresses the question of whether the Court committed error in accepting the flawed valuation of the Reorganized Genesis propounded by debtors, and concluding based on that valuation that the Plan does not unfairly result in the Senior Lenders receiving greater than 100% of their claims.

As this Court explained in its September 12 Opinion (Op. at 33), "[t]he issue raised by [Mr. Grimes] is whether the reorganized enterprise value of Genesis and Multicare, either individually or combined, provides a recovery to holders of claims in Class G2, the Senior Lenders, that is greater than 100% of their claims. If so, then the plan violates the requirement that the plan be fair and equitable as to the non-consenting Class G5 Genesis Senior Subordinated Note Claims." On page 33 of its opinion, the Court began its determination of that "reorganized enterprise value," recognizing that "[t]he professionals who testified generally agreed that the Comparable Company analysis was the most significant to ascertain enterprise value in this case." That method of valuing a company requires determination of two components, an appropriate earnings level for the company (here, EBITDA) and an appropriate market multiple to apply to those earnings (*Id.*).

The valuation experts who testified in support of confirmation of the Plan attempted to determine a range of valuations for either Genesis separately, Multicare separately or both separately. On the other hand, Mr. Grimes' expert, William Becklean, valued the combined companies, because that is the company whose stock is being distributed as part of the Plan. It appears from the September 12 Opinion that one of the principal reasons why the Court accepted the valuation conclusions of debtor's

MCG3581.WPD

9

experts over that of Mr. Becklean was due to the Court's conclusion that it was not proper to value the companies together.[5]  However, as Genesis' counsel admitted (during the hearing on Mr. Grimes' motion to amend) that the stock of the combined companies will trade at a higher value than if they were separate, it was clear error not to value those companies together  The difference in valuation as a result of accepting the debtors' analysis is hundreds of millions of dollars.

The determination by the Court not to accept Mr. Becklean's valuation also reflects a misunderstanding of his analysis.  In that analysis, Mr. Becklean did not directly value any synergies resulting from the expected merger of Genesis and Multicare.  Instead, he used the EBITDA numbers supplied by Genesis and Multicare and added them together (because it was the combined company, and not the companies independently, which needed to be valued here) (Tr. 172-73[6] (Becklean)).

Mr. Becklean then applied multiples to those earnings, and this is where he differed from the experts retained by the debtors.  Because the combined Genesis/Multicare obviously would be no less strong than Genesis individually (an assumption no one denied), Mr. Becklean applied multiples obtained from that combined analysis to the EBITDA of the combined companies (Tr. 175; 178-179 (Becklean)).  In obtaining these multiples, Mr. Becklean used the same three comparable companies as debtors' experts: Beverly Enterprises, HCR ManorCare and Omnicare (Tr. at 177 (Becklean)).

---

[5]This is based on the Court's statements at the October 5, 2001 hearing on Mr. Grimes' motion to amend.  Because we do not yet have a transcript of that hearing, we cannot yet supply record citations. We will do so once we obtain the transcript.

[6]renced pages of the transcript of the August 29, 2001 hearing are attached as Ex. B.  These pages will be cited as "Tr."

MCG3581.WPD                                    10

**AA. 1016**

(1) With respect to Omnicare, he used the same discount to the multiple as the debtors' experts (Tr. 181-82 (Becklean)).

(2) For Beverly Enterprises, the Court found (and all witnesses at trial agreed) that Beverly was the company that most closely resembled Genesis (Op. at 36). Accordingly, Mr. Becklean did not discount the Beverly Enterprises multiple at all (Tr. 180 (Becklean)). Debtor's experts, however, *did* discount (without explanation) the Beverly Enterprises multiple when applying it to Genesis' EBITDA (Tr. 179-180 (Becklean)). The Court, however, apparently misunderstood the approach of debtors' experts, because it stated (Op. at 37) that "the experts testifying on behalf of debtors' plan *applied enhancements to the Beverly multiples*," when exactly the opposite is true. This was clear error on the Court's part, and appears to have contributed to its acceptance of the valuations determined by debtors' experts instead of the one performed by Mr. Becklean.

(3) For HCR ManorCare, Genesis' expert (UBS Warburg) had discounted its multiple by 10% more than its discount for Beverly Enterprises (19% *vs.* 9%) (Tr. 179-80 (Becklean)). Because nothing in this case changed the comparison between HCR ManorCare and Beverly Enterprises, if the true discount for Beverly is 0% (as it should be under the Court's findings) then the appropriate discount to HCR ManorCare's multiple is 10% (Tr. 181 (Becklean)). Again, no one testified to the contrary.

Because there is no legitimate basis not to value the companies together, because Mr. Becklean's EBITDA numbers are those of the company's and because his calculations of the multiples

MCG3581.WPD

11

to be applied to the combined companies earnings are logically superior to those of debtors' experts, it was clear error for the Court not to accept Mr. Becklean's valuation analysis.

That analysis has a mid-point value of approximately $1.95 billion (Op. at 39). Of course, one then must determine the portion of that value attributable to Multicare. As Mr. Becklean did not perform such a separate valuation, Mr. Grimes relied upon the valuations performed by debtors' experts. At trial, he suggested the "most likely" valuation proposed by David Schulte, the Senior Lenders' expert, of $343 million (Tr. 41). Using either that amount or even the mid-point of all the experts' valuations of $399 million (Op. at 39), and subtracting it from the overall valuation leaves a value for Genesis of *at least* $1.56 billion ($1.95 billion minus no more than $399 million).

Because that latter amount ($1.56 billion) is greater than the amount necessary for the Senior Lenders to obtain a 100% recovery (Op. at 39-40), the Plan violates the requirement that "the plan be fair and equitable as to the non-consenting Class G5 Genesis Senior Subordinated Note Claims." *See* 11 U.S.C. § 1129(b).

