# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | : | |
| | : | |
| Genesis Health Ventures, Inc., *et al.*, | : | Civ. Act. No. 05-CV-427 (KAJ) |
| | : | Related to Case No. 00-2692 (JHW) |
| Debtors, | : | Jointly Administered |
| | : | |
| Richard Haskell, *et al.*, | : | |
| | : | |
| Plaintiffs-Appellants, | : | |
| | : | |
| v. | : | Adv. Pro. No.: 04-53375 (JHW) |
| | : | |
| Goldman, Sachs & Co., et al., | : | VOLUME IV OF V |
| | : | |
| Defendants-Appellees. | : | |

## DEFENDANTS-APPELLEES' APPENDIX IN SUPPORT OF THEIR BRIEF IN OPPOSITION TO THE APPEAL OF RICHARD HASKELL ET AL. FROM THE MAY 10, 2005 ORDER OF THE BANKRUPTCY COURT

Steven K. Kortanek
Morton R. Branzburg
KLEHR, HARRISON, HARVEY,
BRANZBURG & ELLERS LLP
919 Market Street, Suite 1000
Wilmington, Delaware 19809-3062
(302) 426-1189
-and-
Sheldon Raab
Eric A. Hirsch
FRIED, FRANK, HARRIS, SHRIVER &
JACOBSON LLP
One New York Plaza
New York, New York 10004-1980
(212) 859-8000

Attorneys for Defendant Goldman,
Sachs & Co.

Russell C. Silberglied (No. 3462)
Jason M. Madron (No. 4431)
RICHARDS, LAYTON & FINGER, P.A.
P.O. Box 551
Wilmington, Delaware 19899
(302) 651-7700
- and -
Michael F. Walsh
Diane Harvey
Gary T. Holtzer
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
(212) 310-8000
- and -
Adam P. Strochak
Joanne M. Guerrera
WEIL, GOTSHAL & MANGES LLP
1501 K Street, NW, Suite 100
Washington, DC 20005
(202) 682-7000

Attorneys for Defendant NeighborCare Inc.
(sued herein as Genesis Health Ventures, Inc.)

Daniel K. Hogan (No. 2814)
THE HOGAN FIRM
1311 Delaware Avenue
Wilmington, Delaware  19806
(302) 656-7540
     - and -
Paul Lackey
Michael Aigen
LACKEY, HERSHMAN LLP
3102 Oak Lawn Avenue, Suite 700
Dallas, Texas  75219
(214) 560-2206

Attorneys for Defendant Highland Capital
Management, L. P.

Robert S. Brady (No. 2847)
YOUNG CONAWAY STARGATT &
TAYLOR LLP
1000 West Street, 17th Floor
Wilmington, Delaware  19899-0391
(302) 571-6690
     - and -
Paul V. Shalhoub
WILLKIE FARR & GALLAGHER LLP
787 7th Avenue
New York, New York  10019-6099
(212) 728-8000

Attorneys for Defendant George V. Hager

Teresa K.D. Currier
Peter J. Duhig (No. 4024)
KLETT ROONEY LIEBER &
SCHORLING, PC
The Brandywine Building
1000 West Street, Suite 1410
Wilmington, Delaware  19801
(302) 552-4200

Attorneys for Defendant Mellon Bank, N.A.

     - and -

Richard S. Toder
Menachem O. Zelmanovitz
MORGAN, LEWIS & BOCKIUS LLP
101 Park Avenue
New York, New York  10178
(212) 309-6000

Attorneys for Defendant Mellon Bank, N.A.
with respect to all Plaintiffs other than
Charles L. Grimes, Louis IG Ireland Trust, C.
Yvonne Cooke, Jane G. Brown, Serena R.
Schwartz and Gordon W. Chaplin

     - and -

Steven Russo
SIVE, PAGET & RIESEL, P.C.
460 Park Avenue
New York, New York  10022
(212) 421-2150

Attorneys for Defendant Mellon Bank N.A.
with respect to Plaintiffs Charles L. Grimes,
Louis IG Ireland Trust, C. Yvonne Cooke,
Jane G. Brown, Serena R. Schwartz and
Gordon W. Chaplin

RLF1-2972764-1

UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY

IN THE MATTER OF                    )   Bankruptcy #00-2692(JHW)
                                    )
                                    )   Camden, NJ
                                    )   September 25, 2003
                                    )   10:20 a.m.
GENESIS HEALTHCARE VENTURES, INC.,  )
                                    )
            Debtor                  )
                                    )

------------------------------------

TRANSCRIPT OF HEARING
BEFORE THE HONORABLE JUDITH H. WIZMUR
UNITED STATES BANKRUPTCY JUDGE

APPEARANCES:

For GMS & Grimes:         DAVID A. JENKINS, ESQ.
                          SMITH, KATZENSTEIN & FURLOW LLP
                          800 Delaware Avenue
                          Wilmington, DE  19801

For Debtors:              JEFFREY L. CIMBALO, ESQ.
                          WEIL, GOTSHAL & MANGES LLP
                          1501 K. Street NW, Suite 100
                          Washington, DC  20005

                          ETTA R. WOLFE, ESQ.
                          RICHARDS, LAYTON & FINGER
                          One Rodney Square
                          Wilmington, DE  19899

Audio Operator:           NORMA SADER

Transcribed by:           DIANA DOMAN TRANSCRIBING
                          P.O. Box 129
                          Gibbsboro, New Jersey  08026-0129
                          (856) 435-7172
                          FAX:  (856)  435-7124
                          EMAIL:  Doman5123@snip.net

Proceedings recorded by FTR, transcript produced by
transcription service.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

I N D E X

ARGUMENT BY:                          PAGE

Ms. Wolfe

Mr. Jenkins

Mr. Cimbalo


THE COURT

Decision

3

1    THE COURT:  Please be seated.  Good morning.

2    COUNSEL:  Good morning, Your Honor.

3    THE COURT:  Sorry to keep you waiting.  May I have

4  appearance, please?

5    MS. WOLFE:  Etta Wolfe, Richards, Layton & Finger, on

6  behalf of the reorganized debtor.  With me in the courtroom is

7  Mr. Cimbalo, our co-counsel.

8    MR. CIMBALO:  Good morning.

9    THE COURT:  Sir?

10    MR. JENKINS:  Good morning, Your Honor.  David

11  Jenkins for Charles Grimes and GMS Group.

12    THE COURT:  All right.  Please proceed.

13    MS. WOLFE:  Thank you, Your Honor.  If you would

14  like, we can just go through the agenda in the order that it's

15  presented here.

16    THE COURT:  That's fine.

17    MS. WOLFE:  The first item on the agenda is the

18  motion on behalf of Karen Bethea (phonetic).  Her counsel

19  contacted me on my way here, as a matter of fact, and he will

20  be unable to appear.  And, I suggested -- I didn't want to make

21  any representations on his behalf, of course, since he's not

22  here, but it is my understanding that we have agreed, if Your

23  Honor is willing, to allow him to submit a form of order under

24  certification of counsel.  We don't oppose the relief requested

25  as far as we understand it.

Wolfe - Argument

1    THE COURT:  That's fine.

2    MS. WOLFE:  Okay.  So then we can move on to number

3  two on the agenda, and that's the opt-out stipulation regarding

4  Robert McGill.  We would like to have that order entered if at

5  all possible.  We submit it under certification -- I'm sorry,

6  certificate of no objection.

7    THE COURT:  That's fine.

8    MS. WOLFE:  I have a form of order if you would like

9  me to hand that up.

10    THE COURT:  I would appreciate it.  Thank you.

11  You're welcome to continue.

12    MS. WOLFE:  Okay.  Item number three on the agenda is

13  the stipulation to reduce and allow the claim of Richard -- I'm

14  probably going to mutilate his last name -- Olumakin

15  (phonetic).  And, we have been in negotiations with his counsel

16  and have come up with a stipulation that reduces his claim by

17  approximately $50,000.  And, we've agreed to allow that as a

18  general unsecured claim against the reorganized debtor.  And, I

19  have a form of order.  We also submitted that under a

20  certificate of no objection as well.

