In RE:GENESIS HEALTH VENTURES INC.et al.,
In Re:MULTICARE AMC INC.et al.

GEORGE HAGER
August 23, 2001

---

Page 81

**GEORGE HURST**

[1]
[2] to reflect a higher level of health insurance
[3] expense that was reflected when the detailed
[4] budgets were prepared.
[5]    The budget process at Genesis
[6] starts typically in the April/May time frame.
[7]    Q: Do you recall how the actual
[8] experience ended up relating to this budgeted
[9] adjustment that's discussed here?
[10]    A: It appears right now that actual
[11] performance is tracking fairly close to our 2001
[12] budgeted level of health insurance expense.
[13]    Q: So the incremental provision of
[14] $13 million was necessary?
[15]    A: Yes, absolutely.
[16]    Q: Turning to the next page, GS 807,
[17] I draw your attention to the adjustments shown on
[18] that page for liability insurance, Age Institute
[19] and rehab services.
[20]    Is that an accurate reflection of
[21] the budgeted adjustments that were made for
[22] fiscal year 2000 in those three items?
[23]    A: I would assume they are.
[24]    Q: Now, the Age Institute adjustment,
[25] again, that reflects a loss of a management

---

Page 82

**GEORGE HURST**

[1]
[2] contract?
[3]    A: A management contract and the
[4] contracts to provide primarily pharmacy, medical
[5] supply and rehabilitation therapy services to the
[6] Age Institute facilities.
[7]    Q: Was there any reduction in
[8] overhead that was associated with losing that
[9] contract?
[10]    A: Yes, there was.
[11]    Q: Do you know what the
[12] quantification of that was?
[13]    A: I don't know specifics.
[14]    MR. PRIMPS: I need just a one
[15] minute recess here.
[16]    (At this point in the proceedings
[17] there was a recess, after which the
[18] deposition continued as follows:)
[19]    MR. PRIMPS: I would like to mark
[20] as Hager Exhibit 9 a document entitled
[21] "Genesis Health Ventures Inc., Meeting
[22] with Steering Committee for the Senior
[23] Lenders," and at the bottom of the
[24] document it's the Weil, Gotshal logo
[25] appearing dated February 13, 2001.

---

Page 83

**GEORGE HURST**

[1]
[2]    (The above described document was
[3] marked Hager Exhibit 9 for identification,
[4] as of this date.)
[5]    Q: You've had a chance to look at
[6] this document, Mr. Hager?
[7]    A: I have.
[8]    Q: Have you seen it before?
[9]    A: I have.
[10]    Q: Can you state for the record what
[11] it is?
[12]    A: This document was a presentation
[13] that was made to the Steering Committee for the
[14] senior lenders of an initial restructuring
[15] proposal put forth by Genesis and MultiCare.
[16]    Q: Did you play a part in making the
[17] presentation before this senior lender group?
[18]    A: I did.
[19]    Q: Could you state for the record
[20] what role you played in making that presentation?
[21]    A: I recall that I made the
[22] presentation myself regarding this proposal.
[23]    Q: Were you the principal
[24] draftsperson of this document?
[25]    A: This document was drafted with

---

Page 84

**GEORGE HURST**

[1]
[2] myself and my counsel from Weil, Gotshal.
[3]    Q: This was a meeting with the
[4] Steering Committee for the senior lenders at the
[5] Weil, Gotshal law firm's New York offices, is
[6] that correct?
[7]    A: I don't recall the location of the
[8] meeting specifically.
[9]    Q: Drawing your attention to stamped
[10] Page 575 of the document, "Genesis Health
[11] Ventures and MultiCare Companies Restructuring
[12] Proposal Summary," also dated February 13, 2001,
[13] do you see that?
[14]    A: Yes.
[15]    Q: Did you play a role in the
[16] drafting of this page?
[17]    A: I did.
[18]    Q: Were you the principal drafter of
[19] this page?
[20]    A: Yes.
[21]    Q: You have a series of statements
[22] under the heading "Goals." Were these the goals
[23] of the restructuring proposal at that point in
[24] time?
[25]    A: They were.

---

**GEORGE HAGER**
**August 23, 2001**

In Re:GENESIS HEALTH VENTURES INC.et al.,
In Re:MULTICARE AMC INC.et al.

---

Page 93

### GEORGE HURST

[1]
[2] **MR. STROCHAK:** Thank you. Same
[3] objection. Do you have the question in
[4] mind.
[5] **A:** Could you repeat the question?
[6] **Q:** Yes. Do you see where under
[7] "Postpetition Interest Paid" there's $112 million
[8] shown for Genesis and nothing is shown for
[9] MultiCare?
[10] **A:** That's correct.
[11] **Q:** Is that difference because Genesis
[12] was the financially sounder company and better
[13] able to pay postpetition interest?
[14] **MR. STROCHAK:** Objection, assumes
[15] facts, is speculation.
[16] **A:** I really can't respond to that
[17] question. Obviously if we had to borrow out of
[18] the Debtor in Possession facility to pay the
[19] interest it would tell one that we did not have,
[20] you know, the capability without borrowing to pay
[21] interest; nor did MultiCare.
[22] **Q:** Well, do you know why there was no
[23] allocation of postpetition interest paid for
[24] MultiCare?
[25] **A:** MultiCare negotiated with its

---

Page 94

### GEORGE HURST

[1]
[2] financial institutions, as did Genesis, payment
[3] or nonpayment of interest at the time we were
[4] negotiating for the Debtor in Possession
[5] financing at the time we entered bankruptcy.
[6] **Q:** But they were the same group of
[7] lenders, were they not, for both entities?
[8] **A:** They were substantially the same.
[9] **Q:** During the period to date when
[10] Genesis and MultiCare have been under the
[11] protection of the bankruptcy laws, has there been
[12] any drawdown by MultiCare from the DIP?
[13] **A:** There has not been.
[14] **Q:** Why was there no drawdown on the
[15] DIP by MultiCare to pay Genesis Health Ventures
[16] for the services that it was rendering to
[17] MultiCare?
[18] **MR. MUNDIYA:** Objection to the
[19] form.
[20] **MR. STROCHAK:** Objection, assumes
[21] facts.
[22] **A:** MultiCare has paid Genesis
[23] postpetition for all services provided, and in
[24] fact, MultiCare was required to pay for services
[25] in advance in the postpetition period.

---

Page 95

### GEORGE HURST

[1]
[2] **Q:** Wasn't there a writeoff of some of
[3] the payments that MultiCare owed Genesis?
[4] **MR. MUNDIYA:** Objection to the
[5] form of the question.
[6] **A:** You're saying a writeoff in the
[7] postpetition period?
[8] **Q:** Yes.
[9] **A:** The only expectation of nonpayment
[10] is the subordinated management fee. All other
[11] services have been paid in full to date in the
[12] postpetition period.
[13] **Q:** How much was that, that management
[14] fee that you just referred to?
[15] **A:** It's approximately $1 million a
[16] month.
[17] **Q:** Excuse me?
[18] **A:** It's approximately $1 million per
[19] month.
[20] **Q:** Do you know how much was written
[21] off that was owed Genesis by MultiCare?
[22] **MR. STROCHAK:** Objection, vague.
[23] Written off? I mean, Bill, are you
[24] referring to an accounting write-down?
[25] **MR. PRIMPS:** Yes, a write-down in

---

Page 96

### GEORGE HURST

[1]
[2] accounting terms.
[3] **A:** There is no writeoff that I'm
[4] aware of to date. Genesis and MultiCare have
[5] reached an agreement regarding claims that either
[6] entity might have against each other.
[7] MultiCare owed Genesis
[8] approximately $56 million for services provided
[9] in the prepetition period, say, trade services,
[10] and the deferred management fee was approximately
[11] $35 million or $36 million, which was
[12] subordinated under the provisions of all the loan
[13] agreements and was not allowed to be paid.
[14] **Q:** So that was a total of something
[15] in excess of $90 million that was owing from
[16] MultiCare to Genesis, is that correct?
[17] **A:** That's correct. 56 in trade and
[18] approximately 36 in subordinate deferred
[19] management fees.
[20] **Q:** Why wasn't the DIP drawn on by
[21] MultiCare to pay those amounts?
[22] **A:** MultiCare had no obligation to pay
[23] for prepetition services.
[24] If Genesis would have forced the
[25] payment of prepetition services, not having been

---

In Re:GENESIS HEALTH VENTURES INC.et al.,
In Re:MULTICARE AMC INC.et al.

GEORGE HAGER
August 23, 2001

---

Page 97

**GEORGE HURST**

[1]
[2] forced to make that decision. I'm sure that the
[3] independent officer of MultiCare would have
[4] evaluated an alternative provider of service.
[5]    Q: Why did Genesis determine that it
[6] should continue providing services to MultiCare
[7] if it was owed something in excess of $90
[8] million?
[9]    MR. MUNDIYA: Objection to the
[10] form.
[11]    A: I think we can look at — you need
[12] to separate the deferred management fee and the
[13] trade.
[14]    The deferred management fee,
[15] Genesis knew when it went into the management
[16] agreement that it was structurally subordinate,
[17] and MultiCare's debt levels had to be reduced
[18] before Genesis could be paid for those management
[19] fees.
[20]    As far as the trade is concerned,
[21] Genesis had reached agreement with MultiCare to
[22] prepay for services, and even though Genesis had
[23] incurred a loss for the prepetition services,
[24] there were still significant value to Genesis to
[25] continue to serve the MultiCare buildings as long

---

Page 98

**GEORGE HURST**

[1]
[2] as MultiCare would pay for those services.
[3]    We reached agreement to pay for
[4] those services with MultiCare with no incremental
[5] credit being extended.
[6]    Genesis service providers want to
[7] continue to service those buildings and realize
[8] the profit of servicing those buildings in the
[9] postpetition period.
[10]    That reaction was not atypical to
[11] other vendors of Genesis, who wanted to provide
[12] services to Genesis in the postpetition period
[13] that were impaired in the prepetition period.
[14]    Q: If these various obligations,
[15] whether management fee or trade, owed from
[16] MultiCare to Genesis could have been collected,
[17] what would impact would it have had on the
[18] Genesis estate?
[19]    MR. MUNDIYA: Objection, calls for
[20] speculation.
[21]    MR. STROCHAK: Same objection.
[22]    A: I'm not aware they could have been
[23] collected.
[24]    Q: Why could they not have been
[25] collected?

---

Page 99

**GEORGE HURST**

[1]
[2]    A: MultiCare had no cash to pay.
[3]    Q: I'd like to draw your attention to
[4] the portion of Hager Exhibit 9 stamped GEN C
[5] 00577.
[6]    Do you see that page that is
[7] divided into projected enterprise value,
[8] restructuring proposal, and leverage and
[9] allocation of debt and equity value?
[10]    A: I do.
[11]    Q: Were you responsible for drafting
[12] this page?
[13]    A: I was.
[14]    Q: Under the projected enterprise
[15] value, can you state what this presentation was
[16] designed to show?
[17]    A: Excuse me, the projected
[18] enterprise value section?
[19]    Q: Yes.
[20]    A: Was meant to show Genesis' view of
[21] the enterprise value of Genesis on an individual
[22] basis, MultiCare on an individual basis, and the
[23] value of the combined company.
[24]    Q: Do you know how the valuation
[25] multiples shown there of 7 for Genesis and 6 for

---

Page 100

**GEORGE HURST**

[1]
[2] MultiCare with a consolidated 6.7, how those
[3] numbers were derived?
[4]    A: The Genesis multiple of 7 was a
[5] weighting of an 8 times multiple for the pharmacy
[6] business and a 6 times multiple for the nursing
[7] center business.
[8]    The weighting of approximately 7
[9] times — a weighted average of approximately 7
[10] times.
[11]    MultiCare is principally a nursing
[12] home business, was afforded the same 6 times
[13] multiple.
[14]    And the 6.7 times multiple is just
[15] a weighted average of the two.
[16]    Q: I understand now how the multiples
[17] were weighted. How were they derived by you?
[18] Was it with reference to real world data,
[19] comparables?
[20]    A: I don't have the specific market
[21] comparables that we used in making that
[22] determination, but we would have been looking at
[23] market comparables of peers in our industry,
[24] discounting them for appropriate factors, as the
[25] basis for those valuation multiples.

---

AA. 1090

IN RE:GENESIS HEALTH VENTURES INC.et al.,
In Re:MULTICARE AMC INC.et al.

