In Re: HEALTH VENTURES INC. et al.,
In Re: MULTICARE AMC INC. et al.

JOSEPH LaNASA
August 15, 2001

---

**JOSEPH LANASA**

[1]
[2]    A: No.
[3]    Q: But that is the stated goal of
[4] Goldman?
[5]    A: The company has had numerous
[6] discussions with the Steering Committee about it
[7] and the projections show it doing many of those
[8] things.
[9]    Q: I'd like to draw your attention to
[10] GS 05117, "Genesis Health Ventures At Plan
[11] Valuation."
[12]    Did you play a role in the
[13] drafting of this page of the presentation?
[14]    A: I reviewed it.
[15]    Q: Ms. Lau was the principal
[16] draftsperson?
[17]    A: Yes, I assume she just took these
[18] numbers from this Disclosure Statement.
[19]    Q: I see that in this table the
[20] normalized 2001 EBITDA is used. That's 222.2
[21] million combined for the two enterprises?
[22]    A: Yes.
[23]    Q: Why was that number chosen as an
[24] at plan valuation?
[25]    A: Because that's what she, and me by

---

**JOSEPH LANASA**

[1]
[2] reviewing it, think is what this company is
[3] capable of doing on an EBITDA basis.
[4]    Q: That was your best estimate as of
[5] July, the recent past?
[6]    A: Yes, when we drafted this, yes.
[7]    Q: I'd like to draw your attention to
[8] GS 01520, "Genesis Health Ventures, Investor
[9] Returns."
[10]    Did you play a role in the
[11] drafting of this penultimate page, I guess, of
[12] the document?
[13]    A: I reviewed it.
[14]    Q: Did Ms. Lau do the principal
[15] drafting?
[16]    A: Um-hum.
[17]    Q: This reflects a case 2 of "lose
[18] APS, lose Mariner Health contract."
[19]    A: Yes.
[20]    Q: Could you explain what those two
[21] potentials are?
[22]    A: I believe she's assuming that the
[23] company does not acquire APS and does not
[24] maintain the Mariner Health contract.
[25]    Q: What impact would that have, then,

---

**JOSEPH LANASA**

[1]
[2] on the projected EBITDA?
[3]    A: I don't recall.
[4]    Q: What impact would that have on the
[5] Genesis Health Ventures enterprise value
[6] generally? Would it have a depressing impact?
[7]    A: On APS it's unclear, because
[8] you're paying money to buy a business, you're
[9] paying 60 million bucks to buy a business that
[10] does 7 million of cash flow, so whether it would
[11] increase or decrease is unclear.
[12]    On losing the Mariner Health
[13] contract, you're losing revenue and you're losing
[14] whatever cash flow you make on that revenue, so
[15] that would be a negative impact.
[16]    On APS it's unclear whether it
[17] would be a positive or negative impact.
[18]    Q: I'd just like to go back a page to
[19] GS 05119, "Genesis Health Ventures, Bank Debt
[20] Investment."
[21]    A: Um-hum.
[22]    Q: Again, did you play a role in the
[23] drafting of this page?
[24]    A: Again, I reviewed it.
[25]    Q: As of today, where is the bank

---

**JOSEPH LANASA**

[1]
[2] debt price trading?
[3]    A: I believe that Genesis bank debt
[4] trades around 75 cents, which implies a share
[5] price of 22.50, and that Multicare bank debt
[6] trades around 80 to 81 cents, which implies a
[7] share price between 19.86 an 20.41.
[8]    Q: That bank debt price, if it were
[9] to go up, that would imply a higher share price,
[10] is that correct?
[11]    A: Um-hum.
[12]    Q: How is this relationship between
[13] the bank debt price and the share price derived?
[14]    A: I believe it's the bank debt price
[15] times the amount of bank debt outstanding, plus
[16] the amount of debt ahead of the bank debt, bank
[17] debt price times the bank debt outstanding — I'm
[18] sorry, bank debt price times bank debt
[19] outstanding minus the amount of debt the bank
[20] debt holder is receiving minus the amount of
[21] preferred stock the bank debt holders are
[22] receiving equals the equity value.
[23]    And in each case, dividing that by
[24] the number of shares being received by the bank
[25] group in each one of the two companies.

---

~4282085.txt

UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE
-----------------------------------------------------

In Re:

GENESIS HEALTH VENTURES INC.,
et al.
                    Debtors.

                         Chapter 11 Case Nos.
                         00-2692 (JHW)
                         Jointly Administered
-----------------------------------------------------
In Re:

MULTICARE AMC, INC., et al.,


                    Debtors.

                         Chapter 11 Case Nos.
                         00-2494 (JHW)
                         Jointly Administered
-----------------------------------------------------
               9:10 a.m.
               August 24, 2001

               101 Park Avenue
               New York, New York  10178


           DEPOSITION of DAVID SCHULTE, testifying on

behalf of Chilmark Partners in the above entitled

matter, taken pursuant to Notice, before Suzanne

F. Moore, a Registered Professional Reporter,

Certified Realtime Reporter, and Notary Public of

the State of New York.




                               2


1                  DAVID SCHULTE

2
                  Page 1

~4282085.txt

13          who knows if that transaction will

14  eventuate, and that loss of business is out

15  there, and there are blandishments that

16  management has given us about booking more

17  business and the like, and we're covering.

18          But it's very hard to put a

19  premium valuation on a company that has got a

20  palpable prospective loss of 15 percent of its

21  profit, and that kept us from simply doing a high

22  end/low end kind of a bracket approach to this.

23  we felt obliged to pay closer attention.

24          we picked a multiple point that

25  isn't the midpoint, because NeighborCare has

                                                        38

                        DAVID SCHULTE

1   better profitability than NCS, not quite as good

2   as OmniCare, and we just applied judgment to it,

3   but we thought a lot about it.

4   

5       Q      Let's talk about the APS

6   transaction. Can you tell me what that is?

7       A      It's a gleam in the eye.

8       Q      If the gleam comes to fruition

9   what will happen?

10      A      If everything goes according to

11  plan, the Debtors will get at least a bust-up

12  fee, and I would say almost may be the best case,

13  but I don't want to be humorous about this.

14  They'll get the bust-up fee almost for certain.

15          They may make an overpriced

                        Page 34

~4282085.txt

16  acquisition, that would be the downside.  But

17  there will be at some point in one of the Mariner

18  bankruptcy cases an auction of APS, and someone

19  is likely to buy it.

20      Q    Do you know whether Genesis would

21  like to make that acquisition if they could?

22      A    Oh, the management of Genesis is

23  eager to make this acquisition.

24      Q    So in terms of your assumptions

25  for your valuation, did you assume the loss of

39

1              DAVID SCHULTE

2  the Mariner business?

3      A    We -- the loss of Mariner beds is

4  cranked into the forecast for Genesis, and so

5  yes.

6      Q    And you didn't --

7      A    Well, but in there we used the

8  business plan, remember, and in their business

9  plan they've also got some business replacement,

10  so it isn't a cold turkey loss.

11              There are offsets that they

12  anticipate, but we've taken the business plan per

13  se.

14      Q    That doesn't anticipate an APS --

15      A    It does not.

16      Q    (Continuing) -- transaction.

17      A    It does not.

18      Q    It doesn't take into account any

Page 35

~4282085.txt

19  other acquisitions?

20          A       That's correct.

21          Q       Have you heard anything from

22  management as to one of the things they want to

23  do coming out of bankruptcy is to make

24  acquisitions of other companies?

25          A       I have not heard them say that.

40

1                   DAVID SCHULTE

2   Their track record suggests that the idea might

3   come up.

4           Q       But you don't anticipate in your

5   evaluation that there will be acquisitions?

6           A       We have put in nothing for future

7   potential acquisitions.

8           Q       Let's see if I can ask you about a

9   few other documents.  We're finished with your

10  report for the time being.

11          A       Certainly.

12                  MR. KINZEY:  Let me ask the court

13          reporter to mark for identification as

14          Chilmark Exhibit 2 a document bearing

15          production numbers CH 003101 through

16          3113.

17                  (The above described document was

18          marked Chilmark Exhibit 2 for

19          identification, as of this date.)

20          Q       Do you recognize that document?

21          A       Yes, sir.

Page 36

# In The Matter Of:

*Genesis Health Ventures, Inc, et al.*

---

*David C. Barr*
*August 17, 2001*

---

*Corbett & Associates*
*1400 N French Street*
*P.O. Box 25085*
*Wilmington, DE  USA  19899-5085*
*(302) 571-0510    FAX: (302) 571-1321*

Original File 010817D.ASC, 77 Pages
Min-U-Script® File ID: 3619049710

## Word Index included with this Min-U-Script®

id C. Barr
ust 17, 2001

Page 20

eighborCare segment of the Genesis Health Ventures
usiness is?

