exit without allowing the Court to determine whether Genesis is abusing the benefits provided by this Court.

Far from being just a step in the confirmation process, Congress said that disclosure statements, and hearings to consider the adequacy of disclosure statements, are the "heart" of the chapter 11 process. H.R. Rep. No. 595, 95th Cong., 1st Sess. 408 (1977); see also In re Crowthers McCall Pattern, Inc., 120 B.R. 279, 300 (Bankr. S.D.N.Y. 1990) ("Given the necessity for adequate information in the Disclosure Statement and the paramount position section 1125 occupies in the chapter 11 process, there is little, if any, room for harmless error.") Accordingly, the Court should not defer consideration of the conflict issues raised by the Trustee Motion until after considering a Disclosure Statement that is the very product of the conflict issues raised by the Trustee Motion. Otherwise, the Court will be giving its judicial imprimatur and practical impetus to a process that the Committee submits -- with good, documented cause -- is infected to its core. Moreover, properly resolving the Trustee Motion prior to the commencement of the plan process would avoid the need for Multicare to begin the process all over again if, as the Committee believes will be the case, it is determined that Genesis's conflict precludes a joint plan, or if a trustee is appointed and, unlike Multicare, actually realizes Multicare's inherent value, through, for example, a stand-alone plan. The Committee submits that it, as well as Genesis, should complete discovery and present a full record of that evidence prior to the Court's consideration of the Disclosure Statement.

Genesis's reorganization will not be unduly delayed by the few weeks it takes to complete discovery and to try the Trustee Motion. Certainly, satisfaction of Genesis's hunger for Multicare should not be expedited at the cost of the propriety of Multicare's chapter 11 process. From the

8

very outset of these cases, the Committee urged Multicare to permit a market-based analysis of its true value for the benefit of all of its creditors; not just the Bank Group that is owed three times as much at the Genesis level as at Multicare. Genesis consistently has refused to allow Multicare to do so. Because the Committee could not force Multicare to do so, from the petition date through the winter of 2001, the Committee and its financial advisors undertook a detailed investigation of the Related Party Contracts, which involved, among many other aspects, extensive on-site document review, interviews with Multicare and Genesis personnel, and analysis of comparable companies. In March 2001, the Committee presented its findings to Multicare, and on April 3, 2001, the Committee presented its findings to Genesis, Multicare, all of their advisors, and the Bank Group. After the meeting, at the Bank Group's request, the Committee prepared and circulated to Multicare, its advisors and the Bank Group the detailed methodology for its conclusion that Multicare would receive approximately $27 million in projected cost savings if the Related Party Contracts were put out to market. The Committee again urged Multicare to perform its fiduciary duties to its estate by attempting to realize this value. Multicare (Genesis) again refused. On April 27, 2001, as required by the STN line of cases,[3] the Committee sent a formal demand letter to Multicare requesting, inter alia, that Multicare obtain the services provided under the Related Party Contracts on a market basis and evaluate Multicare's stand-alone value. Multicare (Genesis) again refused. The Committee only then filed the Trustee Motion having exhausted all other avenues. Multicare cannot be heard to complain that the Committee

---

[3]     In re STN Enterprises, 779 F.2d 901 (2d Cir. 1985); see also Louisiana World Exposition v. Federal Ins. Co., 858 F.2d 233 (5th Cir. 1988); In re Official Committee of Unsecured Creditors of Corell Steel v. Fishbein and Co., P.C., 1992 WL 196768 (E.D. Pa. 1992) (attached hereto as Exhibit "C"); In re Nicolet, Inc., 80 B.R. 733 (Bankr. E.D. Pa. 1987).

434332.1 6/15/01

did everything in its power to address the issues underlying the Trustee Motion without resort to Court.

Moreover, the debtors will not be prejudiced by the Court's considering the Trustee Motion prior to permitting Genesis to hustle through its Multicare acquisition. If the Court adjourns the Disclosure Statement Hearing and ultimately denies the Trustee Motion, Genesis and Multicare will be able to proceed with the Disclosure Statement Hearing and other steps towards confirmation of the Plan with nothing more than a matter of weeks having elapsed. On the other hand, if, as the Committee believes will happen, the Court grants the Trustee Motion, the estates will be spared the wasted time and expense of soliciting votes on the present Plan until the trustee determines how to maximize Multicare's value. A trustee will unlock the true, demonstrated value of Multicare for the benefit of all of its creditors by viewing Genesis as only one of a field of potential acquirers of Multicare, and may determine that another acquirer or a stand-alone plan is in Multicare's best interest. For that matter, if a merger with Genesis is truly the best result for the Multicare estates, a trustee, too, will reach that conclusion. Thus, the benefit to the Multicare estates that could inure by adjourning the Disclosure Statement Hearing until discovery on the Trustee Motion and the Trustee Motion Hearing are complete far outweigh any slight inconvenience to the Debtors.

434332.1 6/15/01

## CONCLUSION

**WHEREFORE**, the Committee respectfully requests that the Court (i) adjourn the

Disclosure Statement Hearing until a date after the determination of the Trustee Motion, and (ii)

grant such other and further relief as is just and proper.

Mark Minuti (No. 2659)
Tara L. Lattomus (No. 3515)
**SAUL EWING LLP**
222 Delaware Avenue, Suite 1200
P.O. Box 1266
Wilmington, DE 19899
(302) 421-6840/6847

-and-

David S. Rosner
Athena F. Foley
KASOWITZ, BENSON, TORRES
  & FRIEDMAN LLP
1633 Broadway
New York, NY 10019
(212) 506-1700

Counsel to Official Committee of Unsecured
Creditors of Multicare AMC, Inc., *et al.*

Dated: June 15, 2001

434332.1 6/15/01

11

**AA. 1198**

# EXHIBIT "A"

COPY

### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE DISTRICT OF DELAWARE

IN RE:                                    )        Chapter 11
                                          )
MULTICARE AMC, INC., *et al.*,            )        Case No. 00-2494 (JHW)
                                          )        through 00-2623 (JHW)
                                          )
                    Debtors.              )        Jointly Administered

Objection Deadline: May 30, 2001 @ 4:00 p.m.
Hearing Date: June 6, 2001 @ 10:00 a.m.

2001 MAY 14  PM 12: 26  FILED

US BANKRUPTCY COURT
DISTRICT OF DELAWARE

### NOTICE OF MOTION

TO:

Robert S. Brady, Esquire
Young Conaway Stargatt &
Taylor, LLP
1100 North Market St., 11th Fl.
P.O. Box 391
Wilmington, DE 19899-0391
(Counsel to Debtors)

Marc Abrams, Esquire
Willkie Farr & Gallagher
153 East 53rd Street
One Citicorp Center
New York, NY 10022
(Counsel to Debtors)

Kevin Callahan, Esquire
Office of the US Trustee
601 Walnut Street
Curtis Center, Suite 950 West
Philadelphia, PA 19106
(US Trustee)

Multicare AMC, Inc.
Attn:  George V. Hager, Sr., CFO
101 East State Street
Kennett Square, PA 19348
 (Debtors)

Teresa K. D. Currier, Esquire
Kathleen P. Makowski, Esquire
Klett Rooney Lieber & Schroling
The Brandywine Building
1000 West Street, Suite 1410
Wilmington, DE 19801
(Counsel to Mellon Bank, N.A.)

