the Related Party Contracts, has failed to realize the inherent value in those contracts for the benefit of Multicare, has directed Multicare to continue to overpay Genesis, and has failed to prosecute actions arising out of those contracts. As detailed above, E&Y did not conduct a thorough, arm's length investigation of the Related Party Contracts, but yet nevertheless determined that the Related Party Contracts are $15 million overmarket. That itself is a staggering concession. Yet even after E&Y's analysis, the Multicare Board has failed to implement all of E&Y's modest recommendations. The Multicare Board likely will not allow unaffiliated third parties to bid on the Related Party Contracts and will not commence litigation against Genesis to recapture value lost prepetition. Meanwhile, more than one-fourth of Multicare's total operating expenses are being consumed by the Related Party Contracts, to the benefit of Genesis and to the detriment of Multicare. Absent a break of Genesis's iron grip on Multicare's potential, this value will be lost forever, and over $284 million in unsecured creditors will be wiped out.

72.     This case thus presents a compelling case for a trustee, and is decidedly unlike Lernout, where this Court denied a shareholders' motion for appointment of a trustee. In Lernout, this Court found that general allegations of poor management decisions, such as the cancellation of a debtor's international development activity, and allegations of overlapping management between the debtor and its parent, were insufficient bases for the appointment of a trustee. Lernout Tr., pp. 22-24. The management decisions at issue in Lernout were not, like here, made for the benefit of a controlling manager who was systematically draining valuable assets from its captive debtor. The overlapping management in Lernout did not benefit personally from the transfer of assets, as Management does here. In this case, as distinguished from

432304 1 5/14/01

Lernout, management certainly has not "change[d] hats to represent the two corporations separately." Tr., p. 24. Rather, here, Management maintains its Genesis hat while operating at Multicare, and uses Genesis to deplete Multicare. Also in Lernout, unlike here, the Court found that introduction of a trustee would severely disrupt the debtors' business. Lernout Tr., p. 25. Here, introduction of a trustee for limited purposes in this case would not disrupt Multicare because under a trustee, the Manager would continue to operate Multicare while the Trustee pursued Multicare's interests.

73.    In sum, the Multicare Board is paralyzed by Management's conflict of interest. Under Cajun Electric, this conflict is sufficient cause to appoint a trustee under section 1104(a)(1). Under Humphrey's Pest Control, a trustee would be in the best interest of creditors under section 1104(a)(2).

## II.

## MULTICARE MANAGEMENT MUST PROVE THE INTRINSIC FAIRNESS OF THE RELATED PARTY CONTRACTS

74.    Here, the business judgment rule cannot insulate Management's self-interested decisions. In fact, the business judgment rule does not even apply here. The rule generally provides a "presumption that in making a business decision the director of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interest of the company." Aronson v. Lewis, 473 A.2d 805, 812 (Del. 1984). However, the protections of the business judgment rule "can only be claimed by disinterested directors. . . [which] means that directors can neither appear on both sides of a transaction nor expect to derive any personal benefit from it." Id. at 812; see also In re Main, Inc., 1999 WL 424296, *19

(E.D. Pa. June 23, 1999) (the "business judgment rule will not apply. . . if there is evidence that the director's decisions were either made in bad faith or influenced by self-interest.")

75.    Management cannot use the business judgment rule to justify its inaction concerning the Related Party Contracts because Management appears on both sides of the transactions. George Hager, of course, actually executed the Management Contract for both Multicare and Genesis. Management's broader conflict is plain: Although renegotiation or termination of the Related Party Contracts would clearly benefit Multicare, the same adjustments would be detrimental to Genesis. Therefore, Management has, and surely will continue to, obstruct the actions it must take as a Multicare fiduciary. Moreover, Management concedes the contracts are unfair to Multicare by over $15 million.

76.    In cases where directors have conflicts of interest and their duty of loyalty is in question, it is well established that the directors bear the burden of establishing the "intrinsic fairness" of a transaction. Pepper v. Litton, 308 U.S. 295, 306 (1939); see also In re Reading Co., 711 F.2d 509, 517-18 (3d Cir. 1983) (where a "majority shareholder has used his control over the corporation's board of directors to engage in self-dealing, the Delaware courts will judge the self-dealing action of the dominated board by the test of 'intrinsic fairness'"); Byelick v. Vivadelli, 79 F. Supp.2d 610, 629 (E.D. Va. 1999) (once "an interested director transaction is established, the burden of proof shifts to the defendant [the interested directors who]. . . bear the burden of showing that the transaction at issue was fair to the corporation"); Mills Acquisition Co. v. MacMillan, Inc., 559 A.2d 1261, 1280 (Del. 1989) (directors are "required to demonstrate both their utmost good faith and the most scrupulous inherent fairness of transactions in which they possess a financial, business or other personal interest."). Here, Genesis has

33

installed its own executives on the Multicare Board and provides substantial compensation to Management. Accordingly, the Multicare Board has the burden to show the propriety of the Related Party Contracts. Of course, Genesis cannot prove that such contracts, which steadily and substantially deplete the value of Multicare, are somehow intrinsically fair to the Multicare estates and their creditors. This is particularly true because its own advisors already have conceded that Genesis is abusing its control over Multicare and exacting at least $15 million in value.

77.    The Multicare Board was not relieved of the burden of proving the intrinsic fairness of the Related Party Contracts when Management (in connection with the Bank Group) selected Beverly Anderson to be a purportedly "disinterested" director. Directors are independent only if they are not "beholden" to other directors or "so under the influence that their discretion would be sterilized." Rales v. Blasband, 634 A.2d 927, 936 (Del. 1993). However, where such independent directors are "torpid, if not supine" in their efforts to act independently from the interested members of the board, a board of directors is not relieved of the burden of showing intrinsic fairness. Mills Acquisition Co., infra, 559 A.2d at 1268 and 1280 (reviewing management-led LBO under intrinsic fairness standard where interested directors selected the financial advisor to the independent directors, and where the independent directors lacked negotiating authority regarding the proposed restructuring).

78.    The Committee believes that Ms. Anderson has exercised no independent decision-making and, in fact, has not countermanded a single Management decision.[12] Management, acting in concert with the Bank Group, installed Ms. Anderson immediately before the Petition Date,

---

[12]    The Committee asked Multicare to provide it with evidence of any decisions of Management overruled by Ms. Anderson or evidence of areas in which Ms. Anderson has actual decisionmaking unfettered by the Genesis-infected directors. Multicare declined.

34

and upon information and belief, there is no evidence that Ms. Anderson has ever acted independently from Management in twelve months of service with respect to any issue where Management faced a conflict of interest. There is also no evidence that Ms. Anderson wields any authority to renegotiate the Related Party Contracts, and no evidence that she has engaged independent legal counsel. Moreover, Ms. Anderson was (and still may be) an employee of E&Y, the very firm that Multicare retained to investigate the Related Party Contracts, and who has submitted applications for over $1.3 million in fees and expenses so far in these cases. Accordingly, the appointment of Ms. Anderson may simply "mask an ineffectual or corrupted effort" for independent review of Multicare's transactions with Genesis. <u>Kahn v. Tremont Corp.</u>, 1992 WL 205637, *3 (Del. Ch. Aug. 21, 1992) (denying conflicted directors' motion to stay discovery in a derivative action). Moreover, even if Multicare could demonstrate that Ms. Anderson is independent or has some authority, she cannot whitewash the historical upstream of value to Genesis, the failure or Multicare to market the contracts, and Multicare's continuing to operate post-petition under Genesis's dominance and control. For this, Ms. Anderson is just as culpable as the Genesis directors, and a trustee should be appointed to pursue Multicare's claims.

**III.**

<u>A TRUSTEE WOULD NEGOTIATE WITHOUT A CONFLICT OF INTEREST</u>

79.    The Multicare Board's own financial advisors have identified various aspects of the Related Party Contracts that should be renegotiated to the benefit of Multicare, but the Multicare Board has only partially implemented even those cost-saving measures. The Committee has identified other significant contract terms that should be renegotiated, but the Multicare Board has

35

refused to do so. Therefore, it is clearly in the best interests of the Multicare estates and the Multicare creditors for the Court to order the appointment of an independent trustee to evaluate the Related Party Contracts, market, renegotiate and/or replace them, and to prosecute all available estate claims against Genesis.

### IV.

### IN THE ALTERNATIVE, THE COURT SHOULD DIRECT MULTICARE TO ENGAGE IN A FAIR SALE PROCESS OF THE RELATED PARTY CONTRACTS IN ORDER TO BRING THE RELATED PARTY CONTRACTS TO MARKET PRICING FOR THE BENEFIT OF MULTICARE'S CREDITORS

80. In the alternative, the Court could order a more limited remedy: the sale of the Related Party Contracts on the open market. A public auction would establish conclusively the value of the services provided under the Related Party Contracts. See, e.g., Amerada Hess Corp. v. Commissioner of Internal Revenue, 517 F.2d 75 (3d Cir. 1975), cert. denied, 423 U.S. 1037 (1975) (value of stock was price on the open market, not price that the buyer and seller assigned to the stock in their sale contract); see also Keener v. Exxon Co., USA, 32 F.3d 127, 132, cert. denied, 513 U.S. 1154 (1995) ("fair market value is, by necessity, best set by the market itself"); In re The Two S Corp., 875 F.2d 240, 243 (9th Cir. 1989) ("the price paid at a commercially reasonable sale is the best evidence of value"); In re Harris, 1998 WL 318724, *3 (Bankr. E.D. Pa. 1998) ("What better indication of fair market value is there than the price a willing buyer not obligated to pay an owner, who is not obligated to sell, would pay"); In re Flores de New Mexico, 151 B.R. 571, 576 (Bankr. D. N.M. 1993) (same). The Committee certainly is willing to abide by the dictates of the marketplace, and has told Multicare its Bank Group so.

36

81.    Estate property is typically sold upon a motion brought by a debtor. However, courts have directed estate property to be sold without the support of the debtor. In re Bjolmes Realty Trust, 134 B.R. 1000 (Bankr. D. Mass. 1991), for example, the court ordered the sale of the debtor's equity at auction after a secured creditor objected to the debtor's proposed plan, which provided that the principals would retain their stock in consideration for a capital contribution. Id. at 1000. In order to determine if the principals were making a capital contribution that was reasonably equivalent to the stock, the court held that the "transaction should be measured against market forces" and therefore, the court required, as a condition to plan confirmation, that an auction of the shares be held. Id. at 1009.

