discounts of 30% to 50% from par. Goldman itself acquired $175 million of Genesis' senior debt, making it by far the largest senior creditor of Genesis. Goldman's average purchase price for these debt participations was about 53¢ on the dollar (A57 ¶ 19).

Defendant Mellon was an original lender, and at the time of the bankruptcy held almost $56 million in Genesis senior debt. In the bankruptcy, Mellon acted as agent and representative for all the senior creditors (A58 ¶ 21). Defendant Highland Capital Management ("Highland") is an investment advisory firm (A59 ¶ 22).

Today, Goldman and Highland are the two largest shareholders of Genesis and each has a designee on the six-person board of directors. They received stock, notes and other consideration which, based on their own depressed valuations, was approximately equal in value to 100% of the face amount of their creditor claims. When the *actual* value of the Genesis shares they received is considered, the reality is that they received substantially more than the face value of their claims. Because Goldman and Highland had purchased those senior creditor claims from the lenders for less than half their face value, they were able to triple their money in the space of three years (A58-A59 ¶¶ 21-22).

By March, 2000, Goldman and Highland joined Mellon on the seven member Senior Lender Steering Committee (the "Committee"), where they exercised ultimate control over the Company and the bankruptcy proceedings. Most importantly, their approval would now be needed for all the management incentives, retention bonuses and other benefits that would ultimately shower millions of dollars upon Genesis senior management (A62 ¶ 31).

### B. The Plan Confirmation Proceedings

#### 1. Defendants Submit Valuations of Genesis Based on "Budgeted" And "LTM" EBITDA

In the elder care and pharmacy industries, as elsewhere, the primary barometer of financial performance is Earnings Before Interest, Taxes, Depreciation and Amortization ("EBITDA"). In

7

both 1998 and 1999 Genesis (excluding its subsidiary MC) had more than $200 million in EBITDA. For the first two quarters of fiscal 2000, EBITDA was in line with prior years' performance (A64 ¶ 35). But soon after Goldman had taken its seat on the Committee, both Genesis and MC filed petitions for reorganization under Chapter 11 (A65 ¶ 37). In July of 2001, Genesis submitted a proposed Plan that posited that the Company was worth $200 million less than the senior creditor claims *alone*. It provided for Genesis to merge with MC and for about 94% of the new equity of the combined entity to be distributed to the senior creditors in satisfaction of their claims (A66 ¶ 40).

In support of this Plan, Genesis submitted valuations of the Company prepared by UBS Warburg ("Warburg"), the last of which was submitted on August 22, 2001. Warburg started with Genesis' "Budgeted EBITDA" figure of $158 million for fiscal 2001 (ending September 30), about $50 million below Genesis' performance in 1999 and 2000. To this figure it applied a multiplier derived from a comparable company trading analysis, and calculated an enterprise value range of $1.2 billion to $1.45 billion, with a midpoint of about $1.35 billion (A66 ¶ 41).

But by August of 2001, 11 of the 12 months for which earnings had been projected had now passed. To cure that problem the senior creditors submitted, on the same day as Warburg's final report, their own valuation analysis, prepared by Chilmark Partners ("Chilmark"). Chilmark relied on actual, historical "LTM" [Last Twelve Months] EBITDA for the period July 1, 2000 through June 30, 2001, which had also been supplied by Genesis management. By an astonishing coincidence, this LTM EBITDA was *also* exactly $158 million, precisely dovetailing with the Budgeted EBITDA projections that had been prepared over a year earlier (A67 ¶ 43). Using these figures, Chilmark valued Genesis at between $1.17 billion to $1.43 billion, with a midpoint of about $1.3 billion, within an eyelash of the valuation calculated by Warburg. Not surprisingly, the bankruptcy court ultimately viewed the Chilmark analysis and the LTM data as retroactively confirming the Budgeted

8

EBITDA projections.[6]

## 2. The Debentureholders' Objections to the Plan

Certain debentureholders objected to the proposed Plan and tried to prove that Genesis was worth more than the senior creditor claims; but none of them alleged that any of the EBITDA data had been manipulated (A78 ¶¶ 174-75).[7] For example, a group of debentureholders ("the GMS Group") submitted an objection claiming, in part, that Genesis was worth more than Warburg's valuation. Its valuation expert, Evercore, reached a much higher valuation of Genesis, but it relied on Genesis' EBITDA data, primarily by using a higher valuation multiple.

## 3. Discovery

The complaint recounts that all discovery related to confirmation of the Plan occurred during the three weeks immediately before the hearing (A117-A120 ¶¶ 169-77). From this, the bankruptcy court surmised that plaintiffs were conceding that the fraud was disclosed in those materials but that plaintiffs were not diligent or savvy enough to realize it in time (324 B.R. at 526). But the complaint says no such thing. Rather, in its very next section (A121-A22 ¶¶ 178-79), it explains that the fraud was not disclosed until the SEC filings Genesis issued months after the confirmation hearing.

Paragraphs 169-77 (A117-A120) were included in the complaint in anticipation of a challenge that never materialized: an argument that there was enough suspicious information in the

---

[6] The filing of the Chilmark report one week before the Plan confirmation hearing was the first time that historical EBITDA data had been used by any party to support the bankruptcy Plan. (A26 ¶ 43). Both Warburg and Chilmark disclaimed any opinion concerning the validity or accuracy of either the Budgeted or LTM EBITDA figures (A27, A78 ¶¶ 46, 175).

[7] Because the LTM EBITDA data were not submitted until the day after the last of these objections was filed, none of the objections mentions that subject. Instead, the objectors challenged the adequacy of disclosures; the scope of the proposed releases; the forgiveness of loans to officers and directors; the possible payment of "interest on interest" to the senior lenders; the classification of the debentureholder claims; the contention that the senior lenders were receiving more than 100% of the face value of their claims, while junior creditors were receiving a haircut; that the apportionment of new debt instruments as between Genesis and MC was unfair; and that the Plan was an "improper substantive consolidation" of Genesis and MC.

9

There is no reference in the court's confirmation opinion to any challenge to the accuracy of Genesis' financial information; for there was none. Instead, the court recounted that the debentureholders had submitted other projections of Genesis' EBITDA which the Company had prepared at various times, for various purposes, and which showed numbers somewhat higher than those ultimately used. The court held that this evidence was not persuasive because the other projections had been done to support various "negotiating postures." Most importantly, the court relied heavily on "the fact that the debtors' actual results are on target with 2001 budget projections for the first ten months of the fiscal year", a fact which "confirms the reasonableness of the management projections". 266 B.R. at 614.

Thus, although the confirmation proceedings entailed a dispute over the valuation of Genesis, with many experts testifying and many documents produced, they were all arguing about the wrong thing. The debentureholders and the court took as a given that the EBITDA data used by Warburg and Chilmark had been prepared in good faith. We now know differently.

### b. The Releases in the Plan

In its dismissal opinion the bankruptcy court held that any claims of fraud by Genesis in the bankruptcy proceedings had been released and discharged by §§ 10.2 and 10.3 of the Plan, which generally exculpated Genesis from all pre-confirmation claims. However, both of those sections start with the phrase "except as otherwise provided herein". (A30-A31) Section 10.6 pertains specifically to the debtor's conduct in the course of the bankruptcy proceedings, and exculpates Genesis and its "members, officers, directors, employees, agents or professionals" only from

> [A]ny liability to any holder of any Claim or Equity Interest for any act or omission in connection with, or arising out of, the Reorganization Cases, the confirmation of the Plan of Reorganization, the consummation of the Plan of Reorganization, or the administration of the Plan of Reorganization or property to be distributed under the Plan of Reorganization, *except for willful misconduct or gross negligence.*

11

(Emphasis added)[9] (A31). "Willful misconduct or gross negligence" is exactly what the debentureholders allege here (A31). Section 10.6 deals specifically with the survival of claims based on such conduct and therefore controls over the more general §§ 10.2 and 10.3.

## C. The Post-Confirmation Discovery Of Defendants' Fraud[10]

### 1. Improper Exclusion from EBITDA of All Sales to Mariner

Like Genesis, Mariner Post-Acute Network ("Mariner") operated nursing homes and had a separate pharmaceutical subsidiary, American Pharmaceutical Supply Company ("APS"). Genesis had a contract to supply pharmaceuticals to fifty-eight Mariner nursing homes, and the contract generated revenue of about $53 million per year (A93 ¶ 119).

In January of 2000, Mariner filed for bankruptcy. Genesis continued to sell pharmaceuticals to Mariner and, as a "critical vendor", it continued to be paid in full under its agreement. As of March of 2000, Genesis had made no provision to reserve any of the receivables from Mariner; nor was any provision even discussed for the possible loss of the Mariner business. Later that year Mariner decided to sell APS; and by August 30, 2000, Genesis had began negotiating to purchase APS. Had this purchase gone through, millions in EBITDA, well beyond anything experienced in the past, would have been added to Genesis' financial results (A94 ¶¶ 120-21).

However, defendants projected the opposite would occur – in the spring of 2001 they announced that they now expected to lose the Mariner supply contracts. Therefore pharmaceutical sales to Mariner should be "adjusted out" of Budgeted EBITDA, reducing that figure by $13.424

---

[9] In its original form, the releases from liability applied not only to Genesis but also to its senior creditors and all of their advisors. But in its decision approving the Plan, the court held that "the release of third-party claims against the Senior Lenders must be stricken". 266 B.R. at 609. That is why the court did not hold that the Plan released or discharged plaintiffs' claims against the senior creditors.

[10] The following are just examples of some of the most serious frauds described in the complaint.

12

million. The proffered justification was that if another company purchased APS it would have the "inside track" to acquire all of the Mariner business, including sales to Mariner locations being serviced currently by Genesis, and that therefore current sales to Mariner could no longer be reviewed as recurring revenues. Defendants waged a concerted campaign to convince the junior creditors that the impending sale of APS threatened the Mariner supply contract. Even when Genesis signed a letter of intent to buy APS, Genesis still maintained that the exclusion of the Mariner sales remained necessary because another purchaser might come forward and outbid Genesis (A96 ¶ 126).

But unbeknownst to the debentureholders and the court, Genesis had protected itself from this possibility by separately negotiating an extension of its pharmacy supply contract, which would remain in effect regardless of who acquired APS. The complaint alleges that the terms of the extension were agreed upon months before the Plan approval hearings and were disclosed to the senior creditors at that time; but that the agreement was deliberately concealed until after confirmation in order to maintain the illusion that the continuation of this revenue was in doubt, so that Genesis to continue to exclude the Mariner revenues from EBITDA (A97 ¶ 127).

Finally, on September 24, 2001, about 12 days after the court issued its opinion approving the Plan, and just four days *after* the court's order approving the Plan, Genesis and Mariner signed their agreement and submitted it for court approval in the Mariner bankruptcy proceeding (A97 ¶ 128). The debentureholders did not become aware of it until Genesis itself disclosed the extension of the Mariner supply contract in its 10Q for the first quarter of 2002, filed 4 months after the confirmation of the Plan (A97 ¶ 128).

In its dismissal opinion the bankruptcy court brushed off these critical allegations, holding that because the Mariner supply contract was signed two weeks after its confirmation opinion, "no affirmative act of concealment" had been alleged (324 B.R. 526 n.8). The court's assumption that

13

this agreement was totally unanticipated at the time of the Plan confirmation hearings took place is preposterous. Worse, it contradicts the complaint, which specifically alleges that the terms of the agreement had been settled months before the confirmation hearings. The bankruptcy court's eagerness to turn a blind eye to such conduct is unfathomable.

GAAP permits the accrual of a loss contingency *only* when the potential loss is "probable". Here, the loss of the Mariner business was never "probable", and by the date the Plan was confirmed Genesis had a contract already in hand that guaranteed that this business would not be lost. Therefore, the exclusion of over $13 million from the EBITDA projections and LTM EBITDA , causing the reduction in Genesis valuation over $100 million, was manifestly improper (A98 ¶ 129).

### 2. Improper Exclusion of 10% of Pharmacy Sales to Manorcare

In August of 1998, Genesis entered into an agreement to sell pharmaceuticals to Manorcare through 2004 at scheduled prices. In 1999, Manorcare demanded price concessions; and when Genesis refused, Manorcare purported to terminate the contract, resulting in an arbitration (A90 ¶ 110).

On May 23, 2000, the arbitrator announced that, in view of Genesis' imminent bankruptcy filing, the hearing of the case would be postponed indefinitely. Genesis subsequently reported that Manorcare had agreed, while the arbitration was pending, to pay 90% of Genesis' charges for pharmaceuticals, and would deposit the remaining 10% into escrow. Genesis did not disclose, however, that the escrowed 10% had been excluded from EBITDA, reducing it by about $11 million (A91 ¶¶ 112-13). This one exclusion reduced the Genesis valuation by $90 million.

In April 2002, several months after the court approved the Plan, the arbitrator ruled that the Genesis contract with Manorcare was enforceable and required Manorcare to turn over all the escrowed funds, with interest, totaling $21.7 million. Four months after Plan confirmation, in its 10Q for the second quarter of 2002, Genesis described the arbitrator's ruling and disclosed, *for the*

14

*first time*, that it had been excluding 10% of the Manorcare revenue from EBITDA (A92 ¶ 115).

Under GAAP a loss contingency cannot be accrued unless it is "probable" that the loss will occur and the amount of that loss can be reasonably estimated. Where the putative loss contingency arises from a pending litigation, no loss can be accrued unless Genesis' counsel had opined that a loss, of a particular size, was probable. That did not happen here, because it was never "probable" that Manorcare would succeed on its claims; and no such opinion letter was ever produced (A92 ¶ 116).

### 3. Improper Expensing of Excessive Insurance Reserves

Nursing homes and pharmacies, including those operated by Genesis, carry general/professional liability ("GL/PL"), workers compensation ("WC"), and employee health and casualty insurance. On June 1, 2000, just before filing its bankruptcy petition, Genesis and MC restructured their insurance program by obtaining third party WC insurance and switching their GL/PL coverage to Genesis' wholly owned insurance subsidiary, Liberty Health Corporation ("Liberty"). Genesis expensed all deposits it made to Liberty's reserve accounts (A75 ¶ 58).

Liberty obtained reinsurance for this GL/PL coverage, which provided "stop loss" limits to Genesis' and MC's exposure. That limit was initially $14 million, including $9 million for its Florida elder care facilities and $5 million for its other facilities. Based upon its own internal actuarial studies done in June of 2000, Genesis calculated that its (Liberty's) actual likely exposure was about half the total stop loss limits. That is the amount that should have been reserved, and no amount above that could properly have been charged against EBITDA (A76 ¶ 59).

But Genesis went far beyond that and instead posted reserves significantly in excess of its total stop loss limits, and fully expensed those reserve payments immediately. A review of financial statements issued by Genesis *after the Plan was confirmed* reveals, upon analysis, that between July 1 and August, 2, 2000, *before* confirmation, Genesis (including MC) had fully funded the

15

GL/PL self-insurance program for 2000-2001, by transferring to Liberty $14 million, the aggregate stop loss limit, and it fully expensed that entire payment during the LTM period. Subsequent financial disclosures also showed that Genesis posted significant additional reserves in the month following the insurance renewal date, June 1, 2001, but before the end of the LTM EBITDA period on June 30, 2001. During that month Genesis made large deposits to Liberty and fully expensed all of them. Those deposits not only exceeded, on a pro rata basis, the actuarial risk, but they were risks that were already covered by reinsurance. Plaintiffs now estimate that Genesis (excluding MC) intentionally took excessive insurance reserve expenses during the valuation period of approximately $13 million, lowering EBITDA by that same amount, and the resulting valuation by about $100 million (A77 ¶ 61).[11]

GAAP requires that companies deduct contingent liabilities from earnings under certain circumstances. Charges to earnings, based on contingent insurance liabilities, are to be accrued only when both the liability is probable and the amount can be reasonably estimated (A79 ¶ 64). Neither condition was satisfied here.

