**ORIGINAL**

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

---

Richard Haskell et al.,

    Plaintiffs,

       v.

Goldman, Sachs & Co. et al.,

    Defendants.

x
:
:
:
:
:
:
:
:
:
:
:
x

Civ. Act. No. 04-CV-157 (SLR)
Related to
Case No. 00-2692
(JHW)

(Jointly Administered)

---

## DEFENDANTS' JOINT MOTION TO DISMISS PLAINTIFFS' COMPLAINT

### TO THE HONORABLE JUDITH H. WIZMUR:

Pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure and Rule 7012(b) of the Rules of Bankruptcy Procedure, Defendants Neighborcare Inc. (one of the Reorganized Debtors, sued as "Genesis Health Ventures, Inc.," its former corporate name), Goldman, Sachs & Co. ("Goldman Sachs"), Mellon Bank, N.A. ("Mellon Bank"), Highland Capital Management, L.P. (together with Goldman Sachs and Mellon Bank, alleged to be senior creditors of Genesis Health Ventures, Inc. and The Multicare Companies, Inc., hereinafter the "Senior Lenders"), and George V. Hager hereby submit this motion to dismiss Plaintiffs' Complaint in its entirety. The Complaint is wholly defective. Not only is it time-barred under section 1144 of title 11 of the United States Code (the "Bankruptcy Code"), it is also barred by the doctrines of res judicata and collateral estoppel, and constitutes a violation of this Court's final, now nonappealable Confirmation Order (including the injunction barring pre-effective date claims against the Debtors). Equally fatal is the Complaint's failure to state a claim for fraud, conspiracy,

DC1:\17845\07\31P202!.DOC\50505.0003
RLF1-2732706-1

FILED
2004 APR 23  PM 4: 19
CLERK U.S. DISTRICT COURT
DISTRICT OF DELAWARE

and gross negligence upon which any relief may be granted. The myriad reasons for granting this motion are fully set forth below.

## I.    PRELIMINARY STATEMENT

1.    Plaintiffs' purported fraud action is their fourth attempt to alter the distributions to creditors under the Joint Plan of Reorganization of Genesis Health Ventures, Inc. ("Genesis"), Multicare AMC, Inc. ("Multicare") and their affiliates (the "Plan"). Plaintiffs, who are former subordinated debenture holders of Genesis, commenced this attack almost three years ago, when they were the principal objecting parties to confirmation of the Plan. At that time, this Court overruled Plaintiffs' objections, confirmed the Plan, and entered a final order and judgment directing Genesis and its affiliated debtors to make distributions to creditors.

2.    Now, after the time for appellate review has long since expired, Plaintiffs seek to change those distributions to creditors by suing Genesis, certain of its former Senior Lenders and Mr. Hager in this collateral civil action for "not less than $200 million" in damages. The allegations asserted in Plaintiffs' present Complaint -- that Genesis allegedly depressed and manipulated its enterprise valuation to minimize distributions to junior creditors under the Plan -- were litigated and lost by Plaintiffs during the jointly administered bankruptcy proceedings of *In re Genesis Health Ventures, Inc.* and *In re Multicare AMC, Inc.* (the "Bankruptcy Proceedings"). Indeed, Plaintiffs fully presented their arguments to this Court at a two-day confirmation hearing in August, 2001 (the "Confirmation Hearing"), through two sophisticated law firms. The Confirmation Hearing took place after intensive discovery of Genesis' financial

AA. 1420

condition, including the exchange of thousands of documents, six expert reports and the depositions of twelve expert and fact witnesses (including Mr. Hager).

3.    Thereafter, this Court, in a 49-page Opinion on Confirmation (the "Opinion"), rejected Plaintiffs' objection that the Senior Lenders were oversecured, that Genesis' projected EBITDA (*i.e.*, earnings before interest, taxes, depreciation and amortization) for Genesis for 2001 was "too low," and that the Debtors had been undervalued. The Court approved the Plan allocations to creditors, specifically found that the Plan was proposed in good faith, satisfying section 1129(a)(3) of the Bankruptcy Code, and specifically found that the Plan was fair and equitable, as required by section 1129(b)(1) of the Bankruptcy Code.

4.    Having lost the confirmation battle, Plaintiff Charles L. Grimes (who claimed to hold approximately $20 million in junior debt) moved to amend the Court's findings, raising the identical valuation issues litigated during the Confirmation Hearing itself. This Court denied that motion on October 5, 2001, reiterating and affirming its findings on valuation. Grimes then filed an appeal to the District Court, and moved for a stay of the Confirmation Order pending appeal. This Court denied the motion for a stay, the District Court dismissed the appeal, and Grimes voluntarily dismissed a later-filed appeal before the Third Circuit. The other Plaintiffs never exercised their appeal rights.

5.    Now, over two years after entry of the Confirmation Order, Plaintiffs have filed the instant action which -- despite the ominous labels Plaintiffs place on their causes of action -- is merely an untimely and transparent collateral attempt to effect a different distribution from that provided in the Plan. A monetary recovery

against Genesis in this action would have the direct effect of diluting the value of its common stock distributed to its former senior creditors, and a judgment against the Senior Lenders named in this suit would have the effect of transferring distributions made to them under the Plan into the hands of the subordinated debentureholders.[1] This action is meritless, is an affront to the Bankruptcy Proceedings, and should be dismissed on numerous grounds.

      6.    *Section 1144.* Section 1144 of the Bankruptcy Code mandates that a party seeking to revoke a confirmation order on the grounds that a plan was procured by fraud must do so within 180 days after the date of the entry of that order. A party cannot avoid this statute by styling its claim as one for damages as opposed to revocation where the effect would be to change the distributions provided for in the Plan. The courts in the Third Circuit have made clear that the 180-day deadline is strict and must be applied even if (under an overly generous reading of Plaintiffs' allegations) the alleged fraud was discovered after the expiration of the statutory period. Plaintiffs' action alleging that the Plan was premised on fraudulent valuation information was filed over two years after entry of the Confirmation Order -- substantially beyond the six-month jurisdictional, nonwaivable cutoff date.

      7.    *Res Judicata.* It is hornbook res judicata doctrine that a "final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were or could have been raised in that action." <u>Federated Dep't Stores v. Moitie</u>, 452 U.S. 394, 398 (1981). It is indisputable that (i) the Confirmation Order is a

---

[1] It is both ironic and reflective of the Complaint's lack of merit that Mellon Bank, in fact, received no Plan distribution on account of a prepetition claim since it sold its share of such debt prior to confirmation of the Plan.

final judgment on the merits; (ii) Plaintiffs, as creditors, were parties to the Bankruptcy Proceedings; and (iii) Plaintiffs now seek to relitigate the very same creditor distributions that were at the heart of the confirmation contest.

8.    *Collateral Estoppel.* Collateral estoppel, another doctrine that enforces principles of finality, bars Plaintiffs' attack on the Court's findings of fact concerning (i) the Debtors' enterprise value (ii) that the Plan was fair and equitable; and (iii) that the Plan was proposed in good faith. Those issues have been fully litigated and determined and Plaintiffs remain bound by those determinations.

9.    It makes no difference whether Plaintiffs purport to bring their claims based on "newly discovered" facts. The circumstances complained of in Plaintiffs' Complaint actually were or could have been discovered during pre-confirmation discovery or during the confirmation proceedings. Plaintiffs rely extensively in their Complaint on the very same documents produced to them by the Debtors and others during the Bankruptcy Proceedings. Plaintiffs' explanation for not couching their allegations as "fraud" at the Confirmation Hearing is that they allegedly did not have the time to carefully review the material prior to confirmation and did not review the material with "fraud" in mind. Simply put, these are *not* cognizable justifications for avoiding claim or issue preclusion. It is exactly the kind of relitigation of prior proceedings which these doctrines were intended to bar.

10.    *Violation of Injunction as to the Debtors.* The Complaint against the Debtors constitutes nothing short of contempt. It completely ignores the discharge granted to Genesis under section 1142 of the Bankruptcy Code and the injunctions prohibiting the assertion of claims against Genesis arising before the effective date of the

Plan ("Effective Date") found in the Confirmation Order. Plaintiffs' assertion that they can sue the Reorganized Debtor pursuant to section 523 of the Bankruptcy Code, notwithstanding this Court's injunction, is barred by clear, well-established law and only highlights their flouting of the Court's orders.

11.     *Preserving the Finality of the Plan and Injunction.* The underlying rationale for the time-bar in section 1144 of the Bankruptcy Code and the res judicata and collateral estoppel doctrines is the overarching need in our judicial system for the finality of judgments. These principles have particular force in the bankruptcy context, where the public interest in the finality of a plan of reorganization and any injunctive relief provided therein is of utmost importance. Allowing Plaintiffs' case to proceed would frustrate these fundamental public policies, effectively deprive the Debtors of their fresh start, and upset the certainty the confirmed Plan provided to all parties nearly three years ago.

