"who, what, when, where and how" of the alleged fraud.[12]  Grant v. Kingswood Apts., 2001 Dist. LEXIS 15815, at *5 (E.D. Pa., Oct. 2, 2001).  Furthermore, the complaint must specify why the representation at issue is, in fact, false.  See In re Receivership of Indian Motorcycle Manuf., Inc., 299 B.R. 36, 47 (D. Mass. 2003) (dismissing plaintiff's common law fraud claim under Rule 9(b) because plaintiff failed to explain precisely how alleged representation was false statement).  Finally, a complaint alleging fraud against multiple defendants must separately and specifically allege *each* defendant's alleged wrongdoing.  See De Lage Landen Fin. Servs., Inc. v. Cardservice Int'l, Inc., 2001 U.S. Dist. LEXIS 9692, at *9-10 (E.D. Pa., July 12, 2001) (dismissing plaintiff's complaint for failure to comply with Rule 9(b) because fraud was not separately alleged as to each defendant).  The Complaint cannot merely lump defendants together under umbrella allegations of fraud purportedly applicable to every defendant.  See Vicom, Inc. v. Harbridge Merch. Servs., Inc., 20 F.3d 771, 777-78 (7th Cir. 1994) (holding that blanket allegations "lump[ing] together multiple defendants" and failing to specify the nature of *each* defendant's alleged fraudulent conduct fell short of the requirements of Rule 9(b)); see also De Lage Landen Fin. Servs., Inc., 2001 U.S. Dist LEXIS, at *9 ("It is insufficient to attribute individual acts of fraud to all defendants generally.").

88.    Plaintiffs' fraud claim is principally based on the allegation that the 2001 EBITDA *projections* were fraudulent when made.  But as demonstrated above, Plaintiffs have failed to plead facts showing *why* those projections were fraudulent.  To the contrary, those projections were determined by this Court to be reasonable.

---

[12] Indeed, by way of example, in the case of Mellon Bank, the Complaint identifies no individual who allegedly participated in the fraudulent conduct, utterly failing to justify the "who" requirement, much less the "what, when, where or how" elements.

Additionally -- and equally fatal to Plaintiffs' claims -- Plaintiffs fail to plead the circumstances of *each* Defendant's involvement in the purported wrongful conduct. Instead, Plaintiffs rely on blanket allegations purportedly applicable to all Defendants. As has been shown above, blanket allegations purportedly applicable to all Defendants are not a proper substitute for specific allegations of each Defendant's involvement in every purported misrepresentation. In particular, the following allegations do not distinguish among defendants:

- **Loss of Sales to Manorcare.** <u>See</u> Compl. at ¶¶ 110-18. Plaintiffs allege, with respect to the litigation between Genesis and Manorcare, that Manorcare's "fabricated claim was frivolous and should have been treated as such" but do not -- as they are required to do -- allege which Senior Lender, *if any*, knew that the loss contingency was allegedly inappropriate and represented to the contrary. <u>See</u> <u>id.</u> at ¶ 116. Rather, Plaintiffs resort to blanket and conclusory allegations, such as that "the $4 million 'price compression adjustment' to budgeted EBITDA had no basis because no price concessions were made during that fiscal year." <u>Id.</u> at ¶ 118.

- **Loss of AGE Institute Business.** <u>See</u> Compl. at ¶¶ 130-35. Plaintiffs allege that *Genesis* furnished the unsecured creditors committee with allegedly misleading information concerning the magnitude of the adverse effect of the loss of AGE, but do not allege which, *if any*, of the *Senior Lenders* had any knowledge of this purported misinformation, <u>see</u> <u>id.</u> at ¶ 133, or the "loss contingency that should have been accrued" as a result of the lost AGE business, and represented to the contrary. <u>Id.</u> at ¶ 134. Instead, Plaintiffs merely allege that Genesis advised certain Senior Lenders that "the adverse impact [of the lost AGE business] on EBITDA would . . . be about $2,226,000." <u>Id.</u> at ¶ 132. Plaintiffs do not specify which Senior Lenders were actually privy to this information. <u>See</u> <u>id.</u>

- **Non-Recurring Reorganization Charges.**

  - Plaintiffs allege that Genesis should not have included a bankruptcy court approved $11 million Special Retention Program as a charge against EBITDA (<u>see</u> Compl. at

¶¶ 136-39), but do not even purport to allege which, *if any*, Senior Lender knew about this charge or its purportedly improper effect on LTM EBITDA and represented to the contrary. Instead, Plaintiffs improperly rely on the blanket and conclusory allegation that these charges "improperly found their way into the Genesis standalone LTM EBITDA, improperly reducing it by that amount." Id. at ¶ 139.

- Plaintiffs contend that certain costs associated with the First Choice Plan were non-recurring and should not have been included in EBITDA (see Compl. at ¶¶ 140-43) and Genesis, Goldman Sachs and "other lenders present" at a meeting of the Senior Lenders' steering committee knew that the charges were non-recurring "but did nothing to take these costs out of the LTM EBITDA calculation." Id. at 143. But, Plaintiffs fail to specify which Senior Lenders were present at the alleged March 13, 2001 senior creditors meeting at the time that it was purportedly announced that the First Choice Plan charges were allegedly non-recurring.

- **Medicare Population Increase.** See Compl. ¶¶ 147-51. Plaintiffs contend that Genesis improperly based EBITDA projections on 2000 data concerning Medicare -- even though, according to plaintiffs, pertinent 2001 data was available, see id. at ¶ 148 -- and "Genesis management advised the senior creditors of the improvements in the Medicare census, but did not inform other creditors, or the Bankruptcy Court." Id. at 149. But, Plaintiffs fail to specify which Senior Lenders received this information and, more to the point, and equally fatal, *when* this purported information should have been and was not disclosed, and by whom. See Grant, 2001 Dist. LEXIS, at *5 (holding that a complaint must specify the "who, what, *when*, where and how" of the alleged fraud) (emphasis added).

- **Personnel Costs.** See Compl. at ¶¶ 152-53. Plaintiffs claim that budgeted EBITDA expenses were improperly depressed because projected incentive-driven personnel costs were factored into the projections even though, allegedly, the "performance criteria for awarding those bonuses was utterly unrealistic and unreachable." Id. at ¶ 153. Plaintiffs fail to allege which, *if any*, Defendant knew that the "performance criteria" were allegedly "unrealistic" and "unreachable" and misrepresented these facts. Id.

89. *Plaintiffs Have Not Adequately Alleged Intent.* In order to maintain a fraud claim, Plaintiffs must allege that the Defendants intended to defraud them. Plaintiffs attempt to satisfy this element through unsupported allegations that Defendants were involved in a "scheme" to depress the valuation of Genesis. Unsupported, conclusory allegations of intent, however, are not sufficient to plead a claim of fraud. See Sanders v. Devine, 1997 WL 599539, at *7 (Del. Ch. Sept. 24, 1997) ("conclusions in complaint will not be accepted as true without specific allegations of fact to support them") (citation omitted); see also York Linings v. Roach, 1999 WL 608850, at *3 (Del. Ch. July 28, 1999) (rejecting insufficiently pled allegations that defendants acted "intentionally, fraudulently and wrongfully"). This is particularly true where, as here, judicially noticeable facts undercut any allegations of knowledge.

90. As set forth more fully in paragraph 37, Defendants, through discovery prior to and testimony in the Confirmation Hearing, freely disclosed to Plaintiffs and this Court the very facts which Plaintiffs claim form the basis for their allegations of fraud. This is entirely inconsistent with Plaintiffs' allegations that Defendants were engaged in an intentional scheme to commit fraud. See Sanders, 1997 WL 599539, at *8 (dismissing complaint where plaintiffs "[did not] allege that the defendants acted with scienter and faile[ed] even to set forth facts from which it could reasonably be inferred that the defendants acted with such requisite knowledge.").

91. *Plaintiffs Cannot Plead Justifiable Reliance.* To state a fraud claim under Delaware law, a plaintiff is required to plead facts showing justifiable reliance. Simply put, a plaintiff cannot recover for alleged fraud if the plaintiff was *aware* of the "*true facts*" which are [allegedly] misrepresented." Merrill v. Crothall-Am.,

Inc., 606 A.2d 96, 100 (Del. 1992) (holding that defendant's alleged misrepresentation of permanency of employment position was not fraudulent because plaintiff was aware that the position was temporary); Debakey Corp. v. Raytheon Serv. Co., 2000 Del. Ch. LEXIS 129, at *77 (Del. Ch. Ct., Aug. 25, 2000) (noting that "[a]n essential element of a claim for fraud is that the alleged victim be ignorant of the true facts that are misrepresented").

92.    Here, substantially all of the information Plaintiffs plead in their Complaint regarding the EBITDA line items that they contend were purportedly fraudulently concealed from, or misrepresented to them, was in fact known or should have been known to Plaintiffs *before* the Plan was confirmed by the Court.

93.    As is described in paragraph 38, *supra,* Plaintiffs were (or based on the information available to them should have been) fully aware of, and previously advanced allegations concerning the effect on projected and LTM EBITDA of the Multicare Contract, the Loss of Sales to Manorcare, the APS Transaction/Loss of Sales to Mariner, the Insurance Loss Reserves, the Non-Recurring Reorganization Charges, the Loss of AGE Institute Business, and Personnel Costs. Accordingly, these matters cannot form the basis of Plaintiffs' purported fraud claims. Plaintiffs' remaining allegations also fail, as described below.

(2)    Plaintiffs' Conspiracy Claim Fails as a Matter of Law.

