Genesis' charges for pharmaceuticals, and would deposit the remaining 10% into escrow. Although Genesis' public disclosures suggested that the arbitrator had ordered the 10% holdback, in fact he had not. Genesis did not disclose, however, that this 10% account receivable had been excluded from EBITDA, reducing it by about $11 million (¶¶ 112-13).

In April 2002, several months after this Court approved the Plan, the arbitrator ruled that the Genesis contract with Manorcare was fully enforceable, and required Manorcare to turn over all the escrowed funds, with interest, totaling $21.7 million. In its 10Q for the second quarter of 2002, Genesis described the arbitrator's ruling and disclosed, for the first time, that it had been, in effect, excluding 10% of the Manorcare revenue from EBITDA up to that point (¶ 115).

Under SFAS No. 5 (a GAAP standard), it is improper to accrue a loss contingency unless it is "probable" that an event will occur that will cause the loss, and the amount of that loss can be reasonably estimated. Where, as here, the putative loss contingency arose from a pending arbitration, it would be inappropriate to accrue any loss unless counsel representing the debtor had rendered an opinion that it was probable that a loss of this particular magnitude would occur. No such opinion would have been rendered here, because it was never "probable" that Manorcare would succeed on its claims; and no such opinion letter was ever produced (¶ 116).

b.    **Evidence from the Plan Confirmation Proceedings**

Defendants contend that the Manorcare issue came up in Hager's hearing testimony (p. 67) and his deposition testimony (pp. 159-61). But in his hearing testimony Hager merely mentioned the existence of litigation between Genesis and Manorcare, in which, he said, Manorcare was claiming that it had a right to terminate the entire contract. He did not testify that Genesis had taken any reduction to EBITDA as a result of this litigation.

19

In his deposition, Hager was specifically asked about a list showing that Genesis' prepaid expenses had increased by $14.6 million, including a $4 million increase in prepaid expenses relating to Manorcare. After describing this amount as representing a "receivable" equal to the escrowed 10% of Manorcare's payments, he testified that all the increases in prepaid expenses "had a zero impact on EBITDA for the portion of the 2001 fiscal year we've seen so far" (p. 160).

Once again, this testimony did not reveal the fraud, it *was* the fraud.

3.     **Improper Expensing of Excessive Insurance Reserves**

    a.     **Allegations of the Present Complaint**

Nursing homes and pharmacies, including those operated by Genesis, carry general/profes-sional liability ("GL/PL"), workers compensation ("WC"), and employee health and casualty insurance. On June 1, 2000, just before filing its bankruptcy petition, Genesis and MC restructured their insurance program by obtaining third party WC insurance and switching their GL/PL coverage to Genesis' wholly owned insurance subsidiary, Liberty Health Corporation ("Liberty"). This amounted to a self-insurance program. Genesis expensed all deposits it made to Liberty's reserve accounts (¶ 58).

Liberty obtained reinsurance for this GL/PL coverage, which provided "stop loss" limits to Genesis' and MC's exposure. That limit was initially $14 million, including $9 million for its Florida elder care facilities and $5 million for its other facilities.[17] Based upon its own internal actuarial studies done in June of 2000, Genesis calculated that its (Liberty's) actual likely exposure

---

[17] For the period June 1, 2001 through May 30, 2002, this aggregate stop loss limit was raised to $19 million. Overall, during the period June 30, 2000 through June 30, 2002, when Genesis' total stop loss limit was about $34 million, and the actuarial loss exposure was about half that amount. Yet, during this period loss reserves were increasing by $50 million, and the reserve deposits were all expensed.

20

was about half the total stop loss limits. That is the amount that should have been reserved, and no amount above that could properly have been charged against EBITDA (¶ 59).

But Genesis went far beyond that, and instead posted reserves significantly in excess of its total stop loss limits, and fully expensed those reserve payments immediately. A review of financial statements issued by Genesis *after the Plan was confirmed* reveals, upon analysis, that between July 1 and August, 2, 2000, Genesis (including MC) fully funded the GL/PL self-insurance program for 2000-2001, by transferring to Liberty $14 million, the aggregate stop loss limit, and it fully expensed that entire payment during the LTM period.[18] Moreover, subsequent financial disclosures showed that Genesis posted significant additional reserves in the month following the insurance renewal date, June 1, 2001, but before the end of the LTM EBITDA period on June 30, 2001. During that month Genesis made large deposits to Liberty and fully expensed all of them. Those deposits not only exceeded, on a pro rata basis, the actuarial risk, but they were risks that were already covered by reinsurance. Plaintiffs now estimate that Genesis (excluding MC) intentionally took excessive insurance reserve expenses during the valuation period of approximately $13 million,

---

[18] The evidence will show that the DIP lenders, including Goldman, Highland and Mellon, were well aware of this reserve deposit because it was their $14 million letter of credit that was posted with Liberty, enabling the payment to occur. These three lenders were also well aware of the stop loss limits and actuarial projections of insurance losses, all of which were discussed at the steering committee.

