"[R]es judicata . . . does not shield a blameworthy defendant from the consequence of his own misconduct." *McCarty v. First of Georgia Ins. Co.*, 713 F.2d 609, 612 (10th Cir. 1983). In *McCarty*, the plaintiffs first instituted a breach of contract action in state court after their insurer claimed that it had never issued any policy to plaintiffs. Upon removal, the district court dismissed the case because it was not timely. Thereafter, in a related case, plaintiffs obtained documentary proof that the insurer had lied in disclaiming the policy. Plaintiffs instituted a second state court action alleging failure to act fairly, which had a longer statute of limitations. The Tenth Circuit reversed the district court's grant of summary judgment and refused to apply res judicata, despite its recognition that "the tort and the contract claims arose out of the same transaction." *Id.* The court reasoned: "'where plaintiff's omission of an item of his cause of action was brought about by the defendant's fraud, deception, or wrongful conduct, the former judgment had been held not to be a bar to suit.'" *Id.* at 613, (citation omitted). This is exactly the situation here.

Also on point is *Powell v. American Bank & Trust Co.*, 640 F. Supp. 1568 (N.D. Ind. 1986). In that fraud action for damages, plaintiffs claimed that defendants had obtained a probate order approving the sale of plaintiffs' bank stock by failing to disclose to the court or to plaintiffs an agreement reached in the banking industry that would add tremendously to the value of the bank stock. In addition, plaintiffs alleged that defendants had made factual misrepresentations in the proposed order, as well as in the petition to the probate court. The district court refused to dismiss these charges, reasoning that res judicata "was not created to protect such fraud on the courts," or to deprive plaintiffs of their due process right to a meaningful hearing. *Id.* at 1574.

Numerous other courts have reached the same conclusion. *See Christian v. American Home Assurance Co.*, 577 P.2d 899, 905 (Okla. 1977) (no res judicata applied, where, upon winning breach

41

of contract action against insurer for failing to pay his claim, plaintiff instituted another lawsuit for

bad faith disclaimer, alleging that the bad faith was revealed only as the first case was submitted to

the jury); *United States Rubber Co. v. Lucky Nine, Inc.*, 159 So. 2d 874 (Fla. Dist. Ct. App. 1963)

(defendant's deceitful testimony at the first trial concealed from plaintiff the true amount it was

owed); *Restatement (Second) of Judgments* § 26, comment j (1982) ("[a] defendant cannot justly

object to being sued on a part or phase of a claim that the plaintiff failed to include in an earlier

action because of the defendant's own fraud").

> **3.    The Claims Alleged in the Complaint Are Not the Same
>         as Those Raised in the Bankruptcy Proceedings, Where
>         Plaintiffs Were Not in a Position to Raise Them**

Defendants have not established certain basic prerequisites for the application of res judicata.

Res judicata prevents a "'party from litigating a claim that it could have raised or did raise in a prior

proceeding in which it raised another claim based on the *same* cause of action.'" *Edwards v. Wyatt*,

266 B.R. 64, 71 (E.D. Pa. 2001) (citation omitted, emphasis added). In the Third Circuit, the res

judicata doctrine is narrowly applied where the prior judgment was issued in a bankruptcy

proceeding. *See Eastern Minerals & Chems. Co. v. Mahan*, 225 F.3d 330, 337 (3d Cir. 2000)

("Claim preclusion doctrine must be properly tailored to the unique circumstances that arise when

the previous litigation took place in the context of a bankruptcy case"); *Edwards*, 266 B.R. at 72 (D.

Pa. 2001) ("Courts apply the claim preclusion doctrine narrowly when the previous litigation is in

the form of a bankruptcy case") (citations omitted); *In re Mariner Post-Acute Network Inc.*, 267 B.R.

46, 53 (Bankr. D. Del. 2001) ("[a]pplication of [the res judicata] doctrine in bankruptcy cases is not

as straightforward as in other cases").

*Eastern Minerals* provides a good illustration of the narrow application even where, unlike

42

here, plaintiff has notice of facts such that he could have raised his state court claims in the bankruptcy proceedings. The creditor-plaintiff had been an aggressive objector during the bankruptcy proceedings and had "repeatedly asserted" that the debtor "had been used for the benefit of the affiliated companies" to the detriment of plaintiff and other trade creditors. 225 F.3d at 332. Plaintiff had actually drafted a complaint to subordinate the claims of two affiliated creditors. Although the Complaint did not name as defendant the debtor's sole shareholder, who also controlled that affiliated creditors, it did describe how he "allegedly engaged in conduct causing [the debtor] to prefer [the affiliated creditors] over the [debtor's] other creditors." *Id.* at 333. Because the plaintiff settled its claim, it never filed the Complaint.

Upon receiving a pro-rata distribution that was substantially less than the amount of its settlement, plaintiff sued the debtor's sole shareholder in state court to recover the remainder of the money, claiming that the defendant had used the debtor as his "'mere instrumentality' and 'alter ego' for his individual benefit." *Id.* at 338. More specifically, plaintiff alleged that defendant caused the debtor to be undercapitalized and shifted the risk of loss from himself and affiliated companies to the debtor and the debtor's other trade creditors. Although the Third Circuit did not take issue with defendant's charge that plaintiff knew all the facts pertinent to these claims during the bankruptcy proceedings, it nonetheless reversed the grant of summary judgment, ruling that the application of res judicata was not justified. The court concluded: "Although some of the descriptions of certain events and particular relationships are common to both claims, the theory of the case and relief sought in [plaintiff's] instant complaint are markedly different from those underlying the draft complaint to subordinate the claims of [the affiliated creditors] that [plaintiff] considered filing in bankruptcy court." *Id.* In other words, plaintiff had not raised the "precise" claim before. *Id.* at

43

336.[30]

