disregarded all the manipulations they had been forced to use to get the LTM EBITDA to corroborate the projections. They knew or recklessly disregarded at that point that both the LTM EBITDA and, therefore, the Budgeted EBITDA, were wrong.

The Complaint exhaustively details the existing facts which made defendants' statements false, and actionable, *when they made them*. Plaintiffs will summarize them briefly here:

- by the date of the Confirmation Hearing, at the latest, they knew that, although the Budgeted and LTM EBITDA reflected a loss of the entire Mariner business, the Mariner contract had already been extended (¶¶ 123, 125, 128).

- by the date of the Confirmation Hearing, at the latest, they knew that the LTM EBITDA reflected the expensing of insurance reserves well beyond the actuarial exposure to loss, and even substantially beyond their own reinsurance stop loss limits (¶ 61).

- by the date of the Confirmation Hearing, at the latest, they knew that LTM EBITDA included an improper deduction for non-recurring expenses, such as the costs of the First Choice Plan and of the executive Special Recognition Program (¶¶ 9, 56, 136).

- by the date of the Confirmation Hearing, at the latest, they knew that LTM EBITDA excluded 10% of the sales to Manorcare, even though there was no legal opinion or other basis to believe that these revenues would actually be lost. The mere fact that the matter was in litigation was not, without more, a sufficient basis to exclude any portion of the Manorcare revenues from EBITDA (¶¶ 110-18)

- by the date of the Confirmation Hearing, at the latest, they knew that the Budgeted EBITDA and LTM EBITDA had both been reduced by an excessive amount to account for the loss of the AGE Institute business. They knew that the EBITDA margin for that business had been grossly exaggerated to produce an excessive EBITDA adjustment (¶¶ 55, 132-33).

- by the date of the Confirmation Hearing, at the latest, they knew that their "budgeted" figure for the pharmacy cost of goods sold was materially overstated (¶ 144).

- by the date of the Confirmation Hearing, at the latest, they knew that they had not made an adjustment for the improved Medicare census, which would have

64

significantly increased EBITDA (¶ 148).

- by the date of the Confirmation Hearing, at the latest, they knew that Beverly Anderson, who had "renegotiated" the management contract with MC, was not "independent", as advertised, and that the existing contract provisions were entirely fair and not in need of any revision (¶¶ 75-79, 100, 106-07).

- by the date of the Confirmation Hearing, at the latest, they knew that personnel costs had not increased by $35 million, as posited in the Budgeted EBITDA (¶¶ 55-56).

- by the date of the Confirmation Hearing, at the latest, they knew that, without the above manipulations, LTM EBITDA would have been significantly higher than Budgeted EBITDA data, and that the Budgeted EBITDA had turned out to be grossly off the mark (¶¶ 55, 152).

There is no hindsight involved here. What the Complaint alleges is a series of misrepresentations to this Court and to the plaintiffs of known, existing facts. For purposes of this case, it makes no difference *when* defendants realized that the Budgeted EBITDA data were wrong, because it is clear from the Complaint that they knew it quite well by the date of the Confirmation Hearing.

In *In re Burlington Coat Factory Secs. Litig.*, 114 F.3d 1410 (3d Cir. 1997), the court discussed, in detail, both the "duty to correct" and the "duty to update" previously issued projections or other "soft information". The "duty to correct" can arise when the defendant learns that it has misstated information that existed at the time of its original statement. By contrast, the "duty to update" can arise where the defendant learns *new* information that makes its previous statement no longer true. Even if we assume that defendants originally had some basis for the Budgeted EBITDA projections, developments during the 11 months afterwards made it quite clear that those projections had not been borne out. As the Third Circuit held in *Burlington Coat*:

> The duty to update, in contrast to the duty to correct, concerns statements that, although reasonable at the time made, become misleading when viewed in the context of subsequent events. . . .

. . . .

> For a plaintiff to allege that a duty to update a forward-looking statement arose on account of an earlier-made projection, the argument has to be that the projection contained an implicit factual representation that remained "alive" in the minds of investors as a continuing representation.

114 F. 3d at 1431-32.[40]

In the present context, application of the *Burlington Coat* analysis is self-evident. By submitting the Budgeted EBITDA to the Court, as part of the Warburg valuation, Genesis and Hager in effect made a "factual representation that remained alive" concerning the continuing validity of that data. They, therefore, had a duty to update them, which they violated.

### b.    The Requirements of Rule 9(b)

While requiring that "the circumstances constituting fraud or mistake shall be stated with particularity," Rule 9(b) expressly provides that "[m]alice, intent, knowledge, and other condition of mind of a person may be averred *generally*." Fed. R. Civ. P. R. 9(b) (emphasis added).

"The Third Circuit applies a lenient, flexible reading of complaints under Rule 9(b)." *Easton & Co. v. Mut. Ben. Life Ins. Co.*, Civ. No. 91-4012, 1992 U.S. Dist. LEXIS 10913, at *4-*5, 1992 WL 136857 at *2 (D.N.J. 1992), citing *Seville Industrial Machinery Corp. v. Southmost Machinery Corp.*, 742 F.2d 786, 791 (3d Cir. 1984); *see also In re Fruehauf Trailer Corp.*, 250 B.R. 168, 198 (D. Del 2000); *Household Int'l*, 286 F. Supp. 2d at 373. Indeed,

> There is no formula for pleading [the circumstances of] fraud with

---

[40] *See also Weiner v. Quaker Oats Co.*, 129 F.3d 310, 318 (3d Cir. 1997) ("The complaint alleges facts on the basis of which a reasonable factfinder could determine that Quaker's statements regarding its total debt-to-total capitalization ratio guideline would have been material to a reasonable investor, and hence that Quaker had a duty to update such statements when they became unreliable") (footnote omitted).

> particularity: "Allegations of 'date, place or time' fulfill these functions, but nothing in the rule requires them. A plaintiff is free to use alternative means of injecting precision and some measure of substantiation into their allegations of fraud."

