ownership among the [defendant] entities" who were potentially "alter egos of one another." In <u>Interlease Aviation Investors II (Aloha) L.L.C. v. Vanguard Airlines, Inc.</u>, 262 F. Supp. 2d 898 (N.D. Ill. 2003), where two of the defendants were related -- a corporation and its officer who held himself out to be an officer of the third defendant -- the Court held that specific allegations had been made against each separate defendant. <u>Id.</u> at 915.

Finally, <u>State Farm Mut. Auto. Ins. Co. v. Makris</u>, No. Civ. A. 01-5351, 2003 WL 924615 (E.D. Pa. Mar. 4, 2003), is clearly inapplicable. <u>State Farm</u> involved claims of an alleged racketeering conspiracy under the RICO statute where the "association-in-fact enterprise" may include all defendants. <u>Id.</u> at *5. Of course, no association-in-fact enterprise RICO claim is alleged in the instant case. Thus, group pleading cannot satisfy the specificity requirement of Rule 9(b).

## II. PLAINTIFFS FAIL TO ADEQUATELY PLEAD SCIENTER WITH RESPECT TO MELLON

A factual allegation of scienter must either demonstrate "a motive and a clear opportunity for committing the fraud," or "circumstances indicating conscious or reckless behavior by defendants." <u>In re Burlington Coat Factory Sec. Litig.</u>, 114 F.3d 1410, 1422 (3d Cir. 1997); <u>see also</u> <u>In re Crown American Realty Trust Sec. Litig.</u>, No. Civ. A. 95-202, 1997 WL 599299, at *11 (W.D. Pa. Sept. 15, 1997). More specifically, a plaintiff "must state facts that, if true, would compel or forcefully suggest that a given defendant acted with the required state of mind." <u>Nappier v. Pricewaterhouse Coopers LLP</u>, 227 F. Supp. 2d 263, 278 (D.N.J. 2002).

As stated above, the Complaint utterly fails to identify any specific "conscious or reckless behavior" by Mellon. Equally absent is any rational allegation of motive.

To establish motive and opportunity a plaintiff must establish

> ... concrete benefits that would be realized by one or more of the false statements and wrongful nondisclosures alleged. Opportunity would entail the means and likely prospect of achieving [such] concrete benefits.

In re Crown American Realty, 1997 WL 599299, at *11 (quoting Shields v. Citytrust Bancorp, Inc., 25 F.3d 1124, 1130 (2d Cir. 1994)). In the instant case, Plaintiffs cannot meet this burden. It is undisputed that Mellon sold its prepetition claim prior to confirmation of the Plan, and thus, received no shares of the reorganized Genesis' stock. Accordingly, there were "no concrete benefits that would be realized" by Mellon from the alleged fraudulent scheme.

Further, analysis of each of the scienter allegations in the Complaint cited by Plaintiffs (see Opposition Memo at 71) demonstrates that Plaintiffs have failed to establish either motive or "'circumstantial evidence that would indicate fraudulent behavior or recklessness'" on the part of Mellon. In re Crown American Realty, 1997 WL 599299, at *14 (quoting Shields, 25 F.3d at 1129).

- Paragraph 11 of the Complaint is a blanket allegation against "senior lender power concentrated in the hands of the seven member Steering Committee" with no specific allegations against Mellon.
- Paragraphs 19 through 23 of the Complaint are merely expositions as to the identity of the Defendants.
- Paragraph 49 of the Complaint, alleging that the senior creditors received "94.3% of the newly issued common stock" of Genesis, conveniently omits to note that none of such stock was received by Mellon.
- Paragraph 62 of the Complaint is a general and unsupportable allegation as to knowledge of the senior creditors, with no specificity as to Mellon.

- Similarly, paragraph 67 of the Complaint is nothing more than a general allegation against the senior creditors, improperly attributing knowledge to each of them.

- Paragraph 109 of the Complaint is wholly inapplicable with respect to Mellon; Mellon did not acquire a greater share, <u>or any share at all</u>, of the equity in the reorganized Genesis.

- Paragraphs 126 and 127 fail entirely to establish any reckless conduct or motive on the part of Mellon. The allegations in these paragraphs simply state that the "creditors committee was persuaded" to agree to a reduction in EBITDA based on the loss of the Mariner business but that the senior creditors were "told" that the Mariner contract was "locked in." Such a vague allegation simply cannot constitute evidence of scienter by Mellon.

