the failure or delay in performance or breach by any Bank or by the Borrower or the Guarantors of any of their respective obligations under this Agreement or any of the Loan Documents or in connection herewith or therewith.

(c)     The Agent, in its capacity as Agent hereunder, shall be entitled to rely on any communication, instrument, or document reasonably believed by such person to be genuine or correct and to have been signed or sent by a person or persons believed by such person to be the proper person or persons, and such person shall be entitled to rely on advice of legal counsel, independent public accountants, and other professional advisers and experts selected by such person.

SECTION 8.06     **Reimbursement and Indemnification.** Each Bank agrees (i) to reimburse (x) the Agent for such Bank's Commitment Percentage of any expenses and fees incurred for the benefit of the Banks under this Agreement and any of the Loan Documents, including, without limitation, counsel fees and compensation of agents and employees paid for services rendered on behalf of the Banks, and any other expense incurred in connection with the operations or enforcement thereof not reimbursed by the Borrower or the Guarantors and (y) the Agent for such Bank's Commitment Percentage of any expenses of the Agent incurred for the benefit of the Banks that the Borrower has agreed to reimburse pursuant to Section 10.05 and has failed to so reimburse and (ii) to indemnify and hold harmless the Agent and any of its directors, officers, employees, agents or Affiliates, on demand, in the amount of its proportionate share, from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses, or disbursements of any kind or nature whatsoever which may be imposed on, incurred by, or asserted against it or any of them in any way relating to or arising out of this Agreement or any of the Loan Documents or any action taken or omitted by it or any of them under this Agreement or any of the Loan Documents to the extent not reimbursed by the Borrower or the Guarantors (except such as shall result from their respective gross negligence or willful misconduct).

SECTION 8.07     **Rights of Agent.** It is understood and agreed that Mellon shall have the same rights and powers hereunder (including the right to give such instructions) as the other Banks and may exercise such rights and powers, as well as its rights and powers under other agreements and instruments to which it is or may be party, and engage in other transactions with the Borrower or any Guarantor, as though it were not the Agent of the Banks under this Agreement.

SECTION 8.08     **Independent Banks.** Each Bank acknowledges that it has decided to enter into this Agreement and to make the Loans hereunder based on its own analysis of the transactions contemplated hereby and of the creditworthiness of the Borrower and the Guarantors and agrees that the Agent shall bear no responsibility therefor.

SECTION 8.09     **Notice of Transfer.** The Agent may deem and treat a Bank party to this Agreement as the owner of such Bank's portion of the Loans for all purposes, unless and until a written notice of the assignment or transfer thereof executed by such Bank shall have been received by the Agent.

SECTION 10.04  **Confidentiality**. Each Bank agrees to keep any information delivered or made available by the Borrower or any of the Guarantors to it confidential from anyone other than persons employed or retained by such Bank who are or are expected to become engaged in evaluating, approving, structuring or administering the Loans; provided that nothing herein shall prevent any Bank from disclosing such information (i) to any other Bank, (ii) upon the order of any court or administrative agency, (iii) upon the request or demand of any regulatory agency or authority, (iv) which has been publicly disclosed other than as a result of a disclosure by the Agent or any Bank which is not permitted by this Agreement, (v) in connection with any litigation to which the Agent, any Bank, or their respective Affiliates may be a party to the extent reasonably required, (vi) to the extent reasonably required in connection with the exercise of any remedy hereunder, (vii) to such Bank's legal counsel and independent auditors, and (viii) to any actual or proposed participant or assignee of all or part of its rights hereunder subject to the proviso in Section 10.03(f). Each Bank shall use reasonable efforts to notify the Borrower of any required disclosure under clause (ii) of this Section.

