deemed an allowed Genesis Other Secured Claim in the principal amount of $19,337,000, plus accrued and unpaid interest, fees, and other costs. The Plan shall leave unaltered the legal, equitable, and contractual rights to which the holders of claims in Subclass G1-12 are entitled, and the allowed Claim of U.S. Bank in Subclass G1-12 shall be unimpaired under the Plan. In satisfaction of their allowed Subclass G1-12 claim, members of Subclass G1-12 shall receive, on or before the Effective Date, (i) all accrued and unpaid interest due under the 9 1/4% First Mortgage Bonds (Series A) due 2007 in the original principal amount of $25,000,000 (the "Bradford Bonds"), whether incurred prior to or after the Commencement Date, together with interest on interest, pursuant to the terms of the U.S. Bank Indenture, and (ii) all indenture trustee fees and expenses due under the U.S. Bank Indenture, including reasonable attorneys' fees, whether incurred prior to or after the Commencement Date. U.S. Bank shall submit to the Genesis Debtors an itemization of the amounts due and owing under the U.S. Bank Indenture ten (10) days prior to the Effective Date. From and after the Effective Date, all documents relating to the Bradford Bonds, including, but not limited to, the U.S. Bank Indenture, the mortgages securing repayment of the Bradford Bonds, and the bond instruments shall be deemed reinstated in their entirety. In connection with such reinstatement and as a result of the Genesis Debtors' failure to redeem the Bradford Bonds in April 2001, any holder of a Bradford Bond shall have the right for sixty (60) days following the Effective Date to present such Bradford Bonds for redemption in accordance with Article 9 of the U.S. Bank Indenture. Thereafter, the deadline to present the Bradford Bonds for redemption shall be governed by the applicable provisions of the Indenture. All rights and liens of U.S. Bank, as indenture trustee, shall survive to the same extent, validity, and priority as existed prior to the Commencement Date. Among other things, all of the mortgages securing repayment of the Bradford Bonds shall continue to be valid and perfected, and no further notice, filing, or other act shall be required to effect such perfection.

*Subclass G1-17.* Subclass G1-17 consists of the claims under the Amended and Restated Synthetic Lease Financing Facility, dated as of October 7, 1996, among Genesis, Genesis Eldercare Properties, Inc., Mellon Bank N.A., as administrative agent, certain co-agents named therein, and the lender parties thereto. These claims are secured by the properties identified in the chart above (the "G1-17 Properties"). Under the Plan, the holders of these claims will receive a mortgage note in the principal amount of $50,000,000. The mortgage note will bear interest at LIBOR plus 5% and will mature on the sixth anniversary of the Effective Date. The mortgage note will be secured by (i) the G1-17 Properties and (ii) a lien of equal priority with the New Senior Notes on the property securing such notes. The mortgage documents will permit a junior lien on the G1-17 property in favor of the New Senior Notes.

*Other Subclasses.* In addition to Subclasses G1-1 through G1-17, there are other subclasses of miscellaneous secured claims of approximately $3,536,000 against the Genesis Debtors, each of which will be treated as a separate class. This class also includes certain contingent claims of Bank of America, N.A. in connection with a guaranty by Genesis of the obligations of the Age Institute. Under the Plan of Reorganization, either these claims will be reinstated or the Reorganized Debtors will return the property securing such claim. The reinstated claims are not impaired and the holders are not entitled to vote to accept or reject the Plan of Reorganization.

2.    *Genesis Senior Lender Claims (Class G2)*

*Description.* The prepetition claims in this class aggregate approximately $1.2 billion and are the largest claims against the Genesis Debtors. This class consists of the following prepetition claims:

16

| Instrument | | Amount |
|---|---|---|
| Revolver | | $650,000,000 |
| Term Loan A | | 110,445,000 |
| Term Loan B | | 152,131,000 |
| Term Loan C | | 151,378,000 |
| Tranche II | | 40,000,000* |
| Swap termination claims | | 17,291,000 |
| Synthetic Lease deficiency claims | | 28,236,000 |
| | Subtotal | $1,149,481,000 |
| Prepetition interest | | 43,979,000* |
| Total prepetition claims | | $1,193,460,000 |

\* Paid as part of adequate protection payments pursuant to the cash collateral order described in sections VI.C and VI.D, below.

The claims under the Revolver, Term Loan A, Term Loan B, Term Loan C, and Tranche II arise under Genesis's Fourth Amended and Restated Credit Agreement, dated as of August 20, 1999, among Genesis, certain subsidiary Genesis Debtors named therein, Mellon Bank N.A., as administrative agent, certain co-agents named therein, and the lenders participating in such agreement. To secure those claims, the Genesis Debtors granted first priority security interests in substantially all their assets and junior security interests in certain properties already subject to liens.

The swap termination claims arise from the prepetition termination of certain interest rate hedging agreements between Citibank, N.A. and Genesis. Prior to the commencement of these chapter 11 cases, Genesis hedged a portion of the floating interest rate risk associated with the obligations under the credit agreement identified above. In accordance with that credit agreement, Genesis's obligations under those hedging agreements were entitled to share in the collateral securing the other Genesis Senior Lender Claims. Citibank, N.A. asserted $28,548,000 of claims against Genesis due to the termination of the hedging agreements. Genesis and Citibank, N.A. have agreed that $17,290,962 of those claims share the same collateral as the other Genesis Senior Lender Claims. The balance of the claims of Citibank, N.A. are part of Class G4. That agreement was approved by the Bankruptcy Court on May 11, 2001.

Certain properties owned by the Genesis Debtors were financed through a "synthetic lease." The claims of the lenders under that financing arise under the Amended and Restated Synthetic Lease Financing Facility, dated as of October 7, 1996, among Genesis, Genesis Eldercare Properties, Inc., Mellon Bank N.A., as administrative agent, certain co-agents named therein, and the lender parties thereto. For purposes of bankruptcy law, the "synthetic lease" is treated as a loan rather than a true lease. The synthetic lease claims, which total $78,236,000, are secured by the properties leased under the Synthetic Lease Financing Facility referred to above, as well as by the same collateral securing the other Genesis Senior Lender Claims. Accordingly, a portion of such claims ($50,000,000) is classified in Subclass G1-17 (based on a negotiated valuation of the properties securing such claims – see the discussion for Class G1, above). The remaining portion of the claims (deficiency claims of $28,236,000) are part of this Class G2. However, for purposes of the pro rata distribution of property to this class,

17

the deficiency claims of the synthetic lease lenders shall be deemed to be $35,154,762.47. This amount reflects a negotiated settlement among the holders of claims in Class G2.

At the commencement of these chapter 11 cases, the Bankruptcy Court entered a cash collateral order which permitted the Genesis Debtors to grant senior postpetition liens on their properties to the lenders under their debtor in possession financing. The debtor in possession financing and the cash collateral order are described in sections VI.C and VI.D, below. Under the cash collateral order, the Genesis Debtors will have made approximately $195,979,000 of payments as of June 30, 2001, with respect to the Genesis Senior Lender Claims. Based on the valuation of the Genesis Debtors presented in section IV, below, these postpetition payments are assumed to apply against the prepetition Genesis Senior Lender Claims described above, resulting in an outstanding Genesis Senior Lender Claim of approximately $997,481,000. However, in the event the Bankruptcy Court determines that the value of the Genesis Debtors is higher, the Genesis Senior Lender Claims would include postpetition interest. In that case, the postpetition payments would be allocated to repay the Tranche II facility ($40,000,000), prepetition interest ($43,979,000), and approximately $112,000,000 of postpetition interest at contractual nondefault rates. Other than interest that accrued prior to the Commencement Date on overdue payments of interest as of that date, no portion of the postpetition payments would be allocated to compound interest.

The claims in Class G2 have the benefit of subordination provisions in the various instruments representing the claims in Class G5 (Genesis Senior Subordinated Note Claims). The effect of these subordination provisions is to require that distributions that would otherwise be made to Class G5 be made to the holders of Genesis Senior Lender Claims. The Plan of Reorganization does not give effect to those provisions, and the distribution of New Common Stock and New Warrants to the holders of claims in Class G5 (Genesis Senior Subordinated Note Claims) represents a negotiated settlement between the official committee of unsecured creditors in the Genesis reorganization cases and the holders of the Genesis Senior Lender Claims.

*Treatment.* Class G2 will receive

- cash in an amount equal to the interest on the Genesis Senior Lender Claims at contractual, nondefault rates, as paid pursuant to certain cash collateral and adequate protection stipulations described in section VI.D.1, below (as of June 30, 2001, such amount is $195,979,000)

- New Senior Notes in the principal amount of $94,923,000

- shares of New Convertible Preferred Stock with an aggregate liquidation preference of $31,000,000

- approximately 74.35% of the New Common Stock

The allocation of New Common Stock is also subject to dilution based on future issuances of additional shares of New Common Stock, including in connection with the conversion of the New Convertible Preferred Stock, the exercise of the New Warrants, and the issuance of restricted shares of New Common Stock and options under the New Management Incentive Plan for key employees. Distributions to Class G2 will be made to the individual holders of the Genesis Senior Lender Claims in such denominations and registered in the names of the holders as Mellon Bank, N.A. shall have directed in writing.

