**B.    The Genesis Debtors**

    *1.    Operating Performance*

        For a recent description of the operating performance of the Genesis Debtors and the Multicare Debtors on a consolidated basis, see the Form 10-K for the fiscal year ended September 30, 2000, which was filed by Genesis with the Securities and Exchange Commission on February 21, 2001, and the Form 10-Q for the period ended March 31, 2001, and the Form 10-Q for the period ended March 31, 2001, which was filed by Genesis on May 17, 2001. The following is a consolidating balance sheet and income statement indicating the relative contribution of Genesis and Multicare, individually, to the consolidated totals for the same periods.

**Balance Sheet for the Year Ended December 31, 2000 ($000)**

|  | Genesis | Multicare | Eliminations | Consolidated |
|---|---|---|---|---|
| Cash and equivalents | $ 3,312 | $ 19,636 | $ - | $ 22,948 |
| Restricted investments in marketable securities | 27,899 | - | - | 27,899 |
| Accounts receivable, net | 396,473 | 101,953 | (51,812) | 446,614 |
| Other current assets | 102,931 | 16,929 | - | 119,860 |
| Current Assets | 530,615 | 138,518 | (51,812) | 617,321 |
| Property and equipment, net | 543,901 | 563,445 | - | 1,107,346 |
| Goodwill and other intangibles, net | 897,500 | 337,806 | - | 1,235,306 |
| Other long-term assets | 207,401 | 61,924 | (101,399) | 167,926 |
| Total Assets | $ 2,179,417 | $ 1,101,693 | $ (153,211) | $ 3,127,899 |
| Current installments of long-term debt | $ 133,000 | $ - | $ - | $ 133,000 |
| Other current liabilities | 127,440 | 69,694 | (17,054) | 180,080 |
| Current Liabilities | 260,440 | 69,694 | (17,054) | 313,080 |
| Liabilities subject to compromise | 1,665,921 | 875,111 | (94,359) | 2,446,673 |
| Deferred income taxes | - | 54,082 | - | 54,082 |
| Other long term liabilities | 51,113 | 14,141 | (3,140) | 62,114 |
| Minority interest | 6,052 | - | 50,007 | 56,059 |
| Redeemable preferred stock (subject to compromise) | 442,820 | - | - | 442,820 |
| Shareholders' equity (deficit) | (246,929) | 88,665 | (88,665) | (246,929) |
| Total Liabilities and shareholders' deficit | $ 2,179,417 | $ 1,101,693 | $ (153,211) | $ 3,127,899 |

**Income Statement for the Year Ended September 30, 2000 ($000)**

|  | Genesis | Multicare | Eliminations | Consolidated |
|---|---|---|---|---|
| Pharmacy and medical supply services | $ 993,215 | $ - | $ (40,865) | $ 952,350 |
| Inpatient services | 688,073 | 632,078 | - | 1,320,151 |
| Other revenues | 243,126 | 13,501 | (95,270) | 161,357 |
| Revenues, net | 1,924,414 | 645,579 | (136,135) | 2,433,858 |

42

| | Genesis | Multicare | Eliminations | Consolidated |
|---|---|---|---|---|
| Operating expenses | | | | |
| Operating expenses | 1,740,701 | 592,865 | (136,135) | 2,197,431 |
| Debt restructuring, reorganization and other charges | 250,999 | 186,503 | - | 437,502 |
| Loss on sale of eldercare centers | - | 7,922 | - | 7,922 |
| Multicare joint venture restructuring charge | 420,000 | - | - | 420,000 |
| EBITDAR | (487,286) | (141,711) | - | (628,997) |
| Lease expense | 25,159 | 12,965 | - | 38,124 |
| EBITDA | (512,445) | (154,676) | - | (667,121) |
| Depreciation and amortization | 78,897 | 38,064 | - | 116,961 |
| Interest expense (Note A) | 145,627 | 57,943 | - | 203,570 |
| Pretax loss before income tax (benefit), minority interest, equity in net income (loss) of unconsolidated affiliates and cumulative effect of accounting change | $ (736,969) | $ (250,683) | $ - | $ (987,652) |

Note A - Genesis and Multicare contractual interest expense for the period presented was $155,345 and $76,154, respectively.

**Balance Sheet as of March 31, 2001 ($000)**

| | Genesis | Multicare | Eliminations | Consolidated |
|---|---|---|---|---|
| Cash and equivalents | $ - | $ 23,867 | $ - | $ 23,867 |
| Restricted investments in marketable securities | 34,493 | - | - | 34,493 |
| Accounts receivable, net | 390,086 | 99,221 | (50,912) | 438,395 |
| Other current assets | 118,747 | 15,046 | - | 133,793 |
| Current Assets | 543,326 | 138,134 | (50,912) | 630,548 |
| Property and equipment, net | 542,938 | 539,093 | - | 1,082,031 |
| Goodwill and other intangibles, net | 884,055 | 332,489 | - | 1,216,544 |
| Other long-term assets | 194,883 | 59,485 | (99,689) | 154,679 |
| Total Assets | $ 2,165,202 | $ 1,069,201 | $ (150,601) | $ 3,083,802 |
| Current installments of long-term debt | $ 165,000 | $ - | $ - | $ 165,000 |
| Other current liabilities | 145,879 | 59,684 | (14,396) | 191,167 |
| Current Liabilities | 310,879 | 59,684 | (14,396) | 356,167 |
| Liabilities subject to compromise | 1,657,661 | 855,372 | (92,909) | 2,420,124 |
| Deferred income taxes | - | 54,082 | - | 54,082 |
| Other long term liabilities | 50,335 | 22,567 | (9,508) | 63,394 |
| Minority interest | 5,652 | - | 43,708 | 49,360 |
| Redeemable preferred stock (subject to compromise) | 455,735 | - | - | 455,735 |
| Shareholders' equity (deficit) | (315,060) | 77,496 | (77,496) | (315,060) |
| Total Liabilities and shareholders' deficit | $ 2,165,202 | $ 1,069,201 | $ (150,601) | $ 3,083,802 |

43

Income Statement for the Six Months Ended March 31, 2001 ($000)

| | Genesis | Multicare | Eliminations | Consolidated |
|---|---:|---:|---:|---:|
| Pharmacy and medical supply services | $ 529,543 | $ - | $ (18,368) | $ 511,175 |
| Inpatient services | 354,084 | 313,890 | - | 667,974 |
| Other revenues | 129,443 | 5,384 | (54,875) | 79,952 |
| Revenues, net | 1,013,070 | 319,274 | (73,243) | 1,259,101 |
| Operating expenses | | | | |
| Operating expenses | 922,881 | 295,015 | (73,243) | 1,144,653 |
| Debt restructuring, reorganization and other charges | 20,305 | 7,901 | - | 28,206 |
| (Gain)/loss on sale of eldercare center | (1,770) | 2,310 | - | 540 |
| EBITDAR | 71,654 | 14,048 | - | 85,702 |
| Lease expense | 12,301 | 6,200 | - | 18,501 |
| EBITDA | 59,353 | 7,848 | - | 67,201 |
| Depreciation and amortization | 36,466 | 16,921 | - | 53,387 |
| Interest expense (Note A) | 63,469 | 2,298 | - | 65,767 |
| Pretax loss before income tax (benefit), minority interest and equity in net income (loss) of unconsolidated affiliates | $ (40,582) | $ (11,371) | $ - | $ (51,953) |

Note A - Genesis and Multicare contractual interest expense for the period presented was $41,798 and $19,954, respectively.

2.    *Five Year Projections*

*General Operating Assumptions.*  Genesis will continue to operate its healthcare service businesses through its five lines of business: ElderCare, NeighborCare Pharmacies, Rehabilitation Services, Other Services, and Management Services & Overhead.  ElderCare operates long-term care nursing facilities, NeighborCare is Genesis's institutional pharmacy business and medical supply business, and Rehabilitation Services is the rehabilitation therapy business.  Other Services includes hospitality services, group purchasing services, diagnostic services, consulting services, and physician services.  Management Services & Overhead includes third party management contracts and administrative costs.

The operation of Genesis's business will not change materially from that described in Genesis's Form 10-K as of and for the year ended September 30, 2000.  The financial projections generally assume inflationary rate increases and relatively stable occupancy and pharmacy beds served.  The financial projections do not assume that Genesis acquires additional nursing facilities or new institutional pharmacies.  For purposes of calculating the financial projections of Reorganized Genesis it has been assumed that no consolidated NOLs or NOL carryforwards of the Genesis Group or the Multicare Group will survive the reorganization and that any reduction in the tax basis in depreciable or amortizable assets of the Debtors would be insignificant.

