The Bank of New York
101 Barclay Street
Floor 21W
New York, New York 10286

The Genesis creditors' committee has retained Akin, Gump, Strauss, Hauer & Feld, L.L.P., 590 Madison Avenue, New York, New York 10022, and Pachulski Stang Ziehl Young & Jones PC, 919 N. Market Street, 16th Floor, P.O. Box 8075, Wilmington, Delaware 19899-8705, as its attorneys, and Houlihan Lokey Howard & Zukin, 2 First National Plaza, 20 South Clark Street, 21st Floor, Chicago, Illinois 60603-1881, as its financial advisors. The Genesis creditors' committee has actively participated in all aspects of the Genesis reorganization cases.

      2.     *Multicare Creditors' Committee*

The Multicare creditors' committee currently consists of the following three members:

Mackay-Shields Financial Corp.
9 West 57th Street
New York, NY 10019

HSBC Bank USA, as Indenture Trustee
452 Fifth Avenue
New York, NY 10018-2706

Gulf South Medical Supply, Inc.
4345 Southpoint Blvd
Jacksonville, FL 3216

The Multicare creditors' committee has retained Kasowitz, Benson, Torres & Friedman LLP, 1633 Broadway, New York, New York 10019, and Saul, Ewing, Remick & Saul LLP, 222 Delaware Avenue, Suite 1200, P.O. Box 1266, Wilmington, Delaware 19899-1266, as its attorneys, and Chanin Capital Partners, 11100 Santa Monica Blvd, Suite 830, Los Angeles, California 90025, as its financial advisors. The Multicare creditors' committee has actively participated in all aspects of the Multicare reorganization cases.

## C.    DIP Credit Agreements

      1.     *Genesis Debtors*

On July 18, 2000, the Bankruptcy Court entered a final order (i) authorizing the Genesis Debtors to (a) obtain postpetition financing and (b) utilize cash collateral, and (ii) granting adequate protection to certain prepetition secured parties. In particular, the Bankruptcy Court approved that certain Revolving Credit and Guaranty Agreement, dated as of June 22, 2000, among Genesis, as borrower, the other Genesis Debtors, as guarantors, Mellon Bank, N.A., as agent, and the lender parties thereto. This agreement provided for maximum borrowings of $250 million and terminates on December 21, 2001. The obligations of the Genesis Debtors under this agreement are secured by substantially all the assets of the Genesis Debtors, subject to certain existing mortgages and inventory liens. The liens granted to the postpetition lenders are senior to the liens securing the Genesis Senior Lender Claims. As of the date hereof, the Debtors have drawn approximately $180,000,000 under their debtor in possession credit facility. The

66

borrowings under this facility have been used to make payments to the holders of the Genesis Senior Lender Claims, to issue letters of credit, to make payments to Cardinal Distribution, and to make other miscellaneous payments. See section II.E.2, above, for a description of those claims and the payments made. The Genesis Debtors amended certain covenants under their debtor in possession credit facility as of February 14, 2001, to bring those covenants into line with current performance and projections.

     2.    *Multicare Debtors*

     On July 18, 2000, the Bankruptcy Court entered a final order (i) authorizing the Multicare Debtors to (a) obtain postpetition financing and (b) utilize cash collateral, and (ii) granting adequate protection to certain prepetition secured parties. In particular, the Bankruptcy Court approved that certain Revolving Credit and Guaranty Agreement, dated as of June 22, 2000, among Multicare, as borrower, the other Multicare Debtors, as guarantors, Mellon Bank, N.A., as agent, and the lender parties thereto. This agreement provided for maximum borrowings of $50 million and terminates on December 21, 2001. The obligations of the Multicare Debtors under this agreement are secured by substantially all the assets of the Multicare Debtors, subject to certain existing mortgages and inventory liens. The liens granted to the postpetition lenders are senior to the liens securing the Multicare Senior Lender Claims. As of the date hereof, the Debtors have not drawn any funds under this debtor in possession credit facility, although letters of credit for approximately $2 million issued under the facility are outstanding. The Multicare Debtors have been paying the Genesis Debtors under the various service agreements on a current basis postpetition. The Multicare Debtors amended certain covenants under their debtor in possession credit facility as of February 14, 2001, to bring those covenants into line with current performance and projections.

**D.    Cash Collateral Protection**

     1.    *Genesis Debtors*

     At the commencement of these chapter 11 cases, a number of third-party lenders, including the holders of the Genesis Senior Lender Claims, had an interest in the Genesis Debtors' receivables or other cash collateral. In order to provide for the continued use of such cash collateral, the Genesis Debtors agreed to provide certain protections to those third-party lenders. For the holders of the Genesis Senior Lender Claims, the protections consisted of the following:

- a superpriority administrative claim against the Genesis Debtors, immediately junior to the claims of the lenders under the debtor in possession credit facility

- liens on substantially all the property of the Genesis Debtors immediately junior to the claims of the lenders under the debtor in possession credit facility and existing third party liens

- payment of an amount equal to interest on the Genesis Senior Lender Claims at the contractual nondefault rate

- reimbursement for the reasonable fees and disbursements of counsel and consultants to the holders of the Genesis Senior Lender Claims and payment of certain administrative fees

In addition, the Bankruptcy Court entered a generic order protecting all other third party lenders for the use of cash collateral that they had an interest in by providing a postpetition interest in certain accounts and inventory. Since entry of that order, the Genesis Debtors have agreed to provide more specific adequate protection to certain third party lenders, based on the extent to which the claims of such lenders are secured. For Subclasses G1-5, G1-6, and G1-7, the Genesis Debtors agreed to pay amounts equal to postpetition interest at contractual nondefault rates and to pay real estate taxes and insurance on the underlying real property collateral. For Subclass G1-8, the Genesis Debtors agreed to pay amounts equal to postpetition interest at contractual nondefault rates and to maintain insurance on the underlying real property collateral. Finally, for Subclass G1-12, the Genesis Debtors agreed to pay postpetition real estate taxes and maintain insurance on the underlying real property collateral.

    2.    *Multicare Debtors*

As of the Commencement Date, the Multicare Debtors also required the continued use of cash collateral of certain third parties holding security interests in specified accounts receivable, inventory, or other rights to payments, or cash proceeds thereof. The Multicare Debtors therefore requested and received authority from the Bankruptcy Court to use cash collateral as is necessary to continue the Multicare Debtors' business operations. The protections granted to the holders of the Multicare Senior Lender Claims in return for permitting the Multicare Debtors' continued use of cash collateral consisted of the following:

- a superpriority administrative claim against the Multicare Debtors, immediately junior to the claims of the lenders under the debtor in possession credit facility

- liens on substantially all the property of the Multicare Debtors immediately junior to the claims of the lenders under the debtor in possession credit facility and existing third party liens

- reimbursement for the reasonable fees and disbursements of counsel and consultants to the holders of the Multicare Senior Lender Claims and payment of certain administrative fees

To date, the Multicare Debtors have not been required to provide more specific adequate protection to any third party lenders (except for Subclass M1-4), although the Multicare Debtors presently are engaged in discussions with a number of such lenders regarding more specific adequate protection. For Subclass M1-4, the Multicare Debtors agreed to bring current their prepetition and postpetition obligations on the underlying loan and to remain current on a go-forward basis.

**E.    Key Employee and Executive Retention Programs**

The Genesis Debtors have established two separate retention programs for key employees. The first program covers all key employees, other than the top four executives of Genesis and was approved by the Bankruptcy Court on September 5, 2000. The second program covers the top four executives of Genesis and was approved by the Bankruptcy Court on February 23, 2001. Both retention programs are designed to encourage key employees to remain with the Debtors by providing them with additional incentives, including cash payments. Inasmuch as the Multicare Debtors do not have any management employees, no retention programs have been implemented for those Debtors (although the Multicare Debtors did request

and receive authority from the Bankruptcy Court to reimburse Genesis for retention bonuses made by it to administrators and directors of nursing at those of Multicare's facilities managed by Genesis).

