*1.      The Genesis Debtors*

| Statement of Assets  (S000) | Notes Ref | Unaudited Book Value | Asset Realization | | Liquidation Values | |
|---|---|---|---|---|---|---|
| | | | Scenario I | Scenario II | Scenario I | Scenario II |
| Cash & equivalents | A | $806 | 100% | 100% | $806 | $806 |
| Restricted investments in marketable securities | B | 31,697 | 0% | 0% | - | - |
| Accounts receivable (net) | C | 404,770 | 39% | 53% | 157,860 | 214,528 |
| Inventory | D | 65,011 | 0% | 0% | - | - |
| Prepaid expenses and other current assets | E | 45,884 | 21% | 36% | 9,636 | 16,518 |
| Proceeds from the sale of operating entities | F | | N/A | N/A | 273,635 | 478,557 |
| Property, plant and equipment | G | 537,215 | N/A | N/A | 11,893 | 22,436 |
| Notes receivable and other investments | H | 38,881 | 48% | 63% | 18,663 | 24,495 |
| Other long term assets | I | 114,222 | 16% | 24% | 18,276 | 27,413 |
| Investments in unconsolidated affiliates | J | 56,801 | 0% | 0% | - | - |
| Goodwill and other intangibles | K | 890,888 | 0% | 0% | - | - |
| Avoidance & contingency claims | L | | | | Unknown | Unknown |
| Total liquidated proceeds | | 2,186,175 | 22.45% | 35.90% | 490,769 | 784,753 |

| | | | | | Estimated Recovery | |
|---|---|---|---|---|---|---|
| | | | | | Scenario I | Scenario II |
| **CHAPTER 7 ADMINISTRATIVE CLAIMS – Section 503(b)** | | | | | | |
| Trustee & Receiver fees | M | | | | 14,747 | 23,599 |
| Counsel for Trustee | N | | | | 7,374 | 11,800 |
| Other professional fees | O | | | | 13,200 | 13,200 |
| Estimated liquidation costs | P | | | | 39,262 | 62,780 |
| **TOTAL CHAPTER 7 ADMINISTRATIVE CLAIMS** | | | | | 74,583 | 111,379 |
| *Net Estimated Recovery - Chapter 7 Admin Claims* | | | | | 100% | 100% |
| *Net Estimated Proceeds Available for Distribution* | | | | | $416,186 | $673,374 |

| | | Estimated Balance | | | | |
|---|---|---|---|---|---|---|
| **SECURED CLAIMS** | | | | | | |
| DIP Financing | Q | 180,000 | 100% | 100% | 180,000 | 180,000 |
| G1 miscellaneous mortgage claims | R | 120,385 | 28% | 45% | 33,765 | 54,631 |
| G2 senior lender claims | R | 1,198,460 | 17% | 37% | 202,421 | 438,743 |
| **TOTAL SECURED CLAIMS** | | 1,498,845 | | | 416,186 | 673,374 |
| *Net Estimated Proceeds Available for Distribution After Secured Claims* | | | | | $0 | $0 |
| **ADMINISTRATIVE CLAIMS** | | | | | | |
| Post petition trade creditor claims | S | 47,655 | 0% | 0% | - | - |
| Accrued salaries, wages, and other compensation | T | 51,753 | 0% | 0% | - | - |
| **TOTAL ADMINISTRATIVE CLAIMS** | | 99,408 | | | - | - |
| *Balance available for distribution to priority creditors* | | | | | $0 | $0 |
| **PRIORITY CLAIMS (G3)** | | | | | | |
| Accrued salaries, wages, and other compensation | U | 17 | 0% | 0% | - | - |

89

| | Notes Ref | Unaudited Book Value | Asset Realization | | Liquidation Values | |
|---|---|---|---|---|---|---|
| | | | Scenario I | Scenario II | Scenario I | Scenario II |
| Taxes | U | 11,508 | 0% | 0% | - | - |
| Other claims | U | 2,056 | 0% | 0% | - | - |
| **TOTAL PRIORITY CLAIMS** | | 13,581 | | | - | - |
| | | | | | | |
| *Balance available for distribution to unsecured creditors* | | | | | $0 | $0 |
| | | | | | | |
| **GENERAL UNSECURED CLAIMS** | | | | | | |
| G4 general unsecured claims | v | 80,761 | 0% | 0% | - | - |
| G5 senior subordinated note claims | w | 387,425 | 0% | 0% | - | - |
| **TOTAL GENERAL UNSECURED CLAIMS** | | 468,186 | | | - | - |

## Notes to Genesis Liquidation Analysis

GENERAL ASSUMPTIONS

1   This Liquidation Analysis was prepared in accordance with section 1129(a)(7)(A)(ii) of the Bankruptcy Code to determine that the Plan of Reorganization is in the best interest of each holder of a claim or interest.

2   The Liquidation Analysis is based upon a number of estimates and assumptions that, although developed and considered reasonable by the management of Genesis, are inherently subject to significant economic, business, governmental regulation, competitive uncertainties, and contingencies beyond the control of Genesis or its management. The Liquidation Analysis is also based on assumptions with regard to liquidation decisions that are subject to change. Accordingly, there can be no assurance that the values reflected in this Liquidation Analysis would be realized if Genesis were, in fact, to undergo such a liquidation and actual results could vary materially and adversely from those contained herein.

3   This analysis assumes the conversion of the current chapter 11 cases to chapter 7 cases with the liquidation of the company's assets being finalized over a six-month period. A chapter 7 trustee would be either elected by creditors or appointed by the Bankruptcy Court to administer the estates. The chapter 7 trustee is independent and would be entitled to make all of his or her own decisions regarding the liquidation of the estates, the hiring of professionals, the pursuit of claims or litigation, the payment of or objection to claims, and the distribution of any ultimate dividend. The chapter 7 trustee would be compensated in accordance with section 326 of the Bankruptcy Code.

4   The Liquidation Analysis assumes that Genesis's captive insurance business would be liquidated separately, and accordingly, that business is excluded from this analysis. It is assumed that this Liquidation Analysis includes all other assets of Genesis, including investments in subsidiaries not currently in bankruptcy. It is assumed that all operating assets would be disposed of through sale, liquidation, and/or termination as appropriate.

5   The Liquidation Analysis uses Genesis's unaudited financial statements as of December 31, 2000, and other figures estimated by Genesis's management.

6   Genesis operates skilled nursing and assisted living eldercare facilities ("centers"). The skilled nursing centers offer three levels of care to their customers: skilled, intermediate, and personal. This analysis assumes that the majority of these centers will be sold as a going-concern over the six-month liquidation period. Genesis believes a six-month liquidation period is sufficient to allow for an orderly transfer of operations to acquirers. During this time, certain personnel would be retained as necessary to support the completion of the sale and liquidation process.

AA. 1873

7   Management has assumed that those centers generating negative earnings will be either closed within the six month liquidation period or involuntarily placed into receivership by various state authorities as a result of Genesis's conversion to a chapter 7 case.

8   Genesis operates pharmacy and medical supply services that provide prescription and nonprescription pharmaceuticals, infusion therapy, medical supplies, and equipment to elderly, chronically ill, and disabled patients in long-term care and alternative site settings. Genesis also operates community-based pharmacies which are located in or near medical centers, hospitals, and physician office complexes. This analysis assumes that Genesis's pharmacy services will be sold as a going-concern over the six-month liquidation period. Genesis believes a six-month liquidation period is sufficient to allow for an orderly transfer of operations to acquirers. During this time, certain personnel would be retained as necessary to support the completion of the sale and liquidation process.

9   Genesis provides physical, speech, and occupational rehabilitation services. This analysis assumes that Genesis's rehabilitation services will be sold as a going-concern over the six-month liquidation period. Genesis believes a six-month liquidation period is sufficient to allow for an orderly transfer of operations to acquirers. During this time, certain personnel would be retained as necessary to support the completion of the sale and liquidation process.

10  Genesis provides other ancillary services including group purchasing, hospitality services, respiratory health services, diagnostic services, home healthcare, and other miscellaneous healthcare, management, and consulting services. This analysis assumes that Genesis's other ancillary services will be sold as a going-concern over the six-month liquidation period. Genesis believes a six-month liquidation period is sufficient to allow for an orderly transfer of operations to acquirers. During this time, certain personnel would be retained as necessary to support the completion of the sale and liquidation process.

11  This liquidation analysis assumes that all assets of the Genesis Debtors will be liquidated during the six-month liquidation period. There can be no assurances made that all assets will be completely liquidated during this time period.

12  For purposes of this analysis, management has assumed a high and low range of liquidation scenarios entitled Scenario I and II.

