## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| IN RE:<br><br>GENESIS HEALTH VENTURES, INC., et al.,<br><br>        Debtors. | C.A. No. 05-CV-427 (KAJ)<br>Related to Case No. 00-2692 (JHW)<br>Jointly Administered |
| RICHARD HASKELL, et al.,<br><br>       Plaintiffs-Appellants,<br><br>   v.<br><br>GOLDMAN, SACHS & CO., et al.,<br><br>      Defendants-Appellees. | Adv. Pro. No.: 04-53375 (JHW) |

## PLAINTIFFS-APPELLANTS' REPLY TO DEFENDANTS-APPELLEES' JOINT MEMORANDUM

R. Bruce McNew (# 967)
TAYLOR & McNEW LLP
3711 Kennett Pike, Suite 210
Greenville, DE 19807
Telephone: (302) 655-9200
*Attorneys for Plaintiffs-Appellants*

*Co-Counsel*:
Stanley M. Grossman
H. Adam Prussin
Leigh Handelman Smollar
POMERANTZ HAUDEK BLOCK
 GROSSMAN & GROSS LLP
100 Park Avenue, 26th Floor
New York, New York 10017
Telephone: (212) 661-1100

Date of Filing: March 6, 2006

## TABLE OF CONTENTS

Page

NATURE AND STAGE OF PROCEEDINGS .......................................... 1

I. RES JUDICATA AND COLLATERAL ESTOPPEL CANNOT APPLY WHERE THE
PRIOR ADJUDICATION WAS PROCURED BY FRAUD ...................... 3

A. The Fraud Was Not Disclosed During the Confirmation Proceedings ............ 3

1. The Record Before the Court ...................................... 3

2. The Documents Produced in Discovery ............................. 9

B. The Fraud Was Disclosed and Discovered After Plan Confirmation ............. 9

II. *CORESTATES* IS NOT A BAR TO THESE CLAIMS ............................. 14

III. SECTION 1144 DOES NOT BAR THIS DAMAGE ACTION
AGAINST ANY OF THE DEFENDANTS ................................... 15

CONCLUSION ............................................................. 20

## TABLE OF AUTHORITIES

**CASES**                                                                     Page

*680 Fifth Ave. Assocs.*, 209 B.R. 314 (Bankr. S.D.N.Y. 1997) . . . . . . . . . . . . . . . . . . . 17

*In re Allegheny. Inc.*, 86 B.R. 466 (Bankr. W.D. Pa. 1988). . . . . . . . . . . . . . . . . . . . . . 19

*In re Botany Industries Inc.*, 463 F. Supp. 793 (E.D.Pa. 1978),
    *affd,* 609 F.2d 500 (3d Cir. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Browning v. Prostok,* 165 S.W.3d 336. 351 (Tex. 2005) . . . . . . . . . . . . . . . . . . . . . . . 17

*In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410 (3d Cir. 1997) . . . . . . . . . . . 13

*In re Circle K Corp.*, 181 B.R. 457 (Bankr. D. Ariz. 1995) . . . . . . . . . . . . . . . . . . . . . . 17

*Corestates Bank. N.A. v. Huls Am., Inc.*, 176 F.3d 187 (3d Cir. 1999) . . . . . . . . . . . . 14

*Craftmatic Sec. Litig. v. Kraftsow*, 890 F.2d 628 (3d Cir. 1989) . . . . . . . . . . . . . . . . . 13

*In re DESA Holdings Corp.*. Civ. No. 03-1089-SLR. 2004 U.S. Dist. LEXIS 2429.
    2004 WL 316451 (D. Del. Feb. 9, 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Eisenberg v. Gagnon.* 766 F.2d 770 (3d Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*In re Emmer Bros. Co.*, 52 B.R. 385 (D. Minn. 1985). . . . . . . . . . . . . . . . . . . . . . . . . . 16

*In re Genesis Health Ventures, Inc..* 266 B.R. 591 (Bankr. D. Del. 2001) . . . . . . . . . . . 8

*Helwig v. Vencor, Inc.*, 251 F.3d 540 (6th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Herring v. United States of America*, 424 F.3d 384 (3d Cir. 2005) . . . . . . . . . . . . . . . . 5

*Hewlett v. Hewlett-Packard Co..* C.A. No. 19513-NC, 2002 Del. Ch. LEXIS 44,
    2002 WL 549137 (Del. Ch. Apr. 8, 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*In re Marriott Hotel Props. II Ltd. Pshp. Unitholders Litig..*
    Consol. C.A. No. 14961, 2000 Del. Ch. LEXIS 17.
    2000 WL 128875 (Del. Ch. Jan. 24, 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

**CASES**                                                                                   <u>Page</u>

*McDuffy v. DeGeorge Alliance, Inc.*, No. Civ. A. 99-1420 SLR,
    2002 WL 1858779 (D. Del. Aug. 9, 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*In re Newport Harbor Associates*, 589 F.2d 20 (1st Cir. 1978) . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Nielsen Elecs. Inst. v. Student Fin. Corp.*, Civ. A. No. 99-285-JJF,
    2001 U.S. Dist. LEXIS 25556, 2001 WL 34367324
    (D. Del. Jan 16. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*In re RBGSC Inv. Corp.*, 253 B.R. 352 (E.D. Pa. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*In re Rafferty*, Civ. A. No. 97-CV06763, 1998 U.S. Dist. LEXIS 104,
    1998 WL 13584 (E.D. Pa. Jan. 9. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Southmark Prine Plus, L.P. v. Falzone*, 776 F. Supp. 888 (D. Del. 1991) . . . . . . . . . . . . . . . . . 19

*Tam v. Spitzer*, Civ. A. No. 12538. 1995 Del. Ch. LEXIS 116.
    1995 WL 510043 (Del. Ch. Aug. 17, 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Virginia Bankshares, Inc. v. Sandberg*, 501 U.S. 1083 (1991) . . . . . . . . . . . . . . . . . . . . . . . . . . 13

## NATURE AND STAGE OF PROCEEDINGS

This is the reply of Plaintiffs-Appellants ("Plaintiffs") to the joint memorandum submitted on behalf of all Defendants-Appellees ("Defendants"). Pursuant to stipulation, Plaintiffs are also submitting a separate memorandum responding to arguments raised in individual Defendants' supplemental memoranda.