### 2.    Irreparable Harm to Mr. Grimes

Absent a partial stay of the Confirmation Order, the debtors may consummate the Plan at any time, including distributing all the stock attributable to the Senior Lenders. As explained in Section I.A. above, such distribution raises the very real possibility that Mr. Grimes' appeal will be rendered moot. *See Zenith II, supra.* Thus, in the absence of the partial stay sought, there is a real likelihood that Mr. Grimes will be denied the ability to exercise meaningfully his due process appeal rights. In addition, if all stock is distributed to the Senior Lenders, those lenders will presumably be free to trade

MCG3581.WPD

12

that stock. In that event, Mr. Grimes could win on appeal, but be denied an effective remedy because the Plan cannot easily be undone.

### 3. Lack of Harm to Other Interested Persons

The debtors and Senior Lenders certainly will suffer no substantial harm if the 10% of the stock that would otherwise be distributed to the Senior Lenders is delayed for the limited amount of time necessary to allow Mr. Grimes a fair opportunity to exercise his appellate rights. Under the circumstances of this case, this factor thus balances heavily in favor of granting the partial stay sought by Mr. Grimes. *See Evans*, 435 F. Supp. at 844 (stay appropriate where (as here) appellant has satisfied first two factors and the interests of the other parties and the public are not harmed substantially).

### 4. The Public Interest Favors a Stay

There can be no dispute that the public interest favors the promulgation and pursuit of legitimate plans of reorganization that comply with the bankruptcy laws. *See In re Moreau*, 135 B.R. 209 (N.D.N.Y. 1992) (public interest favors stays of bankruptcy court order to protect innocent parties from effects of erroneous decisions). Thus, this factor favors Mr. Grimes' request for a partial stay in that a stay will serve to protect his ability to proceed with his appeal of the Confirmation Order.

In addition, there is no identifiable harm to the public from the limited stay sought here. Mr. Grimes is not seeking to completely overturn the Plan. Rather, he seeks only to escrow a small portion of the stock to be otherwise distributed to the Senior Lenders so that it will be available to be reallocated in the event Mr. Grimes prevails on appeal.

### C. No Bond is Necessary Under the Circumstances

MCG3581.WPD

13

AA. 1019

Bankruptcy Rule 8005 allows the Court to condition a stay pending appeal on the filing of a bond. The purpose of such a bond "is to protect the adverse party from potential losses resulting from the stay." *United Merchants*, 138 B.R. at 430, citing *In re Alwan Bros. Co.*, 112 B.R. 294, 296 (Bankr. C.D. Ill. 1990). Thus, where the adverse party will not suffer any loss as a result of a stay pending appeal, a bond is not necessary. 138 B.R. at 430. *See also Zenith II*, 258 F.3d at 191 (noting that a stay may be sought "with or without a bond").

Here there is no likely loss to debtors or any other party if distribution of 10% of the stock earmarked for Senior Lenders is delayed pending this appeal.

MCG3581.WPD

14

**AA. 1020**

## CONCLUSION

For the above reasons, Mr. Grimes requests that this Court grant a partial stay of the Confirmation Order, requiring debtors to hold in escrow 10% of the stock otherwise to be distributed to the Senior Lenders pending resolution of Mr. Grimes' appeal.

Date:  October 11, 2001                SMITH, KATZENSTEIN & FURLOW LLP


                                        /s/ David A. Jenkins
                                        David A. Jenkins  (Bar No. 932)
                                        Selinda A. Melnik  (Bar No. 4032)
                                        800 Delaware Avenue
                                        Post Office Box 410
                                        Wilmington, DE 19899-0410 (Courier 19801)
                                        Telephone (302) 652-8400
                                        Facsimile (302) 652-8405
                                        E-mail: DAJ@skfdelaware.com
                                                SAMelnik@skfdelaware.com
                                        Attorneys for Appellant Charles L. Grimes

MCG3581.WPD                        15

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| IN RE: | : | Chapter 11 |
| GENESIS HEALTH VENTURES, INC.,<br>et al., | : | Bankruptcy Case No. 00-2692-JHW<br>(Jointly Administered) |
| Debtors. | : | |

| | | |
|---|---|---|
| IN RE: | : | Chapter 11 |
| MULTICARE AMC, INC., et al., | : | Bankruptcy Case No. 00-2494-JHW<br>(Jointly Administered) |
| Debtors. | : | |

| | | |
|---|---|---|
| CHARLES L. GRIMES, | : | |
| Appellant, | : | **CONSOLIDATED** |
| v. | : | Civil Action No. 01-734-JJF |
| GENESIS HEALTH VENTURES, INC.,<br>et al., | : | |
| Appellees. | : | |

| | | |
|---|---|---|
| CHARLES L. GRIMES, | : | |
| Appellant, | : | |
| v. | : | Civil Action No. 02-103-JJF |
| MULTICARE AMC, INC., et al., | : | |
| Appellees. | : | |

O R D E R

At Wilmington, this 14 day of June 2002, for the reasons

set forth in the Memorandum Opinion issued this date;

IT IS HEREBY ORDERED that Appellees' Joint Motion To Dismiss The Appeal (D.I. 12) is GRANTED.

UNITED STATES DISTRICT JUDGE

*Bankruptcy Court*

*. FYI*

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| IN RE: | : | Chapter 11 |
| | : | |
| GENESIS HEALTH VENTURES, INC., | : | Bankruptcy Case No. 00-2692-JHW |
| et al., | : | (Jointly Administered) |
| | : | |
| Debtors. | : | |

---

| | | |
|---|---|---|
| IN RE: | : | Chapter 11 |
| | : | |
| MULTICARE AMC, INC., et al., | : | Bankruptcy Case No. 00-2494-JHW |
| | : | (Jointly Administered) |
| Debtors. | : | |

---

| | | |
|---|---|---|
| CHARLES L. GRIMES, | : | |
| | : | |
| Appellant, | : | **CONSOLIDATED** |
| | : | |
| v. | : | Civil Action No. 01-734-JJF |
| | : | |
| GENESIS HEALTH VENTURES, INC., | : | |
| et al., | : | |
| | : | |
| Appellees. | : | |
| | : | |

---

| | | |
|---|---|---|
| CHARLES L. GRIMES, | : | |
| | : | |
| Appellant, | : | |
| | : | |
| v. | : | Civil Action No. 02-103-JJF |
| | : | |
| MULTICARE AMC, INC., et al., | : | |
| | : | |
| Appellee. | : | |

---

David A. Jenkins, Esquire and Michele C. Gott, Esquire of SMITH
KATZENSTEIN & FURLOW LLP, Wilmington, Delaware.
Attorneys for Appellant.