21    THE COURT:  All right.

22    MS. WOLFE:  May I approach with the form of order?

23    THE COURT:  Please.  Thank you.  Please continue.

24    MS. WOLFE:  Item numbers four and five on the agenda,

25  Your Honor, are the remaining omnibus claims objection motions

Wolfe - Argument

1   that are the debtor's seventh omnibus and the debtor's ninth

2   omnibus.  We regretfully have to ask Your Honor if we can

3   continue both of these until the next hearing.  I do have a bit

4   more of an update.  If Your Honor would like me to go through

5   each one individually I can do that.  Or I can just represent

6   to Your Honor that we are very, very close.  I -- on several of

7   the claims it should be resolved by next week.  We believed

8   that two of the other claims were resolved and when we

9   contacted the claimants to verify that in order to prepare the

10  form of order to present to Your Honor today, we found that

11  there may be a couple of remaining issues, people are running

12  numbers, things like that.  But they are very, very close to

13  coming to a resolution.

        THE COURT:  That's fine.

        MS. WOLFE:  But we don't have an order for you today.

        THE COURT:  It does bring to mind the need to assign

17  additional dates going forward.  And, I'll take your suggestion

18  on this.  I think that after we assign a date for the

19  resolution of those matters that you've just referred to, I

20  think we're probably waiting for the resolution of certain

21  appeals; is that right?  That's basically all that is left.

22  And, so an occasional control date every two months with simply

23  a letter report would be sufficient for my purposes.  If there

24  is any kind of need in the case to address issues post-

25  confirmation and as they arise, of course I'll be available to

Wolfe - Argument

6

1    set other dates.  But does that make sense to you?

2    　　　　MS. WOLFE:  I think that's a perfect idea, Your

3    Honor.

4    　　　　THE COURT:  All right.

5    　　　　MS. WOLFE:  I would actually like if we could set a

6    hearing date maybe next month --

7    　　　　THE COURT:  Yes.

8    　　　　MS. WOLFE:  -- for the resolution of the claims

9    matters.  That way it holds everyone's feet to the fire to get

10   these matters taken care of.

11   　　　　THE COURT:  That's exactly what I had thought about.

12   How about November 5th at 10?  If matters are resolved or if

13   you can report, I'd gladly have it by telephone conference call

14   if that would be easier.

15   　　　　MS. WOLFE:  Thank you, Your Honor.  At this -- we

16   really believe that these matters will be resolved, --

17   　　　　THE COURT:  Understood.

18   　　　　MS. WOLFE:  -- that an appearance or evidentiary

19   presentations will not be necessary.

20   　　　　THE COURT:  Uh-huh.  That's understood.  Thereafter,

21   I would propose -- well, why don't we see where we are on that

22   date and do it that way.

23   　　　　MS. WOLFE:  Perfect, Your Honor.  Thank you.  That

24   brings us to the last item on the agenda and it's the motion of

25   Charles Grimes.  And, I will turn the podium over to his

Jenkins - Argument

1   counsel.

2          THE COURT:  Okay.

3          MR. JENKINS:  Good morning, Your Honor.  May it

4   please the Court, David Jenkins for Charles L. Grimes and GMS

5   Group.

6          THE COURT:  Yes.  I have familiarized myself with

7   your arguments.  Let me understand, is there a way to

8   characterize the information that we're talking about more

9   specifically?  Are we talking about financial information,

10  certainly pre-confirmation, regarding I don't know what?  Help

11  me to understand as much as possible what we're talking about.

12         MR. JENKINS:  Yes, Your Honor.  I will do the best I

13  can.  Excuse me.  The bulk of the information that we are

14  talking about is pre-confirmation financial information of the

15  debtors.  This went back several years prio -- let's see, we

16  were to produce the documents in the summer of 2001.  It was

17  the financial information that would have existed, excuse me,

18  at that time and prior to that time.  It was two or three years

19  worth of financial information and supporting documents.  There

20  was also a lot of other -- I don't want to call it junk, but

21  related documents, emails, letters, correspondence back and

22  forth from the senior lenders to senior management.

23         THE COURT:  In terms of the financial information,

24  clearly we have the benefit, as a matter of public knowledge in

25  the disclosure statement and so forth, of much of the financial

**AA. 1060**

Jenkins - Argument                    8

1  information, obviously, to do with the corporate organization

2  and reorganization. Certainly emails, letters, correspondence,

3  we did not. In both categories, if you will, the -- one

4  category financial information and the second category emails,

5  letters, correspondence, whatever, are there things -- I mean,

6  what is the nature of the confidentiality aspect? I mean, is

7  there proprietary information that you know of. I mean,

8  perhaps I ought to be directing this question to the other

9  side, but to the extent that you can help me to get a hold on

10  what we're talking about.

11      MR. JENKINS: I'll do -- excuse me, Your Honor --

12  I'll do the best I can. I think Mr. Cimbalo would want to say

13  something as well on the subject because it's his client's

14  information. As Your Honor recognizes, there is publically

15  available information concerning Genesis, it's either

16  publically available from this Court or otherwise publically

17  available, that's not properly covered by a confidentially

18  report. The Pomerantz Firm can look at that as well as

19  anybody.

20      What we're concerned here with, and let me for a

21  minute get into where our big concern is, Your Honor may

22  perhaps recall the big fight in the confirmation hearing was

23  the enterprise value of the company. The enterprise value

24  comes -- I'm simplifying matters, but it's essentially the

25  product of two numbers. One is the projected EBITDA of the

Jenkins - Argument

1  company going forward.  The other is the appropriate multiple

2  applied to the EBITDA.

3          What we are focused on is -- our concern -- I say,

4  our, my client's concern with the Pomerantz Firm, that the

5  EBITDA was improperly manipulated to lower the enterprise value

6  of the company.  The documents showing the derivation of the

7  EBITDA, and there were changes in the EBITDA throughout the

8  time period, throughout the year prior to the confirmation

9  hearing, those documents by and large are not publically

10  available information.  We think -- one of the arguments we

11  made in our brief is we think at this point the stuff simply

12  doesn't deserve confidential protection.  It's historical

13  financial information, several -- two, three, four years in the

14  past, doesn't deserve confidential protection anymore.

15          THE COURT:  Uh-huh.

16          MR. JENKINS:  And, we think it's the burden of

17  Genesis to show that.

18          THE COURT:  What do you say to the argument offered

19  by Genesis that this is pre-complaint discovery for which there

20  is no provision in the Federal Rules?  What -- yes?

21          MR. JENKINS:  That's exactly what we're trying to

22  avoid, Your Honor.  There are a number of cases that say pre-

23  complaint discovery is inappropriate.  All of them, however, as

24  I recall, focus on the burden on the plaintiff.  If these

25  documents were sitting in Genesis possession and we were coming

Jenkins - Argument                                    10

1    here and seeking to have them taken from Genesis and given over

2    to the Pomerantz firm, that would be pre-complaint discovery.

3    And, I think the rules say you can't do that because of the

4    burden on the client.  There's been no lawsuit filed.  We are

5    not seeking that.  We are asking them to do nothing.  All we're

6    asking to do is have permission to turnover the documents

7    currently in my clients' possession, clients plural,

8    possession, and turn them over to the Pomerantz Firm.  There is

9    no burden on Genesis at all.  The physical burden is on us to

10   pull it together and get it to Pomerantz.

11           THE COURT:  Is there -- some of the cases talk about

12   the need to preserve the integrity of confidentiality orders,

13   to insure to the parties who are relying on them that the --

14   the limitations that are incorporated in those orders will be

15   enforced going forward?  That these orders or the information

16   that is supplied will not later be vulnerable for other

17   purposes?  What about that basic doctrinal framework?

18           MR. JENKINS:  I think there's two responses, Your

19   Honor.  Number one, they've got the confidentiality right now.

20   We are -- we did not unilaterally turn this information over to

21   the Pomerantz Firm.  Instead, we've come to the Court and asked

22   for a modification of protective orders.  Modifications of

23   protective orders are clearly conceived us in the order itself,

24   typically, and you can come into Court and ask for a

25   modification.  This Court never opined upon whether the

Jenkins - Argument                                          11

information was confidential in the first place.

As is typical in these complex litigations, parties agree to turn over the documents. We do not waive an argument that information isn't confidential, we just want to see the documents at that point. So we have waived nothing by accepting the documents and they still have the burden, should we decide to press it, of showing that the documents require confidentiality treatment.

THE COURT: So that's part of the equation here, your contention that, in fact, these documents should not have that kind of confidentiality protection even under the orders as they stand, or the order?

MR. JENKINS: That is correct, Your Honor. At this point, several years after the litigation, we're talking about historical financial information, we are not talking about projections as of this point in the future. I presume Genesis has it, we don't have that information and we're not seeking it at this point. We're talking solely about historical financial documents.