GEORGE HAGER
August 23, 2001

Page 113

GEORGE HURST

[1]
[2]   A: It is today. Concurrently with
[3]   the transaction of the joint venture buying
[4]   MultiCare, Genesis Health Ventures purchased from
[5]   the joint venture MultiCare's rehabilitation
[6]   therapy business.
[7]       Approximately three months after
[8]   the closure of the transaction Genesis Health
[9]   Ventures purchased the MultiCare pharmacy
[10]  business.
[11]  Q: How much was that for?
[12]  A: My recollection is the pharmacy
[13]  business was acquired for $50 million and the
[14]  therapy business was acquired for I believe
[15]  around $22 million to $24 million.
[16]  Q: What was the total purchase price
[17]  of the MultiCare transaction in 1997?
[18]  A: I don't recall today.
[19]  Q: If I told you it was $1.5 billion
[20]  would that refresh your recollection?
[21]  A: No. It sounds high.
[22]  Q: Have you seen any numbers
[23]  indicating what the valuation on a per bed basis
[24]  of the new MultiCare/Genesis enterprise will be
[25]  upon emergence from the bankruptcy?

Page 114

GEORGE HURST

[1]
[2]   MR. MUNDIYA: Objection to the
[3]   form of the question. Could you repeat
[4]   the question.
[5]       (The question requested was read
[6]   back by the reporter.)
[7]   A: I have not. They're calculable,
[8]   but I have not calculated them.
[9]   Q: Can you estimate them as you sit
[10]  here today?
[11]  MR. MUNDIYA: Objection, calls for
[12]  speculation.
[13]  MR. PRIMPS: I'm not asking for
[14]  speculation, I'm asking for an estimate.
[15]  A: I don't have an estimate that I
[16]  can do that quickly.
[17]      You have to apply a value to the
[18]  owned beds that was different from the leased
[19]  beds, and obviously dramatically different from
[20]  any managed or affiliated beds, so it's not an
[21]  easy calculation to do.
[22]  Q: I'd like to draw your attention to
[23]  the same exhibit, Hager Exhibit 9, moving ahead
[24]  to the portion of the document stamped GEN C
[25]  00603.

Page 115

GEORGE HURST

[1]
[2]   Do you see that sheet?
[3]   A: I do.
[4]   Q: Was this prepared by UBS Warburg?
[5]   A: It looks like the model format
[6]   that they used, yes.
[7]   Q: Do you know if you had input into
[8]   this document?
[9]   A: I did.
[10]  Q: What was the nature of that input?
[11]  A: Myself and my staff provided the
[12]  historical data, and with the input of UBS we
[13]  developed the forecast assumptions that were used
[14]  to create this model.
[15]  Q: I'd like to draw your attention to
[16]  the model assumptions in the box in the upper
[17]  right area of that chart. Do you see that?
[18]  A: I do.
[19]  Q: On this particular chart you've
[20]  got "APS Acquisition." That's not a model
[21]  assumption. I see zero next to it, so it's not
[22]  included?
[23]  A: That's correct.
[24]  Q: Likewise, the Mariner contract
[25]  loss, that's not assumed, correct?

Page 116

GEORGE HURST

[1]
[2]   A: That's also correct.
[3]   Q: Just moving down that list, the
[4]   BBRA revenue adjustment, do you see that?
[5]   A: Yes.
[6]   Q: That is an assumption, is it not?
[7]   A: It is.
[8]   Q: Can you state for the record what
[9]   BBRA is?
[10]  A: The Balanced Budget Refinement
[11]  Act.
[12]  Q: That was passed when?
[13]  A: I don't recall specifically, but I
[14]  would say sometime near the end of 1999.
[15]  Q: Do you know when it was effective?
[16]  A: It was effective in pieces. One
[17]  piece of the BBRA was effective 4/1/2000, and
[18]  that's where BBRA adjusted the payment rates on I
[19]  believe 13 RUG payment categories.
[20]      It was, another piece was
[21]  effective 10/1/00, which gave an across the board
[22]  increase in the inflation adjustment on all
[23]  categories of approximately 4 percent, in
[24]  addition to the normal market basket rate
[25]  increase.

GEORGE HAGER
August 23, 2001

In Re:GENESIS HEALTH VENTURES INC.et al.,
In Re:MULTICARE AMC INC.et al.

Page 117

**GEORGE HURST**

[1]
[2]    The reason why you were making an
[3] assumption there is the legislation as written,
[4] the impact of the BBRA adjustments on those 13
[5] RUG categories I believed sunset 9/30/00 unless
[6] HCVA did not make the changes required to the or
[7] expected to be made to the current PPS system.
[8]    Those changes were not made,
[9] therefore, the payment rate increases in BBRA
[10] continue to this day.
[11]    Q: So the actual BBRA revenue
[12] adjusted fee, what does the PPD refer to?
[13]    A: Per patient day.
[14]    Q: That number is $20.68?
[15]    A: That's correct. Now, as I look at
[16] this model, what I think, what I believe is being
[17] referred to in this model for BBRA is not the
[18] Balanced Budget Refinement Act.
[19]    I believe BBRA reference here is
[20] referencing the Benefit Improvement Protection
[21] Act.
[22]    We were interchanging BBRA 2 with
[23] the Benefit Improvement Protection Act when we
[24] were creating these models.
[25]    Because the PPD impact of BBRA was

Page 118

**GEORGE HURST**

[1]
[2] not $20.68, but that is close to the impact of
[3] the Benefit Improvement Protection Act changes.
[4]    Q: When did the Benefit Improvement
[5] Protection Act changes take place?
[6]    A: April 1st of 2001.
[7]    Q: The adjustment shown here, was
[8] this actually calculated, the $20.68, on a
[9] weighted caseload by average basis?
[10]    A: Yes, it was.
[11]    Q: What is the actual rate, then, on
[12] a per day basis, per Medicare day?
[13]    A: Our current Medicare rate with the
[14] Benefit Improvement Protection Act rate increase
[15] is somewhere in the neighborhood of $340 per
[16] Medicare patient day.
[17]    Q: I'd like to draw your attention to
[18] GEN C 00604. That's a February 12, 2001 document
[19] with UBS Warburg on it. Do you see that?
[20]    A: I do.
[21]    Q: Were you involved in the
[22] production of this document in any way?
[23]    A: This page and that first page that
[24] we just looked at are all part of the same model
[25] that was created.

Page 119

**GEORGE HURST**

[1]
[2]    This is a summarization of the
[3] actual forecasts. I didn't create the model. I
[4] did participate in the development of the
[5] assumptions.
[6]    Q: Do you know, looking at the EBITDA
[7] calculation as it's set up in the left-hand
[8] column where you've got EBITDA, and then next to
[9] it is ElderCare, NeighborCare, rehab services,
[10] management services, other, and intercompany,
[11] going down to a total? Do you see that?
[12]    A: Yes.
[13]    Q: What's included in that management
[14] service line item?
[15]    A: I'd have to go and pull all the
[16] specifics, but the largest component of that
[17] would be the regional and corporate overhead of
[18] the company.
[19]    Q: That's a number that reduces
[20] EBITDA, is it not?
[21]    A: That's correct. In this model we
[22] have not allocated either regional or corporate
[23] overhead to any of the business lines.
[24]    Q: Is there anything else that you
[25] can recall that's in the management service item?

Page 120

**GEORGE HURST**

[1]
[2]    A: I would be guessing. I'm sure
[3] there's other things that roll up there.
[4]    There might be some management fee
[5] income in that line. I'm not sure whether that
[6] component of our business rolls into management
[7] services or into other.
[8]    So there might be some small
[9] elements of investment income or rental income,
[10] but I'd have to go pull the model to get the
[11] specifics.
[12]    Q: Does that indicate, though, that
[13] it's costing you more to run the business than
[14] the fees that are coming in?
[15]    A: This is — the total corporate
[16] overhead is not the cost of running a management
[17] services business.
[18]    No, the EBITDA in any one of those
[19] years is positive over $200 million, so obviously
[20] we are generating enough cash flow to more than
[21] pay for the corporate overhead.
[22]    Q: But are the MultiCare fees being
[23] booked into that category of management services?
[24]    MR. STROCHAK: Objection, vague.
[25]    Go ahead.

Page 117 - Page 120  (32)        Min-U-Script®        RAYVID REPORTING SERVICE, INC.

AA. 1092

In RE:GENESIS HEALTH VENTURES INC.et al.,
In Re:MULTICARE AMC INC.et al.

GEORGE HAGER
August 23, 2001

---

Page 121

**GEORGE HURST**

[1]
[2]    A: In this model the MultiCare
[3] management fees are — this is a consolidated
[4] model. The MultiCare management fees are not a
[5] factor because they are eliminated in
[6] consolidation.
[7]    MultiCare management fee is
[8] revenue to Genesis and expense in the exact same
[9] amount on the books of MultiCare, so the
[10] management fee itself would not have any impact
[11] on consolidated or combined EBITDA.
[12]    Q: I'd like to draw your attention to
[13] the printout that's stamped GEN C 0060 7, another
[14] UBS Warburg printout dated February 12, 2001.
[15]    Do you see that?
[16]    A: I do.
[17]    Q: Can you state if you had any role
[18] in the production of this document?
[19]    A: I was involved with the production
[20] of the UBS models. I can't — this model looks
[21] like it's very close to the previous model, so I
[22] would say I was involved as I was in the
[23] production of all of the UBS forecasts.
[24]    Q: I'd like to just draw your
[25] attention to the expense side of the ledger and

---

Page 122

**GEORGE HURST**

[1]
[2] some of these, going down to the bottom of the
[3] page, cost of sales, salaries, wages and
[4] benefits, do you see that left-hand column?
[5]    A: Yes.
[6]    Q: In particular, next to salaries,
[7] wages and benefits, year 2000 versus first
[8] quarter 2001, do you see the salary, wages and
[9] benefits going from a 42.5 percent number to a
[10] 49.3 percent number?
[11]    A: I do.
[12]    Q: Do you know why there was that
[13] kind of jump, from 42.5 for the year 2000, and
[14] then in the first quarter of 2001 you're all the
[15] way up to 49.3 percent?
[16]    A: I would have to get into the
[17] specifics of the model, but I will tell you that
[18] it is apparent here that there are some
[19] differences in classification of expense.
[20]    One should look at salaries, wages
[21] and benefits and other operating expense on a
[22] combined basis.
[23]    In fiscal 2000 that number is,
[24] combined number I believe is hard to read. I
[25] have to do the calculation, I assume that's 48.9

---

Page 123

**GEORGE HURST**

[1]
[2] percent. I'm sorry, it's 58.9 percent.
[3]    Q: Where are you reading from in the
[4] document?
[5]    A: The 2000 column combining the
[6] bottom table, salaries, wages and benefits, and
[7] other operating expenses. These are calculated
[8] on a percent of revenue basis.
[9]    Q: Yes.
[10]    A: And you go to fiscal '01 for the
[11] full year and it's 61.6 percent. Additionally,
[12] cost of sales as a percent of revenue has gone
[13] down from 29.9 percent to I believe 26.5 percent.
[14]    You have to get into the mechanics
[15] of the model, but clearly we have some cost
[16] classification issues, as well as revenue mix
[17] issues, because to the extent the relationship of
[18] the pharmacy revenue and the nursing home revenue
[19] change in this model, because they grow a
[20] different rates, it will change the mix of the
[21] and the percentage of the expense relationships
[22] to revenue by line item.
[23]    I think you'll see this model in
[24] total projects relatively stable margins on a
[25] consolidated basis, EBITDA margins for the

---

Page 124

**GEORGE HURST**

[1]
[2] forecast period.
[3]    Q: But again, just comparing year
[4] 2000 with the projection for the year 2001, on
[5] salary, wages and benefits you're going from 42.5
[6] percent to whatever that is, 48 or 46.6 percent.
[7] 48.6 percent.
[8]    MR. STROCHAK: Objection. Are you
[9] asking him if that's what the document
[10] says?
[11]    MR. PRIMPS: I'm asking whether he
[12] agrees that that is a substantial
[13] increase.
[14]    A: I can't comment on that, because I
[15] don't know whether that change reflects changes
[16] in classifications of individual line items or a
[17] change in business mix.
[18]    I will tell you that the EBITDA
[19] margin for fiscal 2000 on a consolidated basis
[20] was 8.2 percent, and it increased to 8.4 percent
[21] in 2001. So this model projects a growth in
[22] EBITDA margin.
[23]    I really can't comment on the
[24] specific growth in individual line items.
[25]    There's too many factors that

---

GEORGE HAGER
August 23, 2001

In Re:GENESIS HEALTH VENTURES INC.et al.,
In Re:MULTICARE AMC INC.et al.