A: NeighborCare is our pharmacy/medical supply
peration.

Q: And I see here in the second line that the
BITDA number is 72 million. Is that $72 million actual
ersus an $83 million budgeted number?

A: Yes, sir, that's what this is.

Q: Do you recall what accounted for that variance
etween the actual and the budget at this point in time?

A: Well, a portion of that variance was bad debt,
nd a portion of it was cost of goods sold, and a portion
f it was delivery expense, which is highlighted here.

Q: And those items were all adverse to budgeted
rojections; is that correct, the three that you just
nentioned?

A: Yes, sir.

Q: Now I would like to turn to another one of the
eading sheets that doesn't bear a number on it. I think
t's between — it's right before page 12 of the
resentation that you put on. And it's stamped 31.
NeighborCare Proposal to Acquire APS, Presentation to
teering Committee. Do you see that?

A: Yes, sir.

Page 21

Q: Was this part of the presentation that you
made to the steering committee on August 2nd, 2000? I
see the date here of July 25th, 2000.

A: I don't recall whether I reviewed this
proposal on August 2nd again or not. We had done a
previous meeting, which I believe was July 25th, and I'm
not positive whether I reviewed it again on August 2nd or
not.

Q: At some point, however, you did make a
presentation to the steering committee on a proposal to
acquire APS?

A: Yes, sir, I did.

Q: And could you describe for the record just in
very summary terms what the proposal to acquire APS was?

A: I put forth a proposal for the acquisition of
the pharmacy operations of Mariner Healthcare.

Q: Were you primarily responsible for making this
proposal to acquire the pharmacy operations of Mariner
Healthcare?

A: I would say yes, I was.

Q: This was a project that was assigned to you by
your superior in the corporation?

A: Yes, sir.

Q: Could you state for the record where that

Page 22

[1] proposal sits today? Has such an acquisition been made?

[2] A: No, sir, it has not. We continue to negotiate
[3] an asset purchase agreement, which has not been completed
[4] to date.

[5] Q: Are you optimistic that such an acquisition
[6] will take place?

[7] A: I'm hopeful that we will be able to complete
[8] it. There is not an agreement in place, and it would
[9] have to go through the bidding procedure process of the
[10] bankruptcy court at this point. So I am hopeful that we
[11] will be able to accomplish it.

[12] Q: Is there a time frame for accomplishing this?

[13] A: I would say, yes, sir, there is. There is a
[14] time frame that's been developed on a pro forma sort of
[15] basis based on when an asset purchase agreement could be
[16] signed.

[17] Q: And what is that time frame?

[18] A: I believe the structure is that following the
[19] signing of an asset purchase agreement, completion of an
[20] asset purchase agreement, Genesis would be required to
[21] submit a proposal to our bankruptcy court for approval of
[22] the transaction within three days. And then following
[23] that they're required to submit the bidding procedures
[24] motion, I believe it's called, to their bankruptcy court.

Page 23

[1] Then if Genesis' motion is approved, they would proceed
[2] with the bidding motion. If the bidding motion was
[3] approved, then it would go through an auction period,
[4] which I believe is about 30 or 45 days, where other
[5] bidders could submit a bid, and then a period during
[6] which those bids are reviewed. And then if Genesis is
[7] the successful bidder, we have set, I believe it's a
[8] 90-day time frame on trying to close the transaction if
[9] we are the successful bidder. It's either 60 or 90 days.

[10] Q: Okay. I would like to turn to page 17 of your
[11] presentation, which is entitled Strategic Fit with
[12] NeighborCare. Do you see that?

[13] A: Yes, sir.

[14] Q: And, again —

[15] A: With the chart of pharmacy services provided.

[16] Q: Yes. Was this part of your presentation made
[17] to the steering committee whenever it was made? I
[18] realize there was some uncertainty as to when precisely
[19] this was made.

[20] A: Yes.

[21] Q: But this was part of it?

[22] I would like you to flip over to page

[23] 19 Again it's a different page, but it's headed

[24] Strategic Fit with NeighborCare. Do you see that?

AA. 1128

Page 24

[1] A: Yes, sir.

[2] Q: And that has another set of considerations,

[3] does it not, an opportunity to combine business units in

[4] nine states and consolidation of existing APS pharmacies,

[5] all with subheadings under that? Do you see that?

[6] A: Yes, sir.

[7] Q: And that was part of your presentation as

[8] well?

[9] A: Yes, sir, it was.

[10] Q: And the following page, 20, also, and 21

[11] contain other strategic fit items. Is that correct?

[12] A: Yes, sir, it does.

[13] Q: Were you an advocate of doing this APS

[14] transaction in the presentation that you made to the

[15] steering committee —

[16] A: Yes, sir, I was.

[17] Q: — in 2000?

[18] A: I recommended it.

[19] Q: You thought it was a good strategic fit?

[20] A: Yes, sir, I did.

[21] Q: You thought there were synergies. Is that

[22] correct?

[23] A: Yes, sir, I did.

[24] MR. PRIMPS: At this time I would ask

Page 25

[1] the reporter to mark as Genesis Exhibit 2 for

[2] identification a Genesis Health Ventures Presentation to

[3] Steering Committee, September 12, 2000, document.

[4] (Genesis Deposition Exhibit No. 2 was

[5] marked for identification.)

[6] BY MR. PRIMPS:

[7] Q: Could you state for the record what this

[8] document is, Mr. Barr?

[9] A: It is a presentation to the steering committee

[10] of the banks.

[11] Q: And did you play a part in this presentation

[12] to the steering committee?

[13] A: Yes, sir, I believe I attended this meeting.

[14] Q: On the second page of the document, the one

[15] stamped 78, next to your name is shown July operating

[16] results, Rehabilitation Services and NeighborCare for the

[17] slot of 11:45 to 12:15?

[18] A: Yes, sir, it does.

[19] Q: Do you recall making a presentation at around

[20] that time on September 12th, 2000?

[21] A: Not specifically. I made a number of

[22] presentations, and it would appear I did, but I don't

[23] specifically remember.

[24] Q: Okay. I would like to draw your attention to

Page 26

[1] the document stamped 96 and entitled Operations Review

[2] Presentation to Steering Committee, September 12th,

[3] 2000 —

[4] A: Yes, sir.

[5] Q: — and ask you if that portion of this

[6] document marked as Genesis Exhibit 2, whether it reflects

[7] the opening page of that portion of this document that

[8] related to your presentation to the steering committee?

[9] MR. STROCHAK: Objection. He's

[10] testified that he couldn't recall if he made a

[11] presentation.

[12] THE WITNESS: It looks like the first

[13] page, yes, sir.

[14] BY MR. PRIMPS:

[15] Q: Does a review of these documents starting at

[16] the stamped document 96 and going forward to the document

[17] stamped 115, does that refresh your recollection that you

[18] made a presentation on September 12th, 2000, to the

[19] steering committee?

[20] A: Yes, sir, it looks like a proposal or a

[21] presentation that I would have made to the steering

[22] committee. Again, I made several presentations, and

[23] specifically recalling this one, it generally looks like

[24] a presentation that I made to the committee.

Page 27

[1] Q: Do you have any recollection that a

[2] presentation that you made was structured as this

[3] document shows it? In other words, having an initial

[4] portion relating to Genesis Rehabilitation Services,

[5] moving on to —

[6] A: Yes, sir, it's the way I put together

[7] presentations for the bank group, it's consistent with

[8] the way I did it, and unquestionably I put together the

[9] presentation. I just don't remember specifically whether

[10] I was there at this September 12th meeting. In all

[11] probability I was.

[12] Q: And it was divided three ways, like the one

[13] that we went over in August, with a Rehabilitation

[14] Services, a NeighborCare —

[15] A: Yes, sir.

[16] Q: — and then — a NeighborCare section and then

[17] an APS Acquisition section. Is that correct?

[18] A: Yes, sir.

[19] Q: Has due diligence been done on the APS

[20] acquisition?

[21] A: Due diligence has been done several times on

[22] the APS acquisition, yes, sir.

[23] Q: Were you in charge of the group doing the due

[24] diligence review?

Page 28

A: The group reported to me, yes, sir.

Q: Who was the group that reported to you?

A: The group was composed primarily of Rick nderland, and Bob Williams and Judy Pasquess-Weis also articipated periodically.

Q: Has that due diligence process been completed?

A: I would say that process is still ongoing. We ave in point of fact completed the process several mes, but it's ongoing as we receive updated financial :sults from the company.

Q: And there would be continued due diligence up ) the time of an agreement to merge that has not appened yet?

A: That's correct, sir. The period of time hat's passed while we were engaged in this process is ubstantive, so we continue to look at their operating esults and review issues as a function of that :ansaction.