Richard S. Toder, Esquire
Morgan Lewis & Bockius, LLP
101 Park Avenue
New York, NY 10178-0060
(Counsel to Mellon Bank, N.A.)

Jill Bronson, Esquire
Drinker Biddle & Reath LLP
One Logan Square
18th & Cherry Streets
Philadelphia, PA 19103-6996
(Counsel to Mellon Bank, N.A.)

All parties on the 2002
Service List

The Official Committee of Unsecured Creditors in the above-captioned cases (the "Committee") filed the attached **Motion By The Official Committee Of Unsecured Creditors For An Order Directing The Appointment Of A Trustee Or, Alternatively, The Sale Of The Related Party Contracts** (the "Motion"). In the Motion, the Committee seeks an order directing the appointment of a trustee or alternatively, directing Multicare to engage in a fair sale process of the Related Party Contracts in order to bring such Related Party Contracts to market-pricing for the benefit of Multicare's creditors.

432304.1 5/14/01

You are required to file a response to the attached Objection on or before May 30, 2001 at 4:00 p.m.

At the same time, you must also serve a copy of the response on the Movant's attorney:

Mark Minuti, Esquire
Saul Ewing LLP
222 Delaware Avenue, Suite 1200
P.O. Box 1266
Wilmington, DE 19899

David S. Rosner, Esquire
Athena F. Foley, Esquire
Kasowitz, Benson, Torres & Friedman LLP
1633 Broadway
New York, NY 10019

HEARING ON THE OBJECTION WILL BE HELD ON **June 6, 2001 at 10:00 a.m.** before The Honorable Judith H. Wizmur, United States Bankruptcy Judge, Mitchell H. Cohen Courthouse, 401 Cooper Street, Camden, New Jersey 80101.

IF YOU FAIL TO RESPOND IN ACCORDANCE WITH THIS NOTICE, THE COURT MAY GRANT THE RELIEF DEMANDED BY THE OBJECTION WITHOUT FURTHER NOTICE OR HEARING.

Mark Minuti (No. 2659)
Tara L. Lattomus (No. 3515)
**SAUL EWING LLP**
222 Delaware Avenue, Suite 1200
P.O. Box 1266
Wilmington, DE 19899
(302) 421-6840/6847

-and-

David S. Rosner
Athena F. Foley
KASOWITZ, BENSON, TORRES
    & FRIEDMAN LLP
1633 Broadway
New York, NY 10019
(212) 506-1700

Counsel to Official Committee of Unsecured Creditors of Multicare AMC, Inc., *et al.*

Dated: May 14, 2001

432304.1 5/14/01

2

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| IN RE: | ) | Chapter 11 |
| | ) | |
| MULTICARE AMC, INC., *et al.*, | ) | Case No. 00-2494 (JHW) |
| | ) | through 00-2623 (JHW) |
| | ) | |
| Debtors. | ) | Jointly Administered |

Objection Deadline: May 30, 2001 @ 4:00 p.m.
Hearing Date:  June 6, 2001 @ 10:00 a.m.

## MOTION BY THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS FOR AN ORDER DIRECTING THE APPOINTMENT OF A TRUSTEE OR, ALTERNATIVELY, THE SALE OF THE RELATED PARTY CONTRACTS

The Official Committee of Unsecured Creditors in the above-captioned cases (the "Committee"), by its undersigned counsel, hereby moves this Court for entry of an order (i) directing the appointment of a trustee for the estates of Multicare AMC, Inc., *et al.* (together, "Multicare") (a) to evaluate, renegotiate, and bring to market-pricing the Related Party Contracts (as defined below) among Multicare and Genesis Health Ventures, Inc., *et al.* (together, "Genesis"), (b) to evaluate and to prosecute Multicare claims against Genesis, and (c) to propose and to seek confirmation of a fair plan of reorganization that maximizes Multicare's value for the benefit of Multicare's creditors; or, alternatively, (ii) directing Multicare to engage in a fair sale process of the Related Party Contracts in order to bring such Related Party Contracts to market-pricing for the benefit of Multicare's creditors.  In support thereof, the Committee respectfully represents as follows:

## PRELIMINARY STATEMENT

Multicare does not have independent management. Instead, Multicare is managed by Genesis ElderCare Network Services, Inc. (the "Manager"), one of the debtors in the Genesis chapter 11 cases pending before this Court. Multicare does not have an independent board. Instead, three of Multicare's four directors are Genesis directors, with directly conflicting fiduciary duties owed to Genesis.[1] In fact, the three executives (identified below as "Management") who control both Multicare and Genesis receive massive compensation at the Genesis level — including Genesis equity — but receive no compensation at the Multicare level. To say that Management has every incentive to generate value at the Genesis level, even if at Multicare's expense, is to state the obvious.

And that, precisely, is the problem that requires appointment of an independent trustee for Multicare. Genesis does generate value at Multicare's expense. Tremendous value. Genesis is Multicare's largest vendor. Genesis sells to Multicare all of Multicare's management services and all of Multicare's so-called "ancillary" services – that is, all of Multicare's rehabilitation, pharmacy, support, and third-party management services (the contracts and informal, undocumented arrangements for these services are collectively referred to as the "Related Party Contracts"). And the price tag is colossal. In fiscal 2001, Multicare will pay to Genesis over $139 million pursuant to the Related Party Contracts– a staggering 25% of Multicare's total operating expenses. In fact, due in large part to Genesis's unfettered control over Multicare, Multicare pays approximately $50 million of this amount without even the protection of written

---

[1]     The fourth Multicare director was appointed just prior to Multicare's bankruptcy filing, was hand selected by Genesis's primary secured lenders, and played no role whatsoever in the initial execution of the Related Party Contracts. It is these Related Party Contracts that, as explained below, operate to transfer enormous value from Multicare to Genesis to the detriment of Multicare's creditors.

2

contracts with Genesis. As with Multicare's undeniably conflicted Management, to say that Genesis has every incentive to overcharge Multicare for the ancillary services is to state the obvious. And overcharge it does. Genesis takes value from Multicare on the order of tens of millions of dollars on an annual operating basis, which translates to hundreds of millions of dollars on an enterprise value basis. In fact, even Ernst & Young LP ("E&Y"), which was retained by the Genesis-controlled Multicare board, concedes that Genesis overcharges Multicare at least $15 million on an annual basis. $15 million in Multicare cost savings would go directly to Multicare's bottom line and, when multiplied by the 8 multiple used at the Genesis level, constitutes the transfer of $120 million of Multicare enterprise value away from Multicare's creditors. Again, E&Y was retained by Multicare under Genesis's control. Thus, Multicare and Genesis concede the $120 million theft.

But E&Y is only half right. Chanin Capital Partners LLC ("Chanin"), the Committee's financial advisors, conducted an exhaustive analysis of the Related Party Contracts with a view towards bringing the contracts to true market-pricing. The Committee determined that Genesis overcharges Multicare by close to $27 million on an annual basis. In other words, if the Related Party Contracts were brought to market, Multicare would save approximately $27 million annually, resulting in $216 million in preserved enterprise value that would inure directly to the benefit of Multicare's creditors. At present, however, Multicare has absolutely no check on Genesis overcharging. Multicare, and Multicare's chapter 11 cases, are run for the benefit of Genesis by Genesis employees. At best, these Genesis employees operate under an undeniable conflict of interest favoring Genesis. At worst, these Genesis employees operate under their personal incentives to earn as Genesis earns – at Multicare's expense.