82.    A debtor's decisions "made in furtherance of its statutory duties are subject to judicial review for an abuse of discretion." In re Monsour Medical Center, 5 B.R. 715, 718 (Bankr. W.D. Pa. 1980). Accordingly, when a debtor-in-possession breaches its statutory duties, a creditor "may petition the Court to compel the. . . debtor-in-possession to act." Id. at 718 (affirming that creditors' committee had standing to bring fraudulent transfer action on behalf of the estate). In fact, the Bankruptcy Code specifically empowers a committee to investigate the debtor's conduct, and "perform such other services as are in the interest of those represented." 11 U.S.C. § 1103(c).[13]

83.    It also is well established that a court may empower a creditors' committee to take action for the benefit of the estates when the debtor unreasonably fails to do so. See, e.g., In re Philadelphia Light Supply Co., 39 B.R. 51, 53 (Bankr. E.D. Pa. 1984) (granting motion of creditors' committee for leave to commence preference action against debtor's president and sole

---

[13]    Furthermore, any party in interest, including a creditors' committee, "may raise and may appear and be heard on any issue in a case" under chapter 11. 11 U.S.C. § 1109(b).

AA. 1238

shareholder where it was "unreasonable to expect the debtor in possession to objectively view its claim against that defendant"); In re Walnut Leasing Co., Inc., 1999 WL 729267 (E.D. Pa. Sept. 8, 1999) (creditors' committee had standing to bring securities fraud action against debtors' insiders).

84.    Here, where the Multicare Board has abused its discretion by failing to obtain the services under the Related Party Contracts at market prices, if the Court will not appoint an independent trustee, the Committee submits that the Court should permit the Committee to receive market bids on the services. Short of a trustee, an order directing the sale of the Related Party Contracts would be consistent with the goals of the Bankruptcy Code to maximize the value of Multicare's estate for the benefit of Multicare's, rather than Genesis's, creditors. Again, the cost savings achieved by a sale of the contracts would enure to the benefit of all Multicare creditors.

38

## CONCLUSION

WHEREFORE, the Committee requests that the Court enter an order (i) directing the appointment of a trustee for the Multicare estates (a) to evaluate, renegotiate, and bring to market-pricing the Related Party Contracts among Multicare and Genesis, (b) to evaluate and to prosecute Multicare claims against Genesis, and (c) to propose and to seek confirmation of a fair plan of reorganization that maximizes Multicare's value for the benefit of Multicare's creditors; or, alternatively, (ii) directing Multicare to engage in a fair sale process of the Related Party Contracts in order to bring such Related Party Contracts to market-pricing for the benefit of Multicare's creditors, and (iii) granting such other and further relief as is just and proper.

Mark Minuti (No. 2659)
Tara L. Lattomus (No. 3515)
SAUL EWING LLP
222 Delaware Avenue, Suite 1200
P.O. Box 1266
Wilmington, DE  19899
(302) 421-6840/6847

-and-

David S. Rosner
Athena F. Foley
KASOWITZ, BENSON, TORRES
  & FRIEDMAN  LLP
1633 Broadway
New York, NY 10019
(212) 506-1700

Counsel to Official Committee of Unsecured
Creditors of Multicare AMC, Inc., *et al.*

Dated:  May 14, 2001

39

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| IN RE: | ) | Chapter 11 |
| | ) | |
| MULTICARE AMC, INC., *et al.*, | ) | Case No. 00-2494 (JHW) |
| | ) | through 00-2623 (JHW) |
| | ) | |
| Debtors. | ) | Jointly Administered |

ORDER GRANTING MOTION BY THE OFFICIAL COMMITTEE OF UNSECURED
CREDITORS FOR AN ORDER DIRECTING THE APPOINTMENT OF A TRUSTEE
OR, ALTERNATIVELY, THE SALE OF THE RELATED PARTY CONTRACTS

Upon the motion (the "Motion") of the Official Committee of Unsecured Creditors (the
"Committee") for the estates of the above-captioned debtors (the "Debtors"), for an order
(i) directing the appointment of a trustee for the estates of Multicare (a) to evaluate, renegotiate,
and bring to market-pricing the Related Party Contracts among Multicare and Genesis, (b) to
evaluate and to prosecute Multicare claims against Genesis, and (c) to propose and to seek
confirmation of a fair plan of reorganization that maximizes Multicare's value for the benefit of
Multicare's creditors; or, alternatively, (ii) directing Multicare to engage in a fair sale process of
the Related Party Contracts in order to bring such Related Party Contracts to market-pricing for
the benefit of Multicare's creditors; and all capitalized terms herein having the meanings ascribed
to them in the Motion; and the Court having jurisdiction to consider the Motion and the relief
requested therein in accordance with 28 U.S.C. §§ 157 and 1334; and consideration of the
Motion, the relief requested therein and the responses thereto, if any, being a core proceeding in
accordance with 28 U.S.C. § 157(b); and good and sufficient notice of the Motion having been
given, and it appearing that no other or further notice need be given; and all objections to the
Motion, if any, having been overruled or otherwise resolved; and the Court further having found

that appointment of an independent trustee as set forth in the Motion is in the best interest of the estates and their creditors; and after due deliberation and sufficient cause appearing therefor

IT IS HEREBY ORDERED, ADJUDGED, FOUND AND DECREED that:

1.  The Motion is approved.

2.  The Office of the United States Trustee is hereby directed to appoint a chapter 11 trustee (the "Trustee") for the purposes set forth herein.

3.  The Trustee is authorized and directed to review the Related Party Contracts and any documents relating thereto, as the Trustee deems reasonably necessary.

4.  The Trustee is authorized and directed to take all steps necessary to bring to market-pricing the Related Party Contracts.

5.  The Trustee is authorized to evaluate and to prosecute all available claims of the Multicare estates against Genesis.

6.  The Trustee is authorized to take all steps on behalf of Multicare necessary to propose and to seek confirmation of a fair plan of reorganization that maximizes Multicare's value for the benefit of Multicare's creditors.

7.  Multicare, Genesis and each of their directors, officers, employees, attorneys, advisors, and agents are directed to provide all information requested by the Trustee and to cooperate with the Trustee in all respects.

_____
United States Bankruptcy Judge

Dated: June ___, 2001

2

432304 1 5/14/01

AA. 1242

AA. 1243

EXHIBIT "B"

1

5920

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

In the matter of              )
                              )
LOEWEN GROUP                  )
INTERNATIONAL, INC.,          )  Case No. 99-1244 ·(PJW)
et al.,                       )
                              )
        Debtors.              )


            Bankruptcy Courtroom
            Room No. 2 - Sixth Floor
            Marine Midland Plaza
            824 Market Street Mall
            Wilmington, Delaware


            Thursday, December 21, 2000
            9:35 a.m.



BEFORE:  THE HONORABLE PETER J. WALSH,
         United States Bankruptcy Judge




            TRANSCRIPT OF PROCEEDINGS



            WILCOX & FETZER
1330 King Street - Wilmington, Delaware 19801
            (302) 655-0477



**W&F**
**WILCOX & FETZER LTD.**
Registered Professional Reporters

91

1  don't think we can be appropriately criticized for that.

2  You haven't heard anybody dispute the fact that this

3  company operationally is ready to go. We want to come

4  out. We want to get to the end. If there's going to be

5  a stay, it should be after there is a confirmation

6  hearing, because if there's going to be an appeal and

7  stay, it should be after all issues are vetted. It's in

8  the context of a plan, and this Court or the district

9  court can make a determination as to whether or not a

10 stay is appropriate and should proceed.

11           Again, we urge the Court to stay the

12 adversary proceeding, to let us proceed with

13 confirmation. We have proposed a schedule for proceeding

14 promptly and expeditiously. Let's get this matter

15 resolved either through the Court or hopefully through a

16 settlement.

17           Thank you, Your Honor.

18           THE COURT: Let me see if I can hit the

19 highlights of what's been presented to me. I think all

20 parties agree that this issue could be decided either in

21 the adversary proceeding or by a motion challenging the

22 plan classification. Given the fact that there is

23 already an adversary proceeding filed, which has now

24 brought the issue to the fore, I see no reason why we



1   shouldn't continue with that proceeding to address the

2   issue that needs to be decided before a plan can be

3   confirmed.  And let me just give you my conclusion, then

4   I'll elaborate.  I'm going to deny the motion to stay the

5   adversary proceeding, and with respect to the

6   cross-motion to stay the plan process, I'm going to have

7   a hybrid decision.

8           Let me address the stay motion with respect

9   to the adversary proceeding.  Counsel for the debtor has

10  just pointed out in regard to this controversy that,

11  indeed, there is some uncertainty as to the outcome of

12  this issue, and counsel for the debtor points out and

13  attempts to distinguish the cited cases, that is, the

14  cases cited by the Bank of Montreal, that the court in

15  those cases had already decided that the plan was not

16  confirmable.  But it seems to me that when a court, as

17  this one does now, concludes that this is a serious

18  enough issue that it ought to be decided prior to

19  confirmation, lest the confirmation process be a wasted

20  effort, then I think it's appropriate to embark upon a

21  course of action which on an expedited basis allows that

22  issue to be resolved and then the plan confirmation to go

23  forward.

24          So given the agreed uncertainty of the



93

1   outcome, given the magnitude of the issue involved, and

2   given this Court's extremely limited understanding of the

3   issue at this point, I think the issue needs to be fully

4   aired, and I think it is entirely appropriate for the

5   issue to be aired in the context in which it was brought

6   to the Court's attention; namely, by an adversary

7   proceeding filed not by the debtor or the disputants but

8   by the collateral agent looking for direction, and so it

9   seems to me that that adversary proceeding should go

10  forward on an expedited basis.

11          With respect to whether the plan process

12  should be stayed, I'm inclined to, first of all, not

13  schedule the disclosure statement hearing immediately,

14  but at some point I think it may be appropriate to

15  schedule the disclosure statement hearing, even in the

16  absence of a resolution of this issue, so that other

17  matters relating to the plan which may have controversy

18  associated with them can be addressed and resolved so

19  that at some point, when the big issue is finally

20  settled, the other issues, the smaller issues, will be

21  already resolved.