Genesis did not report publicly, until the third quarter of 2002 (a year after confirmation of the Plan): (I) what its aggregate stop loss limits were for its GL/PL insurance, (ii) that it had deposited reserves equal to 100% of those limits, and (iii) that it had fully expensed all those deposits in the current period, regardless of whether those deposits exceeded Genesis' actual exposure to claims. Moreover, Genesis never reported that it had deposited, and expensed, amounts

---

[11] These manipulations in insurance reserves coincided with an overall massive increase to Genesis' insurance reserves. The consolidated Genesis/MC 10Qs and 10Ks for fiscal 2000, 2001 and 2002 show that on September 30, 2000, loss reserve balance was $27.9 million; by a year later, that amount had risen to $51.6 million; and that by June 30, 2002, the total was $74.9 million. The last two figures were disclosed after the confirmation hearing. Thus, neither the court nor the debentureholders had the slightest idea that Genesis and MC had nearly doubled their collective insurance loss reserves in the past year, much less that this entire $24 million increase had been fully expensed.

16

in excess of the stop loss limits, and in excess of its own internal actuarial estimates of its potential exposure to claims. Instead, Genesis management maintained that insurance costs were "spiraling upwards" (A80-A81 ¶¶ 65-66). It turns out that these reports of spiraling costs were grossly exaggerated.

#### 4. Excessive Deduction for Loss of AGE Institute Business

Genesis had a contract to provide management, pharmacy and rehabilitation services to AGE Institute, a not-for-profit company that owned 20 nursing homes. In 2000, AGE Institute went bankrupt and notified Genesis that it was unilaterally terminating the contract (A99 ¶ 130).

At a meeting with the senior creditors in September of 2000, Genesis management reported that the adverse impact on EBITDA would be about $2.226 million. About three weeks later, Genesis management asked the Unsecured Creditors Committee to approve an adjustment to the Budgeted EBITDA to reflect the loss of this business. Now, however, they represented that the adverse effect on EBITDA would be $5.25 million, rather than $2.23 million. The reduction to EBITDA was therefore at least $3 million overstated which, at a multiplier of over 8, reduced the valuation by over $24 million (A99-A101 ¶¶ 132-33, 135).

#### 5. Improper Deduction of Non-Recurring Employee and Management Retention Bonuses

As noted above, non-recurring charges and restructuring charges are not to be included in EBITDA. GAAP expressly defines bankruptcy reorganization expenses as non-recurring expenses (A101 ¶ 136). On September 5, 2000, Genesis obtained bankruptcy court approval for a "Special Recognition Program" totaling over $11 million. The program was allegedly designed to assure that key employees remained with the Company despite the ongoing bankruptcy. This program fit the classic definition of one-time, non-recurring charges and expenses which are not part of EBITDA. Accordingly, Genesis categorized these expenses as reorganization costs, separate and apart from its statement of operations, in its consolidated financial statements for fiscal 2001. Nonetheless,

17

subsequent investigation revealed that approximately $6 million of these costs had been improperly charged against Genesis LTM EBITDA, lowering the valuation by another $50 million (A102 ¶¶ 137-38).

### 6. Improper Deduction of Non-Recurring Costs for the "First Choice Plan"

On January 1, 2000, Genesis started a new employee health insurance plan called the "First Choice Plan". The plan quickly proved unaffordable and by September 30, 2000, at the latest, Genesis had announced that the plan would be discontinued after March 31, 2001 (A102 ¶ 140).

In the last quarter of fiscal 2000, Genesis took a charge to earnings of about $13 million with respect to the cancellation of the First Choice Plan. Because the Plan had already been designated for termination by this time, GAAP defined this adjustment as a non-recurring charge, and it was treated as such in the Genesis 2001 10-K. Nonetheless, it was improperly (and secretly) included in the calculation of LTM EBITDA (A103 ¶ 141), thereby reducing the calculated valuation of Genesis by over $100 million.

### 7. Improper Inflation of Pharmacy Cost of Goods Sold

Genesis' pharmacy subsidiary contributed about $1 billion in revenues to the Company each year, representing about 55% of the total. The pharmacy cost of goods sold ("CGS"), as a percentage of revenue, was 58.7% in fiscal 1998 and 58% in fiscal 1999. In fiscal 2000 the budgeted CGS was 59.2% and, on August 2, 2000, Genesis management reported to the senior lender steering committee that the actual average CGS had been 59.8%. Nonetheless, the budgeted EBITDA for fiscal 2001 assumed a pharmacy CGS of 61.9%, allegedly based on results for the first two quarters (A104 ¶ 144).

There was no legitimate basis for projecting the pharmacy CGS level this high, or for staying with that inflated projection even after they were contradicted by the actual results for the first two quarters. In its 10Q issued about seven months after the Plan was confirmed, Genesis disclosed the

18

truth for the first time: that the actual pharmacy CGS for the first two quarters of fiscal 2001 had been 59.3%. The inflation of pharmacy CGS by 2.6% would have reduced annual EBITDA by about $26 million (A104-A105 ¶¶ 145-46), reducing the valuation of Genesis by another $200 million.

### D. The Misrepresentations Come to Light

In dismissing the complaint, the bankruptcy court erroneously concluded that the fraud was fully disclosed before the bankruptcy confirmation hearing. However, the complaint alleges in detail how the fraud actually came to light *after* the confirmation hearing. The bankruptcy court signed the order confirming the bankruptcy reorganization plan on September 20, 2001. The complaint alleges that just over one month later, in November of 2001, Genesis disclosed that it had made massive increases in its insurance reserves. Its 10-K issued on December 28, 2001, almost three months after Plan confirmation, showed that reserves had shot up by $23.7 million, doubling since the prior year (A121 ¶ 178(a)). This information clearly related back to the valuation period, which included the first nine months of the 2001 fiscal year.

Then, in its 10-Q for the first quarter of fiscal 2002, dated February 12, 2002, over four months after confirmation, Genesis made disclosures about its continuing business providing pharmaceuticals to the Mariner Corporation (A121 ¶ 178(b)). Genesis' EBITDA during the valuation period had been adjusted downward by $24.5 million to reflect the anticipated loss of this business. But now Genesis disclosed for the first time that it had signed an agreement with Mariner, just when the reorganization plan was being approved, to extend the pharmaceutical supply agreement through the year 2003. Once again, this information related back to events that had occurred during the valuation period and which had, or should have had, an impact on the EBITDA data used for the confirmation proceeding valuation.

Then, in its 10-Q for the second quarter of fiscal 2002, issued seven months after confirmation, Genesis disclosed for the first time that it had excluded from EBITDA, prior to plan

19

confirmation, 10% of revenues on its sales to Manorcare (A93 ¶ 117). In this same 10-Q Genesis also disclosed for the first time that its pharmacy cost of goods sold during the first two quarters of fiscal 2001 had been 59.2% of revenues, not the "budgeted" 62.9% CGS that had ostensibly been based on the results of those quarters (A121 ¶ 178 ©)).

These post-confirmation revelations prompted a complete re-evaluation by the debentureholders of the financial data that Genesis had submitted to the court. After months of investigation and analysis, plaintiffs discovered that many other dubious transactions had adversely affected the EBITDA data that had been reported to the court.

In short, the complaint leaves no doubt that the fraud was not disclosed until after confirmation of the Plan.

## III. ARGUMENT

### A. JURISDICTION AND STANDARD OF REVIEW

This Court has jurisdiction over the subject matter of this action pursuant to 28 USC § 158(a). *In re YES! Entm't Corp. v. Kingsborough*, 316 B.R. 141 (D. Del. 2004).

This appeal concerns issues of law and is therefore governed by a *de novo* standard of review. *In re Olick*, No. 99-CV-5128, 2000 U.S. Dist. LEXIS 4275, at * 6, 2000 WL 354191 at *2-*3 (E.D. Pa. Apr. 4, 2000); *In re United Artists Theatre Co.*, 315 F.3d 217 (3d Cir. 2003); *YES! Entm't*, 316 B.R. at 144; *In re Lernout & Hauspie Speech Prods. N.V.*, 308 B.R. 672, 675 (D. Del. 2004); *Sabratek Liquidating, LLC v. Ross & Hardies*, Civ. A. No. 04-226, 2005 U.S. Dist. LEXIS 11257, at *4, 2005 WL 1385203 at *2 (D. Del. Mar. 30, 2005). *De novo* review "extends to the Bankruptcy Court's application of the law to the facts." *In re RBGSC Inv. Corp.*, 253 B.R. 352, 362 (E.D. Pa. 2000) (citation omitted) (whether or not *res judicata* applies to a prior bankruptcy order is a question of law, and therefore, *de novo* standard applies). "*De novo* review requires the court to make a judgment independent of the bankruptcy court's, without deference to that court's analysis

20

and conclusions." *In re Piper Aircraft Corp.*, 244 F.3d 1289, 1295 (11th Cir. 2001) (citation omitted).

## B. THE STRICT STANDARDS APPLICABLE TO A MOTION TO DISMISS

The Third Circuit has a liberal test for construing the adequacy of pleadings. *Timothy B. v. Neshaminy Sch. Dist.*, 153 F. Supp. 2d 621 (E.D. Pa. 2001). *See also Whetherhold v. RadioShack Corp.*, 339 F. Supp. 2d 670, 673 (E.D. Pa. 2004). On a Rule 12(b)(6) motion to dismiss a complaint, a court must "accept as true the factual allegations in the complaint and all reasonable inferences that can be drawn from them." *Langford v. City of Atlantic City*, 235 F.3d 845, 847 (3d Cir. 2000). Dismissal is only warranted "where it is certain that no relief could be granted under any set of facts that could be proved." *Markowitz v. Northeast Land* Co., 906 F.2d 100, 103 (3d Cir. 1990) (citation omitted); *see also Household Int'l, Inc. v. Westchester Fire Ins. Co.*, 286 F. Supp. 2d 369, 372 (D. Del. 2003); Dismissal Op. 324 B.R. at 515; *In re BCP Mgmt.*, 320 B.R. 265, 270 (D. Del. 2005).

## C. RES JUDICATA DOES NOT BAR PLAINTIFFS' ACTION

### 1. Res Judicata Is Inapplicable Where the Prior Judgment Was Procured by Fraud

In dismissing the action, the bankruptcy court acknowledged that there is "a so-called fraud exception" to *res judicata* (324 B.R. at 525-26), citing *McCarty v. First of Georgia Ins. Co.*, 713 F.2d 609, 612 (10th Cir. 1983)("*Res judicata* . . . does not shield a blameworthy defendant from the consequences of his own misconduct"); and *Browning v. Levy*, 283 F.3d 761 (6th Cir. 2002). In order to trigger the fraud exception from a prior bankruptcy order, the plaintiff must:

> [D]emonstrate that the judgment was obtained as the result of a scheme or collusion that is designed to influence corruptly the proceedings, or to inhibit the ability of an adverse party to fully present his case or defense, and which has the effect of foreclosing to him the opportunity to have a fair and complete trial.

*Browning v. Navarro*, 826 F.2d 335, 345(5th Cir. 1987). Hence, *res judicata* does not bar a claim where "[p]laintiff in the prior action was unaware of the additional facts due to the fraud or negligent misrepresentation of the other party". James Wm. Moore et al., 18 MOORE'S FEDERAL

21

PRACTICE § 131.21 (Matthew Bender 3d ed. 1999) (footnote citing *McCarty*, 713 F.2d at 612-13).

This doctrine springs from the general principle that, for any judgment to have either *res judicata* or collateral estoppel effect, the parties must have had a "full and fair opportunity" to litigate the issue or cause of action in question. *Kremer v. Chemical Constr. Corp.*, 456 U.S. 461, 481 (1982).

In *In re PHP Healthcare Corp.*, No. 98-2608, 2002 Bankr. LEXIS 449, 2002 WL 923932 (Bankr. D. Del. May 7, 2002), after the plan confirmation, the plaintiff debtor sued PricewaterhouseCoopers ("PwC") to void a preferential transfer. PwC argued that because the court had found that it was disinterested when it authorized PwC to represent the debtor, *res judicata* applied and required dismissal of the action. LEXIS, at *2, WL at *1. The court refused to apply *res judicata*:

> [The court] found disinterestedness based on information disclosed by PwC, which has proven to be incomplete. The court was not informed of the payments that PwC received which are now alleged to be preferential.

LEXIS, at * 8, WL at *3.

In the present case the bankruptcy court held that the fraud exception did not apply, for two reasons. First, it held that

> [T]he plaintiffs do not contend that the defendants wrongfully concealed material facts from them prior to confirmation. Rather, the plaintiffs contend that the documents produced by the defendants prior to confirmation were too voluminous to review adequately, that there was insufficient time to review the materials thoroughly, and that the materials were not reviewed to ferret out fraud .... The affirmative act of concealment or contrivance is missing in the plaintiffs' presentation. ... As to the SEC disclosure, the SEC filings were timely filed, and included post confirmation data

324 B.R. at 526. As discussed above, this determination reflects a complete misreading of the complaint. Plaintiffs did *not* allege that the fraud was disclosed to them in the materials produced prior to the hearing. Rather, the complaint alleges, in great detail, that the fraud was not disclosed

22

until post-confirmation financial disclosures by Genesis.[12] Nor did plaintiffs allege that the post-confirmation SEC disclosures were limited to post-confirmation data, as the Opinion implies. Rather, the complaint alleges in detail exactly what *pre-confirmation* facts were disclosed in the *post-confirmation* SEC filings.

> Second, the court held that the fraud exception was inapplicable because plaintiffs
>
> > [W]ere not prevented from asserting their claims at confirmation. As noted above, their claims focused on the correctness of the enterprise valuation of the debtors. That claim was fully litigated at confirmation.

(*Id.*). This determination would require, for the fraud exception to apply, that the injured party was *totally precluded* by the fraud from asserting a claim or defense. But that is not what *Browning* or any of the other relevant cases requires. All that is required is that the injured party show that he or she was prejudiced by being prevented from establishing or presenting *some element, phase or aspect* of the claim.