12.     *Failure to State a Claim.* Last, but by no means least, Plaintiffs' Complaint must be dismissed for failure to state a claim upon which relief can be granted. For the precise reasons that this Court rejected the valuation contentions made by the subordinated debentureholders nearly three years ago (as well as other reasons), it should find that Plaintiffs here have failed to state a claim for fraud, conspiracy, or gross negligence.

a.     *Plaintiffs' fraud claim.* Plaintiffs have inartfully and inappropriately attempted to bring a "fraud by hindsight" claim, alleging that Genesis' 2001 valuation was improper by pointing to events which occurred years *after* the Debtors made their EBITDA projections and pleading that Debtors should have been prescient in predicting the future. But courts have long held that such fraud by hindsight

DCI:\178454\0203 JFP2021 DOC\50505 0003

RLF1-2732706-1

6

does not constitute "fraud" in any way, shape, or form. Additionally, Plaintiffs fail to specify the "who, what, when, where and how" of the alleged fraud, and thus fail to satisfy the strict pleading requirements of Fed. R. Civ. P. 9(b). Plaintiffs do not plead any specific facts to support their allegations against specific Defendants, but instead merely lump all Defendants together under generalized allegations of wrongful conduct. Finally, Plaintiffs' pre-confirmation awareness of the circumstances pled in the Complaint eviscerates any argument that they reasonably relied on alleged misstatements or omissions by the Defendants during the Bankruptcy Proceedings.

       b. *Plaintiffs' conspiracy claim.* Because Plaintiffs have failed to allege a viable fraud claim, Plaintiffs' claim for conspiracy to commit fraud also fails.

       c. *Plaintiffs' gross negligence claim.* Finally, Plaintiffs' gross negligence claim fails for the same reasons as their fraud claim, but also contains an additional defect with respect to the allegations against the Senior Lenders. As a matter of law, the Senior Lenders owed no legal duty to the junior debentureholders. Instead, they were direct adversaries in the Bankruptcy Proceedings with opposing interests, with each faction having ample resources and sophisticated counsel to protect themselves.

       13.     Accordingly, this Court should dismiss Plaintiffs' Complaint in its entirety with prejudice.

## II.    RELEVANT BACKGROUND[2]

       14.     On June 22, 2000, Genesis, Multicare, and certain of their direct and indirect subsidiaries (collectively, the "Debtors") commenced chapter 11 proceedings

---

[2] The Court can take judicial notice of what transpired in the Bankruptcy Proceedings and take those proceedings into account in deciding Defendants' Motion to Dismiss. See pp. 19-20 infra.

in this Court. During the course of the Debtors' Bankruptcy Proceedings, Plaintiffs extensively challenged the distributions proposed and later effected by the Plan, centralizing their focus on the valuation of the Debtors.

A.     <u>Plaintiffs' Objections to the Debtors' Disclosure Statement</u>

15.     Approximately one year after the filing of the Debtors' petitions, the Debtors filed a motion for approval of their Disclosure Statement in connection with their proposed Plan. Grimes, a plaintiff in this action and holder of approximately $20 million in junior debt, filed an Objection to Debtors' Joint Motion for Order Approving Disclosure Statement (Exhibit ("Exh.") A).[3] He claimed that the Plan *"grossly understate[d] the enterprise value"* of the Debtors, and that *"there is considerable value in Genesis that the Plan and Disclosure Statement improperly and unjustifiably conceal, release, and ultimately strip away from holders of the Genesis 2005 Notes . . . for no consideration – for the benefit of the Senior Lenders, the Debtors' Officers and Directors, and the Multicare Creditors."* Exh. A, at 4 (emphasis added).

16.     GMS Group LLC (presumably an affiliate of GMS Investment Advisors, Inc., the brokerage firm of "many of the plaintiffs" (Compl. ¶ 13)) ("GMS"), which held approximately $170-180 million in junior debt, filed a similar objection to the Disclosure Statement, and indeed successfully persuaded the Court to allow it to include a letter in the Debtors' solicitation package urging creditors to vote against the Plan. Exh. B.

---

[3] All exhibits referenced herein are contained in the Appendix of Exhibits to Defendants' Joint Motion to Dismiss served and filed simultaneously herewith.

17.    On July 13, 2001, notwithstanding the Grimes and GMS

Objections, the Court entered an Order approving the Debtors' Disclosure Statement.

Exh. C.

**B.    Plaintiffs' Objections to the Debtors' Plan and
the Discovery Taken In Connection Therewith**

18.    The Debtors filed their Plan on July 6, 2001.

19.    Prior to the Confirmation Hearing, both GMS and Grimes served

extensive discovery requests on the parties in interest, including document requests,

interrogatories, and numerous deposition notices.  Six valuation experts prepared and

exchanged reports pursuant to Rule 26 of the Federal Rules of Civil Procedure:  William

McGahan (UBS Warburg, Genesis' expert), Halisey Kennedy (Credit Suisse First

Boston, Multicare's expert ), David Schulte (Chilmark Partners, Mellon Bank's expert),

Patrick Hurst (Houlihan Lokey Howard & Zukin, Genesis Creditors' Committee's

expert), Anthony Grillo (Evercore Partners, GMS' expert), and William Becklean

(Grimes' expert).  Thousands of documents were produced to GMS and Grimes by the

Debtors, Mellon Bank, Goldman Sachs, and other major constituencies.  Documents were

also produced to GMS and Grimes by experts.  GMS and Grimes liberally reference and

rely on these documents in the present Complaint.

20.    In total, twelve depositions were taken.  GMS and Grimes deposed

all of the Plan proponents' experts, as well as George Hager (then Chief Financial Officer

of the Debtors), Michael R. Walker (then Chairman and CEO of Genesis), David Barr

(then Vice Chairman of Genesis) and Joseph La Nasa from Goldman, Sachs (alleged

holder of approximately $300 million of the Genesis/Multicare bank debt).  Notably,

GMS and Grimes vigorously questioned Mr. Hager at his deposition regarding valuation, and more specifically, the preparation of the EBITDA projections, and the propriety of the adjustments made to those projections (as discussed more fully below, specifically probing many of the very same adjustments at issue in this action).

21.     On August 17, 2001, GMS formally interposed an Objection to the Plan, arguing that the Plan was not "fair and equitable" because the Senior Lenders were purportedly receiving more than a 100% distribution on account of their claims. GMS stated that it would prove at trial that the Debtors "ha[d] *significantly undervalued their business enterprise* by utilizing an unreasonably low multiplier, and applying this multiplier to an EBITDA that is undisputedly out of date," and urged the use of an "*accurate and current EBITDA*." (Exh. D, at 3-4, emphasis added).

22.     On August 21, 2001, Grimes filed his Objection, asserting that "[t]he central feature of the Plan is a *dramatic misvaluation and undervaluation* of the reorganized entity for purposes of Plan Distributions," and that the enterprise value was "grossly understate[d]." (Exh. E, at 2, emphasis added).

23.     The Debtors, Mellon Bank as Agent for the Senior Lenders, and the statutory committee appointed in the Genesis chapter 11 case ("the Genesis Creditors' Committee") filed responses to the GMS and Grimes' Objections (with supporting affidavits from their valuation experts), taking issue with the Objectors' accusations of "misvaluation and undervaluation, " and providing substantial evidence that the enterprise value of Genesis was far from sufficient to provide a 100% recovery to the Senior Lenders. Exh. F.

C.    **The Contested Confirmation Hearing**

24.    The two-day Confirmation Hearing took place on August 28 and 29, 2001. GMS' and Grimes' Objections were the focus of the hearing. See Exh. G (August 28, 2001 Hearing Transcript) and Exh. H (August 29, 2001 Hearing Transcript). Counsel for GMS (LeBoeuf, Lamb, Greene & Macrae LLP) and Grimes (Smith, Katzenstein & Furlow LLP) rigorously examined and cross-examined eight witnesses: Messrs. Hager, McGahan, Schulte, Kennedy, Hurst, Darr, Grillo and Becklean.

25.    Significantly, on direct, Mr. Hager testified regarding the Multicare contract, and the evaluation and negotiation of the payment rates charged by Genesis to Multicare that led to an $11.9 million reduction in rates (Exh. G, at 58-59), as well as the Debtors' projected EBITDA and the assumptions, risks and adjustments made to projected EBITDA (including the adjustment for possible loss of pharmacy sales to Mariner Post-Acute Network ("Mariner")) (Id. at 61-70). On cross-examination, counsel for GMS and counsel for Grimes further explored Mr. Hager's testimony regarding projected and last twelve month (or "LTM") EBITDA, including Genesis' budget, the purported existence of differing EBITDA figures, the purported existence of financial incentives for Mr. Hager to obtain approval of the Plan, and the various projected EBITDA assumptions and adjustments (in particular, the topics of a potential purchase of the pharmacy business of APS, the potential loss of sales to Mariner, insurance rate adjustments, improved prospects in the industry, and the exclusion of non-recurring items from EBITDA, such as executive restructuring bonuses and other restructuring-related costs). Id. at 105-136, 151-59; see also id. at 137-38 and 178-80 (further testimony by

Mr. Hager concerning a potential transaction with APS and its effect on the Debtors' EBITDA).

26.    All six valuation experts were questioned and challenged extensively regarding enterprise valuation of the Debtors. The Debtors' financial expert (Mr. McGahan) was specifically asked to explain how the Debtors' projected EBITDA was derived, and the assumptions and adjustments within those projections (Exh. G, at 198-201, 205, 207-20, 227, discussing several of the adjustments to EBITDA at issue in this action). Mellon Bank's expert, Mr. Schulte, was extensively questioned on the company's LTM EBITDA results and the reasons for the Debtors' bankruptcy filing. Exh. H, at 18-29, 71-72. Patrick Hurst, the expert proffered by the Genesis Creditors' Committee, also testified about the company's projections and the extensive diligence they employed in working with the company to analyze the assumptions underlying the projections. Exh. H, at 95-99.

27.    Plaintiffs' experts testified regarding their use and views as to the relevance of LTM data for the valuation of Genesis. GMS' expert Mr. Grillo testified as to how he arrived at a projected EBITDA for the company for use in his analysis (stating that "the EBITDA for the current period is a relevant issue") (Exh. H, at 134-35), and Grimes' expert Mr. Becklean explained why he used last twelve month data, rather than projections, which he characterized as "subject to all kinds of subjective, you know, guesses .... I chose to accept them as they were, but they clearly are projections with which one could raise potentially one or a number of questions." Id. at 182-83.