94.    Plaintiffs' claim for conspiracy to commit fraud must also be dismissed. Civil conspiracy is "the combination of two or more persons or entities for an unlawful purpose or for accomplishment of a lawful purpose by unlawful means, resulting in damage." Connolly v. Labowitz, 519 A.2d 138, 143 (Del. Super. Ct. 1986).

Civil conspiracy is not an *independent* cause of action under Delaware law. <u>See</u>

<u>Ramunno v. Cawley</u>, 705 A.2d 1029, 1039 (Del. 1998). "The gravamen of an action for

civil conspiracy is not the conspiracy *itself* but the underlying wrong *which would be*

*actionable absent the conspiracy.*" <u>Connolly</u>, 519 A.2d at 143 (internal citations omitted)

(emphasis added). Here, because Plaintiffs have failed to allege a fraud claim, their claim

for conspiracy to commit fraud must be dismissed. <u>See In re Crown-Simplimatic, Inc.</u>

(<u>Adcor Indus. v. Crown-Simplimatic, Inc.</u>), 299 B.R. 319, 327 (Bankr. D. Del. 2003)

(dismissing conspiracy to commit fraud claim because plaintiffs failed to state a fraud

claim).

      (3)    <u>Plaintiffs' Claim For Gross Negligence Fails as a Matter of Law.</u>

     95.    Plaintiffs' gross negligence claim appears to be premised on the

theory that the alleged factual misrepresentations made by Defendants, if they were not

intentionally made, were made though gross negligence (Compl. ¶ 196). <u>See Brown v.</u>

<u>Robb</u>, 583 A.2d 949, 953 (Del. 1990) ("Gross negligence is a higher level of negligence

representing 'an extreme departure from the ordinary standard of care.'") (internal

citations omitted). But as shown above, Plaintiffs have failed to plead facts showing any

factual misrepresentation was made by any of the Defendants. Accordingly, Plaintiffs'

gross negligence claim should be dismissed as well.

     96.    There is an additional reason why Plaintiffs' gross negligence

claim should be dismissed as to the Senior Lenders. Like negligence, a gross negligence

claim must derive from a duty of care that is owed to Plaintiffs. <u>See Fritz v. Yeager</u>, 790

A.2d 469 (Del. 2002) ("In order to be held liable in negligence, a defendant must have

been under a legal obligation – a duty – to protect plaintiff from risk of harm which

caused his injuries."). Creditors in a bankruptcy proceeding do not owe each other a duty of care. See In re Hechinger Investment Co., 2004 WL 724960, at *5 (D. Del., Mar. 28, 2004) ("In the absence of the presence of the badges of fraud, to require something less than actual knowledge on the part of defendants would result in the imposition of a duty as between a secured lender and prior unsecured creditors of the debtor. Such a duty, the Court finds, does not have a basis in law.") (citing In re Sharp Intern. Corp., 302 B.R. 760,777-81 (E.D.N.Y. 2003)). Accordingly, the Senior Lenders here owed no duty to the Plaintiffs, junior debentureholders in the Bankruptcy Proceedings. Plaintiffs cannot as a matter of law establish an essential element of their gross negligence claim against the Senior Lenders.

## IV.    WAIVER OF MEMORANDUM OF LAW

97.    The legal basis for the requested relief is set forth above. Accordingly, Defendants respectfully request that the Court waive the requirement contained in the Local Bankruptcy Rules that a separate memorandum of law be submitted.

## V.    CONCLUSION

98.    For the foregoing reasons, Movants request an order dismissing

Plaintiffs' Complaint, together with such other and further relief as this Court deems just

and proper.

Dated: April 23, 2004
       Wilmington, Delaware


Steven K. Kortanek (No. 3106)
Morton R. Branzburg
KLEHR, HARRISON, HARVEY,
BRANZBURG & ELLERS LLP
919 Market Street, Suite 1000
Wilmington, Delaware  19809-3062
(302) 426-1189
     - and -
Barry Sher
FRIED, FRANK, HARRIS, SHRIVER &
JACOBSON LLP
One New York Plaza
New York, New York  10004-1980
(212) 859-8000

Attorneys for Defendant Goldman,
Sachs & Co.

Russell C. Silberglied (No. 3462)
RICHARDS, LAYTON & FINGER, P.A.
P.O. Box 551
Wilmington, Delaware  19899
(302) 651-7700
     - and -
Michael F. Walsh
Diane Harvey
Gary T. Holtzer
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
(212) 310-8000
     - and -
Adam P. Strochak
Joanne M. Guerrera
WEIL, GOTSHAL & MANGES LLP
1501 K Street, NW, Suite 100
Washington, DC 20005
(202) 682-7000

Attorneys for Defendant NeighborCare Inc.
(sued herein as Genesis Health Ventures,
Inc.)

Daniel K. Hogan (No. 2814)
1701 Shallcross Avenue, Suite C
Wilmington, Delaware 19806
(302) 656-7540
        - and -
Paul Lackey
Michael Aigen
LACKEY, HERSHMAN LLP
3102 Oak Lawn Ave., Suite 700
Dallas, Texas 75219
(214) 560-2206

Attorneys for Defendant Highland Capital
Management, L.P.

Robert S. Brady (No. 2847)
YOUNG CONAWAY STARGATT &
TAYLOR LLP
1000 West Street, 17th Floor
Wilmington, Delaware 19899-0391
(302) 571-6690
        - and -
Paul V. Shalhoub
WILLKIE FARR & GALLAGHER LLP
787 7th Avenue
New York, New York 10019-6099
(212) 728-8000

Attorneys for Defendant George V. Hager

Peter J. Duhig (No. 4024)
KLETT ROONEY LIEBER &
SCHORLING, PC
The Brandywine Building
1000 West Street, Suite 1410
Wilmington, Delaware 19801
(302) 552-4200

Attorneys for Defendant Mellon Bank, N.A.

- and -

Richard S. Toder
Menachem O. Zelmanovitz
MORGAN, LEWIS & BOCKIUS LLP
101 Park Avenue
New York, New York 10178
(212) 309-6000

Attorneys for Defendant Mellon Bank, N.A.
with respect to all Plaintiffs other than
Charles L. Grimes, Louis IG Ireland Trust,
C. Yvonne Cooke, Jane G. Brown, Serena
R. Schwartz and Gordon W. Chaplin

- and -

Steven Russo
SIVE, PAGET & RIESEL, P.C.
460 Park Avenue
New York, New York 10022
(212) 421-2150

Attorneys for Defendant Mellon Bank, N.A.
with respect to plaintiffs Charles L. Grimes,
Louis IG Ireland Trust, C. Yvonne Cooke,
Jane G. Brown, Serena R. Schwartz and
Gordon W. Chaplin

Daniel K. Hogan (No. 2814)
1701 Shallcross Avenue, Suite C
Wilmington, Delaware 19806
(302) 656-7540

- and -

Paul Lackey
Michael Aigen
LACKEY, HERSHMAN LLP
3102 Oak Lawn Ave., Suite 700
Dallas, Texas 75219
(214) 560-2206

Attorneys for Defendant Highland Capital
Management, L.P.

/s/ Robert S. Brady
Robert S. Brady (No. 2847)
YOUNG CONAWAY STARGATT &
TAYLOR LLP
1000 West Street, 17th Floor
Wilmington, Delaware 19899-0391
(302) 571-6690

- and -

Paul V. Shalhoub
WILLKIE FARR & GALLAGHER LLP
787 7th Avenue
New York, New York 10019-6099
(212) 728-8000

Attorneys for Defendant George V. Hager

Peter J. Duhig (No. 4024)
KLETT ROONEY LIEBER &
SCHORLING, PC
The Brandywine Building
1000 West Street, Suite 1410
Wilmington, Delaware 19801
(302) 552-4200

Attorneys for Defendant Mellon Bank, N.A.

- and -

Richard S. Toder
Menachem O. Zelmanovitz
MORGAN, LEWIS & BOCKIUS LLP
101 Park Avenue
New York, New York 10178
(212) 309-6000

Attorneys for Defendant Mellon Bank, N.A.
with respect to all Plaintiffs other than
Charles L. Grimes, Louis IG Ireland Trust,
C. Yvonne Cooke, Jane G. Brown, Serena
R. Schwartz and Gordon W. Chaplin

- and -

Steven Russo
SIVE, PAGET & RIESEL, P.C.
460 Park Avenue
New York, New York 10022
(212) 421-2150

Attorneys for Defendant Mellon Bank, N.A.
with respect to plaintiffs Charles L. Grimes,
Louis IG Ireland Trust, C. Yvonne Cooke,
Jane G. Brown, Serena R. Schwartz and
Gordon W. Chaplin

Peter J. Duhig (No. 4024) and *Teresa K.D. Currier (No. 3080)*

Daniel K. Hogan (No. 2814)
1701 Shallcross Avenue, Suite C
Wilmington, Delaware 19806
(302) 656-7540
        - and -
Paul Lackey
Michael Aigen
LACKEY, HERSHMAN LLP
3102 Oak Lawn Ave., Suite 700
Dallas, Texas 75219
(214) 560-2206

Attorneys for Defendant Highland Capital
Management, L.P.

Peter J. Duhig (No. 4024)
KLETT ROONEY LIEBER &
SCHORLING, PC
The Brandywine Building
1000 West Street, Suite 1410
Wilmington, Delaware 19801
(302) 552-4200

Attorneys for Defendant Mellon Bank, N.A.