21

lowering EBITDA by that same amount (¶ 61).[19]

GAAP requires that companies deduct contingent liabilities from earnings under certain circumstances. Under SFAS No. 5, "Accounting for Contingencies", charges to earnings, based on contingent insurance liabilities, are to be accrued only when both the liability is probable and the amount can be reasonably estimated (¶ 64).

Genesis did not report publicly, until the third quarter of 2002 (a year after confirmation of the Plan): (I) what its aggregate stop loss limits were for its GL/PL insurance, (ii) that it had deposited reserves equal to 100% of those limits, and (iii) that it had fully expensed all those deposits in the current period, regardless of whether those deposits exceeded Genesis' actual exposure to claims. Moreover, Genesis never reported that it had deposited, and expensed, amounts in excess of the stop loss limits, and in excess of its own internal actuarial estimates of its potential exposure to claims. Instead, Genesis management told the unsecured creditors, and stated in their filings and in statements to the financial wire services, that insurance costs were "spiraling upwards" (¶¶ 65-66).

Genesis was, however, telling a different story to the senior creditors. On August 8, 2000, it explained the stop loss provisions and told the senior creditors that WC costs were declining from 1999 levels, and that rates had declined slightly from 2000 to 2001. In June of 2001, Genesis told

---

[19] These manipulations in insurance reserves coincided with an overall massive increase to Genesis' insurance reserves. The consolidated Genesis/MC 10Qs and 10Ks for fiscal 2000, 2001 and 2002 show the following:

| Date | Reserve Balance ($ thousands) |
| --- | --- |
| 9/30/00 | 27,899 |
| 9/30/01 | 51,625 |
| 6/30/02 | 74,912 |

The last two figures were disclosed after the confirmation hearing. Thus, neither the Court nor the debentureholders had the slightest idea that Genesis and MC had nearly doubled their collective insurance loss reserves (from $27 million to $51 million ) in the past year — much less that this entire $24 million increase had been fully expensed.

22

them that the GL/PL retention (the amount up to the stop loss limit) had been fully funded and expensed. Hager, other members of Genesis management, and the senior creditors all knew that (1) the actuarially experienced losses were far lower than the amounts being reserved and expensed, (2) that, as a result, EBITDA had been improperly reduced; and (3) that no one else knew about this (¶ 67).

### b.    Evidence from the Plan Confirmation Proceedings

Defendants contend that insurance reserve issues came up during Hager's testimony at the confirmation hearing (p. 178), at his deposition testimony (p. 54) and at the deposition testimony of Mr. McGahan of Warburg (p. 219). But collectively, this testimony was to the effect that (1) health insurance costs had supposedly increased by either $13 million or $15 million; and (2) liability insurance costs had supposedly increased by either $6 million or $10 million. This was part of the "party line" explanation of why the EBITDA figures were down 25% from prior years. There was no evidence that the increases to the insurance reserves, or the expensing of those increases, was ever disclosed, much less challenged, during the course of the Plan confirmation process.

### 4.    Excessive Deduction for Loss of AGE Institute Business

### a.    Allegations of the Present Complaint

Genesis had a contract to provide management, pharmacy and rehabilitation services to AGE Institute, a not-for-profit company that owned 20 nursing homes. In 2000, AGE Institute went bankrupt and notified Genesis that it was unilaterally terminating the contract (¶ 130).

Genesis management reported this at a meeting with the senior creditors in September of 2000, it advised them that the management contract had a 20% EBITDA margin and that the adverse impact on EBITDA would therefore be about $2.226 million. About three weeks later, Genesis

23

management asked the Unsecured Creditors Committee to approve an adjustment to the Budgeted

EBITDA to reflect the loss of this business. Although Genesis used the same presentation boards

it had recently used for the senior lender presentation, they had changed the boards so that they now

showed EBITDA margin of 74%, rather than 20%, and an adverse effect on EBITDA of $5.25

million, rather than $2.23 million. The Committee was thus misled and fraudulently manipulated

into approving a reduction to EBITDA that was at least $3 million overstated (and which, at a

multiplier of over 8, reduced the valuation by over $24 million) (¶¶ 132-33, 135).

**b.    Evidence From the Plan Confirmation Proceedings**

Defendants contend, once again, that the subject of the AGE Institute came up during the

confirmation proceedings; but, once again, a review of that testimony establishes that none of it dis-

closed the fraud. To the contrary, the Hager confirmation hearing testimony cited by the defendants

was to the effect that the loss of the AGE Institute management agreement had cost Genesis $5

million to $6 million (p. 57), and he confirmed that a reduction of $5.25 million was made to

Budgeted EBITDA to reflect the loss of this business (p. 81).[20] Thus, the testimony is merely the

"party line".[21]

The critical document, showing that the EBITDA margins disclosed to the senior creditors

was far lower than the margin assumed in the EBITDA adjustment, was buried in the mountains of

---

[20]  This testimony refers to document page number GS 807, which shows that in October 2000 Genesis represented that the loss of the AGE Institute contract would result in a reduction of $5.8 million to Genesis' EBITDA.