   *Edwards* is also instructive. There, the debtor's estate included his stock holdings in a company, which he had once served as president. The debtor had outstanding disputes with the company and two of its large shareholders, Wyatt and Phillips. During the debtor's Chapter 7 liquidation proceedings, Wyatt wanted to take over that company and sought to align himself with the debtor, because of his large holdings. The debtor settled his outstanding disputes relating to the company, in exchange for Wyatt's promise that he would help him obtain the maximum value for the sale of his stock and would not enter into any agreement with Phillips without his involvement. On the very day of the scheduled sale of his stock, the debtor discovered that Wyatt and Phillips had put in a joint bid to purchase his assets, and objected to the bid "as an illegal collusive effort to control the sales price for his assets." 266 B.R. at 68. The bankruptcy court rejected his objection and allowed the trustee to accept the bid and release any claim that the debtor had against the bidders. Thereafter, the debtor sued Wyatt for breach of contract and fraud. The district court denied defendant's motion to dismiss, finding that "[t]he factual underpinnings and theories of the current claims are significantly different from what they were in the bankruptcy proceeding," and that the "existence of overlapping facts and events" was insufficient for claim preclusion. *Id.* at 72.

   There are numerous additional authorities that debunk defendants' assertion that plaintiffs are trying to relitigate the same claims that they previously pursued. *See e.g., Facchiano Constr. Co., Inc. v. United States Dep't of Labor*, 987 F.2d 206, 212-13 (3d Cir. 1993) (one agency's barring

---

[30] The *Eastern Minerals* Court made plain that the "essential similarity" test applied by some courts, literally construed, was not ideally suited where the previous litigation was in the bankruptcy context. 225 F.3d at 337. It further emphasized that "the similarity of certain events in and of itself does not trigger a bar of [plaintiff's] subsequent complaint," and that "the mere existence of overlapping facts and events was not sufficient to foreclose [the subsequent] claim." *Id.*

of a construction company from agency work because of mail fraud does not preclude another agency from barring same company from obtaining any federal government contract because although two proceedings implicated the same underlying wrongful conduct, the two debarment proceedings arose from different statutes and different evidence, as well as sought different relief); *A.B.H. Investments, Inc. v. Narven Enters. Inc.*, No. D040361, 2003 Cal. App. Unpub. LEXIS, at *33, 2003 WL 22796049 at *12 (Cal. Ct. App. Nov. 25, 2003) (disclosure during bankruptcy proceedings about certain funding "does not show that the bankruptcy court adjudicated defendants' alleged misrepresentations and concealment regarding the source of this funding"); *Household Int'l, Inc.*, 286 F. Supp. 2d at 375 (although both actions relate to the extent of coverage provided by [insurer's] policies, the earlier action "dependent upon contract interpretation and whether or not the claims were wrongfully denied," while subsequent lawsuit "focus[ed] on [insurer's] alleged misrepresentations or omissions to [insured] and its understanding of [the insured's] needs for the policy"); *Mariner Post-Acute Network*, 267 B.R. at 53-54 (financing orders holding that debtors should turn over to secured lenders any funds due to debtors did not preclude subsequent proceeding concerning whether any funds were due to debtors in the first place).

In the case at bar, plaintiffs' current fraud and gross negligence claims were not raised or adjudicated in the bankruptcy proceedings. The theory of the present claims, the relief sought, and much of the underlying facts are dramatically different from what was involved in those proceedings. Although plaintiffs did previously dispute the valuation of Genesis, they did not claim that the EBITDA data that was used by defendants was fraudulent. Instead, they focused on different factors, such as the use of a low multiplier. Furthermore, plaintiffs are seeking money damages against the senior creditor defendants, as well as the Debtor, a relief that was not available to them in the

45

bankruptcy proceedings.

Defendants' position is that the fraud claims could have been asserted before the Plan's confirmation and therefore should be barred. Under *Eastern Minerals*, however, it is irrelevant what plaintiffs could have done, unless the claim that they actually litigated was the same as their current claims:

> *Claim preclusion only bars claims arising from the same cause of action previously raised, not every conceivable claim that could have been brought* in the context of a bankruptcy case over which the court would have had jurisdiction.

225 F.3d at 337 (emphasis added).

In any event, whether plaintiffs had notice of the fraud before confirmation of the Plan is a hotly contested issue of fact that cannot be resolved as a matter of law. The Complaint alleges, with strong factual support, that plaintiffs were in no position to raise their current claims in the bankruptcy proceedings because of defendants' misrepresentations and misleading omissions. It was only when Genesis made certain disclosures months after the Confirmation Order that plaintiffs had any reason to suspect fraud (¶ 178-79).

Defendants' argument to the contrary only highlights the factual dispute. For example, they invoke this Court's conclusion that the exclusion from EBITDA of the positive impact of Genesis' possible acquisition of APS was reasonable because a higher bidder might emerge (Joint Motion at 33-34 n.8). The charge of fraud, however, rests on the manipulations defendants used to conceal from this Court, and from plaintiffs, the agreement they had made to extend the Mariner sales contract, even if someone else purchased APS. Thus, defendants failed to reveal to the Court and plaintiffs that the very rationale that defendants proffered for deducting the Mariner sales from

46

EBITDA had evaporated.