*See State Farm Mut. Auto. Ins. Co. v. Makris*, No. 01-5351, 2003 U.S. Dist. LEXIS 3374, at *12-*13, 2003 WL 924615 at *4 (E.D. Pa. Mar. 4, 2003), quoting *McHale v. NuEnergy Group*, Civ. A No. 01-4111, 2002 U.S. Dist. LEXIS 3307, 2002 WL 321797 at *3 (E.D. Pa. Feb 27, 2002) (citations omitted); *see also Seville Industrial*, 742 F.2d at 791; *Gurfein v. Sovereign Group*, 826 F. Supp. 890, 906 (E.D. Pa. 1993). Plaintiffs are not required to plead an exhaustive "cataloging of facts." *In re ML-Lee Acquisition Fund II, L.P.*, 848 F. Supp. 527, 555 (D. Del. 1994) (citing *Temple v. Haft*, 73 F.R.D. 49, 53 (D. Del. 1976)). The main purpose of Rule 9(b) "is to provide notice, not to test the factual allegations of the claim." *Universal Computer Consulting, Inc. v. Pitcairn Enters.*, No. 03-2398, 2004 U.S. Dist. LEXIS 2719, at *14, 2004 WL 345415 at *4 (E.D. Pa. Feb. 24, 2004) (citation omitted).

### i.    Plaintiffs Have Particularized the Circumstances of the Fraud

Plaintiffs have pled the circumstances of defendants' fraud with more than the required particularity, as already discussed. Suffice it to say that the Complaint specifies:

- the content of the alleged misrepresentations and omissions and the reason why they were materially misleading (¶¶ 8-11, 162 (1)-(11));

- the manipulations used to depress EBITDA and thereby lower Genesis' valuation (¶¶ 4, 8-9, 53-56, 58-61, 65-67, 72, 109, 111, 126-27, 142-43, 149, 150, 155-57; 162(1)-(11));

- the amount by which each alleged manipulation deflated EBIDTA, and in turn, Genesis' valuation (¶¶ 8-10, 53, 55-56, 161); and

- who made the misrepresentations and omissions and engaged in the accounting manipulations (¶¶ 157, 160-68, 184-85).

67

Nothing more is required. *See Snyder v. Butcher & Co.*, C.A. No. 91C-04-0289, 1992 Del. Super. LEXIS 362, at *34, 1992 WL 240344 at *40 (Del. Super. Ct. Sept. 15, 1992) ("Plaintiffs have identified the Memorandum, the specific manner in which the Memorandum is misleading, and the Defendants as those who prepared and offered the Memorandum to them. Defendants are free to deny these allegations at trial. The . . . purposes of Rule 9(b) have been fulfilled").

In contesting the sufficiency of the allegations, defendants make arguments that, at best, demonstrate that many material facts germane to the fraud are "in substantial controversy," and, therefore, are not susceptible to resolution as a matter of law. *Chase Manhattan Mortg. Corp. v. Advanta Corp.*, No. 01-507, 2004 U.S. Dist. LEXIS 3933, at *18-*19, 2004 WL 422681 at *5 (D. Del. Mar. 4, 2004).

ii.     **Each Defendant's Role in the Fraud Has Been Sufficiently Delineated**

The Complaint provides a solid factual basis for attributing the alleged misleading statements and manipulations to each defendant, as already described. Defendants' call for additional delineation is unsupportable.

The descriptions of Genesis' and Hager's roles in the fraud are foolproof. Hager was intimately involved in preparing and defending the EBITDA and portrayed himself as an expert about Genesis' financial affairs. It was after all Hager who informed this Court: "the actual results for the first 10 months of the 2001 fiscal year were on target with budget projections." ¶ 48; *see also* ¶ 160. Courts have upheld far less particularized allegations of fraud against corporate insiders. *See In re Reliance Securities Litig.*, 91 F. Supp. 2d 706, 722, 726 (D. Del. 2000)

Specific facts are also alleged about the senior creditor defendants' participation in the

68

misconduct. Through their financial advisors, they fed Hager the challenged adjustments to the Budgeted EBITDA (¶ 166). They made full use of the false LTM EBITDA, causing Chilmark to base its valuation on this data. In confirming the Plan, this Court found comfort in the fact that the LTM EBITDA was the same as the Budgeted EBITDA: "The fact that the debtors' actual results are on target with 2001 budget projections for the first ten months of the fiscal year confirms the reasonableness of the management projects." (Defs' Ex. I at 35-36). Needless to say, neither the Court nor plaintiffs knew that the management data upon which the projections and valuations had been based and had been manipulated.

Indeed, the three senior creditor defendants influenced the entire fraudulent scheme through their dominant position in the Steering Committee, ¶¶ 11, 19-22, 31, *see also* ¶¶ 161-68, which met monthly. They further extended their influence over Genesis in connection with the DIP financing (¶¶ 154, 165). Goldman Sachs' personnel actually kept notes of the intense monitoring of all EBITDA related developments (¶ 165).

The Complaint identifies by date meetings where Genesis kept the senior creditors apprised of the true state of affairs, while spinning a misleading tale to the junior creditors. *See* ¶¶ 132-33 (in an October 2000 meeting, the junior creditors were told by Genesis of a far higher adverse impact of the loss of the AGE business than the $2.2 million number it provided to the senior creditors in September 2000). Defendants also overlook numerous additional detailing of the senior creditors' participation in the fraud, including those concerning the Mariner sales contract (¶¶ 123-28).

Defendants demand a unrealistically high level of specificity about the senior creditor defendants' role. For example, they attack the allegation: "At a meeting of management and the senior creditors steering committee of March 13, 2001, Goldman and the other lenders present recognized

69

that the First Choice Plan had been discontinued and that the charges associated with that plan were non-recurring.   Nonetheless, they did nothing to take these costs out of the LTM EBITDA calculation." ¶ 143. Defendants assert "Plaintiffs fail to specify which Senior Lenders were present" at this meeting. Joint Motion, ¶¶ 88, 47.