- Paragraphs 149 and 152 have absolutely nothing to do with Mellon as they relate to EBITDA adjustments made based on Medicare census data and adjusted personnel costs.

- Paragraphs 160 and 162 are merely restatements of the vague and unsupported allegations of fraudulent activities and statements by the group of "lumped" co-defendants described above. Mellon is specifically mentioned only once, in paragraph 161[5] as having cooperated with Goldman, Sachs.

- Paragraph 166 is yet another blanket assertion against the members of the Steering Committee.

- Finally, paragraph 180 bears no relation to Mellon whatsoever, being a recitation of the terms of several former Genesis management officers' severance packages.

Such vague, speculative and conclusory allegations directed at Mellon solely based upon its status as administrative agent for the Senior Lenders cannot support a finding of scienter against it. <u>See, e.g., O'Brien v. Nat'l Prop. Analysts Partners</u>, 936 F.2d 674, 676 (2d Cir. 1991); <u>see also</u> <u>P. Schoenfeld Asset Mgmt. LLC v. Cendant Corp.</u>,

---

[5] Plaintiffs' Complaint was apparently misnumbered in this section. The reference here is to paragraph 161 of the Complaint found on page 72.

142 F. Supp. 2d 589, 617 (D.N.J. 2001) (the court cannot "infer scienter based on the defendant's positions as a director or officer").

### III. PLAINTIFFS' CIVIL CONSPIRACY CLAIM FAILS TO STATE A CLAIM

As set forth in the Joint Motion and Reply, Plaintiffs' failure to state an actionable claim for fraud against any of the Defendants mandates dismissal of their conspiracy claim since such a claim cannot be "sustained as an independent tort." In re Crown-Simplimatic Inc., 299 B.R. 319, 327 (Bankr. D. Del. 2003). Even had Plaintiffs sufficiently alleged a fraud claim against one of Mellon's co-defendants, their civil conspiracy claim against Mellon is still legally deficient.

Contrary to Plaintiffs' assertion (Opposition Memo at 73), where the allegations of civil conspiracy are grounded in an alleged underlying fraud, the heightened pleading standard of Rule 9(b) applies. See, e.g., Odyssey Re (London) Ltd. v. Stirling Cooke Brown Holdings Ltd., 85 F. Supp. 2d 282, 297-98 (S.D.N.Y. 2000), aff'd, 2 Fed. Appx. 109 (2d Cir. 2001) (finding that a civil conspiracy to defraud was inadequately established as to one alleged co-conspirator, and granting that party's motion to dismiss); 5 Wright & Miller, Fed. Prac. & Proc. Civ. 3d § 1233 (West 2004).

A proper allegation of a civil conspiracy to commit fraud must:

> set forth with certainty facts showing particularly: (1) what a defendant or defendants did to carry the conspiracy into effect; (2) whether such acts fit within the framework of the conspiracy alleged; and (3) whether such acts, in the ordinary course of events, would proximately cause injury to the plaintiff.

Odyssey, 85 F. Supp. 2d at 297. See also In re Prods. Liab. Litig., No. MDL 1014, 1996 WL 482977, at *7 (E.D. Pa. Aug. 22, 1996) ("the United States Court of Appeals for the Third Circuit has required parties pleading conspiracy to do so with specificity").

Accordingly, Plaintiffs must -- but fail -- to meet the heightened pleading standard of Rule 9(b) with respect to Mellon's participation in the alleged fraudulent scheme constituting the civil conspiracy. The Complaint is barren of any "underlying facts...which might connect [Mellon] even inferentially, with an alleged conspiracy" and thus the conspiracy claim must be dismissed. In re Harvard Footwear, Inc., 153 B.R. 617, 628 (Bankr. E.D.N.Y. 1993); see also Devaney v. A.P. Chester, 709 F. Supp. 1255, 1264 (S.D.N.Y. 1989) ("[b]ald allegations . . . that a defendant acted "in concert" with another are clearly insufficient to state a claim for conspiracy liability under Rule 9(b)" (citing Decker v. Massey-Ferguson, Ltd., 681 F.2d 111, 119 (2d Cir. 1982)).