SECTION 10.05  **Expenses**. Whether or not the transactions hereby contemplated shall be consummated, the Borrower and the Guarantors agree to pay all reasonable out-of-pocket expenses incurred by the Agent (including but not limited to the reasonable fees and disbursements of Drinker, Biddle & Reath, LLP, Morgan, Lewis & Bockius LLP, any other counsel that the Agent shall retain and third-party appraisers, consultants, and auditors advising the Agent (including but not limited to Policano & Manzo LLC and Freed Maxick ABL Services, Inc.) as to which invoices have been furnished, in connection with the preparation, execution, delivery and administration of this Agreement and the other Loan Documents, the making of the Loans and the issuance of the Letters of Credit, the perfection of the Liens contemplated hereby, the syndication of the transactions contemplated hereby, the reasonable and customary costs, fees and expenses of the Agent in connection with its monthly and other periodic field audits, monitoring of assets (including reasonable and customary third-party fees related to the initial and ongoing Borrowing Base examinations), the costs of electronic communications services and publicity expenses, and, during the continuance of an Event of Default, all reasonable out-of-pocket expenses incurred by the Banks and the Agent in the enforcement or protection of the rights of any one or more of the Banks or the Agent in connection with this Agreement or the other Loan Documents, including but not limited to the reasonable fees and disbursements of any counsel for the Banks or the Agent. Such payments shall be made on the Closing Date and thereafter on demand, promptly upon delivery of a statement setting forth such costs and expenses. Whether or not the transactions hereby contemplated shall be consummated, the Borrower and the Guarantors agree to reimburse the Agent for the expenses set forth in the Commitment Letter and the reimbursement provisions thereof are hereby incorporated herein by reference. The obligations of the Borrower and the Guarantors under this Section shall survive the termination of this Agreement and/or the payment of the Loans.

SECTION 10.06  **Indemnity**. The Borrower and each of the Guarantors agree to indemnify and hold harmless the Agent, and the Banks and their directors, officers, employees, agents and Affiliates (each an "Indemnified Party") from and against any and all expenses, losses, claims, damages and liabilities incurred by such Indemnified Party arising out of claims made by any Person

73

in any way relating to the transactions contemplated hereby, but excluding therefrom all expenses, losses, claims, damages, and liabilities to the extent that they are determined by the final judgment of a court of competent jurisdiction to have resulted from the gross negligence or willful misconduct of such Indemnified Party. The obligations of the Borrower and the Guarantors under this Section shall survive the termination of this Agreement and/or the payment of the Loans.

SECTION 10.07 **CHOICE OF LAW**. THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS SHALL IN ALL RESPECTS BE CONSTRUED IN ACCORDANCE WITH AND GOVERNED BY THE LAWS OF THE STATE OF PENNSYLVANIA APPLICABLE TO CONTRACTS MADE AND TO BE PERFORMED WHOLLY WITHIN SUCH STATE, WITHOUT TAKING INTO ACCOUNT ANY CONFLICT OF LAWS PRINCIPLES THEREOF, AND THE BANKRUPTCY CODE.

SECTION 10.08 **No Waiver**. No failure on the part of the Agent or any of the Banks to exercise, and no delay in exercising, any right, power or remedy hereunder or any of the other Loan Documents shall operate as a waiver thereof, nor shall any single or partial exercise of any such right, power or remedy preclude any other or further exercise thereof or the exercise of any other right, power or remedy. All remedies hereunder are cumulative and are not exclusive of any other remedies provided by law.

SECTION 10.09 **Extension of Maturity**. Should any payment of principal of or interest or any other amount due hereunder become due and payable on a day other than a Business Day, the maturity thereof shall be extended to the next succeeding Business Day and, in the case of principal, interest shall be payable thereon at the rate herein specified during such extension.

SECTION 10.10 **Amendments, etc.**

(a) No modification, amendment or waiver of any provision of this Agreement or the other Loan Documents, and no consent to any departure by the Borrower or any Guarantor therefrom, shall in any event be effective unless the same shall be in writing and signed by the Required Banks, and then such waiver or consent shall be effective only in the specific instance and for the purpose for which given; *provided, however*, that no such modification or amendment shall without the written consent of the Bank affected thereby (x) increase the Commitment of a Bank (it being understood that a waiver of an Event of Default shall not constitute an increase in the Commitment of a Bank), or (y) reduce the principal amount of any Loan or the rate of interest payable thereon, or extend any date for the payment of interest hereunder or reduce any Fees payable hereunder or extend the final maturity of the Borrower's obligations hereunder; and, *provided, further*, that no such modification or amendment shall without the written consent of (A) all of the Banks (i) amend or modify any provision of this Agreement which provides for the unanimous consent or approval of the Banks, (ii) amend this Section 10.10 or the definition of Required Banks, (iii) amend or modify the Super-Priority Claim status of the Banks contemplated by Section 2.23 or (iv) release all or any substantial portion of the Liens granted to the Agent hereunder (other than in connection with dispositions permitted hereunder), under the Orders or

74

# EXHIBIT C

Exhibit A-2 to the
Revolving Credit and
Guaranty Agreement

Signed Copy

UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

------------------------------------------------X
In re:                                           :    Chapter 11
                                                 :
Genesis Health Ventures, Inc., et al.,           :    Case Nos. 000-2692 (PJW)
                                                 :    (Jointly Administered)
                     Debtors.                    :
------------------------------------------------X