18

3.    *Genesis Priority Non-Tax Claims (Class G3)*

*Description.* The claims in Class G3 are the types of claims identified in section 507(a) of the Bankruptcy Code that are entitled to priority in payment (other than administrative expense claims and priority tax claims). For the Genesis Debtors, these claims relate primarily to prepetition wages and employee benefit plan contributions that had not yet been paid as of the Commencement Date. The Genesis Debtors believe that all of these claims have already been paid pursuant to an order entered by the Bankruptcy Court on the Commencement Date.

*Treatment.* Claims in Class G3 that have not already been paid will be paid on the later of (i) the Effective Date, (ii) the date such claim becomes allowed, and (iii) the date for payment provided by any agreement or understanding between the parties, except to the extent the holders of such claims agree to a different treatment.

4.    *Genesis General Unsecured Claims (Class G4)*

*Description.* The aggregate amount of general unsecured claims filed against the Genesis Debtors on or before the December 19, 2000 bar date was approximately $1,131,655,000. However, the Genesis Debtors estimate that the aggregate amount of allowed claims in Class G4 will be approximately $80,069,000, after deducting duplicate claims, claims not supported by the Genesis Debtors' books and records, claims that are covered by insurance, and claims that are subject to other objections. The claims in Class G4 consist of the claims of suppliers and other vendors, landlords with prepetition rent claims and/or claims based on rejection of leases, personal injury and other litigation claimants to the extent not covered by insurance, parties to contracts with the Genesis Debtors that are being rejected, deficiency claims of mortgage lenders, the unsecured portion of the claims arising from the prepetition termination of certain interest rate hedging agreements, claims (if any) arising from the remaining *qui tam* suit identified in section V.D.6, below, contingent (as of the date hereof) claims relating to bonds executed on behalf of the Debtors by Liberty Bond Services, and other general unsecured claims. The following table lists the types of claims and the estimated amount in these groups to the extent material.

| Type of claim | Amount |
|---|---|
| Suppliers and vendors (estimated amount) | $51,329,000 |
| Mortgage deficiency claims | 7,483,000 |
| Swap deficiency claims | 11,257,000 |
| Other (including estimate of rejection damages) | 10,000,000 |
| Total | $80,069,000 |

For purposes of the initial distribution, and as part of the distribution mechanism under the Plan for holders of claims in Classes G4 and G5, the Debtors will be required to estimate the total amount of claims that will be allowed. See section V.D.5, below.

For completeness, this class also includes claims covered by insurance in whole or in part maintained by the Genesis Debtors. However, such claims will be entitled to share in the treatment of this class only to the extent they are not covered by such insurance. See section V.D.7, below. The Genesis Debtors believe that their professional liability insurance is sufficient to cover all allowed claims for personal injury or wrongful death.

19

*Treatment.* The holders of claims in Class G4 which are uninsured in whole or in part will share 4.12% of the New Common Stock and 62.19% of the New Warrants with the holders of claims in Class G5. Based on the books and records of the Genesis Debtors, the holders of claims in Class G4 will receive

- approximately 0.71% of the New Common Stock

- 10.65% of the New Warrants

Holders of claims in this class that are covered by insurance in whole or in part will be paid in the ordinary course of the business of the Reorganized Debtors to the extent of such insurance, and to the extent that these claims are not covered by insurance will be treated in the same manner as the holders of uninsured claims in this class. All shares of New Common Stock are subject to dilution based on future issuances of additional shares of New Common Stock, including in connection with the conversion of the New Convertible Preferred Stock, the exercise of the New Warrants, and the issuance of restricted shares of New Common Stock and options under the New Management Incentive Plan for key employees.

5.    *Genesis Senior Subordinated Note Claims (Class G5)*

*Description.* The claims in this class total $387,425,000 and consist of the principal and interest accrued and unpaid through the Commencement Date under four separate series of senior subordinated notes issued by Genesis. The following table describes the notes:

| Subordinated Note | Amount |
|---|---|
| 9-3/4% Senior Subordinated Notes due 2005 | $120,000,000 |
| Indenture, dated as of June 15, 1995, between Genesis and State Street Bank and Trust Company, as trustee | |
| 9-1/4% Senior Subordinated Notes due 2006 | 125,000,000 |
| Indenture, dated as of October 7, 1996, between Genesis and State Street Bank and Trust Company, as successor trustee | |
| 9-7/8% Senior Subordinated Notes due 2009 | 120,920,000* |
| Indenture, dated as of December 23, 1998, between Genesis and The Bank of New York, as trustee | |
| 9-3/8% Senior Subordinated Notes due 2005 | 1,590,000 |
| Indenture, dated as of September 15, 1995, between Grancare, Inc. and Marine Midland Bank, as trustee | |
| Plus prepetition interest | 19,915,000 |
| Total | $387,425,000 |

*$125,000,000 face amount less $4,080,000 of original issue discount

The claims in Class G5 are contractually subordinated to the Genesis Senior Lender Claims in Class G2.

20

*Treatment.* The holders of claims in Class G5 will share 4.12% of the New Common Stock and 62.19% of the New Warrants with the holders of claims in Class G4. Based on the books and records of the Genesis Debtors, Class G5 will receive

- approximately 3.41% of the New Common Stock

- 51.54% of the New Warrants

All shares of New Common Stock are subject to dilution based on future issuances of additional shares of New Common Stock, including in connection with the conversion of the New Convertible Preferred Stock, the exercise of the New Warrants, and the issuance of restricted shares of New Common Stock and options under the New Management Incentive Plan for key employees.

6. *Genesis Intercompany Claims (Class G6)*

*Description.* The Genesis Debtors record transfers of funds among themselves as intercompany claims. For example, funds raised by Genesis through the issuance of securities to the public (both stock and debt), as well as amounts borrowed under its prepetition credit agreement, have been used to fund and build the operations of many of the other Genesis Debtors. In addition, funds earned by the subsidiaries of Genesis have been transferred to Genesis as partial repayment of such advances.

*Treatment.* For purposes of the Plan, these claims are unimpaired.

7. *Genesis Punitive Damage Claims (Class G7)*

*Description.* Class G7 consists of any claim against any of the Genesis Debtors for any fine, penalty, forfeiture, or attorneys' fees (but only to the extent such attorneys' fees are punitive in nature), or for multiple, exemplary, or punitive damages, to the extent that such fine, penalty, forfeiture, attorneys' fees, or damages is not compensation for actual pecuniary loss suffered by the holder of such claim and not statutorily prescribed. In general, punitive or exemplary damage claims are intended to punish or make an example of a wrongdoer. However, in the context of an insolvent entity, such as the Genesis Debtors, the enforcement of punitive claims would have the effect of punishing unsecured creditors by diluting the ultimate recovery to all unsecured creditors. Moreover, punitive and exemplary damage claims differ significantly from other general unsecured claims which are based upon pecuniary losses. For these reasons, such claims have been classified separately from other unsecured claims. The Genesis Debtors do not believe that there will be any allowed claims in this class. However, several proofs of claim have been filed concerning personal injury or wrongful death claims that include punitive or exemplary damage amounts and this class has been included in the Plan for completeness. In addition, the AGE Institute has asserted unspecified punitive and exemplary damages in connection with certain counterclaims it has asserted against certain Genesis Debtors in response to the commencement of an adversary proceeding commenced against it.

*Treatment.* To the extent there are any allowed claims in this class, they are subordinated to the claims in other classes. No property will be distributed to the holders of any allowed claims in this class from the Genesis Debtors' estates. Solely, to the extent these claims are covered by applicable insurance policies, and such insurance is permitted under state law, holders of allowed claims in this class shall receive insurance proceeds.

21

8.   *Genesis Series G Preferred Stock Interests (Class G8)*

*Description.* Class G8 consists of the equity interests represented by the outstanding shares of Genesis's Series G Cumulative Convertible Preferred Stock. This issue consists of 586,240 shares of preferred stock issued to HCR Manor Care, Inc. in connection with Genesis's 1998 acquisition of the pharmacy business of that company. This class also includes any claims that HCR Manor Care, Inc. has or may assert against Genesis in connection with the issuance of this preferred stock, whether based on state or federal securities laws or otherwise (although no proof of claim for such amounts has been filed).

*Treatment.* Holders of equity interests in Class G8 will receive no property under the Plan, and these equity interests will be cancelled on the Effective Date.

9.   *Genesis Series H Preferred Stock Interests (Class G9)*

*Description.* Class G9 consists of the equity interests represented by the outstanding shares of Genesis's Series H Senior Convertible Participating Cumulative Preferred Stock. This issue consists of 24,369 shares of preferred stock issued to The Cypress Group and certain of its affiliates, TPG Partners II, L.P., and Nazem, Inc. in connection with a 1999 restructuring of Genesis's obligations. That restructuring is described in detail in Genesis's Form 10-K for the fiscal year ended September 30, 2000.