44

Fiscal year 2001 reflects the Genesis Business Plan developed through a detailed bottom-up budgeting approach. Fiscal years 2002-2006 have been projected using fiscal year 2001 as a basis and adjusted for anticipated changes in government reimbursement, patient mix, occupancy rates, and industry trends. The following represents the highlights of the financial projections:

- No growth assumed from acquisitions

- Revenue CAGR 2001-2006 of 5.6%

- EBITDA CAGR 2001-2006 of 4.5%

- EBITDA Margin % at 7.7% in 2001, increasing to 8.0% in 2002 and declining to 7.5% in 2006

- Capital expenditures at $40 million in 2001 and growing at a CAGR from 2001 to 2006 of 4.5%

*Projections.* The following table presents summary projected financial information for Genesis:

| | Fiscal Years ($ in 000's) | | | | | |
|---|---|---|---|---|---|---|
| | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 |
| Revenue | $2,039,000 | 2,126,000 | 2,229,000 | 2,349,000 | 2,476,000 | 2,610,000 |
| EBITDA | 158,000 | 170,000 | 174,000 | 182,000 | 190,000 | 197,000 |
| EBITDA % | 7.7% | 8.0% | 7.8% | 7.7% | 7.7% | 7.5% |
| Capital Expenditures | 40,000 | 42,000 | 44,000 | 46,000 | 48,000 | 50,000 |

More detailed information on the financial projections is included in the Plan Supplement.

### 3. *Going Concern Valuation*

UBS Warburg has acted as financial advisor for the Genesis Debtors in their chapter 11 cases. In connection with UBS Warburg's engagement, Genesis requested that UBS Warburg analyze the enterprise value of Genesis. The valuation analyses did not address other aspects of the proposed restructuring or any related transaction. The valuation analyses were prepared for the information of the Board of Directors of Genesis in connection with its consideration of the Plan of Reorganization and for the purpose of determining the value available to distribute to creditors pursuant the Plan and the relative recoveries to creditors thereunder. These analyses do not constitute a recommendation to any holder of claims against Genesis as to how to vote on the Plan. UBS Warburg's estimate of a range of enterprise value does not constitute an opinion as to the fairness from a financial point of view of the consideration to be received under the Plan or of the terms and provisions of the Plan.

45

In arriving at its views on valuation, UBS Warburg reviewed the Plan and certain related documents, as well as publicly available business and financial information relating to Genesis. UBS Warburg also reviewed other information relating to Genesis, including the 2001 to 2006 financial projections (the "Genesis Projections") (which are included in the Plan Supplement), which Genesis provided to or discussed with UBSW, and met with the management of Genesis to discuss the business and prospects of Genesis. A summary of the Genesis Projections are included above. UBS Warburg also considered financial data of Genesis and compared that data with similar data for other publicly held companies in businesses similar to Genesis and considered, to the extent publicly available, the financial terms of restructurings and other similar transactions that have recently been effected. UBS Warburg also considered other information, financial studies, analyses and investigations, and financial, economic, and market criteria that it deemed relevant.

The analysis of comparable companies involved identifying a group of publicly traded companies comparable, in whole or in part, to Genesis and then calculating ratios of the enterprise values and equity values (based on publicly traded stock prices) for such companies to certain operating and financing data estimates for such companies (i.e., EBITDAR and EBITDA). The ranges of ratios indicated by such analysis were then applied to corresponding operating and financial data and estimates for Genesis based on the Genesis Projections to derive an implied enterprise value. UBS Warburg also conducted a discounted cash flow analysis applied on the unlevered free cash flows that Genesis would generate assuming the Genesis Projections were realized. Based on discussions with management, UBS Warburg then applied a range of perpetual growth rates and discount rates based upon the weighted average cost of capital ("WACC") for Genesis after the restructuring. Genesis's WACC was determined by analyzing the WACC of comparable companies and applying the comparable companies' unlevered betas to Genesis's reorganized capital structure.

In connection with its review, UBS Warburg did not assume any responsibility for independent verification of any of the information that was provided to, or otherwise reviewed by, it and relied on that information being complete and accurate in all material respects. With respect to financial forecasts, UBS Warburg was advised, and assumed, that the Genesis Projections were reasonably prepared on bases reflecting the best currently available estimates and judgments of Genesis's management as to the future financial performance of Genesis after giving effect to the proposed restructuring. No representation or warranty, express or implied, can be or is made by UBS Warburg as to the accuracy or achievability of any such valuations, estimates, and/or forecasts, and UBS Warburg expressly disclaims any and all liability relating to or resulting from the use of this material. In addition, UBS Warburg assumed that the restructuring would be completed in accordance with the terms of the Plan without any amendments, modifications, or waivers and also assumed that in the course of obtaining the necessary judicial, regulatory, and third party consents for the proposed restructuring and related transactions, there will be no delays, modifications, or restrictions imposed that will have a material, adverse effect on the contemplated benefits of the proposed restructuring to Genesis. UBS Warburg was not requested to, and did not, make an independent evaluation or appraisal of the individual assets or liabilities, contingent or otherwise, of Genesis, and was not furnished with any such evaluations or appraisals. UBS Warburg's valuation analyses were based on information available to, and financial, economic, market, and other conditions as they existed and could be evaluated by, UBS Warburg on April 6, 2001. Actual results may vary from such estimates, valuation, or forecasts and such variations may be material.

The preparation of valuation analyses is a complex analytical process involving various determinations as to the most appropriate and relevant methods of financial analysis and

46

the application of those methods to particular facts and circumstances, many of which are beyond the control of Genesis and UBS Warburg. The valuation range indicated by UBS Warburg's analyses is not necessarily indicative of the prices at which the common stock or other securities of Genesis may be bought or sold or predictive of future financial results or values, which may be significantly more or less favorable than those indicated by the analyses. Accordingly, UBS Warburg's analyses and estimates are inherently subject to substantial uncertainty.

In arriving at its enterprise valuation, UBSW reviewed the current trading performance of Beverly Enterprises, HCR Manor Care, and Omnicare. This comparable company analysis indicated a range of multiples of enterprise to 2001 projected EBITDA multiples of 6.3x – 7.5x, and adjusted enterprise value (which capitalizes Genesis's rent expense as a long-term liability and accounts for other off balance sheet liabilities) to 2001 projected EBITDAR multiples of 6.5x – 7.7x. These ranges were based on the multiples indicated by the comparable companies identified above, adjusted to take into account, among other things, the relative size of the enterprise, payor mix, quality of assets, and business plan risk. The ranges were applied to Genesis's comparably projected 2001 EBITDA and EBITDAR.

UBS Warburg has advised Genesis that, based upon and subject to the foregoing, as of April 6, 2001, their analyses indicated that the enterprise value of Genesis would be between $1.0 billion and $1.25 billion.

## C.    The Multicare Debtors

### 1.    Operating Performance

For a recent description of the operating performance of the Multicare Debtors, see the Form 10-K for the fiscal year ended September 30, 2000, which was filed by The Multicare Companies, Inc. (the wholly-owned subsidiary of Multicare) with the Securities and Exchange Commission on February 21, 2001, and the Form 10-Q for the period ended March 31, 2001, which was filed on May 17, 2001.

### 2.    Five Year Projections

*General Operating Assumptions.* The Multicare only projections are exclusive of capital structure (100% equity) and fresh-start accounting is not applied. The projections assume no taxes are paid and no interest is either paid or accrued. These assumptions are made since a capital structure is not relevant in determining a total enterprise value for Multicare and the postbankruptcy capital structure is relevant to feasibility and other issues as applied against only the pro forma consolidated Genesis and Multicare. Accordingly, these issues are discussed in the consolidated assumption section of the Disclosure Statement.

Multicare will continue to operate in its primary line of business of ElderCare which operates nursing facilities.

The operations of Multicare's business will not change materially from that described in Multicare's Form 10-K as of and for the year ended September 30, 2000. The financial projections generally assume inflationary rate increases and relatively stable occupancy. The financial projections do not assume that Multicare will acquire additional nursing facilities. For purposes of calculating the financial projections of Reorganized Genesis it has been assumed that no consolidated NOLs or NOL carryforwards of the Genesis Group or the Multicare Group

47

will survive the reorganization and that any reduction in the tax basis in depreciable or amortizable assets of the Debtors would be insignificant.