> 1.    *First Retention Program*

Pursuant to the first retention program, a maximum aggregate of $11.5 million in retention bonus payments are available for all qualifying key employees. The retention payments, paid out over a course of four payments beginning September 30, 2000 and ending on May 31, 2001, are available to middle managers, senior officers, directors, or officers (other than the top four executives of Genesis) who were employed by the Genesis Debtors on or before April 1, 2000, and continue to be employed on the date of payment. As part of this program, the Genesis Debtors also assumed 24 employment agreements of certain key employees.

> 2.    *Second Retention Program*

The second retention program, which was not submitted to the Bankruptcy Court until several months after the initial program was implemented, is designed to retain the top four executives through the restructuring process and beyond. The program does not include any guaranteed retention payments. Instead, it provides for incentive or restructuring payments to be made on the Effective Date. The aggregate amount of such payments will be approximately $2.1 million if the Effective Date is August 31, 2001. Such amounts increase or decrease if the Effective Date is earlier or later than that date. An earlier Effective Date results in an increase of 5% (up to a maximum increase of 15%) for each month. A later Effective Date results in a decrease of 7.5% (up to a maximum decrease of 15%) for each month.

The program also provides severance protection in an amount equal to two times the base salary of the executive. This protection is in place of existing severance arrangements in the prepetition employment agreements for those individuals. In exchange for such protection, each executive will agree to a two-year noncompete arrangement.

Finally, the program provides for the assumption of certain deferred compensation arrangements and the forgiveness of certain loans that three of the executives incurred in order to comply with a prepetition requirement by the Board of Directors that they purchase shares of the stock of Genesis. The forgiveness will occur on the earlier of the first anniversary of the Effective Date or the termination of the employment of the executive. The forgiveness includes an agreement to pay any taxes due from the executives due to such forgiveness. The aggregate amount of such loans is approximately $2.5 million.

## F.    Claims Process and Bar Date

> 1.    *Schedules and Statements*

On October 19, 2000, the Genesis Debtors filed with the Bankruptcy Court their statement of financial affairs, schedules of assets and liabilities, schedules of executory contracts and unexpired leases, and schedule of equity security holders. The Genesis Debtors' schedules and statements were filed on a partially consolidated basis.

On October 19, 2000, the Multicare Debtors filed with the Bankruptcy Court their statement of financial affairs, schedules of assets and liabilities, schedules of executory

69

contracts and unexpired leases, and schedule of equity security holders. The Multicare Debtors' schedules and statements were filed on a partially consolidated basis.

>    2.    *Bar Date*

By separate orders dated November 6, 2000, the Bankruptcy Court fixed December 19, 2000, at 4:00 p.m. (Eastern Time) as the date and time by which proofs of claim were required to be filed in the Genesis and Multicare reorganization cases, except that governmental entities have until June 25, 2001, at 4:00 p.m. (Eastern Time) to file proofs of claim against the Genesis Debtors and the Multicare Debtors. In accordance with the orders fixing the bar date, on or about November 6, 2000, notices informing creditors of the last date to timely file proofs of claims, and a "customized" proof of claim form, reflecting the nature, amount, and status of each creditor's claim as reflected in the schedules of assets and liabilities, were mailed to all creditors listed on the schedules of assets and liabilities. In addition, consistent with that order, the Debtors caused to be published in the national editions of the *Wall Street Journal, New York Times,* and *USA Today* a notice of the last date to timely file proofs of claim.

## G.    ElderTrust Transactions

In November 2000, the Genesis Debtors and the Multicare Debtors reached agreements to restructure their relationship with ElderTrust, a Maryland healthcare real estate investment trust, and certain of its affiliates (collectively, "ElderTrust"). On January 4, 2001, the Bankruptcy Court approved those agreements. The following transactions were consummated on January 31, 2001. The agreements with ElderTrust cover leases and mortgages for 33 properties operated by the Genesis Debtors and the Multicare Debtors, either directly or through joint ventures. Under its agreement with ElderTrust, Genesis has (i) assumed its leases with ElderTrust, subject to certain modifications, including a reduction in annual lease expenses of $745,000, (ii) extended the maturity and reduced the principal balances for three assisted living properties by $8,500,000 through the satisfaction of an ElderTrust obligation of like amount, and (iii) acquired a building currently leased from ElderTrust, which is located on the campus of a Genesis skilled nursing facility, for $1,250,000.

Pursuant to its agreement with ElderTrust, the Multicare Debtors sold three owned assisted living properties that were mortgaged to ElderTrust in exchange for a release of principal amounts owed totaling $19,500,000. ElderTrust has leased the properties back to the Multicare Debtors under a new ten-year lease with annual rents of $791,561.

## H.    CareFirst Transactions

On January 4, 2001, the Bankruptcy Court approved the Genesis Debtors' settlement agreement with CareFirst of Maryland, Inc., a health insurance corporation, and its affiliates (collectively, "CareFirst"). This agreement settles certain disputes among the Genesis Debtors and CareFirst, and provides a basis from which the Genesis Debtors are able to maintain their integral business relationship with CareFirst and its 2.9 million members. More specifically, the agreement authorizes the Genesis Debtors to (i) assume certain contracts with CareFirst, including (a) home care provider contracts under which the Debtors receive payments in exchange for arranging for or providing certain home care services to CareFirst, and (b) preferred provider agreements which formalize the Genesis Debtors' status as the preferred healthcare provider to CareFirst, (ii) continue to hold as deposit without any impact resulting from the Genesis reorganization cases, the aggregate $4 million in service deposits previously provided by CareFirst, and provide the terms under which such service deposits will be allocated, (iii) pay

$4,673,398 to CareFirst as settlement for amounts owed under that certain Transition Agreement between certain of the Genesis Debtors and CareFirst, dated October 20, 1999, and (iv) enter into new business agreements with CareFirst. These agreements were consummated on January 19, 2001.

## I.     Swap Settlement

Genesis and Citibank, N.A. ("Citibank") are parties to certain interest rate hedging agreements ("swap agreements"). Certain of those agreements allowed Genesis to fulfill its obligation under its prepetition credit agreement to hedge against a portion of the risk of the floating rate of interest in such facility. The obligations of Genesis under swap agreements that met certain requirements are entitled to share in the collateral securing the Genesis Senior Lender Claims. On March 24, 2000, Citibank terminated all its swap agreements with Genesis. Based on the underlying documents and information obtained from other financial institutions engaged in interest rate hedging agreements, Citibank asserted a claim against Genesis of approximately $28.5 million to unwind the swap agreement. Citibank also asserted that such claims constituted Genesis Senior Lender Claims. After negotiations between the parties, they agreed to treat approximately 61% of the claim as a Genesis Senior Lender Claim and the balance as a Genesis General Unsecured Claim in Class G4. The Bankruptcy Court approved this settlement on May 11, 2001.

## J.     Alternative Dispute Resolution Procedures

The Genesis Debtors and the Multicare Debtors identified approximately 375 prepetition claims (not including claims in which a lawsuit has yet to be commenced or a statutory pre-suit demand has yet to be served) (the "Pending Actions") against the Debtors based on personal injury, employment litigation, and similar claims by various entities (the "Claimants"). Certain Pending Actions related or relate to claims against persons or entities for whom the Debtors retain ultimate liability, including non-Debtor defendants in Pending Actions who are current or former employees, officers, and directors of the Debtors, and any person or entity indemnified by any of the Debtors or listed as additional insureds under the Debtors' liability policies (collectively, the "Indemnitees").