NOTES TO ASSET ACCOUNTS

A   <u>Cash & equivalents</u>. The Liquidation Analysis assumes no further cash would be generated during the chapter 7 cases for distribution, except for net proceeds from the disposition of noncash assets. It is assumed that the cash at the date of the actual liquidation would be equal to the cash balance as of December 31, 2000. That cash would be fully available for distribution to creditors.

B   <u>Restricted investments in marketable securities</u>. This amount represents investments in marketable securities held by Genesis's captive insurance subsidiary which did not file for bankruptcy. Restricted investments in marketable securities would not be available in Genesis's chapter 7 liquidation. All outstanding liabilities (potential claims) in connection with Genesis's captive insurance subsidiary are omitted from this analysis.

C   <u>Accounts receivable</u>. Genesis will retain ownership of the accounts receivable for all entities. The chapter 7 trustee will bill and collect these receivables. For purposes of this analysis, management anticipates recovering between 39% and 53% of net accounts receivable. These percentages are based upon a review of the detailed aging balance for the various payers. Management has assessed the potential recoverability for these receivables based on payer-mix and the days outstanding of these receivables.

91

AA. 1874

Below are the recovery percentages applied for the nursing centers:

|  | Medicare/Medicaid | | Managed Care/Private | |
| --- | --- | --- | --- | --- |
|  | Scenario I | Scenario II | Scenario I | Scenario II |
| Current | 80% | 95% | 75% | 90% |
| 31 – 60 | 65% | 85% | 55% | 75% |
| 61 – 90 | 55% | 80% | 45% | 65% |
| 91 – 120 | 30% | 60% | 25% | 55% |
| 121 – 365 | 15% | 35% | 10% | 30% |
| Over 365 | 0% | 0% | 0% | 0% |

Below are the recovery percentages applied for the pharmacy and medical supply division:

|  | Medicare/Medicaid | | Managed Care/Private | |
| --- | --- | --- | --- | --- |
|  | Scenario I | Scenario II | Scenario I | Scenario II |
| Current | 75% | 90% | 70% | 85% |
| 31 – 60 | 60% | 80% | 50% | 70% |
| 61 - 90 | 50% | 75% | 40% | 60% |
| 91 - 120 | 25% | 55% | 20% | 50% |
| 121 – 365 | 10% | 30% | 5% | 25% |
| Over 365 | 0% | 0% | 0% | 0% |

Certain trade receivables are due from a related entity – Multicare – for prepetition services rendered. It is estimated that no recovery will be made from these receivables.

All other receivables from rehabilitation and other ancillary services represent approximately 5% of net receivables. The cash recovery value for these other receivables was estimated by applying the aggregate recovery percentage average for nursing and pharmacy receivables.

The estimate herein reflects management's approximation of the recoverable value of these receivables during the six-month liquidation period.

D    **Inventory.** For purposes of this analysis, it is assumed that inventory will be included in the sale of going-concern entities and is therefore not projected.

E    **Prepaid expenses and other current assets.** This asset account consists primarily of miscellaneous receivables, prepaid rents, prepaid property taxes, and prepaid insurance. Management has reviewed the individual account balances for this account and has estimated that in aggregate approximately $9 million and $17 million will be recovered under a liquidation scenario.

F    **Proceeds from the sale of operating entities.** The proceeds from the distressed sale of going-concern operations is estimated to be in the range of $274 million to $479 million. The entities sold include Genesis's inpatient nursing centers, pharmacy business, rehabilitation services, and other ancillary businesses. The values estimated for those businesses are based upon various earnings multiples for distressed going concern operations which management considers reasonable.

The enterprise value for these entities was determined by applying these multiples to a normalized earnings for Genesis. The 2001 projected earnings (EBITDA) were adjusted to reflect the following:
-    current operations through January 31, 2001;
-    the elimination of negative earnings for underperforming entities likely to be closed;
-    allocation of corporate overhead to the operating businesses

92

AA. 1875

A range of multiple of earnings was then applied to this "normalized EBITDA" to estimate enterprise value for these entities. The calculated enterprise value was then further reduced by the secured debt and current liabilities from nonbankrupt subsidiaries of Genesis. It is assumed that any secured debt and current liabilities of the nonbankrupt entities would be paid upon sale of the business units.

G   <u>Property, plant & equipment</u>.

    i.    **Centers, Pharmacy, Rehabilitation, and Other Ancillary Services:** Property, plant, and equipment will be included in the sale as a going concern.

    ii.   **Corporate Division:** Property, plant, and equipment net of accumulated depreciation is approximately $70 million. The liquidation recovery as a percentage of cost is assumed to be the following: Buildings & Land (25% - 50%), Equipment (10% - 20%), Computer Equipment (10% - 15%), and construction in progress (10% - 21%).

H   <u>Notes receivable and other investments</u>. This asset account is comprised of loans made to various third parties, including managed and jointly-owned properties. Management has reviewed the various notes receivables and investments to determine potential recoveries under a liquidation scenario. It is estimated that Genesis would be able to recover approximately $19 million and $24 million from these receivables and investments.

I   <u>Other long-term assets</u>. This asset account is primarily comprised of real estate deposits, deferred financing costs, a deferred management fee due from Multicare, net receivables from CMS and other third-party payors. Management estimates that approximately $18 million and $27 million will be recovered under a liquidation scenario.

J   <u>Investments in unconsolidated affiliates</u>. The majority of the investments in unconsolidated affiliates is with Multicare. Management of Genesis assigns no recoverability for this asset.

K   <u>Goodwill and other intangibles</u>. Goodwill and other intangible assets are estimated to have no liquidation recovery value.

L   <u>Avoidance & contingency claims</u>. The Genesis Debtors may have certain rights for avoidance actions and other contingency claims that may benefit the estate. It is unknown at this time the total benefit that these claims may generate for the estates if the Genesis Debtors were successful in litigating these matters.


NOTES TO CHAPTER 7 ADMINISTRATIVE CLAIMS

M   <u>Trustee & Receiver fees</u>. Compensation for the chapter 7 trustee will be limited to fee guidelines in section 326 of the Bankruptcy Code.

N   <u>Counsel for Trustee</u>. Compensation for trustee's counsel is estimated at 50% of estimated trustee fees.

O   <u>Other professional fees</u>. Management estimates that professional fees for legal, financial, and other advice relating to the bankruptcy proceedings will be $1.7 million per month for the first three months of the liquidation process. It is anticipated that professional fees would reduce to $1 million per month for the subsequent three months. In addition, there was approximately $5.1 million owing in relation to fees outstanding from the Commencement Date to December 31, 2000.

P   <u>Liquidation costs</u>. For purposes of this analysis, liquidation costs are estimated as 8% of total liquidated proceeds.

NOTES TO SECURED CLAIMS

Q    DIP financing. The administrative claim owing in relation to DIP Financing has been estimated as the amount outstanding as disclosed in the Debtors' borrowing base certificate as of May 31, 2001.

R    Secured Claims. Amount of liability represented herein is based on proof of claims filed by the various claimants.

NOTES TO ADMINISTRATIVE CLAIMS

S    Postpetition trade creditor claims. This amount represents the trade creditor debt incurred during the Genesis reorganization cases payable as an administrative claim.

T    Accrued salaries, wages, and other compensation. Amount represents salaries, wages, and other compensation incurred pre- and postpetition subject to Bankruptcy Court order.

NOTES TO PRIORITY CLAIMS

U    Priority Claims. Amount represents section 507 claims.

NOTES TO UNSECURED CLAIMS

V    General unsecured – Class G4 claims. Amount represents trade creditor debt outstanding as of the Commencement Date. Although not specifically shown, technically, this class would also include deficiency claims from Classes G1 and G2.

W    Unsecured debt – Class G5 claims. Amount represents claims under certain prepetition senior subordinated notes.