In their various memoranda submitted on this appeal, Defendants have tried to find some rationale, other than the one actually used by the bankruptcy court, to uphold its decision. In their individual briefs Defendants advance alternative grounds for affirmance based on grounds not reached in the bankruptcy court's opinion; and in their joint brief Defendants try to find alternative grounds to uphold the rulings the lower court actually did make. Despite this massive effort, Defendants' search for a valid reason to dismiss this case has been in vain.

The bankruptcy court claimed to detect in the complaint itself a concession that evidence of the fraud was actually disclosed in the confirmation proceedings for the Genesis reorganization plan (the "Plan"), and that the post-confirmation disclosures, where the complaint alleges the fraud was actually disclosed, actually revealed nothing new.

Defendants pay only lip service to those rationalizations but instead try to show that the fraud was actually the subject of testimony in the confirmation proceedings, and that the bankruptcy court had actually found, as a fact, that the fraud had been fully disclosed to the Court and the debentureholders. To support this alternative theory they have compiled and dumped onto this Court a massive appendix containing most of the confirmation proceedings record; but rather than describe in detail the substance of that testimony, they have instead provided, at pages 13-14 of their joint memorandum,[1] a chart listing citations to various pages in the appendix where various "issues" were

---

[1] Defendants' joint memorandum will be referred to here as "Def. Mem." Pursuant to the parties stipulation, which was submitted to this Court, Plaintiffs will be submitting a separate memorandum to respond to Defendants' individual memoranda submitted on this appeal.

"raised". They invite the Court to rummage through this material on its own to figure out what it shows.

To facilitate the Court's task we have reviewed this material in detail and can report that in this testimony these witnesses did not disclose the fraud, but, rather, consistently sought to justify the use, for valuation purposes, of EBITDA data that had been totally corrupted. As a result, there is simply no getting away from the fact that the bankruptcy court's decision was not based on its own recollection or review of the evidence presented at the time but was, in fact, based entirely on its determination that the complaint "conceded" that the fraud had been fully disclosed.

Nor have Defendants been able to "save" the bankruptcy court's response to the allegations in the complaint that described, in great detail, exactly how and when critical elements of the fraud were first revealed in Genesis' post-confirmation filings with the SEC. The bankruptcy court dismissed these allegations with the offhand comment that those disclosures had been "timely filed and included post-confirmation data". Once again, fearing that this approach cannot stand up on appeal, Defendants take an entirely different tack.

On this appeal Defendants do not dispute that these post-confirmation disclosures *did* relate to the valuation period, and *did* show that the EBITDA data used for the valuation had been seriously in error. Defendants now argue that these startling disclosures are irrelevant because they show only that they made mistakes, but not that they committed fraud.

And what a litany of convenient "mistakes" we have here: it turns out that the Mariner revenues, which were surely going to be lost, had actually been guaranteed by a contract signed within days of Plan confirmation; that the pharmacy cost of goods sold, which Defendants testified had increased by many millions of dollars, actually had *not* increased at all; that the 10% of Manorcare revenues, which were also deemed likely to be lost, were in fact not lost; and that unprecedented, undisclosed multi-million-dollar increases in insurance reserves suddenly had to be taken and fully

2

expensed against EBITDA – all during the valuation period. And Defendants do not even try to argue that other reductions to EBITDA were "mistakes", such as the millions of dollars of improper reductions to reflect non-recurring charges such as management bankruptcy retention plan bonuses and the cancellation of the "First Choice" insurance plan for employees. Had these "mistakes" never been made, Genesis' EBITDA during the valuation period would have been about the same as it had been for several years previously – and would not, as Defendants had represented to the Court, have suddenly fallen off a cliff, dropping by almost 30%.

This collection of so many separate "mistakes", all favoring the Defendants at the expense of the debentureholders, is sufficiently suspicious on its face to constitute a badge of fraud. But even if it were not, the complaint alleges a host of detailed facts showing that these were not innocent "mistakes" but were deliberate manipulations.

## I. RES JUDICATA AND COLLATERAL ESTOPPEL CANNOT APPLY WHERE THE PRIOR ADJUDICATION WAS PROCURED BY FRAUD

### A. The Fraud Was Not Disclosed During the Confirmation Proceedings

#### 1. The Record Before the Court

Defendants contend that the bankruptcy court reviewed the entire record of the bankruptcy confirmation proceeding and made a *factual finding* that no fraud occurred[2], and that on this appeal this "finding" is governed by the "clearly erroneous" standard.

No such "finding" exists. Most notably, the court never found that the Defendants had

_____

[2] *See, e.g.,* the following artfully worded statement from page 4 of Defendants' joint opposition memorandum:

> Judge Wizmur in fact reviewed the record of the bankruptcy proceeding and found that the factual underpinnings of Plaintiffs' claims were either before the Bankruptcy Court at the confirmation hearing or the Bankruptcy Court was aware that it was dealing with a projection or uncertainty about the future and took this into account in determining enterprise value.

disclosed to it, or to the Plaintiffs, any of the things we are complaining about, such as:

- the agreement with Mariner to extend the pharmacy supply contract, which removed any justification for excluding the Mariner revenues from EBITDA because they were "non-recurring";

- the unjustified exclusion from EBITDA of 10% of the sales to Manorcare;

- the drastic, sudden and unjustified increases to insurance reserves, which were charged against EBITDA;

- the excessive deduction from EBITDA for the loss of the AGE Institute Business;

- the improper deduction from EBITDA of Non-Recurring Employee and Management Retention Bonuses;

- the improper deduction from EBITDA of non-recurring costs for the "First Choice" health insurance plan; or

- the improper deduction from EBITDA of inflated projections of pharmacy costs of goods sold.