Mark D. Collins, Esquire, Russell C. Silberglied, Esquire of
RICHARDS, LAYTON & FINGER, P.A., Wilmington, Delaware.
Of Counsel:  Michael F. Walsh, Esquire, Gary T. Holtzer, Esquire
of WEIL, GOTSHAL & MANGES LLP, New York, New York.
Adam P. Strochak, Esquire and Jeffrey L. Cimbalo, Esquire of
WEIL, GOTSHAL & MANGES LLP, Washington, D.C.
Attorneys for Appellees Reorganized Debtors Genesis Health
Ventures, Inc., et al.

Robert S. Brady, Esquire of YOUNG CONAWAY STARGATT & TAYLOR, LLP,
Wilmington, Delaware.
Of Counsel:  Paul V. Shalhoub, Esquire of WILLKIE FARR &
GALLAGHER, New York, New York.
Attorneys for Appellees/Reorganized Debtors Multicare AMC, Inc.,
et al.

Teresa K.D. Currier, Esquire of KLETT ROONEY LIEBER & SCHORLING,
Wilmington, Delaware.
Of Counsel:  Menachem O. Zelmanovitz, Esquire of MORGAN, LEWIS &
BOCKIUS LLP, New York, New York.
Attorneys for Appellees Melon Bank, N.A., as Agent for the
prepetition Senior Lenders and the First Union National Bank as
Agent for the Exit Lenders.

---

## MEMORANDUM OPINION

June 14, 2002

Wilmington, Delaware

Farnan, District Judge.

Presently before the Court is a Joint Motion To Dismiss The Appeal (D.I. 12) filed by Appellees, Genesis Health Ventures Inc. ("Genesis") and its affiliated co-debtors, Multicare AMC, Inc. and its affiliated co-debtors ("Multicare"), Mellon Bank, N.A., as agent for the prepetition senior secured lenders of Genesis and Multicare, and First Union National Bank, as agent for the exit financing lenders.[1]  For the reasons set forth below, Appellees' Joint Motion will be granted.

**BACKGROUND**

**I.    Procedural Background**

On June 22, 2000, Genesis and Multicare (collectively "the Debtors") filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code.  The Debtors are providers of healthcare and support services to the elderly.  Appellant, Charles L. Grimes, was the holder of approximately $20,000,000 in face amount of 9 3/4% Senior Subordinated Notes issued by Genesis and due in 2005.  As such, Appellant was an unsecured creditor of the Debtors.

Approximately one year after filing their Petition, the Debtors proposed a plan of reorganization (the "Plan") that

---

[1]    Docket Item numbers referenced correspond to the Lead Case in this consolidated action, Civil Action 01-734-JJF.

1

provided for the payment of claims primarily through the distribution of securities in the reorganized entity.  In negotiating the Plan, the Debtors contend that it became clear that their enterprise value would not be sufficient to provide full recovery to the Genesis Senior Lenders and the Multicare Senior Lenders (collectively, the "Senior Secured Lenders").  Applying the absolute priority rule, the Debtors contend that there would have been no value available to distribute to the Debtors' unsecured creditors.  To avoid delaying the reorganization and to prompt a consensus among the creditors, the Senior Secured Lenders agreed to allocate a portion of their recovery to the unsecured creditors.

Pursuant to this compromise, the Plan provided for Multicare to merge into Genesis, creating the Reorganized Genesis.  The Debtors would then issue 41 million new common shares in the Reorganized Genesis and warrants to purchase another 4.5 million shares.  The Senior Secured Lenders would receive 30,485,0790 shares of the new common stock, plus convertible preferred stock and cash.  The unsecured creditors would receive 1,689,147 new common shares and warrants to purchase more than 2.8 million additional common shares.

Under the terms of the Plan, Appellant became the holder of a Class G5 Senior Subordinated Note Claim.  Appellant objected to

2

the Plan on the grounds that the Plan failed to conform to the requirements of Section 1129(b) of the Bankruptcy Code. Specifically, Appellant argued that the Plan provided more than 100% recovery to the Senior Secured Lenders while the Class G5 Noteholders only received pennies on the dollar for their claims. Appellant contended that this disproportionate recovery resulted from the Debtors' use of incorrect methodologies which materially understated the enterprise value of the Reorganized Genesis and the securities issued to the Senior Secured Lenders under the Plan.

A two-day confirmation hearing was held on the Debtors' Plan. The Bankruptcy Court heard the testimony of six valuation experts and admitted into evidence reports from each expert. The Bankruptcy Court accepted the valuation conclusions of the Debtors' experts and concluded that the Debtors were in fact solvent. The Bankruptcy Court further found that the Plan did not provide for more than a 100% recovery for the Senior Secured Lenders.

Two days later, Appellant filed a motion to amend the findings of the Bankruptcy Court concerning the valuation of the Reorganized Genesis. On September 20, 2001, before ruling on Appellant's motion, the Bankruptcy Court entered an order confirming the Debtors' Plan.

3

On September 24, 2001, Appellant appealed from the Confirmation Order. Appellant did not promptly seek a stay of the Confirmation Order pending his appeal, even though the Plan provided that distributions "shall be made on the Effective Date or as soon thereafter as is practicable." (D.I. 14, Ex. A, Plan § 6.2 at 24).

On October 2, 2001, the Debtors' Plan became effective. The Debtors closed their exit financing and made the requisite distributions to their creditors.

On October 5, 2001, the Bankruptcy Court held a hearing on Appellant's motion to amend and orally denied the motion. Appellant subsequently appealed the Bankruptcy Court's denial of his motion.

On October 11, 2001, Appellant moved the Bankruptcy Court for a partial stay of the Confirmation Order pending appeal. Appellant sought to prevent the Debtors from distributing 10% of the total amount of stock to be distributed to the Senior Secured Lenders under the Plan. By that time, however, the Reorganized Genesis had distributed 100 percent of the stock allocated to the Senior Secured Lenders under the Plan. In addition, the Debtors made significant distributions of stock and warrants to the unsecured creditors, including Appellant. Accordingly, the Bankruptcy Court denied as moot Appellant's

4

motion for a stay.