THE COURT: Isn't there information in there that would still be proprietary and -- well, I'm arguing to the wrong person? I am asking the wrong person again, but you know, I'm guessing about pricing provisions, contractual arrangements with whoever, you know, all kinds of financial information that might still have relevance and might still be

1   in need of protection.

2          MR. JENKINS:  It is possible that that exists.  I say

3   it's possible because I don't remember every document, and

4   there were crate loads of documents.  But we are not seeking

5   the public release of this information.  Even the information

6   we do not believe is proper -- currently -- should be protected

7   protective order.  We're willing to concede that.  All we're

8   asking here is to have a slight modification of the protective

9   order so that the Pomerantz Firm can review these documents.

10         As indicated by the affidavit we supplied of Mr.

11  Prussin, the partner at the Pomerantz Firm who is in charge of

12  investigating this matter, he will -- he and his firm will

13  abide by the current existing confidentiality order.  They will

14  not make those documents publically available.  He just wants

15  to be able to use them for investigation of a potential fraud

16  suit against the senior lenders.

17         THE COURT:  Understood.  Anything else, sir?

18         MR. JENKINS:  Nothing else.  If I can -- if Your

19  Honor has further questions, I'll attempt to answer them.

20         THE COURT:  That's fine.  Thank you.  Sir?

21         MR. CIMBALO:  Your Honor, I'm Jeff Cimbalo, from

22  Weil, Gotshal's Washington Office.  The only reason we are here

23  today is that GMS has retained the documents, along with Mr.

24  Grimes, retained the documents in clear violation of the

25  expressed language of the confidentiality stipulation.

Cimbalo - Argument                                    13

1       THE COURT:  Has the debtor requested the return or

2   destruction of these documents before this point?

3       MR. CIMBALO:  Your Honor, I broached the question,

4   actually, with the client and they did not think so, but I can

5   tell you that I hereby do that to this Court.  We wanted to

6   wait until we came in here.  If it -- we haven't actually -- if

7   we haven't asked for it, we would like to ask for it now.

8       THE COURT:  Uh-huh.  I know that, of course, there

9   was a period of time during which the matter was on appeal and

10  eventually, apparently, dismissed on appeal for mootness,

11  equitable mootness, I think.

12      MR. CIMBALO:  It was dismissed at the District Court

13  level, Your Honor.

14      THE COURT:  And, that was a while ago, wasn't it?

15      MR. CIMBALO:  There was a pending Appeals Court case

16  that was then withdrawn by Mr. Grimes.

17      THE COURT:  Uh-huh.  Do you have any time frame for

18  that, because obviously there would have been opportunity to

19  retain the documents -- the underlying documents, while the

20  litigation was still pending?

21      MR. CIMBALO:  Certainly, Your Honor, there was that

22  right.  And, I would submit to the Court that we have not

23  waived any ability to get those documents back by the several

24  months, if it's been several months, without --

25      THE COURT:  I'm not suggesting waiver, but I'm also

AA. 1066

Cimbalo - Argument                                    1

1    wondering about the opportunity to assert the violation of that

2    provision as a basis for denying this relief.  I think that's

3    the context in which I raise it.  You start with the

4    proposition that that provision of the consent order was

5    violated and I wonder, in this particular context, whether that

6    is a first focus, an appropriate first focus?

7          MR. CIMBALO:  Well, Your Honor, we think it is,

8    because we relied on the representations -- several

9    representations made by Mr. Grimes and Mr. -- and GMS through

10   their lawyers at the time.  That they -- they said that they

11   would only use them -- that they were only being produced for

12   the proceedings relating to the confirmation hearings.  That

13   they would destroy them at the end of the process, and we

14   maintain that it is their responsibility to have done so.  And

15   to come to equity and ask Your Honor for an equitable change of

16   an agreed protective order without one side's permission is

17   coming to equity with unclean hands.

18         THE COURT:  Well, there is provision, is there not,

19   for modification in the document?  Isn't that correct?

20         MR. CIMBALO:  Yes, Your Honor.

21         THE COURT:  I mean, there's contemplation by the

22   parties that things may change, that there might be a need to

23   address, for instance, an expansion of availability of these

24   documents.

25         MR. CIMBALO:  Well, there is no evidence in the -- on

**AA. 1067**

Cimbalo - Argument                                    15

1    the face of the document and I was not party to the drafting of

2    this document, Your Honor.  But there is nothing on the face of

3    the document that says that there would be any reason to -- to

4    change or that there was any contemplation of changing what the

5    purpose of the production was.  In other words, that the

6    purpose was for the confidentiality -- for the -- the purpose

7    was for the confirmation hearings.

8              And, also, there was never any contemplation on the

9    face of the document, which is how I believe we should look at

10   the document, that says anything about changing the destruction

11   or return provisions of the document.  We relied on the

12   document when we produced the documents.  We feel like we

13   should be able to rely on those document -- on that

14   confidentiality stipulation today.  And, any change that would

15   be made needs to -- needs to be with clean hands, the person

16   requesting it.  There may be -- there may be a separate thing

17   that Your Honor did point out about pre-complaint discovery and

18   how they're no differently situated now that this case -- that

19   the confirmation hearings are over than they were before.

20             THE COURT:  Well, the cases that address pre-

21   complaint discovery, and they're certainly correct that there

22   are no provisions in the Federal Rules for pre-complaint

23   discovery, but they concern themselves with burden on the

24   producing party.  Here, what burden is there when the papers

25   are already in the hands of the party seeking to avail

AA. 1068

1   themselves of it and there is further confidentiality

2   arrangement proposed for the new set of professionals who would

3   be looking at the materials?

4           MR. CIMBALO:  Well, Your Honor, you heard it here

5   before me that -- that this is really, you know, a glorified

6   fishing expedition.  They don't know what's in the documents

7   but they want to have a look at them.  There's no particular

8   reason -- they -- he -- you know, Mr. Jenkins wasn't anymore --

9           THE COURT:  How is that burdensome to -- when we talk

10  about fishing expedition we're concerned about burden on the

11  fishee?  (Laughter)

12          MR. CIMBALO:  Well, Your Honor, --

13          THE COURT:  That's a new one, isn't it?

14          MR. CIMBALO:  Your Honor, I would submit that there

15  is very little case law on this because the Federal Rules are

16  so clear on the fact that the only people that are entitled to

17  discovery are parties.  And, no complaint has been filed in

18  this -- in the case that Mr. Jenkins contemplates.

19          THE COURT:  Well, this is investigation.  And, of

20  course, we understand that before a complaint is filed the

21  party filing the complaint must satisfy themselves that there

22  is a cause of action, a valid cause of action based on fact and

23  law, grounded in fact.  This -- what is proposed here, is it

24  not, is a restricted investigatory process that will not impact

25  one iota in terms of production requirements on the debtor or

Cimbalo - Argument                                    1

its affiliates?  And, there is no quest for public exposure or

commercial exposure of theoretically commercially sensitive

information.  What's wrong with that?

        MR. CIMBALO:  Well, Your Honor, the Eastern District

of Pennsylvania addressed this very issue in Videon.

        THE COURT:  I don't think it's the very same issue.

I looked at that case with great interest since you focused on

it to such an extent.  That case involved collateral litigants.

I mean, it involved not the same party but different parties

who were represented by the same attorney, --

        MR. CIMBALO:  Yes.

        THE COURT:  -- but who were non-parties to the

confidentiality agreement.  Here we have the same party who is

seeking the information for a different purpose, no doubt.  But

don't you think that the fact that there were new parties

introduced would -- impacted on the result in Videon?

        MR. CIMBALO:  Well, Your Honor, the most important

difference between the instant case and Videon is there has

been no complaint filed here to compare the similarities.  What

Videon was particularly concerned with, aside from the -- very

similar to this case, equitable considerations of the fact that

they violated the confidentiality stipulation that said they

had to return or destroy the documents.

        In that case they examined -- Videon also examined

what the similarities were in the case.  Now, remember, there

1   was a case there -- they were otherwise entitled to discovery,

2   these people in the lawsuit, that had filed the lawsuit, were

3   entitled to some sort of discovery because they were a party.

4   Here, there is no entitlement to any discovery for an

5   investigation under the Federal Rules.  And, certainly, Your

6   Honor, there are some states where pre-complaint discovery is

7   allowed but under the Federal System, that's not allowed.

8         THE COURT:  In terms of the allegations presented,

9   don't they deal with -- in other words, this turnover of

10  information related to the confirmation process, what the

11  applicant here is contending is that the confirmation process

12  was flawed in some way and they would like to explore that.