Page 133

**GEORGE HURST**

[1]
[2] been others, but I don't recall others speaking
[3] at that meeting.
[4]    Q: What was your impression of the
[5] presentation? Was it professional and of high
[6] caliber?
[7]    A: It was a good presentation, yes.
[8]    Q: Now, moving on to GS 1851, the
[9] financing strategy assumptions, do you see under
[10] that exit financing bullet that the pro forma
[11] leverage is based on third quarter 2001 annual
[12] EBITDA of $230 million?
[13]    A: I do.
[14]    Q: Did you have an understanding of
[15] what that $230 million EBITDA related to? Was it
[16] combined pro forma for Genesis and MultiCare?
[17]    A: I don't know. I assumed it was
[18] combined, but I do not know where the $230
[19] million number came from other than it is very
[20] close to the $231 million normalized EBITDA
[21] number that we had discussed previously.
[22]    Q: But you noticed that the term
[23] normalized is not used on that line, it is
[24] annualized?
[25]    A: Oh, that's correct.

Page 134

**GEORGE HURST**

[1]
[2]    Q: How do you distinguish between the
[3] normalized EBITDA and the annualized EBITDA in
[4] your mind?
[5]    A: Once again, I didn't create this
[6] document, but it looks like what they've done is
[7] annualized the third quarter 2001 projected
[8] EBITDA, I guess.
[9]    Since this presentation was given
[10] in February, our third quarter would not have
[11] begun yet, so I'm quite frankly not sure where
[12] they got the $230 million number from.
[13]    Q: Do you know if they looked at
[14] projected third quarter EBITDA and then
[15] multiplied it times four?
[16]    A: I don't know.
[17]    Q: Do you know if the annualized
[18] EBITDA had a synthetic lease expense attributed
[19] to it?
[20]    A: In this presentation?
[21]    Q: Yes.
[22]    A: I don't know.
[23]    Q: I draw your attention to the
[24] scenario assumption listing bullet where the
[25] final item is synthetic lease in EBITDA.

Page 135

**GEORGE HURST**

[1]
[2]    Does that refresh your
[3] recollection as to whether there was a synthetic
[4] lease expense included in the EBITDA?
[5]    A: I don't know what that means, what
[6] that line means. I would have expected that the
[7] synthetic lease adjustment and anything that
[8] Goldman presented with respect to exit financing
[9] would have been eliminated.
[10]    Q: Why would you make that
[11] assumption?
[12]    A: Because a synthetic lease in
[13] connection with our restructuring is considered
[14] debt, so the lease expense gets eliminated and
[15] EBITDA is increased and the debt level is
[16] increased to reflect the underlying debt of the
[17] synthetic lease.
[18]    Q: You see that in the scenario
[19] assumptions, there's the second item, no APS
[20] acquisition and the Mariner contract loss.
[21]    Do you see those two assumptions?
[22]    A: Yes.
[23]    Q: Do you know what the impact on the
[24] projected EBITDA would be if there were an APS
[25] acquisition?

Page 136

**GEORGE HURST**

[1]
[2]    MR. STROCHAK: Objection, calls
[3] for speculation.
[4]    A: In what period?
[5]    Q: In the period going forward, I
[6] guess it would be fiscal 2000 when the
[7] acquisition would actually occur?
[8]    A: Fiscal 2002?
[9]    Q: 2002, yes.
[10]    A: There were models created to model
[11] that impact. I don't have those models in front
[12] of me, but it would reflect the impact of that
[13] acquisition.
[14]    Q: That would have a positive impact
[15] on EBITDA?
[16]    A: It would.
[17]    Q: Do you recall what order of
[18] magnitude that impact would be on an annual
[19] basis?
[20]    A: It's a somewhat complicated
[21] analysis, but one would have to first make an
[22] assumption of whether or not the current revenue
[23] that Genesis generates by serving Mariner
[24] facilities is retained.
[25]    This model would assume that we

AA. 1094

In Re:GENESIS HEALTH VENTURES INC.et al.,
In Re:MULTICARE AMC INC.et al.

GEORGE HAGER
August 23, 2001

---

Page 137

**GEORGE HURST**

[1]
[2] completed the APS transaction, that we would most
[3] likely retain that business.
[4]     The next assumption would be how
[5] much EBITDA do you acquire when you acquire APS.
[6]     That number, that current
[7] operating performance of APS is approximately $4
[8] million of EBITDA.
[9]     Then the next component of the
[10] transaction is synergies, how many synergies will
[11] be realized by integrating APS with the existing
[12] pharmacy subsidiary of Genesis.
[13]     You have to go back and look at —
[14] there are many presentations that reflect
[15] synergies, my recollection is the gross synergies
[16] are as high as 20, low $20 million range.
[17]     You have to make an assumption as
[18] to how many of those synergies you would expect
[19] to realize. We have historically used a 50
[20] percent factor in evaluating synergies for
[21] purposes of modeling.
[22]     Q: So if you added the impact of the
[23] APS acquisition and also the Mariner contract and
[24] the synergies, do you know what kind of order of
[25] magnitude the impact on EBITDA would be?

Page 138

**GEORGE HURST**

[1]
[2]     A: There's one more assumption you
[3] have to make. When we made the assumption in the
[4] base case model, which is the model that we've
[5] seen before, with the $214 million of EBITDA,
[6] that we've lost the Mariner beds.
[7]     We make another assumption, that
[8] we increase our ability to utilize the excess
[9] pharmacy capacity and grow the number of beds
[10] that NeighborCare serves of external third-party
[11] customers.
[12]     I don't recall that exact amount
[13] of EBITDA growth or number of beds that we
[14] assumed, but we did make an assumption that we
[15] would replace some of that excess capacity.
[16]     So those two things, I believe the
[17] excess capacity replacement and the continuation
[18] of the APS or the Mariner beds that we serve for
[19] the most part offset each other in the models.
[20]     It would leave you with the
[21] synergies and the acquired EBITDA. As I said,
[22] the acquired EBITDA is $4 million. At current
[23] run rate, and I think the synergies are somewhere
[24] in the fully realized, and I believe in our
[25] models we don't fully realize all the synergies

Page 139

**GEORGE HURST**

[1]
[2] until sometime in '03, I believe. I think it was
[3] in the low $20 million range, and we are
[4] obligated to pay approximately $60 million to
[5] acquire the business.
[6]     It's a $42.5 million purchase
[7] price with three contingent payments of $6
[8] million on the successive three anniversaries of
[9] the closure of the transaction.
[10]     And obviously any ability it
[11] acquire the business at that level is subject to
[12] a bidding process in Mariner's Bankruptcy Court.
[13]     Q: Does the deal look like it's going
[14] to go through at this point?
[15]     MR. STROCHAK: Objection, calls
[16] for speculation.
[17]     A: We are hopeful that we will sign a
[18] purchase agreement with them relatively shortly.
[19] Whether or not the transaction will close I would
[20] say is out of our control.
[21]     The largest industry competitor,
[22] OmniCare, we've been told has expressed interest
[23] in this asset, and obviously have the financial
[24] wherewithal to outbid NeighborCare/Genesis in any
[25] acquisition transaction.

Page 140

**GEORGE HURST**

[1]
[2]     We would need to get Bankruptcy
[3] Court and exit lender approval to increase our
[4] current bid, so I would say there's significant
[5] uncertainty with respect to the ultimate closure
[6] of that transaction and the retention of the
[7] Mariner beds.
[8]     Q: I'd like to draw your attention to
[9] the portion of this document stamped GS 01858,
[10] "Structuring Rollover Indebtedness."
[11]     Do you recall seeing this page
[12] prior to today?
[13]     A: I don't recall it specifically.
[14] The issues of the — the issue of the terms of
[15] the rollover indebtedness were discussed, though.
[16]     Q: Looking at the last bullet
[17] appearing on that page where it states, "A bond
[18] offering to refinance the rollover debt
[19] will eliminate significant intercreditor
[20] issues and allow existing lenders to
[21] receive cash that can be rolled into the
[22] new credit facilities."
[23]     Is it your understanding that all
[24] the exit financing package ultimately is going to
[25] be sold in secondary markets?

---

In Re:GENESIS HEALTH VENTURES INC.et al.,
In Re:MULTICARE AMC INC.et al.

GEORGE HAGE[
August 23, 200[

Page 153

**GEORGE HURST**

[2] eroding EBITDA margin are overly conservative in
[3] many respects?
[4]    A: Can you repeat that question
[5] again?
[6]    Q: Did you discuss with Mr. Hurst or
[7] anyone from Houlihan the assertion contained or
[8] the conclusion contained here, the fourth
[9] bulleted item, "The assumptions in the company's
[10] five year plan for revenue growth and
[11] eroding EBITDA margin are overly
[12] conservative in many respects?
[13]    A: I did not.
[14]    Q: Did you have a view at this time
[15] that agreed or disagreed with the statement that,
[16] "A more realistic assessment based on a
[17] detailed line item review of the plan and
[18] comparisons with similar companies in the
[19] industry indicates that the company
[20] should post much stronger performance"?
[21]    MR. STROCHAK: Objection, at what
[22] time?
[23]    MR. PRIMPS: This was in his
[24] discussion with Mr. Hurst.
[25]    A: I had discussions with Patrick

Page 154

**GEORGE HURST**

[2] Hurst on that issue, I don't recall them on this
[3] specific point of the presentation, but we have
[4] strong disagreement in that regard.
[5]    We provided information to
[6] Houlihan Lokey that said our operations equal our
[7] peers in the industry.
[8]    Q: Well, the final bulleted item,
[9] "Genesis compares favorably to other
[10] comparably publicly traded companies and
[11] would be priced at similar EBITDA
[12] multiples," did you discuss that with
[13] Mr. Hurst?
[14]    A: I did not.
[15]    Q: Do you agree with that statement,
[16] that Genesis compares favorably to other
[17] comparable publicly traded companies and would be
[18] priced at similar EBITDA multiples?
[19]    A: I couldn't comment on that bullet.
[20]    Q: Do you have a concept of what a
[21] comparable publicly traded company to Genesis
[22] would be?
[23]    MR. STROCHAK: Objection. Are you
[24] asking him in the sense that it's written
[25] in this report, or are you asking him

Page 155

**GEORGE HURST**

[2] just in his own sense?
[3]    MR. PRIMPS: His own views.
[4]    A: I think if someone presented me
[5] with a description of a company I could make an
[6] assessment as to whether or not I thought that
[7] company was comparable to Genesis Health
[8] Ventures.
[9]    Q: You don't have one or more
[10] publicly traded companies that you would think
[11] would be a comparable company to combined
[12] Genesis/MultiCare?
[13]    A: I really don't think there is a
[14] comparable company to Genesis/MultiCare combined
[15] in the public marketplace.
[16]    There are, you know, some
[17] companies that would be comparable to a component
[18] of Genesis/MultiCare combined and other companies
[19] that would be comparable to other components of
[20] Genesis/MultiCare combined, but I'm not aware of
[21] a company in the public marketplace that has the
[22] same business mix or model as Genesis Health
[23] Ventures.
[24]    MR. PRIMPS: Can we take a very
[25] short break here?

Page 15[

**GEORGE HURST**

[2]    MR. STROCHAK: Sure.
[3]    (At this point in the proceedings
[4] there was a recess, after which the
[5] deposition continued as follows:)
[6]    MR. PRIMPS: Let's mark this Hager
[7] 11.
[8]    (The above described document was
[9] marked Hager Exhibit 11 for
[10] identification, as of this date.)
[11]    Q: Let me just ask you very quickly,
[12] Mr. Hager, if you've seen this document before?
[13]    A: No.
[14]    Q: I note that on the fourth page of
[15] the document it has a run rate EBITDA set of
[16] numbers with the combined $231.4 million number
[17] shown.
[18]    We've seen that number before,
[19] haven't we?
[20]    A: We have.
[21]    Q: Then it has an APS impact of $18.3
[22] million. Are you aware of any projections that
[23] the impact of the APS acquisition would be a
[24] positive $18.3 million of EBITDA?
[25]    A: I do not know where that number

filings with the Securities and Exchange Commission after the confirmation hearings. As to the discovery provided prior to the confirmation hearings, at the time of the hearings, the defendants did not request additional time to review the materials and prepare their objections to confirmation. As to the SEC disclosure, the SEC filings were timely filed, and included post confirmation data. Neither the circumstances before or after confirmation justify a finding of wrongful concealment of material facts.