MR. PRIMPS: At this time I would like ) mark as Genesis Exhibit 3 for identification a ocument entitled Presentation to the Senior Lenders of 3enesis Health Ventures, The Multicare Companies.

(Genesis Deposition Exhibit No. 3 was narked for identification.)

Page 29

BY MR. PRIMPS:

Q: Could you state for the record, Mr. Barr, what his document is?

A: It says it's a presentation to the senior enders of Genesis Health Ventures. And then it says The Multicare Companies.

Q: Do you recall attending a presentation to the senior lenders of Genesis Health Ventures on or about January 30th, 2001?

A: I don't recall the specific date, but it would have been about this time that I made a presentation like this, yes, sir.

Q: And you are shown on the second page of this document in the agenda as making a presentation involving NeighborCare Pharmacy and Rehabilitation Services. Do you see that?

A: Yes, sir.

Q: And looking at that page, does that refresh your recollection that you, in fact, did make a presentation on NeighborCare Pharmacy and Rehabilitation Services?

A: Well, looking at that and some of the pages themselves, it is a presentation outline I made, yes, sir.

Page 30

[1] Q: And looking at the agenda, do you recall that
[2] others, the others that are shown, Mr. Walker, your
[3] chairman and CEO, Rick Howard, George Hager, and then two
[4] outside advising firms, UBS Warburg and CSFirst Boston
[5] also made presentations?
[6] A: This indicates that they made presentations,
[7] yes, sir. I don't recall actually being there when these
[8] presentations were made.
[9] Q: You don't recall being there when either
[10] Mr. McGahan or Soren Reynertson of UBS Warburg made a
[11] presentation?
[12] A: I don't recall that.
[13] Q: Do you recall being present when Hal Kennedy
[14] of CSFirst Boston made a presentation?
[15] A: No, I do not.
[16] Q: Have you heard presentations given by any of
[17] those three professionals that are listed on this agenda,
[18] two from UBS Warburg and the other from CSFirst Boston?
[19] A: I have heard Bill McGahan make a couple
[20] presentations, very industry-general presentations, one
[21] at one of our management conferences.
[22] Q: You don't recall him giving a presentation
[23] specifically on a five-year forecast looking ahead for
[24] Genesis Health Ventures in the process of coming out of

Page 31

[1] bankruptcy?
[2] A: No, sir. I don't know whether I stayed or
[3] whether I left the meeting following my presentation. I
[4] just don't remember.
[5] Q: I would like to draw your attention to the
[6] portion of the document marked as GEN C00549. It has a
[7] page entitled NeighborCare, Dave Barr, vice chairman.
[8]    Does this indicate to you that this was
[9] part of your presentation?
[10] A: Yes, sir.
[11] Q: And, again, was this a Power Point or a
[12] handout; do you recall?
[13] A: I believe for this meeting it actually was a
[14] Power Point presentation.
[15] Q: Do you recall for how long you stayed at this
[16] meeting?
[17] A: I don't really recall. I mean, I generally
[18] left the meetings when I completed my portion of the
[19] presentation. I may have attended part of it beyond
[20] that, but...
[21] Q: Do you recall where this meeting was?
[22] A: I think this meeting was in New York, at a
[23] hotel in New York.
[24] Q: Unlike the steering committee agendas that we

Genesis Health Ventures, Inc., et al.

---

Page 32

[1] have, there is no time given for your presentation. Do
[2] you have a recollection of how long you spent in giving
[3] your presentation to the senior lenders?
[4]    A: As I recall, this was a fairly long
[5] presentation, probably took an hour.
[6]    Q: And how do you recall there was a distinction
[7] between making a presentation to the senior lenders as
[8] opposed to the steering committee presentations you were
[9] making?
[10]    MR. STROCHAK: Objection to form.
[11]                    BY MR. PRIMPS:
[12]    Q: Was there any difference between the steering
[13] committee and the senior lenders?
[14]    A: This was a much larger group of people.
[15]    Q: About how many were there?
[16]    A: I mean, it was a large room. I would guess a
[17] hundred people.
[18]    Q: Did you have to speak into a microphone and
[19] behind a rostrum or a lectern; do you recall?
[20]    A: Yes, I believe I made this presentation from a
[21] lectern.
[22]    Q: Drawing your attention to page 550, stamped
[23] 550, of this document, which I don't think has any
[24] individual page numbers on it, I draw your attention to

Page 33

[1] the portion of that page entitled NeighborCare. Again,
[2] now, do you recall — it's the lower portion NeighborCare
[3] without any embellishment.
[4]    Do you recall that each of these black
[5] boxes with the print on it formed the basis of one Power
[6] Point slide?
[7]    A: Yes, I believe that's the case.
[8]    Q: Okay. You see the NeighborCare product lines
[9] fiscal year 2000 revenue chart?
[10]    A: Yes, sir.
[11]    Q: Because of the coloration or lack thereof of
[12] this Xerox, I can't allocate those percentages to the
[13] particular product lines. Do you recall how to make that
[14] allocation? I see there is a 76 percent portion of the
[15] pie chart. And then the only one I think we can really
[16] tell is, there is a white allocation for home medical
[17] equipment, which seems to correlate to the 4 percent
[18] portion of the pie chart. Do you see that?
[19]    A: Yes, sir.
[20]    Q: Am I right in associating the 4 percent figure
[21] with home medical equipment?
[22]    A: Yes, I believe that's right.
[23]    Q: Could you do the other allocations for me?
[24]    A: Well, the 76 percent is clearly for pharmacy

Page 34

[1] operation, pharmacy revenues. That's our largest segment
[2] of our business. I would think the 10 percent represents
[3] medical supplies. I am not absolutely positive of that.
[4] The numbers are fairly close. And that retail pharmacy
[5] represents 7 percent. And home IV and other represents
[6] the 3 percent.
[7]    Q: Turning to the next page stamped 551, you have
[8] got budget assumptions there?
[9]    A: Yes, sir.
[10]    Q: Is that for fiscal year 2001?
[11]    A: Yes, sir, those would be budget assumptions
[12] for fiscal year 2001, I believe. Yes.
[13]    Q: And in your financial reporting is there a
[14] difference between fiscal year and calendar year?
[15]    A: Yes, sir, there is.
[16]    Q: Could you state what that difference is?
[17]    A: Our fiscal year ends September 30th.
[18]    Q: And could you describe for me what those
[19] budget assumptions are? The bullet points I think need
[20] some expanding.
[21]    There is the portion on revenues with
[22] new/lost business. Could you tell me, what is new
[23] business and what's lost business?
[24]    A: The net bed growth for the pharmacy, 21,000

Page 35

[1] beds, was the budgeted increase in beds, pharmacy beds.
[2]    The AGE Institute note reflects the loss
[3] of the AGE Institute business, both pharmacy and medical
[4] supplies, which was approximately $11.2 million reflected
[5] on here.
[6]    The medical supply program referred to
[7] here was a projected increase as a result of a new
[8] program we were attempting through a joint venture with
[9] another provider to provide medical supply services in
[10] the midwest and west where we don't have operations.
[11]    The home IV contract cancellation
[12] represents a loss of business from the cancellation of a
[13] home IV contract with a large insurance company of 3.7
[14] million.
[15]    Q: Now, we are coming up to the end of the fiscal
[16] year. Is that correct?
[17]    MR. STROCHAK: Pardon me. Objection.
[18]    THE WITNESS: I mean, today as we sit
[19] here?
[20]                    BY MR. PRIMPS:
[21]    Q: Yes. In other words, looking at this chart is
[22] one thing. But now here we are sitting here a number of
[23] months later.
[24]    A: Yes, sir, we are approaching the end of our

---

AA. 1131

d C. Barr                                                         Genesis Health Ventures, Inc, et al.
st 17, 2001

---

**Page 36**

cal year.

Q: As far as these budget assumptions are
ncerned, the four that are shown here, how has the
tual experience borne those assumptions out?

A: The new bed growth has been substantially
low budget. In fact, reflects a net loss. No, I'm
rry, would reflect still a net gain, but it is
bstantially below budget.

   The AGE Institute contracts were lost.
though they were lost two months later than originally
nticipated, the loss was still approximately in this
ount.

   The medical supply program has not been
uccessful. In fact, we have changed suppliers there and
rvamped the program. So we are well under budget there.

   And the home IV contract cancellation
d occur and we lost that business.

Q: Was there any timing differential on the
ncellation of the home IV contract as opposed to what
ou were projecting?

A: I don't think so, but I am not positive.

Q: Flipping over to the next page stamped 552.
or the NeighborCare fiscal year 2001 budget, you were
redicting an increase in EBITDA from the actual budget

---

**Page 37**

scal year 2000 to the budgeted amount for 2001. Is
at correct?

A: Yes, sir.