3

This clearly is not an ordinary situation where a parent and subsidiary may share management and allocation of overhead may present inter-company obligations. This is an extraordinary situation where a controlling shareholder manages an entire eldercare business pursuant to a management agreement and uses its position to force its services upon its captive buyer– services that could be provided at market-based, competitive pricing by third parties– at prices that usurp over $27 million annually from the captive's operating income.

And the problem gets worse. Ordinarily, this Court would hear, not only from Multicare's unsecured creditors, but also from Multicare's secured bank creditors (the "Bank Group") who, unlike the unsecured creditors, actually have the economic leverage to stop Multicare's upstreaming of value to Genesis. Multicare's Bank Group and Multicare's unsecured creditors ordinarily would have a common interest in maximizing Multicare's value even as they may dispute, intramurally, the appropriate allocation of that value. But here, Genesis has hedged that risk structurally. Multicare's Bank Group is also Genesis's Bank Group, but the conflicted Bank Group has a much greater economic interest in its recovery at Genesis than at Multicare. This is because prepetition, Multicare's controller, Genesis, required that its bank creditors maintain "stapled" bank debt by which two-thirds of their indebtedness, and therefore two-thirds of their economic interest, reside at Genesis and only one-third resides at Multicare. Accordingly, Multicare's Bank Group – the same bank creditors as at Genesis – are owed approximately $1.2 billion at the Genesis level, and only approximately $443 million at the Multicare level.[2] Thus, the Bank Group, who should be checking Multicare's attempted transfer of value to Genesis,

---

[2]     Genesis separated its revolving bank debt, but not its term bank debt, from the "stapled" requirement. The Committee has been advised that, through this separation, there are now two of the forty-four banks that do not hold their debt two-thirds at Genesis and one-third at Multicare, but instead are half and half. The overwhelming majority of the banks remain two-thirds interested at Genesis and only one-third at Multicare.

4

because of its much larger interest at Genesis, actually supports Management's goal. In other words, to the Bank Group, the Related Party Contracts present the opportunity to take Multicare's unsecured creditors' recoveries, upstream them to Genesis, and pay them out to the Bank Group at Genesis.

There is a second reason that the Bank Group is economically incentivized to allow Genesis to remove value without consideration from Multicare. The Committee has been advised that Genesis calculates enterprise value at the Multicare level by a ratio of approximately 6 times operating income, but it calculates enterprise value of net income which has been upstreamed from Multicare at the Genesis level by a ratio of approximately 8 times operating income. In other words, $1 of operating income at Multicare is worth $6 of Multicare enterprise value, but, if upstreamed, the same dollar is worth $8 of Genesis enterprise value. Therefore, earnings that are upstreamed from Multicare to Genesis generate more enterprise value, according to Genesis, than earnings that remain at the Multicare level. As a result, equity provided to the Bank Group in either a Genesis or a Genesis/Multicare combined entity pursuant to a plan of reorganization would be worth more than it would without the Multicare value being upstreamed improperly. Thus, Multicare's financial health, once transferred to Genesis, can reduce the Bank Group's losses at the Genesis level. Again, that may be good for Genesis and its creditors, but it is a disaster for Multicare and its creditors.

Multicare's $284 million in unsecured creditors are the only constituency invested solely in Multicare and that is not conflicted by Genesis. Multicare's unsecured creditors are the only constituency that is economically motivated for Multicare (as opposed to Genesis) to achieve

5

chapter 11's rehabilitation purposes; that is, to bring to market Multicare's costs, particularly Multicare's Related Party Contracts, and to maximize the value of Multicare's estate.

Since its formation, the Committee consistently has urged Multicare to bring to market-pricing (reflective of Multicare's size and leverage in the market) Multicare's business relations with Genesis. Once Multicare and Genesis filed for chapter 11 protection, and regularly thereafter, the Committee asked Multicare to put out to bid the Related Party Contracts and to evaluate Multicare's stand-alone value. In March 2001, the Committee presented the results of its investigation directly to Multicare, and then at a meeting on April 3, 2001, the Committee presented the information to Multicare, all of its advisors, and the Bank Group. After the meeting, at the Bank Group's request, the Committee prepared and circulated to Multicare, its advisors and the Bank Group the detailed bases and methodology for its approximately $27 million in projected cost savings, and the apparent defects in the analysis performed by Multicare's own (Genesis-hired) financial advisors. On April 27, 2001 the Committee sent a formal demand letter to Multicare's counsel requesting, inter alia, that Multicare obtain the services provided under the Related Party Contracts on a market basis. To date, Multicare has refused to do so.

The Committee submits that this Court must replace the conflicted, Genesis-controlled board with a truly disinterested independent trustee to do that which is necessary to maximize the value of Multicare's estate for the benefit of Multicare's creditors-- first, by bringing the Related Party Contracts to market and then by formulating a fair, unconflicted Multicare plan of reorganization. The Committee submits that the circumstances here present perhaps the paradigm case for the appointment of an independent chapter 11 trustee.

6

## INTRODUCTION

1.      On June 22, 2000 (the "Petition Date"), the Multicare debtors each commenced a case under chapter 11 of the Bankruptcy Code.  The Multicare debtors operate approximately 140 eldercare facilities in ten states (the "Multicare Facilities"), providing skilled nursing care and other medical services to their patients.  The Multicare cases are jointly administered before this Court under the caption In re Multicare AMC, Inc., et al., Case No. 00-2494 (JAW).

2.      Also on the Petition Date, Multicare's principal owner, Genesis Health Ventures, Inc. ("GHV") and its affiliates, including Multicare's Manager, each commenced a case under chapter 11 of the Bankruptcy Code.[3]  The Genesis cases are jointly administered before this Court under the caption In re Genesis Health Ventures, Inc., et al., Case No. 00-2692 (JAW).  The Genesis debtors provide healthcare and related services to the elderly, and management services to other healthcare providers.  The Genesis debtors also provide "ancillary" services to companies like Multicare, including HCR Manor Care and Mariner Post-Acute Network.

3.      On July 11, 2000, the United States Trustee appointed the Committee.

4.      On October 2, 2000, the Court authorized the employment and retention of Chanin as financial advisors to the Committee, nunc pro tunc to July 11, 2000.  Since its retention, Chanin, on behalf of the Committee, has analyzed Multicare's operations, financial condition, business strategy and management, and its relationship to Genesis, and Chanin has reviewed its findings with the Committee.

5.      In this regard, the Committee, together with Chanin, found that Multicare substantially overpays for the services Genesis provides under the Related Party Contracts.  Thus,

---

[3]      One of the Genesis Debtors, Healthcare Resources Corp., did not file its chapter 11 case until July 31, 2000.

7

from the perspective of the Multicare unsecured creditors, the Related Party Contracts are the most significant impediment to Multicare's financial recovery and to Multicare's creditors' recovery.