22          Now, counsel for the Bank of Montreal

23  suggests that going forward with a plan would only create

24  opportunities to raise more issues.   That may be, but I



94

1  don't think that is a sufficient basis to say that we

2  should not have a disclosure statement hearing before the

3  resolution of this issue in the adversary proceeding.  I

4  don't know whether -- and I don't have my calendar with

5  me.  I don't know whether the debtor has already received

6  a disclosure statement hearing date or not.

7          MR. GORDON:  No, we have not, Your Honor.

8          THE COURT:  I'm going to defer that and

9  suggest that we're not going to have that until at least

10 probably February or March, but I want to see what

11 progress is being made on the litigation, which I would

12 assume everybody agrees will need to be pursued on an

13 expedited basis; that is, the discovery process.  And I

14 think what we should do is perhaps have a status

15 conference on this matter say sometime in perhaps mid- to

16 late February, and at that time I will decide at what

17 point we should have a disclosure statement hearing.

18          Let me raise one other issue at this point.

19 It seems to me that this matter may be appropriate for

20 the intervention of a mediator, and I have had such

21 process put into place, with mixed results, in the past,

22 and I guess I'll throw it out as an idea and see if

23 there's any reaction to it.

24          MR. BIENENSTOCK:  We would certainly



WILCOX & FETZER LTD.
Registered Professional Reporters

95

1  support it but suggest that it go simultaneously with

2  discovery so it doesn't slow things down.

3      THE COURT:  Certainly, if we did a mediator

4  step, I would insist that the discovery process proceed

5  on a dual track.  And while we're at it, I won't ask

6  Mr. Bienenstock to comment, but I have in mind a mediator

7  who we used in the -- I have so many of these cases.

8      MR. BIENENSTOCK:  Lomas?

9      THE COURT:  Lomas.  Who I think would be

10  qualified in this particular area as well as anybody.  I

11  won't identify them.  You people can talk among

12  yourselves.

13      Let me hear from the debtor whether you

14  think this is a worthwhile process.  Again, I'm saying

15  that it will not derail or otherwise slow down the march

16  to a final court-determined resolution of the adversary

17  proceeding.

18      MR. GORDON:  As we indicated, we would like

19  to see a settlement and if the mediation can help that

20  process, we would be all in favor of that.  We will

21  undertake any effort we can to try to settle.

22      THE COURT:  Yes?

23      MR. RICHMAN:  I just wanted to point out we

24  concur with those views, as well.



WILCOX & FETZER LTD.

AA. 1249

96

1            MR. FLASCHEN:  On behalf of the committee,

2 we got a lot of big boys and girls in this room.  Our

3 committee, as zealous as we were, can come to an

4 agreement with Loewen and the bondholders.  I'm sure if

5 we put these parties in a room, everyone knows the

6 issues, they briefed it up, briefed it all over the

7 place.  We spent $25,000 an hour in this court.  We spend

8 a million dollars on a mediator.  Can we give it a shot

9 first?  These issues aren't really that difficult.  We're

10 talking about money.  We're not talking about legal

11 issues.  I think they can be solved.

12            THE COURT:  Well, I'm not sure it's just

13 about money.  I think, obviously, there is a legal issue

14 involved, and I think the particular mediator I have in

15 mind may shed some light on the merits of the various

16 positions which might be an inducement for people to make

17 concessions.

18            I'm not going to direct that a mediator be

19 appointed, but I'm going to direct that counsel confer

20 and advise me in writing within 10 days from today as to

21 their position on a mediator.  If there is a consensus

22 that there should be one, I need only one letter.  If

23 there's not a consensus, then I would like to get no more

24 than two letters, that is, one letter favoring it and one



**W&F**

WILCOX & FETZER LTD.
Registered Professional Reporters

AA. 1250

97

1   opposing it, and then I will take it from there.

2       Now, with respect to the discovery

3   schedule -- first of all, I think we ought to set the

4   status conference today, and then on the discovery

5   schedule I'm going to leave it up to the parties to work

6   one out, and if you have disagreements, then bring them

7   to me by way of letter and we will have a conference call

8   and I'll try to resolve them.

9       Let me make one other comment and that is

10  that I appreciate the comments of the debtor and others,

11  and I think there's merit to it, that getting out of this

12  Chapter 11 is in the best interest of the estate and the

13  parties-in-interest, particularly given, and I assume

14  representation is correct, that the debtors' business

15  problems have been fixed and there is no doubt that a

16  Chapter 11 case is a cloud over any enterprise ahead in

17  doing business, so, therefore, the interest of the

18  parties in a quick exit from this Chapter 11 is to be

19  commended, and the Court should do its best to see that

20  that is done.  But as I have indicated, this is an

21  uncertain issue.  I think it's a serious issue.  It's an

22  issue that I have never addressed before.  So I think it

23  needs attention before we get too far in the plan

24  confirmation process.



WILCOX & FETZER LTD.
Registered Professional Reporters

98

1          Let me see if I can get us a date where we
2     can have a status conference.
3          MR. FLASCHEN:  We have an omnibus hearing
4     on February 14th in Loewen.
5          MR. SCHWARTZ:  16th.
6          THE COURT:  That's 9:30 on February 16,
7     Friday.  We will have a status conference on the progress
8     of the discovery and then I will decide at that point
9     whether we should go forward with a disclosure statement
10    hearing, and if we do, it would probably be sometime in
11    March.  I'll try to keep some dates open in March to do
12    that.
13          Is there anything else you need from me?
14          MR. McCARTHY:  David McCarthy on behalf of
15    U.S. Bank.  There's presently a deadline of January 15th,
16    I believe, for responsive pleadings.  In view of the
17    holidays, I request that that be put out a couple more
18    weeks to the end of January and still be before the
19    status conference and that would give us time to
20    formulate our response.
21          THE COURT:  Is there any objection to that?
22          MR. EPLING:  No objection to moving it out,
23    Your Honor.
24          THE COURT:  Responding to a complaint,

**W&F**
WILCOX & FETZER LTD.
Registered Professional Reporters

AA. 1252

# EXHIBIT "C"

1992 WL 196768
(Cite as: 1992 WL 196768 (E.D.Pa.))

Only the Westlaw citation is currently available.

United States District Court, E.D. Pennsylvania.

The OFFICIAL COMMITTEE OF UNSECURED
CREDITORS OF CORELL STEEL on Behalf of
CORELL STEEL
v.
FISHBEIN AND COMPANY, P.C., et al.

Civ. A. No. 91-4919.

Aug. 10, 1992.

Martin J. Weis, Ralph J. Kelly, Dilworth, Paxson, Kalish & Kauffman, Philadelphia, Pa., for The Official Unsecured Creditors' Committee.

Jacqueline H. Canter, Philip B. Toran, Jay S. Rothman, Marshall, Dennehey, Warner, Coleman and Goggin, Philadelphia, Pa., for defendants.

Ralph J. Kelly, Dilworth, Paxson, Kalish & Kauffman, Philadelphia, Pa., Douglas H. Weiss, Marlton, N.J., for Corell Steel Company.

*MEMORANDUM*

LOUIS H. POLLAK, Senior District Judge.

*1 Plaintiff, The Official Committee of Unsecured Creditors of Corell Steel ("Committee"), has filed this accountant malpractice action on behalf of Corell Steel ("Corell"), against defendants, Fishbein and Company, P.C., and its partners ("Fishbein"), alleging that Fishbein's performance of audits for Corell in 1986 and 1987 led to the dissipation of Corell's assets and, ultimately, its insolvency. Presently before the court is Defendants' Motion to Dismiss plaintiff's complaint.

Defendants' motion asserts the following grounds for dismissal of the complaint: (1) plaintiff lacks standing to pursue this action; (2) plaintiff's claims are barred by the applicable statutes of limitations; (3) plaintiff has failed to state an adequate claim for breach of contract; (4) plaintiff's claims sounding in fraud have not been pled with the requisite level of specificity; and (5) plaintiff has failed to allege breach of any duty owed to it by defendants.

A.

Defendants argue that plaintiff lacks standing to bring this action. This suit was initiated in the Bankruptcy Court of the Eastern District of Pennsylvania, ostensibly on Corell's behalf, after that court granted plaintiff leave, by order dated April 11, 1991, to bring an adversary proceeding against defendants. Plaintiff's Complaint at ¶ 4, and to employ the law firm of Dilworth, Paxson, Kalish & Kauffman as special counsel to prosecute this claim. Defendants contend that plaintiff may not bring the case because it is unable to demonstrate that the debtor has unjustifiably failed to pursue its claims itself against defendants. Defendants argue that the bankruptcy court's order of April 11, 1991 authorizing initiation of the suit is not determinative of the standing question, and recommend dismissal of the action or remand to the bankruptcy court for "determination as to whether the debtor unjustifiably refused to bring an action against Fishbein, and accordingly as to whether the Unsecured Creditors Committee has standing to bring this action, as well as whether such an adversary proceeding would ultimately benefit the debtor's estate and hence the creditors." [FN1] Defendants' Motion to Dismiss at 24.

Defendants' argument is without merit. In either of two approaches used by courts in this circuit, plaintiff has standing to bring this suit on behalf of Corell.

One approach used by Third Circuit courts has been to permit a creditors committee to maintain an action, in its own right or on behalf of a debtor, depending on the circumstance, upon "only a showing that a Committee's cause has merit and that the [debtor-in-possession] refused to sue ... as opposed to requiring a Committee to make any further showing of extenuating circumstances." *In re Nicolet, Inc.,* 80 B.R. 733, 737-38 (E.D.Pa.1987). *See also Coral Petroleum, Inc. v. Banque Paribas-London,* 797 F.2d 1351, 1362-63 (5th Cir.1986) (to bring suit on behalf of unwilling debtor in possession, committee of unsecured creditors need only show that the claim has merit and that the debtor in possession refused to sue; no further showing is necessary). *Cf. In re McKeesport Steel Castings Co.,* 799 F.2d 91, 94 (3d Cir.1986) (individual creditors may act in lieu of trustee when debtor in possession refuses to act and creditors have a colorable claim).

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

1992 WL 196768
(Cite as: 1992 WL 196768, *1 (E.D.Pa.))

*2 In *Nicolet*, the bankruptcy court entertained a motion by an unsecured creditor's committee to file a legal action on behalf of the debtor to recover payments made out of the debtor's estate. The court surveyed various holdings of the Third Circuit Court of Appeals, which has not directly addressed the question of creditors' standing to sue in such circumstances, and concluded that:

[W]e infer that the Court would utilize a functional approach in the analogous instant situation and determine that a Committee could maintain an action on behalf of a [debtor-in-possession] as long as the claim had any merit and the [debtor] was, for any reason at all or for no reason, failing to maintain the action in prompt fashion.