In *McCarty*, for example, the plaintiffs first instituted a breach of contract action against their insurer. After the district court dismissed that case, plaintiffs obtained documentary proof that the insurer had lied in disclaiming the policy and brought a second action, this one in tort. The Tenth Circuit refused to apply *res judicata*, because "'where plaintiff's omission *of an item of his cause*

---

[12] Even if some evidence of the fraud had been contained in these last-minute disclosures, at most there would be an issue of fact as to whether the circumstances of their disclosure gave plaintiffs a full and fair opportunity to litigate these issues. *A.B.H. Investments, Inc. v. Narven Enters., Inc.*, No. D040361, 2003 Cal. App. Unpub. LEXIS 11126, at *32, 2003, WL 22796049 at *11 (Cal. App. 4th Dist., Nov. 25, 2003) (Not Reported in Cal. Rptr. 3d), *review denied*, (Mar. 24, 2004); *In re Circle K Corp.*, 181 B.R. 457, 462-63 (Bankr. D. Ariz. 1995) (whether plaintiff could have discovered the fraud before confirmation was an issue of fact); *Houbigant, Inc. v. Dev. Specialists, Inc.*, 229 F. Supp. 2d 208, 222 (S.D.N.Y. 2002); *Tanaka Bros. Farms, Inc. v. Home State Bank*, Civ. A. No. 86-2108-S, 1986 U.S. Dist. LEXIS 17745 (D. Kan. Nov. 13, 1986) (annexed hereto) (issue of fact when plaintiff knew about fraud); *In re AmeriServe Food Distrib. Inc.*, 267 B.R. 668, 672 (D. Del. 2001) (where a new expert report appeared at plaintiff's "door a 'couple of days' before [the bankruptcy court] disposition . . . casts doubt that [plaintiff] had 'a fair opportunity procedurally, substantively and evidentially to pursue his claim the first time.'" (citation omitted).

23

*of action* was brought about by the defendant's fraud, deception, or wrongful conduct, the former judgment had been held not to be a bar to suit.'" 713 F. 2d at 613 (citation omitted) (emphasis added).

In *Powell v. American Bank & Trust Co.*, 640 F. Supp. 1568, 1574 (N.D. Ind. 1986), a fraud action for damages, plaintiffs claimed that defendants had improperly obtained a probate order approving the sale of plaintiffs' bank stock by failing to disclose that the banking industry had recently agreed upon a new regulation that would add tremendously to the value of the stock. The district court held that in view of the fraud the order of the probate court was not preclusive, and it refused to dismiss the case, holding that *res judicata* "was not created to protect such fraud on the courts," or to prevent a plaintiff "from presenting *all of his case* to the court" (emphasis added).

Similarly, in *Christian v. American Home Assurance Co.*, 577 P.2d 899, 905 (Okla. 1977), the court refused to apply *res judicata* in a case where the plaintiff, upon winning a breach of contract action against his insurer for failing to pay his claim, instituted another lawsuit against the insurer for a bad faith disclaimer of coverage. Because the facts surrounding defendants' bad faith had been fraudulently concealed during the first trial, the court allowed the second case to proceed:

> Where plaintiff's omission *of an item of his cause of action* was brought about by defendant's fraud, deception or wrongful concealment, the former judgment has been held not to be a bar to suit on the omitted part of the claim.

(Citation omitted; emphasis added). This language is echoed in the RESTATEMENT (SECOND) OF JUDGMENTS § 26, cmt. j (1982), which says that a "defendant cannot justly object to being sued on a *part or phase of a claim* that the plaintiff failed to include in an earlier action because of the defendant's own fraud" (emphasis added). [13]

---

[13] Similarly, in *United States Rubber Co. v. Lucky Nine, Inc.*, 159 So. 2d 874 (Fla. Dist. Ct. App. 1963), the court held that *res judicata* would not bar a second action on a debt where, in the first such action defendant had misrepresented the amount he owed, and had thereby limited the size of the judgment against him. Although the plaintiff, despite the fraud, had been able to assert *some* claim against the defendant, this was held not to bar a second claim where the defendant had,

24

Here, defendants' fraud prevented the debentureholders from asserting a critical "item, part

or phase" of their position, and as a result they could never present "all of their case" to the court.

Under these circumstances, *res judicata* cannot apply.

### 2. The Claims for Relief Asserted in the Present Complaint Are Not the Same As Those Raised as Objections in the Bankruptcy Proceedings

In deciding that this case presented the same "claim for relief" that had been adjudicated in

the Plan confirmation proceedings, the bankruptcy court stated that

> The factual underpinnings of this complaint, involving the alleged undervaluation of the enterprise value of the debtors by the debtors' officer, Hager, and the senior lenders to eliminate junior creditors and receive most of the ownership of the reorganized companies, and the alleged participation by the Senior Lenders in presenting misleading and false financial information to the court in the course of confirmation hearings, are so close to the claim actually litigated at confirmation that it would be unreasonable not to have brought them both at the same time in the bankruptcy forum.

324 B.R. at 522-23. The court acknowledged that

> [T]he alleged misconduct on the part of the named Senior Lenders, including control of the debtors, fraudulent manipulation of adjustments to projected and actual EBIDTA numbers, and fraudulent misrepresentations through the Debtors' management to the creditor body, was not specifically asserted at confirmation by the objectors. . . . . However . . . I must conclude that the critical factual underpinnings at issue in the complaint, i.e., the correctness of the enterprise valuation of the debtors proposed by the proponents of the plan, are the same . . . .

*Id.* at 523.

To the contrary, the "factual underpinnings" of the objections and of this action are

fundamentally different from each other. The objections assumed that the EBITDA data used by

Genesis and the senior creditors as the basis for the valuation were prepared in good faith; the

complaint in this action alleges exactly the opposite. *Res judicata* normally prevents a "'party from

litigating a claim that it could have raised or did raise in a prior proceeding in which it raised another

_____

through fraud, prevented the plaintiff from recovering the full amount owed.

25

claim based on the same cause of action.'" *Edwards v Wyatt*, 266 B.R. 64, 71 (E.D. Pa. 2001) (citation omitted). But in this Circuit, at least, the *res judicata* doctrine is narrowly applied where the prior judgment was issued in a bankruptcy proceeding. In such cases, the scope of *res judicata* has essentially been limited to theories of liability actually raised in the bankruptcy proceedings; it does not extend to theories that could have, or even should have, been asserted but were not. *Eastern Minerals & Chems. Co. v. Mahan*, 225 F.3d 330, 337 (3d Cir. 2000); *see also Edwards*, 266 B.R. at 72; *In re Mariner Post-Acute Network Inc.*, 267 B.R. 46, 53 (Bankr. D. Del. 2001).

*Eastern Minerals*, the controlling case on this subject in this Circuit, illustrates how these special principles work. There the creditor-plaintiff had filed a proof of claim in the debtor's bankruptcy in the amount of $2.2 million, had objected to the sale of certain assets of the debtor, and had threatened to file other claims involving transactions between the debtor and various affiliated entities. The creditor ultimately settled all these objections and reduced its claim from $2.2 million to $900,000, and the court entered judgment in that amount. A plan was then approved that resulted in a distribution from the debtor to the creditor of $380,000 on its $900,000 judgment.

The creditor then sued the debtor's sole shareholder in state court to recover the remainder of the money, claiming that the defendant had used the debtor as his "'mere instrumentality' and 'alter ego' for his individual benefit." 225 F. 3d at 338. Unlike the present case, in *Eastern Minerals* the creditor had been aware of all these facts during the bankruptcy proceedings, and had *chosen not to* bring the claim there. The defendant moved to dismiss the action on grounds of *res judicata*, arguing that this was a claim the creditor could have brought in the bankruptcy court, and it involved the same series of transactions, and that he was a "privy" of the corporation that had been sued, and would thereby be entitled to protection of the rule.

The Third Circuit rejected the application of *res judicata*, holding that "[a]lthough some of the descriptions of certain events and particular relationships are common to both claims, the theory

26

of the case and relief sought in [plaintiff's] instant complaint are markedly different . . ." The *Eastern Minerals* court emphasized that "the similarity of certain events in and of itself does not trigger a bar of [plaintiff's] subsequent complaint;" that "the mere existence of overlapping facts and events . . . is not sufficient to foreclose [the subsequent] claim"; and that "[c]laim preclusion only bars claims arising from the same cause of action previously raised, not every conceivable claim that could have been brought in the context of a bankruptcy case over which the court would have had jurisdiction." *Id.* at 337 (footnote omitted).[14]

In *Edwards*, an individual debtor, owned a large block of stock in Pilot Corp., which was to be sold off as part of the liquidation proceedings. He also had outstanding disputes with Pilot and two of its large shareholders, Wyatt and Phillips. In the course of the bankruptcy proceedings Edwards settled these disputes in exchange for Wyatt's oral agreement to help Edwards obtain the maximum value for the sale of his stock and not to enter into any agreement with Phillips concerning that stock without his involvement. On the very day of the scheduled sale of his stock, Edwards discovered that Wyatt and Phillips, who up to that point had been submitting competing bids for Edwards' stock, had put in a joint bid to purchase the shares, thereby eliminating competition between them. Edwards objected to the bid "as an illegal collusive effort to control the sales price for his assets." 266 B.R. at 68.

The bankruptcy court rejected this objection and allowed the trustee to accept the bid. Later, Edwards sued Wyatt for breach of the oral contract and fraud. Even though the same oral contract had been the centerpiece of Edwards' objection to the collusive bid in the bankruptcy proceeding, the district court denied defendant's motion to dismiss on *res judicata* grounds:

> In the Bankruptcy Court, Edwards objected to an illegal collusive effort to control

---

[14] This line of reasoning extends to other Circuits as well. *See In re S.N.A. Nut Co.*, 215 B.R. 1004, 1010 (Bankr. N.D. Ill. 1997) ("A general rule that confirmation acts as an adjudication of any claim that could have been raised in the bankruptcy proceeding is without merit").

the sale of his assets and sought to halt the sale of those assets. In this Court, Edwards is simply claiming he has been injured by Wyatt's breach of independent financial promises and he seeks recovery for those injuries. Of course, the Court does not deny that there are facts in each set of claims which do relate. Nevertheless, the mere existence of overlapping facts and events is not sufficient to preclude Edwards' current claims.

266 B.R. at 72 (citing *Eastern Minerals*, 225 F.3d at 337).[15]

In attempting to distinguish the Genesis case from *Eastern Minerals* and *Edwards*, the bankruptcy court gave too much emphasis to the "overlapping facts and events" in this case and the Plan reorganization proceedings, and failed to give enough emphasis to the fact that the "theory of the case and the relief sought" are entirely different, because the facts underlying the present action were not disclosed until after Plan confirmation.

Moreover, *res judicata* is inapplicable because the fraud claims could not have been raised in the bankruptcy proceedings. "Claims that could have been brought" and are therefore subject to *res judicata* " "'are claims in existence at the time the original complaint is filed or claims actually asserted by supplemental pleadings or otherwise in the earlier action'". *Piper Aircraft*, 244 F.3d at 1299 (citation omitted). "[C]laims for fraud are deemed to arise when the fraud is discovered by the injured party, and not when it takes place." *In re Emmer Bros. Co.*, 52 B.R. 385, 394 (D. Minn. 1985) (citations omitted).

---

[15] *See also, e.g., Piper Aircraft*, 244 F.3d 1289 (refusing to apply *res judicata* to subsequent case arising out of circumstances leading to plan confirmation, because the bankruptcy court had not expressly ruled on this specific claim at issue); *A.B.H. Investments*, 2003 Cal. App. Unpub. LEXIS 11126, at *33, 2003 WL 22796049 at *12 (disclosure during bankruptcy proceedings about certain funding "does not show that the bankruptcy court adjudicated defendants' alleged misrepresentations and concealment regarding the source of this funding"); *Household Int'l*, 286 F. Supp. 2d at 375 (although both actions relate to the extent of coverage provided by [insurer's] policies, the earlier action "dependent upon contract interpretation and whether or not the claims were wrongfully denied," while subsequent lawsuit "focus[ed] on [insurer's] alleged misrepresentations or omissions to [insured] and its understanding of [the insured's] needs for the policy"); *Mariner Post-Acute Network*, 267 B.R. at 53-54 (financing orders holding that debtors should turn over to secured lenders any funds due to debtors did not preclude subsequent proceeding concerning whether any funds were due to debtors in the first place).

28

## D. COLLATERAL ESTOPPEL IS INAPPLICABLE HERE AS WELL

The prerequisites for collateral estoppel or issue preclusion are:

(1) the issue sought to be precluded [is] the same as that involved in the prior action; (2) that issue [was] actually litigated; (3) it [was] determined by a final and valid judgment; and (4) the determination [was] essential to the prior judgment ...

*In re Graham*, 973 F.2d 1089, 1097 (3d Cir. 1992) (citations omitted; alterations and omission in the original). "[T]he issue [sought to be precluded], must have been one which was actually litigated and one which was essential to the decision, not one of 'those that merely lurk in the record before the court.'" *Rushton v. Shea*, 419 F. Supp. 1349, 1363 (D. Del. 1976) (citation omitted).

In addition, the party against whom the doctrine is asserted must have had a full and fair opportunity to litigate the issue in the first proceeding. *Kremer*, 456 U.S. at 481 n.22; *Lovell v. Mixon*, 719 F. 2d 1373, 1377 (8th Cir. 1983). "The doctrine of issue preclusion is premised on principles of fairness." *In re Freeman*, 30 F.3d 1459, 1467 (Fed. Cir. 1994) (citation omitted). Therefore, as in *res judicata*, fraud in the original proceeding renders collateral estoppel inoperative. *In re Bulic*, 997 F.2d 299, 305 n.7 (7th Cir 1993); *In re Laing*, 945 F.2d 354, 357 (10th Cir. 1991). *See also Pepper v. Litton*, 308 U.S. 295, 305-06 (1939) (bankruptcy court may disallow or subordinate a judgment procured by fraud); *In re Kovalchick*, 175 B.R. 863, 872 (E.D. Pa. 1994) ("[n]otwithstanding the doctrines of *res judicata* and collateral estoppel, this court may not be bound by judgments secured by fraud . . . ") (citation omitted). If there is reason to doubt the quality, extensiveness, or fairness of procedure in the prior litigation, collateral estoppel is inapplicable. *Montana v. United States*, 440 U.S. 147, 164 n.11 (1979).

For all the reasons discussed above in connection with *res judicata*, the debentureholders never had a full and fair opportunity to litigate the issue of whether the EBITDA dated submitted to the court had been manipulated, and never had a "full and fair opportunity" to do so, because evidence relating to that issue was covered up and misrepresented..

29

Moreover, the issue of whether the EBITDA data was fraudulent was not actually litigated, or actually decided, in the Plan confirmation proceedings. In confirming the Plan, the bankruptcy court made no finding as to whether defendants artificially depressed the value of Genesis by intentionally or with gross negligence submitting false EBITDA data. Although the enterprise value of Genesis at the time of Plan confirmation was litigated and decided (324 B.R. at 527), that is not the way "issue" is defined for collateral estoppel purposes.

To establish issue identity, the factual predicate of both "issues" must be essentially the same and must both have been "actually litigated" in the prior proceeding. For example, in *Hudgins v. Davison*, 127 B.R. 6 (E.D. Va. 1991), the bankruptcy court found for the debtor after trial of a creditor's charge that the debtor had misrepresented its assets. A year later, the trustee filed suit to revoke the discharge of the debtor, alleging fraud on the basis of facts different from those raised at trial. The district court found that collateral estoppel did not apply "because the issues presented in the trustee's complaint, while generally based upon fraud, involve different factual allegations and were not 'actually litigated' in the prior suit brought by the creditor." *Id.* at 8.