AA. 1430

**D.**    **The Opinion on Confirmation and Confirmation Order**

28.    The Court considered all of the evidence presented, including the numerous arguments made concerning Debtors' valuation, and the reasonableness of the Debtors' projections used in the analysis, and issued a 49-page Opinion on September 12, 2001, confirming the Plan. See Exh. I. The Court overruled the GMS and Grimes objections on value, finding that the Plan was indeed "fair and equitable." The Court specifically considered the objectors' arguments that upward adjustments should be made to EBITDA, and ultimately concluded that management's projections were reasonable. Id. at 33-36. The Court also held that the opinions expressed by GMS' expert were "substantially discredited," and that Grimes' expert expressed no "qualitative judgments." Id. at 37-39.

29.    The Court also determined that the Plan was proposed in good faith, and overruled the objection to the "speed with which the debtors pursued the presentation of the reorganization plan, the approval of the disclosure statement, and the confirmation hearings." Exh. I, at 25. The Court "decline[d] to assign bad faith motives to the debtors on this record for moving the case to confirmation promptly." Id.

30.    The Court entered the Confirmation Order on September 20, 2001, which expressly incorporated all of the Plan provisions, and the distributions to creditors made therein. See Exh. J, at 17 (providing that "[t]he terms of the Plan and the Plan Supplement are incorporated by reference into and are an integral part of the Plan and this Confirmation Order."). That Order explicitly found that the Plan was proposed in good faith, and that:

Debtors' good faith is evident from the facts and records of these Reorganization Cases, the Disclosure Statement and the hearings thereon, and the record of the Confirmation Hearing and other proceedings held in these Reorganization Cases. The Plan was proposed with the legitimate and honest purpose of maximizing the value of the Debtors' estates and to effectuate a successful reorganization of the Debtors.

Exh. J, at 10-11. The Confirmation Order also found that:

[b]ased upon the Confirmation Affidavits and evidence proffered, adduced, or presented by the Debtors at the Confirmation Hearing, the Plan does not discriminate unfairly and is fair and equitable with respect to the Rejecting Classes.

Id. at 14. The Confirmation Order also found that the releases and injunctions contained

in the Plan were "fair and equitable" and were "in the best interests of the Debtors and

their chapter 11 estates." Id. at 37. The Plan at Section 10.2 provided that it

discharge[d] all existing debts and Claims, and terminate[d] all Equity Interests, of any kind, nature, or description whatsoever against or in the Debtors or any of their assets or properties to the fullest extent permitted by section 1141 of the Bankruptcy Code . . . . [and] precluded and enjoined from asserting against the Reorganized Debtors, or any of their assets or properties, any other or further Claim or Equity Interest based upon any act or omission, transaction, or other activity of any kind or nature that occurred prior to the Effective Date.

The Plan at Section 10.3 further provided that:

[u]pon the Effective Date, all [holders of Claims against or Equity Interests in the Debtors] shall be forever precluded and enjoined, pursuant to section 524 of the Bankruptcy Code, from prosecuting or asserting any such discharged Claim against or terminated Equity Interest in the Debtors.

The Plan became effective on October 2, 2001. See Exh. K.

E.    **Plaintiffs' Post-Trial Motions and Appeals**

31.    Two days after the Opinion was issued, Grimes moved to amend

the findings, arguing that the Court misunderstood his expert's valuation analysis (Exh.

L). This Court denied the motion, holding that "[t]he overwhelming and convincing and credible and competent evidence presented at trial supports still the conclusions that I reached at trial." Exh. M, at 10.

32.    Undaunted by his previous defeats, Grimes filed an appeal of the Confirmation Order with the District Court, and moved this Court for a partial stay of the Order pending the appeal, again raising the valuation issue. Exh. N. Grimes' Motion to Stay was heard and denied on November 2, 2001, on the grounds that that the motion was mooted by the fact that distributions under the Plan had already been made, and that he failed to demonstrate the likelihood of success on appeal of the valuation issue. Exh. O, at 29-30.

33.    Grimes' appeal to the District Court was ultimately dismissed on June 14, 2002, Exh. P, and he voluntarily dismissed his Third Circuit appeal on December 16, 2002. Exh. Q.

34.    GMS chose not to appeal the Confirmation Order.

35.    On July 3, 2003, Grimes and GMS moved this Court for relief from the Protective Order entered in the bankruptcy cases in connection with the pre-confirmation discovery. Exh. R. Grimes and GMS sought leave to provide confidential documents to the law firm of Pomerantz, Haudek, Block, Grossman, and Gross LLP whom they had "recently retained" "to investigate the possibility that a fraud was perpetrated upon this Court in connection with approval of the Plan." Id. at 2-3. The Court granted limited relief from the Protective Order. Exh. S, at 21-24 (stating that the Court would not address at that time whether such an investigation was untimely). The Pomerantz firm represents Plaintiffs in this action.

F.   **Plaintiffs' Current Complaint**

36.   On January 24, 2004, over two years after the Plan was confirmed, Plaintiffs filed this Complaint in the Supreme Court for the State of New York against NeighborCare Inc. (sued as Genesis), Goldman Sachs, Mellon Bank, Highland Capital Management, L.P., and George V. Hager asserting claims for fraud (Count I), conspiracy to commit fraud (Count II), and gross negligence (Count III). That action was removed by Defendants to the United States District Court for the Southern District of New York, and with the parties' stipulation, that Court ordered the action transferred from the Southern District to the United States District Court for the District of Delaware.

37.   The central allegations in the Complaint concerning the propriety of the adjustments and assumptions underlying the valuation of Genesis were squarely before this Court during the Bankruptcy Proceedings. Plaintiffs claim that Genesis' 2001 EBITDA projections were depressed for the following reasons:

- **The Multicare Contract.** Plaintiffs allege Genesis deducted $11.6 million from projected and LTM EBITDA as a result of improperly revising management contracts between itself and Multicare (Compl. ¶¶ 9, 69-109, 162);

- **Loss of Sales to Manorcare.** Plaintiffs allege Genesis excluded $11 million from projected and LTM EBITDA based on the possibility that this business might be lost and/or price concessions may need to be made to keep the Manorcare business due to litigation with Manorcare over its contract with Genesis (Compl. ¶¶ 9, 110-118, 162);

- **APS Transaction/Loss of Sales to Mariner.** Plaintiffs allege Genesis excluded $13 million from projected and LTM EBITDA based on the possibility that business with Mariner may be lost, even though Genesis had signed a letter of intent to acquire APS, a subsidiary of Mariner. (Compl. ¶¶9, 119-29, 162).

AA. 1434

- **Insurance Loss Reserves.** Plaintiffs allege Genesis booked excessive insurance loss reserves and improperly took a $13 million charge to LTM EBITDA for those reserves (Compl. ¶¶ 9, 58-68, 162);

- **Non-Recurring Reorganization Charges.** Plaintiffs allege Genesis improperly deducted $19 million from LTM EBITDA in certain non-recurring bankruptcy reorganization costs and costs associated with a discontinued employee health plan (the "First Choice Plan") (Compl. ¶¶ 9, 136-143, 162);

- **Loss of AGE Institute Business.** Plaintiffs allege Genesis' estimated earnings deficit due to the loss of business from the AGE Institute was higher than was reasonable and resulted in a $3 million over-charge to projected EBITDA (Compl. ¶¶ 130-35, 162);

- **Personnel Costs.** Plaintiffs allege Genesis unreasonably estimated the amount personnel costs would increase, resulting in a $35 million over-charge to projected EBITDA (Compl. ¶¶ 152-53, 162);

- **Cost of Pharmacy Goods Sold.** Plaintiffs allege Genesis inflated the cost of pharmacy goods sold by approximately $13 million (Compl. ¶¶ 56, 144-45, 162); and

- **Medicare Population Increase.** Plaintiffs allege Genesis failed to increase projected EBITDA by $4 million to reflect an increase in the projected Medicare population (Compl. ¶¶ 147-151, 162).

38.    The following are the record cites where each of the nine allegations from Plaintiffs' Complaint were raised during the Confirmation Hearings and/or Plaintiffs' pre-Confirmation discovery in the Bankruptcy Proceedings:

- **The Multicare Contract.** See, e.g., Exh. G, at 59-63, 68-69; Exh. T, Deposition of George V. Hager ("Hager Tr.") at 14-17, 39-40, 53-58, 72-73, 94-99, 120-22; Exh. U, Deposition of J. Halisey Kennedy ("Kennedy Tr.") at 10-11; Exh. V, Deposition of Michael R. Walker ("Walker Tr.") at 19-22;

- **Loss of Manorcare Sales.** See, e.g., Exh. G, at 67; Exh. T, Hager Tr. at 159-61;

- **APS Transaction/Loss of Mariner Sales.** <u>See</u>, <u>e.g.</u>, Exh. G, at 69, 119-21, 126-27, 129-31, 178-80, 183, 200-01, 208, 212-14, 216-18; Exh. H, at 46-47, 59-62, 65-67; Exh. T, Hager Tr. at 115-16, 135-40, 156-57, 168-70; Exh. W, Deposition of Joseph LaNasa ("LaNasa Tr.") at 42-43; Exh. X, Deposition of William McGahan ("McGahan Tr.") at 17, 23-24, 37-42; Exh. V, Walker Tr. at 34-38; Exh. Y, Deposition of David Schulte ("Schulte Tr.") at 38-39; Exh. Z, Deposition of Dave Barr ("Barr Tr.") at 20-24, 27-28.

- **Insurance Loss Reserves.** Exh. G, at 178, 219; Exh. T, Hager Tr. at 53-57, 79-81;

- **Non-Recurring Reorganization Charges.** <u>See</u>, <u>e.g.</u>, Exh. G, at 159, Exh. T, Hager Tr. at 53-57, 79-81;

- **Loss of AGE Institute Business.** <u>See</u>, <u>e.g.</u>, Exh. T, Hager Tr. at 53-57, 81-82; Exh. Z, Barr Tr. at 35-36.

- **Personnel Costs.** <u>See</u>, <u>e.g.</u>, Exh. G, at 122, 178; Exh. T, Hager Tr. at 53-57, 121-24; Exh. X, McGahan Tr. at 20-21; and

- **Pharmacy Cost of Goods Sold.** <u>See</u>, <u>e.g.</u>, Exh. T, Hager Tr. at 121-24.