- and -

Richard S. Toder
Menachem O. Zelmanovitz
MORGAN, LEWIS & BOCKIUS LLP
101 Park Avenue
New York, New York 10178
(212) 309-6000

Attorneys for Defendant Mellon Bank, N.A.
with respect to all Plaintiffs other than
Charles L. Grimes, Louis IG Ireland Trust,
C. Yvonne Cooke, Jane G. Brown, Serena
R. Schwartz and Gordon W. Chaplin

Robert S. Brady (No. 2847)
YOUNG CONAWAY STARGATT &
TAYLOR LLP
1000 West Street, 17th Floor
Wilmington, Delaware 19899-0391
(302) 571-6690
        - and -
Paul V. Shalhoub
WILLKIE FARR & GALLAGHER LLP
787 7th Avenue
New York, New York 10019-6099
(212) 728-8000

Attorneys for Defendant George V. Hager

- and -

Steven Russo
SIVE, PAGET & RIESEL, P.C.
460 Park Avenue
New York, New York 10022
(212) 421-2150

Attorneys for Defendant Mellon Bank, N.A.
with respect to plaintiffs Charles L. Grimes,
Louis IG Ireland Trust, C. Yvonne Cooke,
Jane G. Brown, Serena R. Schwartz and
Gordon W. Chaplin

## CERTIFICATE OF SERVICE

I, Russell C. Silberglied, hereby certify that on April 23, 2004, I caused copies of the foregoing *Defendants' Joint Motion to Dismiss Plaintiffs' Complaint* to be served upon the following party in interest in the manner indicated:

Russell C. Silberglied (No. 3462)

*Service List*
*Via First Class Mail (Non-Local)*
*Via Hand Delivery (Local):*

Steven K. Kortanek
Morton R. Branzburg
Klehr, Harrison, Harvey
Branzburg & Ellers LLP
919 Market Street, Suite 1000
Wilmington, DE 19809-3062

Paul Lackey
Michael Aigen
Lackey, Hershman LLP
3102 Oak Lawn Ave., Suite 700
Dallas, TX 75219

Paul V. Shalhoub
Willkie Farr & Gallagher LLP
787 7th Avenue
New York, NY 10019-6099

H. Adam Prussin
Pomerantz, Haudek, Block,
Grossman & Gross LLP
100 Park Avenue, 26th Floor
New York, NY 10017-5516

Robert S. Brady
Young Conaway Stargatt & Taylor
1000 West St., 17th Floor
Wilmington, DE 19899-0391

Teresa K.D. Currier, Esquire
Peter J. Duhig
Klett Rooney Lieber & Schorling
The Brandywine Building
1000 West Street, Suite 1401
Wilmington, DE 19801

R. Bruce McNew
Taylor & McNewLLP
3711 Kenneth Pike, Ste. 210
Greenville, DE 19807

Joseph J. McMahon, Jr., Esquire
Office of the U.S. Trustee
844 King Street, Suite 2313
Lockbox 35
Wilmington, DE 19801-3519

Michael F. Walsh
Diane Harvey
Gary T. Holtzer
Weil, Gotshal & Manges LLP
767 Fifth Ave.
New York, NY 10153

Barry Sher
Fired, Frank, Harris, Shriver & Jacobson LLP
One New York Plaza
New York, NY 10004-1980

Richard S. Toder
Menachem O. Zelmanovitz
Morgan, Lewis & Bockius LLP
101 Park Avenue
New York, NY 10178

Steve Russo
Sive Paget & Riesel, P.C.
460 Park Avenue
New York, NY 10022

Daniel K. Hogan
Law Offices of Daniel K. Hogan
1701 Shallcross Avenue, Suite C
Wilmington, DE 19806

Deborah Deitsch-Perez
Lackey, Hershman LLP
3102 Oak Lawn Avenue, Suite 700
Dallas, TX 75219

Adam P. Strochak
Joanne Guerrera
Weil, Gotshal & Manges LLP
1501 K Street, NW, Suite 100
Washington, DC 20005

# UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| IN RE:<br><br>GENESIS HEALTH VENTURES, INC., et al.,<br><br>                Debtors, | C.A. No. 04-CV-157 (SLR)<br>Related to Case No. 00-2692 (JHW)<br>Jointly Administered<br><br>Adv. Pro. No.:  04-53375 (JHW) |

RICHARD HASKELL, et al.,

                Plaintiffs,

      v.

GOLDMAN, SACHS & CO., et al.,

                Defendants

## PLAINTIFFS' MEMORANDUM IN OPPOSITION TO MOTION TO DISMISS

**TAYLOR & McNEW LLP**
3711 Kennett Pike, Suite 210
Greenville, Delaware 19807
Telephone:  (302) 655-9200

**POMERANTZ HAUDEK BLOCK
GROSSMAN & GROSS LLP**
100 Park Avenue, 26th Floor
New York, New York
Telephone:  (212) 661-1100

*Attorneys for Plaintiffs*

# TABLE OF CONTENTS

Table of Authorities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . (v)

I.  INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II. FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

    A.  THE PARTIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

    B.  THE PLAN CONFIRMATION PROCEEDINGS . . . . . . . . . . . . . . . . . . . 6

        1.  Defendants Submit Valuations of Genesis Based on
           "Budgeted" EBITDA and "LTM" EBITDA . . . . . . . . . . . . . . . . . . . 6

        2.  The Objections to the Plan . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

        3.  Discovery . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

        4.  The Confirmation Hearing and Approval of the Plan . . . . . . . . . . . . . 10

            a.  The Valuation of Genesis . . . . . . . . . . . . . . . . . . . . . . . . . . 11
            b.  The Senior Lenders Get 94% of the Company . . . . . . . . . . . . . . 12
            c.  The Releases . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

    C.  THE EBITDA DATA WERE ARTIFICIALLY DEPRESSED . . . . . . . . . . . . 14

        1.  Improper Exclusion from EBITDA of All Sales to Mariner . . . . . . . . . . 15

            a.  Allegations of the Present Complaint . . . . . . . . . . . . . . . . . . . 15
            b.  Evidence from the Plan Confirmation Proceedings . . . . . . . . . . . 17

        2.  Improper Exclusion of 10% of the Pharmacy Sales to Manorcare . . . . . . . 18

            a.  Allegations of the Present Complaint . . . . . . . . . . . . . . . . . . . 18
            b.  Evidence from the Plan Confirmation Proceedings . . . . . . . . . . . 19

        3.  Improper Expensing of Excessive Insurance Reserves . . . . . . . . . . . . . 20

(i)

a.    Allegations of the Present Complaint ........................ 20
b.    Evidence from the Plan Confirmation Proceedings ............ 23

4.    Excessive Deduction for Loss of AGE Institute Business ............. 23

a.    Allegations of the Present Complaint ........................ 23
b.    Evidence From the Plan Confirmation Proceedings ............ 24

5.    Improper Deduction of Non-Recurring Employee and
Management Retention Bonuses ................................ 25

a.    Allegations of the Present Complaint ........................ 25
b.    Evidence from the Plan Confirmation Proceedings ............ 25

6.    Improper Deduction of Non-Recurring Costs for the "First Choice
Plan" ...................................................... 26

a.    Allegations of the Present Complaint ........................ 26
b.    Evidence from the Plan Confirmation Proceedings ............ 27

7.    Improper Deduction for Renegotiated Management Agreements
with MC .................................................... 27

a.    The Allegations of the Present Complaint ................... 27
b.    Evidence from the Plan Confirmation Proceedings ............ 29

8.    Improper Inflation of Pharmacy Cost of Goods Sold ................. 29

a.    Allegations of the Present Complaint ........................ 29
b.    Evidence from the Plan Confirmation Proceedings ............ 30

9.    Failure to Adjust Budgeted EBITDA to Reflect Increased
Medicare Population Mix ...................................... 31

a.    Allegations of the Present Complaint ........................ 31
b.    Evidence from the Plan Confirmation Proceedings ............ 32

10.   Unjustified Decrease of $35 Million in Budgeted EBITDA to
Reflect Imaginary Additional Personnel Costs ...................... 32

a.    Allegations of the Present Complaint ........................ 32
b.    Evidence from the Plan Confirmation Proceedings ............ 32

(ii)

D.  EACH DEFENDANT PARTICIPATED IN AND HAD KNOWLEDGE
    OF THE MISREPRESENTATIONS ................................... 33

E.  THE MISREPRESENTATIONS COME TO LIGHT ..................... 36

III. ARGUMENT ...................................................... 38

A.  THE STRICT STANDARDS APPLICABLE TO A RULE 12(b)(6)
    MOTION TO DISMISS .......................................... 38

B.  THE CONFIRMATION ORDER DOES NOT IMPOSE ANY RES
    JUDICATA BAR TO PLAINTIFFS' CURRENT CAUSES OF ACTION ...... 39

    1.  The Right to Bring This Action is Expressly Reserved in the Confirmed
        Plan ................................................... 39

    2.  Res Judicata Cannot Insulate Fraudulent Conduct ...................... 40

    3.  The Claims Alleged in the Complaint Are Not the Same as Those
        Raised in the Bankruptcy Proceedings, Where Plaintiffs Were Not
        in a Position to Raise Them ................................ 42

C.  THE PREREQUISITES FOR COLLATERAL ESTOPPEL ARE NOT
    SATISFIED HERE ............................................. 49

D.  THE CLAIMS AGAINST THE DEBTORS WERE NOT DISCHARGED
    BY THE CONFIRMATION ORDER ................................. 54

E.  SECTION 1144'S 180-DAY LIMITATION PERIOD FOR SEEKING
    REVOCATION OF A REORGANIZATION PLAN DOES NOT APPLY
    TO THIS COMMON LAW ACTION FOR MONEY DAMAGES .......... 54