[21]  Defendants also cite to testimony at the Barr deposition (pp. 35-36), but that testimony is irrelevant to this issue. Barr testified that in January 2001 he told the senior creditors that the loss of the AGE Institute *pharmacy and medical supply agreements* would cost Genesis about $11.2 million of revenues. That is not the agreement we are concerned with here. He did not testify about the impact on EBITDA of the cancellation of the *management agreement.*

24

documents produced a few days before the confirmation hearing. Neither Warburg nor Chilmark

picked up on it either.

### 5. Improper Deduction of Non-Recurring Employee and Management Retention Bonuses

#### a. Allegations of the Present Complaint

As noted above, non-recurring charges and restructuring charges are not to be included in

EBITDA. Bankruptcy reorganization expenses are expressly defined, by GAAP, as non-recurring

expenses. *See* AICPA Statement of Position (SOP) 90-7 (¶ 136) (provisions for losses resulting from

the reorganization and restructuring of the business should be reported separately as reorganization

items ...). Paragraphs 28 and 49 of SOP 90-7 further provide that restructuring and reorganization

expenses, professional fees and similar types of expenditures directly relating to the Chapter 11 pro-

ceeding are, by definition, non-recurring, as defined by APB 30, paragraphs 19 through 24 (¶ 136).

On September 5, 2000, Genesis obtained Bankruptcy Court approval for a "Special Recogni-

tion Program" totaling over $11 million. The program was allegedly designed to assure that key

employees remained with the Company despite the ongoing bankruptcy. This program fit the classic

definition of one-time, non-recurring charges and expenses, unusual in nature and infrequent of

occurrence, which are not part of EBITDA. Accordingly, Genesis categorized these expenses as

reorganization costs, separate and apart from its statement of operations, in its consolidated financial

statements for fiscal 2001. Nonetheless, approximately $6 million of these costs were improperly

charged against Genesis LTM EBITDA (¶¶ 137-38).

#### b. Evidence from the Plan Confirmation Proceedings

Hager testified at the Plan confirmation hearing (p. 159) that all non-recurring costs, includ-

25

ing bonuses to be paid to executives for getting the Plan approved, would be excluded from EBITDA. That is the only evidence about these bonuses cited in defendants' motion.[22] There was no revelation that some of these costs were not excluded and, in fact, were used to reduce EBITDA.

### 6. Improper Deduction of Non-Recurring Costs for the "First Choice Plan"

#### a. Allegations of the Present Complaint

On January 1, 2000, Genesis started a new employee health insurance plan called the "First Choice Plan". The plan quickly proved unaffordable and by September 30, 2000, at the latest, Genesis had announced that the plan would be discontinued after March 31, 2001 (¶ 140).

In the last quarter of fiscal 2000, Genesis took a charge to earnings of about $13 million with respect to the cancellation of the First Choice Plan. Because the Plan had already been designated for termination by this time, this insurance adjustment was a non-recurring charge, as defined in APB 30, paragraph 26, and was treated as such in the Genesis 2001 10-K. Nonetheless, it was improperly (and secretly) included in the calculation of LTM EBITDA (¶ 141), thereby reducing the calculated valuation of Genesis by over $100 million.

The evidence will show that Goldman, Highland and Mellon, in their capacity as DIP lenders, were direct participants in this fraud. The $13 million charge against EBITDA helped trigger an EBITDA covenant default in the DIP loan agreement. Had the charge been handled correctly in the first place, it never would have been taken against EBITDA. But rather than simply correct the problem, defendants agreed to "waive" it, in exchange for a $1 million fee from Genesis (¶ 143). In the waiver agreement, the parties expressly acknowledged that the charge related to a non-

---

[22] Although defendants also refer to pages 53-57 and 79-81 of Hager's deposition transcript, those pages do not, in fact, touch upon this subject.

26

recurring item.[23]

Their failure to treat this item as non-recurring is one of the reasons for the alleged $13 million to $15 million increase in insurance costs which, they represented to this Court and to the debentureholders, had contributed heavily to the decline in Genesis' EBITDA from prior years.

### b.   Evidence from the Plan Confirmation Proceedings

Defendants' motion makes no reference to any evidence being adduced in the Plan confirmation proceedings concerning the First Choice Plan.

### 7.   Improper Deduction for Renegotiated Management Agreements with MC

### a.   The Allegations of the Present Complaint

A major part of the inducement for Genesis to acquire its stake in MC in 1997 was that it also would be able to earn significant revenues by (a) providing management services to MC, (b) selling pharmaceuticals to MC from the Genesis institutional pharmacy division, NeighborCare, and (c) selling therapy services from its therapy division (¶ 69).