In analogous circumstances, courts have consistently held that the issue of notice must be resolved by the trier of fact. For example, in *A.B.H. Investments*, a fraud action brought four year's after a plan's confirmation, the defendants claimed that plaintiffs had every opportunity to inquire about the alleged chief culprit's misrepresentations in the bankruptcy proceedings and that "plaintiffs' factual claims were actually discussed and adjudicated by the bankruptcy court." 2003 Cal. App. Unpub. LEXIS, at *32, 2003 WL 22796049 at *11. Plaintiffs' position was that they discovered the fraud one year after the confirmation of the plan. *Id.* LEXIS at *33, WL at *12. The court denied summary judgment, finding that defendants' evidence, including deposition testimony, was "subject to differing inferences," *id.* LEXIS at *28, WL at *10, and therefore, "a triable issue of material fact" was presented. *See also In re Circle K Corp.*, 181 B.R. 457, 462-63 (Bankr. D. Ariz. 1995) (where plaintiffs had originally objected to the plan, and ultimately sought money damages for fraud after the plan's confirmation, court found that whether plaintiff could have discovered the fraud before confirmation was an issue of fact); *Houbigant, Inc. v. Dev. Specialists, Inc.*, 229 F. Supp. 2d 208, 222 (S.D.N.Y. 2002); *Tanaka Bros. Farms, Inc. v. Home State Bank*, Civ. A. No. 86-2108-S, 1986 U.S. Dist. LEXIS 17745 (D. Kan. Nov. 13, 1986) (issue of fact when plaintiff knew about fraud).[31]

---

[31] Defendants' citations do not support claim preclusion. Their main case, *CoreStates Bank N.A. v. Huls Am., Inc.*, 176 F.3d 187 (3d Cir. 1999) predates *Eastern Minerals* and did not apply the test articulated therein. *Eastern Minerals*, essentially limited *CoreStates Bank* to its facts, describing it as involving "a unique factual and procedural setting," and finding that it "was largely fact-bound and . . . the result of 'the coincidence of several unusual circumstances.'" *Eastern Minerals*, 225 F.3d at 339. Furthermore, unlike *CoreStates Bank*, the plaintiffs here have not "actually litigated" the specific claims that they are raising in this action. *Id.*

Defendants' other citations are inapposite. *See e.g.*, *Sure-Snap Corp. v. State Street Bank*

47

Significantly, in their lengthy harangue about plaintiffs' notice of their current claims before confirmation, even defendants have not even tried to establish that the factual predicate for those claims was contained in the tens of thousands of pages of documents that they dumped on plaintiffs — after the deadline for filing objection had passed and only days before the Confirmation Hearing. Their unsupported assertions, like their citations to testimony, utterly fail to establish as a matter of law — or even support — that the fraud was actually disclosed prior to the confirmation, or rebut the well-supported allegation that it was not until the post-confirmation disclosures that they had any reason to suspect fraud (¶ 178-79).

Furthermore, plaintiffs surely cannot be found, as a matter of law, to have had a full and fair opportunity to litigate their current claims, given the extraordinarily short time they had to review the voluminous last minute production. *See Rudell v. Comprehensive Accounting Corp.*, 802 F.2d 926, 932 (7th Cir. 1986) ("[i]t is well-established that the doctrine of res judicata is applicable only in cases where the party against whom it is asserted had a full and fair opportunity to litigate the issue" (citation omitted)); *Lovell v. Mixon*, 719 F.2d 1373, 1376 (8th Cir. 1983) (full and fair

_____

& *Trust Co.*, 948 F.2d 869 (2d Cir. 1991) (predates *Eastern Minerals*; court's finding that "far from there being only a few 'operative facts' which were common to these successive actions, . . . it appears the entire basis of contention was the same," *id.* at 875, is entirely inapplicable here; also, the plaintiff there had actually drafted a complaint during the bankruptcy proceedings containing the same tort claim that it tried to raise in the second action, *id.* at 871); *In re Justice Oaks II, Ltd.*, 898 F.2d 1544 (11th Cir. 1990) (predates *Eastern Minerals*; the charge of "inequitable conduct" raised subsequently was litigated in bankruptcy, *id.*, at 1552; the other claim questioning secured status of a creditor might not have been labeled as such but was resolved by the bankruptcy court, *id.* at 1554); *Crop-Maker Soil Servs., Inc. v. Fairmount State Bank*, 881 F.2d 436 (7th Cir. 1989) (predates *Eastern Minerals*; unlike here, no dispute that plaintiff had all the operative facts to sue for fraud during the bankruptcy proceedings but did not do so for strategic reasons); *In re Atlanta Retail, Inc*, 297 B.R. 299 (Bankr. N.D. Ga. 2003) (*Eastern Minerals* test not applied; also, unlike here, there was an "uncanny similarity" between the complaints in bankruptcy and the subsequent state action (*id.* at 305) and key issue involving the validity of a subordination agreement had been actually litigated in bankruptcy).

opportunity is a prerequisite for res judicata and collateral estoppel).  Adding exponentially to the

time constraints was the fact that the LTM EBITDA, which contained a dramatically changed view

of defendants' theory of valuation, and the related Chilmark report were also filed after the deadline

for objections and days before the Confirmation Hearing (¶ 171).

Faced with similar facts, the court in *In re AmeriServe Food Distrib. Inc.*, 267 B.R. 668 (D.

Del. 2001), concluded that the right to a full and fair opportunity to litigate was compromised.

Recognizing an adverse party's "entitlement to timely receive expert reports and conduct discovery

in order to evaluate whether and to what extent the basis of such opinions can be challenged," the

court ruled that a new expert report, which appeared at plaintiff's "door a 'couple of days' before

[the bankruptcy court] disposition . . . casts doubt that [plaintiff] had 'a fair opportunity procedurally,

substantively and evidentially to pursue his claim the first time.'" *Id.* at 672 (citation omitted).

## C.   THE PREREQUISITES FOR COLLATERAL ESTOPPEL ARE NOT SATISFIED HERE

Defendants' assertion that collateral estoppel bars plaintiffs from proceeding with their

current claims is frivolous.

The prerequisites for collateral estoppel or issue preclusion are:

"(1) the issue sought to be precluded [is] the same as that involved in the prior action; (2) that issue [was] actually litigated; (3) it [was] determined by a final and valid judgment; and (4) the determination [was] essential to the prior judgment. . . ."