Plaintiffs have no obligation, before discovery, to provide further identification, including specific names of the senior creditor defendants' representatives. Given that the date and subject of a meeting of the steering committee is identified, these defendants have more than adequate notice to prepare a defense. *See Bernstein v Kelso*, 231 A.D. 2d 314, 320-21 (N.Y. App. Div. 1997) (upholding allegation that defendants had secretly conspired to orchestrate a buyout at an unfairly low price, although plaintiff had not specified "which defendants were involved in the allegedly clandestine meetings . . ." ).

As the court concluded in *MBIA Ins. Corp. v. Royal Indem. Co.*, Nos. 02-1294, 02-1361, 2004 U.S. Dist. LEXIS 6609, at *10-*11, 2004 WL 830964 (D. Del. Apr. 6, 2004), in upholding plaintiff's treatment of related entities as a group in alleging fraud:

> [T]he Court concludes that each Third-Party Defendant in the SFC Group of Entities has notice of the allegations against which they must defend, thus distinguishing the instant action from cases where courts are compelled to dismiss complaints because of vague attributions of fraudulent statements to "defendants."

(Citations omitted.) *See e.g., Airlines Reporting Corp. v. Belfon*, No. 2003-146, 2004 U.S. Dist. LEXIS 7381, at *10, 2004 WL 903800 at *3 (D.V.I. 2004) (before discovery, plaintiffs cannot be expected to describe each defendant's participation with the exactitude demanded by defendants); *State Farm*, 2003 U.S. Dist. LEXIS 3374, at *11-*41, 2003 WL 924615 at *4-*13; *Duggan v. Terzakis*, 275 F. Supp. 2d 968, 973 (N.D. Ill. 2003) (related parties can be grouped together);

70

*Interlease Aviation Investors II (ALOHA) L.L.C. v. Iowa Corp.*, 262 F. Supp. 2d 898, 914 (N.D. Ill. 2003) (where "'it is obvious that a plaintiff may not be privy to the workings of a group of defendants who have acted in concert to defraud him,'" plaintiff cannot be expected to provide the particulars demanded by defendants) (citation omitted).

### iii.    Scienter is Properly Alleged

Rule 9(b) expressly allows for a "general" allegation of defendants' scienter. Particularity is not required. *See Weiner*, 129 F.3d at 318 n.8 ("[s]cienter 'need not be [pleaded] with "great specificity"'") (citations omitted); *Easton*, 1992 U.S. Dist. LEXIS 10913, at \*4-\*5, 1992 WL 136857 at \*2.

To the extent defendants suggest any prerequisite of deliberate intent to defraud, they are wrong. It is well-settled that scienter can be alleged by either (1) "'a motive and an opportunity to commit fraud,'" or (2) facts indicative of "'either reckless or conscious behavior.'" *Penn Treaty*, 202 F. Supp. 2d at 391 (citation omitted); *see also Reliance*, 91 F. Supp. 2d at 724.

Here, the Complaint identifies numerous compelling facts in support of defendants' motivation to commit fraud, as well as knowing or reckless misconduct. *See* ¶¶ 11, 19-23, 49, 62, 67, 109, 126-27, 148, 152, 160-62, 166, 180(a)(c). Defendants' assertion that scienter is conclusorily pled is without justification, especially when all detail is within their possession, knowledge and control.

Defendants' further argument that they could not have acted with scienter because they disclosed at or before the Confirmation Hearing all the facts that plaintiffs charge that they concealed has been thoroughly discredited.

71

### c.    The Complaint Adequately Pleads Justifiable Reliance

The particularity requirement of Rule 9(b) does not apply to allegations of reliance, and defendants do not contend otherwise. In attacking the allegations of reliance, defendants repeat their argument that plaintiffs knew or should have known about the frauds concerning Manorcare, Mariner, AGE Institute, insurance reserves, non-recurring expenses being charged to EBITDA, and other elements of the manipulations.

The testimony citations they offer in support (contained in paragraph 28 of the Joint Motion), do not disclose any of the manipulations plaintiffs allege here, as detailed in the statement of facts. That testimony did not disclose the fraud; it *was* the fraud.[41]

In this case, it certainly cannot be said that plaintiffs will not be able to prove any set of facts to establish reliance. Reliance is thus a question of fact, rather than law. *Snyder*, 1992 Del. Super. *23.

### 2.    The Complaint States a Claim for Civil Conspiracy

To plead a cause of action for civil conspiracy, plaintiffs must allege a combination of two or more persons, an unlawful act done in furtherance of the conspiracy, and actual damage. *Outdoor Tech. v. Allfirst Fin.*, No. 99C-09-151 WTQ, 2000 Del. Super. LEXIS, at *18, 2000 WL 141275 at *6 (Del. Super. Ct. Jan. 24, 2000).[42] Without belaboring points discussed above, plaintiffs submit that they have alleged, in more than sufficient detail, a conspiracy between Goldman, Mellon,

---

[41] As a result, defendants' reliance upon *DeBakey Corp. v. Raytheon Serv. Co.*, C.A. No. 14947, 2000 Del. Ch. LEXIS 129, 2000 WL 1273317 (Del. Ch. Aug. 25, 2000), for the proposition that plaintiffs, to establish reliance, must be ignorant of the true facts, is misplaced. This Complaint easily satisfies that standard.

[42] Contrary to Highland's assertion, civil conspiracy does not require additional allegations of "aiding and abetting."

Highland, Hager and other members of the senior management of Genesis to deceive the other creditors and this Court (¶¶ 192-93), concerning the value of Genesis, and thereby to secure approval of a reorganization Plan favorable to their personal interests.

Defendants contend that "because Plaintiffs have failed to allege a fraud claim, their claim for conspiracy to commit fraud must be dismissed" (Joint Motion at 50). The short answer to that argument is that plaintiffs *have* adequately pleaded a fraud claim; therefore, the conspiracy claim stands as well.[43]

### 3.     The Complaint States a Claim for Gross Negligence

The two arguments defendants raise in disputing the adequacy of the gross negligence claim are easily rebutted.