### IV. MELLON OWED NO DUTY TO PLAINTIFFS, AND THUS, CANNOT BE LIABLE FOR GROSS NEGLIGENCE

As succinctly held in In re Hechinger Inv. Co. of Del., Inc., No. 99-02261-PJW, Civ. 00-973-SLR, 2004 WL 724960, at *5 (D. Del. Mar. 28, 2004), there is simply no duty owed "as between a secured lender and prior unsecured creditors." Thus, Mellon owed no duty to Plaintiffs and cannot be held liable to them for negligence, gross or otherwise. See Joint Motion at 51.

Plaintiffs strain to distinguish Hechinger in stating that they are "not seeking to impose on the senior lenders such a free-floating duty to investigate and protect other creditors from someone else's violations." See Opposition Memo at 75. That is a distinction without a difference. What Plaintiffs are seeking is nothing short of revocation of a confirmed chapter 11 plan of reorganization predicated on an illusory

duty owed by the Senior Lenders to junior subordinated debenture holders with respect to financial information provided by a third party, Genesis. <u>Hechinger</u> clearly holds that such a duty is non-existent.

Plaintiffs further seek to infer a duty on the part of the Senior Lenders based on cases involving claims for equitable subordination. Those cases do not involve claims for gross negligence and do not support Plaintiffs' assertion of a duty on the part of Mellon that is necessary for the assertion of such a claim.[6]

A claim for equitable subordination must be brought prior to confirmation of a plan of reorganization since it would substantively reorder the distributions made under the plan, which has <u>res judicata</u> effect upon confirmation. See, e.g., <u>In re GEX Kentucky, Inc.</u>, 100 B.R. 887 (Bankr. N.D. Ohio 1988) (a creditor is barred from bringing a complaint for equitable subordination after confirmation of a plan of reorganization). Thus, Plaintiffs may not assert an equitable subordination claim, in the guise of a negligence claim, at this late date.

In addition, cases outside of the equitable subordination context have held that a creditor owes no duty to a debtor, and by extension, to any subordinated lenders to the debtor. See, e.g., <u>Paradise Hotel Corp. v. Bank of Nova Scotia</u>, 842 F.2d 47, 53 (3d Cir. 1988); <u>In re Sharp Int'l Corp.</u>, 302 B.R. 760, 775-6 (E.D.N.Y. 2003).

Plaintiffs' further contention that the principles of Section 552 of the Restatement (Second) of Torts impose a duty on the Senior Lenders is also without merit. Section 552 states that liability may be had for supplying "false information for the guidance of others

---

[6] <u>In re Lois/USA, Inc.</u>, 264 B.R. 69 (Bankr. S.D.N.Y. 2001) and Andrew DeNatale and Prudence B. Abram, <u>The Doctrine of Equitable Subordination as Applied to Non-management Creditors</u>, 40 Bus. Law. 417, 424-25 (Feb. 1985), cited by Plaintiffs (Opposition Memo at 74), deal with equitable subordination claims and not claims of negligence.

1-NY/1798626.7                              15

in their business transactions" but that such liability is limited to "the person or one of a limited group of persons for whose benefit and guidance" the information was intended to be supplied and "through reliance upon [the information] in a transaction that [the information supplier] intends the information to influence." Restatement (Second) of Torts, § 552. However, for Section 552 to apply, the allegedly fraudulent or false information "must be used in a <u>transaction not involving the defendant</u>." <u>Playtex, Inc. v. Columbia Cas.</u>, No. Civ. A. 88C-MR. 233, 1993 WL 390469, at *8 (Del. Super. Ct. Sept. 20, 1993) (emphasis added).

Here, no business transaction was involved. Rather, the confirmation proceeding was a patently adversarial litigation pitting Plaintiffs, subordinated debenture holders, against the Senior Lenders. Even were that not so, the Defendants were intimately involved in the proceeding. Therefore, no duty was imposed on the Defendants under Section 552 of the Restatement.

In sum, Plaintiffs cannot allege that Mellon owed them a duty under any theory. Accordingly, the claim of gross negligence against Mellon must be dismissed.