FINAL ORDER (I) AUTHORIZING DEBTORS TO (A) OBTAIN
POST-PETITION FINANCING PURSUANT TO 11 U.S.C. §§105, 361, 362, 363,
364(c)(1), 364(c)(2), 364(c)(3) AND 364(d)(1) AND (B) UTILIZE CASH
COLLATERAL PURSUANT TO 11 U.S.C. §363 AND (II) GRANTING
ADEQUATE PROTECTION TO PRE-PETITION SECURED PARTIES

Upon the motion (the "Motion"), dated June 22, 2000, of Genesis Health Ventures, Inc., as debtor and debtor-in-possession (the "Borrower"), and the Guarantors listed on Schedule I hereto, each as a debtor and debtor-in-possession (hereinafter referred to collectively as the "Guarantors"; and together with the Borrower, the "Debtors"),

(i) seeking this Court's authorization, pursuant to Sections 105, 361, 362, 363 364(c)(1), 364(c)(2), 364(c)(3) and 364(d)(1) of the United States Bankruptcy Code, 11 U.S.C. §§101, et seq. (the "Code"), and Rules 2002, 4001 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), for the Borrower to (1) obtain post-petition financing (the "Financing"), and for the Guarantors to guaranty the payment of the Borrower's obligations incurred in connection with the Financing, up to the principal amount of $250,000,000 from Mellon Bank, N.A. ("Mellon" or "Agent"), and a syndicate of financial institutions (together with Mellon, the "Banks"), with Mellon acting as Agent for itself and the Banks,

RLF1-2184303.1

amounts paid under the Tranche II Revolver or amounts paid as adequate protection under this Order or challenging the appropriate manner of application of such amounts paid as adequate protection, and (ii) the Court rules in favor of the plaintiff in any such timely filed adversary proceeding or contested matter. If no such adversary proceeding or contested matter is filed as of such date, (a) the Pre-Petition Debt shall constitute allowed claims, not subject to subordination and otherwise unavoidable, for all purposes of the Debtors' Chapter 11 Cases and any subsequent Chapter 7 Cases, (b) the Pre-Petition Agent's and the Pre-Petition Secured Parties' liens on the Pre-Petition Collateral shall constitute, as of the Commencement Date, legal, valid, binding, perfected, not subject to recharacterization, subordination and otherwise unavoidable and (c) the Pre-Petition Debt, the Pre-Petition Agent's and the Pre-Petition Secured Parties' liens on the Pre-Petition Collateral and the Pre-Petition Agent and the Pre-Petition Secured Parties shall not be subject to any other or further challenge by any party in interest seeking to exercise the rights of the Debtors' estates, including, without limitation, any successor thereto. The Creditors' Committee has standing to commence such adversary proceeding or contested matter on behalf of any Debtor's estate without the need for further order of the Court or any Debtor's consent.

24.    Unless all obligations and indebtedness owing to the Agent and the Banks under the DIP Credit Agreement shall theretofore have been paid in full (and, with respect to outstanding Letters of Credit issued pursuant to the DIP Credit Agreement, collateralized with cash or back-to-back letters of credit in accordance with the provisions of the DIP Credit Agreement), the Debtors shall not seek, and it shall constitute an Event of Default if any of the Debtors seek, or if there is entered, an order dismissing any of the Cases, unless same is otherwise permitted under the DIP Credit Agreement. If an order dismissing any of the Cases under Section 1112 of the Code or otherwise is at any time entered, such order shall provide (in accordance with Sections 105 and 349 of the Code) that (x) the priming liens and security interests and replacement security interests

pursuant to the DIP Credit Agreement with respect to all uses of Cash Collateral and such indebtedness, obligation or liability. The obligations of the Debtors under this Order and the Financing shall not be discharged by the entry of an order confirming a plan of reorganization in any of the Cases and, pursuant to Section 1141(d)(4) of the Code, the Debtors have waived such discharge with respect to such obligations.

25. Nothing set forth in this Order shall be deemed to be a determination as to the validity, priority, perfection or nonavoidability of the liens and security interests of any of the Real Estate Lenders or Cardinal and its subsidiaries, and the rights of all parties with respect thereto are fully reserved.