*Treatment.* Holders of equity interests in Class G9 will receive no property under the Plan and these equity interests will be cancelled on the Effective Date.

10.  *Genesis Series I Preferred Stock Interests (Class G10)*

*Description.* Class G10 consists of the equity interests represented by the outstanding shares of Genesis's Series I Senior Convertible Exchangeable Participating Cumulative Preferred Stock. This issue consists of 17,631 shares of preferred stock issued to The Cypress Group and certain of its affiliates, TPG Partners II, L.P., and Nazem, Inc. in connection with a 1999 restructuring of Genesis's obligations. That restructuring is described in detail in Genesis's Form 10-K for the fiscal year ended September 30, 2000.

*Treatment.* Holders of equity interests in Class G10 will receive no property under the Plan, and these equity interests will be cancelled on the Effective Date.

11.  *Genesis Common Stock Interests (Class G11)*

*Description.* This class consists of the common equity interests in Genesis represented by Genesis's outstanding 48,641,456 shares of common stock, $0.02 par value. The class includes all shares owned by affiliates or members of the management of the Genesis Debtors and any outstanding options, warrants, or rights to purchase such stock, including conversion or exchange rights under the Series G Cumulative Convertible Preferred Stock, the Series H Senior Convertible Participating Cumulative Preferred Stock, and the Series I Senior Convertible Exchangeable Participating Cumulative Preferred Stock.

*Treatment.* Holders of equity interests in Class G11 will receive no property under the Plan, and these equity interests will be cancelled on the Effective Date.

22

F.    **Description of the Multicare Classes**

Unless otherwise indicated, the characteristics and amount of the claims or equity interests in the following classes are based on the books and records of the Multicare Debtors. Each subclass is treated as a separate class for purposes of the Plan of Reorganization and the Bankruptcy Code. However, the following discussion may refer to a group of subclasses as a single class for ease of reference.

1.    *Multicare Other Secured Claims (Class M1)*

*Description.* Class M1 is a group of subclasses, with aggregate allowed secured claims of approximately $26,318,000 as of the date of this Disclosure Statement (exclusive of interest and net of reinstatement payments). For the most part, claims in these subclasses are mortgage financings of various properties owned and/or operated by the Multicare Debtors and equipment financings of various types. Each subclass represents a separate mortgage or collateral pool. The following table describes the material subclasses in Class M1.

The Plan of Reorganization reinstates the claims in Subclasses M1-1 through M1-6. The aggregate cost to cure defaults and reinstate the debt in these subclasses is projected to be $3,522,000 as of June 30, 2001. These claims are not impaired, and the holders of the debt are not entitled to vote to accept or reject the Plan. Subclass M1-7 is impaired and is entitled to vote. The following table identifies and summarizes the treatment for each of the material subclasses in Class M1. The percentage recovery indicated in the following table is based on the value of the collateral securing these obligations.

*Treatment of Subclasses*

| Subclass | Description<br>Collateral (lender or guarantor) | Treatment | Entitled to Vote | Estimated Recovery |
|---|---|---|---|---|
| M1-1 | Rosewood Center (Tyler County, WV) | $825,000 mortgage reinstated | No | 100% |
| M1-2 | Sisterville Center (Care Haven) (Tyler County, WV) | $1,960,000 mortgage reinstated | No | 100% |
| M1-3 | Raleigh Center (WV Hospital Authority) | $1,840,000 mortgage bonds reinstated | No | 100% |
| M1-4 | Westford Center (HUD) | $6,637,992 mortgage reinstated | No | 100% |
| M1-5 | Willows Center<br>Cedar Ridge Center<br>Dawn View Center<br>(MediTrust) | $11,900,815 mortgage reinstated | No | 100% |
| M1-6 | Teays Valley (West Virginia Hospital Authority) | $3,665,000 mortgage reinstated | No | 100% |
| M1-7 | Point Pleasant (Mason County WV) Outstanding Mortgage:  $1,535,000 | Return of collateral | Yes | 100%* |

\* Based on a valuation of the collateral securing these claims. Section 506(a) of the Bankruptcy Code provides that a claim is secured only to the extent of the value of the underlying collateral.

In addition to Subclasses M1-1 through M1-7, there are other subclasses of miscellaneous secured claims of approximately $71,000 against the Multicare Debtors, each of

which will be treated as a separate class. Under the Plan of Reorganization, either these claims will be reinstated or the Reorganized Debtors will return the property securing such claim. The reinstated claims are not impaired, and the holders are not entitled to vote to accept or reject the Plan of Reorganization.

1.        *Multicare Senior Bank Claims (Class M2)*

           *Description.* The prepetition claims in this class aggregate approximately $443,400,000 and are the largest claims against the Multicare Debtors. This class consists of the following prepetition claims:

| Instrument | | Amount |
|------------|---|--------|
| Revolver | | $112,700,000 |
| Term Loan A | | 116,400,000 |
| Term Loan B | | 145,800,000 |
| Term Loan C | | 49,100,000 |
| | Subtotal | $424,000,000 |
| Prepetition interest | | 19,400,000 |
| Total prepetition claims | | $443,400,000 |

           The claims under the Revolver, Term Loan A, Term Loan B, and Term Loan C arise under Multicare's Fourth Amended and Restated Credit Agreement, dated as of August 20, 1999, among The Multicare Companies, Inc., certain subsidiary Multicare Debtors named therein, Mellon Bank N.A., as administrative agent, certain co-agents named therein, and the lenders participating in such agreement. To secure those claims, the Multicare Debtors granted first priority security interests in substantially all their assets and junior security interests in certain properties already subject to liens.

           The claims in Class M2 have the benefit of subordination provisions in the instruments representing the claims in Class M5 (Multicare Senior Subordinated Note Claims). The effect of these subordination provisions is to require that distributions that would otherwise be made to Class M5 be made to the holders of Multicare Senior Lender Claims. The Plan of Reorganization does not give effect to those provisions, and the distribution of New Common Stock and New Warrants to the holders of claims in Class M5 (Multicare Senior Subordinated Note Claims) represents a negotiated settlement between the official committee of unsecured creditors in the Multicare reorganization cases and the holders of the Multicare Senior Lender Claims.

           *Treatment* Class M2 will be entitled to receive 88.37% of the shares of the New Multicare Stock. However, approval of the Plan will implement the Plan of Merger, under which all such stock will be deemed to be immediately exchanged for

           • $25,000,000 in cash

           • New Senior Notes in the principal amount of $147,682,000

           • shares of New Convertible Preferred Stock with an aggregate liquidation preference of $11,600,000

24

- approximately 19.02% of the New Common Stock

The allocation of New Common Stock is also subject to dilution based on future issuances of additional shares of New Common Stock, including in connection with the conversion of the New Convertible Preferred Stock, the exercise of the New Warrants, and the issuance of restricted shares of New Common Stock and options under the New Management Incentive Plan for key employees. Distributions to Class M2 will be made to the individual holders of the Multicare Senior Lender Claims in such denominations and registered in the names of the holders as Mellon Bank, N.A. shall have directed in writing.

3.    *Multicare Priority Non-Tax Claims (Class M3)*

*Description.* The claims in Class M3 are the types of claims identified in section 507(a) of the Bankruptcy Code that are entitled to priority in payment (other than administrative expense claims and priority tax claims). For the Multicare Debtors, these claims relate primarily to prepetition wages and employee benefit plan contributions that had not yet been paid as of the Commencement Date. The Multicare Debtors believe that all of these claims have already been paid pursuant to an order entered by the Bankruptcy Court on the Commencement Date.

*Treatment.* Claims in Class M3 that have not already been paid will be paid on the later of (i) the Effective Date, (ii) the date such claim becomes allowed, and (iii) the date for payment provided by any agreement or understanding between the parties, except to the extent the holders of such claims agree to a different treatment.

4.    *Multicare General Unsecured Claims (Class M4)*

*Description.* The aggregate amount of general unsecured claims filed against the Multicare Debtors on or before the December 19, 2000 bar date was approximately $1,702,490,000. However, the Multicare Debtors estimate that the aggregate amount of allowed claims in Class M4 will be approximately $26,439,000, after deducting duplicate claims, claims not supported by the Multicare Debtors' books and records, claims covered by insurance, and claims that are subject to other objections. The claims in Class M4 consist of the claims of suppliers and other vendors, landlords with prepetition rent claims and/or claims based on rejection of leases, personal injury and other litigation claimants to the extent not covered by insurance, parties to contracts with the Multicare Debtors that are being rejected, deficiency claims of mortgage lenders, contingent (as of the date hereof) claims relating to bonds executed on behalf of the Debtors by Liberty Bond Services, and other general unsecured claims. For completeness, this class also includes claims covered by insurance in whole or in part maintained by or on behalf of the Multicare Debtors. However, such claims will be entitled to share in the treatment of this class only to the extent they are not covered by such insurance. The Multicare Debtors believe that their professional liability insurance is sufficient to cover all allowed claims for personal injury or wrongful death. See section V.D.7, below. For purposes of the initial distribution, and as part of the distribution mechanism under the Plan for holders of claims in Classes M4 and M5, the Debtors will be required to estimate the total amount of claims that will be allowed. See section V.D.5, below.