Fiscal year 2001 reflects the Multicare Business Plan developed through a detailed bottom-up budgeting approach. Fiscal years 2002-2006 have been projected using fiscal year 2001 as a basis and adjusted for anticipated changes in government reimbursement, patient mix, occupancy rates, and industry trends. The following represents the highlights of the financial projections:

- No growth assumed from acquisitions

- Revenue CAGR 2001-2006 of 3.3%

- EBITDA CAGR 2001-2006 of 4.4%

- EBITDA Margin % at 8.7% in 2001, increasing to 9.2% in 2003, and remaining constant through 2006

- Capital expenditures at $10 million in 2001 and growing at a CAGR from 2001 to 2006 of 4.2%

*Projections.* The following table presents summary projected financial information for Multicare:

| | Fiscal Years *($ in 000's)* | | | | | |
|---|---|---|---|---|---|---|
| | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 |
| Revenue | $641,800 | 670,100 | 690,500 | 711,500 | 733,100 | 755,300 |
| EBITDA | 56,000 | 59,400 | 63,300 | 65,200 | 67,300 | 69,500 |
| EBITDA % | 8.7% | 8.9% | 9.2% | 9.2% | 9.2% | 9.2% |
| Capital Expenditures | 10,000 | 10,400 | 10,800 | 11,200 | 11,700 | 12,200 |

More detailed information on the financial projections is included in the Plan Supplement.

3.    *Going Concern Valuation*

Credit Suisse First Boston Corporation ("CSFB") has acted as financial advisor for the Multicare Debtors in their chapter 11 cases. In connection with CSFB's engagement, Multicare requested that CSFB analyze the enterprise value of Multicare. The valuation analyses did not address other aspects of the proposed restructuring or any related transaction. The valuation analyses were prepared for the information of the Board of Directors of Multicare in connection with its consideration of the Plan of Reorganization and for the purpose of determining the value available to distribute to creditors pursuant to the Plan and the relative recoveries to creditors thereunder. These analyses do not constitute a recommendation to any holder of claims against Multicare as to how to vote on the Plan. CSFB's estimate of a range of

enterprise value does not constitute an opinion as to the fairness from a financial point of view of the consideration to be received under the Plan or of the terms and provisions of the Plan.

In arriving at its views on valuation, CSFB reviewed the Plan and certain related documents, as well as publicly available business and financial information relating to Multicare. CSFB also reviewed other information relating to Multicare, including the 2001 to 2006 financial projections (the "Multicare Projections") (which are included in the Plan Supplement), which Multicare provided to or discussed with CSFB, and met with the management of Multicare to discuss the business and prospects of Multicare. A summary of the Multicare Projections is included above. CSFB also considered financial data of Multicare and compared that data with similar data for other publicly held companies in businesses similar to Multicare and considered, to the extent publicly available, the financial terms of restructurings and other similar transactions that have recently been effected. CSFB also considered other information, financial studies, analyses and investigations, and financial, economic, and market criteria that it deemed relevant.

The analysis of comparable companies involved identifying a group of publicly traded companies comparable, in whole or in part, to Multicare and then calculating ratios of the enterprise values and equity values (based on publicly traded stock prices) for such companies to certain operating and financing data estimates for such companies (i.e., EBITDAR and EBITDA). The ranges of ratios indicated by such analysis were then applied to corresponding operating and financial data and estimates for Multicare based on the Multicare Projections to derive an implied enterprise value. CSFB also conducted a discounted cash flow analysis applied on the unlevered free cash flows that Multicare would generate assuming the Multicare Projections were realized. Based on discussions with management, CSFB then applied a range of perpetual growth rates and discount rates based upon the weighted average cost of capital ("WACC") for Multicare after the restructuring. Multicare's WACC was determined by analyzing the WACC of comparable companies and applying the comparable companies' unlevered betas to Multicare's reorganized capital structure.

In connection with its review, CSFB did not assume any responsibility for independent verification of any of the information that was provided to, or otherwise reviewed by, it and relied on that information being complete and accurate in all material respects. With respect to financial forecasts, CSFB was advised, and assumed, that the Multicare Projections were reasonably prepared on bases reflecting the best currently available estimates and judgments of Multicare's management as to the future financial performance of Multicare after giving effect to the proposed restructuring. In addition, CSFB assumed that the restructuring would be completed in accordance with the terms of the Plan without any amendments, modifications, or waivers and also assumed that in the course of obtaining the necessary judicial, regulatory, and third party consents for the proposed restructuring and related transactions, there will be no delays, modifications, or restrictions imposed that will have a material, adverse effect on the contemplated benefits of the proposed restructuring to Multicare. CSFB was not requested to, and did not, make an independent evaluation or appraisal of the individual assets or liabilities, contingent or otherwise, of Multicare, and was not furnished with any such evaluations or appraisals. CSFB's valuation analyses were based on information available to, and financial, economic, market, and other conditions as they existed and could be evaluated by, CSFB on March 19, 2001.

The preparation of valuation analyses is a complex analytical process involving various determinations as to the most appropriate and relevant methods of financial analysis and the application of those methods to particular facts and circumstances, many of which are beyond the control of Multicare and CSFB. The valuation range indicated by CSFB's analyses is not

necessarily indicative of the prices at which the common stock or other securities of Multicare may be bought or sold or predictive of future financial results or values, which may be significantly more or less favorable than those indicated by the analyses. Accordingly, CSFB's analyses and estimates are inherently subject to substantial uncertainty.

        In arriving at its enterprise valuation though the comparable company analysis, CSFB reviewed the enterprise values of Beverly Enterprises and HCR Manor Care and the reorganization value of Vencor (now known as Kindred Healthcare, Inc.) reflected in the company's disclosure statement. This comparable company analysis indicated a range of multiples of enterprise value to 2001 projected EBITDA in the range of 5.0x - 7.0x and of adjusted enterprise value (which capitalizes Multicare's rent expense as a long-term liability and accounts for other off balance sheet liabilities) to 2001 projected EBITDAR in the range of 6.0x - 8.0x. These ranges were based on the multiples indicated by the comparable companies identified above adjusted to take into account, among other things, the relative size of the enterprise, payor mix, quality of assets, and business plan risk. These ranges were then applied to Multicare's projected 2001 EBITDA and EBITDAR.

        CSFB has advised Multicare that, based upon and subject to the foregoing, as of March 20, 2001, their analyses indicated that the enterprise value of Multicare would be between $350 million and $400 million.

**D.    Reorganized Genesis (Merger of Genesis and Multicare)**

    *1.    Operating Performance*

        Genesis currently reports its financial results on a consolidated basis with Multicare. The most recent results can be found in the Form 10-K for the fiscal year ended September 30, 2000, which was filed with the Securities and Exchange Commission on February 21, 2001, and the Form 10-Q for the fiscal quarter ended March 31, 2001, which was filed on May 17, 2001.

    *2.    Five Year Projections*

        The following table presents summary projected financial information for the combined companies of Genesis and Multicare:

| | Fiscal Years ($ in 000's) | | | | | |
|---|---|---|---|---|---|---|
| | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 |
| Revenue | $2,545,443 | 2,660,686 | 2,783,726 | 2,924,518 | 3,073,072 | 3,229,942 |
| EBITDA | 214,457 | 229,743 | 238,163 | 247,495 | 257,094 | 266,917 |
| EBITDA % | 8.4% | 8.6% | 8.6% | 8.5% | 8.4% | 8.3% |
| Capital Expenditures | 50,000 | 52,400 | 54,800 | 57,200 | 59,700 | 62,200 |

        More detailed information on the financial projections is included in the Plan Supplement.

V.

### Business Description and Reasons for Chapter 11

A.    **The Debtors' Businesses**

The Genesis Debtors and the Multicare Debtors are leading providers of healthcare and support services to the elderly. They operate inpatient facilities in five regional areas of the United States and a national pharmacy and medical supply business. The Genesis Debtors also provide an extensive range of rehabilitation therapy services, including speech pathology and physical and occupational therapy, through six certified rehabilitation agencies. Other related healthcare services provided by the Genesis Debtors include management of elder care centers, group purchasing and shared services programs, portable x-ray, diagnostic, home healthcare, physician, adult day care, staffing, transportation, and consulting services.

1.    *Relationship Between the Genesis Debtors and the Multicare Debtors*

Prior to October 1997, The Multicare Companies, Inc. was publicly-owned and not affiliated with the Genesis Debtors. Genesis, The Cypress Group, L.L.C., TPG Partners II, L.P., and Nazem, Inc. formed Genesis ElderCare Corp. for the purpose of acquiring The Multicare Companies, Inc. Through a tender offer and merger transaction, Genesis ElderCare Corp. (a Multicare Debtor) acquired 100% of the outstanding stock of The Multicare Companies, Inc. Genesis owns 43.6% of the common stock of Genesis ElderCare Corp. Genesis ElderCare Network Services, Inc., one of the Genesis Debtors, manages Genesis ElderCare Corp. pursuant to a management services agreement, dated as of October 7, 1997.