By motions dated March 19, 2001, the Genesis Debtors and the Multicare Debtors respectively sought Bankruptcy Court approval of the implementation of alternative dispute resolution procedures (the "ADR Procedures") to assist in expediting the resolution of the Pending Actions. The ADR Procedures in the Genesis Debtors' and the Multicare Debtors' reorganization cases are governed by substantially similar "ADR Term Sheets." By orders dated June 8, 2001 and July 10, 2001, the Bankruptcy Court approved the Genesis Debtors' and the Multicare Debtors' revised ADR Term Sheets, respectively (the "ADR Orders"). The ADR Procedures are implemented as follows:

- The Debtors compiled lists of all the Pending Actions of which the Debtors were aware (the "Preliminary ADR Claims Lists"). The Debtors will serve upon the Claimant (or such Claimant's counsel, if known) in each Pending Action a Bankruptcy Court approved notice (the "ADR Notice") indicating that such Claimant's Pending Action shall be deemed an "ADR Claim" and shall be subject to the ADR Procedures.

- Additional Pending Actions, which are omitted from the Preliminary ADR Claims Lists, will be added to the ADR Procedures by serving upon such

71

Claimants (i) the appropriate ADR Orders; (ii) the appropriate ADR Term Sheet; (iii) an ADR Notice; and (iv) an Opt-Out Stipulation (as defined below) (the "Additional ADR Claims"). If the holder of an Additional ADR Claim does not timely object to inclusion in the ADR Procedures, or if the Bankruptcy Court overrules such objection, such holder's Additional ADR Claim will become subject to the ADR Procedures.

- The ADR Term Sheets provide for an injunction, which enjoins until one year from the date of entry of the ADR Orders, holders of ADR Claims and Additional ADR Claims from, among other things, commencing or continuing any action or proceeding in any manner or any place to collect or otherwise enforce such claims against the Debtors or their property other than through the ADR Procedures (the "ADR Injunction"). In addition, the ADR Injunction enjoins proceedings against any Indemnitee and any direct action against a third party payer (which includes insurance companies).

- The ADR Procedures establish a four stage process for the orderly and efficient resolution of the ADR Claims and Additional ADR Claims. The first stage is a formal demand/counteroffer stage, where limited discovery is available to the parties. The second stage is mediation. The third stage is binding arbitration for those Claimants who have previously consented to such arbitration and whose ADR and Additional ADR Claims are not resolved through the first two stages of the ADR Procedures. The fourth stage, which shall commence only after all mediations have been completed, is relief from the automatic stay for those Claimants whose ADR Claims and Additional ADR Claims are not settled or submitted to binding arbitration.

- At any time, a Claimant has the option to opt out of the ADR Procedures by entering into a stipulation with the Debtors (the "Opt-Out Stipulation"), which requires the Claimant to (i) waive any and all claims for punitive damages, attorneys' fees, and any similar enhanced remedies; (ii) dismiss, with prejudice, any and all claims against any Indemnitee; (iii) agree not to name any Indemnitee as a defendant in the Pending Action; and (iv) agree to limit his or her recovery, if any, solely to available insurance proceeds and waive any and all rights to seek recovery from the assets of the Debtors or their estates. Relief from the automatic stay granted pursuant to an Opt-Out Stipulation shall commence no earlier than four (4) months after the entry of the ADR Orders.

Because the ADR Notices were recently sent out in the Genesis reorganization cases, and have not yet been sent out in the Multicare reorganization cases, the Debtors are not aware of any Claimants who have elected to opt out of the ADR Procedures to date.

## K.    Settlement with the Multicare Debtors

As described in section II.K, above, the Genesis Debtors and the Multicare Debtors have entered into a settlement of the claims between them. The Debtors intend to seek approval of that settlement at the hearing on confirmation of the Plan.

AA. 1855

**L.    Appointment of Fee Auditor**

On April 26, 2001, the Bankruptcy Court ordered the appointment of the legal auditing firm Stuart, Maue, Mitchell & James, Ltd. as the fee auditor in the reorganization cases to act as a special consultant to the Bankruptcy Court for professional fee review and analysis.

**M.    Motion for Appointment of Trustee in the Multicare Reorganization Cases**

On May 14, 2001, the statutory committee of unsecured creditors in the Multicare reorganization cases filed a motion seeking, in the alternative, (i) the appointment of a trustee to renegotiate the management services and other agreements between Genesis and Multicare, evaluate and prosecute alleged claims of Multicare against Genesis, and propose a competing plan of reorganization for Multicare, or (ii) to force Multicare to bid out its agreements with Genesis. Based on the distribution of property to Classes M4 and M5 under the Plan, the Multicare committee has agreed to withdraw the motion, without prejudice. The Multicare committee has also agreed that it will not refile the motion as long as the Debtors are prosecuting the Plan or any other plan of reorganization that provides the same economic benefit to Classes M4 and M5.

**N.    Potential Purchase of Pharmacy Business of Mariner Post-Acute Networks and
      Mariner Health Group**

Genesis and NeighborCare Pharmacy Services, Inc. ("NeighborCare" and one of the Genesis Debtors) are considering entering into an asset purchase agreement (the "APS Agreement") with Mariner Post-Acute Networks, Inc., Mariner Health Group, Inc., and certain of their affiliates (collectively, the "Mariner Debtors"). Under the APS Agreement, Genesis and NeighborCare propose to purchase the pharmacy businesses of the Mariner Debtors and certain assets related to those businesses (the "APS Pharmacy Business"). Genesis and NeighborCare will also assume certain of the obligations of the Mariner Debtors in connection with the performance of certain contractual employee-related obligations and the payment of a portion of certain personal property and ad valorem taxes. According to the Mariner Debtors, the APS Pharmacy Business provides pharmacy and related services to a significant number of nursing care facilities.

The APS Agreement, which will be submitted for approval to the Bankruptcy Court by separate motion, will require an initial cash payment of at least $40 million, with additional earnout payments over time. Due to the fact that the Mariner Debtors have also commenced chapter 11 cases under the Bankruptcy Code, the sale of the APS Pharmacy Business is subject to an auction procedure and approval by the Bankruptcy Court in their chapter 11 cases. The APS Agreement will provide certain bidding protections for Genesis and NeighborCare, including a breakup fee of $1.2 million. The Mariner Debtors will seek court approval for the auction procedures, including the payment of the breakup fee to Genesis and NeighborCare in the event the APS Pharmacy Business is sold to a higher bidder. In addition, Genesis and NeighborCare will seek approval from the Bankruptcy Court in their chapter 11 cases to purchase the APS Pharmacy Business and obtain any necessary financing for that transaction.

Genesis and NeighborCare believe that the acquisition of the APS Pharmacy Business will enhance NeighborCare's operations and increase the value of their estates. However, it is not possible at this time to quantify those benefits. In addition, it is not possible to predict whether Genesis and NeighborCare ultimately will be the successful bidders for these

assets. Accordingly, the projections described in section IV, above, do not include any adjustments for this potential acquisition.

## VII.

### Governance of the Reorganized Debtors

#### A.    Board of Directors of Reorganized Genesis

The initial Board of Directors of Reorganized Genesis will consist of seven members, whose names, qualifications, and compensation will be available upon request to the Genesis Debtors and will be posted on www.ghv.com no later than seven days before the last date to vote to accept or reject the Plan. Six members will be selected by the holders of the Genesis Senior Lender Claims and the Multicare Senior Lender Claims. The Chief Executive Officer of Reorganized Genesis will be the remaining director and Chairman of the Board. Each member of the initial Board of Directors will serve on the Board of Directors in accordance with Reorganized Genesis's Amended Certificate of Incorporation and Bylaws, as the same may be amended from time to time. The Debtors expect that the compensation for directors will include (i) $25,000 and options to purchase 2,500 shares of New Common Stock each year, (ii) $1,500 for attendance at each board meeting, (iii) $1,000 for attendance at each meeting of a committee of the board of directors, and (iv) a one-time grant of options to purchase 25,000 shares of New Common Stock. The final compensation will also be posted on www.ghv.com no later than seven days before the last date to vote.