### Best Interest Comparison

| Class | Liquidation Recovery | | Chapter 11 |
|---|---|---|---|
| | Low | High | Recovery |
| G1 (Misc Secured Claims) | 28% | 45% | 100.00% |
| G2 (Genesis Senior Lender Claims | 17% | 37% | 78.89% |
| G3 (Priority Claims) | 0% | 0% | 100.00% |
| G4 (Genesis General Unsecured Claims) | 0% | 0% | 7.34% |
| G5 (Genesis Sr Subordinated Note Claims) | 0% | 0% | 7.34% |
| G7 (Genesis Punitive Damage Claims) | 0% | 0% | 0.00% |

2.    *Multicare Debtors*

| | Notes Ref | Unaudited Book Value | Asset Realization | | Liquidation Values | |
|---|---|---|---|---|---|---|
| | | | Scenario 1 | Scenario 2 | Scenario 1 | Scenario 2 |
| Statement of Assets ($000) | | | | | | |
| Cash and equivalents | A | $19,070 | 100% | 100% | $19,070 | $19,070 |
| Accounts receivable, net | B | 104,581 | 46% | 63% | 48,107 | 65,886 |
| Prepaid expenses and other current assets | C | 15,876 | 15% | 29% | 2,381 | 4,604 |
| Proceeds from the sale of operating entities | D | | N/A | N/A | 83,672 | 148,731 |
| Property, plant and equipment, net | E | 559,963 | 0% | 0% | - | - |

94

| | Notes Ref | Unaudited Book Value | Asset Realization Scenario 1 | Scenario 2 | Liquidation Values Scenario 1 | Scenario 2 |
|---|---|---|---|---|---|---|
| Other long-term assets | F | 62,052 | N/A | N/A | 5,000 | 10,000 |
| Goodwill and other intangibles, net | G | 335,147 | 0% | 0% | - | - |
| Avoidance & contingency claims | H | | | | Unknown | Unknown |
| **Total** | | $1,096,689 | 14.4% | 22.6% | $158,230 | $248,291 |
| **CHAPTER 7 ADMINS - Section 503(b)** | | | | | | |
| Trustee & Receiver fees | I | | | | 4,771 | 7,473 |
| Counsel for Trustee | J | | | | 2,386 | 3,737 |
| Other professional fees | K | | | | 8,252 | 8,252 |
| Estimated liquidation costs | L | | | | 12,658 | 19,863 |
| TOTAL CHAPTER 7 ADMIN CLAIMS | | | | | 28,067 | 39,325 |
| *Net Estimated Recovery - Chapter 7 Admin Claims* | | | | | 100% | 100% |
| *Net Estimated Proceeds Available for Distribution* | | | | | $130,163 | $208,966 |
| **SECURED CLAIMS** | | | | | | |
| DIP financing | M | - | | | - | - |
| M1 miscellaneous mortgage claims | N | 27,854 | 28% | 44% | 7,693 | 12,351 |
| M2 senior lender claims | N | 443,400 | 28% | 44% | 122,470 | 196,615 |
| TOTAL SECURED CLAIMS | | 471,254 | | | 130,163 | 208,966 |
| *Net Estimated Proceeds available for distribution* | | | | | $0 | $0 |
| **ADMINISTRATIVE CLAIMS** | | | | | | |
| Postpetition trade creditor claims | O | 23,755 | 0% | 0% | - | - |
| Accrued salaries, wages, and other compensation | P | 13,594 | 0% | 0% | - | - |
| TOTAL ADMINISTRATIVE CLAIMS | | 37,349 | | | - | - |
| *Balance available for distribution to priority creditors* | | | | | $0 | $0 |
| **PRIORITY CLAIMS (M3)** | | | | | | |
| Accrued salaries, wages, and other compensation | Q | 50 | 0% | 0% | - | - |
| Taxes | Q | 5,570 | 0% | 0% | - | - |
| Other claims | Q | 405 | 0% | 0% | - | - |
| TOTAL PRIORITY CLAIMS | | 6,025 | | | - | - |
| *Balance available for distribution to general unsecured creditors* | | | | | $0 | $0 |
| **GENERAL UNSECURED CLAIMS** | | | | | | |
| M4 General Unsecured Claims | R | 26,439 | 0% | 0% | - | - |
| M5 Unsecured Debt | S | 257,817 | 0% | 0% | - | - |
| TOTAL GENERAL UNSECURED CLAIMS | | 284,256 | | | - | - |

Notes to Multicare Liquidation Analysis

GENERAL ASSUMPTIONS

1   This Liquidation Analysis was prepared in accordance with section 1129(a)(7)(A)(ii) of the Bankruptcy Code to determine that the Plan of Reorganization is in the best interest of each holder of a claim or interest.

2   The Liquidation Analysis is based upon a number of estimates and assumptions that, although developed and considered reasonable by Multicare's management, are inherently subject to significant economic, business, governmental regulation, competitive uncertainties, and contingencies beyond the control of Multicare or its management. The Liquidation Analysis is also based upon assumptions with regard to liquidation decisions that are subject to change. Accordingly, there can be no assurance that the values reflected in this Liquidation Analysis would be realized if Multicare were, in fact, to undergo such a liquidation and actual results could vary materially and adversely from those contained herein.

3   This analysis assumes the conversion of the current chapter 11 cases to chapter 7 cases with the liquidation of the company's assets being finalized over a six-month period. A chapter 7 trustee would be appointed to administer the estates. The chapter 7 trustee is independent and would be entitled to make all of his or her own decisions regarding the liquidation of the estates, the hiring of professionals, the pursuit of claims or litigation, the payment of or objection to claims, and the distribution of any ultimate dividends. The chapter 7 trustee would be compensated in accordance with section 326 of the Bankruptcy Code.

4   It is assumed that this Liquidation Analysis includes all assets of the parent company, including investments in subsidiaries not currently in bankruptcy. It is assumed that all operating assets would be disposed of through sale, liquidation, and/or termination as appropriate.

5   The Liquidation Analysis utilizes Multicare's unaudited financial statements as of December 31, 2000, and other figures estimated by management.

6   This analysis assumes that the majority of inpatient services assets will be sold as a going-concern over the six-month liquidation period. Multicare believes a six-month liquidation period is sufficient to allow for an orderly transfer of operations to acquirers. During this time, certain personnel would be retained as necessary to support the completion of the sale and liquidation process.

7   Management has assumed that those centers generating negative earnings will be either closed within the six month liquidation period or involuntarily placed into receivership by various state authorities as a result of Multicare's conversion to a chapter 7 case.

8   This Liquidation Analysis assumes that all assets of the Multicare Debtors will be liquidated during the six-month liquidation period. There can be no assurances made that all assets will be completely liquidated during this time period.

9   For purposes of this analysis, management has assumed a high and low range of liquidation scenarios entitled Scenario I and II.

NOTES TO ASSET ACCOUNTS

A   <u>Cash & equivalents</u>. The Liquidation Analysis assumes no further cash would be generated during the chapter 7 case for distribution, except for net proceeds from the disposition of noncash assets. It is assumed that the available cash at the date of liquidation would be equal to the cash balance as of December 31, 2000. That cash would be fully available for distribution to creditors.

96

B   **Accounts receivable**. Multicare will retain ownership of the accounts receivable for all entities. The trustee will bill and collect these receivables. For purposes of this analysis, management anticipates recovering between 46% and 63% of net accounts receivable. These percentages are based upon a review of the detailed aging balance for the various payors. Management has assessed the potential recoverability for these receivables based on payor-mix and the days outstanding for these receivables. Listed below are the recovery percentages applied:

|            | Medicare/Medicaid | | Managed Care/Private | |
|------------|------------|-------------|------------|-------------|
|            | Scenario I | Scenario II | Scenario I | Scenario II |
| Current    | 80%        | 95%         | 75%        | 90%         |
| 31 - 60    | 65%        | 85%         | 55%        | 75%         |
| 61 - 90    | 55%        | 80%         | 45%        | 65%         |
| 91 - 120   | 30%        | 60%         | 25%        | 55%         |
| 121 - 365  | 15%        | 35%         | 10%        | 30%         |
| Over 365   | 0%         | 0%          | 0%         | 0%          |

The estimate herein reflects management's estimate of the recoverable value of these trade receivables during the six-month liquidation period.

C   **Prepaid expenses and other current assets**. This asset account is comprised of the following assets: prepaid insurance, patient trust accounts, miscellaneous inventory, and miscellaneous receivables. For purposes of this analysis, management estimates that approximately $2.3 to $4.6 million will be recoverable under a liquidation scenario.

D   **Proceeds from sale of going-concern operations**. The proceeds from the distressed sale of going-concern operations is estimated to be in the range of $83 million to $148 million. The values estimated for those businesses sold are based upon various earnings multiples for distressed going-concern operations which management considers reasonable.

The enterprise value for these entities was determined by applying these multiples to a normalized earnings for Multicare. The 2001 projected earnings (EBITDA) were adjusted to reflect the following:
-   current operations through January 31, 2001;
-   elimination of negative earnings for underperforming entities likely to be closed;
-   potential management fee savings upon termination with Multicare's relationship with Genesis;
-   loss of revenues from management contracts due to liquidation of Multicare

A range of multiple of earnings was then applied to this "normalized EBITDA" to estimate enterprise value for these entities. The calculated enterprise value was then further reduced by the secured debt and current liabilities from nonbankrupt subsidiaries of Multicare. It is assumed that any secured debt and current liabilities of the nonbankrupt entities would be paid upon sale of the business units.

E   **Property, plant & equipment**. Property, plant, and equipment will be included in the sale of centers as a going concern and therefore no value is contained herein.