In fact, the bankruptcy court never said that it had been aware of any of these or other elements of the fraud alleged in the complaint when it approved the Plan, or that any of the elements of the fraud was actually disclosed to anyone during the Plan confirmation proceedings.

Rather than make any such findings, the bankruptcy court asserted, in dismissing the complaint, that Plaintiffs had "conceded" in their complaint that "most or all of the information establishing defendants' fraudulent conduct was actually provided in discovery prior to the confirmation hearings," and that the post-confirmation SEC filings that the complaint alleged, in great detail, had disclosed much of the fraud, had been "timely filed and included post-confirmation data." Those are not "factual findings", they are simply mischaracterizations of the allegations of the complaint and of the SEC disclosure documents to which the complaint refers.

On appeal, such conclusions, based solely on adverse inferences improperly drawn from the complaint, are not sheltered by the "clearly erroneous" rule but are to be reviewed *de novo. See, e.g., In re RBGSC Inv. Corp.*, 253 B.R. 352, 362 (E.D. Pa. 2000), cited in Plaintiff's opening memorandum

4

but ignored in Defendants' opposition: *see also In re DESA Holdings Corp.*, Civ. No. 03-1089-SLR 2004 U.S. Dist. LEXIS 2429, at \*3, 2004 WL 316451, at\*1 (D. Del. Feb. 9, 2004). This Court is in just as good a position as the bankruptcy court to determine whether the complaint, and the written disclosure documents to which it refers, establish as a matter of law that the fraud was disclosed during the Plan confirmation process. *See Herring v. United States*, 424 F.3d 384, 389(3d Cir. 2005)(the Third Circuit reviewed under a *de novo* standard a district court's decision on a motion to dismiss an action alleging that fraud had been committed upon the court).[3]

In an effort to suggest that the bankruptcy court's opinion was based on the record of the bankruptcy proceedings, rather than simply on the allegations of the complaint, Defendants have submitted a summary chart of citations to the Plan confirmation record, which they claim demonstrates that these "issues" were "raised" during the Confirmation proceedings. Def. Mem. pp. 13-14. Our review of those references shows that, rather than disclosing the fraud, this testimony was an integral *part of* the fraud. For example:

**Mariner**. None of the testimony cited on the subject of Mariner disclosed that Genesis and Mariner had actually agreed to continue Genesis' pharmaceutical supply contract with that company, regardless of who acquired the Mariner subsidiary APS. To the contrary, these witnesses said nothing about this new agreement but instead swore that a significant risk still existed that the Mariner

---

[3] Neither of the cases cited in Defendants' joint memorandum for the "clearly erroneous" standard were decided on motions to dismiss. *In re Botany Industries Inc.*, 463 F. Supp. 793, 795 (E.D. Pa. 1978), *aff'd*, 609 F. 2d 500 (3d Cir. 1986), for example, concerned the appeal of an evidentiary ruling excluding certain proffered testimony from a hearing; and *In re Rafferty*, Civ. A. No. 97-CV-6763, 1998 U.S. Dist LEXIS 104, 1998 WL 13584 (E.D. Pa. Jan. 9, 1998), involved the decision on the merits, after an evidentiary hearing, refusing to revoke the confirmation of a bankruptcy plan on grounds of fraud. In *Rafferty* the bankruptcy court had found that the plan was entitled to res judicata effect, but only after making a finding of fact that the objector's allegation of fraud was "unsupported by any evidence of record." *Id.* LEXIS, at \*7, WL, at \*3. Such findings are clearly factual in nature and were therefore properly subject to review under the clearly erroneous standard. No factual findings were made here, on this motion to dismiss.

business would be lost. Most notably. Hager testified that the Mariner contract could be terminated in Mariner's bankruptcy proceeding, and that the purchaser of APS could end up with all the Mariner business. AA 1095. p.140: AA 182. Hager repeated that Genesis might lose its contract with Mariner, or be forced to lower its prices to Medicaid rates. AA 240. Similarly. at his deposition. McGahan (of Chilmark) testified that the prices charged to Mariner were "above market" and that Genesis would be forced, at a minimum, to reduce its prices to Medicaid rates. AA 1118. p.24.

Defendants echo the bankruptcy court's statement, in its opinion below, that because the Mariner supply contract was not signed until a few days after the Plan was confirmed. there was "no concealment" of anything as a matter of law. In the court's words, the "*potential* contract with Mariner" to continue the supply agreement had been disclosed as a possibility. Def. Mem. p. 33 (emphasis added). But there is a huge difference between a "potential" or possible agreement and an *actual* one. The complaint alleges that the terms of the extension had been agreed upon well before confirmation of the Plan, and that the signing of the agreement had been deliberately delayed. because once it was signed it would have to be submitted to the bankruptcy court for approval. Because all uncertainty had been removed. there was no valid basis for continuing to exclude the millions in Mariner revenue from valuation EBITDA. Unfortunately. neither the bankruptcy court nor the debentureholders knew it.

**Manorcare**. Defendants' chart notes that Hager testified about the Manorcare situation: but those pages show that he testified merely that litigation was pending between Genesis and Manorcare, in which, he said. Manorcare was claiming that it had a right to terminate the entire contract. He did *not* reveal that Genesis had taken any reduction to EBITDA as a result of this litigation.

In fact. at his deposition, Hager actually denied that the Manorcare dispute was having any effect on Genesis EBITDA. He was specifically asked about a list showing that Genesis' prepaid expenses had increased by $14.6 million. including a $4 million increase in prepaid expenses relating

6

to Manorcare. After describing this amount as representing a "receivable" equal to the escrowed 10% of Manorcare's payments, he testified that all the increases in prepaid expenses "had a zero impact on EBITDA for the portion of the 2001 fiscal year we've seen so far." AA 1097 p. 160. That testimony was false. As Genesis revealed after Plan confirmation, the 10% escrowed payments had been deducted from EBITDA, on a dollar for dollar basis, all along.