By the instant Motion, Appellees seek to dismiss Appellant's appeal on the grounds of equitable mootness. Appellees contend that dismissal is appropriate, because the relief Appellant seeks would result in an "unscrambling" of the Debtors' substantially consummated Plan. Appellant has filed a response opposing the Debtors' Motion and urging the Court to allow this appeal to proceed to the merits of whether the Bankruptcy Court erred in accepting the Debtors' valuation of the Reorganized Genesis. Appellees have filed their Reply Brief, and accordingly, this matter is fully briefed and ripe for the Court's review.

## DISCUSSION

### I. Legal Standard For The Doctrine Of Equitable Mootness

Under the doctrine of equitable mootness, "[a]n appeal should . . . be dismissed as moot, even though effective relief could conceivably be fashioned, where implementation of that relief would be inequitable." In re Continental Airlines, 91 F.3d 553, 559 (3d Cir. 1996) (en banc). The equitable mootness doctrine is aimed at "prevent[ing] a court from unscrambling complex bankruptcy reorganizations when the appealing party should have acted before the plan became extremely difficult to retract." Nordhoff Investments, Inc. v. Zenith Elecs. Corp., 258 F.3d 180, 185 (3d Cir. 2001). As adopted by the Third Circuit in

5

<u>Continental</u>, the doctrine of equitable mootness requires the court to balance five factors which are unique to bankruptcy proceedings:

> (1) whether the reorganization plan has been substantially consummated; (2) whether a stay has been obtained; (3) whether the relief requested would affect the rights of parties not before the court; (4) whether the relief requested would affect the success of the plan; and (5) the public policy of affording finality to bankruptcy judgments.

<u>Continental</u>, 91 F.3d at 560. The manner in which these factors are weighed depends on the facts and circumstances of each case. <u>Id.</u>

**II. Whether Appellant's Appeal Should Be Dismissed On The Grounds Of Equitable Mootness**

After weighing the factors relevant to the doctrine of equitable mootness in light of the circumstances of this case, the Court concludes that the instant appeal should be dismissed on the grounds of equitable mootness. In reaching this conclusion, the Court analyzes the relevant factors as follows:

**A.    Substantial Consummation Of The Plan**

In determining whether an appeal should be dismissed on the grounds of equitable mootness, "the foremost consideration is whether the reorganization plan has been substantially consummated." <u>In re PWS Holding Corp.</u>, 228 F.3d 224, 236 (3d Cir. 2000). In this case, Appellant concedes that the Plan has

6

been substantially consummated. (D.I. 17 at 10). Accordingly,

the Court finds that this factor weighs heavily in favor of

dismissing the instant action.

> B.    Obtaining A Stay

In the context of bankruptcy confirmations, the Third

Circuit has held that

> '[I]t is obligatory upon appellant . . . to pursue with
> diligence all available remedies to obtain a stay of
> execution of the objectionable order (even to the
> extent of applying to the Circuit Justice for relief .
> . .), if the failure to do so creates a situation
> rendering it inequitable to reverse the orders appealed
> from.'

Zenith, 258 F.3d 180, 185 (3d Cir. 2001) (quoting In re Highway

Truck Drivers & Helpers Local Union #107, 888 F.2d 293, 297 (3d

Cir. 1989)); see also Continental, 91 F.3d at 566 (stating that

it was "incumbent" on appellants to obtain a stay where there was

a "clear possibility" that their claims would become moot"); In

re Chateaugay Corp., 988 F.2d 322, 326 (2d Cir. 1993)

(recognizing that "the party who appeals without seeking to avail

himself of that [stay] protection does so at his own risk").

In this case, Appellant did not promptly seek a stay of the

Bankruptcy Court's confirmation order or the effective date of

the Plan. More than nine days after the effective date of the

Plan, Appellant sought a partial stay of the Confirmation Order.

In seeking the partial stay, Appellant recognized that the

7

failure to obtain a stay could result in the dismissal of his appeal on the grounds of equitable mootness. (D.I. 14, Ex. F at 6-7). However, Appellant's motion for a partial stay was moot by the time he filed it, because the distributions he sought to prevent had already been made. As the Third Circuit recognized in Continental, "[e]ven the seeking of a stay may not be enough." 91 F.3d at 562. Where a stay is sought and denied, or as in this case, a stay is sought but is moot, the end result is the same, the implementation of the plan of reorganization. Id. (quoting In re UNR Industries., 20 F.3d 766, 769 (7th Cir.), cert. denied, 513 U.S. 999 (1994)). Accordingly, Appellant's failure to obtain a stay weighs in favor of dismissing his appeal. Continental, 91 F.3d at 562.

Appellant contends, however, that it was not necessary for him to obtain a stay, because the relief he seeks would not require unraveling the Debtors' substantially consummated Plan. The Court disagrees with Appellant's argument. Appellant initially sought to hold back 10% of the shares disbursed to the Senior Secured Lenders. To preserve this remedy, Appellant should have promptly sought a stay of the Confirmation Order or the effective date of the Plan.

In lieu of the 10% hold back, Appellant now requests the Court to require the Reorganized Genesis to issue him additional

8

shares of common stock. This remedy, however, is no different than the initial remedy he sought for purposes of determining whether Appellant should have sought a stay. The common shares of the Reorganized Genesis have already been disbursed to the Senior Secured Lenders and public trading of those shares has since commenced. The relief Appellant seeks would have a direct impact on this already consummated distribution. As such, it was incumbent upon Appellant to seek a stay before that distribution happened.[2]

In this case, Appellant waited to seek a partial stay until the distribution he sought to affect had already been made. Appellant's delay effectively rendered his request for a stay moot and resulted in the failure to preserve his remedies. Further, Appellant offers no reasonable justification to excuse his delay.[3] Accordingly, in these circumstances, the Court finds

---

[2]    Appellant suggests that the impact of not obtaining a stay is lessened in this case, because Debtors' counsel knew he would be appealing the Confirmation Order. See In re S.S. Retail Stores, 216 F.3d 882, 884 (9th Cir. 2000). Even accepting Appellant's argument that this factor should receive less weight, the Court would conclude that Appellant's appeal should be dismissed on the grounds of equitable mootness. On balance, the remaining factors weigh in favor of dismissing the appeal, and Appellant's failure to obtain a stay, though not dispositive, is not irrelevant.