13  Still related in a different way than perhaps was initially

14  contemplated but certainly related, is it not, to confirmation

15  of these plans?

16        MR. CIMBALO:  Well, Your Honor, the answer to that is

17  I don't know because no complaint has been filed.  I have no

18  idea what their cause of action is.  It could be common law

19  fraud, it could be statutory fraud, be a securities violation,

20  I just don't know.  And, it could be a class action involving

21  many different parties other than the two that are asking for

22  it today.

23        THE COURT:  Do we know whether there was a

24  modification opportunity under the Videon consent order?  The

25  decision is, I think, void of any mention of opportunity to

1    modify the consent order.

2        MR. CIMBALO: You mean between the two parties.  I

3    think the Court in that case just assumed that it had the power

4    to do it.  I think, certainly, if it had been prohibited by

5    the, you know, four corners of the stipulation, the Court would

6    have considered it.  But in that case, you know, when the Court

7    was seriously considering changing it, it did go through that

8    three-point test that centered on whether the four separate

9    actions would eventually exchange the same material as the

10   confidential discovery material and we don't know because we

11   don't know what the complaint is; and, whether the complaints

12   are focused on virtually identical allegations, we don't know,

13   because there has been no complaint filed; or whether much of

14   the discovery material in the litigation will be relevant in

15   the four separate suits?

16        And, all we have are innuendos and a sneer attempt

17   against Genesis to say that there was some kind of fraud.  Not

18   a single scintilla of evidence has come forward to show that

19   there was any fraud.  And, certainly, if there had been some

20   fraud, the liberal pleading requirements under the Federal

21   Rules would allow them to file a very bare bones complaint and

22   then flesh it out in a discovery request, which is what the

23   rules require.

24        THE COURT: Understood.  Can you expand upon the type

25   of information that we're talking about and why it's important

Cimbalo - Argument                                    20

1    to the debtors to maintain the confidentiality of these -- or

2    the limitations that were envisioned in the stipulation?

3            MR. CIMBALO:  Well, the most important thing I can

4    say about that, Your Honor, I means, because there are many,

5    many document boxes that we've produced in this, and to make,

6    you know, a general statement would be very difficult to do,

7    but it was deemed highly confidential or confidential

8    information under the actual terms of the confidentiality

9    stipulation.  The other sides in this case, GMS and Mr. Grimes,

10   had the opportunity to object to those and they didn't object

11   to them in writing.  They did not file a motion.  It was never

12   discussed to change any of the confidentiality stipulation

13   coverage for any particular document at all.  So I would say

14   that to the extent it says "confidentiality", it says that

15   "it's confidential" or "highly confidential", those

16   designations aren't changeable at this point, except for the

17   fact, although Mr. Jenkins might be exactly right that some of

18   them might be less critically sensitive to Genesis' operations.

19   If Mr. Jenkins improperly continues or his clients continue to

20   improperly hold onto these documents, eventually they will all

21   be less confidential, Your Honor.  But the point is, he should

22   have returned them.  And, the point is he should have destroyed

23   them.  He agreed to do it.  And, we were allowed -- and we did

24   rely on that when we produced the documents to them in the

25   first place.

The Court - Decision                                    21

1    THE COURT: Understood. Thank you, sir.

2    MR. CIMBALO: Thank you, Your Honor.

3    THE COURT: Well, let me reflect that while I

4    certainly appreciate opposing points of view, for instance, in

5    Videon, which I think can be distinguished in some respects, I

6    think that there is opportunity to grant the motion as it has

7    been presented. Indeed, a critical component of the general

8    proposition that there is no pre-complaint discovery, the fact

9    that the Federal Rules of Civil Procedure don't have

10   particulars that relate to it, doesn't mean that under no

11   circumstances can it be allowed.

12          The critical component of the cases that discuss that

13   basic proposition is the anticipated burden on the non-movant,

14   on the opposing party, in terms of producing information to

15   someone who might be on a fishing expedition; who might have

16   allegations that are -- that have a factual basis or don't.

17   And, the idea of exposing entities or individuals to that kind

18   of un-anchored investigatory procedure without rules and so

19   forth is certainly problematic.

20          This is a much different scenario. We have the same

21   party who was contesting the confirmation of the debtors, who

22   retrieved substantial information under the protective order

23   that was entered into by the parties by consent for confirm --

24   for their purposes of contesting confirmation, who now wants to

25   explore those -- that information, that body of information, in

1   effect, continuing to pursue post-confirmation issues.  I don't

2   take up on this record whether Mr. Grimes is too late to do

3   that, whether back then, two years ago when he and the related

4   GMS Corporation had opportunities to examine this information,

5   they might have discovered any untoward activity connected with

6   adjustments of numbers getting ready for confirmation or the

7   like.  We don't know precisely what the allegations are because

8   we haven't seen them.  So I certainly don't take up any

9   questions like that in this scenario, but simply -- the very

10  limited relief that is sought for the turnover or the

11  opportunity of a law firm to, under the provisions of the

12  confidentiality order and subject to them without any public

13  exposure or the like to be able to review these documents with

14  other thoughts in mind, or other directions, potentially, than

15  those that we have taken up heretofore, is a kind of limited

16  and restrictive modification of the consent order that may be

17  permitted on this record.

18          I note very significantly in my mind that the order

19  did contemplate the possible modification of the order,

20  including the prospect under paragraph 18 to provide access to

21  other persons.  So there was that prospect to begin with.  I

22  certainly understand and reaffirm the basic proposition that

23  when parties exchange information under the auspices of a

24  protective order, a consensual protective order, that they are

25  entitled to have that order enforced now and forever.  And, the

1    order did provide for the recipient of the information after

2    final termination to return or destroy the documents within 30

3    days after that termination.  And, that's paragraph 21 of the

4    decision.  And, apparently that was not done.  I am confident

5    that the Third Circuit appeal was dismissed more than 30 days

6    ago.

7              But this isn't quite the clean hands argument, I

8    don't think, that counsel is suggesting.  It's not an

9    application of a particular equitable principal, it is simply

10   an application of the provision of the consent order that

11   allowed for one party or another to apply for modification.

12   The implication is that until this matter came up the debtor

13   wasn't all that concern about the failure of Grimes to follow

14   the dictates of the provision in the consent order requiring

15   return or destruction.  Indeed, those terms continue in the

16   consent order and will ultimately be enforced.

17             I think that perhaps a revision of the time frame is

18   in order to guide this process in some way, because the parties

19   did envision a prompt and certain deadline for destruction or

20   return.

21             Let me propose, and I will enter an order, requiring

22   that kind of return or destruction within 60 days.  That time

23   frame may be extended upon further request and justification,

24   which may be contested, of course, in the usual manner.  But I

25   think that otherwise I will modify the stipulated protective

The Court - Decision                                24

1    order in this fashion to allow access to the Pomerantz Firm,

2    subject, of course, to the confidentiality requirements that

3    are already in that order.  Is there any questions from either

4    side?

5             MR. JENKINS:  Your Honor, I had a form of order we

6    attached to the motion and handed up.  I understand Your Honor

7    has now modified that still further.  I'm not all that familiar

8    with bankruptcy procedures.  Should I redraft an additional

9    order and send it to Your Honor?

10            MR. CIMBALO:  Your Honor, we would like to see the

11   stipulation that incorporates Your Honor's comments before it

12   is handed up to this Court, if that's all right.

13            THE COURT:  That's fine.  I think the final ruling is

14   all that is necessary.  Of course, a record of this hearing may

15   be obtained.  I think that a new order should be drafted, sent

16   to counsel, if there is no objection to form.  If there is

17   objection to form, try to resolve it.  If you can't, reach out

18   and we'll have a telephone conference call to resolve the form

19   of the order.  Otherwise, you'll simply submit the revised form

20   of order and I will enter it.

21            COUNSEL:  Thank you, Your Honor.

22            THE COURT:  And, I thank you both.

23

24

25                              * * * * *

25

# C E R T I F I C A T I O N

I, Diana Doman, court approved transcriber, do hereby certify the foregoing is a true and correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter.


_Diana Doman_                          _10/3/03_
DIANA DOMAN                               DATE

# In The Matter Of:

## In Re:GENESIS HEALTH VENTURES INC.et al.,
## In Re:MULTICARE AMC INC.et al.

---

### GEORGE HAGER
### August 23, 2001

---

### RAYVID REPORTING SERVICE, INC.
### 420 LEXINGTON AVENUE
### NEW YORK, NY 10170
### (212) 599-3642    FAX: (212) 692-9171

Original File 082301GH.TXT, 188 Pages
Min-U-Script® File ID: 1059686608

## Word Index included with this Min-U-Script®

GEORGE HAGER
August 23, 2001

In Re:GENESIS HEALTH VENTURES INC.et al.,
In Re:MULTICARE AMC INC.et al.