> FN8. The plaintiffs do assert that the defendants wrongfully concealed the fact that a new contract with Mariner "was executed on or about September 24, 2001, but defendants did not disclose it until October 8, 2001, *6 days* after the Court approved the Genesis bankruptcy Plan. Genesis did not disclose the extension of the Mariner supply contract until its 10Q for the first quarter of 2002, which was filed 4 months after the confirmation of the Plan." Complaint at 57, ¶ 128. However, debtors' plan of confirmation was approved on September 12, 2001, approximately two weeks prior to the alleged execution of the agreement. Second, the proposed Mariner transaction was specifically addressed in the opinion on confirmation which recognized that the "debtors have entered into a letter of intent to purchase APS. If the purchase is consummated, the potential for an increase in the debtors' EBITDA is strong." 266 B.R. at 613. However, the "actual consummation of the transaction was deemed too speculative for inclusion as a basis for the calculation of a forecast EBITDA for valuation purposes." *Id.* The potential contract with Mariner was not new or concealed, but rather a recognized and contested adjustment to EBITDA during the confirmation process. Plaintiffs have failed to establish an affirmative act of concealment or contrivance on this record.

Second, the plaintiffs were not prevented from asserting their claims at confirmation. As noted above, their claims focused on the correctness of the enterprise valuation of the debtors. That claim was fully litigated at confirmation. The fraud exception to res judicata does not apply.

I conclude that the plaintiffs' complaint against each of the named Senior Lenders, including Goldman,

Mellon and Highland Capital, is barred by the doctrine of res judicata.

### IV. *Collateral Estoppel*

[11] In the alternative, the defendants contend that the doctrine of collateral estoppel,*527 or issue preclusion, bars the plaintiffs' complaint. They allege that "the central issue during the confirmation contest was the measure of enterprise value of the Debtors, including the reasonableness of the Debtors' fiscal year 2001 projections. As they did at confirmation, the Plaintiffs, now through the Complaint, have focused on the allegation that the valuation of Genesis has been depressed." Defs. Joint Reply at 12. Defendants insist that the plaintiffs should not be permitted to relitigate the issue of the debtors' valuation simply because the plaintiffs are now asserting fraud.

Plaintiffs respond that the issues asserted in their complaint were never previously adjudicated by the bankruptcy court. "In confirming the Plan, this Court made no finding as to whether defendants artificially depressed the value of Genesis by intentionally, recklessly or with gross negligence submitting false or misleadingly incomplete EBITDA information." Pl. Memo in Opposition at 50. Plaintiffs assert that "nobody challenged the data as false or manipulated." *Id.*

[12] [13] [14] There is no dispute that collateral estoppel principles apply in bankruptcy proceedings. *Grogan v. Garner,* 498 U.S. 279, 284 n. 11, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991); *Brown v. Felsen,* 442 U.S. 127, 139 n. 10, 99 S.Ct. 2205, 2213 n. 10, 60 L.Ed.2d 767 (1979) (applying collateral estoppel to a nondischargeability proceeding). Where the prior judgment was rendered by a federal court, federal principles of collateral estoppel apply. *In re Docteroff,* 133 F.3d 210, 214 (3d Cir.1997); *In re Jordana,* 232 B.R. 469, 475 (10th Cir. BAP 1999), *aff'd,* 216 F.3d 1087 (10th Cir.2000). To estop a party from relitigating an issue, the movant must show that:
(1) the issue sought to be precluded is the same as the one involved in the prior action;
(2) the issue must have been actually litigated;
(3) the issue must have been determined by a valid and final judgment; and
(4) the determination must have been essential to the prior judgment.

*In re Docteroff,* 133 F.3d at 214. *See also Saudi v.*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

324 B.R. 510                                                    Page 15
324 B.R. 510
(Cite as: 324 B.R. 510)

*Acomarit Maritimes Services, S.A.,* 114 Fed.Appx. 449, 454 (3d Cir.2004); *Witkowski v. Welch,* 173 F.3d 192, 199 (3d Cir.1999). All four elements of collateral estoppel are apparent in this case, and serve to bar the complaint against the three Senior Lenders and Hager.

First, the issue sought to be precluded is the same as the one involved in the prior action, i.e. the issue of the appropriate enterprise value of the debtor. As reflected in the opinion on confirmation, "[t]he issue raised by the objectors [was] whether the reorganized enterprise value of Genesis and Multicare, either individually or combined, provides a recovery to holders of claims in Class G2, the Senior Lenders, that is greater than 100% of their claim." *In re Genesis Health Ventures, Inc.,* 266 B.R. at 612. Various valuation methodologies were considered, with agreement among the experts, including the objectors' experts, that the Comparable Company analysis was the most significant way to ascertain the debtors' enterprise value in this case. That analysis is comprised of EBITDA and selecting an appropriate multiplier to apply to EBITDA to arrive at enterprise value.

The plaintiffs contend that the budgeted EBITDA, including the management assumptions underlying the projections, was not challenged at confirmation, and that the primary focus was only on the appropriate multiplier to be selected. The opinion itself, in which I reviewed the objectors' arguments challenging the budgeted EBITDA numbers presented by the plan proponents, belies the plaintiffs' contentions.*528 *Id.* at 613-14. I rejected the proofs submitted by the objectors, including various documents and the cross examination of Hager by the objectors, and accepted the reasonableness of the management projections. The contentions in this complaint that the fraud and manipulation by the Senior Lenders and Hager caused the management projections to be invalid do not alter the basic proposition that the issue of the debtors' enterprise value raised in this complaint is the same issue litigated in the prior action.

Secondly, the issue of enterprise value was actually litigated. This prong of the doctrine of collateral estoppel requires that the party against whom the issue is sought to be estopped must have had a full and fair opportunity to litigate the issue. The plaintiffs contend here that they were deprived of such full and fair opportunity because there was insufficient time prior to confirmation to review the thousands of documents given to them shortly before

confirmation, and that the documents were not reviewed with the possibility in mind that fraud had been committed prior to confirmation. Both arguments must be rejected. Most notably, the plaintiffs, then objectors to the debtors plan, did not object to the discovery schedule or assert at the confirmation hearing that they did not have sufficient time to review the materials. Some concern was raised regarding the speed with which the debtors pursued the presentation of the reorganization plan, the approval of the disclosure statement, and the confirmation hearings, with several objectors contending that the proponents of the plan presented the plan in bad faith. As I noted in the opinion, the suggestion appears to have been that in light of increases in value experienced in the healthcare industry by various companies during the last six months preceding confirmation, the deal that was consummated with the Senior Lenders, which presupposed that the Senior Lenders were undersecured, might fail if the enterprise value of the debtors continued to rise. *Id.* at 609. I declined to assign bad faith motives to the debtors for moving the case to confirmation promptly, and determined that the plan was proposed in good faith. *Id.* at 609-10.

As to the plaintiffs' contention that the documents were not reviewed with the possibility of fraud in mind, the plaintiffs cannot relitigate the same issue on this basis. *See, e.g., Liberty Mutual Ins. Co. v. FAG Bearings Corp.,* 335 F.3d 752, 761 (8th Cir.2003) ("Where the first and second actions are both based on an evaluation of the same historical facts, a litigant seeking to introduce newly discovered evidence otherwise in existence at the time of the first suit may not argue that the facts have changed in the time period between the two actions in order to avoid the preclusive effect of the first decision."); *Klein v. C.I.R.,* 880 F.2d 260, 263 (10th Cir.1989) ("A party may not assert a change in controlling facts when the facts allegedly showing a change in circumstances could have been discovered in the exercise of due diligence."). The plaintiffs' new contention that the Senior Lenders and Hager are guilty of fraud does not present a new issue, but simply represents new factual assertions underlying the issue that was resolved in the first litigation, i.e. the issue of the debtors' enterprise value. *See Yamaha Corp. of America v. United States,* 961 F.2d 245, 257-58 (D.C.Cir.1992), *cert. denied,* 506 U.S. 1078, 113 S.Ct. 1044, 122 L.Ed.2d 353 (1993) ("A new contention is not ... necessarily a new issue.").

The third and fourth elements of collateral estoppel are also established here. The confirmation order

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

324 B.R. 510
324 B.R. 510
**(Cite as: 324 B.R. 510)**

represents a valid and final judgment on the issue of the confirmability of the debtors' plan.     The determination of the debtors' enterprise value was essential to the judgment of **\*529** confirmation to establish the good faith of the plan, and that the plan was fair and equitable under 11 U.S.C. § 1129(b).

I conclude that the plaintiffs' complaint must fail against the Senior Lenders and Hager because the central issue of the complaint is the correct enterprise value of the debtors at the time of the confirmation of the plan, an issue that was litigated in the context of confirmation.

## CONCLUSION

For the foregoing reasons, and by way of summary, I conclude as follows:

1. As to the former debtor, Genesis Health Ventures, Inc., the plaintiffs' complaint must be dismissed as time barred under 11 U.S.C. § 1144, and, in the alternative, on the basis of ¶¶ 10.2 and 10.3 of the debtors' confirmed plan of reorganization.

2. As to the Senior Lenders, the complaint must be dismissed on the basis of the application of defense of res judicata.   In the alternative, as to the Senior Lenders and Hager, the plaintiffs' complaint must be dismissed in its entirety on the basis of the defense of collateral estoppel.

The additional arguments advanced by the defendants on their motion to dismiss need not be considered in light of these rulings.   The defendants are directed to submit an order in conformance with this opinion.

For the reasons expressed above, plaintiffs' complaint will be dismissed in its entirety.

Bkrtcy.D.Del.,2005.
In re Genesis Health Ventures, Inc.
324 B.R. 510

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

GEORGE HAGER
August 23, 2001

In Re:GENESIS HEALTH VENTURES INC.et al.,
In Re:MULTICARE AMC INC.et al.

---

Page 157

### GEORGE HURST

[1]
[2] was arrived at.
[3]    **Q:** Have you heard anyone or are aware
[4] of anyone using an 18.3 million projection for
[5] the EBITDA impact of the APS acquisition?
[6]    **A:** No, I have not.
[7]    **MR. PRIMPS:** Please mark as Hager
[8] Exhibit 12 a multi-page document produced
[9] by UBS Warburg, stamped CH 019252.
[10]    (The above described document was
[11] marked Hager Exhibit 12 for
[12] identification, as of this date.)
[13]    **Q:** Mr. Hager, is this another copy of
[14] the UBS Warburg model that was attached to the
[15] February 13th meeting with Steering Committee for
[16] the senior lenders document that we had reviewed
[17] earlier as Hager Exhibit 9?
[18]    I'm not going to hold you to a
[19] line by line reading. Does it appear to be the
[20] same document?
[21]    **A:** It's a similar form of the model,
[22] but it has different assumptions than the
[23] attachment on February 13th document.
[24]    **Q:** I see.
[25]    **A:** I believe the primary assumption

---

Page 158

### GEORGE HURST

[1]
[2] is that this model assumes that the Mariner
[3] contract has been lost. The previous model in
[4] the February 13th presentation did not.
[5]    **Q:** You and your department had
[6] provided input for this document?
[7]    **A:** I did and they did, yes.
[8]    **MR. PRIMPS:** Please mark as Hager
[9] Exhibit 13 for identification an
[10] FTI/Policano & Manzo memo to
[11] Genesis/MultiCare Steering Committee
[12] entitled "Balance sheet, Follow-up
[13] Questions."
[14]    (The above described document was
[15] marked Hager Exhibit 13 for
[16] identification, as of this date.)
[17]    **A:** Document marked Hager Exhibit 13
[18] for identification, as of this date.)
[19]    **Q:** I'll quickly ask have you seen
[20] this document before, Mr. Hager?
[21]    **A:** I don't recall seeing this
[22] document.
[23]    **Q:** Are you aware, just looking at the
[24] heading near the bottom or near the middle,
[25] actually, of Page 1 of Hager 13, "Increase in

---

Page 159

### GEORGE HURST

[1]
[2] Prepaid Expenses," is it correct that since
[3] September 30, 2001, and that must be a typo,
[4] September 30, 2000 prepaid expenses have
[5] increased by approximately $14.6 million?
[6]    **MR. STROCHAK:** Objection,
[7] foundation.
[8]    I just object. It calls for
[9] speculation. You're asking him to
[10] speculate about a potential typo on a
[11] document he didn't create, and there's
[12] layers upon layers of speculation.
[13]    You can go ahead and answer if you
[14] know.
[15]    **A:** It would appear that the schedule
[16] says that the prepaids have increased on a
[17] combined basis by $14.6 million, yes.
[18]    **Q:** Has there been an increase in
[19] prepaid expenses in the current fiscal year?
[20]    **MR. STROCHAK:** Objection, vague.
[21]    **A:** This document would say yes, there
[22] was an increase in prepaid expenses.
[23]    **Q:** To the best of your knowledge, has
[24] there been an increase in prepaid expenses?
[25]    **A:** In the assets that are classified

---

Page 160

### GEORGE HURST

[1]
[2] in that broad category, which I believe is called
[3] prepaid expenses and other assets, yes, I would
[4] believe there is an increase.
[5]    One item that's clearly on here
[6] that is without a doubt an increase is the HCR
[7] Manor Care deferred payment.
[8]    **Q:** Do you know if this increase in
[9] prepaids has had an impact on EBITDA for the
[10] company?
[11]    **A:** I do not believe it has. These
[12] items appear to be normal course type items,
[13] other than the HCR Manor Care deferral.
[14]    **Q:** So it's your testimony that the
[15] increase in prepaid expenses has had a zero
[16] impact on EBITDA for the portion of the 2001
[17] fiscal year we've seen so far?
[18]    **A:** That's correct.
[19]    **MR. STROCHAK:** Objection, vague.
[20]    **Q:** Looking at the HCR Manor Care
[21] deferral of $4 million, do you see that?
[22]    **A:** Yes, I do.
[23]    **Q:** Is the Page 2 description of that,
[24] "The $4 million HCR Manor Care deferral
[25] represents a receivable from HCR Manor

---

Page 157 - Page 160   (42)          Min-U-Script®          RAYVID REPORTING SERVICE, INC.