Q: Again, now that we are sitting here with the
iscal year coming to a close, do you know where the
erformance of the company has gone in relation to what
he budgeted projections are?

A: Yes, sir, I have those numbers through June,
nd through June we are behind budgeted NeighborCare on
n EBITDA basis.

Q: And does that, being behind budget, is that
ttributable in part to some of the negative events that
ou referred to earlier on the prior page?

A: Oh, certainly, sir. It's partly because of
he difference in the projected growth in new beds versus
he actual growth, has a substantial impact, yes, sir.

Q: I would like to turn ahead to page 555.

MR. STROCHAK: Are you okay? Do you
eed a break or anything?

THE WITNESS: Let's finish this one, if
we can.

MR. STROCHAK: Yes, when you get to a
ogical point.

BY MR. PRIMPS:

---

**Page 38**

[1]    Q: The panel headed Rehabilitation Services. Do
[2] you see that?

[3]    A: Yes, sir.

[4]    Q: Did that start another segment of your
[5] presentation in this meeting?

[6]    A: Yes, sir.

[7]    Q: Now, I just wanted to try to trace out the
[8] math here. If you look ahead under Rehabilitation
[9] Services to the next page, which is 556, that's got an
[10] EBITDA number for actual fiscal year 2000 —

[11]    A: Yes, sir.

[12]    Q: — of 25.1 million. Do you see that?

[13]    A: Yes, sir.

[14]    Q: And then if you go ahead to the next page, you
[15] have got your actuals versus your budget numbers. That's
[16] on page 557?

[17]    A: Yes, sir.

[18]    Q: And that budgeted EBITDA is 23.9 million. Do
[19] you see that on that page?

[20]    A: Yes, sir.

[21]    Q: Just focusing on your budgeted figures at page
[22] 552, where you show a budgeted EBITDA for NeighborCare of
[23] $104.9 million. Is that correct? Do you see that?

[24]    A: Yes, sir.

---

**Page 39**

[1]    Q: And then moving ahead to page 557, where for
[2] Rehabilitation Services you are showing an EBITDA number
[3] of 23.9 million. Do you see that?

[4]    A: Yes, sir.

[5]    Q: What additional segments of company operations
[6] have to be added to those EBITDA numbers to come up with
[7] the total that's shown in Mr. Hager's presentation at
[8] pages 559 and 560, which shows Genesis Health Ventures-
[9] Standalone, EBITDA adjusted at 170, and on the next page,
[10] The Multicare Companies, EBITDA adjusted 2001 at 41.9,
[11] which according to my math would be a budgeted EBITDA for
[12] 2001 of $211.9 million?

[13]    MR. STROCHAK: Objection. Compound.
[14] Asked and answered. I am — can you follow it?

[15]    THE WITNESS: Well, the —

[16]              BY MR. PRIMPS:

[17]    Q: This will finish with this document.

[18]    A: In an attempt to try and say again what I have
[19] tried to explain before, you would have to add up a
[20] substantial number of operations, all of the service
[21] company operations and the nursing center operations and
[22] then add in the corporate overhead, all the overhead
[23] departments, and I couldn't possibly list all those, but
[24] as well as make the consolidating entries for the

---

AA. 1132

---

## IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| IN RE: | ) | Chapter 11 |
| | ) | |
| MULTICARE AMC, INC., *et al.*, | ) | Case No. 00-2494 (JHW) |
| | ) | through 00-2623 (JHW) |
| | ) | |
| Debtors. | ) | Jointly Administered |

Objection Deadline: May 30, 2001 @ 4:00 p.m.
Hearing Date: June 6, 2001 @ 10:00 a.m.

### NOTICE OF MOTION

TO:

Robert S. Brady, Esquire
Young Conaway Stargatt &
Taylor, LLP
1100 North Market St., 11th Fl.
P.O. Box 391
Wilmington, DE 19899-0391
(Counsel to Debtors)

Marc Abrams, Esquire
Willkie Farr & Gallagher
153 East 53rd Street
One Citicorp Center
New York, NY 10022
(Counsel to Debtors)

Kevin Callahan, Esquire
Office of the US Trustee
601 Walnut Street
Curtis Center, Suite 950 West
Philadelphia, PA 19106
(US Trustee)

Multicare AMC, Inc.
Attn: George V. Hager, Sr., CFO
101 East State Street
Kennett Square, PA 19348
(Debtors)

Teresa K. D. Currier, Esquire
Kathleen P. Makowski, Esquire
Klett Rooney Lieber & Schroling
The Brandywine Building
1000 West Street, Suite 1410
Wilmington, DE 19801
(Counsel to Mellon Bank, N.A.)

Richard S. Toder, Esquire
Morgan Lewis & Bockius, LLP
101 Park Avenue
New York, NY 10178-0060
(Counsel to Mellon Bank, N.A.)

Jill Bronson, Esquire
Drinker Biddle & Reath LLP
One Logan Square
18th & Cherry Streets
Philadelphia, PA 19103-6996
(Counsel to Mellon Bank, N.A.)

All parties on the 2002
Service List

The Official Committee of Unsecured Creditors in the above-captioned cases (the "Committee") filed the attached **Motion By The Official Committee Of Unsecured Creditors For An Order Directing The Appointment Of A Trustee Or, Alternatively, The Sale Of The Related Party Contracts** (the "Motion"). In the Motion, the Committee seeks an order directing the appointment of a trustee or alternatively, directing Multicare to engage in a fair sale process of the Related Party Contracts in order to bring such Related Party Contracts to market-pricing for the benefit of Multicare's creditors.

432304.1 5/14/01

AA. 1133

You are required to file a response to the attached Objection on or before **May 30, 2001 at 4:00 p.m.**

At the same time, you must also serve a copy of the response on the Movant's attorney:

Mark Minuti, Esquire
Saul Ewing LLP
222 Delaware Avenue, Suite 1200
P.O. Box 1266
Wilmington, DE 19899

David S. Rosner, Esquire
Athena F. Foley, Esquire
Kasowitz, Benson, Torres & Friedman LLP
1633 Broadway
New York, NY 10019

HEARING ON THE OBJECTION WILL BE HELD ON **June 6, 2001 at 10:00 a.m.** before The Honorable Judith H. Wizmur, United States Bankruptcy Judge, Mitchell H. Cohen Courthouse, 401 Cooper Street, Camden, New Jersey 80101.

IF YOU FAIL TO RESPOND IN ACCORDANCE WITH THIS NOTICE, THE COURT MAY GRANT THE RELIEF DEMANDED BY THE OBJECTION WITHOUT FURTHER NOTICE OR HEARING.

Mark Minuti (No. 2659)
Tara L. Lattomus (No. 3515)
**SAUL EWING LLP**
222 Delaware Avenue, Suite 1200
P.O. Box 1266
Wilmington, DE 19899
(302) 421-6840/6847

-and-

David S. Rosner
Athena F. Foley
KASOWITZ, BENSON, TORRES
   & FRIEDMAN LLP
1633 Broadway
New York, NY 10019
(212) 506-1700

Counsel to Official Committee of Unsecured
Creditors of Multicare AMC, Inc., *et al.*

Dated: May 14, 2001

2

432304.1 5/14/01

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| IN RE: | ) | Chapter 11 |
| | ) | |
| MULTICARE AMC, INC., *et al.*, | ) | Case No. 00-2494 (JHW) |
| | ) | through 00-2623 (JHW) |
| | ) | |
| Debtors. | ) | Jointly Administered |

Objection Deadline: May 30, 2001 @ 4:00 p.m.
Hearing Date: June 6, 2001 @ 10:00 a.m.

### MOTION BY THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS FOR AN ORDER DIRECTING THE APPOINTMENT OF A TRUSTEE OR, ALTERNATIVELY, THE SALE OF THE RELATED PARTY CONTRACTS

The Official Committee of Unsecured Creditors in the above-captioned cases (the "Committee"), by its undersigned counsel, hereby moves this Court for entry of an order (i) directing the appointment of a trustee for the estates of Multicare AMC, Inc., et al. (together, "Multicare") (a) to evaluate, renegotiate, and bring to market-pricing the Related Party Contracts (as defined below) among Multicare and Genesis Health Ventures, Inc., et al. (together, "Genesis"), (b) to evaluate and to prosecute Multicare claims against Genesis, and (c) to propose and to seek confirmation of a fair plan of reorganization that maximizes Multicare's value for the benefit of Multicare's creditors; or, alternatively, (ii) directing Multicare to engage in a fair sale process of the Related Party Contracts in order to bring such Related Party Contracts to market-pricing for the benefit of Multicare's creditors. In support thereof, the Committee respectfully represents as follows:

## PRELIMINARY STATEMENT

Multicare does not have independent management. Instead, Multicare is managed by Genesis ElderCare Network Services, Inc. (the "Manager"), one of the debtors in the Genesis chapter 11 cases pending before this Court. Multicare does not have an independent board. Instead, three of Multicare's four directors are Genesis directors, with directly conflicting fiduciary duties owed to Genesis.[1] In fact, the three executives (identified below as "Management") who control both Multicare and Genesis receive massive compensation at the Genesis level – including Genesis equity -- but receive no compensation at the Multicare level. To say that Management has every incentive to generate value at the Genesis level, even if at Multicare's expense, is to state the obvious.