## RELIEF REQUESTED

6.     The Committee believes that, in order for Multicare to complete a successful restructuring, Multicare must end, or at a minimum, bring to market level, its onerous relationship with Genesis. Put simply, Multicare must engage in an open and unfettered market process to obtain management, pharmaceutical, rehabilitation therapy, and other ancillary services at the lowest cost possible. The Multicare Board, though, has refused to market the contracts despite its undeniable fiduciary obligation to do so and despite repeated requests from the Committee. The Committee seeks a truly independent, disinterested trustee to be appointed to undertake this task.

7.     Importantly, the Committee does not seek an operating trustee to replace the Manager or to risk disruption of Multicare's daily operations unless and until Multicare can transition to a more cost-effective management. The Committee seeks an order directing the appointment of a trustee (i) to evaluate, renegotiate, and bring to market-pricing the Related Party Contracts among Multicare and Genesis, (b) to evaluate and to prosecute Multicare claims against Genesis, and (c) to propose and to seek confirmation of a fair plan of reorganization that maximizes Multicare's value for the benefit of Multicare's creditors; or, alternatively, (ii) directing Multicare to engage in a fair sale process of the Related Party Contracts in order to bring such Related Party Contracts to market-pricing for the benefit of Multicare's creditors.

8

## GROUNDS FOR THE RELIEF REQUESTED

## GENESIS'S UNFETTERED CONTROL OF THE MULTICARE DEBTORS

8.   Genesis is effectively Multicare's sole shareholder.  GHV owns 44% of the stock of one of the Multicare debtors, Genesis ElderCare Corp. ("ElderCare"), who, in turn, owns 100% of the stock of Multicare.  However, GHV and the other shareholders of ElderCare, The Cypress Group, TPG Partners II, L.P. and Nazem, Inc., entered into a shareholders agreement which, as amended on November 15, 1999: (i) granted GHV an irrevocable proxy from the other shareholders to vote their shares of ElderCare on all matters, including the election of directors, (ii) empowered GHV to appoint two-thirds of the members of the ElderCare board of directors, (iii) empowered GHV to appoint 100% of the members of the operating committee of the ElderCare board of directors, and (iv) eliminated the requirement that certain significant actions required approval from shareholders other than GHV.

9.   Genesis totally controls Multicare:

- Michael Walker, chairman and CEO of GHV, serves as chairman, CEO, and director of Multicare.

- George Hager, executive vice president and CFO of GHV, serves as executive vice president, CFO, and director of Multicare.

- Richard Howard, president and director of GHV, serves as director of Multicare.

10.   The above parties ("Management") were Multicare's only directors up to just prior to the Petition Date and were Multicare's only directors at the times that Multicare entered into the Related Party Contracts.  Management apparently realized the severity of its conflict in a restructuring of Multicare and Genesis, and to create a thin veil, installed Beverly Anderson as "Chief Restructuring Officer" and the sole "independent" director of Multicare immediately prior

9

432304.1 5/14/01

to the Petition Date (Ms. Anderson and Management together, the "Multicare Board").

Ms. Anderson was nominated by the conflicted Bank Group, and since her incumbency, the

Committee understands that she has been given no independent control and has not countermanded

any decisions of Management on issues where Management was conflicted.

## MANAGEMENT HAS UNDENIABLE, INESCAPABLE CONFLICTS

11.     Management has absolutely no economic incentive to further the interests of

Multicare when Multicare's interests conflict with the interests of Genesis.  While Multicare has

not allowed the Committee to review Management's employment contracts, Multicare has

publicly disclosed that the "Company's Directors and Officers except for [Beverly Anderson] are

not employees of the Company and are compensated by Genesis."  Multicare Companies, Inc.

10K for the period ended September 30, 2000, filed February 21, 2001 ("Multicare 2000 10K").

12.     Management, in fact, receives enormous compensation at the Genesis level

pursuant to employment agreements with Genesis.  Mr. Walker, for instance, receives the

following:

- $750,000 annual salary;

- an undisclosed amount of incentive pay;

- $1,118,007 of deferred compensation (accrued as of March 2, 2001);[4]

- $1,125,000 upon confirmation of a Genesis plan of reorganization;[5] and

- $2,250,000 upon termination by him for good reason, or by Genesis for reasons other than cause, death, or disability.

---

[4]     The Genesis Debtors have already assumed Management's deferred compensation agreements.

[5]     Each executive will receive an even greater plan confirmation bonus if the effective date occurs before August 31, 2001 (and will receive a reduced bonus if the plan confirms after that date).

10

13.   Mr. Howard receives the following compensation from Genesis:

- $500,000 annual salary;

- an undisclosed amount of incentive pay;

- $214,476 of deferred compensation (accrued as of March 2, 2001);

- $500,000 upon confirmation of a Genesis plan of reorganization; and

- $1,500,000 upon termination by him for good reason, or by Genesis for reasons other than cause, death, or disability.

14.   Mr. Hager receives the following compensation from Genesis:

- $350,000 annual salary;

- an undisclosed amount of incentive pay;

- $117,962 of deferred compensation (accrued as of March 2, 2001);

- $350,000 upon confirmation of a Genesis plan of reorganization;

- $1,050,000 upon termination by him for good reason, or by Genesis for reasons other than cause, death, or disability.

15.   Management is also heavily invested in Genesis. Genesis has publicly disclosed that Mr. Walker has purchased GHV stock in the amount of $2,700,955, Mr. Howard has purchased GHV stock in the amount of $871,483, and Mr. Hager has purchased GHV stock in the amount of $853,133. Although Howard and Hager borrowed the funds for their stock purchases from GHV, GHV forgave these debts during the bankruptcy cases, and also agreed to compensate Mr. Howard in the amount of $708,722 and Mr. Hager in the amount of $693,799 for the income taxes generated upon the cancellation of the loans.

11

432364.1 5/14/01

## THE RELATED PARTY CONTRACTS

16.    Because Management has no incentive to act for the benefit of Multicare at the expense of Genesis, Management has allowed Multicare to enter into and maintain various above market contracts with Genesis through which Genesis upstreams value from the Multicare estates. As detailed below, Genesis supplies Multicare with management, pharmaceutical, rehabilitation therapy, third-party management, and support services at a cost of approximately $140 million a year pursuant to the Related Party Contracts– $27 million of which, or 24%, is above market.

### The Management Contract

17.    On October 9, 1997, ElderCare entered into a Management Agreement with the Manager pursuant to which the Manager agreed to manage and to operate substantially all of Multicare's business (the "Management Contract"). Manager is a subsidiary of Genesis, and it is one of the Genesis debtors. The Management Contract, as amended, does not expire until 2003, and it is subject to automatic renewals unless the terminating party notifies the other party otherwise.

18.    The Manager has sweeping control over Multicare. The Manager oversees the daily operations of the Multicare facilities (the "Multicare Facilities"), including the employment of directors of nursing ("DONs") and administrators at the facilities, provides management services on behalf of Multicare pursuant to third-party contracts, and manages staff development, operational planning, budgeting, and marketing at the Multicare Facilities. The Manager also provides all financial management services, including budgeting, financial accounting, and administration and billing of accounts receivable.

12

19.    Multicare is charged by the Manager a fee of 6% of net revenues (currently 4% in cash and 2% accrued) with a floor of $24 million a year, or $2 million per month. Multicare is bound to pay this minimum fee, even if a change in their circumstances were greatly to reduce the Manager's workload. For instance, under the Management Contract, Multicare would pay the same fee even if it sold most of the Multicare Facilities. In fiscal year 2001, Multicare will pay to Genesis over $38.1 million in management fees. Put another way, these fees consume 6.9% of Multicare's total operating expenses. As detailed below, this 6% fee is well above what Multicare would be able to obtain in the marketplace.