* * *

[W]e do not think that the reasons why a [debtor] has failed to proceed are really very important, or that a Committee must undertake to prove the existence of any such reason to be allowed to proceed with an action in its own name on the [debtor's] behalf. Rather, we believe that, upon proving the potential merit of its case and the [debtor's] failure to proceed, the Committee should be allowed to proceed on its own without establishing anything further.

*Nicolet*, 80 B.R. at 738, 739. I will follow the approach outlined in *Nicolet*. [FN2]

Plaintiff has made the requisite showing to proceed with this complaint. The bankruptcy court's order of April 11, 1991 granting plaintiff leave to bring this adversary proceeding and authorizing this action, the retention of special counsel to prosecute this action, specifically contained the court's finding that good cause had been shown to maintain the suit. Bankruptcy Court Order of April 11, 1991, No. 89-20656. While not determinative, the bankruptcy court's acknowledgment of good cause certainly encourages a finding that plaintiff's claims are potentially meritorious. In addition, personal review of the plaintiff's complaint and applicable law demonstrates that plaintiff has stated colorable claims, pleading in detail defendants' alleged misconduct and Corell's injuries supposedly suffered as a result. As will be discussed in the remainder of this memorandum, the Committee has stated claims for which they are possibly entitled to relief. [FN3]

Second, plaintiff points out that, as of the time the bankruptcy court granted it leave to file this action, the debtor had been in bankruptcy for nearly two years [FN4] but had not pursued these claims. This seems sufficient proof of the second element of the standing formula, that the debtor, "for any reason at all or for no reason, [is] failing to maintain the action in prompt fashion." *See Nicolet*, 80 B.R. at 738. Thus, absent superseding events in the bankruptcy court, such as the debtor itself bringing an action against defendants, *see id.* 739-40, the Committee may pursue its claims of accountant malpractice on Corell's behalf.

Even if plaintiff could not at this stage make a showing sufficient under the *Nicolet* standard, the Committee may establish standing in yet another way. Where the debtor's legal claims arose prior to the filing of bankruptcy, as is the case in this instance, the claims become part of the debtor's estate under 11 U.S.C. § 541. It is well established that a committee of unsecured creditors may pursue these claims on behalf of the debtor or trustee upon a showing that the bankruptcy court has appointed the committee to enforce the debtor's claims and that the committee is a representative of the estate. *Committee of Unsecured Creditors v Doemling*, 127 B.R. 945, 949 (W.D.Pa.1991) (citing *In re Amarex, Inc.*, 96 B.R. 330, 334 (W.D.Okla.1989). A committee is a representative of an estate if a " 'successful recovery by the appointed representative would benefit the debtor's estate and particularly the unsecured creditors.' " *Doemling*, 127 B.R. at 950 (quoting *In re Sweetwater*, 884 F.2d 1323, 1327 (10th Cir.1989)); *see also Amarex*, 96 B.R. at 334; *In re Kroh Bros. Development Co.*, 100 B.R. 487, 499-500 (Bkrtcy.W.D.Mo.1989); *In re Tennessee Wheel & Rubber Co.*, 64 B.R. 721, 725- 26 (Bkrtcy.M.D.Tenn.1987). Whether a committee is a representative of an estate is determined on a case-by-case basis. *Doemling*, 127 B.R. at 949- 950.

*3 Under *Doemling*, plaintiff has standing to bring suit on behalf of Corell. As noted above, the bankruptcy court appointed the Committee for the purpose of bringing suit against defendants, satisfying the first condition of *Doemling*. Moreover, the Committee is acting as representative of the estate since success in the suit will increase the assets of the debtor's estate and benefit the unsecured creditors.

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

B.

Defendants contend that the applicable statutes of limitations bar all but one count of plaintiff's complaint. They argue that, under Pennsylvania law, a four-year period applies to plaintiff's breach of contract claim (Count I), and that a two-year period applies to plaintiff's causes of action for negligent misrepresentation (Count II), negligence (Count III), breach of fiduciary duty (Count IV), and fraudulent misrepresentation (Count V). Defendants further argue that, in cases involving alleged reliance on an accountant's report, the statute of limitations begins to run upon plaintiff's receipt of the accountant's report, such that the periods in this case commenced to run on receipt of Fishbein's 1986 audit on December 5, 1986, and on receipt of Fishbein's 1987 audit on December 9, 1987. Since plaintiff filed its complaint April 23, 1991, defendants calculate that plaintiff is time-barred from asserting all counts of its complaint save the Count I claim of breach of contract based upon the 1987 audit.

Defendants' calculation fails to take into account Corell's state of bankruptcy and the slight latitude the law gives bankrupt businesses in bringing their claims. Section 108(a) of the Bankruptcy Code provides:

If applicable nonbankruptcy law, an order entered in a nonbankruptcy proceeding, or an agreement fixes a period within which the debtor may commence an action, and such period has not expired before the date of the filing of the petition, the trustee may commence such action only before the later of—
(1) the end of such period, including any suspension of such period occurring on or after the commencement of the case; or
(2) two years after the order for relief.

11 U.S.C. § 108(a). Corell filed its Chapter 11 Petition on *April 24, 1989.* Pursuant to section 108(a), any causes of action that were not time-barred as of April 24, 1989 could be filed by the later of the running of the statute of limitations or April 24, 1991, two years after the order for relief was entered in the bankruptcy court. [FN5] Because plaintiff's complaint was filed in the bankruptcy court on April 23, 1991, within the two-year extension period prescribed by section 108(a)(2), plaintiff need only establish that the statutes of

limitations on each count had not run as of April 24, 1989. [FN6]

1. *Breach of contract*

Plaintiff disputes defendants' contention that the Pennsylvania statute of limitations for breach of contract in an accountant malpractice action is four years; it argues instead that the applicable period is six years. Whether the applicable statute of limitations is four or six years is of no consequence given the applicability of § 108. Even assuming the statute of limitations commenced to run on the breach of contract claim on the day Corell received the audits, the breach of contract claims based on either the 1986 audit or the 1987 were not time-barred as of April 24, 1989 under either the four- or six- year statute of limitation periods.

2. *Negligent Misrepresentation, Negligence, Breach of Fiduciary Duty, and Fraudulent Misrepresentation*

a. Claims based on the 1987 Audit

*4 The parties agree that the applicable statute of limitations for the tort claims in counts II through V is two years. The earliest date the statute of limitations on the 1987 audit could have commenced to run was December 9, 1987, the day Corell received the audit. Thus none of the tort claims associated with the 1987 audit had expired by April 24, 1989.

b. Claims based on the 1986 Audit

Defendants argue that the statute of limitations with respect to the claims arising out of the 1986 audit began to run on the day the plaintiff received the accountant's report, December 5, 1986. Plaintiff responds that the statute of limitations does not begin to run until Corell discovered the tortious conduct. Plaintiff is correct. Under Pennsylvania's well established equitable discovery rule, the statute of limitations does not begin to run until the injured party "knew or using reasonable diligence should have known of the claim." *Vernau v. Vic's Market, Inc.,* 896 F.2d 43, 45-46 (3rd Cir.1990). *See also School District of the Borough of Aliquippa v. Maryland Casualty Company,* 587 A.2d 765 (Pa.Super.1991) (plaintiffs had two years from time they learned of injury to determine whether accountants were negligent).

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

In applying the discovery rule, the court must determine when Corell learned or, using reasonable diligence should have learned, of the injury to the company.    In *Urland v. Merrell-Dow Pharmaceuticals, Inc.,*, 822 F.2d 1268, 1273 (3rd Cir.1987), the court defined "reasonable diligence" as follows:

There are very few facts which diligence cannot discover, but there must be some reason to awaken inquiry and direct diligence in the channel in which it would be successful.

Arguably, there was reason to awaken Corell's inquiry as to defendants' alleged injury to the company prior to April 24, 1987 such that the tort claims would have expired prior to April 24, 1989. In its complaint plaintiff states:

during the 1986 fiscal year, Corell was experiencing certain conditions and events which when considered in the aggregate indicated that there could be substantial doubt about Corell's ability to continue as a going concern for a reasonable period of time, [including a substantial drop in sales, a meager net profit, a cash flow problem, and a decrease in working capital.]

Plaintiff's Complaint at ¶ 43.    Receiving a rosy audit on December 5, 1986, in light of these serious indicators might "awaken inquiry." *Urland*, 822 F.2d at 1273.    Plaintiff also notes that the 1987 fiscal year indicators were even more foreboding. Id. at ¶ 49.    Such poor business after a glowing audit might also alert Corell of some accounting problems.

However, poor sales or financial difficulties may not implicate one's accountant so much as the current financial conditions. "Financial problems do not necessarily suggest accounting fraud," *Gruber v. Price Waterhouse*, 697 F.Supp. 859, 865 (E.D.Pa.1988) (quoting *Mosesian v. Peat, Marwick, Mitchell & Co.*, 727 F.2d 873, 878 (9th Cir.), *cert. denied*, 469 U.S. 932 (1984). Further development of the facts through discovery is called for to determine when Corell knew or, using reasonable diligence should have known, of Fishbein's fraudulent conduct toward them.

### C.

*5 Defendants claim that, aside from being time-barred, count I fails to state a claim for breach of contract. Plaintiff claims that Fishbein entered into a contract with Corell in which Fishbein agreed to perform auditing and accounting services in accordance with both generally accepted auditing standards ("GAAS") and generally accepted accounting principles ("GAAP"). Plaintiff's Complaint at ¶ 27.    In failing to comply with various elements of GAAS and GAAP, defendants allegedly breached their contract with Corell. *Id.* at ¶¶ 56-61.

GAAS represents auditing standards approved and adopted by the membership of the American Institute of Certified Public Accountants (AICPA), AU § 150.02, and GAAP "encompasses the conventions, rules, and procedures necessary to define accepted accounting practice at a particular time," AICPA, AU § 411.02. In essence, GAAS and GAAP delineate due professional care owed by accountants to their clients as stated by the accounting community.