Similarly, in *In re Huang*, 275 F.3d 1173 (9th Cir. 2002), Huang had settled an action by her bank charging her with fraud, RICO, and other misconduct. In that settlement agreement she admitted that these loans would not be dischargeable in bankruptcy, and the court entered a judgment enforcing the settlement agreement. Fourteen months later Huang filed for bankruptcy, alleging that the loans were, in fact, dischargeable in bankruptcy because the bank had defrauded her into signing the settlement agreement. The Ninth Circuit held that collateral estoppel was not justified on the fraud issue because "[f]raud, or facts showing fraud, are not mentioned in the Settlement Agreement or in the judgment enforcing it." *Id.* at 1178.

By the same token, the court's Plan confirmation opinion makes no mention of any claims

30

of fraud, and therefore cannot be said to have resolved them.[16]

## E. THE PLAN DID NOT RELEASE GENESIS FROM THESE CLAIMS

### 1. The Plan Does Not Discharge or Release Any Claim Based on Fraud or Willful Misconduct in the Course of the Confirmation Proceedings

The bankruptcy court held that the claims against Genesis were expressly released in the Plan, and that the release thereafter acted as an additional reason to dismiss the present action. The court, we submit, got it exactly backwards: the Plan expressly states that such claims are *not* released by the Plan. In holding that the release applies here, the bankruptcy court relied on paragraphs 10.2 and 10.3 of the Plan, which, as noted above, provide in pertinent part that

> Except as otherwise provided herein ... the rights afforded in the Plan ... shall discharge all existing debts and Claims, .... [A]gainst the Debtors ... based upon any act or omission, transaction, or other activity of any kind or nature that occurred prior to the Effective Date [of the Plan], ...
>
> .... [E]ach holder ... of a Claim or Equity Interest ... shall be deemed to have forever waived, released, and discharged the Debtors, to the fullest extent permitted by section 1141 of the Bankruptcy Code, of and from any and Claims, Equity Interests, rights and liabilities that arose prior to the Effective Date. ...

324 B.R at 518 n.3. (*See also* A30-A31).

The court then held that:

> The plaintiffs' contention, without specific citation, that the "Confirmed Plan expressly does not release any claim against the debtors for willful misconduct or gross negligence in post-petition matters" is not substantiated.

*Id.* (footnote omitted).

In fact, the "unsubstantiated" contention was based on § 10.6 of the Plan, which deals

---

[16] *See also Graham*, 973 F.2d at 1098 (collateral estoppel not applied "even though the penalty imposed by the Tax Court was based on the fraud penalty ... authorize[d] in cases where fraud is established, [because] the issue of fraud was never litigated or admitted, nor was a specific factual finding concerning it made"); *cf. Lundborg v. Phoenix Leasing*, 91 F.3d 265, 271-72 (1st Cir. 1996) (where defendant opposed plaintiff's motion to set aside confirmation of plan on the basis of fraud, the bankruptcy court ruled that the motion had no basis, because there was no showing that the fraud issue was actually adjudicated); *Janess v. Messick*, 202 B.R. 196, 198 (Bankr. D. Del, 1996) (same).

31

directly with claims based on misconduct during the bankruptcy proceedings and plan confirmation proceedings.[17] That provision "exculpated" Genesis and its "members, officers, directors, employees, agents, or professionals" from

> [A]ny liability to any holder of any Claim or Equity Interest for any act or omission in connection with, or arising out of, the Reorganization Cases, the confirmation of the Plan of Reorganization, the consummation of the Plan of Reorganization, or the administration of the Plan of Reorganization or property to be distributed under the Plan of Reorganization, *except for willful misconduct or gross negligence*

(Emphasis added. *See also* A31).

The debentureholders' complaint expressly charges Genesis with "willful misconduct or gross negligence" "in connection with, or arising out of, the confirmation of the Plan of Reorganization." These are precisely the types of claims that § 10.6 of the Plan expressly states are *not* being barred or released. While §§ 10.2 and 10.3 of the Plan do provide in general for the release of pre-confirmation claims against the debtor, those sections do not deal specifically with possible claims arising out of the bankruptcy proceedings themselves. That is the role of § 10.6.

"Courts apply the rules of contract interpretation to the interpretation of a reorganization plan." *National Gypsum Co. v. Prostok*, Civ. A. No. 3:98-CV-0859, 2000 U.S. Dist. LEXIS 16174, at *48, 2000 WL 1499345 at *16 (N.D. Tex. 2000) (citation omitted), *aff'd*, 44 Fed. Appx. 654 (5th Cir. 2002). Under principles of contract law, a more specific provision, such as § 10.6, trumps more general provisions, such as §§ 10.2 and 10.3. *Southland Corp. v. Ashland Oil, Inc.*, Civ. No. 88-0700, 1988 U.S. Dist. LEXIS 13108, 1988 WL 125855 (D.N.J. Nov. 23, 1988). *See also J.E. Faltin Motor Transp., Inc. v. Eazor Express, Inc.*, 172 F.Supp. 175, 178 (W.D. Pa. 1959), *quoting* CORBIN ON CONTRACTS, § 547, *aff'd*, 273 F.3d 444 (3d Cir. 1959):

---

[17] In making this determination that the contention was "unsubstantiated" the court cited page 53 of plaintiffs' memorandum in opposition to the motion to dismiss. That page did not cite the relevant provision, because it had been described in great detail in the fact section of that brief, which quoted § 10.6 specifically. At other points in the decision the bankruptcy court referred directly to § 10.6 (324 B.R. at 525).

32

> "If the apparent inconsistency is between a clause that is general and broadly inclusive in character and one that is more limited and specific in its coverage, the latter should generally be held to operate as a modification and pro tanto nullification of the former."

(Citations omitted).

As we have seen, § 10.6 expressly refuses to bar claims based on willful or grossly negligent conduct in the Plan confirmation process. That provision directly applies here, and therefore trumps the more general exculpation provisions of §§ 10.2 and 10.3.

### 2. Because Section 10.6 of the Plan Expressly Preserves These Claims It Also Necessarily Limits the Res Judicata Effect of the Plan Confirmation

Because §10.6 refuses to release claims of willful misconduct or gross negligence in the course of the bankruptcy proceedings, it expresses the parties', and the court's, determination that anyone injured by such conduct should retain a full right to redress. That right would be meaningless if, in such an action, the guilty parties could hide behind, and invoke the benefits of, the "preclusive effect" of the Plan confirmation order they obtained through their own wrongful conduct. That is why § 10.6 operates as a reservation of rights provision, and thereby limits the preclusive effect of those proceedings on subsequent claims that fit within the exclusion. In this respect, § 10.6 parallels, and confirms, the fraud exception to *res judicata* and collateral estoppel, extending it to instances of "gross negligence" in procuring confirmation of the Plan.

The bankruptcy court held that §10.6 of the Plan "does not preserve any right to bring claims that would be otherwise barred by the Plan and the confirmation order" (324 B.R. at 525). But it would be an exercise in futility to include § 10.6, which refuses to release such claims, while enshrining as conclusive the very findings that were the product of that misconduct. A contract provision will not be construed in such a way as to render it a nullity. *CitiSteel USA, Inc. v. General Electric Co.*, 78 Fed. Appx. 832, 837 (3d Cir. 2003)(provisions not to be construed as "meaningless"); *GNB Battery Technologies v. Gould, Inc.* 65 F. 3d 615, 622 (7th Cir. 1995)(courts

33

should avoid interpretation that "gives no effect to some terms" of an agreement).

The bankruptcy court held that the exculpation provisions are superseded by the *res judicata* effect of the Plan confirmation. In fact, however, the rule is precisely the opposite: exculpation provisions override *res judicata*. "[U]nder a generally accepted exception to the *res judicata* doctrine, a litigant's claims are not precluded if the court in an earlier action expressly reserves the litigant's right to bring those claims in a later action.'" *D&K Props. Crystal Lake v. Mutual Life Ins. Co*, 112 F.3d 257, 260 (7th Cir. 1997), quoting *Apparel Art Int'l, Inc. v. Amertex Enters.*, 48 F.3d 576, 586 (1st Cir. 1995).[18] Accordingly, "most courts hold that where a disclosure statement and/or plan of reorganization expressly reserves an action for later adjudication, *res judicata* does not apply." *In re USN Communs., Inc.*, 280 B.R. 573, 588 (Bankr. D. Del. 2002) (citations omitted). *See also In re Kelley*, 199 B.R. 698, 704 (B.A.P. 9th Cir. 1996) ("If a confirmed plan expressly reserves the right to litigate a specific cause of action after confirmation, then res judicata does not apply"(citations omitted)).

In this case the bankruptcy court held that because §10.6 was not written in the specific language of a preservation of rights, it could not be construed as such (324 B.R. at 525). However, courts in this District have found that *res judicata* has no application even if a plan uses general and broad language to preserve claims. *USN Communs.*, 280 B.R. at 589 (rejecting defendant's argument that "a reservation must specifically disclose the proposed subsequent action against the particular

---

[18] *See also Buckley v. Goldman, Sachs & Co.*, Civ. A. No. 02-cv-11497 2005 U.S. Dist. LEXIS 9626, 2005 WL 1206865 (D. Mass. May 20, 2005); *Washington Pub. Power Supply Sys. v. Pittsburgh-Des Moines Corp.*, 876 F.2d 690, 699 (9th Cir. 1989) ("[w]hen a court reserves a question for further adjudication a judgment does not bar subsequent determination of that question" (citations omitted)); *Merrifield v. Beaven/Inter-American Cos.*, No. 89 C 8436, 1992 U.S. Dist. LEXIS 11964, at *7-*9, 1992 WL 193553 at *3 (N.D. Ill. Aug. 3, 1992); *A.J. Masi Electric Co. v. Marron & Sipe Bldg. & Contracting Corp.*, 574 A.2d 1323, 1324 (Conn. App. Ct. 1990); *RESTATEMENT (SECOND) OF JUDGMENTS* § 26(1)(b) (1982) ("the general rule" against splitting of a cause of action "does not apply to extinguish the claim," when the "court in the first action has expressly reserved the plaintiff's right to maintain the second action").

defendant"). *Accord In re Ampace Corp.*, 279 B.R. 145, 159 (Bankr. D. Del. 2002) (general language preserving certain claims was sufficient); *see also In re I. Appel Corp.*, 300 B.R. 564, 568-69 (S.D.N.Y. 2003).

In fact, several recent cases thoroughly considered the issue of how specific a preservation clause must be in order to permit post confirmation prosecution, and have found that "specific identification of defendants or causes of action is not necessary." *In re Value Music Concepts, Inc.*, 329 B.R. 111, 119, 120 n. 15 (Bankr. N.D. Ga. 2005)(noting that "this Court's observation is that the cases requiring specific identification of causes of action and defendants are not a new trend but a departure from the fundamentally sound approach exemplified by the cases [cited herein]").[19]

## F. SECTION 1144'S LIMITATION PERIOD FOR REVOKING A PLAN DOES NOT APPLY TO THIS ACTION FOR MONEY DAMAGES

The court also held that this action is untimely, as against Genesis, because it was not commenced within 180 days of the entry of the Confirmation Order (324 B.R. at 516-17). This limitation period, contained in § 1144 of the Bankruptcy Code, applies to actions for revocation or modification of a confirmation order.

The present action does not seek an order revoking or modifying the Plan; and in its dismissal opinion the bankruptcy court recognized that courts have regularly allowed parties injured in a bankruptcy proceeding to assert common law fraud claims for damages arising out of those proceedings against debtors, and others, after expiration of the 180-day period. (*Id.*). As stated in Lawrence P. King, ed., 8 *Collier on Bankruptcy* ¶ 1144.04 [2][a] (Matthew Bender 15th ed rev.

---

[19] *Accord, In re Bridgeport Holdings, Inc.*, No. 03-12825 (PJW), 2005 Bankr. LEXIS 1552 (Bankr. D. Del. Aug. 12, 2005) (annexed hereto); *In re Railworks Corp.*, 325 B.R. 709, 716-18 (Bankr. D. Md. 2005); *In re Western Integrated Networks, LLC*, 322 B.R. 156 (Bankr. D. Colo. 2005); *In re Pen Holdings Inc.*, 316 B.R. 495, 504-05 (Bankr. M.D. Tenn. 2004); *In re Kmart Corp.*, 310 B.R. 107, 119-26 (Bankr. N.D. Ill. 2004); *In re Ariz. Fast Foods, LLC*, 299 B.R. 589 (Bankr. D. Ariz. 2003); *In re Bankvest Capital Corp.*, 375 F.3d 51, 59-60 (1st Cir. 2004); *In re Associated Vintage Group, Inc.*, 283 B.R. 549, 563-65 (B.A.P. 9th Cir. 2002).

1997):

> Even though the 180 day deadline is absolute, a court is not without power
> to remedy an injustice created by fraud in a bankruptcy case. While the court is
> without power after expiration of the deadline to *revoke* the confirmation order,
> there may be other avenues to provide relief to parties affected by fraud during the
> chapter 11 case. The nature of the relief will vary from case to case depending on
> the nature of the fraudulent conduct and the position of the parties to the chapter 11
> case. The most likely form the relief will take is to allow a party injured by fraud
> to maintain an action for damages caused by the fraud.

(Footnote omitted). *See also Emmer Bros.*, 52 B.R. at 391 (creditor allowed to prosecute a fraud

damage action *against the debtor* a year after plan confirmation; 180-day period held inapplicable

because it was not "an attempt to revoke or otherwise collaterally attack the confirmation order");

*Circle K*, 181 B.R. at 462 (court denied motion for summary judgment under §1144 and allowed

creditors to pursue claims *against debtor* alleging fraud in the course of the bankruptcy proceeding,

reasoning that "[i]f plaintiffs prevail, the Court can fashion a remedy that does not upset the

confirmed plan, *i.e.*, monetary damages"); *In re Coffee Cupboard, Inc.*, 119 B.R. 14, 19-20

(E.D.N.Y. 1990) (holding that "the 180 day deadline in Section 1144 does not act as a bar to truly

independent causes of action based on a *debtor's* wrongful conduct") (emphasis added, citation

omitted).[20]

   The bankruptcy court deemed all these precedents inapplicable because here, it believed,

allowing the damage claims to proceed against Genesis might reduce the value of the Genesis stock,

warrants and debt securities distributed to the senior creditors under the Plan (324 B.R. at 516-17).

---

[20] *See also A.B.H Investments*, 2003 Cal. App. Unpub. LEXIS 11126, at *7, *32, 2003 WL
22796049 at *3, *11 (holding that the 180-day limitation period "does not bar participants injured
by fraud from seeking damages or other relief under common law theories in state or federal
courts"(citation omitted), and affirming the denial of summary judgment on the fraud count, finding
that "plaintiffs' claims for monetary damages would not upset the Plan" or "re-divide the pie");
*Donaldson v. Bernstein*, 104 F.3d 547, 553 (3d Cir. 1997) ("'misconduct during the bankruptcy
proceeding' by the debtor often compels the court to allow the fraud to be redressed") (quoting
*Emmer Bros.*, 52 B.R. at 394-95); *In re Newport Harbor Assocs.*, 589 F.2d 20, 24 (1st Cir. 1978);
*Williams v. Texaco*, 165 B.R. 662, 672 n.3 (D.N.M. 1994).