- **Medicare Population Increase.** <u>See</u> Exh. Z, Barr Tr. at 50-51.

39.     The allegations listed above clearly do not constitute newly-discovered facts, and even if they did, would not provide Plaintiffs with a basis to set aside this Court's prior judgment, or reopen the factual issues that were previously determined.

### III.     ARGUMENT

40.     A motion to dismiss under Rule 12(b)(6) must be granted where, as here, "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." <u>Rottlund Homes of New Jersey, Inc. v. Saul, Ewing, Remick & Saul, L.L.P.</u>, 243 F. Supp. 2d 145, 156 (D. Del. 2003) (quoting <u>Conley v. Gibson</u>, 355 U.S. 41, 45 (1957)). Under Rule 12(b)(6), unsupportable claims must be

dismissed. See Neitzke v. Williams, 490 U.S. 319, 326-27 (1989) ("Rule 12(b)(6) authorizes a court to dismiss a claim based on a dispositive issue of law."); Port Authority of New York and New Jersey v. Arcadian Corp., 189 F.3d 305, 311 (3d Cir. 1999) (Rule 12(b)(6) "is designed to screen out cases where complaint states a claim based on a wrong for which there is clearly no remedy, or a claim which the plaintiff is without right or power to assert and for which no relief could possible be granted.").

      41.    While the Court is required to accept well-plead allegations in the Complaint as true, "conclusory allegations unsupported by any factual assertions . . . cannot withstand a motion to dismiss." CareFirst of Maryland, Inc. v. Care First Transp., Inc., No. Civ.A. 02-229(MPT), 2002 WL 31500927, at *3 (D. Del. Nov. 1, 2002). Similarly, the Court "is not required to accept legal conclusions either alleged or inferred from the pleaded facts." Rottlund Homes of New Jersey, Inc., 243 F. Supp. 2d at 156 (quoting Kost v. Kozakiewicz, 1 F.3d 176, 183 (3d Cir. 1993)). Furthermore, courts "will not accept as true allegations that are contradicted by facts that can be judicially noticed or by other allegations or exhibits attached to or incorporated in the pleading." 5A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure, § 1363 (2d ed. 1990 & 2002 Supp). The Third Circuit has held that, "[t]o resolve a 12(b)(6) motion, a court may properly look at public records, including judicial proceedings, in addition to allegations in the complaint" (emphasis added). See S. Cross Overseas Agencies, Inc. v. Wah Kwong Shipping Group Ltd., 181 F.3d 410, 426 (3d Cir. 1999) (examining a prior court's opinion "to see if it contradicts the complaint's legal conclusions or factual claims"). See also Lum v. Bank of America, 2004 U.S. App. LEXIS 4637, at *9 (3d Cir.

Mar. 11, 2004)(courts may properly look to "exhibits attached to the complaint, matters of public record, and documents that form the basis of a claim.").

42.     Under this standard, Plaintiffs' Complaint -- which seeks to rehash litigated matters from the Bankruptcy Proceedings and overturn a now non-appealable and non-revocable Confirmation Order -- must be dismissed.

A.     <u>Plaintiffs' Complaint Must Be Dismissed As Time-Barred</u>

43.     Even a cursory review of the allegations contained in the Complaint reveals that it is nothing more than a collateral effort to revoke the over two year old Confirmation Order approving the Plan.  Plaintiffs go through great pains to obfuscate this by proclaiming they are not seeking to "re-divide the pie." Compl. ¶ 12. However, that is the exact objective and unavoidable result of Plaintiffs' Complaint -- their goal is to alter significantly the distributed recoveries of the senior creditors and themselves.  Plaintiffs' form-over-substance pleading cannot escape the purview of the 180-day time bar limitation under section 1144 of the Bankruptcy Code.  Indeed, courts have rejected claims for damages as barred by section 1144 which were merely attempts to undo distributions effected by confirmed plans of reorganization.

44.     Section 1144 provides that, "[o]n request of a party in interest at any time before 180 days after the date of the entry of the order of confirmation, and after notice and a hearing, the court may revoke such order if and only if such order was procured by fraud." 11 U.S.C. § 1144.  This Court has made clear that the 180-day deadline is a strict one, and that "a party requesting revocation of an order confirming a chapter 11 plan must file its request within 180 days of entry of that order."  See <u>In re Vencor, Inc.</u>, 284 B.R. 79 (Bankr. Del. 2002) (ruling untimely a creditors' request for

AA. 1438

relief from an allegedly fraudulently obtained release provision in plan; creditors sought

relief approximately one-year after confirmation, and after federal district court dismissed

creditors' fraud class action as impermissible collateral attack on confirmation order); see

also In re Cinderella Clothing Indus., 93 B.R. 373 (Bankr. E.D. Pa. 1988).

45.     Courts have equally made clear that this 180-day limitations period

applies even when the fraud is allegedly discovered *after* the expiration of 180 days.  See

In re Crown Globe, Inc., 107 B.R. 60, 62 (Bankr. E.D. Pa. 1989) (rejecting the plaintiffs'

defense that it had discovered fraud after debtors' plan was confirmed and after 180 day

period, and treating count of the plaintiffs' complaint seeking to shift priority of claims to

be paid as untimely attempt to revoke plan under section 1144).   As the Ninth Circuit

eloquently stated in In re Orange Tree Associates, 961 F.2d 1445 (1992) (cited with

approval by this Court in Vencor):

> Congress has determined that a 180-day limitations period strikes the
> appropriate balance between the strong need for finality in reorganization
> plans and the interest in affording parties in interest a reasonable
> opportunity to discover and assert fraud.  In recognition of the strength of
> interest in finality of reorganization plans, courts have held uniformly that
> strict compliance with section 1144 is a prerequisite to relief . . . .
> Expiration of the limitations period bars a motion to set aside the
> confirmation of a reorganization plan even if the fraud is not discovered
> until the period has passed . . . . A Chapter 11 proceeding is focused
> towards rehabilitating a business, which if successful, is to the benefit of
> all persons . . . [and] is necessary to keep alive the potential life of that
> business.  *Uncertainty of continued operations, injected by a Sword of*
> *Damocles in the form of fraud allegations which can be filed at any time*
> *in the future, would render meaningless the whole purpose of a Chapter*
> *XI proceeding.*

Id. at 1447-48 (emphasis added); see also In re 680 Fifth Ave. Assocs., 209 B.R. 314

(S.D.N.Y. 1997) (explaining that section 1144 contains "a short six-month window," and

that "usually accepted 'discovery of the fraud' exceptions to a limitations period are not available to late confirmation challenges").

46.     The Confirmation Order was entered on September 20, 2001, and the instant action was not filed until January 24, 2004, well outside the requisite limitations period.  Even if Plaintiffs' Complaint can be generously construed to be alleging that they did not "discover" the alleged "fraud" until after the expiration of the sixth month window in March 2002 (a point that is completely contradicted by the public record of this case, see Relevant Background supra, and belied by several allegations made in the Complaint), the action cannot stand due to the strictness of the deadline.

47.     Plaintiffs in several instances in the Complaint complain that they did not have enough time to read the documents produced to them before the Confirmation Hearing, an obvious rehash of their prior complaints about the time schedule which -- even outside the Section 1144 context -- could not possibly constitute grounds for re-asserting their claims.  Compl. ¶¶ 72-73.  Equally absurd are their cries of surprise at Mellon Bank's expert's use of historical, last twelve month EBITDA in his valuations when their own experts based their valuations on historical data.  Even if this lack of diligence before the Confirmation Hearing could be excused, certainly their lack of diligence during the six months following the hearing cannot.  Tellingly, Plaintiffs acknowledge that they failed to hire counsel to investigate the purported fraud claims until summer 2003.  Plaintiffs' fraud Complaint is precisely the "Sword of Damocles" section 1144 was designed to prohibit.  In all events, there is no "too busy" or "not enough time" exception to section 1144.

48.    Nor can Plaintiffs avoid the section 1144 bar by characterizing their claims as claims for damages rather than an attempt to revoke the Confirmation Order. See Hotel Corp. of the South v. Rampart 920, Inc., 46 B.R. 758, 770-71 (E.D. La. 1985) ("[Section 1144] places a limit on the period of time within which a party may attack a bankruptcy plan on the ground that it was procured by fraud. To allow Plaintiffs to collaterally attack the Bankruptcy reorganization on grounds of fraud is to allow them to do indirectly what they no longer may do directly because of 11 U.S.C. § 1144."); Crown-Globe, 107 B.R. at 62 (equitable subordination action brought more than 180 days after confirmation "should be dismissed as an untimely attempt to revoke confirmation of debtor's chapter 11 plan.").

49.    The same is true under Rule 60(b) of the Federal Rules of Civil Procedure. Rule 60(b) is the general rule governing requests for relief from federal judgments, and when used in bankruptcy cases, it incorporates section 1144's 180-day rule. See Fed. R. Bankr. P. 9024; Vencor, 284 B.R. at 82-83. Courts have rejected subsequent actions whose effect is to revoke a prior judgment. See Hendrick v. Avent, 891 F.2d 583, 588-89 (5th Cir. 1990) (dismissing action for securities fraud, RICO violations, and various state law claims based on alleged misrepresentations, omissions, and fiduciary breaches in bankruptcy; "The law and policy surrounding a Rule 60(b) motion is clear that this motion was intended to be the only method of attacking a final judgment."); Met-L-Wood Corp. v. Pipin, 861 F.2d 1012, 1019 (7th Cir. 1988) (dismissing untimely attempt to vacate judgment confirming sale of debtor's assets on the grounds of fraud).