    1.  A Cause of Action for Money Damages Arising From Fraud in
        Bankruptcy Proceedings Can Be Commenced Outside of the
        180-Day Period ........................................... 54

    2.  The Relief Sought Here Does Not Amount to a De Facto Revocation
        of the Plan .............................................. 57

    3.  Whether or Not Plaintiffs Had Notice of the Fraud Within the
        180-Day Period Is Irrelevant ............................... 58

(iii)

F.  PLAINTIFFS HAVE STANDING TO PROSECUTE THESE
    CLAIMS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

G.  THE COMPLAINT ADEQUATELY ALLEGES CAUSES OF
    ACTION FOR FRAUD, CONSPIRACY AND GROSS NEGLIGENCE . . . . . . . 60

    1.  The Fraud Claims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60

        a.  The Complaint Alleges Actionable Misrepresentations and
            Omissions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60

        b.  The Requirements of Rule 9(b) . . . . . . . . . . . . . . . . . . . . . . 66

            i.   Plaintiffs Have Particularized the Circumstances of the
                 Fraud . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 67

            ii.  Each Defendant's Role in the Fraud Has Been
                 Sufficiently Delineated . . . . . . . . . . . . . . . . . . . . . . . 68

            iii. Scienter is Properly Alleged . . . . . . . . . . . . . . . . . . . . 71

        c.  The Complaint Adequately Pleads Justifiable Reliance . . . . . . . . . . 72

    2.  The Complaint States a Claim for Civil Conspiracy . . . . . . . . . . . . . . . . . 72

    3.  The Complaint States a Claim for Gross Negligence . . . . . . . . . . . . . . . . . 73

IV.  CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 77

(iv)

## TABLE OF AUTHORITIES

**CASES**                                                                                    **Page**

*In re 680 Fifth Ave. Assocs.*, 209 B.R. 314 (Bankr. S.D.N.Y. 1997) . . . . . . . . . . . . . . . 56 n.34

*A.B.H. Investments, Inc. v. Narven Enters. Inc.*, No. D040361,
    2003 Cal. App. Unpub. LEXIS 11126, 2003 WL 22796849
    (Cal. Ct. App. Nov. 25, 3003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45, 47, 54, 55

*A.J. Masi Electric Co. v. Marron & Sipe Bldg. & Contracting Corp.*,
    574 A.2d 1323 (Conn. App. Ct. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . 39 n.28

*Airlines Reporting Corp. v. Belfon*, Civ. No. 2003-146,
    2004 U.S. Dist. LEXIS 7381, 2004 WL 903800
    (D.V.I. Apr. 26, 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 70

*In re AmeriServe Food Distrib. Inc.*, 267 B.R. 668 (D. Del. 2001) . . . . . . . . . . . . . . . . 49

*In re Ampace Corp.*, 279 B.R. 145 (Bankr. D. Del. 2002) . . . . . . . . . . . . . . . . . . . . . . 40

*Apparel Art Int'l, Inc. v. Amertex Enters.*, 48 F.3d 576 (1st Cir. 1995) . . . . . . . . . . . . . . 39

*In re Atlanta Retail, Inc*, 297 B.R. 299 (Bankr. N.D. Ga. 2003) . . . . . . . . . . . . . . . . 48 n.31

*Averbach v. Rival Mfg. Co.*, 809 F.2d 1016 (3d Cir. 1987) . . . . . . . . . . . . . . . . . . . 58 n.36

*Berkowitz v. Vari*, Nos. C.A. 94C-11-252 WTQ, C.A. 91J-12-187,
    No. 95J-03-227, 1999 Del. Super. LEXIS 28, 1999 WL 167818
    (Del. Super. Ct. Mar. 3, 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

*Bernstein v Kelso*, 231 A.D.2d 314 (N.Y. App. Div. 1997) . . . . . . . . . . . . . . . . . . . . . 70

*Board of Trustees v. Foodtown Inc.*, 296 F.3d 164 (3d Cir. 2002) . . . . . . . . . . . . . . . 59 n.37

*In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410 (3d Cir. 1997) . . . . . . . . . . . . 65-66

*Carello v. PriceWaterhouseCoopers*, No. 01C-10-219,
    2002 Del. Super. LEXIS 180, 2002 WL 1454111
    (Del. Super. Ct. July 3, 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 76

(v)

**CASES**                                                                                    **Page**

*Carlton Invs. v. TLC Beatrice Int'l Holdings, Inc.*, Civ. A. No. 13950,
    1996 Del. Ch. LEXIS 47, 1996 WL 189435
    (Del. Ch. Apr. 16, 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

*Chase Manhattan Mortg. Corp. v. Advanta Corp.*, Civ. A. No. 01-507,
    2004 U.S. Dist. LEXIS 3933, 2004 WL 422681
    (D. Del. Mar. 4, 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 68

*Christian v. American Home Assurance Co.*, 577 P.2d 899 (Okla. 1977) . . . . . . . . . . . . 41-42

*In re Cinderella Clothing Indus. Inc.*, 93 B.R. 373
    (Bankr. E.D. Pa. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56 n.34

*In re Circle K Corp.*, 181 B.R. 457 (Bankr. D. Ariz. 1995) . . . . . . . . . . . . . . . . . . 47, 54, 55-56

*In re Coffee Cupboard, Inc.*, 119 B.R. 14 (E.D.N.Y. 1990) . . . . . . . . . . . . . . . . . . . . . . . 56

*Coleman v. Coleman*, 522 A.2d 1115 (Pa. Super. Ct. 1987) . . . . . . . . . . . . . . . . . . 40 n.29

*CoreStates Bank, N.A. v. Huls Am., Inc.*, 176 F.3d 187
    (3d Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47 n.31

*Crop-Maker Soil Servs., Inc. v. Fairmount State Bank*, 881 F.2d 436
    (7th Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48 n.31

*In re Crown-Globe, Inc.*, 107 B.R. 60 (Bankr. E.D. Pa. 1989) . . . . . . . . . . . . . . . . . 56 n.34

*D&K Props. Crystal Lake v. Mutual Life Ins. Co.*, 112 F.3d 257
    (7th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

*DeBakey Corp. v. Raytheon Serv. Co.*, No. 14947,
    2000 Del. Ch. LEXIS 129, 2000 WL 1273317
    (Del. Ch. Aug 25, 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 72 n.41

*Donaldson v. Bernstein*, 104 F.3d 547 (3d Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . 56

*Duggan v. Terzakis*, 275 F. Supp. 2d 968 (N.D. Ill., 2003) . . . . . . . . . . . . . . . . . . . 70

*In re E.F. Hutton Southwest Properties II, Ltd.*, 103 B.R. 808
    (Bankr. N.D. Tex. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59-60

(vi)

**CASES**                                                                                                    Page

*Eastern Minerals & Chems. Co. v. Mahan,* 225 F.3d 330
    (3d Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42-44 & n.30, 46, 47 n.31

*Easton & Co. v. Mut. Ben. Life Ins. Co.,* Civ. No. 91-4012,
    1992 U.S. Dist. LEXIS 10913, 1992 WL 136857
    (D.N.J. Mar. 29, 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 66, 71

*In re Educators Group Health Trust,* 25 F.3d 1281 (5th Cir. 1994) . . . . . . . . . . . . . . . . . . . . 59

*Edwards v. Wyatt,* 266 B.R. 64 (E.D. Pa. 2001) . . . . . . . . . . . . . . . . . . . . 42, 44, 60 n.37

*Eisenberg v. Gagnon,* 766 F.2d 770 (3d Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . 61

*In re Emmer Bros. Co.,* 52 B.R. 385 (D. Minn. 1985) . . . . . . . . . . . . . . . . . . . . 54, 55, 56

*Fucchiano Constr. Co., Inc. v. United States Dep't of Labor,*
    987 F.2d 206 (3d Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **44-45**

*In re Fruehauf Trailer Corp.,* 250 B.R. 168 (D. Del 2000) . . . . . . . . . . . . . . . . . . . . 66

*In re Graham,* 973 F.2d 1089 (3d Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . 49, 52 n.32

*In re Granite Partners L.P.,* 194 B.R. 318 (Bankr. S.D.N.Y. 1996) . . . . . . . . . . . . . . . . . . . . 59

*Great Lakes Chem. Corp. v. Pharmacia Corp.,* 788 A.2d 544
    (Del. Ch. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62 n.38

*Guardian Constr. Co. v. Tetra Tech Richardson, Inc.,* 583 A.2d 1378
    (Del. Super. Ct. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 76

*Gurfein v. Sovereign Group,* 826 F. Supp. 890 (E.D. Pa. 1993) . . . . . . . . . . . . . . . . . . . . 67

*Hanson, Jones & Leta, P.C. v. Segal,* 220 B.R. 434 (D. Utah 1998) . . . . . . . . . . . . . . . 74 n.45

*In re Hechinger Inv. Co. of Del., Inc.,* Nos. 99-02261-PJW, 00-973-SLR,
    2004 U.S. Dist. LEXIS 5537, 2004 WL 724960
    (D. Del. Mar. 28, 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 74-75

*Helwig v. Vencor, Inc.,* 251 F.3d 540 (6th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . 61-62

**CASES**           <u>Page</u>

*Hewlett v. Hewlett-Packard Co.*, No. 19513-NC,
    2002 Del. Ch. LEXIS 44, 2002 WL 549137
    (Del. Ch. Apr. 8, 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62

*Hotel Corp of South v. Rampart 920, Inc.*, 46 B.R. 758 (E.D. La. 1985),
    *aff'd*, 781 F.2d 901 (9th Cir. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . 56 n.34