On October 9, 1997, MC signed a five year management contract with Genesis with an automatic two-year renewal. At about the same time, separate therapy and pharmacy contracts were also signed. These contracts were negotiated at arm's length, with Texas Pacific Group and Cypress Group, which together owned over 56% of the MC stock, representing MC. The management services contract provided for payment of a fee equal to 6% of MC's gross revenue. This fee was well within industry norms, as were the pharmacy and therapy contracts (¶ 70).

---

[23]  As a consequence of this decision, Genesis was held to be in default of the minimum EBITDA requirements of its DIP lending facility. The senior lenders waived the default (in exchange for a $1 million fee), in a document that specifies that the costs of the First Choice Plan had contributed to the EBITDA default.

27

In its Disclosure Statement, ultimately disseminated in support of the bankruptcy Plan, Genesis recounted that "the terms of these agreements were the product of arm's-length negotiations between Genesis and the parties controlling Multicare". Nonetheless, by March of 2000, these senior Genesis/MC managers, with the concurrence of the senior creditors, had begun an examination of all the contracts between Genesis and MC, ostensibly to determine the "fairness" of these same contracts (¶¶ 71-72).

Because the same senior executives were in charge of both companies, Beverly Anderson was hired as an "independent restructuring officer" of MC, and Anderson retained E&Y Capital Advisors ("E&Y") to work with her in the renegotiations. Genesis represented in the Plan disclosure statement, and in its 10K report, that Anderson was independent of Genesis and the senior lenders (¶ 74).

In fact, however, Anderson was financially beholden both to Goldman and to Genesis. What was not disclosed was that Anderson had done consulting work for Mariner and had run up unpaid prepetition bills of over $500,000. Because Mariner was now bankrupt, Anderson's only chance of repayment was to be designated a "critical vendor" to Mariner, which would be highly unusual for a consultant unless the creditors consented (¶ 75).

Four members of the Genesis Steering Committee held at least $380 million of Mariner's senior debt, with Goldman alone holding $242.3 million (over 25%) of it. Because Genesis was the largest unsecured creditor of Mariner, David Barr of Genesis chaired the Mariner unsecured creditors committee. Goldman and Genesis were therefore in a position to determine whether Anderson's $500,000 bill would be paid — a fact that deprived Anderson of any claim to be "independent" of either Genesis or its senior creditors (¶ 76).

The evidence concerning Anderson's lack of independence was never disclosed publicly in

28

the Genesis bankruptcy proceedings.[24]

b.   **Evidence from the Plan Confirmation Proceedings**

Defendants contend that the facts concerning the renegotiation of the MC contract were addressed in Hager's confirmation hearing testimony (pp. 59-60, 68-69), his deposition testimony (14-16, 39-40, 53-58, 72-73, 94-99, and 120-22), and the depositions of Kennedy and Walker (10-11 and 19-22, respectively). But this testimony was all to the effect that Anderson was "independent"; had been brought in to renegotiate the management fee contracts, so that they would be closer to current market rates; that the reductions ultimately took over $11 million out of Genesis' EBITDA (reducing the valuation of Genesis by about $90 million); and that the new rates were never actually to be used. The testimony also sought to explain why Genesis had agreed to cancel an account receivable from MC of almost $100 million.

There is no evidence that Anderson's independence was ever an issue in the Plan confirmation proceedings.

8.   **Improper Inflation of Pharmacy Cost of Goods Sold**

a.   **Allegations of the Present Complaint**

Genesis' "Neighbor Care" pharmacy subsidiary contributed about $1 billion in revenues to the Company each year, representing about 55% of the total. The NeighborCare cost of goods sold ("CGS"), as a percentage of revenue, was 58.7% in fiscal 1998 and 58% in fiscal 1999. In fiscal 2000 the budgeted CGS was 59.2% and, on August 2, 2000, Genesis management reported to the

---

[24] Moreover, the evidence will show that Anderson's "renegotiation" of these contracts was merely for show. In fact, the senior lenders steering committee decided what the adjustments were going to be as early as January 2001, more than six months before Anderson had ostensibly concluded here "renegotiation."

29

senior lender steering committee that as of mid-2000, the actual average CGS had been 59.8%. Two months later, Genesis management told the unsecured creditors committee that the budgeted EBITDA for fiscal 2001 assumed a pharmacy CGS of 61.9%, based on the most recent two months' results (¶ 144).

There was no legitimate basis for jacking up the pharmacy CGS level this high. In its 10Q for the second quarter of fiscal 2002, issued about seven months after the Plan was confirmed, Genesis disclosed for the first time the actual pharmacy CGS for the first two quarters of fiscal 2001. CGS had been 59.3% — not 61.9%, as represented to the unsecured creditors committee and used as a basis of the budgeted EBITDA figures.[25] Because of the the large volumes involved, the inflation of pharmacy CGS by 2.6% would have reduced EBITDA by about $26 million on an annualized basis (¶¶ 145-46).