*In re Graham*, 973 F.2d 1089, 1097 (3d Cir. 1992) (citations omitted; alterations and omission in

the original). "[T]he issue [sought to be precluded], must have been one which was actually litigated

and one which was essential to the decision, not one of 'those that merely lurk in the record before

the court.'" *Rushton v. Shea*, 419 F. Supp. 1349, 1363 (D. Del. 1976) (citation omitted). In addition,

49

the entity against whom the doctrine is asserted must have had a full and fair opportunity to litigate the issue. *See Lovell*, 719 F.2d at 1377. Defendants have failed to establish that these elements are met here.

In confirming the Plan, this Court made no finding as to whether defendants artificially depressed the value of Genesis by intentionally, recklessly or with gross negligence submitting false or misleadingly incomplete EBITDA information. Defendants were so successful in hiding their misconduct until after the Plan's confirmation, that nobody challenged the data as false or manipulated. The objections to the Plan, including to valuation, were on entirely different grounds. To the extent that a transaction that is currently relevant was touched upon previously, such as APS, defendants' omission of critically important data precluded the Court and plaintiffs from suspecting any fraud or gross negligence. Thus, the key factual and legal issues here had no relevance, far less being essential, to any actual adjudication by this Court about valuation, the fairness of the Plan, or its submission in good faith.

If defendants' extraordinarily broad-brush definition of issue preclusion as accepted, all post confirmation attacks based on any fraud relating to valuation would be precluded because every confirmation order contains findings of good faith and fairness. In sharp contrast to defendants' approach, courts define the issue previously adjudicated narrowly and strictly.

For example, in *Jacobson v. AEG Capital Corp.*, 50 F.3d 1493 (9th Cir. 1995), plaintiffs charged that defendant engaged in securities fraud in connection with the submission of its reorganization plan. The Ninth Circuit rebuffed defendant's assertion that the bankruptcy court's confirmation order, which included the determination that defendant had proposed the plan in good faith, barred the fraud claim, reasoning:

50

> [T]he issue of "good faith relates" only to the disclosure statement, and as we have noted earlier Jacobson and Fury's claim "is not premised exclusively on a false and misleading disclosure statement, but . . . on a broader scheme to freeze out non-AEG shareholders." Even if the issue of "good faith" in disclosure and solicitation of its plan of reorganization had been fully litigated in the bankruptcy court, Jacobson and Fury's security fraud claims, construed most favorably to them, turn on more than disclosure and solicitation. Consequently, their securities fraud claims are not barred by the doctrine of collateral estoppel.

*Id.* at 1497 (citation omitted; omission in the original). In this case, plaintiffs' fraud charges are based on facts that were not raised in the prior proceedings and were not encompassed in this Court's previous judgment.

In *Hudgins v. Davison*, 127 B.R. 6 (E.D. Va. 1991), the bankruptcy court found in favor of the debtor after trial of a creditor's charge that the debtor had misrepresented its assets. A year later, the trustee filed suit to revoke the discharge of the debtor, alleging fraud on the basis of the *same* facts that the creditor had tried to assert in an amended complaint, but was unable to do because he had waited too long. The district court found that collateral estoppel did not apply "because the issues presented in the trustee's complaint, while generally based upon fraud, involve different factual allegations and were not 'actually litigated' in the prior suit brought by the creditor." *Id.* at 8. Here, the objections that this Court previously adjudicated were not even "generally based upon fraud."

In *In re Huang*, 275 F.3d 1173 (9th Cir. 2002), the debtor filed for bankruptcy fourteen months after reaching a settlement of an action by her bank, where she was charged with fraud, RICO, and other misconduct. In that settlement, she agreed not to voluntarily file for bankruptcy and admitted that her loans from the bank were not dischargeable in bankruptcy. Yet, the Ninth Circuit held that the bankruptcy court erred in granting summary judgment to the bank on the discharge-

51

ability issue based on that agreement. The court found that collateral estoppel was not justified because "[f]raud, or facts showing fraud, are not mentioned in the Settlement Agreement or in the judgment enforcing it." *Id.* at 1178. Similarly, in the case at bar, this Court's prior rulings make no mention of fraud.[32]

Even a previous finding of fraud does not automatically justify the application of collateral estoppel. *See In re Spigel*, 260 F.3d 27 (1st Cir. 2001). There the prior adjudication concerned a state court's ruling that the debtor's sale of a stolen car to a third party, to whom the creditors were previously found liable as principals of the debtor, had "failed 'to bear any indicia of legitimacy,'" *id.* at 30, and that the debtor was entirely at fault, while the creditors were blameless. The state court ordered the debtor to indemnify the creditors for the money they had paid to the third party. The First Circuit held that the creditors were not entitled to a finding that the debt was not dischargeable in bankruptcy on the basis of this previous judgment because, while the judgment was an adjudication that the debtor had committed fraud against the third party, it contained no determination that the debtor had intentionally deceived the creditors. *Id.* at 34-35. *See also Lovell*, 719 F.2d at 1377 (ruling that a transfer of property was a "constructively fraudulent conveyance and therefore voidable," not adjudication of whether or not the debtor *deliberately* intended to defraud his creditors);

---

[32] *See also Graham*, 973 F.2d at 1098 (collateral estoppel not applied "even though the penalty imposed by the Tax Court was based on the fraud penalty . . . authorize[d] in cases where fraud is established, [because] the issue of fraud was never litigated or admitted, nor was a specific factual finding concerning it made."); *Lundborg v. Phoenix Leasing*, 91 F.3d 265, 271-72 (1st Cir. 1996) (where defendant opposed plaintiff's motion to set aside confirmation of plan not only on the basis of fraud but also as untimely, and the bankruptcy court merely ruled that the motion had no basis, no showing that the fraud issue was actually adjudicated); *Janess v. Messick*, 202 B.R. 196, 198 (Bankr. D. Del, 1996) (same). *Accord Swineford v. Snyder County*, 15 F.3d 1258, 1268 (3d Cir. 1994) (agency's determination about plaintiff's ineligibility for unemployment compensation benefits because of willful misconduct has no preclusive effect on plaintiff's lawsuit alleging that her firing violated her first amendment rights).