Defendants assert that plaintiffs "have failed to plead facts showing any factual misrepresentation" (Joint Motion at 50). The detailed facts pleaded here *do*, however, establish numerous factual misrepresentations.[44]

Goldman, Mellon and Highland Capital also argue that, as senior creditors, they owed no

---

[43] The heightened pleading standard of Rule 9(b) does not apply to allegations of conspiracy. *Official Comm. of Unsecured Creditors ex rel. SmarTalk Teleservices, Inc. Bankruptcy Estate v. Donaldson, Lufkin & Jenrette Sec. Corp.*, No. 00 Civ. 8688, 2002 U.S. Dist. LEXIS 3747, at *19, 2002 WL 362794 at *6 (S.D.N.Y. Mar. 6, 2002). Highland cites a 1984 case for the proposition that conspiracy must be specifically alleged; however, the law overwhelmingly supports the opposite conclusion.

[44] Because the Court "exculpated" Genesis from claims other than for "willful misconduct and gross negligence" in connection with the bankruptcy proceedings, as to Genesis, this claim is plead as a gross negligence claim. But this Court did not offer such exculpation to the senior creditor defendants, and therefore, they can be liable for ordinary negligence.

73

duty of care to other creditors in the reorganization proceedings (Joint Motion at 50-51).[45] Whether such a duty exists in a particular case is "often a fact-specific inquiry reserved for a jury" or other finder of fact. *Official Comm.*, 2002 U.S. LEXIS, at *28, 2002 WL 362794 at *9 (citation omitted), *see also In re Lois/USA, Inc.*, 264 B.R. 69, 120 (Bankr. S.D.N.Y. 2001).

The facts alleged in the Complaint, which must be assumed to be true, support the existence of such a duty. The Complaint describes numerous facts concerning the senior creditor defendants' exercise of effective control over the affairs of Genesis. "Once a creditor assumes control over a debtor's operations, it assumes a duty to deal fairly with the debtor and its creditors, and its conduct is subjected to the scrutiny of the court.'" *In re Lois/USA*, 264 B.R. at 136 n.169, quoting Andrew DeNatale and Prudence B. Abram, *The Doctrine of Equitable Subordination as Applied to Non-management Creditors*, 40 Bus. Law. 417, 424-25 (Feb. 1985). These defendants' control, moreover, extended in particular to the formulation of the reorganization Plan, which was engineered to benefit them at the expense of the junior creditors. Thus, although they were not specifically identified as the Plan "proponents" (a title assumed by Genesis and MC), they were, de facto, the proponents of that Plan. Not only were they the moving force behind the formulation and propagation of the Plan, they also submitted evidence, in the form of the Chilmark valuation report, that proved critical in securing Court approval of the Plan. It is beyond peradventure that a plan proponent owes a duty to propose a plan in good faith. *In re Tenn-Fla Partners*, 226 F.3d 746, 749 (6th Cir. 2000).

*In re Hechinger Inv. Co. of Del., Inc.*, No. 00-973-SLR, 2004 U.S. Dist. LEXIS 5537, 2004

---

[45] Genesis does not make this argument, because, as debtor in possession, it unquestionably had a fiduciary duty to the estate, including the unsecured creditors. *Hanson, Jones & Leta, P.C. v. Segal*, 220 B.R. 434, 450, 458 (D. Utah 1998).

74

WL 724960 (D. Del. Mar. 28, 2004), upon which defendants rely, is irrelevant. The alleged misconduct in that case was a corporation's violation of its contractual obligations to junior creditors, which put a limitation on the ability of the company to incur additional senior debt. In that case, the court rejected an effort by the junior creditors to impose an equitable lien on the corporation, to the detriment of the senior creditors. The court held that senior creditors, in entering into business transactions with a borrowing corporation, had no duty, absent a "badge of fraud," to conduct an investigation to assure that the rights of junior creditors were not being violated by their loan transaction.

Plaintiffs are not seeking to impose on the senior lenders such a free-floating duty to investigate and protect other creditors from someone else's violations. Rather, plaintiffs are seeking to hold these defendants responsible for their own actions and misrepresentations. Goldman and Highland deliberately interjected themselves into the Genesis bankruptcy, by buying up its distressed senior debt, and then were instrumental in the formulation of the Genesis reorganization Plan, so as to maximize their own financial gain. In so doing, they and Mellon collaborated with Genesis in formulating its EBITDA data, and in making adjustments to those data, which had the effect of artificially depressing Genesis' perceived valuation. Their conduct culminated in the submission, *on their behalf,* of false and misleading financial information to this Court, to persuade it to approve a Plan that effectively transferred hundreds of millions of dollars of value from the debentureholders to themselves. This affirmative conduct, plaintiff submits, creates a duty on their part to exercise due care.

Where a party makes affirmative representations that it has reason to believe a third party will rely upon, he has a duty of care. For example, in *Prudential Ins. Co. of America v. Dewey,*

75

*Ballantine, Bushby, Palmer & Wood*, 605 N.E.2d 318, 320, 322 (N.Y. 1992), the New York Court of Appeals held that a duty of care can exist when a defendant is aware that his or her statements will be used for a particular purpose, where the plaintiffs have, in fact, relied on those statements, and where defendant understands that plaintiffs are going to rely upon these statements.

Section 552 of the *Restatement (Second) of Torts* (1977) provides that a party who negligently supplies false information "for the guidance of others in their business transactions", is liable for losses suffered as a result of their justifiable reliance thereon, if the plaintiff is among a "limited group" of persons "for whose benefit he intends to supply the information." Recently, the Delaware courts have been increasingly inclined to follow the principles of the *Restatement. See Carello v. PriceWaterhouseCoopers*, No. 01C-10-219, 2002 Del. Super. LEXIS 180, at *20-*21, 2002 WL 1454111 at *5-*6 (Del. Super. Ct. July 3, 2002); *Playtex v. Columbia Casualty*, No. 88C-MR-233, 1993 Del. Super. LEXIS 286, at *23, 1993 WL 390469 at *8 (Sept. 20, 1993); *Guardian Constr. Co. v. Tetra Tech Richardson, Inc.*, 583 A.2d 1378 (Del. Super. Ct. 1990).