## CONCLUSION

As stated in In re Public Service Co., 43 F.3d at 768, "the Bankruptcy Code looks not only toward repose for a confirmed plan, 11 U.S.C. § 1144, but toward protecting those who have participated in the development of execution of the plan." Plaintiffs have previously litigated the precise merits of their instant claims unsuccessfully and should not be permitted to renew that same litigation in the guise of specious tort claims.

For the reasons set forth above, and in the Joint Motion and Reply, the Complaint should be dismissed in its entirety as against Mellon, as well as the other Defendants.

Dated: July 12, 2004
Wilmington, Delaware

_/s/ Teresa K.D. Currier_
Teresa K.D. Currier (3080)
KLETT ROONEY LIEBER &
SCHORLING, PC
The Brandywine Building
1000 West Street, Suite 1410
Wilmington, Delaware 19801
(302) 552-4200

Attorneys for Defendant Mellon Bank, N.A.

- and -

| | |
|---|---|
| Steven Russo | Richard S. Toder |
| SIVE, PAGET & RIESEL, P.C. | Menachem O. Zelmanovitz |
| 460 Park Avenue | MORGAN, LEWIS & BOCKIUS LLP |
| New York, New York 10022 | 101 Park Avenue |
| (212) 421-2150 | New York, New York 10178 |
| | (212) 309-6000 |
| Attorneys for Defendant Mellon Bank, N.A. with respect to plaintiffs Charles L. Grimes, Louis IG Ireland Trust C. Yvonne Cooke, Jane G. Brown, Serena R. Schwartz and Gordon W. Chaplin | Attorneys for Defendant Mellon Bank, N.A. with respect to all Plaintiffs other than Charles L. Grimes, Louise IG Ireland Trust, C. Yvonne Cooke, Jane G. Brown, Serena R. Schwartz and Gordon W. Chaplin |

# EXHIBIT A

# FOURTH AMENDED AND RESTATED CREDIT AGREEMENT

dated as of August 20, 1999

by and among

**GENESIS HEALTH VENTURES, INC.** and

**CERTAIN OF ITS SUBSIDIARIES**, AS BORROWERS,

THE **FINANCIAL INSTITUTIONS** IDENTIFIED HEREIN AS LENDERS,

**MELLON BANK, N.A.** AS ISSUER OF LETTERS OF CREDIT,

**MELLON BANK, N.A.** AS ADMINISTRATIVE AGENT

**CITICORP USA, INC.** AS SYNDICATION AGENT

**FIRST UNION NATIONAL BANK** AS DOCUMENTATION AGENT and

**BANK OF AMERICA, N.A.** (as successor to **NATIONSBANK, N.A.** and **BANK OF AMERICA NT&SA**)
AS SYNDICATION AGENT

PHADMIN\262172

AA. 1726

equal to the Commitment and Loans retained by it. Such Notes shall be in an aggregate principal amount equal to the aggregate principal amount of such surrendered Notes, shall be dated the date of such surrendered Notes (each assignee shall confirm in the Assignment and Acceptance that, notwithstanding the date of the new Notes made in favor of such assignee, such assignee shall have no right to, or interest in, any fees or interest which shall have accrued on the Loans prior to the effective date of the Assignment and Acceptance). Cancelled or replaced Notes shall be returned to the Borrowers upon the execution of such new Notes.

(e) **Assignments to Federal Reserve Bank.** Notwithstanding any of the terms of this Section 12.9 without the consent of the Administrative Agent and the Borrowers, (i) any Lender may assign all or any portion of its rights to payments in connection with this Agreement to a Federal Reserve Bank as collateral in accordance with Regulation A of the Board of Governors of the Federal Reserve System and (ii) in the case of any Lender that is a fund, any such Lender may collaterally assign or pledge any portion of its Loans (other than RC Loans) and its Notes (other than RC Notes) to its trustee (if such trustee is an Eligible Institution) in support of its obligations to such trustee, provided, however, that before any other transfer may be made to such trustee (whether as a result of such collateral assignment or pledge or otherwise) the conditions of paragraphs (c) and (d) above must be satisfied. Such assignment shall not affect any other rights or any obligations of the assigning Lender.

12.10 COUNTERPARTS; PHOTOCOPIED OR TELECOPIED SIGNATURE PAGES. Any Loan Document may be executed in one or more counterparts, each of which shall constitute an original, but all of which together shall constitute one and the same instrument. Delivery of a photocopy or telecopy of an executed counterpart of a signature page to any Loan Document shall be as effective as delivery of a manually executed counterpart of such Loan Document.