26. Notwithstanding anything in this Order to the contrary (including, without limitation, the findings herein and the definition of the term "Financing"), the claims (including superpriority administrative claims), liens, and protections that are granted or provided by this Order to the Agent and the Banks (including pursuant to paragraphs 10 and 12 hereof) against: (i) each of the Guarantors that are listed on Schedule 1-A hereto (collectively, the "Identified Debtors") and (ii) the assets of each of the Identified Debtors, shall be limited to the amount that is equal to, and shall apply only to the extent that, the amount by which the cash flow of each of the Identified Debtors from and after June 1, 2000, taken as a whole, and determined on a cash basis, but after deducting amounts specified in clauses (i) and (ii) below whether paid in cash or accrued (the "Identified Debtors' Cash Flow"), is negative. In calculating each of the Identified Debtors' Cash Flow, expenses shall include operating expenditures and capital expenditures directly incurred by each of the Identified Debtors, and shall further include, without duplication: (i) a management fee payable to the Borrower by each of the Identified Debtors in an amount equal to five percent (5%) of the net inpatient revenues of the facilities of each of the Identified Debtors or, in the case of Identified Debtors, if any, that do not

RLF1-2184305-1

23

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re<br><br>GENESIS HEALTH VENTURES, INC., et al.,<br><br>Debtors. | C.A. No. 04-CV-157 (SLR)<br>Related to Case No. 00-2692 (JHW)<br>Jointly Administered<br><br>Adv. Pro. No.: 04-53375 (JHW) |
| RICHARD HASKELL et al.,<br><br>Plaintiffs,<br><br>v.<br><br>GOLDMAN, SACHS & Co., et al.,<br><br>Defendants. |  |

**HIGHLAND CAPITAL MANAGEMENT, L.P.'S
REPLY TO PLAINTIFFS' OPPOSITION TO JOINT MOTION TO DISMISS**

TO THE HONORABLE JUDITH H. WISMER:

Defendant Highland Capital Management, L.P. ("Highland") submits this Reply to Plaintiffs' Opposition to Joint Motion to Dismiss ("Plaintiffs' Response"), as follows:

**SUMMARY OF REPLY**

Defendant Highland respectfully directs the Court's attention to three points of reply. First, Plaintiffs still have not identified any fraudulent acts committed by Highland and the decisions cited by Plaintiffs (all of which are either unpublished or from other jurisdictions) do not relieve them from this black-letter pleading requirement. Second, Plaintiffs have still not alleged any facts indicating that they relied in any way on the alleged misrepresentations made by

Highland and have not presented any legal authority supporting their position that they are not required to do so. And <u>third</u>, Plaintiffs have not established that they have standing to prosecute the claims alleged in their Complaint.

**.   Noticeably Absent from Plaintiffs' Opposition, as with their Complaint, are any allegations of wrongdoing by Defendant Highland.**

In its Motion to Dismiss, Highland requested that the Court dismiss Plaintiffs' fraud claims pursuant to Federal Rule of Civil Procedure 9(b) because Plaintiffs fail to allege that any specific misstatements were made by Highland or any of its representatives. In its Response, Plaintiffs claim that "[e]ach Defendant's role in the fraud has been sufficiently delineated."[1] The Response then goes on to describe specific acts taken by several of the other defendants.[2] The Response (like Plaintiffs' Complaint), however, fails to describe any specific acts taken by Highland related to the fraud. Instead, Plaintiffs lump Plaintiff Highland in with other defendants and make general allegations that "the senior creditor defendants' participat[ed] in the misconduct."

These general allegations violate Federal Rule of Civil Procedure 9(b), which requires that a pleading alleging fraud describe circumstances constituting fraud with particularity so that each of the defendants is on notice of the precise misconduct charge.[3]

Plaintiffs attempt to counter this black-letter statement of law by claiming that they have "no obligation, before discovery, to provide further identification, including specific names of the

---

[1] See Plaintiffs' Response at 68.

[2] See id. at 68-69.

[3] See FED. R. CIV. P. 9; Seville Indus. Mach. Corp. v. Southmost Mach. Corp., 742 F.2d 786, 791 (3d Cir. 1984).

senior creditor defendants' representatives."[4] In support of this legal contention, Plaintiffs cite several cases (all of which are either unpublished or from other jurisdictions) that generally upheld general fraud allegations against several different defendants that are lumped together. These cases, however, are easily distinguished from the case at bar.