*Treatment.* The holders of claims in Class M4 which are uninsured in whole or in part will share 11.63% of the shares of New Multicare Stock with the holders of claims in Class M5. Approval of the Plan will implement the Plan of Merger, under which all such stock will be deemed to be immediately exchanged for 2.50% of the New Common Stock and 37.81%

25

of the New Warrants, which will be shared with the holders of claims in Class M5 on a pro rata basis. Based on the books and records of the Multicare Debtors, Class M4 will receive

- approximately 0.23% of the New Common Stock

- 3.52% of the New Warrants

Holders of claims in this class that are covered by insurance will be paid in the ordinary course of the business of the Reorganized Debtors to the extent of such insurance, and to the extent that these claims are not covered by insurance will be treated in the same manner as the holders of uninsured claims in this class. All shares of New Common Stock are subject to dilution based on future issuances of additional shares of New Common Stock, including in connection with the conversion of the New Convertible Preferred Stock, the exercise of the New Warrants, and the issuance of restricted shares of New Common Stock and options under the New Management Incentive Plan for key employees.

     5.     *Multicare Senior Subordinated Note Claims (Class M5)*

     *Description.* The claims in this class total $257,817,000 and consist of the principal and interest accrued and unpaid under Multicare's 9% Senior Subordinated Notes due 2007, issued and governed by the Indenture, dated as of August 11, 1997, between Multicare and PNC Bank, National Association, as trustee. The claims in Class M5 are contractually subordinated to the Multicare Senior Lender Claims in Class M2.

     *Treatment.* The holders of claims in Class M5 will share 11.63% of the shares of New Multicare Stock with the holders of claims in Class M4. Approval of the Plan will implement the Plan of Merger, under which all such stock will be deemed to be immediately exchanged for 2.50% of the New Common Stock and 37.81% of the New Warrants, which will be shared with the holders of claims in Class M4 on a pro rata basis. Based on the books and records of the Multicare Debtors, Class M5 will receive

- approximately 2.27% of the New Common Stock

- 34.29% of the New Warrants

All shares of New Common Stock are subject to dilution based on future issuances of additional shares of New Common Stock, including in connection with the conversion of the New Convertible Preferred Stock, the exercise of the New Warrants, and the issuance of restricted shares of New Common Stock and options under the New Management Incentive Plan for key employees.

     6.     *Multicare Intercompany Claims (Class M6)*

     *Description.* The Multicare Debtors record transfers of funds among themselves as intercompany claims. For example, funds borrowed by Multicare under its prepetition credit agreement have been used to fund and build the operations of many of the other Multicare Debtors. In addition, funds earned by the subsidiaries of Multicare have been transferred to Multicare as partial repayment of such advances.

     *Treatment.* For purposes of the Plan, these claims are unimpaired.

7.    *Multicare Punitive Damage Claims (Class M7)*

*Description.* Class M7 consists of any claim against any of the Multicare Debtors for any fine, penalty, forfeiture, or attorneys' fees (but only to the extent such attorneys' fees are punitive in nature), or for multiple, exemplary, or punitive damages, to the extent that such fine, penalty, forfeiture, attorneys' fees, or damages is not compensation for actual pecuniary loss suffered by the holder of such claim and not statutorily prescribed. In general, punitive or exemplary damage claims are intended to punish or make an example of a wrongdoer. However, in the context of an insolvent entity, such as the Multicare Debtors, the enforcement of punitive claims would have the effect of punishing unsecured creditors by diluting the ultimate recovery to all unsecured creditors. Moreover, punitive or exemplary damage claims differ significantly from other general unsecured claims which are based upon pecuniary losses. For these reasons, such claims have been classified separately from other unsecured claims. The Multicare Debtors do not believe that there will be any allowed claims in this class. However, several proofs of claim have been filed concerning personal injury or wrongful death claims that include punitive or exemplary damage amounts and this class has been included in the Plan for completeness.

*Treatment.* To the extent there are any allowed claims in this class, they are subordinated to the claims in other classes. No property will be distributed to the holders of any allowed claims in this class from the Multicare Debtors' estates. Solely, to the extent these claims are covered by applicable insurance policies, and such insurance is permitted under state law, holders of allowed claims in this class shall receive insurance proceeds.

8.    *Multicare Common Stock Equity Interests (Class M8)*

*Description.* This class consists of all the common equity interests in Genesis ElderCare Corp., including any outstanding options, warrants, or rights to acquire such equity interests, represented by that company's 745,000 outstanding shares of common stock, $0.01 par value, of which approximately 43.6% is currently owned by Genesis.

*Treatment.* Holders of equity interests in Class M8 will receive no property under the Plan, and these equity interests will be cancelled on the Effective Date.

G.    **Administrative Expenses for the Genesis Debtors and the Multicare Debtors**

In order to confirm the Plan of Reorganization, Administrative Expense Claims and Priority Tax Claims must be paid in full or in a manner otherwise agreeable to the holders of those claims. Administrative expenses are the actual and necessary costs and expenses of the chapter 11 cases of the Genesis Debtors and the Multicare Debtors. Those expenses include, but are not limited to, postpetition salaries and other benefits for employees, postpetition rent for facilities and offices, amounts owed to vendors providing goods and services during the chapter 11 cases, tax obligations incurred after the commencement of the chapter 11 cases, and certain statutory fees and expenses. Other administrative expenses include the actual, reasonable, and necessary professional fees and expenses of the professionals retained by the Genesis Debtors, the Multicare Debtors, and their respective creditors' committees, as well as the obligations outstanding under the separate debtor in possession financing agreements for the Genesis Debtors and the Multicare Debtors.

Consistent with the requirements of the Bankruptcy Code, the Plan of Reorganization generally provides for allowed Administrative Expense Claims to be paid in full

on the later of the Effective Date and the first business day after the date that is thirty (30) days after the date such Administrative Expense Claim becomes allowed, except for Administrative Expense Claims relating to ordinary course of business transactions or for money borrowed, both of which will be paid in accordance with the past practice of the Debtors and the terms of the agreements governing such obligations. Administrative Expense Claims relating to compensation of the professionals retained by the Genesis Debtors, the Multicare Debtors, their respective creditors' committees, or for the reimbursement of expenses for certain members of their respective creditors' committees will, unless otherwise agreed by the claimant, be paid on the later of the Effective Date and the date on which an order allowing such Administrative Expense Claim is entered.

Allowed tax claims entitled to priority under the Bankruptcy Code will be paid either in full on the later of the Effective Date and the first business day after the date that is thirty (30) days after the date such claim becomes allowed or with interest at a fixed annual rate equal to eight percent (8%) over a period not exceeding six (6) years from the date of assessment of the tax.

### 1. Debtor in Possession Financing

The Genesis Debtors estimate that there will be approximately $200,000,000 outstanding under their debtor in possession financing agreements on the Effective Date. Of that amount, approximately $2,500,000 will relate to outstanding letters of credit. With the exception of those letters of credit, obligations under the debtor in possession financing agreements will be paid on the Effective Date. On the Effective Date, outstanding letters of credit will either be replaced or will remain outstanding and will be backed up with new letters of credit or cash collateralized on the Effective Date. The Multicare Debtors do not expect that any amounts will be outstanding under their debtor in possession financing agreements on the Effective Date, other than approximately $500,000 of letters of credit, which will either be replaced or will remain outstanding and will be backed up with new letters of credit or cash collateralized on the Effective Date.

### 2. Federal Medicare Claims

The Medicare fiscal intermediaries for the Genesis Debtors and the Multicare Debtors have determined that the Debtors have received Medicare overpayments. The Medicare statute, regulations, and procedures require the fiscal intermediaries to adjust Medicare payments to recover such overpayments upon determining those overpayments. However, because of the bankruptcy, many of these determined overpayments remain outstanding. In addition, the Centers for Medicare and Medicaid Services (CMS) f/k/a the Health Care Financing Administration (HCFA) has imposed civil money penalties (CMPs) on certain of the Debtors that remain unpaid to date. CMS asserts no other claims against the Debtors.

CMS and the Debtors agree that total determined overpayments have not taken into account underpayments that Genesis and Multicare believe are due under the Medicare program. The Debtors expect that these determined overpayments, and CMPs, will be reduced to zero, as of the effective date of the confirmation of the Plan of Reorganization, by application of underpayments. After the effective date, the Debtors will pay all Medicare determined overpayments and CMPs, and receive all determined underpayments, in the ordinary course of their businesses, in accordance with the Medicare statute, regulations, and procedures.

Separately, the Genesis Debtors have entered into an agreement to resolve four pending civil *qui tam* suits filed by private citizens under the federal False Claims Act, 31 U.S.C. § 3729 *et seq.* relating to alleged overbilling to the federal Medicare program. The terms of that settlement, which involve a payment of approximately $2.1 million to the federal government, are described in section II.K.1, below.