At the time the management services agreement and other agreements were entered into, Multicare was controlled by parties unrelated to Genesis or the Genesis Debtors. The terms of these agreements were the product of arm's-length negotiations between Genesis and the parties controlling Multicare and the agreements were approved by Multicare's independent board of directors. In addition, the terms were disclosed at the time of the issuance of Multicare's senior subordinated notes (Class M5).

Services provided by Genesis to Multicare under the management services and other agreements between the parties include operational oversight and management of Multicare's inpatient facilities, rehabilitation, pharmacy, medical supply, and other operational services, as well as accounting, financial services, and corporate administrative services. (In addition to the management services agreement, Genesis (through Genesis ElderCare Rehabilitation Services, Inc., a Genesis Debtor) is the predominant provider of inpatient and outpatient rehabilitation services for Multicare's facilities, and Genesis also is currently the predominant provider of institutional pharmacy services for Multicare's facilities.) In accordance with the understandings between Genesis and Multicare's independent board, the prices under the ancillary agreements were adjusted each year to reflect changes in the marketplace and the market median rate charged by Genesis for similar goods and services provided to other parties.

In November 1999, as part of an overall restructuring of the financial obligations of Genesis and Multicare, Genesis became the effective controlling shareholder of Multicare. At that time, the independent members of the board of directors of Multicare resigned. At no time since that change in control were any changes made to the management services and other agreements that were beneficial to Genesis. Within seven months after the change in control, both Genesis and Multicare filed these chapter 11 cases.

51

Multicare's board of directors now consists of two members of Genesis's board of directors, one Genesis officer, and one independent director and officer unaffiliated with Genesis (the "Independent Director"). Each of Multicare's officers (other than the Independent Director) is also an officer of or affiliated with Genesis. As Multicare has no corporate infrastructure and relies upon Genesis to provide operational oversight and accounting, financial, and corporate administrative services, the Independent Director was hired in April 2000 to review and evaluate Multicare's relationships with Genesis.

To assist the Independent Officer in performing its duties, Multicare retained Ernst & Young and E&Y Capital Advisers (together, "E&Y") to conduct a comprehensive review and analysis of the related party transactions between Genesis and Multicare. In this regard, E&Y reviewed the following broad lines of contractual and/or business relationships between Genesis and Multicare: (a) Genesis's management of Multicare; (b) Genesis's provision of rehabilitation services to Multicare; (c) Genesis's provision of hospitality services to Multicare; and (d) Genesis's provision of pharmacy services to Multicare. More specifically, E&Y evaluated, among other matters, (i) whether the rehabilitation therapy rates being charged by Genesis were the same or better than those Genesis charged to third parties, (ii) the expected costs and required management structure if Multicare were to provide these services directly, (iii) the costs, benefits, and structure of the hospitality services (such as food, dietary, housekeeping, linen, and laundry services) being provided by Genesis to Multicare, (iv) the cost and structure of the management services agreement, and (v) the cost and structure of the pharmacy services being provided by Genesis to Multicare.

The Independent Director, utilizing the findings and recommendations of E&Y, thereafter engaged in negotiations with Genesis management regarding the terms of the related party relationships to reflect current market conditions. Ultimately, Multicare and Genesis agreed to modifications of the related party business and contractual relationships that resulted in an annualized cost savings to the Multicare Debtors of approximately $12 million. The effects of these changes have been included in the budgets, projections, and valuations described in section IV, above. Thus, the effects have been included in the materials needed for valuation of the separate estates of the Genesis Debtors and the Multicare Debtors. However, the effects of the changes have not been reflected in Multicare's historical financial statements and new contracts have not actually been entered into due to the proposed merger of Genesis and Multicare.

2.    *Pharmacy and Medical Supply Services (Genesis Debtors)*

The Genesis Debtors provide pharmacy and medical supply services through their NeighborCare pharmacy subsidiaries. Included in pharmacy and medical supply service revenues are institutional pharmacy revenues, which include the provision of prescription and nonprescription pharmaceuticals, infusion therapy, medical supplies, and equipment provided to eldercare centers operated by the Genesis Debtors, as well as to independent healthcare providers by contract. The pharmacy services provided in these settings are tailored to meet the needs of the institutional customer. These services include highly specialized packaging and dispensing systems, computerized medical records processing, and 24-hour emergency services. NeighborCare provides institutional pharmacy products and services to the elderly, chronically ill, and disabled in long-term care and alternate sites settings, including skilled nursing facilities, assisted living facilities, residential and independent living communities, and the home. The Genesis Debtors also provide pharmacy consulting services to assure proper and effective drug therapy. The Genesis Debtors provided these services through institutional pharmacies (one is jointly-owned) and medical supply distribution centers located in their various market areas. In addition, the Genesis Debtors operated community-based pharmacies which are located in or near

52

medical centers, hospitals, and physician office complexes. The community-based pharmacies provide prescription and over-the-counter medications and certain medical supplies as well as personal service and consultation by licensed professional pharmacists. Approximately 91% of the sales attributable to all pharmacy operations in the twelve months ended September 30, 2000 were generated through external contracts with independent healthcare providers, with the balance attributable to centers owned or leased by the Genesis Debtors, including centers jointly owned with the Multicare Debtors.

3.    *Inpatient Services (Genesis Debtors and Multicare Debtors)*

The Genesis Debtors own, lease, or manage eldercare centers, standalone assisted living facilities, and transitional care units located in 15 states. These include eldercare centers owned or leased by the Multicare Debtors. The skilled nursing centers of the Genesis Debtors and the Multicare Debtors offer three levels of care for their customers: skilled, intermediate, and personal. Skilled care provides 24-hour per day professional services of a registered nurse; intermediate care provides less intensive nursing care; and personal care provides for the needs of customers requiring minimal supervision and assistance. Each eldercare center is supervised by a licensed healthcare administrator and engages the services of a Medical Director to supervise the delivery of healthcare services to residents and a Director of Nursing to supervise the nursing staff. The Genesis Debtors maintain a corporate quality assurance program to monitor regulatory compliance and to enhance the standard of care provided in each center.

The Genesis Debtors have established and actively market programs for elderly and other customers who require subacute levels of medical care. These programs include ventilator care, intravenous therapy, postsurgical recovery, respiratory management, orthopedic or neurological rehabilitation, terminal care, and various forms of coma, pain, and wound management. Private insurance companies and other third party payors, including certain state Medicaid programs, have recognized that treating customers requiring subacute medical care in centers such as those operated by the Genesis Debtors and the Multicare Debtors is a cost-effective alternative to treatment in an acute care hospital. The Genesis Debtors and the Multicare Debtors provide such care at rates that they believe are substantially below the rates typically charged by acute care hospitals for comparable services.

4.    *Other Services (Genesis Debtors and Multicare Debtors)*

*Rehabilitation Therapy*. The Genesis Debtors provide an extensive range of rehabilitation therapy services, including speech pathology, physical therapy, and occupational therapy, through six certified rehabilitation agencies in all five of their regional market concentrations. These services are provided by approximately 3,200 licensed rehabilitation therapists and assistants employed or contracted by Genesis to substantially all of the eldercare centers it operates, as well as by contract to healthcare facilities operated by others.

*Management Services*. The Genesis Debtors provided management services to 190 eldercare centers (including those owned or leased by the Multicare Debtors) pursuant to management agreements that provide generally for the day-to-day responsibility for the operation and management of the centers. In turn, the Genesis Debtors receive management fees, depending on the agreement, computed as either an overall fixed fee, a fixed fee per customer, a percentage of net revenues of the center plus an incentive fee, or a percentage of gross revenues of the center with some incentive clauses. The various management agreements, including option periods, are scheduled to terminate between 2001 and 2015. The Genesis Debtors have arranged for the extension of various mortgage and other loans to certain facilities under management

53

contract. The Multicare Debtors also provided management services to eldercare centers pursuant to similar management agreements in return for management fees specified in the relevant agreement.

*Group Purchasing.* The Genesis Debtors jointly own and operate The Tidewater Healthcare Shared Services Group, Inc. ("Tidewater"), one of the largest group purchasing companies in the MidAtlantic region. Tidewater provides purchasing and shared service programs specially designed to meet the needs of eldercare centers and other long-term care facilities. Tidewater's services are contracted to approximately 3,100 members with over 308,000 beds in 45 states and the District of Columbia.