#### B.    Senior Management of Reorganized Genesis

As of the Effective Date, Reorganized Genesis will enter into long term employment agreements with its top four senior executives. In general, the contracts provide for three year employment terms which are automatically renewed unless either Reorganized Genesis or the employee provides advance notice. The following table summarizes the base salary for the top four executives of Reorganized Genesis:

| Name | Title | Base Salary |
|---|---|---|
| Michael R. Walker | Chief Executive Officer and Chairman of the Board | $850,000 |
| Richard R. Howard | Vice Chairman | $500,000 |
| David C. Barr | Vice Chairman | $500,000 |
| George V. Hager, Jr. | Executive Vice President and Chief Financial Officer | $400,000 |

These executives will also be entitled to incentive compensation, based on a determination by the new board of directors of Reorganized Genesis. The maximum amount of incentive compensation for these employees under the current incentive plan is 50% of their respective base salaries.

Reorganized Genesis will also adopt a new long term Management Incentive Plan under which stock grants and options will be allocated to 129 management employees, including the senior executives   See section VIII.F, below, for a description of the New Management Incentive Plan. Copies of the new employment agreements and the New Management Incentive Plan will be part of the Plan Supplement. The executives named above

74

AA. 1857

are also entitled to certain rights under an executive retention plan approved by the Bankruptcy Court. That plan is described in section VI.E, above.

The Plan of Reorganization will be deemed a solicitation of the holders of New Common Stock for approval of the New Management Incentive Plan. The Debtors believe that the order confirming the Plan of Reorganization should constitute such approval of the New Management Incentive Plan for purposes of sections 422 and 162(m) of the Internal Revenue Code. There can be no assurance, however, that the Internal Revenue Service will agree with such position.

## VIII.

### Other Aspects of the Plan of Reorganization

**A.    Analysis of the Proposed Merger of Genesis and Multicare**

At the present time, Genesis manages the Multicare Debtors pursuant to a management contract that was negotiated with the independent majority shareholders of Multicare in 1997 which is comprehensive and encompasses all management and administrative functions. For the reasons described in the followings sections, both the Genesis Debtors and the Multicare Debtors have concluded that a merger will result in the best outcome for the creditors who will receive distributions under the Plan of Reorganization for the following reasons:

At the present time, Genesis and Multicare employ a management structure which serves the combined assets of both companies. Significant efficiencies are realized through the maintenance of a single infrastructure, particularly in an environment where qualified managerial personnel are difficult to recruit and retain. The creation and execution of a common operating strategy implemented using common practices enhances revenues for both companies in the most efficient manner. For instance, Genesis and Multicare are marketed using a common "ElderCare" branding strategy which promotes better name recognition, increasing referrals, and enhances the options for referral sources and third-party payers in geographically concentrated markets. Likewise, the companies are able to leverage off of common resources, such as discharge planning functions and care coordinators and the ElderCare telephone line, to increase the admissions for both companies' centers. The utilization of common systems and a single uniform set of policies and procedures improves internal controls and compliance to standards which result in greater operating cost efficiencies. The merger of Genesis and Multicare creates incentive for additional investment of time and resources to enhance the companies' abilities to realize efficiencies and capitalize on revenue opportunities across the wider group of operating entities.

Together, Genesis and Multicare enjoy considerable purchasing power, which is utilized to achieve favorable pricing for nearly all goods and services needed for the operation of their businesses. Additionally, the size and clout of the combined organization provides access to certain goods and services which are more difficult to obtain, for various reasons. For instance, both Genesis and Multicare are able to contract for adequate professional liability insurance, which due to the recent exit of insurers has become significantly more difficult to obtain.

Similarly, the availability of debt and equity capital, which has become scarce for the long-term care industry and is essential to the long-term viability and success of each company, is greatly enhanced through the merger of the two companies. Capital markets favor larger and more diverse companies. For instance, the proposed exit financing is possible due, in

75

part, to the size of the combined credit facility, which promotes greater liquidity and the more diversified business operation financed, which mitigates credit risk. Access to capital is important for three reasons. First, the long term care industry is real estate based and accordingly, capital intensive. Eldercare centers require regular maintenance in order to remain competitive and meet regulatory standards. Second, capital is necessary in order for either company to realize new business opportunities or to provide necessary working capital for internal growth. Finally, changes in the regulatory landscape, whether state or federal, can result in a significant cash drain, which may be temporary or more permanent, which effects can be mitigated through stronger liquidity. The larger capital base and greater float for the new equity securities than either company would have or enjoy individually enhances the market value for both Genesis and Multicare.

While today Genesis and Multicare realize certain savings and efficiencies from contracting with common accounting professionals for financial auditing and consulting services, the merger of Genesis and Multicare into a single corporate entity will eliminate the duplicative costs associated with preparing separate audits and filing separate financial statements and other documents as required by the federal securities laws.

In summary, the security the creditors are entitled to receive under the proposed scenario incorporates the value of the combined Multicare and Genesis estates. It is the position of both Debtors that through the preservation of the common infrastructure, purchasing power, access to capital, and opportunities for administrative cost reductions, value is created which exceeds the value that each company would be able to realize independently.

## B.    Mechanics of the Merger

The merger will be implemented through the Plan of Merger, a copy of which is part of the Plan Supplement. A subsidiary of Genesis will create a new subsidiary – Multicare Acquisition Corporation -- to effectuate the merger. Genesis, Multicare Acquisition Corporation, and Multicare will be parties to the Plan of Merger. Authorization for the merger will be pursuant to the Plan of Reorganization and the approval of the shareholders of Multicare Acquisition Corporation and the deemed shareholders of Reorganized Multicare. As part of the merger process, Multicare Acquisition Corporation will be merged into Multicare. Note that the shareholders of Multicare will consist of the holders of the Multicare Senior Lender Claims, the Multicare General Unsecured Claims, and the Multicare Senior Subordinated Note Claims in accordance with the distribution provisions of the Plan. The Plan of Merger will provide for the exchange of the stock of Reorganized Multicare received by (i) the holders of the Multicare Senior Lender Claims for New Senior Notes, New Convertible Preferred Stock, and New Common Stock, (ii) the holders of the Multicare General Unsecured Claims for New Common Stock and New Warrants, and (iii) the holders of the Multicare Senior Subordinated Note Claims for New Common Stock and New Warrants.

## C.    Exit Facility -- Condition Precedent to Effective Date

The Effective Date cannot occur unless the Debtors arrange for sufficient financing to pay the administrative expenses of their respective chapter 11 cases (an "Exit Facility") and all the conditions precedent to the initial extensions of credit thereunder shall be satisfied. The Genesis Debtors estimate that their administrative expenses will total approximately $225 million, including repayment of their debtor in possession financing. The Multicare Debtors estimate their administrative expenses at approximately $10 million. The Debtors expect to arrange for a revolving line of credit for working capital purposes with

availability of up to $150 million. In addition, to fund the administrative expenses of the reorganization cases, the Debtors expect to issue senior secured debt of between $235 million and $245 million, repayable at the end of 5-1/2 years. The Exit Facility will permit the New Senior Notes to be outstanding. It is anticipated that the obligations under the Exit Facility will be guaranteed by all the Debtors and will be secured by all their assets.

Several lending institutions have expressed an interest in providing an Exit Facility in the amounts needed. In the alternative, it may be desirable for Reorganized Genesis to raise funds in the public debt markets. The exact form and terms of the Exit Facility selected by the Debtors will be finalized as the Debtors prepare for confirmation of the Plan.

**D.    Distributions Under the Plan of Reorganization**

One of the key concepts under the Bankruptcy Code is that only claims and equity interests that are "allowed" may receive distributions under a chapter 11 plan. This term is used throughout the Plan of Reorganization and the descriptions below. In general, an "allowed" claim or "allowed" equity interest simply means that the debtor agrees, or in the event of a dispute, that the Bankruptcy Court determines, that the claim or interest, and the amount thereof, is in fact a valid obligation of the debtor.