F   **Other long-term assets**. Other long term assets are comprised of deferred financing costs, deposits to a related company, investments in joint-ventures, and potential settlement with CMS. Management estimates to receive approximately $5 to $10 million from CMS. Other long term costs are estimated to have no liquidation recovery value.

G   **Goodwill and other intangibles**. Goodwill and other intangibles are estimated to have no liquidation recovery value.

H    <u>Avoidance & contingency claims</u>.  The Multicare Debtors may have certain rights for avoidance actions and other contingency claims that may benefit the estates.  It is unknown at this time the total benefit that these claims may generate for the estates if the Multicare Debtors were successful in litigating these matters.

NOTES TO CHAPTER 7 ADMINISTRATIVE CLAIMS

I    <u>Trustee & Receiver fees</u>.  Compensation for the chapter 7 trustee will be limited to fee guidelines in section 326 of the Bankruptcy Code.

J    <u>Counsel for Trustee</u>.  Compensation for trustee's counsel is estimated at 50% of estimated trustee fees.

K    <u>Professional fees</u>.  As of December 31, 2000, approximately $3.7 million in professional fees was outstanding.  Management estimates that combined professional fees will be $1,000,000 per month for the first three months of the liquidation process.  It is anticipated that professional fees would reduce to $500,000 per month for the subsequent three months.

L    <u>Liquidation costs</u>.  For purposes of this analysis, liquidation costs are estimated as 8% of total liquidated proceeds.

NOTES TO SECURED CLAIMS

M    <u>DIP Financing.</u>  As of May 31, 2001, Multicare did not have an outstanding balance on its debtor in possession lending facility.

N    <u>Secured claims</u>.  Amount of liability represented herein is based on proofs of claim filed by the various claimants.

NOTES TO ADMINISTRATIVE CLAIMS

O    <u>Postpetition trade creditor claims</u>.  Amount represents trade creditor debt incurred during the Multicare reorganization cases.  Management has reduced the trade payable by $23 million for intercompany debt payable to Genesis related to certain deposits that have been made.  Management does not anticipate paying this obligation upon liquidation.

P    <u>Accrued salaries, wages and other compensation</u>  Amount represents salaries, wages, and other compensation incurred postpetition.  For purposes of this analysis, this amount is estimated as one-half of payroll and benefits expense for the month of December 2000.

NOTES TO PRIORITY CLAIMS

Q    <u>Priority claims</u>.  Amount represents management estimates for priority claims.

NOTES TO GENERAL UNSECURED CLAIMS

R    <u>Other unsecured creditor claims</u>.  This balance is exclusive of a $93 million intercompany claim filed by Genesis.

S    <u>Unsecured Debt</u>.  Amount represents claims under certain prepetition senior subordinated notes.

*Best Interest Comparison*

| Class | Liquidation Recovery | | Chapter 11 |
| | Low | High | Recovery |
| --- | --- | --- | --- |
| M1 (Misc Secured Claims) | 28% | 44% | 100.00% |
| M2 (Multicare Senior Lender Claims | 28% | 44% | 77.31% |
| M3 (Priority Claims) | 0% | 0% | 100.00% |
| M4 (Multicare General Unsecured Claims) | 0% | 0% | 7.34% |
| M5 (Multicare Sr Sub Note Claims) | 0% | 0% | 7.34% |
| M7 (Multicare Punitive Damage Claims) | 0% | 0% | 0.00% |

## E.    Feasibility

The Bankruptcy Code requires that a debtor demonstrate that confirmation of a plan is not likely to be followed by liquidation or the need for further financial reorganization. For purposes of determining whether the Plan meets this requirement, the Debtors have analyzed their ability to meet their obligations under the Plan. As part of this analysis, the Debtors have prepared projections contained in section IV, above. Based upon such projections, the Debtors believe that they will be able to make all payments required pursuant to the Plan and, therefore, that confirmation of the Plan is not likely to be followed by liquidation or the need for further reorganization.

## F.    Section 1129(b)

The Bankruptcy Court may confirm a plan of reorganization over the rejection or deemed rejection of the plan of reorganization by a class of claims or equity interests if the plan of reorganization "does not discriminate unfairly" and is "fair and equitable" with respect to such class.

### 1.    *No Unfair Discrimination*

This test applies to classes of claims or equity interests that are of equal priority and are receiving different treatment under the Plan of Reorganization. The test does not require that the treatment be the same or equivalent, but that such treatment be "fair."

### 2.    *Fair and Equitable Test*

This test applies to classes of different priority and status (e.g., secured versus unsecured) and includes the general requirement that no class of claims receive more than 100% of the allowed amount of the claims in such class. As to the dissenting class, the test sets different standards, depending on the type of claims or interests in such class:

- *Secured Creditors.* Each holder of an impaired secured claim either (i) retains its liens on the property, to the extent of the allowed amount of its secured claim and receives deferred cash payments having a value, as of the effective date, of at least the allowed amount of such claim, or (ii) has the right to credit bid the amount of its claim if its property is sold and retains its

99

AA. 1882

liens on the proceeds of the sale (or if sold, on the proceeds thereof) or (iii) receives the "indubitable equivalent" of its allowed secured claim.

- *Unsecured Creditors*. Either (i) each holder of an impaired unsecured creditor receives or retains under the plan property of a value equal to the amount of its allowed claim, or (ii) the holders of claims and interests that are junior to the claims of the dissenting class will not receive any property under the plan.

- *Equity Interests*. Either (i) each equity interest holder will receive or retain under the plan property of a value equal to the greater of (a) the fixed liquidation preference or redemption price, if any, of such stock and (b) the value of the stock, or (ii) the holders of interests that are junior to the equity interests of the dissenting class will not receive or retain any property under the plan of reorganization.

These requirement are in addition to other requirements established by case law interpreting the statutory requirement.

The Debtors believe the Plan of Reorganization will satisfy the "fair and equitable" requirement notwithstanding that Classes G7 (Genesis Punitive Damage Claims), G8 (Genesis Series G Preferred Stock Interests), G9 (Genesis Series H Preferred Stock Interests), G10 (Genesis Series I Preferred Stock Interests), G11 (Genesis Common Stock Interests), M7 (Multicare Punitive Damage Claims), and M8 (Multicare Common Stock Interests) are deemed to reject the Plan of Reorganization because no class that is junior to such classes will receive or retain any property on account of the claims or equity interests in such class.

The Genesis Senior Subordinated Note Claims (Class G5) are unsecured claims that are contractually subordinated to the Genesis Senior Lender Claims (Class G2). Pursuant to the terms of the respective indentures under which these senior subordinated notes were issued, holders of these senior subordinated notes are not entitled to receive a distribution unless the Genesis Senior Lender Claims are paid in full. The Plan of Reorganization does not give effect to these subordination provisions as to the Genesis Senior Subordinated Note Claims. The distribution provided to the holders of claims in Class G5 (Genesis Senior Subordinated Note Claims) under the Plan of Reorganization represents a negotiated settlement between the unsecured creditors' committee in the Genesis reorganization cases on behalf of the holders of claims in Class G5 and the holders of the Genesis Senior Lender Claims. Accordingly, the distributions to the holders of the Genesis Senior Subordinated Note Claims shall not be subject to levy, garnishment, attachment, or other legal process by any senior holder of indebtedness by reason of claimed contractual subordination rights. On the Effective Date, all holders of claims against the Genesis Debtors shall be deemed to have waived any and all contractual subordination rights which they may have with respect to such distribution, and the Confirmation Order shall permanently enjoin, effective as of the Effective Date, all holders of senior indebtedness from enforcing or attempting to enforce any such rights with respect to the distributions under the Plan of Reorganization to the holders of the Genesis Senior Subordinated Note Claims.

The Multicare Senior Subordinated Note Claims (Class M5) are unsecured claims that are contractually subordinated to the Multicare Senior Lender Claims (Class M2). Pursuant to the terms of the indenture under which these senior subordinated notes were issued, holders of these senior subordinated notes are not entitled to receive a distribution unless the Multicare Senior Lender Claims are paid in full. The Plan of Reorganization does not give effect

to these subordination provisions as to the Multicare Senior Subordinated Note Claims. The distribution provided to the holders of claims in Class M5 (Multicare Senior Subordinated Note Claims) under the Plan of Reorganization represents a negotiated settlement between the unsecured creditors' committee in the Multicare reorganization cases on behalf of the holders of claims in Class M5 and the holders of the Multicare Senior Lender Claims. Accordingly, the distributions to the holders of the Multicare Senior Subordinated Note Claims shall not be subject to levy, garnishment, attachment, or other legal process by any senior holder of indebtedness by reason of claimed contractual subordination rights. On the Effective Date, all holders of claims against the Multicare Debtors shall be deemed to have waived any and all contractual subordination rights which they may have with respect to such distribution, and the Confirmation Order shall permanently enjoin, effective as of the Effective Date, all holders of senior indebtedness from enforcing or attempting to enforce any such rights with respect to the distributions under the Plan of Reorganization to the holders of the Multicare Senior Subordinated Note Claims.