**Expensing of Insurance Reserves**. The testimony of Hager and McGahan cited on this subject says nothing about any increases in insurance reserves, or the charging of those increases against EBITDA. Instead, this testimony was all to the effect that health insurance and liability insurance costs had increased, in part explaining why the Genesis EBITDA figures were down 25% from prior years. That testimony was false and misleading.

**AGE Institute.** Defendants cite testimony by Hager on the subject of the AGE Institute, but he testified that the loss of that business had cost Genesis $5 million to $6 million, and that a reduction of $5.25 million was made to Budgeted EBITDA to reflect the loss of this business. AA 1088 p. 81.[4] In fact, Genesis had advised the senior creditors that the actual loss of EBITDA from the AGE Institute business was closer to $2 million, not $5 million.

**Non-Recurring Reorganization Charges.** Defendants' chart cites to testimony by Hager where he testified that all non-recurring costs, including bonuses to be paid to executives for getting the Plan approved, would be excluded from EBITDA. There was no revelation that some of these costs were not excluded and, in fact, were being charged against EBITDA.

---

[4]This testimony refers to document page number GS 807, which shows that in October 2000 Genesis represented that the loss of the AGE Institute contract would result in a reduction of $5.8 million to Genesis' EBITDA.

**Pharmacy Cost of Goods Sold.** Defendants' chart again cites to testimony of Hager on this subject. but here. again, Hager advanced the fraud in his testimony rather than disclose it. He testified that "a substantial decline in pharmacy margins (of $20 million to $25 million)" was one of the main reasons that Genesis' EBITDA had declined significantly from prior years. The court's opinion confirming the Plan specifically relied on that testimony. *In re Genesis Health Ventures. Inc.*, 266 B.R. 591, 613 (Bankr. D. Del. 2001). Genesis' own financial data, published after the Plan was confirmed, shows that this testimony was completely inaccurate.[5]

---

[5]Defendants' chart also touches upon other issues. addressed in the complaint but not in our opening brief. First, it cites testimony about the "renegotiation" of Genesis' management contract with its own subsidiary, Multicare. That contract was purportedly renegotiated during the course of the bankruptcy proceedings allegedly because it was an "unfair" "self-dealing" arrangement imposed on Multicare by Genesis. Representing Multicare in the renegotiation was a supposedly independent consultant. Beverly Anderson. The complaint alleges that the renegotiation was a sham and that it was not until after Plan confirmation that Plaintiffs found out that Anderson was not independent of the Defendants but was, in fact, financially beholden to them. Compl. ¶¶ 74-75.

Defendants contend that the facts concerning the renegotiation of the MC contract were addressed at various points in the confirmation hearing and deposition testimony. But this testimony, to the extent relevant to the complaint's allegations. was all to the effect that Anderson was "independent." even though she was not. Defendants also contend that the issue of Anderson's independence was raised by the Multicare Unsecured Creditors Committee in its motion for an order directing the appointment of a trustee. But that motion had no facts to establish that she was financially beholden to the senior creditors. The Multicare motion did not demonstrate awareness of the critical undisclosed fact, alleged in our complaint, that Anderson had done consulting work for Mariner and had run up unpaid prepetition bills of over $500,000. Because Mariner was now bankrupt, Anderson's only chance of repayment was to be designated a "critical vendor" to Mariner. which would be highly unusual for a consultant unless the creditors consented. Compl. ¶ 75.

Defendants also contend that the Medicare population increase was addressed in Barr's deposition. The complaint alleges that Defendants failed to adjust their EBITDA data to reflect the fact that the percentage of their patients that were on Medicare had increased. Because Medicare reimbursements tend to be higher than reimbursements for other patients, this factor should have been. but was not. used to adjust EBITDA upwards. Compl. ¶¶ 148-49. Mr. Barr's testimony did not, however. disclose that there had been an increase in the Genesis Medicare census.

Finally, Defendants contend that the facts concerning overstated personnel costs were addressed in Hager's hearing and deposition testimony and in McGahan's deposition testimony. The complaint alleges that projected EBITDA was improperly reduced by hyper-inflating the projected costs of hiring additional personnel. Compl. ¶¶ 152-53. The testimony cited has nothing whatsoever to do with those allegations.

In short, although these topics "were raised" during the Plan confirmation hearings, Defendants have failed to establish that any of the fraudulent information was in fact disclosed during those proceedings. All that Defendants have shown is that they provided testimony during those proceedings which the complaint shows, in great detail, was materially false and misleading, and thereby deprived the debentureholders of a full and fair opportunity to challenge Defendants' valuations.

### 2. The Documents Produced in Discovery

Echoing the bankruptcy court's inference that Plaintiffs conceded that documents disclosing the fraud had, in fact, been produced prior to Plan confirmation proceedings, Defendants proclaim that

> In fact, Genesis produced to Plaintiffs in discovery prior to the confirmation hearing many of the documents which the Complaint contends show that certain EBITDA data was inappropriately used in the Debtors' projections.

Def. Mem. p. 5. But Defendants never substantiate that assertion, and in the end neither they nor the bankruptcy court could point to a single document produced during discovery that actually reveals the fraud, and no such document can be found anywhere in Defendants' massive appendix.

As a result, the assertions in the complaint concerning the lateness of production of these documents and Plaintiffs' resultant inability to review them all in detail prior to the hearing, upon which the bankruptcy court so heavily relied – while true – are moot. No one has ever shown that anything was produced that disclosed the fraud or even put Plaintiffs on notice of it.