[3]    Appellant's only justification for failing to timely obtain a stay was his belief that a stay was not necessary. Given that the relief Appellant sought would have a direct impact on the distribution to be made on the effective date of the Plan,

9

that Appellant's failure to timely obtain a stay weighs in favor of dismissing his appeal.

C.    The Rights Of Parties Not Before The Court

The reliance of third parties on the finality of the transaction is "[h]igh on the list of prudential considerations taken into account by courts considering whether to allow an appeal following a consummated reorganization . . ." Continental, 91 F.3d at 562.    Public policy favors enabling a debtor to maximize its estate and successfully reorganize.  Id. at 565.  This public policy weighs in favor of encouraging third parties, particularly investors, to rely on the finality of reorganizations, because the participation of these third parties in the formerly bankrupt entity enhances the prospects for a successful reorganization.

In this case, both the Exit Lenders and Senior Secured Lenders relied upon the finality of the Confirmation Order in extending exit financing to the Debtors.  Had the Confirmation Order been stayed and the distribution to the Senior Secured Lenders' delayed, the Exit Lenders, who included some Senior Secured Lenders, would not have closed and the Debtors would not have been able to obtain their exit financing.

_____

the Court cannot accept Appellant's position that a stay was unnecessary.

10

Appellant contends that the Exit Lenders and Senior Secured Lenders are parties before the Court, and thus, their reliance on the finality of the confirmation Order should not be considered. The Court disagrees. Although the agents of the Exit Lenders and the Senior Secured Lenders are before the Court, the actual lenders are not and the agents may not be able to bind the lenders they represent in all respects as a result of the terms of their respective credit agreements.[4]

Further, even if these lenders are before the Court such that their interests should not be considered in the context of this factor, there are other third parties whose rights would be adversely affected by the relief Appellant seeks. The shares of the Reorganized Genesis have been traded on the over-the-counter "Bulletin Board" market since the effective date of the Plan. Between October 10, 2001 and November 28, 2001 more than 1,800,000 shares of the reorganized debtor were traded. (D.I. 14, Ex. G). The rights of these third party investors would be directly affected by the relief Appellant seeks, because the distribution of additional shares to Appellant would result in the dilution of the shares these investors currently hold.

_____

[4]    Further, these circumstances are relevant to another consideration, i.e. the public policy favoring the finality of bankruptcy judgments. Thus, the reliance of these entities, whether before the Court or not, is a relevant consideration which weighs in favor of dismissing this appeal.

11

Appellant contends that these investors cannot legitimately claim that they would be harmed by a dilution in their stock, because they could have found out that Appellant was appealing this matter.  The Court disagrees that notice of an appeal alone is sufficient to undercut the reliance of third party investors on the substantial consummation of the Plan in these circumstances.  Indeed, in this case, Appellant initially sought a 10% hold back of the stock distributed to the Senior Secured Lenders and a redistribution of those shares to him.  Such relief would not have affected the total number of shares distributed by the Reorganized Genesis.  For purposes of this appeal, however, Appellant requests the Reorganized Genesis to issue him additional shares of stock.  The Court cannot conclude that Appellant's notice of appeal would have been sufficient to caution investors of this prospect.  Further, to conclude that the investors would not be harmed in these circumstances would be to charge these investors, whose reliance should be encouraged, with the duty of following Appellant's appeal and understanding the legal contours of the parties' respective positions.  In the Court's view, this type of knowledge extends beyond that which should be expected by a reasonable investor and undercuts the public policies favoring the finality of bankruptcy judgments and the reliance of investors on such judgments.  Because the Exit

12

Lenders and Senior Secured Lenders were entitled to rely on the
substantially consummated Plan and because the rights of third
party investors would be adversely affected by the relief
Appellant seeks, the Court finds that this factor also weighs in
favor of dismissing Appellant's appeal.

    D.   The Success Of The Plan

If the relief an appellant requests has an "integral nexus"
with the reorganization plan such that it would cause the
"reversal or unraveling" of the plan, then dismissal of the
appellant's appeal on the grounds of equitable mootness is
favored.  In re Trans World Airlines, Inc., 2002 WL 500569. *2
(D. Del. Mar. 26, 2002) (citing PWS Holding Corp., 228 F.3d at
236).  Appellant contends that issuing additional shares of stock
to him would not result in the reversal or unraveling of the
Debtors' Plan.  The Court disagrees with Appellant's argument for
several reasons.  First, Appellant's substantive argument rests
on the premise that the valuation that the Bankruptcy Court based
confirmation on is too low such that the Plan is not fair and
equitable.  If Appellant's argument is accepted as true, the Plan
would not be fair and equitable for all of the Debtors' unsecured
creditors, not just Appellant.  Such a finding would doubtless
result in the need to negotiate a new plan.

Second, the Plan in this case was consented to by all of the

13

AA. 1038

creditors except for Class G5 bondholders like Appellant.  Class G5 creditors have allowed claims in the amount of $387 million. Appellant is a creditor holding $20 million of Genesis bonds. Under the Bankruptcy Code, creditors of the same class are to be treated in the same manner, unless they consent to receive less favorable treatment.  11 U.S.C. § 1123(a)(3)-(4); 11 U.S.C. § 1129(b)(1) (prohibiting unfair discrimination among creditors when plan is confirmed over objection of non-consenting creditors).  The relief Appellant proposes, i.e. the issuance of additional shares to him, would be unfair to the other creditors in Appellant's own class, and thus, prohibited under the Bankruptcy Code.