Page 13

**GEORGE HURST**

[1]
[2]    **Q:** Were those services that you just
[3]  enumerated, starting with rehabilitation therapy,
[4]  was their provision governed by this 1997
[5]  management agreement?
[6]    **A:** Not specifically. I believe, and
[7]  I haven't reviewed the management agreement in
[8]  some time, that there was no requirement in those
[9]  management agreements for Genesis to be a
[10]  provider of services such as rehabilitation
[11]  therapy or pharmacy.
[12]    **Q:** Do you know under what legal
[13]  document, if any, rehabilitation therapy and
[14]  pharmacy services were provided from Genesis to
[15]  MultiCare?
[16]    **A:** I don't. In some cases there are
[17]  contracts that exist at the individual facility
[18]  level that determine the terms of the contract,
[19]  contractual rates for services provided.
[20]    I don't know specifically whether
[21]  or not these contracts exist at each facility or
[22]  not.
[23]    **Q:** Do you regard the management
[24]  agreement entered into in 1997 between MultiCare
[25]  and Genesis to have been the product of arm's

Page 14

**GEORGE HURST**

[1]
[2]  length bargaining?
[3]    **MR. STROCHAK:** Objection, calls
[4]  for a legal conclusion. Go ahead to the
[5]  best of your ability.
[6]    **MR. PRIMPS:** I dispute the
[7]  objection, but I don't want to argue it
[8]  now.
[9]    **A:** The terms of the management
[10]  agreement were negotiated between Genesis and the
[11]  then controlling shareholders of MultiCare, which
[12]  were Texas Pacific Group and the Cyprus Group,
[13]  who owned roughly 57 percent of the company at
[14]  the point in time that MultiCare was acquired by
[15]  the joint venture.
[16]    It was majority owned by Cyprus
[17]  and TPG and minority owned by Genesis.
[18]    **Q:** Do you believe that Genesis as the
[19]  43 percent owner had any influence on the
[20]  negotiation of the services contract between it
[21]  and MultiCare?
[22]    **A:** Do you mean the management
[23]  services contract?
[24]    **Q:** Yes.
[25]    **A:** Sure, Genesis' principals were

Page 15

**GEORGE HURST**

[1]
[2]  negotiating, you know, from the Genesis
[3]  perspective that management agreement.
[4]    **Q:** Did they have any influence on the
[5]  MultiCare position in those contract
[6]  negotiations, to the best of your knowledge?
[7]    **MR. STROCHAK:** Objection, calls
[8]  for speculation. To the extent you know
[9]  you can answer.
[10]    **A:** I don't know.
[11]    **Q:** The management services contract
[12]  that was entered into in 1997 contained formulas
[13]  by which or methods by which Genesis was paid by
[14]  MultiCare, is that correct?
[15]    **A:** That's correct.
[16]    **Q:** Do you regard those payment
[17]  provisions as having been set at a fair market
[18]  value?
[19]    **A:** At that point in time, yes.
[20]    **Q:** Do you think that during the term
[21]  of the management agreement those services
[22]  continued to be provided from Genesis to
[23]  MultiCare at fair market value?
[24]    **A:** I'm not sure I understand the
[25]  question. Are you asking me do I think that the

Page 16

**GEORGE HURST**

[1]
[2]  contractual management fee rate represented a
[3]  fair market rate up through the end of the
[4]  pre-bankruptcy or post-bankruptcy period?
[5]    **Q:** Correct, having I believe stated
[6]  that at the time of the negotiation it
[7]  represented a fair market value rate.
[8]    **A:** There was a process that was
[9]  undertaken in negotiating a new management
[10]  contract rate, undertaken by independent parties
[11]  at MultiCare, Beverly Anderson, being an
[12]  independent restructuring officer supported by
[13]  financial analysis from Ernst & Young, I believe,
[14]  and the result of that negotiation determined
[15]  that the management contract rate would change to
[16]  reflect the view of current market conditions.
[17]    The historic management contract
[18]  provided for a 6 percent management fee of which
[19]  4 percent was cash pay and 2 percent was deferred
[20]  and subordinated to achievement of certain
[21]  leverage ratios which were never achieved and the
[22]  2 percent was never paid.
[23]    The revised management contract
[24]  terms that were agreed to as the result of that
[25]  negotiation between the independent restructuring

Min-U-Script®

RAYVID REPORTING SERVICE, INC.

GEORGE HAGER
August 23, 2001

In Re:MULTICARE AMC INC.et aL

Page 17

### GEORGE HURST

[1]
[2] officer of MultiCare and MultiCare's financial
[3] advisor, Ernst & Young, and Genesis, was to
[4] change that management contract rate to 4.6
[5] percent cash pay.
[6]     Q: Did the failure to achieve the 2
[7] percent payment that you just referred to, did
[8] that, during the time that that payment was not
[9] made, render the services being provided by
[10] Genesis to MultiCare as not at fair market value?
[11]     MR. MUNDIYA: Objection to the
[12] form.
[13]     MR. STROCHAK: Objection. I'm not
[14] sure I understand. Do you understand the
[15] question?
[16]     THE WITNESS: No.
[17]     Q: Okay. You mentioned a failure to
[18] achieve the 2 percent payment prior to the
[19] involvement of Ernst & Young and the
[20] restructuring officer.
[21]     As a result of that failure to
[22] achieve the 2 percent payment, in your view did
[23] that render the contract as not being one at a
[24] fair market value?
[25]     A: It's difficult for me to reach any

Page 18

### GEORGE HURST

[1]
[2] conclusion there. I wouldn't know.
[3]     Q: Now, you had been with the company
[4] in the senior management group for approximately
[5] eight years when the decision was made to file
[6] for bankruptcy protection.
[7]     Could you state your view of the
[8] underlying economic causes? You've stated the
[9] inability to a pay creditors. What were the
[10] underlying economic causes of that seeking
[11] protection of the bankruptcy laws?
[12]     A: The long term care industry
[13] effective July 1st of 1998 was required to
[14] implement a new reimbursement program called
[15] prospective payment, commonly referred to as PPS,
[16] which significantly reduced the payments that our
[17] industry and specifically Genesis Health Ventures
[18] and MultiCare received for providing services to
[19] a Medicare customer.
[20]     Our payment rates per day
[21] immediately preceding PPS were approximately $390
[22] per day, and they were reduced to approximately
[23] $270 a day.
[24]     This payment reduction also was at
[25] a time where the industry was beginning to

Page 19

### GEORGE HURST

[1]
[2] experience significant operating cost inflation,
[3] primarily wage inflation, as the economy was
[4] expanding and the unemployment rates were
[5] declining.
[6]     Those operating costs were not
[7] being adequately reimbursed or reflected in the
[8] market basket or inflation rate adjustments being
[9] provided not only in the Medicare reimbursement
[10] programs, but also the state Medicaid programs.
[11]     Our industry also began to incur
[12] significant exposure ω general liability, we
[13] refer to them as malpractice claims, most
[14] significantly in certain states such as Florida,
[15] where the cost of liability insurance has gone up
[16] from roughly $500 a bed to some estimates today
[17] of $10,000 per bed.
[18]     And lastly, we had a period of
[19] rising interest rates that caused our capital
[20] costs to rise significantly since the company did
[21] have significant levels of debt from its
[22] acquisition activities of the early, mid- '90s
[23] and the acquisition of MultiCare.
[24]     Q: When was MultiCare acquired?
[25]     A: It was acquired in the joint

Page 20

### GEORGE HURST

[1]
[2] venture in 1997.
[3]     Q: And that acquisition was financed
[4] through debt, is that your testimony?
[5]     A: It was financed through debt and
[6] equity.
[7]     Q: Can you give approximate
[8] percentages on that?
[9]     A: Approximately 30 percent of the
[10] purchase price was financed with equity, the
[11] remainder through debt. Some of the debt was
[12] incurred at the Genesis level, and some debt
[13] incurred directly at the MultiCare level.
[14]     Q: You talked about the malpractice
[15] exposure as being a cause for the bankruptcy
[16] filing.
[17]     Isn't it correct that Genesis was
[18] able to provide for some of its malpractice needs
[19] through the device of a captive insurance
[20] company?
[21]     MR. STROCHAK: Objection,
[22] mischaracterizes the prior testimony, and
[23] also leading, but go ahead.
[24]     A: What I intended to say from my
[25] prior comment was that the liability cost

AA. 1081

GEORGE HAGER
August 23, 2001

In Re:GENESIS HEALTH VENTURES INC.et al.,
In Re:MULTICARE AMC INC.et al.