AA. 1097

In Re:MULTICARE AMC INC.et al.

GEORGE HAGER
August 23, 2001

---

**Page 161**

**GEORGE HURST**

[2] Care for 10 percent of revenues generated
[3] by providing NeighborCare products and
[4] services to HCR Manor Care," is that an
[5] accurate description of that receivable?
[6]    A: The only point of clarification is
[7] Manor Care is only required to pay 90 percent of
[8] the invoiced amount.
[9]    Currently we are in an arbitration
[10] in a dispute on the contract terms. If Genesis
[11] would be successful in that arbitration, I
[12] believe Manor Care would be required to pay at
[13] the full contract rate.
[14]    That was a provision in the
[15] agreement that we — the Manor Care contract that
[16] we agreed to during the course of our bankruptcy
[17] to continue the stay in the arbitration through
[18] the bankruptcy case.
[19]    MR. PRIMPS: I'd ask the reporter
[20] at this point to please mark as Hager
[21] Exhibit 14 a presentation stamped GEN C
[22] 00306.
[23]    (The above described document was
[24] marked Hager Exhibit 14 for
[25] identification, as of this date.)

---

**Page 162**

**GEORGE HURST**

[2]    Q: Have you had a chance to look at
[3] the document that's been marked Hager Exhibit 14
[4] for identification?
[5]    A: I have.
[6]    Q: Can you state what it is?
[7]    A: It appears to be at least the form
[8] of a presentation that I made with our corporate
[9] Treasurer to Standard & Poors and Moody's to
[10] receive a rating for our exit financing facility.
[11]    Q: Where was this presentation given?
[12]    A: This presentation was given in two
[13] different locations, at the offices of Standard &
[14] Poors and at the offices of Moody's.
[15]    Q: About how long did it take to put
[16] this presentation on?
[17]    A: It differed because there was
[18] different level of interaction, but somewhere in
[19] the neighborhood of two to three hours.
[20]    Q: When was the presentation given?
[21]    A: I believe sometime in June, but
[22] I'd have to confirm the exact dates. They were
[23] given on two separate days, consecutive days.
[24]    Q: At Page 5 of the presentation —
[25] by the way, was this a Power Point?

---

**Page 163**

**GEORGE HURST**

[2]    A: It was given in hard copy. It was
[3] not given on computerized.
[4]    Q: At Page 5 it shows the
[5] confirmation hearing set for August 28th and
[6] 29th. The fact that that was known at the time
[7] is some indication, is it not, that the
[8] presentation couldn't have been made any earlier
[9] than June, is that right?
[10]    A: I agree. I believe it was
[11] sometime in June.
[12]    Q: Turning to Page 7, the
[13] capitalization, these PF figures, that's pro
[14] forma?
[15]    A: Yes.
[16]    Q: This shows a total capitalization
[17] of $1.5 billion, isn't that correct?
[18]    A: That's correct.
[19]    Q: Again, do you know how in this
[20] statement of capitalization the cash on hand in
[21] the companies is treated?
[22]    A: At exit the $25 million of cash
[23] has been used to pay administrative expenses, so
[24] at this point there is no cash on the closing or
[25] opening balance sheet at the point of emergence.

---

**Page 164**

**GEORGE HURST**

[2]    Q: I'd like to turn your attention to
[3] the company overview that appears right before
[4] Page 14 and then immediately turn to Page 14,
[5] which states what the company overview is.
[6]    Did you draft the three points
[7] listed here in the company overview?
[8]    A: I did.
[9]    Q: Those were an accurate depiction
[10] of the overview for the company at the time you
[11] drafted it, isn't that correct?
[12]    A: That's correct.
[13]    Q: Then the following page, 15, the
[14] ElderCare, NeighborCare divisions shown on this
[15] pie chart, does that reflect the nursing home
[16] versus pharmaceutical division by revenues for
[17] the company?
[18]    A: It does.
[19]    Q: I'd like you to turn to Page 18,
[20] the industry overview, "Improving Federal
[21] Reimbursement Outlook," do you see that?
[22]    A: I do.
[23]    Q: Was this drafted by you?
[24]    A: Yes, it was.
[25]    Q: Again, did you intend for this to

---

AA. 1098

GEORGE HAGER
August 23, 2001

In Re:GENESIS HEALTH VENTURES INC.et al.,
In Re:MULTICARE AMC INC.et al.

---

Page 165

**GEORGE HURST**

[1]
[2] be an accurate overview of your industry?
[3]     MR. STROCHAK: Objection, vague.
[4]     A: This overview does present the, in
[5] a chronological way the actual changes to the
[6] Medicare reimbursement system started with the
[7] Balanced Budget Act of 1997, going through the
[8] Benefit Improvement Act of December of 2000.
[9]     The last bullet is an assumption
[10] or an expectation that the reimbursement rates
[11] will match inflation going forward, which are
[12] consistent with our forecast model assumptions.
[13]     Q: You would say that in any overview
[14] of the industry at this time that the improving
[15] federal reimbursement outlook is a major factor?
[16]     MR. STROCHAK: Objection, vague.
[17]     A: I don't know what you mean by that
[18] question. Using the word improving, I would say
[19] the federal reimbursement outlook has improved.
[20] Yes, that has been a factor in our industry.
[21]     Q: Why did you immediately below
[22] "Industry Overview" place the subheading
[23] "Improving Federal Reimbursement Outlook" on this
[24] document?
[25]     A: Because this was meant to present

---

Page 166

**GEORGE HURST**

[1]
[2] a historical trend since prospective payment and
[3] the federal reimbursement rates have improved
[4] since the Balanced Budget Act of 1997.
[5]     The fifth bullet says, "We do not
[6] expect any significant increases
[7] prospectively other than increases that
[8] match inflationary increase in cost."
[9]     Q: Could you turn to Page 26 of this
[10] presentation. Can you state what this page,
[11] entitled "Quality Surveys," shows?
[12]     A: This page presents the, and I
[13] don't see — oh, there are the legends, I can't
[14] see which bars are which colors, but this page
[15] presents the actual survey results from the
[16] surveys that are an annual requirement in our
[17] industry at each facility, and the number of
[18] citations, which are deficiency citations per
[19] survey.
[20]     We're contrasting Genesis against
[21] the rest of the industry. The fewer your
[22] citations, one would argue the better quality you
[23] are providing in your nursing centers.
[24]     Q: And although it is hard to tell
[25] because of the fuzziness of the copy, does this

---

Page 167

**GEORGE HURST**

[1]
[2] average citation per survey show that Genesis has
[3] fewer average citations than the industry
[4] average?
[5]     A: It does.
[6]     Q: In terms of percentage of
[7] deficiency for the facilities, again, you can't
[8] really tell because of the copying process which
[9] bar chart is which, or which part of the bar
[10] chart is attributable to which side of the
[11] survey, but does this show that Genesis has a
[12] higher percentage of deficiency free facilities
[13] than the rest of the industry?
[14]     A: It does.
[15]     Q: Would quality surveys of this type
[16] to the best of your knowledge be considered in
[17] any effort to apply a multiplier to the EBITDA of
[18] the company in coming to an enterprise valuation
[19] of Genesis/MultiCare?
[20]     MR. STROCHAK: Objection, calls
[21] for speculation.
[22]     A: As I said before, I'm not a
[23] valuation expert, but I have never heard of any
[24] research analyst using this data specifically or
[25] directly to compare or contrast multiple

---

Page 168

**GEORGE HURST**

[1]
[2] valuations of providers in our industry.
[3]     Indirectly you would think that if
[4] your quality is better your operating performance
[5] would be better. So our operating performance in
[6] the forecast reflects our historical level of
[7] quality.
[8]     I would say there's more of an
[9] indirect relationship between valuation and your
[10] quality survey results.
[11]     Q: Better quality survey results
[12] would not hurt one's valuation; is that true?
[13]     MR. STROCHAK: Objection, calls
[14] for speculation, asked and answered.
[15]     A: You would expect it would not.
[16]     Q: Could you please turn to Page 46
[17] of this presentation entitled "APS Acquisition."
[18] Did you draft this portion of the report?
[19]     A: I believe I did.
[20]     Q: Do you know why you included a
[21] page on the APS acquisition in your presentation
[22] to the rating agencies?
[23]     A: Yes. In connection with the exit
[24] financing facility, there is a component of the
[25] exit financing facility that we refer to as the

---

Page 165 - Page 168  (44)        Min-U-Script®        RAYVID REPORTING SERVICE, INC.

AA. 1099

In Re:MULTICARE AMC INC.et al.

---

Page 169

**GEORGE HURST**

[1]
[2] delayed draw term loan.
[3]     That term loan is available to be
[4] drawn if we are the successful bidder on the APS
[5] transaction.
[6]     There's also one other small
[7] component of that delayed draw term loan that
[8] would allow us to purchase two nursing facilities
[9] that we currently lease subject to a purchase
[10] option.
[11]     We felt that it was important for
[12] the rating agencies to understand the impact of
[13] the APS transaction on our credit statistics if
[14] we were successful in acquiring APS and the
[15] delayed draw term loan would be drawn.
[16]     Q: The numbers concerning the
[17] purchase price and synergies, those are accurate
[18] to the best of your knowledge, is that correct?
[19]     A: Are you referring to a specific —
[20] are you still on Page 46?
[21]     Q: Yes.
[22]     A: Yes, I would say so. That's still
[23] our current estimate of the synergy potential in
[24] the transaction.
[25]     Q: Turning to Page 48, entitled

---

Page 170

**GEORGE HURST**

[1]
[2] "Impact of APS Acquisition," the final column
[3] there, "PF APS," does that refer to the pro forma
[4] APS acquisition, in other words, that the APS
[5] acquisition has occurred sometime during fiscal
[6] year 2002?
[7]     A: Yes, it does. And that assumes in
[8] that calculation that Genesis has realized 100
[9] percent of the synergies, potential synergies
[10] identified in the transaction.
[11]     Q: If all that happens the EBITDA
[12] number would increase to $255.3 million as you've
[13] written there, is that correct?
[14]     A: Yes, in fiscal '02.
[15]     Q: Turning to Page 59, the page
[16] entitled "Credit Strengths," can you state what
[17] this page of the presentation is?
[18]     A: This page was our concluding
[19] remarks to the rating agencies.
[20]     Q: You believe this is an accurate
[21] depiction of the credit strengths of the new
[22] company emerging from bankruptcy?
[23]     MR. STROCHAK: Objection, vague.
[24]     A: Yes.
[25]     MR. PRIMPS: At this time I would

---

Page 171

**GEORGE HURST**

[1]
[2] ask the reporter to mark as Hager Exhibit
[3] 15 for identification a business wire
[4] release, the subject of which is
[5] MultiCare, third quarter results, 10-Q.
[6]     (The above described document was
[7] marked Hager Exhibit 15 for
[8] identification, as of this date.)
[9]     Q: Have you had a chance to review
[10] Hager Exhibit 15?
[11]     A: I have.
[12]     Q: Does this business wire release
[13] accurately summarize Genesis', ElderCare Corp.
[14] including The MultiCare Companies reporting on
[15] The MultiCare Companies' results for the third
[16] quarter of fiscal year 2001?
[17]     A: I believe so, but I would caution
[18] one in looking at this information and comparing
[19] it to the previous information we've looked at in
[20] the forecast, we have not reflected the impact of
[21] the revisions to the MultiCare contractual
[22] adjustments in these numbers, since those
[23] contract modifications have never been
[24] implemented.
[25]     So these numbers continue to