And that, precisely, is the problem that requires appointment of an independent trustee for Multicare. Genesis does generate value at Multicare's expense. Tremendous value. Genesis is Multicare's largest vendor. Genesis sells to Multicare all of Multicare's management services and all of Multicare's so-called "ancillary" services – that is, all of Multicare's rehabilitation, pharmacy, support, and third-party management services (the contracts and informal, undocumented arrangements for these services are collectively referred to as the "Related Party Contracts"). And the price tag is colossal. In fiscal 2001, Multicare will pay to Genesis over $139 million pursuant to the Related Party Contracts– a staggering 25% of Multicare's total operating expenses. In fact, due in large part to Genesis's unfettered control over Multicare, Multicare pays approximately $50 million of this amount without even the protection of written

---

[1]     The fourth Multicare director was appointed just prior to Multicare's bankruptcy filing, was hand selected by Genesis's primary secured lenders, and played no role whatsoever in the initial execution of the Related Party Contracts. It is these Related Party Contracts that, as explained below, operate to transfer enormous value from Multicare to Genesis to the detriment of Multicare's creditors.

2

432304.1 5/14/01

contracts with Genesis. As with Multicare's undeniably conflicted Management, to say that Genesis has every incentive to overcharge Multicare for the ancillary services is to state the obvious. And overcharge it does. Genesis takes value from Multicare on the order of tens of millions of dollars on an annual operating basis, which translates to hundreds of millions of dollars on an enterprise value basis. In fact, even Ernst & Young LP ("E&Y"), which was retained by the Genesis-controlled Multicare board, concedes that Genesis overcharges Multicare at least $15 million on an annual basis. $15 million in Multicare cost savings would go directly to Multicare's bottom line and, when multiplied by the 8 multiple used at the Genesis level, constitutes the transfer of $120 million of Multicare enterprise value away from Multicare's creditors. Again, E&Y was retained by Multicare under Genesis's control. Thus, Multicare and Genesis concede the $120 million theft.

But E&Y is only half right. Chanin Capital Partners LLC ("Chanin"), the Committee's financial advisors, conducted an exhaustive analysis of the Related Party Contracts with a view towards bringing the contracts to true market-pricing. The Committee determined that Genesis overcharges Multicare by close to $27 million on an annual basis. In other words, if the Related Party Contracts were brought to market, Multicare would save approximately $27 million annually, resulting in $216 million in preserved enterprise value that would inure directly to the benefit of Multicare's creditors. At present, however, Multicare has absolutely no check on Genesis overcharging. Multicare, and Multicare's chapter 11 cases, are run for the benefit of Genesis by Genesis employees. At best, these Genesis employees operate under an undeniable conflict of interest favoring Genesis. At worst, these Genesis employees operate under their personal incentives to earn as Genesis earns – at Multicare's expense.

3

This clearly is not an ordinary situation where a parent and subsidiary may share management and allocation of overhead may present inter-company obligations. This is an extraordinary situation where a controlling shareholder manages an entire eldercare business pursuant to a management agreement and uses its position to force its services upon its captive buyer– services that could be provided at market-based, competitive pricing by third parties– at prices that usurp over $27 million annually from the captive's operating income.

And the problem gets worse. Ordinarily, this Court would hear, not only from Multicare's unsecured creditors, but also from Multicare's secured bank creditors (the "Bank Group") who, unlike the unsecured creditors, actually have the economic leverage to stop Multicare's upstreaming of value to Genesis. Multicare's Bank Group and Multicare's unsecured creditors ordinarily would have a common interest in maximizing Multicare's value even as they may dispute, intramurally, the appropriate allocation of that value. But here, Genesis has hedged that risk structurally. Multicare's Bank Group is also Genesis's Bank Group, but the conflicted Bank Group has a much greater economic interest in its recovery at Genesis than at Multicare. This is because prepetition, Multicare's controller, Genesis, required that its bank creditors maintain "stapled" bank debt by which two-thirds of their indebtedness, and therefore two-thirds of their economic interest, reside at Genesis and only one-third resides at Multicare. Accordingly, Multicare's Bank Group – the same bank creditors as at Genesis – are owed approximately $1.2 billion at the Genesis level, and only approximately $443 million at the Multicare level.[2] Thus, the Bank Group, who should be checking Multicare's attempted transfer of value to Genesis,

---

[2]     Genesis separated its revolving bank debt, but not its term bank debt, from the "stapled" requirement. The Committee has been advised that, through this separation, there are now two of the forty-four banks that do not hold their debt two-thirds at Genesis and one-third at Multicare, but instead are half and half. The overwhelming majority of the banks remain two-thirds interested at Genesis and only one-third at Multicare.

4

because of its much larger interest at Genesis, actually supports Management's goal. In other words, to the Bank Group, the Related Party Contracts present the opportunity to take Multicare's unsecured creditors' recoveries, upstream them to Genesis, and pay them out to the Bank Group at Genesis.

There is a second reason that the Bank Group is economically incentivized to allow Genesis to remove value without consideration from Multicare. The Committee has been advised that Genesis calculates enterprise value at the Multicare level by a ratio of approximately 6 times operating income, but it calculates enterprise value of net income which has been upstreamed from Multicare at the Genesis level by a ratio of approximately 8 times operating income. In other words, $1 of operating income at Multicare is worth $6 of Multicare enterprise value, but, if upstreamed, the same dollar is worth $8 of Genesis enterprise value. Therefore, earnings that are upstreamed from Multicare to Genesis generate more enterprise value, according to Genesis, than earnings that remain at the Multicare level. As a result, equity provided to the Bank Group in either a Genesis or a Genesis/Multicare combined entity pursuant to a plan of reorganization would be worth more than it would without the Multicare value being upstreamed improperly. Thus, Multicare's financial health, once transferred to Genesis, can reduce the Bank Group's losses at the Genesis level. Again, that may be good for Genesis and its creditors, but it is a disaster for Multicare and its creditors.

Multicare's $284 million in unsecured creditors are the only constituency invested solely in Multicare and that is not conflicted by Genesis. Multicare's unsecured creditors are the only constituency that is economically motivated for Multicare (as opposed to Genesis) to achieve

5

432304.1 5/14/01

**AA. 1139**

chapter 11's rehabilitation purposes; that is, to bring to market Multicare's costs, particularly Multicare's Related Party Contracts, and to maximize the value of Multicare's estate.

Since its formation, the Committee consistently has urged Multicare to bring to market-pricing (reflective of Multicare's size and leverage in the market) Multicare's business relations with Genesis.  Once Multicare and Genesis filed for chapter 11 protection, and regularly thereafter, the Committee asked Multicare to put out to bid the Related Party Contracts and to evaluate Multicare's stand-alone value.  In March 2001, the Committee presented the results of its investigation directly to Multicare, and then at a meeting on April 3, 2001, the Committee presented the information to Multicare, all of its advisors, and the Bank Group.  After the meeting, at the Bank Group's request, the Committee prepared and circulated to Multicare, its advisors and the Bank Group the detailed bases and methodology for its approximately $27 million in projected cost savings, and the apparent defects in the analysis performed by Multicare's own (Genesis-hired) financial advisors.  On April 27, 2001 the Committee sent a formal demand letter to Multicare's counsel requesting, inter alia, that Multicare obtain the services provided under the Related Party Contracts on a market basis.  To date, Multicare has refused to do so.

The Committee submits that this Court must replace the conflicted, Genesis-controlled board with a truly disinterested independent trustee to do that which is necessary to maximize the value of Multicare's estate for the benefit of Multicare's creditors— first, by bringing the Related Party Contracts to market and then by formulating a fair, unconflicted Multicare plan of reorganization.  The Committee submits that the circumstances here present perhaps the paradigm case for the appointment of an independent chapter 11 trustee.

6

432304.1 5/14/01

## INTRODUCTION

1.      On June 22, 2000 (the "Petition Date"), the Multicare debtors each commenced a case under chapter 11 of the Bankruptcy Code. The Multicare debtors operate approximately 140 eldercare facilities in ten states (the "Multicare Facilities"), providing skilled nursing care and other medical services to their patients. The Multicare cases are jointly administered before this Court under the caption In re Multicare AMC, Inc., et al., Case No. 00-2494 (JAW).