**The Therapy Contract**

20.    On December 1, 1999, ElderCare entered into a Master Agreement for Therapy Services (the "Therapy Contract")[6] with another Genesis debtor, Genesis ElderCare Rehabilitation Services, Inc. ("Genesis Therapy"). Under the Therapy Contract, Genesis Therapy is the exclusive provider of rehabilitation, and occupational, speech, and respiratory therapy at the Multicare Facilities from December 1, 1999 for 10 years, plus automatic extensions unless the terminating party notifies the other party otherwise.

21.    Multicare will pay over $45 million to Genesis under the Therapy Contract in fiscal year 2001, which amounts to 8.1% of Multicare's total operating expenses. The Therapy Contract provides that Genesis Therapy will bill each Multicare Facility at rates that "shall reflect the negotiation of rates that are no greater than the rates [Genesis Therapy] charges in the Facility's service area for such Services when rendered to a comparable facility. . . ." This provision simply binds Multicare to pricing methods set by Genesis and does not reflect benefits

---

[6]    Genesis Therapy also executed individual contracts for therapy services with individual Multicare debtors.

432304.1 5/14/01

that should inure from Multicare's significant purchasing power.  Not surprisingly, as detailed below, the Therapy Contract is substantially above market.

## The Pharmacy Relations

22.    One of the Genesis subsidiaries, NeighborCare Pharmacies, Inc. ("Genesis NeighborCare"), is the exclusive provider of institutional pharmacy services for the Multicare Facilities.  Incredibly, there is currently no formal pricing agreement at all between Genesis NeighborCare and Multicare.  Rather, Genesis NeighborCare has entered into pharmacy contracts (the "Pharmacy Contracts") with individual Multicare debtors which reference a master pharmacy pricing list that either has never been compiled or simply has not been provided to the Committee.

23.    Pursuant to the Pharmacy Contracts, Genesis NeighborCare provides medications, including prescription drugs, over the counter drugs, and intravenous medications, as well as consulting services and medical supplies.

24.    Multicare will pay to Genesis over $33 million through the Pharmacy Contracts in fiscal year 2001, which represents 6.0% of Multicare's operating expenses.  As detailed below, the Pharmacy Contracts are also significantly above-market.

## The Support Contracts

25.    Multicare also has an "informal" arrangement with Genesis ElderCare Hospitality Services ("Genesis Hospitality"), pursuant to which Genesis Hospitality manages its dietary, housekeeping, and laundry services (the "Support Contracts").[7]  Genesis Hospitality also provides budgeting, staff development, and operational planning in these areas.

---

[7]    This arrangement is "documented" only by an unsigned letter with no pricing terms attached.

26.     Multicare will pay $20 million in fiscal year 2001 to Genesis pursuant to the Support Contracts, which represents 3.7% of Multicare's total operating expenses.   These arrangements, which, unbelievably, have never been formalized with a written contract, are also above-market.

27.     Simply as an aside, one need look no further than to the fact that over $50 million "informally" changes hands from Multicare to Genesis to know how completely Genesis exercises control over Multicare.[8]

**Third Party Management Contracts**

28.     The Multicare debtors also have entered individually into third-party management contracts with the Manager, pursuant to which the Manager has assumed the management obligations of Multicare debtors to third parties (the "Third Party Management Contracts"). Multicare will pay $2.25 million in fiscal year 2001 to Genesis under these Third Party Management Contracts, which transfer 52% of adjusted third-party revenue to Genesis.   This amount represents 0.4% of Multicare's total operating expenses.

## MULTICARE'S EXCUSES ARE NONSENSE

A.     MULTICARE'S REVIEW OF THE RELATED
          PARTY CONTRACTS WAS INADEQUATE

29.     The Committee has requested that Multicare Board market the service contracts to third parties. The Multicare Board has refused.  Multicare claims, in response to the Committee, that its own auditor has not found such egregious problems with the Related Party Contracts.

---

[8]     In fact, during the cases and without obtaining Court approval, Genesis required Multicare to prepay for services postpetition even though it has total control over Multicare's payables.  This prepayment, of course, serves no purpose for Multicare; in fact, it costs Multicare money.  It does, however, lessen the amount that Genesis needs to borrow under its DIP facility.  In other words, Genesis views Multicare's working capital as there for the taking.

15

Multicare retained E&Y, purportedly to review the Related Party Contracts, to determine whether they were within market parameters, and to compare the pricing provided by Genesis and its affiliates to non-affiliated parties for similar services. E&Y concedes that the Related Party Contracts are overpriced by $15 million. Accordingly, E&Y made recommendations to reduce the pricing of certain services in limited ways. To date, however, Multicare has implemented only a modest number of those changes. This alone supports appointment of a trustee.

30.    The Committee's due diligence included a review of the scope and methodology of the E&Y analysis. The Committee found serious deficiencies in E&Y's review, which prevented E&Y from obtaining an accurate picture of the burden the Related Party Contracts impose on Multicare.

31.    The E&Y analysis did not examine, for instance, the cost-effectiveness of purchasing services through Genesis. For instance, E&Y failed to evaluate whether Multicare's purchasing of over-the-counter drugs and medical supplies through a full-service pharmacy rather than through a medical supply distributor, and Multicare's purchasing of support services through a long-term care operator compared to a third-party specializing in such services, was economical.

32.    The E&Y analysis also was deficient because it reviewed per unit pricing for core (or routine) services and did not consider the costs of non-core (or non-routine) services under basic unit prices (i.e., nurse training). Charges associated with such non-core services have accounted for more than 10% of a Multicare Facility's invoice.

33.    The E&Y analysis also failed to examine the cost efficiency of purchasing particular products under the Related Party Contracts, such as generic versus branded drug

16

selections, or the cost efficiency of purchasing particular services, such as support and therapy services, under the Related Party Contracts as compared to providing the services in-house.

34.    The E&Y analysis also focused solely on the pricing of services and failed to examine the utilization of services. In fact, the conflicts of interest faced by Management, and the fact that the DONs and the facility administrators are hired and fired by the Manager (a Genesis debtor) raise serious questions that Multicare is over-utilizing services provided under the Related Party Contracts.

35.    In short, E&Y did not truly examine whether and to what extent Genesis was "managing" Multicare for Genesis's benefit, rather than for Multicare's benefit.

B.    **THE COMMITTEE'S REVIEW OF THE RELATED PARTY CONTRACTS REVEALED WASTEFUL PRACTICES**

36.    As part of its own due diligence and to address concerns with the scope and methodology of the E&Y review, the Committee independently analyzed the Related Party Contracts, focusing on the pricing of services as compared to competitive standards, the economies of scale and purchasing power of Multicare, the scope of the services provided and the utilization and appropriateness of such services. The Committee, in conjunction with Chanin, analyzed contracts between Genesis and non-affiliated parties, as E&Y did, and, unlike E&Y, toured and interviewed administrators and DONs at the Multicare and Genesis Facilities. Also unlike E&Y, the Committee reviewed similar contracts of other long-term care operators, interviewed senior management of other long-term care providers, interviewed other providers of services provided under the Related Party Contracts, and reviewed industry reports produced by independent third parties.