Failure to perform a service with the requisite level of professional care typically constitutes a claim of negligence, not breach of contract. *See, e.g. Yosuf v. U.S.*, 642 F.Supp. 415, 426-27 (M.D.Pa.1986) (physician who fails to provide services with reasonable skill and diligence subject to malpractice suit sounding in tort); *Hoyer v. Frazee*, 470 A.2d 990, 992-93 (Pa.Super.1984) (standard of care in an attorney malpractice case is whether attorney has exercised ordinary skill and knowledge).    That is, an accountant's failure to perform an audit in accordance with GAAS and GAAP classically precipitates a claim for negligence, not breach of contract. *See Robert Wooler Co. v. Fidelity Bank*, 479 A.2d 1027, 1032 (Pa.Super.1984) (where accounting firm violated duty of care owed to client, it could be found liable for plaintiff's losses if accountant's negligence was a substantial factor in causing the loss).

Plaintiff argues, though, that Fishbein had not merely a general duty, but a *contractual obligation* to perform up to a certain standard.    Plaintiff's argument is problematic in two respects, though. First, it is not clear under basic contract law that Corell's agreement with Fishbein, even as characterized by plaintiff, creates a cause of action in contract.    Second, even if the agreement does create a cause of action in contract, plaintiff has failed properly to state a claim of breach of contract in accordance with Pennsylvania law.    Both

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

weaknesses in plaintiff's pleading derive from the basic inadequacy in the claim: count I sounds in negligence, not contract.

According to Corpus Juris Secundum (C.J.S.):
an action in contract is for the breach of a duty arising out of a contract either express or implied, while an action in tort is for a breach of duty imposed by law, which arises from an obligation created by a relation, promise upon ordinarily unconnected with a contract, but may arise either independently of any contract or by virtue of contract relations.

*6 1A C.J.S. *Actions* § 85 (1985). The source of the duty determines the appropriate cause of action. [FN7] *Id.*

Although Fishbein contracted to act in accordance with GAAP and GAAS, the contract is not the source of Fishbein's duty to act with professional care. Rather, Fishbein's duty to act in compliance with GAAS and GAAP arises by law. Fishbein's agreement to work in accordance with GAAS and GAAP represents no more than its recognition of a legal duty to provide services with the ordinary skill and knowledge required by both Pennsylvania law and AICPA rules.

Under Pennsylvania law, accountants who contract to provide services must "use such skill in the performance of their agreement as reasonably prudent, skillful accountants would use under the circumstances." *Wooler*, 479 A.2d at 1031 (quoting *O'Neill v. Atlas Automobile Finance Corp.*, 11 A.2d 782, 786 (Pa.Super.1940)) In addition, Rules 202 and 203 of the Rules of Conduct of the Code of Professional Ethics of the AICPA require accountants to comply with GAAS and GAAP in the performance of their professional services. Fishbein's duty to act in accordance with GAAS and GAAP existed notwithstanding the contract with Corell, suggesting count I more properly lies in tort than in contract.

Even if Fishbein's duty arose by contract, plaintiff has failed to plead a claim in breach of contract under Pennsylvania law standards. In an effort to prevent plaintiffs from circumventing the two-year limitation on tort actions by pleading claims as breaches of contract, Pennsylvania courts have established different pleading requirements for the breach of contract and tort causes of action. In

*Sherman Industries, Inc. v. Goldhammer*, 683 F.Supp. 502, 506 (E.D.Pa.1988), the court explained:
[I]n order to distinguish a contract malpractice claim from a tort claim, the plaintiff claiming under a contract theory must raise an issue as to whether it specifically instructed the defendant to perform a task that the defendant failed to perform, or as to whether the defendant made a specific promise upon which plaintiff reasonably relied to its detriment.

*See also Hoyer*, 470 A.2d at 992-993 (since complaint did not aver breach of specific provision of contract, complaint did not state a breach of contract claim, but rather a negligence claim). A plaintiff need only allege breach of a general duty of care to properly plead malpractice based in tort. *Sherman Industries, Inc.*, 683 F.Supp. at 506.

As defendants properly note, plaintiff has failed to specify a breach of a specific promise or instruction as required under *Sherman*. Instead, the Complaint broadly alleges that defendants "fraudulently, recklessly, negligently" failed to do a number of things required under GAAP and GAAS. Plaintiff's Complaint at ¶¶ 56-61. Not only is plaintiff's language in the form of a prototypical negligence claim (such that the claim literally sounds in tort), but none of the averments refers to a breach of a specific contract provision. An agreement to act with the legally required level of care cannot constitute a specific contractual promise. Otherwise, claims in tort and in breach of contract, at least within the context of service contracts, would be indistinguishable. Plaintiff's true complaint is not that Fishbein failed to perform the contract--for the financial statements were delivered--but that Fishbein performed the contract without the requisite level of care.

*7 Plaintiff argues that *Sherman* and *Hoyer* have no bearing on this case since they involve attorney malpractice claims not accountant malpractice. This distinction is unconvincing. Plaintiff gives neither reasoning nor Pennsylvania law in support of the assertion that malpractice claims against attorneys based in contract should be pled differently than similar claims against accountants. More likely, the manner of asserting malpractice claims against attorneys and accountants is comparable given the quite analogous relationships of attorney-

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

client and accountant-client. In both cases, the client has sought professional advice, and expects in return service performed with skill, knowledge, and confidentiality.

Moreover, *Sherman* has a broader application than simply attorney malpractice. While the case specifically concerns attorney malpractice, as plaintiff notes, the pleading standards articulated by the court make no reference to attorneys, but state quite universally the different pleading requirements for contract and tort claims. The similarity of the accountant- client and attorney-client relationships, together with the nonexclusive language used by the court in *Sherman*, demonstrate that the standards outlined in *Sherman* have significant bearing upon this case.

As opposed to *Sherman* and *Hoyer*, plaintiff argues that two other cases are controlling in the present circumstances: *Foster v. Peat Marwick Main & Co.*, 587 A.2d 382 (1991) and *Baehr v. Touche-Ross & Co.*, 62 B.R. 793 (E.D.Pa.1986). [FN8] Neither of the cases provides guidance for this case.

*Foster* and *Baehr* do involve breach of contract claims against accountants for failure to provide services in accordance with GAAP and GAAS. However, neither case directly addresses the issue of whether the breach of contract claim is sufficiently stated. The courts' silence on the sufficiency of the breach of contract claims in the absence of direct challenges thereto [FN9] ought not be read as an affirmation of the sufficiency of the pleading. The opinions in *Foster* and *Baehr* provide no information on how the claims were formulated. The cases, therefore, can hardly serve as a guide for how breach of contract claims may be adequately pled in accountant malpractice cases.

In sum, plaintiff has failed to state a cause of action in breach of contract. The true nature of Corell's complaint lies in tort, involving a breach of duty arising in law, not contract. Moreover, the broad averments in the complaint do not satisfy Pennsylvania law pleading requirements for breach of contract. As the very same negligence claim is pled in count III, incorporating the allegations listed in count I paragraphs 34 through 55, dismissal of count I will be granted. [FN10]

                    D.

Defendants also move to dismiss plaintiff's fraud allegations raised throughout the complaint and count V sounding in fraudulent misrepresentation. Defendants tender two arguments. First, they contend that the Committee failed to plead fraud with the particularity required under Fed.R.Civ.P. 9(b). Second, defendants assert that even if the claims are sufficiently pled pursuant to Rule 9(b), the Committee has failed to allege scienter, one of the elements of fraud. Neither argument withstands scrutiny.

*8 Rule 9(b) reads:
   In all averments of fraud and mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge and other condition of mind of a person may be averred generally.

With respect to motions to dismiss under Rule 9(b), the Third Circuit has stated that "focusing exclusively on its 'particularity' language is 'too narrow an approach and fails to take account of the simplicity and flexibility contemplated by the rules.' " *Christidis v. First Pennsylvania Mortg. Trust,* 717 F.2d 96, 100 (3rd Cir.1983) (quoting 5 C. Wright & A. Miller Federal Practice and Procedure § 1298, at 407 (1968)). The purpose of Rule 9(b) is to give defendants notice of the "precise misconduct with which they are charged and to safeguard defendants against spurious charges of immoral and fraudulent behavior." *Seville Industrial Machinery Corp. v. Southmost Machinery Corp.*, 742 F.2d 786, 791 (3rd Cir.1984), *cert. denied*, 469 U.S. 1211 (1985).

In a case with substantially similar facts, *In re U.S. Healthcare, Inc. Securities Litigation*, 122 F.R.D. 467 (E.D.Pa.1988), the court found that the plaintiffs had sufficiently pled a fraud claim against defendant accountants where plaintiffs "identified numerous accounting and auditing standards which, they allege, were not followed by [their accountants,] ... identified the financial statements which they allege were materially false and ... particularly identified the allegedly misleading portion of the documents." [FN11] Likewise, in *In re Fiddler's Woods Bondholders Litigation*, 102 F.R.D. 291-294 (E.D.Pa.1984), the court ruled that plaintiffs had sufficiently pled a fraud claim against the defending accounting firm where the plaintiff identified the "established principles" defendant

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

1992 WL 196768                                                    Page 7
(Cite as: 1992 WL 196768, *8 (E.D.Pa.))

supposedly violated. *See also Christidis*, 717 F.2d at 100 (plaintiffs did not aver fraud with sufficient particularity since they failed to disclose how defendants knowingly departed from accounting standards).

In view of the standard for pleading with specificity outlined in *In re U.S. Healthcare*, *In re Fiddler's Woods*, and *Christidis*, the Committee has pled its fraud claims with sufficient particularity. In paragraph 59, (a) through (t), the Committee identifies the specific accounting and auditing standards allegedly violated by Fishbein. [FN12] Plaintiff is also quite specific as to which financial statements it alleges were materially false and how these statements were fraudulent. Plaintiff's Complaint at ¶¶ 37-55. [FN13] The averments in the complaint are sufficiently particular within the contemplation of Rule 9(b): the complaint provides Fishbein adequate notice of its alleged misconduct and protects them from frivolous allegations of fraud.

Defendants also argue that the fraud claims must be dismissed because plaintiff has failed to plead scienter, one of the five elements of fraud. [FN14] "[F]raud can take many forms ..., whether by direct falsehood or innuendo." *Delahanty v. First Pennsylvania Bank, N.A.*, 464 A.2d 1243, 1251 (Pa.Super.1983). As such, it is not always necessary, let alone possible, to demonstrate specific intent. Under Pennsylvania law, a showing of gross negligence or recklessness is sufficient to plead scienter in fraud claims. *Rosen and Co. Inc. v. Seidman*, 48 D. & C. 3d 411, 421 (1988).