36

This, the court held, would be an "indirect" revocation of the Plan even though plaintiffs are not making any claim to the securities or any other property distributed pursuant to the Plan.[21] In holding that any claim against the debtor amounts to a *de facto* revocation of the reorganization plan, the court overlooked the fact that most of the cases holding §1144 inapplicable were cases just like this, brought against the debtor. If the court below was right, all these cases were wrong. In fact, to the best of our knowledge, no other court has ever ruled that all damage claims against the debtor automatically fall within §1144 merely because they might reduce the value of the debtor's newly issued securities. The case that came closest to such a ruling, *Hotel Corp. of the South v. Rampart 920*, 46 B.R. 758, 770-71 (E.D. La. 1985), *aff'd*, 781 F. 2d 901 (5th Cir. 1986) (*cited in* 324 B.R. at 516), held that such a claim against the debtor was an attempt to "do indirectly what they no longer may do directly". But that conclusory ruling offered no rationale, cited no supporting authority, and came after the court had ruled that the claims were barred by *res judicata* anyway. Not surprisingly, then, no court has subsequently followed this decision.

In contrast, the bankruptcy court acknowledged that in *Coffee Cupboard, Emmer Bros.* and *Circle K*, the courts had all allowed claims against the debtor concerning bankruptcy fraud to go forward despite the lapse of 180 days, determining that those claims were not an effort to redivide the pie (324 B.R. at 516).[22] The court never attempted to distinguish those cases from the present case.

In support of its ruling on this point the bankruptcy court cited only two cases, *Newport Harbor Assocs.*, 589 F.2d at 24.n6, and *In re Orange Tree Assocs., Ltd.*, 961 F.2d 1445, 1447-48 (9th Cir. 1992)(324 B.R. at 517). Neither case is apposite here. In *Newport Harbor* the plaintiff had

---

[21] Indeed, at least one of these defendants, Mellon Bank, no longer holds any such securities.

[22] The court also cited *In re Midstate Mortg. Investors, Inc.*, 105 Fed. Appx. 420, 423 (3d Cir. 2004), which also concerned a direct attack on a reorganization plan, because it attempted to revoke releases granted in the plan.

37

"moved the bankruptcy court to revoke the confirmation of the 1973 plan and reopen the Chapter XI proceedings" (*id.* at 21); and, similarly, in *Orange Tree* the plaintiff was "seeking to overturn the order confirming the Orange Tree reorganization plan on the ground of fraud in its procurement"(*id.* at 1446, footnote omitted). Such efforts are squarely within the 180-day proscription of §1144. The cases obviously do not stand for the proposition that the 180-day limitation can also apply to independent causes of action that seek no such relief, simply because they would diminish the value of the securities distributed pursuant to the plan.

The novel theory espoused by the court below would turn almost any damage action against a debtor into an effort to "revoke" the debtor's reorganization plan. Such a rule would effectively eliminate the safety valve the law presently provides for claims like ours that are filed more than 180 days after plan confirmation.

Tellingly, the bankruptcy court deliberately did not apply its reasoning under §1144 to the claims against the senior creditor defendants, apparently concluding that, as to them, the claims asserted here did not amount to a *de facto* revocation of the Plan. The court never, however, explained how the claims against these defendants would not also be considered as a revocation of the Plan as to them; and these defendants, it will be recalled, received a very large percentage of the securities distributed pursuant to that Plan, and would be the parties most directly affected if the value of the securities they received pursuant to the Plan were diminished. The court provided no explanation because none is possible.

Finally, the bankruptcy court's reasoning assumes its own conclusion, which is that "innocent" investors were entitled to expect that Genesis was going to be immune, after 180 days, to any claim arising from the bankruptcy proceeding that might adversely affect the value of its securities. In other words, these claims must be barred because investors will have assumed that they would be barred. Such reasoning turns logic on its head: investor expectations concerning their legal

38

rights must be based on the courts' decisions, not the other way around. Given the existence of *Circle K* and other cases holding that damage actions *are* available under these circumstances, there was no basis for any assumption that a damage claim against Genesis would necessarily be barred after 180 days. It is therefore not a "revocation" of the plan for the court to entertain claims which, under existing law, could properly be asserted even after the 180 day time limit imposed by §1144.

## CONCLUSION

For the foregoing reasons, the bankruptcy court's order dismissing the complaint should be reversed.

Dated: November 21, 2005

Respectfully submitted,

By: _____
R. Bruce McNew (# 967)
TAYLOR & McNEW LLP
3711 Kennett Pike, Suite 210
Greenville, DE 19807
Telephone: (302) 655-9200

*Attorneys for Plaintiffs*

CO-COUNSEL:

Stanley M. Grossman
H. Adam Prussin
POMERANTZ HAUDEK BLOCK
 GROSSMAN & GROSS LLP
100 Park Avenue, 26th Floor
New York, N.Y. 10017-5516
Telephone: (212) 661-1100

Leigh Handelman Smollar
POMERANTZ HAUDEK BLOCK
 GROSSMAN & GROSS LLP
One North LaSalle Street, Suite 2225
Chicago, IL 60602-3908
Telephone: (312) 377-1181

39

## ANNEX 1

*In re Bridgeport Holdings, Inc.*

No. 03-12825(PJW)

2005 Bankr. LEXIS 1552

(Bankr. D. Del. Aug. 12, 2005)

LEXSEE 2005 BANKR LEXIS 1552

**In Re: BRIDGEPORT HOLDINGS, INC., et. al., Debtors. KEITH F. COOPER, as Liquidating Trustee of the Bridgeport Holdings, Inc. Liquidating Trust, Plaintiff, v. TECH DATA CORPORATION, Defendant.**

**Chapter 11, Case No. 03-12825 (PJW), Jointly Administered, Adv. Proc. No. 05-50064 (PJW)**

**UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE**

**2005 Bankr. LEXIS 1552**

**August 12, 2005, Decided**

**PRIOR HISTORY:** Cooper v. Tech Data Corp (In re Bridgeport Holdings, Inc.), 326 B.R. 312, 2005 Bankr. LEXIS 1257 (Bankr. D. Del., 2005)

**LexisNexis(R) Headnotes**

**COUNSEL:** [*1] For Keith F. Cooper, as Liquidating Trustee of the Bridgeport Holdings Inc. Liquidating Trust, Plaintiff: S. Margie Venus, Akin Gump Strauss Hauer & Feld, LLP, Houston, TX; William H. Sudell, Jr., Morris, Nichols, Arsht & Tunnell, Wilmington, DE.

For Tech Data Corporation, Defendant: Andrew J. Flame, Howard A. Cohen, Drinker Biddle & Reath LLP, Wilmington, DE.

For Bridgeport Holdings, Inc., Debtor: Brendan Linehan Shannon, Edmon L. Morton, Kara S. Hammond, Matthew Barry Lunn, Young, Conaway, Stargatt & Taylor, Wilmington, DE; Daniel B. Butz, Morris, Nichols, Arsht & Tunnell, Wilmington, DE; Gordon Z. Novod, Jack A. Hazan, Robert T. Schmidt, Kramer Levin Naftalis Frankel, LLP, New York, NY.

For United States Trustee, U.S. Trustee: David Michael Klauder, Wilmington, DE.

For OFFICIAL COMMITTEE OF UNSECURED CREDITORS, Creditor Committee: Christopher Martin Winter, Duane Morris LLP, Wilmington, DE; Daniel B. Butz, Morris, Nichols, Arsht & Tunnell, Wilmington, DE; William H. Sudell, Jr., Morris, Nichols, Arsht & Tunnell, Wilmington, DE.

Attorneys for Defendant and Movant, Tech Data Corporation: Charles M. Tatelbaum, Stephen C. Hunt, Adorno & Yoss, LLP, Fort Lauderdale, [*2] FL.

Attorneys for Plaintiff, Keith F. Cooper, as Liquidating Trustee of the Bridgeport Holdings, Inc. Liquidating Trust: Daniel B. Butz, Morris, Nichols, Arsht & Tunnell, Wilmington, DE; Matthew S. Okin, Katy Gottsponer, Akin Gump Strauss Hauer & Feld LLP, Houston, TX.

**JUDGES:** Peter J. Walsh, United States Bankruptcy Judge.

**OPINIONBY:** Peter J. Walsh

**OPINION:**

### REVISED MEMORANDUM OPINION *

> \* This is a revision of the Court's Memorandum Opinion of July 1, 2005 (Doc. # 23) to correct two minor factual misstatements. See pages 18 and 19.

**WALSH, J.**

In this adversary proceeding defendant Tech Data Corporation's ("Tech Data") motion (Adv. Doc. # 4) n1 seeks to dismiss the preference action complaint of Keith F. Cooper, as liquidating trustee (the "Liquidating Trustee") of the Bridgeport Holdings, Inc. Liquidating Trust (the "Liquidating Trust"). For the reasons set forth below, Tech Data's motion will be denied.

> n1 References to documents filed in adversary proceeding 05-50064 will be cited as "(Adv. Doc. #   )." References to documents filed in chapter 11 case number 03-12825 will be cited as "(Doc. #   )."

[*3]

**BACKGROUND**

On September 10, 2003, Bridgeport Holdings Inc. and its domestic affiliates (the "Debtors" or "Bridgeport") filed voluntary petitions under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101 et seq. (the "Bankruptcy Code") n2 Prior to filing for bankruptcy, the Debtors were one of the country's largest specialty catalog and online retailers for computer hardware, software, and related products. Excluding foreign operations, the Debtors had net sales of approximately $1.15 billion for the fiscal year ending December 31, 2002. (Doc. # 815 at 7.) Immediately prior to and during the course of the Debtors' chapter 11 cases, substantially all of their assets were sold. Thereafter, the Debtors' disclosure statement (the "Disclosure Statement") was approved. Pursuant to the order (Doc. # 937) issued by this Court on September 21, 2004 (the "Confirmation Order"), the Debtors' plan of distribution (the "Plan") and liquidating trust agreement (the "Liquidating Trust Agreement") were confirmed, and the Plan became effective on October 14, 2004. n3 Under the terms of the Confirmation Order and Plan, the Liquidating Trustee is the designated [*4] representative of the Debtors' estates with respect to all causes of action arising under § 547 of the Bankruptcy Code. n4 (Adv. Doc. # 1 at 3.)

n2 Particular sections of the Bankruptcy Code will be cited herein as "§   ."

n3 The Disclosure Statement, Plan, Confirmation Order, and Liquidating Trust Agreement will be referred to collectively as the "Confirmation Documents."

n4 Section 547(b) provides:

(b) Except as provided in subsection (c) of this section, the trustee may avoid any transfer of an interest of the debtor in property

(1) to or for the benefit of a creditor;

(2) for or on account of an antecedent debt owed by the debtor before such transfer was made;

(3) made while the debtor was insolvent;

(4) made

(A) on or within 90 days before the date of the filing of the petition; or

(B) between 90 days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider; and

(5) that enables such creditor to receive more than such creditor would receive if

(A) the case were a case under chapter 7 of this title;

(B) the transfer had not been made; and

(C) such creditor received payment of such debt to the extent provided by the provisions of this title.

[*5]

This liquidating chapter 11 concerns more than 1,000 creditors, roughly $102 million in general unsecured claims, and over 3,000 property transfers aggregating over $221 million made during the 90 day pre-petition period. (Doc. # 1; Doc. # 815 at 6.) Tech Data is only one of the numerous entities that may have received a preferential transfer from the Debtors. Virtually none of the details relating to the 3,000 potential preference actions were listed in the Debtors' Confirmation Documents. As is often the case in large chapter 11 liquidations, the Plan was confirmed well before any preference actions were filed.

On January 13, 2005, the Liquidating Trustee filed its § 547 complaint alleging that Tech Data had received over $19 million in preferential transfers. In its motion to dismiss, Tech Data argues that the Liquidating Trustee is precluded from bringing this preference action because it was not sufficiently preserved in the Debtors' Disclosure Statement and Plan. (Adv. Doc. # 5 at 5.) Tech Data argues that this action is bared by the doctrine of res judicata and, therefore, this Court lacks jurisdiction to hear the preference claim. In response, the Liquidating Trustee [*6] points to numerous provisions in the Confirmation Documents regarding the preservation of preference actions for post-confirmation adjudication. A number of these provisions are detailed below.

The Plan defines "Cause of Action" in a manner that preserves all claims that have been or could have been

brought by or on behalf of the Debtors, including those "arising under chapter 5 of the Bankruptcy Code." (Doc. # 937, Ex. A at 3.) The term "Cause of Action" is then incorporated into the definition of "Transferred Causes of Action" and paragraph 24 of the Confirmation Order, Article V Section C of the Disclosure Statement, and Article IV Section E of the Plan vest any Transferred Cause of Action with the Liquidating Trust and give the Liquidating Trustee power to pursue those claims. Specifically, paragraph 24 of the Confirmation Order provides:

> Entry of the Confirmation Order shall not constitute a waiver or release by the Debtors or their Estates of any Cause of Action except as expressly provided for by the Plan. On and after the Effective Date, and pursuant to Bankruptcy Code section 1123(b)(3), the Liquidating Trust shall be designated representative [*7] of the estates with respect to, and shall be assigned, all Causes of Action arising under sections 542, 543, 544, 547 through 551, and 553 of the Bankruptcy Code . . . but excluding (i) avoidance claims against Apple and its affiliates . . (the "Transferred Causes of Action"). The Liquidating Trust shall be authorized to enforce, prosecute, settle or compromise the Transferred Causes of Action. . . . The Liquidating Trustee may pursue such Transferred Causes of Action. .

(Doc. # 937 at 24-25.)

Article V Section C of the Disclosure Statement and Article IV Section E of the Plan do not reference § 1123(b)(3), n5 but are identical to paragraph 24 of the Confirmation Order in all material respects. Those passages provide:

> Entry of the Confirmation Order shall not constitute a waiver or release by the Debtors or their Estates of any Cause of Action except as expressly provided for by the Plan. On and after the Effective Date, the Liquidating Trust shall be assigned all Causes of Action arising under sections 542 [*8] , 543, 544, 547 through 551, and 553 of the Bankruptcy Code . . . but excluding (i) avoidance claims against Apple and its affiliates . . . (the "Transferred Causes of Action"). The Liquidating Trust shall be authorized to enforce, prosecute, settle or compromise the Transferred Causes of Action. . . . The Liquidating Trustee may

pursue such Transferred Causes of Action. .
. .

(Doc. # 815 at 32; Doc. # 937, Ex. A at 17.)

> n5 Section 1123(b)(3) provides that, subject to certain exceptions not relevant here, a plan may —
>
> > (3) provide for —
> >
> > > (A) the settlement or adjustment of any claim or interest belonging to the debtor or to the estate; or
> > >
> > > (B) the retention and enforcement by the debtor, by the trustee, or by a representative of the estate appointed for such purpose, of any such claim or interest.

The Bridgeport Confirmation Documents refer to the Transferred Causes of Action [*9] (defined to include preference actions), the Liquidating Trust, and the powers of the Liquidating Trustee in numerous provisions. For example:

(1) Article V Section C of the Plan and Article V Section E of the Disclosure Statement provide: "The Liquidating Trust shall be empowered . . . to prosecute, litigate, settle, adjust, retain, enforce or abandon any of the Transferred Causes of Action assigned to the Liquidating Trust. . . ." (Doc. # 937, Ex. A at 27; Doc. # 815 at 42.)