**B.     Plaintiffs' Complaint Is Barred By Res Judicata**

50.     Plaintiffs' Complaint must be dismissed under basic principles of res judicata. The distribution scheme under the Plan has already been fully adjudicated, and a final, nonappealable judgment has been rendered, including an adjudication of the issues raised in this collateral attack.

51.     The doctrine of res judicata, also known as claim preclusion, provides that "[a] final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were or could have been raised in that action." Federated Dep't Stores v. Moitie, 452 U.S. 394, 398 (1981); see also CoreStates Bank, N.A. v. Huls America, Inc., 176 F.3d 187, 191 (3d Cir. 1999) ("Claim preclusion bars a party from litigating a claim that it could have raised or did raise in a prior proceeding in which it raised another claim based on the same cause of action."); Board of Trustees of Trucking Employees Welfare Fund, Inc. v. Centra, 983 F.2d 495, 504 (3d Cir. 1992) (Claim preclusion "gives dispositive effect to a prior judgment if a particular issue, although not litigated, could have been raised in the earlier proceeding."); Nanavati v. Burdette Tomlin Mem'l Hosp., 857 F.2d 96, 111 (3d Cir. 1988) (preclusion extends to all grounds for and defenses to recovery that were available to parties, regardless of whether they were asserted or determined in prior proceeding).

52.     In evaluating whether a later-asserted claim is barred by res judicata, the Court must determine (1) whether there was a final judgment on the merits; (2) whether the parties or their privies were involved in both proceedings; and (3) whether both claims are based on the same cause of action so that the claim should

AA. 1442

have or could have been litigated in the previous case. See CoreStates Bank, 176 F.3d at

194. Each and every element of res judicata is easily satisfied here.

       53.    *The Confirmation Order is a Final Judgment on the Merits.* The

Confirmation Order, approving and incorporating the Plan provisions and overruling Plan

objections, constitutes a final judgment on the merits. See Donaldson v. Bernstein, 104

F.3d 547, 554 (3d Cir. 1997) ("A confirmation order is res judicata as to all issues

decided or which could have been decided at the hearing on confirmation.") (quoting In

re Szostek, 886 F.2d 1405, 1408 (3d Cir. 1989)); Eastern Minerals & Chem. Co. v.

Mahan, 225 F.3d 330, 336 (3d Cir. 2000); CoreStates Bank, 176 F.3d at 194 ("The

principle of claim preclusion applies to final orders overruling objections to a

reorganization plan in bankruptcy proceedings just as it does to any other final judgment

on a claim."); Katchen v. Landy, 382 U.S. 323, 334 (1966) ("The normal rules of res

judicata and collateral estoppel apply to the decisions of bankruptcy courts."); Stoll v.

Gottlieb, 305 U.S. 165 (1938) (holding that confirmation of plan acts to bar attempts by

parties to relitigate any matters that could have been raised during the bankruptcy

proceedings). Thus, the Confirmation Order satisfies the first element of res judicata.

       54.    *Plaintiffs Were Parties to the Bankruptcy Proceedings and the*

*Contested Confirmation Matter.* Section 1141(a) of the Bankruptcy Code sets forth that:

> the provisions of a confirmed plan bind . . . any creditor, equity security
> holder, or general partner in the debtor whether or not the claim or interest
> of such creditor, equity security holder or general partner is impaired
> under the plan and whether or not such creditor, equity security holder, or
> general partner has accepted the plan.

There can be no dispute that, under Section 1141(a), Plaintiffs were parties to the

Bankruptcy Proceedings and therefore are bound by the Confirmation Order.

AA. 1443

55.    Plaintiffs were all creditors of the Debtors, were represented by the Genesis Creditors' Committee (GMS, who represents many plaintiffs in this action, sat on the Committee), received notice of and had the opportunity to be heard on all matters before this Court, including all claims and issues relating to Plan confirmation.[4]  Indeed, GMS and Grimes took advantage of that opportunity to be heard and were the principal objectors to the distribution scheme (and valuations) underlying the Plan.  The cases are clear that, under such circumstances, the "parties and privies" requirement is met.  See In re Justice Oaks II Ltd., 898 F.2d 1544, 1550-51 (11th Cir. 1990) (for purpose of former adjudication, party includes "all who are directly interested in the subject matter and who have a right to make defense, control the proceedings, examine and cross-examine witnesses and appeal from the judgment if an appeal lies," and all creditors of debtor are parties in interest)(internal citations omitted); see also In re Atlanta Retail, Inc., 297 B.R. 299, 306 (N.D. Ga. 2003) (same); In re USN Communications, Inc., 280 B.R. 573, 586 (D. Del. 2002) (quoting In re Varat Enter., Inc. 81 F.3d 1310, 1316 (4th Cir. 1996) ("A party for the purposes of former adjudication includes one who participates in a Chapter 11 plan confirmation proceeding."); CoreStates, 176 F.3d at 195 ("We believe . . . that claim preclusion should apply . . . between all parties to a bankruptcy case."); In re Monument Record Corp., 71 B.R. 853, 861 (M.D. Tenn. 1987) (holding that "[p]rivity exists where 'successive parties. . . adequately represent the same legal interests,' and

---

[4]  See generally 11 U.S.C. § 1109(b) ("A party in interest, including . . . a creditors' committee . . . [and] a creditor .    may raise and may appear and be heard on any issue in a case under this chapter"); Bankr. R. 2002(b) and (f) (rules requiring notice to all creditors of time for filing objections to and hearings on confirmation and disclosure statement); Bankr. R. 3017(c) and (d) (rules governing the transmission of the plan, disclosure statement and solicitation materials to all creditors).

where "the prior and present parties have similar incentives, powers and opportunities to investigate and litigate").

56. *The Same Cause of Action Was or Could Have Been Litigated.*
Plaintiffs' previous objections at confirmation and the instant Complaint rest on the same cause of action. The Third Circuit in Eastern Minerals & Chemical Co., 225 F.3d at 337-38, explained that res judicata applies if

> the factual underpinnings, theory of the case, and relief sought against the parties to the proceeding are so close to a claim actually litigated in the bankruptcy that it would be unreasonable not to have brought them both at the same time in the bankruptcy forum.

Id. at 338-39. The factual underpinnings, the theory of the case, and relief sought by Plaintiffs at the time of confirmation of the Plan are substantially identical to what is asserted now.

57. The objections raised by Plaintiffs during the Bankruptcy Proceeding were based – as is their instant Complaint – on the premise that the valuation of the Debtors and the distributions made under the Plan should have been different. The Confirmation Order specifically incorporated the Plan and adjudged that the Plan distributions were proper, and the distributions were thereafter made. At the core of the present action is Plaintiffs' malcontent that the "senior creditors walked away from the bankruptcy with over 94% of the equity of Genesis, and junior creditors, including plaintiffs, received next to nothing, " and their concomitant demand for $200 million in damages to remedy the perceived unfair distribution. Compl. ¶ 3. In both the Bankruptcy Proceedings, and in this action, Plaintiffs were/are seeking to shift the recoveries made to the senior creditors under the Plan to themselves, a junior class. That

AA. 1445

Plaintiffs now formalistically invoke words like "fraud" or "gross negligence" has no bearing as to whether the claim -- regarding which creditors were entitled to which recoveries -- has previously been adjudicated.

58.    The Third Circuit's decision in CoreStates Bank is highly instructive. In that case, both CoreStates Bank ("CoreStates") and Huls America, Inc. ("Huls") had extended substantial credit to a Chapter 11 debtor and entered into a subordination agreement under which Huls's right to receive payment was subordinated to CoreStates' right. When Huls received a $600,000 payment from the debtor as contemplated in its reorganization plan -- but before the plan's actual confirmation -- CoreStates filed objections to the plan on the ground, inter alia, that the plan unfairly discriminated between creditors. The bankruptcy judge confirmed the reorganization plan over CoreStates' objections, and CoreStates did not appeal the plan's confirmation.

59.    Shortly thereafter, CoreStates filed a separate action against Huls, this time asserting its right to recovery under the subordination agreement. The Third Circuit found that the claim to the $600,000 based on the subordination agreement was "essentially similar" to the discrimination claim rejected in the confirmation order because underlying both the objection to the plan and CoreStates' current claim was the distribution of the $600,000. The Court emphasized that "in the bankruptcy proceeding, CoreStates and Huls contested at length the fairness of the Reorganization Plan to the extent it provided for the payment of $600,000 to Huls," and accordingly held that res judicata barred CoreStates's separate action. CoreStates Bank, 176 F.3d at 206. The

AA. 1446

Court placed great significance on the fact that the ultimate distribution at issue had already been litigated and resolved in the Confirmation Order, just like the case at bar.[5]

60.    The court's reasoning in In re Atlanta Retail, Inc., 297 B.R. 299 (Bankr. N.D. Ga. 2003), is likewise instructive.  There, Eastman Kodak ("Kodak") unsuccessfully sought recovery of its $30 million pre-petition loan to the debtors, Wolf Camera ("Wolf").  An earlier subordination agreement between Kodak and Wachovia Bank ("Wachovia") subordinated Kodak's right to recovery to the claims and liens of other pre-petition secured lenders.  During the course of the chapter 11 proceedings, the bankruptcy court entered various orders which addressed the validity, extent and priority of claims against Wolf's estate.  The court also entered an order approving the settlement of an adversary proceeding brought by a committee of unsecured creditors that expressly found the subordination agreement between Kodak and Wachovia enforceable.  Despite these earlier rulings, Kodak subsequently sought to challenge the validity of the subordination agreement in a later state court action alleging, inter alia, fraud against Wachovia in obtaining the subordination agreement.  The debtors and Wachovia sought to permanently enjoin prosecution of the state court action on grounds of res judicata and equitable estoppel.