*Houbigant, Inc. v. Dev. Specialists, Inc.*, 229 F. Supp. 2d 208
    (S.D.N.Y. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

*Household Intl., Inc. v. Westchester Fire Ins. Co.*, 286 F. Supp. 2d 369
    (D. Del. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38, 45, 66

*In re Huang*, 275 F.3d 1173 (9th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . 51-52

*Hudgins v. Davison*, 127 B.R. 6 (E.D. Va. 1991) . . . . . . . . . . . . . . . . . . . . . . . 51

*In re I. Appel Corp.*, 300 B.R. 564 (S.D.N.Y. 2003) . . . . . . . . . . . . . . . . . . . . . 40

*Interlease Aviation Investors II (ALOHA) L.L.C. v. Iowa Corp.*,
    262 F. Supp. 2d 898 (N.D. Ill., 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 71

*Jacobson v. AEG Capital Corp.*, 50 F.3d 1493 (9th Cir. 1995) . . . . . . . . . . . . . . 50-51

*Janess v. Messick*, 202 B.R. 196 (Bankr. D. Del, 1996) . . . . . . . . . . . . . . . . . 52 n.32

*In re Justice Oaks II, Ltd.*, 898 F.2d 1544 (11th Cir. 1990) . . . . . . . . . . . . . . . 48 n.31

*Kaplan v. Rose*, 49 F.3d 1363 (9th Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . 61

*In re Kelley*, 199 B.R. 698 (B.A.P. 9th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . 40

*Klein v. Commissioner*, 880 F.2d 260 (10th Cir. 1989) . . . . . . . . . . . . . . . . . 53 n.33

*Klem v. Greenwood*, 450 N.W.2d 738 (N.D. 1990) . . . . . . . . . . . . . . . . . . . . 40 n.29

*Langford v. City of Atlantic City*, 235 F.3d 845 (3d Cir. 2000) . . . . . . . . . . . . . . . 38

*Liberty Mut. Ins Co. v. FAG Bearings Corp.*, 335 F.3d 752
    (8th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53 n.33

(viii)

**CASES**                                                                                                **Page**

*In re Lois/USA, Inc.*, 264 B.R. 69 (Bankr. S.D.N.Y. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . 74

*Lovell v. Mixon*, 719 F.2d 1373 (8th Cir. 1983) . . . . . . . . . . . . . . . . . . . . . . . . . . 48-49, 50, 52

*Lundborg v. Phoenix Leasing*, 91 F.3d 265 (1st Cir. 1996) . . . . . . . . . . . . . . . . . . . . 52 n.32

*MBIA Ins. Corp. v. Royal Indem. Co.*, Nos. 02-1294, 02-1361,
    2004 U.S. Dist. LEXIS 6609, 2000 WL 830964
    (D. Del. Apr. 6, 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 70

*In re ML-Lee Acquisition Fund II, L.P.*, 848 F. Supp. 527
    (D. Del. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 67

*In re Mariner Post-Acute Network Inc.*, 267 B.R. 46
    (Bankr. D. Del. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42, 45

*Markowitz v. Northeast Land Co.*, 906 F.2d 100 (3d Cir. 1990) . . . . . . . . . . . . . . . . . 38

*In re Marriott Hotel Props.*, Consol. Civ. A. No. 14961,
    2000 Del. Ch. LEXIS 17, 2000 WL 128875
    (Del. Ch. Jan. 24, 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62-63

*McCarty v. First of Georgia Ins. Co.*, 713 F.2d 609
    (10th Cir. 1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

*Merrifield v. Beaven/Inter-American Cos.*, No. 89 C 8436,
    1992 U.S. Dist. LEXIS 11964, 1992 WL 193553
    (N.D. Ill. Aug. 3, 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39 n.28

*In re Newport Harbor Assocs.*, 589 F.2d 20 (1st Cir. 1978) . . . . . . . . . . . . . . . . . . . . . 56

*Nova Telecom, Inc. v. Long Distance Mgmt. Sys.*, Civ. A. No. 00-2113,
    2000 U.S. Dist. LEXIS 15510, 2000 WL 1593994
    (E.D. Pa Oct. 25, 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38-39

*Official Comm. Unsecured Creditors ex rel. SmarTalk Teleservices, Inc.*
    *Bankruptcy Estate v. Donaldson, Lufkin & Jenrette Sec. Corp.*,
    No. 00 Civ. 8688, 2002 U.S. Dist. LEXIS 3747, 2002 WL 362794
    (S.D.N.Y. Mar. 6, 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 73 n.43, 74

*In re Orange Tree Assocs.*, 961 F.2d 1445 (9th Cir. 1992) . . . . . . . . . . . . . . . . . . . . 56 n.34

(ix)

**CASES**                                                                    **Page**

*Outdoor Techs. v. Allfirst Fin.*, No. 99C-09-151 WTQ,
    2000 Del. Super. LEXIS 16, 2000 WL 141275
    (Del. Super. Ct. Jan. 24, 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 72

*In re Penn Treaty Amer. Corp. Sec. Litig.*, 202 F. Supp. 2d 383
    (E.D. Pa. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 63 n.39, 71

*Playtex v. Columbia Casualty*, No. 88C-MR-233,
    1993 Del. Super. LEXIS 286, 1003 WL 390469
    (Del. Super. Ct. Sept. 20, 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 76

*Powell v. American Bank & Trust Co.*, 640 F. Supp. 1568
    (N.D. Ind. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

*Provenz v. Miller*, 102 F.3d 1478 (9th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . 61

*Prudential Ins. Co. of America v. Dewey, Ballantine, Bushby,*
    *Palmer & Wood*, 695 N.E.2d 318 (N.Y. 1992) . . . . . . . . . . . . . . . . . . 75-76

*Publicker v. Shallcross*, 106 F.2d 949 (3d Cir. 1939) . . . . . . . . . . . . . . . . . 58 n.36

*In re Reliance Secs. Litig.*, 91 F. Supp. 2d 706 (D. Del. 2000) . . . . . . . . . . . . 68, 71

*Robinson v. Toyota Motor Credit Corp.*, 775 N.E.2d 951 (Ill. 2002) . . . . . . . . . 40 n.29

*Rudell v. Comprehensive Accounting Corp.*, 802 F.2d 926
    (7th Cir. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

*Rushton v. Shea*, 419 F. Supp. 1349 (D. Del. 1976) . . . . . . . . . . . . . . . . . . . . 49-50

*Seville Industrial. Machinery Corp. v. Southmost Machinery Corp.*,
    742 F.2d 786 (3d Cir. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 66, 67

*Shearson Lehman Hutton, Inc. v. Wagoner*, 944 F.2d 114
    (2d Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59 n.37

*Snyder v. Butcher & Co.*, No. 91C-04-289, 1992 Del. Super. LEXIS 362,
    1992 WL 230244 (Del. Super. Ct. Sept. 15, 1992) . . . . . . . . . . . . . . . 68, 72

*In re Spigel*, 260 F.3d 27 (1st Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

(x)

**CASES**                                                                                                                                                      **Page**

*State Farm Mut. Auto. Ins. Co. v. Makris*, Civ. A. No. 01-5351,
    2003 U.S. Dist. LEXIS 3374, 2003 WL 924615
    (E.D. Pa. Mar. 4, 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 66-67, 70

*Stridiron v. Stridiron*, 698 F.2d 204 (3d Cir. 1983) . . . . . . . . . . . . . . . . . . . . . . 58 n.36

*Sure-Snap Corp. v. State Street Bank & Trust Co.*, 948 F.2d 869
    (2d Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47 n.31

*Swineford v. Snyder County*, 15 F.3d 1258 (3d Cir. 1994) . . . . . . . . . . . . . . . . . . . 52 n.32

*Tam v. Spitzer*, Civ. A. No. 12538, 1995 Del. Ch. LEXIS 116,
    1995 WL 510043 (Del. Ch. Aug. 17, 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . 63

*Tanaka Bros. Farms, Inc. v. Home State Bank*, Civ. A. No. 86-2108-S,
    1986 U.S. Dist. LEXIS 17745 (D. Kan. Nov. 13, 1986) . . . . . . . . . . . . . . . . . 47

*In re Tenn-Fla Partners*, 226 F.3d 746 (6th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . 74

*In re USN Communs., Inc.*, 280 B.R. 573 (Bankr. D. Del. 2002) . . . . . . . . . . . . . . . . 40

*United States Rubber Co. v. Lucky Nine, Inc.*, 159 So. 2d 874
    (Fla. Dist. Ct. App. 1963) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

*Universal Computer Consulting, Inc. v. Pitcairn Enters.*,
    Civ. A. No. 03-2398, 2004 U.S. Dist. LEXIS 2719,
    2004 WL 345415 (E.D. Pa. Feb. 23, 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . 67

*In re Vencor Inc.*, 284 B.R. 79 (Bankr. D. Del. 2002) . . . . . . . . . . . . . . . . . . . . . . 56 n.34

*Virginia Bankshares, Inc. v. Sandberg*, 501 U.S. 1083 (1991) . . . . . . . . . . . . . . . . . . 61

*Washington Pub. Power Supply Sys. v. Pittsburgh-Des Moines Corp.*,
    876 F.2d 690 (9th Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39 n.28

*Weiner v. Quaker Oats Co.*, 129 F.3d 310 (3d Cir. 1997) . . . . . . . . . . . . . . . . . . . . 66 n.40

*Williams v. Texaco*, 165 B.R. 662 (D.N.M. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . 56

*Yamaha Corp. of America v. United States*, 961 F.2d 245
    (D.C. Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53 n.33

AA. 1488

## STATUTES

Bankruptcy Code
    11 U.S.C. § 541 (a)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   59

## SECONDARY SOURCES

*Collier on Bankruptcy* (15th ed. rev.)
    8-1114, ¶ 1144.04 [2][a] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   54

*Restatement (Second) of Judgments* (1982)
    § 26 (1)(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   39 n.28
    § 26 comment j . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   42

*Restatement (Second) of Torts* (1977)
    § 552 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   76

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

IN RE:

GENESIS HEALTH VENTURES, INC., et
al.,

               Debtors,

RICHARD HASKELL et al.,

               Plaintiffs,

      v.