### b.    Evidence from the Plan Confirmation Proceedings

The Court's opinion confirming the Plan notes that Hager had testified that "a substantial decline in pharmacy margins (of $20 million to $25 million)" was one of the main reasons that Genesis' EBITDA had declined significantly from prior years. 266 B.R. at 613. Genesis' own financial data, published after the Plan was confirmed, shows that this testimony was completely inaccurate.[26]

---

[25] Plaintiffs subsequently discovered that the inflated CGS percentage had been based on the false assumption that price "compression" had occurred on sales to Manorcare and Omnicare.

[26] Defendants' motion contends that the pharmacy margin issue was addressed at pages 121-24 of Hager's deposition. Although Hager was asked about a Warburg document showing cost of sales is projected for fiscal 2001 at 61.6% of revenue, Hager was unable to answer that question, falling back on the observation that the Warburg "model" reflected in that particular document projected "relatively stable margins on a consolidated basis". These margins were not "relatively stable" but had declined significantly. This testimony did not reveal that the pharmacy CGS had been

30

9.   **Failure to Adjust Budgeted EBITDA to**
     **Reflect Increased Medicare Population Mix**

a.   **Allegations of the Present Complaint**

Medicare daily reimbursement rates were about $140 per day higher than Medicaid rates and, as a result, Medicare patients were far more profitable than other patients. Beginning in early 2001 and building steadily through the year, Genesis was experiencing a greater percentage of Medicare patients than it had in fiscal 2000. In fact, Medicare patient days had increased from 12.2% of total patient days in 2000, to 14.5% in 2001. Nonetheless, in projecting EBITDA, Genesis used the patient mix data for 2000 and assumed that it would continue unchanged into the future. The benefit of this additional 2.3% Medicare patient ratio would have been several million of additional EBITDA for the remainder of fiscal 2001 (¶¶ 147-48).

Genesis management advised the senior creditors of the improvement in the Medicare census, but did not inform other creditors, or the Bankruptcy Court. More importantly, although Genesis management had pounced on every opportunity to make negative adjustments to EBITDA, it never sought a positive adjustment to reflect this favorable development. Defendants should have, but did not, make an upward adjustment to budgeted EBITDA to reflect this development (¶ 149).

Genesis did not disclose its overall Medicare census for the first two quarters of 2001 until April 30, 2002, over four months after the Plan was approved, when it filed its 10-Q for the second quarter of 2002. Had they adjusted the EBITDA data to reflect the improved Medicare census, EBITDA would have increased by about $4 million, and the calculated valuation of Genesis would have increased by over $32 million (¶¶ 150-51).

---

manipulated and inflated.

31

**b.    Evidence from the Plan Confirmation Proceedings**

Defendants contend that the Medicare population increase was addressed at pages 50-51 of Barr's deposition. Mr. Barr did not disclose that there had been an increase in the Genesis Medicare census. He merely recounted that some increased pharmaceutical revenues could be traced to the Medicare census in Genesis' facilities.

10.    **Unjustified Decrease of $35 Million in Budgeted EBITDA to Reflect Imaginary Additional Personnel Costs**

a.    **Allegations of the Present Complaint**

One of the fundamental assumptions, on which the Budgeted EBITDA data were based, was that personnel expenses at the corporate level were going to increase by $35 million, even though Genesis was actively divesting itself of nursing beds and would, presumably, not need additional personnel to oversee this shrinking operation. In fact, the new positions that Genesis created, and factored into Budgeted EBITDA, were not filled (¶ 152).

Included among the projected personnel costs were new management performance driven incentives, which the Budgeted EBITDA assumed would be awarded even though the performance criteria for awarding those bonuses were utterly unrealistic and unreachable (¶ 153).

b.    **Evidence from the Plan Confirmation Proceedings**

Defendants contend that these facts were addressed at pages 122 and 178 of Hager's hearing testimony, at pages 53-57 and 121-24 of Hager's deposition testimony, and at pages 20-21 of McGahan's deposition testimony. The testimony cited has nothing whatsoever to do with the facts alleged in the Complaint, and seems, rather, to have been selected at random.

32

**D.    EACH DEFENDANT PARTICIPATED IN AND HAD KNOWLEDGE OF THE MISREPRESENTATIONS**

Defendant Hager, a CPA, was the chief financial officer of Genesis and of MC during the relevant period and, as such, was directly involved with, and responsible for, the preparation of the Genesis financial statements, including both the actual and "budgeted" EBITDA figures. He created the budgeted EBITDA numbers, which he knew grossly understated Genesis' prospective financial performance for the relevant period; then, when further "negative" adjustments were needed to keep the end result "in line", he devised these adjustments, knowing that they were unjustified.  He participated in the fraud in order to secure the approval of the senior creditors of a lucrative compensation package for himself, and in the hope of retaining his position with the Company after the senior creditors formally became controlling stockholders or, failing that, to obtain a lucrative severance package (¶ 160).