52

*Berkowitz v. Vari*, Nos. C.A. 94C-11-252 WTQ, C.A. 91J-12-187, No. 95J-03-227, 1999 Del. Super. LEXIS 28, at *13-*14, 1999 WL 167818 at *4-*5 (Del. Super. Ct. Mar. 3, 1999) (ruling that the debtor did not engage in fraud in its assignment of a note is not equivalent to a determination that the assignment was valid and enforceable).

Because of defendants' utter failure to satisfy the prior adjudication requirement, this Court need not make any determination on whether the plaintiffs had a full and fair opportunity to litigate. Were the Court to reach this issue, it would be yet another reason for rejecting the collateral estoppel bar.[33] *See* III, B(3), *supra*.

## D.     THE CLAIMS AGAINST THE DEBTORS WERE NOT DISCHARGED BY THE CONFIRMATION ORDER

The Confirmed Plan expressly does not release any claim against the Debtors for wilful misconduct or gross negligence in *post*-petition matters, which is what is involved in this case. Defendants conveniently ignore the most relevant provision, while invoking releases concerning *pre*-petition conduct, which is not being challenged by plaintiffs.

---

[33] The issue of plaintiffs' diligence is not relevant where defendants have not established that this Court had adjudicated any of the issues that they are seeking to preclude. In defendants' citations, there had been actual prior adjudication of the issues. Furthermore, in those cases, unlike here, there was no allegation of defendants' concealment of relevant information or about last minute document productions. *See Liberty Mut. Ins Co. v. FAG Bearings Corp.*, 335 F.3d 752, 765 (8th Cir. 2003) (court ruled that "some degree of diligence must be shown to avoid the application of issue preclusion on a 'new evidence' theory" but only where there was "no allegation that another party's actions prevented the introduction of the evidence by the estopped party in the initial litigation") *Klein v. Commissioner*, 880 F.2d 260, 263 (10th Cir. 1989) (similar, also "new" evidence cumulative); *Yamaha Corp. of America v. United States*, 961 F.2d 245, 253, 255, 257-58 (D.C. Cir. 1992) (similar).

53

**E.    SECTION 1144'S 180-DAY LIMITATION PERIOD FOR SEEKING
REVOCATION OF A REORGANIZATION PLAN DOES NOT
APPLY TO THIS COMMON LAW ACTION FOR MONEY DAMAGES**

    **1.    A Cause of Action for Money Damages Arising
From Fraud in Bankruptcy Proceedings Can Be
Commenced Outside of the 180-Day Period**

Defendants' argument that this action is untimely because it was not commenced within 180 days of the entry of the Confirmation Order is misguided. This limitation period, contained in Section 1144, applies to actions for *revocation* or *modification* of a confirmation order. It is totally irrelevant to this action under the common law for *money damages* based on defendants' egregious fraud in the bankruptcy proceedings.

Contrary to defendants' suggestion, plaintiffs are not attempting to make new law. As described in the well respected treatise on bankruptcy:

> *Even though the 180-day deadline is absolute, a court is not without power to remedy an injustice created by fraud in a bankruptcy case.* While the court is without power after expiration of the deadline to *revoke* the confirmation order, there may be *other avenues* to provide relief to parties affected by fraud during the chapter 11 case. The nature of the relief will vary from case to case depending on the nature of the fraudulent conduct and the position of the parties to the chapter 11 case. *The most likely form the relief will take is to allow a party injured by fraud to maintain an action for damages caused by the fraud.*

8-1144 *Collier on Bankruptcy* ¶ 1144.04 [2][a] (15th ed rev.) (emphasis added).

Courts have concluded that, while the 180-day limitation period obviously applies to revocation actions, it does not pose any hurdle to cases for money damages arising out of fraud committed in bankruptcy proceedings that are instituted after this deadline. *See e.g., A.B.H. Investments, In re Emmer Bros. Co.*, 52 B.R. 385, 391 (D. Minn. 1985); *Circle K Corp.*, 181 B.R. 457.

54

In *A.B.H. Investments*, plaintiffs started their state law fraud action for money damages *over four years* after a plan's confirmation. Plaintiffs, after losing their interests in a partnership as a result of the partnership's reorganization, sued the general partner and other affiliated parties alleging that "defendants misrepresented the amount of money needed to fund the bankruptcy reorganization in an attempt to dissuade plaintiffs from contributing additional capital and thus allow them to become the Partnership's sole owners." 2003 Cal. App. Unpub. LEXIS 11126, at *7, 2003 WL 22796049 at *3. The court ruled that the 180-day limitation period "does not bar participants injured by fraud from seeking damages or other relief under common law theories in state or federal courts." *Id.* LEXIS at *32, WL at *11 (citation omitted). It then affirmed the denial of summary judgment on the fraud count, finding that "plaintiffs' claims for monetary damages would not upset the Plan." *Id.* LEXIS at *32-*33, WL at *11. It further dismissed the argument, also raised by defendants' in this case, that plaintiffs were in fact attempting "to re-divide the pie." *Id.* LEXIS at *33, WL at *11.

Similarly, in *Emmer Bros. Co.*, a creditor started a money damage fraud action *a year* after a plan's confirmation, attacking the debtor's failure to disclose during the bankruptcy proceedings its interest in a massive antitrust class action. The district court ruled that the 180-day period was not applicable to this "independent cause of action," and rejected defendant's characterization of the relief for money damages as "in attempt to revoke or otherwise collaterally attack the confirmation order." 52 B.R. at 391.