Here, Goldman, Highland and Mellon supplied the Chilmark valuation, with the LTM EBITDA data attached, to the Court and to the debentureholders (among others), for "guidance" in connection with the decision to approve the Plan. They knew the Court, Chilmark, and the debentureholders would rely on this data. Under these circumstances, they had a duty of care.

76

## IV. CONCLUSION

For the foregoing reasons, defendants' Joint Motion and Highland's motion to dismiss should

be denied.

Dated: June 21, 2004

Respectfully submitted,

By: _____
R. Bruce McNew

TAYLOR & McNEW LLP
3711 Kennett Pike, Suite 210
Greenville, Delaware  19807
Telephone:  (302) 655-9200

H. Adam Prussin
Shaheen Rushd
POMERANTZ HAUDEK BLOCK
    GROSSMAN & GROSS LLP
100 Park Avenue, 26th Floor
New York, New York  10017
Telephone:  (212) 661-1100

*Attorneys for Plaintiffs*

77

# EXHIBIT A

STRICTLY PRIVATE AND CONFIDENTIAL

UBS Warburg

# Plan of Reorganization:
# Updated Enterprise Valuation Analysis

Genesis Health Ventures

AUGUST 2001

# Disclosure

The following pages contain material provided in the context of the Chapter 11 Plan of Reorganization of Genesis Health Ventures, Inc. (or, "the Company"). The basic information utilized in preparing this study was obtained from Genesis Health Ventures, as well as from public sources. Estimates and projections for the Company used herein have been prepared by management of the Company. UBS Warburg LLC ("UBS Warburg") relied upon the information obtained from the management of Genesis Health Ventures and did not independently verify the accuracy of the information. No representation or warranty, express or implied, is made as to the accuracy or completeness of such information. This material provides an estimate of the reorganization value of Genesis Health Ventures but is not a prediction of the value at which the common stock will actually trade. The trading value may be different than the reorganization value stated herein. UBS Warburg undertakes no obligation to update or otherwise revise the accompanying materials.

✤ UBS Warburg

UBS Warburg

# Executive Summary

## SECTION 1

UBS Warburg

# Executive Summary

**UBS Warburg's Enterprise Valuation Analysis**

♦ UBS Warburg has been retained by Genesis Health Ventures, Inc. in conjunction with the Company's Chapter 11 Reorganization

♦ As part of its responsibilities, UBS Warburg performed an Enterprise Valuation of the continuing operations of Genesis Health Ventures

- UBS Warburg prepared its original valuation report in April 2001
- this updated report takes current market conditions into consideration

♦ Continuing operations of Genesis Health Ventures consist of

- ElderCare Centers
- NeighborCare Pharmacies
- Rehabilitation Services
- Other Businesses and Management Services

♦ In addition to financial analysis, UBS Warburg considered the following

- the state of the overall health care market within which the Company operates and;
- the business environment of the long-term care sector

♦ UBS Warburg has considered three valuation methodologies to achieve a range of Enterprise Values for Genesis Health Ventures

- comparable company analysis
- discounted cash flow analysis
- precedent transaction analysis



❀ UBS Warburg

Section 1 Executive Summary    2

GEN VAN 0491

# Valuation Summary

| ($mm) | Valuation Range | | Implied 2001P EBITDA Multiple Range |
|---|---|---|---|
| | Low | High | |
| **Comparable Company Analysis** | 1,200 | 1,500 | 7.6–9.5 |
| **Discounted Cash Flow Analysis** | 1,150 | 1,400 | 7.3–8.8 |
| **Precedent Transactions Analysis** | nm | nm | nm |
| **Valuation Range** | 1,200 | 1,450 | 7.6–9.2 |

GHY VM-1717

Section 1  Executive Summary

⚜ UBS Warburg

UBS Warburg

2

# Industry Background

SECTION 2

UBS Warburg

# Industry Background

## GENERAL

Long-term care companies are providers of inpatient geriatric medical care through licensed skilled care nursing facilities (SNFs). Services typically include required nursing care, room and board, therapy and other services as specified by a patient's physician.

The long-term care industry has undergone massive changes in the last several years. For example, in 1995 there were 28 public long-term care providers; today there are eight, five of which are in bankruptcy.

The publicly traded segment of the industry, constituting about a fifth of total bed capacity, was devastated by the implementation of the Balanced Budget Act (BBA) of 1997, which called for a transition of Medicare reimbursement to facilities from a cost-based structure to a predetermined pricing program, or Prospective Payment System (PPS).

The change in reimbursement fundamentally altered the incentives inherent in the old reimbursement system. Prior to PPS, the cost-based reimbursement system incentivized providers to offer a full range of services to patients. The payment of a per day rate for each patient based on their acuity level (Resource Utilization Groups or RUGs) as instituted by PPS fundamentally shifted the locus of the industry to cost containment.

Furthermore, the repeal of the Boren Amendment, which required states to compensate providers for the level of care they demand, placed downward pressure on Medicaid profitability.

## REGULATORY PRESSURES

As part of the finalization of the fiscal 2000 federal budget, Congress passed the Balanced Budget Relief Act (BBRA) in November 1999. The BBRA was the culmination of a yearlong attempt by healthcare providers, their representative organizations in Washington, and numerous Congresspeople to address the apparent fact that the Medicare savings effected by the BBA of 1997 well exceeded those legislated by that Act. Indeed, because of the BBA, total Medicare outlays declined on an absolute basis in 1999 versus 1998, the first time they had done so since the program's inception in 1965. For SNFs, the BBRA primarily addresses the argument that the RUGS system on which the PPS is based, does not adjust Medicare per diem payments upward enough to pay for patients needing complex medical services or heavy drug regimens. It also enhances facilities' case-mix flexibility and adds higher inflationary increases beginning later this year.

UBS Warburg

AA. 1576

# Industry Background (continued)

Analysts believe that for SNF operators, the BBRA will provide a meaningful increase in Medicare payments over the next two years versus previous levels. In the aggregate for the publicly traded companies, analysts estimate that the "givebacks" legislated by the BBRA will total 11%–12% of the group's current annualized Medicare payments. This amount suggests a minimal disproportionate share of the total projected cost of BBRA bill as it relates to SNFs. That is, once fully implemented, the bill could raise aggregate Medicare SNF payments by roughly $1.4 billion, or 11% of current run-rate spending of about $12.7 billion.