12.11 MAXIMUM LAWFUL INTEREST RATE. Notwithstanding any provision contained in this Agreement or the Notes or any other Loan Document, the total liability of the Borrowers for payment of interest pursuant to this Agreement and the Notes shall not exceed the maximum amount of such interest permitted by Law to be charged, collected, or received from the Borrowers, and if any payment by the Borrowers includes interest in excess of such a maximum amount, each Lender shall apply such excess to the reduction of the unpaid principal amount due pursuant to this Agreement and the Notes, or if none is due, to the other Loan Obligations, if any, and then such excess shall be refunded to Genesis (on behalf of the Borrowers).

12.12 INDEMNIFICATION.

(a) Whether or not any fundings are made under this Agreement, the Borrowers jointly and severally shall unconditionally upon demand, pay or reimburse the Administrative Agent and other Lender Parties for, and indemnify and save the Administrative Agent, the other Lender Parties and their respective Affiliates, officers, directors, employees, agents, attorneys, shareholders and consultants (collectively, "**Indemnitees**") harmless from and against, any and all losses, liabilities, claims, damages, expenses, obligations, penalties, actions, judgments, suits, costs or disbursements of any kind or nature whatsoever (including the fees and

disbursements of counsel for such Indemnitee in connection with any investigative, administrative or judicial proceeding commenced or threatened, whether or not such Indemnitee shall be designated a party thereto) that may at any time be imposed on, asserted against or incurred by such Indemnitee as a result of, or arising out of, or in any way related to or by reason of, this Agreement or any other Loan Document, the Existing Credit Agreement or any "Loan Document" referred to therein, the Tender Offer, any Acquisition or transaction from time to time contemplated hereby or by any other Loan Document, or any transaction actually or proposed to be financed in whole or in part or directly or indirectly with the proceeds of any Loan or Letter of Credit, any transaction contemplated by the Transaction Documents but excluding any such losses, liabilities, claims, damages, expenses, obligations, penalties, actions, judgments, suits, costs or disbursements that the Borrower proves were the result solely of the gross negligence or willful misconduct of such Indemnitee, as finally determined by a court of competent jurisdiction. If and to the extent that the foregoing obligations of the Borrowers under this paragraph (a), or any other indemnification obligation of the Borrowers hereunder or under any other Loan Document are unenforceable for any reason, the Borrowers hereby agree, jointly and severally, to make the maximum contribution to the payment and satisfaction of such obligations which is permissible under applicable Law.

(b) Without limiting the generality of the foregoing, the Borrowers jointly and severally hereby indemnify and agree to defend and hold harmless each Indemnitee, from and against any and all claims, actions, causes of action, liabilities, penalties, fines, damages, judgments, losses, suits, expenses, legal or administrative proceedings, interest, costs and expenses (including court costs and attorneys', consultants' and experts' fees) arising out of or in any way relating to: (i) the use, handling, management, production, treatment, processing, storage, transfer, transportation, disposal, release or threat of release of any Environmental Concern Material by or on behalf of, any Borrower or any of its Environmental Affiliates; (ii) the presence of Environmental Concern Materials on, about, beneath or arising from any premises owned or occupied by any Borrower or any of its Environmental Affiliates (herein collectively, the "**Premises**"); (iii) the failure of any Borrower or Environmental Affiliate of a Borrower or any occupant of any Premises to comply with the Environmental Laws; (iv) any Borrower's breach of any of the representations, warranties and covenants contained herein or in any Loan Documents; (v) Regulatory Actions (as hereinafter defined) and Third Party Claims (as hereinafter defined); or (vi) the imposition or recording of a Lien against any Premises in connection with any release at, on or from any Premises or any activities undertaken on or occurring at any Premises, or arising from such Premises or pursuant to any Environmental Law. The Borrowers' indemnity and defense obligations under this section shall include, whether foreseeable or unforeseeable, any and all costs related to any remedial action. "**Regulatory Action**" means any notice of violation, citation, complaint, request for information, order, directive, compliance schedule, notice of claim, consent decree, action, litigation or proceeding brought or instituted by any governmental authority under or in connection with any Environmental Law involving any Borrower or any occupant of any of the Premises or involving any of the Premises or any activities undertaken on or occurring at any Premises. "**Third Party Claims**" means claims by a party (other than a party to this Agreement and other than Regulatory Actions) based on negligence, trespass, strict liability, nuisance, toxic tort or detriment to human health or welfare due to Environmental Concern Materials on, about, beneath or arising from any

Premises or in any way related to any alleged violation of any Environmental Laws or any activities undertaken on or occurring at any Premises.