In each of the cases cited by Plaintiffs, the defendants grouped together in the complaint were all officers or representatives of the same corporate defendant or related entities, thus leading the courts to conclude that their acts could not be easily distinguished. For example, in *MBIA Ins. Corp. v. Royal Indem. Co.*, 2004 US Dist. LEXIS 6609 (D. Del. Apr. 6, 2004), cited by Plaintiffs, the court found that a justification existed to relax Rule 9(b)'s particularity standards.[5] In that case, however, the court found that this relaxation of the Rule was necessary in the case "of a small corporation, where the boundaries between the corporate entity and the individual director are often permeable."[6] In that case, the court stated:

> Because Mr. Yao is alleged to control or own each of the SFC Group of Entities, the Court is persuaded that it would be unfair to hold Royal to a requirement that it identify which of the SFC Group of Entities Mr. Yao was acting through when he, or the entities, made the various alleged fraudulent statements, misrepresentations, or concealments.[7]

Similarly, in *Airlines Reporting Corp. v. Belfon*, 2004 US Dist. LEXIS 7381, at *10 (D. V. I. 2004), also cited by Plaintiffs, the court also relaxed the Rule 9(b) standards. In that case, however, as in *MBIA Ins. Corp.*, the defendants were all officers of the same company.[8]

---

[4] *See* Response at 70.

[5] *See MBIA Ins. Corp.*, 2004 US Dist. LEXIS 6609, at *9 (D. Del. Apr. 6, 2004).

[6] *See id.* (citation omitted).

[7] *See id.* at *10.

[8] *See Airlines Reporting Corp.*, 2004 US Dist. LEXIS 7381, at *10 ("ARC has alleged that all three WWT officers conspired and participated in the alleged fraud.").

In *Bernstein v. Kelso*, 231 A.D.2d 314, 320-21 (N.Y. App. Div. 1987), also cited by Plaintiffs, the court once again allowed a plaintiff to plead fraud without alleging which defendants were specifically involved in which meetings. In that case, like the other cases cited by Plaintiffs, the defendants were all officers of the same corporation, as well as the corporation.[9]

Plaintiffs' reliance on *Interlease Aviation Investors II (ALOHA) LLC v. Iowa Corp.*, 262 F.Supp.2d 898 (N.D. Ill. 2003) is also misplaced. Plaintiffs cite that case for the general proposition that Plaintiffs cannot be expected to provide the particulars demanded by Defendants when "it is obvious that a plaintiff may not be privy to the workings of a group of defendants who have acted in concert to defraud him."[10] In that case, however, the defendants who moved to dismiss the complaint had specific detailed allegations made against them in the complaint. Specifically, the plaintiffs in *Interlease Aviation* alleged that the defendants met with plaintiff on a particular date and made specific misrepresentations to plaintiff.[11] The court found that the specific allegations "satisfied Rule 9(b)" by placing [the defendants] on notice of their roles in the fraudulent scheme.[12]

Plaintiffs cannot rely on this relaxed pleading requirement found in a few unpublished cases from other jurisdictions. Each of the defendants in this case are unrelated entities with no control over each other. Therefore, Plaintiffs must meet the pleading requirements of Rule 9(b) and separately plead the fraudulent acts of each defendant.

The general rule, as described in cases cited by Plaintiffs, is that "when alleging fraudulent behavior against a group of defendants, a plaintiff is required to separately plead the fraudulent

---

[9] *See id.* at 319.

[10] *See* Plaintiffs' Response at 71.

[11] *See id.* at 915.

[12] *See id.* at 915.

acts of each defendant to satisfy Rule 9(b).[13] "Collective allegations of fraud against a group of defendants generally do not satisfy Rule 9(b) because the Rule was intended to insure that each defendant has adequate notice of the charges against it, thereby permitting each defendant to mount a defense and not just deny that they did anything wrong."[14] Although the unpublished cases and/or cases from other jurisdictions that are cited by Plaintiffs relax the requirements of this general rule in limited circumstances, this is not justified in this case because each of the Defendants are unrelated, distinct entities. Because Plaintiffs fail to provide any information related to any specific misstatements made by Highland, including when and where such representations were allegedly made, Highland has not been adequately put on notice of its alleged misconduct. Therefore, Plaintiffs' fraud claims must be dismissed against Highland pursuant to Federal Rule of Civil Procedure 9(b).

.   **Plaintiffs still have not alleged any reliance on the alleged misrepresentations.**

In its Motion to Dismiss, Highland requested that the Court dismiss Plaintiffs' fraud claim because Plaintiffs fail to describe what specific acts they took or what acts they refrained from taking in reliance upon Highland or the other Defendants' representations.[15] In its Response, Plaintiffs completely ignore this issue. Instead, Plaintiffs respond by simply stating that "it certainly cannot be said that plaintiffs will not be able to prove any set of facts to establish reliance. Reliance is thus a question of fact rather than law."[16] Plaintiffs, however, have not pled any facts that would demonstrate any kind of reliance on their part.