### 3. State Medicaid Claims

Certain of the Genesis Debtors have accrued credits or overpayments due to various state Medicaid programs. The aggregate amount of such credits and overpayments is approximately $8,000,000. As part of the assumption of certain agreements and/or programs related to participation in the Medicaid programs in those states, the Genesis Debtors expect to make such payments in the ordinary course of their businesses.

### 4. Fees and Expenses of Professionals

The Genesis Debtors estimate that the fees and expenses of the various professionals in their chapter 11 cases will be approximately $8,000,000, including amounts paid on an interim basis during the chapter 11 cases. The Multicare Debtors estimate that the fees and expenses of the various professionals in their chapter 11 cases will be approximately $10,000,000, including amounts paid on an interim basis during the chapter 11 cases.

### 5. Payments to Employees

The Bankruptcy Court has approved retention programs for key employees of the Genesis Debtors and has approved the reimbursement of a portion of those expenses from the estates of the Multicare Debtors. Under those programs, approximately $4.4 million in retention payments has not yet been made and approximately $2.1 million in plan of reorganization incentive payments will be made (assuming an Effective Date of August 31, 2001).

### 6. Fees and Expenses of Indenture Trustees

The Debtors estimate that the fees and expenses of the trustees under the indentures described in sections II.E.5 and II.F.5, above, including the fees and expenses of any professionals retained by such indenture trustees, assuming an Effective Date of August 31, 2001, will be approximately $280,000.

## H. Securities to be Issued Under the Plan of Reorganization

### 1. New Senior Notes

Reorganized Genesis will issue $242,605,000 of New Senior Notes as part of the Plan. The New Senior Notes will bear interest at LIBOR plus 5.0%. The New Senior Notes will mature 6 months after the term note portion of the exit financing, which is expected to be 5-1/2 years after the Effective Date. The New Senior Notes will amortize 1% each year and will be secured by a junior lien on real property and related fixtures of substantially all the Debtors, subject to the liens granted to the lenders providing exit financing and any other pre-existing liens on such property. The liens granted to secure the New Senior Notes will also secure, on an equal and ratable basis, the claims in Subclass G1-17 and the liens of the property securing the claims in Subclass G1-17 will secure the New Senior Notes, on a junior and subordinate basis. The New Senior Notes will be governed by an Indenture, a copy of which is part of the Plan Supplement.

29

The Indenture will include covenants that are standard for public debt. Reorganized Genesis may prepay all or a portion of the New Senior Notes at any time without penalty (although such prepayment may be restricted by the terms of the exit financing). The New Senior Notes will be guaranteed by substantially all the Debtors. The only Debtors excluded from the liens and guaranties are ones that have obligations which are being reinstated under the Plan if the terms of those obligations would prohibit such liens and/or guaranties. See sections II.E.1 and II.F.1, above, for a discussion of reinstated classes, and section VIII.C, below, for a discussion of the exit financing.

The Debtors used the following methodology to allocate the New Senior Notes between the holders of the Genesis Senior Lender Claims and the holders of the Multicare Senior Lender Claims. After consultation with their respective advisors and with prospective exit financing lenders, the Debtors determined that the overall debt capacity of the combined companies should not exceed $624,000,000. The Debtors allocated this debt capacity pro rata, based on the respective adjusted year 2001 EBITDA projections for the Genesis Debtors and the Multicare Debtors, to determine an overall debt capacity of $440,000,000 for the Genesis Debtors and $184,000,000 for the Multicare Debtors. The Genesis Debtors then deducted their aggregate miscellaneous secured claims (Class G1) and the amount of exit financing needed to pay their administrative expenses from their overall debt capacity allocation. After those calculations, the Genesis Debtors would have a remaining debt capacity of $94,923,000. The Multicare Debtors performed a similar calculation, resulting in a remaining debt capacity of $147,682,000. These amounts were used to allocate the New Senior Notes.

2.    *New Convertible Preferred Stock*

On the Effective Date, Reorganized Genesis will issue convertible preferred stock with a liquidation preference of $42,600,000. The New Convertible Preferred Stock will accrue dividends at the annual rate of 6%, payable by Reorganized Genesis in additional shares of New Convertible Preferred Stock. The New Convertible Preferred Stock is convertible at any time, at the option of the holders, into shares of New Common Stock. Reorganized Genesis will have the right to convert all the shares of New Convertible Preferred Stock to shares of New Common Stock at any time after the first anniversary of the Effective Date when the average trading price for a share of New Common Stock over the immediately preceding 30 calendar days is $30.00 or more. In either case, the conversion rate will be $20.33 of liquidation preference for each share of New Common Stock. Reorganized Genesis will have the right to redeem the New Convertible Preferred Stock at any time by giving 30 days notice to the holders (although such redemptions may be restricted by the terms of the exit financing). The holders may convert their shares prior to the expiration of that 30-day period. The New Convertible Preferred Stock is also subject to mandatory redemption on the 9th anniversary of the Effective Date. It will also be subject to mandatory redemption from the actual cash received by Reorganized Genesis from the following: (i) the sale of certain real and personal property, as identified in the Plan Supplement; (ii) the exercise of the New Warrants; (iii) any settlement with the federal government in connection with certain administrative appeals identified in the Plan Supplement; (iv) the settlement or other resolution of the claims of the Genesis Debtors against the AGE Institute and its related entities; and (v) the issuance of any equity (other than exercise of the New Warrants) to the extent that such proceeds are not required to be a mandatory prepayment pursuant to the terms of the exit financing required by the Plan. Although the recovery of any cash from the AGE Institute is uncertain (the AGE Institute has asserted that there will be no recovery), the receipt of such amounts is not needed to meet the redemption requirements for the New Convertible Preferred Stock. See section V.D.5, below. Reorganized Genesis will give 30 days notice to the

30

holders of any mandatory redemption, and holders of the New Convertible Preferred Stock may convert their shares prior to the expiration of that period.

3.    *New Common Stock*

On the Effective Date, Reorganized Genesis will issue 41,000,000 shares of its New Common Stock, par value $0.01. The shares will be issued to the holders of claims in Classes G2, G4, G5, M2, M4, and M5. The following table shows the allocation among these classes:

| Class | Shares of New Common Stock | % of New Common Stock |
|---|---|---|
| G2 (Genesis Senior Lender Claims) | 30,485,079 | 74.35% |
| G4 (Genesis General Unsecured Claims) | 289,305 | 0.71% |
| G5 (Genesis Senior Subordinated Claims) | 1,399,842 | 3.41% |
| Subtotal | 32,174,226 | 78.47% |
| | | |
| M2 (Multicare Senior Lender Claims) | 7,798,917 | 19.02% |
| M4 (Multicare General Unsecured Claims) | 95,509 | 0.23% |
| M5 (Multicare Senior Subordinated Claims) | 931,348 | 2.27% |
| Subtotal | 8,825,774 | 21.53% |
| Total | 41,000,000 | 100.00% |

The New Common Stock will vote as a single class for the election of directors and on other matters that require shareholder approval and will be subject to dilution for the issuance of additional shares of New Common Stock, including in connection with the conversion of the New Convertible Preferred Stock, the exercise of the New Warrants, and the issuance of restricted shares of New Common Stock and options under the New Management Incentive Plan for key employees. The Management Incentive Plan is described in section VIII.F, below. The Plan of Reorganization will provide for authorization of sufficient shares of New Common Stock to accomplish the purposes described hereunder.

4.    *New Warrants*

On the Effective Date, Reorganized Genesis will issue warrants to purchase 4,559,475 shares of New Common Stock. This represents approximately 11.12% of the New Common Stock issued on the Effective Date, before dilution for stock issuances or the exercise of options under the New Management Incentive Plan for key employees described in section VIII.F, below. The New Warrants will expire on the first anniversary of the Effective Date and will have an exercise price of $20.33 per share of New Common Stock. The current valuation of the New Warrants of between $16,000,000 and $23,000,000 is based on (i) a volatility of 40% - 60%, (ii) a market price of $20.33 per share for the New Common Stock, (iii) the exercise price of $20.33 for the New Warrants, (iv) a one-year expiration for the New Warrants, and (v) a risk free rate of 3.6%.

5.    *New Multicare Common Stock*

On the Effective Date, Multicare will issue shares of its new common stock to the holders of claims in Classes M2, M4, and M5. This stock will not be distributed. Instead, it

31

will be exchanged for New Senior Notes, New Convertible Preferred Stock, New Common Stock, and New Warrants in accordance with the Plan and the terms of the Plan of Merger.

## I.    Deemed Consolidation of Certain Debtors for Purposes of the Plan

For purposes of distributions to Classes G2, G4, and G5, the Genesis Debtors will be considered to be a single legal entity. Similarly, for purposes of distributions to Classes M2, M4, and M5, the Multicare Debtors will be considered to be a single legal entity (although separate from the Genesis Debtors). This "deemed" consolidation has three major effects. First, it eliminates intercompany claims from the treatment scheme. Second, it eliminates guaranties of the obligations of one Genesis Debtor by another Genesis Debtor and one Multicare Debtor by another Multicare Debtor. Finally, each claim filed in Classes G2, G4, and G5 against any of the Genesis Debtors will be considered to be a single claim against the consolidated Genesis Debtors and each claim filed in Classes M2, M4, and M5 against any of the Multicare Debtors will be considered to be a single claim against the consolidated Multicare Debtors.