*Other Services.* The Genesis Debtors employ or have consulting arrangements with approximately 81 physicians, physician assistants, and nurse practitioners who are primarily involved in designing and administering clinical programs and directing patient care. The Genesis Debtors also provide an array of other specialty medical services in certain parts of their eldercare network, including portable x-ray and other diagnostic services, home healthcare services, adult day care services, consulting services, respiratory health services and hospitality services such as dietary, housekeeping, laundry, plant operations, and facilities management services.

5.    *Revenue Sources*

The Genesis Debtors and the Multicare Debtors receive revenues from Medicare, Medicaid, private insurance, self-pay residents, other third party payors, and long term care facilities which utilize their specialty medical services. The health care industry is experiencing the effects of the federal and state governments' trend toward cost containment, as government and other third party payors seek to impose lower reimbursement and utilization rates and negotiate reduced payment schedules with providers. These cost containment measures, combined with the increasing influence of managed care payors and competition for patients, generally have resulted in reduced rates of reimbursement for services provided by the Genesis Debtors and the Multicare Debtors.

The sources and amounts of the patient revenues for the Genesis Debtors and the Multicare Debtors are determined by a number of factors, including licensed bed capacity and occupancy rates of the nursing centers, the mix of patients, and the rates of reimbursement among payors. Changes in the case mix of the patients as well as payor mix among private pay, Medicare, and Medicaid significantly affect the profitability of the Genesis Debtors and the Multicare Debtors.

Additional detail on the operations and business segments of the Genesis Debtors and the Multicare Debtors can be found in Genesis's annual report on Form 10-K for the fiscal year ended September 30, 2000 and quarterly report on Form 10-Q for the fiscal quarter ended March 31, 2001, and in Multicare's annual report on Form 10-K for the fiscal year ended September 30, 2000, and its quarterly report on Form 10-Q for the fiscal quarter ended March 31, 2001.

6.    *Personnel*

At December 31, 2000, the Debtors employed over 46,000 people, including approximately 33,000 full-time and 13,000 part-time employees. Approximately 19% of these

54

employees are physicians, nurses, and professional staff. Approximately 13,000 of these employees are employed by the Multicare Debtors.

Including Multicare, the Debtors currently have 81 facilities that are covered by, or are negotiating, collective bargaining agreements. The agreements expire at various dates from 2001 through 2005 and cover approximately 5,100 employees. The Debtors believe that their relationship with their employees is generally good.

The Debtors and the industry continue to experience significant shortages in qualified professional clinical staff. They compete with other healthcare providers and with nonhealthcare providers for both professional and nonprofessional employees. As the demand for these services continually exceeds the supply of available and qualified staff, the Debtors and their competitors have been forced to offer more attractive wage and benefit packages to these professionals and to utilize outside contractors for these services at premium rates. Furthermore, the competitive arena for this shrinking labor market has created high turnover among clinical professional staff as many seek to take advantage of the supply of available positions, each offering new and more attractive wage and benefit packages. In addition to the wage pressures inherent in this environment, the cost of training new employees amid the high turnover rates has caused added pressure on the Debtors' operating margins. While the Debtors have been able to retain the services of an adequate number of qualified personnel to staff their facilities appropriately and maintain their standards of quality care, there can be no assurance that continued shortages will not in the future affect their ability to attract and maintain an adequate staff of qualified healthcare personnel. A lack of qualified personnel at a facility could result in significant increases in labor costs at such facility or otherwise adversely affect operations at such facility. Any of these developments could adversely affect the Debtors' operating results or business strategy.

**B.**    **Events Leading to the Commencement of the Chapter 11 Cases**

The Genesis Debtors and the Multicare Debtors believe that their financial difficulties are attributable to a number of factors. First, the federal government has made fundamental changes to the reimbursement for medical services provided to eligible individuals. The changes have had a significantly negative impact on the healthcare industry as a whole and on the Debtors' cash flows. Second, the federal reimbursement changes have exacerbated a long-standing problem of less than fair reimbursement by the states for medical services provided to indigent persons. Third, numerous other factors have adversely affected the Debtors' cash flows, including increased labor costs, increased professional liability costs and insurance, and increased interest rates. Finally, as a result of declining governmental reimbursement rates and in the face of rising inflationary costs, the Debtors were too highly leveraged to service their indebtedness.

   *1.*    *Medicare Reimbursement*

The Health Insurance for Aged and Disabled Act (Title XVIII of the Social Security Act), known as "Medicare," has made available to nearly every American 65 years of age and older a broad program of health insurance designed to help the nation's elderly meet hospital and other health care costs. Health insurance coverage has been extended to certain persons under age 65 qualifying as disabled and those having end-stage renal disease. Medicare includes three related health insurance programs: (i) hospital insurance ("Part A"); (ii) supplementary medical insurance ("Part B"); and (iii) a managed care option for beneficiaries who are entitled to Part A and enrolled in Part B ("Medicare+Choice" or "Medicare Part C").

The Medicare program is currently administered by fiscal intermediaries (for Part A and some Part B services) and carriers (for Part B) under the direction of CMS of the Department of Health and Human Services ("HHS").

Pursuant to the Balanced Budget Act of 1997 and regulations promulgated by HHS, reimbursement under the Medicare program has changed from a cost-based retrospective reimbursement system to what is known as a prospective-payment system ("PPS") for Medicare Part A services. The changes also resulted in the adoption of fee screen schedules which limit and "cap" reimbursement for Medicare Part B therapy services. The reimbursement rates under PPS were not published until May 12, 1998, less than two months prior to the implementation of PPS, and were significantly lower than anticipated within the industry.

The magnitude of the reduction in rates took the industry by surprise. During the mid-1990's, CMS funded the development of the Multi-State Nursing Home Care-Mix and Quality Demonstration. The purpose of that project was to design, implement, and evaluate Medicare nursing home prospective payment and quality monitoring system across several states. A number of facilities participated in the demonstration and helped to perfect the case mix classification system (RUG-III) developed to capture resource use of nursing home patients. Under the demonstration project, most nontherapy ancillary costs were passed through and Medicare Part B expenditures incurred during the beneficiary's inpatient (Part A) stay were not considered. The industry was led to believe that CMS would adjust its payment "grouper" to compensate for these variable costs. That did not happen. First, the expected adjustments for nontherapy ancillary costs were not made. Second, the Medicare Part B expenditures during inpatient stays were undercalculated. Third, adjustments were made that reduced the aggregate base year to the 1995 spending level. Fourth, the market basket used by CMS to trend forward the 1995 expenditures to 1998 was defective. Fifth, the RUG-III case-mix classification system, as implemented, was insensitive to patients requiring multiple services, e.g., rehabilitation and extensive medical care.

Since Medicare patients account for a substantial portion of the Debtors' revenues, this change has materially and adversely affected the financial condition of both the Genesis Debtors and the Multicare Debtors. Among other effects, and despite efforts to reduce costs and otherwise adjust operations, the Debtors' revenues fell short of the levels needed to service the debt under their respective debt instruments.

In November of 1999, Congress passed the Medicare Balanced Budget Refinement Act (the "Refinement Act"), which repealed the cap on Medicare Part B services and provided for modest increases in the per diem rates paid to skilled nursing facilities for their sickest patients. In spite of the Refinement Act, the substantial reduction in reimbursement under the Medicare system has materially impaired many of the lines of business of the Genesis Debtors and the Multicare Debtors. Long-term care facilities now receive significantly less compensation for any given level of care. In many cases, reimbursement does not cover even the direct cost of care, let alone overhead and capital costs. The Genesis Debtors' eldercare centers began implementation of PPS on October 1, 1998, and the majority of the Multicare Debtors' eldercare centers began implementation of PPS on January 1, 1999.

On December 15, 2000, Congress passed the Benefit Improvement and Protection Act of 2000 which, among other provisions, increases the nursing component of Federal PPS rates by approximately 16.7% for the period April 1, 2001 through September 30, 2002. The legislation will also change the 20% add-on to 3 of the 14 rehabilitation RUG categories to a 6.7% add-on to all 14 rehabilitation RUG categories beginning April 1, 2001. The

56

Part B consolidated billing provision of BBRA will be repealed except for Medicare Part B therapy services and the moratorium on the $1,500 therapy caps will be extended through calendar year 2002.

The implementation of PPS has been identified as a significant factor affecting the commencement of chapter 11 cases by five other national nursing home chains (Vencor, Sun Healthcare Group, Inc., Integrated Health Services, Inc., Mariner Post-Acute Network, Inc., and Mariner Health Group, Inc.), and the bankruptcy of numerous smaller nursing home companies.