*1.    Timing and Conditions of Distributions*

(a)    Date of Distribution

Except as otherwise provided for in the Plan of Reorganization, distribution on account of allowed claims will be made on or as soon as practicable after the later of the Effective Date and the date an order allowing a disputed claim becomes a Final Order. Disputed claims will be treated as set forth below. All distributions to the holders of the Genesis Senior Lender Claims and the Multicare Senior Lender Claims will be made to the individual holders of the Genesis Senior Lender Claims and Multicare Senior Lender Claims in such denominations and registered in the names of the holders as Mellon Bank, N.A. shall have directed in writing.

(b)    Surrender of Certain Securities Necessary for Distribution

Plans of reorganization generally require a holder of an instrument or security of a debtor to surrender such instrument or security prior to receiving a new instrument or security in exchange therefor under a plan of reorganization. This rule avoids disputes regarding who is the proper recipient of instruments or securities under a plan of reorganization.

As a condition to participating in the distribution under the Plan, a holder of a certificated instrument or note must surrender such instrument or note prior to the first anniversary of the Effective Date or provide the Disbursing Agent with a satisfactory affidavit of loss and/or indemnity and bond. Failure to do so will result in the forfeiture of such holder's right to receive any distribution relating to such instrument or note. This requirement does not apply to certificated instruments or notes that are being reinstated under the Plan.

Holders of the Debtors' preferred or common equity interests shall not be required to surrender such securities because they are not receiving a distribution under the Plan of Reorganization on account of such securities.

77

AA. 1860

(c)    Fractional Shares

No fractional shares of New Convertible Preferred Stock, New Common Stock, or fractional New Warrants or cash in lieu thereof will be distributed. For purposes of distribution, fractional shares of New Convertible Preferred Stock or New Common Stock, and fractional New Warrants shall be rounded down to the next whole number or zero, as appropriate.

(d)    Final Distribution of New Common Stock and New Warrants

Upon the resolution or determination of all disputed claims, the Disbursing Agent shall distribute to all holders of allowed claims entitled to receive New Common Stock and New Warrants the amount of such securities that such holders would have received if the resolution of all disputed claims had been known on the Effective Date. In the event that dividend distributions have been made with respect to the New Common Stock, such holder shall be entitled to receive the allocable portion of such dividends without any interest with respect thereto.

2.    *Certain Claims Allowed*

Claims in the following classes are allowed in the following amounts (exclusive of postpetition interest, if applicable):

| Class | Description | Allowed Claim |
|-------|-------------|---------------|
| G2 | Genesis Senior Lender Claims | $1,193,460,000 |
| G5 | Genesis Senior Subordinated Note Claims | 387,425,000 |
| M2 | Multicare Senior Lender Claims | 443,400,000 |
| M5 | Multicare Senior Subordinated Note Claims | 257,817,000 |

3.    *Procedures for Treating Disputed Claims Under the Plan of Reorganization*

For purposes of the following discussion, the term "allowed" when it applies to a claim means that the claim has been recognized as a valid claim against the Debtors and is entitled to participate in the class to which such claim belongs.

(a)    Disputed Claims

Disputed claims include those claims (i) listed by any Debtor in such Debtors' schedules of assets and liabilities, as may be amended from time to time, as not liquidated in amount or contingent or disputed, (ii) to which an objection or request for estimation has been filed and not withdrawn or determined, (iii) for which a proof of claim has been filed and with respect to which no corresponding claim is listed in the schedules or the corresponding claim is listed as other than contingent, disputed, or unliquidated but for which the nature or amount of the claim as filed differs from that listed in the schedules, or (iv) asserting tort claims.

(b)     Objections to Claims

The Debtors shall be entitled to object to all claims. Any objections to claims shall be served and filed on or before one hundred and twenty (120) days after the Effective Date or such later date as may be fixed by the Bankruptcy Court.

(c)     No Distributions Pending Allowance

If any portion of a claim is a disputed claim, no payment or distribution shall be made on account of the claim until the disputed portion of the claim becomes an allowed claim or is otherwise resolved. Pending the allowance or disallowance of the disputed claims, the Debtors shall withhold from the payments and distributions made pursuant to the Plan of Reorganization to the holders of allowed claims the payments and distributions allocable to the disputed claims as if the disputed claims had been allowed claims.

(d)     Distributions After Allowance

Once a disputed claim becomes an allowed claim, the holder of such allowed claim shall receive a distribution in accordance with the provisions of the Plan of Reorganization. If the holder is entitled to a cash distribution under the Plan, the cash distribution shall include interest, calculated at the average rate received by the Debtors in their deposit accounts, from the Effective Date until the date of distributions. Cash distributions shall be made as soon as practicable after the order allowing the disputed claim becomes a Final Order. If the holder of a disputed claim which becomes allowed after the Effective Date is entitled to New Common Stock or New Warrants, the Disbursing Agent may distribute to such holder the amount of shares of such securities as such holder would have received had such holder's claim been allowed in such amount on the Effective Date. In the event dividend distributions have been made with respect to the New Common Stock, such holder shall be entitled to receive such previously distributed dividends without any interest with respect thereto.

To the extent that a disputed claim is disallowed, the amount of property withheld by the Debtors on account of such claim shall be retained by the Debtors.

E.     Treatment of Executory Contracts and Unexpired Leases

1.     *Contracts and Leases Not Expressly Rejected Are Assumed*

All executory contracts and unexpired leases, except for those expressly rejected by the Plan of Reorganization or by separate motion, are assumed pursuant to the Plan of Reorganization, including the bonds executed by Liberty Bond Services on behalf of the Debtors. The Plan of Reorganization provides for the Debtors to reject those executory contracts and unexpired leases specifically designated as a contract or lease to be rejected as specified in the Schedule of Rejected Contracts attached to the Plan. Any time prior to the first Business Day prior to the commencement of the hearing on confirmation of the Plan of Reorganization, the Debtors may modify that list. The Debtors will provide notice to the parties affected by any such amendment. The Debtors expressly reserve the right to reject any contract in the event there is a dispute concerning the amount necessary to cure defaults, notwithstanding the fact that such dispute may arise after the confirmation of the Plan.

79

        2.    *Cure of Defaults*

      Generally, if there has been a default (other than a default specified in section 365(b)(2) of the Bankruptcy Code) under an executory contract or unexpired lease, the debtor can assume the contract or lease only if the debtor cures the default. Accordingly, a condition to the assumption of an executory contract or unexpired lease is that any default under an executory contract or unexpired lease that is to be assumed pursuant to the Plan of Reorganization will be cured in a manner consistent with the Bankruptcy Code and as set forth in the Plan of Reorganization.

        3.    *Rejection Claims*

      If an entity with a claim for damages arising from the rejection of an executory contract or unexpired lease under the Plan of Reorganization has not filed a proof of claim for such damages, that claim shall be barred and shall not be enforceable against the Debtors and the Reorganized Debtors unless a proof of claim is filed with the Bankruptcy Court and served upon counsel for the Debtors within thirty (30) days after the Confirmation Date.

**F.**    **Management Incentive Plan**

      Reorganized Genesis will adopt a New Management Incentive Plan, which will provide for grants of shares of New Common Stock and options to purchase additional shares of New Common Stock to the senior managers of Reorganized Genesis. The New Management Incentive Plan will include grants of 750,000 shares of New Common Stock which shall be allocated among 43 management employees. Although all shares shall be allocated to this group, the exact amount of shares allocated to each employee, as well as the establishment of the vesting period (within the range of 3-5 years), will be determined by the new board of directors for Reorganized Genesis or pursuant to agreement with the steering committee for the holders of the Genesis Senior Lenders Claims and the Multicare Senior Lender Claims.