Because several classes of claims are not being paid in full, the existing equity interests in the Debtors are being extinguished.

## XI.

## Alternatives to Confirmation and Consummation of the Plan of Reorganization

### A.     Liquidation Under Chapter 7

If no chapter 11 plan can be confirmed, the chapter 11 cases may be converted to cases under chapter 7 of the Bankruptcy Code in which a trustee would be elected or appointed to liquidate the assets of the Debtors for distribution in accordance with the priorities established by the Bankruptcy Code. A discussion of the effect that a chapter 7 liquidation would have on the recoveries of holders of claims is set forth in sections X.C and X.D, above. The Debtors believe that liquidation under chapter 7 would result in smaller distributions being made to creditors than those provided for in the Plan of Reorganization because of (i) the likelihood that other assets of the Debtors would have to be sold or otherwise disposed of in a less orderly fashion, (ii) additional administrative expenses attendant to the appointment of a trustee and the trustee's employment of attorneys and other professionals, and (iii) additional expenses and claims, some of which would be entitled to priority, which would be generated during the liquidation and from the rejection of leases and other executory contracts in connection with a cessation of the Debtors' operations. In a chapter 7 liquidation, the Debtors believe that there would be no distribution to holders of claims in Classes G4 (other than insured claims to the extent of such insurance) through G11 and Classes M4 (other than insured claims to the extent of such insurance) through M8.

.

101

AA. 1884

**B.     Alternative Plan of Reorganization**

If the Plan of Reorganization is not confirmed, the Debtors or any other party in interest (if the Debtors' exclusive period in which to file a plan of reorganization has expired) could attempt to formulate a different plan of reorganization. Such a plan might involve either a reorganization and continuation of the Debtors' business or an orderly liquidation of the Debtors' assets under chapter 11. The Debtors have concluded that the Plan of Reorganization enables creditors and equity holders to realize the most value under the circumstances. In a liquidation under chapter 11, the Debtors would still incur the expenses associated with closing or transferring to new operators numerous facilities. The process would be carried out in a more orderly fashion over a greater period of time. Further, if a trustee were not appointed, because such appointment is not required in a chapter 11 case, the expenses for professional fees would most likely be lower than those incurred in a chapter 7 case. Although preferable to a chapter 7 liquidation, the Debtors believe that liquidation under chapter 11 is a much less attractive alternative to creditors and equity holders than the Plan of Reorganization because of the greater return provided by the Plan of Reorganization.

## XII.

### Certain Federal Income Tax Consequences of the Plan of Reorganization

The following discussion summarizes certain federal income tax consequences of the implementation of the Plan to the Debtors and certain holders of claims. The following summary does not address the federal income tax consequences to (i) holders whose claims are entitled to reinstatement or payment in full in cash, or are otherwise unimpaired under the Plan (e.g., holders of certain Genesis Other Secured Claims, Genesis Priority Non-Tax Claims, Multicare Priority Non-Tax Claims, and certain Multicare Other Secured Claims) and (ii) holders of equity interests or claims which are extinguished without a distribution in exchange therefor (e.g., holders of Genesis Punitive Damage Claims and Multicare Punitive Damage Claims).

The following summary is based on the Internal Revenue Code of 1986, as amended (the "Tax Code"), Treasury Regulations promulgated thereunder, judicial decisions, and published administrative rules and pronouncements of the Internal Revenue Service ("IRS") as in effect on the date hereof. Changes in such rules or new interpretations thereof may have retroactive effect and could significantly affect the federal income tax consequences described below.

The federal income tax consequences of the Plan are complex and are subject to significant uncertainties. The Debtors have not requested a ruling from the IRS or an opinion of counsel with respect to any of the tax aspects of the Plan. Thus, no assurance can be given as to the interpretation that the IRS will adopt. In addition, this summary does not address foreign, state, or local tax consequences of the Plan, nor does it purport to address the federal income tax consequences of the Plan to special classes of taxpayers (such as foreign taxpayers, broker-dealers, mutual funds, insurance companies, financial institutions, small business investment companies, regulated investment companies, tax-exempt organizations, and investors in pass-through entities).

This discussion assumes that the various debt and other arrangements to which the Debtors are currently a party and any consideration issued to the Debtors under the Plan of Reorganization will be respected for federal income tax purposes in accordance with their form.

*Accordingly, the following summary of certain federal income tax consequences is for informational purposes only and is not a substitute for careful tax planning and advice based upon the individual circumstances pertaining to a holder of a claim. All holders of claims are urged to consult their own tax advisors for the federal, state, local, and other tax consequences to them of the implementation of the Plan.*

A.    Consequences to the Debtors

The Genesis Debtors, on the one hand (the "Genesis Group"), and the Multicare Debtors, on the other hand (the "Multicare Group"), each file a separate consolidated federal income tax return, excluding those Debtors that are treated as partnerships for federal income tax purposes.

Genesis estimates that, for federal income tax purposes, the Genesis Group will have consolidated net operating losses ("NOLs") and/or NOL carryforwards and consolidated capital loss carryforwards of roughly $300 million and $740 million, respectively, through the Effective Date of the Plan, which is anticipated to occur on or about September 30, 2001. Of this amount, only a minor portion of the NOL carryforwards, but all of the capital loss carryforwards, was incurred by Genesis. Multicare estimates that, for federal income tax purposes, the Multicare Group will have consolidated NOLs and/or NOL carryforwards of roughly $60 million through the Effective Date of the Plan (of which only a minor portion was incurred by Multicare). The amount of such losses of the Genesis Group and the Multicare Group may be adjusted during the course of the preparation of the actual tax returns and remain subject to examination by the IRS.

Moreover, at or about the end of 1999, the Genesis Group and the Multicare Group each underwent an "ownership change" within the meaning of Section 382 of the Tax Code. As a result, approximately $110 million of NOL carryforwards and a substantial portion of the capital loss carryforwards of the Genesis Group, and only approximately $1 million of NOL carryforwards of the Multicare Group, cannot be used to offset future taxable income to any significant extent. However, such loss carryforwards remain an available tax attribute for purposes of the cancellation of debt ("COD") rules discussed below.

The Genesis Group and the Multicare Group each has a substantial tax basis in its assets. Both Genesis and Multicare believe that the aggregate tax basis of the business assets (including goodwill) of the Genesis Group and the Multicare Group, respectively, approximates the fair market value of such assets.

As discussed below, the current year losses and loss carryforwards of the Genesis Group and the Multicare Group may be substantially reduced or eliminated, or subject to additional limitations upon implementation of the Plan. In addition, certain other tax benefits (such as the tax basis of Genesis and Multicare in the stock of certain subsidiaries) may be reduced, or subject to limitation, upon implementation of the Plan.

1.    *Cancellation of Debt*

In general, the discharge of a debt obligation by a debtor for an amount less than the remaining balance of the debt obligation (as determined for federal income tax purposes) gives rise to COD income which must be included in the debtor's income, subject to certain statutory or judicial exceptions that can apply to limit the amount of COD income in a title 11 bankruptcy case (such as where the payment of the cancelled debt would have given rise to a tax

103

AA. 1886

deduction). A statutory exception applies to corporate and certain other debtors if the discharge is granted in a title 11 bankruptcy case or pursuant to a plan approved by a bankruptcy court.

In general, for debtors in bankruptcy, no portion of the COD is includable in income; however, the debtor must still reduce certain of its tax attributes -- such as NOL carryforwards, current year NOLs, capital loss carryforwards, current year capital losses, tax credits, and tax basis in assets -- by the amount of any COD. To the extent the amount of COD exceeds the tax attributes available for reduction, the remaining excludable COD income is simply forgiven. It is unclear whether the reduction in tax attributes will occur on a separate company basis, even though the Debtors file consolidated federal income tax returns with the other members of their respective groups. The Debtors are aware that the IRS has, in certain cases, asserted that such reduction generally should occur on a consolidated basis. Any reduction in tax attributes does not effectively occur until the first day of the taxable year following the year the COD occurs. If advantageous, a debtor could elect to reduce the basis of depreciable property prior to any reduction in their loss carryforwards.

In the case of a partnership (or a limited liability company treated as a partnership for federal income tax purposes), the above bankruptcy exception to COD income applies at the partner level, rather than the partnership level, and is determined by the financial status of the partner. Thus, a corporate partner that is itself in bankruptcy should be able to apply the above bankruptcy exception to its allocable share of the COD income of the partnership.