### B. The Fraud Was Disclosed and Discovered After Plan Confirmation

Equally unavailing is Defendants' attempt to debunk Plaintiffs' specific allegations concerning how and when much of the fraud *actually was* first disclosed, in post-Confirmation SEC filings.

In discussing these post-confirmation disclosures, Defendants do not dispute that they do, in fact, contain material information that was *not* presented or available at the time of the Plan confirmation proceedings and which presented Genesis' results during the valuation period in a much

brighter light. In conceding this point, Defendants make no effort to support the bankruptcy court's dismissive in misguided treatment of these post-Confirmation disclosures as being "timely filed and includ[ing] post-confirmation data."

Defendants' conclusory arguments seeking to get around these post-confirmation disclosures are not persuasive. First they argue that the disclosures concerning insurance reserves and the Mariner contract were made within 180 days after Confirmation, during which a motion to revoke the Plan could have been made. Def. Mem. p. 32. That assertion has nothing to do with the fraud exception to res judicata.[6]

Defendants' principal argument – although it is pressed mostly in a lengthy footnote at page 32 of their memorandum – is that the post-confirmation disclosures do not establish that fraud actually occurred at all. In their view, those disclosures are nothing but subsequently disclosed "bad news" that does not prove that previous optimistic statements were fraudulent when made.

Defendants devote far more effort to pulling together a string cite of cases supporting the "fraud by hindsight" principle in the abstract than they do to applying it to the allegations of this complaint. For example, they claim that this principle applies to the post-confirmation disclosures concerning the pharmacy cost of goods sold (Def. Mem. p. 33): but on that issue the complaint alleges far more than an unexpected turn of events. It specifically alleges that pharmacy cost of goods sold had historically been stable at around 59% of sales revenues, but that for purposes of the Plan valuation the percentage was suddenly hiked to over 62%, allegedly based on data, as yet unpublished, from Genesis' most recent two months operating results. After Plan confirmation, Genesis disclosed that pharmacy cost of goods sold for the very quarter that included those two months had actually been

---

[6]Nor is there any requirement that parties who discover fraud in a plan confirmation process within 180 days of confirmation are limited to the remedy of Plan revocation and to the time limits for making such an application.

close to the typical figure of 59%, completely undercutting the purported basis for raising the estimate in the first place.

These facts collectively create a strong inference that the data on which Defendants claimed to rely did *not* support an increase in the estimate for cost of goods sold, and that they knew, when they projected 62% as the relevant cost of goods sold figure, that this was a significantly inflated number. Such allegations are sufficient to support a claim of fraud. *Nielsen Elecs. Inst. v. Student Fin. Corp.*, Civ. A. No. 99-285-JJF, 2001 U.S. Dist. LEXIS 25556, at *28-*29, 2001 WL 34367324, at *6 (D. Del. Jan. 16, 2001).

In a similar vein, Defendants argue that their failure to disclose the 10% reduction to EBITDA for the Manorcare transaction is also a fraud by hindsight allegation, because at the time they did this they had no way to know how the litigation with Manorcare was going to come out. As a result, they conclude, "plaintiffs cannot claim surprise that amounts which were disputed and paid into escrow were not taken into earnings." Def. Mem. p. 33.

Yes, we can. In the first place, the uncertainty created by the pendency of any litigation does not, without more, justify any reduction or exclusion of income from a company's financial statements; nor can the parties' agreement to escrow some portion of a disputed amount provide such a basis either. As Plaintiffs explained in their opening memorandum, under GAAP income can be excluded on grounds of litigation contingency only if counsel has provided a written opinion that there is a substantial threat that the company will lose the case. Given that, as the complaint alleges, no such opinion letter was ever produced, it was improper to exclude any portion of those agreed-upon payments from earnings.

Moreover, Defendants' arguments once again overlook the broader context in which these allegations are made. Plaintiffs allege more than just that the Defendants failed to predict the outcome of the litigation. Plaintiffs allege that the Manorcare litigation was frivolous from the outset and was

close to a resolution more than a year before Plan confirmation, but that the parties suddenly agreed to adjourn the case for well over a year – even though Genesis had originally told the arbitrator that an expedited ruling was essential. By delaying the outcome unnecessarily, Genesis was able to put off the final resolution of the action until after confirmation of the Plan, and thereby continue to use the pendency of the case as a pretext for secretly excluding millions of dollars of payments from earnings and, hence, from the valuation. This tactic is eerily similar to Defendants' tactics in the Mariner situation, where they also delayed resolution of the issue until the Plan had been confirmed, so that they could use the "uncertainty" to justify excluding the entire Mariner income from the valuation EBITDA.

Although even individually these separate events reek of fraud, collectively they are even more compelling, because they show that Defendants systematically seized on every possible excuse for lowering the Genesis EBITDA. All sorts of "accidents" and "coincidences" seem to have converged: a "mistaken" exclusion of Mariner revenue which, in fact, continued unabated; a "mistaken" exclusion of 10% of the Manorcare revenue, which also continued unabated; a "mistaken" overstatement of the pharmacy cost of goods sold, which actually had not changed; a "mistaken" overstatement of the effects of losing the AGE Institute business; and the undisclosed, exquisitely timed, but equally improper, explosion of insurance reserves, which were charged against EBITDA as well.

Finally, midway through their lengthy footnote 13 on page 32, Defendants throw in the argument that their forecasts (*i.e.* the "budgeted EBITDA") are opinions, not facts, and are therefore either not actionable at all or (as they finally concede) are actionable only if they "lack any basis and [were] given with intent to defraud". This argument ignores the fact that the fraud alleged here also includes the all-important last-twelve-months' "actual" EBITDA data, historical data which ostensibly confirmed the projections. LTM EBITDA is factual, not mere "opinion."