Further, it is likely that those who agreed to the initial Plan would withdraw their support if new shares of stock were redistributed in the manner in which Appellant suggests.  The original Plan was the result of several negotiations and compromises, including the agreement of the Senior Secured Lenders to accept less than the over $1.6 billion they were owed and to allow unsecured creditors to share in the recovery.  The granting of Appellant's relief would likely topple the delicate balances and compromises struck by the Plan.  Because the relief Appellant seeks would have an adverse impact on the success of the current Plan, the Court finds that this factor likewise

14

weighs in favor of dismissing this appeal.

    E.   <u>Finality Of Bankruptcy Judgments</u>

Although identified by the Third Circuit as a separate factor, the public policy favoring the finality of bankruptcy judgments has been described as "the lens through which the other equitable mootness factors should be viewed." <u>In re Zenith Elecs. Corp.</u>, 250 B.R. 207, 219 (D. Del. 2000). The Court addressed this factor in its discussion of the rights of third parties not before the Court and the effect the Appellant's relief would have on the success of the Plan. Public policy weighs in favor of facilitating quick and successful reorganizations of financially troubled companies. This policy is furthered by the policy favoring finality of bankruptcy judgments. When investors and other third parties can rely on a confirmed plans of reorganization and other bankruptcy judgments, they have the footing and confidence they need to pursue investments and business arrangements with the reorganized debtor, all of which foster the debtor's successful reorganization.

As the Court discussed previously, the relief Appellant seeks would adversely effect several third parties and unravel a substantially consummated reorganization plan, thereby undermining the finality of the Bankruptcy Court's Confirmation

15

Order. Accordingly, the Court concludes that the public policy favoring the finality of judgments would be better served by the dismissal of the instant appeal.

## CONCLUSION

For the reasons discussed, the Court concludes that the relevant factors weigh in favor of dismissing the instant appeal on the grounds of equitable mootness. Accordingly, Appellee's Joint Motion To Dismiss The Appeal will be granted.

An appropriate Order will be entered.

16

## UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT

### No. 2-2940

In Re: Genesis, et al.

vs.

Charles L. Grimes, Appellant

(Delaware District Civil No. 01-cv-00734) )) F

### O R D E R

In accordance with the agreement of the parties in the above entitled case, it is entered dismissed by the Clerk under the authority conferred upon her by Rule 42(b), Federal Rules of Appellate Procedure without cost to either party.

*Kathleen Brouwer*

Acting Clerk
United States Court of Appeals
for the Third Circuit

A TRUE COPY:

*Kathleen Brouwer*

Kathleen Brouwer,
Chief Deputy Clerk

Date: December 16, 2002

cc:
    Adam P. Strochak, Esq.
    Jeffrey L. Cimbalo, Esq.
    Russell C. Silberglied, Esq.
    David A. Jenkins, Esq.

OFFICE OF THE CLERK

# UNITED STATES COURT OF APPEALS

FOR THE THIRD CIRCUIT

21400 UNITED STATES COURTHOUSE

601 MARKET STREET

PHILADELPHIA 19106-1790

MARCIA M. WALDRON

CLERK

TELEPHONE

215-597-2995

*Delaware* Clerk of District Court

(District)

Date _*12-16-02*_

*Lake Genesis*

(Caption)

C. of A. No. _*02-2940*_

*Charles L. Grimes*

(Appellants)

*01-CV-734*

(D.C. No.)

Enclosures:

_*12-16-02*_ Certified copy of C of A. Order by the Court/Clerk

(Date)

_____ Released (Record) (Supplemental Record - First - Second - Third)

_____ Copy of this form to acknowledge receipt and return to C. of A.

_____ Record not released at this time until appeal(s) closed at No.(s)_____

_____ Please forward Certified List in Lieu of Record to this office.

_____ The certified copy of order issued as the mandate on_____
is recalled.

*Phyllis Ruff* (267)-299-*4918*

Deputy Clerk        Telephone Number

Receipt Acknowledge:

_____
(Name)

_____
(Date)

Rev. 3/13/00
Appeals (Certified List in Lieu of Record)

O:\FORMS\CASEMGMT\Record Release.wpd

AA. 1043

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| IN RE: | : | **CHAPTER 11** |
| | : | **Case No. 00-2692 (JHW)** |
| **GENESIS HEALTH VENTURES, INC., et al.,** | : | **(Jointly Administered)** |
| | : | |
| Debtors. | : | |
| | : | |
| | : | |
| IN RE: | : | **CHAPTER 11** |
| | : | **Case No. 00-2494 (JHW)** |
| **MULTICARE AMC, INC., et al.,** | : | **(Jointly Administered)** |
| | : | |
| Debtors. | : | **Hearing Date: 8/14/03 at 2:00 p.m.** |
| | : | **Objection Deadline: 8/7/03 at 4:00 p.m.** |

**MOTION OF CHARLES L. GRIMES AND GMS GROUP, LLC
FOR LIMITED RELIEF FROM STIPULATED PROTECTIVE ORDER**

**FACTUAL BACKGROUND**

1.      Movants, Charles L. Grimes and GMS Group, LLC ("GMS"),  were

substantial holders of senior subordinated debt and as such were Class G5 creditors of Genesis

Health Ventures, Inc. ("Genesis"). *In re Genesis Health Ventures, Inc.,* 266 B.R. 591, 598

(Bankr. D. Del. 2001).[1]  As the Court will recall, Movants filed objections to confirmation of

---

[1]GMS acted on behalf of holders of approximately $170-$180 million in Genesis senior
subordinated debt.  Mr. Grimes held approximately $20 million in Genesis senior subordinated
debt. *Genesis,* 266 B.R. at 598.

MCG3852.WPD

Genesis' proposed plan of reorganization (the "Plan") on the grounds that the Plan was not fair and equitable to the Class G5 creditors because it seriously undervalued the reorganized Genesis for purposes of Plan distributions. *Id.*

        2.      In connection with their objections to confirmation of the Plan, Movants obtained discovery from Genesis, various senior lenders, and their financial advisors. Much of that discovery was produced pursuant to a Stipulated Protective Order, a copy of which is attached as Exhibit A (the "Protective Order"). Pursuant to the Protective Order, a producing party could designate documents or depositions as "Confidential" or "Highly Confidential for Attorneys Eyes Only" (together, "Confidential Information") (Protective Order ¶ 2). The Protective Order provides that Confidential Information may be used solely for purposes of the proceedings with respect to confirmation of the Plan (Protective Order ¶¶ 1, 3). It further provides that Confidential Information may be provided only to those persons identified in paragraphs 4 and 5 of the Order. The Protective Order expressly states that acceptance of Confidential Information by any party would "not constitute an admission or concession or permit an inference" that Confidential Information "is in fact confidential" (Protective Order ¶ 11), and further contemplated that any party could apply to this Court for relief from the Order (Protective Order ¶ 19).