---

Page 37

**GEORGE HURST**

[1]
[2] that.
[3]    Q: What do you base your projection
[4] on for this reduction below the projected number
[5] contained here in this document?
[6]    A: The July to date results of
[7] MultiCare.
[8]    Q: And the July to date results of
[9] MultiCare have negative performance features in
[10] them?
[11]    MR. STROCHAK: Objection, vague.
[12]    A: The MultiCare July to date
[13] performance is not today at the level of the
[14] forecast for 2001 in the plan.
[15]    Q: Are there specific factors
[16] accounting for that performance being below the
[17] level projected in the plan?
[18]    A: I can't comment on the specific
[19] factors.
[20]    Q: Do you know who in your
[21] organization would have the expertise and
[22] familiarity with MultiCare's operations who could
[23] testify as to why the numbers for EBITDA are
[24] coming in under the projection?
[25]    A: I would have that —

---

Page 38

**GEORGE HURST**

[1]
[2]    MR. STROCHAK: Just one second,
[3] I'm sorry. Just objection to the form of
[4] the question to the extent you're asking
[5] him about whether somebody could testify
[6] or not.
[7]    If you understand the question you
[8] can go ahead.
[9]    A: I would have the expertise. I
[10] just have not done the analysis to respond to
[11] your question specifically. ·· ····
[12]    Q: Is there anyone who has provided
[13] you with information concerning the financial
[14] performance of MultiCare in the fiscal year 2001
[15] to date that you've relied on in sitting here
[16] today making the prediction that there will be a
[17] lower EBITDA number coming in for MultiCare?
[18]    A: I see the monthly financial
[19] statements of MultiCare in the normal course of
[20] my responsibility. Based on that review that I
[21] made those statements.
[22]    (At this point in the proceedings,
[23] the witness and counsel conferred.)
[24]    MR. PRIMPS: The record should
[25] reflect a conference that the witness

---

Page 39

**GEORGE HURST**

[1]
[2] just had with his counsel; not that
[3] there's anything improper with that.
[4]    Q: Is there anything that you want to
[5] change in your response to my last question?
[6]    A: No.
[7]    Q: Have you had any discussions with
[8] CS First Boston concerning the possibility that
[9] the EBITDA number for the year 2001 will come in
[10] below $56 million for MultiCare?
[11]    A: I don't recall any specific
[12] conversations.
[13]    Q: Do you recall the nature of the
[14] conversations that you had with CS First Boston
[15] in arriving at this $56 million number for EBITDA
[16] that's shown at Page 48 of GMS Exhibit 2?
[17]    A: In the process of preparing the
[18] projections there was potentially daily dialogue
[19] between Credit Suisse First Boston and myself and
[20] members of my organization. I can't recall the
[21] specifics of any one of those conversations.
[22]    The $56 million was based on the
[23] historical performance of MultiCare at the date
[24] the forecasts were prepared, adjusted for known
[25] events that we knew would occur in the forecast

---

Page 40

**GEORGE HURST**

[1]
[2] period, such as the new Medicare payment system
[3] impact that we refer to as BIPA, standing for the
[4] Benefit Improvement Protection Act, which
[5] increased Medicare payment rates effective April
[6] 1st of 2001.
[7]    Q: Any other changes that were
[8] influencing the EBITDA number?
[9]    A: We had renegotiated certain
[10] managed care contracts that had a favorable
[11] impact on both Genesis and MultiCare. I know
[12] those adjustments were reflected.
[13]    And MultiCare as well as Genesis
[14] was running behind the original management budget
[15] for census levels that we expected to realize in
[16] 2001.
[17]    MR. STROCHAK: Bill, we've been
[18] going an hour or so. Whenever you get to
[19] a logical breaking point, five minutes
[20] would be good.
[21]    MR. PRIMPS: Five or ten would
[22] probably do, if it ten is not too long.
[23] But that's five or ten to get to a
[24] logical breaking point.
[25]    MR. STROCHAK: I understand.

---

AA. 1082

GEORGE HAGER
August 23, 2001

In Re:GENESIS HEALTH VENTURES INC.et al.,
In Re:MULTICARE AMC INC.et al.

Page 53

**GEORGE HURST**

[1]
[2] don't recall specifically who was in attendance,
[3] but it was members of the I believe then
[4] co-arrangers of our senior secured credit
[5] facility.
[6]     It was a proposal regarding an
[7] attempt to restructure Genesis Health Ventures
[8] with an equity infusion, not an equity infusion,
[9] but the purchase of equity by Cyprus Group and
[10] Texas Pacific Group that would produce additional
[11] cash in that pre-structuring proposal.
[12]     Q: Now, what role did you play if any
[13] in the drafting of this document?
[14]     A: I was actively engaged with
[15] Merrill Lynch in the preparation of this
[16] document.
[17]     Q: I see that its date is April 12,
[18] 2000, and I draw your attention to Page 14 of the
[19] document.
[20]     Do you know if the numbers
[21] appearing on Page 14 represent Genesis on a
[22] stand-alone basis, or a consolidated
[23] Genesis/MultiCare presentation?
[24]     A: I believe they represent numbers
[25] on a general stand-alone basis.

Page 54

**GEORGE HURST**

[1]
[2]     Q: Do you know, bearing in mind the
[3] date of this document, whether the BIPA changes
[4] were reflected in the numbers shown on the page
[5] 14 chart, cash flow implications?
[6]     A: I would be surprised if they did.
[7] I also don't believe that the subsequent
[8] increases in insurance liability cost,
[9] significant increases in our health insurance
[10] programs and the impact of the renegotiated
[11] MultiCare contracts were included in those
[12] numbers either.
[13]     Those were dramatically greater in
[14] impact than were the BIPA changes.
[15]     Q: If you had to net those two
[16] figures out, how much greater would those
[17] increases in expenses you just referred to be
[18] than the BIPA increase in revenue?
[19]     A: In fiscal '01?
[20]     Q: Yes.
[21]     A: I don't have a specific
[22] recollection of those numbers, but they are very,
[23] very significant numbers.
[24]     Q: You say significantly greater than
[25] the BIPA increase in revenue.

Page 55

**GEORGE HURST**

[1]
[2]     Could you frame that number with
[3] an approximate percentage greater than the BIPA
[4] increase in revenue?
[5]     A: Multiples, multiples. The health
[6] insurance incremental costs by themselves were, I
[7] would be guessing, but in the neighborhood of $15
[8] million a year of incremental expense. The
[9] liability insurance cost numbers were probably
[10] close to $10 million.
[11]     Those two issues by themselves
[12] were close to five times the impact of the impact
[13] of BIPA in fiscal '01.
[14]     You also don't have the impact of
[15] the loss of the management contract with the Age
[16] Institute, which also had a significant impact on
[17] our EBITDA.
[18]     Q: I was going to ask you what the
[19] EBITDA number of stand-alone Genesis here
[20] appearing at Page 14 in Hager Exhibit 3 of $204
[21] million, and then in the plan, what was marked as
[22] GMS Exhibit 2, that number being as we referred
[23] to earlier, $156 on stand-alone Genesis.
[24]     MR. MUNDIYA: Objection. Was it
[25] 156 or —

Page 56

**GEORGE HURST**

[1]
[2]     Q: 158, excuse me. I don't want to
[3] cheat myself.
[4]     MR. STROCHAK: Just a point of
[5] clarification, it's the Disclosure
[6] Statement you're referring to?
[7]     MR. PRIMPS: Yes, the Disclosure
[8] Statement.
[9]     Q: That's a substantial difference,
[10] the decrease from $202 million to $158 million in
[11] approximately a year's time.
[12]     How would you account for that
[13] decrease?
[14]     MR. STROCHAK: Objection to the
[15] preface to the question, and just another
[16] point of clarification, it's 204 rather
[17] than 202.
[18]     Q: 204.
[19]     MR. STROCHAK: With the objection
[20] you can go ahead.
[21]     A: That's $46 million of reduction.
[22] As I said, there are four specific items that
[23] account for the majority of that.
[24]     That is the significant increase
[25] in our health insurance programs, I don't have an

Page 53 - Page 56  (16)       Min-U-Script®       RAYVID REPORTING SERVICE, INC.