---

Page 172

**GEORGE HURST**

[1]
[2] reflect a 6 percent management fee and the
[3] historic pricing for pharmacy, therapy, medical
[4] supply and hospitality services.
[5]     Q: Okay. Is the quoted portion an
[6] accurate account of your comments and statements?
[7]     That's the portion that starts
[8] with, "Our EBITDA, excluding debt restructuring,
[9] reorganization costs and other charges
[10] for the three months ended June 30, 2001
[11] increased approximately $1.7 million over
[12] the three months ended March 31, 2001."
[13]     MR. STROCHAK: Objection, vague
[14] and ambiguous.
[15]     A: Yes.
[16]     Q: At this time I'd like to show you
[17] a document that was previously marked as Genesis
[18] Exhibit 5 for identification, another business
[19] wire release, also dated August 14, 2001.
[20]     MR. STROCHAK: I think this was
[21] marked as Mr. Barr's deposition. I can't
[22] recall the nomenclature that we used, but
[23] I'm pretty sure this was marked as
[24] Mr. Barr's deposition.
[25]     Q: Have you had a chance to review

---

1

1

2  UNITED STATES BANKRUPTCY COURT

3  DISTRICT OF DELAWARE

4  ————————————————x

5  In Re:

6  GENESIS HEALTH VENTURES, INC., et al.,

7      Debtors.
         Chapter 11 Case Nos.
8          00-2692 (JHW)
         Jointly Administered

9  ————————————————x

10  In Re:

11  MULTICARE AMC, INC., et al.,

12
         Debtors.
13         Chapter 11 Case Nos.
           00-2692 (JHW)
14         Jointly Administered
    ————————————————x

15  HIGHLY CONFIDENTIAL-PURSUANT TO PROTECTIVE ORDER

16          August 16, 2001
            9:00 a.m.

17

18      Deposition of J. HALISEY KENNEDY, taken by

19  GMS, pursuant to Notice, at the offices of

20  Willkie Farr & Gallagher, 787 Seventh Avenue, New

21  York, New York, before TAMMEY M. PASTOR, a

22  Registered Professional Reporter and Notary

23  Public within and for the State of New York.

24

25

10

1        J. HALISEY KENNEDY

2   it.

3        Q.   What was the principal purpose?

4        A.   Really to establish what the

5   valuation of Multicare would be and how

6   consideration should be allocated among Multicare

7   creditors.

8        Q.   Again on page 6 of this document

9   there is some discussion of contracts between

10   Multicare and Genesis.  Can you tell me what

11   those contracts were?

12       A.   They are a number of contracts.

13   There is a pharmacy contract, a hospitality

14   contract, a management agreement between the

15   companies.

16       Q.   How did those contracts factor if at

17   all into your valuation of the company?

18       A.   Multicare, through its independent

19   director in conjunction with E&Y negotiated a set

20   of contracts going forward that would, that if

21   Multicare were reorganized as an independent

22   company, would govern how Multicare was

23   operated.  We factored the economics of those

24   contracts into the projections.

25       Q.   They reduced the costs to Multicare

11

1           J. HALISEY KENNEDY

2   going forward; is that correct?

3       A.   They reduced it from the historical

4   costs that Multicare was paying.

5       Q.   Can you describe for me generally how

6   you decided how you would go about valuing the

7   company for purposes of this report?

8       A.   We used two primary methodologies,

9   one looking at comparable companies.  Another

10  looking at discounted cash flow.

11      Q.   How did you determine what the

12  comparable companies were?

13      A.   We looked at other companies in the

14  nursing industry.

15      Q.   Public companies?

16      A.   Public companies.

17      Q.   How did you go about selecting which

18  ones were comparable and which -- for purposes of

19  your study?

20      A.   We looked at public companies that

21  were not in financial distress.  We also were

22  focused on companies that there were earnings

23  projections on.

24      Q.   Do you remember what companies you

25  selected as comparables?

AA. 1103

HIGHLY CONFIDENTIAL TRANSCRIPT

1

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

1
2
3  IN RE:                           :
                                    :
4  GENESIS HEALTH VENTURES,         : CHAPTER 11
   INC., et al.,                    : Case No. 00-2692 (JHW)
5                                   : (Jointly Administered)
                                    :
6          Debtors.                 :

   **THIS TRANSCRIPT HAS BEEN DESIGNATED**
7              **HIGHLY CONFIDENTIAL**

8      Deposition of MICHAEL R. WALKER, taken pursuant to
   notice at the law offices of Richards, Layton & Finger,
9  One Rodney Square, Wilmington, Delaware, beginning at
   2:06 p.m., on Monday, August 20, 2001, before
10 Debra A. Donnelly, Registered Professional Reporter and
   Notary Public.

11 APPEARANCES:

12
       JOANNE M. GUERRERA, ESQUIRE
13     MICHAEL F. WALSH, ESQUIRE
       WEIL, GOTSHAL & MANGES LLP
14         1615 L Street, N.W.
           Washington, D.C.  20036
15         for Genesis Debtors

16     JOHN S. KINZEY, ESQUIRE
       LEBOEUF, LAMB, GREENE & MACRAE LLP
17         125 West 55th Street
           New York, New York  10019
18         for GMS

19     ALITIA FACCONE STOCKWELL, ESQUIRE
       WILLKIE FARR & GALLAGHER
20         787 Seventh Avenue
           New York, New York  10019
21         for The Multicare Debtors

22 - - - - - - - - - - - - - - - - - - - - - - - - -
              CORBETT & ASSOCIATES
23        REGISTERED PROFESSIONAL REPORTERS
   1400 FRENCH STREET     WILMINGTON, DELAWARE  19801
24              (302) 571-0510


                    CORBETT & ASSOCIATES

MICHAEL R. WALKER

19

1          MS. GUERRERA:  Objection to form.  But

2     go ahead.

3               THE WITNESS:  Other synergies?

4     BY MR. KINZEY:

5          Q.   Yes.

6          A.   I didn't.

7          Q.   Are you aware that in connection with the

8     merger of Multicare and Genesis there will be an exchange

9     of releases between the two companies?

10         A.   Generally.

11         Q.   Were you involved in discussions of whether

12    those releases should be exchanged?

13              MR. WALSH:  Discussions outside

14    discussions with counsel.

15              MR. KINZEY:  Right.  We don't want to

16    ask anything you learned from lawyers, assuming anybody

17    ever learns anything from their lawyers.

18              THE WITNESS:  I had discussions

19    regarding -- what types of releases are you referring to?

20    Releases on what topics or issues?

21    BY MR. KINZEY:

22         Q.   Well, let me just ask you:  Are you aware of

23    any particular claims running back and forth between the

24    two companies that might be released?

CORBETT & ASSOCIATES

MICHAEL R. WALKER

20

1          MS. GUERRERA:  Objection to form.

2          THE WITNESS:  I am aware of issues

3    running back and forth between the two companies that

4    relate to service contracts.

5    BY MR. KINZEY:

6          Q.   And what service contracts are they?

7          A.   Pharmacy Services, Rehabilitation Therapy

8    Services, Hospitality Services, Management Services,

9    principally.

10         Q.   And those are payments that would be due from

11   Multicare to Genesis?

12         A.   Yes.

13         Q.   And are there payments due going the other

14   way, from Genesis to Multicare?

15         A.   Over the course of the relationship there were

16   payments that went that way.  But they really had to do

17   with the purchase of assets from Multicare by Genesis.

18         Q.   Are the Genesis claims under those contracts

19   you just discussed being released in connection with the

20   merger?

21         MS. GUERRERA:  Objection to form.

22         THE WITNESS:  You have to ask counsel

23   exactly what's happening there.  I know that claims are

24   supposed to be resolved.  I am not quite sure what

CORBETT & ASSOCIATES

MICHAEL R. WALKER

21

1    release means.

2    BY MR. KINZEY:

3        Q.    Do you know the amount of those claims?

4        A.    No, I don't.

5        Q.    Do you know who would know that?

6        A.    I would assume George Hager.

7        Q.    And what's the reason, if you know it, for

8    settling those claims between Genesis and Multicare?

9        A.    The service contracts is what I am referring

10   to.

11       Q.    Right.

12       A.    The reason to settle the claims is that there

13   is potentially an argument made that Genesis charged

14   prices that were in excess of market, and on the other

15   side of the table Multicare hasn't paid Genesis for a

16   good deal of those services.  So we wanted to resolve the

17   complaint going both ways as a result of the

18   reorganization plan.

19       Q.    And were those negotiations looking toward the

20   resolution of those claims that you were aware of?

21            MS. GUERRERA:  Objection to form.  I

22   didn't catch the beginning of your question.

23   BY MR. KINZEY:

24       Q.    Were there negotiations pertaining to the

CORBETT & ASSOCIATES

MICHAEL R. WALKER

22

1   resolution of those claims in connection with the plan

2   process; do you know?

3       A.   I would rephrase your question a little and

4   say I negotiated new service agreements between the

5   parties.  I did not negotiate settlements of the claims.

6       Q.   Did anyone else negotiate the settlement of

7   the claims?

8       A.   I would assume counsel, the counsel negotiate

9   how to settle those claims.

10      Q.   Were you involved in that process?

11      A.   They only told me that they were negotiated

12  and reported back, the results of which I am not even

13  sure I could relate to you today.

14      Q.   And who was representing Multicare in

15  connection with those discussions, if you know?

16              MS. GUERRERA:  Objection to form.

17              THE WITNESS:  They have legal counsel.

18  You can ask me the name of it.  I have to think a while.

19  BY MR. KINZEY:

20      Q.   That's okay.

21              MR. WALSH:  It's one of those "W" names.

22              MR. KINZEY:  Let me ask the court

23  reporter to mark for identification as Walker Exhibit 2 a

24  document that's titled Settlement and Release Agreement.

CORBETT & ASSOCIATES

MICHAEL R. WALKER

34

1    should be asking?

2         A.    That's correct.

3         Q.    Let's talk about the attachment.   You said you

4    are familiar with that document?

5         A.    Yes, I am.

6         Q.    Can you tell me what that is?

7         A.    It's a proposal to acquire a company called

8    APS.

9         Q.    And were you involved in making that proposal?

10        A.    Only from a policy and strategic perspective.

11   I did not engage in the negotiations.

12        Q.    What was your role in the policy and strategic

13   area in connection with this proposed acquisition?

14        A.    Genesis had two complimentary strategies.   One

15   was the operation and development of strategic networks

16   and the other one was a national service strategy.   APS

17   was an opportunity for our service organization and also

18   a way to defend and protect our existing cash flows

19   inside our service division.

20              So when the Mariner organization filed

21   bankruptcy, which owns APS, and we had a significant

22   service relationship with Mariner, it became known to us

23   that they were selling APS, which served the other parts

24   of their pharmaceutical needs.   And we believed that by

CORBETT & ASSOCIATES

MICHAEL R. WALKER

35

1    having Mariner market APS into the marketplace, that a

2    prospective buyer would price the service contracts that

3    were running to Genesis as well as the service contracts

4    that were running to APS.  In order to protect our cash

5    flow and that relationship with Mariner, we felt it would

6    be prudent for us to acquire APS and to engage in those

7    conversations.

8            In addition to that, growing our

9    institutional pharmacy business so it had national scale

10   and national infrastructure and the right critical mass

11   would be important in this more critical environment of

12   prospective payment.  So it was helpful, it would be

13   strategic, I guess is the right word, for us to acquire

14   APS because it gives us the scale and the scope of

15   critical mass, and it also protects our existing

16   contracts with Mariner.

17        Q.    So I gather from that you were in favor of the

18   transaction going forward?

19        A.    Yes.

20        Q.    Could you tell me what the current status of

21   the transaction is?

22        A.    We have negotiated an offer.  The offer will

23   be filed in the Genesis plan of reorganization as well as

24   in the Mariner plan of reorganization, and then people

CORBETT & ASSOCIATES

**AA. 1110**

MICHAEL R. WALKER

36

1   will, organizations will have an opportunity to bid on

2   the asset and Genesis will have an opportunity to try to

3   consummate the offer that it's made.

4       Q.   Do you have financing in place to consummate

5   the transaction?

6       A.   Yes.

7       Q.   And who is providing that?

8       A.   I am somewhat reluctant to say an absolutely

9   affirmative yes because I don't have a reorganization

10  plan approved and what have you.

11      Q.   But you have it subject to that?

12      A.   Yes.

13              MS. GUERRERA:   Objection to form.

14  BY MR. KINZEY:

15      Q.   And that's with Goldman-Sachs?

16              MS. GUERRERA:   Objection to form.

17              THE WITNESS:   I believe it's a number of

18  different parties.

19  BY MR. KINZEY:

20      Q.   Have you discussed this APS proposal with the

21  various creditor constituencies in the case?