2.      Also on the Petition Date, Multicare's principal owner, Genesis Health Ventures, Inc. ("GHV") and its affiliates, including Multicare's Manager, each commenced a case under chapter 11 of the Bankruptcy Code.[3] The Genesis cases are jointly administered before this Court under the caption In re Genesis Health Ventures, Inc., et al., Case No. 00-2692 (JAW). The Genesis debtors provide healthcare and related services to the elderly, and management services to other healthcare providers. The Genesis debtors also provide "ancillary" services to companies like Multicare, including HCR Manor Care and Mariner Post-Acute Network.

3.      On July 11, 2000, the United States Trustee appointed the Committee.

4.      On October 2, 2000, the Court authorized the employment and retention of Chanin as financial advisors to the Committee, nunc pro tunc to July 11, 2000. Since its retention, Chanin, on behalf of the Committee, has analyzed Multicare's operations, financial condition, business strategy and management, and its relationship to Genesis, and Chanin has reviewed its findings with the Committee.

5.      In this regard, the Committee, together with Chanin, found that Multicare substantially overpays for the services Genesis provides under the Related Party Contracts. Thus,

---

[3]      One of the Genesis Debtors, Healthcare Resources Corp., did not file its chapter 11 case until July 31, 2000.

7

AA. 1141

from the perspective of the Multicare unsecured creditors, the Related Party Contracts are the most significant impediment to Multicare's financial recovery and to Multicare's creditors' recovery.

### RELIEF REQUESTED

6.    The Committee believes that, in order for Multicare to complete a successful restructuring, Multicare must end, or at a minimum, bring to market level, its onerous relationship with Genesis. Put simply, Multicare must engage in an open and unfettered market process to obtain management, pharmaceutical, rehabilitation therapy, and other ancillary services at the lowest cost possible. The Multicare Board, though, has refused to market the contracts despite its undeniable fiduciary obligation to do so and despite repeated requests from the Committee. The Committee seeks a truly independent, disinterested trustee to be appointed to undertake this task.

7.    Importantly, the Committee does not seek an operating trustee to replace the Manager or to risk disruption of Multicare's daily operations unless and until Multicare can transition to a more cost-effective management. The Committee seeks an order directing the appointment of a trustee (i) to evaluate, renegotiate, and bring to market-pricing the Related Party Contracts among Multicare and Genesis, (b) to evaluate and to prosecute Multicare claims against Genesis, and (c) to propose and to seek confirmation of a fair plan of reorganization that maximizes Multicare's value for the benefit of Multicare's creditors; or, alternatively, (ii) directing Multicare to engage in a fair sale process of the Related Party Contracts in order to bring such Related Party Contracts to market-pricing for the benefit of Multicare's creditors.

8

432304.1 5/14/01

## GROUNDS FOR THE RELIEF REQUESTED

## GENESIS'S UNFETTERED CONTROL OF THE MULTICARE DEBTORS

8.      Genesis is effectively Multicare's sole shareholder.  GHV owns 44% of the stock of one of the Multicare debtors, Genesis ElderCare Corp. ("ElderCare"), who, in turn, owns 100% of the stock of Multicare.  However, GHV and the other shareholders of ElderCare, The Cypress Group, TPG Partners II, L.P. and Nazem, Inc., entered into a shareholders agreement which, as amended on November 15, 1999: (i) granted GHV an irrevocable proxy from the other shareholders to vote their shares of ElderCare on all matters, including the election of directors, (ii) empowered GHV to appoint two-thirds of the members of the ElderCare board of directors, (iii) empowered GHV to appoint 100% of the members of the operating committee of the ElderCare board of directors, and (iv) eliminated the requirement that certain significant actions required approval from shareholders other than GHV.

9.      Genesis totally controls Multicare:

- Michael Walker, chairman and CEO of GHV, serves as chairman, CEO, and director of Multicare.

- George Hager, executive vice president and CFO of GHV, serves as executive vice president, CFO, and director of Multicare.

- Richard Howard, president and director of GHV, serves as director of Multicare.

10.      The above parties ("Management") were Multicare's only directors up to just prior to the Petition Date and were Multicare's only directors at the times that Multicare entered into the Related Party Contracts.  Management apparently realized the severity of its conflict in a restructuring of Multicare and Genesis, and to create a thin veil, installed Beverly Anderson as "Chief Restructuring Officer" and the sole "independent" director of Multicare immediately prior

9

432384.1 5/14/01

**AA. 1143**

to the Petition Date (Ms. Anderson and Management together, the "Multicare Board").

Ms. Anderson was nominated by the conflicted Bank Group, and since her incumbency, the

Committee understands that she has been given no independent control and has not countermanded

any decisions of Management on issues where Management was conflicted.

## MANAGEMENT HAS UNDENIABLE, INESCAPABLE CONFLICTS

11.    Management has absolutely no economic incentive to further the interests of

Multicare when Multicare's interests conflict with the interests of Genesis. While Multicare has

not allowed the Committee to review Management's employment contracts, Multicare has

publicly disclosed that the "Company's Directors and Officers except for [Beverly Anderson] are

not employees of the Company and are compensated by Genesis." Multicare Companies, Inc.

10K for the period ended September 30, 2000, filed February 21, 2001 ("Multicare 2000 10K").

12.    Management, in fact, receives enormous compensation at the Genesis level

pursuant to employment agreements with Genesis. Mr. Walker, for instance, receives the

following:

- $750,000 annual salary;

- an undisclosed amount of incentive pay;

- $1,118,007 of deferred compensation (accrued as of March 2, 2001);[4]

- $1,125,000 upon confirmation of a Genesis plan of reorganization;[5] and

- $2,250,000 upon termination by him for good reason, or by Genesis for reasons other than cause, death, or disability.

---

[4]    The Genesis Debtors have already assumed Management's deferred compensation agreements.

[5]    Each executive will receive an even greater plan confirmation bonus if the effective date occurs before August 31, 2001 (and will receive a reduced bonus if the plan confirms after that date).

10

13.    Mr. Howard receives the following compensation from Genesis:

- $500,000 annual salary;

- an undisclosed amount of incentive pay;

- $214,476 of deferred compensation (accrued as of March 2, 2001);

- $500,000 upon confirmation of a Genesis plan of reorganization; and

- $1,500,000 upon termination by him for good reason, or by Genesis for reasons other than cause, death, or disability.

14.    Mr. Hager receives the following compensation from Genesis:

- $350,000 annual salary;

- an undisclosed amount of incentive pay;

- $117,962 of deferred compensation (accrued as of March 2, 2001);

- $350,000 upon confirmation of a Genesis plan of reorganization;

- $1,050,000 upon termination by him for good reason, or by Genesis for reasons other than cause, death, or disability.

15.    Management is also heavily invested in Genesis. Genesis has publicly disclosed that Mr. Walker has purchased GHV stock in the amount of $2,700,955, Mr. Howard has purchased GHV stock in the amount of $871,483, and Mr. Hager has purchased GHV stock in the amount of $853,133. Although Howard and Hager borrowed the funds for their stock purchases from GHV, GHV forgave these debts during the bankruptcy cases, and also agreed to compensate Mr. Howard in the amount of $708,722 and Mr. Hager in the amount of $693,799 for the income taxes generated upon the cancellation of the loans.

11

432304.1 5/14/01

## THE RELATED PARTY CONTRACTS

16.    Because Management has no incentive to act for the benefit of Multicare at the expense of Genesis, Management has allowed Multicare to enter into and maintain various above market contracts with Genesis through which Genesis upstreams value from the Multicare estates. As detailed below, Genesis supplies Multicare with management, pharmaceutical, rehabilitation therapy, third-party management, and support services at a cost of approximately $140 million a year pursuant to the Related Party Contracts– $27 million of which, or 24%, is above market.

**The Management Contract**

17.    On October 9, 1997, ElderCare entered into a Management Agreement with the Manager pursuant to which the Manager agreed to manage and to operate substantially all of Multicare's business (the "Management Contract"). Manager is a subsidiary of Genesis, and it is one of the Genesis debtors. The Management Contract, as amended, does not expire until 2003, and it is subject to automatic renewals unless the terminating party notifies the other party otherwise.

18.    The Manager has sweeping control over Multicare. The Manager oversees the daily operations of the Multicare facilities (the "Multicare Facilities"), including the employment of directors of nursing ("DONs") and administrators at the facilities, provides management services on behalf of Multicare pursuant to third-party contracts, and manages staff development, operational planning, budgeting, and marketing at the Multicare Facilities. The Manager also provides all financial management services, including budgeting, financial accounting, and administration and billing of accounts receivable.