AA. 1218

37.    In short, without yet being able to obtain third-party bids, the Committee's investigation revealed that Multicare could reduce its expenses by an astonishing $27 million (or 18.8%) with competitive pricing of the Related Party Contracts– twice the overcharge that Management already has been forced to concede. Multicare's earnings would increase dollar for dollar with these savings. Therefore, Multicare's fiscal year 2000 EBITDA, $45.0 million, would have increased to $72.0 million– a 60% increase.[9] Management has asserted in discussions with the Committee that Multicare should be valued at 6 times EBITDA, so even assuming that Management's purposely low multiple is correct, Multicare would increase its value by $162 million with competitive pricing of the Related Party Contracts. The Committee believes, on the basis of disclosed weighted average methodology, that Multicare, in fact, should be valued at 8.7 times EBITDA. Therefore, Multicare's enterprise value increases by $235.0 million with competitive pricing of the Related Party Contracts. However, putting the multiple argument aside, either way, Multicare would reap enormous savings by obtaining market rates. An independent trustee, free from Genesis's conflict, would capture these savings for the benefit of Multicare's creditors.

1.    The Therapy Services Contract Burdens The Multicare Debtors

38.    The Committee analyzed the Therapy Agreement by reviewing the contracts of other multi-state operators who received therapy services from organizations comparable to Genesis, and examining (i) invoices of Multicare Facilities, (ii) an independent third-party report

---

[9]    As an aside, the fact that Multicare's EBITDA is only $45 million and actually is shrinking, when revenues are flat to up, demonstrates both Genesis's mismanagement and its tendency to upstream value. Industry analysts uniformly believe that if Multicare were effectively managed, its EBITDA would exceed $75 million.

on therapy contracts of comparable long-tem care operators, and (iii) third-party contracts maintained by Genesis Therapy.

39.     The Committee found that the Therapy Agreement, like the other Related Party Contracts, has harmed Multicare.  Multicare is one of the largest customers of Genesis, but its rates for therapy services do not reflect its substantial purchasing power.  For instance, many agreements between Genesis Therapy and third parties provided twenty-five hours of complimentary non-routine services, but the Therapy Agreement with Multicare provided only five hours.  Based on a review of the Multicare invoices, if the Multicare Facilities received the full twenty-five hours of complimentary services that Genesis Therapy typically provides to non-affiliated entities, what is currently 5% of the aggregate charges to Multicare would shrink to less than 1%.

40.     The Committee's analysis revealed that Multicare would likely save over $8.6 million if it purchased therapy services on the open market.  This represents an enterprise value increase of between $51.6 million and $74.8 million depending on the multiple used.

### 2.  The Pharmacy Contracts Injure The Multicare Debtors

41.     The Committee found that the Pharmacy Contracts, too, benefit Genesis at the expense of Multicare, and that Multicare pays more under the Pharmacy Contracts than it would as a large customer in the marketplace.  The Committee reviewed (i) the individual pharmacy contracts for 35 Multicare debtors, (ii) invoices for Multicare debtors, (iii) the contracts of other multi-state operators receiving similar services from entities comparable to Genesis NeighborCare, and (iv) Genesis NeighborCare's pharmacy contracts with third parties.

19

42.     There is, somewhat incredibly, no formal pricing structure for pharmacy items, and there is no standardization for non-drug charges, such as fees for consulting, education, and training. Perhaps most fundamentally, there is no established review process for Multicare to ensure the cost-effectiveness of these charges. This lack of a standard audit procedure for the facilities has caused, among other problems, wide variances among Multicare Facilities in the use of the house account, leading to non-reimbursable drugs, as well as non-routine services and managed care co-pay amounts to be billed to the Multicare Facilities rather than to the patients.

43.     A host of problems with Medicare also has been allowed to occur under the Genesis Manager. Interviews with administrators at the Multicare Facilities revealed, for instance, a lack of pre-certification and pre-authorization procedures which, if implemented, would ensure that drugs provided to Medicaid patients were covered in the Medicaid formulary, and that patients that are identified as Medicare-eligible are covered under the Medicare program.

44.     Genesis NeighborCare also simply overcharges Multicare.[10]  The prices that Genesis NeighborCare charges third parties for prescription drugs, for instance, are approximately 15% less than the prices Genesis NeighborCare charges to Multicare because of differences in formularies and prices. Genesis NeighborCare also has dispensed drugs generally to Multicare in larger quantities than needed. The Committee's analysis further found that it is not cost

_____

[10]     Two other entities that are unrelated to Multicare also assert that Genesis NeighborCare has overbilled its service contracts. First, HCR Manor Care has claimed in a lawsuit with Genesis NeighborCare that "it was entitled to repayment for alleged pharmaceutical overcharges beginning as far back as September 19, 1997." *Genesis Health Ventures, Inc. v. HCR Manor Care, Inc. et al.*, Civ. No. 99 287 (D. Del.), Complaint, ¶¶ 62-69. Genesis NeighborCare had supplied pharmaceutical, infusion and consulting services to HCR ManorCare after merging with HCR Manor Care's former supplier, Vitalink. Second, Genesis admits that it is at risk of losing its service contracts with Mariner Post-Acute Network because such contracts are overmarket. Genesis, similarly, had assumed those contracts when it merged with Vitalink. Here, Genesis should not be able to use its dominance and total control over Multicare to rinse its burdensome contracts through Multicare's bankruptcy.

20

effective for Multicare to purchase over-the-counter drugs and medical supplies through a pharmacy, like Genesis NeighborCare.

45.     The Committee found that overall Multicare would likely save over $7.2 million in expenses if it sought pharmacy services in the marketplace. This represents an enterprise value increase of between $43.2 million and $62.6 million depending on the multiple used.

### 3. The Service Contracts Also Do Not Benefit The Multicare Debtors

46.     The Committee reviewed the Service Contracts primarily by (i) reconciling amounts due from Genesis Hospitality to Multicare as a result of budget overages, and (ii) reviewing a draft letter detailing proposed pricing for hospitality services.

47.     The Service Contracts also present a host of problems for Multicare. As a preliminary matter, Genesis Hospitality does not charge unaffiliated facilities at all for the services that it charges Multicare. Moreover, the basic services under the Service Contracts are generally contained within third-party management agreements, which effectively causes Multicare to pay twice for the same services.

48.     Furthermore, Multicare transfers millions of dollars a year to Genesis without a formal written agreement between Genesis Hospitality and Multicare delineating the pricing or scope of services to be provided. There also is no accurate reconciliation process to calculate amounts due to Multicare as a result of budget overages because there is no clear delineation of which costs and products are included in the budgets, and because budgets are not set based on industry standards, but rather by agreement between Genesis Hospitality and Multicare.

49.     The Committee's investigation found that Multicare is likely to save over $3.6 million if it obtained services provided under the Service Contracts in a competitive market. This

432304.1 5/14/01

represents an enterprise value increase of between $21.6 million and $31.3 million depending on the multiple used.