*9 In *Rosen*, the court held that "either gross negligence or reckless misstatements would support a finding of fraud, even without a finding of specific intent to deceive." *Rosen*, 48 D. & C. 3d at 421 (citing *Ultramares Corp. v. Touche*, 174 N.E. 441 (1931)). Similarly, in *Delahanty*, the court stated: "It is well settled that fraud is proved when it is shown that the false representation was made knowingly, or in conscious disregard of the truth, or *recklessly without caring whether it be true or false.* " *Delahanty*, 464 A.2d at 1252 (citing *Warren Balderston Co. v. Integrity Trust Co.*, 170 A. 282 (1934)) (emphasis added).

The Committee's complaint has certainly alleged gross negligence and/or recklessness on the part of Fishbein. Plaintiff does not simply assert "Fishbein's conduct was fraudulent," as defendants suggest. Rather, the Committee alleges numerous misrepresentations and omissions by Fishbein which, if proved, would constitute recklessness or gross negligence. The Committee's allegations of fraud and fraudulent misrepresentation are sufficiently pled and dismissal of the claims will be denied.

E.

Finally, defendants argue that all of the Committee's tort claims against Fishbein must be dismissed because Fishbein owed no duty of care to the Committee. Further, defendants contend that Fishbein did not owe a fiduciary duty to either Corell or the Committee, and therefore, count IV of plaintiff's complaint alleging breach of a fiduciary duty should be dismissed. Neither argument has merit.

As discussed in Part A, the Committee has properly instituted this suit "on behalf of Corell." Since the Committee is acting "on behalf of Corell," the Committee has stepped into the shoes of the company and thus may assert any claims accrued by Corell, including Fishbein's breach of duty toward the company. [FN15] Fishbein certainly owed a duty of care to Corell, the client. Plaintiff's claims will not be dismissed on these grounds.

Concerning defendants' fiduciary duty toward Corell or the Committee, defendants correctly note that it is generally established that an accountant is not necessarily in a fiduciary relationship with a client. *See, e.g. Stainton v. Tarantino*, 637 F.Supp. 1051, 1066 (E.D.Pa.1986); *Rubin v. Katz*, 347 F.Supp. 322, 324 (E.D.Pa.1972). However, a fiduciary relationship may be shown where the plaintiff can prove that the "accounting services and confidential advice ... provided them gave rise to a confidential relationship." *Stainton*, 637 F.Supp. at 1066.

The court in *Stainton* explains that a confidential relationship arises "only if parties surrender substantial control over some part of their business affairs." *Id.* In more recent years, courts have stated a somewhat different, though similar, definition of fiduciary relationships. The court in *Antinoph v. Laverell Reynolds Securities, Inc.*, 703 F.Supp. 1185, 1188 (E.D.Pa.1989), describes a

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

1992 WL 196768                                                      **Page 8**
(Cite as: 1992 WL 196768, *9 (E.D.Pa.))

fiduciary relationship as follows:
*10 a fiduciary relationship 'arises whenever a trust, continuous or temporary, is specially reposed in the skill or integrity of another, or the property, or pecuniary interest, in the whole or in a part ... is placed in the charge of another.' .. [I]n addition ... the defendant must also have accepted the fiduciary relationship (quoting *Consolidated Oil and Gas, Inc. v. Ryan*, 250 F.Supp. 600, 604 (W.D.Ark.1966), *aff'd*, 368 F.2d 177 (8th Cir.1966).

Whether Corell yielded "substantial control," *Stainton*, 637 F.Supp. at 1066, to Fishbein, or whether Corell placed its business "in the charge of," *Antinoph*, 703 F.Supp. at 1188, Fishbein is not completely clear from the complaint. Nor do we know if Fishbein accepted the fiduciary relationship.

The standard for determining the sufficiency of a complaint is quite liberal, though. A complaint should only be dismissed where "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45-46, 78 S.Ct. 99, 102 (1957). *See also D.P. Enterprises, Inc. v. Bucks County Community College*, 725 F.2d 943, 944 (3rd Cir.1985) (claim should be dismissed only if no relief could be granted under any set of facts which could be proved). Further development of the facts through discovery may offer some substantiation of the claim that a fiduciary relationship did exist between Corell and Fishbein, and transitively between Fishbein and the Committee, or may conclusively demonstrate the contrary. Accordingly, dismissal of count IV on its face, in advance of such further factual development, would be premature.

### CONCLUSION

For the foregoing reasons, defendants' motion to dismiss will be granted in part and denied in part. The Defendants' Motion to Dismiss will be granted with respect to striking count I for failure to state a breach of contract claim. Defendants' Motion to Dismiss will be denied in all other respects.

### ORDER

Upon consideration of defendants motion to dismiss, for the reasons given in the accompanying memorandum, it is hereby ORDERED and DIRECTED that:

(1) Defendants' motion to dismiss count I for failure to state a claim is GRANTED, and count I is dismissed; and

(2) In all other respects, defendants' motion to dismiss is DENIED.

FN1. In a motion to stay these proceedings, filed simultaneously with this Motion to Dismiss, defendants urged this court to stay this litigation until the bankruptcy court determines whether plaintiff's authority to prosecute this claim should be excluded from a plan of reorganization approved by that court for the debtor. In a separate memorandum, I denied the motion to stay on a finding that plaintiff's ability to fund this litigation by leave of the bankruptcy court was a matter independent of the merits of this case. I will not revisit in this memorandum defendants' arguments on that issue made under the guise of a motion to dismiss rather than a motion to stay. However, I note that in concluding that this action need not await a finding by the bankruptcy court that this litigation would ultimately benefit the debtor's estate, I made no judgment as to whether plaintiff met the applicable standing test to prosecute this case on the debtor's behalf.

FN2. Defendants argue that an unsecured creditors committee lacks standing to sue on behalf of a debtor in possession unless the committee can show that the debtor *unjustifiably* refused to bring suit. Defendants' Motion to Dismiss at 21-26 (citing *STN Enterprises, Inc. v. Noyes*, 779 F.2d 901, 904 (2d Cir.1985). I am persuaded by Bankruptcy Judge Scholl's conclusion in *Nicolet* that the Third Circuit would be more likely to employ a less exacting standard than that used by the Second Circuit.

FN3. Defendants argue in their Reply Brief that plaintiff must "prove" the potential merit of their claim to some court before plaintiff has standing. Defendants seem to suggest that plaintiff lacks standing unless it can show now they will ultimately prevail. A potentially meritorious claim is not the same as a meritorious claim—and a motion to dismiss is not the same as a motion for summary judgment.

FN4. Corell initiated its Chapter 11 proceeding on April 24, 1989.

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

1992 WL 196768
(Cite as: 1992 WL 196768, *10 (E.D.Pa.))

FN5. The "order for relief" was issued on the date debtor filed for bankruptcy, not on the date the bankruptcy court authorized the Committee to proceed on behalf of Corell.    According to 2 *Collier on Bankruptcy* ¶ 102.7 (15th Ed.1992), "In a voluntary case the filing of the petition under section 301 commences the voluntary case and is itself entry of the order for relief from which time periods are to be measured." Corell's bankruptcy was such a voluntary case.  *See also Jackson v. Security Finance Group*, 42 B.R. 76, 84 (Bkrtcy.D.C.1984)    (§    108(a)    allows commencement of suit within two years from date bankruptcy petition filed, as long as statute of limitations has not run by the date of filing); *Ellenberg v. Dekalb County Georgia*, 23 B.R. 384, 391    (Bkrtcy.N.D.Ga.1982)    (in    voluntary bankruptcy case, *date of filing of petition is* considered the date relief ordered under § 108(a)).

FN6. In holding that the tolling provision of § 108(a) is applicable to plaintiff's causes of action, I reject defendants' arguments, advanced in their Reply Memorandum, that the Committee may not invoke the benefits of § 108.  Defendants state that "no court has gone as far as to permit a creditors committee to invoke § 108 even when suing derivatively on behalf of the debtor.... In the case *sub judice*, the Committee is not acting as a collection agent of the debtor.    Rather, an agreement was entered into between the debtor and the Unsecured Creditor's Committee whereby the debtor assigned its rights to any claim over and against Fishbein."    Reply of Defendant, Fishbein & Company    to    Plaintiff's    Response    to Defendant's Motion to Dismiss ("Reply Brief") at 2-3. In support of this position, defendants cite *Motor Carrier Audit and Collection Company v. Light Products, Inc.*, 113 B.R. 424 (N.D.Ill.1989). There, the court determined that "a mere purchaser or assignee" of the debtor's rights could not be the beneficiary of the § 108 tolling provision where the complaint did not allege that the action was brought on the trustee's behalf. The court explained, though, that if the plaintiff can show that it is an agent of the trustee, as opposed to an assignee, the plaintiff is entitled to the benefits of § 108. *Motor Carrier*, 113 B.R. at 426.
The Committee is not an assignee, as defendants contend.   Rather, the Committee is acting on behalf of Corell, the debtor-in-possession.    *See* Plaintiff's Complaint at ¶ 2.  In a Chapter 11 case, a debtor-in-possession has the powers and duties of a trustee    11 U.S.C. § 1107(a).    The

Committee, therefore, both because it is standing in the shoes of Corell in bringing these claims and because it is "acting on behalf of or as an agent for the trustee," *Motor Carrier*, 113 B.R. at 426, is entitled to invoke the statutory protections of § 108

FN7. Of course, there are occasions where an action may be brought in both contract and tort. *See Sherman Industries, Inc. v. Goldhammer*, 683 F.Supp. 502, 506 (E.D.Pa.1988) (noting that malpractice actions may be raised in both tort and in contract where the defendant pleads each claim properly).

FN8. Plaintiff also refers to *Robert Wooler Co. v. Fidelity Bank*, 479 A.2d 1027 (1984). *Wooler* is inapposite, however.    The case does not even involve a breach of contract claim, but rather upholds a finding of accountant liability for tortious malpractice.

FN9. The contract claims were challenged on different grounds.  In *Foster*, defendant contended plaintiff brought the breach of contract claim on behalf of too wide a group. *Foster*, 587 A.2d at 384-85.  And in *Baehr*, defendants challenged the breach of contract claim by arguing that plaintiff was not a real party of interest and that defendants' conduct did not cause plaintiff's loss. *Baehr*, 62 B.R. at 796.