(2) Article V Section C of the Plan also provides: "With respect to any Transferred Causes of Action or other claims or rights assigned to the Liquidating Trust in which the asserted amount is equal to or less than $200,000, the Liquidating Trustee shall be empowered and authorized, without approval of the Bankruptcy Court or notice to any other Person, to settle, adjust, dispose of or abandon any such Transferred Causes of Action . . . (Doc. # 937, Ex. A at 28.)

(3) Article I Section 1.1 of the Liquidating Trust Agreement provides: "The Debtors hereby transfer, assign, and deliver to the Liquidating Trust all of their right, title, and interest in and to all of the Transferred Causes of Action. . . ." (Doc. [*10] # 937, Ex. B at 2.)

(4) Article III Section 3.2 of the Liquidating Trust Agreement empowers the Liquidating Trustee "to compromise, adjust, arbitrate, sue on or defend, pursue, prosecute, abandon, or otherwise deal with and settle . . . the Transferred Causes of Action. . . ." (Doc. # 937, Ex. B at 6.)

(5) Article V Section E of the Disclosure Statement and Article V Section A of the Plan provide: "From and after the Effective Date, the Liquidating Trustee shall . . . liquidate all other assets, including the Transferred Causes of Action." (Doc. # 815 at 34; Doc. # 937, Ex. A at 20.)

Article IV Section J of the Disclosure Statement contains a section titled "Preference and other Causes of Action" that explains in some detail what preference litigation is about:

> Pursuant to the Bankruptcy Code, a debtor may seek to recover, through adversary proceedings in the bankruptcy court, certain transfers of the debtor's property, including payments of cash, made while the debtor was insolvent during the ninety (90) days immediately prior to the commencement of the bankruptcy case (or, in the case of a transfer to, or on behalf of, an "insider," one year prior to the commencement of the [*11] bankruptcy case) in respect of antecedent debts to the extent the transferee received more than it would have received on account of such pre-existing debt had the debtor been liquidated under chapter 7 of the Bankruptcy Code. Such transfers include cash payments, pledges of security interests or other transfers of an interest in property. In order to be preferential, such payments must have been made while the debtor was insolvent; debtors are presumed to have been insolvent during the 90-day preference period.
>
> However, there are certain defenses to preference claims. For example, transfers made in the ordinary course of the debtor's and the transferee's business according to ordinary business terms are not recoverable. Furthermore, if the transferee extended credit contemporaneously with or subsequent to the payment, and prior to the commencement of the bankruptcy case, for which the defendant was not repaid, such extension constitutes an offset against an otherwise recoverable transfer of property. If a payment is recovered by a debtor, the defendant has a general unsecured claim against the debtor to the extent of the recovery.
>
> Under the Plan, all Causes of Action will be preserved [*12] including preference claims and all other claims under Chapter 5 of the Bankruptcy Code. The extent of recoveries from such claims is uncertain and

speculative in nature.

(Doc. # 815 at 22-23.)

Also, Article IV Section J of the Disclosure Statement clearly puts creditors on notice that some of them may be targeted for preference complaints:

> The Bankruptcy Code preserves the Debtors' rights to prosecute claims and causes of action which exist outside of bankruptcy, and also empowers the Debtors to prosecute certain claims which are established by the Bankruptcy Code, including claims to avoid and recover preferential transfers and fraudulent conveyances (collectively, "Causes of Action"). . . . The Plan preserves all of the Debtors' rights in respect of all Causes of Action, transfers the Debtors' rights in respect of such Causes of Action to the Liquidating Trust or the Prepetition Secured Lender Agent, and empowers the Liquidating Trustee on behalf of the Liquidating Trust or the Prepetition Secured Lender Agent, as the case may be, to investigate, prosecute, collect, and/or settle the Causes of Action as deemed appropriate.
>
> * * *
>
> **IN REVIEWING THIS DISCLOSURE [*13] STATEMENT AND THE PLAN, AND IN DETERMINING WHETHER TO VOTE IN FAVOR OF OR AGAINST THE PLAN, CREDITORS AND INTEREST HOLDERS (INCLUDING PARTIES THAT RECEIVED PAYMENTS FROM THE DEBTORS WITHIN NINETY (90) DAYS PRIOR TO THE COMMENCEMENT DATE) SHOULD CONSIDER THAT A CAUSE OF ACTION MAY EXIST AGAINST THEM, THAT THE PLAN PRESERVES ALL CAUSES OF ACTION, AND THAT THE PLAN AUTHORIZES EITHER THE LIQUIDATING TRUST OR THE PREPETITION SECURED LENDER AGENT TO PROSECUTE THE SAME.**

(Doc. # 815 at 21.)

The Disclosure Statement also explains how distributions from the Transferred Causes of Action will benefit the Debtors' general unsecured creditors. The general un-

secured creditors are grouped into Class 3 under the Plan. (Doc. # 815 at 6, 28.) The Disclosure Statement provides:

> Actual distributions to holders of Class 3, 4 and 5 Claims will depend upon, among other things, the amount of allowed claims against the Debtors' Estates, the expenses incurred by the Debtors' Estates and the Liquidating Trust, and the ultimate realization on the Debtors' assets including the prosecution of Transferred Causes of Action. Please refer to Article V.C.5 herein regarding Transferred Causes [*14] of Action that may result in substantial changes to the estimated recoveries on Class 3, 4 and 5 Claims.

(Doc. # 815 at 4.)

Furthermore, that the Confirmation Documents foretold of post-confirmation preference actions being filed is clearly reflected in the provisions that preserve set-off rights for any preference defendants who may be creditors. Article V Section M of the Disclosure Statement and Article XII Section D of the Plan provide:

> Nothing contained herein, in the Plan or the Confirmation Order shall be deemed to discharge, enjoin, restrict or otherwise impair any rights that may exist in favor of the holder of any Claim to setoff such Claim against any Causes of Action that may be asserted before, on or after the Effective Date against such holder by any Debtor or successor in interest to a Debtor (including, without limitation, the Liquidating Trust).

(Doc. # 815 at 54; Doc. # 937, Ex. A at 40.) n6 And paragraph 26 of the Confirmation Order, titled "No Waiver of Rights", provides:

> n6 This paragraph in the Plan does not contain the word "herein."

[*15]

> Unless otherwise agreed to in writing, no distribution on account of any claim, whether allowed on or after the Effective Date shall be deemed to waive the rights of the Debtors in connection with any causes of action against the holder of any claim receiving such distribution, including without limitation, any causes of action under chapter 5 of the Bankruptcy code. Nothing in the Plan or this

> Confirmation Order shall be deemed to discharge, enjoin, restrict or otherwise impair any rights that may exist in favor of a person or entity to assert any defensive rights of setoff or recoupment with respect to any cause of action that may be asserted against such person or entity by the Debtors or successor in interest to the Debtors, including the Liquidating Trust.

(Doc. # 937 at 26.)

The issue presented here is whether the retention language used in the Bridgeport Confirmation Documents is sufficiently specific to preserve preference actions for post-confirmation adjudication by the Liquidating Trustee. Notwithstanding the reservation language listed above, Tech Data argues that the Confirmation Documents are insufficiently specific. Tech Data contends that this preference [*16] action would only be actionable if the Debtors' Confirmation Documents identified Tech Data by name and listed this matter as a future cause of action.

**DISCUSSION**

A motion to dismiss must be denied "unless it appears beyond doubt that the [nonmoving party] can prove no set of facts in support of its claims which would entitle it to relief." Conley v. Gibson, 355 U.S. 41, 45–46, 2 L. Ed. 2d 80, 78 S. Ct. 99 (1957). In ruling on a motion to dismiss, "I accept the allegations of the complaint as true and draw all reasonable factual inferences in favor of the [nonmoving party]." Weston v. Pennsylvania, 251 F.3d 420, 425 (3d Cir. 2001).

**A. Res Judicata**

For the doctrine of res judicata to apply, three factors must be present: (1) a final judgment on the merits, rendered by a court of competent jurisdiction, in a prior action involving; (2) the same parties or their privies; and (3) a subsequent suit based on the same cause of action. E.g., CoreStates Bank, N.A. v. Huls America, Inc., 176 F.3d 187, 194 (3d Cir. 1999); Novacare Holdings, Inc. v. Mariner Post-Acute Network, Inc. (In re Mariner Post-Acute Network Inc.), 267 B.R. 46, 52 (Bankr. D. Del. 2001).

On two prior occasions, I issued [*17] opinions addressing questions almost identical to those presented here by Tech Data's motion. Under the facts of both Peltz v. Worldnet Corp (In re USN Communications, Inc.), 280 B.R. 573 (Bankr. D. Del. 2002) and Cohen v. TIC Fin. Sys. (In re Ampace Corp.), 279 B.R. 145, 155 (Bankr. D. Del. 2002), I found that the doctrine of res judicata did not stand as a bar to the filing of post-confirmation

preference actions I rested my decisions, in part, on findings that those preference actions and the prior confirmation proceedings did not constitute the same cause of action. Therefore, the third factor in the res judicata analysis was not present. Furthermore, and most relevant for this proceeding, I also recognized that the doctrine of res judicata did not apply where confirmation documents preserved preference actions for post-confirmation adjudication. In their pleadings, neither Tech Data nor the Liquidating Trustee mounted a traditional res judicata analysis. Rather, both parties focus their arguments on what degree of specificity is required of reservation language to preserve causes of action for post-confirmation pursuit. Because neither [*18] of the parties addressed the issue and because I find the reservation language sufficient, a full res judicata analysis is unnecessary here.

### B. Retention of Preference Actions

In arguing for dismissal of this preference action, Tech Data does two things: (1) it cites numerous cases that it alleges support its position and (2) argues that creditors were unable to cast an informed vote because the Confirmation Documents provided insufficient notice. I will address each of these arguments in turn.

#### 1. Cases Relied On By Tech Data

In presenting the cases on which it relies, Tech Data contends that my decisions in USN Communications and AMPACE represent the minority view. Tech Data argues that a majority of courts find that preference actions can only be reserved for post-confirmation adjudication where confirmation documents contain reservation language detailing the specific actions to be preserved. Tech Data believes that a general retention clause identifying the category of actions to be brought (e.g. preference actions under § 547) is insufficient. In support of its position, Tech Data cites a long list of cases. Because I believe that almost every [*19] case cited by Tech Data is factually distinguishable, and because I disagree with the legal holdings of the cases that are not factually inapposite, I will rule against Tech Data and deny its motion to dismiss.

Tech Data first cites D&K Properties Crystal Lake v. Mutual Life Insurance Co., 112 F.3d 257 (7th Cir. 1997). In that case, a former chapter 11 debtor pursued a breach of contract action against a secured creditor. In finding the plaintiff's cause of action barred by res judicata, the court of appeals found reservation language in the debtor's plan to be insufficiently specific. Unlike the matter before me, D&K Properties' cause of action was based on facts known to it before its plan of reorganization went effective. Indeed, the facts of D&K Properties' action were even clear pre-petition. Before filing for bankruptcy protection, D&K Properties had instituted a related cause of action

in an Illinois state court. Once D&K Properties filed its petition, the action was removed to the bankruptcy court and the creditor persuaded the court that D&K Properties was not entitled to relief.

Furthermore, the reservation language in D&K Properties' plan was less specific [*20] than the relevant language before me. D&K Properties unsuccessfully argued that a passage preserving "all causes of action existing in favor of the Debtor" was sufficient to preserve its breach of contract action. D&K Properties, 112 F.3d at 260. Bridgeport's Plan specifically reserved preference actions pursuant to § 547. On both the facts of D&K Properties and the reservation language used in its confirmation documents, the matter before me is distinguishable.

Tech Data next cites Goldin Assocs., L.L.C. v. Donaldson, Lufkin & Jenrette Sec. Corp., 2004 U.S. Dist. LEXIS 9153, 2004 WL 1119652 (S.D.N.Y. May 20, 2004). The facts of Goldin Associates could not be more dissimilar. The issue before that court was whether a general reservation of rights in a plan of reorganization, coupled with a specific reservation in the corresponding disclosure statement was sufficient to preserve certain causes of action. The Goldin Associates court was not ruling on the specificity required of reservation language in the plan because the language contained in the Goldin Associates' disclosure statement was clearly sufficient. Among other things, the complaint alleged breach [*21] of fiduciary duty and fraud, and the actions were filed by the committee of unsecured creditors before the disclosure statement and plan of reorganization were finalized. 2004 U.S. Dist. LEXIS 9153, [WL] at *1-2. The facts underlying those causes of action were known pre-confirmation and, therefore, a detailed reservation in the Goldin Associates' disclosure statement was possible. At no time did the Goldin Associates court address what language would be required to preserve a post-confirmation preference action in a large chapter 11 case.

Bonwit Teller, Inc. v. Jewelmasters, Inc. (In re Hooker Investments, Inc.), 162 B.R. 426 (Bankr. S.D.N.Y. 1994) is similarly distinguishable. The specificity required to preserve causes of action for later adjudication was not at issue in Hooker Investments. The plan contained "an express reservation for Bonwit (or the Committee on its behalf) to commence an avoidance action against Jewelmasters. . . ." Id. at 434. The court never discussed whether language reserving a category of actions would be acceptable.

The facts of Browning v. Levy, 283 F.3d 761 (6th Cir. 2002) are quite different from those here. In [*22] Browning, the causes of action at issue, which arose out of prepetition facts, were breach of fiduciary duty, legal

malpractice, breaches of duty under Ohio law, and violations of the Employment Retirement Income Security Act. No preference actions were considered by the Browning court. The Court addressed the issue in the context of what it characterized as a "blanket reservation" which read as follows:

> In accordance with section 1123(b) of the Bankruptcy Code, the Company shall retain and may enforce any claims, rights, and causes of action that the Debtor or its bankruptcy estate may hold against any person or entity, including, without limitation, claims and causes of action arising under section 542, 543, 544, 547, 548, 550, or 553 of the Bankruptcy Code.

Id. at 774–75. In that context the court found that because the debtor's reservation neither named the defendant nor stated the factual basis for the claim the claim was barred by res judicata. Aside from the fact [*23] that Browning did not address the reservation of preference actions, as discussed below, a recent bankruptcy court decision in the Sixth Circuit, Elk Horn Coal Co. v. Conveyor Manufacturing & Supply, Inc. (In re Pen Holdings, Inc.), 316 B.R. 495 (Bankr. M.D. Tenn. 2004), casts serious doubt on the application of the Browning holding to the reservation of preference actions for post-confirmation pursuit.

Kelley v. South Bay Bank (In re Kelley), 199 B.R. 698 (B.A.P. 9th Cir. 1996) is inapposite. Kelley involved the res judicata effect of a confirmed plan on the ability of individual debtors to object to the claim of one of the debtors' secured lenders. Kelley did not involve a preference action and did not arise against the backdrop of a large corporate chapter 11 case. Furthermore, unlike in this avoidance action, the court in Kelley found that the circumstances giving rise to the debtors' objections were known to the debtors at least four months before plan confirmation. Id. at 703. The court also noted that the bankruptcy court found that the debtors' negotiated with the lender pre-confirmation, and that the secured [*24] lender's vote was obtained in exchange for favorable treatment of that lender's claim. n7 Id. at 701. Presumably, because Tech Data is not a creditor of the Debtors' estates, Bridgeport and Tech Data did not engage in pre-confirmation discussions regarding claims treatment under the Plan. star2

> n7 Although the Kelley court found that res judicata was a bar to the causes of action at issue in that case, the Bankruptcy Appellate Panel for the

Ninth Circuit has since had opportunity to elaborate on its holding in Kelley. As discussed below, in Alary Corp. v. Sims (In re Associated Vintage Group, Inc.), 283 B.R. 549 (9th Cir. B.A.P. 2002) the court clarified that Kelley does not stand for the proposition that a general reservation of rights is never sufficient to preserve causes of action for post-confirmation adjudication.