---

[5] Notably, the Third Circuit, in Eastern Minerals & Chemicals Co. v. Mahan, 225 F.3d 330 (2000), while explaining that the "factual underpinnings" test, set forth supra p. 27 is more suitable than the "essential similarity" test in the bankruptcy res judicata context, reaffirmed its reasoning and decision in CoreStates. The Court emphasized again the importance of the fact that CoreStates specifically challenged the fairness of providing the $600,000 to the debtor in the plan, and noted that its decision in CoreStates helped to frame the key res judicata question, that is, whether the later claim had been interposed in the bankruptcy proceeding and resolved by the confirmation order. Id. at 339-40. The court found that, under the facts of Eastern Minerals, the res judicata defense was unavailable given that the claim asserted in the second action was "markedly different" from any claim in the first litigation. Id. at 338-39. Here, by contrast, Plaintiffs' case is substantially identical to the claims in the Bankruptcy Proceedings.

AA. 1447

61.    On summary judgment, the bankruptcy court rejected Kodak's argument that the state court action was merely an inter-creditor dispute unrelated to the debtor and held Kodak's claims barred by the doctrine of res judicata. The court found that validity of the subordination agreement was at the heart of its earlier proceedings to determine the validity, extent and priority of claims, and thus could not be relitigated in a separate action:

> The validity of the 1998 Subordination and Intercreditor Agreements was an integral part of the prior orders entered by this Court . . . . Kodak's loan of $30,000,000 to the Debtors, which ultimately was used to pay down the Debtors' obligations to Wachovia, formed the factual basis for the . . . New York Action, and any defense or claims that Kodak could have alleged in connection with this Court's determination of validity, extent and priority of claims.

In re Atlanta Retail, Inc., 297 B.R. at 306. The court applied res judicata despite finding that "Kodak stood silent while the Court determined the validity, extent, and priority of Wachovia's claims against the Debtors." Id. at 307.

62.    Unlike Kodak, Plaintiffs in the instant action neither stood silent nor idly by while the recoveries of the senior and junior creditors were adjudicated. In fact, Plaintiffs' challenges to the Plan distributions were at the forefront of the confirmation proceedings, yet they mount the same challenge again here. Thus, if res judicata barred the claims in Atlanta Retail, the application of res judicata here is not even a close call.

63.    Other cases abound demonstrating the full application of res judicata here. In In re Justice Oaks II, Ltd., 898 F.2d 1544 (11th Cir. 1990), a set of creditors objected to a plan on the grounds that another lender had engaged in unfair conduct in obtaining a security interest in the bankruptcy estate, and that such security

DC1:\174454\02\31P3021 DOC\50505.0003

30

RLF1-2732706-1

**AA. 1448**

interest was really a partnership interest. The bankruptcy court confirmed the debtor's

reorganization plan over these objections. Like Plaintiffs here, the In re Justice Oaks II,

Ltd. creditors subsequently brought a separate claim against the same lender alleging that

the lender had fraudulently obtained its secured lender status. The court held that these

claims were barred by res judicata:

> The Wallises' objection was overruled, and they failed to appeal the order.
> The Wallises' adversary complaint essentially brings an impermissible
> collateral attack on the order confirming the plan. Because the claims
> raised in the Wallises' adversary complaint were already raised, or could
> have been raised, in their objection to confirmation, we hold that the
> doctrine of claim preclusion bars them from relitigating those claims.

In re Justice Oaks II, Ltd., 898 F.2d at 1552 (footnote omitted); see also Crop-Maker Soil

Servs., Inc. v. Fairmount State Bank, 881 F.2d 436 (7th Cir. 1989) (bankruptcy

proceeding to determine priority of various secured creditors in debtor's asset was res

judicata barring subsequent action by one creditor against another alleging that

defendant's priority was fraudulently obtained); Sure-Snap Corp. v. State Street Bank &

Trust Co., 948 F.2d 869 (2d Cir. 1991) (order confirming debtor's reorganization plan

was entitled to res judicata effect and thus precluded debtor from subsequently bringing

lender liability claims in separate, tort-based suit); Southmark Props. v. Charles House

Corp., 742 F.2d 862, 871 (5th Cir. 1984) (claims of fraud and other wrongdoing arising

out of earlier approved reorganization sale barred by res judicata where the purported

improper acts were "alleged to have produced or resulted from, and were integrally

related to, the sale of the property").[6] In this case, Plaintiffs' attempt at revamping the

---

[6] See also In re Public Service Co. of New Hampshire, 43 F.3d 763, 767-768 (1st Cir 1995) (enjoining a
shareholder's post confirmation suit alleging that there had been false statements made in the debtors'
Disclosure Statement, finding that disclosure statement attacks were in part made or could have been made
in the reorganization proceeding, and explaining that allowing the second suit "would disrupt Congress'

DC1A17845-4\02\3TP2021 DOC\50505 0003

31

creditor recoveries should also be barred.

    **C.**    **Collateral Estoppel Principles Preclude Plaintiffs' Attempt to Relitigate the Same Issues Raised and Litigated During the Bankruptcy Proceedings**

    64.    The fact issues Plaintiffs seek to attack and litigate in this action have already been litigated and determined in the prior Bankruptcy Proceedings. Plaintiffs' thinly-disguised attempt to re-argue (1) the appropriate enterprise value of the Debtors, (2) whether the Plan was fair and equitable, and (3) whether the Plan was proposed in good faith, is exactly the type of conduct that the issue preclusion doctrine is supposed to stop in its tracks.

    65.    Collateral estoppel proscribes relitigation where, as here: (1) the identical issue was decided in a prior adjudication; (2) there was a final judgment on the merits; (3) the party against whom the bar is asserted was a party or in privity with a party to the prior adjudication; and (4) the party against whom the bar is asserted had a full and fair opportunity to litigate the issue in question. Board of Trustees of Trucking Employees Welfare Fund, Inc. v. Centra, 983 F.2d 495, 505 (3d Cir. 1992). It is well-settled that "once an issue is raised and determined, it is the entire *issue* that is precluded, not just the particular arguments raised in support of it in the first case." Yamaha Corp. v. United States, 961 F.2d 245, 254 (D.C. Cir. 1992).[7] All four elements are fully satisfied here.

---

detailed scheme for approval of disclosure statements and reorganizations, and would frustrate the proper administration of the Bankruptcy Code.").

[7] See also Restatement (Second) of Judgments § 27 ("[I]f the party against whom preclusion is sought did in fact litigate an issue . . . and suffered an adverse determination . . . new arguments may not be presented to obtain a different determination of that issue."); 1B Moore's Federal Practice § 0.443[2] ("Any contention that is necessarily inconsistent with a prior adjudication of a material and litigated issue . . . is subsumed in that issue and precluded by the effect of the prior judgment as collateral estoppel.").

66.    *The Issues Litigated Before, and Decided by the Bankruptcy Court Have Been Re-Asserted in this Action.*  First and foremost, the central issue during the confirmation contest was the measure of enterprise value of the Debtors, including the reasonableness of Debtors' fiscal year 2001 projections.  See Relevant Background, *supra.*  No less than six expert witnesses and the Debtors' Chief Financial Officer (Mr. Hager) testified at the Confirmation Hearing regarding valuation.  During the confirmation proceedings, Plaintiffs argued that there had been a "dramatic misvaluation and undervaluation" of the Debtors and asked the Court to use an "accurate" EBITDA.  See Exhs. D & E (Grimes and GMS Objections).  As they did at confirmation, Plaintiffs' Complaint is focused on the allegation that the valuation of Genesis had been depressed.  Compl. ¶¶ 8-10.  Clearly, valuation -- which was the basis of creditor distributions under the Plan -- has already been hotly-contested, fully litigated and finally adjudged.[8]

---

[8]  Notably (although unnecessary to this Court's determination on collateral estoppel), even the particular allegations and arguments raised in both proceedings are largely the same.  See pp. 16-18, *supra*  Most striking is Plaintiffs' claim in the Complaint that the 2001 projections were understated because of an improper downward adjustment in the amount of $11.6 million on the account of a "voluntary and retroactive" reduction in fees payable to Genesis under contracts with Multicare.  Compl. ¶¶ 9, 55 (alleging that the "'renegotiation' was not undertaken to make these contracts more 'fair,' but to arbitrarily transfer value, retroactively out of the estate.").  Not only was the propriety of this adjustment raised and litigated in connection with confirmation, see Exh. T, Hager Dep. Tr 12-17, 72-73; Exh. G, at 58-59 (Hager testifying in detail regarding the $11.6 million reduction in fees and the negotiations leading up to that change), it was the main issue raised in a motion to appoint a chapter 11 trustee ("Trustee Motion") in the Multicare bankruptcy case (and a related motion to adjourn the disclosure statement hearing) filed by the statutory committee appointed in the Multicare chapter 11 case ("Multicare Creditors' Committee") brought two months before confirmation.  In the Trustee Motion, Multicare's Committee argued for a $28 million reduction, relying on the same Ernst & Young information Plaintiffs rely on in their Complaint, pointing to what it considered extensive conflicts of interest, and taking issue with the role of Multicare's Chief Restructuring Officer Beverly Anderson.  Exh. AA.  Discovery was taken in connection with the Trustee Motion, and the Genesis Creditors' Committee -- acting as fiduciary for Plaintiffs -- opposed the positions taken by the Multicare Committee.  Exh. BB.  Plaintiffs clearly received notice of the Trustee Motion, as Grimes even addressed it in his Objection to the Plan Exh. E, at 3-4.  That litigation was ultimately settled and approved as part of the Plan.  Plaintiffs also dedicate a great many allegations in their Complaint to the lack of an adjustment to EBITDA concerning the impact of a potential transaction with APS (a transaction which in fact was never consummated)  Compl. ¶ 9, 119-29.  During discovery and at the Confirmation Hearing, a great portion of the testimony elicited dealt with that very subject.  Moreover, the Court in fact

67.    Second, another issue that was presented, litigated, and decided during confirmation was whether the Plan was fair and equitable. It is clear from the record and the Confirmation Order that the Court found that the Plan was "fair and equitable" over the Plaintiffs' objection that the Debtors were undervalued, and despite the testimony elicited by Plaintiffs challenging the Debtors' EBITDA projections, assumptions and adjustments. The Complaint takes direct issue with this "fair and equitable" finding by again alleging that the projected EBITDA presented to the Court was "too low," and "depressed" by reason of the same allegedly misleading assumptions and adjustments. See Compl. at ¶¶ 9, 128.