GOLDMAN, SACHS & CO., et al.,

               Defendants

C.A. No. 04-CV-157 (SLR)
Related to Case No. 00-2692 (JHW)
Jointly Administered

Adv. Pro. No.: 04-53375 (JHW)

## PLAINTIFFS' MEMORANDUM IN OPPOSITION TO MOTION TO DISMISS

### I. INTRODUCTION

This case is about a systematic fraud that was perpetrated on this Court, as well as on the plaintiffs, to enable a small group of financial institutions to steal control of a multi-billion-dollar company, Genesis Health Ventures ("Genesis"). Led by Goldman Sachs & Company ("Goldman"), this group bought up the lion's share of Genesis' senior debt at a huge discount and then forced Genesis into bankruptcy, where they pushed through a reorganization plan (the "Plan") that gave the senior creditors over 94% of the stock of the company.

They accomplished this scheme by conspiring with Genesis management to submit fraudulent information about Genesis' earnings to the Court, to the junior creditors and to the public. Then, knowing full well that these earnings data were false, they provided them to their financial advisors

to use as the basis of their valuations of Genesis. The consultants then plugged these phony earnings data into their valuation programs, and pronounced that Genesis had a value of only about $1.3 billion, substantially *less* than the claims of the senior creditors. Those valuations were then used to justify approval of the Plan.

After the scheme had succeeded, Genesis management reaped its reward, in the form of millions of dollars of bonuses and retirement packages the senior lenders had approved. Last month, the Company received an offer to buy the pharmacy operations *alone* for $1.5 billion, a price the directors — including designees appointed by defendants Goldman and Highland — rejected as inadequate.

For purposes of this motion, defendants do not argue that any claims of fraud were actually raised, much less adjudicated, in the bankruptcy proceedings    because they were not. They argue instead that these fraud claims *should have and could have been* raised, based on the information adduced in the confirmation proceedings, but that the debentureholders simply did not work hard enough to unravel this complex fraud in the week or two before the confirmation hearing.

But what is this evidence of fraud that defendants say was disclosed to the debentureholders during the Plan confirmation process? Defendants' motion papers are full of citations to hearing and deposition testimony; but none of that testimony revealed the defendants' scheme. To the contrary, that testimony was used to justify various "adjustments", discounts and exclusions from EBITDA that Genesis and the senior lenders were using to support their proposed low valuation. This testimony did not disclose the fraud — it *was* the fraud. The citation to their own false testimony falls way short of establishing — *as a matter of law* — that plaintiffs were on notice of defendants' scheme.

2

Moreover, defendants completely ignore the detailed allegations in the Complaint concerning the disclosures which came *after* the Plan was confirmed, and which finally did arouse plaintiffs' suspicions. Although the Court would never realize it from reading defendants' motions, the Complaint alleges, in detail, exactly what information came out, and when, which led to the uncovering of this scheme. For example, the Complaint specifically alleges that months after confirmation, defendants publicly disclosed, for the first time: (1) that they had signed, *prior to approval of the Plan*, an agreement to extend the Mariner supply contract, a contract which they had told this Court was almost certain to be lost; (2) that they had excluded from earnings 10% of the income they were deriving from the Manorcare supply contract, even though they testified that none of this income was being excluded; and (3) that they had almost doubled insurance loss reserves in the space of a single year, an amount which was well beyond any possible liability exposure, and charged those increases to EBITDA. By these three manipulations alone, EBITDA for Genesis had been reduced by over $27 million, and the valuation of Genesis had been reduced by about $220 million. And this is just the tip of the iceberg.

Thus, the debentureholders were not chargeable with knowing that a fraud was being perpetrated upon them; they never made such an allegation; and this Court therefore did not rule upon it. Nor did this Court, in confirming the Plan, confer immunity upon the defendants for the type of conduct alleged here. In its confirmation opinion and order this Court made it crystal clear that it was *not* adjudicating or releasing claims alleging misconduct in the confirmation process. The Plan expressly provides that Genesis itself will not be released from any claims for "*willful misconduct or gross negligence*" committed in the course of the bankruptcy proceedings, including the confirmation of the Plan; and willful misconduct and/or gross negligence is exactly what is

3

alleged here. Moreover, the Court expressly refused to grant *any* release of claims against the senior lenders arising from their conduct in the confirmation proceedings.

Defendants also argue that the Complaint must be dismissed under Section 1144 of the Bankruptcy Code, because plaintiffs are seeking to "revoke" a confirmation order more than 180 days after it was entered. Plaintiffs are not seeking to revoke anything; nor are they attempting to "redistribute the pie" created by the Plan. The vast majority of the senior creditors are not defendants here and will not be affected by the outcome of this litigation. Section 1144 does not preclude injured parties from recovering damages from those few creditors who have engaged in unlawful conduct during a confirmation process. Such a recovery would not be tantamount to the unscrambling of any eggs, and would not prejudice innocent parties who have relied on the finality of the reorganization Plan. In particular, Goldman and Highland could retain their positions, obtained through this proceeding, as de facto controlling shareholders of Genesis.

Finally, defendants invoke virtually every boilerplate argument, defendants raise in virtually every fraud case, to the effect that the Complaint fails to state a claims. As demonstrated below, defendants knowingly misrepresented and concealed known, existing facts, each defendant's role in the fraud was described with particularity, and their deception had the intended effect, a transfer of hundreds of millions of dollars in value from the plaintiffs to themselves. Such allegations state a claim for relief.

4

## II. FACTS[1]

### A.    THE PARTIES

The 275 plaintiffs collectively held over $205 million of Genesis subordinated debentures. Defendant Genesis is a leading provider of health care and support services to the elderly.[2]  It had two primary business segments:  pharmacy services (under its "Neighborcare" division) and in-patient services (under its "Eldercare" division).  Prior to October of 2001, Multi-Care Corp. ("MC") was a 43.6%-owned subsidiary of Genesis that was also in the elder care industry.  Pursuant to the bankruptcy Plan, MC became a wholly-owned subsidiary of Genesis.  Defendant George V. Hager, Jr. ("Hager") is executive vice president and chief financial officer of Genesis, and held that position during the relevant time period (¶ 18).[3]

By August of 2000 investment banks, including Goldman, had purchased about half the total Genesis and MC senior debt participations from the original lending consortium, at discounts of 30% to 50% from par. Goldman itself acquired $175 million of Genesis' senior debt, making it by far the largest senior creditor of Genesis.  Goldman's average purchase price for these debt participations was about 53¢ on the dollar (¶ 19).[4]

Defendant Mellon was an original lender, and at the time of the bankruptcy held almost $56

---

[1] Unless otherwise noted, paragraph ("¶") references are to the Complaint.

[2] The nursing home business has since been spun off and the Company is now known as Neighborcare, Inc.

[3] Since December of 2003 he has also been the chief executive officer of the recently spun off nursing home operations.

[4] By the dates of the confirmation hearing, investment banks held about 75% of the senior creditor claims.

5

million in Genesis senior debt. In the bankruptcy, Mellon acted as agent and representative for all the senior creditors (¶ 21). Defendant Highland Capital Management ("Highland") is an investment advisory firm (¶ 22).

Today, Goldman and Highland are the two largest shareholders of Genesis and each has a designee on the six-person board of directors. They received stock, notes and other consideration which, based on their own depressed valuations, was approximately equal in value to 100% of the face amount of their creditor claims. When the *actual* value of the Genesis shares they received is considered, the reality is that they received substantially more than the face value of their claims. Moreover, because Goldman and Highland had purchased those claims for less than half their face value, they were able to triple their money in the space of about three years (¶¶ 21-22).

By March, 2000, Goldman and Highland joined Mellon on the seven member Senior Lender Steering Committee, where they exercised ultimate control over the Company and the bankruptcy proceedings. Most importantly, their approval would now be needed for all the management incentives, retention bonuses and other benefits that would ultimately shower millions of dollars upon Genesis senior management (¶ 31).

**B.     THE PLAN CONFIRMATION PROCEEDINGS**

**1.     Defendants Submit Valuations of Genesis Based on "Budgeted" EBITDA and "LTM" EBITDA**

In the elder care and pharmacy industries, as elsewhere, the primary barometer of financial performance is Earnings Before Interest, Taxes, Depreciation and Amortization ("EBITDA"). In both 1998 and 1999 Genesis (excluding MC) had more than $200 million in EBITDA. For the first two quarters of fiscal 2000, Genesis was on pace to achieve the same results once again. EBITDA

6

results for the first two quarters, on a standalone basis, were $50.8 million and $51 million, respectively; and its internal projections were for EBITDA to increase annually in subsequent years (¶ 35).

But once Goldman had taken its seat on the Senior Lender Steering Committee, optimism at Genesis suddenly vanished, and in short order both Genesis and MC had filed petitions in this Court for reorganization under Chapter 11 (¶ 37).

In July of 2001, Genesis submitted a final proposed Plan that posited that the Company, on a stand-alone basis, was worth $200 million less than the senior creditor claims *alone*.[5] The Plan provided for Genesis to merge with MC and for about 94% of the new equity of the combined entity to be conveyed to the senior creditors in satisfaction of their claims (¶ 40).