Goldman orchestrated and directed the scheme, with the cooperation of Mellon and Highland. Goldman and Highland aggressively purchased Genesis debt participations at drastic discounts, seeing an opportunity to double or triple their money within the space of 18 months. Goldman then inserted itself into these proceedings by joining the senior lender steering committee. Its attitude manifested itself immediately: at the March 2000 meeting of Genesis with the steering committee, management proposed that Genesis' debts be restructured so that the junior bonds could be repurchased at a deep discount to market.  The response of the Goldman representative, Jody LaNassa, as recorded in his notes, was "R U Nuts?" This revealing comment unmasks Goldman's intent to enrich itself, as much as possible, at the expense of the debentureholders (¶ 161-62).

Then, in July of 2000, it took a lead position in the DIP lending facility.  After that point

33

Goldman, Mellon and Highland, acting in concert, effectively controlled all of the Genesis purse strings for the duration of the bankruptcy, and they also controlled the financial fate of the individual Genesis senior managers, including the four individual defendants named in this action (¶ 163).

Goldman, Mellon and Highland then procured the cooperation of Genesis senior management by offering them immensely lucrative retention bonuses, including stock grants, options and the forgiveness of debt they had incurred to purchase Genesis shares. The packages offered to the four most senior managers had an aggregate post-reorganization value of about $23 million, not including severance benefits. These packages are now worth about $28 million (¶ 164).

Although they were justified as retention incentives to assure that these key executives would remain with the company, within a year after confirmation of the Plan three of the four recipients of these retention payments had departed from the Company and had cashed in their severance benefits, totaling an additional $10 million in cash and other benefits. These packages, when offered, had a value that was about three times the value of compensation paid to senior executives at comparable companies (*id.*).

- Michael Walker resigned as chief executive officer and received $5,100,000 of severance, $425,000 of incentive compensation, and life insurance and other related benefits of $91,367. In addition, unrestricted shares of common stock valued at $2,744,550 vested upon his resignation (¶ 180(a)).

- David Barr resigned as Vice Chairman and received $1,500,000 of severance, and life insurance and other related benefits of $310,000. In addition, unrestricted shares of common stock valued at $1,372,275 vested upon his resignation (¶ 180(b)).

- Richard Howard, who had succeeded David Barr as Vice Chairman, entered into a "voluntary separation agreement" with Genesis in October of 2002, pursuant to which he received $2,797,000 of severance, incentive compensation of $250,000 and life insurance and other benefits of $418,000. In addition, unrestricted shares of common stock valued at $1,220,000 vested upon his resigna-

34

tion (¶ 180(c)).

Only one member of senior management, defendant George Hager, remains with the Company.

Under the guise of monitoring compliance with DIP loan covenants, Goldman quarterbacked the entire panoply of financial manipulations detailed in this Complaint. They conducted monthly meetings with Genesis management. Goldman's notes of those meetings show that they were tracking, in minute detail, (a) the actual EBITDA being generated; (b) the targeted EBITDA level necessary in order to achieve a finding of senior lender impairment; (c) reconciliation of the LTM EBITDA being used for valuation purposes to the pro forma budgeted EBITDA, which was also being used for valuation purposes, to make sure that they were in agreement; (d) the EBITDA relationship of Genesis and MC; (e) the "current state of play"; (f) the various adjustments discussed in this Complaint, and their affect on the "current state of play"; (g) anticipated Medicare revenue and its potential affect on the "current state of play"; (h) the "significant exposure" created by the fact that the valuation multipliers the experts were going to be using was 20% to 30% higher for the Genesis pharmacy sector than for the nursing home sector  (¶ 165).

To assure that the predetermined valuation was achieved, adjustments to Budgeted EBITDA were fed to Hager by the senior creditors' financial advisors, Policano & Manzo and Chilmark, through the Steering Committee (¶ 166).

After confirmation of the Plan, Goldman took complete control of Genesis. It holds over 15% of the common stock (the largest block by a factor of two) and its managing director, Jody LaNassa, is one of the six members of the board and is also a member of the compensation committee. Highland Partners, another member of the senior lender group, is the second largest shareholder, with just over 7% of the outstanding stock. Highland Partners has placed one of its

35

executives, James D. Dondero, onto the Genesis board as well (¶ 168).

Mellon, Goldman and Highland were well aware of these manipulations, through their attendance at senior lender steering committee meetings and at DIP Financing meetings, even if they did not expressly direct management regarding each manipulation to artificially depress Genesis' EBITDA. Despite their knowledge that the figures had been manipulated, they nonetheless made affirmative use of them in this Court, by feeding to them to their advisor and Chilmark then submitting the resulting Chilmark valuations in support of the Plan. In so doing, they deceived the debentureholders, the Court and, in all likelihood, their advisors as well.