In *Circle K Corp*, the creditors complained that the debtor and others had obtained confirmation through, among other things, misrepresentations and omissions concerning valuation. The court dismissed these allegations because the relief sought would have required undoing transactions already undertaken pursuant to a confirmed plan. After the expiration of the 180-day

55

period, plaintiffs amended the Complaint, seeking only monetary damages, but otherwise raising

"nearly identical" charges as before. 181 B.R. at 462. On this record, the court denied the debtor's

motion for summary judgment, reasoning that "[i]f plaintiffs prevail, the Court can fashion a remedy

that does not upset the confirmed plan, *i.e.,* monetary damages." *Id. See also, Donaldson v.*

*Bernstein,* 104 F.3d 547, 553 (3d Cir. 1997) ("'misconduct during the bankruptcy proceeding' by

the debtor often compels the court to allow the fraud to be redressed") (quoting *Emmer Bros.,* 52

B.R. at 394-95); *In re Newport Harbor Assocs.,* 589 F.2d 20, 24 (1st Cir. 1978); *Williams v. Texaco,*

165 B.R. 662,  672 n.3 (D.N.M. 1994); *accord In re Coffee Cupboard, Inc.,* 119 B.R. 14, 19-20

(E.D.N.Y. 1990) (granting creditors' motion to reopen case for conversion into chapter 7 proceedings

based on debtor's submission of false filings and concealment of assets during chapter 11

proceedings, reasoning, "the 180 day deadline in Section 1144 does not act as a bar to truly

independent courses of action based on a debtor's wrongful conduct").[34]

---

[34] Defendants' citations are easily distinguishable. *In re Crown-Globe, Inc.,* 107 B.R. 60,
62 (Bankr. E.D. Pa. 1989), actually helps plaintiffs because the court allowed the fraud claim to
proceed and barred only the request for equitable subordination. *See also In re Orange Tree Assocs.,*
961 F.2d 1445, 1447 (9th Cir. 1992) (revocation, in the form of subordination of certain liens, sought
rather than damages); *In re 680 Fifth Ave. Assocs.,* 209 B.R. 314, 322-23 (Bankr. S.D.N.Y. 1997)
(the requested relief was for adoption of plaintiff's proposed plan); *Hotel Corp. of South v. Rampart
920, Inc.,* 46 B.R. 758, 770 (E.D. La. 1985), *aff'd,* 781 F.2d 901 (9th Cir. 1986) (plaintiff wanted
various declaratory relief, in addition to damages, and the court's brief one-paragraph discussion did
not mention the precedents recognizing the validity of a damage action for fraud outside of the 180-
day period); *In re Vencor Inc.,* 284 B.R. 79 (Bankr. D. Del. 2002) (an attempt to vacate a release
approved in the confirmed plan, not for money damages); *In re Cinderella Clothing Indus. Inc.,* 93
B.R. 373, 378 (Bankr. E.D. Pa. 1988) (court "did not decide" whether the independent action for
fraud was available).

56

## 2.   The Relief Sought Here Does Not Amount
   to a De Facto Revocation of the Plan

The above precedents demonstrate not only the inappropriateness of defendants' invocation of the 180-day bar but also discredit their attempt to paint the relief sought for money damages as a disguised attempt to seek revocation or re-division of the pie.

Plaintiffs are not seeking to undo the Confirmation Order.  For example, under the Plan, the senior creditor defendants received stock and warrants in the re-organized company.  Plaintiffs are not making any claim to those securities.[35]  In fact, the vast majority of the senior creditors of Genesis are not even defendants in this action, and would not be affected by it at all.

Any money judgment paid by Genesis cannot be said, as a matter of law, to injure any innocent parties who may have purchased the reorganized company's securities in reliance on the Plan.  Defendants would have this Court believe that such a judgment would result in a decrease in the market value of the securities and hurt those parties.  A price drop, however, does not automatically follow every time a company pays a money judgment.  Indeed, the opposite can happen because the market sometimes weighs the resolution of a litigation as a positive sign.  Most importantly, given the preservation of the right to sue the Debtors and creditors for willful misconduct or gross negligence in the post-petition period that is preserved in the Plan, as well as the law discussed above, no one could have reasonably believed that Genesis would be shielded from a fraud action, unless it was instituted within 180 days of the Confirmation Order.[36]

---

[35] Indeed, at least one of these defendants, Mellon Bank, no longer holds any such securities.

[36] Also without basis is defendants' further assertion that Fed. R. Civ. P. Rule 60(b) bars this action because it was not started within a year of the Confirmation Order.  Rule 60(b)(3) expressly states that the one-year limitation "does not limit the power of a court to entertain an independent action to set aside a judgment for fraud upon the court."  The Advisory Committee notes

57

### 3.   Whether or Not Plaintiffs Had Notice of the Fraud Within the 180-Day Period Is Irrelevant

Defendants also argue that they are entitled to dismissal of plaintiffs' claims as a matter of law because plaintiffs were on notice of the fraud within the 180-day cutoff period of Section 1144. It is legally insignificant whether or not plaintiffs had knowledge within that period because plaintiffs are pursuing state common law claims, not Section 1144 claims. Plaintiffs' action is entirely independent of an action under Section 1144. While the 180-day period is strictly applied to protect the finality of a confirmed plan, it has no relevance here, where the Plan is not being threatened in any way by plaintiffs' request for monetary relief in their common law action for fraud, conspiracy and gross negligence, as already discussed. The timeliness of plaintiffs' causes of action must be judged by the well defined state limitation periods for bringing these common law claims. Significantly, defendants do not make any suggestion that any such relevant state limitation period has expired.