While the impact on nursing facilities was not as drastic as on the contract rehabilitation and home health businesses, the industry has endured significant operational strain caused by considerable expense reductions in an attempt to keep up with the reimbursement changes. This strain is evidenced by the three other publicly traded long-term care companies currently in bankruptcy, including Sun Healthcare Group, Mariner Health Group and Integrated Health Services (Vencor, now Kindred Healthcare recently emerged).

GMV VAL UDC

❧ UBS Warburg

BS Warburg

# Summary Financial Information

SECTION 3

UBS Warburg

# Pro Forma Historical and Projected Income Statement

Income Statement [1,2]

| ($mm) | Proforma Actual | | Projected | | | | | |
|---|---|---|---|---|---|---|---|---|
| | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 |
| Net sales | 1,865.6 | 1,924.4 | 2,039.8 | 2,126.7 | 2,229.3 | 2,349.1 | 2,476.0 | 2,610.7 |
| Cost of Sales (excl depreciation and amortization) | 504.3 | 575.8 | 673.7 | 712.3 | 763.7 | 823.8 | 888.6 | 958.3 |
| Gross profit | 1,361.2 | 1,348.6 | 1,366.1 | 1,414.3 | 1,465.6 | 1,525.3 | 1,587.5 | 1,652.3 |
| Salaries, wages and benefits | 770.2 | 817.1 | 902.7 | 931.4 | 969.3 | 1,011.4 | 1,055.7 | 1,102.0 |
| Other operating expenses/(income) | 337.5 | 315.0 | 261.7 | 265.8 | 272.0 | 279.6 | 287.3 | 295.3 |
| Bad Debts | 54.1 | 36.4 | 30.4 | 33.6 | 35.2 | 37.2 | 39.3 | 41.5 |
| Capitalized Items | (17.2) | (5.3) | (6.0) | (6.2) | (6.4) | (6.7) | (7.0) | (7.2) |
| EBITDARM | 216.6 | 185.5 | 177.4 | 189.7 | 195.5 | 203.8 | 212.1 | 220.7 |
| Management Fee | 1.6 | 1.7 | 1.9 | 1.9 | 2.5 | 2.5 | 2.6 | 2.6 |
| EBITDAR | 215.2 | 183.7 | 175.5 | 187.8 | 193.0 | 201.3 | 209.6 | 218.1 |
| Rent | 18.9 | 17.4 | 17.0 | 17.4 | 18.2 | 19.0 | 19.8 | 20.7 |
| EBITDA | 180.7 | 150.8 | 158.4 | 170.4 | 174.9 | 182.3 | 189.7 | 197.4 |
| | | | | | | | | |
| Sales growth (%) | – | 3.2 | 6.0 | 4.3 | 4.8 | 5.4 | 5.4 | 5.4 |
| Gross profit margin (%) | 73.0 | 70.1 | 67.0 | 66.5 | 65.7 | 64.9 | 64.1 | 63.3 |
| Salaries, wages and benefits margin (%) | 41.3 | 42.5 | 44.3 | 43.8 | 43.5 | 43.1 | 42.6 | 42.2 |
| Other operating expenses margin (%) | 18.1 | 16.4 | 12.8 | 12.5 | 12.2 | 11.9 | 11.6 | 11.3 |
| Bad debts margin (%) | 2.9 | 1.9 | 1.5 | 1.6 | 1.6 | 1.6 | 1.6 | 1.6 |
| EBITDARM margin (%) | 11.6 | 9.6 | 8.7 | 8.9 | 8.8 | 8.7 | 8.6 | 8.5 |
| EBITDAR margin (%) | 11.5 | 9.5 | 8.6 | 8.8 | 8.7 | 8.6 | 8.5 | 8.4 |
| EBITDA margin (%) | 10.1 | 8.2 | 7.8 | 8.0 | 7.8 | 7.8 | 7.7 | 7.6 |

NOTES
1  As per Company financial statements and business plan

UBS Warburg
Section 3 Summary financial information

# Financial Assumptions

In conducting its analysis, UBS Warburg based its Enterprise Valuation on a "comparable" 2001 EBITDA, which took into account the full-year impact of known adjustments to the 2001 budgeted EBITDA

The 2001 Normalized EBITDA adjustments include the following

- Facility Startup Impact—remove one time losses from facilities in start-up phases of development

- BBRA Revenue Adjustments—full year impact of BBRA passage

- Synthetic Lease Payments—reclassification of synthetic lease from off- to on-balance sheet financing (from Rent to Depreciation and Interest)

- ElderTrust Full-Year Impact—full year impact of lease renegotiation

- Impact on Management Fee from Multicare due to BBRA—increase in management fee revenue as a result of passage of BBRA

- Managed Care Full-Year Rate Adjustment—full year impact of rate adjustments

- One quarter BBRA—comparable companies' projections reflect only three quarters of BBRA impact (begins April 2001)

- Mariner bed loss—reflects loss of NeighborCare contract to service Mariner beds

- New NeighborCare beds—new NeighborCare business to replace lost Mariner beds

UBS Warburg

# 2001 EBITDA

| | |
|---|---:|
| 2001 EBITDA—Genesis | **158,443** |
| Add: | |
| BBRA Full Year Adjustment | 5,977 |
| Impact of Development Facilities | 3,017 |
| Impact of Management Fee from Multicare due to BBRA | 400 |
| ElderTrust full year impact | 316 |
| Managed Care full-year rate adjustment | 1,050 |
| **Normalized 2001 EBITDA—Genesis (as discussed with creditors)** | **169,203** |
| Adjustments: | |
| One quarter BBRA impact to make comparable to BEV and HCR | (2,989) |
| Mariner bed loss | (13,242) ← *MAC* |
| New NeighborCare beds | 5,456 |
| **Comparable Company 2001 EBITDA** | **158,429** |

UBS Warburg

# Challenges to Genesis' Business Model

Genesis Health Ventures currently faces significant competitive and operational challenges in both the center-based business as well as the institutional pharmacy business, including

♦ Patient Census/Payor Mix

   – the Company's census and payor mix ("quality mix") are key drivers of sales growth. Although a number of long-term care operators are currently reorganizing under Chapter 11 of the bankruptcy code such as Sun, Integrated Health Services, and Mariner Post-Acute Network, the Company continues to face significant competition from them as well as from larger, well-capitalized companies such as Beverly Enterprises and HCR ManorCare.