(c) The indemnities contained herein shall survive repayment of the Loan Obligations, termination of the Commitment and satisfaction, release, and discharge of the Loan Documents, whether through full payment of the Loans, foreclosure, deed in lieu of foreclosure or otherwise.

(d) The foregoing amounts are in addition to any other amounts which may be due and payable to the Administrative Agent and/or the Lenders under this Agreement. A certification by the Administrative Agent or a Lender hereunder of the amount of liabilities, losses, costs, expenses, claims and/or charges shall be conclusive, absent manifest error.

**12.13 EXPENSES.**

Whether or not there shall be any funding hereunder, the Borrowers agree, jointly and severally, to pay promptly or cause to be paid promptly and to hold harmless

(i) with respect to matters relating to clause (1) of this paragraph (i), the Agents, and, with respect to clauses (2) and (3) of this paragraph (i), the Administrative Agent (and after an Event of Default and for the period in which the same shall continue, each Lender Party) against liability for the payment of all reasonable out-of-pocket costs and expenses (including but not limited to reasonable fees and expenses of counsel, including local counsel, auditors, consulting engineers, appraisers, and all other professional, accounting, evaluation and consulting costs) incurred by it from time to time arising from or relating to (1) the negotiation, preparation, execution and delivery of this Agreement and the other Loan Documents, (2) the administration and performance of this Agreement and the other Loan Documents, and (3) any requested amendments, modifications, supplements, waivers or consents (whether or not ultimately entered into or granted) to this Agreement or any other Loan Document;

(ii) the Administrative Agent (and, with respect to clause (4) of this paragraph (ii) after an Event of Default and for the period in which the same shall continue, each Lender Party) against liability for the payment of all reasonable out-of-pocket costs and expenses (including but not limited to reasonable fees and expenses of counsel, including local counsel, auditors, consulting engineers, appraisers, and all other professional, accounting, evaluation and consulting costs) incurred by it from time to time arising from or relating to the enforcement or preservation of rights under, or administration of, this Agreement or any other Loan Document (including but not limited to any such costs or expenses arising from or relating to (1) the creation, perfection or protection of any Lien on any Collateral, (2) the protection, collection, lease, sale, taking possession of, preservation of, or realization on, any Collateral, including advances for storage, insurance premiums, transportation charges, taxes, filing fees and the like, (3) collection or enforcement of an outstanding Loan Obligation, and (4) any litigation, proceeding, dispute, work-out, restructuring or rescheduling related in any way to this Agreement or the other Loan Documents); and

# EXHIBIT B

**COMPOSITE**
**CONFORMED COPY**

## REVOLVING CREDIT AND GUARANTY AGREEMENT

Among

**GENESIS HEALTH VENTURES, INC.**
a Debtor and a Debtor-in-Possession under Chapter 11 of the Bankruptcy Code

<u>as Borrower</u>

and

**THE SUBSIDIARIES OF THE BORROWER NAMED HEREIN,**
each a Debtor and a Debtor-in-Possession under Chapter 11 of the Bankruptcy Code

<u>as Guarantors</u>

and

**THE BANKS PARTY HERETO**

<u>as Lenders,</u>

and

**MELLON BANK, N.A.** as Administrative Agent and Arranger,

**FIRST UNION NATIONAL BANK,** as Syndication Agent,

**GOLDMAN SACHS CREDIT PARTNERS, L.P.,** as Documentation Agent,

and

**THE CHASE MANHATTAN BANK,** as Co-Agent

Dated as of June 22, 2000

**CONFORMED TO REFLECT MODIFICATIONS SET FORTH IN THE FIRST AMENDMENT TO REVOLVING CREDIT AND GUARANTY AGREEMENT DATED AS OF AUGUST 10, 2000**

1-NY/1179168.1

AA. 1731