---

[13] See *MBIA Ins. Corp.*, 2004 US Dist. LEXIS 6609, at *8.

[14] See *id.* (citation omitted).

[15] See Highland's Motion to Dismiss at 7.

[16] See Response at 72.

Plaintiffs have not alleged reliance for a simple reason. Plaintiffs did not rely upon anything said or done by Defendants. Specifically, Plaintiffs admit that they did not accept any valuation proposed by Defendants in the bankruptcy. To the contrary, Plaintiffs were the principle objecting parties to the confirmation of the Plan. As such, Plaintiffs' fraud claims must be dismissed because it fails to properly plead the reliance element of fraud.

Additionally, Plaintiffs' reliance on *Snyder v. Butcher & Co.*, 1992 Del. Super LEXIS 362 (Del. Super. CT. Sept. 15, 1992), for the proposition that reliance is a question of fact is also misplaced. In that case, unlike the case at bar, the plaintiffs specifically pled that they purchased securities in reasonable reliance on defendants' misrepresentations.[17] The question of fact referred to by the court in that case was whether plaintiffs' reliance was "justifiable," not whether there was any reliance at all.[18] Therefore, Plaintiffs have not provided any authority that they are excused from pleading acts that would constitute reliance on the part of Plaintiffs and have still not alleged any acts in their Response (or their Complaint) that would constitute reliance on their part. Thus, Plaintiffs' fraud claim should be dismissed.

### Plaintiffs Still Have Not Established That They Have Standing.

In opposition to Highland's challenge to Plaintiffs' lack of standing, Plaintiffs' only response is the incorrect legal conclusion that causes of action that arise after a bankruptcy commences cannot be property of the bankruptcy estate and, therefore, their claims cannot belong to the Genesis bankruptcy estate. Plaintiffs' argument is fatally flawed in several ways.

As an initial matter, Plaintiffs' argument fails because it is based on the incorrect premise that their claims arose after the commencement of the bankruptcy. To the contrary, Plaintiffs

---

[17] *See id.* at 19.

[18] *See id.* at 23 ("This question of what Defendants' warnings covered must go to the trier of fact.").

make it clear throughout their Complaint that the "fraudulent scheme" began before the filing of the Genesis Chapter 11 bankruptcy petition on June 22, 2000. For example, Plaintiffs allege that the Defendants purchased senior debt participations "at a massive discount from face value" . . . and "then conspired with Genesis management to put the Company into bankruptcy . . . ."[19] Therefore, even if property of the estate was limited to causes of action that arise prior to commencement of a bankruptcy, the estate would still be the proper party to bring the claims alleged by Plaintiffs.

Additionally, Plaintiffs ignore the fact that the property of the estate is not solely limited to property held "as of the commencement of the bankruptcy case." Although it is true that the estate does own this type of property under Section 541(a)(1) of the Bankruptcy Code, the estate's property is much broader that what is encompassed under this provision. Plaintiffs' "analysis" ignores Section 541(a)(7) of the Bankruptcy Code, which further delineates additional types of property contained in the bankruptcy estate. Specifically, Section 541(a)(7) includes "[a]ny interest in property that the estate acquires after the commencement of the case" in the property of the estate. The Third Circuit has specifically held that these interests include causes of action.[20] Therefore, the timing of the accrual of the claims asserted by Plaintiffs is irrelevant – the claims belong to the estate regardless of whether they arose pre- or post- petition.

The cases cited by Plaintiffs for the proposition that "causes of action that arise *after* the bankruptcy petition . . . are not considered property of the bankruptcy estate," actually support

---

[19] *See* Complaint at 8; *see also id.* at 54 ("But somewhere between March of 2000 and August of 2001 . . . over half a billion dollars of enterprise value had disappeared . . . ."); at 41 ("By March of 2000, . . . these senior Genesis/MC managers had begun an examination of the management, pharmacy, therapy and service contracts between Genesis and MC. . . . The real purpose of this exercise, however, was to divert as much value as possible from Genesis . . . .").

[20] *See Kollar v. Miller*, 176 F.3d 175, 178 (3d Cir. 1999) ("[Sections 541(a)(1) and (a)(7)] have been interpreted broadly, and include an interest in a cause of action.").