The deemed consolidation will not affect the legal and organizational structure of the Reorganized Debtors, the modification or reinstatement of claims in Classes G1 and M1 (with the legal, equitable, and contractual rights to which the holder of any such claim in Glass G1 or M1 being reinstated and unimpaired under the Plan being left unaltered), guaranties or the grants of collateral in connection with any financing entered into, or New Senior Notes issued, on the Effective Date or pursuant to any contract or lease that is assumed under the Plan, or distributions out of any insurance policies or proceeds of policies. The foregoing deemed consolidation of the Genesis Debtors will result in the deemed elimination of multiple and duplicative claims, joint and several liability claims and guaranties, and the payment of allowed claims against each of the Genesis Debtors from a common fund. The deemed consolidation of the Multicare Debtors will have the same effect in their respective chapter 11 cases.

Subject to the proviso contained at the end of this section, the Genesis Debtors and the Multicare Debtors believe that the foregoing deemed consolidation of their respective estates is warranted in light of the criteria established by the courts in ruling on the propriety of substantive consolidation in other cases. The two critical factors considered in assessing the entitlement to substantive consolidation are (i) whether creditors dealt with the Genesis Debtors or the Multicare Debtors as a single economic unit and did not rely on their separate identity in extending credit or (ii) whether the affairs of the Genesis Debtors or the Multicare Debtors are so entangled that consolidation will benefit all creditors. With respect to the first factor, creditors who make loans on the basis of the financial wherewithal of a separate entity expect to be able to look to the assets of their particular borrower for satisfaction of that loan. The second factor involves whether there has been a commingling of the assets and business functions and considers whether all creditors will benefit because untangling is either impossible or so costly as to consume the assets. The following is a discussion of these factors as they relate to the Genesis Debtors and the Multicare Debtors.

### 1.    Genesis Debtors

There is an ample factual basis for the deemed consolidation of the Genesis Debtors. First, the holders of the Genesis Senior Lender Claims dealt with substantially all the Genesis Debtors as a single economic unit and did not rely on their separate identity in extending credit. Specifically, almost all the Genesis Debtors are obligors under the credit agreement governing the Genesis Senior Lender Claims. In addition, almost all the Genesis Debtors granted first priority security interests in substantially all their assets and junior security interests in

32

certain properties already subject to liens to secure the Genesis Senior Lender Claims. This course of dealing and the expectations of the holders of the Genesis Senior Lender Claims together justify consolidation.

Second, the affairs of the Genesis Debtors are entangled to the extent that consolidation will benefit all creditors. The Genesis Debtors consist of Genesis and 152 of its direct and indirect subsidiaries. Genesis's integrated healthcare networks provide inpatient, pharmacy, medical supply, and other healthcare services through eldercare centers, long-term care pharmacies, medical supply distribution centers serving over 1,000 eldercare centers, and community-based pharmacies in over 40 states. There is little correlation between the names of the centers and the names of the legal entities that technically own such facilities. This fact alone will make it very difficult for creditors to ascertain which Genesis Debtors they have a claim against. In fact, due to the organization of their books and records, the Genesis Debtors filed with the Bankruptcy Court their statement of financial affairs, schedules of assets and liabilities, and schedules of executory contracts and unexpired leases on a partially consolidated basis.

Third, the books and records of the Genesis Debtors reflect a large amount of intercompany claims reflecting, among other things, advances from Genesis to fund and build its operations, upstreamed funds from the other Genesis Debtors to enable Genesis to make payments to creditors, the allocation of corporate overhead, and the transfer of other property from one Genesis Debtor to another. In view of the complexity of such transactions and the adjustments that have been made over time, it would be difficult to reconcile intercompany claims without embarking on an enormous effort that would diminish the return for all creditors.

Finally, for the most part, the business units of the Genesis Debtors operate as integrated units, without all the formalities of separate corporate entities. As such, the Genesis Debtors participate in a unified cash management system (which includes non-Debtor subsidiaries) which would make it extremely difficult to confirm a plan of reorganization for individual Genesis Debtors.

In view of the foregoing, the Genesis Debtors believe that creditors would not be prejudiced to any significant degree by the deemed consolidation proposed in the Plan of Reorganization, which is consistent with creditors' having dealt with the Genesis Debtors as a single economic entity, and further believe that such deemed consolidation would best utilize the Genesis Debtors' assets and potential of all of the Genesis Debtors to pay to the creditors of each entity the distributions proposed in the Plan of Reorganization.

2.    *Multicare Debtors*

There is an ample factual basis for the deemed consolidation of the Multicare Debtors. First, the Multicare Debtors all share a single manager -- Genesis -- which, as a general matter, operates each of the Multicare Debtors under the "Genesis" trade name.

Second, holders of the Multicare Senior Lender Claims dealt with substantially all the Multicare Debtors as a single economic unit and did not rely on their separate identity in extending credit. Specifically, almost all the Multicare Debtors are obligors under the credit agreement governing the Multicare Senior Lender Claims. In addition, almost all the Multicare Debtors granted first priority security interests in substantially all their assets and junior security interests in certain properties already subject to liens to secure the Multicare Senior Lender Claims. This course of dealing and the expectations of the holders of the Multicare Senior Lender Claims together justify consolidation.

33

Third, the affairs of the Multicare Debtors are entangled to the extent that consolidation will benefit all creditors. The Multicare Debtors operate as a single enterprise, and have a single line of business -- the operation of assisted living and skilled nursing care facilities. There is not always a correlation between the names of the centers and the names of the legal entities that technically own such facilities. This fact alone will make it very difficult for some creditors to ascertain which Multicare Debtors they have a claim against. In fact, due to the organization of their books and records, the Multicare Debtors filed with the Bankruptcy Court their statement of financial affairs, schedules of assets and liabilities, and schedules of executory contracts and unexpired leases on a partially consolidated basis.

Fourth, the books and records of the Multicare Debtors reflect a large amount of intercompany claims reflecting, among other things, advances from Multicare to fund and build its operations, upstreamed funds from the other Multicare Debtors to enable Multicare to make payments to creditors, the allocation of corporate overhead, and the transfer of other property from one Multicare Debtor to another. In view of the complexity of such transactions and the adjustments that have been made over time, it would be difficult to reconcile intercompany claims without embarking on an enormous effort that would diminish the return for all creditors.

Finally, for the most part, the Multicare Debtors operate as a single integrated unit, without all the formalities of separate corporate entities. As such, the Multicare Debtors participate in a unified cash management system (which includes non-Debtor subsidiaries) which would make it extremely difficult to confirm a plan of reorganization for individual Multicare Debtors.

In view of the foregoing, the Multicare Debtors believe that creditors would not be prejudiced to any significant degree by the deemed consolidation proposed in the Plan of Reorganization, which is consistent with creditors' having dealt with the Multicare Debtors as a single economic entity, and further believe that such deemed consolidation would best utilize the Multicare Debtors' assets and potential of all of the Multicare Debtors to pay to the creditors of each entity the distributions proposed in the Plan of Reorganization.

3.    *Proviso*

In the event the Plan of Reorganization is not confirmed, any and all statements made in section II.I, above and any and all evidence presented with respect to the appropriateness of the substantive consolidation of (i) each of the Genesis Debtors into a single legal entity for purposes of distributions under the Plan and (ii) each of the Multicare Debtors into a single legal entity for purposes of distributions under the Plan, shall be deemed withdrawn by the Debtors and shall not constitute admissions with respect to the appropriateness of substantive consolidation of such entities. The Plan represents a negotiated settlement among the holders of the Genesis Senior Lender Claims, the Multicare Senior Lender Claims, and the respective official committees of unsecured creditors appointed in the Genesis Debtors' and Multicare Debtors' reorganization cases concerning the distribution of property to unsecured creditors despite the deficiency claims of the holders of the Genesis Senior Lender Claims and the Multicare Senior Lender Claims. Because the Plan is a settlement, the statements contained herein and in the Plan are entitled to the protection of Rule 408 of the Federal Rules of Evidence.

**J.    Securities Law Matters**

Holders of allowed claims in Classes G2, G4, G5, M2, M4, and M5 will receive Plan Securities pursuant to the Plan of Reorganization. Section 1145 of the Bankruptcy Code

provides certain exemptions from the securities registration requirements of federal and state securities laws with respect to the distribution of securities under a plan of reorganization.