2.    *Medicaid Reimbursement*

Medicaid (Title XIX of the Social Security Act) is a federal-state cooperative program in which the federal government supplements funds provided by the participating states for medical assistance to "medically indigent" persons. The programs are administered by the applicable state welfare or social service agencies. Although Medicaid programs vary from state to state, traditionally they have provided for the payment of certain expenses, up to established limits, at rates determined in accordance with each state's regulations. Most states pay prospective rates and have some form of acuity adjustment.

Although the amount of reimbursement varies significantly from state to state, in general, Medicaid payments are lower than the costs associated with treating those patients. Moreover, the Balanced Budget Act of 1997 repealed the "Boren Amendment" federal payment standard for Medicaid payments to nursing facilities effective October 1, 1997. The Boren Amendment required that Medicaid payments to certain health care providers be reasonable and adequate in order to cover the costs of efficiently and economically operated healthcare facilities.

This imbalance between Medicaid rates and the costs of providing Medicaid patient care has been a chronic problem which, until the implementation of PPS, was partially offset by Medicare reimbursement rates. With the unanticipated and excessive reductions in Medicare reimbursement under PPS, the Genesis Debtors and the Multicare Debtors no longer had the ability to subsidize the treatment of their Medicaid patients while meeting their debt service obligations.

3.    *Debt Burden*

The most significant portion of the growth of the Genesis Debtors and the Multicare Debtors has been through acquisitions. Those acquisitions were financed through the sale of stock and the incurrence of a significant amount of senior and junior debt obligations. The amount of debt (leverage) incurred was based on revenue projections. Revenue projections were driven, for the most part, by expected reimbursement from the Medicare and Medicaid programs. The negative impact from the implementation of PPS changed the level of debt of the Debtors from "moderate" to "far too high."

Following the completion of the Multicare acquisition, the Genesis Debtors' obligations under their senior lender credit facility and Genesis's senior subordinated notes alone aggregated in excess of $1.5 billion. Similarly, the senior lender credit facility for the Multicare Debtors and Multicare's senior subordinated notes aggregated over $700 million. Despite substantial reductions in corporate overhead and operational changes, the Genesis Debtors and the Multicare Debtors simply were unable to repay such indebtedness in accordance with its terms.

## C.    Prepetition Negotiations

In 1999, the Debtors developed a restructuring strategy based on an infusion of additional equity, an increase in availability under existing bank credit lines, and the sale of certain assets. These restructuring efforts are described in detail in the most recent Form 10-K filed by Genesis. In early 2000, it became apparent that the Debtors would not be able to sell sufficient assets to meet the repayment obligations under their existing debt obligations. At that time they began discussions with the holders of their senior lender claims. Those lenders agreed to forbear from exercising remedies due to certain types of default through May 19, 2000, which was further extended through June 30, 2000. In addition, Genesis and The Multicare Companies, Inc. began discussions with certain holders of their respective public senior subordinated notes. Genesis and Multicare continued discussions with these creditor groups until it became apparent that the businesses would require additional liquidity. In addition, certain creditors threatened to commence involuntary bankruptcy cases against Genesis and Multicare. During this process, Genesis and Multicare determined to commence voluntary cases under chapter 11 of the Bankruptcy Code, which, except for Healthcare Resources Corp., ultimately occurred on June 22, 2000.

## D.    Pending Litigation and Other Proceedings

### 1.    The Genesis and Vitalink Actions Against the Manor Care Entities

On May 7, 1999, Genesis and Vitalink Pharmacy Services (d/b/a NeighborCare[(R)]), a subsidiary of Genesis, filed multiple lawsuits requesting injunctive relief and compensatory damages against HCR Manor Care, Inc. ("HCR Manor Care"), Manor Care, Inc. ("Manor Care"), ManorCare Health Services, Inc. ("MCHS," and collectively, the "Manor Care Entities") and two principals of such entities. The lawsuits arise from MCHS's threatened termination of long-term pharmacy services contracts effective June 1, 1999. Vitalink filed a complaint against HCR Manor Care, Manor Care, and MCHS in Baltimore City, Maryland circuit court (the "Maryland State Court Action"). Genesis filed a complaint against HCR Manor Care, Manor Care, and two of their principals in federal district court in Delaware including, among other counts, securities fraud (the "Delaware Federal Action"). Vitalink has also instituted an arbitration action before the American Arbitration Association (the "Arbitration"). In these actions, Vitalink is seeking a declaration that it has a right to provide pharmacy, infusion therapy, and related services to all of HCR Manor Care's facilities and a declaration that MCHS's termination of the long-term pharmacy service contracts was unlawful. Genesis, certain of its subsidiaries, and Vitalink also seek over $100,000,000 in compensatory damages and enforcement of a 10-year noncompetition clause.

Genesis acquired Vitalink from Manor Care in August 1998. In 1991, Vitalink and MCHS (then known as Manor Healthcare Corp.) had entered into long-term master pharmacy, infusion therapy, and related agreements which gave Vitalink the right to provide pharmacy services to all facilities owned or licensed by MCHS and its affiliates. In 1998, the terms of the pharmacy service agreements were extended to September 2004. Under the master service agreements, Genesis and Vitalink receive revenues at the rate of approximately $107,000,000 per year. The projections upon which the valuation of the Genesis Debtors is based assumes that the Manor Care Entities will not be allowed to terminate the master service agreements and includes the amounts the Genesis Debtors expect to receive in connection with these master service agreements over their remaining 3-1/2 year term. The termination of these agreements, if allowed, would decrease the value of the New Common Stock, although it would not affect the Plan's feasibility.

By agreement dated May 13, 1999, the parties agreed to consolidate the Maryland State Court Action relating to the master service agreements with the Arbitration matter. Accordingly, on May 25, 1999, the Maryland State Court Action was dismissed voluntarily. It is the position of the Genesis Debtors that until such time as a final decision is rendered in such Arbitration, the parties have agreed to maintain the master service agreements in full force and effect. However, the Manor Care Entities take the position that the master service agreements were properly terminated prior to the commencement of these chapter 11 cases and that upon a favorable ruling in the Arbitration they intend to implement such termination.

The Manor Care Entities have asserted counterclaims in the Arbitration seeking damages for Vitalink's alleged overbilling for products and services provided to MCHS, a declaration that MCHS had the right to terminate the master service agreements, and a declaration that Vitalink does not have the right to provide pharmacy, infusion therapy, and related services to facilities owned by HCR Manor Care (then known as Health Care and Retirement Corporation) prior to its merger with Manor Care. According to an expert report submitted by the Manor Care Entities on May 8, 2000, the Manor Care Entities are seeking $17,800,000 in compensatory damages for alleged overbilling by Vitalink between September 1, 1998 and March 31, 2000.

On January 14, 2000, the Manor Care Entities moved to dismiss Vitalink's claims in the Arbitration that it has a right to provide pharmacy and related services to the HCR Manor Care facilities not previously under the control of Manor Care. On May 17, 2000, the Arbitrator ordered the dismissal of Vitalink's claims seeking a declaratory judgment and injunctive relief for denial of Vitalink's right to service the additional HCR Manor Care facilities, but sustained for trial Vitalink's claim seeking compensatory damages against the Manor Care Entities for denial of that right.

Trial in the Arbitration was originally scheduled to begin on June 12, 2000. On May 23, 2000, however, the Arbitrator postponed the trial indefinitely due to Vitalink's potential bankruptcy filing. In connection with this stay, the parties agreed that MCHS may pay NeighborCare 90% of the face amount of all invoices for pharmaceutical and infusion therapy goods and services that NeighborCare renders to MCHS under the Master Service Agreements. After Genesis and its affiliates, including Vitalink, commenced their chapter 11 cases on June 22, 2000, the Arbitration was automatically stayed pursuant to section 362(a) of the Bankruptcy Code.

On August 1, 2000, the Manor Care Entities moved to lift the automatic stay and compel arbitration. On September 5, 2000, the Bankruptcy Court denied that motion, with leave to refile its request in 90 days. On December 8, 2000, the Manor Care Entities filed a similar motion for relief from the stay. The Genesis Debtors opposed the motion and filed their own motion to assume the contracts between the parties. On February 6, 2000, the Bankruptcy Court ruled in favor of the Manor Care Entities' renewed motion and deferred consideration of the motion to assume until completion of the Arbitration. As a result, the parties are proceeding forward in the Arbitration. The trial in the Arbitration is now scheduled to commence during the week of July 30, 2001.