      The New Management Incentive Plan will also include options to purchase 3,480,000 shares of New Common Stock, which shall be allocated among 129 management employees. As with the stock grants, the exact amount of shares allocated to each employee, as well as the establishment of the vesting period (within the range of 3-5 years), will be determined by the new board of directors for Reorganized Genesis or pursuant to agreement with the steering committee for the holders of the Genesis Senior Lenders Claims and the Multicare Senior Lender Claims. The option exercise price will be $20.33 per share and is based on the enterprise valuations described in this Disclosure Statement.

      A copy of the New Management Incentive Plan is part of the Plan Supplement.

**G.**    **Releases**

      The Plan of Reorganization includes two types of releases. First, certain affiliates of the Genesis Debtors and the Multicare Debtors, that are not Debtors in these reorganization cases, are obligors on the Debtors' prepetition credit agreements. As part of the Plan, the holders of the Genesis Senior Lender Claims and the Multicare Senior Lender Claims will release those non-Debtors, provided that such entities become guarantors of the New Senior Notes and assuming that the net worth of such entities is not significant.

Second, the Plan provides for a release of all claims by the Debtors against the officers, directors, employees, financial advisors, professionals, accountants, and attorneys of the Debtors, the Genesis unsecured creditors' committee, the Multicare unsecured creditors' committee, and Mellon Bank, N.A., as agent for the holders of the Genesis Senior Lender Claims, the Multicare Senior Lender Claims, and the lenders under the Debtors' postpetition financing. This provision is intended to release all claims of the Debtors, whether arising prepetition or postpetition, and based on any theory (whether negligence, gross negligence, or willful misconduct) against these individuals. The release is limited to claims that could be asserted by the Debtors and only applies to claims against such parties in their representative capacity. The Plan also provides that the releases may be further limited by the provisions of the order of the Bankruptcy Court confirming the Plan and does not release certain loan obligations of certain of the senior officers, except as provided in a prior order of the Bankruptcy Court, dated February 23, 2001 (see section VI.E.2, above).

The purpose of the release of the Genesis and Multicare personnel is to prevent a collateral attack against those individuals based on derivative actions. It is the intent of the Plan to bring finality to the disruption caused by the reorganization of these companies. Because of the extraordinary regulatory scrutiny which currently exists in the healthcare industry, it is generally very difficult to retain qualified management. This difficulty is compounded when the healthcare company is operating as a debtor in possession under chapter 11 of the Bankruptcy Code. Despite these daunting obstacles, management of the Debtors has not only continued to stay with the company, but also made enormous contributions to the reorganization efforts and the compromises set forth in the Plan. The Debtors are not aware of any pending or threatened actions, whether civil or criminal, against the management of the Debtors. However, in order to continue to retain the Debtors' management, it is important that they be relieved of the threat of any derivative actions against them personally by parties in these reorganization cases that may be dissatisfied with the treatment provided in the Plan.

The purpose of the release of the representatives of the other major constituencies in these cases, such as the creditors' committees, is to protect the chapter 11 process for individuals who have contributed to the restructuring process. The Debtors are not aware of any pending or threatened actions against these representatives.

## H.     Effect of Confirmation

### 1.     Discharge of Claims and Termination of Equity Interests

Except as otherwise provided in the Plan, confirmation of the Plan of Reorganization will discharge all existing debts and claims and terminate all equity interests, of any kind, nature, or description whatsoever, against or in the Debtors or any of their assets or properties. All holders of existing claims against and equity interests in the Debtors will be enjoined from asserting against the Reorganized Debtors, or any of their assets or properties, any other or further claim or equity interest based upon any act or omission, transaction, or other activity that occurred prior to the Effective Date, whether or not such holder has filed a proof of claim or proof of equity interest. In addition, upon the Effective Date, each holder of a claim against or equity interest in the Debtors shall be forever precluded and enjoined from prosecuting or asserting any discharged claim against or terminated equity interest in the Debtors or the Reorganized Debtors.

81

    2.    *Indemnification*

        The Plan provides for the assumption and continuation of normal corporate indemnification provisions related to the protection of officers and directors.

    3.    *Exculpation*

        The Plan of Reorganization exculpates the Debtors, the Disbursing Agent, the statutory committees of unsecured creditors appointed in these reorganization cases, Mellon Bank, N.A., as administrative agent under, and any lender under, the Genesis Senior Lender Agreements, the Multicare Senior Lender Agreements, and the Revolving Credit and Guaranty Agreements described in sections II.E.2, II.F.2, and VI.C, above, and their respective agents for conduct relating to the prosecution of the reorganization cases. Specifically, the Plan of Reorganization provides that neither the Debtors, the Disbursing Agent, the statutory committees of unsecured creditors appointed in these reorganization cases, nor their respective members, officers, directors, employees, agents, or professionals shall have or incur any liability to any holder of any claim or equity interest for any act or omission in connection with, or arising out of, the reorganization cases, the confirmation of the Plan of Reorganization, the consummation of the Plan of Reorganization, or the administration of the Plan of Reorganization or property to be distributed under the Plan of Reorganization, except for willful misconduct or gross negligence.

**I.    Preservation of Certain Avoidance Actions**

        The Debtors and the Reorganized Debtors are waiving all avoidance actions except as set forth in the Plan Supplement.

**J.    Miscellaneous Provisions**

        The Plan of Reorganization contains provisions relating to the cancellation of existing securities, corporate actions, the Disbursing Agent, delivery of distributions, manner of payment, vesting of assets, binding effect, term of injunctions or stays, injunction against interference with the Plan of Reorganization, payment of statutory fees, retiree benefits, dissolution of the statutory committees of unsecured creditors appointed in the reorganization cases, recognition of guaranty rights, substantial consummation, compliance with tax requirements, severablity, revocation, and amendment of the Plan of Reorganization, governing law, and timing. For more information regarding these items, see the Plan of Reorganization attached hereto as Exhibit A.

**IX.**

**Certain Factors To Be Considered**

**A.    Certain Bankruptcy Considerations**

        Although the Debtors believe that the Plan of Reorganization will satisfy all requirements necessary for confirmation by the Bankruptcy Court, there can be no assurance that the Bankruptcy Court will reach the same conclusion. Moreover, there can be no assurance that modifications of the Plan of Reorganization will not be required for confirmation or that such modifications would not necessitate the resolicitation of votes. In addition, although the Debtors believe that the Effective Date will occur soon after the Confirmation Date, there can be no assurance as to such timing.

The Plan of Reorganization provides for no distribution to Classes G7 (Genesis Punitive Damage Claims), M7 (Multicare Punitive Damage Claims), and equity interests in the Debtors. The Bankruptcy Code conclusively deems these classes to have rejected the Plan of Reorganization. Notwithstanding the fact that these classes are deemed to have rejected the Plan of Reorganization, the Bankruptcy Court may confirm the Plan of Reorganization if at least one impaired class with respect to the Genesis Debtors and one impaired class with respect to the Multicare Debtors votes to accept the Plan of Reorganization (with such acceptance being determined without including the vote of any "insider" in such class). Thus, for the Plan of Reorganization to be confirmed, (i) one of the impaired subclasses in Class G1 or one of Classes G2 (Genesis Senior Lender Claims), G4 (Genesis General Unsecured Claims), or G5 (Genesis Senior Subordinated Note Claims), and (ii) one of the impaired subclasses in Class M1 or one of Classes M2 (Multicare Senior Lender Claims), M4 (Multicare General Unsecured Claims), or M5 (Multicare Senior Subordinated Note Claims) must vote to accept the Plan of Reorganization. As to each impaired class that has not accepted the Plan of Reorganization, the Plan of Reorganization may be confirmed if the Bankruptcy Court determines that the Plan of Reorganization "does not discriminate unfairly" and is "fair and equitable" with respect to these classes. The Debtors believe that the Plan of Reorganization satisfies these requirements. For more information, see section XI.F, below.