As a result of the discharge of claims pursuant to the Plan, the Debtors will incur COD, resulting in a reduction of their respective current year NOLs, loss carryforwards, and, possibly, the tax basis in their respective assets, effective as of the beginning of the taxable year following the taxable year in which the Effective Date occurs. The extent of such COD and resulting tax attribute reduction will depend, in part, on the fair market value of the New Common Stock, New Convertible Preferred Stock, New Warrants, New Senior Notes, and cash distributed and the dollar amount of claims ultimately allowed. Based on the estimated enterprise value of Reorganized Genesis (see section IV, above), it is anticipated that the Genesis Debtors will incur approximately $800 million of COD (almost all of which is attributable to debt of Genesis), and that the Multicare Debtors will incur approximately $375 million of COD (almost all of which is attributable to debt of Multicare). Due to the magnitude of the loss carryforwards of the Multicare Group and the Genesis Group and the fact that substantially all of the COD is attributable to debt of Genesis and Multicare, both of which are holding companies with little or no operating assets, it is not anticipated that the Debtors' tax basis in depreciable or amortizable assets will be significantly reduced, if at all. Accordingly, for purposes of calculating the financial projections of Reorganized Genesis (see section IV, above), it has been assumed that no consolidated NOLs or NOL carryforwards of the Genesis Group or the Multicare Group will survive the reorganization and that any reduction in the tax basis in depreciable or amortizable assets of the Debtors would be insignificant.

2.    *Limitations on Loss Carryforwards and Other Tax Benefits*

Following the implementation of the Plan, any NOLs and capital losses (and carryforwards thereof) and certain other tax attributes of the corporate Debtors allocable to the period prior to the Effective Date of the Plan will be subject to the limitations imposed by Section 382 of the Tax Code.

Under Section 382, if a corporation undergoes an "ownership change," the amount of its pre-change losses that may be utilized to offset future taxable income is, in general,

subject to an annual limitation. Such limitation also may apply to certain losses or deductions that are "built-in" (i.e., economically accrued but unrecognized) as of the date of the ownership change that are subsequently recognized. The Debtors anticipate that an ownership change of the Genesis Group and the Multicare Group will occur upon implementation of the Plan.

      a.     *General Section 382 Limitation.* The amount of the annual limitation to which a loss corporation may be subject (i) depends, in part, on whether the corporation is in bankruptcy and the ownership change occurs pursuant to a plan of reorganization confirmed by the bankruptcy court, and (ii) within the context of an affiliated group of corporations that file a consolidated federal income tax return, generally applies on a consolidated basis. As discussed below, a corporation in bankruptcy may also be able to avoid any annual limitation.

      In general, the amount of the annual limitation to which a corporation (or consolidated group) would be subject would be equal to the product of (i) the fair market value of the stock of the corporation (or, in the case of a consolidated group, the common parent) immediately before the ownership change (with certain adjustments) multiplied by (ii) the "long-term tax-exempt rate" in effect for the month in which the ownership change occurs (5.01% for ownership changes occurring in July 2001). For a corporation in bankruptcy and, presumably, where, as in the case of the Genesis Group and the Multicare Group, the common parent is in bankruptcy and undergoes the ownership change pursuant to a confirmed plan, the stock value generally is determined immediately after (rather than before) the ownership change, and some of the adjustments that ordinarily would apply do not apply.

      For example, the annual limitation applicable to a corporation not in bankruptcy generally would be determined after reduction of its stock value for any capital infusions within the two year period ending on the date of the ownership change, whereas the stock value of Genesis and Multicare for purposes of computing the annual limitation generally would not. However, regardless of whether the ownership change occurs pursuant to a confirmed plan, certain "anti-duplication" rules apply. These rules principally are intended to prevent the value of a nonconsolidated, more than 50% owned subsidiary from being taken into account both in the determination of such subsidiary's own annual limitation and, as a result of being an asset of the controlling corporation, indirectly in the determination of the annual limitation of the controlling corporation (or group). Similar rules or principles can apply within a consolidated group in those cases where the consolidated return regulations continue to require separate company (or subgroup) annual limitations. As a result, the stock value of Reorganized Genesis attributable to its ownership of Reorganized Multicare will not be able to be taken into account in determining the annual limitation applicable to the Genesis Group to the extent that the value of Reorganized Multicare is taken into account in determining the annual limitation applicable to the Multicare Group (and possibly will only be useable by Genesis if an affirmative election is made by Multicare permitting it to do so).

      Any unused limitation may be carried forward, thereby increasing the annual limitation in the subsequent taxable year. However, if the corporation (or consolidated group) does not continue its historic business or use a significant portion of its assets in a new business for two years after the ownership change, the annual limitation resulting from the ownership change is zero.

      b.     *Built-In Gains and Losses.* If a loss corporation (or consolidated group) has a net unrealized built-in gain at the time of an ownership change (determined taking into account most assets and all items of "built-in" income and deductions), any built-in gains recognized during the following five years (up to the amount of the original net built-in gain)

generally will increase the annual limitation in the year recognized, such that the loss corporation (or consolidated group) would be permitted to use its pre-change losses against such built-in gain income in addition to its regular annual allowance.

On the other hand, if the loss corporation (or consolidated group) has a net unrealized built-in loss at the time of an ownership change, then any built-in losses recognized during the following five years (up to the amount of the original net built-in loss) generally will be treated as a pre-change loss and will be subject to the annual limitation in the same fashion as a pre-change NOL carryforward. In addition, although this net built-in loss rule generally applies to consolidated groups on a consolidated basis, any corporation that joins the consolidated group within the preceding five years may have to be excluded from the group computation and tested for a net built-in loss on a separate company basis. Accordingly, even though a consolidated group of corporations may not have a net unrealized built-in loss on an overall group basis, the group may have a net unrealized built-in loss if certain members of the group are required to be excluded. Additionally, if the excluded member has a net built-in loss when tested on a separate company basis, any subsequently recognized built-in losses of such corporation may be subject to a more restrictive annual limitation based on the separate value of such member.

A loss corporation's (or consolidated group's) net unrealized built-in gain or loss generally will be deemed to be zero unless it is greater than the lesser of (i) $10 million or (ii) 15% of the fair market value of its gross assets (with certain adjustments) immediately before the ownership change.

It is currently unclear whether the Genesis Group or the Multicare Group will be in a net unrealized built-in loss position and/or a net unrealized built-in gain position as of the Effective Date. However, neither Genesis nor Multicare believes that deductibility of future depreciation or amortization deductions of the Genesis Debtors or the Multicare Debtors, respectively, would be significantly impaired, even if the Genesis or Multicare Group (as the case may be) were determined to be in a net unrealized built-in loss position.

c.    *Special Bankruptcy Exception.*  An exception to the general annual limitation (including the described built-in gain and loss rules) applies where the stockholders and/or qualified creditors of the debtor retain or receive (other than for new value) at least 50% of the vote and value of the stock of the reorganized debtor pursuant to a confirmed bankruptcy plan. Under this exception, a debtor's pre-change losses are not limited on an annual basis, but are required to be reduced by the amount of any interest deductions claimed during the three taxable years preceding the date of the reorganization, and during the part of the taxable year prior to and including the reorganization, in respect of the debt converted into stock in the reorganization. Moreover, if this exception applies, any further ownership change of the debtor within a two-year period will preclude the debtor's utilization of any pre-change losses at the time of the subsequent ownership change against future taxable income.

Because the creditors of the Multicare Debtors (even though partially overlapping with those of the Genesis Debtors) will not receive 50% or more of the stock of Reorganized Genesis in exchange for their claims against the Multicare Debtors, this exception will not apply to the Multicare Group. It is possible, however, that the receipt of New Common Stock by the holders of Genesis Senior Lender Claims solely in exchange for such interests would qualify for this exception with respect to the Genesis Group. Even if the Genesis Group so qualifies, Genesis may, if it so desires, elect not to have the exception apply and instead remain subject to the annual limitation and built-in gain and loss rules described above. Such election

106

would have to be made in the Genesis Group's federal income tax return for the taxable year in which the reorganization occurs.

The statute does not address whether this exception can be applied on a consolidated basis or only on a separate company basis. Accordingly, it is possible that only any pre-change losses attributable to Genesis itself (rather than to the other members of the Genesis Group)—all of which would likely be eliminated in any event due to the attribute reduction resulting from the COD under the Plan—may be able to benefit from this exception. If the exception were applicable only to Genesis itself, it appears that the pre-change losses attributable to the other members of the Genesis Group would be subject to the annual limitation rules described above determined as if Genesis had not qualified for this exception.