Even defendants' "Budgeted EBITDA" were actionable, because projections, as well as

12

opinions, can be fraudulent if defendants had no reasonable basis for them, if Defendants did not actually believe them, or if they were inconsistent with existing facts known to the Defendants but not disclosed. *See e.g. Virginia Bankshares, Inc. v. Sandberg*, 501 U.S. 1083, 1092-93 (1991) (recognizing actionability of statement that merger price was "fair" or "high" if those statements were not based on, or were inconsistent with, existing facts); *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410 (3d Cir.1997); *Craftmatic Sec. Litig. v. Kraftsow*, 890 F.2d 628, 645-46 (3d Cir. 1989); *Eisenberg v. Gagnon*, 766 F.2d 770, 776 (3d Cir. 1985). As the court held in *Helwig v. Vencor, Inc.*, 251 F.3d 540, 560 (6th Cir. 2001), projections amount to representations of certain existing facts:

> [P]redictions and opinions contain "at least three implicit factual assertions: (1) that the statement is genuinely believed, (2) that there is a reasonable basis for that belief, and (3) that the speaker is not aware of any undisclosed facts tending to seriously undermine the accuracy of the statement."

*Id.* at 557 (citation omitted). If any of those implicit representations is untrue, the projection is actionable. *See also Hewlett v. Hewlett-Packard Co.*, C.A. No. 19513-NC, 2002 Del. Ch. LEXIS 44, at *31-*33, 2002 WL 549137, at *10 (Del. Ch. Apr. 8, 2002); *In re Marriott Hotel Props. II Ltd. Pshp. Unitholders Litig.*, Consol. C.A. No. 14961, 2000 Del. Ch. LEXIS 17, 2000 WL 128875 (Del. Ch. Jan. 24, 2000); *Tam v. Spitzer*, CA No. 12538, 1995 Del. Ch. LEXIS 116, at *20, 1994 WL 510043, at *7 (Del. Ch. Aug. 17, 1995).

Here, the Budgeted EBITDA projections were in effect promulgated twice: the first time, when they were originally issued in early 2001; and the second time, when they were used at the confirmation hearing in August of 2001. The second time is the key: even if Defendants had *originally* believed that the budgeted EBITDA numbers were right, because they knew better by the date of the Hearing, it would have been fraudulent for Defendants to have asked the Court to rely on them without correcting known mistakes. As the complaint demonstrates, by the date of the Confirmation Hearing, Defendants were well aware of or recklessly disregarded all the manipulations they had used to get the

LTM EBITDA to corroborate the projections. They knew or recklessly disregarded at that point that both the LTM EBITDA and the Budgeted EBITDA were wrong.

Moreover, well after the Defendants created their original "budgeted EBITDA" they went out of their way to make significant changes to it, including most notably the elimination of all revenue attributable to Mariner or the AGE Institute, and to persuade the junior creditors to accept the changes. Those changes, the complaint alleges, had no basis and were fraudulent.

## II. *CORESTATES* IS NOT A BAR TO THESE CLAIMS

Defendants contend that, irrespective of the fraud exception to res judicata, the court's decision in *Corestates Bank, N.A. v. Huls Am., Inc.,* 176 F. 3d 187, 194 (3d Cir. 1999) is "dispositive of Appellants' claims." Def. Mem. p. 29. Perhaps so, but the result is not the one Defendants have in mind.

*Corestates* did not involve fraud in the original proceedings, and the court made it clear that, had fraud occurred, res judicata would not apply. In *Corestates* the claimant Corestates had brought an action against Huls pursuant to a loan subordination agreement, seeking the turnover of $600,000 which Huls had received from UCT, a bankrupt entity. Previously, Corestates had objected to UCT's bankruptcy reorganization plan, arguing that it was unfair to creditors because it allowed for the payment of this $600,000 to Huls before payments were to be made to any other creditors: but in that proceeding Corestates had not argued, as a basis for its objection, the existence of the subordination agreement. The court held that res judicata barred the second lawsuit because the subordination claim could have, and should have, been raised in the bankruptcy proceeding:

> [Corestates] could have raised its claim under the Subordination Agreement during the confirmation proceeding along side its objections, both as a legal and as a factual matter. . . . In addition, since UCT paid Huls the money before the Plan was confirmed, CoreStates's claim accrued before the confirmation proceeding concluded.

*Id.* at 191. Here, as we pointed out in our opening memorandum (Pl. Mem. p. 28), the debentureholders' fraud claims did not accrue until they discovered the fraud: they could therefore not

have been raised at the confirmation proceedings. The court in *Corestates* also held that

> Ordinarily, a party will not be precluded from raising a claim by a prior adjudication if the party did not have the opportunity to fully and fairly litigate the claim. See Restatement (Second) of Judgments § 26(1)(c).

*Id.* at 197. In the present case, of course, Defendants' conduct deprived the debentureholders of a full and fair opportunity to litigate these issues.[7]

Defendants rely heavily on the fact that the prior proceedings here (concerning the confirmation of the Plan) involved some of the same issues and transactions including, ultimately, the correctness of the Defendants' valuation of Genesis. That will of course be true in any case involving fraud in the prior proceedings: it will necessarily have touched upon the very transactions and events that were the subject of that proceeding. That was why the fraud worked in the first place. But neither *Corestates* nor any other case supports the untenable argument that a claim of fraud in a prior proceeding is barred by the very judgment that the fraud procured.

## III. SECTION 1144 DOES NOT BAR THIS DAMAGE ACTION AGAINST ANY OF THE DEFENDANTS

The court dismissed the claims against Genesis – but not the other Defendants – on the ground that the claim was time-barred under § 1144 of the Bankruptcy Code. Although the complaint does not seek revocation of the Plan as a form of relief, the bankruptcy court nonetheless held that allowing damage claims against Genesis to proceed would be a de facto revocation because it would devalue the shares of the debtor issued in the reorganization, possibly injuring "innocent" parties who acquired those shares pursuant to the Plan. *In re Genesis Health Ventures, Inc.*, 324 B.R. 510, 517 (Bankr. D. Del. 2005).