        3.      By Opinion dated September 12, 2001, this Court overruled Movant's objections to confirmation of the Plan. 266 B.R. 591.

        4.      Movants recently retained the law firm of Pomerantz, Haudek, Block, Grossman and Gross LLP (the "Pomerantz Firm") to investigate the possibility that a fraud was

MCG3852.WPD                        2

perpetrated upon this Court in connection with the approval of the Plan and, if appropriate, to pursue litigation against those responsible. In particular, Movants have serious concerns that financial information concerning Genesis may have been improperly manipulated in order to justify approval of a bankruptcy plan that favored the senior lenders at the expense of junior creditors, including the Movants. The opinion of the Court approving the Plan expressly provided that fraud claims such as those being investigated now were not to be released. 266 B.R. at 606-09.

        5.    In order for the Pomerantz Firm to investigate these potential claims properly, it is essential that it have access to and the ability to use the discovery obtained in the proceedings leading to Plan confirmation, including the Confidential Information. The Pomerantz Firm was not involved in the proceedings leading to confirmation of the Plan, and thus has not previously received the Confidential Information. In addition, pursuant to paragraph 3 of the Protective Order, Confidential Information may be used only for purposes of the Plan confirmation proceedings and not for other purposes. Although requested to do so, Genesis has not agreed to allow the Pomerantz Firm access to the Confidential Information. Accordingly, Movants request that this Court grant them relief from the Protective Order as follows:

        (a) include the Pomerantz Firm (and any experts or consultants it may retain) among those persons authorized to receive Confidential Information pursuant to paragraphs 4 and 5 of the Protective Order;

        (b) permit the Pomerantz Firm to use the Confidential Information to investigate and prosecute any lawsuit it deems appropriate based on this information,

MCG3852.WPD

3

notwithstanding paragraph 3 of the Protective Order; and

     (c) allow the Pomerantz Firm to retain documents containing Confidential Information until 30 days after final termination of any lawsuit that it files based on such information, or alternatively, 30 days after the Pomerantz Firm notifies Movants that it does not intend to file a lawsuit based on such information, notwithstanding paragraph 21 of the Protective Order.[2]

  6. As set forth in the affidavit of H. Adam Prussin, Esquire, a partner in the Pomerantz Firm (attached as Exhibit B), subject to the above requested relief the Pomerantz Firm agrees to be bound by the terms of the Protective Order.

## ARGUMENT

  7. This Court has broad discretion to modify protective or confidentiality orders that it has entered. *Pansy v. Borough of Stroudsburg,* 23 F.3d 772, 784, 789 (3d Cir. 1994); *Videon Chevrolet, Inc. v. General Motors Corp.,* C.A. No. 91-4202, 1995 WL 395925, at *1 (E.D. Pa. June 28, 1995) (attached as Exhibit D). In exercising its discretion, the

---

  [2]In preparing this motion, Movants' counsel attempted to obtain the docket number for the Protective Order from the dockets in both the Genesis and Multicare proceedings, but was unable to find the Protective Order on either docket. Counsel for Genesis was unable to tell Movants' when, or if, the Protective Order was ever filed. Regardless, Movants currently are bound by the terms of the Protective Order pursuant to paragraph 23, which provides "[t]he parties to this Stipulated Protective Order shall be bound by the provisions herein pending the entry of the Order by the Court." In signing the Protective Order, all parties anticipated that it would be filed with the Court, and Movants relied on the fact that, if necessary, they would thereafter be able to seek relief from the Protective Order from this Court (Protective Order ¶19). Under these circumstances, Movants request that, if the Protective Order was not filed, the Court treat it as entered for purposes of this motion.

MCG3852.WPD          4

Court should evaluate the particular circumstances of each case, with a goal toward preventing both the unnecessary denial of confidentiality for information that deserves it and the overly broad use of confidentiality restrictions. *Pansy*, 23 F.3d at 789. In keeping with the latter, "[c]ourts should take the least restrictive course when ruling on these matters." *Doe v. Methacton School Dist.*, 878 F. Supp. 40, 42 (E.D. Pa. 1995).

8.     A party seeking relief from a protective or confidentiality order must first offer a reason for such relief. *Pansy*, 23 F.3d at 790. As explained above, Movants have retained the Pomerantz Firm to investigate and potentially file suit based on a possible fraud perpetrated in this Court. Movants seek relief from the Protective Order for the limited purpose of allowing the Pomerantz Firm to review, copy and use Confidential Information produced pursuant to the Protective Order in connection with their investigation and potential lawsuit.

9.     Once a reason for the requested relief is provided, the Court will view the request in the same manner in which it determines whether to issue a protective or confidentiality order in the first place. *Pansy*, 23 F.3d at 790; *Charlie H. v. Whitman*, 213 F.R.D. 240, 245 (D.N.J. 2003). A party seeking confidentiality bears the burden of showing good cause for protecting every document that it seeks to protect. *Pansy*, 23 F.2d at 786-87. In determining whether good cause has been shown, the courts generally will "balance the requesting party's need for information against the injury that might result if uncontrolled disclosure is compelled." *Pansy*, 23 F.3d at 786-87. This balancing process involves considering several factors, including whether disclosure (a) will indeed injure the party seeking confidentiality protection; (b) will promote

MCG3852.WPD                                          5

fairness and efficiency; (c) involves issues important to the public; or (d) will cause a party embarrassment.[3] *Id.* at 787-88; *Whitman*, 213 F.R.D. at 246. Here, because confidentiality was obtained pursuant to a *stipulated* protective order, the parties producing Confidential Information never made a good cause showing in the first place. Thus, to avoid the relief sought by Movants, any producing party opposing this motion must show that the above factors justify refusing the disclosure sought.