AA. 1083

In Re:GENESIS HEALTH VENTURES INC.et al.,
In Re:MULTICARE AMC INC.et al.

GEORGE HAGER
August 23, 2001

Page 57

**GEORGE HURST**

[1]
[2] exact number, my guess is in the range of $15
[3] million annually.
[4]    A significant increase in
[5] liability insurance cost.
[6]    Q: Could you quantify that?
[7]    A: I would say it's in the range of
[8] $10 million, the loss of the management contract
[9] and all of the service contracts with the Age
[10] Institute.
[11]    Q: Could you quantify that loss?
[12]    A: I can't quantify that number
[13] specifically. There were twenty properties under
[14] management. I would assume that the management
[15] fee reductions in and of themselves were between
[16] $5 million and $6 million, is a guess.
[17]    In addition, we provided pharmacy
[18] and therapy services to all of those properties
[19] as well.
[20]    And fourthly, the extent of and
[21] renegotiation of contractual relationships with
[22] MultiCare are different in this forecast than in
[23] the projections in the Disclosure Statement.
[24]    In reviewing this briefly, it
[25] looked like the MultiCare contractual adjustments

Page 58

**GEORGE HURST**

[1]
[2] reduced the management fee to 5 percent instead
[3] of 4.6 percent, and there was no adjustment for
[4] hospitality services or rehabilitation therapy
[5] services.
[6]    I don't know what those numbers
[7] would add up to, but it's also in the range of I
[8] think $5 million additional impact of the
[9] MultiCare contract renegotiations.
[10]    Q: Could you quantify what kind of
[11] revenue enhancement would have occurred between
[12] the time of Hager Exhibit 3, the proposal to the
[13] bank group, and the GMS Exhibit 2, the Disclosure
[14] Statement, caused by BIPA?
[15]    A: Other than BIPA, the only specific
[16] revenue enhancement change that I can recall is
[17] the management contract renegotiations.
[18]    I believe they had approximately a
[19] $2 million impact in fiscal '01, in that range.
[20]    Q: You say other than BIPA, but could
[21] you put a number on the BIPA improvement?
[22]    A: The BIPA improvement in fiscal '01
[23] is $6 million, approximately $6 million.
[24]    Q: I'd like to draw your attention to
[25] Page 13 of Hager Exhibit 3 for identification,

Page 59

**GEORGE HURST**

[1]
[2] and just to frame our review of this page, at the
[3] time this document was produced a final
[4] determination to file for bankruptcy protection
[5] had not been reached, is that correct?
[6]    A: I believe that's correct.
[7]    Q: Interest payments had been
[8] suspended, however, on the debt of the companies?
[9]    A: I believe so.
[10]    Q: Were any other concrete actions
[11] taken aside from the suspension of debt payments
[12] relating to the financial difficulties that the
[13] company was in at this time?
[14]    MR. STROCHAK: Objection, vague.
[15]    A: I'm not sure what types of actions
[16] you might be referring to.
[17]    Q: Any actions detrimental to the
[18] holders of company debt in addition to the
[19] suspension of interest payments on that debt.
[20]    MR. STROCHAK: Objection, vague.
[21] Go ahead.
[22]    A: I'm not aware of any. I can't
[23] recall.
[24]    Q: Drawing your attention back to the
[25] Page 13 chart entitled "Financial Analysis of New

Page 60

**GEORGE HURST**

[1]
[2] Money Restructuring Proposal," could you state
[3] for the record what this chart depicts?
[4]    A: It depicts a proposed adjusted
[5] capital structure of Genesis Health Ventures
[6] based on this proposal.
[7]    Q: Does the adjusted capital
[8] structure of Genesis Health Ventures include
[9] taking out the Genesis bondholders?
[10]    I refer your attention to the
[11] "subordinated notes," a $370 million entry
[12] adjusted to a pro forma zero.
[13]    A: Yes, this capital structure pro
[14] forma is only the debt structure. It does show
[15] the subordinated noteholders would have zero
[16] recovery under this plan in the form of debt, but
[17] the proposal did include providing the
[18] subordinate debtholders a minority equity stake,
[19] which is not reflected in this page.
[20]    Q: Is it reflected elsewhere in the
[21] document?
[22]    A: Yes.
[23]    Q: Could you state where that's
[24] reflected?
[25]    A: Page 17.

GEORGE HAGER
August 23, 2001

In Re:GENESIS HEALTH VENTURES INC.et al.,
In Re:MULTICARE AMC INC.et al.

Page 69

## GEORGE HURST

[1]
[2] recollection, but the column title would tell one
[3] that they should be historical numbers, not
[4] projections.
[5]   Q: That shows for the year ended
[6] 4/30/2000 an EBITDA number of $208.1 million, is
[7] that correct, for Genesis stand-alone?
[8]   A: That's correct.
[9]   Q: Turning to the next page, 2674, do
[10] you recall reviewing this page, "Historical
[11] Financial Summary, The MultiCare Companies Inc."?
[12]   A: I don't have a specific
[13] recollection of reviewing this page.
[14]   Q: In light of the importance of
[15] securing the Debtor in Possession credit
[16] facility, do you believe that you did review it
[17] at or about the time shown on the date of the
[18] document, July 2000?
[19]   MR. STROCHAK: Objection,
[20] foundation.
[21]   A: I believe that I would have.
[22]   Q: This document also contains 1999
[23] and LTM ending April 30, 2000 EBITDA numbers,
[24] does it not?
[25]   A: It does.

Page 70

## GEORGE HURST

[1]
[2]   Q: And for the 1999 actual number it
[3] shows for MultiCare Companies on a stand-alone
[4] basis, $73.3 million EBITDA, is that correct?
[5]   A: That's correct.
[6]   Q: And for the year ending April
[7] 30th, 2000 it shows a $62.7 million EBITDA number
[8] for The MultiCare Companies, isn't that correct?
[9]   A: That's also correct.
[10]   Q: So looking at these two sheets,
[11] 2673 and 2674, the 1999 actual EBITDA on a
[12] consolidated basis being shown to the Debtor in
[13] Possession lenders was $299,600,000, is that
[14] correct, for the consolidated companies?
[15]   A: That appears to be correct.
[16]   Q: And the year ending April 30th,
[17] 2000 was being shown at that time as
[18] $270,800,000, is that correct, for the combined
[19] companies?
[20]   A: That's correct.
[21]   Q: Did you raise any questions at
[22] this point, in April of 2000, about the validity
[23] of those figures?
[24]   A: I don't recall raising any
[25] objection.

Page 71

## GEORGE HURST

[1]
[2]   MR. PRIMPS: Could the reporter
[3] please mark as Hager Exhibit 5 an October
[4] 5, 2000 document of the Mellon Bank to
[5] the Genesis/MultiCare Steering Committee.
[6]   (The above described document was
[7] marked Hager Exhibit 5 for identification,
[8] as of this date.)
[9]   Q: Could you state for the record
[10] whether you've seen this document before,
[11] Mr. Hager?
[12]   A: I'm not sure I've seen the
[13] covering letter, but I believe I've seen
[14] everything else in this document.
[15]   Q: I'd like to draw your attention to
[16] the — I'm going to hold my questions on this
[17] right now..
[18]   MR. STROCHAK: Do you want to
[19] break for lunch now, or do you want to
[20] keep going?
[21]   MR. PRIMPS: We might as well
[22] break.
[23]   (At this point in the proceedings
[24] there was a luncheon recess, after which
[25] the deposition continued as follows:)

Page 72

## GEORGE HURST

[1]
[2]   MR. PRIMPS: I'd like to mark as
[3] Hager Exhibit 6 for identification a
[4] report entitled "The MultiCare Companies,
[5] Unsecured Creditors Committee Meeting
[6] Update, November 13, 2000."
[7]   (The above described document was
[8] marked Hager Exhibit 6 for identification,
[9] as of this date.)
[10]   Q: Mr. Hager, have you had a chance
[11] to review the document marked as Hager Exhibit 6
[12] for identification?
[13]   A: I have.
[14]   Q: Is this report a document referred
[15] to you earlier in this deposition as Ernst &
[16] Young's investigation into the allocation issues
[17] as between MultiCare and Genesis?
[18]   MR. STROCHAK: Objection.
[19] Objection to the characterization. You
[20] can go ahead and answer.
[21]   A: I'm not sure I specifically
[22] referred to E&Y as you have just referred to
[23] them, but E&Y did support the independent
[24] restructuring officer of MultiCare in evaluating
[25] what would be in today's market fair market rates

AA. 1085

In Re:GENESIS HEALTH VENTURES INC.et al.,
In Re:MULTICARE AMC INC.et al.