22      A.   Yes.

23      Q.   And what is their view of it expressed to you?

24      A.   It's a mixed.  Some were opposed, others are

CORBETT & ASSOCIATES

MICHAEL R. WALKER

37

1      supportive.

2              Q.    Can you tell me who is opposed to it?

3              A.    I believe Mellon Bank is opposed to this.

4              Q.    And which constituents are supportive?

5                      MS. GUERRERA:  I'm sorry?

6      BY MR. KINZEY:

7              Q.    Which constituencies are supportive?

8              A.    Goldman-Sachs.  I don't know if I could tell

9      you the position of each and every other one of them.

10     Highland I think is supportive.

11             Q.    I am going to ask you, if you would,

12     Mr. Walker -- unfortunately, I only have one extra copy

13     of this -- but could you take a look at this document

14     that was marked as an exhibit yesterday as UBS Exhibit 3

15     at the UBS Warburg deposition.  I just want to see if you

16     recognize that document?

17                     MR. KRAMER:  Would you mind identifying

18     the document, what it is?

19                     MR. KINZEY:  It is the Genesis Health

20     Ventures Review of Expected Impact of APS Acquisition.

21             MR. KRAMER:  Okay.

22                     THE WITNESS:  I am familiar with the

23     issues, but the document I can't say that I have seen

24     before.

                      CORBETT & ASSOCIATES

MICHAEL R. WALKER

38

1    BY MR. KINZEY:

2        Q.   Do you know whether anyone at the company

3    asked UBS Warburg to prepare a document like this?

4        A.   May I rephrase?

5        Q.   Sure.

6        A.   Did you ask if somebody at Genesis knew,

7    somebody at Genesis instructed UBS Warburg to prepare

8    this?

9        Q.   Did someone at Genesis ask for this document,

10   to your knowledge?

11       A.   I don't know.  This specific document, I don't

12   know.  We would have had discussions with UBS Warburg

13   about projecting the impacts of an acquisition of APS.

14   Whether this is an actual document that we requested, I

15   don't know that.

16       Q.   Do you recall discussing the APS acquisition

17   with anyone at UBS?

18       A.   No, I wouldn't have done that.

19       Q.   Who would have within Genesis?

20       A.   George.  I don't even give you his last name

21   anymore.  If I just say George, is that okay?

22       Q.   We just want to make sure we are all pointing

23   in the same direction.  Okay.  Thanks.

24              Are you aware that Genesis just put out

CORBETT & ASSOCIATES

*Ory J Cambellan*
*& MFW*

*GTH*
*JG*
*AS*

## In The Matter Of:

*In Re:HEALTH VENTURES INC.et al.,*
*In Re:MULTICARE AMC INC.et al.*

---

*JOSEPH LaNASA*
*August 15, 2001*

---

*RAYVID REPORTING SERVICE, INC.*
*420 LEXINGTON AVENUE*
*NEW YORK, NY 10170*
*(212) 599-3642    FAX: (212) 692-9171*

*Original File 081501JL.TXT, 60 Pages*
*Min-U-Script® File ID: 1566929957*

## Word Index included with this Min-U-Script®

In Re:HEALTH VENTURES INC.et al.,
In Re:MULTICARE AMC INC.et al.

JOSEPH LaNASA
August 15, 2001

Page 41

**JOSEPH LANASA**

[1]
[2]  **A:** No.
[3]  **Q:** But that is the stated goal of
[4] Goldman?
[5]  **A:** The company has had numerous
[6] discussions with the Steering Committee about it
[7] and the projections show it doing many of those
[8] things.
[9]  **Q:** I'd like to draw your attention to
[10] GS 05117, "Genesis Health Ventures At Plan
[11] Valuation."
[12]  Did you play a role in the
[13] drafting of this page of the presentation?
[14]  **A:** I reviewed it.
[15]  **Q:** Ms. Lau was the principal
[16] draftsperson?
[17]  **A:** Yes, I assume she just took these
[18] numbers from this Disclosure Statement.
[19]  **Q:** I see that in this table the
[20] normalized 2001 EBITDA is used. That's 222.2
[21] million combined for the two enterprises?
[22]  **A:** Yes.
[23]  **Q:** Why was that number chosen as an
[24] at plan valuation?
[25]  **A:** Because that's what she, and me by

Page 42

**JOSEPH LANASA**

[1]
[2] reviewing it, think is what this company is
[3] capable of doing on an EBITDA basis.
[4]  **Q:** That was your best estimate as of
[5] July, the recent past?
[6]  **A:** Yes, when we drafted this, yes.
[7]  **Q:** I'd like to draw your attention to
[8] GS 01520, "Genesis Health Ventures, Investor
[9] Returns."
[10]  Did you play a role in the
[11] drafting of this penultimate page, I guess, of
[12] the document?
[13]  **A:** I reviewed it.
[14]  **Q:** Did Ms. Lau do the principal
[15] drafting?
[16]  **A:** Um-hum.
[17]  **Q:** This reflects a case 2 of "lose
[18] APS, lose Mariner Health contract."
[19]  **A:** Yes.
[20]  **Q:** Could you explain what those two
[21] potentials are?
[22]  **A:** I believe she's assuming that the
[23] company does not acquire APS and does not
[24] maintain the Mariner Health contract.
[25]  **Q:** What impact would that have, then,

Page 43

**JOSEPH LANASA**

[1]
[2] on the projected EBITDA?
[3]  **A:** I don't recall.
[4]  **Q:** What impact would that have on the
[5] Genesis Health Ventures enterprise value
[6] generally? Would it have a depressing impact?
[7]  **A:** On APS it's unclear, because
[8] you're paying money to buy a business, you're
[9] paying 60 million bucks to buy a business that
[10] does 7 million of cash flow, so whether it would
[11] increase or decrease is unclear.
[12]  On losing the Mariner Health
[13] contract, you're losing revenue and you're losing
[14] whatever cash flow you make on that revenue, so
[15] that would be a negative impact.
[16]  On APS it's unclear whether it
[17] would be a positive or negative impact.
[18]  **Q:** I'd just like to go back a page to
[19] GS 05119, "Genesis Health Ventures, Bank Debt
[20] Investment."
[21]  **A:** Um-hum.
[22]  **Q:** Again, did you play a role in the
[23] drafting of this page?
[24]  **A:** Again, I reviewed it.
[25]  **Q:** As of today, where is the bank

Page 44

**JOSEPH LANASA**

[1]
[2] debt price trading?
[3]  **A:** I believe that Genesis bank debt
[4] trades around 75 cents, which implies a share
[5] price of 22.50, and that Multicare bank debt
[6] trades around 80 to 81 cents, which implies a
[7] share price between 19.86 an 20.41.
[8]  **Q:** That bank debt price, if it were
[9] to go up, that would imply a higher share price,
[10] is that correct?
[11]  **A:** Um-hum.
[12]  **Q:** How is this relationship between
[13] the bank debt price and the share price derived?
[14]  **A:** I believe it's the bank debt price
[15] times the amount of bank debt outstanding, plus
[16] the amount of debt ahead of the bank debt, bank
[17] debt price times the bank debt outstanding — I'm
[18] sorry, bank debt price times bank debt
[19] outstanding minus the amount of debt the bank
[20] debt holder is receiving minus the amount of
[21] preferred stock the bank debt holders are
[22] receiving equals the equity value.
[23]  And in each case, dividing that by
[24] the number of shares being received by the bank
[25] group in each one of the two companies.

IN RE: GENESIS HEALTH VENTURES, INC.

WILLIAM MCGAHAN - 8/19/01

*CONFIDENTIAL*

CONCORDANCE AND CONDENSED TRANSCRIPT
PREPARED BY:



*Ellen Grauer*
Court Reporting Co.

133 East 58th Street, Suite 1201, New York, New York 10022
Phone: (212) 750-6434   Fax: (212) 750-1097
www.ellengrauer.com

IN RE: GENESIS HEALTH VENTURES, INC.
WILLIAM MCGAHAN - 8/19/01

BSA                                                                                          XMAX(5/5)

## Page 17

(1)

(2)   a change in methodology between Exhibit 1 and
(3)   Exhibit 2?
(4)        A.   In Exhibit 1 there has been added
(5)   one quarter of BBRA reflecting the fact that
(6)   capable companies projections reflect only
(7)   three-quarters of the BBRA impact and in
(8)   addition we have added Mariner bed loss which
(9)   reflects the loss of the NeighborCare contract
(10)  to service the Mariner beds offset by the new
(11)  NeighborCare beds which is new NeighborCare
(12)  business to replace the lost Mariner beds.
(13)       Q.   Is that something that you did
(14)  differently when you did the update or not?
(15)       A.   What that reflects again is
(16)  adjusting the company's 2001 EBITDA for those
(17)  three impacts of the bullet point on page 9.
(18)       Q.   It appears to me from the next
(19)  page that the numbers don't change, that you
(20)  did that both the first time and the second
(21)  time you prepared the report; is that correct?
(22)       A.   That's correct.
(23)       Q.   Is it fair to say that the
(24)  additional language is just an additional
(25)  explanation for something you were doing all

## Page 18

(1)

(2)   along?
(3)        A.   It appears that way.
(4)        Q.   If you compare page 10, I think
(5)   the numbers are the same, but there is on the
(6)   new report Exhibit 1 you have added after
(7)   normalized 2001 EBITDA line Genesis you added
(8)   words as discussed with creditors. Why was
(9)   that addition made?
(10)       A.   In order to property and we think
(11)  helpfully communicate with the creditors of
(12)  numbers that they had previously seen before.
(13)       Q.   Could you tell me when they had
(14)  previously seen these numbers?
(15)       A.   I don't recall exactly when.
(16)       Q.   What do you recall about
(17)  discussions of those numbers with the creditors
(18)  that you are cross-referencing here?
(19)       A.   I believe that the 169.2 million
(20)  number was previously supplied to the creditors
(21)  as a number and what this page attempts to do
(22)  is to walk-through the 2001 EBITDA for Genesis,
(23)  adjust the numbers in order to make it more
(24)  comparable to the publicly traded companies and
(25)  then adjust that number for the impact of

## Page 19

(1)

(2)   operational changes that have happened to
(3)   Genesis to result in the 2001 EBITDA numbers
(4)   that could be then compared to the comparable
(5)   traded companies.
(6)        Q.   Let's start with the very first
(7)   number on the line, the 2001 EBITDA for Genesis
(8)   of 158,443. Where did that number come from?
(9)        A.   That number came from a budget
(10)  presentation that the management supplied to us
(11)  that can be seen on page 8.
(12)       Q.   That's under the line projected
(13)  on 2001 and dropped down to the 158?
(14)       A.   That's right.
(15)       Q.   Do you know how that budgeted
(16)  EBITDA was prepared?
(17)       A.   I believe that number was
(18)  prepared by the management team per their
(19)  business plan at the beginning of the year and
(20)  I believe that the company is operating on that
(21)  plan.
(22)       Q.   Did you have any role in
(23)  generating the projections for EBITDA for 2001?
(24)       A.   We worked with management and
(25)  discussed with management the plan and talked

## Page 20

(1)

(2)   to them about their assumptions, but this plan
(3)   was primarily put together by the management
(4)   team.
(5)        Q.   What steps, if any, did you take
(6)   to evaluate the way the plan was put together
(7)   by the management?
(8)        A.   We worked with the company and
(9)   our role was one of financial modeling and
(10)  talked to them about their assumptions and
(11)  behind the plan such as the affect of the rate
(12)  changes, the impact of their assumptions on
(13)  occupancy, the loss of certain business, their
(14)  cost assumptions and to talk to them about that
(15)  and we worked with them on those issues and
(16)  helped them model out the projected plan.
(17)       Q.   Did you make any independent
(18)  determination of whether the projected plan was
(19)  reasonable, unreasonable, conservative,
(20)  unconservative?
(21)       A.   We talked to the company about it
(22)  and there is certainly a lot of risk in this
(23)  plan. For example, the reimbursement changes
(24)  which have been assumed in this plan to
(25)  continue beyond 2002 and if those changes

IN RE: GENESIS HEALTH VENTURES, INC.
WILLIAM MCGAHAN - 8/19/01

BSA                                                                                                                    XMAX(6/6)

## Page 21

(1)
(2) don't – if changes don't take place to the
(3) current regulatory or reimbursement
(4) environment, then the model is over stating the
(5) projections.
(6)        In addition, labor costs which
(7) are approximately two-thirds of the cost of the
(8) nursing home business are assumed to stay
(9) relatively flat over the time period and this
(10) country is facing a huge nursing shortage.
(11)        There are occupancy assumptions
(12) embedded in this model which the company is
(13) hoping to hit which have some risk. There is
(14) also not further cuts in this model which could
(15) and my personal view is will happen over the
(16) course of this model so there are a lot of
(17) risks in this model achieving these numbers so,
(18) you know, to answer your question, I believe
(19) that this is my personal view is that this is a
(20) reasonable estimate of a business plan.
(21)        Q.    Can we just go through each of
(22) the adjustments that you made in the 2001
(23) EBITDA and you can explain to me how you
(24) arrived at those adjustments. First you add in
(25) the BBRA four year adjustment?