12

19.    Multicare is charged by the Manager a fee of 6% of net revenues (currently 4% in cash and 2% accrued) with a floor of $24 million a year, or $2 million per month. Multicare is bound to pay this minimum fee, even if a change in their circumstances were greatly to reduce the Manager's workload. For instance, under the Management Contract, Multicare would pay the same fee even if it sold most of the Multicare Facilities. In fiscal year 2001, Multicare will pay to Genesis over $38.1 million in management fees. Put another way, these fees consume 6.9% of Multicare's total operating expenses. As detailed below, this 6% fee is well above what Multicare would be able to obtain in the marketplace.

**The Therapy Contract**

20.    On December 1, 1999, ElderCare entered into a Master Agreement for Therapy Services (the "Therapy Contract")[6] with another Genesis debtor, Genesis ElderCare Rehabilitation Services, Inc. ("Genesis Therapy"). Under the Therapy Contract, Genesis Therapy is the exclusive provider of rehabilitation, and occupational, speech, and respiratory therapy at the Multicare Facilities from December 1, 1999 for 10 years, plus automatic extensions unless the terminating party notifies the other party otherwise.

21.    Multicare will pay over $45 million to Genesis under the Therapy Contract in fiscal year 2001, which amounts to 8.1% of Multicare's total operating expenses. The Therapy Contract provides that Genesis Therapy will bill each Multicare Facility at rates that "shall reflect the negotiation of rates that are no greater than the rates [Genesis Therapy] charges in the Facility's service area for such Services when rendered to a comparable facility. . . ." This provision simply binds Multicare to pricing methods set by Genesis and does not reflect benefits

---

[6]    Genesis Therapy also executed individual contracts for therapy services with individual Multicare debtors.

13

**AA. 1147**

that should inure from Multicare's significant purchasing power.  Not surprisingly, as detailed

below, the Therapy Contract is substantially above market.

## The Pharmacy Relations

22.    One of the Genesis subsidiaries, NeighborCare Pharmacies, Inc. ("Genesis

NeighborCare"), is the exclusive provider of institutional pharmacy services for the Multicare

Facilities.  Incredibly, there is currently no formal pricing agreement at all between Genesis

NeighborCare and Multicare.  Rather, Genesis NeighborCare has entered into pharmacy contracts

(the "Pharmacy Contracts") with individual Multicare debtors which reference a master pharmacy

pricing list that either has never been compiled or simply has not been provided to the Committee.

23.    Pursuant to the Pharmacy Contracts, Genesis NeighborCare provides medications,

including prescription drugs, over the counter drugs, and intravenous medications, as well as

consulting services and medical supplies.

24.    Multicare will pay to Genesis over $33 million through the Pharmacy Contracts in

fiscal year 2001, which represents 6.0% of Multicare's operating expenses.  As detailed below,

the Pharmacy Contracts are also significantly above-market.

## The Support Contracts

25.    Multicare also has an "informal" arrangement with Genesis ElderCare Hospitality

Services ("Genesis Hospitality"), pursuant to which Genesis Hospitality manages its dietary,

housekeeping, and laundry services (the "Support Contracts").[7]  Genesis Hospitality also provides

budgeting, staff development, and operational planning in these areas.

---

[7]    This arrangement is "documented" only by an unsigned letter with no pricing terms attached.

14

432304.1 5/14/01

26.    Multicare will pay $20 million in fiscal year 2001 to Genesis pursuant to the Support Contracts, which represents 3.7% of Multicare's total operating expenses. These arrangements, which, unbelievably, have never been formalized with a written contract, are also above-market.

27.    Simply as an aside, one need look no further than to the fact that over $50 million "informally" changes hands from Multicare to Genesis to know how completely Genesis exercises control over Multicare.[8]

### Third Party Management Contracts

28.    The Multicare debtors also have entered individually into third-party management contracts with the Manager, pursuant to which the Manager has assumed the management obligations of Multicare debtors to third parties (the "Third Party Management Contracts"). Multicare will pay $2.25 million in fiscal year 2001 to Genesis under these Third Party Management Contracts, which transfer 52% of adjusted third-party revenue to Genesis. This amount represents 0.4% of Multicare's total operating expenses.

## MULTICARE'S EXCUSES ARE NONSENSE

### A.    MULTICARE'S REVIEW OF THE RELATED PARTY CONTRACTS WAS INADEQUATE

29.    The Committee has requested that Multicare Board market the service contracts to third parties. The Multicare Board has refused. Multicare claims, in response to the Committee, that its own auditor has not found such egregious problems with the Related Party Contracts.

---

[8]    In fact, during the cases and without obtaining Court approval, Genesis required Multicare to prepay for services postpetition even though it has total control over Multicare's payables. This prepayment, of course, serves no purpose for Multicare; in fact, it costs Multicare money. It does, however, lessen the amount that Genesis needs to borrow under its DIP facility. In other words, Genesis views Multicare's working capital as there for the taking.

15

Multicare retained E&Y, purportedly to review the Related Party Contracts, to determine whether they were within market parameters, and to compare the pricing provided by Genesis and its affiliates to non-affiliated parties for similar services. E&Y concedes that the Related Party Contracts are overpriced by $15 million. Accordingly, E&Y made recommendations to reduce the pricing of certain services in limited ways. To date, however, Multicare has implemented only a modest number of those changes. This alone supports appointment of a trustee.

30.    The Committee's due diligence included a review of the scope and methodology of the E&Y analysis. The Committee found serious deficiencies in E&Y's review, which prevented E&Y from obtaining an accurate picture of the burden the Related Party Contracts impose on Multicare.

31.    The E&Y analysis did not examine, for instance, the cost-effectiveness of purchasing services through Genesis. For instance, E&Y failed to evaluate whether Multicare's purchasing of over-the-counter drugs and medical supplies through a full-service pharmacy rather than through a medical supply distributor, and Multicare's purchasing of support services through a long-term care operator compared to a third-party specializing in such services, was economical.

32.    The E&Y analysis also was deficient because it reviewed per unit pricing for core (or routine) services and did not consider the costs of non-core (or non-routine) services under basic unit prices (i.e., nurse training). Charges associated with such non-core services have accounted for more than 10% of a Multicare Facility's invoice.

33.    The E&Y analysis also failed to examine the cost efficiency of purchasing particular products under the Related Party Contracts, such as generic versus branded drug

16

432304.1 5/14/01

selections, or the cost efficiency of purchasing particular services, such as support and therapy services, under the Related Party Contracts as compared to providing the services in-house.

34.    The E&Y analysis also focused solely on the pricing of services and failed to examine the utilization of services.  In fact, the conflicts of interest faced by Management, and the fact that the DONs and the facility administrators are hired and fired by the Manager (a Genesis debtor) raise serious questions that Multicare is over-utilizing services provided under the Related Party Contracts.

35.    In short, E&Y did not truly examine whether and to what extent Genesis was "managing" Multicare for Genesis's benefit, rather than for Multicare's benefit.

**B.    THE COMMITTEE'S REVIEW OF THE RELATED
       PARTY CONTRACTS REVEALED WASTEFUL PRACTICES**

36.    As part of its own due diligence and to address concerns with the scope and methodology of the E&Y review, the Committee independently analyzed the Related Party Contracts, focusing on the pricing of services as compared to competitive standards, the economies of scale and purchasing power of Multicare, the scope of the services provided and the utilization and appropriateness of such services.  The Committee, in conjunction with Chanin, analyzed contracts between Genesis and non-affiliated parties, as E&Y did, and, unlike E&Y, toured and interviewed administrators and DONs at the Multicare and Genesis Facilities.  Also unlike E&Y, the Committee reviewed similar contracts of other long-term care operators, interviewed senior management of other long-term care providers, interviewed other providers of services provided under the Related Party Contracts, and reviewed industry reports produced by independent third parties.

17

37.    In short, without yet being able to obtain third-party bids, the Committee's investigation revealed that Multicare could reduce its expenses by an astonishing $27 million (or 18.8%) with competitive pricing of the Related Party Contracts— twice the overcharge that Management already has been forced to concede. Multicare's earnings would increase dollar for dollar with these savings. Therefore, Multicare's fiscal year 2000 EBITDA, $45.0 million, would have increased to $72.0 million– a 60% increase.[9] Management has asserted in discussions with the Committee that Multicare should be valued at 6 times EBITDA, so even assuming that Management's purposely low multiple is correct, Multicare would increase its value by $162 million with competitive pricing of the Related Party Contracts. The Committee believes, on the basis of disclosed weighted average methodology, that Multicare, in fact, should be valued at 8.7 times EBITDA. Therefore, Multicare's enterprise value increases by $235.0 million with competitive pricing of the Related Party Contracts. However, putting the multiple argument aside, either way, Multicare would reap enormous savings by obtaining market rates. An independent trustee, free from Genesis's conflict, would capture these savings for the benefit of Multicare's creditors.