### 4. Third Party Management Agreements

50.    The Multicare Debtors will pay $2.25 million in fiscal year 2001 to the Manager under the Third Party Management Agreements, which transfer 52% of adjusted third-party revenue to Genesis. Genesis "double-dips" on these services because these fees are included as part of the Multicare Debtors' overall revenue when Genesis's fee (which is based on the Multicare Debtors total revenue) is calculated in connection with the Management Agreement.

51.    The Committee's investigation found that Multicare is likely to save at least $250,000 if this artificial charge were eliminated.[11] This represents an enterprise value increase of between $1.5 million and $2.17 million depending on the multiple used.

### 5. The Management Contract Does Not Reflect Market Rates

52.    The Committee found that many aspects of the Management Contract benefitted Genesis at the expense of Multicare. Thus, it is not surprising that George Hager, one of the members of Management who receives enormous compensation from Genesis, actually executed the Management Contract on behalf of both Genesis and Multicare.

53.    As part of its review, the Committee analyzed approximately fifteen management and proposed management contracts for 160 facilities, including the review of a proposed contract for 75 skilled nursing facilities, interviewed senior managers of comparable long-term care operators, and interviewed REITs and lenders who were currently hiring managers.

---

[11]    Remarkably, E&Y actually recommends that Genesis increase these charges by $2 million. This recommendation alone demonstrates to whom E&Y believes it is reporting.

54. Most fundamentally, without an open bidding process, Multicare has been unable to realize the cost savings that its size and business volume in all likelihood would generate. Specifically, other comparable managers that provide ancillary services typically earn management fees between 3.5% to 7% of revenues, which includes an incentive portion of up to 3.5%. In stark contrast, the Manager here earns a 6% fee with no incentive to meet budgets or otherwise to manage Multicare efficiently. This minimum annual fee is wholly unrelated to revenue. Furthermore, under the Management Contract, fees above the floor are calculated based on net revenue, but net revenue includes even related party revenues (e.g., pharmacy).

55. The Management Contract also gives senior management at the Genesis level authority to make all key decisions that impact Multicare's finances and operations. Under the Management Agreement, the Manager employs both the administrator and the DON at each Multicare Facility, and accordingly, the top staff at each Multicare Facility are obligated to the Manager (a Genesis debtor), not Multicare. As Multicare concedes:

> The Debtors estimate that there are 111 administrators/executive directors and 107 DONs at those of the Debtors' facilities managed by the Manager. Pursuant to the Management Agreement, each administrator/executive director and DON employed at a facility operated by the Manager. . . is employed and paid directly by Manager and the Debtors reimburse [Genesis] bi-monthly for Manager's payroll obligations. . . to such individuals.

Motion of Debtors for Order Authorizing Debtors to Reimburse Manager in Connection with Employee Retention Program for Directors of Nursing and Administrators that are Employed in the Debtors' Facilities and Related Relief, ¶ 8, August 16, 2000 (emphasis added).

23

56.     The Management Contract also imposes non-compete requirements based on geographic region. This provision artificially maintains Genesis's market share, and it inhibits the growth of Multicare.

57.     Moreover, the current Management Contract does not reflect Multicare's economic leverage in dealing with Genesis. An independent trustee, who literally could switch managers, would require Genesis to give Multicare the best price, rather than the least embarrassing one. The Committee believes that Genesis "needs" Multicare a lot more than Multicare needs Genesis. Accordingly, an open bidding process to identify the most cost-effective, skilled management would enable Multicare to unlock its economic leverage. To be sue, any debtor would and should do this in chapter 11. The only reason Multicare is not doing this is because it is under the control and domination of Genesis.

58.     The Committee believes that Multicare could save over $5.4 million be restructuring its Management Contract. This represents between $32.4 million and $47 million in increased enterprise value depending on the multiple used.

59.     The Multicare Board has "argued" that marketing the contracts might cause instability among the employees of Multicare (even though Multicare has no management level employees) or impact the quality of patient. This is nonsense. In fact, there is little risk that line management– the directors of nursing and administrators, each of whom is a Genesis employee– would leave their positions if Multicare's ancillary contracts were marketed because, among other things, they will receive stay bonuses at certain milestones throughout the cases, including confirmation of a plan of reorganization. There is also virtually no risk to the quality of patient care if the Related Party Contracts were marketed. Genesis itself is well aware that large

24

companies routinely switch suppliers without internal disruption because Genesis itself bids on such contracts in the normal course of its business. Genesis, for example, recently acquired Vitalink (an entity with 172,000 beds) without disruptions to Vitalink's operations. It borders on the absurd to suggest that patient care will be impacted adversely if Multicare purchases drugs at a fair price. Moreover, with literally hundreds of millions of dollars of enterprise value at stake, Multicare can survive a little disruption.

    60.    Based on the foregoing facts, the Committee submits that this Court must direct the appointment of an independent trustee to protect Multicare's estate and Multicare's creditors, and to preserve the legitimacy of this Court's oversight of the interconnected bankruptcies of Multicare and Genesis.

## ARGUMENT

### I.

### THIS COURT SHOULD APPOINT AN INDEPENDENT, UNCONFLICTED CHAPTER 11 TRUSTEE

**A.**    <u>A Trustee Is Necessary When Management Is Conflicted</u>

    61.    The Bankruptcy Code empowers a creditors' committee to "request the appointment of a trustee or examiner under section 1104 of [title 11]." 11 U.S.C. § 1103. Section 1104 of the Bankruptcy Code provides, in relevant part:

> At any time after the commencement of the case but before confirmation of a plan, on request of a party in interest. . . and after notice and a hearing, the court shall order the appointment of a trustee (1) for cause, including fraud, dishonesty, incompetence, or gross mismanagement of the affairs of the debtor by current management, either before or after the commencement of the case, or similar cause. . . or (2) if such appointment is in the interest of creditors, any equity security holders, and other interests of the estate. . . .

11 U.S.C. § 1104(a).  See also In re Sharon Steel Corp., 871 F.2d 1217 (3d Cir. 1989) (affirming appointment of trustee where management failed to take action to recover assets that were systematically siphoned to affiliated entities on the eve of bankruptcy).

62.     Indeed, as this Court recently affirmed, "current management has an obligation to refrain from acting in a manner which could damage the estate or hinder [a] successful reorganization."  In re Lernout & Hauspie Speech Products, N.V., Case No. 00-4398, Transcript of Decision on Motions for Appointment of Chapter 11 Trustee and Disqualification of Milbank Tweed and Continuation of Uncontested/Contested Matters ("Lernout Tr.") (Bankr. D. Del. March 29, 2001) p. 18 (internal citation omitted).

63.     In accordance with that principle, courts repeatedly have found cause for appointment of a trustee under section 1104(a)(1) based upon an actual conflict of interest of management.  In Cajun Electric Power Cooperative, Inc., 191 B.R. 659 (Bankr. M.D. La. 1995), aff'd, 74 F.3d 599, 600 (5th Cir. 1996), cert. denied, 519 U.S. 808 (1996), for example, the court granted a creditor's motion for appointment of a trustee for cause where the debtor was a utility cooperative, and members of management were conflicted because they also served as managers of the individual utility companies in the cooperative.  The court found that management was hopelessly conflicted in  evaluating whether to appeal an order lowering utility rates; if management appealed, it would be seeking to charge higher rates to individual utility companies which would benefit the estates, but if management failed to appeal, the individual utility companies where management also served would benefit.  In granting the motion for appointment of a trustee, the court found that a trustee was necessary where management was "working at cross-purposes."  Id.; see also In re Intercat, Inc., 247 B.R. 911 (Bankr. S.D. Ga. 2000)

432304.1 5/14/01

(granting creditor's motion to appoint trustee for cause where there was a "lack of [evenhandedness] in dealings with insiders or affiliated entities vis-a-vis other creditors or customers," an "unwillingness or inability of management to pursue estate causes of action" and "conflicts of interest on the part of management interfering with its ability to fulfill fiduciary duties to the debtor.")