FN10. Since count I will be dismissed, defendants' argument that plaintiff is not entitled to consequential damages for the alleged breach of contract is no longer relevant.

FN11. Defendants rely on Second Circuit law in citing the standard for pleading with specificity. Third Circuit courts have rejected Second Circuit case law on Rule 9(b) as too stringent. *In re U.S. Healthcare, Inc. Securities Litigation*, 122 F.R.D. at 470 (citing *Recchion v. Westinghouse Electric Corp.*, 606 F.Supp. 889, 894 (W.D.Pa.1985)).

FN12. In four averments, (p) through (s), plaintiff does not indicate a specific accounting standard breached by defendants.  However, the language of the four averments, particularly in the context of the eleven other allegations that do refer to standards, adequately notifies Fishbein of the misconduct with which it is charged, thereby defeating a Rule 9(b) motion. *See In re Fiddler's Woods*, 102 F.R.D. at 294 (while not clear that plaintiffs' alleged violation was of "established" principles, Rule 9(b) motion failed since allegations

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

1992 WL 196768
(Cite as: 1992 WL 196768, *10 (E.D.Pa.))

specific enough to give defendant notice of the claims against it and to prevent frivolous claims).

FN13. For example, plaintiff lists seven very specific problems with Fishbein's performance of the 1987 audit, including failure "to discover and deduct from the inventory certain inventory on hand but held on consignment for third parties," and failure "to make sufficient inquiry and provide allowance for scrap and/ or obsolete inventory." Plaintiff's Complaint at ¶ 47.

FN14. Under Pennsylvania law, the five elements of fraud include: (1) false representation of an existing fact, (2) materiality of the misrepresentation, (3) scienter, (4) reliance, and (5) damage to the person relying thereon. *Rosen and Co., Inc. v. Seidman,* 48 D. & C. 3d 411, 415-16 (1988).

FN15. Moreover, as mentioned in Part A, the Committee is entitled to raise Corell's claims as the appointed representative of the estate. *See Doemling,* 127 B.R. at 948 (committee of unsecured creditors could bring tort claim against defendant where committee appointed by court and committee representative of estate). Under 11 U.S.C. § 541, the property of the debtor's estate includes the debtor's legal or equitable causes of action. In that Corell's cause of action against Fishbein arose prior to the filing for bankruptcy, Corell's cause of action is part of the estate.

END OF DOCUMENT

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

———————————————————x
                                              :    Chapter 11 Case
In re:                                        :
                                              :    Case No. 00-02692 (JHW)
GENESIS HEALTH VENTURES, INC., *et al.*,      :    (Jointly Administered)
                                              :
            Debtors.                          :
———————————————————x
                                              :    Chapter 11 Case
In re:                                        :
                                              :    Case No. 00-02494 (JHW)
MULTICARE AMC, INC., *et al.*,                :    (Jointly Administered)
                                              :
            Debtors.                          :
———————————————————x

ORDER GRANTING MOTION FOR ORDER ADJOURNING THE
HEARING TO CONSIDER APPROVAL OF THE DISCLOSURE STATEMENT

Upon the motion (the "Motion") of the Official Committee of Unsecured Creditors of the above captioned case *In re Multicare AMC, Inc., et al.* for entry of an order pursuant to sections 105(a) and 125 of the Bankruptcy Code adjourning the hearing to consider approval of the Disclosure Statement filed with respect to the joint merger plan of reorganization by the estates of *Genesis Health Ventures, Inc.*, et al. and *Multicare AMC, Inc.*, et al.; and all capitalized terms herein having the meanings ascribed to them in the Motion; and good and sufficient notice of the Motion having been given, and it appearing that no other or further notice need be given; and after due deliberation and sufficient cause appearing therefor

IT IS HEREBY ORDERED:

1.    The Motion is approved.

434332.1 6/15/01

2.     The July 6, 2001 hearing to consider the adequacy of the Disclosure Statement is hereby adjourned to _____, 2001.

_____
United States Bankruptcy Judge

Dated: _____, 2001

2

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

```
--------------------------------------x
                                      :
In re:                                :
                                      :
GENESIS HEALTH VENTURES, INC., et al.,:
                                      :
         Debtors.                     :
--------------------------------------x
                                      :
In re:                                :
                                      :
MULTICARE AMC, INC., et al.,          :
                                      :
         Debtors.                     :
--------------------------------------x
```

Chapter 11 Case

Case No. 00-02692 (JHW)
(Jointly Administered)

Chapter 11 Case

Case No. 00-02494 (JHW)
(Jointly Administered)

## CERTIFICATE OF SERVICE

I, Mark Minuti, Esquire, hereby certify that on June 15, 2001, I caused a copy of the foregoing Motion Of Official Committee Of Unsecured Creditors Of Multicare AMC, Inc., *et al.* For Order Scheduling An Expedited Hearing/Motion For Order Pursuant To Bankruptcy Code Sections 105(A) And 1125 Adjourning The Hearing To Consider Approval Of Disclosure Statement to be served on each of the parties on the attached list in the manner indicated thereon.

Mark Minuti (No. 2659)
SAUL EWING LLP
222 Delaware Avenue, Suite 1200
P.O. Box 1266
Wilmington, DE 19899
(302) 421-6840

434332 1 4/25/01

MULTICARE AMC, INC., *et al.*
2002 Service List

**Via Hand Delivery:**
Robert S. Brady, Esquire
Maureen D. Luke, Esquire
Young Conaway Stargatt & Taylor, LLP
1100 North Market St., 11th Floor
P.O. Box 391
Wilmington, DE 19899-0391

Teresa K. D. Currier, Esquire
Kathleen P. Makowski, Esquire
Klett Rooney Lieber & Schroling
The Brandywine Building
1000 West Street, Suite 1410
Wilmington, DE 19801

Laura Davis Jones, Esquire
Rachel S. Lowy, Esquire
Pachulski, Stang, Ziehl, Young & Jones
919 N. Market Street, Suite 1600
P.O. Box 8705
Wilmington, DE 19801

William P. Bowden, Esquire
Ashby & Geddes
222 Delaware Avenue, 17th Floor
P.O. Box 1150
Wilmington, DE 19801

Michael R. Lastowski, Esquire
Duane Morris & Heckscher, LLP
1201 Orange Street, Suite 1001
Wilmington, DE 19801

Mark D. Collins, Esquire
Deborah E. Spivack, Esquire
Richards, Layton & Finger
One Rodney Square
P.O. Box 551
Wilmington, DE 19899

James S. Green, Esquire
R. Karl Hill, Esquire
Seitz, Van Ogtrop & Green, P.A.
222 Delaware Avenue
Suite 1500
Wilmington, DE 19801

Rachel B. Mersky, Esquire
Walsh Monzack and Monaco, P.A.
1201 N. Orange Street, Suite 400
Wilmington, DE 19801

Scott D. Cousins, Esquire
Victoria Watson Counihan, Esquire
Greenberg Traurig, LLP
The Brandywine Builidng
1000 West Street, Suite 1540
Wilmington, DE 19801

Steven F. Mones, Esquire
McCullough, McKenty & Kafader, P.A.
824 Market Street, Fourth Floor
P.O. Box 397
Wilmington, DE 19899-0397

Marla Rosoff Eskin, Esquire
Jacobs & Crumplar, P.A.
2 East 7th Street
P.O. Box 1271
Wilmington, DE 19899

**Via Federal Express:**
Marc Abrams, Esquire
Paul V. Shalhoub, Esquire
Willkie Farr & Gallagher
The Equitable Center
787 Seventh Avenue
New York, NY 10019-6099

Kevin Callahan, Esquire
Office of the U.S. Trustee
601 Walnut Street
Curtis Center, Suite 950 West
Philadelphia, PA 19106

Michael F. Walsh, Esquire
Gary T. Holzer, Esquire
Weil, Gotshal & Manges, LLP
767 Fifth Avenue
New York, NY 10153

Lisa G. Beckerman, Esquire
Akin Gump Strauss Hauer & Feld, LLP
590 Madison Avenue, 19th Floor
New York, NY 10022

Sam J. Alberts, Esquire
Akin Gump Strauss Hauer & Feld, LLP
1333 New Hampshire Ave., N.W., Ste. 400
Washington, DC 20036

Via U.S. Mail:
David E. Retter, Esquire
Karen Ostad, Esquire
Kelley Drye & Warren LLP
101 Park Avenue
New York, NY 10178

Mr. Robert Conrad
Vice Presisdent
HSBC BankUSA
140 Broadway
New York, NY 10005-1180

Mary F. Rubinstein, Esquire
Deputy Attorney General
Attorney General's Off./RJ Hughes Justice
Complex
P.O. Box 112
Trenton, NJ 08625

William J. Perlstein, Esquire
Craig Goldblatt, Esquire
Wilmer Cutler & Pickering
2445 M Street, NW
Washington, DC 20037-1420

Peter A. Chapman, Esquire
24 Perdicaris Place
Trenton, NJ 08618

Joseph J. Wielebinski, Esquire
Munsch Hardt Kops & Harr, P.C.
1445 Ross Avenue, Suite 4000
4000 Fountain Place
Dallas, TX 75202

Ms. Nancy Gregoris
APCI Credit A6327
Air Products and Chemicals, Inc.
7201 Hamilton Boulevard
Allentown, PA 18195-1501

Lawrence D. Coppel, Esquire
Gordon Feinblatt Rothman Hoffberger
 & Hollander
233 East Redwood Street
Baltimore, MD 21202

Margaret A. Holland, Esquire
Deputy Attorney General
Attorney General's Off./RJ Hughes Justice
Complex
P.O. Box 106
Trenton, NJ 08625

Daniel J. Lett, Esquire
General Counsel
Bunzl Distribution USA, Inc.
701 Emerson Road Suite 500
St. Louis, MO 63141

-2-

Deborah L. Thorne, Esquire
Dennis E. Quaid, Esquire
Fagel & Haber
140 South Dearborn Street
Suite 1400
Chicago, IL 60603

Peter M. Gilhuly, Esquire
Latham & Watkins
633 West Fifth Street, Suite 4000
Los Angeles, CA 90071

Richard S. Toder, Esquire
Robert Scheibe, Esquire
Morgan Lewis & Bockius, LLP
101 Park Avenue
New York, NY 10178-0060