* This revised sentence is a correction.

Tech Data's reliance on Tracar v. Silverman (In re American Preferred Prescription, Inc.), 266 B.R. 273 (E.D.N.Y. 2000) [*25] is also misplaced. American Preferred involved an attempt by a chapter 11 trustee to expunge claims of a creditor more than two years after plan confirmation. American Preferred in no way involved prosecution of timely filed preference actions by a liquidating trustee. In addition, unlike the situation before me where the Debtors have specifically reserved a particular type of avoidance action, the reservation language in American Preferred provided the "Debtor with the right to object to any claim filed with the Bankruptcy Court' . . . ." Id. at 279. In holding that language to be overly general, the court relied on a Second Circuit case, Sure-Snap Corp. v. State Street Bank and Trust Co., 948 F.2d 869 (2nd Cir. 1991).

Sure-Snap, however, never addressed how specific the reservation language must be to preserve causes of action, and the American Preferred court acknowledged that the Second Circuit had not ruled on that issue. American Preferred, 266 B.R. at 278. At most, Sure-Snap only offers dicta from the Second Circuit that a blanket reservation may be insufficient. The Sure-Snap court merely held [*26] that a bankruptcy judge's statement, "I think it's a matter of law, is it not, that any claims, I mean any actions, are reserved to the debtor," Sure-Snap, 948 F.2d at 872, was insufficient to preserve lender liability claims that could have been brought prior to confirmation. Id. at 873. The Sure-Snap decision did not turn on the interpretation of a retention provision. star3 Thus, Tech Data's reliance on American Preferred and Sure-Snap is unpersuasive.

* Correction: a sentence has been deleted.

In Holly's Inc. v. City of Kentwood (In re Holly's Inc.), 178 B.R. 711 (W.D. Mich. 1995) the district court affirmed the bankruptcy court's holding that res judicata prevented the debtor from bringing a post-confirmation action to determine the debtor's real property tax liability. Holly's, Inc. has no relevance here. As the district court noted, "Holly's was aware that there was an issue

in the bankruptcy proceeding regarding the real property taxes based [*27] upon [the taxing authority's] proofs of claim filed." Id. at 714. The taxing authority had filed its proofs of claim "prior to the confirmation of the plan . . . ." Id. Furthermore, with that information readily available, Holly's, Inc 's plan of reorganization failed to "reserve the right to institute a post–confirmation proceeding under 11 U.S.C. § 505. . . ." Id at 713.

Tech Data's reliance on Westland Oil Development Corp. v. MCORP Management Solutions, Inc.,157 B.R. 100 (S.D. Tex. 1993) is also misplaced. In Westland Oil, the debtor sued on theories of successor liability, breach of contract, and tortious interference. The action arose because of an unsuccessful attempt to restructure Westland Oil's debt on the eve of filing. No preference or similar avoidance action was at issue in Westland Oil. Furthermore, the Westland Oil court stated that "Westland was aware of its claim against [that creditor] before it filed for bankruptcy" Id. at 103. The Court also noted that "Westland knew about the claim, was mad about it, and hid it within the murky language of a general [*28] retention clause." Id. The retention language in Westland Oil did not specify the categories of actions to be preserved and did not mention the claim that Westland Oil had against the relevant creditor. The court explained that "the institution of bankruptcy exists to give debtors a fresh start, not to allow debtors to seek revenge against creditors who were difficult in earlier business dealings. General retention clauses are not convenient hiding places for debtors." Id. In contrast to the facts of Westland Oil, the retention language in Bridgeport's Plan is not murky, nor is there any indication that Bridgeport's reservation of preference actions is an attempt to seek revenge against a particular party.

In Galerie Des Monnaies of Geneva, Ltd. v. Deutsche Bank, A.G. (In re Galerie Des Monnaies), 62 B.R. 224 (S.D.N.Y. 1986), aff'g 55 B.R. 253 (Bankr. S.D.N.Y. 1985), both the bankruptcy and district court applied the doctrine of judicial estoppel and not res judicata. Therefore, the analysis provided by those cases is tangentially relevant at best. The debtor in Galerie Des Monnaies, filed its preference action on the same day [*29] that its plan of reorganization was confirmed. The action was curious considering that Galerie Des Monnaies' disclosure statement provided that "the Debtor has discussed the nature of preferential payments and fraudulent conveyances with its counsel and accountants. The Debtor's management does not believe any preferences or fraudulent transfers have occurred. . . ." Galerie Des Monnaies, 55 B.R. at 259. As a result of that provision, the debtor convinced its creditors to approve a plan of reorganization that vested the proceeds of any preference action with the debtor. Galerie Des Monnaies, 62

B.R. at 225. The fact that the debtor's "management knew of at least some of the alleged preferential transfers prior to the Bankruptcy Court's confirmation of its reorganization plan" and did not amend the debtor's disclosure statement persuaded the court that judicial estoppel was appropriate. Id. at 225.

The retention language in Galerie Des Monnaies is nothing like the provisions before me. Whereas Galerie Des Monnaies stated that it did not believe that any preference actions existed, Bridgeport preserved § 547 causes of action because [*30] it obviously anticipated a substantial number of actions with prospects for significant recoveries for unsecured creditors. Furthermore, as stated above, the Galerie Des Monnaies decisions base their relevant holdings on the doctrine of judicial estoppel, not res judicata. Tech Data's reliance on Galerie Des Monnaies is unpersuasive.

Tech Data cites Mickey's Enterprises, Inc. v. Saturday Sales, Inc. (In re Mickey's Enterprises, Inc.), 165 B.R. 188 (Bankr. W.D. Tex. 1994) for the proposition that general retention clauses are always insufficient to preserve preference actions for post–confirmation adjudication. Considering the extreme facts of Mickey's Enterprises, it is unclear to me whether that case was intended to stand for such a sweeping proposition. In Mickey's Enterprises, the court repeatedly stated that the debtor had knowledge of the facts and circumstances supporting the preference action prior to confirmation and that the debtor "veiled its existence from the creditors and the Court." Id. at 193. The court alluded to impropriety on the part of the debtor by stating that "the Debtor lay behind the proverbial log until this [*31] creditor's remedies were exhausted and then, and only then, did it come forward with its claim." Id. at 194. The court added, "this Debtor . . . waited for the right moment to spring its trap." Id. at 194–95. Given the extensive provisions relating to reservation of and prosecution of preference actions set forth in the Confirmation Documents, by no stretch of the imagination can it be suggested that Bridgeport was either attempting to spring a trap on Tech Data or attempting to veil the existence of this preference action from the Court. Thus, I find Mickey's Enterprises factually distinguishable from the matter before me. However, to the extent that Mickey's Enterprises stands for the proposition that general retention clauses are never sufficient to preserve preference actions from the preclusive effect of res judicata, I must respectfully disagree.

Tech Data's reliance on Harstad v. First American Bank, 39 F.3d 898 (8th Cir. 1994) is also misplaced. The Harstad court did not conduct a res judicata analysis and the facts of Harstad demonstrate that a large number of preference actions were never contemplated by [*32] the

debtors. Language in the Harstad disclosure statement included a provision stating that the "Debtors do not know at the present time whether or not there are any avoidable preferential transfers." Id. at 901.

The Harstad court based its decision, in part, on the grounds that the debtor did not have standing to bring the action because the plan failed to retain any post-confirmation preference actions for the Harstads. Id. at 902, 903. The Harstad court also took issue with who would receive the benefit of the alleged preference. The Harstad plan

> [did] not provide for the distribution of any preference recoveries to creditors. Moreover, the Harstads [were] not suggesting that they voluntarily will turn over additional funds to creditors or that they will seek a modification of the Plan in order to insure that the creditors share in any recovery. . . . They contend that the "estate" is now Keith and Diane Harstad d/b/a Harstad Companies, which would be directly benefited by the recovery of the alleged preference.

Id. at 903–04.

I am not faced with the situation presented in Harstad. Under the facts [*33] before me, any recovery will benefit general unsecured creditors. (Doc. # 815 at 6.) The Bridgeport Disclosure Statement provides that "actual distributions to holders of [unsecured claims] will depend upon, among other things, . . . the ultimate realization on the . . . Transferred Causes of Action." (Doc. # 815 at 4.) And, "class 3 consists of General Unsecured claims. . . . Each holder of an Allowed Class 3 Claim will receive Class 3 Trust Interests entitling such holder to receive distributions from the Liquidating Trust. . . ." (Doc. # 815 at 28.) Furthermore, "the Liquidating Trustee shall distribute any proceeds of the liquidation of Trust Assets, including Transferred Causes of Action . . . to the holders of Class 3 . . . in accordance with the Plan." (Doc. # 815 at 41.) Harstad is distinguishable.

Tech Data's reliance on Southtrust Bank N.A. v. WCI Outdoor Prods. (In re Huntsville Small Engines, Inc.), 228 B.R. 9 (Bankr. N.D. Ala. 1998) is similarly unconvincing. In Huntsville Small Engines, the debtor attempted to assign a preference action to one of its largest secured creditors. In disallowing the preference action, the Huntsville [*34] Small Engines court concluded that the third-party creditor lacked standing to pursue the action, that the action would not provide a benefit to the debtor's estate, and that the action was barred by res judicata. The court held that the general retention language found in the disclosure statement and plan of reorganization was insufficient to preserve the cause of action. The language cited by the court was a general retention provision that did not even mention preference actions. Therefore, I find Huntsville Small Engines to be not on point. However, to the extent that Huntsville Small Engines holds that a debtor's plan and disclosure statement must always specifically name each party that will be subject to a preference action, I must respectfully disagree.

Although not cited by Tech Data, I note the recent holding in Slone v. M2M Int'l, Inc. (In re G-P Plastics, Inc.), 320 B.R. 861 (E.D. Mich. 2005) that supports Tech Data's position. G-P Plastics, like the matter before me, arose out of a liquidation case in which the liquidating trust brought an action after plan confirmation. The court found that a "blanket reservation" in a chapter 11 [*35] plan was insufficient to preserve from res judicata a preference action coupled with other causes of action. The court noted that the reservation of rights provision was similar to that addressed in the Browning case. In the G-P Plastics case, the reservation of rights read as follows:

> "Notwithstanding the confirmation of the Plan, except as stated herein, the Reorganized Debtor shall retain all causes of action which the Debtor and/or the Debtor in Possession may have under the Bankruptcy Code, including, but not limited to, causes of action under Chapter 5 of the Bankruptcy Code."

Id. at 868. The court found that the debtor's plan "fails to (1) name [defendant], (2) describe the specific cause of action, or (3) identify the factual basis for any claim against the defendant as required by Browning." Id. at 868. It therefore concluded that the reservation of rights provision "was an insufficient basis upon which to avoid the res judicata effect of the Plan." Id. at 868. I do not believe that Browning should be read in such a fashion. Rather, I believe the interpretation of Browning found [*36] in Pen Holdings, discussed below, more accurately interprets that Sixth Circuit decision.

### 2. Cases Holding Contrary to Tech Data's Position

As noted above, I have rendered two prior published opinions holding contrary to Tech Data's position. There are additional noteworthy opinions supporting the position I take here.

The Pen Holdings facts are similar to those before me, the opinion is quite instructive on the issue here, and the court reached the same result as I reach here. In

2005 Bankr. LEXIS 1552, *36

Pen Holdings, on the eve of the § 546 two-year statute of limitations, the reorganized debtor filed 173 adversary proceedings to avoid preferential transfers. The sole issue in the decision was whether the reservation language contained in the Pen Holdings confirmation documents was sufficient to preserve preference actions for post-confirmation adjudication. In holding that res judicata did not bar § 547 actions, the court stated that general reservation language was sufficient for purposes of § 1123(b)(3) under the facts of that case. In reaching its decision, the court conducted a review of the legislative history of § 1123(b)(3) and concluded that "as history of § 1123(b)(3) [*37] plainly shows . . . the notice at issue in § 1123(b)(3) is not notice to potential defendants, it is notice to creditors generally that there are assets yet to be liquidated that are being preserved for prosecution by the reorganized debtor or its designee." Pen Holdings, 316 B.R. at 500-01.

Furthermore, in discussing Browning, the Pen Holdings court had this to say: "Browning does not establish a general rule that naming each defendant or stating the factual basis for each cause of action are the only ways to preserve a cause of action at confirmation of a Chapter 11 plan." Id. at 504. The court also stated:

> Ironically for current purposes, § 547 is one of the sections listed in the "blanket reservation" rejected by the Sixth Circuit in Browning. Because the complaint in Browning alleged breach of duty and malpractice, the Sixth Circuit had no occasion to express an opinion whether the reservation of "causes of action arising under . . . § 547" was or was not sufficiently specific to preserve preference actions.

Id. at 503. Finally, the Pen Holdings court observed:

> It is not practicable, [*38] especially in larger cases, for the debtor to identify by name in the plan or disclosure statement every entity that may have received a preferential payment. There is no common practice in Chapter 11 cases of even attempting to do so. Nothing in § 1123(b)(3) suggests such specificity is required. The history of § 1123(b)(3) suggests just the opposite — that preserving the value of preferences for distribution to creditors after confirmation should be easily accomplished in the plan without magic words or typographical traps.

Id. at 504-05.

The Pen Holdings court's view is consistent with my experience with post-confirmation pursuit of preference actions in large chapter 11 cases. Large chapter 11 liquidation cases typically result in the filing of hundreds of preference actions. In liquidation cases, unless the debtor's business was sold as a going concern with the purchaser insisting on eliminating or limiting preference actions so as to not disturb its business relationship with vendors and suppliers, the prosecution of preference actions will usually be handed over to a liquidating trustee or administrator whose appointment will often be selected [*39] by the creditors committee. That trustee or administrator usually will also be responsible for the claims resolution process. These functions are costly and time consuming — oftentimes running on for many months, if not years, after the plan confirmation. It is not a process that is typically undertaken by the debtor or even by the creditors committee during the plan negotiations and confirmation process. It is usually deferred to a later time. Consistent with that experience, I note the Disclosure Statement provision that "all books and records of the Debtors shall become the property of the Liquidating Trust." (Doc. # 815, p. 37.) In my view, absent unusual circumstances, not present here, requiring names and causes of action specific information to be included in confirmation documents places an unnecessary burden on the bankruptcy process and is not required by the Bankruptcy Code.

There is an interesting factual parallel in the matter before me and the Pen Holdings opinion. In its statement of financial affairs, Bridgeport disclosed that during the 90-day period preceding the petition date, it made over 3,000 transfer payments aggregating over $221 million. In Pen Holdings [*40] the court noted that for the 90-day pre-petition period, the debtor made over 700 payments aggregating $160 million (of which at least $120 million were unlikely candidates for preference actions). The 700 plus payments in Pen Holdings resulted in the filing of 173 preference actions. This clearly portends that in the Bridgeport case we can anticipate hundreds of preference actions to be filed. To date, the Liquidating Trustee has filed 44 preference actions. The § 546 two-year statute of limitations for such actions is not set to expire until September 10, 2005.