68.    Third, the Court held in its Opinion and the Confirmation Order that the Plan was proposed in "good faith," and with the "legitimate and honest purpose of maximizing the value of the Debtors' estates." Exh. I, at 24-25; Exh. J, at 10-11. Yet, the Complaint strikes out again at this "good faith" finding through its numerous allegations that there was a "conspiracy" among the Senior Lenders and the Debtors. Compl. ¶¶ 1, 56, 169, 171-72. This Court has determined that the Plan was proposed in "good faith," and the issue cannot be litigated here again.

69.    *The Confirmation Order is a Final Judgment on the Merits.* For the reasons set forth in paragraph 53 above, this element is satisfied.

70.    *Plaintiffs Were Parties to the Bankruptcy Proceedings and the Contested Confirmation Hearing.* For the reasons set forth in paragraphs 54-55 above, this element is satisfied as well.

---

addressed the Debtors' exclusion of the APS impact from EBITDA in its Opinion, determining that it was reasonable. Exh. I, at 33, 35-36.

71.     *Plaintiffs Had a Full and Fair Opportunity to Litigate the Issues Raised in Their Complaint.*  Anticipating the assertion of collateral estoppel, Plaintiffs' Complaint proffers that despite the exchange of thousands of documents, the taking of twelve depositions, the exchange of six expert reports, and two full days of evidentiary hearings, they did not have a full and fair opportunity to litigate the issues raised in the Complaint.  Compl. ¶¶ 169-77.  They claim this is so because (1) they had not reviewed the thousands of documents given to them with the possibility of "fraud" in mind prior to confirmation, and (2) they did not have enough time to read the discovery, taking issue with the expedited nature of the Bankruptcy Proceedings.

72.     Both arguments are meritless.  It does not matter whether Plaintiffs were aware of the facts alleged in the Complaint during the Confirmation Hearing.  Subsequently-discovered facts that were nevertheless available during a prior proceeding do not permit a party to relitigate previously determined issues of fact.  Liberty Mut. Ins. Co. v. FAG Bearings Corp., 335 F.3d 752, 761 (8th Cir. 2003) ("Where the first and second actions are both based on an evaluation of the same historical facts, a litigant seeking to introduce newly discovered evidence otherwise in existence at the time of the first suit may not argue that the facts have changed in the time period between the two actions in order to avoid the preclusive effect of the first decision."); Klein v. Commissioner, 880 F.2d 260, 263 (10th Cir. 1989) ("A party may not assert a change in controlling facts when the facts allegedly showing a change in circumstances could have been discovered in the exercise of due diligence."); Yamaha Corp. v. United States, 961 F.2d 245, 257-58 (D.C. Cir. 1992) ("A new contention is not . . . necessarily a new issue. If a new legal theory or factual assertion put forward in the second action is related to the

subject-matter and relevant to the issues that were litigated and adjudicated previously, so that it could have been raised, the judgment is conclusive on it despite the fact that it was not in fact expressly pleaded or otherwise urged.") (internal citations omitted).

73.    Plaintiffs' complaint that they needed more time before the Confirmation Hearing is an *admission* that they "could have" raised their claims during the confirmation process but were simply not diligent enough. Compl. ¶¶ 56, 169-72. As such, they are estopped from asserting their claims.

74.    The second argument, *i.e.*, that Plaintiffs did not have adequate time to read the discovery materials, truly misses the mark. First, if every bankruptcy litigant was allowed to reopen bankruptcy confirmation proceedings because the proceedings were too expeditious, the judicial dockets would be swamped with endless re-litigation, and there never would be any finality to plans of reorganization. Second, Plaintiffs' complaint about the discovery schedule, and specifically, the timing of the receipt of expert reports, was an issue to be decided by the Court at the time of the hearings, not three years after discovery closes. See Crossroads Cogeneration Corp., 159 F.3d 129, 137 (3d Cir. 1998) (rejecting argument that plaintiff did not have a full and fair opportunity to litigate issue before administrative agency where agency "did not heed [plaintiff's] request to file additional materials before it rendered its decision on the merits of the petition"). Particularly meritless is Plaintiffs' related argument that they were "surprised" by the use of historical or last twelve month EBITDA data by Mellon Bank's expert at the eleventh hour. This contention is absurd for numerous reasons. First, the starting point for all projections of future EBITDA is, by necessity, past performance, *i.e.*, historical EBITDA. Further, Plaintiffs' own experts relied on last

twelve month data, see Exh. H, at 134-35, 182-83 and Exh. CC, Becklean Dep. Tr. at 48. In fact, the Genesis Creditors' Committee, acting as a fiduciary for Plaintiffs, had been given unfettered access to the Debtors' last twelve month data during the course of the Bankruptcy Proceedings and timely updated its expert report to reflect the actual results through June 2001. See Exh. DD, and Exh. H, at 94-99.

**D.    Plaintiffs' Complaint Asserts Previously-Discharged Claims Against Debtors**

75.    The Court's Confirmation Order contains explicit terms "discharg[ing] all existing debts and Claims . . . against or in the Debtors," and "preclud[ing] and enjoin[ing]" the assertion of all pre-Effective Date claims against the Debtors ("Discharge and Injunction"). Exh. J, at 37; Exh. K, at 10.2 and 10.3. Since the Effective Date of the Debtors' Plan was October 2, 2001, and Plaintiffs' claims are based on allegedly fraudulent pre-confirmation conduct, Plaintiffs' claims against the Debtors have been discharged. Accordingly, Plaintiffs' Complaint as against the Reorganized Debtor must be dismissed.

76.    Plaintiffs' alleged defense to the clear and unequivocal language of the Discharge and Injunction is that 11 U.S.C. § 523 saves their claims against the Reorganized Debtors. (See Compl. ¶ 186). They are wrong as a matter of law. By its clear terms, section 523, which contains certain exceptions to the discharge of pre-petition debts under 11 U.S.C. § 1141, applies solely to *individual – not corporate --* debtors. Section 523 provides that under certain circumstances, "[a] discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an *individual* debtor from any debt . . . ." 11 U.S.C. § 523(a) (2003) (emphasis added).

Significantly, Congress makes no reference to *corporate* debtors in this subsection. <u>See</u> <u>id.</u> Numerous federal courts, including the Third Circuit and four other Circuit Courts of Appeals, have found that section 523 is inapplicable to corporate debtors. <u>In re</u> <u>Pelkowski</u>, 990 F.2d 737, 742 (3d Cir. 1993) (commenting that in the context of § 523 "it is evident that 'individual' debtor is used in contradistinction to 'corporate' debtor"); <u>In</u> <u>re Pacific-Atlantic Trading, Co.</u> (<u>Towers v. United States</u>), 64 F.3d 1292, 1302 (9th Cir. 1995) ("§ 523 only applies to individual and not corporate debtors"). <u>See also</u> <u>Garrie v.</u> <u>James L. Gray, Inc.</u>, 912 F.2d 808, 812 (5th Cir. 1990) ("all of the exceptions to discharge found in section 523(a) . . . appl[y] only to individual, not corporate, debtors"); <u>In re Spring Valley Farms, Inc.</u> (<u>Spring Valley Farms, Inc. v. Crow</u>), 863 F.2d 832, 834 (11th Cir. 1989) ("A corporate debtor is not an individual debtor for the purposes of Section 523."); <u>Yamaha Motor Corp. v. Shadco, Inc.</u>, 762 F.2d 668, 670 (8th Cir. 1985) ("Congress clearly did not intend the term 'corporate debtor' to be used interchangeably with the term 'individual debtor,' as such a construction would 'render meaningless employment by Congress of the term 'individual.''"). Accordingly, Plaintiffs' argument based on Section 523 is frivolous and only underscores that they are proceeding in flagrant disregard of the Court's prior determinations.

E.     **Preserving the Finality of the Reorganization**
       **Plan and Injunction is Paramount**

77.     At the core of the res judicata and collateral estoppel doctrines, as well as the 180-day time bar of section 1144, is the important need in our judicial system for the finality of judgments, and it is beyond dispute that the public interest in the finality of a plan of reorganization (and the injunctive relief provided therein) is

enormously significant. As the First Circuit aptly stated in In re Public Service Co. of

New Hampshire, 43 F.3d at 768:

> In acting to protect its prior proceedings, the bankruptcy court acts in an
> equitable capacity. Later suits that threaten to undermine a bankruptcy
> judgment are not merely the concern of the individual litigants; the
> willingness of future claimants and creditors to compromise in chapter 11
> proceedings depends on giving the reorganization court's approval a due
> measure of finality.

See also In re Atlanta Retail, Inc., 207 B.R. 299 (N.D. Ga. 2003) (explaining that

"[R]estraining litigious plaintiffs from taking more than 'one bite of the apple' has been

our avowed purpose since the common law doctrine of res judicata first evolved . . . . Of

course, in the bankruptcy context, ... that bite is to be taken as expeditiously and

economically as possible."). If Plaintiffs' Complaint is allowed to survive, the entirety of

the Plan will be nullified almost three years after the fact, after distributions have been

made, a result that is clearly anathema to the proper administration of chapter 11 of the

Bankruptcy Code. Accordingly, for this independent, and overarching public policy

reason, the Complaint must be dismissed.