In support of this Plan, Genesis submitted valuations of the Company prepared by UBS Warburg ("Warburg"). The last of these was submitted on August 22, 2001. Warburg started with Genesis' "Budgeted EBITDA" figure of $158 million for fiscal 2001,[6] which had been prepared months earlier and which was about $50 million below Genesis' recent performance. To this figure it applied a multiplier derived from a comparable company trading analysis, and came up with an enterprise value range of $1.2 billion to $1.45 billion, with a midpoint of about $1.35 billion (¶ 41).

But by August of 2001, the Budgeted EBITDA projections were already way out of date: 11 of the 12 months for which earnings had been projected were now in the past. To cure that problem the senior creditors also submitted, on the same day, August 22, 2001, their own valuation analysis,

---

[5] Defendants' Exhibit K.

[6] Exhibit 1.

7

prepared by Chilmark Partners ("Chilmark").[7] Rather than relying on projections, Chilmark relied on historical "LTM" [Last Twelve Months] EBITDA, which had also been supplied by Genesis management. By an astonishing coincidence, this LTM EBITDA was *also* exactly $158 million, precisely dovetailing with the Budgeted EBITDA projections that had been prepared over a year earlier (¶ 43).

Relying on these "actual" EBITDA figures, Chilmark valued Genesis at between $1.17 billion to $1.43 billion, with a midpoint of about $1.3 billion, within an eyelash of the valuation calculated by Warburg. Not surprisingly, this Court ultimately viewed the LTM data as providing essential *post hoc* confirmation of the accuracy of the Budgeted EBITDA projections. The filing of the Chilmark report on August 22 was the first time that historical EBITDA data had been used by any party to support the bankruptcy Plan. ¶ 43.

Warburg and Chilmark both disclaimed any opinion concerning the validity or accuracy of either the Budgeted or LTM EBITDA figures. They stated that they had relied on management data, and that data was not a subject of dispute at the confirmation hearing (¶¶ 46, 175).

### 2.    The Objections to the Plan

In their motion, defendants try to create the impression that many of the issues raised in the present Complaint were also raised in the debentureholders' objections in the bankruptcy proceeding. That is not so. In fact, the objectors never challenged the financial data submitted by management, assuming (as they were entitled to do) that it had been prepared in good faith and were accurate.

Rather, the focus of the debentureholders' objections was elsewhere. As defendants point

---

[7] Exhibit 2.

out, there were four relevant objections submitted to this Court.[8] These objections are exhibits A, B, D and E to defendants' motion.

Nowhere in any of those objections is there any claim that the Budgeted EBITDA data are wrong, much less fraudulent; and since the LTM EBITDA data was not served and filed until the day after the last of these objections was filed, none even mentions that subject (¶ 174-75). Instead, they challenged the adequacy of disclosures; the scope of the proposed releases; the forgiveness of loans to officers and directors; the possible payment of "interest on interest" to the senior lenders; the classification of the debentureholder claims; the contention that the senior lenders were receiving more than 100% of the face value of their claims, while junior creditors were receiving a haircut; that the apportionment of new debt instruments as between Genesis and MC was unfair; and that the Plan was an "improper substantive consolidation" of Genesis and MC.

GMS' objection to confirmation did express an intention to prove, at trial, that the value of Genesis was higher than Warburg's valuation - - but not because of any alleged misrepresentations in that data:

> Specifically, GMS will demonstrate at trial that the Debtors, in their Plan, have significantly undervalued their business enterprise by utilizing an unreasonably low EBITDA *multiplier*, and applying this multiplier to an EBITDA that is undisputably out of date, resulting in unreasonably low market capitalization compared to comparable companies in the same industry. In contrast, utilization of a reasonable EBITDA multiplier and an accurate and current EBITDA, given the Debtors' historical and projected performance, as well as current trends in the health care industry, will yield greater than 100% recoveries to the

---

[8] These are the objection to the disclosure statement by Charles Grimes, a debentureholder, dated June 29, 2001; an objection to the disclosure statement of the GMS Group, an investment advisory firm representing many debentureholders, dated July 2, 2001; the GMS Group's objection to confirmation of the Plan, dated August 17, 2001; and Mr. Grimes' objection to confirmation, dated August 21, 2001.

9

Genesis Senior Lenders and the Multcare Senior Lenders ....[9] (Emphasis added.)

The GMS Group's valuation expert, the Evercore Group, reached a much higher valuation of Genesis; but its report, and its testimony, did not challenge management's EBITDA figures. In fact, in reaching its valuation Evercore, like everyone else, relied on Genesis' EBITDA data for the combined Genesis-MC entity and made a minimal $4 million addition to it (Defs. Ex. H at 153-54). Where Evercore differed from defendants' valuations was primarily in the multiple it used.

**3.    Discovery**

Discovery in connection with the Plan confirmation (a) was not directed at challenging the Budgeted or LTM "actual" EBITDA figures, and (b) all occurred within the three weeks immediately preceding the hearing. The hearing started on August 28. By August 8, about 25% of the requested documents had been produced; the balance were produced the following week. More than 50,000 documents were produced within a week of the confirmation hearing. Depositions began on August 16, 2001, and were completed by August 24. Creditors were allowed to examine Hager at his deposition on August 23 for only three hours (¶ 172). This compressed schedule was appropriate given the limited scope of the issues presented by the objections.

**4.    The Confirmation Hearing and Approval of the Plan**

This Court held a confirmation hearing on August 28 and 29, 2001, and on September 12, 2001, it issued an opinion confirming the essential elements of the Plan. *Matter of Genesis Health Ventures, Inc., et al., Debtors*, 266 B.R. 591.

---

[9] Defs. Ex. D at 3-4.

10

a. **The Valuation of Genesis**

The centerpiece of the Court's ruling was its determination that, based on the valuation report prepared by Warburg, the reorganization value of Genesis was so low, compared to the size of the senior creditor claims, that an allocation of 94% of the new Genesis equity to the senior creditors was reasonable. As noted above, Warburg had relied upon the validity and accuracy of the Budgeted EBITDA data supplied by management.

The Court recognized that the EBITDA projections for Genesis had dropped by more than 25% from the previous two years. In accepting that these data were reliable despite the steep drop-off, the Court relied on the testimony of George Hager to the effect that health insurance costs had increased by $13 million, that liability insurance costs were up by $6 million, and that pharmacy margins had declined by $20 to $25 million. 266 B.R. at 613. As discussed below, facts subsequently disclosed show that none of that was true.

There is nothing in the Court's opinion to suggest that anyone had claimed that Genesis' financial data was false. Rather, the Court recounted that the debentureholders had submitted other projections of Genesis' EBITDA which had been prepared at various times, for various purposes, and which showed numbers somewhat higher than those ultimately used. The Court held that this evidence was not persuasive:

> The fixing of a projected EBITDA for the companies is largely a matter of judgment, and the judgment exercised by management in this regard appeared to be balanced, taking into account both positive and negative forces and trends. Many of the cited references were produced in various negotiating postures, in which context the reliability of specific numbers is generally more suspect. The experts agreed that budget projections of EBITDA are most commonly used for valuation purposes. *The fact that the debtors' actual results are on target with 2001 budget projections for the first ten months of the fiscal year confirms the reasonableness of*

11

*the management projections.*

*Id.* at 614 (emphasis added).

Thus, the Court also relied heavily on the fact that the LTM EBITDA were consistent with the Budgeted EBITDA. Facts that were subsequently disclosed established that these "actual results" were also fictitious; but no such claim was made during the confirmation proceedings. Had *unmanipulated* LTM EBITDA data been used, it would have been 25% higher than the Budgeted EBITDA data, and neither the Budget EBITDA figures, or Warburg's valuation, which was predicated thereon, would have been accepted.

**b.    The Senior Lenders Get 94% of the Company**

Pursuant to the Plan approved by the Court, the senior creditors were credited with $195 million in "adequate protection payments" they had previously received, and were awarded new senior notes in the face amount of $94.9 million, shares of new convertible preferred stock with an aggregate liquidation preference of $31 million, and about 94.3% of the newly issued common stock of the Company.

The debentureholders were awarded about 3.8% of the new Genesis common stock and warrants to purchase an additional 5.7% at an exercise price of $20.33 per share. The warrants were to expire one year later, on October 2, 2002.[10] Although the unsecured creditors committee approved the Plan,[11] the debentureholders, voted overwhelmingly to reject it. In bankruptcy parlance, the Plan

---

[10] When they expired, they were worthless. Most of those trade creditors had been deemed "critical vendors" and were receiving 75% to 100% of their pre-petition claims.

[11] Although the bondholders represented 75% of the dollar amount of unsecured claims, they had only 33% of the votes on the committee, which was dominated by trade creditors who had ongoing business relationships with Genesis. Most of those trade creditors had been treated as "critical vendors" and were receiving 75% to 100% of their pre-petition claims.

12

was "crammed down" on the dissenting debentureholders (¶ 50).

### c.    The Releases

In its original form, the Plan also contained sweeping releases from liability not only for Genesis but also for all the senior creditors and all of their advisors. Section 10.6 of the Plan, as originally proposed, would have "exculpated" Genesis and its senior lenders and their "members, officers, directors, employees, agents or professionals" from

> any liability to any holder of any claim or equity interest for any act or omission in connection with, or arising out of, the Reorganization Cases, the confirmation of the Plan of Reorganization, the consummation of the Plan of Reorganization, or the administration of the Plan of Reorganization or property to be distributed under the Plan of Reorganization, *except for willful misconduct or gross negligence.*

(Emphasis added.)