## E.     THE MISREPRESENTATIONS COME TO LIGHT

This Court confirmed the bankruptcy reorganization plan in September of 2001. Two months later, in November of 2001, Genesis disclosed that it had made massive increases in its insurance reserves. In its 10-K issued on December 28, 2001, well after Plan confirmation, showed that reserves had shot up by $23.7 million, doubling in a single year (¶ 178(a)).

Then, in its 10-Q for the first quarter of fiscal 2002, dated February 12, 2002, Genesis made disclosures about its continuing business providing pharmaceuticals to the Mariner corporation (¶ 178(b)). Genesis' EBITDA during the valuation period had been adjusted downward by $24.5 million, to reflect the anticipated loss of this business. But now Genesis disclosed for the first time that it had signed an agreement with Mariner, *before the reorganization plan had been approved*, to extend the pharmaceutical supply agreement through the year 2003. Obviously, then, there was no basis — if there ever had been — for fearing the loss of this business, or for excluding this $13 million in sales from EBITDA. This deduction from EBITDA, all by itself, reduced the calculated valuation of the company by over $100 million (¶ 129).

36

Other disturbing revelations were soon to follow. In its 10-Q for the second quarter of fiscal 2002, dated May 15, 2002, Genesis disclosed for the first time that it had been excluding from EBITDA 10% of revenues on its sales of pharmaceuticals to Manorcare corporation. This time the exclusion was based on the professed fear that Manorcare might possibly prevail in a frivolous litigation seeking a lowering of the prices Manorcare had previously agreed to pay for pharmaceuticals supplied by Genesis (¶ 178(c)). In total, Genesis had excluded about $11 million of its actual Manorcare income from EBITDA during the valuation period, lowering the valuation by another $90 million. There was never a bona fide basis to exclude 10% of these revenues from EBITDA (¶ 117).

In this same 10-Q Genesis also disclosed, for the first time, that its cost of goods sold in its pharmacy operations was 59.2% of revenues. But this was far lower than the "budgeted" 62.5% cost of good sold percentage that Genesis had used to calculate LTM EBITDA for valuation purposes. This difference had led to an understatement of EBITDA of about $26 million. Because the cost of goods sold had always been below 60%, there was no known basis for the high percentage used for the calculation (¶ 178(c)).

These post-confirmation revelations prompted a complete re-evaluation of the financial data that Genesis had submitted to the Court. After months of investigation and analysis, plaintiffs discovered that many other dubious transactions had adversely affected the EBITDA data that had been reported to the Court. Eventually, plaintiffs figured out that Genesis had taken about $13 million out of EBITDA in order to make unjustified increases to insurance loss reserves. That maneuver alone reduced the valuation of Genesis by over $100 million (¶ 68).

Most notably, plaintiffs also discovered that EBITDA had also had been reduced by certain bankruptcy reorganization costs, and costs associated with a discontinued employee health benefit

37

plan. Both of those categories of expenses were non-recurring, and therefore neither of them should have been included in EBITDA. Together, these two cost items reduced EBITDA by about $123 million, and reduced the valuation of Genesis by over $84 million (¶ 56).

Finally, after the approval of the reorganization plan, plaintiffs learned for the first time that Beverly Anderson, the so-called "independent" director who had been appointed to "renegotiate" the management agreement between Genesis and its subsidiary MC, was financially beholden to the senior lenders and to Genesis management, through her unpaid bill for $500,000 in the Mariner bankruptcy that would not be paid unless the Mariner creditors committee approved it (¶ 75).

## III. ARGUMENT

### A.    THE STRICT STANDARDS APPLICABLE TO A RULE 12(b)(6) MOTION TO DISMISS

The Third Circuit has a "liberal test for construing the adequacy of pleadings." *Carlton Inv. v. TLC Beatrice Int'l Holdings*, No. 13950, 1996 Del Ch. LEXIS 47, at *32, 1996 WL 189435 at *10 (Del. Ch. Apr. 16, 1996). On a Rule 12(b)(6) motion to dismiss a complaint, a court must "accept as true, the facts alleged in the Complaint and all reasonable inferences that can be drawn from them." *Langford v. City of Atlantic City*, 235 F.3d 845, 847 (3d Cir. 2000). Dismissal is only warranted "where it is certain that no relief could be granted under any set of facts that could be proved." *Markowitz v. Northeast Land* Co., 906 F.2d 100, 103 (3d Cir. 1990) (citations omitted); *see also Household Int'l, Inc. v. Westchester Fire Ins. Co.*, 286 F. Supp. 2d 369, 372 (D. Del. 2003). Furthermore, there is no requirement for a "detailed pleading of the facts on which a claim is based. Instead, all that is required is 'a short and plain statement of the claim showing that the pleader is entitled to relief,' . . . ." *Nova Telecom, Inc. v. Long Distance Mgmt. Sys.*, No. 00-2113, 2000 U.S.