Of course, if plaintiffs actually knew about the fraud *before the confirmation of the plan*, that would be relevant to the issue of collateral estoppel, not to the application of § 1144. As

---

to this rule make plain, and the Third Circuit has repeatedly ruled, that an independent action to vacate a judgment that was obtained by fraud can be brought outside the time limit specified in the Rule. *See Averbach v. Rival Mfg. Co.*, 809 F.2d 1016 (3d Cir. 1987). Although plaintiffs here are not seeking to set aside any prior judgment, even where that drastic remedy is sought, courts do not allow defendants to use a prior judgment as a shield where there is evidence of fraud on the party or the court. *See Publicker v. Shallcross*, 106 F.2d 949, 951 (3d Cir. 1939) (where defendant had induced receivers of a company in bankruptcy, its bondholders, a special master and the district court to believe that he had assets of $8,500, thereby compromising a claim of $850,000 for one cent on the dollar, when he knew that he had assets valued over $230,000, Third Circuit ruled that the perjury prevented defendant from raising the court approval of compromise as a bar to the fraud action); *Averbach*, 809 F.2d at 1022-23 (failure to make complete responses to an interrogatory is a sufficient basis for a subsequent common law fraud action); *Stridiron v. Stridiron*, 698 F.2d 204, 207 (3d Cir. 1983) ("Failure to disclose or produce evidence requested in discovery can constitute Rule 60(b)(3) misconduct" (citation omitted)).

58

demonstrated above, plaintiffs had no such knowledge.

**F.    PLAINTIFFS HAVE STANDING TO PROSECUTE THESE CLAIMS**

Only Highland challenges plaintiffs' standing, arguing that the claim that defendants devalued Genesis' assets belongs to Genesis' bankruptcy estate, not to plaintiffs. This contention is baseless.

It is true that causes of action can, in the proper circumstances, constitute property of the bankruptcy estate pursuant to Section 541(a)(1) of the Bankruptcy Code. But this same section defines the debtor's estate as "all legal and equitable interests of the debtor in property *as of the commencement* of the [bankruptcy] case" (except for certain specified exceptions not applicable here). 11 U.S.C § 541(a)(1) (emphasis added). The law is settled that causes of action that arise *after* the bankruptcy petition, even when they can be said to belong exclusively to the debtor, which is not the case here, are not considered property of the bankruptcy estate.

This is recognized in all the authorities that Highland cites. *See e.g. In re Educator's Group Health Trust*, 25 F.3d 1281, 1286 (5th Cir. 1994) ("It is well established that the bankruptcy estate succeeds to the causes of action which the debtor could have bought as of the commencement of the case . . . ."); *In re Granite Partners L.P.*, 194 B.R. 318, 323, 328 (Bankr. S.D.N.Y. 1996); *In re E.F. Hutton Southwest Properties II, Ltd.*, 103 B.R. 808 (Bankr. N.D. Tex. 1989) ("The filing of a petition in bankruptcy creates a legal estate comprising 'all legal or equitable interests of the debtor in property as of the commencement of the case'" (citation omitted)).[37]

---

[37] *See also, Board of Trustees v. Foodtown Inc.*, 296 F.3d 164, 169 n. 5, 170 (3d Cir. 2002) (claim that accrued after filing of bankruptcy petition not part of estate because "[a] cause of action is considered property of the estate if the claim existed at the commencement of the filing and the debtor could have asserted the claim on his own behalf . . ."); *Shearson Lehman Hutton, Inc. v. Wagoner*, 944 F.2d 114, 119 (2d Cir. 1991) ("'the critical time as of which the property comprising

59

At the time Genesis filed its bankruptcy petition, the alleged claims did not exist because the misconduct by defendant had not yet begun. Thus, plaintiffs' claims cannot conceivably belong to Genesis' bankruptcy estate. *Id.*

## G.    THE COMPLAINT ADEQUATELY ALLEGES CAUSES OF ACTION FOR FRAUD, CONSPIRACY AND GROSS NEGLIGENCE

### 1.    The Fraud Claims

#### a.    The Complaint Alleges Actionable Misrepresentations and Omissions

Defendants contend that the representations at issue in this action are all non-actionable because they are based on "mere" projections which turned out to be wrong — *i.e* that plaintiffs simply plead "fraud by hindsight". These shop-worn arguments have no merit.

As the discussion of the factual allegations should have made clear, this case is partly about projections that were wrong from the start (the original Budgeted EBITDA); partly about "adjustments" to those projections that were also wrong from the start; and partly about the "actual" LTM EBITDA results, which purported to show the actual financial results of the Company for the previous 12 months. The LTM EBITDA were especially crucial here because, by the time of the Confirmation Hearing, 11 months of the "projected" 12 month period were already in the past. If the LTM EBITDA had been significantly higher than the EBITDA projections — which it would have been, but for defendants' manipulations — the Court would never have accepted defendants' valuation, or the Plan.

---

the estate is to be determined . . . is the date upon which the petition is filed'"), quoting 15 *Collier on Bankruptcy* ¶ 541.04 at 541-22 (15th ed. 1989); *Edwards*, 266 B.R. at 69-70 (a chapter 7 debtor's claims of fraud and breach of contract arising from defendants' misconduct during debtor's liquidation proceedings "did not exist" when the debtor filed for bankruptcy and therefore belonged to debtor personally rather than to his bankruptcy estate).

While defendants Hager and Genesis were directly responsible for the Budgeted EBITDA, and the adjustments to the original Budgeted EBITDA data (for Mariner, the revision of the MultiCare management contract, and the loss of the AGE Institute business), the senior creditor defendants were intimately involved in assuring that these numbers were consistent with their interests. The Budgeted EBITDA data, as lowered by the subsequent downward adjustments, were then submitted by Hager and Genesis to Warburg, which used them as the basis of its valuation, and, ultimately, were submitted to the Court to demonstrate the fairness of the Plan.