♦ Medicaid/Medicare reimbursement

   – Medicaid reimbursement continues to lag the costs associated with providing care. Medicare reimbursement continues its transition to the Prospective Payment System (PPS). Legislative pressure to provide relief to the skilled nursing facility (SNF) industry is beginning to show progress, including the recent passage of BBRA which is expected to improve annual EBITDA by $12mm at Genesis.

♦ Operational costs

   – Genesis has committed to reducing its costs and to date has taken steps toward achieving this goal. The Company continues to focus on the following areas, including

      · maintaining industry-leading census levels

      · improving quality mix by shifting from a Medicaid dependent patient population to a Medicare and Private patient population

      · controlling pharmacy costs and;

      · managing employee wage growth in a competitive environment

❖ UBS Warburg

UBS Warburg

# Contents

SECTION 1    **Executive Summary** ————————— 1

SECTION 2    **Industry Background** ————————— 4

SECTION 3    **Summary Financial Information** ————— 7

SECTION 4    **Valuation Analysis** ————————— 12

    A    Comparable Company Analysis
    B    Discounted Cash Flow Analysis
    C    Precedent Transactions Analysis

APPENDICES    A    Comparable Company Information

    B    Form of Valuation Disclaimer

    C    Genesis Health Ventures Five Year Plan

    D    Qualifications of William C. McGahan

GEN VAN POLE

❖ UBS Warburg

# Valuation Analysis

SECTION 4

A    Comparable Company Analysis

B    Discounted Cash Flow Analysis

C    Precedent Transactions Analysis

UBS Warburg

UBS Warburg

# Summary Comparable Company Analysis

| | Enterprise Value to | | Adj. Enterprise Value to | |
|---|---|---|---|---|
| | 2001P EBITDA | 2002P EBITDA | 2001P EBITDAR | 2002P EBITDAR |
| **Long-Term Care** | | | | |
| Beverly | 7.6 | 7.2 | 8.3 | 7.9 |
| Kindred | 6.8 | 5.7 | 8.2 | 7.8 |
| Manor Care | 10.7 | 9.8 | 10.4 | 9.6 |
| | | | | |
| **Institutional Pharmacy** | | | | |
| Omnicare | 10.1 | 9.0 | 9.9 | 8.9 |

❖ UBS Warburg

# Comparable Company Analysis

## Comparable Company Analysis

GHV-VAL DOC

| ($mm) | Ticker | Price [1] ($) | Market Value ($) | Enterprise Value ($) | LTM (2/3/1/01) Revenue ($) | EBITDA ($) | EBITDAR ($) | Enterprise Value / LTM Revenue (x) | EBITDA (x) | EBITDAR (x) | 2001P EBITDA (x) | 2002P EBITDA (x) | Adjusted Enterprise Value / LTM EBITDAR (%) | 2001P EBITDAR (x) | 2002P EBITDAR (x) | Est. Rev. Growth 2001P (%) | EBITDA Margins LTM (%) | 2001P (%) | 2002P (%) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Company** | | | | | | | | | | | | | | | | | | | |
| **Long-Term Care** | | | | | | | | | | | | | | | | | | | |
| Beverly Enterprises | BEV | 10.70 | 1,119.0 | 1,867.6 | 2,651.6 | 285 | 355.4 | 0.7 | 7.8 | 7.6 | 7.2 | 8.4 | 8.3 | 7.9 | 4.0 | 9.0 | 8.9 | 9.7 |
| Kindred | KIND | 46.50 | 706.8 | 989.6 | 2,925.5 | 810 | 391.6 | 0.3 | 11.9 | 6.8 | 5.7 | 8.8 | 8.2 | 7.8 | 15.2 | 2.8 | 4.8 | 5.4 |
| Manor Care | HCR | 30.85 | 3,174.1 | 3,908.3 | 2,468.9 | 320.1 | 337.9 | 1.6 | 12.2 | 10.7 | 9.8 | 12.0 | 10.4 | 9.6 | 6.0 | 13.1 | 13.8 | 14.2 |
| **Institutional Pharmacy** | | | | | | | | | | | | | | | | | | | |
| Omnicare | OCR | 23.46 | 2,184.1 | 2,844.7 | 2,020.0 | 234.8 | 262.7 | 1.4 | 12.1 | 10.1 | 9.0 | 11.7 | 9.9 | 8.9 | 9.3 | 11.7 | 13.2 | 11.6 |

**Genesis Valuation Matrix**

| | | | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | 1,100.0 | 1,924.4 | 158.6 | 183.7 | 0.6 | 6.9 | 6.9 | 6.5 | 7.0 | 7.0 | 5.9 | 6.0 | 8.2 | 7.8 | 8.0 | |
| | | | 1,200.0 | 1,924.4 | 158.6 | 183.7 | 0.6 | 7.6 | 7.6 | 7.0 | 7.6 | 7.6 | 6.4 | | | | | |
| | | | 1,300.0 | 1,924.4 | 158.6 | 183.7 | 0.7 | 8.2 | 8.2 | 7.6 | 8.2 | 8.2 | 6.9 | | | | | |
| | | | 1,400.0 | 1,924.4 | 158.6 | 183.7 | 0.7 | 8.8 | 8.8 | 8.2 | 8.8 | 8.8 | 7.5 | | | | | |
| | | | 1,500.0 | 1,924.4 | 158.6 | 183.7 | 0.8 | 9.5 | 9.5 | 8.8 | 9.3 | 9.3 | 8.0 | | | | | |

| | LTM (12/31/00) Revenue | EBITDA [3] | 2001P EBITDA [4,5] | 2002P EBITDA | 2001P EBITDAR | 2002P EBITDAR |
|---|---|---|---|---|---|---|
| GHV LTC | 872.1 | 72.4 | 77.9 | 83.1 | 95.0 | 100.5 |
| NeighborCare | 1,052.3 | 86.1 | 80.5 | 87.3 | 80.5 | 87.3 |
| Total GHV | 1,924.4 | 158.6 | 158.4 | 170.4 | 175.5 | 187.8 |