> *1.    Issuance and Resale of New Securities Under the Plan of Reorganization*

Section 1145 of the Bankruptcy Code provides that the securities registration requirements of federal and state securities laws do not apply to the offer or sale of stock, warrants, or other securities by a debtor if (i) the offer or sale occurs under a plan of reorganization, (ii) the recipients of securities hold a claim against, an interest in, or claim for administrative expense against the debtor, and (iii) the securities are issued in exchange for a claim against or interest in a debtor or are issued principally in such exchange and partly for cash and property. In reliance upon this exemption, the issuance of the New Senior Notes, the New Convertible Preferred Stock, the New Common Stock, and the New Warrants on the Effective Date as provided in the Plan of Reorganization generally will be exempt from the registration requirements of the Securities Act. Accordingly, such securities may be resold without registration under the Securities Act or other federal securities laws pursuant to an exemption provided by section 4(1) of the Securities Act, unless the holder is an "underwriter" (see discussion below) with respect to such securities, as that term is defined in the Bankruptcy Code. In addition, such securities generally may be resold without registration under state securities or "blue sky" laws pursuant to various exemptions provided by the respective laws of the several states. However, recipients of securities issued under the Plan of Reorganization are advised to consult with their own legal advisors as to the availability of any such exemption from registration under state law in any given instance and as to any applicable requirements or conditions to such availability.

Section 1145(b)(1) of the Bankruptcy Code defines "underwriter" for purposes of the Securities Act as one who, except with respect to "ordinary trading transactions" of an entity that is not an "issuer," (A) purchases a claim against, interest in, or claim for an administrative expense, with a view to distribution of any security to be received in exchange for the claim or interest, or (B) offers to sell securities issued under a plan to the holders of such securities, or (C) offers to buy securities issued under a plan from the holders of such securities, if the offer to buy is made with a view to distribution of such securities and under an agreement made in connection with the plan, the consummation of the plan, or the offer or sale of securities under the plan, or (D) is an issuer of the securities within the meaning of section 2(11) of the Securities Act.

The term "issuer" is defined in section 2(4) of the Securities Act; however, the reference contained in section 1145(b)(1)(D) of the Bankruptcy Code to section 2(11) of the Securities Act purports to include as statutory underwriters all persons who, directly or indirectly, through one or more intermediaries, control, are controlled by, or are under common control with, an issuer of securities. "Control" (as defined in Rule 405 under the Securities Act) means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise. Accordingly, an officer or director of a reorganized debtor or its successor under a plan of reorganization may be deemed to be a "control person" of such debtor or successor, particularly if the management position or directorship is coupled with ownership of a significant percentage of the reorganized debtor's or its successor's voting securities. Moreover, the legislative history of section 1145 of the Bankruptcy Code suggests that a creditor who owns ten percent (10%) or more of the securities of a reorganized debtor may be presumed to be a "control person."

35

To the extent that persons deemed to be "underwriters" receive Plan Securities pursuant to the Plan, resales by such persons would not be exempted by section 1145 of the Bankruptcy Code from registration under the Securities Act or other applicable law. Entities deemed to be statutory underwriters for purposes of section 1145 of the Bankruptcy Code may, however, be able, at a future time and under certain conditions described below, to sell securities without registration pursuant to the resale provisions of Rule 144 and Rule 144A under the Securities Act.

Under certain circumstances, holders of Plan Securities deemed to be "underwriters" may be entitled to resell their securities pursuant to the limited safe harbor resale provisions of Rule 144. Generally, Rule 144 provides that if certain conditions are met (e.g., the availability of current public information with respect to the issuer, volume limitations, and notice and manner of sale requirements), specified persons who resell "restricted securities" or who resell securities which are not restricted but who are "affiliates" of the issuer of the securities sought to be resold, will not be deemed to be "underwriters" as defined in section 2(11) of the Securities Act.

Pursuant to the Plan, certificates evidencing Plan Securities received by a holder of ten percent (10%) or more of the outstanding New Common Stock will bear a legend substantially in the form below in the event the Debtors reasonably believe such holder is an underwriter:

> **The securities evidenced by this certificate have not been registered under the Securities Act of 1933, as amended, or under the securities laws of any state or other jurisdiction and may not be sold, offered for sale, or otherwise transferred unless registered or qualified under said act and applicable state securities laws or unless the company receives an opinion of counsel reasonably satisfactory to it that such registration or qualification is not required.**

Any person or entity that would receive legended securities as provided above may instead receive certificates evidencing Plan Securities without such legend if, prior to the Effective Date, such person or entity delivers to Reorganized Genesis (i) an opinion of counsel reasonably satisfactory to Reorganized Genesis to the effect that the Plan Securities to be received by such person or entity are not subject to the restrictions applicable to "underwriters" under section 1145 of the Bankruptcy Code and may be sold without registration under the Securities Act and (ii) a certification that such person or entity is not an "underwriter" within the meaning of section 1145 of the Bankruptcy Code.

Any holder of a certificate evidencing Plan Securities bearing such legend may present such certificate to the transfer agent for the shares of Reorganized Genesis for exchange for one or more new certificates not bearing such legend or for transfer to a new holder without such legend at such time as (i) such shares are sold pursuant to an effective registration statement under the Securities Act, or (ii) such holder delivers to Reorganized Genesis an opinion of counsel reasonably satisfactory to Reorganized Genesis to the effect that such shares are no longer subject to the restrictions applicable to "underwriters" under section 1145 of the Bankruptcy Code and may be sold without registration under the Securities Act or to the effect that such transfer is exempt from registration under the Securities Act, in which event the certificate issued to the transferee shall not bear such legend, unless otherwise specified in such opinion.

Whether or not any particular person would be deemed to be an "underwriter" of Plan Securities to be issued pursuant to the Plan, or an "affiliate" of Reorganized Genesis, would depend upon various facts and circumstances applicable to that person. Accordingly, the Debtors express no view as to whether any such person would be such an "underwriter" or an "affiliate."

**In view of the complex, subjective nature of the question of whether a particular person may be an underwriter or an affiliate of Reorganized Genesis, the Debtors make no representations concerning the right of any person to trade in Plan Securities. Accordingly, the Debtors recommend that potential recipients of Plan Securities consult their own counsel concerning whether they may freely trade such securities.**

2.    *Listing*

Reorganized Genesis will use reasonable commercial efforts to continue to be a reporting company under the Securities Exchange Act of 1934 and will continue to file periodic and current reports as required by that statute. Reorganized Genesis will also list the New Common Stock on a nationally recognized market or exchange or a qualifying interdealer quotation system. Listing criteria initially may not be satisfied.

3.    *Secondary Stock Offering*

Reorganized Genesis will undertake a secondary stock offering for up to 30% of the shares of New Common Stock received by holders of Genesis Senior Lender Claims and Multicare Senior Lender Claims. Reorganized Genesis will retain an underwriter and holders of the New Common Stock may enter into underwriter agreements with such entity. The secondary stock offering will take place as soon as reasonably practical after the Effective Date, but no sooner than the time when Reorganized Genesis has filed financial reports with the Securities and Exchange Commission for two full financial quarters after the Effective Date.

4.    *Registration Rights*

The Plan of Reorganization provides for the execution of a registration rights agreement, under which Reorganized Genesis will have the obligation to register the Plan Securities. A copy of the registration rights agreement will be part of the Plan Supplement.

**K.    Settlement and Compromise**

The Plan incorporates two significant settlements under Bankruptcy Rule 9019. The settlement with the federal government is being submitted for approval to the Bankruptcy Court. Approval for the settlement between the Genesis Debtors and the Multicare Debtors will be sought at the time of the hearing on confirmation of the Plan. On the Effective Date, the settlement between the Genesis Debtors and the Multicare Debtors will be binding on the Debtors and all holders of claims or interests in these chapter 11 cases. Entry of the order confirming the Plan will constitute a finding that this compromise and settlement is in the best interests of the Genesis Debtors and the Multicare Debtors, are fair, equitable, and reasonable, and are made in good faith in accordance with Bankruptcy Rule 9019.

1.    *Settlement with the Federal Government*

The Genesis Debtors have entered into a settlement agreement to resolve four pending civil *qui tam* suits filed by private citizens under the federal False Claims Act, 31 U.S.C.

37

3729 *et seq.* Each action will be dismissed and a release executed, consistent with the settlement agreement, for a total payment of $2,095,000, plus statutory attorneys' fees in the amount of approximately $80,000. The Genesis Debtors dispute the allegations asserted in these actions, and the agreement contains no admission of liability. The settlement agreement will resolve all claims against the Debtors in connection with these suits.

The parties to the settlement agreement are Genesis and certain affiliates, the private citizens who brought the suits, the Department of Justice, and the Office of Inspector General for the Department of Health and Human Services. The Department of Justice will provide a release of all administrative and civil monetary claims under the False Claims Act, Civil Monetary Penalties Law, Program Fraud Civil Remedies, common law theories of payment by mistake, unjust enrichment, breach of contract, and fraud for the covered conduct in the agreement. The Office of Inspector General will provide a release of its permissive exclusion remedies for the covered conduct in the agreement.

The Debtors are in negotiation with CMS over claims asserted by that agency, as well as claims asserted by Genesis and Multicare regarding reimbursement issues. The parties are working towards a global negotiation of the pending claims.