The Manor Care Entities have not filed proofs of claim in these chapter 11 cases. Accordingly, their claims for prepetition overcharges under the contracts will not be a claim against the Genesis Debtors unless they successfully assume those agreements. However, to the extent that the Manor Care Entities have valid setoff or recoupment rights against any of the Debtors, they will be entitled to reduce any recovery by such Debtors against any of the Manor

Care Entities by such amounts. Any such valid setoff or recoupment rights are not being affected by the Plan.

2.    *The Vitalink Action Against Omnicare and Heartland*

On July 26, 1999, NeighborCare, through its Maryland counsel, filed an additional complaint against Omnicare, Inc. ("Omnicare") and Heartland Healthcare Services (a joint venture between Omnicare and HCR Manor Care) seeking injunctive relief and compensatory and punitive damages. The complaint includes counts for tortious interference with Vitalink's contractual rights under its exclusive long-term service contracts with the Manor Care Entities. On November 12, 1999, in response to a motion filed by the defendants, that action was stayed pending a decision in the Arbitration.

3.    *The Manor Care Action Against Genesis in Delaware*

On August 27, 1999, Manor Care, a wholly-owned subsidiary of HCR Manor Care, filed a lawsuit against Genesis in federal district court in Delaware based upon Section 11 and Section 12 of the Securities Act of 1933, as amended. Manor Care alleges that in connection with the sale of the Genesis Series G Cumulative Convertible Preferred Stock as part of the purchase price to acquire Vitalink, Genesis failed to disclose or made misrepresentations related to the effects of the conversion to PPS on Genesis's earnings, the restructuring of Genesis's ElderCare Joint Venture, the impact of the operations of Genesis's Multicare affiliate on Genesis's earnings, the status of Genesis's labor relations, Genesis's ability to declare dividends on the Series G Preferred Stock, the value of the conversion right attached to the Series G Preferred Stock, and information relating to the ratio of combined fixed charges and preference dividends to earnings. Manor Care seeks, among other things, compensatory damages and rescission of the purchase of the Series G Preferred Stock.

On November 23, 1999, Genesis moved to dismiss this action on the ground, among others, that Manor Care's complaint failed to plead fraud with particularity. On September 29, 2000, the court granted that motion in part and denied it in part. Specifically, the court dismissed all of defendants' allegations except those concerning the company's labor relations and the ratio of combined fixed charges and preference dividends to earnings.

On January 18, 2000, Genesis moved to consolidate this action with the Delaware Federal Action. That motion has been fully submitted and is awaiting decision. As a result of the commencement of Genesis's chapter 11 cases, this action is also automatically stayed pursuant to section 362(a) of the Bankruptcy Code. However, as noted above, Manor Care has not filed a proof of claim in these chapter 11 cases. Therefore, it will not be entitled to any affirmative relief against the Genesis Debtors based on these claims. Notwithstanding the fact that no proofs of claim have been filed, to the extent that Manor Care has valid setoff or recoupment rights against any of the Debtors, it will be entitled to reduce any recovery by such Debtors against Manor Care by such amounts. Any such valid setoff or recoupment rights are not being affected by the Plan.

4.    *The Manor Care Action Against Genesis in Ohio*

On December 22, 1999, Manor Care filed a lawsuit against Genesis and others in the United States District Court for the Northern District of Ohio. Manor Care alleges, among other things, that the Series H Senior Convertible Participating Cumulative Preferred Stock and Series I Senior Convertible Exchangeable Participating Cumulative Preferred Stock were issued

in violation of the terms of the Series G Preferred Stock and the Rights Agreement dated as of April 26, 1998 between Genesis and Manor Care. Manor Care seeks, among other things, damages and rescission or cancellation of the Series H and Series I Preferred Stock. On February 29, 2000, Genesis moved to dismiss this action on the ground, among others, that Manor Care's complaint failed to state a cause of action. This motion has been fully submitted, including supplemental briefing by both parties, and is awaiting decision. As a result of the commencement of Genesis's chapter 11 cases, this action is also automatically stayed pursuant to section 362(a) of the Bankruptcy Code. However, as noted above, Manor Care has not filed a proof of claim in these chapter 11 cases. Therefore, it will not be entitled to any affirmative relief against the Genesis Debtors based on these claims. Notwithstanding the fact that no proofs of claim have been filed, to the extent that Manor Care has valid setoff or recoupment rights against any of the Debtors, it will be entitled to reduce any recovery by such Debtors against Manor Care by such amounts. Any such valid setoff or recoupment rights are not being affected by the Plan.

     5.     *Age Institute*

       On November 27, 2000, Genesis, along with several other Genesis Debtors, filed an adversary proceeding in their chapter 11 cases against four related nursing home owners affiliated with AGE Holdings, Inc. (the "AGE Entities") to collect unpaid receivables, among other things. In response, the AGE Entities filed counterclaims against the Genesis Debtors alleging violations of RICO, fraud, lender liability, breach of fiduciary duty, breach of management agreements, breach of professional standards/professional negligence, conversion, interference with business relations, and conspiracy. The counterclaims seek punitive, compensatory, statutory, and/or exemplary damages, as well as claims to invalidate certain working capital and subordinated loan obligations of the AGE Entities to the Genesis Debtors. The counterclaims further seek administrative expense treatment of any amount found due to the AGE Entities for postpetition damages. While the Genesis Debtors believe that the counterclaims have no merit, in the event the AGE Entities were to prevail on their counterclaims, such counterclaims could exceed the claims of the Genesis Debtors against the AGE Entities. The AGE Entities have filed proofs of claim (in unliquidated amounts) in the Genesis Reorganization Cases in connection with their counterclaims. It is anticipated that the adversary proceeding will not be tried until the summer of 2002. It should be noted that any recovery against the AGE Entities is uncertain. As part of the mechanics of distribution under the Plan, the Genesis Debtors will estimate the amount that the AGE Entities may establish as an allowed claim against the Genesis Debtors. This amount will result in a holdback from the distribution to unsecured creditors in Classes G4 and G5 until the claims of the AGE Entities are resolved. Based upon the information the Genesis Debtors have at this time, the Genesis Debtors believe that such holdback, if any, will be minimal with respect to this dispute. Inasmuch as the adversary proceeding will not be tried until the summer of 2002, the AGE Entities and the Genesis Debtors have agreed that the AGE Entities will retain the ability to (i) set off any allowed claims they may have against the Genesis Debtors against the claims the Genesis Debtors have against the AGE Entities, and (ii) participate in any recovery for holders of claims in Class G4 notwithstanding that the Plan will become effective before the claims of the AGE Entities are resolved.

     6.     *Qui Tam Suits*

       Currently pending against Genesis or its affiliates, divisions, or subsidiaries are five private citizen suits filed under the federal False Claims Act, 31 U.S.C. § 3729 *et seq.* Genesis has reached an agreement to resolve four of the pending suits. For a description of that settlement, see section II.K, above. The remaining private citizen suit, styled *U.S. ex rel Scherfel*

*v. Genesis Health Ventures et al.* (D.N.J.), is the subject of a proof of claim in the Genesis reorganization case.

In the *Scherfel* suit, the plaintiff alleges that a pharmacy owned by NeighborCare, Inc. failed to process Medicaid credits for returned medications. The allegations are vaguely alleged for other jurisdictions. While the action was under seal in United States District Court, Genesis fully cooperated with the Department of Justice's evaluation of the allegations. On or about March 2001, the Department of Justice declined to intervene in the suit and prosecute the allegations. The plaintiff filed a proof of claim in the bankruptcy proceeding initially for approximately $650 million and more recently has submitted an amended claim in the amount of approximately $325 million. The Debtors believe that the allegations have no merit and intend to object to the proof of claim and defend the suit. In the event the Debtors are incorrect, any claims ultimately allowed in connection with this suit will be treated as part of Class G4 (Genesis General Unsecured Claims) and thus would dilute the recovery for holders of claims in Class G4 on a pro rata basis. Inasmuch as the claims in Classes G4 and G5 share recoveries on a pro rata basis, any recovery against the Genesis Debtors in connection with the Scherfel suit will dilute the recoveries for the holders of other claims in those classes (which aggregate $467,494,000).

7.    *Personal Injury and Employment Law Litigation*

Prior to the Commencement Date, the Debtors and/or persons or entities which the Debtors indemnify, were defendants in approximately 375 prepetition lawsuits alleging personal injury, employment disputes, and similar allegations, and/or potential lawsuits where a statutory notice of intent to sue was timely served. These lawsuits allege a variety of personal injury allegations arising from patient care, automobile accidents, and other personal injury incidents, as well as employment discrimination, wrongful termination, and related employment law claims. The lawsuits are pending in state and federal courts nationwide.