**B.     Risks Relating to the Plan Securities**

   *1.     Variances from Projections*

The projections included in this Disclosure Statement reflect numerous assumptions concerning the anticipated future performance of the Debtors and with respect to the prevailing market and economic conditions which are beyond the control of the Debtors and which may not materialize. The projections include assumptions concerning reimbursement rates with respect to third party payors and patient mix, occupancy, the collectability of accounts receivable, operating costs, and rent expense. The Debtors believe that the assumptions underlying the projections are reasonable. However, unanticipated events and circumstances occurring subsequent to the preparation of the projections may affect the actual financial results of the Debtors. Therefore, the actual results achieved throughout the periods covered by the projections necessarily will vary from the projected results, which variations may be material and adverse.

   *2.     Substantial Leverage; Ability to Service Debt*

The Reorganized Debtors will have substantial indebtedness. On the Effective Date, after giving effect to the transactions contemplated by the Plan of Reorganization, the Reorganized Debtors will have approximately $624 million in secured indebtedness. Although this level of debt represents significantly less leverage than many of the Debtors' competitors, significant amounts of cash flows will be necessary to make payments of interest and repay the principal amount of this indebtedness.

   *3.     Significant Holders*

Under the Plan of Reorganization, certain holders of allowed claims may receive distributions of shares in Reorganized Genesis representing in excess of five percent (5%) of the outstanding shares of New Common Stock. If holders of a significant number of shares of Reorganized Genesis were to act as a group, such holders may be in a position to control the outcome of actions requiring shareholder approval, including the election of directors. Further,

the possibility that one or more of the holders of a number of shares of Reorganized Genesis may determine to sell all or a large portion of their shares in a short period of time may adversely affect the market price of the stock of Reorganized Genesis.

### 4.    Lack of Trading Market

Reorganized Genesis will use reasonable commercial efforts to cause the shares of New Common Stock to be listed on a national securities exchange or a qualifying interdealer quotation system as soon as practicable following the Effective Date. There can be no assurance, however, that the New Common Stock will be listed on such exchange or system. Accordingly, there can be no assurance that a holder of such securities will be able to sell such shares in the future or as to the price at which such shares might trade.

### 5.    Dividend Policies

Because all of the Debtors' cash flows will be used in the foreseeable future to make payments under the exit facility that will be entered into in connection with the emergence from chapter 11 and under certain of the Plan Securities, Reorganized Genesis does not anticipate paying dividends on the New Common Stock in the near future.

### 6.    Restrictions on Transfer

Holders of Plan Securities who are deemed to be "underwriters" as defined in section 1145(b) of the Bankruptcy Code, including holders who are deemed to be "affiliates" or "control persons" within the meaning of the Securities Act, will be unable freely to transfer or to sell their securities except pursuant to (i) "ordinary trading transactions" by a holder that is not an "issuer" within the meaning of section 1145(b), (ii) an effective registration of such securities under the Securities Act and under equivalent state securities or "blue sky" laws, or (iii) pursuant to the provisions of Rule 144 under the Securities Act or another available exemption from registration requirements. For a more detailed description of these matters, see section II.J, above.

## C.    Risks Associated with the Business

The following categories of risks associated with the Debtors' businesses are set forth in their respective Form 10-Ks, which have been filed with the Securities and Exchange Commission: Risk Associated with Reimbursement Process; Reduced Revenues Resulting from Prospective Payment System; Self-Funded Insurance; Competitive Conditions; Collectability of Certain Accounts Receivable; Risks Related to Investigations and Legal Proceedings; Risk Of Adverse Effect Of Future Healthcare Reform; Potential Adverse Effect of Change in Revenue Sources; Potential Adverse Impact from Extensive Regulation; Risk of International Operations; Foreign Exchange Risk; and Increased Labor Costs. Please refer to those SEC filings for a further discussion on this topic.

## X.

### Confirmation of the Plan of Reorganization

#### A.    Confirmation Hearing

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court, after appropriate notice, to hold a hearing on confirmation of a plan of reorganization. The confirmation hearing is scheduled for August 28, 2001 (and August 29, 2001 if necessary), at 9:30 a.m., Eastern Time, before the Honorable Judith H. Wizmur, United States Bankruptcy Court for the District of New Jersey, Mitchell H. Cohen Courthouse, Courtroom 4B, 4th and Cooper Street, Camden, New Jersey 08101. The confirmation hearing may be adjourned from time to time by the Debtors or the Bankruptcy Court without further notice except for an announcement of the adjourned date made at the confirmation hearing or any subsequent adjourned confirmation hearing.

Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to confirmation of a plan of reorganization. Any objection to confirmation of the Plan of Reorganization must be in writing, must conform to the Federal Rules of Bankruptcy Procedure, must set forth the name of the objector, the nature and amount of claims or interests held or asserted by the objector against the particular Debtor or Debtors, the basis for the objection and the specific grounds therefor, and must be filed with the Bankruptcy Court, with a copy to Chambers, together with proof of service thereof, and served upon (i) Weil, Gotshal & Manges LLP, Co-Attorneys for the Genesis Debtors and Debtors in Possession, 767 Fifth Avenue, New York, New York 10153, Attention: Michael F. Walsh, Esq.; (ii) Richards, Layton & Finger PA, Co-Attorneys for the Genesis Debtors and Debtors in Possession, One Rodney Square, P.O. Box 551, Wilmington, Delaware 19899, Attention: Mark D. Collins, Esq.; (iii) Willkie, Farr & Gallagher, Co-Attorneys for the Multicare Debtors and Debtors in Possession, 787 Seventh Avenue, New York, New York 10019, Attention: Marc Abrams, Esq.; (iv) Young, Conaway, Stargatt & Taylor, Co-Attorneys for the Multicare Debtors and Debtors in Possession, 11th Floor, Wilmington Trust Company, P.O. Box 391, Wilmington, Delaware 19899-0391, Attention: James J. Patton, Esq.; (v) The United States Trustee for the District of Delaware, Attention: Joseph McMahon, Esq., 601 Walnut Street, Suite 950 West, Philadelphia, Pennsylvania 19106; (vi) Akin, Gump, Strauss, Hauer & Feld, L.L.P., Co-Attorneys for the Official Committee of Unsecured Creditors for the Genesis Debtors, 590 Madison Avenue, New York, New York 10022, Attention: Lisa Beckerman, Esq.; (vii) Pachulski Stang Ziehl Young & Jones PC, Co-Attorneys for the Official Committee of Unsecured Creditors for the Genesis Debtors, 919 N. Market Street, 16th Floor, P.O. Box 8075, Wilmington, Delaware 19899-8705, Attention: Laura Davis Jones, Esq., (viii) Kasowitz, Benson, Torres & Friedman LLP, Co-Attorneys for the Official Committee of Unsecured Creditors for the Multicare Debtors, 1633 Broadway, New York, New York 10019, Attention: David Rosner, Esq.; (ix) Saul, Ewing, Remick & Saul LLP, Co-Attorneys for the Official Committee of Unsecured Creditors for the Multicare Debtors, 222 Delaware Avenue, Suite 1200, P.O. Box 1266, Wilmington, Delaware 19899-1266, Attention: Norman Pernick, Esq., (x) Morgan, Lewis & Bockius LLP, Co-Attorneys for Agent for the Prepetition Senior Secured Lenders and Postpetition Lenders, 101 Park Avenue, New York, New York 10178-0060, Attention: Richard S. Toder, Esq., and (xi) Klett Rooney Lieber & Schorling, Co-Attorneys for Agent for the Prepetition Senior Secured Lenders and Postpetition Lenders, 1000 West Street, Suite 1410, Wilmington, Delaware 19801, Attention: Teresa Currier, Esq.