3.    *Alternative Minimum Tax*

In general, an alternative minimum tax ("AMT") is imposed on a corporation's "alternative minimum taxable income" ("AMTI") at a 20% rate to the extent such tax exceeds the corporation's regular federal income tax for the year. AMTI is generally equal to regular taxable income with certain adjustments. For purposes of computing AMTI, certain tax deductions and other beneficial allowances are modified or eliminated. In particular, even though a corporation otherwise might be able to offset all of its taxable income for regular tax purposes by available NOL carryforwards, a corporation (or consolidated group) is entitled to offset no more than 90% of its AMTI with NOLs (as recomputed for AMT purposes).

In addition, if a corporation (or consolidated group) undergoes an "ownership change" within the meaning of Section 382 and is in a net unrealized built-in loss position on the date of the ownership change, the corporation's (or group's) aggregate tax basis in its assets would be reduced for certain AMT purposes to reflect the fair market value of such assets as of the change date. The application of this provision is unaffected by whether the special bankruptcy exception to the annual limitation (and built-in gain and loss) rules of Section 382 applies.

Any AMT that the corporation pays generally will be allowed as a nonrefundable credit against its regular federal income tax liability in future taxable years when the corporation is no longer subject to AMT.

4.    *Issuance of the New Senior Notes*

It is possible, although not anticipated, that the New Senior Notes will be issued at original issue discount ("OID"). See section XII.B.11, below. Any such OID generally would be amortizable by Genesis utilizing the constant interest method, and deductible as interest, unless the New Senior Notes are treated as applicable high-yield discount obligations ("AHYDO") within the meaning of Section 163(e)(5) of the Tax Code. The New Senior Notes would be treated as AHYDOs if, among other requirements, their yield to maturity is at least five percentage points over the applicable federal rate in effect for the calendar month in which such notes are issued (approximately 5.01% compounded annually for the month of June 2001) and the notes have significant OID (in general, where there is unamortized OID as of the end of the fifth year after issuance that exceeds the amount of one year's interest, both actual and imputed).

If the New Senior Notes are treated as AHYDOs, a portion of the accrued discount attributable to the "disqualified portion," if any, of the interest deduction otherwise allowable as OID would be disallowed, and the balance of such deduction would be deferred until

107

actually paid in cash. The "disqualified portion" of any interest deduction otherwise allowable as OID on an AHYDO is that portion, if any, of the total OID multiplied by a fraction, the numerator of which is equal to the "disqualified yield" (i.e., the excess of the yield to maturity of the notes over the sum of the applicable federal rate for the calendar month in which the notes are issued plus six percentage points) and the denominator of which is equal to the total yield to maturity of the notes.

## B.    Consequences to Holders of Certain Claims

Pursuant to, and in accordance with, the Plan, holders of allowed claims in Class G2 (Genesis Senior Lender Claims) and holders of allowed claims in Class M2 (Multicare Senior Lender Claims) will be entitled to receive in satisfaction of their claims cash, New Senior Notes, New Common Stock, and New Convertible Preferred Stock. Holders of allowed claims in Class G4 (Genesis General Unsecured Claims), except to the extent such a claim constitutes an Insured Claim, and holders of allowed claims in Class G5 (Genesis Senior Subordinated Note Claims) will receive in satisfaction of their Claims New Common Stock and New Warrants. Holders of allowed claims in Class M4 (Multicare General Unsecured Claims), except to the extent such a claim constitutes an Insured Claim, will receive in satisfaction of their claims New Common Stock, and holders of allowed claims in Class M5 (Multicare Senior Subordinated Note Claims) will receive in satisfaction of their claims New Common Stock and New Warrants.

The federal income tax consequences of the Plan to holders of allowed claims against Genesis depend, in part, on whether such claims, and in the case of Genesis Senior Lender Claims, whether the New Senior Notes, constitute "securities" for federal income tax purposes. The term "security" is not defined in the Tax Code or in the regulations issued thereunder and has not been clearly defined by judicial decisions. The determination of whether a particular debt constitutes a "security" depends on an overall evaluation of the nature of the debt. One of the most significant factors considered in determining whether a particular debt is a security is its original term. In general, debt obligations issued with a weighted average maturity at issuance of five years or less (e.g., trade debt and revolving credit obligations) do not constitute securities, whereas debt obligations with a weighted average maturity at issuance of ten years or more constitute securities. For purposes of the following discussion it has been assumed that Genesis Senior Subordinated Note Claims constitute "securities." Each holder of a Genesis Senior Lender Claim, Genesis General Unsecured Claim, and Genesis Senior Subordinated Note Claim is urged to consult its tax advisor regarding the status of its claim, or any portion thereof, as a "security."

The following discussion does not necessarily apply to holders who have claims in more than one class relating to the same underlying obligation (such as where the underlying obligation is classified as partially secured and partially unsecured). Such holders should consult their tax advisor regarding the effect of such dual status obligations on the federal income tax consequences of the Plan to them.

1.     *Consequences to All Holders (Including Holders Whose Claims Are Against Any of the Multicare Debtors) Who Receive Cash, New Senior Notes, New Convertible Preferred Stock, New Common Stock, or New Warrants, Other Than Holders of Claims Against Genesis That Constitute "Securities"*

In general, holders of claims who receive Cash, New Senior Notes, New Common Stock, New Convertible Preferred Stock, and/or New Warrants (other than holders of claims against Genesis that constitute "securities") will recognize gain or loss in an amount equal

to the difference between (i) the "amount realized" by the holder in satisfaction of its claim (other than any claim for accrued but unpaid interest) and (ii) the holder's adjusted tax basis in its claim (other than any claim for accrued but unpaid interest). For a discussion of the tax consequences of any claims for accrued interest, see section XII.B.4, below.

For these purposes, the "amount realized" by a holder will equal the sum of the aggregate of (i) cash, (ii) the "issue price" of any New Senior Notes (see section XII.B.11, below), (iii) the fair market value of any New Convertible Preferred Stock, (iv) the fair market value of any New Common Stock, and (iv) the fair market value of any New Warrants received by the holder (less any portion of such distribution required to be treated as imputed interest as a result of any such distribution being made after the Effective Date).

Due to the possibility that a holder of a Genesis General Unsecured Claim and Multicare General Unsecured Claim may receive a distribution of New Common Stock and/or New Warrants subsequent to the Effective Date in respect of any subsequently disallowed disputed claims, the imputed interest provisions of the Tax Code may apply to treat a portion of the distribution to such holders as imputed interest. Such imputed interest may (with respect to certain holders) accrue over time using the constant interest method, in which event the holder may be required to include such imputed interest in income prior to the actual distribution.

In addition, because distributions of New Common Stock and/or New Warrants to such holders may be made after the Effective Date, any loss, and a portion of any gain, realized by a holder in satisfaction of its claim may be deferred until all such subsequent distributions are made. Such holders are urged to consult their tax advisors regarding the possible application of (or ability to elect out of) the "installment method" of reporting any gain that may be recognized by such holder in respect of its claim.

Where gain or loss is recognized by a holder, the character of such gain or loss as long-term or short-term capital gain or loss or as ordinary income or loss will be determined by a number of factors, including the tax status of the holder, whether the claim constitutes a capital asset in the hands of the holder and how long it has been held, whether the claim was acquired at a market discount, and whether and to what extent the holder had previously claimed a bad debt deduction.

A holder's aggregate tax basis in any New Convertible Preferred Stock, New Common Stock, and any New Warrants received will equal the fair market value of such preferred stock, common stock, and warrants. A holder's tax basis in any New Senior Notes received will equal the "issue price" of such notes. The holding period for any New Convertible Preferred Stock, New Common Stock, New Senior Notes, and New Warrants generally will begin the day following the issuance of such preferred stock, common stock, notes, or warrants.

Notwithstanding the foregoing, it is possible the IRS may attempt to treat the receipt of New Common Stock, New Convertible Preferred Stock, New Senior Notes, and/or New Warrants in satisfaction of claims against Multicare or any subsidiary of Genesis as part of a non-recognition transaction. So treated, such a holder would not be permitted to recognize any loss, but to the extent that the holder receives New Senior Notes, New Warrants, and possibly New Convertible Preferred Stock, such holder would still be required to recognize a portion of its gain. In the case of a holder that does not recognize loss, the holder's tax basis in its New Common Stock would reflect the unrecognized loss. In addition, the holder's holding period in the New Common Stock would, in whole or in part, include its holding period in its claim. However, Genesis believes, and the discussion herein assumes, that the satisfaction of claims

109

described in this paragraph should be treated as a fully taxable transaction, in which both gain and loss may be recognized.

For a discussion of the tax treatment of New Warrants, New Common Stock, New Convertible Preferred Stock, and New Senior Notes, see sections XII.B.5, XII.B.6, XII.B.7, XII.B.8, XII.B.9, XII.B.10, XII.B.11, below.