On this appeal, Genesis makes no attempt to justify the bankruptcy court's decision to treat

---

[7] *McDuffy v. DeGeorge Alliance, Inc.*, No. Civ. A. 99-1420 SLR, 2002 WL 1858779 (D. Del. Aug. 9, 2002) (Def. Mem. p. 30)does not help Defendants either, because there the prior bankruptcy proceeding involved the exact same claim, based on the exact same evidence.

the claims against it differently from those against the other Defendants. Instead, it joins with the other defendants in arguing that allowing claims against *any* of them to proceed would upset the Plan. Thus, there is no attempt to show that a claim against a debtor amounts to a de facto revocation of a plan just because securities of the debtor, which were issued in the plan, might theoretically lose some value if Plaintiffs prevail.

The argument they all advance boils down to the simplistic notion that recovering anything from anyone amounts to "redividing the pie" because it would "undo the valuation" upon which the Plan was based. Def. Mem. p. 19. That argument misses the point of the "redivide the pie" doctrine, which is not to make sure that wrongdoers hold onto their ill-gotten gains from the bankruptcy proceeding, but, rather, to protect innocent parties who have relied on the finality of a plan in making business decisions that are critical to the future viability of the reorganized debtor. Courts are naturally reluctant to try to unscramble the eggs after a host of transactions have gone through in reliance on the finality of a plan. As the court observed in *In re Newport Harbor Associates*, 589 F.2d 20, 22 (1st Cir. 1978):

> A principal purpose of a Chapter XI proceeding is the rehabilitation of a debtor's ailing business. Since a plan of arrangement affects the rights of, and restructures the relationships between, the debtor and its perhaps numerous creditors, it is vital, if this rehabilitative purpose is to be realized, that Chapter XI proceedings be concluded with reasonable expedition and finality so as to allow certainty for future business planning.

(Citation omitted.) Following this rationale, the court in *In re Emmer Bros. Co.*, 52 B.R. 385, 392 (D. Minn. 1985) held that a damage action for fraud could be brought against the debtor more than six months after plan confirmation because

> Finally, and most importantly, the relief sought . . . would not upset the confirmed plan of arrangement. A judgment in favor of [plaintiff] . . . would not affect the distributions previously made to the creditors under the plan nor the debtor's

reorganization.[8]

*See also In re Circle K Corp.*, 181 B.R. 457, 462 (Bankr. D. Ariz. 1995)(damage claim can go forward against debtor because even if plaintiff prevails. there would be no "redivision of the pie" inasmuch as "innocent creditors keep their dividends").[9]

Defendants have not identified any "egg" that would have to be "unscrambled" if plaintiffs were to prevail in this action. Their inability to do so reflects the fact that these defendants. including Genesis itself. can be ordered to pay damages to the plaintiffs without disturbing any of the distributions already made to innocent creditors. Plan beneficiaries would be allowed to keep everything they received pursuant to the Plan, and there would be no "undoing" of any transaction contemplated in the Plan. Plaintiffs are not seeking any equity in Genesis: other holders are therefore not threatened with dilution. It is precisely because no one else could possibly be harmed if plaintiffs were allowed to pursue their claims against the senior creditors that the bankruptcy court did not extend § 1144 protection to those defendants: and they have failed to come forward. in their appeal brief. with any colorable argument as to why it should be extended to them.[10]

---

[8]This is the critical distinction drawn by *Emmer Bros.*. and not whether or not the claim was directed at a secret asset that had not been distributed pursuant to the plan. *See* Def. Mem. pp. 20-21. In addition. the Defendants here concealed assets of the debtor in much the same way the debtor had done in *Emmer Bros.*

[9]Defendants contend that *Circle K* is inapposite because there the case was brought within 180 days of plan confirmation. Def. Mem. p. 21. That point is irrelevant. inasmuch as the court held that the relief sought in Plaintiffs' new complaint did not seek a "revocation" of the plan and was therefore not covered by § 1144. because it sought only damages against parties who committed fraud in the bankruptcy. Any action not based on § 1144 is not subject to the 180 day limitation imposed by that provision.

[10] The lower court did not reject their argument because of some erroneous belief that § 1144 could apply only t debtors. Defendants' citation to cases where such relief was entered are therefore wholly irrelevant. Moreover, in one of their cases, *680 Fifth Ave. Assocs,* 209 B.R. 314, 322 (Bankr. S.D.N.Y. 1997). the complainant was directly attacking the plan by seeking. as relief, the right to solicit consents for its own proposed reorganization plan for the debtor, different from the one already approved. Defendants' other case. *Browning v. Prostok*, 165 S.W.3d 336. 351 (Tex. 2005), concerned an attempt to relitigate the exact same fraud claims that were actually litigated in the plan confirmation

Nor would it "upset" the Plan if even the claims against Genesis were to go forward. The shares that "innocent" senior lenders received pursuant to the Plan (and who are still holding it, if any)[11], were issued pursuant to a Plan that specifically preserved the very claims against Genesis that Plaintiffs are pursuing here. Section 10.6 of the Plan expressly provides that claims against the debtor can still be pursued, even after consummation of the Plan, if they are based on "willful misconduct or gross negligence" committed in connection with the confirmation of the Plan. *See* Pl. Mem. pp. 11-12. There is no 180-limitation on the right to prosecute such claims; and that is precisely the type of claim Plaintiffs have raised here. No one who received Genesis shares pursuant to the Plan can legitimately claim to be unfairly surprised or prejudiced if such claims were allowed to proceed here.

In their brief Defendants echo the bankruptcy court's rationale that Section 10.6 was not designated as a "reservation of rights" provision that could override the effects of res judicata from the Plan confirmation process (Def. Mem. pp. 35-36), but they do not address any of the arguments raised in Plaintiffs' opening memorandum. Plaintiffs find it difficult to imagine how the Plan could have been more specific in preserving claims, then unknown, that might someday arise concerning misconduct in connection with the bankruptcy proceedings. Moreover, it is no answer to say that Section 10.6 cannot override the res judicata effect of Plan approval. Where such approval is procured by fraud, as Plaintiffs allege here, there is no res judicata effect to be overridden.