        (a) To successfully oppose Movants' motion, Genesis or the other producing parties must show a "clearly defined and serious injury." *Pansy*, 23 F.3d at 786. There is no discernable serious injury to the producing parties in allowing the limited disclosure sought by Movants. Although Genesis or other producing parties may claim a privacy interest in the Confidential Information at issue, Movants are not seeking public disclosure in a way that would seriously interfere with that interest. Rather, Movants seek only to disclose the Confidential Information to the Pomerantz Firm, who will agree to use the information only in connection with their investigation and potential prosecution of the suit described above – which should sufficiently protect any privacy interests of Genesis or other producing parties. *See Beckman Indus., Inc. v. International Ins. Co.*, 966 F.2d 470, 475 (9th Cir. 1992) (legitimate interests in privacy would be protected by requiring intervenors who sought confidential information to agree to a protective

---

    [3]Other factors generally considered include whether confidentiality is being sought over information important to public health and safety and whether the party seeking confidentiality is a public entity or official. *Pansy*, 23 F.3d at 787-91. Those factors are not relevant here.

MCG3852.WPD

order); *United Nuclear Corp. v. Cranford Ins. Co.*, 905 F.2d 1424, 1428 (10th Cir. 1990) (same). Moreover, any privacy interests of the party resisting disclosure may be outweighed where the party seeking disclosure does so for a legitimate purpose as opposed to an improper purpose. *Pansy*, 23 F.3d at 787. Here, Movants' have articulated a proper purpose. *See Beckman*, 966 F.2d at 475 (recognizing that modification of a protective order is appropriate "to meet the reasonable needs of other parties in other litigation").

(b) Disclosure of the Confidential Information to the Pomerantz Firm will undeniably promote the interests of fairness and efficiency. The Pomerantz Firm seeks to review this information as part of their investigation into potential causes of action. Disclosing the Confidential Information will assist the Pomerantz Firm in drafting a more precisely focused complaint, if such a complaint is justified. Moreover, if the Confidential Information is not provided now, the Pomerantz Firm will seek (and undoubtedly be entitled to) the same information through discovery in any ensuing litigation. Thus, the limited relief from the Protective Order requested here will simply place Movants in the position they would otherwise reach in litigation, without requiring repetitive discovery efforts.[4] *See Videon, supra*, at *2-3 ("[w]hen modification of a protective order will place private litigants in a position they would otherwise reach *only* after repetition of another's discovery, modification is appropriate"); *United Nuclear Corp.*, 905 F.2d at 1428 (emphasizing goal of avoiding duplicative discovery and stating "[w]here an appropriate

---

[4]The Confidential Information at issue is already in the possession of Movants; thus the producing parties will not be put to the extra burden of producing it again.

MCG3852.WPD                                    7

modification of a protective order can place private litigants in a position they would otherwise reach only after repetition of another's discovery, such modification can be denied only where it would tangibly prejudice substantial rights of the party opposing modification"); *Beckman*, 966 F.2d at 475 (stressing the importance of modifying protective orders in order to eliminate duplicative discovery).

(c) Disclosing the Confidential Information involves issues of importance to the public. If, as Movants suspect, a fraud has been perpetrated in this Court, the public has an interest in seeing that such allegations are fully and fairly reviewed and that any wrongful conduct is rectified. *See, e.g., General Instrument Corp. of Del., Inc. v. Nu-Tek Elecs. & Mfg., Inc.,* 3 F. Supp. 2d 602, 606 (E.D. Pa. 1998), *aff'd*, 197 F.3d 83 (3d Cir. 1999) (public interest factor weighed in favor of modifying confidentiality order to allow party to provide to law enforcement officers documents that contained information indicating that opposing party had engaged in unlawful business practices).

(d) The relief requested will not result in embarrassment to any producing party that would justify denying Movants' request. Indeed, as the Third Circuit noted in *Pansy*, "[a]s embarrassment is usually thought of as a nonmonetizable harm to individuals, it may be especially difficult for a business enterprise, whose primary measure of well-being is presumably monetizable to argue for a protective order on this ground." 23 F.3d at 787.

10.    It is also significant that the documents and information at issue here do not concern any current business or trade secrets, future business plans or strategies, secret customer

MCG3852.WPD

8

**AA. 1051**

lists, or other highly sensitive documents whose disclosure could threaten serious harm to the producing party. Instead, the information concerns financial data that is already at least two years old and whose significance is, at this point, primarily if not entirely historical.

        11.    Finally, where relief from an existing order is sought, the Court will consider an additional factor – the opposing parties' reliance on the existing confidentiality order. *Pansy,* 23 F.3d at 789. "The parties' reliance on an order, however, should not be outcome determinative . . ." *Pansy,* 23 F.3d at 790. That is particularly true here given that the Protective Order expressly contemplated that any party could apply to the Court for relief from the Order (Protective Order ¶ 19). Moreover, the extent to which a party opposing relief can claim reliance on an existing order is less in the case of a stipulated blanket order (such as the Protective Order), because such an order is obtained without a showing of good cause in the first place. *Pansy,* 23 F.3d at 790, citing *Beckman,* 966 F.2d at 475-76 and *Public Citizen v. Liggett Group, Inc.,* 858 F.2d 775, 790 (1st Cir. 1988) (reliance will be less with a blanket protective order, because it is "by nature overinclusive," and thus "peculiarly subject to later modification").

MCG3852.WPD

9

12.    Accordingly, Movants request that this Court grant Movants relief from

the Protective Order in the form of Order attached hereto.

SMITH, KATZENSTEIN & FURLOW LLP

/s/ David A. Jenkins
David A. Jenkins (ID #0932)
800 Delaware Avenue
Post Office Box 410
Wilmington, DE 19899-0410 (Courier 19801)
Telephone (302) 652-8400
Facsimile (302) 652-8405

July 3, 2003                           Attorneys for Charles L. Grimes and GMS Group, LLC

MCG3852.WPD                          10