GEORGE HAGER
August 23, 2001

**GEORGE HURST**

[1]
[2] for the services provided to MultiCare by
[3] Genesis.
[4]     I believe this is a report that
[5] Ernst & Young issued summarizing their findings.
[6]     Q: This was presented at an Unsecured
[7] Creditors Committee meeting?
[8]     A: Yes, I believe at some — I
[9] believe the results of this were presented to
[10] both the secured creditors and the unsecured
[11] creditors of both companies.
[12]     Q: Do you know whether any action was
[13] taken based on this report?
[14]     A: The actions that were taken with
[15] respect to this report were the inclusion of the
[16] results of the negotiations of the contractual
[17] arrangements between Genesis and MultiCare in the
[18] forecasts that were used for the restructuring
[19] proposals and plan and valuation.
[20]     MR. PRIMPS: At this time I'd like
[21] to have marked as Hager Exhibit 7 for
[22] identification a document entitled
[23] "Genesis Health Ventures Restructuring
[24] Plan Proposal, Steering Committee
[25] Meeting, January 9, 2001."

**GEORGE HURST**

[1]
[2]     (The above described document was
[3] marked Hager Exhibit 7 for identification,
[4] as of this date.)
[5]     MR. PRIMPS: By the way, I just
[6] wanted to state on the record we had
[7] referred to a number of documents earlier
[8] today as Goldman Sachs exhibits, in
[9] particular Goldman Sachs 2, Goldman Sachs
[10] 6, and I think Goldman Sachs 10.
[11]     Those are actually GMS exhibits,
[12] just so the record is clear. That's how
[13] they've been marked.
[14]     MR. STROCHAK: I wasn't sure if it
[15] was GMS for Goldman Sachs or for your
[16] client, but I appreciate the
[17] clarification.
[18]     MR. PRIMPS: I think we certainly
[19] identified most of them in terms of the
[20] GS production numbers.
[21]     (With the stipulation of all
[22] parties present, the references to Goldman
[23] Sachs Exhibits were changed to read GMS
[24] Exhibits throughout the transcript.)
[25]     Q: Mr. Hager, do you recognize the

**GEORGE HURST**

[1]
[2] document that's been marked as Hager Exhibit 7
[3] for identification?
[4]     A: No.
[5]     Q: You don't think you've seen this
[6] document before?
[7]     A: I don't think so.
[8]     Q: I'd like to draw your attention to
[9] Page 7 of the document that's stamped CH 003423.
[10] That's, "Restructuring Plan Framework Market
[11] Multiples" is the statement on that piece of
[12] paper. Do you see that?
[13]     A: Yes, I do.
[14]     Q: I see in the market multiple
[15] numbers that are listed for NCS Healthcare, do
[16] you see aggregate value and debt to fair market
[17] value EBITDA numbers listed for that entity?
[18]     A: Yes.
[19]     Q: Do you know anything about the
[20] financial condition or prospects of NCS
[21] Healthcare?
[22]     A: Not specifically, no.
[23]     Q: I'd like to draw your attention to
[24] the portion of this document stamped CH 003434.
[25]     This is a draft memorandum to the

**GEORGE HURST**

[1]
[2] members of the Steering Committee from Chilmark
[3] Partners.
[4]     Have you ever seen this document
[5] specifically?
[6]     A: I have not.
[7]     Q: Drawing your attention to the
[8] second paragraph of this page, did you ever hear
[9] anyone state that the management fee constituted
[10] a more challenging allocation issue?
[11]     A: Not that I can recall.
[12]     MR. PRIMPS: At this time I'd ask
[13] the reporter to mark as Hager Exhibit 8 a
[14] report of Chilmark Partners, the first
[15] page of which is stamped GEN C 00921.
[16]     (The above described document was
[17] marked Hager Exhibit 8 for identification,
[18] as of this date.)
[19]     Q: Have you had a chance to review
[20] Hager Exhibit 8 for identification?
[21]     A: I have.
[22]     Q: Have you seen that document
[23] before?
[24]     A: No, I haven't.
[25]     Q: Drawing your attention to Page 2

GEORGE HAGER
August 23, 2001

In Re:GENESIS HEALTH VENTURES INC.et al.
In Re:MULTICARE AMC INC.et al.

---

**GEORGE HURST**

[1]
[2] of the document, the restructuring overview and
[3] the reasons for Genesis and MultiCare to get out
[4] of bankruptcy, were you aware of any professional
[5] advisors of Genesis and MultiCare in the early
[6] part of this year communicating that there was no
[7] compelling reason to be in Chapter 11 now other
[8] than compromising liabilities?
[9]     MR. STROCHAK: Objection,
[10] foundation. The question is the
[11] company's financial advisors?
[12]     MR. PRIMPS: Yes.
[13]     MR. STROCHAK: Okay.
[14]     A: Can you please repeat that
[15] question?
[16]     Q: Sure. Were you aware of any of
[17] the companies — let me rephrase it.
[18]     Were you aware of any of the
[19] professional advisors of either the companies or
[20] the lenders to the companies communicating that
[21] there was no compelling reason to be in Chapter
[22] 11 now other than compromising liabilities?
[23]     A: Not specifically.
[24]     Q: Were you aware of anyone stating
[25] that there was no compelling reason for Genesis

---

**GEORGE HURST**

[1]
[2] and MultiCare to be in Chapter 11 in the early
[3] part of this year other than for compromising
[4] liabilities?
[5]     A: I do know it was the Debtor's
[6] view, at least my personal view, that there was
[7] not a reason to be in Chapter 11.
[8]     It's very expensive, and there's
[9] no reason to be in Chapter 11 if you can get the
[10] capital structure straightened out.
[11]     Q: When did you first have that view,
[12] that there was no reason to be in Chapter 11 save
[13] for the need to get the capital structure
[14] straightened out?
[15]     A: I don't have a specific
[16] recollection of a date.
[17]     Q: Did you hold that view at the time
[18] that this memorandum apparently was prepared or
[19] this report was prepared for the bank meeting,
[20] January 30, 2001?
[21]     A: I don't recall.
[22]     Q: Do you recall whether you had that
[23] view earlier than January of 2001?
[24]     A: I really don't recall a specific
[25] time.

---

**GEORGE HURST**

[1]
[2]     MR. PRIMPS: I'd like it remark
[3] Hager Exhibit 5. This is a more accurate
[4] version. If you could hand back —
[5]     MR. STROCHAK: Is this one
[6] incomplete?
[7]     MR. PRIMPS: It's got some
[8] marginal notes on it that weren't in the
[9] original.
[10]     (The above described document was
[11] remarked Hager Exhibit 5 for
[12] identification, as of this date.)
[13]     Q: Do you have Hager Exhibit 5 in
[14] front of you, Mr. Hager?
[15]     A: I do.
[16]     Q: I'd like to draw your attention to
[17] the page stamped GS 00806. Do you see the
[18] statement on that portion of Hager Exhibit 5 at
[19] the top, "Management believes the current level
[20] of health insurance expense provided in
[21] the detailed budget to be below the
[22] projected costs for fiscal year 2001"?
[23]     Do you see that statement?
[24]     A: Yes.
[25]     Q: Is that an accurate statement of

---

**GEORGE HURST**

[1]
[2] what management's belief was late in the year
[3] 2000 at about the time that Hager Exhibit 5 was
[4] produced?
[5]     A: I believe it was.
[6]     Q: Did management, around October
[7] 2000, believe that an incremental provision of
[8] $13 million was necessary to properly reflect the
[9] level of health insurance expense?
[10]     A: I assume we did, as this
[11] memorandum says. In the fourth quarter, fiscal
[12] fourth quarter of 2001, Genesis Health Ventures
[13] took a material charge for health insurance
[14] expense resulting from the conversion of fully
[15] insured programs to self-insured programs, a
[16] negative experience that we incurred in the
[17] utilization of health insurance expense for our
[18] employees. I don't recall the specifics of that
[19] charge.
[20]     When that issue was identified and
[21] quantified, that identification and
[22] quantification occurred after the time the
[23] detailed budgets were prepared.
[24]     That's why the budgets presented
[25] to the Creditors Committees and our Board needed

---

**Min-U-Script®**          RAYVID REPORTING SERVICE, INC.