## Page 22

(1)
(2)        A.    First of all, generally speaking,
(3) many what these adjustments are attempting to
(4) do is make the Genesis 2001 EBITDA a number
(5) which is comparable to the other publicly
(6) traded companies projected cash flows.
(7)        The first thing that we did and
(8) what many of these line items point to is a
(9) change from Genesis numbers which are based
(10) upon a September fiscal year end and we are
(11) attempting to put those on a calendar fiscal
(12) year end so we are comparing apples to apples
(13) in our projected cash flow to the projected
(14) cash flow of the other projected companies so
(15) the BBRA four year adjustment is proforma in
(16) the BBRA rate increases which occurred on April
(17) 1st of this year back to the beginning of the
(18) fiscal year end period and off setting that on
(19) the adjustments in the bottom half of the page
(20) which is trying to calendarize that by taking
(21) out the quarter which appears prior to the
(22) calendar 2001 calendar year.
(23)        The impact of the development
(24) facilities is a number which represents the
(25) cost of start-up facilities that we are

## Page 23

(1)
(2) expensing that we believe should be added back
(3) to get a more normalized value for this
(4) company. The impact of the management fee for
(5) Multicare due to BBRA represents the
(6) calendarized impact of the BBRA rate increases
(7) on our management fee for Multicare. The Elder
(8) Trust full year impact represents the
(9) calendarization of the renegotiated pack with
(10) Elder Trust in order to reflect the lower lease
(11) payments that we have to pay Elder Trust and
(12) the managed care four year rate adjustments
(13) represents one time rate increases for managed
(14) care companies calendarized for 2001.
(15)        Q.    These adjustments you added in,
(16) are these numbers that UBS calculated or did
(17) you get them from the company?
(18)        A.    We got these numbers from the
(19) company.
(20)        Q.    On the adjustment downward I
(21) think you explained BBRA, how about the Mariner
(22) bed loss?
(23)        A.    The Mariner bed loss and new
(24) NeighborCare bed number represents the
(25) following. We are currently providing

## Page 24

(1)
(2) institutional pharmacy services to Mariner at
(3) rates which are in excess of the market price.
(4) Mariner is currently a company which is
(5) bankrupt.
(6)        The company Mariner has made it
(7) known to us that this revenue and profitability
(8) on the new contract is not sustainable and in
(9) bankruptcy my understanding of the situation is
(10) that we will either end up repricing that
(11) contract down to the Medicaid rate or we will
(12) lose the contract.
(13)        What we have modeled in here is
(14) that we will lose the contract which represents
(15) a loss of profitability of 13.2 million of
(16) EBITDA and then we offset by the fact that
(17) we would have available capacity and we would
(18) go out and hopefully sign up new nursing homes
(19) unidentified and have replacement beds in for a
(20) profitability of 5.456 million which, again,
(21) has yet to be identified and may or may not
(22) happen.
(23)        Q.    Again, are those numbers provided
(24) to you by the company?
(25)        A.    Yes.

IN RE: GENESIS HEALTH VENTURES, INC.
WILLIAM MCGAHAN - 8/19/01

BSA                                                                                        XMAX(10/10)

## Page 37

(1)
(2)   Q.   It's fair to say there is just
(3)   insufficient data during the time they have
(4)   been out of bankruptcy to make useful numbers?
(5)   A.   I don't think you can derive a
(6)   trend line out of the short period of time that
(7)   they have been trading.
(8)       MR. KINZEY: If it's okay, I would
(9)   like to take a five minute break.
(10)      (Recess taken.)
(11)      MR. KINZEY: Mark this as Exhibit
(12)   3.
(13)      (UBS Exhibit 3, Genesis Health
(14)   Ventures Review of Expected Impact of
(15)   APS Acquisition, marked for
(16)   identification.)
(17)   Q.   While we were off the record I
(18)   asked the court reporter to mark for
(19)   identification as UBS Exhibit 3 a document
(20)   entitled Genesis Health Ventures Review of
(21)   Expected Impact of APS Acquisition, has
(22)   production numbers GEN C 02922 through 30.
(23)   Do you recognize this document?
(24)   A.   It looks like it's a document
(25)   prepared by our firm for Genesis.

## Page 38

(1)
(2)   Q.   When you say your firm, you were
(3)   involved in preparing this document?
(4)   A.   I believe my team was.
(5)   Q.   Could you tell me why this
(6)   document was prepared?
(7)   A.   I believe that Genesis Health
(8)   Ventures is looking at acquiring APS.
(9)   Q.   Do you know what stage of
(10)   discussion that potential transaction has
(11)   reached at this point?
(12)   A.   My understanding is that the
(13)   company has a letter of intent and is close to
(14)   signing a further agreement with Mariner who's
(15)   the manager of APS which would then be subject
(16)   to the approval of the creditors committees
(17)   which would then be subject to the approval of
(18)   the Bankruptcy Court and would also then be
(19)   subject to an advisor being hired to auction
(20)   APS to the highest bidder.
(21)   Q.   Do you know why this particular
(22)   document was prepared for Genesis?
(23)   A.   I believe that we were assisting
(24)   the company in looking at the APS situation due
(25)   to the fact that that's a -- due to the fact

## Page 39

(1)
(2)   that it was a potential acquisition.
(3)   Q.   If you will look at page 6 of
(4)   this document there is two lines that have
(5)   adjusted normalized 2001 EBIDTA run rates. Can
(6)   you tell me what those numbers represent?
(7)   A.   This is a presentation first of
(8)   all that was done I believe in March of 2001
(9)   prior to our most recent plan of reorganization
(10)   or updated enterprises valuation analysis so I
(11)   think the first point to make is that there's a
(12)   lot of time that's passed between when this was
(13)   done and the information that we have today.
(14)      While I don't perfectly recall
(15)   everything in every document ever prepared for
(16)   Genesis or for all the other companies that we
(17)   work with, I do believe that the normalized
(18)   2000 EBITDA run rate and the lost Mariner
(19)   contract reflects similar numbers that were in
(20)   our original Exhibit 1 and I would have to get
(21)   reoriented to the other numbers on this page.
(22)   Q.   Is the second adjusted normalized
(23)   2001 EBIDTA run.rate an EBIDTA rate that gives
(24)   affect to the transaction with APS that's under
(25)   consideration?

## Page 40

(1)
(2)   A.   Again, not having memorized all
(3)   the presentations that we put together, let me
(4)   take a -- let me understand. First of all,
(5)   this does not reflect a number which can be
(6)   compared to any public company because we don't
(7)   have run rates out of any of the other public
(8)   companies so you can't compare this number to
(9)   another public company.
(10)      Second of all, this reflects the
(11)   acquisition I believe of APS given there's
(12)   acquired APS EBITDA in this number and there's
(13)   a synergies number and third of all, it doesn't
(14)   reflect I believe the full Medicaid pricing
(15)   reduction adjustment that is inherent in the
(16)   APS business and then lastly, the starting
(17)   point which is the normalized 2001 EBITDA run
(18)   rate is a number which you can't compare to the
(19)   2001 numbers of the other publicly traded
(20)   companies so this is an analysis which attempts
(21)   to ask a question which is entirely different
(22)   than any of the other previous questions that
(23)   had been asked before.
(24)   Q.   What was the question you were
(25)   being asked to address here when you prepared

IN RE: GENESIS HEALTH VENTURES, INC.
WILLIAM MCGAHAN - 8/19/01

BSA                                                                                    XMAX(11/11)

## Page 41

(1)
(2) these numbers, do you recall?
(3)     MR. STROCHAK: The numbers in
(4) Exhibit 3?
(5)     MR. KINZEY: In Exhibit 3, yes.
(6)     A.   I believe that based on the
(7) information we had in March and not based on
(8) information we had in August that this was
(9) numbers which on the top half of the page
(10) attempted to look at the adjusted normalized
(11) 2001 EBITDA run rate and in the bottom half of
(12) the page I don't recall. It appears that it's
(13) some sort of look at what would happen in a
(14) future period if we acquired APS at the full
(15) and as you can see from the footnote, the full
(16) 2002 impacted by 12 percent.
(17)     Q.   Just for clarification, you
(18) mentioned in an answer there was no comparable
(19) public company that you could compare these
(20) numbers to?
(21)     A.   You can't compare run rate
(22) numbers from one company to a calendar number
(23) of another company.
(24)     Q.   Okay. But you're not saying
(25) there are not public companies comparable to

## Page 42

(1)
(2) APR in terms of what sort of business they are
(3) in?
(4)     A.   You mean APS?
(5)     Q.   Yes.
(6)     A.   That's a different question.
(7)     MR. STROCHAK: Is that the
(8) question you are asking?
(9)     Q.   That's the question I was asking
(10) because I may have misunderstood your answer
(11) the first time around.
(12)     A.   I'm lost.
(13)     Q.   Are there comparable companies,
(14) public companies that are comparable in your
(15) opinion to APS?
(16)     A.   There are companies which are in
(17) the same business as APS which you can compare
(18) APS to although the one public company, it's an
(19) institutional pharmacy business, is a company
(20) which in my view is very difficult to compare
(21) any other institutional pharmacy business to
(22) due to its purchasing power, its size, its
(23) breath, its experience as a public company none
(24) of which APS has, but yes, there are companies
(25) who are public which are in APS' business.

## Page 43

(1)
(2)     Q.   That would be OmniCare?
(3)     A.   OmniCare.
(4)     Q.   Can I go back and ask you one
(5) quick question on Exhibit 1 and 2. When you
(6) did the comparable company analysis, did you
(7) change the EBITDA analysis for any of the
(8) comparable companies between Exhibit 1 and
(9) Exhibit 2?
(10)     A.   It appears so. On Manor Care,
(11) for example, it was projected back at the
(12) beginning of the year that Manor Care would
(13) have EBITDA of 328.5 as it appears in Exhibit 2
(14) on page 23.
(15)     In Exhibit 1 on page 22 EBITDA
(16) adjusted for Manor Care is 366.8. On Beverly
(17) Enterprise's adjusted EBITDA in Exhibit 2 is
(18) 252.7 for 2001 and on page 23 in Exhibit 1 that
(19) has declined to 244.8 based upon estimates from
(20) UBS Warburg research.
(21)     For OmniCare, EBITDA is projected
(22) in Exhibit 2, page 22 to be 276.3. In Exhibit
(23) 1, page 25 it's projected to be 282.8.
(24)     MR. KINZEY: I ask the reporter to
(25) mark for identification as UBS Exhibit 4

## Page 44

(1)
(2) a document entitled Genesis Health
(3) Ventures Discussion Materials prepared
(4) by Houlihan Lokey Howard & Zukin,
(5) production numbers GEN C 02423 through
(6) 38.
(7)     (UBS Exhibit 4, Genesis Health
(8) Ventures Discussion Materials prepared
(9) by Houlihan Lokey Howard & Zukin,
(10) production numbers GEN C 02424 through
(11) 38, marked for identification.)
(12)     Q.   Have you had an opportunity to
(13) examine Exhibit 4?
(14)     A.   I have seen it briefly.
(15)     Q.   Have you seen it before today?
(16)     A.   Not before today.
(17)     Q.   Do you know, if you just flip
(18) through it, say, for example, on page 7, there
(19) is some handwritten notes, do you recognize
(20) that handwriting?
(21)     A.   No.
(22)     Q.   It's not yours?
(23)     A.   Not mine.
(24)     Q.   I take it if you have not seen
(25) this today you did not take it into

AA. 1120

*Ong J Cambele*
*& MFW*

*GTH*
*JG*
*AS*

## In The Matter Of:

*In Re: HEALTH VENTURES INC. et al.,*
*In Re: MULTICARE AMC INC. et al.*

---

*JOSEPH LaNASA*
*August 15, 2001*

---

*RAYVID REPORTING SERVICE, INC.*
*420 LEXINGTON AVENUE*
*NEW YORK, NY  10170*
*(212) 599-3642    FAX: (212) 692-9171*

Original File 081501JL.TXT, 60 Pages
Min-U-Script® File ID: 1566929957

## Word Index included with this Min-U-Script®