1.    The Therapy Services Contract Burdens The Multicare Debtors

38.    The Committee analyzed the Therapy Agreement by reviewing the contracts of other multi-state operators who received therapy services from organizations comparable to Genesis, and examining (i) invoices of Multicare Facilities, (ii) an independent third-party report

---

[9]    As an aside, the fact that Multicare's EBITDA is only $45 million and actually is shrinking, when revenues are flat to up, demonstrates both Genesis's mismanagement and its tendency to upstream value. Industry analysts uniformly believe that if Multicare were effectively managed, its EBITDA would exceed $75 million.

18

on therapy contracts of comparable long-term care operators, and (iii) third-party contracts maintained by Genesis Therapy.

39.     The Committee found that the Therapy Agreement, like the other Related Party Contracts, has harmed Multicare. Multicare is one of the largest customers of Genesis, but its rates for therapy services do not reflect its substantial purchasing power. For instance, many agreements between Genesis Therapy and third parties provided twenty-five hours of complimentary non-routine services, but the Therapy Agreement with Multicare provided only five hours. Based on a review of the Multicare invoices, if the Multicare Facilities received the full twenty-five hours of complimentary services that Genesis Therapy typically provides to non-affiliated entities, what is currently 5% of the aggregate charges to Multicare would shrink to less than 1%.

40.     The Committee's analysis revealed that Multicare would likely save over $8.6 million if it purchased therapy services on the open market. This represents an enterprise value increase of between $51.6 million and $74.8 million depending on the multiple used.

2.  The Pharmacy Contracts Injure The Multicare Debtors

41.     The Committee found that the Pharmacy Contracts, too, benefit Genesis at the expense of Multicare, and that Multicare pays more under the Pharmacy Contracts than it would as a large customer in the marketplace. The Committee reviewed (i) the individual pharmacy contracts for 35 Multicare debtors, (ii) invoices for Multicare debtors, (iii) the contracts of other multi-state operators receiving similar services from entities comparable to Genesis NeighborCare, and (iv) Genesis NeighborCare's pharmacy contracts with third parties.

19

432304.1 5/14/01

AA. 1153

42.    There is, somewhat incredibly, no formal pricing structure for pharmacy items, and there is no standardization for non-drug charges, such as fees for consulting, education, and training. Perhaps most fundamentally, there is no established review process for Multicare to ensure the cost-effectiveness of these charges. This lack of a standard audit procedure for the facilities has caused, among other problems, wide variances among Multicare Facilities in the use of the house account, leading to non-reimbursable drugs, as well as non-routine services and managed care co-pay amounts to be billed to the Multicare Facilities rather than to the patients.

43.    A host of problems with Medicare also has been allowed to occur under the Genesis Manager. Interviews with administrators at the Multicare Facilities revealed, for instance, a lack of pre-certification and pre-authorization procedures which, if implemented, would ensure that drugs provided to Medicaid patients were covered in the Medicaid formulary, and that patients that are identified as Medicare-eligible are covered under the Medicare program.

44.    Genesis NeighborCare also simply overcharges Multicare.[10] The prices that Genesis NeighborCare charges third parties for prescription drugs, for instance, are approximately 15% less than the prices Genesis NeighborCare charges to Multicare because of differences in formularies and prices. Genesis NeighborCare also has dispensed drugs generally to Multicare in larger quantities than needed. The Committee's analysis further found that it is not cost

---

[10]    Two other entities that are unrelated to Multicare also assert that Genesis NeighborCare has overbilled its service contracts. First, HCR Manor Care has claimed in a lawsuit with Genesis NeighborCare that "it was entitled to repayment for alleged pharmaceutical overcharges beginning as far back as September 19, 1997." *Genesis Health Ventures, Inc. v. HCR Manor Care, Inc. et al.*, Civ. No. 99 287 (D. Del.), Complaint, ¶¶ 62-69. Genesis NeighborCare had supplied pharmaceutical, infusion and consulting services to HCR ManorCare after merging with HCR Manor Care's former supplier, Vitalink. Second, Genesis admits that it is at risk of losing its service contracts with Mariner Post-Acute Network because such contracts are overmarket. Genesis, similarly, had assumed those contracts when it merged with Vitalink. Here, Genesis should not be able to use its dominance and total control over Multicare to rinse its burdensome contracts through Multicare's bankruptcy.

432304.1 5/14/01

effective for Multicare to purchase over-the-counter drugs and medical supplies through a pharmacy, like Genesis NeighborCare.

45.    The Committee found that overall Multicare would likely save over $7.2 million in expenses if it sought pharmacy services in the marketplace. This represents an enterprise value increase of between $43.2 million and $62.6 million depending on the multiple used.

### 3. The Service Contracts Also Do Not Benefit The Multicare Debtors

46.    The Committee reviewed the Service Contracts primarily by (i) reconciling amounts due from Genesis Hospitality to Multicare as a result of budget overages, and (ii) reviewing a draft letter detailing proposed pricing for hospitality services.

47.    The Service Contracts also present a host of problems for Multicare. As a preliminary matter, Genesis Hospitality does not charge unaffiliated facilities at all for the services that it charges Multicare. Moreover, the basic services under the Service Contracts are generally contained within third-party management agreements, which effectively causes Multicare to pay twice for the same services.

48.    Furthermore, Multicare transfers millions of dollars a year to Genesis without a formal written agreement between Genesis Hospitality and Multicare delineating the pricing or scope of services to be provided. There also is no accurate reconciliation process to calculate amounts due to Multicare as a result of budget overages because there is no clear delineation of which costs and products are included in the budgets, and because budgets are not set based on industry standards, but rather by agreement between Genesis Hospitality and Multicare.

49.    The Committee's investigation found that Multicare is likely to save over $3.6 million if it obtained services provided under the Service Contracts in a competitive market. This

432304.1 5/14/01

represents an enterprise value increase of between $21.6 million and $31.3 million depending on the multiple used.

### 4. Third Party Management Agreements

50.    The Multicare Debtors will pay $2.25 million in fiscal year 2001 to the Manager under the Third Party Management Agreements, which transfer 52% of adjusted third-party revenue to Genesis. Genesis "double-dips" on these services because these fees are included as part of the Multicare Debtors' overall revenue when Genesis's fee (which is based on the Multicare Debtors total revenue) is calculated in connection with the Management Agreement.

51.    The Committee's investigation found that Multicare is likely to save at least $250,000 if this artificial charge were eliminated.[11] This represents an enterprise value increase of between $1.5 million and $2.17 million depending on the multiple used.

### 5. The Management Contract Does Not Reflect Market Rates

52.    The Committee found that many aspects of the Management Contract benefitted Genesis at the expense of Multicare. Thus, it is not surprising that George Hager, one of the members of Management who receives enormous compensation from Genesis, actually executed the Management Contract on behalf of both Genesis and Multicare.

53.    As part of its review, the Committee analyzed approximately fifteen management and proposed management contracts for 160 facilities, including the review of a proposed contract for 75 skilled nursing facilities, interviewed senior managers of comparable long-term care operators, and interviewed REITs and lenders who were currently hiring managers.

---

[11]    Remarkably, E&Y actually recommends that Genesis increase these charges by $2 million. This recommendation alone demonstrates to whom E&Y believes it is reporting.

432304.1 5/14/01

54.   Most fundamentally, without an open bidding process, Multicare has been unable to realize the cost savings that its size and business volume in all likelihood would generate. Specifically, other comparable managers that provide ancillary services typically earn management fees between 3.5% to 7% of revenues, which includes an incentive portion of up to 3.5%.  In stark contrast, the Manager here earns a 6% fee with <u>no</u> incentive to meet budgets or otherwise to manage Multicare efficiently.  This minimum annual fee is wholly unrelated to revenue. Furthermore, under the Management Contract, fees above the floor are calculated based on net revenue, but net revenue includes even related party revenues (e.g., pharmacy).

55.   The Management Contract also gives senior management at the Genesis level authority to make all key decisions that impact Multicare's finances and operations.  Under the Management Agreement, the Manager employs both the administrator and the DON at each Multicare Facility, and accordingly, the top staff at each Multicare Facility are obligated to the Manager (a Genesis debtor), not Multicare.  As Multicare concedes:

> The Debtors estimate that there are <u>111 administrators/executive directors and 107 DONs</u> at those of the Debtors' facilities managed by the Manager. Pursuant to the Management Agreement, each administrator/executive director and DON employed at a facility operated by the Manager. . . is <u>employed and paid directly by Manager</u> and the Debtors reimburse [Genesis] bi-monthly for Manager's payroll obligations. . . to such individuals.

<u>Motion of Debtors for Order Authorizing Debtors to Reimburse Manager in Connection with Employee Retention Program for Directors of Nursing and Administrators that are Employed in the Debtors' Facilities and Related Relief</u>, ¶ 8, August 16, 2000 (emphasis added).

432304.1 5/14/01

23