64.     As this Court also recently recognized, section 1104(a)(2) of the Bankruptcy Code allows a bankruptcy court to appoint a trustee "when doing so addresses the interests of the creditors, equity, securityholders or other interests even when no cause exists." Lernout Tr., p. 18 (internal citation omitted). Accordingly, courts also have utilized section 1104(a)(2) to appoint a trustee where management faces a conflict of interest. See In re Oklahoma Refining Co., 838 F.2d 1133 (10th Cir. 1988) (granting creditor's motion to appoint trustee as in the best interest of creditors where debtor failed to collect debts from affiliated companies); In re Tel-Net Hawaii, Inc., 105 B.R. 594, 595 (Bankr. D. Haw. 1989) (appointing trustee in the best interest of creditors where debtor's sole shareholder faced a conflict in its fiduciary duty to the debtor's creditors and to its own creditors in its own bankruptcy, and therefore, it was unlikely the shareholder could vigorously investigate or prosecute claims against itself in the debtor's bankruptcy); In re Microwave Products of America, Inc., 94 B.R. 971 (Bankr. W.D. Tenn. 1989) (appointing trustee in the best interest of creditors where the debtor and its parent had overlapping management and the debtor failed to pursue claims against its parent).

65.     In In re Humphrey's Pest Control Franchises, Inc., 40 B.R. 174 (Bankr. E.D. Pa. 1984), the court granted a creditors committee's motion for appointment of a trustee under circumstances very similar to the case at bar. The debtor transferred assets to its parent company

432304.1 5/14/01

27

before and after the petition date, purportedly pursuant to the terms of a management agreement. Id. at 176. The creditors committee found, however, that the debtor's records did not justify the transfers, the transfers seriously depleted the debtor's assets, and that "an obvious conflict of interest exists in the management of the two corporations because the officers and principals of the parent corporation are the same individuals as the officers and principals of the debtor." Id. at 177. The court found:

> Once the issue of the propriety of the transfers was raised by the creditors, it was incumbent upon the debtor to convince the Court that the transfers were not an at-random siphoning of assets but rather could be appropriately accounted for.

Id. at 177. The debtor failed to come forward with an accounting, and therefore, the Court appointed a trustee in the best interest of creditors under Bankruptcy Code section 1104(a)(2). Id. at 177.

66.    Here, Management not only cannot account for the siphoning, Management concedes that it siphons over $15 million a year. The Committee believes that it siphons over $27 million a year. But either way, a trustee must be appointed. Management faces an undeniable conflict of interest. Management has a duty to Multicare to right-size the Related Party Contracts, and a conflicting duty to Genesis (the one it chose to observe) to maintain the profitable contracts. Because Management receives compensation only from Genesis, and because it intends to merge Multicare into Genesis— after it ultimately wipes out Multicare's unsecured creditors— it is not surprising that Management has refused the Committee's request to market the Related Party Contracts.

67.    Management cannot reconcile its conflicting duties, and does not want to. Accordingly, the Committee seeks the appointment of a trustee to market the Related Party

28

**AA. 1229**

Contracts, to negotiate and document a fair plan of reorganization, and to prosecute claims against Genesis arising from the Related Party Contracts. To be clear, the Committee does not seek to disrupt the daily operations of Multicare, and thus does not seek at this point to dislodge the Management Agreement. The trustee may determine that issue and oversee a smooth transition if that is in Multicare's best interest.

**B.     Management Of The Multicare Debtors Undeniably Is Conflicted**

. 68.     Here, appointment of a trustee is appropriate under both Bankruptcy Code sections 1104(a)(1) and 1104(a)(2). The practice of leaving a debtor in possession of its estate is "premised upon an assurance that the officers and managing employees can be depended upon to carry out the fiduciary responsibilities of a trustee." **Commodity Futures Trading Commission v. Weintraub**, 471 U.S. 343, 355 (1985) (internal citation omitted). See also **In re Marvel Entertainment Group, Inc.**, 140 F.3d 463, 474 (3d Cir. 1998) (a debtor in possession has a duty to "protect and conserve property in its possession for the benefit of creditors"); **In re Microwave Products of America**, 102 B.R. 659, 671 (Bankr. W.D. Tenn. 1989) ("Because a debtor-in-possession stands in a fiduciary relationship with its creditors, its fiduciary obligation includes refraining from acting in a manner which could damage the estate, or hinder a successful reorganization of the business.")

69.     Indeed, as this Court recently found, although there may be a general presumption that directors who serve at both the parent and subsidiary levels will advocate for the subsidiary when acting on behalf of the subsidiary,

> This general presumption is not a per se rule. . . [and] it is prudent to say that the presumption that an act is taken on behalf of the corporation for whom the officer claims to act is strongest when the act is perfectly consistent with the norms of corporate behavior, but wanes as the distance

432304.1 5/14/01

> from those accepted norms approaches the point of action by a dual officer
> plainly contrary to the interests of the subsidiary, yet nonetheless
> advantageous to the parent.

Lernout Tr., p. 25 (*quoting* United States v. Best Foods, 524 U.S. 51, 70 n.13 (1998)) (emphasis

added). Here, of course, Management has acted in a manner plainly contrary to the interests of

·Multicare, yet nonetheless advantageous to Genesis, by allowing Multicare to enter into and to

continue to operate under the detrimental Related Party Contracts.

70.    Management, in fact, has acknowledged its serious conflict of interest in a recent

Multicare filing with the Securities and Exchange Commission:

> Genesis and Messrs. Walker, Hager and Howard have substantial influence
> on Multicare and the outcome of any matters submitted to our stockholders
> for approval, and are in positions that may result in conflicts of interest
> with respect to transactions involving us and Genesis. Genesis and its
> affiliates provide healthcare and related services to our customers and
> facilities either directly or through contracts with us. Conflicts of interest
> may arise in connection with the negotiation of the terms of such
> arrangement.
>
> Genesis is in the business of providing healthcare and support services to
> the elderly, and substantially all if its markets are contiguous to or overlap
> with our existing markets. Genesis may compete with us in certain of these
> markets or in the provision of certain healthcare services. Although our
> directors who are also directors or officers of Genesis have certain
> fiduciary obligations to us under Delaware law, such directors and Genesis
> are in positions that may create potential conflicts of interest with respect
> to certain business opportunities available to and certain transactions
> involving us. Neither Genesis nor Messrs. Walker, Hager and Howard are
> obligated to present to us any particular investment opportunity which
> comes to their attention, even if such opportunity is of a character which
> might by suitable for investment by us.

Multicare 2000 10K (emphasis added).

71.    The Committee firmly believes that the Multicare Board has breached its fiduciary

duties to the estates. Among other things, the Multicare Board has failed to investigate vigorously

30