Matthew P. Gerdisch, Esquire
Kohner, Mann & Kailas, S.C.
1572 East Capitol Drive
P.O. Box 11982
Milwaukee, WI 53211-0982

Jeanne P. Darcey, Esquire
Eddirland D. Christel
Palmer & Dodge, LLP
One Beacon Street
Boston, MA 02108

Jill Bronson, Esquire
Counsel to Mellon Bank
Drinker Biddle & Reath LLP
One Logan Square
18th & Cherry Streets
Philadelphia, PA 19103-6996

Sondra M. Korman, Esquire
Commonwealth of Massachusetts,
Dept. Public Health
250 Washington St.
Executive Office of Health and Human Serv.
Boston, MA 02108-4619

Christopher Beard, Esquire
Beard & Beard
4601 North Park Avenue
Chevy Chase, MD 20815

Marnie S. Gordon, Esquire
Angelo Gordon & Co.
245 Park Avenue, 26th Floor
New York, NY 10167

Mr. Art Sundby
Healthcare Property Investors, Inc.
4675 MacArthur Court, Suite 900
Newport Beach, CA 92660

Raymond L. Shapiro, Esquire
Steven M. Miller, Esquire
Blank Rome Comisky & McCauley LLP
One Logan Square
Philadelphia, PA 19103-6998

First Union National Bank
Attn: Mr. Matthew Maciver
NC 0737
Capital Markets
301 South College Street, TW-5
Charlotte, NC 28288-0737

Kevin J. Carey, Esquire
Fox, Rothschild, O'Brien & Frankel
2000 Market Street, 10th Floor
Philadelphia, PA 19103-3291

Kathleen M. Miller, Esquire
Smith, Katzenstein & Furlow LLP
800 Delaware Avenue
P.O. Box 410
Wilmington, DE 19899

John J. Nesius, Esquire
Spilman, Thomas & Battle
P.O. Box 273
Charleston, WV 25231

-3-

Michele C. Gott, Esquire
Smith, Katzenstein & Furlow LLP
800 Delaware Avenue
P.O. Box 410
Wilmington, DE  19899

Lawrence F. Landgraff, Esquire
Pension Benefit Guaranty Corporation
Office of the General Counsel
1200 K Street, N.W., Suite 340
Washington, D.C.  20005-4026

Sean C. Kulka, Esquire
Mark I. Duedall, Esquire
Alston & Bird LLP
1201 West Peachtree Street
Atlanta, GA  30309-3424

David S. Musgrave, Esquire
Piper Marbury Rudnick & Wolfe
6225 Smith Avenue
Baltimore, MD  21209-3600

Mr. Eric Scroggins
Chanin Capital Partners
11100 Santa Monica Blvd., Suite 830
Los Angeles, CA  90025

Timothy W. Walsh, Esquire
LeBeouf, Lamb, Greene & MacRae, L.L.P.
125 West 55th Street
New York, NY  10019

Douglas Bacon, Esquire
Timothy Barnes, Esquire
Latham & Watkins
Sears Tower, Suite 5600
Chicago, IL  60606

Phil Seligman, Esquire
Commercial Litigation Branch
Department of Justice – Civil Div.
P.O. Box 875, Ben Franklin Station
1100 L Street, N.W., Room 10152
Washington, D.C.  20044

Keith J. Shapiro, Esquire
Matthew T. Gensburg, Esquire
Greenberg Traurig, LLP
227 West Monroe Street, Suite 3500
Chicago, IL  60606

Bruce Rutsky, Esquire
Elk & Elk Co., L.P.A.
Landerhaven Corporate Center
6110 Parkland Boulevard
Mayfield Heights, OH  44124

Gene E. Matthews
Parcels/D.D.R.
917 King Street
Wilmington, DE  19801

Honorable Judith H. Wizmur
United States Bankruptcy Court
Mitchell H. Cohen Courthouse
4th and Cooper Streets, Room 2020
Camden, NJ  08101

-4-

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

------------------------------------------------x

In re                                           Chapter 11

GENESIS HEALTH VENTURES, INC., et al.,          Case No. 00-2692 (JHW)

                Debtors.        (Jointly Administered)

------------------------------------------------x

                                Chapter 11

In re:                                          Case No. 00-02494 (JHW)

MULTICARE AMC, INC., et al.                     (Jointly Administered)

                Debtors.

------------------------------------------------x      Objection Deadline: June 25, 2001 at 12 noon
                                         Hearing: June 26, 2001 at 2:00 p.m.

## OBJECTION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF GENESIS HEALTH VENTURES, INC., ET AL., TO THE MOTION FOR ORDER PURSUANT TO BANKRUPTCY CODE SECTIONS 105(A) AND 1125 ADJOURNING THE HEARING TO CONSIDER APPROVAL OF DISCLOSURE STATEMENT

The Official Committee of Unsecured Creditors (the "Committee") of Genesis Health Ventures, Inc. ("Genesis" or "GHV") and certain of its direct and indirect subsidiaries (collectively, the "Debtors"), by and through its undersigned counsel, hereby files this objection to the Motion for Order Pursuant to Bankruptcy Code Sections 105(a) and 1125 Adjourning Hearing to Consider Approval of Disclosure Statement (the "Motion"), filed on behalf of the Official Committee of Unsecured Creditors (the "Multicare Committee" or the "Movant") of Multicare AMC, Inc., et al. ("Multicare" or the "Multicare Debtors"). In support of its Objection, the Committee respectfully submits as follows:

## INTRODUCTION

1.    The Committee objects to the Motion on the grounds that the Movant has not met its burden of demonstrating that adjournment of the July 6, 2001 hearing on the Debtors' Disclosure Statement for Joint Plan of Reorganization (the "Disclosure Statement") is an appropriate exercise of this Court's power under Sections 105(a) and 1125 of the Bankruptcy Code.

2.    The Multicare Committee alleges that the bankruptcy process by which the Disclosure Statement was formulated is fraught with conflicts of interest. It bases this allegation on the overlap between the management of the Debtors and the Multicare Debtors. The Motion places no significance on the fact that (a) Multicare hired Ms. Beverly Anderson as its Chief Reorganization Officer and appointed Ms. Anderson to the Board of Directors of Multicare and (b) hired Ernst & Young (as defined below) to review the various contracts between the Multicare Debtors and the Debtors. Rather, the Multicare Committee dismisses Ms. Anderson's hiring as an effort to create a "thin veil" to give the appearance of propriety to the Multicare board of directors. Trustee Motion (as hereafter defined), at pp. 9-10.

3.    Ms. Anderson's investigation, however, led to the settlement of claims between Multicare and Genesis as explained in the Disclosure Statement. Moreover, the record does not support the unsubstantiated allegations that the Debtors and the Multicare Debtors have cavalierly disregarded their fiduciary obligations to the various constituencies in these Chapter 11 cases.

4.    The Multicare Committee contends that, because of these alleged conflicts of interest, the Multicare board of directors has refused to open the Related Party Contracts to competitive bidding.[1] The Multicare Committee contends that such marketing would ultimately

---

[1] Capitalized terms not otherwise defined shall have the meanings ascribed to them in the Motion.

result in such significant cost reductions that the recovery of the Multicare secured lenders would be enhanced by nearly $80 million, and the unsecured creditors of Multicare would have a significant recovery. Curiously, the Multicare secured lenders do not appear to share the Multicare Committee's concern regarding the marketing of the Related Party Contracts. Furthermore, the Multicare Committee has not offered any evidence of the existence of any alternative managers who could actually realize the alleged $216 million of cost savings.

5.    The Motion is merely a poorly disguised effort to derail the Joint Plan of Reorganization (the "Plan") in order to extort better recoveries for the unsecured creditors of the Multicare Debtors. The Multicare Committee's allegations of improper conflicts of interest and inappropriate valuations would force this Court to consider confirmation issues even before it has had an opportunity to evaluate the adequacy of the disclosure contained in the Disclosure Statement. Consideration of confirmation issues is only proper at a hearing on a disclosure statement if the plan of reorganization is patently unconfirmable on its face. The Plan is confirmable. Additionally, the Plan has the support of all of the major constituencies in these Chapter 11 cases, including the Committee, except for the Multicare Committee.

6    Efficiency and cost effectiveness may appear to be reasons to consider delaying the hearing on the Disclosure Statement. However, countervailing considerations weigh heavily against delay. The outstanding amount of the Debtors' DIP financing facility, which must be repaid in full in cash at confirmation, increases daily. Moreover, delaying a process with significant positive momentum could result in the total breakdown of the plan process. Furthermore, the cost of any delay will be borne by the Debtors' secured lenders and the Multicare Debtors' secured lenders and the Debtors' unsecured creditors[2]. The cost of any supplemental disclosure or additional solicitation of acceptances or rejections to a plan of

---

[2]  The Plan provides that the general unsecured creditors of the Multicare Debtors will receive new common stock and the Multicare senior subordinated noteholders will not receive any consideration.

2

reorganization would also be borne by these creditors. In contrast, the Multicare senior subordinated noteholders who, on an absolute priority basis, are entitled to no recovery, lose nothing by a delay. Accordingly, this Court should deny the Motion.

**BACKGROUND**

**General Background**

7.    On June 22, 2000 (the "Petition Date"), the Debtors commenced their reorganization cases by filing voluntary petitions for relief under Chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").

8.    The Debtors continue in possession of their properties and are operating and managing their businesses as debtors-in-possession pursuant to Sections 1107 and 1108 of the Code.

9.    On August 18, 2000, the Court entered an order authorizing the retention of Akin, Gump, Strauss, Hauer & Feld, L.L.P. as co-counsel to the Committee. In September 2000, the Court entered an order authorizing the retention of Pachulski, Stang, Ziehl, Young & Jones, P.C. as co-counsel to the Committee.

10.    The Debtors provide healthcare and support services to the elderly by operating a network of long-term care facilities, institutional and retail pharmacies and a medical supply business and by offering rehabilitation therapy services.

**The Disclosure Statement**

11.    The Disclosure Statement includes a number of relevant provisions.

12.    **Going Concern Valuations** -- The Debtors' financial advisors, UBS Warburg, conducted a going concern valuation of the Debtors. Based on UBS Warburg's analyses, the Debtors' enterprise value as of April 6, 2001 is between $1 billion and $1.25 billion. Disclosure Statement, at pp. 42-43.

**AA. 1274**