Cases from the Seventh, Ninth, and Tenth Circuits also support the conclusion reached in Pen Holdings. While discussing the requirements of § 1123(b)(3) in the context of a preference action, the Seventh Circuit Court of Appeals has stated that, "while there might be some logic in requiring specific and unequivocal' language to preserve claims belonging to the estate that have never been raised, the statute itself contains no such requirement."

2005 Bankr. LEXIS 1552, *40

P.A. Bergner & Co. v. Bank One (In re P.A. Bergner & Co.), 140 F.3d 1111, 1117 (7th Cir. 1998). The Bergner decision was recently discussed by the [*41] Bankruptcy Court for the Northern District of Illinois in Kmart Corp. v. Intercraft Co. (In re Kmart Corp.), 310 B.R. 107 (Bankr. N.D. Ill. 2004). The court in Kmart stated that

> Bergner stands for the proposition that plan provisions identifying causes of action by type or category are not mere blanket reservations. Therefore, categorical reservation can effectively avoid the res judicata bar. Dispensing with a requirement of cataloging claims by name comports with the Court's view in Bergner that section 1123(b)(3) does not require "specific and unequivocal" identification.

Kmart, 310 B.R. at 124.

The Bankruptcy Appellate Panel for the Ninth Circuit similarly allows for more general reservation language to preserve causes of action. In clarifying its earlier decision in Kelley, the court stated: "We agree with the other courts that regard it as impractical and unnecessary to expect that a disclosure statement and plan must list each and every possible defendant and each and every possible theory." Associated Vintage, 283 B.R. at 564. Unlike in its earlier Kelley decision which involved a claim [*42] objection, in Associated Vintage the court was addressing a preference action and in doing so expressed a view similar to that of the Pen Holdings court:

> A plan, as here, may provide that particular causes of action, or categories of causes of action, are preserved and not affected by confirmation and may, likewise, prescribe terms for conducting post-confirmation litigation over specific matters or categories of matters.
>
> * * *
>
> Moreover, the argument in this appeal illustrates the danger of engrafting an unduly burdensome specificity requirement onto the § 1123(b)(3) authorization for the retention and enforcement of claims belonging to the estate. 11 U.S.C. § 1123(b)(3). The statute does not require it. As Alary's appeal demonstrates, no defendant will ever concede a reservation is specific enough.

Id. at 563–64.

Along with the Seventh and Ninth Circuits, courts in the Tenth Circuit agree that general retention language in confirmation documents can be sufficient to preserve causes of action for post-confirmation adjudication. In Connolly v. City of Houston (In re Western Integrated Networks, LLC), 322 B.R. 156, 2005 WL 674890 [*43] (Bankr. D. Col. 2004), the Bankruptcy Court for the District of Colorado recently addressed the power of a liquidating trustee to bring preference actions post-confirmation where the reservation language stated that "the [Liquidating] Trustee shall have the right to commence adversary proceedings to enforce any claim or interest belonging to Consolidated WIN, including any claims or interests arising under Section 547 through 551 of the Bankruptcy Code." 322 B.R. 156, [WL] at *3. That reservation language clearly failed to identify defendants and claim-specific causes of action. Nevertheless, the court stated that "until the Tenth Circuit provides direction contrary to the strong implication . . . approving section-specific reservation language, this Court does not believe it is appropriate to apply a more restrictive analysis." 322 B.R. 156, [WL] at *4.

In summary, I believe that a substantial body of case law supports the view that clear and unambiguous retention provisions such as those involved here, that specify the category of causes of action to be preserved and the potential effect of the pursuit of those causes of action, suffice to preserve [*44] such causes of action for post-confirmation adjudication.

It is not my intent to limit the position I take here to liquidation cases. Even in chapter 11 reorganization cases when it may be advisable to pursue preference actions, it may be appropriate to defer consideration of preference actions to the post-confirmation period and the reservation of those causes of action may be effected in a manner similar to what was done in this chapter 11 case. The Kmart decision, a reorganization case, supports this position.

### 2. Sufficiency of Notice

Tech Data argues that creditors who may be targets of post-confirmation preference actions should receive notice of those actions before voting on a plan of reorganization. Tech Data believes that the Confirmation Documents were insufficiently specific and that notice was improper. Tech Data's argument is misplaced for three reasons.

First, Tech Data is not a creditor of the Debtors' estates. Indeed, Tech Data's argument defeats itself. Tech Data was not entitled to receive the Plan and Disclosure Statement and, therefore, presumably did not rely on its terms. And, as pointed out in Pen Holdings, § 1123(b)(3)

was intended to [*45] benefit the creditors of a bankruptcy estate, not the potential defendants of the preserved claims.

Second, this is not a reorganizing chapter 11 case. Bridgeport is a liquidation. Therefore, the vote of the general unsecured creditors is in large part not a significant factor. In the vast majority of liquidation cases, general unsecured creditors will either receive a money distribution under a liquidation plan or a money distribution under a chapter 7 administration of the estate. The unsecured creditors in this type of a liquidation will not generally be affected by the vote on the plan. n8 Indeed, if the plan is rejected and the case is converted to chapter 7, the chapter 7 trustee would likely pursue preference actions that have merit.

> n8 I do not recall a liquidation plan in my court that was rejected by the voting class of general unsecured creditors.

Finally, as detailed above, Article IV Section J of the Disclosure Statement clearly put creditors on notice that they may be defendants to later filed [*46] preference actions. Once again, in relevant part, that provision states:

**IN REVIEWING THIS DISCLOSURE STATEMENT AND THE PLAN, AND IN DETERMINING WHETHER TO VOTE IN FAVOR OF OR AGAINST THE PLAN, CREDITORS AND INTEREST HOLDERS (INCLUDING PARTIES THAT RECEIVED PAYMENTS FROM THE DEBTORS WITHIN NINETY (90) DAYS PRIOR TO THE COMMENCEMENT DATE) SHOULD CONSIDER THAT A CAUSE OF ACTION MAY EXIST AGAINST THEM, THAT THE PLAN PRESERVES ALL CAUSES OF ACTION, AND THAT THE PLAN AUTHORIZES EITHER THE LIQUIDATING TRUST OR THE PREPETITION SECURED LENDER AGENT TO PROSECUTE THE SAME.**

(Doc. # 815 at 21.)

**CONCLUSION**

For the reasons set forth above, I find that the Confirmation Documents adequately describe preference actions as causes of action preserved for pursuit by the Liquidating Trustee for the benefit of general unsecured creditors.

Tech Data also asserts that the complaint fails to comply with Bankruptcy Rule 7008 and, alternatively, seeks dismissal on that basis. I find no merit to that assertion. The complaint satisfies the notice pleading standard and further details regarding the many transfers can easily be fleshed out in the discovery process.

**ORDER**

For [*47] the reasons set forth in the Court's letter ruling of this date, Defendant Tech Data Corporation's motion (Doc. # 29) to alter, amend, and reconsider the Court's Memorandum Opinion of July 1, 2005 (Doc. # 23) is denied, except that two minor factual misstatements are corrected by the entry of a Revised Memorandum Opinion of this date.

Peter J. Walsh

United States Bankruptcy Judge

Dated: August 12, 2005

**ANNEX 2**

*Tanaka Bros. Farms, Inc. v. Home State Bank*

Civ. A. No. 86-2108-S

1986 U.S. Dist. LEXIS 17745

(D. Kan. Nov. 13, 1986)

LEXSEE 1986 U.S. DIST. LEXIS 17745

TANAKA BROTHERS FARMS, INC., Plaintiff, v. HOME STATE BANK, et al.,
Defendants

CIVIL ACTION No. 86–2108–S

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF KANSAS

1986 U.S. Dist. LEXIS 17745

November 13, 1986, Filed

COUNSEL: [*1]

David W. Carson, Carson & Fields

Ronald C. Newman, Mustain & Newman

Daniel M. Dibble/Sue Phillips, Lathrop, Koontz & Norquist

Gordon E. Wells

Robert F. Lytle, Bennett, Lytle, Wetzler, Winn & Martin

George Maier, Jr, Weeks, Thomas & Lysaught

OPINIONBY:

SAFFELS

OPINION:

MEMORANDUM AND ORDER

This matter is before the court on the motions of defendant Everett Mealman and defendants Richard Bond, Gerald Boyer, Russel Bysel, Earl Clark, Jr., Urban Hess, Ervin Johnston, Robert Kissick, George Maier, Clay Roberts, Jr., Orrin Shephard, Harry Winkler, Larry Winn, III, and Bernard Zarda for summary judgment or to dismiss.

The facts of this case can be summarized as follows. Stafos Farms, Inc. was a Kansas corporation engaged in growing, packaging, and selling farm produce on a wholesale basis. Plaintiff, a Colorado corporation, supplied produce to Stafos. Plaintiff claims that around August 1, 1984, Stafos owed it approximately $1.2 million for produce supplied. On August 2, 1984, Stafos filed bankruptcy under Chapter 11 of the Bankruptcy Code. In the bankruptcy proceeding, plaintiff filed a proof of claim for $989,000.00. Plaintiff later filed a written approval of Stafos' liquidation plan [*2] and voted in favor of Stafos'

Amended Plan of Reorganization. No appeal was taken from the confirmation of the plan, which was entered on March 5, 1985.

Subsequently, on March 11, 1986, plaintiff filed it complaint in this court, claiming that defendants had fraudulently schemed to create an illusion of solvency of Stafos in the period before it filed bankruptcy. Plaintiff claims that it continued to deal with Stafos because of the false sense of security created by defendants. furthermore, plaintiff claims that before the bankruptcy petition was filed, defendants milked Stafos of most of its assets, which plaintiff claims was also a fraud on it. In addition, plaintiff claims that the bankruptcy plan was a fraud on the court and on plaintiff. Beside the fraud claim, plaintiff seeks recovery under the Racketeer Influenced & Corrupt Organizations Act, 18 § U.S.C. §§ 1961–1968.

Defendants' motion relies on the res judicata effect of the bankruptcy court action. Defendant claims that the failure of plaintiff to raise these issues before the bankruptcy court precludes this litigation.

The Kansas Supreme Court recently discussed the law of res judicata:

Application of the doctrine [*3] of res judicata is unconcerned with the procedural avenue employed to acquire jurisdiction in a particular tribunal. The doctrine prevents a second assertion of the same claim or cause of action and, regardless of which statute a party uses to proceed to a tribunal, where the same facts, same parties and same issues have previously been litigated before a court of competent jurisdiction which renders a judgment within its competency, the cause of action is barred.

In re Estate of Reed, 236 Kan. 514, 519–20, 693 P.2d 1156, 1161 (1985). Defendant relies heavily on Miller v. Meinhard, 462 F.2d 358 (5th Cir. 1972) in claiming that all the elements have been met and that the present

1986 U.S. Dist. LEXIS 17745, *3

action is barred. The court need not address each of defendants' points because one issue is dispositive. When did the plaintiff become aware of defendants' alleged fraudulent acts? Because the answer to this question establishes the point at which plaintiff's cause of action accrued, see Seiffer v. Topsy's International, Inc., 487 F. Supp. 653, 666–67 (D. Kan. 1980); K.S.A. 60–513(a)(3), only if the discovery was made before the bankruptcy proceedings concluded would the confirmation be res [*4] judicata as to the present fraud claim. See Miller v. Meinhard, 462 F.2d at 360–61; F & M Marquette National Bank v. Emmer Brothers Co., 52 B.R. 385, 394–95 (D. Minn. 1985). The defendants do not allege that plaintiff knew of the fraud before march 5, 1985. In its complaint, plaintiff appears to allege that the bankruptcy action was a further attempt to conceal defendants' supposed fraudulent scheme, which indicates that plaintiff may not have become aware of its cause of action for fraud until after the confirmation. The court there fore finds that summary judgment should be denied as to the fraud claim.

As regards to the claim under the Racketeer INfluenced & Corrupt Organizations Act (RICO), the court does not hesitate in findings that summary judgment should be granted. To establish a RICO claim, a "pattern of racketeering activity" must be shown. 18 U.S.C. § 1962. This court recently held that "the continuity in the term 'pattern' presumes repeated activity, not merely repeated acts to carry out the same scheme." Pitts v. Turner & Boisseau, Chartered, No. 84–4342 slip op. at 6 (D. Kan. Aug. 26, 1986). In its complaint, plaintiff alleges that defendants "embarked [*5] on a scheme to create . . . the illusion of solvency." The court finds that a reading of plaintiff's complaint does not state a cause of action under RICO based on its failure to allege a pattern of racketeering activity. The motion to dismiss this court should therefore be granted.

IT IS BY THE COURT THEREFORE ORDERED that defendants' motions for summary judgment on the issue of fraud be denied. IT IS FURTHER ORDERED that defendants' motion for dismissal of the RICO claim be granted.

DATED: This 13th day of November, 1986, at Kansas City, Kansas.

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on this 21st day of November, 2005, he caused a true and correct copy of the foregoing **PLAINTIFFS-APPELLANTS' OPENING MEMORANDUM and APPENDIX** thereto to be served upon the following counsel by electronic E-filing:

Steven K. Kortanek, Esquire
Klehr Harrison Harvey Branzburg & Ellers LLP
919 Market Street, Suite 1000
Wilmington, DE 19801
**Counsel for Defendant Goldman Sachs & Co.**

Peter J. Duhig, Esquire
Klett Rooney Lieber & Schorling
The Brandywine Building
1000 West Street, Suite 1410
P.O. Box 1397
Wilmington, DE 19899
**Counsel for Defendant Mellon Bank NA**

Russell C. Silberglied, Esquire
Jason Michael Madron, Esquire
Richards, Layton & Finger, P.A.
P.O. Box 551
Wilmington, DE 19899
**Counsel for Defendant Neighborcare, Inc.**

Daniel K. Hogan, Esquire
1701 Shallcross Avenue, Suite C
Wilmington, DE 19806
**Counsel for Defendant Highland Capital Management, L.L.P.**

Robert S. Brady, Esquire
Young Conaway Stargatt & Taylor, LLP
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, DE 19899-0391
**Counsel for Defendant George V. Hager**

Laura Davis Jones, Esquire
Pachulski Stang Ziehl Young Jones & Weintraub P.C.
919 North Market Street, Suite 1600
P.O. Box 8705
Wilmington, DE 19899-8705
**Counsel for Creditor Committee**

Respectfully submitted,

By:

R/ Bruce McNew (# 967)
TAYLOR & McNEW LLP
3711 Kennett Pike, Suite 210
Greenville, DE 19807
Telephone: (302) 655-9200

*Attorneys for Plaintiffs*

*Co-counsel*:

Stanley M. Grossman
H. Adam Prussin
POMERANTZ HAUDEK BLOCK
 GROSSMAN & GROSS LLP
100 Park Avenue, 26th Floor
New York, N.Y. 10017-5516
Telephone: (212) 661-1100

Leigh Handelman Smollar
POMERANTZ HAUDEK BLOCK
 GROSSMAN & GROSS LLP
One North LaSalle Street, Suite 2225
Chicago, IL 60602-3908
Telephone: (312) 377-1181

2