F.   **Plaintiffs' Complaint Fails To State A Claim For Fraud,
     Conspiracy or Gross Negligence**

78.   Each of the above grounds (section 1144 of the Bankruptcy Code,

res judicata, collateral estoppel, this Court's discharge of pre-Effective Date claims

against the Debtors, and the public interest in the finality of judgments) provides an

independent, dispositive basis for dismissal of the Complaint that obviates any need to

analyze Plaintiffs' purported causes of action at length. Nevertheless, the Complaint

should also be dismissed for failure to state an actionable claim for fraud, conspiracy or

gross negligence.

(1)    <u>Plaintiffs' Common Law Fraud Claim Fails as a Matter of Law.</u>

79.    To establish a fraud claim, a plaintiff must plead *facts* showing that: (1) defendant made a false representation of an existing fact; (2) defendant had knowledge of the falsity of the representation or omission; (3) defendant intended to defraud the plaintiff; (4) plaintiff reasonably relied upon the representation and (5) plaintiff suffered damage as a result of such reliance. <u>Crowhorn v. Nationwide Mut. Ins. Co.</u>, 2002 Del. Super. LEXIS 178, at * 35 (Del. Super. Ct. 2002).[9]

80.    Here, the crux of Plaintiffs' claim is that "[t]he valuations of the Company, on which Court approval of the Plan was based, were based on fraudulent information," and that "[t]he linchpin of the fraud was the 'Budgeted EBITDA' projections for fiscal 2001, issued by the Company and provided to [the Company's] financial advisors." <u>See</u>, <u>e.g.</u>, Complaint ¶¶ 4. Plaintiffs allege that the effect of this purported scheme was that Genesis' 2001 EBITDA projections were improperly depressed by Defendants. Thus, Plaintiffs contend that Genesis' EBITDA revenue for fiscal year 2001 should have been increased by approximately $123 million which, according to Plaintiffs, translates to a difference in enterprise value for Genesis of $300-600 million. As demonstrated below, none of these allegations support a claim for fraud.

81.    *Allegedly Improper Projections Are Not Actionable. "False Statements."* Courts in this Circuit have repeatedly rejected pleading fraud by hindsight. That is, for a statement to be actionable as a misrepresentation, it must be shown to have

---

[9] As this case was transferred from the Southern District of New York, this Court is obliged to apply the choice of law rules that the Southern District would apply. <u>See</u> <u>Van Dusen v. Barrack</u>, 376 U.S. 612 (1964). New York choice of law rules require the application of "'the law of the jurisdiction having the greatest interest in the litigation.'" <u>Krock v. Lipsay</u>, 97 F.3d 640, 645 (2d Cir 1996). Here, this would clearly be Delaware.

been false at the time it was made, and not with hindsight gained from events occurring *after* the statements were made. See In re Ikon Office Solutions, Inc. Secs. Litig., 277 F.3d 658, 673 (3d Cir. 2002) (holding that defendant could not be liable for violating federal securities laws because accounting judgments were believed to be true *when made* and knowledge gained by "hindsight" was irrelevant) (internal citations omitted); see also In re Adams Golf, Inc. Secs. Litig., 176 F. Supp. 2d 216 (D. Del. 2001) (holding in federal securities laws context that plaintiff must plead that undisclosed fact was known to the defendant at time alleged omission occurred; "fraud by hindsight" is not actionable) (internal citations omitted); Glen Holly Entm't, Inc v. Tektronix, Inc., 100 F. Supp. 2d 1086 (C.D. Cal. 1999) ("[A] plaintiff does not satisfy the falsity requirement [of common law fraud] by merely asserting that a company's later revelation of bad news means that "earlier, cheerier" statements must have been false); Glaser v. Norris, 1992 Del. Ch. LEXIS 1, at *37 (Del. Ch. Ct., Jan. 6, 1992) (dismissing common law fraud claims because allegations concerning disclosure of company's financial growth were premised on "fraud by hindsight").

      82.    It is also black letter law that projections of a company's performance are not statements of fact but, rather, opinions that are not actionable even if, *in hindsight*, they are proven to have been incorrect. See Great Lakes Chem. Corp. v. Pharmacia Corp., 788 A2d. 544, 554 (Del. Ch. 2001) (holding that company's sales projections were opinions, not statements of fact, and, therefore, not actionable as common law fraud); see also Alnwick v. European Micro Holdings, Inc., 281 F. Supp. 2d 629, 634 (E.D.N.Y. 2003) (holding that "generalized allegations that the defendants were too optimistic when they projected future [business] prospects [are] insufficient to

support a claim of [common law] fraud"); Daily Variety, Ltd. v. Term Leasing, Inc., 1989

U.S. Dist. LEXIS 5605, at *8 (S.D.N.Y., May 22, 1989) (dismissing common law fraud

claims because plaintiffs failed to plead facts showing that allegedly misleading business

projections were "anything more than defendants' best, albeit uncertain, guess about the

future"). For opinions of future business prospects to be actionable as fraud, they must

lack any basis and be given with intent to defraud. See Scott-Douglas Corp. v.

Greyhound Corp., 304 A.2d 309, 317 (Del. Super. Ct., 1973) (holding that statements of

opinion may be actionable as fraud only if the opinions are given with the intent to

deceive).

83.    Here, Plaintiffs' purported fraud claim is based in large part on

allegations that certain of the Company's actual results in 2002 and 2003 differed from

the 2001 projections of those future events.[10] This model of textbook "fraud by

hindsight" pleading is insufficient to state a claim.[11]

84.    For example, Plaintiffs allege that Defendants improperly deducted

$11 million of pharmacy sales to Manorcare which had terminated its contract with

Genesis and had brought an arbitration proceeding against Genesis disputing the $11

million obligation. See Compl. ¶¶ 10-118. Plaintiffs assert that this deduction was

---

[10] Indeed, Plaintiffs attempt to have it both ways. Throughout most of the Complaint, they argue fraud based upon 2002 and 2003 results. But with respect to the APS sale from Mariner, they mislead the Court into believing that Genesis bought APS. In fact, it did not. Genesis was outbid at a section 363 auction by Omnicare, and this Court thereafter approved Mariner's sale of APS to Omnicare, not Genesis, by Order dated December 5, 2001. Exh. EE

[11] Plaintiffs also allege that certain of the items excluded from EBITDA violated GAAP. However, even assuming that is true -- and it is not -- a purported violation of GAAP, per se, does not state a claim for fraud. See In re Ikon Office Solutions, Inc. Secs. Litig., 277 F.3d at 673 (holding in federal securities law context that alleged violations of GAAP could not, by themselves, give rise to inference of scienter, and explaining that "the discovery of discrete errors after subjecting an audit to piercing scrutiny post-hoc does not, standing alone, support a finding of intentional deceit or of recklessness").

improper because "it was never 'probable' that Manorcare would succeed on its claims." Compl. ¶ 116. But the Complaint itself asserts that litigation between Genesis and Manorcare commenced in early 2000, and that it was not until *April 2002* when "the arbitrator ruled that the Genesis contract with Manorcare was fully enforceable, and required Manorcare to turn over all the escrowed funds, with interest, totaling $21.7 million." Compl. ¶ 115. Plaintiffs, therefore, are alleging, without any factual basis, that defendants should have known in October 2000, when the 2001 EBITDA figures were projected, that Manorcare would not prevail in the arbitration, even though Plaintiffs expressly plead that the arbitrator did *not* make that determination until April 2002. This, again, is an impermissible effort to plead fraud by hindsight.

85.    Plaintiffs further allege that Defendants made improper deductions to EBITDA for Cost of Pharmacy Goods Sold ("CGS"). In this regard, Plaintiffs allege that in October 2000, Genesis represented to the unsecured creditors that the budgeted EBITDA for fiscal 2001 assumed a pharmacy CGS of 61.9%, based on the most recent two months' results. Compl. ¶ 144. Plaintiffs, without any factual basis, then assert that "[t]here was no legitimate basis for that assumption." Id. ¶ 145. Instead of pleading any particularized facts, Plaintiffs assert that the Genesis 10Q for the second quarter of fiscal 2002 (issued in April 2002), showed that the *actual* pharmacy CGS for the first two quarters of fiscal 2001 (*i.e,* for the period beginning October 1, 2000 and ending March 31, 2001), had been 59.3%, not 61.9% as had allegedly been projected and used as a basis of the budgeted EBITDA. This too is an attempt to plead fraud by hindsight. Specifically, Plaintiffs, without any factual basis, are claiming that defendants should have known back in October 2000, what the actual pharmacy CGS would be for the

period ending six months later. The fact that the actual CGS for the first two quarters of 2001 turned out to be 59.3%, rather than the 61.9% that Genesis had projected for the entire fiscal 2001, does not mean that the Genesis' projections were false -- much less fraudulent -- when made in October 2000.

86.     In sum, Genesis' 2001 EBITDA figures, including $78 million of the purported $123 million of revenue items Plaintiffs allege should have been included to increase Genesis' EBITDA constitute mere *projections*, reflecting Genesis' best guess regarding its future performance. Specifically, the allegations concerning Insurance Loss Reserves, Loss of Sales to Manorcare, APS Transaction/Loss of Sales to Mariner, Loss of AGE Institute Business, Cost of Pharmacy Goods Sold, Personnel Costs, and the Medicare Population Increase are all premised on projections. No particularized facts are pleaded in the Complaint to support Plaintiffs' claim that those projections lacked a reasonable basis at the time they were made or were given with an intent to defraud.

87.     *Plaintiffs Have Failed to Plead Knowledge of Falsity with the Requisite Particularity Required Under Federal Rule 9(b).* Plaintiffs' fraud claim must be dismissed for failure to plead fraud with the particularity required by Fed. R. Civ. P. 9(b). The purpose of Rule 9(b) is "to place the defendants on notice of the precise misconduct with which they are charged, and to safeguard defendants against spurious charges of immoral and fraudulent behavior." Seville Indus. Mach. Corp. v. Southmost Mach. Corp., 742 F.2d 786, 791 (3d Cir. 1984). Rule 9(b) requires "the circumstances constituting fraud" to be "stated with particularity." The complaint must specify the