Thus, even in the original version, there was to be no release of claims for willful misconduct or gross negligence by Genesis or the senior lenders committed in the course of the reorganization proceedings.

But its decision approving the Plan went even further, holding that "the release of third-party claims against the senior creditors must be stricken". 266 B.R. at 609. Consequently, the revised release, which was ultimately approved by the Court, did not extinguish *any* potential claims against the senior creditors arising from their conduct in the Genesis reorganization case.[12]

---

[12]  In its amendments to debtors joint plan of reorganization to comply with opinion on confirmation, dated September 13, 2001, counsel for Genesis stated, in paragraph 2, that "section 10.6 of the Plan (Exculpation) is amended as follows: in the fourth line after the words "agent under" delete the words "and any lender under". Thus were the senior lenders removed from the scope of the release. *See* Ex. 3.

13

C.    **THE EBITDA DATA WERE ARTIFICIALLY DEPRESSED**

EBITDA is defined as net income, as determined by GAAP standards, plus, among other things, all non-recurring expenses.[13] Both Warburg and Chilmark assumed that Genesis had added back all non-recurring expenses in preparing its projected and LTM EBITDA data.

In the aftermath of this Court's confirmation of the Plan, information started dribbling out which caused the debentureholders, for the first time, to have concerns concerning the bona fides of the EBITDA data defendants had submitted to the Court. When they had completed their review of the post-confirmation data, and their comparison of that data to pre-confirmation information supplied by defendants, they realized for the first time that a series of improper and indefensible decisions had been made, each of which had the effect of taking a bite out of Genesis' EBITDA for the relevant valuation period. Because the multiples used the valuations by defendants' experts were slightly above 8, each $10 million reduction in EBITDA had translated into an $80-plus million reduction in valuation. Although each manipulation took a relatively small bite out of EBITDA, collectively they took hundreds of millions of dollars off the valuation — more than enough to make the senior creditors appear to be "impaired" and to leave nothing for the junior creditors, including

---

[13] More specifically, EBITDA is defined as net income, as determined by GAAP,

> plus (a) the sum of depreciation expense, amortization expense, other non-cash expenses, adjustments for inventory valuation, net total federal state and local income tax expenses, gross interest expense less gross interest income, extraordinary losses, non-recurring charges or restructuring charges, effect of changes in accounting principles and Chapter 11 expenses [emphasis added],
> minus (b) extraordinary gains,
> plus or minus (c) the amount of cash received or expended which was taken into account in determining EBITDA for the current or any prior period (¶ 57).

14

the debentureholders (¶ 56).

1.    **Improper Exclusion from EBITDA of All Sales to Mariner**

    a.    **Allegations of the Present Complaint**

Like Genesis, Mariner Post-Acute Network ("Mariner") operated nursing care facilities and also had a separate pharmaceutical subsidiary, American Pharmaceutical Supply Company ("APS"). Genesis had a contract to supply pharmaceuticals to fifty-eight Mariner nursing homes that were not in APS service locations, and the contract generated revenue of about $53 million per year (¶ 119).

In January of 2000, Mariner filed for bankruptcy. Genesis continued to sell pharmaceuticals to Mariner and, as a "critical vendor", it continued to be paid in full under its agreement. As of March of 2000, Genesis had made no provision to reserve any of the receivables from Mariner; nor was any provision even discussed for the possible loss of the Mariner business. Later that year Mariner decided to sell its APS pharmacy operations; and by August 30, 2000, Genesis had began negotiating to purchase APS. Had this purchase gone through, millions in EBITDA would have been added to Genesis' financial results (¶¶ 120-21).

But that is not what defendants were projecting. In the spring of 2001 defendants announced that they now expected to lose the Mariner contracts and that therefore pharmaceutical sales to Mariner should be "adjusted out" of Budgeted EBITDA, reducing that figure by $13.424 million. The proffered justification was that if another company purchased APS it would have the "inside track" to acquire all of the Mariner business, including sales to Mariner locations being serviced currently by Genesis, and that therefore current sales to Mariner could no longer be reviewed as recurring revenues. Defendants waged a concerted campaign to convince the junior creditors that

15

the impending sale of APS and the Mariner supply contract were inextricably linked.[14] Even when Genesis signed a letter of intent to buy APS, Genesis still maintained that the exclusion of the Mariner sales was still necessary because another purchaser might come forward and outbid Genesis (¶ 126).

In their motion to dismiss, defendants emphasize that they fully disclosed, and the Court understood, the status of their negotiations to buy APS, including their concerns that even if they reached agreement to acquire APS they could still be outbid in the bankruptcy auction process. That is true, but it misses the point. Defendants did *not* disclose that, in addition to negotiating to buy APS, Genesis had also entered into an agreement to extend the pharmaceutical supply contract *regardless of who eventually purchased APS* (*id.*). The risk of losing the Mariner supply contract was therefore eliminated, a fact not disclosed to plaintiffs, the valuation professionals or the Court (¶ 123).

Although Genesis told the senior creditors about this development, it took steps to keep anyone else (including the debentureholders) from finding out. Most significantly, it kept on delaying the submission of the agreement for approval by the court in the Mariner bankruptcy case. On April 30, 2000, Genesis had filed an "emergency" motion in the Mariner bankruptcy to compel Mariner to affirm or reject the pharmacy supply contracts, claiming that an immediate resolution was necessary to prevent "irreparable harm" to Genesis. This "emergency" motion was then adjourned

---

[14] The evidence will show that during the first week of April, 2001, Jody LaNassa of Goldman and Pat Dougherty of Highland visited Houlihan Lokey, financial consultants to the unsecured creditors committee, and, using the "allure of losing the APS deal", persuaded Houlihan to accept this $13.424 million "adjustment." The evidence will also show that the senior creditor steering committee reviewed the results of the LaNassa/Dougherty visit to Houlihan on April 10, 2001, and that on April 12, two days later, a letter agreement for Genesis to purchase APS was signed. They nonetheless continued to exclude the Mariner revenue from EBITDA.

16

by agreement eight times, for a total of 18 months, until October of 2001, *just after* the confirmation hearing on the Genesis Plan (¶ 124).

Finally, just a few days *after* this Court's approval of the Plan, the pharmaceutical extension agreement was submitted in the Mariner bankruptcy proceeding. Even then, those (including the Genesis debentureholders) who were not on the Mariner bankruptcy service list, had no notice of what had happened. Genesis itself did not disclose the extension of the Mariner supply contract until its 10Q for the first quarter of 2002, which was filed 4 months after the confirmation of the Plan (¶ 128).[15]

As noted above, SFAS No. 5 permits the accrual of a loss contingency *only* when the potential loss is "probable". Here, the loss of the Mariner business was never "probable", and by the date the Plan was confirmed the loss of that business had been foreclosed. The exclusion of over $13 million from the EBITDA projections and LTM EBITDA (and, therefore, of over $100 million from the Genesis valuation) for this reason was manifestly improper (¶ 129).

**b.    <u>Evidence from the Plan Confirmation Proceedings</u>**

Defendants contend that the subject of Mariner and APS came up in the trial testimony of Messrs. Hager and Schulte, as well as in the depositions of Messrs. Hager, LaNassa and McGahan. Yet none of that testimony disclosed that Genesis had actually entered into an agreement to continue its pharmaceutical supply contract with Mariner, regardless of who acquired APS. To the contrary, these witnesses stuck to their story that a significant risk still existed that the Mariner business would

---

[15] Genesis also signed a contract to acquire APS on or about September 24, 2001, shortly before the Genesis Plan was approved, but did not disclose that agreement until October 8, 2001, six days after the Court approved the Plan. The Court was aware that an agreement in principle had been reached, but not that a written contract had actually been signed (¶ 128).

17

be lost.

Most notably, Hager testified, at page 69 of the confirmation hearing transcript, that the Mariner contract could be terminated in Mariner's bankruptcy proceeding, and that the purchaser of APS could end up with all the Mariner business. At pages 200-01, Hager repeated that Genesis might lose its contract with Mariner, or be forced to lower its prices to Medicaid rates.[16] Similarly, in his deposition, Mr. McGahan (of Chilmark) testified that the prices charged to Mariner were "above market" and that Genesis would be forced, at a minimum, to reduce its prices to Medicaid rates.

In short, the cited testimony represents the "party line" excuse for excluding the Mariner income. This testimony did not reveal the fraud; it *was* the fraud.

### 2. Improper Exclusion of 10% of the Pharmacy Sales to Manorcare

#### a. Allegations of the Present Complaint

In August of 1998, Genesis entered into an agreement to sell pharmaceuticals to H.C.R. Manorcare ("Manorcare") through 2004 at scheduled pricing rates. In 1999, Manorcare demanded price concessions; and when Genesis refused, Manorcare purported to terminate its contract with Genesis, resulting in various litigations that were consolidated before an arbitrator (¶ 110).

On May 23, 2000, the arbitrator announced that, in view of the imminent bankruptcy filing of Genesis, the arbitration hearing of the case would be postponed indefinitely. Genesis subsequently reported that Manorcare had agreed, while the arbitration was pending, to pay 90% of

---

[16] He also testified, at pages 179-80 of the transcript, that there was as of yet no final agreement to acquire APS and that, in any event, Genesis could be outbid for APS. At that moment, Genesis was only about three weeks away from completing a final agreement to acquire APS. Although Genesis was, ultimately, outbid for APS, it had no way of knowing for sure, in advance, that that would happen. Presumably it would not have bothered to negotiate an acquisition agreement if it was certain that it would not be able to complete the acquisition.

18