38

Dist. LEXIS 15510, at *12, 2000 WL 1593994 at *4 (E.D. Pa. Oct. 25, 2000) (citing Fed. R. Civ.

P. 8(a)(2) (West 2000)).

**B.     THE CONFIRMATION ORDER DOES NOT IMPOSE ANY RES
        JUDICATA BAR TO PLAINTIFFS' CURRENT CAUSES OF ACTION**

     **1.     The Right to Bring This Action is Expressly Reserved in the Confirmed Plan**

The Confirmation Order imposes no res judicata hurdle to this action because the confirmed

Plan expressly preserves  plaintiffs' right to sue the Debtors and the senior creditor defendants for

"willful misconduct or gross negligence" for "any act or omission in connection with, or arising out

of, the Reorganization Cases, the confirmation of the Plan of Reorganization, the consummation of

the Plan of Reorganization, or the administration of the Plan of Reorganization or property to be

distributed under the Plan of Reorganization." (Defs' Ex. K at 31, ¶ 10.6.)[27]

     "[U]nder a generally accepted exception to the res judicata doctrine, a litigant's claims are

not precluded if the court in an earlier action expressly reserves the litigant's right to bring those

claims in a later action.'" *D&K Props. Crystal Lake v. Mutual Life Ins. Co.*, 112 F.3d 257, 260 (7th

Cir. 1997), quoting *Apparel Art Int'l, Inc. v. Amertex Enters.*, 48 F.3d 576, 586 (1st Cir. 1995).[28]

---

[27] This Court also struck the release language that would have immunized the creditor
defendants for claims by the Debtors for willful misconduct or gross negligence in the post-petition
period. (Defs' Ex. I at 20-24.)

[28] *See also Washington Pub. Power Supply Sys. v. Pittsburgh-Des Moines Corp.*, 876 F.2d
690, 699 (9th Cir. 1989) ("[w]hen a court reserves a question for further adjudication a judgment
does not bar subsequent determination of that question" (citations omitted)); *Merrifield v.
Beaven/Inter-American Cos.*, No. 89 C 8436, 1992 U.S. Dist. LEXIS 11964, at *7-*9, 1992 WL
193553 at *3 (N.D. Ill. Aug. 3, 1992); *A.J. Masi Electric Co. v. Marron & Sipe Bldg. & Contracting
Corp.*, 574 A.2d 1323, 1324 (Conn. App. Ct. 1990); *Restatement (Second) of Judgments* § 26(1)(b)
(1982) ("the general rule" against splitting of a cause of action "does not apply to extinguish the
claim," when the "court in the first action has expressly reserved the plaintiff's right to maintain the
second action").

Accordingly, "most courts hold that where a disclosure statement and/or plan of reorganization expressly reserves an action for later adjudication, res judicata does not apply." *In re USN Communs., Inc.*, 280 B.R. 573, 588 (Bankr. D. Del. 2002) (citations omitted). *See also In re Kelley*, 199 B.R. 698, 704 (B.A.P. 9th Cir. 1996) ("If a confirmed plan expressly reserves the right to litigate a specific cause of action after confirmation, then res judicata does not apply") (citations omitted).[29]

Courts in this district have found that res judicata has no application even if a plan uses general and broad language to preserve claims. *USN Communs.*, 280 B.R. at 589 (rejecting defendant argument that "a reservation must specifically disclose the proposed subsequent action against the particular defendant"). *Accord In re Ampace Corp.*, 279 B.R. 145, 159 (Bankr. D. Del. 2002) (court ruled that the use of general language in the plan to preserve certain claims for the debtor was all that was required under 11 U.S.C. 1123 (b)(3), while noting that some courts require more specificity); *In re I. Appel Corp.*, 300 B.R. 564, 568-69 (S.D.N.Y. 2003) (reservation of claims which was drafted broadly was nevertheless effective).

Thus, no dismissal of plaintiffs' claims are justified on any grounds of res judicata.

## 2.    Res Judicata Cannot Insulate Fraudulent Conduct

Another compelling reason why the Confirmation Order does not bar this action is because defendants procured it by defrauding this Court and the plaintiffs.

---

[29] The generally accepted exception to res judicata described above, of course, also applies in the non-bankruptcy context. *See Robinson v. Toyota Motor Credit Corp.*, 775 N.E.2d 951, 959 (Ill. 2002) (plaintiff not barred by res judicata from litigation claims that were preserved in a court approved agreement to settle a class action); *Coleman v. Coleman*, 522 A.2d 1115, 1120-21 (Pa. Super. Ct. 1987) (where divorce decree determined certain economic issues but reserved wife's right to pursue other economic claims, res judicata not applicable when she instituted action on reserved claims); *Klem v. Greenwood*, 450 N.W.2d 738 (N.D. 1990) (judgment in a law firm's collection action did not preclude former client's legal malpractice suit because of parties' agreement that former client did not have to assert malpractice claim in first action).

40