Hager and Genesis also were responsible for the LTM EBITDA data, but in this case the involvement of the senior creditor defendants was more overt — not only did they stage manage these data, as they did the Budgeted EBITDA data, but they also submitted it to their own expert, Chilmark, and, ultimately, to this Court as well, to "confirm" the accuracy of the Budgeted EBITDA and to support the fairness of the Plan (¶ 43).

Although the Budgeted EBITDA were projections, it is simply not true that they are not actionable as a matter of law. Projections, as well as opinions, are actionable if they had no reasonable basis when made, if defendants did not actually believe them, or if they were inconsistent with existing facts. *See e.g. Virginia Bankshares, Inc. v. Sandberg*, 501 U.S. 1083, 1092-93 (1991) (recognizing actionability of statement that merger price was "fair" or "high" if those statements were not based on, or were inconsistent with, existing facts); *Eisenberg v. Gagnon*, 766 F.2d 770, 776 (3d Cir. 1985) (predictions actionable if made without a valid basis); *see also Helwig v. Vencor, Inc.*, 251 F.3d 540, 560 (6th Cir. 2001); *Kaplan v. Rose*, 49 F.3d 1363, 1375 (9th Cir. 1994); *Provenz v. Miller*, 102 F.3d 1478, 1489 (9th Cir. 1996). As the court held in *Helwig*, projections amount to representations of certain existing facts:

61

> [P]redictions and opinions contain "at least three implicit factual
> assertions: (1) that the statement is genuinely believed, (2) that there is
> a reasonable basis for that belief, and (3) that the speaker is not aware of
> any undisclosed facts tending to seriously undermine the accuracy of the
> statement."

251 F.3d at 557 (citation omitted).[38]  A projection or statement of belief may be actionable to the

extent that one of these implicit factual assertions is inaccurate.  *Id.*

Delaware courts, too, have found that projections, which are inconsistent with facts existing

at the time they were made, are fully actionable.

In *Hewlett v. Hewlett-Packard Co.*, C.A. No. 19513-NC, 2002 Del. Ch. LEXIS 44, at *31-

*33, 2002 WL 549137 at *10 (Del. Ch. Apr. 8, 2002), for example, the court found actionable

defendants' statements, made in soliciting shareholder approval of a merger, that the two companies

could be easily integrated.  The court ruled that the Complaint stated a claim because the alleged

facts suggested that these optimistic statements were false when made and that defendants knew this.

*Id.* LEXIS at *34, WL at *11.

In *In re Marriott Hotel Prop.*, Consol. C.A. No. 14961, 2000 Del. Ch. LEXIS 17, 2000 WL

128875 (Del. Ch. Jan. 24, 2000), certain limited partners tendered their partnerships interests on the

basis of defendants' representation in the offering materials that cash distributions to limited partners

would decrease in the near future and defendants' projections that over a ten year period, such

distribution would not exceed $30,000.  Soon after the tender offer closed, distributions to the

remaining limited partners increased dramatically, totaling $33,000 in the first year alone.  In

rejecting defendants' motion to dismiss, the court concluded: "that distributions *rose so*

---

[38]  Defendants' reliance on *Great Lakes Chem. Corp. v. Pharmacia Corp.*, 788 A.2d 544
(Del. Ch. 2001), is misplaced.  There, the projections were found to be covered by plainly written
disclaimers.  *Id.* at 554.

*dramatically* and *so soon* after defendants' disclosure" was a sufficient predicate for plaintiffs' allegation that the challenged statements were false when made. *Id.* LEXIS at \*35-\*36, WL at \*11 (emphasis in original). *See also Tam v. Spitzer*, CA No. 12538, 1995 Del. Ch. LEXIS 116, at \*20, 1994 WL 510043 at \*7 (Del. Ch. Aug. 17, 1995) (buyer of business could attack as fraudulent seller's claim that the business' major client was a loyal and repeat customer and that "she did not believe" it would terminate its relationship after the sale, because at the time of these representations seller had information that the client may take its business elsewhere).[39]

Here, the Budgeted EBITDA projections were in effect promulgated twice: the first time, when they were originally issued in early 2001; and the second time, when they were used at the Confirmation Hearing in August of 2001. The second time is the key: even if defendants had *originally* believed that the Budgeted EBITDA numbers were right, if they knew better by the date of the Hearing, it would have been fraudulent for defendants to have submitted them to this Court, and asked the Court to rely on them, without correcting known mistakes. As the Complaint demonstrates, by the date of the Confirmation Hearing, defendants were well aware of or recklessly

---

[39] *See also In re Penn Treaty Amer. Corp. Secs. Litig.*, 202 F. Supp. 2d 383, 390 (E.D. Pa. 2002). There, the plaintiffs challenged statements by a provider of long-term care insurance that it was not in financial trouble and that its tremendous growth had not jeopardized its minimum statutory capital and surplus levels. According to plaintiffs, at the time these statements were made, defendants knew that the provider's major subsidiary was experiencing a severe drop in a financial ratio ("RBO Ratio") that negatively impacted statutory capital requirements. Defendants moved to dismiss, alleging fraud by hindsight—that plaintiffs' allegations were based on the provider's post-class period announcement that it was facing regulatory action and was in financial jeopardy. Defendants argued that merely because the RBO Ratio declined in 1998 and 1999, did not mean that they knew or recklessly disregarded that it would fall below regulatory level by the end of 2000 (the relevant period), and emphasized that even at the end of that year, the ratio was in fact above the required minimum. The court denied the motion to dismiss, reasoning that the severity of the decline should have set off red flags to defendants that the provider's financial condition was precarious and thus the affirmation of financial health was misleading.

63