**NOTES**
1. As of August 6, 2001
2. Adj. Enterprise Value = Total Enterprise Value + 8.0 × Lease Expense [6,8]
3. All EBITDAR projections are calculated using LTM rent numbers
4. Sources for 2001P numbers are from UBS Warburg High Yield Research
5. Unallocated corporate overhead, estimated at $5mm, is applied to NeighborCare from GHV long-term care
6. Represents 2001 Comparable Company EBITDA

**UBS Warburg**

# Long Term Care Payor Mix as of 6/30/01

| (%) | Genesis | HCR | Beverly | Vencor |
|---|---|---|---|---|
| Private | 24 | 40 | 26 | 23 |
| Medicare A | 24 | 28 | 19 | 28 |
| Medicaid | 52 | 32 | 55 | 49 |
| **TOTAL** | **100** | **100** | **100** | **100** |

SOURCE: Company Reports

UBS Warburg

Section V Valuation Analysis    16



Stock Price Performance of Selected Comparable Companies

SOURCE: FactSet



Stock Price Performance of Selected Comparable Companies

❖ June 1, 2000 to Present

# Historical EBITDA Margin Analysis



- Since Jan 98, GHV's EBITDA margins have been approximately 487 bps or 30.3% lower than HCR

- Since Jan 98, GHV's EBITDA margins have been approximately 203 bps or 21.8% higher than BEV

- In the last twelve months, BEV's EBITDA margins have been approximately the same as GHV's

Section 4. Valuation Analysis.                                                    19

✖ UBS Warburg

# Historical EBITDAR Margin Analysis



- Since Jan 98, GHV's EBITDAR margins have been approximately 388 bps or 22.4 % lower than HCR

- Since Jan 98, GHV's EBITDAR margins have been 51 bps or 3.7% lower than BEV

- In the last twelve months, GHV's margins have been 208 bps or 18.4% lower than BEV

**UBSWarburg**

AA. 1594

# Historical EBITDA Margin

**Institutional Pharmacy**



NOTE    NeighborCare values reflect a $5mm per year allocation of corporate costs from GHV

- Since Jan 98, NeighborCare EBITDA margins have been approximately 280 bps or 21.2% lower than Omnicare

**❊ UBSWarburg**

Section 4  Valuation Analysis        21

# HCR Manor Care

| ($mm) | 1Q00 | 2Q00 | 3Q00 | 4Q00 | 2000 | 1Q01 | 2001E | 2002E |
|---|---|---|---|---|---|---|---|---|
| Revenue | 569.9 | 581.2 | 604.5 | 624.9 | 2,380.6 | 638.2 | 2,650.1 | 2,810.3 |
| Reported EBITDA | 40.8 | 58.8 | 76.6 | 83.3 | 260.3 | 84.4 | 366.8 | 398.6 |
| Adjustments [1] | 36.8 | 0.0 | 0.0 | 0.0 | 36.8 | 0.0 | 0.0 | 0.0 |
| Adjusted EBITDA | 74.4 | 75.8 | 76.6 | 83.3 | 297.1 | 84.4 | 366.8 | 398.6 |
| EBITDA Margin (%) | 13.6 | 13.0 | 12.7 | 13.3 | 12.5 | 13.2 | 13.8 | 14.2 |
| Rent Expense [2] | 5.6 | 5.6 | 5.6 | 5.6 | 22.4 | 5.6 | 22.4 | 22.4 |
| EBITDAR | 80.0 | 81.4 | 82.2 | 88.9 | 319.5 | 90.0 | 389.2 | 421.0 |
| EBITDAR Margin (%) | 14.0 | 14.0 | 13.6 | 14.2 | 13.4 | 14.1 | 14.7 | 15.0 |

## Capitalization as of 3/31/01

| | |
|---|---|
| Cash Equivalents | 23.5 |
| 2003 Revolver | 362.8 |
| Mortgages and Other Notes | 39.9 |
| Capital Leases | 5.4 |
| Total Secured Debt | 602.8 |
| 8% Senior Notes | 200.0 |
| 7 1/2% Senior Notes | 149.7 |
| Total Funded Debt | 757.7 |
| Common Equity | 1,032.8 |
| Total Capitalization | 1,785.1 |
| Implicit Lease Debt [3] | 142.4 |
| Debt-Like Obligations | 142.4 |
| Adjusted Total Debt | 894.7 |

## Enterprise Value as of 8/6/01

| | |
|---|---|
| Shares Outstanding | 102.9 |
| Latest Price | 30.85 |
| Market Value of Equity | 3,174.1 |
| Market / Book | 3.1x |
| + Net Debt | 734.2 |
| Enterprise Value | 3,908.3 |
| EV / Reported EBITDA | 12.9x |
| EV / Adjusted EBITDA | 12.2x |
| EV / 2001 EBITDA | 10.7x |
| + Debt-Like Obligations | 142.4 |
| Adjusted Enterprise Value | 4,050.7 |
| Adjusted EV / EBITDAR | 12.0x |
| Adjusted EV / 2001 EBITDAR | 10.4x |

NOTES:  2001 Revenue and EBITDA estimates are from UBS Warburg Research

1   1Q00 represents special provision to increase reserve for general and professional liability claims

2   2Q00 consists of unusual charges related to GHV bankruptcy ($7mm, excluding $2mm asset impairment charge (below line).

3   reorganization of Alterra relationship ($7mm) and discontinued Manor Care buy-out transaction ($5mm)

4   Estimated, based on 2000 total rent expense

5   Equals LTM Rent Expense x 8

UBS Warburg

AA. 1596