2.    *Settlement Between the Genesis Debtors and the Multicare Debtors*

Genesis has managed the Multicare Debtors pursuant to certain management services agreements since 1997. Those agreements were negotiated with the majority owners of Multicare at that time. As of the date the Multicare Debtors commenced their chapter 11 cases, approximately $36 million in deferred fees under these management services agreement and approximately $57 million on account of pharmacy, rehabilitation, and other ancillary services provided by Genesis to the Multicare Debtors remained outstanding.

In April 2000, the Multicare Debtors retained Beverly Anderson as their independent restructuring officer and as a director. Shortly thereafter, the Multicare Debtors retained Ernst & Young and E&Y Capital Advisers to assist Ms. Anderson in undertaking an investigation and evaluation of all the relationships between the Genesis Debtors and the Multicare Debtors, including the management services agreements. The Multicare Debtors, with the assistance of their legal and financial advisors, also evaluated potential claims that they may have against the Genesis Debtors. The Genesis Debtors engaged in a similar evaluation with respect to claims they held against the Multicare Debtors and claims held by the Multicare Debtors against the Genesis Debtors. These evaluations were not completed before the December 19, 2000 bar date, and the Multicare Debtors and the Genesis Debtors therefore agreed to extend the bar date to give them additional time to complete their analyses. Pursuant to a series of stipulations and orders, the bar date for the Multicare Debtors to assert claims against the Genesis Debtors, and for the Genesis Debtors to assert claims against the Multicare Debtors, presently is June 30, 2001, which the parties have agreed to extend to September 15, 2001.

After consideration of the merits of the claims between the Multicare Debtors and the Genesis Debtors, and after a series of settlement discussions and negotiations between the parties, the Genesis Debtors and the Multicare Debtors have determined to enter into a Settlement and Release Agreement (the "Genesis/Multicare Settlement"), a copy of which will be part of the Plan Supplement. Pursuant to the Genesis/Multicare Settlement, the Genesis Debtors and the Multicare Debtors shall set off their claims against one another and waive and release any and all claims against one another that they may have as of the date of the Settlement Agreement in excess of such setoff. Under the Settlement Agreement, the Genesis Debtors also will

38

acknowledge and agree that they will not seek to recover from the Multicare Debtors any deferred or unpaid management fees that might accrue or have accrued under the Management Agreement on and after the Commencement Date. The Debtors believe that the Genesis/Multicare Settlement represents a fair and equitable settlement of the claims between the parties and satisfies the standards for approval of settlements under Bankruptcy Rule 9019 and applicable law. In addition, the net results of the litigation of these counterclaims would not provide meaningful benefit to the creditors of the winning side. This results from the fact that such claims would share pro rata with hundreds of millions of dollars of other prepetition unsecured claims against the losing debtor and the recoveries under the Plan provide for a relatively small stock and warrant distribution. Moreover, sharing recoveries with the unsecured creditors on the losing side of this litigation could significantly dilute the recoveries of that group.

The Debtors will seek approval of the Genesis/Multicare Settlement in connection with confirmation of the Plan.

## L.    Reservation of "Cram Down" Rights

The Bankruptcy Code permits the Bankruptcy Court to confirm a chapter 11 plan of reorganization over the dissent of any class of claims or equity interests as long as the standards in section 1129(b) are met. This power to confirm a plan over dissenting classes -- often referred to as "cram down" -- is an important part of the reorganization process. It assures that no single group (or multiple groups) of claims or interests can block a restructuring that otherwise meets the requirements of the Bankruptcy Code and is in the interests of the other constituents in the case.

The Genesis Debtors and the Multicare Debtors each reserve the right to seek confirmation of the Plan, notwithstanding the rejection of the Plan by any class entitled to vote. In the event a class votes to reject the Plan, the Debtors will request the Bankruptcy Court to rule that the Plan meets the requirements specified in section 1129(b) of the Bankruptcy Code with respect to such class. The Debtors will also seek such a ruling with respect to each class that is deemed to reject the Plan.

### III.

### Voting Procedures And Requirements

Detailed voting instructions are provided with the ballot accompanying this Disclosure Statement. The following classes are the only ones entitled to vote to accept or reject the Plan.

| Subclass | Description |
|----------|-------------|
| G1-13 | Brakeley Park Center |
| G1-14 | North Cape Center |
| G1-15 | Oak Hill Center |
| G1-16 | Rittenhouse Pine Center |
| G1-17 | Synthetic Lease Claims |
| G2 | Genesis Senior Lender Claims |
| G4 | Genesis General Unsecured Claims |
| G5 | Genesis Senior Subordinated Note Claims |

39

| Subclass | Description |
|----------|-------------|
| M1-7 | Point Pleasant |
| M2 | Multicare Senior Lender Claims |
| M4 | Multicare General Unsecured Claims |
| M5 | Multicare Senior Subordinated Note Claims |

If your claim is not in one of these classes, you are not entitled to vote and you will not receive a ballot with this Disclosure Statement. If your claim is in one of these classes, you should read your ballot and follow the listed instructions carefully. Please use only the ballot that accompanies this Disclosure Statement.

| | |
|---|---|
| **Ballot information number:** | **For creditors of the Genesis Debtors: (800) 510-0923**<br>**For creditors of the Multicare Debtors: (800) 473-1419** |

### A.    Vote Required for Acceptance by a Class

Under the Bankruptcy Code, acceptance of a plan of reorganization by a class of claims is determined by calculating the number and the amount of claims voting to accept, based on the actual total claims voting. Acceptance requires an affirmative vote of a majority of the total claims voting and two-thirds in amount of the total claims voting.

### B.    Classes Not Entitled to Vote

Under the Bankruptcy Code, creditors are not entitled to vote if their contractual rights are unimpaired by the Plan or if they will receive no property under the Plan. Based on this standard, for example, the holders of claims in Classes G3 and M3 and certain miscellaneous secured claims are not being affected by the Plan. In addition, the holders of claims in Classes G7 and M7 and holders of equity interests in Classes G8, G9, G10, G11, and M8 are not receiving any property and are therefore deemed to reject the Plan. For a summary of the classes entitled to vote, see the charts in section II.C, above.

### C.    Voting

In order for your vote to be counted, your vote must be <u>received</u> by the voting agent at the following address before the voting deadline of 5:00 p.m., Pacific time, on August 17, 2001:

| If by overnight or hand delivery: | If by standard mailing: |
|---|---|
| **Poorman-Douglas Corporation**<br>**10300 S.W. Allen Boulevard**<br>**Beaverton, Oregon 97005**<br>**Attn: Genesis-Multicare Balloting Ctr.** | **Poorman-Douglas Corporation**<br>**P.O. Box 4390**<br>**Portland, Oregon 97208-4390**<br>**Attn: Genesis-Multicare**<br>**Balloting Center** |

If the instructions on your ballot require you to return the ballot to your bank, broker, or other nominee, or to their agent, you must deliver your ballot to them in sufficient time

40

for them to process it and return it to the voting agent before the voting deadline. If a ballot is damaged or lost, you may contact the Debtors' voting agent at the number set forth above. Any ballot that is executed and returned but which does not indicate an acceptance or rejection of the Plan of Reorganization will not be counted.

IV.

Financial Information, Projections, and Valuation Analyses

**A.    Introduction**

This section provides summary information concerning the recent financial performance of the Genesis Debtors and the Multicare Debtors. They also provide a summary of five year projections and financial statements for each group of Debtors. Finally, the following discusses an estimate of a going concern valuation for the Genesis Debtors and the Multicare Debtors, based on information available at the time of the preparation of this Disclosure Statement. For purposes of these valuations, the Genesis Debtors and an independent Restructuring Officer for the Multicare Debtors renegotiated the terms of the management and service agreements between the Debtors to reflect current market conditions. The effects of those changes have been included in the projections and valuations described below.

The financial projections assume that the Plan will be confirmed and consummated in accordance with its terms and that there will be no material change in the legislation or negotiation that will have an unexpected impact on the Debtors' operations. The Projections assume an Effective Date of September 30, 2001, with allowed claims treated in accordance with those provided for in the Plan. Expenses incurred as a result of the reorganization cases are assumed to be paid upon confirmation of the Plan of Reorganization. If the Debtors do not emerge from chapter 11 by September 30, 2001, additional bankruptcy expenses will be incurred until such time as a plan of reorganization is confirmed. These expenses could significantly impact the Debtors' results of operations and cash flows. The financial projections of both Genesis and Multicare were prepared individually and on an unlevered basis. Pursuant to the Plan, the Debtors are to be merged, and accordingly, the impact of the new Plan Securities is reflected on a pro forma consolidated basis.

It is important to note that the projections and estimates of values described below may differ from actual performance and are highly dependent on significant assumptions concerning the future operations of these businesses. These assumptions include reimbursement levels under the Medicare and state Medicaid programs, professional liability insurance costs, growth of certain lines of business, labor, and other operating costs, inflation, and the level of investment required for capital expenditures and working capital. Please refer to section IX, below, for a discussion of many of the factors that could have a material effect on the information provided in this section.

The estimates of value are not intended to reflect the values that may be attainable in public or private markets. They also are not intended to be appraisals or reflect the value that may be realized if assets are sold.

41