The majority of the claims asserted in the personal injury lawsuits are covered by insurance. Until June 1, 2000, the Debtors' various insurance policies on personal injury claims contained neither a self-insured retention nor a deductible. Between June 1, 2000 and the Commencement Date, the relevant insurance policies contained a self-insured retention of $500,000 per claim, subject to a $5 million aggregate, except in the state of Florida where the relevant insurance policies contained a self-insured retention of $2.5 million per claim, subject to a $9 million aggregate. Thus, insurance coverage for claims arising in the 22-day period from June 1, 2000 until the Commencement Date are subject to such limitations. However, the Debtors believe that these amounts are fully covered by assets in the Debtors' captive insurance company, which is a non-Debtor subsidiary of Genesis. As of June 10, 2001, the Debtors are aware of 15 claims for which counsel for the claimant has requested insurance information from the Debtors where at least a portion of such claims might be attributed to the period June 1, 2000 through the Commencement Date. Certain claims asserted in the personal injury lawsuits, such as claims for punitive damages, may be uninsured or uninsurable in certain states. With respect to employment law claims, the Debtors purchased an insurance policy in 1999 with a $500,000 self-insured retention per claim. The Debtors vigorously dispute the allegations contained in the personal injury and employment lawsuits. The Debtors are not aware of any general denials of, or challenges to, coverage by any of the Debtors' insurance carriers other than the possibility of the existence of individual reservation of rights letters received in the ordinary course.

To the extent these claims are not covered by insurance, they will be treated as part of Class G4 or M4, as applicable. The following table sets forth certain information about the Debtors' personal injury insurance coverage:

62

| Policy Coverage Period | # of Open Claims* | Aggregate Coverage | Paid Losses* | # of Opt-Outs** |
|---|---|---|---|---|
| June '95 – May '96 (Genesis) | 13 | $50 million*** | $5,005,369 | 4 |
| Mar. '95 – Feb. '96 (Multicare) | 3 | $52 million | 358,419 | 2 |
| Mar. '96 – Apr. 12, 1996 (Multicare) | 1 | $52 million | 137,527 | 1 |
| June '96 – May '97 (Genesis) | 31 | $50 million*** | 10,809,194 | 7 |
| Apr. 12, 1996 -- Apr. '97 (Multicare) | 14 | $52 million | 1,537,846 | 7 |
| June '97 – May '98 (Genesis) | 34 | $50 million*** | 7,413,521 | 4 |
| May '97 -- June '98 (Multicare) | 20 | $52 million | 1,098,903 | 5 |
| June '98 – May '99 (Genesis & Multicare) | 102 | $125 million*** | 4,146,320 | 27 |
| June '99 – May '00 (Genesis & Multicare) | 76 | $128 million | 476,235 | 3 |
| June '00 – May '01 (Genesis & Multicare) | 52**** | $110 million | 10,715 | 0 |

*These numbers are based upon information provided to the Debtors by their insurance carriers AIG, CAN, and Zurich as of April 5, 2001, January 15, 2001, and March 31, 2001, respectively. There can be no guarantee that other claims did not settle prior to the date such numbers were compiled by the respective insurance carrier.

**Number of plaintiffs who have stipulated to relief from the automatic stay and agreed to proceed against insurance coverage only.

***The coverage specified is in addition to $1 million per occurrence/$3 million aggregate per location coverage.

****As set forth in the text above, as of June 10, 2001, the Debtors are aware of 15 claims in which counsel for the claimant has requested insurance information from the Debtors where at least a portion of such claims might be attributed to the period June 1, 2000 through June 22, 2000. The aggregate coverage for this policy is in excess of the self-insured retention (in the amounts described above) under this policy. However, the Debtors believe that these amounts are fully covered by the Debtors' captive insurance company.

8.     *Multicare Litigation*

The Multicare Debtors are not party to any significant litigation, other than litigation arising from the ordinary course of their businesses.

9.     *Ordinary Course Litigation*

The Debtors are parties to various other legal actions and administrative proceedings and are subject to various claims arising in the ordinary course of business.

AA. 1846

# VI.

## Significant Events During the Reorganization Cases

### A.    Filing and First Day Orders

On June 22, 2000, the Genesis Debtors (other than Healthcare Resources Corp.) and the Multicare Debtors filed their petitions under chapter 11 of the Bankruptcy Code. On June 23, 2000, the Bankruptcy Court entered certain orders designed to minimize the disruption of the Debtors' business operations and to facilitate their reorganization.

- *Case Administration Orders.* These orders (i) authorized separate joint administration of the Genesis Debtors' chapter 11 cases and Multicare Debtors' chapter 11 cases, (ii) established interim compensation procedures for professionals, (iii) granted an extension of the time to file the Debtors' schedules and statements, and (iv) authorized the mailing of initial notices and all other mailings directly to parties in interest and the filing of a list of creditors without claim amounts in lieu of a matrix.

- *Payments on Account of Certain Prepetition Claims.* The Bankruptcy Court authorized the payment of prepetition (i) wages, compensation, and employee benefits, (ii) sales and use taxes, (iii) claims of common carriers and warehousemen, (iv) claims of critical trade vendors, and (v) refunds to patients.

- *Business Operations.* The Bankruptcy Court authorized the Genesis Debtors and the Multicare Debtors to (i) comply with certain license and regulatory agency fee requirements, (ii) continue customer service programs, (iii) continue prepetition premium obligations under workers' compensation insurance and all other insurance policies, and bonds relating thereto, (iv) maintain existing bank accounts and business forms, (v) continue their existing cash management system, (vi) employ certain investment guidelines, (vii) provide adequate assurance to utility companies including the payment of certain prepetition claims, (viii) grant administrative expense status to undisputed obligations arising from the postpetition delivery of goods ordered in the prepetition period and make payment of such claims in the ordinary course of business, and (ix) maintain patient trust accounts.

- *Other Stipulations.* The Bankruptcy Court authorized a stipulation between one of the Genesis Debtors and Cardinal Distribution which provided for a long-term commitment by Cardinal Distribution to continue to ship inventory on credit terms in exchange for the payment over time of certain secured prepetition amounts owed to that company. That stipulation has been amended to provide additional postpetition credit to the Genesis Debtors. The Bankruptcy Court also authorized separate stipulations between the Genesis Debtors and certain agencies of the federal government and between the Multicare Debtors and those entities. These stipulations provided adequate protection to the federal government in the form of payment over time of certain prepetition overpayments alleged to have been made under the Medicare program. The stipulation with the Genesis Debtors was amended to reduce the amounts to be paid and provide the federal

64

government with an administrative expense claim to the extent of additional amounts discovered.

- *Bankruptcy Matters.*  The Bankruptcy Court authorized the Genesis Debtors and the Multicare Debtors to (i) establish notice procedures and (ii) obtain interim postpetition financing under debtor in possession credit agreements on a superpriority basis for $250 million (for the Genesis Debtors) and $50 million (for the Multicare Debtors), pending further interim and final hearings.

On July 31, 2000, Healthcare Resources Corp. ("HRC"), one of the Genesis Debtors, filed a petition under chapter 11 of the Bankruptcy Code.  On August 1, 2000, the Bankruptcy Court entered orders in HRC's reorganization case substantially similar to the orders entered on June 23, 2000 for the other Genesis Debtors.  HRC is a party to the Genesis debtor in possession credit facility.

## B.    Appointment of the Creditors' Committee

On July 12, 2000, the United States Trustee for the District of Delaware, pursuant to its authority under section 1102 of the Bankruptcy Code, appointed a statutory committee of unsecured creditors in the Genesis reorganization cases and a separate committee in the Multicare reorganization cases.

### 1.    Genesis Creditors' Committee

The Genesis creditors' committee currently consists of the following six members:

American General Investment Management, L.P.
2929 Allen Parkway
Houston, Texas 77019

Abbot Laboratories
625 Cleveland Avenue
Columbus, Ohio 43215

GMS Group, LLC
c/o LeBouf, Lamb, Greene & MacRae
125 West 55th Street
New York, New York 10019

Service Employees International Union, AFL-CIO
c/o Cohen, Weiss and Simon, LLP
3030 W. 42nd Street
25th Floor
New York, New York 10036

State Street Bank and Trust Company
2 Avenue de Lafayette
6th Floor
Boston, Massachusetts 02111

65

AA. 1848