Objections to confirmation of the Plan of Reorganization are governed by Rule 9014 of the Federal Rules of Bankruptcy Procedure. **UNLESS AN OBJECTION TO**

85

CONFIRMATION IS TIMELY SERVED AND FILED, IT MAY NOT BE CONSIDERED BY THE BANKRUPTCY COURT.

**B.   General Requirements of Section 1129**

At the confirmation hearing, the Bankruptcy Court will determine whether the following confirmation requirements specified in section 1129 of the Bankruptcy Code have been satisfied:

1.   The Plan complies with the applicable provisions of the Bankruptcy Code.

2.   The Debtors have complied with the applicable provisions of the Bankruptcy Code.

3.   The Plan has been proposed in good faith and not by any means proscribed by law.

4.   Any payment made or promised by the Debtors or by a person issuing securities or acquiring property under the Plan for services or for costs and expenses in, or in connection with, the chapter 11 cases, or in connection with the Plan and incident to the chapter 11 cases, has been disclosed to the Bankruptcy Court, and any such payment made before the confirmation of the Plan is reasonable or if such payment is to be fixed after confirmation of the Plan, such payment is subject to the approval of the Bankruptcy Court as reasonable.

5.   The Debtors have disclosed the identity and affiliations of any individual proposed to serve, after confirmation of the Plan, as a director, officer, or voting trustee of the Debtors, affiliates of the Debtors participating in the Plan with the Debtors, or a successor to the Debtors under the Plan, and the appointment to, or continuance in, such office of such individual is consistent with the interests of creditors and equity holders and with public policy, and the Debtors have disclosed the identity of any insider that will be employed or retained by the Debtors, and the nature of any compensation for such insider.

6.   With respect to each class of claims or equity interests, each holder of an impaired claim or impaired equity interest either has accepted the Plan or will receive or retain under the Plan on account of such holder's claim or equity interest, property of a value, as of the Effective Date, that is not less than the amount such holder would receive or retain if the Debtors were liquidated on the Effective Date under chapter 7 of the Bankruptcy Code. See discussion of "Best Interests Test," below.

7.   Except to the extent the Plan meets the requirements of section 1129(b) of the Bankruptcy Code (discussed below), each class of claims or equity interests has either accepted the Plan or is not impaired under the Plan. Classes G7 (Genesis Punitive Damage Claims), G8 (Genesis Series G Preferred Stock Interests), G9 (Genesis Series H Preferred Stock Interests), G10 (Genesis Series I Preferred Stock Interests), G11 (Genesis Common Stock Interests), M7 (Multicare Punitive Damage Claims), and M8 (Multicare Common Stock Interests) are deemed to have rejected the Plan and thus the Plan can be confirmed only if the requirements of section 1129(b) of the Bankruptcy Code are met.

86

8.  Except to the extent that the holder of a particular claim has agreed to a different treatment of such claim, the Plan provides that Administrative Expense Claims and Priority Non-Tax Claims will be paid in full on the Effective Date and that Priority Tax Claims will receive on account of such claims deferred cash payments, over a period not exceeding six (6) years after the date of assessment of such claims, of a value, as of the Effective Date, equal to the allowed amount of such claims.

9.  At least one class of impaired claims has accepted the Plan, determined without including any acceptance of the Plan by any insider holding a claim in such class.

10.  Confirmation of the Plan is not likely to be followed by the liquidation or the need for financial reorganization of the Debtors or any successor to the Debtors under the Plan, unless such liquidation or reorganization is proposed in the Plan. See discussion of "Feasibility," below.

11.  The Plan provides for the continuation after the Effective Date of payment of all retiree benefits (as defined in section 1114 of the Bankruptcy Code), at the level established pursuant to section 1114(e)(1)(B) or 1114(g) of the Bankruptcy Code at any time prior to confirmation of the Plan, for the duration of the period the Debtors have obligated themselves to provide such benefits.

## C.    Best Interests Tests

As described above, the Bankruptcy Code requires that each holder of an impaired claim or equity interest either (i) accept the Plan or (ii) receive or retain under the Plan property of a value, as of the Effective Date, that is not less than the value such holder would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code.

The first step in determining whether this test has been satisfied is to determine the dollar amount that would be generated from the liquidation of the Debtors' assets and properties in the context of a chapter 7 liquidation case. The gross amount of cash that would be available for satisfaction of claims and equity interests would be the sum consisting of the proceeds resulting from the disposition of the unencumbered assets and properties of the Debtors, augmented by the unencumbered cash held by the Debtors at the time of the commencement of the liquidation case.

The next step is to reduce that gross amount by the costs and expenses of liquidation and by such additional administrative and priority claims that might result from the termination of the Debtors' business and the use of chapter 7 for the purposes of liquidation. Any remaining net cash would be allocated to creditors and shareholders in strict priority in accordance with section 726 of the Bankruptcy Code. Finally, the present value of such allocations (taking into account the time necessary to accomplish the liquidation) are compared to the value of the property that is proposed to be distributed under the Plan on the Effective Date.

The Debtors' costs of liquidation under chapter 7 would include the fees payable to a trustee in bankruptcy, as well as those fees that might be payable to attorneys and other professionals that such a trustee might engage. Other liquidation costs include the expenses incurred during the chapter 11 cases allowed in the chapter 7 case, such as compensation for attorneys, financial advisors, appraisers, accountants, and other professionals for the Debtors and statutory committees of unsecured creditors appointed in the chapter 11 cases, and costs and

87

expenses of members of the statutory committee of unsecured creditors, as well as other compensation claims. In addition, claims would arise by reason of the breach or rejection of obligations incurred and leases and executory contracts assumed or entered into by the Debtors during the pendency of the chapter 11 cases.

The foregoing types of claims, costs, expenses, fees, and such other claims that may arise in a liquidation case would be paid in full from the liquidation proceeds before the balance of those proceeds would be made available to pay prepetition priority and unsecured claims. The Debtors believe that in a chapter 7 case, Classes G4 (other than insured claims to the extent of such insurance), G5, G6, G7, G8, G9, G10, G11, M4 (other than insured claims to the extent of such insurance), M5, M6, M7, and M8 would receive no distribution of property.

After consideration of the effects that a chapter 7 liquidation would have on the ultimate proceeds available for distribution to creditors in the chapter 11 cases, including (i) the increased costs and expenses of a liquidation under chapter 7 arising from fees payable to a trustee in bankruptcy and professional advisors to such trustee, (ii) additional costs associated with the rapid transfer or cessation of operations at the facilities and the erosion in value of assets in a chapter 7 case in the context of the expeditious liquidation required under chapter 7 and the "forced sale" atmosphere that would prevail, and (iii) the substantial increases in claims that would be satisfied on a priority basis, the Debtors have determined that confirmation of the Plan will provide each holder of an allowed claim with a recovery that is not less than such holder would receive pursuant to liquidation of the Debtors under chapter 7.

The Debtors also believe that the value of any distributions to each class of allowed claims in a chapter 7 case, including all secured claims, would be less than the value of distributions under the Plan because such distributions in a chapter 7 case would not occur for a substantial period of time. In this regard, it is possible that distribution of the proceeds of the liquidation could be delayed for one or more years or more after the completion of such liquidation in order to resolve claims and prepare for distributions. In the event litigation was necessary to resolve claims asserted in a chapter 7 case, the delay could be prolonged and administrative expenses increased.

**The Debtors' liquidation analysis is an estimate of the proceeds that may be generated as a result of a hypothetical chapter 7 liquidation of the Debtors. The analysis is based on a number of significant assumptions which are described. The liquidation analysis does not purport to be a valuation of the Debtors' assets and is not necessarily indicative of the values that may be realized in an actual liquidation.**

D.    **Liquidation Analyses**

The liquidation analyses has been prepared in consultation with the auditors of Genesis and Multicare. The full reports, including assumptions for each company, are included in the Plan Supplement.