### 2. Consequences to Holders of Genesis Senior Subordinated Note Claims and Genesis General Unsecured Claims That Constitute "Securities"

The receipt of New Common Stock and New Warrants in satisfaction of a Genesis Senior Subordinated Note Claim or a Genesis General Unsecured Claim against Genesis that constitutes a "security" will be a "recapitalization" for federal income tax purposes. Accordingly, in general, the holder of such a claim will not recognize loss upon such exchange, but will recognize gain (computed as described in the preceding section), if any, to the extent of any consideration received other than the New Common Stock and New Warrants (such as proceeds from insurance), excluding the portion of any consideration allocable to a claim for accrued but unpaid interest or required to be treated as imputed interest due to the distribution of such consideration after the Effective Date. The character and timing of such gain would also be determined in accordance with the principles discussed in the preceding section. For a discussion of the tax consequences of any claims for accrued interest, see section XII.B.4, below.

In the case of a recapitalization, a holder's aggregate tax basis in any New Common Stock and New Warrants received in satisfaction of its claim will equal the holder's aggregate adjusted tax basis in its claim (including any claim for accrued but unpaid interest) increased by any gain or interest income recognized in respect of its claim and decreased by any consideration received other than New Common Stock and New Warrants and any deductions claimed in respect of any previously accrued interest. Such tax basis would be allocated between the New Common Stock and the New Warrants based on relative fair market value. In general, the holder's holding period for the New Common Stock and the New Warrants received will include the holder's holding period for the claim except to the extent that the New Common Stock and the New Warrants were issued in respect of a claim for accrued but unpaid interest or treated as imputed interest.

For a discussion of the tax treatment of New Warrants, see sections XII.B.5 and XII.B.10, below.

### 3. Consequences to Holders of Genesis Senior Lender Claims That Constitute "Securities"

The receipt of New Common Stock or New Convertible Preferred Stock, and the receipt of New Senior Notes if such notes constitute "securities," in partial satisfaction of a Genesis Senior Lender Claim (to the extent such claim constitutes a "security") will be a "recapitalization" for federal income tax purposes. Accordingly, in general, the holder of such claim will not recognize loss upon such exchange with respect to the portion of its claim constituting a "security," but will recognize gain (computed as described above in the case of non-securities), if any, to the extent of any consideration received other than stock or securities (such as cash and the New Senior Notes if such notes do not constitute "securities"), excluding the portion of any consideration allocable to a claim for accrued but unpaid interest. The character and timing of such gain would also be determined in accordance with the principles

discussed above with respect to claims that are not securities. See section XII.B.1, above. For a discussion of the tax consequences of any claims for accrued interest, see section XII.B.4, below.

If the New Senior Notes do not constitute "securities," the holder's aggregate tax basis in any New Common Stock and New Convertible Preferred Stock received in satisfaction of the portion of its claim constituting a "security" will equal the holder's aggregate tax basis in such portion (including any claim for accrued but unpaid interest), increased by any gain or interest income recognized in respect of such portion and decreased by any consideration received other than stock or securities (such as any cash or New Senior Notes received) and any deductions claimed in respect of any previously accrued interest. Such basis would be allocated between the New Common Stock and the New Convertible Preferred Stock based on relative fair market value. In general, the holder's holding period for any New Common Stock and the New Convertible Preferred Stock received will include the holder's holding period for the claim, except to the extent that the New Common Stock or New Convertible Preferred Stock was issued in respect of a claim for accrued but unpaid interest. A holder's tax basis in any New Senior Notes received would equal the "issue price" of such notes, and the holding period for any New Senior Notes generally would begin the day following the issuance of such notes.

If the New Senior Notes do constitute "securities," a holder will have an aggregate tax basis in any New Common Stock, New Convertible Preferred Stock, and New Senior Notes received in satisfaction of the portion of its claim constituting a "security" equal to the holder's adjusted tax basis in such portion (including any claim for accrued but unpaid interest) increased by any gain or interest income recognized in respect of such portion and decreased by any consideration received other than stock or securities (such as any cash received) and any deductions claimed in respect of any previously accrued interest. Such tax basis would then be allocated between the New Common Stock, New Convertible Preferred Stock, and New Senior Notes based on relative fair market value. A holder's holding period for any New Common Stock, New Convertible Preferred Stock, and New Senior Notes in this instance will include that holder's holding period for the claim, except to the extent that the New Common Stock, New Convertible Preferred Stock, or New Senior Notes were issued in respect of a claim for accrued but unpaid interest.

### 4. Distributions in Discharge of Accrued Interest

Pursuant to the Plan, all distributions in respect of an allowed claim will be allocated first to the principal amount of the claim, with any excess allocated to the remaining portion of the claim. However, there is no assurance that such allocation would be respected by the IRS for federal income tax purposes. In general, to the extent that any amount received (whether stock, cash, or other property) by a holder of a debt is received in satisfaction of accrued interest during its holding period, such amount will be taxable to the holder as interest income (if not previously included in the holder's gross income). Conversely, a holder generally recognizes a deductible loss to the extent any accrued interest claimed was previously included in its gross income and is not paid in full. Each holder of a claim is urged to consult its tax advisor regarding the allocation of consideration and the deductibility of unpaid interest for tax purposes.

### 5. Market Discount

A holder which purchased its claim from a prior holder at a market discount may be subject to the market discount rules of the Tax Code. Under those rules, assuming that the holder has made no election to amortize the market discount into income on a current basis with respect to any market discount instrument, any gain recognized on the exchange of its claim

AA. 1894

(subject to a *de minimis* rule) generally would be characterized as ordinary income to the extent of the accrued market discount on such claim as of the date of the exchange.

To the extent that a holder's claim constitutes a "security" and is exchanged in a "recapitalization" for federal income tax purposes, the Treasury Department is expected to promulgate regulations that will provide that any accrued "market discount" not treated as ordinary income upon such exchange would carry over to the nonrecognition property received in the exchange. If such regulations are promulgated and applicable to the Plan (and arguably even without issuance of regulations), any holder of a claim that is exchanged in a "recapitalization" would carry over any accrued market discount incurred in respect of such claim, on an allocable basis, to any New Common Stock, New Convertible Preferred Stock, New Senior Notes (if such notes constitute "securities"), and/or New Warrants received, such that any gain recognized by the holder upon a subsequent disposition of such New Common Stock, New Convertible Preferred Stock, New Senior Notes, or New Warrants would be treated as ordinary income to the extent of any accrued market discount not previously included in income. In addition, any accrued market discount that carries over to the New Convertible Preferred Stock would, in turn, carry over to any New Common Stock received upon conversion of such preferred stock, and it is possible that any accrued market discount that carries over to the New Warrants would, in turn, carryover to any New Common Stock received upon the exercise of such warrants.

6.      *Treatment of Distributions on New Convertible Preferred Stock and New Common Stock*

*Distributions – In General.* The amount of distributions, if any, by Reorganized Genesis in respect of the New Common Stock and the New Convertible Preferred Stock will be equal to the amount of cash and the fair market value as of the date of distribution of any property distributed, other than possibly in the case of distributions of the New Convertible Preferred Stock which are payable in kind with additional shares (so called "PIK" distributions). Subject to the discussion below regarding redemption of New Convertible Preferred Stock (see section XII.B.9, below), distributions generally will be treated for federal income tax purposes first as a taxable dividend to the extent of Reorganized Genesis's current and accumulated earnings and profits (as determined for federal income tax purposes) and then as a tax-free return of capital to the extent of the holder's tax basis in its stock, with any excess treated as capital gain from the sale or exchange of the stock.

*PIK /Constructive Distributions.* The New Convertible Preferred Stock provides for annual distributions payable in kind with additional shares of New Convertible Preferred Stock, which will accumulate if not paid. Reorganized Genesis intends to declare and pay such distributions annually. Accordingly, Reorganized Genesis intends to treat the distributions of additional shares of New Convertible Preferred Stock under the normal distribution rules described above. Under the normal distribution rules, the amount of any such distribution will equal the fair market value of the New Convertible Preferred Stock on the distribution date, a holder's tax basis in the New Convertible Preferred Stock so received will equal the fair market value of such stock on the distribution date, and such holder's holding period for such stock will commence on the day following the distribution date.

Additionally, the constructive distribution rules will apply to the New Convertible Preferred Stock acquired pursuant to the Plan if the "redemption price" of the New Convertible Preferred Stock ($20.33) exceeds its issue price (generally fair market value at issue). A holder would be required to accrue such excess -- regardless of the holder's regular method of accounting -- over the term of the New Convertible Preferred Stock. The stated term of the New

112