Even if a damage award against Genesis could be viewed as a "surprise" to Genesis

---

proceedings: "The fraud Prostok now alleges did not prevent the Junior Bondholders from presenting their legal rights in the bankruptcy proceedings. In fact, the BT Committee raised and litigated at the bankruptcy court the fraud Prostok now alleges." *Id.* at 349. This was held to be a collateral attack on the judgment, which is subject to the 180 day time limit of §1144. Here, by contrast, the fraud we allege was never adjudicated by the bankruptcy court and it *did* prevent the debentureholders from presenting their legal rights in the bankruptcy proceedings.

[11]There has, in fact, been no showing that there actually are any innocent senior lenders who are still holding the Genesis shares they received in 2001, or that a recovery by Plaintiffs in this case would have a material adverse effect on the value of those shares.

shareholders, diminishing the value of the shares they hold. that is not a reason to shield Genesis from these claims. No court had previously ruled that diminishing the *value* of what is distributed is the same thing, for purposes of § 1144. as actually interfering with the distributions themselves. As noted above. the purpose of § 1144's time limitation is to further the rehabilitation of the debtor by giving plan participants confidence that, after 180 days, their transactions with the debtor cannot be undone or "rescrambled." Pursuing damage claims against Genesis does not run the risk of undoing business transactions or requiring anyone to give back anything, and should therefore not be covered by the six month limitation period of § 1144.

Finally. Plaintiffs ask the Court to take judicial notice of the fact that. during the pendency of this appeal, Genesis and these same senior creditors filed a petition with the bankruptcy court asking that a final decree be entered that would close the Genesis bankruptcy case, even while this debentureholder lawsuit is still pending.[12] *See* Petition, attached as Exhibit A. At page 5. ¶ 12 of the Petition they claim that the Plan has been substantially consummated: that the claims objections have been completed and virtually all distributions have been made: that no significant property transfers remain unexecuted: and "no motions or contested matters remain unresolved in these Chapter 11 cases." In ¶ 13 of their petition Defendants specifically refer to the present action as "a claim of damages for fraud in connection with the confirmation order" which "should not prohibit the entry of a final decree." If, as they contend in this Court, the present action really threatens to "upset" the Plan, these same Defendants could not possibly be telling the bankruptcy court that the bankruptcy case should be closed. If the Plan may have to be totally reworked or revised, this is surely no time to terminate the bankruptcy proceedings.

---

[12] *In re Allegheny, Inc..* 86 B.R. 466, 469 (Bankr. W.D. Pa. 1988)(federal courts have authority to take judicial notice of proceedings in other courts); *see also Southmark Prine Plus, L.P. v. Falzone*, 776 F. Supp. 888, 892 (D. Del. 1991)(contents of court records that may be judicial noticed included petitions and briefs of the parties).

## CONCLUSION

For the reasons stated above and in Plaintiffs' opening memorandum on this appeal, the judgment entered by the bankruptcy court should be reversed and the complaint should be reinstated.

Dated: March 6, 2006

Respectfully submitted,


By: /s/ R. Bruce McNew
Delaware Bar No. 967          .
TAYLOR & McNEW LLP
3711 Kennett Pike. Suite 210
Greenville. DE 19807
Telephone: (302) 655-9200

Stanley M. Grossman
H. Adam Prussin
POMERANTZ HAUDEK BLOCK
  GROSSMAN & GROSS LLP
100 Park Avenue. 26th Floor
New York. N.Y. 10017-5516
Telephone: (212) 661-1100

Leigh Handelman Smollar
POMERANTZ HAUDEK BLOCK
  GROSSMAN & GROSS LLP
One North LaSalle Street, Suite 2225
Chicago, IL 60602-3908
Telephone: (312) 377-1181

*Attorneys for Plaintiffs-Appellants*

20

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on this 3rd day of March 2006, he caused a true and

correct copy of the foregoing **PLAINTIFFS-APPELLANTS' REPLY TO DEFENDANTS-**

**APPELLEES' JOINT MEMORANDUM** to be served upon the following counsel by hand

delivery:

Steven K. Kortanek, Esquire
Klehr Harrison Harvey Branzburg & Ellers LLP
919 Market Street, Suite 1000
Wilmington, DE 19801
**Counsel for Defendant Goldman Sachs & Co.**

Teresa K. D. Currier, Esquire
Klett Rooney Lieber & Schorling
The Brandywine Building
1000 West Street, Suite 1410
P.O. Box 1397
Wilmington, DE 19899
**Counsel for Defendant Mellon Bank NA**

Russell C. Silberglied, Esquire
Richards, Layton & Finger, P.A.
P.O. Box 551
Wilmington, DE 19899
**Counsel for Defendant Neighborcare, Inc.**

Daniel K. Hogan, Esquire
1701 Shallcross Avenue, Suite C
Wilmington, DE 19806
**Counsel for Defendant Highland Capital Management, L.L.P.**

Robert S. Brady, Esquire
Young Conaway Stargatt & Taylor, LLP
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, DE 19899-0391
**Counsel for Defendant George V. Hager**

Laura Davis Jones, Esquire
Pachulski Stang Ziehl Young Jones & Weintraub P.C.
919 North Market Street, Suite 1600
P.O. Box 8705
Wilmington, DE 19899-8705
**Counsel for Creditor Committee**

Joseph J. McMahon, Jr.
Office of U.S. Trustee
844 King Street, Suite 2313
Lockbox 35
Wilmington, DE 19801-3519
**Trustee**

March 3, 2006

R. Bruce McNew, Esquire (# 967)
Taylor & McNew, LLP
2710 Centerville Road, Suite 210
Wilmington, Delaware 19808
(302) 655-9200